# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - -x

In Re: ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

- - - - - - - - - - - - - - - - - - - -x

Remote, videotaped deposition of NOAM BERK, taken pursuant to Notice, was held via videoconference, commencing March 10, 2023, at 10:02 a.m. ET, on the above date, before Amanda McCredo, a Court Reporter and Notary Public in the State of New York.

online at the moment.
Q That's fine.
If you do look at a hard copy, is it a hard copy with notes in it or just --
A No, it's just a clean, hard copy.
Q Okay.
So paragraph 3, you say you've been involved in the financing, structuring, or direct investment of over $25 billion of commodity assets.
What does that 25 billion-dollar figure refer to?
A The sum total of the investments in those projects.
Q And is that the investments of IOG?
A No. This is -- this is across my career, so it involved everywhere I worked.
Q Let's look at page 2. You reference in paragraph 8 Robbins Geller.
Have you worked with Robbins Geller before this matter?
A I have not.
Q And are you working in conjunction with a consulting shop other than Dean Street in connection with this matter?
A No.

Q In paragraph 9, you give your understanding of the securities fraud class action in this case.
A That is correct.
Q And is that based on your reading the complaint?
A I did review the complaint, yes.
Q And you say "Alleging defendants, quote, misled the investing public about the commercial viability and producible resource size, close quote, of the Shenandoah prospect."
Do you see that?
A Yes, I see it.
Q What does "commercial viability" mean as you're using it here?
A Commercial viability is whether an investment is worthwhile, whether you expect to see a positive return in excess of the expected -- associated risks, sorry, with the project.
Q Okay.
And what does producible resource size mean?
A That's -- economically producible resource size might have been a clearer term. But the amount of resource you can produce to enter a project in an economic fashion.

Q So if a prospect has a nonzero economically producible resource size, does that mean that it's commercially viable?
A If the -- sorry, I just want to -- do you mind just repeating the question?
Q Yeah, no problem.
If a prospect has a nonzero economically producible resource size, does that mean that it's commercially viable?
A Not necessarily. It could be economically produced in an engineering perspective but not meet the return threshold that's required for any particular company that every project/company, that threshold is variable and depends on the associated risks of the project.
Q So I'm trying to understand what you mean by "economically producible resource size."
So how could it be that -- well, what does it mean for a resource to be economically producible? Is it the same as commercially viable?
A It means that with current technology, you could produce it at a cost that's less than the cost to extract it.
Q Right.
So why is that not the same as commercially

viable?
A Because the cost -- you could theoretically break even and it can be producible. Or break even on it and it can be economically producible. That doesn't mean you're going to do it.
Q So commercial viability would include the concept of a hurdle rate?
A It would incorporate the concept of risk, i.e. does the return that you are expecting provide sufficient -- does it provide sufficient return commensurate with the risks you were expecting to encounter.
Q And does "producible resource size" not incorporate a concept of risk?
A It incorporates some of the risks, but not necessarily all of them. Resource size is a very narrowly focused analysis. It focuses on the reservoir itself. There are certainly other risks around the assets that are not necessarily accounted for there.
Q Can you give me an example of what risk may not be accounted for in considering --
A Sure.
Q -- producible resource size?
A Yeah.

C E R T I F I C A T E

I, AMANDA McCREDO, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

AMANDA McCREDO

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

--oOo--

In Re: ANADARKO PETROLEUM
CORPORATION SECURITIES — Civil Action No.
LITIGATION — 4:20-cv-00576
__________________________________/

VIDEO-RECORDED DEPOSITION OF DAVID BLAKELEY

VERITEXT VIRTUAL

FRIDAY, AUGUST 19, 2022

Reported by:
Anrae Wimberley, CSR No. 7778
Job No. 5344478

Who determined what your bonus was? 10:45:38

A. That would have been the exploration leadership team. So it would have been Ernie Leyendecker, Bob Daniels and then international and new ventures guys would probably have some input 10:45:56 into it as well.

Q. Did you have an understanding as to what it was based on?

A. Yes.

Q. What was your understanding? 10:46:06

A. It was based on my performance against my goals.

Q. And would you provide those individuals, Mr. Daniels, Mr. Leyendecker and others, with your goals in advance of a year? 10:46:18

A. Yes.

Q. And then they would decide how well you did in meeting those goals; is that right?

A. That is correct.

Q. Anything else that your bonus was based 10:46:29 on?

A. No. Not that I know of. I mean, it would -- I think -- no, hold on.

It was also based on overall corporate performance. So there would be a corporate 10:46:45

performance at the end of the year and then that corporate performance would set the overall pool of bonuses for the whole corporation. 10:46:48

So it could be higher -- you know, we set -- there was a target bonus set out at the beginning of the year, and depending on corporate performance, the bonus pool could be higher or it could be lower. 10:47:02

Q. During 2015, was Shenandoah part of your goals for the bonus purposes? 10:47:16

A. I don't remember. It would not have been -- I don't think it would have been a specific goal. It would have been part of a goal.

I would say it would be like helping the -- you know, the goal might be to help the exploration team -- the Gulf of Mexico exploration team execute its budget -- you know, its capital budget, so to actually go out and perform the -- you know, do the drilling or whatever was in the capital budget for that year. 10:47:33 10:47:53

There would have been a -- each team at the beginning of the year was given a goal of discovering "X" amount of resources. So my bonus or my goal would have been to assist the exploration team in that, achieving those goals for resources. 10:48:11

Then there would have been other goals involved with making sure that we did fair and accurate and unbiased evaluations. So our goal was to make sure we had consistent evaluations across the groups so that, you know, everybody was doing their evaluations the same. 10:48:18 10:48:39

I think those are the type of goals that I would have had.

Q. Okay. And what percentage, approximately, was your bonus of your overall compensation? 10:48:54

A. I believe the bonus target was something in the order of 35, 40 percent. I don't remember exactly the number in 2015.

Q. Okay. And then you mentioned that you also received long-term incentive compensation in the way of stock; is that right? 10:49:10

A. That is correct.

Q. And I take it that was Anadarko stock; is that right?

A. That is correct. 10:49:19

Q. And did you have an understanding as to what that long-term incentive compensation was based on?

A. That was more based on aligning our goals -- or aligning our performance and our goals 10:49:32

with the long-term success of the company. 10:49:36
Q. And who evaluated that?
A. That would have been the exploration leadership team.
Q. The same folks, Mr. Daniels and 10:49:45 Mr. Leyendecker?
A. Correct.
Q. And did you have an understanding as to how they made that determination?
A. So that was basically an incentive to 10:50:02 make -- it incentivized us to stay with the corporation and to make sure that our goals were consistent and aligned with the long-term goals of the corporation.
Q. Why did it incentivize you to stay with 10:50:26 the corporation?
A. Because they were -- the awards that were given for stock were -- would vest over a three-year period. So you always -- you know, to achieve those incentive plans, you had to be with the company 10:50:46 for -- you know, up to three more years. Otherwise, you would forfeit.
Q. Would you -- did all of it vest at the three-year mark or did it vest over three years?
A. It vested over three years, so a third, a 10:51:01

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript ( ) was (X) was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 23, 2022

ANRAE WIMBERLEY, CSR No. 7778

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_______________________________ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
CHRIS CAMDEN

Thursday, July 14, 2022
Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5303669

Q. Okay. Do you see Shen 3 on this map?
A. It's pretty -- pretty hard. I'd -- I'd -- I'd have to zoom it a little bit. Let's see if I can zoom.
I mean, I can't tell where the trajectory is. I just -- I can't see it. 14:42:14
Q. Okay. That's okay.
Okay. Turning to Slide 6, the "Drilling Results," do you remember this slide?
A. No, I don't -- I don't remember it. 14:42:38
Q. Okay. Do you recall the -- the drilling results, or does this comport with your recollection of what the drilling results were for Shen 3?
A. Yes.
Q. Okay. The last bullet says that the "UW1," which is Upper Wilcox 1; right? 14:43:10
A. Correct.
Q. Okay. So the "Upper Wilcox sand was absent." [As read]
And "UW2" -- that's Upper Wilcox 2? 14:43:22
A. Correct.
Q. -- "sand 500 feet low to prediction due to expanded shale section below top of Upper Wilcox Formation (base of marls)."
You -- you recall that outcome? 14:43:37

A. No, I don't -- I don't recall that.
Q. Okay. Who would be best person to ask about that aspect of the drilling results?
A. Jake or Beth.
Q. Do you recall that the Upper Wilcox sand came in 500 feet low to prediction? 14:43:50
A. No.
Q. Okay.
MS. JENSEN: Okay. Let's pull up Tab 14.
(Camden Deposition Exhibit 156 was marked electronically.) 14:44:12
THE WITNESS: Okay. I have it.
BY MS. JENSEN:
Q. Okay. Great.
So this is what we've marked as Exhibit 155. And for the record, the Bates is APC-'22870. 14:44:34
A. That's not the one I --
THE COURT REPORTER: Excuse me --
BY MS. JENSEN: 14:44:49
Q. Oh, no. I'm sorry. That's -- I have the wrong one up. Okay. Let me try this again. So scratch that. Take two.
This is Exhibit 156, and the tab -- the Bates says "APC '617398." 14:45:01

Is that what you have?

A. Yes.

Q. Okay. Great.

And so, my question is whether you recognize this document. 14:45:18

A. No, I don't remember it.

Q. Do you have any reason to doubt that this is a true and accurate copy of an e-mail exchange between yourself and Beth Kendall on November 24th, 2014? 14:45:39

A. No.

Q. Okay. And this e-mail concerned the updated resource estimates for Shenandoah after the Shen 3 results came in?

A. Correct. 14:46:00

Q. And turning to your e-mail to Beth and Jake on November 21st, you're describing a 25 percent reduction on the mean; right?

A. On the mean resource.

Q. So in -- in other words, that's 14:46:31 approximately a -- a 25 percent reduction in the resource range?

A. Well, since that's a mean, that's the single number, so it wouldn't be the resource range. It would be the mean of the resource range. 14:46:46

Q. Okay. So it's a 25 percent reduction on the mean of the resource range?
A. That's correct.
Q. Okay. So approximately one-fourth reduction? 14:47:03
A. Yes. One quarter.
Q. One quarter.
And do you recall whether that 25 percent reduction took into account the -- the thinning that was observed on the crest of the structure? 14:47:21
A. No, I -- I don't recall if it included that.
Q. Okay. Does -- who would be the best person to ask about that?
A. Jake. Jake and Beth. 14:47:32
Q. Okay.
A. That's their part of the MMRA. It's not my part.
Q. Okay. And turning down to the chart that's below your e-mail, this is the "Shenandoah 14:47:50 Resource Estimate," and this -- this is over time; right?
A. Correct.
Q. Okay. And so, it reflects, among other things, the mean post drill Shen 2, which was 1197 14:48:07

MMBOE?

A. Correct.

Q. And it drops down to 917 MMBOE?

A. Correct.

Q. And MMBOE, what does that stand for? 14:48:26

A. Mill- -- well, it's oil field units. So M, to us, is a thousand, so MM is a million. And BOE is barrels of oil equivalent, so that includes the oil volume itself and then the gas that's dissolved in solution. So it's -- BOE is barrels of 14:48:46 oil equivalent. It's combined -- the combination of the oil and the gas.

Q. And after this reduction of one-fourth, there was also a further reduction taking into account a fault model; right? 14:49:04

A. Well, over time, we had -- we had many adjustments. So I'm -- I'm sure as we drilled more wells, I recall it dropping further from this point.

Q. But -- but also post Shen 3, there was a fault model that was created that further reduced 14:49:24 this number; right?

A. I -- I don't recall that.

Q. Okay. You don't recall a model -- a fault model that dropped the mean down to 740?

A. That number is familiar to me, but I don't 14:49:38

weekly filled out a status report of our -- our work.

Q. And who compiled this information into an activity report?

A. We -- we did individually. We all edited it individually. 14:52:04

Q. Okay. And then was it Robert Strickling's job, then, to send that compilation around?

A. I -- I don't recall. I think so.

Q. So -- 14:52:22

A. I think here.

Q. -- in any event, he sent this one around?

A. Okay. Well...

Q. And what was the -- the purpose of this -- these weekly engineering reports? 14:52:33

A. They're status updates of the -- of the projects we're working on, so management could stay ap- -- apprised of what we're doing.

Q. And on this e-mail from Robert Strickling, it's to Ernie and -- and David. So it's -- to the 14:52:51 best of your recollection, Ernie and David received weekly reports from the exploration team?

A. Correct.

Q. Okay. And does this appear to be a true and accurate copy of the January 29th, 2015, ex- -- 14:53:08

"GOM Exploration Engineering Activity Report"?
A. Yes.
Q. I know I flew through that title pretty quick.
And -- and does -- you see your name listed at the top? 14:53:21
A. Yes.
Q. Okay. And does this accurately reflect what you were doing during this time frame in January 2015? 14:53:35
A. Yes.
Q. So the first few bullets here relate to Shenandoah. And -- and the second -- there's so many bullets here.
But under the first bullet and then the bullets in -- under that, the second one is "Updated Daniels et al. on 1/15 on well results, new resource distributions, and future drilling plans [verbatim]"? 14:53:55
A. Correct. 14:54:12
Q. And -- and -- and did -- did you, indeed, do that?
A. Well, if I put -- I don't recall if I put it in here. I'm pretty sure I did.
BY MS. JENSEN: 14:54:20

Q. Okay. And if you updated Daniels on the Shen 3 well results, would you have done so with a -- with a PowerPoint presentation?

A. Yes.

Q. Okay. And is part of that presentation, 14:54:32 did you advise Bob Daniels that -- that Shen 3 was a dry hole?

A. Well, he would have known it already, but -- so -- so it was a matter of fact. We were updating him on the results of the well and how we 14:54:53 were using it to update our models.

Q. So he -- he -- he knew that Shen 3 was a dry hole?

A. Yeah, absolutely.

Q. And did you also advise Bob Daniels that 14:55:06 the results had -- had -- had resulted in a 25 percent reduction in the resource mean?

A. I don't recall, but if it says "new resource distribution," I would assume that's true.

Q. You have no reason to doubt that you would 14:55:28 have shared that information?

A. No reason.

Q. Okay. There's a resource range that's a couple of bullets down.

Do you see "Shen-Cor-Tan Area Resources 14:55:42

Update Effort"?

A. Mh-hmm. Yes.

Q. And now, two sub-bullets in -- I don't know if you can call them sub-bullets -- but in any event, it says "Shenandoah Resource Distribution" [verbatim]? 14:55:57

A. Mm-hmm.

Q. And so were these the numbers post Shen 3 that you would have reported out to Bob Daniels?

A. I believe so. 14:56:07

Q. And I had asked you before we pulled up this document about the fault model --

A. Mm-hmm.

Q. -- after Shen 3, and -- and mentioned -- I might have mentioned another number that started with 700. 14:56:20

But does this comport with your recollection that the mean went further down to 740?

A. Yes.

Q. And so -- and it also states -- I'm sorry. 14:56:29
I'm just going back up. So the bullets above talks [verbatim] about updating Daniels et al.

Who would be et al.?

A. So that would be Bob -- Bob's -- his staff meeting, which included his direct reports. So it 14:56:54

would be a number of people, most of which I can't remember. Ernie would have been one of them.
Q. Okay. And so, Ernie would have been there.
Anyone else that you can remember? 14:57:08
A. You know, I can remember a few faces, but I don't even remember their names.
Q. Okay. That -- that's okay.
The -- the numbers here on the resource distribution post Shen 3 with no fault, it's higher 14:57:33 than with a fault. And -- and do you recall that the magnitude of difference between the two, being 920 versus 740?
A. Those -- those numbers look familiar. That -- that's about as good as I can give you. 14:57:53
Q. Okay. That's okay.
But it impacted the -- the numbers by almost 200 million barrels of oil equivalent?
A. Hundred and eighty, right. Yeah.
Q. Under the bullet that talks about updating 14:58:09 Daniels, it also states that you "Updated the EC and proposed the next well on January 26th [verbatim]."
And so, you did that?
A. I don't remember it. But again, if I put it in there, that's what I did. 14:58:30

Q. Okay. And for the executive committee, would you have had a PowerPoint presentation?
A. Yes.
Q. And were those executive committee meetings minuted; in other words, did they have minutes? 14:58:44
A. There was not a formal scribe in the meeting.
Q. Did -- did you take notes?
A. No. 14:58:54
Q. Do you know whether anybody else would have?
A. I don't remember anybody ever writing when I was talking.
Q. Okay. Okay. 14:59:06
And so similarly, as you did with Bob Daniels, you would have told the executive committee about the -- the new resource distributions?
A. Yes.
Q. And that would include the -- the fault model with the mean of 740? 14:59:24
A. I don't recall that which, you know, realization or which sensitivity we -- we showed them.
Q. But in any event, you would have ad- -- 14:59:41

advised the executive committee that there was a reduction in the resource range?

A. Post Shen 3, yes.

Q. Yes.

And also would have advised that Shen 3 was a dry hole? 14:59:50

A. Yes. But again, they would have already known it.

Q. Okay. And how would they have already known it? 15:00:02

A. Well results are watched very closely by the executive team, real-time.

Q. As in when the data's coming in?

A. Correct. On a daily basis.

Q. And by the "executive team," do you mean -- do you mean Bob Gwin? 15:00:14

A. Bob Gwin, too, correct.

Q. And Al Walker?

A. Yes.

Q. Of course, that would include Bob Daniels? 15:00:31

A. Yes.

Q. And others on the executive, I believe at the time, that would have included Jim Kleckner?

A. I don't remember who all was on it at the time. 15:00:46

Q. Oh, Okay. Okay.
But the members of the executive committee watched it --
A. Whoever they were at the time, yeah.
Q. They watch- -- they watched it very closely? 15:00:51
A. Yes. These were high-profile wells.
Q. Okay.
MS. JENSEN: Let's go ahead and pull up Tab 20. 15:01:24
(Camden Deposition Exhibit 158 was marked electronically.)
THE WITNESS: Okay. I have it.
BY MS. JENSEN:
Q. Okay. Great. 15:01:36
So this is what we've marked as Exhibit 158, and the Bates is APC '617571.
And I appreciate that you're not a recipient of this e-mail, but I'll ask you nevertheless. 15:01:53
Do you recognize this e-mail?
A. No.
Q. Okay. Let's scroll down to what appears to be the minutes from an exploration and development Shenandoah team workshop from 15:02:19

December 1 -- December 1st and 2nd, 2014?
A. That's correct.
Q. Have you seen these notes before?
A. I don't recall them.
Q. Do you recall attend- -- recall attending 15:02:28
a workshop for the exploration and development
Shenandoah team on December 1st or 2nd -- 1st and/or
2nd on 2014?
A. No.
Q. Sorry. 15:02:51
A. I don't recall this specific one.
Q. Okay. Let's just, for -- real quick for
orientation, let's pull up Tab 21. So we'll come
back to this.
A. Okay. 15:03:13
(Camden Deposition Exhibit 159 was marked
electronically.)
BY MS. JENSEN:
Q. Okay. Now, you should be able to see --
A. I have it. 15:03:35
Q. Great.
What we've marked as Exhibit 159, and for
the record, is APC '148269.
So I -- I'm just putting this in front of
you to see if this refreshes your recollection about 15:03:53

be a true and accurate copy of an e-mail string between yourself and Robert Strickling from May 24, 2017?

A. Yes.

Q. And the e-mail address that you're using is a -- a Gmail address for Robert Strickling; right? 17:40:45

A. Correct.

Q. When did Robert leave?

A. I don't remember. I -- I -- May or June, I want to say. 17:40:56

Q. May or June of 2017, or May or June of 2016?

A. 2017.

Q. Okay. So this is dated in May of 2017. So he's gone by then; right? 17:41:09

A. Yes.

Q. Okay. So that your -- your belief is that he left shortly before then?

A. Well -- well, I didn't hear the last word. 17:41:28

Q. Oh. It's -- so do you believe he had left shortly before then, before you sent this e-mail?

A. I -- I don't. I don't know. I mean, "shortly" not being, you know, two years; something -- something, you know, a few weeks or a 17:41:50

couple of months. But I honestly don't remember.

Q. Okay. And do you know where he went after Anadarko?

A. He retired.

Q. Okay. So -- so could you read your e-mail? 17:42:03

A. Sure. Which -- which one do you want?

Q. Oh, sure.

So the -- the top one, just read the first four sentences. 17:42:30

A. Okay.

"Shen 6 was wet. Sidetrack to Shen 5 fault block was wet. Still no idea where the oil-water contact is. Management decided to write off Shen Field and suspend capital expenditures while we explore go-forward options." [As read] 17:42:48

Q. Okay. That's -- that's fine. Thanks.

A. Okay.

Q. So at -- at this point, now in May of 2017, you still had no idea where the -- the oil-water contact is; right? 17:43:02

A. We did not know where it was.

Q. Okay.

A. We had an idea, but we didn't know.

Q. And -- and this is after Anadarko's 17:43:15

written off Shenandoah at this point; right?
A. Right. It's after; right.
Q. Did you meet up with Robert for -- for lunch?
A. I don't think we ever did. I don't remember. 17:43:27
Q. Have you stayed in contact with him or no?
A. I -- I have not. He moved out of state.
Q. Okay.
MS. JENSEN: That's all I have for now. 17:43:48 So as we have previously, we done -- we will maintain a reservation of rights. We proceeded today with -- with today's deposition despite there being a pending motion to compel, so we're going to leave this deposition open. 17:44:09
Should the Court grant that motion or the Plaintiffs otherwise receive additional documents in discovery that pertains to this testimony, we reserve the right to ask additional questions of Mr. Camden. 17:44:25
MR. GRUENSTEIN: Okay. I'm going to have a few questions. But if we could just take a ten-minute break, that would be great.
MS. JENSEN: Okay.
THE VIDEOGRAPHER: All right. 17:44:35

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name. Dated: 20TH day of JULY, 2022

Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____________________________
)
In re ANADARKO PETROLEUM )
CORPORATION SECURITIES )Civil Action No.
LITIGATION )4:20-cv-00576
)
_____________________________)

VIDEOTAPED REMOTE DEPOSITION OF PAUL CHANDLER
Deponent testifying from Woodlands, Texas
Thursday, July 28, 2022
Volume I

Stenographically Reported By:
Melissa M. Villagran, RPR
CSR No. 12543
Job No. 5316125
PAGES 1 - 282

whatever wells I was using to do my correlation.
Q Okay.
And it was challenging enough that you said (as read:)
"Honestly, the only statement I can make with confidence is that we were in the lower Wilcox." 01:31:21
Right?
A Yes. That's what I said.
Q So it was difficult to make any statement with confidence about the correlation between the Shen 3 sands and those at the other well at this point? 01:31:28
A Yes, because this was a Shen 3 update. We weren't -- we weren't finished. But at the time, with live data coming in, I'm saying it's a difficult thing to correlate at that particular moment in time, yes. 01:31:44
Q Okay.
And when you said that you only see wet sands, that means you hadn't seen oil yet at Shen 3? 01:31:58
A That would be correct.
Q Okay.
And it meant that you hadn't seen oil-water contact yet? 01:32:19

A Yes.
Q And correlating to oil water -- let me rephrase that.
When correlation is a challenge, it's difficult to project oil-water contacts? 01:32:37
A Yes.
Q And ultimately Shen 3 proved up very little, in your view, right?
A In terms of oil pay in extent, yes.
Q All right. Let's see. I'm going to introduce the next exhibit. 01:33:01
I'm introducing what's been marked as Exhibit 203.
(Exhibit 203 was marked for identification and is attached hereto.) 01:33:57
THE DEPONENT: Okay.
BY MS. FRIEDMAN:
Q Do you recognize this as a true and accurate copy of an e-mail exchange that included yourself, Mr. Oudin, Mr. McGrievy, Ms. Frye on or about November 14, 2014? 01:34:11
A Yes.
Q Now, I'll give you a moment to review it.
A So you want me to read -- read this e-mail? 01:34:43

Q Actually, let's look at the second e-mail from the top from you to Mr. McGrievy, Lea, and Jim.
A Okay.
Q Okay.
In the second paragraph, you're -- here -- let me strike that. 01:35:15
The subject line is, "Shenandoah WR52 No. 2 Update." That's a Shen 3 update, right?
A That's correct.
Q It's on November 14th, so the Shen 3 well had reached TD by then, right? 01:35:32
A Yes.
Q Okay.
And the second paragraph of the e-mail that you sent, you wrote (as read): 01:35:47
"As for the O/W projection."
"O/W" means oil water?
A Yes.
Q (As read:)
"As for the O/W projection, like Chip said, it is not definitive at all. It will take a well to prove that. We will certainly need to reopen that discussion about the location of Shen 4, as I fear Shen 3 01:35:59 01:36:09

projecting an oil-water contact. And what I'm saying is, I agree with Chip that that won't be definitive, and the only way it will be is to actually drill a well to prove it, which means you will actually drill a well and actually find the oil-water contact in the well bore. 01:42:30

Q Okay. The oil-water projection is not definitive at all, right?

A That's what Chip is saying, that's correct.

Q And you're agreeing with that, right? 01:42:48

A I do agree with that.

Q That the oil-water projections were not definitive at all?

A I do agree with that.

Q Okay. 01:42:57

And when you say that "we will certainly need to reopen that discussion about the location of Shen 4," do you recall what you are referring to there?

A Yes. Because at the time this e-mail was written, the location for the next well that would follow the Shen 3, which would be the Shen 4, that location had not been decided. It had not been decided in terms of how far west or how far -- or how much central or up dip or down dip. 01:43:20

So what I'm saying -- and maybe it was a 01:43:37

bit obvious, but since we were still struggling where an oil-water contact was in the Shen 3, that might come -- it might play a role in where our next well would be located.

Q Okay. 01:43:53

And -- let's see.

And the fact that you only found wet sands would also play a role in the location of Shen 4?

A Yes would be the short answer to that. Of course, it would. 01:44:20

Q Okay.

Just to make sure that I understand, I'm saying that correlation was -- correlation between sands was a challenge, right?

A I was saying that of the Shen 3 at the time 01:44:53 we were drilling it, yes.

Q Okay.

The oil-water projections were not definitive at all yet?

A Yes. 01:45:04

Q And that Shen 3 was all wet sands?

A Yes.

Q Meaning it had no oil?

A Yes.

Q And it proved up very little? 01:45:18

A It proved up very little in regards to oil pay because we didn't find any oil pay in the sands.
Q You didn't say that in your e-mail, though, right?
A But that's what I meant in the e-mail. I was talking about the fact that we didn't find oil pay. 01:45:30
Q Just clarifying that that's not what you wrote at the time?
A Well, I just said it didn't prove up very little. I didn't elaborate what that meant. 01:45:45
Q Okay.
Now -- all right. Let's see. I'm going to introduce the next exhibit. Thanks for your patience.
All right. I just introduced what has previously been marked as Exhibit 122. 01:46:42
Let me know when you see it.
A Okay.
I've got it.
Q Do you recognize this to be a true and accurate copy of an e-mail from Mr. Oudin to Ms. Kendall, CC'ing Ms. Frye, you, and Mr. McGrievy? 01:46:58
A Yes.
Q Okay.
The subject line is "Shen 3 Non-utility as 01:47:13

Wilcox WI," right?
A Right.
Q And Chip writes, (as read):
"Beth, I checked with Lea, and she said that Shen 3 cannot be utilized as a water injector, given its current design." 01:47:31
Right?
A Right.
Q Now, WI stands for water injector? 01:47:39
A Correct.
Q And water injectors are used to increase oil recovery from an existing reservoir; is that right?
A Yes.
Q And your understanding was that Shen 3 could not be used as a water injector? 01:47:57
A Well, that's -- that's what Lea is saying. That's what Lea apparently told Chip was that it was not -- the well itself in its current design was not conducive to turn it into a water injector. That's what she's saying. 01:48:20
Q Did you dispute that?
A I have no reason to dispute it.
Q Okay.
And so Shen 3 could not be used as a water 01:48:33

of things. But the most likely is that the sands just didn't exist in this particular area.

Q Okay.

But you wrote that the information you had suggested that you crossed a major fault or faults, plural, right? 02:55:21

A Pardon me just a minute. Let me get back to that.

Q The second sentence?

A Oh, yeah. What I'm talking about there, the fact that we'll be structurally so much lower in this case, that just means that my reasoning for that was that structurally, even if we had found the sands, we knew that at this point they were going to be much lower than we had predicted, which would likely indicate that we had crossed something major, like a major fault. 02:55:35 02:55:54

Q Here you wrote, a major fault or faults, plural?

A Or faults. 02:56:07

Q You might have crossed a major fault or faults?

A Well, sometimes major faults are composed of a series of small faults. So I was just trying to be clear. 02:56:17

Q Okay.
And when you wrote that -- strike that.
You wrote that it could have (as read:)
"A huge impact on how much Wilcox to expect." 02:56:47
And that refers to sand?
A That's right.
Q And that could have a huge impact on how much resource to expect?
A It could. 02:57:01
Q And Ramsey asked you (as read:)
"Why so negative on the well result?"
Right?
A He did. 02:57:15
Q But, in your words, you weren't being negative, right?
A Right. Right.
Q You were being realistic, right?
A I didn't mean -- that's correct. 02:57:29
Q I'm going to introduce the next exhibit.
(Exhibit 206 was marked for identification and is attached hereto.)
/// 02:58:10

BY MS. FRIEDMAN:

Q You should be able to see what has been marked as Exhibit 206.

Let me know once you have received it.

A Okay. 02:58:17

I'm just now pulling it up.

Q Do you recognize this to be a true and accurate copy of an e-mail exchange that you had with Mr. Oudin on August 15, 2015, that is also part of an e-mail chain that you forwarded from Jake 02:59:05 Ramsey?

A Yes, I do.

Q Can you please read your -- the message above Jake Ramsey's message that you wrote at 7:39 a.m. on August 15, 2015? 02:59:35

A I'll need to find it. Can you help point that out to me.

Q Sure. Yeah.

So it's on the bottom of the -- of the page marked Bates No. 892430. If you go a little bit up, 02:59:49 it's the e-mail above the line. It starts with (as read:)

"We were always really worried."

A Okay.

Q Can you please read that? 03:00:13

(Exhibit 222 was marked for identification and is attached hereto.)

THE DEPONENT: Okay. I've got that pulled up. 05:56:10

BY MS. FRIEDMAN:

Q Mr. Chandler, do you recognize this to be a true and accurate copy of a slide show titled "Phased Development with an Early Production Test Minimum Size Analysis," dated October 2nd, 2014? 05:56:20

A Yes, I do.

Q Okay.

I can represent that you are a custodian of this slide show.

Do you recall seeing this slide show? 05:56:36

A I do not recall seeing the slide show.

Q But you have no reason to doubt that you were a custodian of it?

A I wouldn't dispute that, no.

Q Okay. 05:56:53

If you could turn to Slide 23.

A Okay.

Q Slide 21. I don't know why it doesn't have a page number. But it should say, "Upper Wilcox Depth Structure Map: Next Locations" at the top. 05:57:24

Do you see that?
A I do.
Q And it says -- do you see where it says (as read:)
"If Shen 3 is wet in upper and 05:57:37
lower Wilcox (worst-case scenario)
recommend Location A."
A I do see that, yes.
Q And Location A refers to a potential location for Shen 4? 05:58:00
A Yes. As far as a well to follow the Shenandoah 3, yes.
Q If you read in the lower left-hand corner where it says "Location A," it says -- well, could you read that into the record, please? 05:58:30
A Okay.
It says (as read:)
"A more conservative location --
better chance of finding
hydrocarbons. Seismic data 05:58:38
reflectivity good. Could indicate
better chance of finding Shen 2 type
pay sands."
Q Okay.
And then could you read Location B into the 05:58:47

record, please.

A Yes.

(As read:)

"A more aggressive location --
higher risk of finding hydrocarbons. 05:58:56
Seismic data difficult to interpret.
Could indicate little to no sand
reservoir presence."

Q Okay.

And you understand the slide to say if Shen 3 05:59:04 is all wet in the upper and lower Wilcox, it would be the worst-case scenario?

A The slide says that, yes.

Q And in the event of the worst-case scenario, the recommendation is for Shen 4's Location A? 05:59:23

A When this map was put together, which was early on, that was our -- that was development's recommendation.

Q Okay.

A Was to move to Location A. 05:59:39

MS. FRIEDMAN: Okay.

No further questions.

I would like to reserve all rights to -- to the -- my remaining time, and also the right to ask Mr. Chandler further questions in the event that we 06:00:00

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ X ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 2, 2022

MELISSA M. VILLAGRAN
CSR No. 12543 RPR

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_______________________________ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
CARLOTTA CHERNOFF

Thursday, June 16, 2022
Remotely Testifying from Anchorage, Alaska

Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5235607

is a true and accurate copy of an e-mail that you sent on or about October 18, 2014?

A. No.

Q. And you have a bolded sentence in here.

Do you recall what the message of your e-mail was with respect to this sentence? 11:21:46

A. Yes. We had a predrill, so pre-spud of the well interpretation based on our subsurface work. And as we had continued to revise our interpretation, the well spud and was drilling, our most likely subsurface interpretation had shifted to one where we expected the most likely outcome for that planned well bottom hole location would not take the well through the oil-water contact, but instead, would be entirely below the oil-water contact. 11:22:06 11:22:27

Q. So it would, in that case, be a wet well?

A. Yes.

Q. Okay. And so, before the well was -- I think what you'd call TDed -- 11:22:50

A. Total death.

Q. -- ConocoPhillips -- Conoco -- ConocoPhillips had predicted that Shen 3's outcome would be a wet well?

A. We had predicted the most likely outcome. 11:23:03

So we clearly, based on this, still carried a range of other possible outcomes.

Q. And, in -- in fact, ConocoPhillips' prediction turned out to be the outcome; correct?

A. Yes, the Shen 3 well was wet. 11:23:25

Q. And ConocoPhillips expensed Shen 3 for that reason; right?

MR. BRYANT: Object to form.

THE WITNESS: Can you -- can you help me understand a little bit more what you mean by 11:23:40 "expensed"?

BY MS. JENSEN:

Q. Do you recall that ConocoPhillips expensed Shen 3?

A. I recall that we made a -- accounting 11:23:48 policy alignment to call Shen 3 a dry hole. What actions happened beyond that, I -- I don't know what was done with that classification of a dry hole, so I was involved in accounting policy classification of the well as a dry hole. 11:24:12

Q. And dry holes aren't considered a success in -- in the business, are they?

A. No, they are not.

Q. The outcome of Shen 3 required a downward adjustment to the estimated resource size of 11:24:34

Shenandoah, didn't it?

MR. BRYANT: Object to the form.

THE WITNESS: So the outcome of Shen 3 was a data point that was incorporated into our interpretation. And it certainly changed the range of outcomes and changed our most likely outcome. But it didn't lead to -- there's -- I guess, how to say this. There isn't a single interpretation, so it revised that range of interpretations. 11:24:50

BY MS. JENSEN: 11:25:15

Q. Downward?

A. The most likely case that we carried going forward was smaller than the case we had prior to Shen 3.

Q. And -- 11:25:26

A. And -- and to be clear, by that, it -- I'm speaking to both in place and recoverable resource.

Q. Thank you.

And -- and that also meant that Shenandoah was seen as less commercially viable after Shen 3 than it was before it? 11:25:41

MR. BRYANT: Object to the form.

THE WITNESS: So seen by whom, I guess, is maybe what I'd like to understand.

BY MS. JENSEN: 11:25:59

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: June 22, 2022

Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

--------------------------------------------------x

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Civil Action No. 4:20-cv-00576 |

--------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ROBERT DANIELS

Thursday, October 13, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 5378981

AFE, didn't you? 11:14AM
A Yes.
Q As did Ernie Leyendecker; right?
A Yes.
Q Go ahead and turn to page ending 353. 11:15AM
A All right.
Q You see that the top of the page reads "Drilling Basis of Design, Well Number 2"?
A Yes.
Q And there's a chart underneath that; 11:15AM right?
A Yes.
Q And the checkmark appears next to "drill and permanent abandonment"; right?
A Yes. 11:15AM
Q There is no checkmark next to "reenter and sidetrack"; right?
A Correct.
Q Let's turn to page ending 355.
A Okay. 11:16AM
Q Do you see there's "Objectives" at the top of the page?
A Yes.
Q And if you look at the third objective, it says, "Success/Dryhole Well Requirements." 11:16AM

Do you see that? 11:16AM
A Correct.
Q And the first bullet reads, "In the success case (oil is found), we will fully evaluate with wireline tools." 11:16AM
Do you see that?
A Yes.
Q So the success case was defined as oil is found; correct?
A That is what this language under drilling objectives is, yes. 11:16AM
Q Did you ever brief the board of directors regarding Shenandoah?
A I'm sure we reviewed it.
Q What do you mean "I'm sure we reviewed it"? 11:16AM
A Meaning I don't specifically recall what we presented and when, but at board meetings we typically reviewed ongoing projects.
Q What does it mean to review an ongoing project? 11:17AM
A Give status updates where we are.
Q When you spoke to the board, I take it you were truthful?
A Yes. 11:17AM

Q And you provided accurate information? 11:17AM
A Yes.
Q And you provided the board with complete information; right?
A Yes. 11:17AM
Q You did not withhold important information from the board?
A No.
Q Did you tell the board that Shen 3 was wet? 11:17AM
A Yes.
Q That means no hydrocarbons were found; correct?
A Correct.
Q Why did you tell the board that Shen 3 was 11:17AM wet?
A Because no hydrocarbons were found.
Q What does it mean to be wet?
A It's an oil field term meaning that the wellbore in the objective section is full of water. 11:18AM
Q It's fair to say that Shen 3 was a dry hole; is that right?
A Yes.
Q You knew that the resource range for Shenandoah fell after you drilled Shen 3; right? 11:18AM

A No. 11:18AM
Q You didn't know that?
A What I knew was that the resource range that we established was very, very broad and so whether or not it specifically changed within that breadth, I 11:18AM don't know or don't remember.
MR. DROSMAN: I'll show you what's been marked as Exhibit 276 for identification.
(Exhibit 276 was marked for identification by the court reporter.) 11:19AM
BY MR. DROSMAN:
Q Do you see Plaintiff's Exhibit 276?
A Yes.
Q This is a Gulf of Mexico exploration activity report dated January 7, 2015. 11:19AM
Do you see that?
A Yes, I do.
Q What is a Gulf of Mexico exploration engineering activity report?
A I guess that's something that they prepared 11:20AM within the group as to the status of things. I don't know it beyond that.
Q Do you see under the third bullet point, there is a number of resource distributions?
A Third bullet point, yes. 11:20AM

Q You sent Mr. Walker an email; correct? 12:31PM
A That's what it says, yes.
Q He was the CEO at this time; correct?
A CEO or president, I don't remember which. I assume CEO at this time. 12:31PM
Q And you sent it on August 28th, 2015; right?
A Yes.
Q And the title was "Forward: Shen Update." Right? 12:31PM
A Yes.
Q Plaintiff's Exhibit 383 is a true and accurate copy of the email that you sent on or about August 28th, 2015 to Mr. Walker; correct?
A I have no reason to disagree with that. 12:31PM
Q And you were providing Mr. Walker with an update on Shenandoah; correct?
A It says, "Shen Update."
Q Okay. You understand that at this time in August of 2015, Shenandoah 4 had been drilled; 12:32PM correct?
A That's the Walker Ridge 51 Number 3 is Shenandoah 4?
Q Correct.
A Okay. It looks like, yes, we've gotten some 12:32PM

results. 12:32PM
Q And you wrote, "Guys, at Shenandoah we exited base of salt, got into normal age section, and then went back into salt." Right?
A Yes. 12:32PM
Q Is that right?
A That's what it says, yes.
Q So were you notifying Mr. Walker that salt had been encountered upon drilling Shenandoah 4; correct? 12:33PM
A I'm telling him what we've experienced so far and then give him some ideas about what it could possibly be.
Q So what you experienced so far was salt; correct? 12:33PM
A Salt, normal age section and then back into salt.
Q And you didn't encounter oil; correct?
A In this wellbore, I don't remember. Does it say so? 12:33PM
Okay. It says we still have to drill some more, if we don't -- if we're still in salt at TD, then they want to -- or we're proposing to our partners they seem to agree sidetrack to south away from bad seismic data targeting the well -- 12:33PM

Wilcox -- 12:34PM
Q Right. I'm just asking you --
A The well's not done.
Q I'm just asking when you drilled Shen 4, the appraisal well, you didn't encounter 12:34PM hydrocarbons, did you?
A In the original wellbore and then we sidetracked.
Q I was just asking you about the appraisal well for Shen 4. Okay? Are we on the same page? 12:34PM
A First appraisal well, okay.
Q No hydrocarbons were encountered; right?
A In that wellbore.
Q Salt was encountered; right?
A Salt was encountered. At least as far as 12:34PM they've gone. They still had some drilling to go, yes.
Q And your email that we just looked at, Plaintiff's Exhibit 383, that's dated August 28th; correct? 12:34PM
A The one we were -- the one we just looked at, yes, August 28th.
MR. DROSMAN: I'll show you what's been identified as Plaintiff's Exhibit 384 for identification. And it should be available to you 12:35PM

now if you refresh your browser. 12:35PM

Just note for the record that it's a one-page email bearing Bates number APC-00191081.

(Exhibit 384 was marked for identification by the court reporter.) 12:33PM

BY MR. DROSMAN:

Q Do you have that in front of you?

A I do.

Q And this particular email is from Mr. Tedesco; right? 12:35PM

A Yes.

Q It's to you; right?

A That's correct.

Q It's dated August 29th, 2015; right?

A Correct. 12:35PM

Q And the subject is "Shenandoah update"; right?

A Correct.

Q And you understand that this is the day after you had provided Mr. Walker with an update on 12:36PM the Shen 4 drill; correct?

A Correct.

Q And so Mr. Tedesco is providing you with additional information about Shenandoah 4; correct?

A That's correct. 12:36PM

A Yes, I do. 12:37PM
Q And this is another email string sent to you from Mr. Tedesco; correct?
A Correct.
Q On September 26th, 2015; correct? 12:38PM
A Okay.
Q Is that right?
A September 26th, yes.
Q Okay. And the subject is "Forward: WR 51 Number 3 ST01 TD & Update." 12:38PM
Do you see that?
A Yes.
Q And TD refers to total depth; right?
A Yes.
Q And so Mr. Tedesco is updating you on the 12:38PM Shen 3 well; right -- I'm sorry, Shen 4 well?
A The Shen 4 sidetrack Number 1 well.
Q The email that you received from Mr. Tedesco on September 26th, 2015 is a true and accurate copy; correct? 12:38PM
A To the best of my knowledge.
Q And then if you look, Mr. Tedesco writes to you, "Tried to send this early this morning. Just realized it bumped back for some reason."
Then he provides you with the email; 12:39PM

correct? 12:39PM
A Correct.
Q He wrote, "Bob, update on wells as we go into the weekend."
And then he says in the third sentence of 12:39PM the second paragraph, "Partners met Thursday and are in general agreement that Upper Wilcox is missing." Right?
A Correct.
Q And then he continued, "Most think section 12:39PM is faulted out." Right?
A Yes.
Q And he was talking -- when he said that Upper Wilcox is missing, you understood that to mean that the sands were missing; right? 12:39PM
A Yes, in this wellbore.
Q And you understand that without sands, there is no oil?
A Well, there's obviously oil because there's 586 feet of pay at this point. 12:39PM
Q When he says the Upper Wilcox is missing, there is no oil with missing sands; right?
A There is no sands, so -- but there's 586 feet of pay in the level estimated at this point.
Q He also said "Most think section is 12:40PM

faulted out." Right? 12:40PM

A Yes.

Q And you understand what that means; right?

A Yes.

Q That there were faults running throughout; 12:40PM correct?

A In this wellbore.

Q And you understand that this reduced the resource range for Shenandoah for the Shenandoah field; correct? 12:40PM

A No, I don't. That's not correct.

Q So it's inaccurate to say that after Shen 4, the resource range for the Shenandoah oil field was reduced?

A I don't know what they would -- what it 12:40PM would do afterwards, but they have to incorporate all of this data prior to doing that. And I wouldn't make an assumption at this point.

Q I'm not asking you at this point in September of 2015. I'm asking you if you understood 12:40PM that after Shen 4 was drilled, the Shen 4 appraisal well was drilled, that the resource range for the Shenandoah oil field was reduced?

A I would not assume that at this point because I don't know the rest of the information that 12:41PM

A That's very hard to read, but yes. 1:33PM
Q You don't see that the P90 to P10 is the dark-shaded area with a mean of 550 million barrels of oil equivalent?
A Like I said, it's very hard to read. But yes, I do see that. I do not see the 575 or whatever number you said. It's not clear on this one. 1:34PM
Q The 550 million barrels of oil equivalent in the middle of that blue-shaded area doesn't say 550 MMBOE? 1:34PM
A I can't read it.
Q Okay. And do you see above post-drill Shenandoah 2?
A Yes.
Q Then the P90 range begins there. 1:34PM
Do you see that?
A Yes.
Q And the P90 range -- or the P10 range for Shen 4 ends at about 800; right?
A I'm sorry, which one are we on now? 1:34PM
Q Shen 4, post-drill Shen 4.
A Okay.
Q The P10 range ends at about 800. I think it's 798 --
A Yes. 1:34PM

Q -- but very close? 1:34PM
You see that the P90 range, which is the low end of the post-drill Shen 2, begins somewhere north of 900; right?
A Post Shen 2, what do you -- 1:35PM
Q Post-drill Shen 2.
A Okay.
Q The P90 range begins north of 900; correct?
A Okay. Yes. 1:35PM
Q Okay. And so the P90 to P10 range for the post-drill Shen 4 does not overlap with the post-drill Shen 2 P90 to P10 range; right?
A No.
Q Is that correct? 1:35PM
A Yes, it doesn't -- in this diagram it does not overlap.
Q You see that the resource range decreases after the post-drill Shen 2 with each successive well; correct? 1:35PM
A Yes, the small end is getting smaller.
Q And the P10 is getting -- the large end, the P10 is getting smaller, too; correct?
A The large end is the P1, actually.
Q I'm looking at the P10. The P10 is 1:36PM

getting smaller -- 1:36PM
A True.
Q -- every well post Shen 2; right?
A The P10 is, yes.
Q And the P90, the low end is also getting 1:36PM smaller for every well after Shen 2; correct?
A That's correct.
Q And you were aware of this fact, weren't you?
A I knew about the -- not the details perhaps, 1:36PM but yes, I knew that this is what we were seeing so far.
MR. DROSMAN: I'll show you what we marked as Plaintiff's Exhibit 387 for identification.
Should be available now if you refresh 1:37PM your browser.
THE WITNESS: Okay.
(Exhibit 387 was marked for identification by the court reporter.)
BY MR. DROSMAN: 1:37PM
Q You see that this is an email and attachment; correct?
A Yes.
Q Bears Bates Numbers APC-00196592 to 96616.
You received this email, correct, and 1:37PM

attachment? 1:37PM
A I'm checking to make sure all the numbers are here. You said 96612? There's more.
Q 196592.
A Uh-huh. 1:38PM
Q To 196616.
A Okay. 616. Yes.
Q You received this particular email and attachment; correct?
A Not that I remember, but it's addressed to 1:38PM me.
Q You received it from Susie Rodriguez; correct?
A That's who sent it, so I assume that's correct. 1:38PM
Q Who is Susie Rodriguez?
A I think she's Jim Kleckner's executive assistant. Yes, senior executive assistant to Jim Kleckner.
Q It's an EC offsite pre-read; right? 1:38PM
A Yes.
Q And EC refers to the executive committee; right?
A That's correct.
Q You were on the executive committee; is 1:39PM

A Yes. 1:40PM
Q So I take it Mr. Walker was on the executive committee as well; correct?
A Yes.
Q And this particular pre-read is for an international/deepwater ops EC offsite; right? 1:40PM
A The offsite was not specifically related to that. This is a portion of the EC offsite is my understanding from reading it.
Q Okay. What is EC offsite? 1:40PM
A It was something that we would go and -- for a day and a half or two days, the EC would go with an agenda to discuss issues and items and do some long-term strategic planning.
Q And did you read the pre-reads when you were provided with them for the EC meetings? 1:40PM
A Generally, yes. But I don't know specifically about this one.
Q Okay. Turn, if you would, to page ending 603. 1:41PM
I'm not sure if I established this particular email was sent on September 25th, 2015; right?
A I can look.
Yes, 9/25/2015. 1:41PM

Q And if you look at the second page, page ending 593, it looks like the offsite was scheduled for September 28th and 29, 2015; right? 1:41PM
A Correct.
Q Now, let's go ahead and turn to page ending 603. Are you on that page? 1:41PM
A Yes, I am.
Q You see the heading at the top reads "2016-2017 Shenandoah Appraisal Assumptions." Right? 1:42PM
A Correct.
Q And then the first bullet point on that page reads, "Results of Shen 4 impact."
Do you see that?
A Yes. 1:42PM
Q And then the subheading underneath that says, "Suggests mid-case reduction of about 900 MMBOE or approximately 1/3rd mapped STOIPs." Right?
A Yes. 1:42PM
Q And you understand what that means, correct?
A Yes.
Q That means that after Shen 4, there was a reduction of about 900 millions of barrels of oil 1:42PM

equivalent; right? 1:42PM

A In place. That's what STOIP --

Q A third of the oil in place was reduced; correct?

A That's what this says. 1:43PM

Q So there was a reduction of about a third after Shen 4 of oil in place; right?

A That's what this says based on the operations results -- or the operations team.

Q And you were aware of this in September; 1:43PM right?

A Yes.

Q Of 2015?

A Yes.

Q You did not have any reason to doubt the 1:43PM veracity of this assertion, did you?

A I didn't know where it came from, I guess. I don't know if it was the exploration numbers or if that was an operations number or what they -- because this is an operations presentation. 1:43PM

Q Right.

A No, I don't but --

Q Did you doubt the truth of that assertion?

A We don't do ST -- we don't do stock tank oil in place, so I don't know. 1:43PM

Q But that's what it says here -- 1:43PM
A Exploration.
Q It says that there is a reduction of about one-third oil in place after Shen 4; right?
A That's what it says. 1:44PM
Q And that was the impact of Shen 4; right?
A That's what this says, yes, in the stock tank oil in place, which again, as explorations we don't utilize typically.
Q This is what you were told on 9/25/2015; 1:44PM correct?
A We were told this when the email went out when I had a chance to read it.
Q That was in September of 2015; correct?
A Correct. 1:44PM
Q And then you spoke to investors on an earnings call on October 28th, right, of 2015?
A I don't know the date.
MR. DROSMAN: I'll show you what's been marked as Plaintiff's Exhibit 388 for 1:45PM identification.
(Exhibit 388 was marked for identification by the court reporter.)
BY MR. DROSMAN:
Q If you refresh your browser, it should be 1:45PM

identification. 1:59PM

(Exhibit 390 was marked for identification by the court reporter.)

BY MR. DROSMAN:

Q If you refresh your browser, you should be able to see that. 1:59PM

A Okay.

Q You see that Plaintiff's Exhibit 390 is an email that was sent to you; right?

A Correct. 2:00PM

Q And it bears Bates number APC-00660100?

A Correct.

Q And it was sent to you from Mr. Tedesco; right?

A Correct. 2:00PM

Q On January 3rd, 2016?

A Okay.

Q Is that right?

A Yes.

Q And Plaintiff's Exhibit 390 is a true and accurate copy of the email you received from Mr. Tedesco on or about January 3rd, 2016; correct? 2:00PM

A I have no reason to doubt that.

Q He wrote to you to give you an update; right? 2:00PM

A Yes. 2:00PM
Q He wrote, "Bob, want to give you a heads up, we have drilled to just above the Wilcox in the sidetrack and have encountered a weak zone where we keep taking losses and sticking. We have made three 2:01PM attempts to get past, raising MW from 14.8 to 15.0 in the process with no success. Team thinks this may be another fault, similar to what we saw in the first sidetrack. We have seen a lot of tar/asphalt along with traces of sand and mud around the zone 2:01PM before losing returns."
Do you see that?
A It says, "sand and marl around the zone before losing returns."
Q Okay. So you understood that when the 2:01PM second sidetrack was drilled for Shen 4, that there was tar that was encountered; correct?
A At the very top of the Wilcox it sounds like.
Q I didn't ask you where. I just asked you 2:01PM if you understood that tar was encountered when Shen 4's second sidetrack well was drilled?
A Yes, they informed me that's what they were seeing in the fault zone if it was a fault.
Q You never told investors that Anadarko 2:02PM

encountered tar on the second sidetrack well to Shen 4, did you? 2:02PM
A No, that was very common.
Q You learned of faulting at Shen 4, didn't you? 2:02PM
A Which Shen 4 are you talking about?
Q The Shen 4 appraisal well.
A The first wellbore?
Q In that -- in the area that is Shen 4 where you were drilling. 2:02PM
A There was a hypothesis, and I don't where they ended up on it, as they were drilling that the Upper Wilcox was faulted out. There was also -- I saw Venari had a different opinion on that, but that's what we knew. 2:02PM
Q When you drilled the bypass wells, you realized that there was faults; correct?
A There was missing section in the first sidetrack well, the Upper Wilcox, which could be geologic, could be structural. And then this -- they 2:03PM are saying this could be a potential fault zone and they are seeing things that would -- we would typically see around some fault zones, which would be the tar asphalt.
Q You knew what structural complexity refers 2:03PM

by the court reporter.) 12:33PM

MR. DROSMAN: For the record, Plaintiff's Exhibit 391 consists of a two-page email string bearing Bates number APC-00686173 to 174.

Q If you take a look at the email below the top one, it says, "Begin forwarded message" and it's from Bill Tedesco; right? 2:10PM

A Correct.

Q It's to you; correct?

A Correct. 2:10PM

Q And it's dated May 21st, 2016?

A Correct.

Q And the subject is "Weekend update"; right?

A Correct. 2:10PM

Q It's addressed to you, Bob. And then the second paragraph reads, "Shen 5: Completed MDT pressure and sampling programs."

Do you see that?

A Correct. 2:10PM

Q And MDT pressure refers to what?

A It's a tool, I think it was modular dynamic tool, but it's -- it basically takes pressure readings in the sands downhole.

Q Those pressure readings had been completed 2:10PM

at this point; right? 2:10PM
A That's what it says.
Q That's what Mr. Tedesco wrote to you; correct?
A Correct. 2:11PM
Q And then he continued, "Slightly lower pressure than Shen 2, indicating a sealing fault."
Do you see that?
A Yes.
Q So you were aware that there was an 2:11PM indication of a sealing fault between Shen 5 and Shen 2; correct?
A At this point I was aware that they -- that this email said that there could be a sealing fault. But that's a leap to say that it's a totally sealing 2:11PM fault with the information that we have.
Q He wrote "indicating a sealing fault"; right?
A That was -- in a quick email that's what he says. 2:11PM
Q And you didn't write anything back to him like, that's a leap, did you?
A No, not in this case. We may have had a communication on that as to what that actually means and what do we know about that. 2:11PM

Q You never told investors at any point that there was a sealing fault between Shen 5 and Shen 2, did you? 2:11PM

A No, because we don't talk about the details.

MR. DROSMAN: I'm going to go ahead and take a break and we may be able to finish up after. 2:12PM

THE WITNESS: Okay.

THE VIDEOGRAPHER: Off the record. It's 2:12 p.m.

(Recess taken.) 2:12PM

THE VIDEOGRAPHER: We're back on the record. It's 2:24 p.m.

MR. DROSMAN: I have no further questions for Mr. Daniels at this time.

MR. SLIFKIN: Great. Thank you. I have no questions at this point. So the deposition is concluded. Thank you for your courtesies. 2:24PM

MR. DROSMAN: Thank you.

THE VIDEOGRAPHER: Okay to go off the record? 2:24PM

MR. DROSMAN: Off the record.

MR. SLIFKIN: Yes.

THE VIDEOGRAPHER: We're going off the record. It's 2:24 p.m.

(Proceedings concluded at 2:24 p.m. Central)

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: OCTOBER 17, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS

CSR No. 6811

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------x

In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

---------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
LEA FRYE
Friday, October 7, 2022

Reported By: Lynne Ledanois, CSR 6811
Job No. 142789

MR. MINCES: Good morning. This is David Minces. I represent the witness, Lea Frye. 10:12AM

LEA FRYE,

having been duly sworn, testified as follows:

EXAMINATION 10:12AM

BY MS. JENSEN:

Q Good morning, Ms. Frye. My name is Rachel Jensen. I represent the plaintiffs in this case.

Could you please state and spell your full name for the record? 10:13AM

A My name is Lea and that's L-E-A, Frye, F-R-Y-E.

Q Where do you live?

A I live in Helena, Montana.

Q Ms. Frye, I would like to ask you about your background. 10:13AM

Did you go to college?

A Yes.

Q And did you earn a degree in petroleum engineering from Penn State? 10:13AM

A Yes.

Q In what year?

A 2000, December 2000.

Q After college, what did you do?

A I started working at ExxonMobil, which was 10:13AM

actually Exxon at the time. 10:13AM
Q And is ExxonMobil an oil and gas company?
A Yes.
Q When did you first start working at Exxon, now ExxonMobil? 10:14AM
A I believe it was early 2021.
Q 2021?
A I'm sorry, 2001.
Q And what was your title at Exxon?
A It would have been reservoir engineer. I 10:14AM don't know if there was more of an exact title than that, I don't recall.
Q And what were your job responsibilities?
A I worked on development fields, watching production, running economics, making decisions around 10:14AM economics and monitoring reserves.
Q Could you explain what that means in layman's terms, could you just break that down?
A In particular which part?
Q So you said that you were running 10:15AM economics, for example. What does that mean?
A Yes. Economics would be utilizing to our best knowledge the information around capital, production and making decisions based on value of a field or a well, was it worth continuing to produce 10:15AM

based on expense or capital, or was it no longer economic to continue to produce, would be a good example. 10:15AM

Q What do you mean by "economic" in this context? 10:16AM

A There would be internal metrics, which I can't disclose, that would need to be met to be considered economic.

Q Does economic mean the same thing or something different than profitable? 10:16AM

A It would mean the same thing in my opinion.

Q Does it mean the same thing as commercially viable?

A Yes.

Q How long did you work at Exxon? 10:16AM

A Almost five years.

Q And what did you do after that?

A I moved to a new company and that was Anadarko.

Q Is that Anadarko Petroleum Company? 10:16AM

A Correct.

Q That was also an oil and gas company?

A Yes.

Q When did you start working at Anadarko?

A It was late 2005. 10:17AM

Q Where geographically did you work when you worked at Anadarko? 10:17AM
A Their office was located in The Woodlands, Texas.
Q Is that in the Houston area? 10:17AM
A It's just north of the Houston metro.
Q What was your title when you first started working at Anadarko?
A If I recall, it would be senior reservoir engineer. 10:17AM
Q What business unit were you assigned to?
A I wouldn't know the exact name. But I was working in onshore development and it was I believe a Louisiana field.
Q What were your job responsibilities in that field as a senior reservoir engineer? 10:18AM
A Basically the same as what I stated for ExxonMobil. It was pretty standard in the industry to have that same kind of responsibilities across that job. 10:18AM
Q How long did you serve in that role?
A It was at least several months. I don't really recall exactly how many months. But it was several months, maybe five.
Q And in 2007 were you promoted into another 10:19AM

Q And at that point were you working onshore or offshore? This is now post 2007. 10:20AM
A At some point in time -- I don't remember the year -- I transitioned from onshore to offshore, still underneath exploration. 10:21AM
Q And when you were in that exploration unit working offshore, what was the geographic region you were working in?
A On a high level, the deepwater Gulf of Mexico. 10:21AM
Q And how long did you work in the exploration unit on deepwater Gulf of Mexico?
A Several years. I don't remember exactly how many months, but it was several years.
Q Does four years sound about right? 10:21AM
A Sounds -- sounds close. I honestly don't remember how many years.
Q When you were in the exploration unit for the deepwater Gulf of Mexico, how were you compensated? 10:22AM
A Can you clarify what you mean by how was I compensated?
Q Did you receive a salary?
A Yes, I received salary, base salary.
Q Did you receive any bonuses? 10:22AM

A Yes, we did receive bonuses. 10:22AM
Q Did you receive bonuses for your individual performance?
A It was factored into the bonus.
Q And did you receive any bonus that was related to the exploration unit's performance targets? 10:22AM
A Yes, we did.
Q Could you explain what that bonus was based on? 10:22AM
A Exploration had annual goals and if those goals were met or exceeded, that would be what our bonus would be based on.
Q And what do you mean by "annual goals"?
A Very specific goals around finding additional potential resources. 10:23AM
Q And could you elaborate by what you mean by "very specific goals around finding additional potential resources"?
A It would have a value associated with the year, finding X amount of resources depending on the year. 10:23AM
Q And when you say "X amount of resources," is the -- what does the X correspond to?
A That could be -- you could do it in millions 10:23AM

of barrels of oil equivalent, which is your hydrocarbon oil and gas. 10:23AM

Q You also refer to that as MMBOE?

A Yes.

Q Is it fair to say then that you received a bonus based on whether the exploration unit found a certain amount of MMBOE in the year? 10:24AM

MS. ROSENBERG: Objection to form.

BY MS. JENSEN:

Q Ms. Frye, let me clarify because I didn't do it at the beginning. 10:24AM

Throughout the day there may be various attorneys making objections. And you should go ahead and answer the question unless you're specifically instructed by your attorney not to answer. Okay? 10:24AM

A Okay. Correct.

Q I assume there's going to be more than one, so I assume we'll encounter this again, where there's going to be an objection, that's just to preserve the record. So nothing that you need to even pay attention to. 10:24AM

Okay. So let me go back now. We've probably lost the question.

So could you restate -- given what we've 10:25AM

talked about, could you restate what the exploration 10:25AM
bonus was based on in your experience?
A It was based on meeting or exceeding meeting a particular value of MMBOE or millions of barrels of oil equivalent found in a particular year. 10:25AM
Q And who set the target for the exploration unit in terms of the MMBOE that were to be found in a particular year?
A I would not know who all was involved, but it would have been a higher level of management that 10:25AM set that.
Q And who was management at that point in time for exploration?
A There was Bob Daniels was senior VP, I believe, if the title is correct. 10:26AM
And then beneath we would have had Stuart Strife over Gulf of Mexico.
Q How did you learn that there was a bonus for exploration if the unit met the particular amount of MMBOE in a particular year? 10:26AM
A Because I benefited from it on a particular project.
Q How was the target tracked? Let me retract that question and let me try to ask it slightly better. 10:27AM

Did the personnel in exploration track the progress toward the goal for a particular year? 10:27AM
A Yes.
Q How was it tracked?
A An individual on the exploration engineering team was in charge of keeping that information. 10:27AM
Q Can you be more specific? In the case that you said you benefited from the bonus, who on your team tracked that information?
A I'm trying to go back. It would have been the planning -- they called that a planning engineer for the team. I do not recall who was in that role at that time because it changed periodically. 10:27AM
Q In 2012 were you promoted into another role at Anadarko? 10:28AM
A Sounds correct.
Q And what was your title when you were promoted in 2012?
A I don't remember what the exact titles were again. 10:29AM
Q Does senior staff reservoir engineer sound about right?
A That sounds right.
Q Were you still working in the exploration unit? 10:29AM

A I believe so, yes. 10:29AM
Q And were you working in the deepwater eastern part of the Gulf of Mexico still at that point?
A Yes. 10:29AM
Q Did you move into the operations department at some point while you were at Anadarko?
A Yes.
Q And when approximately was that?
A I'm sorry, I don't remember exact dates. 10:30AM But it would have been after I worked the deepwater Gulf of Mexico exploration.
Yes. The dates blur together. Sorry, I'm bad with dates.
Q And did you serve as a senior reservoir 10:30AM engineer for Gulf of Mexico operations until you left the company in May of 2016?
A Senior staff reservoir engineer, yes.
Q By the time you left Anadarko in 2016, how many years approximately of experience did you have 10:30AM as reservoir engineer on oil and gas prospects?
A Around 15.
Q During your time at Anadarko, did you receive employee reviews?
A Yes, I did. 10:31AM

Q Generally did you receive favorable or unfavorable reviews? 10:31AM
A Favorable.
MS. JENSEN: I'm going to mark an exhibit. So just stand by for a moment. 10:31AM
Q You should be able to see now in your Exhibit Share feature --
A Okay. I have to alt tab over to it. One second.
MS. JENSEN: Okay. This is a document that's been previously marked as Exhibit 252. For the record, this is a document that bears the Bates stamp APC-00771595. 10:32AM
Q And, Ms. Frye, for your orientation purposes, I'm going to refer to documents both by exhibit numbers and also often what's called a Bates stamp number. And that number is reflected by a prefix and string of numbers at the lower right-hand side of the document. 10:32AM
Can you see both the exhibit stamp and what's called a Bates number in the lower right-hand side of this document? 10:33AM
A Oh, okay. Yes, now I can.
Q Ms. Frye, do you recognize this document? You can take a moment to scroll through if you need 10:33AM

Shenandoah in early 2014? 10:41AM
A Pat McGrievy had come and talked to me.
Q Do you understand why you were recruited?
A I was told he thought I would be a good fit.
Q Why were you a good fit? 10:41AM
A Because I understood the exploration side and the development side.
Q Could you be a little bit more specific? Did it relate to the exploration side and development side of a particular type of project? 10:42AM
A I'm not sure I understand.
Q It was poorly phrased. Let me try again.
Had you worked on deepwater Gulf of Mexico projects before on both the exploration and development side? 10:42AM
A Yes.
Q And what were you tasked with doing on this Shenandoah project?
A We were tasked to start having a team to start evaluating all the different risk and -- the 10:42AM potential risks and rewards and uncertainties so we could characterize that and start making decisions around how would we go about developing this.
And that takes a lot of work around development and running economics as well as 10:43AM

uncertainties in the project. 10:43AM
Q What was your title when you started working on the Shenandoah project?
A Senior staff reservoir engineer.
Q We saw in your review that Pat McGrievy 10:44AM characterized you as the subsurface lead for the Shenandoah team. Was that accurate?
A Correct.
Q Who did you report to on the Shenandoah team? 10:44AM
A Pat McGrievy.
Q Who did Pat McGrievy report to, if you recall?
A Darrell Hollek was who he reported to.
Q And who did Darrell report to, if you 10:44AM recall?
A Jim Kleckner. Sorry, it takes me awhile to remember names.
Q Was Jim on the executive committee?
A Yes. 10:44AM
Q Who else was on the predevelopment team for Shenandoah at the time?
A Paul Chandler and Chip Oudin.
Q What was Paul Chandler's role?
A Geologist. 10:45AM

Q And did he have many years of experience 10:45AM
at that point as a geologist?
A Yes.
Q What about Chip, what was his role?
A Geophysicist. 10:45AM
Q And how many years of experience did Chip
have as a geophysicist?
A I honestly wouldn't know that answer, but I
can say more than me as an engineer.
Q Did he have many years of experience? 10:45AM
A Yes.
Q Were there also personnel from the
exploration unit working on Shenandoah at the time?
A The project was still in exploration, yes.
Q And who was working from exploration? 10:46AM
A Do you mean my counterparts, our development
counterparts?
Q Sure.
A Robert Strickling was the reservoir
engineer. Beth Kendall was the geophysicist and Jake 10:46AM
Ramsey, the geologist.
Q Did the exploration team or management
include Ernie Leyendecker?
A He was over the deepwater Gulf of Mexico for
exploration. I don't remember the exact title. 10:47AM

A Correct. 10:50AM
Q Is that the same as an economic model?
A Yes.
Q What was your economic model on Shenandoah to be used for? 10:50AM
A To look at different development options and comparing those to what would be the best option for development on that project if we decide to go to development.
Q Was your economic model to be used to 10:51AM assist the executive committee in making decisions about its investment in Shenandoah?
A Yes. From a capital standpoint of how much money to continue during a particular year, sort of budget numbers. 10:51AM
Q And was it important for your economic model to be accurate?
A Accurate, yes.
Q Why?
A To inform our board, our executives to the 10:52AM best information we know at that time where we see the value of that project and how that should rank against other projects in the company.
Q Is that also referred to internally as portfolio? 10:52AM

A Yes. 10:52AM
Q What could go wrong if the economic model for Shenandoah wasn't accurate?
MS. ROSENBERG: Objection to form.
MS. JENSEN: I'll restate it. 10:52AM
Q Were there any risks associated with an inaccurate model for Shenandoah?
A Yes.
Q What were those risks?
A That money could be allocated to a project that is not adding as much value as another project could. 10:53AM
MS. JENSEN: I'm going to mark an exhibit.
(Exhibit 345 was marked for identification by the court reporter.) 10:53AM
BY MS. JENSEN:
Q Okay. You should be able to see what was marked as Exhibit 345. For the record, this is a document that bears the Bates stamp FRYE1940.
A Yes. 10:54AM
Q Do you recognize this document?
A Yes, I do.
Q What is this document?
A This is an outline from a course that I was required to take at Anadarko. 10:54AM

Q On the left-hand side it says Rose & Associates. 10:54AM
What is Rose & Associates?
A An outside company that developed some best practices and procedures and some software to help 10:54AM companies in the oil industry evaluate prospects, economics and risk in general.
Q You said that you were required to take this training. Were others at Anadarko also required to take this Rose & Associates training? 10:55AM
A Anybody that worked in an exploration role was required to take this training.
Q Do you see green highlighting on this document?
A Yes. 10:55AM
Q Whose highlighting is that?
A That would be mine.
Q And did you highlight what you thought was important?
A Yes, I did. 10:55AM
Q Could you explain the highlighting that you have here?
A I'll start in Chapter 1, Introduction on the far -- top far right. "Without a consistent process in place, most companies will overestimate the 10:56AM

portfolio results by two times." 10:56AM

Q Could you break that down? What does that mean?

A That was important to me when I took the class because it reminds us that when we're doing a 10:56AM process, using these kinds of tools to help us, we need to be rigorous in following the processes correctly so that we don't accidentally overestimate and give false information.

Q What is the reference to overestimate, 10:56AM what is that referring to?

A I'll use reserves as an analog as other companies in the past have had lawsuits with overestimating in reserves.

This would be the same in potential for 10:57AM resources of overstating the value of recoverable resources or millions of barrels of oil equivalent, MMBOE.

Q Is this something that could go wrong if your economic modeling of Shenandoah was not 10:57AM correct?

A Yes.

Q And throughout your work on Shenandoah, did you follow these best practices from Rose & Associates? 10:57AM

A Yes, I did. 10:57AM
Q Could you explain the next highlighting on here, please?
A Would that be Chapter 2, Statistics?
Q That's what I see. 10:58AM
A "P90 small is the 'greater than' convention."
And then P10 equals P50 squared divided by P90. P90 equals P50 squared divided by P10, and P50 equals P10 times P90 to the square root. 10:58AM
Q Could you explain what that means to non-engineers?
A This portion was basically giving the math behind the values, in particular how would you calculate a -- what we called a P10 value. 10:58AM
And what I'll say here is to be clear, different industries, et cetera, can call P10 and P90 switched. So I'm going to try to distinguish what we're talking about here, which is also stated I believe in the very first one, P90 small. 10:59AM
So think about P90 being small, the smaller number, and P10 is the bigger number in distribution.
Then it also just gives you the calculations of how would you calculate a P10, a P90 10:59AM

or a P50 if you had good values associated with the 10:59AM
different percentiles, the P50 or P90, how you could
physically just calculate it quickly.
Q And these relate to the resource
estimates? 10:59AM
A This is in relation to resource estimates.
Each resource estimate has a distribution associated
with it because we recognize there is uncertainty in
especially predrill. Even post drill there is
uncertainty, so we give it a distribution, a range of 11:00AM
possibilities.
Q And the P90 is the small and the P10 is
the largest?
A P10 means there's less than ten --
10 percent chance that the resource could be bigger 11:00AM
than that value.
Q I would like you to turn to the next page
under Chapter 2, Statistics.
A Okay.
Q You've highlighted "Use field size 11:00AM
distribution as reality checks."
What does that mean?
A Yes, that was one I highlighted because it
was very helpful to me to go back and look. And they
also highly recommend you do this. 11:01AM

You pool historical data, actual fields in -- in the industry you have access to this information that you can look at what other fields of similar characteristics or in similar locations to where you're evaluating to see what they've actually produced and/or projected to produce. 11:01AM 11:01AM

And you use that to check how your distribution for your project you're bringing forward sits. Does it make sense against what has happened in the past? 11:01AM

If it doesn't, you need to revisit what you have already incorporated and make it make sense with what has happened historically.

Q Could you explain the last highlighting in that same box, what that means? It's a reference to a mean. 11:02AM

A "The mean is the best single value in a portfolio and decision analysis."

Q Could you explain that? So to non-engineers, can you explain what that means? 11:02AM

A Yes. The mean is a statistical value and it is in the world of what we were talking about previously, it is estimated using the P50, the P90 and the P10 value. It's called a Swanson's mean for the purposes of estimating that mean value. 11:03AM

That is the value used when doing economic analysis and looking at your portfolio in a greater view, looking at the whole portfolio and seeing how each project matches up. 11:03AM
Q So I believe you testified that this training provided to you best practices at the time; is that right? 11:03AM
A Correct.
Q And did you follow these best practices in developing your economic model for Shenandoah? 11:03AM
A Yes, I did.
Q Did you collaborate with anybody else in working up your economic model for Shenandoah?
A Yes, I collaborated with Paul and Chip on coming up with the resource distribution because their input was very important on how to best define that resource. 11:03AM
And then that resource is utilized in the economic model.
Q So you testified earlier that Paul was a geologist and Chip was a geophysicist. 11:04AM
Would it be fair to say that your economic model was an interdisciplinary collaboration?
A Yes, that's fair to say.
Q Did you also talk to scientists in the 11:04AM

exploration department? 11:04AM
A We talk to them about data. We were asked specifically to come up with our own valuation separately.
Q So in spring of 2014, you're getting up to speed on Shenandoah; is that correct? 11:05AM
A Yes, correct.
Q So I want to go back in time now. So put yourself back in time. I would like to talk to you about a meeting that occurred in February of 2014. 11:05AM
MS. JENSEN: I'm going to mark an exhibit.
(Exhibit 346 was marked for identification by the court reporter.)
BY MS. JENSEN:
Q Okay. Ms. Frye, you should be able to see now what's been marked as Exhibit 346. 11:05AM
MS. JENSEN: For the record, this is a document that bears the Bates stamp FRYE1939.
THE WITNESS: Yes, I see it.
BY MS. JENSEN: 11:06AM
Q Do you recognize this document?
A It looks like a meeting invite. Yes, I recognize it.
Q Is this a meeting invite for a meeting that occurred on February 19, 2014? 11:06AM

A Yes. 11:06AM
Q And what was the purpose of the meeting?
A I had been asked, as is stated in this document, to present a development base case economics with a tornado chart for sensitivity at this meeting. 11:07AM
Q And so does "base case economics" mean the economic model that you were working on at the time?
A Correct.
Q And it states that it's "Preparations for Upcoming E&P Offsite." 11:07AM
What does that mean?
A E stands for exploration and P stands for production. And the higher managers would meet at offsites to discuss what they wanted to look at for the year and things like projects that they want to 11:07AM focus on and understand how much money they want to allocate to certain areas and certain projects for any one year.
Q So were you asked to present at this meeting? 11:08AM
A Which meeting are you referring to?
Q The February 19th, 2014 meeting.
A Yes, I was asked to do that at that meeting.
Q And where was this meeting held physically? 11:08AM

A It was on the floor that I -- I worked on in development, which was the ninth floor of the tower, and it was called a 9069 war room. 11:08AM
Q That's a conference room?
A It's a conference room, yes. 11:08AM
Q Okay. You can set that aside for a moment.
A Okay.
Q So I'd like you to tell us what you can remember about this meeting. And I can walk you through it. 11:08AM
So you go to this conference room and you walk in. Is anybody else there?
A Yes.
Q Who's there? 11:09AM
A My boss, Pat McGrievy. His boss, Darrell Hollek. Our planning engineer for offshore development Gulf of Mexico, David Janise, the manager, he was the manager of that team.
Ernie Leyendecker, who was in charge of the deepwater Gulf of Mexico exploration. And David -- I'm spacing on the last name -- he would have been the engineering manager for the exploration engineers. The name is Blakeley. That's it, David Blakeley. 11:09AM 11:10AM

A I'd say medium for what we utilized in the company. Roughly maybe 12 to 15 chairs around a table. 11:12AM

Q And describe in your own words what happens at this meeting. 11:12AM

A I was asked to present the economics our team had put together and used and it was Chip and Paul.

I don't recall if did I an actual presentation or if it was done on paper. But it would have been one of those two. So everybody could see what I was referring to. 11:12AM

And I walked through what our valuation was and walked through the tornado chart.

For reference, a tornado chart is looking at values that may impact your economics positively or negatively. An easy example would be price. 11:13AM

If you change the price of the commodity, which the commodity we were working with is oil, you would have a higher price and a lower price and see how that impacts that base case and how that looks. 11:13AM

I would have done several different factors. I don't remember or recall which ones I did for that particular meeting.

Q So you present the base case and per your 11:13AM

testimony earlier, this is based on best practices; 11:14AM
correct?
A Correct.
Q And you present the base case, and what is
the reaction? 11:14AM
A Ernie Leyendecker spoke up and said -- I
remember this vividly because it's not something you
expect to happen in a meeting that is a professional
meeting -- he said, "You don't know anything. I've
worked the Gulf of Mexico longer than you have." 11:14AM
And then made reference to this being as
good as Troika, which is another field in the
deepwater Gulf of Mexico.
Q What is Ernie's tone of voice when he's
saying this? 11:15AM
A Gruff and meant to be demeaning.
Q Did you feel demeaned?
A I did.
Q Have you ever been in a situation before
when you were just doing your job and someone 11:15AM
reacted to you that way?
A Once previously, yes.
Q And when was that?
A It was in a meeting with -- when I worked in
exploration and we were meeting with a development 11:15AM

team over a different project, so it was a project 11:15AM
that I had worked that was in actual discovery and we
were handing it over to development.

The manager of that development team did
get -- I don't remember exact words in this one 11:16AM
because that was, oh, goodness, some time in 2009 or
2010, a long time ago.

And I remember that he was very adamant
and talked down in that meeting to our evaluation.
And I remember the G&G manager that I worked with 11:16AM
and my manager were in that meeting and they
basically told him he shouldn't do that in -- I
don't remember the exact words.

Q So Ernie makes these comments to you in a
way that was demeaning. And did you feel 11:17AM
humiliated?

A Yes.

Q What is going through your head as Ernie
is demeaning you in front of your colleagues?

A I just didn't feel it was warranted given I 11:17AM
was asked to view this and we used the best science we
knew at the time to come up with an evaluation we
thought was fair.

Why was I being berated for doing my job?

Q And so in this prior experience you had, 11:17AM

you said that your manager spoke up. In this 11:17AM
instance Pat McGrievy was your manager; right?
A Correct.
Q Did he speak up and defend you?
A No. 11:18AM
Q Did anybody speak up and tell Ernie that
was inappropriate?
A No.
Q And so what did you take away from that
experience? 11:18AM
A That it was accepted within the company.
Q What was?
A To allow behavior that should not be
presented in that kind of environment.
Q So let's step back for a moment. 11:18AM
At this point in time in February of 2014,
are you still learning about Shenandoah?
A Yes, there was a lot of information.
Q Were you following what the information
was leading you to; in other words, were you just 11:18AM
following the data?
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, I was --
BY MS. JENSEN:
Q I know, the objections, it gets hard. You 11:19AM

can disregard the objections and still answer my question. But I'll rephrase it because you might have lost it -- the question. 11:19AM

Okay. So you're getting up to speed on Shenandoah and were you -- was your analysis just following where the data led? 11:19AM

MS. ROSENBERG: Objection to form.

THE WITNESS: Yes, my analysis was following the data and information I had.

BY MS. JENSEN: 11:19AM

Q Did you have any incentive to be negative about Shenandoah?

A No.

Q How about the others in the room, did Ernie have any incentive to hype Shenandoah? 11:20AM

A Yes.

Q What were those incentives?

A The exploration goals for net discovered resources target for 2014 would have been based on that -- I'm sorry, let me rephrase that. 11:20AM

The exploration target for resources would be a reason to want to have a favorable value, which would impact bonus for exploration.

Q In other words, Ernie stood to make a bonus if the resource estimate for Shenandoah was 11:21AM

high? 11:21AM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, Ernie would expect to get a bonus.
BY MS. JENSEN: 11:21AM
Q And so if you convinced others that Shenandoah was potentially less viable than Ernie wanted people to believe, could that negatively impact how much money Ernie stood to make?
MS. ROSENBERG: Object to form. 11:21AM
THE WITNESS: In my opinion, yes.
BY MS. JENSEN:
Q What if it didn't pan out? Would he still receive that bonus or would it be clawed back?
MS. ROSENBERG: Objection to form. 11:21AM
THE WITNESS: To my knowledge, it's never clawed back once it's given.
BY MS. JENSEN:
Q Let me break that down.
So the exploration bonus that you 11:22AM testified about earlier, it was awarded if the exploration unit discovered a certain number of barrels of oil. Is that your testimony?
A Yes, correct.
Q If at a later point in time it was found 11:22AM

not to be accurate, would that bonus be clawed back? 11:22AM
MS. ROSENBERG: Objection to form.
THE WITNESS: In my experience, no, it was not.
BY MS. JENSEN: 11:22AM
Q So in this particular instance, even if Shenandoah did not turn out to be as big as, for example, Ernie was holding it out to be, is it your testimony that he would still keep that bonus?
A To my knowledge, yes. 11:23AM
MS. JENSEN: Let's take a quick break.
THE VIDEOGRAPHER: Okay. We're going off the record at 11:23 a.m. and this is the end of Media Unit Number 1.
(Recess taken.) 11:23AM
THE VIDEOGRAPHER: We are back on the record at 11:40 a.m. This is the beginning of Media Unit Number 2.
MS. JENSEN: Welcome back, Ms. Frye. I've introduced as an exhibit a document that's in a 11:40AM native format of Exhibit 254.
Can we go off the record for a moment?
THE VIDEOGRAPHER: Okay. We're going off the record. The time is 11:41 a.m.
(Recess taken.) 11:41AM

THE VIDEOGRAPHER: We're back on the record at 11:42 a.m. Go ahead, please. 11:42AM

BY MS. JENSEN:

Q Okay. Ms. Frye, you should be able to see in your Exhibit Share a document that has been marked as Exhibit 254. It is the native version of a document previously marked as 254 -- I'm sorry, this has been marked as 254A. It is the native version of prior Exhibit 254. 11:42AM

(Exhibit 254A was marked for identification by the court reporter.) 11:42AM

MS. JENSEN: For the record, it bears Bates stamp APC-01674681.

Q Are you able to see this document?

A Yes, I am. 11:43AM

Q And do you recognize this document?

A Let me look through it real quick. Is there just one page? Hold on.

Okay. I hit the wrong button.

Yes, I recognize this as a document that I would have worked on. 11:43AM

Q And does this appear to be a true and accurate copy of the presentation that you made at the February 19th, 2014 meeting that we were discussing before the break? 11:44AM

A I honestly would not recall which meeting I would have presented this at as I made and presented lots of meetings over that time frame, probably in the hundreds. The time frame, I'm not sure. 11:44AM

Q I can represent to you that my understanding is the metadata on this document is dated February 19th, 2014. 11:44AM

A All right. Then sounds like this is the one.

Q So you don't have any reason to doubt that this was the presentation that you made at the February 19th, 2014 meeting that we were discussing? 11:44AM

A No, sounds like this is correct.

Q Okay. You can set that aside.

A Okay. 11:45AM

Q So you continued to work throughout the spring of 2014 to understand the risks associated with Shenandoah; is that fair?

A Yes, that's fair.

Q And was tar a risk at the time? 11:45AM

A We did do studies that identified tar as a possibility.

Q Is that the same as asphaltene, or is that something different?

A Asphaltene is the more technical term used 11:46AM

in the industry, but it is in concept of layman's term 11:46AM
what you use, tar. Same concept, very sticky.
Q Can that be problematic for an oil prospect?
A Yes, it can be. 11:46AM
Q Why is that?
A This tar-like substance can plug your access to the reservoir as in the perforations that allow the flow and the pore space itself near the wellbore that allows the hydrocarbon to flow into the well to 11:46AM ultimately come to the surface.
Q And could it impact the recovery?
A Yes.
Q I want to show you what's been marked as Exhibit 347. 11:47AM
(Exhibit 347 was marked for identification by the court reporter.)
MS. JENSEN: For the record, this bears the Bates stamp APC-00604655.
THE WITNESS: Sorry, can you repeat the 11:47AM APC number to make sure I have the right one?
BY MS. JENSEN:
Q Sure. Number 1, do you see the exhibit stamp 347?
A Yes. 11:47AM

Q Okay. And the Z in that image, what do 12:08PM
you understand that to be?
A That is identifying where that seismic line
intersects that structure map.
Q And do you understand that pink Z to 12:09PM
correspond to the potentially sealing fault on this
map?
A Yes, I understand that.
Q There are some numbers also in that image
that is on the lower right-hand side, there's S1, S2 12:09PM
and S3. What do those stand for?
A The S1 would have been associated with the
original well drilled, which we called Shenandoah 1 or
Shen 1 for short.
The S2 was associated with the 12:09PM
Shenandoah 2 well or Shen 2 for short.
And the S3, which is highlighted in red,
was the drill location for the Shenandoah 3 well or
Shen 3.
Q So that potential sealing fault was 12:10PM
between S3 and the other two wells; right?
A Correct.
Q This is something that was presented to
management at the time?
MS. ROSENBERG: Objection to form. 12:10PM

THE WITNESS: We would have shown this to Pat McGrievy and most likely Darrell Hollek as well. 12:10PM

There is some chance we even shared this with exploration counterparts to show our concern, which we did on a frequent basis around drill well locations. 12:10PM

BY MS. JENSEN:

Q By "concern" you mean your concerns with what?

A The concern about what kinds of information were we going to get from a well, a drill location that is selected as Shenandoah 3 in relation to the other two wells, was it going to be an ideal location to help us understand the prospect better or not. 12:11PM

Q Part of that discussion was the existence and location of faults? 12:11PM

A Correct.

Q So there was discussion about concerns around faulting. Do you remember that in the fall of 2014, the exploration team told the development team they could not show their maps with faulting to partners? 12:11PM

MS. ROSENBERG: Objection to form.

THE WITNESS: I recall a chain of emails that said in lay terms that no, we show one set of 12:12PM

maps. 12:12PM
BY MS. JENSEN:
Q Okay. So in August of 2014, was the development team told that they could not share their maps with partners? 12:12PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, the exploration manager, I believe Tim Trautman, communicated to our manager, Pat McGrievy, that we were only going to share one set of maps at the partner meeting. 12:12PM
And that set of maps was exploration maps.
BY MS. JENSEN:
Q And so the exploration maps were the only maps that could be shown to partners; is that your testimony? 12:13PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes.
BY MS. JENSEN:
Q And did those maps from exploration contain the faults that development team members had 12:13PM mapped?
MS. ROSENBERG: Objection to form.
THE WITNESS: It did not show the faults in -- it had one fault on the entire map.

BY MS. JENSEN: 12:13PM
Q What --
A That map fault was a small fault isolating Shenandoah 1 to a small area.
Q Did that cause you any concerns? 12:13PM
A Yes, it did.
Q Why?
A Because development team is tasked with coming up with a development plan for the project.
We were ultimately going to be working 12:14PM with these partners for years to come and when it comes to risk and uncertainty around a project and being able to communicate with your partners about those risks and those uncertainties, it's important to be able to communicate on all levels, which 12:14PM includes potential for other interpretations of what the structure and faulting might look like.
Q And so was the development team able to show its interpretations in the mapping to its partners in 2014? 12:15PM
MS. ROSENBERG: Objection to form.
THE WITNESS: No, we were not allowed to.
BY MS. JENSEN:
Q Did that continue into 2015?
A I believe it did. I would have to look at 12:15PM

actual dates around certain meetings to be able to confirm that. 12:15PM

Q To the best of your recollection --

A Yes.

Q -- that continued into 2015? 12:15PM

A To the best of my recollection, yes.

Q In prior projects had the development team been allowed to share their maps with partners?

MS. ROSENBERG: Objection to form.

THE WITNESS: Yes, they were. 12:15PM

BY MS. JENSEN:

Q Could you give us an example?

A The Lucius project in the deepwater Gulf of Mexico, I know because I was on the exploration team and it was that short period of overlaps between exploration and development and the development team was allowed to share their maps with partners at meetings. 12:16PM

Q So in your experience, was the directive not to share development team's maps a departure from your prior experience? 12:16PM

A Yes.

MS. ROSENBERG: Objection to form.

BY MS. JENSEN:

Q Did you understand that the directive not 12:16PM

to show the maps from development team was due to 12:16PM
the faults that were mapped by the development team?
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, that's my
understanding. 12:16PM
BY MS. JENSEN:
Q And what was your understanding based
upon?
A The communication from my supervisor to our
team, Paul and Chip and myself, that only one set of 12:17PM
maps will be shown to keep unity between the teams and
that the exploration team or counterparts did not want
any versions of faulted maps to be shown because it
showed uncertainty around the project.
Q In other words, it showed negative aspects 12:17PM
of Shenandoah?
MS. ROSENBERG: Objection to form.
THE WITNESS: It showed the potential for
negative aspects on the project, yes.
BY MS. JENSEN: 12:18PM
Q So do you recall that in November 2014,
Anadarko completed the Shenandoah 3 well?
A It was late that year. I don't remember the
exact month, but yes.
Q And were the results from Shenandoah 3 12:18PM

like the results from Shenandoah 2? 12:18PM
A No, they were different.
Q How were they different?
A Shenandoah 3 had no hydrocarbons, all water, compared to Shenandoah 2 had hydrocarbons. 12:18PM
Q And were the results from Shenandoah a positive result -- I'm sorry. Were the results from Shenandoah 3 a positive result?
MS. ROSENBERG: Objection to form.
BY MS. JENSEN: 12:19PM
Q I see you struggling with the question. Let me see if I can ask --
A Please rephrase.
Q Was Shenandoah 3 a success?
A In layman's terms of definitions in the 12:19PM industry, Shenandoah 3 would be considered a dry hole because there was no hydrocarbons found.
Q Is that a success for an exploration well?
A No.
Q Did Anadarko describe Shenandoah 3 as a 12:20PM negative to the public?
A I don't remember what all was said to the public. I do recall some high-level verbiage which would be around the continuous reservoir of similar thickness which -- I would have to see the 12:20PM

presentation of -- or the words around what was said 12:21PM
at that shareholder meeting.
But an overall positive feel to their wording, no negative feel to the wording that was said. 12:21PM
Q Did you have any concerns on how Anadarko was characterizing Shenandoah 3 to the public?
A Yes, some concern.
Q And what were your concerns, if you can recall? 12:21PM
A I would have to see exactly how they termed it, but the definition of continuous reservoir costs, the structure denotes in our lingo in the industry that it's exactly the same as Shenandoah 2 and that that was a positive result of the well and the 12:22PM project.
Q Why were you concerned about that?
A Connectivity between Shenandoah and Shenandoah 3 -- or, sorry, Shenandoah 2 -- correct that, please -- and Shenandoah 3 was being implied and 12:22PM the data that we gathered between -- in Shenandoah 3 well and the data that we gathered in Shenandoah 2 well did not definitively give us confidence that the two wells were connected across the entire structure.
Q Do you recall that Anadarko indicated that 12:23PM

pressure data could be used to extrapolate the oil-water contacts from Shenandoah 2 to Shenandoah 3? 12:23PM

A Now that you mention that, yes, I remember that some sort of verbiage in that particular conference. 12:23PM

Q And did that concern you?

A Yes.

Q Why?

A That concerned me in that they were communicating to the public that they now know exactly where the oil-water contact is on this structure. 12:24PM

Q I'm sorry, go ahead.

A As I mentioned previously, it was not definitive that the two wells were connected through the data that we had, so you cannot in true science say you a 100 percent know now where the oil-water contact is. 12:24PM

Q Had Anadarko at this point also identified a potentially sealing fault between Shen 2 and Shen 3? 12:25PM

A The development team as the previous exhibit that we were looking at -- can I go back to the exhibits?

Q Sure. 12:25PM

A Exhibit 349 shows that the development team had a potential north/south sealing fault. In fact, potentially more than one fault between the Shenandoah 2 well and the Shenandoah 3 well. 12:25PM

That would mean you cannot extrapolate across the entire structure an oil-water contact between the Shenandoah 2 well and the Shenandoah 3 well. 12:26PM

Q And the implications of having a sealing fault between two wells, those were understood within the company; right? 12:26PM

A Yes.

Q As you said earlier, this was something that was passed along to management?

MS. ROSENBERG: Objection to form. 12:26PM

THE WITNESS: Yes.

BY MS. JENSEN:

Q Did you also look at other types of data such as MDT pressure data?

A Yes. 12:26PM

Q And what did the MDT pressure show?

A The MDT pressure confirmed we had water. It could not confirm we were connected to Shenandoah 2 and it could not confirm if we were connected to Shenandoah 1. 12:27PM

There also happened to be other wells in 12:27PM
the basin that Anadarko had an interest in and there was no definitive 100 percent confirmation that you could be connected to any of those other wells.

Q Did you also work on OBMI data? 12:27PM

A OBMI was a log that is taken in a particular well. I personally do not work with that information, but it is something that is collected for the geoscientists, which would include Paul and Chip as the main benefactors of that information. 12:28PM

Q Do you have any understanding of what they were seeing based on the OBMI data at the time?

A Yes. In our conversations, once they received information back on the well log is Paul denoted -- and I don't remember a time in this date or 12:28PM anything, I remember he denoted the potential for a fault in the wellbore Shenandoah 3 that was close to the mapped fault in the development team previously shown exhibit.

Q And to the best of your understanding, was 12:29PM the MDT pressure data and the OBMI data presented to management at the time?

A Yes.

Q So if Shenandoah 2 and Shenandoah 3 were separated by a sealing fault, could Shenandoah 3 be 12:29PM

used as an injector well for Shenandoah 2? 12:29PM
A No, not for Shenandoah 2.
Q Could it be used as an injector well on the field as far as you were aware at the time?
A No, it could not. 12:29PM
Q And did you tell others that at the time -- I'll retract that question.
Did you tell anyone in exploration at the time that Shenandoah 3 could not be used as an injector well? 12:30PM
A Yes, I communicated to them that the technology did not exist for -- to complete the Shenandoah 3 well based on the tree which is at the top of the wellbore.
It was not rated to the pressure you would 12:30PM need to meet the regulatory requirements.
Q Who did you tell this to in exploration?
A It would have been my counterpart in exploration, which I believe at the time was Chris Camden. 12:30PM
Q Do you recall the time frame in which you told Chris Camden that Shen 3 could not be used as an injector well?
A I don't recall that time frame, sorry.
Q Would it have been around the time that 12:31PM

A As a partnership, all of us, which would have included Marathon and Venari and Cobalt I believe was the other partners, we did talk a lot about commerciality and how to best help the whole partnership define when that we know we're at a commerciality point. 1:01PM 1:01PM

Because it was a concern amongst multiple partners and we would have meetings specifically about what metrics or how much volume can be proved with an individual well that would help us get over that hurdle. 1:02PM

MS. JENSEN: I've now introduced a document that has been previously marked as Exhibit 259. And for the record, this is document that bears the Bates stamp APC-00013459. 1:02PM

Let me know when you can see this document.

THE WITNESS: I have the document.

BY MS. JENSEN:

Q Do you recognize this document? 1:03PM

A This looks like an email chain between Paul and Jake and then later myself and Paul and Pat were added into the chain.

Q And this is in October of 2014.

Do you recall that at the time, even 1:03PM

before Shen 3 was TD'ed, it was expected that it would be wet? 1:03PM
A It was expected to be wet, yes.
Q Do you see your email that's above Jake's email, it says October 1st, 2014, where you relay a discussion you had with Dan from ConocoPhillips? 1:03PM
A Yes.
Q Can you read into the record your email starting with "Dan"?
A "Dan from ConocoPhillips called me and wanted to chat. Based on Shen 1 pressures and the new interpreted rafts areas," which I think that might have been a typo, "COP is concerned. He was run some volume sensitivities with new maps and oil-water contact variance and has seen in place volumes basically cut in half. They are very concerned about size and commerciality." 1:04PM 1:04PM
Q And was that accurate what you stated at the time?
A Yes, according to this email, it is accurate. 1:05PM
Q Does this refresh your recollection about the discussions that were being had as the results were coming in from Shen 3 about volumes and commerciality? 1:05PM

A Yes, it does. 1:05PM
Q And so is that consistent -- now that your recollection has been refreshed, is that consistent with your recollection of what was happening at the time that there were concerns about commerciality 1:05PM and the volumes being cut in half as the results of Shen 3 were coming in?
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, correct.
BY MS. JENSEN: 1:05PM
Q Let me break that down since I drew an objection.
Is this email consistent with your recollection of what was happening at the time?
A Yes. 1:05PM
Q And there were concerns about the commerciality of the project?
A Yes.
Q There were also concerns that the volumes were cut in half with the Shenandoah 3 results 1:06PM coming in?
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes.
BY MS. JENSEN:
Q We talked a little bit earlier about your 1:06PM

concerns regarding the way that Anadarko was 1:06PM
characterizing the results of Shenandoah 3.
Do you recall your testimony about that?
A Yes, I do.
Q Were you the only one at Anadarko who was 1:06PM
concerned about how Anadarko was characterizing the
results of Shenandoah 3 at the time?
MS. ROSENBERG: Objection to form.
BY MS. JENSEN:
Q Were others on your team also concerned? 1:06PM
A Others on my team, yes.
Q Who was concerned?
A Chip Oudin, and I probably pronounced that
incorrectly, and Paul Chandler.
Q What was Chip's concern? 1:07PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Our overall concern as a
team was having to bring expectations down within
the company about this project because we knew that
was going to be what had to happen. 1:07PM
And by this point we knew that message was
not going to be received well with all teams in the
company and even potentially with some in the
executive committee.
I can't talk, sorry, I need some water. 1:08PM

apparently two different excerpts from two different presentations given about the results of Shenandoah 3. 1:11PM

But without context of where they came from and seeing the information, I am not sure which -- if it was a partner they gave out a different evaluation versus ours or where that difference comes from. 1:11PM

I just can't determine based off this information in front of me. 1:12PM

BY MS. JENSEN:

Q Okay. So let's just take the exhibit out of the equation and let's talk about what you experienced, Ms. Frye, so you don't need to look at the exhibit. 1:12PM

A Okay.

Q You said that -- and you can correct me if I'm wrong. What I understood your testimony to be was that there was concerns broadly across the development team that the message that was given to investors was vastly different than what you were feeling. 1:12PM

And my clarifying question is: Was it just your feelings or was it that it was vastly different from what you were seeing? 1:12PM

MS. ROSENBERG: Objection to form. 1:12PM
THE WITNESS: It was vastly different from what we were seeing in the data, in the science that we had gathered deep in the wellbores.
BY MS. JENSEN: 1:13PM
Q Now, do you recall that Shenandoah 4 was drilled in 2014 -- in 2015?
A Yes, it was drilled in 2015.
Q And what were the results of the first Shenandoah 4 well? 1:13PM
A The first borehole penetrated salt and that is a common mineral found in the deepwater Gulf of Mexico and it's basically like your own table salt except for it is cemented together and does not hold hydrocarbons. 1:13PM
And it also does act as a barrier to hydrocarbons moving from one location to another location, just like a wall in a room is a barrier from one room to the next.
Q So was that a good result? 1:14PM
A No, it was not.
Q What happened next? What was the next operation after the Shenandoah well hit salt?
A Thank you for clarifying because that's what I wanted to ask. 1:14PM

The next operation was sidetracking that wellbore away from the salt in hopes of finding the same formations that we had seen in the other Shenandoah 2 well. 1:14PM

Q What were the results of that next operation? 1:14PM

A The next operation did find some of the sands. I couldn't recall without seeing logs and information which sands and the exact calculated number or, you know, value of sands and hydrocarbon net pay as we call it was significantly less than what we saw with Shen 1. It was roughly 600 feet of net pay versus the roughly 1,000 feet of net pay that we saw in Shen 2. 1:15PM

Q Did it also have water in the column? 1:15PM

A Without seeing a log, I do not recall.

Q Did the results from the Shenandoah sidetrack alter the understanding of the Shenandoah resource size in any way?

A Both the first well, the first penetration that encountered salt, and the sidetrack well both contributed to our knowledge and understanding of the resource size. 1:16PM

The salt itself, because of where that salt -- that well was drilled, it meant that the 1:16PM

structure did not extend as far in that direction as originally mapped by the exploration group. 1:16PM

So therefore, the volume associated with that area no longer existed.

The sidetrack coming in at a different value of net pay also lends to changing -- you can no longer utilize a thousand foot net pay across a structure knowing that you have a wellbore that says, no, that's not possible. 1:16PM

It tells you there's uncertainty in the thickness of this reservoir across that remaining structure. 1:17PM

So that also negatively impacts your resource size. They have to become smaller, there is no other option. 1:17PM

Q So did Shenandoah result in a reduced resource range?

A Post Shen 4, there was a reduction in resource range.

Q There was another operation for Shenandoah 4, wasn't there? 1:17PM

A Correct.

Q And what was the final operation?

A It was a bypass core, which the development team actually paid for and recommended to help gather 1:18PM

additional information about the reservoir to help in our studies. 1:18PM

Q And I'm sorry, go ahead.

A And the result was there was thinning between the sidetrack and the bypass. 1:18PM

Q And what did that indicate, that thinning?

A It indicated even more uncertainty of thickness across the reservoir because that bypass from definition of trajectories out of the wellbore in order to be able to do a bypass, from a distance 1:18PM standpoint you are not very far away from that sidetrack.

So over a very short distance within the reservoir, we had a variance in net pay.

Q Did that indicate that there was faulting? 1:19PM

A It indicates the potential for faulting. We would not have had all the data in yet to know for certain.

But yes, it would be a potential indication of faulting. 1:19PM

Q Would you call that small-scale faulting? Is that another way to say it?

MS. ROSENBERG: Objection to form.

THE WITNESS: You could say it that way.

BY MS. JENSEN: 1:19PM
Q What was the implication of small-scale faulting in Shenandoah?
A The implication is connectivity between wellbores, how much area can any one wellbore 1:19PM effectively access and drain hydrocarbons.
I'm just going to use numbers. Don't take these numbers as being true numbers.
I'm using an example. Is that 10 feet, 20 feet, 100 feet away, just for example of 1:20PM distances.
Q And is that a concern?
A Yes.
Q Why?
A It's a concern because, again, it goes back 1:20PM to are you going to need to drill more wells than originally anticipated to drain effectively the reservoirs and produce hydrocarbons in economic quantities.
Q And did that impact the economic model for 1:20PM Shenandoah?
A Any time you add cost, which new drill wells and completions for those drill wells, subsea tree, flow lines, it all adds cost.
And as costs increase, it challenges your 1:21PM

economics because you need more hydrocarbons, higher flow rates and to be able to make an economic case of viable project. 1:21PM
Q Was there a second sidetrack for Shenandoah 4? 1:21PM
A Not that I recall, no.
Q Was there a Shenandoah 4 operation that was abandoned because of a tar zone?
A I don't recall that. I do recall Shenandoah 1 had an issue with a tar zone. 1:22PM
And I don't remember the specifics around it. But do I remember Shen 1 having an issue around a tar zone.
Q Did the results from Shenandoah 4 increase or decrease the resource range for the field? 1:22PM
A The results from Shenandoah 4 decreased the range.
Q Was it a significant reduction?
A Yes, it was.
Q What order of magnitude? 1:22PM
A By at least half of what was projected post Shen 2.
Q And did Anadarko disclose that to the market as far as you're aware?
A No, not as far as I'm aware. 1:22PM

Q Did Shenandoah 4 impact the commercial 1:23PM
viability of the Shen field?
A Yes, it did.
Q How so?
A We knew there was going to be additional 1:23PM
faulting, which meant additional well costs.
We knew there was a smaller area, which
meant lesser resource, and all of that impacts your
economic case negatively.
MS. JENSEN: I'm going to show you an 1:23PM
exhibit. You should be able to see what's been
marked as Exhibit 352.
(Exhibit 352 was marked for identification
by the court reporter.)
THE WITNESS: Yes. 1:24PM
MS. JENSEN: There is no stamp on it
because it's a native document, but I'm hoping that
Lynne will help us with this after the fact.
In any event, this is a document that
bears the Bates stamp APC-59128. 1:24PM
Q My first question for you is whether you
recognize this document?
A Yes, I recognize this. This was something
that the development team put together. I don't
recall who we presented it to. But we put this 1:25PM

together for some purpose to present to somebody. 1:25PM
Q And it does appear to be a true and accurate copy of a presentation that the development team provided in December of 2015?
A Yes, it does. 1:25PM
Q I would like to turn your attention to Slide 9.
A Yes. "Economic Summary - Base Case" slide?
Q Yes. We talked about PIR10 previously. And are all of the PIR10s below .3 in this document? 1:26PM
A Yes.
Q And some are negative?
A Yes.
Q After Shenandoah 4, did you think that the field at that time had a reasonable chance of being 1:26PM commercially viable?
A Being an optimist, I had a very small, small glimmer of maybe it could be if we explored one more side of the field.
But I was not feeling very optimistic 1:27PM about it and was feeling that we needed to probably cut our losses now in terms of spending money.
Q In fact, after Shenandoah 4, was the team looking for an exit strategy?
A The development team was looking at an exit 1:27PM

difference in the resource range between exploration 1:49PM
and development going -- prior to going into this
meeting and the agreed-upon valuation afterwards.

What I found to be the case later was the
exploration group then later changed the resource 1:49PM
change when they presented to Bob Daniels from what
we agreed upon.

Q Okay. So let me show you some exhibits
and hopefully those will help to clarify.

MS. JENSEN: Let's go ahead and pull up 1:50PM
Tab 20B.

THE WITNESS: Can you repeat which tab it
was?

MS. JENSEN: Don't worry about it, that's
an internal number, so you don't have to be 1:50PM
concerned about that. I'll let you know when it's
up.

THE WITNESS: Okay.

BY MS. JENSEN:

Q You should be able to see now what's been 1:50PM
previously marked as Exhibit 259.

(Discussion off the record.)

MS. JENSEN: Let's go off the record.

THE VIDEOGRAPHER: We are going off the
record at 1:50 p.m. 1:51PM

(Recess taken.) 1:51PM

THE VIDEOGRAPHER: We're back on the record at 1:52 p.m. Go ahead.

BY MS. JENSEN:

Q Ms. Frye, you should be able to see what 1:52PM has been marked as Exhibit 269 previously. So you'll need to go into your Exhibit Share and look. They are all chronological. So Exhibit 269.

MS. JENSEN: And for the record, this is APC-60382. 1:52PM

THE WITNESS: Yes, I see it.

BY MS. JENSEN:

Q Okay. Could you please scroll down?

A Which slide? Sorry.

Q This is the "Evolution of Resources" 1:53PM slide. It's the second-to-last slide.

A Yes.

Q Does this appear to be a true and accurate copy of the Shenandoah resource estimates over time?

MS. ROSENBERG: Objection to form. 1:53PM

THE WITNESS: Clarification, yes. From Shen 1 to Shen 3, it's the Shen 4, that was the agreed-upon value between exploration, development which was not presented to Bob Daniels at a later date. 1:53PM

BY MS. JENSEN: 1:53PM
Q So let's take it step by step.
So you referred to an agreed-upon number. Was the agreed-upon number at the RCT review the 426 or 425 number? 1:54PM
A Yes, it was 420 something, yes.
Q Okay. But this chart accurately depicts the resource estimates over time including the agreed-upon number after the RCT?
A I would point out that you would see here 1:54PM that the value post Shen 2 of the 426 is significantly lower, way less than half of the value that was being presented by Shenandoah 2 of the 1,200 million barrels versus 426 million barrels after Shen 4.
Q Okay. And you mentioned that after the 1:55PM compromise with the RCT review, that the exploration team still used the higher number?
A The exploration team used a higher number than the 426 when they presented to Bob Daniels after our RCT review. It was around 550 or close to that, 1:55PM if I recall correctly.
Still significantly lower, less than half what was being internally promoted for Shen 2 to our executive management.
Q And do you have an understanding as to who 1:56PM

in exploration decided to use the higher number? 1:56PM
A I do not because I would not be privileged to their conversations and why it was decided to do that.
MS. JENSEN: I'm going to show you another 1:57PM exhibit.
You should be able to see what's been previously marked as Exhibit 178.
For the record, this bears the Bates stamp APC-01166304. 1:58PM
THE WITNESS: Yes, I have it open.
BY MS. JENSEN:
Q Do you recognize this document?
A This looks like the exploration presentation that was presented to Bob Daniels at some point. 1:58PM
Q Okay. And how did you become aware that this presentation was made to Bob Daniels?
A All the development team knew that exploration was having the post drill Shen 4 meeting with Bob Daniels to review their current assessment. 1:59PM
Q And if you turn to Slide 10, what is the number that was being used for post drill Shenandoah 4 by the exploration team?
A 550 million barrels of oil equivalent.
Q Was that a significant difference from the 1:59PM

agreed-upon 425? 1:59PM
A By almost 100 million barrels, yes.
Q And in real dollar terms, is that a significant amount of money?
A Yes, that would be a significant amount of money. 1:59PM
Q Now, was the exploration number of 550 MMBOE, was it used for the portfolio purposes?
MS. ROSENBERG: Objection to form.
THE WITNESS: I believe it was at that time, but shortly after I was asked for a portfolio case to be -- to build one to be eventually put into portfolio. 2:00PM
BY MS. JENSEN:
Q But at least for some period of time, the 550 number was used for the portfolio to the best of your understanding? 2:00PM
MS. ROSENBERG: Objection to form.
THE WITNESS: To the best of my understanding, yes. 2:00PM
BY MS. JENSEN:
Q After the downward adjustment with the RCT review, did Anadarko correct its prior estimates about the resource range for Shenandoah?
MS. ROSENBERG: Objection to form. 2:00PM

THE WITNESS: Not that I am aware of. 2:00PM
BY MS. JENSEN:
Q Did Anadarko ever update the market on the resource range for Shenandoah after the significant downward adjustment that was made post Shen 4? 2:01PM
MS. ROSENBERG: Objection to form.
THE WITNESS: I did not read anything in the investor relations conversation that said there was going to be any kind of adjustment to Shenandoah. 2:01PM
BY MS. JENSEN:
Q After you learned that exploration was using the higher number, the 550 number instead of the lower agreed-upon 425 number, did you do anything? 2:01PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, I went to my supervisor.
BY MS. JENSEN:
Q Let me ask that question again because I'm not sure it came across on the transcript. 2:01PM
So after you learned that the exploration team was using the higher 550 number instead of the 425 number post RCT review, did you do anything?
A Yes, I went to my supervisor. 2:02PM

Q And your supervisor was Pat McGrievy? 2:02PM
A Correct, Pat McGrievy.
Q And what happened?
A I went to his office and I told him, I've learned that exploration has changed the mean resource 2:02PM size from what we agreed upon and post RCT.
And I told him I was not going to accept their valuation if it's being forced on me. Because at this point it was expected that it was going to fully transition to development. And I told him 2:03PM that it was wrong.
Q What did he say?
A Don't remember exact words. A lot of head nodding and saying -- agreeing that I shouldn't be forced to accept their resource range when we had an 2:03PM agreed-upon resource range between groups.
Q And did anything change after that?
A Not that I am aware of.
Q Did you draw any conclusions from that experience? 2:03PM
A Yes. I felt at this point that I could be implicated in a potential fraud to our outside investors if my name is attached to something that I don't agree with and I did not want any part of that. I was very concerned and I was a bit scared to be 2:04PM

frank. 2:04PM
Q So what did you do?
A I consulted with a lawyer, who happens to be David Minces.
Q For the record, I don't want you to relay 2:04PM conversations with your attorney, so I'm not asking for that. So you consulted with an attorney?
A Yes.
Q Did you do anything else?
A I at some -- I don't remember the exact 2:05PM timing on the date, but I knew there was at this point in time already a potential layoff coming up or a RIF you can call it. And I wrote a letter to my HR representative because depending on where you were in a new company, you had a person that was supposed to 2:05PM be the one that was your HR rep.
I wrote him to please include me in the RIF.
Q And did the company include you in the RIF? 2:05PM
A They did not.
Q Do you know others who were allowed to sever from the company in that RIF at the time?
A Yes.
MS. ROSENBERG: Objection to form. 2:06PM

BY MS. JENSEN: 2:06PM
Q Could you give me some examples?
A Yes. Brad Berg, the reservoir engineering supervisor. Beth Kendall that was working as a geophysicist on the Shenandoah project. 2:06PM
Jim Kunning, who was a drilling engineer from deep gulf water Mexico who we were already thin in the number of drilling engineers we had.
And Chuck, who I can't recall his last name, Chuck, starts with a C but, sorry, I can't 2:07PM recall last name. Geophysicist, working in development Gulf of Mexico where we also were very thin in the number of geophysicists that we had across the company.
And I'm sure there's more. Those are the 2:07PM ones that come to mind.
Q Was Robert Strickling also allowed to sever from the company?
MS. ROSENBERG: Objection to form.
THE WITNESS: I believe that's correct. 2:07PM
BY MS. JENSEN:
Q He was your counterpart on exploration, was he not?
A He was for a period of time until he had been promoted to the manager of the deepwater Gulf of 2:07PM

Mexico exploration engineers, so he was a manager at the time. 2:07PM

Q And for each of the people that you listed, were they all, to the best of your knowledge, provided severance packages? 2:08PM

A Yes.

Q Do you know anybody else whose request was denied?

MS. ROSENBERG: Objection to form.

THE WITNESS: No, I'm not aware of anybody else that had asked and was denied. 2:08PM

BY MS. JENSEN:

Q So what was your state of mind once you were not able to sever from Anadarko?

A I was very distressed to not really know what I wanted to do. I was concerned about my reputation as an engineer and that I would be associated with potential fraud. And I needed to step away from the company to get my hands around where do I go from here. So I took FML leave. 2:08PM 2:09PM

Q Did you consult with any physicians or medical providers?

A Yes, my regular doctor and then upon suggestion from my regular doctor, because I was having anxiety/depression issues, I worked with a 2:09PM

counselor. 2:09PM

MS. JENSEN: I'm going to show you an exhibit.

Okay. You should be able to see now a document that's been marked as Exhibit 353. 2:09PM

(Exhibit 353 was marked for identification by the court reporter.)

MS. JENSEN: And for the record, there is the Bates stamp FRYE2397.

THE WITNESS: Yes, I see it. 2:10PM

BY MS. JENSEN:

Q Does this appear to be a true and accurate copy of a statement by your attending physician at the time?

A Yes. 2:10PM

Q And did your attending physician advise you not to go back to work?

A Correct.

Q Did you go back to work?

A Ultimately, no. 2:10PM

Q Did you ultimately resign?

A Yes, I ultimately resigned.

(Discussion off the record.)

MS. JENSEN: Why don't we just go ahead and finish this next exhibit and then we can take a 2:11PM

break. 2:11PM

I have -- I'm sorry, just give me second here.

Okay. Ms. Frye, you should be able to see what's been marked as Exhibit 354. 2:12PM

(Exhibit 354 was marked for identification by the court reporter.)

MS. JENSEN: For the record, this is a document that bears the Bates stamp APC-2466.

THE WITNESS: I see it. 2:12PM

BY MS. JENSEN:

Q Does this appear to be a true and accurate copy of your resignation letter?

A Yes, it does.

Q Could you read into the record the second 2:12PM paragraph starting with "Over the last 18 months."

A "Over the last 18 months, Ernie Leyendecker pushed forward a portrait of the Shenandoah project that was beyond optimistic and in doing so violated nearly every aspect of our internal reporting and 2:12PM ethics guidelines. My repeated attempts to have the company follow these guidelines and practices and to report the find honestly and realistically were met with abuse and retaliatory behavior."

"The saddest part to me is that this was 2:13PM

copy of your whistleblower complaint to the SEC 2:55PM
dated May 9th, 2016?
A Yes.
Q Did Anadarko ever disclose the fact that
you filed a whistleblower complaint with the SEC? 2:56PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Not that I am aware.
BY MS. JENSEN:
Q Did Anadarko ever disclose anything about
your whistleblower complaint to the SEC in a public 2:56PM
statement?
A Not that I am aware of.
Q Did Anadarko try to keep you quiet about
your whistleblower complaint to the SEC?
MS. ROSENBERG: Objection to form. 2:56PM
THE WITNESS: As in how? Could you
clarify that?
BY MS. JENSEN:
Q Let's take it chronologically.
So after you filed this SEC report, 2:57PM
Anadarko, as I understand your testimony, did not
disclose it.
Approximately a year later, Anadarko wrote
off the entire Shenandoah project. Is that your
understanding? 2:57PM

MS. ROSENBERG: Objection to form. 2:57PM
THE WITNESS: Yes.
BY MS. JENSEN:
Q Are you aware that Anadarko wrote off the entire Shenandoah project after close of market on 2:57PM May 2nd, 2017?
A Yes.
THE VIDEOGRAPHER: Sorry, counsel. Ms. Frye, can you keep your responses up because we're having a hard time hearing you? Thank you. 2:57PM
MR. MINCES: It sounds like the volume might be different right now, Lea, than it was earlier.
(Discussion off the record.)
THE WITNESS: Yes. 2:58PM
BY MS. JENSEN:
Q What happened after you learned of the writeoff?
A I filed a lawsuit to clarify with a judge what my rights might be to share any information that 2:58PM I had to shareholders.
Q And why did you feel that you needed to file a lawsuit to share this information with shareholders?
A I felt the shareholders had a right to know 2:58PM

and that justice could be served by a court to see the fraud that had been happening by Anadarko to the shareholders. 2:58PM

Q Did you ask Anadarko prior to the lawsuit whether you could share the information with the investors? 2:59PM

MS. ROSENBERG: Objection to form.

THE WITNESS: Yes.

BY MS. JENSEN:

Q And what was the response? 2:59PM

A A lightly worded threatening of we will sue you, in layman's term.

Q Did you consider that an effort by Anadarko to keep you quiet about your whistleblower complaint? 2:59PM

A Yes.

Q So you filed a lawsuit to be able to share the information with shareholders. Was that lawsuit ever made public?

A At a much later date, yes. 2:59PM

Q And what was that date?

A I don't recall the exact date, but it was after the sale of Anadarko, the company.

Q How did the fact of your whistleblower complaint and the lawsuit become public? 3:00PM

A The judge declared -- and I may use wrong legal terminology and I apologize -- that it could be made available to the public and should not be redacted. 3:00PM

THE VIDEOGRAPHER: Can we take one minute, please? 3:00PM

We're going off the record. The time is 3:00 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 3:05 p.m. Go ahead, please. 3:05PM

MS. JENSEN: Okay. I'm going to show you what has been marked as Exhibit 356.

(Exhibit 356 was marked for identification by the court reporter.) 3:06PM

MS. JENSEN: For the record, this is a case -- published case decision styled Frye v. Anadarko Petroleum Corporation, and the cite is 593 F.3d 285 (5th Circuit 2019).

Q Ms. Frye, you referred to a judge saying that you should be able to share the information. Is this the court decision that you were referring to? 3:06PM

A Let me read it real quick.

Yes, it is. 3:06PM

MS. JENSEN: Objection, vague. 3:19PM
BY MS. ROSENBERG:
Q You can answer.
A The operations resided with the exploration team around drilling appraisal wells. 3:20PM
Q Let me clarify that to be clear.
When you joined the Shenandoah project in January 2014, the operations resided with the exploration team around drilling and appraisal; correct? 3:20PM
A Correct.
MS. JENSEN: Hold on. I was going to say misstates the record.
BY MS. ROSENBERG:
Q You worked on the development team at that 3:20PM time; correct?
A Yes.
Q Can you explain the difference between the exploration and the development teams?
A Can you be any more specific as to the 3:20PM differences?
Q Can you explain the difference in the projects and the goals for the exploration and development teams?
MS. JENSEN: Compound. 3:21PM

THE WITNESS: I'll address them one at a time. 3:21PM

The exploration goals were around finding new resources to bring forward to replace production that the company basically did. 3:21PM

You had another part in there beside the goals, I'm sorry?

BY MS. ROSENBERG:

Q Well, I just want to discuss both. So you mentioned the exploration goals. 3:21PM

What is the development goals?

A Development goals are for production, reserves, ensuring that we're following internal processes around reporting to the SEC and understanding economic viability and recommending 3:21PM projects that are economically viable to take forward to production.

Q Now, you mentioned earlier that you had previously worked on the exploration team; is that right, not for Shenandoah but at Anadarko? 3:22PM

A Correct.

Q Was it common in your experience at Anadarko for development and exploration teams to disagree?

MS. JENSEN: Objection, vague. 3:22PM

THE WITNESS: As in to disagreeing on what? 3:22PM

BY MS. ROSENBERG:

Q To disagree, for example, on the potential resource size for a project? 3:22PM

A Let me answer that by saying there can be differences between groups, but in this particular project there was lack of following our internal processes and internal guidance around how to evaluate a particular prospect. 3:23PM

And that was the distinct difference in this particular project.

Q Let me make sure that I understand your testimony.

If I'm understanding you correctly, it was common for development and exploration teams to disagree, but in your experience you thought the scope of that disagreement was bigger in Shenandoah; is that fair? 3:23PM

MS. JENSEN: Objection, misstates the testimony. 3:23PM

MR. MINCES: Same objection.

THE WITNESS: That's not what I said.

As I said previously, the difference here was that they were not following our internal 3:23PM

processes and policies around how to correctly 3:23PM
evaluate the resource. And that was the difference
between the two groups in how we saw this project.
BY MS. ROSENBERG:
Q And just to be clear, when you say 3:23PM
"they" --
A Exploration.
Q -- didn't follow the processes, you mean
exploration?
A Exploration. 3:24PM
Q Only. Now, you -- when you first joined
the Shenandoah team in January 2014, Shen 2 had
finished its drilling; correct?
A That's correct.
Q What were the results of the Shen 2 well? 3:24PM
A The results of the well is that they found
hydrocarbon in roughly a thousand feet of net pay.
Q For someone who is not familiar with oil
drilling, can you give me some sense of what finding
a thousand feet of net oil pay in the Gulf of Mexico 3:24PM
means?
MS. JENSEN: Objection, vague.
THE WITNESS: Let me think on how to
explain that in layman's terms.
(Reporter clarification.) 3:25PM

THE WITNESS: Finding a thousand feet of 3:25PM
net pay means you have found hydrocarbons that over
a vertical segment would equivalate to a thousand
feet in measurement.
BY MS. ROSENBERG: 3:25PM
Q How does that compare to Anadarko's other
oil discoveries in the Gulf of Mexico?
MS. JENSEN: Objection, vague.
THE WITNESS: Do you have a particular one
in mind? 3:25PM
BY MS. ROSENBERG:
Q You worked on other oil projects in the
Gulf of Mexico; correct?
A I did, correct.
Q Lucius, you worked on Lucius; correct? 3:26PM
A Correct.
Q What was the largest net oil pay for a
single well at Lucius?
A I'm not going to recall an exact number.
What I can say is there was a huge difference between 3:26PM
Lucius and Shenandoah because I don't remember exact
pay numbers on Lucius. It's been ten, 15 -- you know,
not 15, it's been over ten years.
And the differences were in the Lucius
well, the net pay was found over one consecutive 3:26PM

A The true definition of an oil-water contact is when you can have the oil literally sitting on top of the water and you can see that as drilled through a sand body and that sand body would be a true definition of an oil-water contact. 5:46PM 5:47PM

Q Given uncertainties in oil drilling, it's often -- do you agree that it's difficult to define oil-water contacts with certainty?

MS. JENSEN: Objection to the extent it calls for speculation. 5:47PM

THE WITNESS: Can you clarify a little bit more what you're asking me, please?

BY MS. ROSENBERG:

Q Sure. You said a minute ago the true definition of an oil-water contact is when you can have the oil literally sitting on top of the water and you can see that; right? 5:47PM

A Correct.

Q Based off of the data, depending on the data you get, you might not be able to assess that; correct? 5:47PM

A If you're implying that we don't always drill directly through an oil-water contact, I would agree with that statement.

Q Right. So there is a distinction then 5:48PM

between drilling through an oil-water contact and 5:48PM
projecting an oil-water contact?
A Correct.
Q And if you project an oil-water contact,
that's not a definitive identification of the 5:48PM
oil-water contact; correct?
MS. JENSEN: Objection, form.
THE WITNESS: As you said, it's a
projection.
BY MS. ROSENBERG: 5:49PM
Q Now, you also discussed before a little
bit about the pressure communication between Shen 2
and Shen 3.
Do you recall that?
A Largely, yes. 5:49PM
Q You testified that it wasn't definitive
that Shen 2 and Shen 3 were in pressure
communication; right?
MS. JENSEN: Objection, asked and
answered. 5:49PM
THE WITNESS: As stated previously, yes.
BY MS. ROSENBERG:
Q One possibility for that reason as you
indicated is that perhaps there is a sealing fault
between Shen 2 and Shen 3; right? 5:49PM

A As stated in my previous statement, yes. 5:49PM
Q But at the time Anadarko did not know one way or the other whether there was in fact a sealing fault between those two wells; right?
MS. JENSEN: Foundation, misstates 5:49PM evidence.
THE WITNESS: I would clarify that there were maps that had map faults between Shen 2 and Shen 3 within the company of Anadarko.
BY MS. ROSENBERG: 5:50PM
Q Did you know whether those faults were sealing faults at the time?
MS. JENSEN: Objection, vague.
THE WITNESS: That's a question that's probably highly unanswerable in any field anywhere. 5:50PM
BY MS. ROSENBERG:
Q Can you use oil-water con -- excuse me, withdrawn.
Is it possible to project oil-water contacts by using pressure data from two different 5:50PM wells if those wells are in pressure communication?
MS. JENSEN: Objection to the extent it calls for speculation, hypothetical.
THE WITNESS: Sorry, can you repeat?
BY MS. ROSENBERG: 5:51PM

Q Sure. Do you agree that you can project oil-water contacts with pressure data from two different wells so long as they are in pressure communication? 5:51PM

MS. JENSEN: Same objections. 5:51PM

THE WITNESS: The science would support being able to do that if those wells are definitely in communication, but that has to be a known factor.

BY MS. ROSENBERG:

Q And two wells can be in pressure communication even if there is a fault between them; right? 5:51PM

MS. JENSEN: Objection to the extent it calls for speculation, calls for a hypothetical.

THE WITNESS: I would clarify that there are wells that have faults between them that are not in communication. 5:52PM

BY MS. ROSENBERG:

Q And there can also be wells with faults between them that are in communication; right? 5:52PM

A The fault will always act as a baffle of some sort.

Q I'm sorry, I missed the word. Act as a?

A Baffle, I would describe that as -- I'm trying to think of an analogy. It does not have -- 5:52PM

A Yes. 6:38PM
Q Bealer Management Consulting, does that ring a bell?
A Oh, at one point. He had since not been doing that for many years. 6:39PM
Q So he hadn't been working at Bealer Management Consulting for a while?
A Yes, prior to -- I don't remember the exact date either, but it had been several years before I left the company. 6:39PM
Q You mentioned that you contacted Mr. Minces at some point; right?
A Correct.
Q When was that?
A It was early 2016 when, after all of that 6:39PM had happened and I was at that point in time really concerned about what was going on with the Shenandoah project and that my name would be associated with a project that was being miscommunicated on purpose, misleading our investors. 6:39PM
Q Mr. Minces is an employment attorney; right?
A Correct.
MR. MINCES: Objection, form.
BY MS. ROSENBERG: 6:40PM

Q And had you previously -- and obviously 6:40PM
don't get into details if the answer is yes. But
had you previously had any engagements with
Mr. Minces?
A No. 6:40PM
Q You learned that there was going to be a
round of involuntary layoffs at Anadarko in February
of 2016; right?
MR. MINCES: Objection, form.
THE WITNESS: I don't remember the exact 6:40PM
time frame. It was early 2016, though.
BY MS. ROSENBERG:
Q In early 2016, you learned there was going
to be a round of involuntary layoffs at Anadarko;
right? 6:40PM
A I assume that's the correct date, but yes.
Q Is that sometimes referred to as a
reduction in force?
A Yes.
Q How did you hear about the layoffs? 6:41PM
A Through the communication via email from
somebody in the company. I don't recall who.
Q Did the company tell its employees that
there was going to be a large involuntary layoff?
A Yes. 6:41PM

Q You were aware that Anadarko would provide a severance payment to anyone who was laid off; right? 6:41PM
MR. MINCES: Objection, form.
THE WITNESS: Correct. 6:41PM
BY MS. ROSENBERG:
Q Was that told to employees by the company when they announced the involuntary layoffs?
A I don't want to guess, so I can't answer with honesty that I know exactly how it was communicated. 6:42PM
Q In any event, you contacted human resources and asked to be included in the involuntary layoff pool; right?
A Yes, I did. 6:42PM
Q Was that on or about February 19th of 2016?
A Sounds roughly around the time.
Q Let me show you an exhibit.
MS. ROSENBERG: Okay. I've introduced as Exhibit 365 an email chain between you and Dalon Schuckman dated February 19th, 2016 with a Bates stamp APC-00670780. 6:42PM
(Exhibit 365 was marked for identification by the court reporter.) 11:33AM

BY MS. ROSENBERG:
Q Do you recognize this?
A Yes, I do.
Q And who is Mr. Dalon Schuckman?
A He would be an HR representative and there were several throughout the company and they would assign certain representatives to certain portions of the company. 6:43PM
So he might have been assigned to the deepwater Gulf of Mexico development, for example. 6:44PM
(Reporter clarification.)
BY MS. ROSENBERG:
Q You wrote to Mr. Schuckman, "I feel that working at Anadarko is no longer a positive for me. Without wanting to go into details, I believe that it would be in the best interest of all parties if Anadarko were to include me in the involuntary layoff pool." 6:44PM
Do you see that?
A Yes, I do. 6:44PM
Q And Mr. Schuckman responded almost immediately; right?
A It appears by the time stamp it was pretty prompt, 15 minutes maybe.
Q And he copies Pat McGrievy, your 6:44PM

Mr. McGrievy? 6:46PM
A No, I did not.
Q Do you recall what you told Mr. McGrievy about why you wanted to be included in the involuntary layoff pool? 6:46PM
A I do not recall exactly what I said, no.
Q Did you express at the time to him any concern -- withdrawn.
Did you express to him in any way that the reason you wanted to be included in the involuntary 6:46PM layoff was because of concerns you had with Shenandoah?
MS. JENSEN: Objection to the form.
THE WITNESS: I don't recall exactly what I said, honestly. 6:46PM
BY MS. ROSENBERG:
Q But you don't recall saying that?
A I don't recall saying that either.
Q You respected Mr. McGrievy; right?
A Yes. 6:47PM
Q You had a good working relationship?
MS. JENSEN: Vague as to time.
BY MS. ROSENBERG:
Q You can answer.
A Yes. 6:47PM

BY MS. ROSENBERG: 6:47PM
Q Mr. McGrievy had given you positive employee reviews; right?
A Correct.
Q You were also aware when you worked at 6:47PM Anadarko that there was an anonymous hotline that could be used to submit complaints about suspected wrongdoing; correct?
MS. JENSEN: Objection to the form, vague.
THE WITNESS: I'll clarify, yes, there was 6:47PM a hotline.
BY MS. ROSENBERG:
Q You were aware of it?
A I was aware of it, but I will clarify that there had been very many -- I won't say very many, I 6:48PM don't know how to say it.
But I had heard through the grapevine that the hotline was not necessarily acting in favor of the person that was reporting to the hotline.
Q You did not submit a call or a complaint 6:48PM to the hotline; right?
A I did not because I did not have faith in the company with the behaviors that I continued to have seen that they would act on my behalf anonymously. 6:48PM

Q You were also aware that the company had 6:48PM
an ethics and compliance group that could receive
complaints as well; right?

A Actually, no, I was not aware of that.

Q Now, you were later told that you would 6:49PM
not -- that you had not been selected to participate
in the involuntary layoff; correct?

A Correct.

Q Do you recall when that was?

A It would have been the day of the voluntary 6:49PM
layoff. Whatever date that was, I don't recall.

Q How were you notified?

A Pat McGrievy would have come to my office
and told me I was not included.

Q Did Mr. McGrievy explain why you were not 6:50PM
included?

A He would have explained at a high level that
they did not include me for reasons that the company
wanted to keep me. Not specifics.

Q The company wanted to keep you on the 6:50PM
development team?

A Yes.

MR. MINCES: Objection, form.

MS. ROSENBERG: Let me show you a
document. 6:50PM

MS. ROSENBERG: Objection to form. 7:52PM
THE WITNESS: No.
BY MS. JENSEN:
Q The Shen 4 sidetrack 1 and BP, under that it says, "UW Faulted out?" 7:52PM
Do you see that?
A Yes.
Q What does that mean?
A I believe that was referring to the bypass well and that between the sidetrack and the bypass 7:52PM well, that upper Wilcox was not present.
Q And is this some of the data that you described earlier to Ms. Rosenberg that came out after the initial well results were known?
MS. ROSENBERG: Objection to form. 7:52PM
THE WITNESS: Can you say that again?
BY MS. JENSEN:
Q So you said that some of the information was still coming out as the well results were coming in. 7:53PM
Is the data about the faulting in Shenandoah 4 sidetrack, was that some of the information that was known after the initial well results came in?
MS. ROSENBERG: Objection to form. 7:53PM

THE WITNESS: Yes. We would have had additional log, additional data from the well that would help us piece together this kind of information that was not known when we had that exchange of emails. 7:53PM

BY MS. JENSEN:

Q That was the information that led to the conclusion that there was small-scale faulting happening in Shenandoah; right?

A Yes. 7:53PM

Q And the results of Shen 4 meant that almost half of the resource was knocked out?

MS. ROSENBERG: Objection to form.

THE WITNESS: Yes.

BY MS. JENSEN: 7:54PM

Q There's also Shen 4 sidetrack 2 here and it says, "DNR Wilcox."

What does that mean?

A "Did not reach" is what DNR is short for, so did not reach the Wilcox. 7:54PM

Q And does it refresh your recollection that it hit tar and was abandoned?

A That's correct. I forgot about that.

Q I would like to turn to Slide 9. The slide here has a -- let me ask you one more question 7:55PM

about that prior slide. 7:55PM
So none of this about Shen 4 was a surprise to the executive committee as far as you could tell; is that correct?
A Correct. 7:55PM
Q So Slide 9, this decision tree states at the top that there is no injection. What does that mean?
A That was in reference to capital money and wells associated with putting water injection to 7:55PM develop the field.
Q And so there was no cost inputs for injection in this economic case?
A No.
Q And if the water injection had been 7:56PM included as a cost in this case, would that have changed the economics in a negative way?
A Yes, because the costs would be higher without potential for a major increase in recovery.
Q Do you recall that earlier we looked at 7:56PM some documents where Dan from ConocoPhillips was asking whether water injection might have to be the base case?
A Yes, I do recall.
Q And water injection was included in your 7:56PM

Q You went to a medical professional. Were you shaking and crying when you went to that medical professional? 8:01PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes, I would have been. 8:01PM
BY MS. JENSEN:
Q And was that related to the anxiety you were feeling at work?
A Yes, it was.
Q And at that point the anxiety was around feeling that you could be blamed as complicit in this fraud? 8:02PM
MS. ROSENBERG: Objection to form.
THE WITNESS: Yes.
BY MS. JENSEN: 8:02PM
Q We discussed -- or Ms. Rosenberg asked you some questions about a lunch that you went to. Was that with some of your colleagues?
A After I left the company?
Q Yes. 8:02PM
A Yes.
Q Before you left, did you tell them what your plans were to do?
A No, I did not.
Q And was that because you wanted to protect 8:02PM

them from the fallout? 8:02PM
MS. ROSENBERG: Objection, form.
THE WITNESS: Yes, I did not want to drag them into this.
BY MS. JENSEN: 8:03PM
Q Ms. Rosenberg asked you whether you called the company hotline and your testimony was that you didn't trust the company to act in your best interests.
Do you believe that your concerns were 8:03PM borne out in the way that the company has treated you since you reported them to the SEC?
A Yes, I do.
Q How so?
A There was incidents around shortening my FML 8:03PM leave, incidents around trying to not pay me my entire vacation leave, canceling my health insurance before it was -- they should not have canceled my health insurance at that time frame because I was still under an FML leave. And the multiple threatening letters 8:04PM around suing me in regards to asking the judge to clarify whether or not I could release information that I needed to the shareholders.
Q Why did you want to release that information to the shareholders? 8:04PM

A I felt it was the right thing to do, that 8:04PM
the shareholders should know and that the case should be tried in court fairly.

Q Now, Ms. Rosenberg asked you some questions about your stock and we talked about your 8:04PM
bonuses earlier today.

Do you remember that testimony?

A Yes, I do.

Q What was your practice in selling stock?

A The stock would come vested in portions per 8:05PM
year and once stock would become vested, within a reasonable time frame of that vesting, I tried to sell stock.

That was a strategy among many of the engineers in the company and a strategy that my 8:05PM
husband and I also discussed as being best for our portfolio of investments to make sure we didn't have too much money in one component stock.

Q And so it was your practice to sell it right away after it vested? 8:05PM

A Shortly after, yes.

Q Now, Ms. Rosenberg showed you an email where you followed the protocol to request permission to sell the stock.

Do you recall that email that 8:06PM

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 11, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS
CSR No. 6811

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
______________________________ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
DEPOSITION OF CATHERINE ANNE GREEN

Wednesday, September 28, 2022
Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5421322

BY MS. ROSSI:

Q. Okay. You should be able to see an exhibit that's been marked as 339.

And, for the record, this is Bates Number APC00718257. 12:07:19

Ms. Green, do you recognize this document?

A. Yes.

Q. What is it?

A. This is an e-mail that I sent to Chris Champion with two attachments in November of 2016. 12:07:40

Q. And is this a true and accurate copy of an e-mail between you and Chris Champion on November 15th, 2016?

A. I believe so.

Q. And the subject of the e-mail is, "FW: Shen Accounting Memos"; correct? 12:07:56

A. Yes.

Q. And there's two attachments to this e-mail; correct?

A. Yes. 12:08:14

Q. The first attachment is titled "Suspended Well Control Memo (Final).docx"; correct?

A. Yes.

Q. And then the second attachment is titled "DH Analysis (Final).docx"; correct? 12:08:32

A. Yes.
Q. Turning to this first attachment, it is a memorandum with the subject "Suspended Wells Controls Assessment"; correct?
A. Yes. 12:08:56
Q. And it's dated November 10th, 2016; correct?
A. Yes.
Q. When was this memorandum prepared?
A. It was prepared late October/early November of 2016. 12:09:10
Q. And did you write this memorandum?
A. This memo, I did, yes.
Q. And why did you write this memorandum?
A. In the -- because in the third quarter of 2016, it came to our attention that, as you pointed out earlier, that the resource estimate did not increase at yearend 2014 based on the Shen 3, and that Cathy had relied on the future utility of the wellbore as the predominant basis for suspending Shen 3. 12:09:24 12:09:50
And so, I was the internal controls manager at third quarter 2016, and we did an evaluation of the internal control impact related to that. 12:10:06

Q. Okay. And how did this come to your attention?

A. So during the third quarter of 2016, I was notified of the investigation that was occurring and had discussions within accounting. Also, during third quarter where they were evaluating the future utility based on various studies that had been completed that quarter. 12:10:18

So let me just clarify, so Chris Champion informed me of the investigation, and then later, I was asked by Jen Edwards to write a -- the well -- the suspended well controls memo. 12:10:38

Q. And your memo found that there was a deficiency in internal controls; correct?

A. Yes. 12:10:56

Q. And how did you determine that Ms. Douglas relied on this information to suspend the cause?

MR. WYLLY: Objection.

THE WITNESS: That information actually came to me via the second memo that is in the attachments here that was drafted by Louis Williams and the property accounting team at that time. So based on discussion with Louis from the memo that his team had drafted and from discussion with Chris Champion. 12:11:14 12:11:48

BY MS. ROSSI:
Q. Okay. So turning to page 2 of this exhibit, which is 339, which is actually the first page of your memo -- I'm sorry, I did mean to look at the second page of your memo. So the second page 12:12:11 of your memo, there is a sentence that's the first sentence of that first full paragraph on that second page. It starts with "During the third quarter of 2016."
And so as you testified, that's when it 12:12:34 was brought to your attention; correct?
A. Yes.
Q. Okay. And then at the bottom of the first page, so the first page of your memo, which is APC-00718258. And it's towards the bottom, but it's 12:13:00 not the last sentence, it's the second-to-last sentence in this paragraph. It states, "No new information came to the attention of Property Accounting during subsequent quarterly discussions with Exploration that indicated the resource 12:13:17 estimates decreased following" -- "following the drilling of the Shenandoah-3 well."
Did I read that correctly?
A. Yes.
Q. Did accounting require -- inquire at the 12:13:34

A. Well, in the technical -- you know, the way that a reservoir engineer, any time you're talking about unproved, it's not a reserve, it's a resource.

So, yeah, I mean, you -- the word "reserves" getting thrown around a lot, but technically, what we were talking about in an unproved property was resources -- resource estimates. 13:04:32

Q. Ms. Green, I've been asking yes-or-no questions, so I'm going to move to strike that response -- I'm sorry. Move to strike your last response as unresponsive. 13:04:45

So again, it states: "An exploratory well finds reserves but those reserves cannot be classified as proved when drilling is completed," meaning the well has to find reserves; correct? 13:04:59

A. That is what it states, yes.

Q. Okay. So I'm going go back to exhibit -- I apologize. I'm looking for the number -- Exhibit 338. And this should be the e-mail between you and Louis Williams that attaches your Shenandoah 3 memorandum from 2014; correct? 13:05:25

A. Yes.

Q. Okay. Under the "Summary" heading, which 13:05:53

we looked at already, in that second paragraph, you -- you wrote: "Pressure data collected in this appraisal well can be used to project an oil/water contact between the discovery and the appraisal well and since the projected oil/water contact is close 13:06:22 to the appraisal well, the data suggests a higher confidence," and in parens, "(and therefore increase)," close parens, "in the resources of the field."

Correct? 13:06:40

A. Yes.

Q. And as you testified earlier, that sentence you drafted was based on the information Forrest Burton provided to you; correct?

A. Yes. 13:06:49

Q. Where did you learn that there was an increase in the resource of the field?

A. I believe in the discussion in the impairment meeting, I left that meeting believing that the resource estimates had increased. We had 13:07:05 discussion in that meeting in relation to the similarities of the Shen 3 well to a Heidelberg well, which was one of the three examples, the limited examples that I referred to earlier where there were not hydrocarbons in the wellbore. And 13:07:23

the fact that the Heidelberg well, you know, had increased the reserves that they would ultimately be booking when they booked proved reserves.

And so, we certainly had a lot of discussion and analogy to the Heidelberg well. And then based in the followup on his e-mail where he talked about the higher resource -- the higher-confidence resources should increase. That confirmed, in my mind, that the resource estimates had increased based on the information gathered from the Shen 3 well. 13:07:36 13:07:52

Q. Was -- Forrest Burton was in that meeting; correct?

A. In the impairment meeting, yes.

Q. Were there other exploration personnel in that meeting? 13:08:03

A. So I believe that one of the financial analysts on his team, Diane Sease, was also in that meeting, but not anybody else from the exploration project teams. 13:08:20

Q. So Forrest Burton told you that the resource size increased in that meeting?

A. That was my understanding.

Q. And you just accepted that?

A. Yes. Forrest was the representative of 13:08:29

exploration team [verbatim]. Our defined processes were, that we met him quarterly, you know, with the intention that he would be representing, you know, the true and accurate information on the status of wells and the status of the projects of the 13:08:44
exploration projects.

Q. And did Forrest Burton give you any documentation to support that?

A. No. In the ordinary course of business, we did not get doc- -- any -- any documentation -- 13:08:56
any additional documentation other than verbal discussion.

Q. Okay. And you testified earlier that this memorandum was sent to Cathy Douglas. That was your understanding; correct? 13:09:09

A. That's right.

Q. And then in 2016, you find out that Cathy Douglas made the decision to spen- -- suspend the well based on differing -- different reasons that what is documented in this memorandum; correct? 13:09:25

A. Yes.

Q. Cathy Douglas never came back to you to state that this was the incorrect reason for suspending Shenandoah 3?

A. No. I sent a followup e-mail beginning of 13:09:38

January 2015 to Louis asking if there were any followup -- was any followup on the e-mail with this memorandum attached, and he responded "no." And so --

Q. So no -- so no -- 13:09:54

(Simultaneous speaking.)

(Interruption in audio/video.)

THE COURT REPORTER: I'm sorry, one second. If we can slow down, there are multiple people speaking. 13:09:59

MS. ROSSI: I'm sorry.

BY MS. ROSSI:

Q. So no one ever communicated to you that the reasoning in your memorandum was incorrect?

MR. WYLLY: Objection. 13:10:07

THE WITNESS: No.

BY MS. ROSSI:

Q. So no one ever communicated to you that there was not an increase in the resource of the field until 2016? 13:10:19

MR. WYLLY: Objection.

THE WITNESS: That's right.

(Simultaneous speaking.)

(Interruption in audio/video.)

BY MS. ROSSI: 13:10:25

Q. Okay. I'm going to --

THE COURT REPORTER: Excuse me, one second. Was there an objection? Because there was some talking over.

MR. WYLLY: There was. 13:10:35

BY MS. ROSSI:

Q. And does prop -- so the reasoning that Cathy Douglas gave was that it could potentially have future utility; correct?

A. That's what I learned in 2016. 13:10:47

Q. Okay.

A. And for predominant -- sorry, as the predominant basis for --

(Interruption in audio/video.)

THE COURT REPORTER: Excuse me, could you 13:11:05 start that over. And for -- sorry, as the predominant basis for...

THE WITNESS: Keeping the well suspended.

BY MS. ROSSI:

Q. So property accounting relies on the 13:11:13 exploration team to provide true and correct information about whether a sidetrack well or a water injection well is a viable option; correct?

A. That wasn't the focus of the discussion at yearend 2014 because we believed the resource 13:11:28

by ConocoPhillips.

Do you have any reason to doubt that this is a true and accurate copy of an e-mail chain between Tim Trautman and Carlotta Chernoff?

A. No. 13:18:53

Q. Who's Tim Trautman?

A. He was in the exploration team. I don't know what his specific role was on the Shenandoah project.

Q. Okay. And I'm going to direct you to this 13:19:03 top e-mail. And it states, "I am hoping that we encounter very 'conclusive' results from Shenandoah 4 (and possibly from a Shenandoah 4 sidetrack" -- "sidetrack) that leads us down another avenue not requiring an up-dip sidetrack from Shenandoah 3 - 13:19:46 particularly if it is concluded that an 'aggressive' sidetrack from Shenandoah 3 has limited chance of success at meeting the objective of testing the 'projected' oil/water contact."

Do you see that? 13:20:03

A. Yes.

Q. Did I read that correctly?

A. I think so.

Q. So you were not aware of this information in 2014; correct? 13:20:12

A. I was not aware.
Q. Do you know if Cathy Douglas was aware of this information in 2014?
A. I do not know what Cathy was aware of.
Q. Would you have liked to have been aware of this information in 2014? 13:20:34
MR. WYLLY: Objection.
THE WITNESS: Yes, of course.
BY MS. ROSSI:
Q. Okay. I am going to -- sorry, looking at the same e-mail, it says, "I PERSONALLY perceive that it should be within a couple of months (not much longer) before we understand the issues and determine if the operation is feasible and worth the risk." 13:20:46 13:21:20
Do you see that sentence?
A. Yeah, let -- can I take a minute to read it again?
Q. Of course.
A. Okay. 13:21:29
Q. Did anyone from exploration ever come back to property accounting and dis -- disclose whether or not there was feedback on whether the operation was feasible?
A. I -- I -- for -- at yearend '14, the 13:21:47

answer is no on that. But, again, we were focused on the predominant basis in property accounting of the information and the increase in resource estimates. And then in past Q1 of '15, I wasn't involved in any discussions on -- on the future 13:22:09 utility of the Shen 3 wellbore.

Q. But nobody from exploration ever came back and said that the resource size had actually decreased; correct, before 2016?

A. That's my understanding based on the 13:22:26 information I got from property accounting covering the period after Q1 of '15 through -- through third quarter of 2016.

Q. They also did not come back and say that a sidetrack or water injection well would be viable; 13:22:44 correct?

A. Not at yearend '14 when I was involved. And, again, I wasn't involved past Q1 of '15.

Q. Okay. So they did not come back with information regarding the future utility of 13:22:58 Shenandoah 3; correct?

A. That's right.

Q. Okay.

A. To my knowledge.

Q. Okay. 13:23:08

A. Yeah.
Q. You were a supervisor in property accounting at one point; correct?
A. Yes.
Q. And you left property accounting, as you testified, prior to Shen 4 -- excuse me, I guess prior to -- to Shen 4 being finished; correct? 13:23:22
A. I believe so, yes.
Q. And as you testified, you were not aware that Shenandoah 4 drilled into salt; correct? 13:23:40
A. Right.
Q. But as a supervisor, would you expect that Shenandoah 4 being drilled into salt would have been discussed during an impairment meeting?
MR. WYLLY: Objection. 13:24:00
THE WITNESS: I wouldn't want to speculate on the discussions that were held.
BY MS. ROSSI:
Q. But did you have discussions during your time in property accounting in impairment meetings regarding what the wells had found? 13:24:07
A. Yes.
Q. Did you discuss resource size in impairment meetings?
A. We generally didn't talk specifics about 13:24:23

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: 3rd day of October, 2022



Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------x

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Civil Action No. 4:20-cv-00576 |

---------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
ROBERT G. GWIN
Wednesday, October 26, 2022

Reported By: Lynne Ledanois, CSR 6811
Job No. 5378978

A That's correct. 11:55AM
Q And so after you received this briefing, Chuck Meloy responded to -- replied all with a jubilant response; right?
A Yes, he did. 11:55AM
Q It was, "Booyah and thumbs up to our exploration team once again"?
A Yes.
Q That was referring to the news at Shenandoah; right? 11:55AM
A Yes. It appears to be. Chuck ran our development organization and so he was congratulating exploration organization on their success with that well.
Q And Al Walker responds with a "I will second that. We are on our way to three digits." 11:55AM
And what do you -- what did you understand Al Walker's email to refer to?
A I don't know. I wouldn't speculate. I don't remember getting the email even though I was clearly on it and then I responded to everyone congratulations as well obviously. 11:56AM
Q And his reference -- Mr. Walker's reference to three digits, do you understand that to be the stock price? 11:56AM

A It could have been, yes. I don't know where our stock was trading at that time. So I don't know that it was. It could have been. 11:56AM
Q It's a reasonable assumption; right?
A I think it's reasonable. 11:56AM
Q And so Al Walker is saying that the good exploration news from Shenandoah meant that the Anadarko stock price was on its way to over $100 per share?
A I think it's reasonable to assume that, but again, I don't know what he's specifically referring to. 11:56AM
Q It's a reasonable conclusion?
A I think as I already stated, it's reasonable. 11:57AM
Q And it did make its way to over $100 a share after this news; right?
A I don't know. It traded -- during my time at the company, it traded over $100. I don't remember if it was around this time or later or earlier, frankly. But I'm -- I know that it traded above 100 during my tenure there. 11:57AM
Q Okay. We talked a little bit earlier about John Colglazier, which for the record, is his last name spelled C-O-L-G-L-A-Z-I-E-R? 11:57AM

A Yes. I'm almost sure that's right. It's in 11:57AM
this email, so you can see it there in the cc field.

MS. JENSEN: You should be able to see a document that I've marked as Exhibit 442.

For the record, this is a document that 11:58AM
bears the Bates stamp APC-159016.

(Exhibit 442 was marked for identification by the court reporter.)

THE WITNESS: I have it open.

BY MS. JENSEN: 11:58AM

Q Does this appear to be a true and accurate copy of an email exchange between yourself and John Colglazier, who we just referred to, on February 2nd, 2015?

A Hold on. I'm sorry, I'm zooming in so I can 11:59AM
see the full numbers.

You said February 2nd, 2015?

Q Yes.

A Yes, it does.

Q Your comment to John was "Well done on 11:59AM
Shenandoah. You got their attention."

What were you referring to?

A I don't know. I need to see what was said down below. I'm sure I was referring to John's discussions with TPH Energy Research. But let me see 11:59AM

you. 3:19PM
You should be able to see what has been previously marked as Exhibit 269. And for the record, this is APC-60382.
THE WITNESS: Okay. I have to figure out 3:20PM how to navigate it back to -- hold on. I think I should be able to get out of -- I'm still in the native PowerPoint working my way back, I'm sorry, to the master file list.
I need tech help. 3:20PM
THE VIDEOGRAPHER: Off the record. It's 3:20 p.m.
(Recess taken.)
THE VIDEOGRAPHER: Back on the record. It's 3:22 p.m. 3:23PM
BY MS. JENSEN:
Q Okay. Welcome back, Mr. Gwin. You can see what's been marked as Exhibit 269 now?
A I can, yes.
MS. JENSEN: Okay. And for the record, 3:23PM this is a document that bears the Bates stamp APC-60382.
Q Have you seen this document before?
A I don't think so.
Q Can you scroll down to the attachment, 3:23PM

which is a native PowerPoint slide? 3:23PM
A I'm scrolling.
Q Do you see here there is a slide which is "Evolution of Resources"?
A Yes. 3:23PM
Q And below that header is "Shenandoah Resource Estimates"?
A Yes, the header for the table, yes.
Q And you see on the left-hand side, there's reference to various Shenandoah wells plus one 3:23PM Yucatan well?
A Yes.
Q And the axis to the right is gross resources or MMBOE?
A You said the estimate to the right? Oh, 3:24PM you're talking about like the X-axis. Yes, I see that.
Q Thank you.
A Yes.
Q You see that refers to "Gross Resources 3:24PM (MMBOE)"?
A Yes.
Q And do you see that the Shenandoah -- post-drill Shenandoah 2, the P90 is over 900 and the P10 is somewhere over 1400 with a mean of 1200? 3:24PM

A This is post-drill Shenandoah 2? 3:25PM
Q Yes.
A Yes, I see that.
Q And the blue is demarcated from P90 to P10. 3:25PM
Do you see that?
A Yes.
Q Okay. Now, there is a reference to post Shen 3, both a faulted and a non-faulted model. The fault model goes down to 740 MMBOE for the mean. 3:25PM
Do you see that?
A I see the one that says "fault model." Is the one above it the one that you're referencing that you were saying is the unfaulted?
Q So the one above the fault model is the 3:25PM unfaulted, that's right, even though it doesn't say unfaulted.
A I don't know if that's accurate. It may be, but I think -- I just wonder if -- and it may be semantics, but I'm assuming that there are a variety 3:25PM of different fault models on a continuum, one is not completely unfaulted and one completed faulted. But I don't know.
Q Let's look at what the mean is for the fault model. Okay? That's 740? 3:26PM

A Yes, that's what it says. 3:26PM
Q Then post-drill Shen 4, you see the mean is 426 MMBOE?
A I do.
Q And do you see that there is no overlap 3:26PM between the post Shen 4 blue column of P90 to P10 with the post Shen 2 blue, which is P90 to P10.
Do you see that?
A Actually, I don't. I see overlap between those. 3:26PM
Q Do you see that the P90 for post Shen 2 is higher than the P10 for --
A You're focused on the blue. I'm sorry, the ranges that are here are P1 to P99, and they do overlap. So you're looking at the truncated ranges of 3:27PM P10 to P90?
Q I'm talking about the P10 to P90 which we've been talking about all day. Those in the blue; correct?
A The blues don't have an overlap between 3:27PM those two cases because all the Shen 3 stuff that explains the differences is in between them, yes.
Q Right. So there is no overlap in the blue, the P90 to P10, between post Shen 2 to post Shen 4; right? 3:27PM

A Correct, with regard to the blue. 3:27PM
Q Okay. You can set this aside.
So we should be back into regular old documents that don't cause us more technical problems. But we'll see. I'm going to mark another 3:28PM exhibit.
A I don't see it yet.
Q It should be up. It's Exhibit 453.
(Exhibit 453 was marked for identification by the court reporter.) 3:28PM
THE WITNESS: Okay.
BY MS. JENSEN:
Q So this is a document that bears Bates stamp APC-01448787.
Do you recognize this document? 3:29PM
A I don't recognize it, but I don't know, I can see what it says that it is. It appears to be a transcript of one of our calls.
Q And does it appear to be a transcript from the October 28th, 2015 Anadarko Q3 2015 earnings 3:29PM call?
A Yes, that's the date that's on the title page.
Q Okay. And you attended this call; right?
A I assume so. I attended most of them. 3:29PM

Yes, if I scroll down, it says I was a participant. 3:29PM

Q Okay. And you also spoke at this call as well; right?

A I don't remember it. We have to review it to know. If you want, I'll take a moment and see if I can validate that. 3:30PM

Q Sure. How about you --

A As I mentioned earlier, I didn't speak on all of the calls. 3:30PM

And what is interesting to me here that I'm struggling with is it identifies both Jim Hackett and Al Walker as chairman and CEO of Anadarko participated on the call.

So if that was true that Al and Jim were both on it, it wouldn't make sense relative to the date. So I think there is an error here with regard to corporate participants unless for some reason Jim was involved at that stage. 3:30PM

Q Sure. Let's look at Page 5. 3:30PM

A Okay.

Q And you were listed as a speaker here?

A Okay. We're talking Page 5 of the PDF; right? Because I don't see page numbers on the actual document. But maybe it's just -- 3:31PM

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 27, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS
CSR No. 6811

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | ) Civil Action No. ) 4:20-cv-00576 ) ) |

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
DARRELL HOLLEK

Thursday, September 1, 2022
Remotely Testifying from The Woodlands, Texas

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5378973

A. Do you have a page number on the bottom of the exhibit?

Q. So, unfortunately, this was produced to us in native format, which means that we don't have the Bates numbers on each individual page. 12:02:14

But what I can tell you is that the slide is 40 or it appears, at least on my copy, it's page 24 of 29 in the exhibits.

Does that help?

MS. ROSENBERG: Slide numbers, Mr. Hollek, 12:02:32 are on the top right.

THE WITNESS: On the top right.

MS. JENSEN: I know. Thanks, Lauren. Yeah, you wouldn't expect that.

A. I just -- and I'm looking for it. I don't 12:02:44 see it. What -- what does it have on the slide?

BY MS. JENSEN:

Q. Okay. So "Total Prospect Resources."

A. "Key Elements," Recommendation and Well Objectives." No. Hold on. 12:03:01

Q. So there's a "Critical Events Chart" and there's "Resources and Economics" --

A. "Total Prospect Resources." "Total Prospect Resources."

Q. Exactly. Yep. 12:03:21

A. Got it.
Q. We're on the same page.
A. Got it.
Q. Okay. So there's a reference here on -- apologies. Strike that. 12:03:29
There's a reference here to what commercial development would require to generate a "PIR 10=0.30."
Do you see that?
A. Yeah. 12:03:42
Q. And was a PIR 10 of .30 generally a threshold for Anadarko to consider a prospect commercial?
A. I don't remember exactly, that -- but that may have been a minimum threshold. 12:04:03
Q. And would that have been set forth in any policies?
A. I wouldn't say a policy; maybe a general guideline.
Q. Do you recall what the document was 12:04:19 called?
A. No, I don't.
Q. But in practice, you recall that .3 was generally considered the threshold?
A. I believe that was sort of a hurdle rate. 12:04:31

THE COURT REPORTER: A what rate; hurdle rate?

THE WITNESS: Yes. Basically an economic threshold to be even considered.

BY MS. JENSEN: 12:04:46

Q. Right below which it would not be deemed commercial?

A. Based on what you know at the time.

Q. Right.

And this is in August of 2012, as we saw 12:04:54 from the -- the front slide; right?

A. Right.

Q. And -- and so, this is before Shen 3 results come in?

A. That's probably before Shen 2 comes in. 12:05:07

Q. Okay.

A. Is it not? Remind me of the timing. Shen 2 was not drilled then, was it?

Q. So it's drilled -- it's drilled for an extended amount of time. If you're talking about 12:05:27 TDed, I don't think it was TDed yet. But it was drilled, I believe, that summer.

A. So when we have -- okay. So Shen -- so only -- the first well was down in the sidetrack; right? 12:05:50

Q. Right.
A. Yeah. So that was --
Q. So in any event, and -- and Shen 3 was spud in May of 2014. So this is -- in any event, this is -- this is way before Shen 3. 12:06:03
A. But I think it's before Shen 2.
Q. Okay.
A. This was the -- the Wilcox that we found.
Q. Okay. Okay.
A. So very, very early in the project. 12:06:21
Q. Got it.
Okay. I'm going to mark another exhibit.
(Hollek Deposition Exhibit 279 was marked electronically.)
BY MS. JENSEN: 12:06:49
Q. Okay. You should be able to see what has been marked as Exhibit 279.
And, for the record, this is a document bearing the Bates stamp APC-00597953 and also includes an attachment. 12:07:07
Now, Mr. Hollek, I don't know if you can see it okay or if you need to zoom in. There's a way to do that, if -- if you need to.
A. Okay. What am I looking for?
Q. Okay. So my first question is going to 12:07:28

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name. Dated: 7TH day of SEPTEMBER, 2022

Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

---------------------------------------------------x

In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

---------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

JAMES KLECKNER

Friday, October 14, 2022

Reported By: Lynne Ledanois, CSR 6811

Job No. 5421318

A Yes. 2:07PM
Q Do you recall that Darrell had some real concerns over that deal?
A I recall this email -- well, vaguely remember him in the email note. I can't remember if 2:07PM we followed up with it in a discussion or not.
Q In any event, that was with the same ConocoPhillips potential swap we were just discussing?
A I believe so, yes. 2:08PM
MS. JENSEN: I'm introducing another exhibit. You should be able to see what has been marked Exhibit 404, which for the record is APC-49208.
(Exhibit 404 was marked for identification 2:10PM by the court reporter.)
THE WITNESS: Email from Pat McGrievy?
BY MS. JENSEN:
Q Yes. Does this appear to be a true and accurate copy of an email from Pat McGrievy to 2:10PM yourself on September 24, 2015?
A Yes.
Q And we touched very briefly earlier on Shen 4 and the first Shen 4 well drilled into salt.
Do you recall that after that, there was a 2:10PM

Shen 4 sidetrack? 2:10PM
A Vaguely, yes.
Q If you need to take a moment to read this email to refresh your recollection, I'll ask you a couple of questions about it. 2:10PM
A Okay. Thank you.
Okay.
Q Does -- do you remember that as the Shenandoah 4 sidetrack well results came in, it became known or understood that there was a fault at 2:12PM or near the top of the Upper Wilcox 1 sand which effectively faulted out the entire Upper Wilcox section?
A Yes, I recollect that based off of past notes stating that. 2:12PM
Q And the Upper Wilcox section was believed to contain about 50 percent of the reserves at Shenandoah?
A At that point in time with the interpretation that we had. 2:12PM
Q Right. And that interpretation prevailed; correct?
A So this was preliminary information prior to all the data being acquired. So I don't know if it prevailed through more detailed analysis of the data. 2:12PM

I don't know. 2:13PM
I'd have to see what the technical teams came up with as we were able to pull in the data, get the logs and do the bypass core.
Q Is this consistent with your recollection 2:13PM that in the neighborhood of half of the reserves were knocked out or faulted out?
MS. ROSENBERG: Objection to form.
THE WITNESS: I don't recall that 50 percent of it were removed like what Pat had said 2:13PM because I hadn't seen a technical update. This is a note from Pat.
BY MS. JENSEN:
Q In any event, it's consistent with your recollection that the results wiped out a 2:13PM significant portion of the reserves at Shenandoah?
MS. ROSENBERG: Objection to form.
THE WITNESS: Like I said, I didn't see the technical presentation, so I don't know.
BY MS. JENSEN: 2:14PM
Q What are you referring to?
A I'm referring to if there was a reduction of 50 percent, there must have been a technical remapping and reworking of all the data. And this was -- the well was currently nearing TD, which means this 2:14PM

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: OCTOBER 18, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS

CSR No. 6811

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_______________________________ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
DEPOSITION OF ERNEST A. LEYENDECKER, III

Thursday, September 22, 2022
Remotely Testifying from Houston, Texas

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5378982

Do you see that?
A. Yes.
Q. And then the second bullet where he's asked whether Anadarko sees any future utilization for this wellbore. 12:05:27
Do you see that?
A. Yes.
Q. He's asked whether, for example, an injector might be one of the utilizations in the future; right? 12:05:34
A. Yes.
Q. And do you see what he says: "Need to check" on the second one?
A. Yes, "I also need to check" on bullet two, yes. 12:05:43
Q. Yeah, he doesn't say, yes, does he, to the second bullet point?
A. That's correct. He says: "Bullet two -- I also need to check."
Q. Okay. But the last he had heard on bullet 12:05:53 number one, it probably could not accommodate a sidetrack; right?
A. It would appear the last he heard "is that a re-entry would be risky (mechanically)," yes.
Q. But you forgot the second half of the 12:06:10

sentence, didn't you?

A. Oh, sorry. "And probably could not accommodate aggressive enough up-dip sidetrack to warrant the re-entry."

Q. Okay. 12:06:25

A. Yes.

Q. And then you received that e-mail string, didn't you?

A. Yes, it appears so.

Q. So you knew that Shen 3 could not be sidetracked, didn't you, sir? 12:06:28

A. It would appear so at this stage, yes.

Q. You were aware of at least a potential fault between Shen 2 and Shen 3, weren't you?

A. I don't recall what the interpretre- -- the -- the interpretation was at the time. 12:06:47

Q. You don't recall being aware of potential fault between Shen 2 and Shen 3.

Is that your testimony under oath, sir?

A. I don't recall the geophysicist that was responsible for the structural interpretation's interpretation at this point in time. 12:07:02

Q. Okay. I'll show you what we'll mark address Plaintiffs' Exhibit 317 for identification.

THE COURT REPORTER: Excuse me. Counsel, 12:07:22

is the next one 316?
MR. DROSMAN: I -- I apologize. You're absolutely correct. 316 for identification.
(Leyendecker Deposition Exhibit 316 was marked electronically.) 12:08:07
BY MR. DROSMAN:
Q. Plaintiffs' Exhibit 316 should be in front of you, if you refresh your browser.
MR. DROSMAN: I'll note for the record that Plaintiffs' Exhibit 316 consists of an e-mail 12:08:15 and attachment. Bears Bates number APC-00021099 to '2100 -- '21100.
BY MR. DROSMAN:
Q. Let's take a look at the e-mail. The e-mail that precedes the attachment is to you and 12:08:36 others; correct?
A. Appears so.
Q. And it's from Beth Kendall; right?
A. Yes. It appears so, yeah.
Q. You told me she was a geophysicist; right? 12:08:55
A. Correct.
Q. Okay. And it's dated January 23rd, 2015, isn't it?
A. Yes.
Q. And the subject is "RE: Shenandoah EC 12:09:02

Q. Do you see that the heading is "Shenandoah Resource Estimate"?
A. No.
Q. You don't see that. The heading at the top of the page, what does that say? 14:13:28
A. "Shenandoah Resource Estimates."
Q. Okay. You understand that these are resource estimates; right?
A. Yes.
Q. Okay. So the second resource estimate is after drilling Shenandoah 1; right? 14:13:36
A. Yes.
Q. And then the next one is after drilling the resource estimate after drilling Shenandoah 2; right? 14:13:53
A. Yes.
Q. And do you see there that the mean is 1200?
A. Yes.
Q. Million barrels of oil equivalent? 14:13:58
A. Yes.
Q. Okay. Now, let's look at the mean, at the resource estimate after drilling Shen 3. There's two different resource estimates.
Do you see that? 14:14:13

A. Yes.
Q. One has a no-fault model; do you see that?
A. Yes, I do.
Q. And one is a fault model; right?
A. Right, I see that. 14:14:20
Q. And the no-fault model has a mean of 920 million barrels of oil equivalent; right?
A. Yes.
Q. That's certainly lower than the mean of 1200 for -- after drilling Shenandoah 2; right? 14:14:32
A. Yes.
Q. So you would agree that the mean resource estimate decreased after drilling Shen- -- Shenandoah 3; right?
A. Yes. 14:14:44
Q. And it decreased even further --
A. Yes.
Q. -- if you used the model showing faults; right?
A. Yes, it appears so. 14:14:54
Q. Right. Showing it decreased to 740 million barrels of oil equivalent; right?
A. Yes.
Q. So we can all agree that the resource estimates for the Shenandoah oil field decreased 14:15:06

after drilling Shen 3; fair?
A. Fair.
Q. And we could also agree that you knew that fact; right?
A. I dis- -- I -- I learned that when I -- when I received this, yes. 14:15:34
Q. I'll show you what has been marked as Plaintiffs' Exhibit 323 for identification.
(Leyendecker Deposition Exhibit 323 was marked electronically.) 14:16:23
BY MR. DROSMAN:
Q. For the record, Plaintiffs' Exhibit 323 consists of a single-page e-mail bearing Bates number APC-00162015.
Mr. Leyendecker, you received this e-mail, Plaintiffs' Exhibit 323; correct? 14:16:48
A. Yes, I see it.
Q. And you received it from Lee Auger; right?
A. Yes, it appears so.
Q. You received it on or about February 17, 2015; right? 14:17:05
A. Yes.
Q. And this subject is "UpstreamOnline on Shenandoah"; right?
A. Yes. 14:17:13

Q. And you understand that this referred to an upstream online report about Shenandoah; correct?

A. I believe so, yes.

Q. Okay. Plaintiffs' Exhibit 323 is a true and correct copy of the e-mail that you received 14:17:30 from Mr. Auger on or about February 17, 2015; correct?

A. Yes, it appears so.

Q. Okay. Look down at the bold language, if you would. 14:17:49

A. Okay.

Q. And you read -- and you read that upstream online wrote, "However, the most recent well, Shenandoah-3, left many observers scratching their heads. 14:17:59

"ConocoPhillips, a partner in the well, said it had expensed the appraisal probe, a test about 1500 feet down dip and 2.3 miles (3.7 kilometers) east of Shenandoah-2.

"Some analysts took that to mean the well 14:18:16 was a bust, but Anadarko's executives cast it in a much more positive light." [As read]

Do you see that?

A. Yes.

Q. And that would be accurate; right? 14:18:25

you must have spoke [verbatim] to Mr. Hollek about it; correct?

A. I don't recall whether I spoke to Darrell or not about it before this.

Q. Well, you would have wanted to speak to Mr. Hollek, if Shenandoah was his primary responsibility, before you made public statements about Shenandoah; right? 17:06:11

A. I -- yeah. Generally, I would have.

Q. It would be reckless not to talk about the point person before you make public statements about a particular oil field, wouldn't it? 17:06:23

A. It would be helpful, yes, to have all the information about what was going on.

Q. Look at the first sentence. "Last year we drilled the number five well where we found yet over 1,000 feet of hay." 17:06:44

I assume that should be pay; right?

A. Most likely, yes.

Q. "And we have moved onto the sixth appraisal well." 17:06:57

Do you see that?

A. Yes.

Q. You talked about "hay" from the Shen 5 well; right? 17:07:05

A. I'm -- I believe so. Yeah, I believe that must have referenced 5. I don't recall how much pay was in 5.

Q. Did you disclose that the first Shen 5 well hit tar, that fact? 17:07:20

A. I -- I don't recall.

Q. Well, look right here. Anywhere here where you disclose that the first Shen 5 well hit -- hit tar?

A. I'm sorry. What was your question again? 17:07:29

Q. Tell me where you disclosed in this passage that the first Shen 5 well hit -- hit -- hit tar.

A. I did not disclose that, according to this transcript. 17:08:21

MR. DROSMAN: I need to take a break to just figure out the remaining portion of my examination.

Videographer, how much time do I have left? 17:08:31

THE VIDEOGRAPHER: Okay. We have -- let's see. We've been on the record --

MR. DROSMAN: Or you can tell me how much time I've been on the record.

THE VIDEOGRAPHER: We've been on the 17:08:40

record for 5 hours and 33 minutes.

MR. DROSMAN: Great. Okay. Why don't we take a break.

THE VIDEOGRAPHER: Okay. We're off the record. It's 5:08 p.m. 17:09:06

(Short recess taken.)

THE VIDEOGRAPHER: We're back on the record. It's 5:30 p.m.

BY MR. DROSMAN:

Q. I'll show you what has already been marked 17:30:46
as Plaintiffs' Exhibit 157 for identification.

(Previously marked Deposition Exhibit 157 was referenced.)

BY MR. DROSMAN:

Q. So it should say "Tab 93, Exhibit '157," 17:30:55
if that helps you to locate it.

A. Okay. Thank you.

Tab -- yes.

Q. So you received this e-mail and attachment; correct? 17:31:17

A. Yes, it appears so.

Q. And you received it on or around January 29th, 2015; right?

A. Yes.

Q. And the attachment is called the "Gulf of 17:31:29

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name this 27th day of September, 2022.



Hanna Kim, CLR, CSR No. 13083

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ANADARKO PETROLEUM | ) Civil Action No. |
| CORPORATION SECURITIES | ) 4:20-cv-00576 |
| LITIGATION | ) |
| ________________________________ | ) |

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
PATRICK McGRIEVY

Wednesday, August 24, 2022
Remotely Testifying from Houston, Texas

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5344464

help other reservoir and production engineers manage the many Brownfield wells in the Gulf of Mexico. She's clearly the lead when it comes to coordinating the efforts of the Shenandoah Team. She continues to be very holistic in her thought process and understands the big knobs that drive the commercial solutions and ultimate decisions. She consistently challenges the status quo and is a highly respected 'big picture' thinker. I have a high regard for Lea and her commercial skill sets." [As read] 12:15:17 12:15:33

BY MS. JENSEN:

Q. Thank you.

So after working with Ms. Frye for about a year, you had high regard for her and her commercial skill sets; correct? 12:15:42

A. Good worker and -- good -- good, hard worker, yes.

Q. And you also held the view of Ms. Frye that she understood the big knobs that drove the commercial solutions and ultimate decisions with respect to Shenandoah; correct? 12:15:54

A. Yes.

Q. And by "ultimate decisions," you meant the -- the commerciality of a prospect?

A. Yes. Generally speaking, yes. 12:16:04

Q. And you also believed Ms. Frye was a "highly respected 'big picture' thinker"?

A. Yes.

Q. Okay. Let's turn to the next page under "Integrity and Trust." And I'm going to read Ms. Frye's comments here. 12:16:22

It says, "I have always upheld the highest standards in business integrity and ethics. I am known as an individual whom speaks truthfully based on the knowledge at hand and who is willing to admit to my errors. I will not be swayed to bend the truth to fit a purpose. I am known as someone who gets things done and done on time." 12:16:41

You agreed with her comments then, didn't you? 12:16:54

A. Yes.

Q. And could you please read what she wrote -- oh, I'm sorry. Strike that.

Could you please read what you wrote about Ms. Frye's integrity and trust? 12:17:04

A. "Since joining the fold belt Team in late 2013 as a subsurface team lead for Shenandoah, Lea has developed a strong professional relationship with both her fellow fold belt Team and her Shenandoah subsurface project for which she leads. 12:17:19

Lea plans her business" and "well" -- I'm sorry. "Lea plans her business well & sets priorities and everyone on the immediate and extended Shenandoah team knows their responsibility and how they can impact the project. She is a trusted technical contributor who readily helps others get organized; laying out goals, objectives and largely corriographing" [verbatim] "each internal and external partnership meeting that she organizes and participates. She produces positive value results under just about any situation that she's dealt. She tells the truth no matter the circumstances-she has an exceptional judgment on how and when to present sensitive material." [As read] 12:17:33 12:17:52

"She continues to establish herself amongst her peers to be reliable, conscientious and one with high moral standards. She has clearly earned the trust and respect of her peers and extended Shenandoah team." 12:18:07

Q. Thank you. 12:18:21

So after work- -- working with Ms. Frye for about a year, you held the view that she was a tested -- "a trusted technical contributor who readily helped others" [as read]?

A. That's true. 12:18:28

Q. And after observing Ms. Frye for approximately a year, you believed she had produced "positive value-added results under just about any situation she was dealt" [as read]?
A. Yes. 12:18:39
Q. And after a year, it was your assessment that she told "the truth no matter the circumstance" [as read]; correct?
A. As far as I know, yes.
Q. And you believed what you said when you 12:18:50 wrote this; correct?
A. I do -- or did.
Q. And the -- the -- and after observing how Ms. Frye comported herself throughout 2014, you wrote about her that she had "exceptional judgment 12:19:04 on how/when to present sensitive material"?
A. Yes.
Q. And after a year of observing Ms. Frye, your view of her was that Ms. Frye had established herself as "reliable, conscientious and one with 12:19:22 high moral standards"?
A. True.
Q. And after a year of working closely with Ms. Frye, you believed she had earn- -- "clearly earned the trust and respect of her peers and 12:19:37

ex-" -- "and extended Shenandoah team"?
A. Yes.
Q. And she had earned your trust and respect, too; correct?
A. That's right. Yes. 12:19:46
Q. Okay. Let's turn to "Open Communication," which is just below "Integrity and Trust."
A. Okay.
Q. Could you please read what you had to say about Ms. Frye in that category. 12:20:00
A. "Lea relates well to others as demonstrated by the broad spectrum of potentially challenging and opinionated personalities" -- that being "drilling, completions," and "project engineers" -- "that she works with on the 12:20:20 Shenandoah surface and subsurface teams on a routine basis. She effectually articulates opinions and ideas to all" audiences -- "audience types and is always timely in her delivery of information to others. She" has -- "also listens appropriately to 12:20:29 other opinions. She's effective at providing the right level of information based on the audience and eagerly seek others opinions and knowledge to ensure that their sentiments are heard and well-understood." [As read] 12:20:45

Q. Thank you.
So after a year of working with Ms. Frye, you believed she related well to others?
A. I would say she re- -- re- -- related fairly well. She obviously -- she -- she could become temperamental at times -- 12:20:59
Q. Well --
A. -- and frustrated potentially.
Q. -- do you -- do you say that here?
A. No, I don't. 12:21:07
Q. You believed that she handled a wide variety of personalities well, as you wrote here?
A. Yes.
Q. You believe she effectively articulated opinions and audiences -- I'm sorry, ideas to all audience types? 12:21:17
A. Yes.
Q. And that she provided "the right level of information based on the audience"?
A. Yes. 12:21:29
Q. And that she actively sought out others opinions and knowledge?
A. Yeah. That's correct.
So -- and she was rated acceptable in this case and not exceptional. I'll point that out. 12:21:39

Q. Oh, sure.
Okay. Let's go to "Servant Leadership."
A. Okay.
Q. Okay. And Ms. Frye's comments in this section for which she describes herself as acceptable, she says, "I work hard to anticipate what people need from me and to deliver an accurate timely product. I strive to perform at my highest level always and have found that by doing so this motivates others to do the same. I make every attempt to give time -- "to give time" to "help others" -- I put "to" in there -- "even when the help they need is not related to my direct work. I respect the opinions and input of others, but I am not afraid to stand up for things I feel are important, or critical to project success. My approach is to credit others as much as possible by helping" -- "and by helping others to succeed at their roles, to help guide the team to succeed in accomplishing great things for the company." [As read]
And you did not disagree with her comments there; correct?
A. True. Yes.
Q. Could you please read your comments about

12:21:56
12:22:12
12:22:25
12:22:43
12:22:47

Ms. Frye's performance in the "Servant Leader" [as read] category?

A. "Lea acts in the company's best interest over her own personal interests. She generally makes others feel valuable. She assesses her peers individual motivator's to get the best results and she can easily relate to any team member regardless of personality differences. Hu-" -- "Humility- always shares credit, uses 'we' &" you -- "& 'us.' She usually using clear and strategic judgment on picking her battles and 'calling in favors.' Request of her colleagues usually come first, no matter what extra effort that may call for in completing tasks on or before the deadline." [As read] 12:23:01 12:23:20 12:23:36

Q. So after a year of working closely with Ms. Frye, you believed that she acted "in the company's best interest over her own interest" [as read]?

A. From what I observed, that's correct. 12:23:45

Q. And that she was humble?

A. Yeah, I would say so, yes.

Q. And that she used "clear/strategic judgment on picking her battles"?

A. Yes. 12:23:59

Q. Okay. Let's look at Ms. Frye's goals. So in each of these performance evaluations, there's a certain number of attribute categories that you're rating employees on and then also goals; correct?
A. That's correct. 12:24:20
Q. And are the goals picked by the employee?
A. It's actually both, both the -- the employee and myself. I mean, we have discussions on what we think is critical for the upcoming year.
Q. So, in other words, at the beginning of 12:24:34 each year, you set out goals for that year, which are later used as benchmarks to evaluate the employee's performance over the course of the year?
A. That's true.
Q. Okay. So one of the goals here -- and now 12:24:48 I'm looking at page APC-00771599.
A. Is that a different file than Exhibit 252?
Q. No. Sorry. So let me see if I can help you orient.
A. Okay. 12:25:26
Q. So -- okay. We -- we were at "Servant Leadership."
A. Okay.
Q. So I'm scrolling down past one page, and then I believe the next page there's a goal name of 12:25:32

accurate copy of an e-mail exchange that you had with Brad Browning, Arnold Rodriguez, Todd Bu- -- oh, gosh -- Bu- -- Butaud?
A. Bu- -- Butaud. Butaud.
Q. Oh, thank you. 13:40:46
-- Lea Frye, and Paul Chandler?
A. Yes.
Q. Okay. And this is on April 1st and 2nd of 2014?
A. Correct. 13:40:57
Q. And who is Todd Bu- -- Butaud?
A. Todd Butaud is a supporting geologist working with Paul Chandler. And he was not part of the -- the team, but he was -- he was more on an -- an advisory basis. 13:41:14
Q. And this e-mail, the context for it, is it that Brad had mapped a pink sealing fault?
A. That's what it states, yes.
Well, Brad didn't map it. It would have been one of the -- the geologists or a geophysicist 13:41:40 that actually mapped it.
Q. Okay. So -- apologies. So it appears, based on this e-mail string then, that Arnold mapped a pink sealing fault and that Brad Browning was potentially comm- -- well, he was commenting on it 13:41:57

to the group.

Does that -- does that ring true?

A. Yeah, I think that's right. Yeah.

Q. Okay. And he's commenting that "If the 'Pink'" -- and I'm looking now at his April 1st e-mail. He's commenting that "If the 'Pink' fault seals, the oil-water contacts in the S3 fault block is independent from the S2 fault block." [As read] 13:42:08

And what do you read that to mean?

A. Meaning that he's suggesting that there is a fault between the two wells, I suspect. 13:42:30

Q. So, in other words, there's a fault between the Shenandoah 2 well and the Shenandoah 3 well?

A. Yes, as it's -- as it was interpreted at the time with the given dataset, yes. 13:42:40

Q. With the pink sealing fault that had been mapped by the development team?

A. Yes.

Q. And what is he -- and your response to him and the others being copied states here, "I recognize the importance of the S3 location with respect to the possible north-south" feeling -- "sealing fault but please recognize that we will be on the feather edge of receiving an APD (as it 13:42:57 13:43:19

currently stands) to spud this well prior to the lease expiration on May 31st."

And are you there -- you're, in this instance, referring to the -- the 180-day clock? Is that what it is? 13:43:36

A. Yes, it is.

Q. Okay. And you state here, "We do not want to be the reason for relinquishment of this exploration unit." And --

A. Yes. 13:43:48

Q. -- what do you mean there?

A. If -- if we were to redesign the well, I was concerned that the time that we absorbed doing that would have pushed us past that 180-day -- -day clock; and, therefore, you would relinquish the 13:44:06 exploration unit, it would break it apart, and we would lose the lease.

So the extra time to -- you know, to -- to make recommendations and change the location of this well would have put us in jeopardy. 13:44:15

Q. And Brad here is saying in his e-mail response to you that it was important to weigh in here because it could have been a gross waste of money if the -- in fact, the Shenandoah 3 fault block was faulted off from Shen 2; right? 13:44:37

THE VIDEOGRAPHER: We're back on record at 2:42 p.m.

BY MS. JENSEN:

Q. Okay. Welcome back, Mr. McGrievy.

A. Good afternoon. 14:43:14

Q. I'm going to bring up another exhibit here.

(McGrievy Deposition Exhibit 258 was marked electronically.)

BY MS. JENSEN: 14:43:46

Q. All right.

You should be able to see what has been marked as Exhibit 258.

A. Okay.

Q. And for the record, this is APC-00617562. 14:43:58

So my question to you -- my first question is whether you recognize this document?

A. I do, yes.

Q. Okay. Is this a document you -- you reviewed in preparation for your deposition? 14:44:21

A. I think I've seen it, yes.

Q. And does it appear to be a true and accurate copy of an e-mail exchange that you had with Darrell Hollek and others in early December 2014? 14:44:40

A. Yes.

Q. Okay. So since you've reviewed this document recently, maybe you can give me some context for the last e-mail at the bottom, that being Jeff Pachman's e-mail to you and others. 14:44:59

A. Okay. This is a -- an e-mail that Jeff has sent out to our partners.

THE COURT REPORTER: Mr. McGrievy --

THE WITNESS: I'm sorry. Yeah. My -- my bad. 14:45:24

So this is a document from Jeff Pachman to our partners indicating what the bottom-hole location -- proposed bottom-hole location would be for the Walker Ridge 51, Number 3, and a subsequent meeting to that in which we share the details on the 14:45:41 well.

BY MS. JENSEN:

Q. And your e-mail back and forth with Darrell Hollek concerned the fact that it appeared exploration had unilaterally set the location for 14:45:55 Shen 4 well without development team's input.

A. That's correct.

Q. And there was some consternation from -- from you about that fact; right?

A. Yeah. It was -- it was frustrating, for 14:46:14

sure.

Q. And so, could you please read the -- I'm sorry. There's a number of e-mails. And so let me just reorient here.

Could you please read into the record your e-mail to Darrell at the top of the chain? 14:46:34

A. At the top?

Q. Yeah.

A. "Darrell, not to beat a dead horse here, but after thinking about it (provided that you don't oppose the idea), my preference would not be to attend the partnership meeting next Wednesday with the exploration team if they appear defiant in working with us to develop a map that indicates acknowledgment of faulting that would suggest potential separation from their currently proposed F location. Unless they (the exploration team) can convince us over the next couple of days that there's a little or no separation via faulting, it would be difficult for me and quite frankly ethically questionable to openly support their current maps which -- which shows no discontinuities. I was never sent an official invitation which may imply that they prefer not I be there in the first place. [As read] 14:46:47 14:47:06 14:47:22 14:47:39

"Also, we are going forward with preparing a presentation on minimum size and MDT data implications. Should have something ready for tomorrow. Unless you see otherwise, I will work with Tim to get a review with you and Ernie on Thursday. [As read] 14:47:50

"Thoughts on my directions? [As read]

"Thanks, Pat."

Q. And did Darrell respond to this e-mail, to your recollection? 14:47:56

A. I don't know. I -- I -- I can't recall.

Q. Okay. And so you're talking about the -- the location -- that being proposed F location for the Shen 4 well?

A. That's correct. 14:48:13

Q. And it went forward with the proposed F location, is that -- that exploration had deemed fit?

A. Yes.

Q. And that drilled into salt; right? 14:48:21

A. That's correct.

Q. And you raised ethical questions about showing a map to the partnership that did not show discontinue -- discontinuities; correct?

MR. GRUENSTEIN: Objection. 14:48:39

Mischaracterizes the document.

BY MS. JENSEN:

Q. I'm just re- -- I'm read- -- I'm reading from your words.

THE WITNESS: So, Ben, I'm sorry. What -- what was your comment? 14:48:51

BY MS. JENSEN:

Q. Ben is just objecting for the record.

A. Oh, okay. Okay.

Q. He shouldn't be -- he shouldn't be coaching you with his objections. So you don't have to worry about what he's saying. He didn't tell you not to answer. 14:49:00

So your e-mail says to Darrell --

A. Right. 14:49:09

Q. -- that it would be "quite frankly questionable" -- "ethically questionable to openly support their current maps which show no discontinuities."

And so just to clarify, what you say is ethically questionable was openly supporting exploration's maps which showed no discontinuities? 14:49:19

A. Yes. That's what I'm referring, yes.

Q. Okay. And at this point, as we'd had seen in prior e-mails, the development team had mapped 14:49:38

faults within Shenandoah?

A. We did, yes.

Q. At this upcoming December 2014 partnership meeting, did the exploration team present their unfaulted map? 14:49:56

A. I can't tell you because I was not there.

Q. You didn't attend --

A. I -- I don't --

Q. -- because of your objections?

A. I -- I don't believe I was there. I don't 14:50:08 recall the meeting and -- and them. So I'm not sure. I would assume they did, but I'm not certain of that.

Q. You would assume that they showed their unfaulted map that you thought was ethically 14:50:16 questionable?

A. I would say so, yes.

Q. Did anybody from the development team attend that meeting?

A. Lea may or may not have. And there's 14:50:28 probably some people that weren't directly reporting to me that were there that were working with the development team. But I can't mention names because I wasn't there. I just don't know for sure.

Q. So Lea would be the right person to ask? 14:50:46

A. I'm not saying that's true or not because whether she recollects it or not or she wasn't there, I just don't know. Yeah. I can't answer that question.

Q. Okay. I've introduced another exhibit which has been marked as Exhibit 259. You should be able to see it. 14:50:57

(McGrievy Deposition Exhibit 259 was marked electronically.)

THE WITNESS: Okay. 14:51:14

BY MS. JENSEN:

Q. And, for the record, it bears the Bates stamp APC-00013459.

A. Okay.

Q. Do you recognize this document? 14:51:30

A. No, I do not.

Q. Okay. If you could just take a quick look at it and --

A. Okay.

Q. -- let me know when you're ready. 14:51:47

A. Okay.

Do you want me to read each thread, or is there anything in particular you want me to focus on?

Q. No. You know what, it's -- it's okay. I 14:51:57

Q. Okay. And did -- did the development team -- in addition to this e-mail string, were there meetings about this issue?
A. I'm certain there would have been, yes.
Q. And -- and Lea Frye says that you already knew her concern. So you had met with Lea Frye about this issue? 15:06:48
A. Yeah.
Q. Okay. And so could you read into the record your -- your response after all the input you've received here. 15:06:59
A. "Thanks All, I think the message to the exploration at this point is the only thing that is clear is ambiguity, if that makes sense. There's a chance that they" might -- or "there is a chance that they right but not something that we want to" get -- "spend 6 to 10 billion dollars on at this point." [As read] 15:07:15
Q. There's just a small typo in there, but you meant there's a chance that they might be right? Is that basically what -- 15:07:30
A. Yes.
Q. -- you meant to say? Okay.
A. There's a chance that -- there's a change that they might be, but not something that we want 15:07:36

to 6 point -- 6 to 10 million -- billion dollars on at this point.

Q. So it was -- it is your view at this point that the data coming out of the Shen 3 well was ambiguous and could not be used to project the oil-water contacts; right? 15:07:52

A. At the time, that was the thinking, yes.

Q. Okay. And, again, you -- you shared that thinking with -- with Darrell Hollek?

A. Yes, I did. 15:08:06

Q. And -- and did you share it with the exploration team?

A. I don't recall explicitly, but there may have been a conversation with Tim Trautman, my counterpart on the exploration side. 15:08:22

Q. Conveying --

A. I just don't recall. Or an e-mail or something, but I --

Q. Okay.

A. -- remember explicit conversations now. 15:08:28

Q. Okay. Conveying the same concerns?

A. Probably so, yes.

Q. And you would expect that Tim would pass that along to Ernie if you didn't speak to Ernie directly? 15:08:40

A. I don't want to speculate.
Q. Do you have any reason to doubt that Ernie Leyendecker knew that this was the development team's perspective on the oil-water contact's issue?
A. I -- I'm not certain. I'm not certain whether Ernie would have been aware at this time or not. At certain -- at some point in time he would have, but I'm not sure if anybody appraised him or not. I didn't at this -- at this time. 15:08:58
Q. There were meetings, though, between exploration and -- and development; right? 15:09:16
A. Were they technical in nature, or were they managerial, or do you know?
Q. Were there managerial-level meetings?
A. At what point in time? Can you be specific? 15:09:33
Q. Sure.
A. I just don't know when you're talking about.
Q. Late 2014/early 2015. 15:09:40
A. There probably would have been early 2015, certainly, but not immediately after the results or -- the results of this just came out. I don't think we would have had discussions with him that early because I think we would have had to have 15:09:56

letter says, there is an east-west trending fault, but I just don't know which one it was -- which one I'm talking about here.

BY MS. JENSEN:

Q. Okay. And so according to the -- the logic of this memo, the -- the same decision made in quarter 4, 2016 could have been made in 2014; correct? 15:42:52

A. Yes, I think so. Right.

Q. Let me pull up another exhibit here. 15:43:13

Okay. So you should be able to see what has been marked as Exhibit 263.

(McGrievy Deposition Exhibit 263 was marked electronically.)

BY MS. JENSEN: 15:43:49

Q. And so, my question -- my first question is whether you recognize this document.

A. No, I don't recognize it. It's very modest. I saw several e-mails every day, and I just can't explicitly point to this e-mail. 15:44:12

Q. No, that's okay. That -- I mean, that's -- that's perfectly reasonable.

Do you have any reason to doubt that that's a true and accurate copy of an e-mail between yourself, Lea Frye, Paul Chandler, and Chip Oudin on 15:44:23

or about December 4th -- 3rd and 4th, 2014?
A. No.
Q. And I'm not sure if I said the Bates for the record, but it's APC '17096.
So after the Shenandoah -- Shen 3 results 15:44:45 were known, and required a downward adjustment, the economics of Shenandoah became tougher; right?
A. Yes.
Q. And as of December 4th, 2014, you had concluded that based on looking at the economic 15:45:09 analysis that Shenandoah was shy of break-even economics; right?
A. Yeah.
Q. Break-even economics means whether you'll make money on a prospect? 15:45:26
A. Correct.
Q. In other words, it's -- it's synonymous with commercial viability?
A. That's right.
Q. And it's -- it's shy of break-even 15:45:34 economics, that means, it's not commercially viable; correct?
A. That's right.
Q. Now, looking at Lea's table below, could you describe to me what this is intended to depict? 15:45:53

A. The -- the recoveries that were modeled for each of the reservoirs, upper Wilcox 1, upper Wilcox 2, all the way down to the lower E sand were oil contacts an oil in place.

Q. And this is showing that all of the upper Wilcox sands were missing? 15:46:20

A. Missing or tight or nonproductive.

Q. Nonproduct- -- I'm sorry. So "missing or nonproductive," meaning, what?

A. Meaning that you can't produce oil from them. 15:46:41

Q. Oh, you can't produce oil from them. Got it. Okay.

And the lower Wilcox B is also missing or can't be produced? 15:46:53

A. From this location; correct.

Q. Okay. I'm going to pull up another exhibit.

(McGrievy Deposition Exhibit 264 was marked electronically.) 15:47:40

BY MS. JENSEN:

Q. Okay. You should be able to see what has been marked as Exhibit 264. And for the record, this is a document bearing the Bates stamp APC '20046. 15:47:51

section last night and today but found, instead, the basin margin as we are currently drilling salt and will probably TD the well This evening as" -- "as" -- "it appears that we are drilling a salt stock." [As read] 16:32:54

Q. Okay.

A. "Preliminary estimates as per some quick updates to the Geomodel by Christian Noll, assume that we are close to the Wilcox hydrocarbon sediment interface, is a loss of almost 1 billion barrels of 16:33:10 oil equivalents or about 1/3rd of the pre-drill oil in place estimates (of 3.2 million barrels") -- "(billion barrels)." I'm sorry. "Our estimates now are approximately 2.3 billion barrels in place. This outcome may have a profound effect on how we 16:33:19 view the project going forward and our update with Jim Kleckner will be definitely be an interesting one. Also, it'll be interesting to see if our partners approve the 20A AFE's which are due on Sept. the 2nd given this negative piece of 16:33:37 information. [As read]

"The plan, according to Tim Trautman, is to P&A the openhole section and sidetrack to the southeast and hopefully find pay. [As read]

"We can talk more on Monday but I would 16:33:49

pre-" -- "would anticipate that our spending pace will change." [As read]

Q. Okay. Thank you.

A. Mm-hmm.

Q. So your reference there to the barrels in place, that referred to the gross barrels? 16:33:52

A. That's correct.

Q. As -- as opposed to -- so that's the amount of oil that you think is in the ground as opposed to what you can retrieve; right? 16:34:07

A. That's correct.

Q. And so, the results of Shen 4 were a loss of, essentially, one-third of the projected oil; right?

A. Yes, about a billion barrels, almost a billion barrels. 16:34:20

Q. And you wanted Mike and Jennie to keep a tight lid on these results because it was a negative imp- -- -- a negative outcome; right?

A. It was in the negative outcome, but it was also preliminary data that we were using, so I don't like information to get out that's its preliminary. I just don't want them to start thinking about what they need -- need to do next. 16:34:37

Q. And, in fact, the -- the TD was in salt; 16:34:52

right?
A. Yes, it was.
Q. And that was a negative piece of information; right?
A. It certainly wasn't positive, yeah. 16:35:00
Q. And -- and you say here this is a negative piece of information?
A. Right.
Q. And so, you were worried about word getting out to the partners? 16:35:14
A. I was -- no, I think it was more so worried about just being preliminary information and things can get twisted, e-mails sent around. And I prefer to make sure we have a concrete estimate before we actually go out with numbers like this, 16:35:33 because it was disappointing.
Q. And -- and that --
A. And it would just -- and that would include our -- our partners as well.
I'm sorry. 16:35:40
Q. Okay. And, in fact, given that the results were that it drilled into salt, it did have a profound view on how Shenandoah was viewed going forward, didn't it?
A. From what -- who's perspective? 16:35:54

right?

A. Yes. Looking at other options, I would say -- I would say that exit strategy might be a little harsh. I think it was looking at other potential options. It was an optionality exercise. 16:37:32

Q. And Lea's words were "exit strategy"; right?

A. You can call it that. You can call it an -- an optionality exercise too, looking at other options. 16:37:42

Q. Sure. But that's what her e-mail said, was "exit strategy"?

A. Yes, that's what she -- the way she termed it.

Q. Okay. And also was contemplating what we may -- might be prepared to show Bob and -- and Jim. And what's your understanding of who Bob and Jim are in this context? 16:37:49

A. Probably Bob Daniels and Jim Kleckner, that would be my -- certainly Jim Kleckner and maybe Bob Daniels, I would suspect. 16:38:08

Q. And was there, in fact, a presentation after this to Bob and Jim about what exit strategies might look like?

A. Yes, I do recall one. Yeah. 16:38:18

Q. And was it also presented to the executive committee?

A. I don't recall whether we pro- -- prod- -- produced it to them or not. It's -- but I'm certain we gave it to Jim Kleckner. 16:38:34

Q. And you would expect for Jim Kleckner to advise the executive committee that there was a -- a contemplation of an exit strategy at this point?

A. An optionality strategy. I like to call it that. I would hope so, yes. 16:38:52

Q. It's functionally the same thing?

A. It's not.

Q. Okay. Well, exit strategy was the verbiage here.

After Shen 4, the development team 16:39:01 presented on the Shenandoah prospect to the executive committee; right?

A. Probably so, yes.

Q. And after the results of Shen 4, the executive committee lost interest in developing 16:39:25 Shenandoah as an operator; right?

A. What time frame was that? Can you --

Q. Post Shen 4, early 20- -- 2016.

A. Yeah, there was -- there was talk about it, right. 16:39:42

Q. And the CEO, Al Walker, didn't want to continue to develop Shenandoah as an operator after Shen 4; right?
A. I thought it was later than that, but, you know, I -- I would call it being later than 2015, 16:40:05 but maybe I'm wrong. But I -- I -- it's going to --
Q. Or early -- or early 2016?
A. Okay. Probably so, yeah.
Q. Just returning to optionality. An optionality study would include an exit strategy; 16:40:20 right?
A. Yes, it would.
Q. Okay. Do you recall after Shenandoah 4, you coordinated an RCT review of Shenandoah?
A. I didn't coordinate it. I suggested it be 16:40:38 done.
Q. Okay.
A. Yeah, I didn't coordinate it.
Q. All right.
Who coordinated it? 16:40:45
A. It would have been the RCT leader, which I think was Matt. I don't recall his last name, but he was actually the RCT manager. But I suggested it be done between exploration and development.
Q. Was it Matt Morris? 16:41:02

A. Yeah, that's it, Matt -- Matt Morris.
Q. And you -- you were fluent in the RCT process because in an earlier iteration of your life at Anadarko, you were also on the RCT team; right?
A. Right. I fully supported it. 16:41:17
Q. You were on the RCT team from 2005 to 2007?
A. Yeah, that's about right. I mean --
Q. And -- oh, sorry. Go ahead.
A. I managed it. 16:41:29
Q. You managed the RCT team?
A. Yeah.
Q. Got it. Okay.
And the -- the RCT provided a -- an -- sort of an internal audit function; correct? 16:41:41
A. That's correct. It's an oversight of exploration prospects, generally.
Q. And the RCT process was intended to review the exploration range of a prospect at every major AFE request; correct? 16:42:03
A. That was the way it was designed, yes.
Q. That's what was supposed to happen?
A. Yes.
Q. In the case of Shenandoah, that had not happened; correct? 16:42:17

A. To my knowledge, it had not happened.
Q. And there was -- there was no involvement of the RCT up until the time when you asked Matt to get involved post-Shen 4?
A. Not to my knowledge. 16:42:36
Q. And what had happened as a result is that the exploration numbers for Shenandoah were, in your words, "simply laughable"; right?
A. I would say --
MR. GRUENSTEIN: Objection. 16:42:52
THE WITNESS: -- the -- I would say that the reserves were higher than they should be -- much higher than they should be. Yeah.
BY MS. JENSEN:
Q. You used the words "simply laughable"; 16:43:06 right?
A. Yeah. I'm not sure if I'd use that term now, but yeah. It was -- it was -- well, I would use preposterous, but I guess that's the same thing.
Q. I -- I can pull up an e-mail if we need 16:43:23 to. I'm happy to do that. Hold on a second.
Okay. You should be able to see what's been previously marked as Exhibit 43.
(Previously marked Deposition Exhibit 43 was referenced.) 16:44:06

THE WITNESS: Okay.
BY MS. JENSEN:
Q. Did you review this document in preparation for your deposition?
A. Yes, I've seen it. Yeah. 16:44:13
Q. Okay. And so, when you said you wouldn't use those words now, that's after meeting with the -- the counsel for the Defendants; right?
A. Yeah --
MR. GRUENSTEIN: Objection. 16:44:29
BY MS. JENSEN:
Q. The answer is "yes"?
A. Correct.
Q. In this e-mail, though, at the time, you used -- used the words "simply laughable"? 16:44:39
A. Mm-hmm. Yes.
Q. And you meant that at the time?
A. Yes. I thought it was very high, yeah.
Q. Okay. So there was an RCT review once you suggested it to Matt Morris, and that took place in 16:45:06 January of 2016; right?
A. Yes.
Q. Did you take in part in those meetings?
A. No, I did not.
Q. Okay. But others on the development team 16:45:19

did?

A. Yes. The protocol was never to have managers at these RCT --

THE COURT REPORTER: Could you start over again, please. Yes...

THE WITNESS: Yes, the pro- -- the protocol was for managers not to attend the RCT meetings.

BY MS. JENSEN:

Q. But you met with your team before the RCT review, and then you were briefed on it afterwards; right? 16:45:36

A. Yes.

Q. And as a result of the RCT review, there was a downward adjustment as the Shen resource range to a mean of 425 MMBOE; right? 16:45:56

A. I think that's correct.

Q. And again, that was a significant downward revision to the resource estimate of Shenandoah; correct? 16:46:14

A. Yeah. Yes, it was. It was pretty large. Fairly large.

Q. It was still too high, the development team's estimates; right?

A. Yes. 16:46:28

Q. But it was a -- a compromised position?
A. Correct.
Q. Given that it was a significant downward revision to the resource estimate, did it -- did it trigger an impairment analysis at the company? 16:46:43
A. I believe it did, yes.
Q. And were you involved in that?
A. Probably on the periphery, yes.
Q. Do you recall having conversations with Chris Champion about it? 16:46:58
A. Vaguely, and also, I think Louis Williams, too. I think both of them, I had discussions with.
Q. Did you have -- did you have an in-person meeting?
A. Repeat that. 16:47:10
Q. Did you have an in-person meeting?
A. With Chris, I believe, yes.
Q. Okay. And would you have sent any e-mails back and forth about it?
A. It's likely that I did, yes. 16:47:23
Q. Okay. Okay.
Okay. Now going to introduce an exhibit.
And you should be able to be see what's been marked as Exhibit 269.
(McGrievy Deposition Exhibit 269 was 16:48:16

marked electronically.)

BY MS. JENSEN:

Q. Does --

A. Okay.

Q. Do you recognize this e-mail? 16:48:27

A. Not particularly, but I -- I recall --

THE COURT REPORTER: I'm sorry. I can't hear you.

THE WITNESS: And we're -- I was just trying to appraise [verbatim] Bob Abendschein, who 16:48:59 was, at that point in time, my -- my new supervisor, of the -- back on the Shen 5 well recommendation.

BY MS. JENSEN:

Q. And was -- what was Bob's title at this point? 16:49:15

A. Bob would have transitioned to the vice president of the Gulf of Mexico. He would have been my -- my supervisor -- direct supervisor.

Q. And Darrell had, at this point, become the -- what was Darrell's title at this point? 16:49:29

A. I believe he was either advising the executive team or he was part of the executive team. I just don't recall his status at this time. I -- I'm not certain. But he was -- he was certainly a high-level manager, remained in that position. 16:49:55

# CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name this 29th day of August, 2022.

Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | ) Civil Action No. 4:20-cv-00576 |

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
CHARLES "CHIP" F. OUDIN, III

Thursday, June 30, 2022
Remotely Testifying from The Woodlands, Texas

Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5267938

it could be smaller without actually showing or saying it."

Was that also your recollection of what happened at the time?

A. Yes.

Q. And so the development team ran sensitivities on smaller per-well recoveries around this time frame regarding Shenandoah?

A. Yes, we did.

Q. And those sensitivities that the development team ran on per-well recoveries, was that shared also with management at Anadarko?

A. I don't know.

Q. Was it shared internally at Anadarko?

A. To some degree, yes.

Q. And what do you mean by "some degree"?

A. Within the development group, it was reviewed. Those sensitivities were discussed, I believe, at a partner meeting. Beyond that, I don't know who saw it.

Q. And who was at that partnership meeting from exploration, do you recall?

A. No, I don't recall. But you may have the minutes to that meeting, and you'll know better than I.

Q. Was -- did Ernie show up to partnership meetings?

A. Occasionally.

Q. Do you recall whether he was attending meetings in this time frame, twen- -- the fall of 2014?

A. I don't recall.

MS. JENSEN: Let's go ahead and pull up, Raffi, the gag order.

MS. FRIEDMAN: Sorry, which -- was that Exhibit 105?

MS. JENSEN: We'll have to come back to this one.

MR. GRUENSTEIN: Rachel, we've been going about an hour if you wanted to take a break to deal with that.

MS. JENSEN: No. That's okay. We'll -- we'll go ahead and move on. We'll come back to it.

So, let's pull up Tab 12.

(Oudin Deposition Exhibit 111 was marked electronically.)

BY MS. JENSEN:

Q. Okay. So you should be able to see what we have marked as Exhibit 111, and for the record, it is APC-'11019. And this should play in

presentation mode.

Do you recognize this document?

A. I do.

Q. Okay. What is this document?

A. I -- I think it's a spoof document I sent to my group.

Q. So was this the document that you -- that you sent in response to Ernie's directive that only one unified sets of maps could be shared?

A. I don't know that.

Q. Okay. Well, let's go back to Exhibit 110.

A. Okay.

Q. Okay. So in response to Pat's e-mail where he says "Ernie was adamant about showing only one unified APC interpretation," you sent an e-mail to the development team the next morning saying, "I've revamped the subsurface part. Take a look at it (in presentation/slide show mode, as there is some animation) and let me know what you think."

So does that refresh your recollection? Was this the presentation that you sent to them?

A. If it was associated with this e-mail, it was.

Q. And so this was a slide show, and it had some animation in it.

Do you see the -- the title of the slide show?

A. I do.

Q. And it states "Structural Uncertainties of Shenandoah -- the Shenandoah Discovery"? [As read]

A. It does.

Q. And did you pull this from some other source, or is this a presentation that you originally created?

A. I created it.

Q. Okay. So looking at Slide 2, did you -- did you write this?

A. I made that slide, yes.

Q. And this is meant to be a -- a satire; correct?

A. This slide shows three segments from our core values.

Q. And "our core values" meaning Anadarko's core values?

A. Yes.

Q. And looking under "Open Communication," were these the core values for Anadarko?

A. They were.

Q. So "Communicate freely, clearly, and concisely; Listen for understanding; Encourage

diverse opinions and constructive debate"; and "We will not ... Knowingly mislead or intentionally withhold information," that's what you've listed here.

And this is -- this is part of a spoof presentation you put together; right?

A. Which question do you want me to answer?

Q. You wrote that; correct?

A. I created the slide, yes.

Q. And -- and you put those words there?

A. I did.

Q. And this was part of a spoof presentation; correct?

A. It was.

Q. And was the directive not to show any alternative interpretations, but only the most positive one, consistent or inconsistent with this value of open communication?

MR. GRUENSTEIN: Objection.

THE WITNESS: When I see that slide, I recall I was disappointed they did not encourage diverse opinions and constructive debate.

BY MS. JENSEN:

Q. And they also didn't let the development team show their mapping of Shenandoah; correct?

A. At this time, correct.
Q. And to the best of your knowledge, Anadarko also didn't disclose the development team's alternative mapping publicly; correct?
A. That is correct.
Q. Okay. Let's turn to the next slide.
So is this a fair assessment of the partnership's mapping of faults as of this time in August of 2014?
A. It was.
Q. And it refers to "APC Ops" on the last bullet where it says "East-West and North-South trending faults." It says "(Venari, ConocoPhillips '14, APC Ops)." [As read]
What does AC- -- "APC Ops" refer to?
A. "APC Ops" refers to the operations group which we also considered ourselves, I think, in the big picture, we were in the operations segment for Anadarko.
Q. So that -- that refers to the development team's faulting at that point?
A. Yes, it does.
Q. And it -- APC Ops was not alone; correct?
A. Correct.
Q. Venari and ConocoPhillips had also mapped

those faults?
A. They had mapped faults along the different trends, yes.
Q. And in addition, Cobalt, ConocoPhillips and Marathon had all mapped east-west trending faults by that time?
A. On some of their interpretations, yes.
Q. Well, according to this slide, they had mapped those faults; right?
A. I don't know what you mean by "those faults."
Q. The faults you have listed here on your slide.
A. This slide is referring to fault orientations and the variety of interpretations that different companies were coming up with at this time.
Q. And that accurately -- the -- your slide accurately represents what faults had been mapped by the various companies by August of 2014?
A. It does.
Q. Okay. Turn to the next -- sorry.
We're looking at -- so if you look at Slide 18 -- no. Strike that.
It's Slide 8. If you click on Slide 8,

what is this an image of?
A. This is a 3D representation of the Eocene-Upper Wilcox Marker Horizon that I was mapping at this time, having been on the project, I think, for about two months and pointing out what you could see in a 3D rendition like this.
Q. Now, if you click that slide again, it's animated; right? There's an animation that comes up?
A. It does.
Q. And what's -- what does that animation bring up in terms of text?
A. It brings up four arrows pointing to dotted lines where my commentary is, "Don't worry, these lineations are not faults and in no way impact the Shenandoah structure."
Q. You're being sarcastic; right?
A. Yes.
Q. And you're speaking from exploration's voice?
A. I -- I -- I don't know what you mean by that statement.
Q. Who -- who's saying, "Don't worry"?
A. Obviously, I was.
Q. Right.

And you're being sarcastic. But who -- who are you portraying as saying "don't worry"?
A. I'm portraying myself and saying, don't worry about these things.
Q. Nothing to see here?
A. Nothing to see here.
Q. And you're being sarcastic?
A. Very.
Q. Okay. If you point -- if you go to the next slide, what are we seeing here?
A. That is the top Upper Wilcox surface map from exploration from July of 2014.
Q. Okay. If you click on it, again, there's a text that comes up.
What does it say?
A. "This is our structure and we're sticking to it!"
Q. What does that mean?
A. This was the exploration interpretation at the time, and that's the one we're going forward with.
Q. And you're being sarcastic; right?
A. At this point, it's a combination of sarcasm and frustration.
Q. And you're mocking the exploration team

for keeping the structure as it was?
A. And for not paying attention to my interpretation.
Q. And not paying attention to the data that was available at the time?
A. They had the data at the time. They weren't looking at my interpretation.
Q. So if you look at the next slide, what is this that we're seeing?
A. This is a seismic line from one of the datasets at the time running through two of the wells, the -- what would have been Shen 2 and Shen 1, with the horiz- -- horizons that corresponded to exploration's interpretation at that time.
Q. And if you click on it again, some text comes up.
What is it?
A. Again, three arrows pointing to faults that I had interpreted, where I labeled them as "Please note -- these are not faults. The only fault is the one that isolates the 52 #1 Bypass 2 from the rest of the structure." [As read]
Q. And, again, you're being sarcastic?
A. Yes.
Q. And you're pointing out the absurdity of

exploration's position at this point?
A. I'm pointing out that they did not pay any attention to my interpretation.
Q. And your interpretation of the available data at the time?
A. Yes.
Q. Okay. Turning to the next slide, what's this?
A. That is a similar seismic line from the same dataset, again, with exploration interpretation on it.
Q. And if you click it again, some text pops up.
And what's that?
A. That, I think, is the same text from the prior slide that says "Please note -- these are not faults. The only fault is the one that isolates the 52 #1 Bypass 2 from the rest of the structure." [As read]
Q. The 51 -- the 52-1BP2 well, was that a -- was that a successful well or not so successful well?
A. That was the original discovery well for Shenandoah, otherwise known as Shen 1.
Q. The bypass was?

A. Yes.
Q. And that was not seen to be the -- the well that the exploration team wanted to extrapolate the Shen prospects from; correct?
A. Yes.
Q. They wanted to use Shen 2 to extrapolate the prospects of Shen from?
A. Yes.
Q. Okay. Turning to the next slide, so what are we looking at here?
A. Similarly, a seismic line running from north-northwest, to south-southeast, through the current -- oh, it was the original well location for the 51 #3 well -- is that right? Okay.
51 #3 well, otherwise known as the K location. Okay. But again, with the exploration horizons showing their interpretation on the data at the time.
Q. Okay. And if you click that again, there's text that pops up.
What -- what does it say?
A. "Please note -- this is not a fault, and there is no chance for salt in the poor data area."
Q. And you're being sarcastic; right?
A. I was.

Q. Because you believed there was a fault there?

A. I believed there was a fault there, and I believed there were other ways in which the data could have been interpreted.

MS. JENSEN: I'm going to move --

BY MS. JENSEN:

Q. But you believe that there was a fault there; right? Just answer that question.

A. Where it was shown, yes, I believe there was a fault there.

Q. And you also believed that there was a chance for salt in the poor data area; correct?

A. I did.

Q. Okay. Let's turn back to Exhibit 105.

MS. KAMIN: And, Rachel, if we're getting close to a -- a stopping point, I'd like the witness to be able to have a little bit of lunch.

MS. JENSEN: Sure.

MS. KAMIN: It's 2 o'clock here.

MS. JENSEN: We -- we allow lunch.

MS. KAMIN: It's civilized.

MS. JENSEN: Yes. Very civilized.

BY MS. JENSEN:

Q. Okay. So just one -- bear with me just

one moment, and then we're going to let you get some lunch.

Okay. Turn to page 10- -- '1732 [sic] in Exhibit 105.

Okay. So if you look at the "Employee Comments" there, could you read your -- your employee comments starting with "Generated maps."

A. "Generated maps and presentations for project in support of Development team and ongoing project activities, but due to interdepartmental politics, I have been restrained from open communication with partners and proceeding with project objectives. It is gratifying to see that my work is in general alignment with previous Development and partner interpretations, but it has been equally frustrating working on a project where my work has been rebuked and/or ignored by other parts of APC."

Q. And you wrote that; right?

A. I did.

Q. And you believed that at the time?

A. At the time, I did.

MS. JENSEN: Okay. We can go ahead and take a lunch break.

MS. KAMIN: Okay.

A. Yes.
Q. So could you read your -- your e-mail to Ms. Frye after your reference to a free lunch.
A. "You should tell a certain VP (perhaps through his minions?) that we've established that the Shen-1 and Shen-3 share the same aquifer....it has as much truth as stating that we now know the oil-water contact's for a variety of sands that were full-to-base."
Q. And you were being sarcastic?
A. Yes.
Q. What was the impetus for this e-mail?
A. I don't recall.
Q. Who's the certain VP you're referring to?
A. Ernie Leyendecker would be my guess.
Q. And who were his minions?
A. My counterparts in the exploration subsurface group of Shenandoah.
Q. So Beth Kendall, Jake Ramsey, Tim Trautman?
A. Not necessarily Tim, more likely Chris Camden.
Q. Okay. I see.
And you're being sarcastic in this e-mail because, in fact, Anadarko hadn't established that

Shen 3 and Shen 1 shared the same aquifer?
A. That was not my interpretation.
Q. Okay. It wasn't. Okay. Then you tell me what -- what you're being sarcastic about here.
A. No. My interpretation was that we did not share a -- the aquifer.
Q. Okay.
A. It was one -- it was one interpretation that could be made. It was one of many that could have been made.
Q. Okay. So I think we were talking about -- I was talking about interpreting your e-mail. You were talking about your interpretation of the -- the -- the structure.
So let me pull back from that for a second.
So you did not believe that Shen 1 and Shen 3 shared the same aquifer?
A. I did not.
Q. And Shen 2 and Shen 3 -- Shen 2 and Shen 3 also did not share the same aquifer; correct?
A. That was not established.
Q. At this time?
A. At this time they could, or they couldn't.
Q. It wasn't shown, one way or the other?

A. (Witness nods.)
Q. It was also in your e-mail --
MR. GRUENSTEIN: There wasn't a verbal answer there.
THE WITNESS: Oh. Could you repeat the question?
MR. GRUENSTEIN: You just nodded your head yes. I assume you meant to say "yes," but...
BY MS. JENSEN:
Q. Okay. So the -- the record reflects that your answer is yes.
A. Okay.
Q. And at this point, you also knew that Shen 3 was -- was a wet well; right?
A. I did.
Q. And so you're being sarcastic as well when you say that it's about -- "it has as much truth as stating that we now know the OWC's for a variety of sands that were full-to-base"?
A. What's the question?
Q. Was that based on Shen 3?
A. Yes, it was.
Q. And, in fact, you didn't know the OWCs for a variety of sands that were full-to-base at that point; right?

A. One interpretation was that if you project Shen 2 to Shen 3, we did know.
Q. But that was not what you believed?
A. It was one interpretation, and I worked off of different hypotheses.
Q. You disagreed?
A. I don't disagree with the statement. I disagree with it being the only statement.
Q. You -- but you di- -- disagreed with the supposition that there was projected oil well contacts -- oil-water contacts at that point?
A. No, there were projected oil-water contacts at that point, based on pressures in the two wells.
Q. Similarity of pressures?
A. Projection of pressures.
Q. But you disagreed with the statement that -- that it was -- that you knew the oil-water contacts for a variety of sands that were full-to-base?
A. I do.
Q. And that's why you made that sarcastic remark?
A. Yes.
MS. JENSEN: Okay. Let's pull up 65.

Q. But exploration was using outdated maps that didn't show faulting?

A. I think at this point they were starting to put a fault down the middle, but I don't know when that occurred.

Q. But in any event, the only maps that could be shown were exploration's maps at partnership meetings still at this point?

A. Yes.

MS. JENSEN: Okay. We're going to pull up Tab 20.

THE WITNESS: Uh-oh.

MS. JENSEN: Do we need to go off the record? Is there a problem?

THE WITNESS: Ye- -- yes, we do. I have just been logged out of Veritext.

MS. JENSEN: Okay. That is a problem.

Can we go ahead and go off the record, then?

THE VIDEOGRAPHER: Sure.

We're going off the record. The time is 3:21 p.m., and this is the end of Media Unit Number 3. One moment.

(Off the record.)

THE VIDEOGRAPHER: All right. We are back

on the record at 3:23 p.m., and this is the beginning of Media Number 4. Go ahead, please.

BY MS. JENSEN:

Q. Okay. You should be able to see now in your Exhibit Share what we've marked as Exhibit 117. And for the record, this is APC-'899.

(Oudin Deposition Exhibit 117 was marked electronically.)

BY MS. JENSEN:

Q. Does this appear to be a true and accurate copy of an e-mail exchange that you had with Paul Chandler on November 25th, 2014?

A. It does.

Q. And the subject line is "The F word."

The F word here isn't what we would typically think of first as the F word; right?

A. I'm not sure what you're thinking of, but I think I know what it refers to.

Q. Well, I'm not going to curse on the record, but ordinarily you would think of a word that's F-U-C-K; correct?

A. Correct.

Q. I think you were trying to make me say that word.

So the "F" here stands for fault; right?

A. Yes.
Q. And the joke here is that the -- a -- the fault is like a -- a swear word?
A. I guess.
Q. So it -- it was a bad word at Anadarko at that time; right?
MR. GRUENSTEIN: Objection.
THE WITNESS: It may have been.
BY MS. JENSEN:
Q. That was certainly the insinuation of your joke?
A. Yes.
Q. It's a fair reading?
A. Yes.
Q. Okay. Could -- could you just read into the record, then, your first e-mail here.
A. "You know, I just got into the Exploration Seisworks project across Shenandoah, and the main fault that potentially separates Shen-2 from the rest of the world (trending NW-SE, down-to-the-southwest, possibly intersecting Shen-2 at the bottom of the well) has already been mapped, at least twice. Someone needs to explain to me why it's never shown up on any exploration maps. We should have a good time next week going over what is

and what isn't significant..... Hope you all have a happy Thanksgiving."

Q. And Chandler -- Paul Chandler responds, "The smoking gun??"

And could you read your response into the record.

A. "Nah. Both versions were probably mapped in the past week, right??? Although if I really wanted to be a pain in the a--, I could find a date-stamp for those faults and determine when they were created."

Q. And so what are you describing here?

A. I'm describing previous, prior interpretation in the exploration dataset across Shenandoah where somebody had mapped faults.

Q. And that was a -- a surprise to you because they were still showing maps that didn't have the faults; right?

A. Correct.

MS. JENSEN: Okay. We can pull up the next tab.

THE WITNESS: Time out.

MS. JENSEN: Did it log you out again?

THE WITNESS: It logged me out. I -- I don't know whether -- what the --

to Beth Kendall on the exploration team?
A. I did, but it looks like I sent it at 11:29 p.m.
Q. So you're saying that you don't normally work at 11:00 p.m., is that -- but you did send this e-mail to Beth Kendall?
A. I did.
Q. Okay. And did you have any meetings around this time about this issue of Shen-3 not being able to be used as a water injection well?
A. I don't recall any meetings. I do recall asking questions of various people.
Q. And with whom did you speak about this issue?
A. Obviously, with Lea; potentially, somebody in drilling.
Q. And do you recall who that was?
A. No, I do not.
Q. Any other communications that you can recall about this issue of Shen 3 not being able to be used as a water injection well at this time?
A. I don't recall making any others, but I might have.
MS. JENSEN: Okay. Let's pull up Tab 33.
BY MS. JENSEN:

Q. Okay. You should be able to see what we have marked as Exhibit 123.

MS. JENSEN: For the record, it's APC '159691.

(Oudin Deposition Exhibit 123 was marked electronically.)

BY MS. JENSEN:

Q. And does this appear to be a true and accurate copy of an e-mail string that you sent to Lea Frye on February 3rd, 2015?

A. It does.

Q. And are you forwarding an e-mail from your daughter to Lea Frye?

A. Yes.

Q. And this is forwarding on an analyst report?

A. Yes.

Q. Was it after Anadarko's February 3rd, 2015, earnings call?

A. That, I don't know.

Q. So if you scroll down to APC '159692, do you see a reference to "CONFERENCE CALLS." (APC) at 9:00 a.m.?

A. I do.

Q. Does that help refresh your recollection

as to whether this is after the Anadarko earnings call?
A. Again, I don't know. My daughter had mailed it to me at 8:24 a.m., which would have been 9:24 Eastern Time. So honestly, I don't know the timing of the original call.
Q. Did you lis- -- you said you listened in to earnings calls?
A. Sometimes.
Q. And what time zone would you have been in at this time?
A. The one I'm currently in, Central.
Q. Central, which is an hour behind Eastern?
A. Correct.
Q. Okay. And do you understand when you receive e-mails, it reflects the time on your time zone?
A. Yes.
Q. And so, the time zone -- the time that's here is 8:24 a.m., which would be 9:24 Eastern?
A. Correct.
Q. Okay. So could you read into the record your daughter Jean- -- Jeanie's e-mail and your response.
A. From my daughter: "Positive on

Shenandoah."

My response: "From my daughter...the spin control must've worked. Wow."

Q. And you meant the spin on Shen-3; right?

A. At this moment, I don't know what I meant. I'd need some time to read this.

Q. So if you look at this document, there's some highlighting in it. And so, looking down, under "E&P," do you see that it highlighted, and it is "Anadarko Petroleum"?

A. I have a hard time seeing any highlighting on my copy of this.

Q. Oh, okay. It -- it doesn't show up in color, but it's shaded. Maybe that's a better way to say it. It appears shaded in this document, as it's black and white.

A. I think I see what you mean.

Q. You see. And the shaded part is "Anadarko Petroleum," and then there's "APC/82.77/Outperform." [As read].

And then also highlighted is "and a successful delineation well at Shenandoah 3," parenthesis -- parenthetically, "(Gulf of Mexico)"? [As read]

A. I see the second part of your statement,

yes.

Q. Okay. The "successful delineation well at Shen 3"? [As read]

A. Yes.

Q. And so that's what you were referring to when you said "spin"; right?

A. Yes.

Q. Because Shen 3 was a dry hole?

A. Yes.

MS. JENSEN: Okay. Let's pull up Tab 34.

BY MS. JENSEN:

Q. Okay. You should be able to see what we've marked as Exhibit 124.

MS. JENSEN: For the record, bears the Bates stamp APC '22869.

(Oudin Deposition Exhibit 124 was marked electronically.)

BY MS. JENSEN:

Q. Do you recognize this to be a true and accurate copy of an e-mail at the top between yourself and Lea Frye on February 12th, 2015?

A. I do.

Q. And in this e-mail, Ms. Frye had sent out a partner workshop agenda; right?

A. Yes.

Q. Okay. In any event, the -- the in- -- inference there is that it was -- you were saying are we going to have a truthful conversation, or is this going to be more propaganda.

MR. GRUENSTEIN: Objection.

THE WITNESS: Is there a question?

BY MS. JENSEN:

Q. Yeah.

A. Could you repeat it, please.

Q. Sure.

I said, so is the -- the gist of what you're asking here in a sarcas- -- sarcastic manner whether it's going to be a truthful discussion or a discussion based on propaganda?

MR. GRUENSTEIN: Objection.

THE WITNESS: I honestly don't know how to answer that question.

BY MS. JENSEN:

Q. And you were being sarcastic because you were frustrated that there wasn't the ability to have open discussions at these partner meetings?

A. In 2014, that was the case. In 2015, that became less of a case.

Q. In -- in any event, what you wrote here was a question about whether there would be an open

dialogue or a propagation presentation, and you wrote this in February 2015?

MR. GRUENSTEIN: Objection. Mischaracterizes.

BY MS. JENSEN:

Q. Right?

A. I did write that, yes.

Q. Okay.

MS. JENSEN: Okay. Let's pull up Tab 35.

BY MS. JENSEN:

Q. Okay. You should be able to see what we marked as Exhibit 125. And for the record, this is APC-00631429.

(Oudin Deposition Exhibit 125 was marked electronically.)

BY MS. JENSEN:

Q. And does appear to be a true and accurate copy of an e-mail exchange that you had with Doug Shotts copying in Lea Frye and Paul Chandler?

A. Yes, it -- yes, it does.

Q. Okay. And could you read into the record your e-mail.

A. "Doug, I saw your upcoming presentation on Insider (and also on the Elevision) and was wondering if you could make some small adjustments

to your talk. I noticed on your cover page that you used the phrases 'challenging problems', 'unmapped barriers', and 'uncertainty parameters', could you please remove them all as they imply a certain negativity about Shenandoah that is not truly not warranted at this time, especially for a discovery that may be one of Anadarko's all-time largest ever. If you have any reference -- references to faults in your presentation - as barriers, either unmapped or mapped - please refrain from calling them 'faults', referring to them instead as 'hypothetical lineaments with potential for full transmissibility'. In fact, you should probably change the title of your talk; 'Dynamic Uncertainty' is too strong and too negative a phrase for a discovery that is probably one of Anadarko's all-time greatest. Sincerely, (names withheld by request of 13th floor hall monitor)."

Q. And this is referring to a presentation that Doug Shotts was scheduled to give on the dynamic uncertainty in February 2015; right?

A. Yes.

Q. And that presentation was canceled because exploration didn't want him to present that information; correct?

A. The presentation was canceled. I don't know exactly why.

Q. Do you know who directed the cancellation of that presentation?

A. No, I don't.

Q. Was it the hall monitor for 13th floor?

MS. KAMIN: Objection.

THE WITNESS: That is an open-ended reference to anybody, like being in school again.

BY MS. JENSEN:

Q. So you didn't have anybody in mind when you said the hall monitor? Ernie Leyendecker, perhaps?

A. I don't know who I would have been referencing.

Q. This was your satire on the cancellation of the Shotts presentation; right?

A. It was.

Q. And what was Mr. Shotts' response?

A. That would be funny if there wasn't so much truth in it. Actually, my meeting with the exploration group went fairly well this afternoon. It started a little rough, but they kind of warmed up a bit by the end. I had changed a few things up before we met to temper the mood a bit."

Q. Was the presentation rescheduled?
A. I don't know.
MS. JENSEN: Okay. So, let's pull up Tab 36.
BY MS. JENSEN:
Q. While we're waiting for that, just to go back for a second. So, again, the 13th floor was where the exploration team worked; right?
A. Yes.
Q. And the exploration team was headed up by Ernie Leyendecker?
A. That is not correct.
Q. Who would you -- who would you say it was?
A. The team on the 13th floor was headed up by Tim Trautman.
Q. Oh, okay. And where did Ernie Ley- -- Leyendecker sit?
A. I don't know exactly. I don't know.
Q. Okay. Let's pull up what we've marked as Exhibit 126.
(Oudin Deposition Exhibit 126 was marked electronically.)
BY MS. JENSEN:
Q. And is marked with APC -- or for the record, is APC-'23283.

A. That was one of my potential interpretations, yes.

Q. Which ended up -- that prediction ended up being true?

A. Yes.

MS. JENSEN: Okay. Let's pull up Tab 52.

BY MS. JENSEN:

Q. Okay. You should be able to see what we have marked as Exhibit 133. And it bears the Bates stamp APC-'45791.

(Oudin Deposition Exhibit 133 was marked electronically.)

BY MS. JENSEN:

Q. And does this appear to be a true and accurate copy of an e-mail you received from Pat McGrievy on August 17, 2015, the subject line "Shen 4"?

A. Yes, it does.

Q. And in this e-mail, Mr. McGrievy is instructing you to "exercise caution and minimize discussions of Shen 4 on -- to an as-needed basis only"? [As read]

A. Yes.

Q. And -- and the reason being that Shen was "a tight hole exploration prospect with rath- --

rather large implications"? [As read]

A. That's what it says, yes.

Q. And that meant it could -- it could destroy the value of Shenandoah for Anadarko?

MS. KAMIN: Objection. Form.

THE WITNESS: I don't know what he meant by "rather large implications."

BY MS. JENSEN:

Q. What did you understand it to mean?

A. It could mean a reduction in size of the discovery.

Q. And could make it less commercially viable?

A. Commercial viability had yet to be determined.

Q. It could require a downward estimate of the resource at Shenandoah; right?

A. Yes.

MS. JENSEN: Okay. Let's pull up Tab 53.

BY MS. JENSEN:

Q. You should be able to see what we have marked as Exhibit 134, which has the Bates stamp APC-'645209.

(Oudin Deposition Exhibit 134 was marked electronically.)

BY MS. JENSEN:
Q. Okay.
A. I'm not there yet. One minute.
Q. Okay.
A. Okay.
Q. Okay. Does this appear to be a true and accurate copy of an e-mail thread between yourself, Paul Chandler, Christian Noll, Lea Frye, on September 13th, 2015?
A. It does.
Q. Okay. And at this point, you felt that even the high -- the -- sorry -- the -- the low side for MMBO might be too high for Shen 4?
A. Yes.
Q. Can you read your e-mail at the top of this string into the record.
A. "Okay, you're right, I'm sorry. My negative attitude is starting to weigh on this whole effort like a festering boil. Once we get back to drilling, I'm sure we'll find a full and possibly amalgamated suite of Wilcox sands, spot on prognosis, full-to-base with sweet, asphaltene-free oil, and in direct pressure communication with Shen-2. Hell, the porosities and perms might even be better than we've ever seen. I see the light

now, and I believe - I truly do - in all those things that Bob and Ernie and Beth and Jake have been saying about this project since June of last year. I can't let a little dose, an insignificant dose of geologic misfortune get me down. Shen-2 is one of the best wells ever drilled by this company, in deep water or anywhere else, and by golly, the field associated with that well has got to be one of the best in the world. So, let's keep digging, lads, and prove up this company-maker! Our ship is about to come in. I feel it."

Q. And you were being sarcastic?
A. Very.
Q. And the "Bob" you were referring to was who?
A. Bob Daniels.
Q. And Bob Daniels at the -- the time was a senior vice president?
A. If not, an executive vice president. I don't know his -- his rank at the time.
Q. That's right. He was on the executive committee at the time; right?
A. I believe so, yes.
Q. And "Ernie" refers to Ernie Leyendecker?
A. It does.

Q. And "Beth" is Beth Kendall?
A. Yes.
Q. And "Jake" is Jake Ramsey?
A. Yes.
MS. JENSEN: Okay. Let's pull up Tab 55.
BY MS. JENSEN:
Q. You should be able to see what we've marked as Exhibit 135.
MS. JENSEN: And for the record, it's APC '902.
(Oudin Deposition Exhibit 135 was marked electronically.)
BY MS. JENSEN:
Q. And does this appear to be a true and accurate copy of an e-mail exchange that you had with Paul Chandler and Lea Frye, with other people copied down the chain?
A. It does.
Q. And this is October 22nd, 2015?
A. Yes.
Q. So this is about a month after the e-mail that we just looked at?
A. I don't remember the time on the previous e-mail, but probably is.
Q. Well, yeah very close in time.

And the slide deck that Tim Trautman attaches here is -- was setting forth the Shen 4 second sidetrack rationale?

A. Yes.

Q. And you thought that the numbers that were being quoted here were very high; right?

A. They were optimistic, yes.

Q. In fact, they were so high, that you thought it made Anadarko look foolish, if not, stupid?

A. Yes.

Q. And Paul Chandler responded: "Come on Chip, looking stupid never slowed us down before! We can do this."

And what was your response to Paul?

A. "You're right. And by the way, the SEC thinks you would look good in orange."

Q. And to be clear, we're talking about the Securities and Exchange Commission?

A. That's what "SEC" would stand for, yes.

Q. And by "orange," you mean prison jumpsuit; right?

A. Yes.

Q. Okay. You can set that aside.

So you should be able to see what has been

marked as Exhibit 136, which, for the record, is APC '656540.

(Oudin Deposition Exhibit 136 was marked electronically.)

MS. JENSEN: There should also be an e-mail that accompanies this. Okay. We're having technical difficulties with this exhibit. So let's just move on. We'll come back to it.

Okay. Let's go with Tab 56.

BY MS. JENSEN:

Q. Okay. You should be able to see what has been marked as Exhibit 137.

MS. JENSEN: And for the record, this is APC '252949.

(Oudin Deposition Exhibit 137 was marked electronically.)

BY MS. JENSEN:

Q. Do you recognize this document?

A. I do.

Q. Does this appear to be a true and accurate copy of an e-mail you sent to Matt Morris copying Paul Chandler on June 13th, 2019 -- 2016?

A. It is.

Q. And it says "RCT Review"?

A. It does say that, yes.

Q. Yes.
A. Yes, it is.
Q. And this follows the meeting of the notes of which we just looked at in the last exhibit. And this is right after that meeting; right?
A. Yes.
Q. And do you recall that in that RCT review, there was discussion about the adjustment, the downward adjustment of the resource size numbers for Shenandoah?
A. Yes.
Q. And as a result of that meeting, there was an agreed-upon mean, according to the attachment to Lea's e-mail, of 426 MMBOE?
A. Yes.
Q. And that was the compromise that was forged between the exploration and development teams?
A. Yes.
Q. And that mean accounted for some risk that the east side of Shenandoah could fail entirely?
A. Yes.
Q. And that was a risk that the development team thought was a -- a real possibility?
A. Yes.

MS. JENSEN: Okay. Let's pull up Tab 64.

BY MS. JENSEN:

Q. You should be able to see what we have marked now as Exhibit 140.

MS. JENSEN: And it bears the Bates stamp APC '666725.

(Oudin Deposition Exhibit 140 was marked electronically.)

BY MS. JENSEN:

Q. Does this appear to be a true and accurate copy of an e-mail exchange between you and Paul Chandler and some of it with Lea Frye?

A. Yes.

Q. And after the RCT review, which required a downward adjustment of the Shenandoah resource size, the exploration team continued to use higher numbers; right?

A. Yes.

Q. And that's what this e-mail's concerning?

A. Yes.

Q. Could you read your e-mail to Lea and Paul on January 28, 2016?

A. The one that starts off with "Bunk"?

Q. Yes.

A. "Bunk. Pure adulterated gibberish.

LWD" -- Lower Wilcox D -- "is wet in all but one western fault block (Shen2). Lower Wilcox E is possible on-water in Shen4 Sidetrack 1 and has a potentially shaled-out" -- "and has potentially shaled-out less than 400 feet away in Shen4 Sidetrack 1, Bypass 1. I'm so confused: Is Shen1 disconnected but it's P99 resources are not? So they therefor extend beyond its fault block boundaries? [As read]

"Just order the damn floater with all the water injection you want. The resources warrant it. And let's rename this puppy 'Heidelberg II.'"

Q. And you were being sarcastic?

A. Very.

Q. And what was the reference to "Heidelberg II"?

A. Heidelberg was a discovery that went to production with a spar and disappointed in terms of its results. The underlying geology and structure was far more complicated than any group envisioned and at the time I wrote this, was producing less than they thought it was going to produce.

Q. And so, based on Paul's response to you, exploration -- the exploration team didn't tell the development team that they were going to go forward

with their higher numbers despite the RCT review?
A. What -- the question? I'm sorry?
Q. He says: "When do you think they were planning to tell us about this??" [As read]
So as of this point, nobody had informed the development team that the higher numbers were continuing to be used?
A. I guess I'm -- I'm still lost as to what the question is.
Q. So you read Paul Chandler's e-mail, the last clause, "When do you think they were planning on telling us about this??"
So as of this time, nobody had told you that the higher numbers had continued to be used after the RCT review?
A. That is correct.
MS. JENSEN: Okay. Let's pull up Tab 60.
BY MS. JENSEN:
Q. Okay. You should be able to see what we have marked as Exhibit 141.
(Oudin Deposition Exhibit 141 was marked electronically.)
BY MS. JENSEN:
Q. Does this appear to be a true and accurate copy of -- actually, hold on a second.

You are not copied on this.

So have you seen this -- have you seen this document before?

A. I have not seen the e-mail before.

Q. And do you understand this to be an e-mail sending the Shenandoah pre-read materials for an executive meeting on or about February 1st, 2016?

A. Mine is dated January 31st, if that's what you meant.

Q. Right.

But it says "pre-read for tomorrow's EC Meeting"?

A. Okay.

Q. And if you scroll down to the attachment, do you see the title -- I'm sorry -- the -- the date?

Did you attend the February 1st, 2016, executive committee meeting?

A. I think so.

Q. Did you present?

A. Yes.

Q. And did you present this entire PowerPoint presentation?

A. No.

Q. Who else presented?

Q. Did you believe that at the time?
A. No. At the time, I felt it was coming from my counterparts in the exploration team group.
Q. And Tim Trautman?
A. Yes.
Q. But one of your e-mails referred to a VP, and I believe it was to Leyendecker; correct?
A. I do know of one e-mail referring to a VP, where I probably referred to him as Leyendecker. I don't know the context of that e-mail right now.
Q. The -- the VP and his minions, that was Leyendecker; right?
A. That was Ernie, yes.
Q. Okay. Okay.
And you do understand that the lawyers who you spent 16 hours on the phone with in advance of this deposition, they represent Ernie Leyendecker? You know that; right?
MS. KAMIN: Objection. I don't represent Mr. Leyendecker.
MS. JENSEN: I'll -- I'll amend.
BY MS. JENSEN:
Q. The lawyers from Cravath that you spent 16 hours with, you know they represent Ernie Leyendecker; right?

A. I know that, yes.

Q. And so if that gag order came down at the time, one could say that you're still under a gag order, couldn't you?

MS. KAMIN: Objection.

BY MS. JENSEN:

Q. You're now being told what to do by the Defendants' counsel, aren't you?

A. No, I am not, and I object to that insinuation. I basically gave you my testimony under oath today, sworn in, first thing. The answers I have given you have been my own, and I really object to any insinuation otherwise.

Q. This case isn't about reserves, is it?

MR. GRUENSTEIN: Objection. Calls for a legal conclusion.

MS. JENSEN: Well, he hasn't shied away from it before.

BY MS. JENSEN:

Q. Do you know if this case is about reserves?

A. This case is not about reserves.

Q. Okay. Just a couple more questions.

So you worked with Lea Frye for -- for several years; right?

A. For a little less than two, yes.
Q. You worked with her closely?
A. Define "closely."
Q. Well, you sat right next to each other.
A. We sat in adjacent offices, yes.
Q. Okay. And you respected her work on the Shenandoah project; right?
A. I did.
MS. JENSEN: Okay. No -- no further questions.
MR. GRUENSTEIN: Nothing from me.
THE COURT REPORTER: May we go off the record, please?
MS. JENSEN: Yes.
THE VIDEOGRAPHER: All right.
MS. JENSEN: Oh, I'm sorry, before we go off the record, I just want to make sure it's clear my reservation still stands from earlier.
THE VIDEOGRAPHER: Okay.
MS. JENSEN: Okay.
THE VIDEOGRAPHER: All right. With that, we are off the record at 8:44 p.m. This ends today's testimony given by Chip Oudin. The total number of media used was eight and will be retained by Veritext Legal Solutions. One moment, please.

All right.

(Proceedings concluded, 8:44 p.m., on June 30, 2022.)

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name. Dated: 7th day of JULY, 2022



Hanna Kim

CLR, CSR No. 13083

# EXHIBIT 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------x

IN RE: ANADARKO PETROLEUM CORPORATE SECURITIES LITIGATION

Case No. 4:20-cv-576

---------------------------------x

December 16, 2022
10:07 a.m. (CST)

REMOTE VIDEOTAPED DEPOSITION

of LYNDON PITTINGER, held at the above time and date taken before Erica Ruggieri, RPR, CSR and Notary Public of The State of New York.

* * *

understand that. I think you said -- the transcript says "separation phase" but I think you said in the "Exploration phase," the appraisal phase or the sanctioning phase?

MS. JENSEN: Ben, can we go off the record. I'm not able to access the real-time and there's a number of issues I think with the transcription here so let's go off the record.

MR. GRUENSTEIN: Okay.

THE VIDEOGRAPHER: Standby. The time is 10:25. We are going off the record. One second, please.

(Whereupon, there is a recess in the proceedings.)

THE VIDEOGRAPHER: The time is 10:44 a.m. We are back on the record.

Q. Okay. Welcome back. Since we had to take a little break why don't we go back and I'll ask the

question again as to what you mean by commercially unviable?
A. Commercially unviable is not a specific industry term. It's just to me in the context of this case, you know, commercially viable is an investment that the investor wants to proceed with.
Q. Okay. And you said earlier that when you are thinking of the investor you are thinking about the final investment decision; is that correct?
A. In the context of this case that's one of the most important decisions made, but there's also economic evaluations along the way after each well is drilled and after each major development occurs of whether the project remains viable.
Q. And when you say whether it remains viable, you mean whether it is an investment that the investor wants to proceed with?
MS. JENSEN: Objection to

form.

A. In the context of this case the -- during an appraisal program the economic process of addressing uncertainty remains essentially the same. The Rose and Associates methodology is applicable to each Exploration appraisal and development equally and, you know, therefore, the economics get revised after each well. Those economics help the investor know is further investment warranted in this.

Most important of the investment decisions is the final investment decision because of the magnitude of the capital being committed at that point. But the economic viability, commercial viability, which I'm equating economic measures of profitability, you know, needs to be on a risk-weighted basis commercially attractive at every stage of the process.

Q. Does commercial viability bear on whether a company continues appraising a project?

MS. JENSEN: Objection to the extent it calls for speculation. Foundation.

A. In the context of this case economic valuations during exploration when they drill -- before they drilled Shen-1 and economics run to justify each of the appraisal wells are all important evaluations that the expected value, the probability of weighted outcome of economic cases that have been run to capture the range of possible outcomes needs to be positive.

Q. So was Shenandoah commercially viable before Shen-1 was drilled?

A. That's outside the scope of my study.

Q. Was it -- I'm sorry, why is it outside the scope of your study?

A. I just corrected myself, of

my report.
Q. Why is it outside the scope of your report?
A. I just simply didn't look at many documents at all regarding Shen-1. I focused on Shen-2 going forward.
Q. Okay. So was Shenandoah commercially viable after Shen-2?
A. That's out of the scope of my study as well. I did not see economics -- did you say before Shen-2 or after Shen-2?
Q. I said after Shen-2.
A. After Shen-2. My work focused on the economics of Shen-3 going forward. I do not recall seeing documents on Shen-2 economics.
Q. Okay. How about after Shen-3, was Shenandoah considered commercially viable after Shen-3?
A. If we could go to my report. Starting on paragraph 222 you can see a Development team

STATE OF NEW YORK )
ss.:
COUNTY OF NEW YORK )

I, ERICA L. RUGGIERI, RPR and a Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings in the within-entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 2022.

ERICA L. RUGGIERI, RPR, CSR, CLR

# EXHIBIT 16

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

--oOo--

In Re: ANADARKO PETROLEUM
CORPORATION SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

_________________________________/

VIDEO-RECORDED DEPOSITION OF JONATHAN MICHAEL RAMSEY

VERITEXT VIRTUAL

THURSDAY, AUGUST 4, 2022

Reported by:
Anrae Wimberley, CSR No. 7778
Job No. 5316162

A. Couldn't rule out the possibility. 12:38:54
You're correct, you can't rule anything out based off of this data.
Q. And was the executive committee advised that Shen 1 was potentially connected to Shen 3? 12:39:15
A. And, again, we go back to the map that you showed on Slide 7, and that exact message was delivered on that map.
MR. MEJIA: Okay. I'm going to introduce the next exhibit. 12:39:55
MS. PHILLIPS: Hey, Frankie, we've been going for over an hour. Is now a good time for a break?
MR. MEJIA: Yeah, sure. How long would you like?
MS. PHILLIPS: Maybe just 10, 15 minutes -- or 12:40:04 it's up to you, Mr. Ramsey.
THE WITNESS: Let's do 10.
MS. PHILLIPS: Sure.
MR. MEJIA: Back at 10:15.
THE VIDEOGRAPHER: All right. We are going off 12:40:14 the record. The time is 12:40 p.m. and this is the end of Media Unit No. 1.
(Recess taken.)
THE VIDEOGRAPHER: All right. We're back on the record at 12:59 p.m. and this is the beginning 12:59:32

of Media Unit No. 2. 12:59:36
Go ahead, please.
MR. MEJIA: Okay. I'm going to introduce the next exhibit.
THE WITNESS: Yes, sir. 12:59:43
(Deposition Exhibit 228 was marked.)
MR. MEJIA: This is being marked as Exhibit 228 and has Bates Nos. APC-00147963.
THE WITNESS: Yes, sir.
BY MR. MEJIA: 01:00:17
Q. Do you recognize this document?
A. I do not.
Q. Does it appear to be a true and accurate copy of an e-mail between you and Tim Trautman on November 24th, 2014? 01:00:30
A. I have no reason not to believe so.
Q. Okay. You write to Mr. Trautman, "Just FYI... Below is the conceptual project timeline presented to the Shenandoah partnership last week, given the 'Bad news from Shen'." 01:00:51
Do you see that?
A. I do.
Q. Does the "Bad news from Shen" refer to the fact that Shen 3 was a dry hole?
A. Correct. 01:01:05

Q. And then you write, "Our OneGOM development counterparts need the Shen 4 well to 'prove MFS (minimum field size)' to be able to keep the below schedule, so that the partnership can approve the field development plan in Q3 of 2016." 01:01:06 01:01:25
Do you see that?
A. Yes, sir.
Q. What does "OneGOM" mean?
A. "OneGOM" refers to the combination of both Exploration and Development working together closely. 01:01:36
Q. And what does "minimum field size" mean?
A. That referred to the smallest volume of hydrocarbon recoverable, proven, at the Shenandoah opportunity. 01:02:13
Q. Minimum for what purposes?
A. Likely to move it onto a more commercial track from its current, at this time, appraisal track.
Q. Is it the minimum number of -- you said proven resources? 01:02:27
A. Correct.
Q. -- that would be needed to make the project economical?
A. Move out of the appraisal phase and into a 01:02:40

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript ( ) was (X) was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 6, 2022

ANRAE WIMBERLEY, CSR No. 7778

# EXHIBIT 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM ) Civil Action No.
CORPORATION SECURITIES ) 4:20-cv-00576
LITIGATION )
_______________________________ )

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
DOUG SHOTTS

Wednesday, June 29, 2022
Remotely Testifying from The Woodlands, Texas

Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5299971

it. So we must have discussed it. I don't doubt that.

Q. What did he say?

A. Well, in -- as his e-mail, he's still saying he's still not sure that he would include it, 15:46:02 which would tell me that we discussed it. And in the meeting he wasn't sure whether he would in- -- include it there, so we must have had discuss- --

Q. Did he say anything beyond -- sorry. Go ahead. I thought you were finished. 15:46:15

A. No.

So that tells me that we must have discussed it during the meeting and -- and -- and talked about it.

Q. Okay. In the -- in the next e-mail, 15:46:22 Sathish says that the meeting can- -- is canceled.

Do you see that?

A. Right.

Q. Is this when you first learned that the meeting would be canceled? 15:46:40

A. I don't know if he told me apart from this or not. I -- I would take this as being notifying all the other people. I don't re- -- recall if he told me before this or not.

Q. In the top e-mail you forward a string to 15:46:55

Neha Bansal and say: "FYI. How things change."
You see that?
A. Right.
Q. What things were you -- were you referring to? 15:47:16
A. Well, the meeting was canceled --
Q. Right.
A. -- and so she needed to be aware so that she could notify everybody that we weren't going to have a meeting. 15:47:28
Q. Right.
But when you say "How things change," what things were you referring to in that sentence of your e-mail?
A. I believe I was referring to the ability 15:47:36 to have the meeting. At one point, we were able to have it, and now it's canceled. We're not able to have it.
Q. And so what -- what -- what about -- so prior to exploration's cancellation of the meeting, 15:47:55 you were allowed to have this meeting. And after they stepped in, you weren't allowed; is that right?
MR. WYLLY: Ob- -- object. It misstates the record and the prior testimony.
BY MR. MEJIA: 15:48:13

Q. I -- I didn't hear your answer. I'm sorry.
A. That's my -- that's my recollection as well.
Q. Okay. And I -- and I think you mentioned this previously, but I think I missed it. 15:48:19
Why did you forward this string to Neha?
A. Neha was the individual responsible for coordinating the -- the talk. And so, she would have needed to know in order to cancel all the arrangements. 15:48:39
Q. Got it. Okay.
MR. MEJIA: Can we move on to Tab 12, which will Exhibit 99.
THE COURT REPORTER: Excuse me, Counsel. 15:48:53
MR. MEJIA: Yeah.
THE COURT REPORTER: I believe it's not be 99. The next one will be 100.
MR. MEJIA: Oh, sorry. I -- I misspoke.
(Shotts Deposition Exhibit 100 was marked electronically.) 15:49:08
BY MR. MEJIA:
Q. If you'd let me know when you have it open and had a chance to review it.
A. Okay. Just opened. 15:49:21

Okay. I got it.
Q. Do you recognize the document?
A. Yeah, vaguely.
Q. Does it -- does it appear to be a true and accurate copy of an e-mail string that began on 15:49:58 February 17, 2015, between you, Chip Oudin, Lea Frye, and Paul Chandler regarding your con- -- regarding "Controversial presentation materials"?
A. That -- the e-mail looks accurate.
Q. Okay. And the -- do the "controversial 15:50:16 presentation materials" refer to your -- your canceled meeting that we were just discussing?
A. What -- does -- I don't know the term "controversial presentation material."
Q. It's in the subject line. 15:50:35
A. Oh.
Yes, so that's -- that's Chip's description. Sorry.
Can you repeat the question.
Q. Sure. 15:50:46
Is -- is he just referring to the -- the canceled presentation that we were just discussing?
A. I -- yeah, it's referring to the same presentation.
Q. Okay. And in Chip's e-mail to you in the 15:50:55

bottom he says: "I noticed on your cover page that you used the phrases 'challenging problems,' 'unmet barriers,' and 'uncertainty parameters'; could you please remove them all, as they imply a certain negativity about Shenandoah that is not truly warranted at this time, especially for a discovery that may be one of Anadarko's all-time largest ever." [As read] 15:51:21

Do you see that?

A. I see that. 15:51:32

Q. And -- and Oudin is on the development team; correct?

A. Right. He's a geophysicist on the development team.

Q. Okay. And he agreed with your modeling; correct? 15:51:46

MR. WYLLY: Objection. Calls for speculation.

THE WITNESS: And when you say "the modeling," we all had a part in -- in constructing the model. So it would -- it had -- would have had his interpretations in there as well. 15:52:01

BY MR. MEJIA:

Q. Okay. So did he, I guess put it another way, disagree with your model? 15:52:12

MR. WYLLY: Objection. Calls for speculation.

THE WITNESS: Yeah, I was -- I mean, he never -- I don't remember him talking about disagreeing or agreeing specifically with the model. 15:52:21

BY MR. MEJIA:

Q. Okay. The -- do you have any knowledge of him disagreeing with your model?

A. No.

Q. Okay. And so, you were asked to remove 15:52:34 information from your presentation; correct?

A. Correct.

Q. And the -- the "challenging problems," "unmet barriers" and "uncertainty parameters" that you originally included in your presentation, those 15:53:08 were all real risks at that point in time for Shenandoah; correct?

A. Correct.

Q. And you wouldn't have put something that was inaccurate in your presentation; right? 15:53:22

A. Not knowingly.

Q. Okay. And moving on to the top e-mail, you write: "That would be funny if there wasn't so much truth in it."

Do you see that? 15:53:46

A. I see that.
Q. But you agree with Chip's e-mail; correct?
A. I don't know that I agree with Chip's e-mail. I agree with the sentiment that there was some frustrating information or changes and -- and not being able to discuss some of the technical information. And so, that's what I was referring to there, I -- I think. 15:54:05
Q. But you would agree that it -- that Chip's e-mail was true, though; correct? 15:54:23
A. Not that it was true; that there was a truth sentiment behind it in the sense that people are asking us to rephrase things and cancel things at the last minute. And so that there's some truth in it, but not that his e-mail is true per se, because this e-mail was obviously in jest, if you look at the content of it. It's satire. 15:54:42
Q. You testified that there was a -- a frustrating sentiment. You were frustrated about the cancellation? 15:54:59
A. Yeah, I would say I was frustrated by it.
Q. That was because it was canceled because of its content?
A. I was frustrated that it was canceled the last minute, you know, it -- it had been prepared 15:55:12

for. I didn't know there was going to be all this last-minute back and forth. And then in -- at the -- at the final hour, it was canceled. So that was my main frustration.

MR. MEJIA: Okay. Can we go to Tab 13, which, I think, will be Exhibit 101. 15:55:53

(Shotts Deposition Exhibit 101 was marked electronically.)

THE WITNESS: Okay.

BY MR. MEJIA: 15:56:18

Q. Do you recognize this document?

A. Yes, I believe so.

Q. Is it a true and accurate copy of a instant message conversation that you had with Jackson Bi on February 19, 2015? 15:56:35

A. I think so.

Q. Okay. Who is Jackson Bi?

A. Jackson was a fellow engineer in the same group that I was working in. So I believe he reported to Sathish as well. 15:56:59

Q. Okay. Did he work on Shen?

A. No.

Q. Okay. And at 7:51 on this day, he asked you why is it canceled -- or -- right?

Do you see that? 15:57:20

A. Yes.
Q. And you respond: "Word came down from Talley that the Exploration SVP was not happy with the content. Apparently, an open technical discussion is not something we like to do here," 15:57:33 parenthesis, "(hint of sarcasm)," close parenthesis.
Do you see that?
A. Right.
Q. And you're referring to Robert -- Robert Talley there; correct? 15:57:44
A. Yeah.
Q. And he was the -- the -- the VP of geoscience and technology; is that right?
A. Correct.
Q. And is the SV- -- the -- the "Exploration 15:58:00 SVP" that you're referring to there, Ernie Leyendecker?
A. Yeah, that would have been Ernie.
Q. Okay. And it -- your response there says: "Word came down from Talley." 15:58:14
Did Robert Talley inform you directly that the meeting would be canceled?
A. No. I don't think Talley -- I -- I didn't really have much contact or access to Talley. So I'm sure that that would have come down through 15:58:33

Sathish.

Q. Okay. And you say "the Exploration VP was not happy with the content; correct [verbatim]?

A. Apparently, that's what I had heard at the time. I didn't hear that -- 15:58:50

Q. Was the content that he was --

Sorry. Go ahead.

A. Oh, I just was saying I didn't have direct contact with him to know what his thoughts were, but that's, apparently, what I thought at the time. 15:59:00

Q. Okay. And was the content that he was unhappy with related to the information in the presentation regarding faulting?

A. I don't know the specific of what he was unhappy with, apparently. 15:59:13

Q. Do you have an understanding as to whether or not it had to do with information that you took out of your original presentation?

MR. WYLLY: Objection. Vague.

THE WITNESS: No idea on my end. I think 15:59:30 that was probably the frustration at the time.

BY MR. MEJIA:

Q. In the next sentence you say -- in the next sentence you say: "Apparently, an open technical discussion is not something we like to do 15:59:51

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name. Dated: 7TH day of JULY, 2022

Hanna Kim
CLR, CSR No. 13083

# EXHIBIT 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

______________________________
)
In re ANADARKO PETROLEUM )
CORPORATION SECURITIES )Civil Action No.
LITIGATION )4:20-cv-00576
)
______________________________)

CORRECTED TRANSCRIPT
VIDEOTAPED REMOTE DEPOSITION OF ROBERT STRICKLING
Deponent testifying from Owenton, Kentucky
Thursday, July 21, 2022
Volume I

Stenographically Reported By:
Melissa M. Villagran, RPR
CSR No. 12543
Job No. 5306719
PAGES 1 - 234

Q Yeah. I'm referring to those numbers on the bottom right-hand corner of the page. Those are called Bates numbers. And just for ease of reference --
A Yes, I see that, yes. 02:21:22
Q -- I'll -- I'll refer to those when I can.
So if you look at --
A Okay.
My screen isn't quite big enough to show that, so I'm having -- 02:21:32
Q Okay.
So yeah. If you look at the Bates page ending 093, that's the first page of the letter.
Do you see that?
A I do. 02:21:38
Q Okay.
And this is written by Mr. Pachman, this particular letter, correct?
A I believe so, yes.
Q He's shown as the signatory; is that right? 02:21:49
A Yes.
Q And it's about the Shenandoah project; is that right?
A Yes.
Q Specifically Shen 3, correct? 02:21:56

A Correct.
Q And it's written to Anadarko's four partners, correct?
A Yes.
Q ConocoPhillips company, right? 02:22:06
A Yes.
Q Marathon Oil Company, correct?
A Yes.
Q Venari Offshore, LLC, right?
A Yes. 02:22:15
Q And Cobalt International Energy, L.P., correct?
A Yes.
Q Okay.
And if you look at the first -- or the second 02:22:20 sentence of the second page of the letter, the letter on page 094, it begins, "Please note."
Do you see that?
A No, I haven't found that yet. Just a moment.
Q It's the second sentence of the second page 02:22:37 of the letter.
A "Please note," yes.
Q And it reads (as read):
"Please note that the "dry hole case" equates to encountering wet 02:22:50

sands, and the "success case" equates
to encountering oil via LWD, mud logs,
or other tools while drilling through
the objective" session "section.'"
Do you see that? 02:23:02
A Yes.
Q Okay.
So this is in reference to an appraisal well, right?
A Yes. 02:23:06
Q And Mr. Pachman defines a dry hole case as encountering wet sands.
Do you see that?
A Yes.
Q Wet sands would indicate an absence of 02:23:16 hydrocarbons, correct?
A Yes.
Q And the success case, Mr. Pachman says for this appraisal well, equates to encountering oil via LWD. 02:23:30
Do you see that?
A Yes.
Q Okay.
And what does LWD stand for?
A Logging while drilling. 02:23:38

Q Okay.
And for the Shen 3 appraisal well, was it a dry hole case or a success case?
A We encountered the wet sand, so if I were to -- it would be a dry hole case. 02:23:54
Q Okay.
I'll show you what we'll mark as Plaintiff's Exhibit 187 for identification.
A But also, for clarification, I believe he's -- when he references a dry hole case, it's 02:24:32 that we're not going to do the amount of -- we're not going to do the testing of -- of -- that sometimes comes out as a separate decision, how much logging, how much testing, how much sampling we're going to do. 02:24:46
Q He doesn't say that in this letter, though, does he?
A No.
(Exhibit 187 was marked for identification and is attached hereto.)
BY MR. DROSMAN:
Q Okay.
I'm showing you what has been marked as Plaintiff's Exhibit 187 for identification. 02:25:02

A Okay.
Q And I'll let you know when -- okay.
Go ahead and refresh your browser now, and it should be up and available.
A Okay. 02:25:08
MR. DROSMAN: And just for the record, Plaintiff's Exhibit 187 consists of a presentation Bates-stamped APC-00129851 and is 28 pages in length.
BY MR. DROSMAN: 02:25:27
Q And let me know, Mr. Strickling, when you're through reviewing this presentation.
If it's helpful, I can begin asking questions, and then if you need additional time to review the document, you can always let me know, and 02:26:33 I'll afford you that time.
Does that make sense?
A Yes, but I would prefer to -- to look at the entire document to get a feel for --
Q Okay. 02:26:39
Yeah, just let me know when you're -- when you're through.
A Okay.
Q Okay.
Do you recognize this presentation? 02:27:43

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ X ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name. Dated: July 25, 2022

MELISSA M. VILLAGRAN
CSR No. 12543 RPR

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

--------------------------------------------------x

In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION

Civil Action No. 4:20-cv-00576

--------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
ROBERT ALVIN WALKER
Thursday, October 20, 2022

Reported By: Lynne Ledanois, CSR 6811
Job No. 5378979

behalf of Jim advanced materials for reading for 1:22PM
discussion at this offsite where we were going to go
into these materials in depth.
Q If you turn to page ending 603. That's
the Bates numbers. 1:22PM
A That would be slide number -- we cannot
tell. This is "Shenandoah Appraisal Assumptions" is
the title?
Q Correct. It says -- the title is
"2016-2017 Shenandoah Appraisal Assumptions." 1:22PM
Do you see that?
A I do.
Q Do you see the first bullet point on the
page reads, "Results of Shen 4 Impact."
Do you see that? 1:22PM
A I do.
Q And then under that it reads, "Suggests
mid-case reduction of about 900 million barrels of
oil equivalent or about 1/3rd mapped STOIPs."
Do you see that? 1:23PM
A I do.
Q And you understand what STOIP refers to,
don't you?
A That's basically oil in place.
Now, what I don't know is whether that's 1:23PM

900 million gross or 900 million net. We only own a 30 percent interest in this well, I believe. 1:23PM

Q So you were told in this presentation that was provided on September 28th and 29th, 2015 that Shen 4 resulted in a reduction of about 900 million barrels of oil equivalent; right? 1:23PM

A I think that suggests a mid-case reduction to the gross was that reduction. But the above graphic has nothing to do with the below information.

The above is a rig schedule. 1:23PM

Q You were told in the presentation dated September 28th and September 29th, 2015 that the Shen 4 resulted in a mid-case reduction of about 900 million barrels of oil equivalent; right?

A Again, I don't know if that's gross or net. 1:24PM
My assumption would be that it's gross. And even with that reduction that's shown here, you see a forward with the rig schedule you see above.

Q Were you told on -- in the presentation dated September 28th and September 29th, 2015 that 1:24PM
Shen 4 resulted in a mid-case reduction of about 900 million barrels of oil equivalent?

A I do not recall it, but it would appear from this slide that that was what was reported.

Q Were you told on in the presentation dated 1:24PM

September 28th and September 29th, 2015 that Shen 4 1:24PM
resulted in about a one-third mapped reduction of
oil in place?
A Yes, but that wouldn't be unusual.
MR. DROSMAN: Move to strike everything 1:25PM
after "yes" as nonresponsive.
Q Were you told in the presentation dated
September 28th and September 29th, 2015 that the
results of Shen 5 could condemn the Shenandoah
project? 1:25PM
A Well, that's a pre-well -- predrill comment
depending upon what we find from that well.
Keeping in mind that in Algeria, we
produced 2 billion barrels to the 100 percent
working interest and the first six wells we drilled 1:25PM
there were dry.
So the fact that there is a number of
wells that were unproductive doesn't necessarily
condemn the next well if, in fact, it gives you
geologic encouragement to keep going. 1:25PM
MR. DROSMAN: Move to strike as
nonresponsive.
Q Do you see under the first bullet point
"Results of Shen 4 Impact," colon?
Do you see that heading? 1:25PM

A I do. 1:25PM
Q Do you see the third sub reads, "Results of Shen 5 could condemn the project"?
A Yes, I do.
Q Were you told in the September 28th and 1:26PM September 29th, 2015 presentation that the results of Shen 5 could condemn the Shenandoah project?
A I don't recall, but I don't dispute the bullet.
Q And this is a presentation that you 1:26PM received when you attended an offsite; correct?
A That's correct. But the bullet would not be atypical. Again, you only learn from wells when you drill the information in order to understand what you do next. 1:26PM
MR. DROSMAN: Move to strike everything after "that's correct" as nonresponsive.
Q Did Anadarko issue press releases with its quarterly earnings every quarter during the years 2015 through 2017? 1:26PM
A We issued press releases with any earnings in quarterly report, so the answer would be yes.
Q What is the purpose of a press release announcing quarterly earnings results?
A Is to provide context to the financial 1:27PM

A No, she never approached me and I was never aware of any of this at that time, nor do I know for a fact it to be true. 4:17PM

But, again, the SEC I believe investigated this and took no action. 4:17PM

Q Had you read the letter, you would have learned of her allegations; correct?

A Correct. But on the other hand, it wasn't something for me to deliberate. It was for the audit committee to deliberate since it was sent to the SEC. 4:17PM

MR. DROSMAN: Move to strike as nonresponsive everything after "correct."

I'll show you what we'll mark as Plaintiff's Exhibit 430 for identification. It's a single-page email bearing Bates number APC-01227135. 4:18PM

(Exhibit 430 was marked for identification by the court reporter.)

BY MR. DROSMAN:

Q Do you see that?

A Not yet. 4:18PM

Did you say 437?

Q 430.

A Sorry, these things are not coming down sequentially.

Sorry, I don't have it yet. 4:18PM

Now I have it. 4:18PM

Q You sent this email; correct?

A Yes. Let me just take a second and refresh my memory of this.

Yes. 4:19PM

Q Okay. Did you send this email?

A Yes, I did. This was sent to -- this would have been an Anadarko all employee email.

Q So you sent this email to all Anadarko employees; right? 4:19PM

A That's correct.

Q And you sent it on or about August 23rd, 2016; right?

A Yes.

Q The subject was "APC leadership changes"; 4:19PM rate?

A Correct.

Q And you wrote, "This afternoon we issued a news release announcing expanded role for Darrell Hollek and the promotion of Ernie Leyendecker to the 4:19PM executive committee."

Do you see that?

A Yes, I do.

Q So you promoted Ernie Leyendecker to the executive committee; is that fair? 4:19PM

A I did on Bob Daniels' recommendation. 4:20PM
Q That was after this particular letter that we looked at to the SEC whistleblower office was written; correct?
A Correct. I believe, and you can correct me if I'm wrong, at that point the SEC had chosen to take no action. Is that correct? 4:20PM
MR. DROSMAN: Move to strike as nonresponsive everything after "that's correct."
Q So you promoted Ernie Leyendecker to the executive committee after the whistleblower letter had been issued; correct? 4:20PM
A I don't know the sequence, but the fact that the whistleblower complaint had been sent to the SEC and had been handled by the audit committee and the SEC took no action, it didn't leave any weight at that point in time with Bob Daniels' recommendation. 4:20PM
Q The SEC complaint was written on June 4th, 2016; right?
A I can go back to it. I don't recall the date since I didn't read the complaint. 4:20PM
Q If you need to, it's Plaintiff's Exhibit 311. If you need to verify that it was written on June 4th, 2016, take a look at it.
A If you said it is, that's sufficient for me. 4:21PM

Q I'd like you to verify personally. 4:21PM
A Tell me the exhibit again.
Q Plaintiff's Exhibit 311.
A June of '16, okay.
Q June 4th, 2016, that's when the whistleblower complaint was dated; correct? 4:21PM
A Correct.
MR. SLIFKIN: I would note for the record that on the subsequent pages it says May 9th, 2016.
BY MR. DROSMAN: 4:21PM
Q Both May 9 and June 4th, 2016 predate your decision to promote Ernie Leyendecker; correct?
A It would appear such, yes.
Q In fact, they predate his promotion by you by over two months; correct? 4:22PM
A It would appear as such, yes.
MR. DROSMAN: Let's take a look at another document, which I'll mark as Plaintiff's Exhibit 431 for identification. I'll let you know when it's available. 4:22PM
(Exhibit 431 was marked for identification by the court reporter.)
THE WITNESS: Okay. Because I'm not seeing it.

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: October 24, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS

CSR No. 6811

# EXHIBIT 20

Anadarko Petroleum Corporation

# NEWS

## ANADARKO ANNOUNCES ANOTHER DEEPWATER GULF OF MEXICO DISCOVERY

HOUSTON, Feb. 4, 2009 – Anadarko Petroleum Corporation (NYSE: APC) today announced its second deepwater Gulf of Mexico discovery this week. The Shenandoah discovery well, located in Walker Ridge block 52, encountered net oil pay approaching 300 feet in the Wilcox formation.

"This has been a remarkable week, with back-to-back deepwater discoveries in the Gulf of Mexico," said Bob Daniels, Anadarko Sr. Vice President, Worldwide Exploration. "Initial data indicates the Shenandoah discovery has reservoir properties that appear to be of much higher quality than industry has seen previously in the emerging Lower-Tertiary play. The success of this well and our recent Heidelberg discovery further confirms the value of Anadarko's extensive acreage position and our capability in exploring proven and emerging deepwater basins worldwide."

Shenandoah is located in approximately 5,750 feet of water and was drilled to a total depth of about 30,000 feet. Anadarko and the co-owners of the discovery are evaluating the well results and the next steps toward future appraisal activity. Anadarko operates Shenandoah with a 30-percent working interest. Co-owners of the discovery include ConocoPhillips (40-percent working interest), Cobalt International Energy, L.P. (20-percent working interest) and Marathon (10-percent working interest).

Also in the deepwater Gulf of Mexico, Anadarko expects to spud the Vito Middle-Miocene prospect in Mississippi Canyon block 984 and the Samurai Middle- and Lower-Miocene exploration well in Green Canyon block 432 during the first quarter. Anadarko operates these wells with a 20-percent working interest and a 33.33-percent working interest, respectively.

A map of the Shenandoah discovery and Anadarko's additional Lower-Tertiary exploration opportunities in the area is provided under the "Media Center/Anadarko News" tabs at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. For more information about Anadarko, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including our ability to successfully drill, complete, test and produce the wells described in this release. See "Risk Factors" in the company's 2007 Annual Report on Form 10-K and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

# # #

ANADARKO CONTACTS

**Media:**
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Paula Beasley, paula.beasley@anadarko.com, 832.636.8765
Matt Carmichael, matt.carmichael@anadarko.com, 832.636.2845

**Investors:**
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Chris Campbell, CFA, chris.campbell@anadarko.com, 832.636.8434
Danny Hart, danny.hart@anadarko.com, 832.636.1355

# EXHIBIT 21

Anadarko Petroleum Corporation

# NEWS

## ANADARKO ANNOUNCES SHENANDOAH APPRAISAL WELL ENCOUNTERS MORE THAN 1,000 NET FEET OF OIL PAY

**HOUSTON**, March 19, 2013 – Anadarko Petroleum Corporation (NYSE: APC) today announced its Shenandoah-2 well in the deepwater Gulf of Mexico encountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs.

"The successful Shenandoah-2 well marks one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries," said Bob Daniels, Anadarko Sr. Vice President Deepwater and International Exploration. "With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico."

The Shenandoah-2 well, located in Walker Ridge block 51, was drilled to a total depth of 31,405 feet in approximately 5,800 feet of water, more than 1 mile southwest and approximately 1,700 feet structurally down-dip from the Shenandoah-1 discovery. Similar to the initial Shenandoah discovery well, log and pressure data from the Shenandoah-2 well indicate excellent-quality reservoir and fluid properties. The well was drilled to test the down-dip extent of the accumulation, and the targeted sands were full to base with no oil-water contact.

"We are incorporating the information obtained from Shenandoah-2 into our planning and anticipate further appraisal drilling to advance this potentially giant project," Daniels added.

Anadarko is the operator of the Shenandoah-2 well and the previously announced Shenandoah-1 discovery well, located in Walker Ridge block 52, with a 30-percent working interest. Other co-owners in Shenandoah are ConocoPhillips (NYSE: COP) with a 30-percent working interest, Cobalt International Energy L.P. (NYSE: CIE) with a 20-percent working interest, Venari Resources LLC with a 10-percent working interest and Marathon Oil Company (NYSE: MRO) with a 10-percent working interest.

Additionally, in the Shenandoah Basin, Anadarko has a 15-percent working interest in both the Coronado well, located in Walker Ridge block 98, and the Yucatan prospect, located in Walker Ridge block 95.

A map of the Shenandoah Basin in the deepwater Gulf of Mexico will be available under the "Media Center/Anadarko News" tab at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2012, the company had approximately 2.56 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to successfully drill, complete, test and produce the wells and prospects identified in this news release. See "Risk Factors" in the company's 2012 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

# # #

**ANADARKO CONTACTS**

**MEDIA:**
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Brian Cain, brian.cain@anadarko.com, 832.636.3404
Christina Ramirez, christina.ramirez@anadarko.com, 832.636.8687

**INVESTORS:**
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Brian Kuck, brian.kuck@anadarko.com, 832.636.1397
Bill Tedesco, william.tedesco@anadarko.com, 832.636.3375

# EXHIBIT 22

**EXHIBIT 31(i)**

**CERTIFICATIONS**

I, R. A. Walker, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 20, 2015

/s/ R. A. WALKER

R. A. Walker
Chairman, President and Chief Executive Officer

# EXHIBIT 23

**EXHIBIT 31(ii)**

**CERTIFICATIONS**

I, Robert G. Gwin, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 20, 2015

/s/ ROBERT G. GWIN

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

# EXHIBIT 24

EX-31.I 4 apc20152q-exhibit31i.htm RULE 13A-14(A)/15D-14(A) CERTIFICATION-CHIEF EXECUTIVE OFFICER

**EXHIBIT 31(i)**

**CERTIFICATIONS**

I, R. A. Walker, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

July 28, 2015

/s/ R. A. WALKER

R. A. Walker
Chairman, President and Chief Executive Officer

# EXHIBIT 25

**EXHIBIT 31(ii)**

## CERTIFICATIONS

I, Robert G. Gwin, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

July 28, 2015

/s/ ROBERT G. GWIN

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

# EXHIBIT 26

**EXHIBIT 31(i)**

**CERTIFICATIONS**

I, R. A. Walker, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 17, 2016

/s/ R. A. WALKER

R. A. Walker
Chairman, President and Chief Executive Officer

# EXHIBIT 27

EX-31.II 10 apc201510k-exhibit31ii.htm RULE 13A-14(A)/15D-14(A) CERTIFICATION-CHIEF FINANCIAL OFFICER

**EXHIBIT 31(ii)**

**CERTIFICATIONS**

I, Robert G. Gwin, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 17, 2016

/s/ ROBERT G. GWIN

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

# EXHIBIT 28

**EXHIBIT 31(i)**

**CERTIFICATIONS**

I, R. A. Walker, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 17, 2017

/s/ R. A. WALKER

R. A. Walker
Chairman, President and Chief Executive Officer

# EXHIBIT 29

**EXHIBIT 31(ii)**

**CERTIFICATIONS**

I, Robert G. Gwin, certify that:

1. I have reviewed this annual report on Form 10-K of Anadarko Petroleum Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 17, 2017

/s/ ROBERT G. GWIN

Robert G. Gwin
Executive Vice President, Finance and Chief Financial Officer

# EXHIBIT 29A

SEC Form 4

**FORM 4**

**Exhibit 381**

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | December 31, 2014 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

1. Name and Address of Reporting Person*
DANIELS ROBERT P
(Last) (First) (Middle)
ANADARKO PETROLEUM CORPORATION
1201 LAKE ROBBINS DRIVE
(Street)
WOODLANDS TX 77380
(City) (State) (Zip)

2. Issuer Name **and** Ticker or Trading Symbol
ANADARKO PETROLEUM CORP [ APC ]

3. Date of Earliest Transaction (Month/Day/Year)
03/20/2015

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer
(Check all applicable)
Director | 10% Owner
X Officer (give title below) | Other (specify below)
EVP, Intl./Deepwater Expl.

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/20/2015 | | M | | 34,559[1] | A | $35.18 | 48,227 | D | |
| Common Stock | 03/20/2015 | | M | | 3,890[1] | A | $65.44 | 52,117 | D | |
| Common Stock | 03/20/2015 | | S | | 38,449 | D | $80.94 | 13,668 | D | |
| Common Stock | | | | | | | | 12,956 | I | 401 (k) Plan |
| Common Stock | | | | | | | | 63,766 | I | By Family Limited Partnership |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Non Qualified Stock Option (Right to Buy) | $35.18 | 03/20/2015 | | M | | | 34,559 | (2) | 11/04/2015 | Common Stock | 34,559 | $0 | 30,841 | D | |
| Non Qualified Stock Option (Right to Buy) | $65.44 | 03/20/2015 | | M | | | 3,890 | (2) | 11/10/2016 | Common Stock | 3,890 | $0 | 28,610 | D | |

**Explanation of Responses:**

1. The reporting person had previously transferred the economic interest in these stock options to his ex-wife pursuant to a divorce decree and has exercise/sold these options/shares at her request.
2. This option is exercisable in three annual installments commencing one year after the date of grant.

| | |
|---|---|
| /s/ Gaye Wilkerson by power of atty. for Robert P. Daniels | 03/24/2015 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby constitutes and appoints Robert K. Reeves, Amanda M. McMillian, Anne Bruner, and Gaye Wilkerson signing singly, the undersigned's true and lawful attorney-in-fact to:

1. execute for and on behalf of the undersigned, in the undersigned's capacity as an officer of Anadarko Petroleum Corporation (the "Company"), Forms ID, 3, 4 and 5, pursuant to Section 16(a) of the Securities Exchange Act of 1934 and the rules thereunder, and Form 144, pursuant to Rule 144 under the Securities Act of 1933 and the rules thereunder, if required; and

2. do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to complete and execute any such Form 3, Form 4, Form 5 or Form 144 and timely file such form with the United States Securities and Exchange Commission and any stock exchange or similar authority; and

3. take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

The undersigned hereby grants such attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever requisite, necessary or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as the undersigned might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted. The undersigned acknowledges that the foregoing attorney-in-fact, in serving in such capacity at the request of the undersigned, is not assuming, nor is the Company assuming, any of the undersigned's responsibilities to comply with Section 16(a) of the Securities Exchange Act of 1934 or Rule 144 of the Securities Act of 1933.

This Power of Attorney shall remain in full force and effect until the undersigned is no longer an officer of the Company unless earlier revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact; provided, however, this Power of Attorney will expire immediately upon the termination of employment of any attorney-in-fact as to that attorney-in-fact only, but not as to any other appointed attorney-in-fact hereunder.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 6th day of November, 2014.

/s/Robert P. Daniels

# EXHIBIT 30

Anadarko Petroleum Corporation

# NEWS

## ANADARKO ANNOUNCES THIRD-QUARTER 2015 RESULTS

**HOUSTON**, Oct. 27, 2015 – Anadarko Petroleum Corporation (NYSE: APC) today announced its financial and operating results for the third quarter of 2015, including a net loss attributable to common stockholders of $2.235 billion, or $4.41 per share (diluted). These results include certain items typically excluded by the investment community in published estimates, which in aggregate decreased net income by $1.877 billion or $3.69 per share (diluted), on an after-tax basis.(1) Net cash flow from operating activities in the third quarter of 2015 was $1.127 billion, and discretionary cash flow from operations totaled $979 million.(2)

**HIGHLIGHTS**

- Exceeded the midpoint of guidance by 6,000 barrels per day of higher-margin U.S. oil sales volumes
- Achieved capital expenditures and lease operating expense (LOE) per barrel of oil equivalent (BOE) below the low end of guidance
- Completed a successful appraisal test at the Shenandoah field in the Gulf of Mexico
- Accomplished a project milestone at the Heidelberg spar with the setting of the topsides
- Continued to actively manage the portfolio by monetizing nearly $2 billion of assets year to date

"We remain committed to building and preserving value in this challenging environment," said Anadarko Chairman, President and CEO Al Walker. "During the third quarter, we continued our focus on maintaining long-term flexibility, while enhancing short-cycle returns by delivering higher-margin sales volumes for lower costs. Our employees have continued to do outstanding work optimizing our performance by moderating our base decline, safely improving efficiencies and rig productivity, and achieving greater cost savings. These efforts and achievements have us well positioned to create differentiating value today and to accelerate activity when the market begins to reward growth again."

Exhibit
419

**OPERATIONS SUMMARY**

During the third quarter, Anadarko's sales volumes of crude oil, natural gas and natural gas liquids (NGLs) totaled 73 million BOE, or an average of 787,000 BOE per day. These results include an increase in oil sales volumes of 11,000 barrels of oil per day (BOPD) on a divestiture-adjusted basis(3) over the third quarter of 2014. Anadarko also updated its full-year 2015 sales-volume guidance to a range of 290 million to 292 million BOE, which excludes 2015 sales volumes associated with the divestitures of EOR, Bossier and Powder River Basin coalbed methane (CBM).

In the U.S. onshore, Anadarko increased oil sales volumes by 11 percent year over year on a divestiture-adjusted basis.(3) In the Wattenberg field, Anadarko increased oil sales volumes by 14 percent versus the third quarter of 2014. During the quarter, the Wattenberg team continued to achieve significant improvements in its drilling metrics. As a result, drilling cycle times were reduced by approximately 20 percent with a corresponding 15-percent reduction in drilling costs per foot versus the second quarter of 2015.

Anadarko continues to position its extensive Delaware Basin Wolfcamp Shale opportunity for future oil growth. As a result of improved well recoveries, now approaching 1 million BOE per well, and efficiency gains and cost reductions in the Wolfcamp Shale, this emerging oil play is beginning to contend with Wattenberg in terms of the most attractive economics in the company's U.S. onshore portfolio. Anadarko has successfully reduced drilling costs in the Wolfcamp Shale to around $7.5 million per well with the expected ability to achieve further reductions of $1.5 million to $2 million per well with a future move to field-wide pad drilling. During the quarter, the company also successfully drilled its first test well in the Second Bone Spring, which demonstrated an initial production rate of more than 1,000 BOPD.

In the Gulf of Mexico, the company continued to successfully advance the Heidelberg project with the installation of the topsides. With the significant milestones achieved to date, first oil at Heidelberg has been accelerated and is now anticipated in the second quarter of 2016 from the first three subsea wells, with production from two additional wells coming on line at a later date. Also in the Gulf of Mexico, the company's third appraisal test of the Shenandoah discovery encountered more than 620 net feet of oil pay, and an appraisal well at the Yeti discovery was spud during the third quarter.

**OPERATIONS REPORT**

For additional details on the operations described above and other operating areas and exploration activities, please refer to Anadarko's comprehensive report on third-quarter 2015 activity. The report is available at www.anadarko.com.

**FINANCIAL SUMMARY**

Anadarko ended the quarter with $2.1 billion of cash on hand. Year to date, Anadarko has reached agreements to monetize or closed asset monetizations totaling approximately $2.0 billion, including the recent Powder River Basin CBM upstream divestiture, which closed Sept. 1, and the associated CBM midstream transaction, which is expected to close in the fourth quarter.

**CONFERENCE CALL *TOMORROW* AT 8 A.M. CDT, 9 A.M. EDT**

Anadarko will host a conference call on Wednesday, Oct. 28, 2015, at 8 a.m. Central Daylight Time (9 a.m. Eastern Daylight Time) to discuss third-quarter results, current operations and the company's outlook for the remainder of 2015. The dial-in number is 866.777.2509 in the United States or 412.317.5413 internationally. Participants can register for the conference at http://dpregister.com/10073998. For complete instructions on how to participate in the conference call, or to listen to the live audio webcast and slide presentation, please visit www.anadarko.com. A replay of the call will be available on the website for approximately 30 days following the conference call.

**FINANCIAL DATA**

Nine pages of summary financial data follow, including current hedge positions, a reconciliation of "divestiture-adjusted" or "same-store" sales, and updated financial and production guidance.

(1) See the accompanying table for details of certain items affecting comparability.

(2) See the accompanying table for a reconciliation of GAAP to non-GAAP financial measures and a statement indicating why management believes the non-GAAP financial measures provide useful information for investors.

(3) See the accompanying table for a reconciliation of "divestiture-adjusted" or "same-store" sales volumes, which are intended to present performance of Anadarko's continuing asset base, giving effect to recent divestitures.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2014, the company had approximately 2.86 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to realize its expectations regarding performance in this challenging economic environment and meet financial and operating guidance, timely complete and commercially operate the projects and drilling prospects identified in this news release, achieve further drilling cost reductions, consummate the transaction described in this release, and achieve production and budget expectations. See "Risk Factors" in the company's 2014 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

# # #

**ANADARKO CONTACTS**

**MEDIA:**
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Stephanie Moreland, stephanie.moreland@anadarko.com, 832.636.2912

**INVESTORS:**
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Robin Fielder, robin.fielder@anadarko.com, 832.636.1462
Jeremy Smith, jeremy.smith@anadarko.com, 832.636.1544

**Anadarko Petroleum Corporation**
**Certain Items Affecting Comparability**

| *millions except per-share amounts* | Quarter Ended September 30, 2015 Before Tax | After Tax | Per Share (diluted) |
|---|---|---|---|
| Total gains (losses) on derivatives, net, less net cash from settlement of commodity derivatives* | **$ (360)** | **$ (227)** | **$ (0.45)** |
| Gains (losses) on divestitures, net (after noncontrolling interest) | **(613)** | **(388)** | **(0.76)** |
| Impairments | | | |
| Producing properties | **(758)** | **(479)** | **(0.94)** |
| Exploration assets | **(787)** | **(698)** | **(1.38)** |
| Inventory adjustments | **(33)** | **(22)** | **(0.04)** |
| Change in uncertain tax positions (FIN 48) | **—** | **(28)** | **(0.05)** |
| Other adjustments | **(40)** | **(35)** | **(0.07)** |
| | **$ (2,591)** | **$ (1,877)** | **$ (3.69)** |

* Includes $46 million related to commodity derivatives, $(407) million related to interest-rate derivatives, and $1 million related to gathering, processing, and marketing sales.

| *millions except per-share amounts* | Quarter Ended September 30, 2014 Before Tax | After Tax | Per Share (diluted) |
|---|---|---|---|
| Total gains (losses) on derivatives, net, less net cash from settlement of commodity derivatives* | $ 276 | $ 175 | $ 0.35 |
| Gains (losses) on divestitures, net | 726 | 647 | 1.27 |
| Impairments | (394) | (249) | (0.49) |
| Change in uncertain tax positions (FIN 48) | — | (60) | (0.12) |
| Third-party well and platform decommissioning obligation | (22) | (14) | (0.03) |
| Interest expense related to Tronox settlement | (19) | (12) | (0.02) |
| | $ 567 | $ 487 | $ 0.96 |

* Includes $371 million related to commodity derivatives, $(96) million related to interest-rate derivatives, and $1 million related to gathering, processing, and marketing sales.

**Reconciliation of GAAP to Non-GAAP Measures**

Below are reconciliations of net income (loss) attributable to common stockholders (GAAP) to adjusted net income (loss) (non-GAAP), cash provided by operating activities (GAAP) to discretionary cash flow from operations (non-GAAP), as well as to free cash flow (non-GAAP) as required under Regulation G of the Securities Exchange Act of 1934. Management uses adjusted net income (loss) to evaluate the Company's operational trends and performance.

| *millions except per-share amounts* | Quarter Ended September 30, 2015 After Tax | Per Share (diluted) | Quarter Ended September 30, 2014 After Tax | Per Share (diluted) |
|---|---|---|---|---|
| Net income (loss) attributable to common stockholders | **$ (2,235)** | **$ (4.41)** | $ 1,087 | $ 2.12 |
| Less certain items affecting comparability | **(1,877)** | **(3.69)** | 487 | 0.96 |
| **Adjusted net income (loss)** | **$ (358)** | **$ (0.72)** | $ 600 | $ 1.16 |

## Anadarko Petroleum Corporation

### Reconciliation of GAAP to Non-GAAP Measures

Management uses discretionary cash flow from operations because it is useful in comparisons of oil and gas exploration and production companies as it excludes certain fluctuations in assets and liabilities and current taxes related to certain items affecting comparability. Management uses free cash flow to demonstrate the Company's ability to internally fund capital expenditures and to service or incur additional debt.

| | Quarter Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| *millions* | **2015** | 2014 | **2015** | 2014 |
| Net cash provided by (used in) operating activities | **$ 1,127** | $ 2,323 | **$ (2,134)** | $ 6,514 |
| Add back | | | | |
| Increase (decrease) in accounts receivable | **(128)** | (287) | **(23)** | (104) |
| (Increase) decrease in accounts payable and accrued expenses | **374** | (689) | **573** | (710) |
| Other items—net | **(1,069)** | 198 | **(800)** | 225 |
| Tronox settlement payment | **—** | — | **5,215** | — |
| Certain nonoperating and other excluded items | **1** | 24 | **26** | 25 |
| Current taxes related to asset monetizations and Tronox tax position | **674** | 207 | **990** | 1,033 |
| **Discretionary cash flow from operations** | **$ 979** | $ 1,776 | **$ 3,847** | $ 6,983 |

| | Quarter Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| *millions* | **2015** | 2014 | **2015** | 2014 |
| Discretionary cash flow from operations | **$ 979** | $ 1,776 | **$ 3,847** | $ 6,983 |
| Less capital expenditures* | **1,352** | 2,117 | **4,575** | 7,087 |
| **Free cash flow**** | **$ (373)** | $ (341) | **$ (728)** | $ (104) |

* Includes Western Gas Partners, LP (WES) capital expenditures of $127 million for the quarter ended September 30, 2015, $147 million for the quarter ended September 30, 2014, $405 million for the nine months ended September 30, 2015, and $490 million for the nine months ended September 30, 2014.

** Free cash flow for the nine months ended September 30, 2015, includes a $910 million current tax benefit associated with the Tronox settlement.

Presented below is a reconciliation of total debt (GAAP) to net debt (non-GAAP). Management uses net debt as a measure of the Company's outstanding debt obligations that would not be readily satisfied by its cash and cash equivalents on hand.

| | September 30, 2015 | | |
|---|---|---|---|
| *millions* | **Anadarko Consolidated** | **WGP* Consolidated** | **Anadarko excluding WGP** |
| Total debt | **$ 15,925** | **$ 2,587** | **$ 13,338** |
| Less cash and cash equivalents | **2,072** | **75** | **1,997** |
| **Net debt** | **$ 13,853** | **$ 2,512** | **$ 11,341** |

| *millions* | **Anadarko Consolidated** | **Anadarko excluding WGP** |
|---|---|---|
| Net debt | **$ 13,853** | **$ 11,341** |
| Total equity | **17,052** | **14,079** |
| **Adjusted capitalization** | **$ 30,905** | **$ 25,420** |
| | | |
| **Net debt to adjusted capitalization ratio** | **45%** | **45%** |

* Western Gas Equity Partners, LP (WGP) is a publicly traded consolidated subsidiary of Anadarko and WES is a consolidated subsidiary of WGP.

**Anadarko Petroleum Corporation**
**(Unaudited)**

| **Summary Financial Information** *millions except per-share amounts* | Quarter Ended September 30, 2015 | Quarter Ended September 30, 2014 | Nine Months Ended September 30, 2015 | Nine Months Ended September 30, 2014 |
|---|---|---|---|---|
| **Consolidated Statements of Income** | | | | |
| **Revenues and Other** | | | | |
| Natural-gas sales | **$ 484** | $ 830 | **$ 1,612** | $ 3,038 |
| Oil and condensate sales | **1,229** | 2,637 | **4,264** | 7,766 |
| Natural-gas liquids sales | **183** | 424 | **644** | 1,221 |
| Gathering, processing, and marketing sales | **334** | 339 | **932** | 928 |
| Gains (losses) on divestitures and other, net | **(542)** | 780 | **(807)** | 2,340 |
| Total | **1,688** | 5,010 | **6,645** | 15,293 |
| **Costs and Expenses** | | | | |
| Oil and gas operating | **262** | 275 | **784** | 861 |
| Oil and gas transportation and other | **271** | 322 | **921** | 869 |
| Exploration | **1,074** | 199 | **2,260** | 1,000 |
| Gathering, processing, and marketing | **289** | 269 | **798** | 771 |
| General and administrative | **345** | 381 | **933** | 984 |
| Depreciation, depletion, and amortization | **1,111** | 1,163 | **3,581** | 3,335 |
| Other taxes | **127** | 306 | **460** | 981 |
| Impairments | **758** | 394 | **3,571** | 514 |
| Deepwater Horizon settlement and related costs | **—** | 3 | **4** | 96 |
| Total | **4,237** | 3,312 | **13,312** | 9,411 |
| **Operating Income (Loss)** | **(2,549)** | 1,698 | **(6,667)** | 5,882 |
| **Other (Income) Expense** | | | | |
| Interest expense | **199** | 204 | **616** | 573 |
| (Gains) losses on derivatives, net | **282** | (323) | **123** | 453 |
| Other (income) expense, net | **47** | 24 | **109** | 12 |
| Tronox-related contingent loss | **—** | 19 | **5** | 4,338 |
| Total | **528** | (76) | **853** | 5,376 |
| **Income (Loss) Before Income Taxes** | **(3,077)** | 1,774 | **(7,520)** | 506 |
| Income Tax Expense (Benefit) | **(917)** | 627 | **(2,232)** | 1,719 |
| **Net Income (Loss)** | **(2,160)** | 1,147 | **(5,288)** | (1,213) |
| Net Income (Loss) Attributable to Noncontrolling Interests | **75** | 60 | **154** | 142 |
| **Net Income (Loss) Attributable to Common Stockholders** | **$ (2,235)** | $ 1,087 | **$ (5,442)** | $ (1,355) |
| **Per Common Share** | | | | |
| Net income (loss) attributable to common stockholders—basic | **$ (4.41)** | $ 2.13 | **$ (10.73)** | $ (2.69) |
| Net income (loss) attributable to common stockholders—diluted | **$ (4.41)** | $ 2.12 | **$ (10.73)** | $ (2.69) |
| **Average Number of Common Shares Outstanding—Basic** | **508** | 506 | **508** | 505 |
| **Average Number of Common Shares Outstanding—Diluted** | **508** | 508 | **508** | 505 |

| | | | | |
|---|---|---|---|---|
| **Exploration Expense** | | | | |
| Dry hole expense | **$ 817** | $ 104 | **$ 859** | $ 527 |
| Impairments of unproved properties | **136** | 30 | **1,134** | 216 |
| Geological and geophysical expense | **67** | 13 | **105** | 93 |
| Exploration overhead and other | **54** | 52 | **162** | 164 |
| Total | **$ 1,074** | $ 199 | **$ 2,260** | $ 1,000 |

**Anadarko Petroleum Corporation**
**(Unaudited)**

| **Summary Financial Information** *millions* | **Quarter Ended September 30, 2015** | Quarter Ended September 30, 2014 | **Nine Months Ended September 30, 2015** | Nine Months Ended September 30, 2014 |
|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | |
| Net income (loss) | **$ (2,160)** | $ 1,147 | **$ (5,288)** | $ (1,213) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities | | | | |
| Depreciation, depletion, and amortization | **1,111** | 1,163 | **3,581** | 3,335 |
| Deferred income taxes | **(1,440)** | (398) | **(2,627)** | (210) |
| Dry hole expense and impairments of unproved properties | **953** | 134 | **1,993** | 743 |
| Impairments | **758** | 394 | **3,571** | 514 |
| (Gains) losses on divestitures, net | **578** | (726) | **1,003** | (2,194) |
| Total (gains) losses on derivatives, net | **281** | (324) | **123** | 462 |
| Operating portion of net cash received (paid) in settlement of derivative instruments | **79** | 48 | **251** | (138) |
| Other | **145** | 87 | **219** | 195 |
| Changes in assets and liabilities | | | | |
| Deepwater Horizon settlement and related costs | **(1)** | 1 | **—** | 93 |
| Tronox-related contingent liability | **—** | 19 | **(5,210)** | 4,338 |
| (Increase) decrease in accounts receivable | **128** | 287 | **23** | 104 |
| Increase (decrease) in accounts payable and accrued expenses | **(374)** | 689 | **(573)** | 710 |
| Other items—net | **1,069** | (198) | **800** | (225) |
| Net Cash Provided by (Used in) Operating Activities | **$ 1,127** | $ 2,323 | **$ (2,134)** | $ 6,514 |
| **Capital Expenditures** | **$ 1,352** | $ 2,117 | **$ 4,575** | $ 7,087 |

| *millions* | **September 30, 2015** | December 31, 2014 |
|---|---|---|
| **Condensed Balance Sheets** | | |
| Cash and cash equivalents | **$ 2,072** | $ 7,369 |
| Accounts receivable, net of allowance | **2,469** | 2,527 |
| Other current assets | **646** | 1,325 |
| Net properties and equipment | **35,381** | 41,589 |
| Other assets | **2,271** | 2,310 |
| Goodwill and other intangible assets | **6,343** | 6,569 |
| Total Assets | **$ 49,182** | $ 61,689 |
| Other current liabilities | **4,348** | 4,934 |
| Deepwater Horizon settlement and related costs | **90** | 90 |
| Tronox-related contingent liability | **—** | 5,210 |
| Long-term debt | **15,892** | 15,092 |
| Deferred income taxes | **6,090** | 9,249 |
| Other long-term liabilities | **5,710** | 4,796 |
| Stockholders' equity | **14,079** | 19,725 |
| Noncontrolling interests | **2,973** | 2,593 |
| Total Equity | **$ 17,052** | $ 22,318 |
| Total Liabilities and Equity | **$ 49,182** | $ 61,689 |
| **Capitalization** | | |
| Total debt | **$ 15,925** | $ 15,092 |
| Total equity | **17,052** | 22,318 |
| Total | **$ 32,977** | $ 37,410 |

| | | |
|---|---|---|
| **Capitalization Ratios** | | |
| Total debt | **48%** | 40% |
| Total equity | **52%** | 60% |

# Anadarko Petroleum Corporation
# (Unaudited)

**Sales Volumes and Prices**

| | Average Daily Sales Volumes | | | Sales Volumes | | | Average Sales Price | | |
|---|---|---|---|---|---|---|---|---|---|
| | Natural Gas MMcf/d | Oil & Condensate MBbls/d | NGLs MBbls/d | Natural Gas Bcf | Oil & Condensate MMBbls | NGLs MMBbl | Natural Gas Per Mcf | Oil & Condensate Per Bbl | NGLs Per Bbl |
| **Quarter Ended September 30, 2015** | | | | | | | | | |
| **United States** | **2,186** | **224** | **117** | **201** | **21** | **11** | **$ 2.41** | **$ 43.48** | **$ 15.83** |
| **Algeria** | **—** | **49** | **5** | **—** | **4** | **1** | **—** | **47.86** | **25.18** |
| **Other International** | **—** | **28** | **—** | **—** | **3** | **—** | **—** | **46.30** | **—** |
| **Total** | **2,186** | **301** | **122** | **201** | **28** | **12** | **$ 2.41** | **$ 44.45** | **$ 16.26** |
| Quarter Ended September 30, 2014 | | | | | | | | | |
| United States | 2,494 | 213 | 129 | 230 | 20 | 11 | $ 3.62 | $ 92.59 | $ 35.11 |
| Algeria | — | 62 | 1 | — | 6 | — | — | 98.69 | 65.55 |
| Other International | — | 28 | — | — | 2 | — | — | 100.48 | — |
| Total | 2,494 | 303 | 130 | 230 | 28 | 11 | $ 3.62 | $ 94.56 | $ 35.35 |
| **Nine Months Ended September 30, 2015** | | | | | | | | | |
| **United States** | **2,424** | **233** | **128** | **662** | **64** | **35** | **$ 2.44** | **$ 47.37** | **$ 17.08** |
| **Algeria** | **—** | **56** | **6** | **—** | **15** | **2** | **—** | **54.90** | **29.79** |
| **Other International** | **—** | **28** | **—** | **—** | **8** | **—** | **—** | **52.58** | **—** |
| **Total** | **2,424** | **317** | **134** | **662** | **87** | **37** | **$ 2.44** | **$ 49.16** | **$ 17.63** |
| Nine Months Ended September 30, 2014 | | | | | | | | | |
| United States | 2,603 | 197 | 116 | 711 | 54 | 31 | $ 4.27 | $ 95.30 | $ 38.21 |
| Algeria | — | 64 | 1 | — | 18 | — | — | 105.38 | 66.14 |
| Other International | — | 27 | — | — | 7 | — | — | 106.06 | — |
| Total | 2,603 | 288 | 117 | 711 | 79 | 31 | $ 4.27 | $ 98.57 | $ 38.38 |

| | Average Daily Sales Volumes MBOE/d | Sales Volumes MMBOE |
|---|---|---|
| **Quarter Ended September 30, 2015** | **787** | **73** |
| Quarter Ended September 30, 2014 | 849 | 78 |
| **Nine Months Ended September 30, 2015** | **855** | **234** |
| Nine Months Ended September 30, 2014 | 839 | 229 |

**Sales Revenue and Commodity Derivatives**

| | Sales | | | Net Cash Received (Paid) from Settlement of Commodity Derivatives | | |
|---|---|---|---|---|---|---|
| *millions* | Natural Gas | Oil & Condensate | NGLs | Natural Gas | Oil & Condensate | NGLs |
| **Quarter Ended September 30, 2015** | | | | | | |
| **United States** | **$ 484** | **$ 897** | **$ 170** | **$ 78** | **$ 1** | **$ —** |
| **Algeria** | **—** | **214** | **13** | **—** | **—** | **—** |
| **Other International** | **—** | **118** | **—** | **—** | **—** | **—** |
| **Total** | **$ 484** | **$ 1,229** | **$ 183** | **$ 78** | **$ 1** | **$ —** |
| Quarter Ended September 30, 2014 | | | | | | |
| United States | $ 830 | $ 1,817 | $ 418 | $ 15 | $ (8) | $ 1 |
| Algeria | — | 565 | 6 | — | 40 | — |
| Other International | — | 255 | — | — | — | — |
| Total | $ 830 | $ 2,637 | $ 424 | $ 15 | $ 32 | $ 1 |
| **Nine Months Ended September 30, 2015** | | | | | | |
| **United States** | **$ 1,612** | **$ 3,018** | **$ 596** | **$ 228** | **$ 6** | **$ 17** |
| **Algeria** | **—** | **843** | **48** | **—** | **—** | **—** |
| **Other International** | **—** | **403** | **—** | **—** | **—** | **—** |
| **Total** | **$ 1,612** | **$ 4,264** | **$ 644** | **$ 228** | **$ 6** | **$ 17** |
| Nine Months Ended September 30, 2014 | | | | | | |
| United States | $ 3,038 | $ 5,125 | $ 1,208 | $ (107) | $ (68) | $ 3 |
| Algeria | — | 1,858 | 13 | — | 40 | — |
| Other International | — | 783 | — | — | — | — |
| Total | $ 3,038 | $ 7,766 | $ 1,221 | $ (107) | $ (28) | $ 3 |

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**As of October 27, 2015**

**Note: Guidance excludes 2015 sales volumes associated with EOR, Bossier, and Powder River Basin CBM.**

| | 4th-Qtr Guidance (see Note) | | | Full-Year Guidance (see Note) | | |
|---|---|---|---|---|---|---|
| | Units | | | Units | | |
| **Total Sales Volumes (MMBOE)** | 68 | — | 70 | 290 | — | 292 |
| **Total Sales Volumes (MBOE/d)** | 739 | — | 761 | 795 | — | 800 |
| **Oil (MBbl/d)** | 297 | — | 305 | 308 | — | 312 |
| United States | 218 | — | 222 | 226 | — | 228 |
| Algeria | 61 | — | 63 | 57 | — | 58 |
| Ghana | 18 | — | 20 | 25 | — | 26 |
| **Natural Gas (MMcf/d)** | | | | | | |
| United States | 1,980 | — | 2,020 | 2,140 | — | 2,160 |
| **Natural Gas Liquids (MBbl/d)** | | | | | | |
| United States | 106 | — | 111 | 122 | — | 124 |
| Algeria | 5 | — | 7 | 5 | — | 6 |

| | $ / Unit | | | $ / Unit | | |
|---|---|---|---|---|---|---|
| **Price Differentials vs NYMEX (w/o hedges)** | | | | | | |
| **Oil ($/Bbl)** | (4.40) | — | (0.40) | (3.40) | — | (0.40) |
| United States | (6.00) | — | (2.00) | (5.00) | — | (2.00) |
| Algeria | — | — | 4.00 | 1.00 | — | 4.00 |
| Ghana | — | — | 4.00 | 1.00 | — | 4.00 |
| **Natural Gas ($/Mcf)** | | | | | | |
| United States | (0.45) | — | (0.35) | (0.45) | — | (0.35) |

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**As of October 27, 2015**

**Note: Guidance excludes items affecting comparability**

| | 4th-Qtr Guidance (see Note) | | | Full-Year Guidance (see Note) | | |
|---|---|---|---|---|---|---|
| | $ MM | | | $ MM | | |
| **Other Revenues** | | | | | | |
| Marketing and Gathering Margin | 40 | — | 50 | 175 | — | 185 |
| Minerals and Other | 45 | — | 55 | 275 | — | 285 |
| | $ / BOE | | | $ / BOE | | |
| **Costs and Expenses** | | | | | | |
| Oil & Gas Direct Operating | 3.40 | — | 3.60 | 3.35 | — | 3.45 |
| Oil & Gas Transportation/Other | 3.75 | — | 3.95 | 3.70 | — | 3.80 |
| Depreciation, Depletion, and Amortization | 15.35 | — | 15.85 | 15.30 | — | 15.50 |
| Production Taxes (% of Product Revenue) | 7.5% | — | 8.5% | 7.0% | — | 7.5% |
| | $ MM | | | $ MM | | |
| General and Administrative | 340 | — | 350 | 1,270 | — | 1,280 |
| Exploration Expense | | | | | | |
| Non-Cash | 230 | — | 250 | 500 | — | 550 |
| Cash | 120 | — | 140 | 375 | — | 395 |
| Interest Expense (net) | 200 | — | 210 | 815 | — | 825 |
| Other (Income) Expense | 35 | — | 45 | 200 | — | 210 |
| **Taxes** | | | | | | |
| Algeria (All current) | 55% | — | 60% | 55% | — | 60% |
| Rest of Company (60% Current / 40% Deferred for Q4 and 25% Current / 75% deferred for FY) | 35% | — | 45% | 30% | — | 40% |
| **Avg. Shares Outstanding (MM)** | | | | | | |
| Basic | 507 | — | 508 | 507 | — | 509 |
| Diluted | 508 | — | 510 | 508 | — | 510 |
| **Capital Investment (Excluding Western Gas Partners, LP)** | $ MM | | | $ MM | | |
| APC Capital Expenditures | 1,225 | — | 1,425 | 5,400 | — | 5,600 |

**Anadarko Petroleum Corporation**
**Commodity Hedge Positions**
**As of October 27, 2015**

| | Volume (MBbls/d) | Weighted Average Price per barrel: Floor Sold | Floor Purchased | Ceiling Sold |
|---|---|---|---|---|
| **Crude Oil** | | | | |
| **Three-Way Collars** | | | | |
| 2016 | | | | |
| WTI | 65 | $ 41.54 | $ 53.08 | $ 62.25 |
| Brent | 18 | $ 47.22 | $ 59.44 | $ 69.47 |
| | 83 | $ 42.77 | $ 54.46 | $ 63.82 |

| | Volume (thousand MMBtu/d) | Weighted Average Price per MMBtu: Floor Sold | Floor Purchased | Ceiling Sold |
|---|---|---|---|---|
| **Natural Gas** | | | | |
| **Three-Way Collars** | | | | |
| 2015 | 635 | $ 2.75 | $ 3.75 | $ 4.76 |
| **Extendable Fixed Price - Financial** | | | | |
| 2015* | 170 | $ 4.17 | | |

* Includes an option for the counterparty to extend the contract term to December 2016 at the same price.

**Interest-Rate Derivatives**
**As of October 27, 2015**

| Instrument | Notional Amt. | Reference Period | Mandatory Termination Date | Rate Paid | Rate Received |
|---|---|---|---|---|---|
| Swap | $50 Million | Sept. 2016 - Sept. 2026 | Sept. 2016 | 5.910% | 3M LIBOR |
| Swap | $50 Million | Sept. 2016 - Sept. 2046 | Sept. 2016 | 6.290% | 3M LIBOR |
| Swap | $250 Million | Sept. 2016 - Sept. 2046 | Sept. 2018 | 6.310% | 3M LIBOR |
| Swap | $300 Million | Sept. 2016 - Sept. 2046 | Sept. 2020 | 6.509% | 3M LIBOR |
| Swap | $250 Million | Sept. 2016 - Sept. 2046 | Sept. 2021 | 6.724% | 3M LIBOR |
| Swap | $200 Million | Sept. 2017 - Sept. 2047 | Sept. 2018 | 6.049% | 3M LIBOR |
| Swap | $300 Million | Sept. 2017 - Sept. 2047 | Sept. 2020 | 6.569% | 3M LIBOR |
| Swap | $500 Million | Sept. 2017 - Sept. 2047 | Sept. 2021 | 6.654% | 3M LIBOR |

**Anadarko Petroleum Corporation**
**Reconciliation of Same-Store Sales**

**Average Daily Sales Volumes**

| | Quarter Ended September 30, 2015 | | | | Quarter Ended September 30, 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| | Natural Gas MMcf/d | Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d | Natural Gas MMcf/d | Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d |
| U.S. Onshore | **1,883** | **162** | **110** | **586** | 2,049 | 146 | 124 | 611 |
| Deepwater Gulf of Mexico | **158** | **55** | **7** | **88** | 154 | 46 | 5 | 77 |
| International and Alaska | — | **84** | **5** | **89** | — | 98 | 1 | 99 |
| Same-Store Sales | **2,041** | **301** | **122** | **763** | 2,203 | 290 | 130 | 787 |
| Divestitures* | **145** | — | — | **24** | 291 | 13 | — | 62 |
| Total | **2,186** | **301** | **122** | **787** | 2,494 | 303 | 130 | 849 |

| | Nine Months Ended September 30, 2015 | | | | Nine Months Ended September 30, 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| | Natural Gas MMcf/d | Crude Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d | Natural Gas MMcf/d | Crude Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d |
| U.S. Onshore | **2,037** | **168** | **121** | **629** | 2,094 | 131 | 110 | 590 |
| Deepwater Gulf of Mexico | **164** | **53** | **7** | **87** | 201 | 44 | 6 | 84 |
| International and Alaska | — | **92** | **6** | **98** | — | 96 | 1 | 97 |
| Same-Store Sales | **2,201** | **313** | **134** | **814** | 2,295 | 271 | 117 | 771 |
| Divestitures* | **223** | **4** | — | **41** | 308 | 17 | — | 68 |
| Total | **2,424** | **317** | **134** | **855** | 2,603 | 288 | 117 | 839 |

* Includes China, Pinedale/Jonah, EOR, Bossier, and Powder River Basin CBM.

**Average Daily Sales Volumes**

| | Year Ended December 31, 2014 | | | |
|---|---|---|---|---|
| | Natural Gas MMcf/d | Crude Oil & Condensate MBbls/d | NGLs MBbls/d | Total MBOE/d |
| U.S. Onshore | 2,092 | 136 | 111 | 595 |
| Deepwater Gulf of Mexico | 196 | 45 | 5 | 83 |
| International and Alaska | — | 94 | 3 | 97 |
| Same-Store Sales | 2,288 | 275 | 119 | 775 |
| Divestitures* | 301 | 17 | — | 68 |
| Total | 2,589 | 292 | 119 | 843 |

* Includes China, Pinedale/Jonah, EOR, Bossier, and Powder River Basin CBM.

# EXHIBIT 31

DEF 14A 1 d158088ddef14a.htm DEF 14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No. )**

Filed by the Registrant ☑ Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☑ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240.Rule 14a-12

# Anadarko Petroleum Corporation

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

# 2016 PROXY STATEMENT

## ANADARKO PETROLEUM CORPORATION

Notice of Annual Meeting of Stockholders
to be held on May 10, 2016

March 18, 2016

TO OUR STOCKHOLDERS:

The 2016 Annual Meeting of Stockholders of Anadarko Petroleum Corporation will be held at The Woodlands Waterway Marriott Hotel and Convention Center, 1601 Lake Robbins Drive, The Woodlands, Texas, 77380 on Tuesday, May 10, 2016, at 8:00 a.m. (Central Daylight Time).

The attached Notice of Annual Meeting of Stockholders and proxy statement provide information concerning the matters to be considered at the Annual Meeting. The Annual Meeting will cover only the business contained in the proxy statement and will not include a management presentation.

Pursuant to rules promulgated by the U.S. Securities and Exchange Commission (SEC), we are also providing access to our proxy materials over the Internet. As a result, we are mailing to most of our stockholders a Notice of Internet Availability of Proxy Materials (Notice) instead of a paper copy of this proxy statement, a proxy card and our 2015 annual report. The Notice contains instructions on how to access those documents over the Internet, as well as instructions on how to request a paper copy of our proxy materials. All stockholders who do not receive a Notice should receive a paper copy of the proxy materials by mail. We believe that the Notice process will allow us to provide you with the information you need in a timelier manner, will save us the cost of printing and mailing documents to you, and will conserve natural resources.

Your vote is important and we encourage you to vote even if you are unable to attend the Annual Meeting. You may vote by Internet or by telephone using the instructions on the Notice, or, if you received a paper copy of the proxy card, by signing and returning it in the postage-paid envelope provided for your convenience. You may also attend and vote at the Annual Meeting.

Very truly yours,

*R. A. WALKER*
*Chairman of the Board, President and Chief Executive Officer*

Anadarko Petroleum Corporation

www.anadarko.com

Table of Contents

Anadarko Petroleum Corporation

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380-1046**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

The Annual Meeting of Stockholders of Anadarko Petroleum Corporation will be held at The Woodlands Waterway Marriott Hotel and Convention Center, 1601 Lake Robbins Drive, The Woodlands, Texas 77380 on Tuesday, May 10, 2016, at 8:00 a.m. (Central Daylight Time) to consider the following proposals:

(1) elect eleven directors;

(2) ratify the appointment of KPMG LLP as the Company's independent auditor for 2016;

(3) approve an Amendment and Restatement of the Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan;

(4) an advisory vote to approve the Company's named executive officer compensation;

(5) if presented, vote on the stockholder proposal set forth on pages 99 through 102 in the accompanying proxy statement; and

(6) transact such other business as may properly come before the Annual Meeting and any adjournments or postponements thereof.

If you are a holder of record of common stock at the close of business on March 15, 2016, the record date, then you are entitled to receive notice of and to vote at the Annual Meeting.

Please take the time to vote by following the Internet or telephone voting instructions provided. If you received a paper copy of the proxy card, you may also vote by completing and mailing the proxy card in the postage-paid envelope provided for your convenience. You may also attend and vote at the Annual Meeting. **You may revoke your proxy at any time before the vote is taken by following the instructions in this proxy statement.**

**As a stockholder, your vote is very important and the Company's Board of Directors strongly encourages you to exercise your right to vote.**

BY ORDER OF THE BOARD OF DIRECTORS

Amanda M. McMillian
*Senior Vice President, General Counsel,*
*Corporate Secretary and Chief Compliance Officer*

March 18, 2016
The Woodlands, Texas

**Important Notice Regarding the Availability of Proxy Materials**
**for the Annual Meeting of Stockholders to be Held on May 10, 2016:**
**The proxy statement and annual report for 2015 are available at**
**https://materials.proxyvote.com/032511**

Table of Contents

TABLE OF CONTENTS


| | |
|---|---|
| GENERAL INFORMATION | 1 |
| Questions and Answers about the Annual Meeting | 1 |
| ANADARKO BOARD OF DIRECTORS | 7 |
| ITEM 1 — ELECTION OF DIRECTORS | 7 |
| CORPORATE GOVERNANCE | 14 |
| Director Compensation Table for 2015 | 25 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 27 |
| SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 30 |
| AUDIT COMMITTEE REPORT | 31 |
| COMPENSATION AND BENEFITS COMMITTEE REPORT ON 2015 EXECUTIVE COMPENSATION | 32 |
| LETTER FROM THE CHAIR OF THE COMPENSATION AND BENEFITS COMMITTEE | 33 |
| COMPENSATION DISCUSSION AND ANALYSIS | 34 |
| EXECUTIVE COMPENSATION | 59 |
| Summary Compensation Table | 59 |
| All Other Compensation Table for 2015 | 60 |
| Grants of Plan-Based Awards in 2015 | 61 |
| Outstanding Equity Awards at Fiscal Year-End 2015 | 63 |
| Option Exercises and Stock Vested in 2015 | 65 |
| Pension Benefits for 2015 | 65 |
| Non-Qualified Deferred Compensation for 2015 | 70 |
| Potential Payments Upon Termination or Change of Control | 72 |
| TRANSACTIONS WITH RELATED PERSONS | 78 |
| INDEPENDENT AUDITOR | 79 |
| ITEM 2 — RATIFICATION OF THE APPOINTMENT OF THE INDEPENDENT AUDITOR | 79 |
| AMENDED AND RESTATED 2012 OMNIBUS INCENTIVE COMPENSATION PLAN | 81 |
| ITEM 3 — APPROVAL OF AN AMENDMENT AND RESTATEMENT OF THE 2012 OMNIBUS INCENTIVE COMPENSATION PLAN | 81 |
| ADVISORY VOTE TO APPROVE EXECUTIVE COMPENSATION | 97 |
| ITEM 4 — ADVISORY VOTE TO APPROVE THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION | 97 |
| STOCKHOLDER PROPOSAL | 99 |
| ITEM 5 — STOCKHOLDER PROPOSAL — PROVIDE A REPORT ON CARBON RISK | 99 |
| 2012 OMNIBUS INCENTIVE COMPENSATION PLAN, AS AMENDED AND RESTATED | Appendix A |

Table of Contents

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380-1046**

**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**

**May 10, 2016**

We are furnishing you this proxy statement in connection with the solicitation of proxies by our Board of Directors (Board) to be voted at the 2016 Annual Meeting of Stockholders (Annual Meeting) of Anadarko Petroleum Corporation, a Delaware corporation, sometimes referred to herein as the Company, Anadarko, us, we or like terms. The Annual Meeting will be held on Tuesday, May 10, 2016, at 8:00 a.m. (Central Daylight Time). The proxy materials, including this proxy statement, proxy card or voting instructions and our 2015 annual report, are being distributed and made available on or about March 25, 2016.

We provide our stockholders access to our proxy materials on the Internet. Accordingly, a Notice of Internet Availability of Proxy Materials (Notice) will be mailed to most of our stockholders on or about March 25, 2016. Stockholders will have the ability to access the proxy materials on the website referred to in the Notice or request a printed set of the proxy materials to be sent to them by following the instructions in the Notice.

The Notice also provides instructions on how to inform us whether to send future proxy materials to you electronically by e-mail or in printed form by mail. If you choose to receive future proxy materials by e-mail, you will receive an e-mail next year with instructions containing a link to those materials and a link to the proxy voting site. Your election to receive proxy materials by e-mail or printed form will remain in effect until you terminate it.

Choosing to receive future proxy materials by e-mail will allow us to provide you with the information you need in a more timely manner, save us the cost of printing and mailing documents to you, and conserve natural resources.

## QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING

### *Where and when is the Annual Meeting?*

The Annual Meeting will be held at The Woodlands Waterway Marriott Hotel and Convention Center, 1601 Lake Robbins Drive, The Woodlands, Texas, 77380, on Tuesday, May 10, 2016, at 8:00 a.m. (Central Daylight Time).

### *Who may vote?*

You may vote if you were a holder of record of Anadarko common stock as of the close of business on March 15, 2016, the record date for the Annual Meeting. Each share of Anadarko common stock is entitled to one vote at the Annual Meeting. On the record date, there were 515,984,695 shares of common stock outstanding and entitled to vote at the Annual Meeting. There are no cumulative voting rights associated with Anadarko common stock.

### *May I attend the Annual Meeting?*

Yes. Attendance is limited to stockholders of record as of the record date for the Annual Meeting, Company employees, and certain guests invited by the Company. Admission will be on a first-come, first-served basis. You may be asked to present valid picture identification, such as a

Table of Contents



driver's license or passport. If your shares of common stock are held in the name of a bank, broker, or other holder of record and you plan to attend the Annual Meeting, you must present proof of your ownership, such as a current bank or brokerage account statement reflecting ownership as of the record date for the Annual Meeting, to be admitted. Cameras, recording devices, cell phones and other electronic devices may not be used during the Annual Meeting.

### *Why did I receive a Notice in the mail regarding the Internet availability of proxy materials instead of a full set of proxy materials?*

In accordance with SEC rules, we are providing access to our proxy materials over the Internet. As a result, we have sent to most of our stockholders a Notice instead of a paper copy of the proxy materials. The Notice contains instructions on how to access the proxy materials over the Internet and how to request a paper copy. In addition, stockholders may request to receive future proxy materials in printed form by mail or electronically by e-mail. A stockholder's election to receive proxy materials by mail or e-mail will remain in effect until the stockholder terminates it.

### *Why didn't I receive a Notice in the mail regarding the Internet availability of proxy materials?*

We are providing certain stockholders, including those who have previously requested to receive paper copies of the proxy materials, with paper copies of the proxy materials instead of a Notice. If you would like to reduce the costs incurred by Anadarko in mailing proxy materials, you can consent to receive all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions provided with your proxy materials and on your proxy card or voting instruction card to vote using the Internet. When prompted, indicate that you agree to receive or access stockholder communications electronically in the future.

### *Can I vote my stock by filling out and returning the Notice?*

No. The Notice will, however, provide instructions on how to vote by Internet, by telephone, by requesting and returning a paper proxy card, or by submitting a ballot in person at the Annual Meeting.

### *How can I access the proxy materials over the Internet?*

Your Notice or proxy card will contain instructions on how to view our proxy materials for the Annual Meeting on the Internet. Our proxy materials are also available at https://materials.proxyvote.com/032511.

### *What am I voting on and how does the Board recommend that I vote?*

| Proposal | Board Vote Recommendation |
|---|---|
| Election of Directors | FOR EACH DIRECTOR NOMINEE |
| **Management Proposals** | |
| Ratification of KPMG LLP as Independent Auditor for 2016 | FOR |
| Approve an Amendment and Restatement of the Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan | FOR |
| Advisory Vote to Approve the Company's Named Executive Officer 2015 Compensation | FOR |
| **Stockholder Proposal** | |
| Provide a Report on Carbon Risk | AGAINST |

Table of Contents

# General Information

### *What is the effect of an "advisory" vote?*

Because your vote with respect to approval of our named executive officer (NEO) compensation is advisory, it will not be binding upon the Board. However, our Compensation and Benefits Committee (Compensation Committee) and the Board will carefully consider the outcome of the vote when reviewing future compensation arrangements for our executive officers.

### *Why should I vote?*

Your vote is very important regardless of the amount of stock you hold. The Board strongly encourages you to exercise your right to vote as a stockholder of the Company.

### *How do I vote?*

You may vote by any of the following four methods:

(i) *Internet.* Vote on the Internet at http://www.proxyvote.com. This website also allows electronic proxy voting using smartphones, tablets and other web-connected mobile devices (additional charges may apply pursuant to your service provider plan). Simply follow the instructions on the Notice, or if you received a proxy card by mail, follow the instructions on the proxy card and you can confirm that your vote has been properly recorded. In addition, we have included a QR (Quick Response) code on the Notice and proxy card. When you scan the QR code with your web-connected mobile device, you will be sent directly to a personalized webpage where you can indicate how you would like to vote. If you vote on the Internet, you can request electronic delivery of future proxy materials. Internet voting facilities for stockholders of record will be available 24 hours a day and will close at 11:59 p.m. (Eastern Daylight Time) on May 9, 2016.

(ii) *Telephone.* Vote by telephone by following the instructions on the Notice or, if you received a proxy card, by following the instructions on the proxy card. Easy-to-follow voice prompts allow you to vote your stock and confirm that your vote has been properly recorded. Telephone voting facilities for stockholders of record will be available 24 hours a day and will close at 11:59 p.m. (Eastern Daylight Time) on May 9, 2016.

(iii) *Mail.* If you received a proxy card by mail, vote by mail by completing, signing, dating and returning your proxy card in the pre-addressed, postage-paid envelope provided. If you vote by mail and your proxy card is returned unsigned, then your vote cannot be counted. If you vote by mail and the returned proxy card is signed without indicating how you want to vote, then your proxy will be voted as recommended by the Board. If mailed, your completed and signed proxy card must be received by May 9, 2016.

(iv) *Meeting.* You may attend and vote at the Annual Meeting.

The Board recommends that you vote using one of the first three methods discussed above, as it is not practical for most stockholders to attend and vote at the Annual Meeting. Using one of the first three methods discussed above to vote will not limit your right to vote at the Annual Meeting if you later decide to attend in person. If your stock is held in street name (for example, held in the name of a bank, broker, or other holder of record), you must obtain a proxy executed in your favor from your bank, broker or other holder of record to be able to attend and vote at the Annual Meeting.

### *If I vote by telephone or Internet and received a proxy card in the mail, do I need to return my proxy card?*

No.

### *If I vote by mail, telephone or Internet, may I still attend the Annual Meeting?*

Yes.

Table of Contents

# General Information

### *Can I revoke my proxy?*

Yes. You may revoke your proxy before the voting polls are closed at the Annual Meeting, by the following methods:

- voting at a later time by Internet or telephone until 11:59 p.m. (Eastern Daylight Time) on May 9, 2016;
- voting in person at the Annual Meeting;
- delivering to Anadarko's Corporate Secretary a proxy with a later date or a written revocation of your most recent proxy; or
- giving notice to the inspector of elections at the Annual Meeting.

If you are a street name stockholder (for example, if your shares are held in the name of a bank, broker, or other holder of record) and you vote by proxy, you may later revoke your proxy by informing the holder of record in accordance with that entity's procedures.

### *How many votes must be present to hold the Annual Meeting?*

Your stock is counted as present at the Annual Meeting if you attend the Annual Meeting and vote in person or if you properly return a proxy by Internet, telephone or mail. In order for us to hold our Annual Meeting, holders of a majority of our common stock entitled to vote must be present in person or by proxy at the Annual Meeting. This is referred to as a quorum. Abstentions and broker non-votes will be counted as present for purposes of determining a quorum.

### *What is a broker non-vote?*

The New York Stock Exchange (NYSE) permits brokers to vote their customers' stock held in street name on routine matters when the brokers have not received voting instructions from their customers. The NYSE does not, however, allow brokers to vote their customers' stock held in street name on non-routine matters unless they have received voting instructions from their customers. In such cases, the uninstructed shares for which the broker is unable to vote are called broker non-votes.

### *What routine matters will be voted on at the Annual Meeting?*

The ratification of the independent auditor is the only routine matter on which brokers may vote in their discretion on behalf of customers who have not provided voting instructions.

### *What non-routine matters will be voted on at the Annual Meeting?*

The election of directors, the vote to approve an amendment and restatement of the Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan, the advisory vote to approve our NEO compensation and the stockholder proposal, if presented, are non-routine matters on which brokers are not allowed to vote unless they have received voting instructions from their customers.

### *How many votes are needed to approve each of the proposals or, with respect to the advisory vote, to be considered the recommendation of the stockholders?*

The election of each director requires the affirmative vote of a majority of the votes cast for such director. Under our By-Laws, a majority of votes are cast for the election of a director if the number of votes cast "for" the director exceeds the number of votes cast "against" the director. Abstentions will not be taken into account in director elections. Each of the other proposals will be approved if it receives the affirmative vote of a majority of the stock entitled to vote and present in person or by proxy at the Annual Meeting. Although the advisory vote on our NEO compensation and the vote on the stockholder proposal are non-binding, the Board will review the results of such vote and, consistent with our record of stockholder engagement, will take the results

Table of Contents



into account when making decisions going forward. Except as otherwise provided above, abstentions are counted as votes present and entitled to vote and have the same effect as votes against a proposal. Broker non-votes are not counted as either votes for or votes against a proposal. Both abstentions and broker non-votes are counted in determining that a quorum is present for the meeting.

### *Could other matters be decided at the Annual Meeting?*

We are not aware of any matters that will be considered at the Annual Meeting other than those set forth in this proxy statement. However, if any other matters arise at the Annual Meeting, the persons named in your proxy will vote in accordance with their best judgment.

### *Where can I find the voting results of the Annual Meeting?*

We will announce the preliminary voting results at the Annual Meeting and disclose the final voting results in a current report on Form 8-K filed with the SEC within four business days of the date of the Annual Meeting unless only preliminary voting results are available at that time. To the extent necessary, we will file an amended report on Form 8-K to disclose the final voting results within four business days after the final voting results are known. You may access or obtain a copy of these and other reports free of charge on the Company's website at http://www.anadarko.com, or by contacting our investor relations department at investor@anadarko.com. Also, the referenced Form 8-K, any amendments thereto and other reports filed with or furnished to the SEC by the Company are available to you over the Internet at the SEC's website at http://www.sec.gov.

### *How can I view the stockholder list?*

A complete list of stockholders of record entitled to vote at the Annual Meeting will be available for viewing during ordinary business hours for a period of ten days before the Annual Meeting at our offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046.

### *Who pays for the proxy solicitation related to the Annual Meeting?*

We do. In addition to sending you these materials or otherwise providing you access to these materials, some of our directors and officers as well as management and non-management employees may contact you by telephone, mail, e-mail or in person. You may also be solicited by means of press releases issued by Anadarko, postings on our website at http://www.anadarko.com, advertisements in periodicals, or other media forms. None of our officers or employees will receive any extra compensation for soliciting you. We have retained Morrow & Co., LLC (Morrow), 470 West Ave., Stamford, Connecticut 06902, to assist us in soliciting your proxy for an estimated fee of $12,500, plus reasonable out-of-pocket expenses. Morrow ensures that brokers, custodians and nominees will supply additional copies of the proxy materials for distribution to the beneficial owners. We will also reimburse banks, nominees, fiduciaries, brokers and other custodians for their costs of sending the proxy materials to the beneficial owners of Anadarko common stock.

### *Who will tabulate and certify the vote?*

Broadridge Financial Solutions, Inc., an independent third party, will tabulate and certify the vote, and will have a representative to act as the independent inspector of elections for the Annual Meeting.

### *If I want to submit a stockholder proposal for the 2017 Annual Meeting, when is that proposal due?*

If you are an eligible stockholder and want to submit a proposal for possible inclusion in the proxy statement relating to the 2017 Annual Meeting, your proposal must be delivered to the attention of our Corporate Secretary and must be received at our principal office, 1201 Lake

Table of Contents

# General Information

Robbins Drive, The Woodlands, Texas 77380-1046, no later than November 25, 2016. We will only consider proposals that meet the requirements of the applicable rules of the SEC and our By-Laws.

### *If I want to nominate a director for the 2017 Annual Meeting, when is that nomination due?*

Eligible stockholders may nominate a candidate for election to the Board for inclusion in the Company's proxy materials in accordance with the "proxy access" provisions of our By-Laws. Our By-Laws require that you provide notice in writing to our Corporate Secretary (at the same address noted above) no later than the close of business on November 25, 2016, and no earlier than the close of business on October 26, 2016. For more information regarding the "proxy access" provisions of our By-Laws, see page 21.

Our By-Laws also provide that any stockholder may nominate a candidate for election to the Board or propose any business to be brought before an annual meeting of stockholders, which nomination or proposal is not submitted for inclusion in the Company's proxy materials. Assuming that our Annual Meeting is held on schedule, our By-Laws require that you provide notice in writing to our Corporate Secretary (at the same address noted above) no later than the close of business on February 9, 2017, and no earlier than the close of business on January 10, 2017. For additional information, see page 22.

### *How can I obtain a copy of the Annual Report on Form 10-K?*

Stockholders may request a free copy of our Annual Report on Form 10-K by submitting such request to Investor Relations, Anadarko Petroleum Corporation, P.O. Box 1330, Houston, Texas 77251-1330. Stockholders may also submit such request via e-mail at investor@anadarko.com or by calling (855) 820-6605. Alternatively, stockholders can access our Annual Report on Form 10-K on Anadarko's website at http://www.anadarko.com. Also, our Annual Report on Form 10-K and other reports filed by the Company with the SEC are available to you over the Internet at the SEC's website at http://www.sec.gov.

### *Will I get more than one copy of the proxy statement, annual report or Notice if there are multiple stockholders at my address?*

In some cases, only one copy of this proxy statement, annual report or Notice is being delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders. We will deliver promptly, upon a written or oral request, a separate copy of this proxy statement, annual report or Notice to a stockholder at a shared address to which a single copy of the document was delivered. Stockholders sharing an address may also submit requests for delivery of a single copy of the proxy statement, annual report or Notice, but in such event will still receive separate proxies for each account. To request separate or single delivery of these materials now or in the future, a stockholder may submit a written request to the Corporate Secretary, Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046 or a stockholder may make a request by calling the Corporate Secretary at (832) 636-1000 or by contacting our transfer agent, Computershare, P.O. Box 30170, College Station, Texas 77842-3170.

Table of Contents

# Anadarko Board of Directors

## ITEM 1 — ELECTION OF DIRECTORS

Our Restated Certificate of Incorporation provides that all directors are to be elected annually and that any director (or the entire Board) may be removed with or without cause at and after the Annual Meeting at which he or she is elected.

At the Annual Meeting, the terms of our eleven incumbent directors will expire. Those eleven directors have each been nominated to stand for election and, if elected at the Annual Meeting, will hold office until the expiration in 2017 of each of their one-year terms.

The Board is not aware of any reason why the director nominees would not be able to serve as directors of the Company. However, if a nominee is unavailable for election, then the proxies will be voted for the election of another nominee proposed by the Board or, as an alternative, the Board may reduce the number of directors to be elected at the Annual Meeting.

Our By-Laws provide for the election of directors by the majority vote of stockholders in uncontested elections. This means the number of votes cast "for" a nominee's election must exceed the number of votes cast "against" such nominee's election in order for him or her to be elected to the Board. In addition, each incumbent nominee is required to provide an irrevocable letter of resignation that states that he or she will resign if that director does not receive the required majority vote. If a director were to fail to receive a majority of votes cast and the Board were to accept the resignation tendered, then that director would cease to be a director of Anadarko. Each of the eleven incumbent director nominees named below has submitted an irrevocable letter of resignation that becomes effective if he or she does not receive a majority of the votes cast for his or her election and the Board decides to accept such resignation.

As discussed in more detail on page 19 of this proxy statement, the Board considers several qualifications, characteristics and other factors when evaluating individual directors, as well as the composition of the Board as a whole. As part of this process, the Board and its Governance and Risk Committee review the particular experiences, qualifications, attributes and skills of each nominee to determine if that person should serve as a director of the Company. The biographies of each of the nominees below contain information regarding the person's experience and director positions held currently or at any time during the last five years, and information regarding involvement in certain legal or administrative proceedings, to the extent applicable. They also highlight the particular experiences, qualifications, attributes or skills that caused the Governance and Risk Committee and the Board to conclude that the person should be nominated to serve as a director of the Company.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## ANTHONY R. CHASE

Mr. Chase, 61, is Chairman and Chief Executive Officer of ChaseSource, L.P., a Houston-based staffing and real estate development firm. He served as an Executive Vice President of Crest Investment Company, a Houston-based private equity firm, from January 2009 until December 2009. Prior to these positions, he had most recently served as the Chairman and Chief Executive Officer of ChaseCom, L.P., a global customer relationship management and staffing services company, until its sale in 2007 to AT&T. Mr. Chase has also been a Professor of Law at the University of Houston since 1991. Mr. Chase is on the board of directors of the Greater Houston Partnership, and served as its Chairman during 2012. From July 2004 to July 2008, he served as a director of the Federal Reserve Bank of Dallas, and also served as its Deputy Chairman from 2006 until his departure in July 2008. He is also on the board of directors of the Houston Endowment and the Texas Medical Center and serves on the Board of Trustees for St. John's School and KIPP Schools. Mr. Chase holds Bachelor of Arts, Master of Business Administration and Juris Doctor degrees from Harvard University. In addition to Mr. Chase's current public-company directorship noted in the box to the right, in the past five years he also served on the boards of Sarepta Therapeutics, Inc. (NASDAQ: SRPT) and Western Gas Holdings, LLC (NYSE: WES), a subsidiary of Anadarko.

Mr. Chase's unique experience as a successful and widely respected business leader, entrepreneur and legal scholar provides invaluable perspective to the Board. In addition, he has significant experience with strategic transactions and mergers and acquisitions.



**Director Since:**
**February 2014**

***Independent***

**Current Directorships:**

Paragon Offshore plc

## KEVIN P. CHILTON

General Chilton, 61, retired as Commander of the United States Strategic Command, Offutt Air Force Base, Nebraska, in February 2011, where he was responsible for the plans and operations for all U.S. forces conducting strategic deterrence and Department of Defense space and cyberspace operations. General Chilton served in the Air Force for more than 34 years in a wide variety of assignments including pilot, test pilot, instructor and astronaut, while earning numerous major awards and decorations. In addition to General Chilton's current public-company directorships noted in the box to the right, in the past five years he also served on the board of Orbital Sciences Corporation.

General Chilton's service as Deputy Program Manager of Operations, International Space Program and Director of Politico-Military Affairs, Asia-Pacific and Middle East, Joint Staff, the Pentagon, provides him with an invaluable blend of political, legislative, international and regulatory knowledge and experience. He also gained valuable managerial, financial and executive experience with his involvement in preparing the Air Force five-year budget/program for several years.



**Director Since:**
**May 2011**

***Independent***

**Current Directorships:**

Level 3 Communications, Inc.

Orbital ATK, Inc.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## H. PAULETT EBERHART (Lead Director)

Ms. Eberhart, 62, currently serves as Chairman and Chief Executive Officer of HMS Ventures, a privately held business involved with technology services and the acquisition and management of real estate. From January 2011 through March 2014, she served as the President and Chief Executive Officer of CDI Corp. (NYSE: CDI), a provider of engineering and information technology outsourcing and professional staffing services. She served as a consultant to CDI from April 2014 through December 2014. Ms. Eberhart also served as Chairman and Chief Executive Officer of HMS Ventures from January 2009 until January 2011. She served as President and Chief Executive Officer of Invensys Process Systems, Inc. (Invensys), a process automation company, from January 2007 to January 2009. From 1978 to 2004, she was an employee of Electronic Data Systems Corporation (EDS), an information technology and business process outsourcing company, and held roles of increasing responsibility over time, including senior level financial and operating roles. From 2003 until March 2004, Ms. Eberhart was President of Americas of EDS, and from 2002 to 2003 she served as President of Solutions Consulting at EDS. Ms. Eberhart is a Certified Public Accountant. In addition to Ms. Eberhart's current public-company directorships noted in the box to the right, in the past five years she also served on the boards of CDI, Fluor Corporation (NYSE: FLR) and Advanced Micro Devices, Inc. (NASDAQ: AMD).

Ms. Eberhart brings a wealth of accounting and financial experience to the Board, as well as managerial, manufacturing and global experience, through her numerous years of service as an executive officer for EDS, Invensys and CDI. She also held various other operating and financial positions during her 26 years at EDS. In addition, she gained significant experience through her service on the boards of other public companies and her involvement with various civic and charitable organizations.



**Director Since:**
**August 2004**

***Independent***

**Current Directorships:**

Cameron International Corporation

Ciber, Inc.

LPL Financial Holdings Inc.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## PETER J. FLUOR

Mr. Fluor, 68, has been Chairman and Chief Executive Officer of Texas Crude Energy, LLC, a private, independent oil and gas exploration company located in Houston, Texas, since 1990. He has been employed by Texas Crude Energy, LLC since 1972 and took over the responsibilities of President in 1980. Mr. Fluor serves as lead director of Fluor Corporation (NYSE: FLR).

Mr. Fluor brings more than 40 years of exploration and production operations, exploration and production service, finance, banking and managerial experience to the Board as a result of his experience at Texas Crude Energy, LLC (most recently as Chairman and Chief Executive Officer), as well as his service as a director of other public companies and involvement with various civic and charitable organizations.



**Director Since:**
**August 2007**

***Independent***

**Current Directorships:**

Cameron International Corporation

Fluor Corporation

## RICHARD L. GEORGE

Mr. George, 65, was appointed independent Chairman of the Board of Penn West Petroleum Ltd. (TSX: PWT) (NYSE: PWE), an exploration and production company based in Calgary, Alberta, in May 2013. He previously served as President and Chief Executive Officer of Suncor Energy Inc. (TSX: SU) (NYSE: SU), an integrated energy company, from 1991 to December 2011, at which time he relinquished the title of President but continued to serve as Chief Executive Officer until his retirement in May 2012. In 2011, Mr. George was named Canadian Energy Person of the Year by the Energy Council of Canada. He has also served on the board of directors of the Canadian Council of Chief Executives since 2003. In 2008, he was inducted into the Canadian Petroleum Hall of Fame. Mr. George was named a member of the Order of Canada in 2007 for his leadership in the development of Canada's natural resources sector, for his efforts to provide economic opportunities to Aboriginal communities and for his commitment to sustainable development. In addition to Mr. George's current public-company directorships noted in the box to the right, in the past five years he also served on the boards of Canadian Pacific Railway (TSX: CP) (NYSE: CP), Suncor Energy Inc., and Transocean LTD. (SIX: RIGN) (NYSE: RIG).

Mr. George's extensive leadership roles and career experiences in the global energy industry provide invaluable insight to the Board and strategically assist Anadarko as it pursues its expanding business opportunities.



**Director Since:**
**May 2012**

***Independent***

**Current Directorships:**

Penn West Petroleum Ltd.

Royal Bank of Canada

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## JOSEPH W. GORDER

Mr. Gorder, 58, is Chairman, President and Chief Executive Officer of Valero Energy Corporation (NYSE: VLO) (Valero), an international manufacturer and marketer of transportation fuels, other petrochemical products and power. He served as President and Chief Operating Officer of Valero from November 2012, until he assumed the role of Chief Executive Officer on May 1, 2014. He assumed the role of Chairman of the Board effective December 31, 2014. Mr. Gorder previously served as Executive Vice President and Chief Commercial Officer beginning in January 2011, and formerly led Valero's European operations from its London office. He previously served as Executive Vice President — Marketing and Supply beginning in December 2005. Prior to that, he held several positions with Valero and Ultramar Diamond Shamrock Corporation with responsibilities for corporate development and marketing. Mr. Gorder is also Chairman and Chief Executive Officer of Valero Energy Partners LP (NYSE: VLP), a midstream logistics master limited partnership formed by Valero in 2013.

Mr. Gorder's nearly 30 years of career experiences in and knowledge of global energy markets provides invaluable insight to the Board and strategically assists Anadarko as it pursues its expanding business opportunities.



**Director Since:**
**July 2014**
***Independent***

**Current Directorships:**
Valero Energy Corporation
Valero Energy Partners LP

## JOHN R. GORDON

Mr. Gordon, 67, is Senior Managing Director of Deltec Asset Management LLC, a registered investment firm located in New York, New York. He was President of Deltec Securities Corporation from 1988 until it was converted into Deltec Asset Management LLC. Prior to joining Deltec Asset Management LLC, Mr. Gordon was a managing director of Kidder, Peabody & Co., where he spent 12 years in the firm's corporate finance department.

Mr. Gordon's role as Senior Managing Director of Deltec Asset Management LLC since 1988 provides him with significant finance and banking experience (including in the energy industry) as well as considerable managerial expertise. He also has significant involvement in various civic and charitable organizations.



**Director Since:**
**April 1988**
***Independent***

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## SEAN GOURLEY

Dr. Gourley, 36, has served as CEO of Primer, a company building software to power artificial intelligence applications for the finance and military intelligence industries, since he founded it in February 2015. From March 2009 to January 2015, he was the Chief Technology Officer of Quid, a San Francisco-based augmented intelligence company he founded which builds software for strategic decision-making. Dr. Gourley studied at The University of Oxford as a Rhodes Scholar where he received a Ph.D. in physics, and he received both his Bachelor of Science and Master of Science in physics from the University of Canterbury in Christchurch, New Zealand. He was additionally a Post-Doctoral Research Fellow at the Said Business School at Oxford University and is currently an Equity Partner with Data Collective Venture Capital Fund, investing in key data and algorithmic technologies.



As a highly successful executive and entrepreneur in the technology sector, Dr. Gourley brings a unique and valuable perspective to the Board. His leadership in big data, algorithmic technologies, information technology and software pertaining to artificial intelligence and strategic decision making adds new skill sets to the Board that can be beneficially applied and leveraged across the Company's global operations. Dr. Gourley's expertise complements and enhances the Company's ability to leverage technology as a competitive advantage.

**Director Since:**
**September 2015**

***Independent***

## MARK C. MCKINLEY

Mr. McKinley, 59, has served as Managing Partner of MK Resources LLC, a private oil and gas development company specializing in the recovery and production of crude oil and the development of unconventional resource projects, for more than ten years. He is also the founder and President of Labrador Oil Company, a private oil and natural gas exploration and development firm. In addition, Mr. McKinley is the Managing Partner of M Natural Resource Partners, LP, which holds mineral, royalty and real estate interests, both directly and indirectly through various partnerships. Mr. McKinley currently serves on the Boards of Directors of the Merrymac McKinley Foundation and the Tip of the Spear Foundation.



Mr. McKinley's entrepreneurial, operational and business achievements during his long career in domestic and international oil and natural gas development bring valuable perspective to the Board.

**Director Since:**
**February 2015**

***Independent***

**Current Directorships:**

Buckeye GP, LLC

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**

*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2017*

## ERIC D. MULLINS

Mr. Mullins, 53, serves as the Managing Director and Co-Chief Executive Officer of Lime Rock Resources, a company that he co-founded in 2005 which acquires, operates and improves lower-risk oil and natural gas properties. From May 2011 through October 2015, he also served as the Co-Chief Executive Officer and Chairman of the Board of Directors of LRE GP, LLC, the general partner of LRR Energy, L.P., an oil and natural-gas company. Prior to co-founding Lime Rock Resources, Mr. Mullins served as a Managing Director in the Investment Banking Division of Goldman Sachs (NYSE: GS) where he led numerous financing, structuring and strategic advisory transactions in the division's Natural Resources Group. In the past five years he served on the board of LRE GP, LLC.

Mr. Mullins's career experiences and knowledge in financing and strategic mergers and acquisitions for exploration and production companies greatly assists and enhances the Board's ability to direct a sustainable and growing enterprise.



**Director Since:**
**May 2012**

***Independent***

## R. A. WALKER

Mr. Walker, 59, was named Chairman of the Board of the Company in May 2013, in addition to the role of Chief Executive Officer and director, both of which he assumed in May 2012, and the role of President, which he assumed in February 2010. He previously served as Chief Operating Officer from March 2009 until his appointment as Chief Executive Officer. He served as Senior Vice President, Finance and Chief Financial Officer from September 2005 until March 2009. Mr. Walker is a director of the Houston Branch of the Dallas Federal Reserve, a Trustee for the Houston Museum of Natural Science, a member of the Business Council, Business Roundtable, All-American Wildcatters (Chairman 2017/18), and the Board of Directors of the American Petroleum Institute (Executive Committee). In addition to his current public-company directorship noted in the box to the right, in the past five years he also served on the boards of Temple-Inland, Inc. and CenterPoint Energy, Inc. (NYSE: CNP), as well as Western Gas Equity Holdings, LLC (NYSE: WGP) and Western Gas Holdings, LLC (NYSE: WES), both of which are subsidiaries of Anadarko.

Mr. Walker has significant energy, banking and asset management experience, in addition to his role as Anadarko's Chairman, President and Chief Executive Officer. He has served on numerous boards of public, private, industry trade associations and philanthropic organizations.



**Director Since:**
**May 2012**

***Not Independent – Management***

**Current Directorships:**

BOK Financial Corporation

Table of Contents

# Corporate Governance

Our Board recognizes that excellence in corporate governance is essential in carrying out our responsibilities to our stakeholders, including our stockholders, employees, customers, communities, and creditors, as well as to the environment. Our Corporate Governance Guidelines, By-Laws, Code of Business Conduct and Ethics, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, and written charters for the Audit Committee, the Compensation Committee, and the Governance and Risk Committee, all as amended from time to time, can be found on the Company's website at http://www.anadarko.com/Responsibility/Good-Governance/#!GDocs. These documents provide the framework for our corporate governance. Any of these documents will be furnished in print free of charge to any stockholder upon request. You can submit such a request to the Corporate Secretary at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046.

Under the Company's Corporate Governance Guidelines, directors are expected to attend regularly scheduled Board of Director meetings and meetings of committees on which they serve, as well as the annual meeting of stockholders. Each incumbent director who served on our Board during 2015 attended at least 75% of the meetings of the Board and the committees on which he or she served. There were seven Board meetings and a total of 21 Board committee meetings in 2015. In addition, all of the incumbent directors attended the 2015 Annual Meeting, other than Mr. Gourley, who joined the Board in September 2015.

## BOARD LEADERSHIP STRUCTURE

Mr. Walker was initially elected Chairman of the Board effective following the Company's 2013 Annual Meeting and has been re-elected to such role each year since that time. As the Company's Chief Executive Officer (CEO), Mr. Walker works in concert with the rest of our majority-independent Board and the independent Lead Director, Ms. Eberhart, to oversee the execution of the Company's strategy. The Board believes that the combined Chairman and CEO role ensures open communication between the Board and executive management and promotes consistent and effective leadership of both the Board and executive management. In addition, the Board believes that a combined Chairman and CEO role is currently the best approach to promote long-term stockholder value for the reasons listed below.

- *Promotes Unified Approach on Corporate Strategy Development and Execution* — Maintaining a combined position enables the Company's CEO to act as a bridge between management and the Board, helping both to act with a common purpose. This also fosters consensus building and alignment on strategy and tactical execution of a Board-approved vision and strategy at the top levels within the Company.

- *Requires that the CEO Recognize Importance of Good Corporate Governance* — Maintaining a combined position requires that the CEO's responsibilities include a mastery of good corporate governance, a focus on broad stakeholder interests, and an open channel of communication, and requires the CEO to work together with the Lead Director as a team and to appreciate the vital importance of good governance practices in executing the Company's strategy.

- *Provides Clear Lines of Accountability* — A combined position has the practical effect of simplifying the accountability of the executive management team, thereby reducing potential confusion and fractured leadership.

- *Provides Clear Roadmap for Stockholder/Stakeholder Communications* — A combined position provides the Company's stakeholders the opportunity to deal with a single point of overall authority, which we believe results in more efficient and effective communications with stakeholders.

Table of Contents



***Role of Lead Director.*** Consistent with industry best practices, the Board has a strong and active Lead Director whose duties and responsibilities ensure the Company maintains a corporate-governance structure with appropriate independence and balance. Our independent Lead Director's duties are closely aligned with the role of an independent, non-executive chairman. Ms. Eberhart was appointed as Lead Director effective February 9, 2016. As the Lead Director, elected exclusively by the independent directors, Ms. Eberhart's role is to assist the Chairman and the remainder of the Board in assuring effective corporate governance in managing the affairs of the Board and the Company. Ms. Eberhart, who has previously served as Chair of both the Audit and Governance and Risk Committees, serves as a liaison between the Chairman and the independent directors and works with the Chairman to approve all meeting agendas. She presides at executive sessions of the independent directors, which are held in conjunction with each regularly scheduled quarterly meeting of the Board, and any other meetings as she, in her capacity as the Lead Director, determines appropriate. Ms. Eberhart also approves information sent to the Board and approves meeting schedules to assure there is sufficient time for discussion of all agenda items. In addition, as Lead Director, Ms. Eberhart has authority to call special meetings of the Board and is also a member of the Board's Executive Committee, providing additional representation for the independent directors in all actions considered by the Executive Committee between Board meetings. Ms. Eberhart is required, if requested by major stockholders, to be available for consultation and direct communication.

## THE BOARD'S ROLE IN RISK OVERSIGHT

The Board's role in the identification, assessment, oversight and management of potential risks that could affect the Company's ability to achieve its strategic, operational and financial objectives consists of (i) reviewing and discussing the Company's risk framework and risk management policies, (ii) facilitating appropriate coordination among the Board's committees with respect to oversight of risk management by delegating oversight of the Company's enterprise risk management program to the Governance and Risk Committee, the risk assessment framework and risk management policies, including the framework with respect to significant financial risk exposures, to the Audit Committee, and compensation risk to the Compensation Committee, and (iii) periodically meeting with members of management, including members of the Company's internal Risk Council, to identify, review and assess the Company's major risk exposures and steps taken to monitor, mitigate and report such exposures.

***Board Committees.*** The Governance and Risk Committee is responsible for oversight of the Company's significant risk exposures and periodically reviews and discusses with members of management those risk exposures and the steps being taken to identify, monitor and mitigate such exposures. With the assistance of the Compensation Committee's independent executive compensation consultant, the Compensation Committee is responsible for the oversight of the annual risk assessment of the Company's compensation programs. The Audit Committee is responsible for oversight of the Company's risk assessment framework and risk management policies, including the framework with respect to significant financial risk exposures, and periodically reviews and discusses such framework and policies with members of management.

***Internal Risk Council.*** In order to facilitate oversight of potential risk exposures to the Company that have not been specifically delegated to any Board committee, the Board periodically meets with members of the Company's internal Risk Council to review and assess the Company's risk-management processes and to discuss significant risk exposures. Members of senior management comprise the Company's internal Risk Council and provide periodic reports to the CEO, the Governance and Risk Committee and the full Board regarding the Company's risk profile and risk-management strategies. In addition, the Company's internal audit function regularly provides additional perspective and insight to the Audit Committee regarding potential risks facing the Company.

Table of Contents



## COMPENSATION COMMITTEE RISK ASSESSMENT

The Compensation Committee reviewed a comprehensive compensation risk assessment conducted independently by Frederic W. Cook & Co., Inc. (FWC), the Compensation Committee's executive compensation consultant. The assessment focused on the design and application of the Company's executive and non-executive compensation programs and whether such programs encourage excessive risk taking by executive officers and other employees. Based on the outcomes of this assessment and the Compensation Committee's review, the Compensation Committee believes that the Company's compensation programs (i) do not motivate our executive officers or our non-executive employees to take excessive risks, (ii) are well designed to encourage behaviors aligned with the long-term interests of stockholders and (iii) are not reasonably likely to have a material adverse effect on the Company. Anadarko's compensation programs are designed to support and reward appropriate risk taking and include the following:

- an appropriate balance of fixed versus variable pay, cash and equity pay components, operating and financial performance measures, short-term and long-term performance periods, extended vesting schedules, and established formulas and discretion;
- established policies to mitigate compensation risk including significant stock ownership guidelines for officers of the Company, insider-trading prohibitions, clawback provisions, and specified caps on incentive awards; and
- independent Compensation Committee oversight, which also extends to incentive plans below the executive officer level.

## COMMITTEES OF THE BOARD

The Board has four standing committees: (i) the Audit Committee; (ii) the Compensation Committee; (iii) the Governance and Risk Committee; and (iv) the Executive Committee. For each of the current committees of the Board, the table below shows the current membership, the principal functions and the number of meetings held in 2015:

| Name, Members and Meetings | Principal Functions |
|---|---|
| **AUDIT COMMITTEE(1)** Eric D. Mullins (Chair)(2)<br>Kevin P. Chilton<br>Mark C. McKinley<br><br>***Meetings in 2015: 8*** | • Discusses the integrity of the Company's accounting policies, internal controls, financial reporting practices and the financial statements with management, the independent auditor and internal audit.<br>• Reviews and discusses with management the Company's risk assessment framework and risk management policies, including the framework with respect to significant financial risk exposures.<br>• Monitors the qualifications, independence and performance of the Company's internal audit function and independent auditor, and meets periodically with management, internal audit and the independent auditor in separate executive sessions.<br>• Establishes and maintains procedures for the submission, receipt, retention and treatment of complaints and concerns received by the Company regarding accounting, internal controls or auditing matters, including those received through the confidential anonymous Anadarko Hotline. |

Table of Contents



| Name, Members and Meetings | Principal Functions |
|---|---|
| **AUDIT COMMITTEE (Continued)** | • Monitors compliance with legal and regulatory requirements and the business practices and ethical standards of the Company.<br>• Approves the appointment, compensation, retention and oversight of the work of the Company's independent auditor and establishes guidelines for the retention of the independent auditor for any permissible services.<br>• Prepares the Audit Committee report, which is on page 31. |
| **COMPENSATION AND BENEFITS COMMITTEE(3)**<br>Peter J. Fluor (Chair)<br>Joseph W. Gorder<br>John R. Gordon<br>***Meetings in 2015: 7*** | • Approves and evaluates the Company's director and officer compensation plans, policies and programs.<br>• Conducts an annual review and evaluation of the CEO's performance in light of the Company's goals and objectives.<br>• Retains, and is directly responsible for the oversight of, compensation or other consultants to assist in the evaluation of director or executive compensation and otherwise to aid the Compensation Committee in meeting its responsibilities. For additional information on the role of compensation consultants, please see Compensation Discussion and Analysis beginning on page 34.<br>• Annually reviews the Company's compensation-related risk profile to confirm that compensation-related risks are not reasonably likely to have a material adverse effect on the Company.<br>• Periodically reviews and discusses with its independent compensation consultants and senior management the Company's policy on executive severance arrangements, and recommends any proposed changes to the Board to the extent required by the Compensation Committee charter.<br>• Reviews the Compensation Discussion and Analysis, disclosures for advisory votes by stockholders on executive compensation, including frequency of such votes, and other relevant disclosures made in the proxy statement.<br>• Produces an annual Compensation Committee report, which is on page 32. |
| **GOVERNANCE AND RISK COMMITTEE(4)**<br>H. Paulett Eberhart (Chair)<br>Anthony R. Chase<br>Richard L. George<br>Sean Gourley<br>***Meetings in 2015: 6*** | • Recommends nominees for director to the full Board and, subject to the Board's power and authority to determine the eligibility of nominees nominated by stockholders pursuant to Section 2.9 of the Company's By-Laws, ensures such nominees possess the director qualifications set forth in the Company's Corporate Governance Guidelines.<br>• Reviews the qualifications of existing Board members before they are nominated for re-election to the Board.<br>• Recommends members of the Board for committee membership.<br>• Proposes Corporate Governance Guidelines for the Company and reviews them annually.<br>• Oversees the Company's compliance structure and programs. |

Table of Contents



| Name, Members and Meetings | Principal Functions |
|---|---|
| **GOVERNANCE AND RISK COMMITTEE (Continued)** | • Develops and oversees an evaluation process for the Board and its committees.<br>• Oversees the emergency and expected CEO succession plans.<br>• Reviews and approves related-person transactions in accordance with the Board's procedures.<br>• Reviews and investigates reports to the confidential anonymous Anadarko Hotline regarding material non-financial matters.<br>• Reviews and discusses with management the Company's significant risk exposures and the steps management has taken to identify, monitor and mitigate such exposures.<br>• Oversees the work of the Company's independent reserve engineering consultant.<br>• Oversees the Anadarko Petroleum Corporation Political and Public Engagement Policy and the Company's political activity, including annually reviewing the Company's political contributions and trade association payments.<br>• Reviews and discusses with management the Company's environmental, health and safety programs. |
| **EXECUTIVE COMMITTEE**<br>R. A. Walker (Chair)<br>H. Paulett Eberhart<br>Peter J. Fluor<br>Eric D. Mullins<br>***Meetings in 2015: 0*** | • Acts with the power and authority of the Board, in accordance with the Company's By-Laws, in the management of the business and affairs of the Company while the Board is not in session.<br>• Approves specific terms of financing or other transactions that have previously been approved by the Board. |

(1) None of the Audit Committee members serves on the audit committee of more than two other public companies.

(2) The Board has determined that Mr. Mullins qualifies as an "audit committee financial expert" under the rules of the SEC based upon his education and employment experience. The Board has also determined that Mr. Mullins, as well as each member of the Audit Committee, is independent, as independence for audit committee members is defined in Rule 10A-3(b)(1) of the Securities Exchange Act of 1934, as amended (Exchange Act), and under the standards set forth by the NYSE.

(3) The Board has determined that each member of the Compensation Committee is: (i) independent under the standards set forth by the NYSE governing Compensation Committee membership; (ii) a "non-employee director" under Rule 16b-3 of the Exchange Act; and (iii) an "outside director" under Section 162(m) of the Internal Revenue Code of 1986, as amended (IRC).

(4) The Board has determined that each member of the Governance and Risk Committee is independent under the standards set forth by the NYSE governing Board membership.

Table of Contents



## BOARD OF DIRECTORS

### *Director Independence*

In accordance with NYSE rules, the Sarbanes-Oxley Act of 2002, the Exchange Act, and the rules and regulations adopted thereunder, and the Company's Corporate Governance Guidelines, the Board must affirmatively determine the independence of each director and director nominee in accordance with the Company's director independence standards, which are contained in the Company's Corporate Governance Guidelines found on the Company's website at http://www.anadarko.com/content/documents/apc/Responsibility/Governance_Documents/Corporate_Governance_Guidelines.pdf.

Based on the standards contained in our Corporate Governance Guidelines, and the recommendation by the Governance and Risk Committee, the Board has determined that each of the following non-employee director nominees is independent and has no material relationship with the Company that could impair such nominee's independence:

- Anthony R. Chase
- Kevin P. Chilton
- H. Paulett Eberhart
- Peter J. Fluor
- Richard L. George
- Joseph W. Gorder
- John R. Gordon
- Sean Gourley
- Mark C. McKinley
- Eric D. Mullins

Mr. Walker is not independent because he is the Chairman, President and CEO of the Company.

For information regarding our policy on Transactions with Related Persons, please see page 78 of this proxy statement.

### *Selection of Directors*

The Company's Corporate Governance Guidelines require that with respect to Board vacancies, the Governance and Risk Committee (or a subcommittee thereof): (i) identify the personal characteristics needed in a director nominee so that the Board as a whole will possess such qualifications as more fully identified below; (ii) compile, through such means as the Governance and Risk Committee considers appropriate, a list of potential director nominees thought to possess the individual qualifications identified in the Corporate Governance Guidelines, as well as any additional specific qualifications the Board deems appropriate at the time; (iii) engage an outside consultant, as necessary, to assist in the search for qualified nominees; (iv) review the background, character, experience and temperament of each potential nominee; (v) conduct interviews, and if appropriate recommend that other members of the Board and/or management interview such potential nominee; and (vi) evaluate each potential nominee in relation to the culture of the Company and the Board, which emphasizes independent thinking and teamwork.

Table of Contents

# Corporate Governance

As stated in our Corporate Governance Guidelines, one of the core competencies our Board has identified in assessing the qualifications of the Board as a whole is a diversity of experience, professional expertise, perspective and age. The Board recognizes that such diversity is an important factor in board composition and the Governance and Risk Committee ensures that such diversity considerations are discussed in connection with each candidate for director. For the past several years, our Board has reviewed on at least an annual basis a director skill set chart that identifies expertise, experience and other characteristics that the Board believes contribute to an effective and well-functioning board and that the Board as a whole should possess.

| Director Skill Sets | Independent | Other Public Boards – Current[1] | Other Public Boards – Past[1] | Current or Former CEO of Public Co. | Current Public Co. Executive Service | Former Public Co. Executive Service[2] | Financial Expertise[3] | Banking/Finance Experience[4] | E&P Operations Experience | E&P Service Experience | International Experience | Government Relations Experience | Commodity Marketing/Hedging Exp. | Manufacturing/Operations Exp. | Civic/Charitable Exp.[5] | Other Specialized Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anthony R. Chase | YES | ● | ● | ○ | ○ | ○ | ◑ | ◑ | ○ | ○ | ● | ◑ | ◑ | ◑ | ● | ○ |
| Kevin P. Chilton | YES | ● | ○ | ○ | ○ | ○ | ◑ | ○ | ○ | ○ | ◑ | ● | ○ | ○ | ◑ | ○ |
| H. Paulett Eberhart | YES | ● | ● | ● | ○ | ● | ● | ● | ○ | ○ | ● | ◑ | ○ | ● | ● | ○ |
| Peter J. Fluor | YES | ● | ● | ○ | ○ | ◑ | ◑ | ◑ | ● | ● | ● | ◑ | ○ | ◑ | ◑ | ○ |
| Richard L. George | YES | ● | ● | ● | ○ | ◑ | ◑ | ◑ | ● | ● | ● | ◑ | ● | ◑ | ◑ | ○ |
| Joseph W. Gorder | YES | ● | ○ | ● | ● | ◑ | ◑ | ◑ | ◑ | ◑ | ● | ○ | ● | ○ | ◑ | ○ |
| John R. Gordon | YES | ○ | ○ | ○ | ○ | ○ | ◑ | ● | ○ | ○ | ◑ | ○ | ○ | ○ | ● | ○ |
| Sean Gourley | YES | ○ | ○ | ○ | ○ | ○ | ◑ | ◑ | ○ | ○ | ● | ○ | ○ | ◑ | ○ | ●[6] |
| Mark C. McKinley | YES | ◑ | ○ | ○ | ○ | ○ | ○ | ◑ | ◑ | ◑ | ○ | ○ | ◑ | ○ | ◑ | ○ |
| Eric D. Mullins | YES | ○ | ◑ | ● | ○ | ◑ | ● | ● | ● | ○ | ○ | ○ | ◑ | ○ | ◑ | ○ |
| R. A. Walker | NO | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ◑ | ◑ | ◑ | ○ |

○ = no significant experience
1 ● = 2 or more other boards; ◑ = 1 other board
2 ● = 2 or more companies; ◑ = 1 other company
3 ● = deemed eligible to be designated an Audit Committee Financial Expert; ◑ = significant education or experience
4 ● = significant banking or financial experience; ◑ = other banking or financial experience
5 ● = very active; ◑ = moderately active
6 Big Data Analytics and Artificial Intelligence

The Governance and Risk Committee considers these and other factors and the extent to which such attributes can be represented when evaluating potential candidates for the Board. Together, this diversity of skill sets, experiences and personal backgrounds allows our directors to provide the diversity of thought that is critical to the Board's decision-making and oversight process.

## *Annual Evaluations*

The Board and each of the independent committees have conducted self-evaluations related to their performance in 2015, including an evaluation of each director. The performance evaluations were supervised by the Governance and Risk Committee. Following a discussion of the results of the evaluations, the Board and each committee review and discuss the evaluation results, and take this information into account when assessing the qualifications of the Board and further enhancing the effectiveness of the Board and its committees over time.

Table of Contents

# Corporate Governance

### *Communication with the Directors of the Company*

The Board welcomes questions or comments about the Company and its operations. Interested parties who wish to communicate with the Board, including the Lead Director, the independent directors, or any individual director, may contact the Chairperson of the Governance and Risk Committee at governanceriskchair@anadarko.com or at Anadarko Petroleum Corporation, Attn: Corporate Secretary, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046. If requested, any questions or comments will be kept confidential to the extent reasonably possible. Depending on the subject matter, the Chairperson of the Governance and Risk Committee, with the assistance of the Corporate Secretary, will:

- forward the communication to the director or directors to whom it is addressed;
- refer the inquiry to the General Counsel for referral to the appropriate corporate department if it is a matter that does not appear to require direct attention by the Board or an individual director; or
- not forward the communication if it is primarily commercial in nature or if it relates to an improper or irrelevant topic.

These procedures may change from time to time, and you are encouraged to visit our website for the most current means of contacting our directors. If you wish to request copies of any of our governance documents, please refer to page 14 of this proxy statement for instructions.

### *Stockholder Participation in the Selection of Director Nominees*

***Proxy Access – Crafting a Responsive Standard with Substantial Stockholder Input.*** In October 2014, the Company received a non-binding stockholder proposal requesting the Board to submit for stockholder approval a proxy access By-Law provision. Between November 2014 and September 2015, the company's stockholder engagement team, which consists of senior management from our Human Resources, Legal, Investor Relations, and Health, Safety and Environment departments, held over 50 meetings with the governance and voting teams of our stockholders and other stakeholders (such as proxy advisory firms) to discuss proxy access as well as other topics. Nine of these meetings were attended by the Chairman of the Compensation Committee. The Company also engaged with the proponent of the proxy access stockholder proposal in February and September 2015 to obtain a better understanding of its concerns and discuss in more detail the proxy access provisions that it viewed as necessary or appropriate. Following the 2015 annual meeting of stockholders, the Company had additional communications with 7 of our top 15 stockholders, representing approximately 25% of our outstanding stock, to specifically discuss the appropriateness of certain proxy access metrics as the Board considered implementation of such a provision. The input gathered from each of the above engagements was conveyed to and discussed by both the Governance and Risk Committee and the Board at each of their regular and special meetings between November 2014 and September 2015.

***Board Responsiveness and Timing***. As stated in the Company's 2015 proxy statement, the Board fully supports the right of stockholders to nominate and elect directors to oversee the management of its corporate affairs under the appropriate conditions. In September 2015, after carefully considering all of the feedback from the engagements described above, and intending to be fully responsive to stockholder concerns, the Board amended the Company's By-Laws to implement proxy access. The amended By-Laws implemented the major points of the stockholder proposal by

Table of Contents



permitting stockholders owning 3% or more of the Company's outstanding common stock continuously for at least three years to nominate and include in the Company's proxy materials directors constituting up to the greater of (i) 20% of the Board or (ii) two directors, provided that the stockholders and nominees satisfy the requirements specified in the By-Laws. The provision allows a group of up to 20 stockholders to make such a director nomination. In addition to the substantial engagement described above, adopting the proposal in September 2015 allowed stockholders reasonable time to carefully review the By-Laws and convey any concerns or questions, as well as submit a stockholder proposal for the Annual Meeting if they believed that there were material restrictions or deficiencies with the provision. During our regular fall 2015 stockholder engagement discussions, which entailed reaching out to each of our then top 50 stockholders, our stockholder engagement team held discussions with 17 of our top 50 stockholders and also had discussions with ISS and Glass Lewis in February 2016, during which the adoption of proxy access was discussed. We have received favorable responses from our stockholders, and substantially all such stockholders expressed general support of the form of proxy access provision adopted by the Board. The Company did not receive a stockholder proposal related to proxy access for the Annual Meeting.

Eligible stockholders may nominate a candidate for election to the Board for inclusion in the Company's proxy materials in accordance with the proxy access provisions of Section 2.9(C) of our By-Laws. An eligible stockholder generally must deliver the Stockholder Notice (as defined in our By-Laws) to the Corporate Secretary at the principal executive offices of the Company not later than the close of business on the 120th day, nor earlier than the close of business on the 150th day, prior to the first anniversary of the date (as stated in the Company's proxy materials) the definitive proxy statement was first sent to stockholders in connection with the preceding year's annual meeting of stockholders and otherwise comply with all of the requirements of the By-Laws. For the 2017 annual meeting of stockholders, we must receive notice of the nomination for inclusion in the Company's proxy materials no earlier than October 26, 2016 and no later than November 25, 2016.

***Other Director Nominations.*** Our By-Laws also provide that any stockholder intending to nominate a candidate for election to the Board or proposing any business to be brought before an annual meeting of stockholders, which nomination is not submitted for inclusion in the Company's proxy materials pursuant to Section 2.9(C) of the By-Laws, generally must deliver written notice by mail to the Company's Corporate Secretary at the at the principal executive officers of the Company not later than the close of business on the 90th day, nor earlier than the close of business on the 120 day, prior to the first anniversary of the preceding year's annual meeting. The notice must include information specified in the By-Laws. For the 2017 annual meeting of stockholders, assuming that the Annual Meeting is held on schedule, we must receive notice of your intention to nominate a director or to introduce an item of business at that meeting no earlier than January 10, 2017 and no later than February 9, 2017.

During the past year, no stockholder submitted names to the Governance and Risk Committee of individuals for nomination to the Company's Board pursuant to the procedures discussed above.

The Chairman of the meeting may disregard any nomination of a candidate for director or refuse to allow the transaction of any business under a proposal if such is not made in compliance with the procedures in our By-Laws or other requirements of rules under the Exchange Act. For more information on stockholder participation in the selection of director nominees, please refer to Section 2.9 in our By-Laws, which are posted on the Company's website at http://www.anadarko.com/Responsibility/Good-Governance/#!GDocs.

Table of Contents



### Directors' Continuing Education

The Company's Director Education Policy encourages all members of the Board to attend director education programs appropriate to their individual backgrounds to stay abreast of developments in corporate governance and best practices relevant to their contribution to the Board as well as their responsibilities in their specific committee assignments. The Director Education Policy provides that the Company will reimburse directors for all costs associated with attending any director education program.

### Compensation and Benefits Committee Interlocks and Insider Participation

The Compensation Committee is made up of three independent directors, Messrs. Fluor, Gorder and Gordon. None of our executive officers currently serve, or in the past year have served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our Board or our Compensation Committee.

### Director Compensation

The Compensation Committee is responsible for determining the type and amount of compensation for non-employee directors. The program is reviewed annually to ensure that it is appropriately designed to attract and compensate qualified individuals who possess the expertise and skill set required by the Company's Board members. In setting non-employee director compensation, the Compensation Committee considers the competitive market as well as the significant amount of time that non-employee directors spend in fulfilling their duties to the Company and its stockholders. To assist in the 2015 annual review of director compensation, the Compensation Committee directly retained FWC as its outside independent compensation consultant to provide benchmark compensation data and recommendations for compensation program design.

Non-employee directors receive a combination of cash and stock-based compensation designed to attract and retain qualified candidates to serve on the Board. In February 2016, the Compensation Committee adopted an amendment to the Anadarko Petroleum Corporation 2008 Director Compensation Plan to limit the total compensation, both cash and stock-based compensation, that non-employee directors may receive annually under any of the Company's compensation plans. Mr. Walker does not receive any compensation for his service as a director.

***Cash Compensation Program.*** The following is a schedule of annual retainers for non-employee directors in effect during 2015, payable on a quarterly basis:

| 2015 Cash Compensation | Amount($) |
|---|---|
| Annual Board Retainer | 110,000 |
| Additional Annual Retainer for Chairperson of Audit Committee, Compensation Committee and Governance and Risk Committee | 25,000 |
| Additional Annual Retainer for Lead Director | 35,000 |

The annual retainers are payable on a quarterly basis. Additionally, to compensate a director in a year when there is an unusually high level of service required, a per meeting fee of $2,000 will be paid for each meeting attended in excess of 20 combined Board and committee meetings in a calendar year.

Non-employee directors may receive their cash compensation in cash, common stock, or if eligible, defer cash compensation into the Anadarko Deferred Compensation Plan (described below), or any combination thereof. Beginning in 2016, in lieu of receiving common stock, non-employee directors may elect to receive their cash compensation in deferred shares of common stock which may not be

Table of Contents



distributed to the non-employee director earlier than one year from the date of grant (except in the event of a separation from the Board due to death or disability). This election option to receive common stock, in lieu of cash compensation, provides non-employee directors a method to invest in the Company as a stockholder and further align their interests with the interests of the Company's stockholders.

***Deferred Compensation Plan for Non-Employee Directors.*** Non-employee directors who are resident in the U.S. may participate in the Company's Deferred Compensation Plan. The Deferred Compensation Plan allows non-employee directors to defer receipt of up to 100% of their cash compensation, and to allocate the deferred amounts among a group of notional accounts that mirror the gains and/or losses of various investment funds. In October 2015, the Compensation Committee elected to eliminate the Anadarko stock fund as an investment option under the Deferred Compensation Plan effective January 1, 2016. The interest rate earned on the deferred amounts is not above-market or preferential. In general, deferred amounts are distributed to the participant upon leaving the Board or at a specific date as elected by the participant. Mr. Fluor is the only director who elected to defer compensation during 2015.

***Stock Plan for Non-Employee Directors.*** In addition to cash compensation, non-employee directors receive annual equity grants. Equity grants to non-employee directors are automatically awarded each year on the date of the Company's annual meeting of stockholders. For 2015, each non-employee director elected at the 2015 annual meeting of stockholders received an annual equity grant with a value targeted at $250,000 and 100% of the value was delivered in deferred shares. Messrs. McKinley and Gourley each received a prorated equity grant when they were elected to the Board in February and September 2015, respectively. Non-employee directors may elect to receive their shares on a specific date, but not earlier than one year from the date of grant or when they leave the Board. Stock-based awards made to non-employee directors are made pursuant to the Anadarko Petroleum Corporation 2008 Director Compensation Plan.

***Stock Ownership Guidelines for Non-Employee Directors.*** Non-employee directors are required to hold stock with a value equivalent to seven times the annual Board retainer and have five years from the date of their initial election to the Board to comply with the guidelines. All non-employee directors exceeded their ownership guidelines at December 31, 2015, other than directors who joined the Board in 2014 and 2015 and are still within the five-year compliance period.

***Other Compensation.*** Non-employee directors are covered under the Company's Accidental Death & Dismemberment Plan and the Company pays the annual premium for such coverage on behalf of each non-employee director. The Company also provides each non-employee director with Personal Excess Liability coverage and pays the annual premium on their behalf. The Company maintains an Aid to Education Program under which certain gifts by employees, officers, non-employee directors and retired employees to qualified institutions of learning are matched on a two-to-one basis. The maximum contribution matched per donor, per calendar year is $2,500, resulting in a maximum Company yearly match of $5,000 per donor.

Table of Contents



## DIRECTOR COMPENSATION TABLE FOR 2015

The following table sets forth information concerning total non-employee director compensation earned during the 2015 fiscal year by each incumbent director who served on the Board in 2015, other than Mr. Walker, who does not receive any compensation for his service as a director:

| Name | Fees Earned or Paid in Cash($) | Stock Awards ($)(1) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($)(3) | Total($) |
|---|---|---|---|---|---|---|---|
| Anthony R. Chase | 110,000 | 250,037 | 0 | 0 | 0 | 1,805 | 361,842 |
| Kevin P. Chilton | 110,000 | 250,037 | 0 | 0 | 0 | 1,805 | 361,842 |
| H. Paulett Eberhart | 135,000 | 250,037 | 0 | 0 | 0 | 1,805 | 386,842 |
| Peter J. Fluor(4) | 135,000 | 250,037 | 0 | 0 | 0 | 1,805 | 386,842 |
| Richard L. George | 110,000 | 250,037 | 0 | 0 | 0 | 1,805 | 361,842 |
| Charles W. Goodyear(5) | 40,192 | 567,475 | 0 | 0 | 0 | 653 | 608,320 |
| Joseph W. Gorder | 110,000 | 250,037 | 0 | 0 | 0 | 1,805 | 361,842 |
| John R. Gordon | 145,000 | 250,037 | 0 | 0 | 0 | 1,805 | 396,842 |
| Sean Gourley(6) | 32,285 | 166,732 | 0 | 0 | 0 | 876 | 199,893 |
| Mark C. McKinley(7) | 97,350 | 312,618 | 0 | 0 | 0 | 1,597 | 411,565 |
| Eric D. Mullins | 135,000 | 250,037 | 0 | 0 | 0 | 1,805 | 386,842 |

(1) Except for Messrs. Goodyear, Gourley and McKinley, the amounts included in this column represent the aggregate grant date fair value of 2,901 deferred shares granted to each non-employee director elected by stockholders on May 12, 2015, computed in accordance with FASB ASC Topic 718. For an explanation of the amounts included in this column for Mr. Goodyear, see footnote (5) below. For Mr. McKinley, the amount includes (i) 731 deferred shares granted upon his appointment to the Board on February 11, 2015, which represents a pro-rata grant for his partial year of service from appointment through the 2015 annual meeting of stockholders and (ii) an award of 2,901 deferred shares granted on May 12, 2015. For Mr. Gourley, the amount includes 2,537 deferred shares granted upon his appointment to the Board on September 15, 2015, which represents a pro-rata grant for his partial year of service from appointment through the Annual Meeting. The value ultimately realized by each director may or may not be equal to this determined value. For a discussion of valuation assumptions, see Note 19 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2015. As of December 31, 2015, each of the non-employee directors had aggregate outstanding deferred shares as follows: Mr. Chase — 3,666; Gen. Chilton — 15,410; Ms. Eberhart — 31,087; Mr. Fluor — 28,758; Mr. George — 11,964; Mr. Goodyear — 0; Mr. Gorder — 4,837; Mr. Gordon — 43,863; Mr. Gourley — 2,537; Mr. McKinley — 3,632; and Mr. Mullins — 2,901.

(2) The non-employee directors did not receive any stock option awards in 2015; however, as of December 31, 2015, each of the non-employee directors had aggregate outstanding vested and exercisable stock options as follows: Mr. Chase — 0; Gen. Chilton — 0; Ms. Eberhart — 0; Mr. Fluor — 5,650; Mr. George — 0; Mr. Goodyear — 0; Mr. Gorder — 0; Mr. Gordon — 17,100; Mr. Gourley — 0; Mr. McKinley — 0; and Mr. Mullins — 0. There were no unvested options as of December 31, 2015.

(3) For all non-employee directors, except for Messrs. Goodyear, Gourley and McKinley, the amounts in this column include annual premiums paid by the Company for each director's benefit in the amount of $130 and $1,675 for Accidental Death & Dismemberment (AD&D) coverage and Personal Excess Liability (PEL) coverage, respectively. For Mr. Goodyear, the amount includes $47 for AD&D coverage and $606 for PEL

Table of Contents



coverage. For Mr. Gourley, the amount includes $38 for AD&D coverage and $838 for PEL coverage. For Mr. McKinley, the amount includes $115 for AD&D coverage and $1,482 for PEL coverage.

(4) Mr. Fluor deferred all of his retainer into the Company's Deferred Compensation Plan.

(5) For Mr. Goodyear, the amount in the stock awards column does not include the value of deferred shares for 2015 because he retired from the Company's Board effective May 12, 2015, and did not receive a new grant. Instead, the amount is related to grants previously made at the time of the Company's annual meeting of stockholders in 2012 and 2013, and reported in the corresponding proxy disclosures. Mr. Goodyear was a resident in the United Kingdom at the time and because of regulatory considerations and ownership objectives, he was awarded restricted stock vesting in five years rather than the immediately vested deferred shares granted to other non-employee directors. The Compensation Committee subsequently accelerated the vesting of these restricted stock awards at Mr. Goodyear's retirement so that Mr. Goodyear would receive comparable treatment to other directors who retire from the Board with fully vested shares. Under applicable accounting rules, the accelerated vesting caused a modification to Mr. Goodyear's 2012 and 2013 grants (covering 6,584 shares), and the value of the modification is the amount reported.

(6) Mr. Gourley was appointed to the Company's Board effective September 15, 2015.

(7) Mr. McKinley was appointed to the Company's Board effective February 11, 2015.

Table of Contents

# Security Ownership of Certain Beneficial Owners and Management

The information provided below summarizes the beneficial ownership of our NEOs, each of our directors and director nominees, all of our directors, director nominees and executive officers as a group, and owners of more than five percent of our outstanding common stock. Generally, "beneficial ownership" includes those shares of common stock held by someone who has investment and/or voting authority of such shares or has the right to acquire such common stock within 60 days. The ownership includes common stock that is held directly and also stock held indirectly through a relationship, a position as a trustee, or under a contract or understanding.

## DIRECTORS, DIRECTOR NOMINEES AND EXECUTIVE OFFICERS

The following table sets forth the number and percentage of Anadarko common stock beneficially owned by our NEOs, each of our directors and director nominees, and all of our executive officers, directors and director nominees as a group as of March 2, 2016. None of the common stock beneficially owned as set forth below is pledged as security.

| | Amount and Nature of Beneficial Ownership | | | |
|---|---|---|---|---|
| Name of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned(1)(2) | Stock Acquirable Within 60 Days | Total Beneficial Ownership(3)(4)(5) | Percent of Class |
| R. A. Walker(6) | 245,754 | 605,330 | 851,084 | * |
| Robert G. Gwin | 104,616 | 269,290 | 373,906 | * |
| Robert P. Daniels(7) | 104,874 | 249,281 | 354,155 | * |
| James J. Kleckner | 55,183 | 127,371 | 182,554 | * |
| Robert K. Reeves(8) | 206,672 | 210,541 | 417,213 | * |
| Anthony R. Chase | 7,987 | 0 | 7,987 | * |
| Kevin P. Chilton | 15,410 | 0 | 15,410 | * |
| H. Paulett Eberhart | 31,087 | 0 | 31,087 | * |
| Peter J. Fluor | 123,745 | 5,650 | 129,395 | * |
| Richard L. George | 22,719 | 0 | 22,719 | * |
| Joseph W. Gorder | 4,837 | 0 | 4,837 | * |
| John R. Gordon | 164,923 | 17,100 | 182,023 | * |
| Sean Gourley | 2,537 | 0 | 2,537 | * |
| Mark C. McKinley | 4,544 | 0 | 4,544 | * |
| Eric D. Mullins | 11,964 | 0 | 11,964 | * |
| All directors, director nominees and executive officers as a group (18 persons) | 1,124,877 | 1,587,784 | 2,712,661 | * |

* Less than one percent.

(1) This column does not include shares of common stock that the directors or executive officers of the Company have the right to acquire within 60 days of March 2, 2015. This column does include shares of common stock held in the Company's Benefits Trust as a result of the director compensation and deferral elections made in accordance with our benefit plans described elsewhere in this proxy statement. Those shares are subject to shared voting power with the trustee under that Trust and receive dividend equivalents on such shares, but the individuals do not have the power to dispose of, or direct the disposition of, such shares until such shares are distributed to them. In addition, some shares of common stock reflected in this column for certain individuals are subject to restrictions.

Table of Contents

# Security Ownership of Certain Beneficial Owners and Management

(2) This column does not include the following number of restricted stock units, which are payable (after taxes are withheld) in the form of Company common stock: Mr. Walker — 69,867; Mr. Gwin — 27,963; Mr. Daniels — 28,594; Mr. Kleckner — 24,506; and Mr. Reeves — 21,840. The restricted stock units do not have voting rights but do receive dividend equivalents which are reinvested in Company stock and paid upon vesting of the underlying award.

(3) In addition to the Anadarko common stock reported in the table, as of December 1, 2015, the directors and executive officers beneficially owned common units of Western Gas Partners, LP (WES) as follows: Mr. Walker — 6,900; Mr. Gwin — 10,000; Mr. Daniels — 5,150; Mr. Hollek — 289; Mr. Kleckner — 439; Mr. Reeves — 9,000; Mr. Chase — 7,400; Ms. Eberhart — 1,000; and Mr. McKinley — 9,000. The Company owns a majority interest in WES indirectly through its wholly-owned subsidiaries. As of December 31, 2015, there were 128,576,965 common units of WES outstanding. The directors and executive officers, individually and as a group, beneficially own less than one percent of WES's outstanding common units.

(4) In addition to the Anadarko common stock reported in the table, as of December 1, 2015, the directors and executive officers beneficially owned common units of Western Gas Equity Partners, LP (WGP) as follows: Mr. Walker — 9,900; Mr. Gwin — 200,000; Mr. Daniels — 20,000; Mr. Hollek — 7,608; Mr. Kleckner — 10,000; Mr. Reeves — 9,000; Mr. Chilton — 900; Mr. Fluor — 61,118; and Mr. George — 5,000. As of December 31, 2015, there were 218,919,380 common units of WGP outstanding. The directors and executive officers, individually and as a group, beneficially own less than one percent of WGP's outstanding common units.

(5) In addition to the Anadarko common stock reported in the table, as of December 1, 2015 Mr. Walker owned 2,500 tangible equity units (TEUs). In June 2015, the Company issued 9.2 million TEUs. Each TEU is comprised of a prepaid equity purchase contract for common units of WGP and a senior amortizing note. Anadarko has a right to elect to issue and deliver shares of Anadarko common stock in lieu of delivering WGP common units at settlement, which, unless settled earlier at the holder's option, is June 7, 2018. The directors and executive officers, individually and as a group, beneficially own less than one percent of the outstanding TEUs.

(6) Includes 108,000 shares of common stock held by a limited liability company (LLC) over which Mr. Walker and his spouse exercise investment control. The membership interests in the LLC are held by Mr. Walker, his spouse and family trusts of which he is the trustee.

(7) Includes 63,766 shares of common stock held by a family limited partnership (FLP) over which Mr. Daniels exercises investment control. The limited partner interests in the FLP are held by Mr. Daniels and family trusts.

(8) Includes 95,000 shares of common stock held by an FLP. Two LLCs serve as the general partners of the FLP. Mr. Reeves serves as the sole manager of one of the LLCs and his spouse serves as the sole manager of the other. The limited partner interests in the FLP are held by family trusts of which Mr. Reeves is the trustee. Mr. Reeves disclaims beneficial ownership of these shares.

Table of Contents

# Security Ownership of Certain Beneficial Owners and Management

## CERTAIN BENEFICIAL OWNERS

The following table shows the beneficial owners of more than five percent of the Company's common stock as of December 31, 2015, based on information available as of February 16, 2016:

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock | BlackRock, Inc.<br>55 East 52nd Street<br>New York, NY 10055 | 37,524,786(1) | 7.40% |
| Common Stock | The Vanguard Group<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 31,667,403(2) | 6.23% |
| Common Stock | Wellington Management Group LLP<br>Wellington Group Holdings LLP<br>Wellington Investment Advisors Holdings LLP<br>c/o Wellington Management Company LLP<br>280 Congress Street<br>Boston, MA 02210 | 26,762,212(3) | 5.27% |
| Common Stock | Clearbridge Investments, LLC<br>620 8th Avenue<br>New York, NY 10018 | 26,219,370(4) | 5.16% |

(1) Based upon its Schedule 13G/A filed February 10, 2016, with the SEC with respect to Company securities held as of December 31, 2015, BlackRock, Inc. has sole voting power as to 33,253,619 shares of common stock, shared voting power as to 3,928 shares of common stock, sole dispositive power as to 37,520,858 shares of common stock and shared dispositive power as to 3,928 shares of common stock.

(2) Based upon its Schedule 13G/A filed February 10, 2016, with the SEC with respect to Company securities held as of December 31, 2015, The Vanguard Group has sole voting power as to 938,426 shares of common stock, shared voting power as to 51,500 shares of common stock, sole dispositive power as to 30,683,819 shares of common stock and shared dispositive power as to 983,584 shares of common stock.

(3) Based upon its Schedule 13G filed February 11, 2016, with the SEC with respect to Company securities held as of December 31, 2015, Wellington Management Group LLP, Wellington Group Holdings LLP and Wellington Investment Advisors Holdings LLP have shared voting power as to 9,604,168 shares of common stock and shared dispositive power as to 26,762,212 shares of common stock.

(4) Based upon its Schedule 13G filed February 16, 2016, with the SEC with respect to Company securities held as of December 31, 2015, Clearbridge Investments, LLC has sole voting power as to 25,732,762 shares of common stock and sole dispositive power as to 26,219,370 shares of common stock.

Table of Contents

# Section 16(A) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's directors and executive officers, and persons who own more than 10% of a registered class of the Company's equity securities, to file with the SEC and any exchange or other system on which such securities are traded or quoted, initial reports of ownership and reports of changes in ownership of the Company's common stock and other equity securities. Officers, directors and more than 10% stockholders are required by the SEC's regulations to furnish the Company and any exchange or other system on which such securities are traded or quoted with copies of all Section 16(a) forms they filed with the SEC.

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company and written representations that no other reports were required, the Company believes that all reporting obligations of the Company's officers, directors and more than 10% stockholders under Section 16(a) were satisfied during the year ended December 31, 2015, except that James J. Kleckner, an executive officer, did not timely report three separate sales of an aggregate of 711 shares by an irrevocable trust, of which he disclaims beneficial ownership. A Form 5 reporting the sale of such shares was filed on February 11, 2016. In addition, Mark C. McKinley, a member of the Board, inadvertently omitted 464 shares of the Company's common stock from an otherwise timely filed Form 3. An amended Form 3 was filed on March 2, 2016.

Table of Contents

# Audit Committee Report

*The following report of the Audit Committee of the Company, dated February 16, 2016, shall not be deemed to be "soliciting material" or to be "filed" with the Securities and Exchange Commission, nor shall this report be incorporated by reference into any filing made by the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.*

The Audit Committee of the Board is responsible for independent, objective oversight of the Company's accounting functions and internal control over financial reporting. The Audit Committee is composed of three directors, each of whom is independent as defined by the NYSE listing standards. The Audit Committee operates under a written charter approved by the Board of Directors, which is available on the Company's website at http://www.anadarko.com/content/documents/apc/Responsibility/Governance_Documents/2013-11-07_Audit_Committee_Charter.pdf.

Management is responsible for the Company's internal control over financial reporting. The independent auditor is responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted auditing standards in the United States of America and issuing a report thereon. The independent auditor is also responsible for performing an independent audit of the Company's internal control over financial reporting. The Audit Committee's responsibility is to monitor and oversee these processes.

KPMG LLP served as the Company's independent auditor during 2015 and was appointed by the Audit Committee to serve in that capacity for 2016 (and we are seeking ratification by the Company's stockholders at this Annual Meeting of such appointment). KPMG LLP has served as the Company's independent auditor since its initial public offering in 1986.

In connection with these responsibilities, the Audit Committee met with management and the independent auditor to review and discuss the December 31, 2015 audited consolidated financial statements and management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2015. The Audit Committee also discussed with the independent auditor the matters required to be discussed by standards of the Public Company Accounting Oversight Board (PCAOB).

The Audit Committee also received the written disclosures and the letter from the independent auditor required by the PCAOB regulating the independent auditor's communications with the audit committee concerning independence and has discussed with the independent auditor that firm's independence.

Based upon the Audit Committee's review and discussions with management and the independent auditor referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 filed with the SEC.

THE AUDIT COMMITTEE
Eric D. Mullins, Chairperson
Kevin P. Chilton
Mark C. McKinley

Table of Contents

# Compensation and Benefits Committee Report on 2015 Executive Compensation

The Compensation Committee, the members of which are listed below, is responsible for establishing and administering the executive compensation programs of the Company. The Compensation Committee of the Company has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on such review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this proxy statement.

THE COMPENSATION AND BENEFITS COMMITTEE
Peter J. Fluor, Chairperson
Joseph W. Gorder
John R. Gordon

Table of Contents

# Letter from the Chair of the Compensation and Benefits Committee

As the Compensation and Benefits Committee for one of the world's largest independent exploration and production companies, we understand the challenges of operating in a complex and volatile industry. The Company's operational and financial results are highly dependent upon commodity prices and we recognize the impact that this current low-price environment has had on our stockholders. In order to manage through the significant decline in commodity prices and position Anadarko for success when the commodity-price environment recovers, the Company's near-term focus is on preserving value and long-term flexibility.

One of our primary responsibilities as a committee is to ensure that the Company's executive compensation programs are appropriately designed to pay for performance and align the executive officers' interest with those of our stockholders. More than 75% of our executive officers' compensation opportunity is delivered in equity-based incentives which are directly aligned with absolute and relative stockholder return. While the target opportunity for at-risk compensation has remained generally flat over the last three years, the realized and realizable value has been materially impacted by the sharp decline in our stock price in this commodity price environment. This pay for performance alignment is illustrated in the CEO realizable pay charts on pages 36 and 37.

The Compensation Committee is also responsible for ensuring that the pay awarded under the short-term bonus program is appropriate and reflects the achievement of rigorous and challenging operational and financial goals. Establishing goals at the beginning of 2015 was extremely difficult given the volatility of the commodity market. While the Company's actual performance against these goals resulted in a near maximum score, the Compensation Committee recognized that given the current environment and its impact on stockholders, the uncertainty in setting goals and an unintended positive impact of commodity-price volatility in calculating performance, it was appropriate to exercise significant downward discretion to reduce the payout from near maximum to slightly above target. See page 44 for more details regarding our Annual Incentive Program.

Through the Company's ongoing engagement with stockholders, including my own direct engagement, this Compensation Committee has continued to incorporate policies and practices that improve upon the pay-for-performance nature of our programs and address stockholders' concerns while preserving our ability to attract, motivate and retain a strong and proven leadership team to position the Company to achieve long-term stockholder value. As you will see by the disclosure that follows, the Compensation Committee believes that the compensation programs we have established are operating as intended to align the pay that executives may realize with stockholder returns. We appreciate your ongoing engagement, feedback and support as we continue our efforts to create long-term stockholder value.

THE COMPENSATION AND BENEFITS COMMITTEE



Peter J. Fluor, Chairperson



Table of Contents

# Compensation Discussion and Analysis

## EXECUTIVE SUMMARY

### *Impact of Commodity Prices on 2015 Strategic Focus — Preserving Value and Flexibility.*

Our revenues, operating results and future growth rates are highly dependent on the prices we receive for our oil, natural gas and natural gas liquids. Commodity prices, which are determined by global market and political factors, declined significantly during the second half of 2014 and remained depressed and volatile throughout 2015. In managing this down-cycle, rather than pursuing year-over-year growth we focused on building and preserving value and long-term flexibility in order to position the Company for future success.

**WHERE TO FIND IT:**


| | |
|---|---|
| Executive Summary | 34 |
| Stockholder Engagement | 38 |
| Governance Practices | 39 |
| Performance-Based Annual Cash Incentives | 44 |
| Equity Compensation | 48 |
| Retirement Benefits | 52 |
| Perquisites | 53 |


### *Commodity Price vs. Stock Price Performance*




Specifically in 2015, we focused on value enhancement by allocating capital investments to higher-margin oil volumes and longer-dated projects, while driving sustainable cost savings and efficiencies in order to enable us to create additional value as commodity prices recover. As a result, we successfully lowered 2015 capital expenditures by almost 40% and significantly improved sustainable efficiencies and reduced controllable spending compared to 2014, while maintaining production levels year over year on a divestiture-adjusted basis. In addition, we continued to manage our asset portfolio and closed $2 billion of asset monetizations during the year. The performance goals for the 2015 Annual Incentive Program were designed to reflect these strategic objectives. See page 44 for additional details on the 2015 Annual Incentive Program performance goals.

[Table of Contents](#)

## Compensation Discussion and Analysis

***Pay For Performance.*** The Compensation Committee (referred to in this section of the proxy statement as the Committee) believes that the Company's executive compensation programs are appropriately designed to pay for performance and align the executive officers' interests with those of stockholders. As demonstrated in the charts on page 42, the vast majority of our executive officers' target total compensation opportunity is delivered in at-risk compensation components tied to the achievement of short- and long-term performance criteria aligned with our business objectives. For 2015, the payouts under our at-risk programs were as follows:

☑ ***Significant Downward Discretion Applied in Annual Incentive Program —*** While the Company's actual performance against the goals initially resulted in a near maximum score, the Committee exercised significant downward discretion to reduce the payout to a level slightly above target. See page 44 for more details regarding our Annual Incentive Program.

☑ ***Below-Target Payout for Long-Term Equity Based Incentives —*** As a result of the Company's total stockholder return (TSR) performance relative to peers, the executive officers earned below-target payouts of performance unit awards. For the two- and three-year performance periods ended December 31, 2015, the executive officers earned payouts of 92% and 72% of their performance units (out of a maximum 200%). See page 48 for more details regarding our Performance Units.

***CEO Realizable Pay.*** Consistent with our pay-for-performance philosophy, 91% of the CEO's total direct compensation is at risk. Accordingly, the value that will ultimately be received directly aligns with the Company's actual operational and financial performance, including absolute and relative stock-price performance. This value can differ substantially from the grant date values required to be reported in the Summary Compensation Table and other proxy tables.

Table of Contents

## Compensation Discussion and Analysis

To illustrate this strong link between CEO compensation and Company performance, the following chart compares the CEO's total compensation and realizable pay as of December 31, 2015, for the compensation that was awarded in 2013, 2014, and 2015. The chart below includes base salary, bonus and the grant date value of the long-term incentive awards (performance units, stock options and restricted stock units) as reported in the 2015 Summary Compensation Table and other proxy tables and the realizable value of those awards based on the Company's stock price as of December 31, 2015.

*CEO Reported vs. Realizable Pay (2013-2015) (1)(2)*




(1) The amounts indicated as Reported on the table above reflect the total compensation (calculated as base salary, bonus and grant value of long-term incentive awards) for 2013, 2014 and 2015 as reported in the 2015 Summary Compensation Table. The amounts indicated as Realizable reflect the actual base salary and bonus earned each year as well as the intrinsic value of long-term incentive awards as of December 31, 2015. Detailed assumptions related to the long-term incentive awards are included in the footnotes to the table below.

(2) The performance unit awards granted in the fall each year have a performance period that commences the following January. For the performance unit awards granted in October 2015, which have a performance period commencing on January 1, 2016, the realizable value as of December 31, 2015 is calculated at target (100%).

Table of Contents

# Compensation Discussion and Analysis

The strong link between CEO long-term incentive compensation (representing 79% of Mr. Walker's target total compensation opportunity) and the Company's absolute and relative stock price performance is further illustrated in the following chart. This chart compares the grant date value for the long-term incentive awards and the realizable value at specified dates, for awards granted in 2013, 2014 and 2015.

**CEO Long-Term Incentive Awards**




(1) The Grant Date Value reflects the values of awards for 2013, 2014 and 2015 as reported in the 2015 Summary Compensation Table.

(2) The amounts indicated as Realizable reflect the intrinsic value of long-term incentive awards based on the Company's closing stock price of $48.58 on December 31, 2015. For stock options, the option exercise prices exceeded the closing stock price as of such date and therefore no intrinsic value is reflected. The restricted stock unit awards reflect the stock price on December 31, 2015 multiplied by the number of units granted in each year. The performance unit awards for 2013 and 2014 reflect the Company's performance ranking relative to the applicable peer group for each performance period through December 31, 2015 and the performance unit awards for 2015 are reflected at 100% of target since the performance period for those awards did not commence until January 1, 2016.

***NEO Target Compensation Held Flat.*** For the second consecutive year, as part of its annual review of executive compensation in October 2015, the Committee determined that the target total compensation opportunity for the executive officers should remain substantially flat year-over-year and that no changes should be made to the current base salaries, target bonus opportunities, and target grant value of annual long-term incentive awards. The Committee believes that the pay opportunity provided by the current levels of fixed and at-risk compensation components (1) properly reflects the scope and responsibilities associated with each executive officer's position, (2) is appropriately aligned with the industry peer group and (3) serves to retain and motivate a highly experienced and cohesive executive team to successfully manage the operations of a global company of our scope and complexity.

***CEO Target Total Compensation Opportunity Unchanged Since 2012 Appointment.*** Mr. Walker's base salary level, target bonus opportunity and target grant value of annual long-term incentive awards have remained the same since his appointment to CEO in May 2012, at which time the Committee positioned his target total compensation at the median of CEOs of our industry peer group. As a result of leadership changes and related compensation actions at several industry peer companies since Mr. Walker's appointment, his target total compensation is now between the 50th and

Table of Contents



75th percentiles compared to the Peer Proxy Data (defined on page 41). The Committee believes this positioning is appropriately aligned with the Company's market capitalization, total asset position and proved reserves against the industry peer group, as discussed beginning on page 40.

As CEO, Mr. Walker's compensation is higher than the compensation of the other NEOs. This difference in compensation is supported by the industry peer group benchmark data, which is substantially higher for the CEO role than for the other NEO positions, and is indicative of the greater responsibility the CEO position entails for the strategic direction, financial condition, operating results and reputation of the Company.

A detailed description of our executive compensation programs and the compensation decisions made by the Committee for 2015 are reported beginning on page 44.

***Active Stockholder Engagement — We Listen.*** We regularly engage with our stockholders, reaching out specifically to the governance and voting teams, to solicit feedback on Anadarko's executive compensation programs, as well as corporate governance, sustainability and environmental issues and other matters. Our stockholder engagement team consists of senior management from our Human Resources, Legal, Investor Relations, and Health, Safety and Environment departments and has also included the chairman of the Committee. We generally reach out to our top 50 stockholders in the spring and fall, but such engagement can also occur at other times during the year, such as with respect to proxy access, as described on page 21. During the spring last year, we solicited feedback from stockholders representing approximately 55% of the Company's outstanding common stock and in the fall we solicited feedback from stockholders representing approximately 52% of the Company's outstanding common stock. Our stockholders' views on corporate governance and executive compensation are very important to us, and we value and utilize the feedback and insights that we have received, and continue to receive, from our stockholders.

The Board and its committees regularly discuss and consider the significant comments or concerns that are identified through this engagement process. For example, following the stockholder vote on our executive compensation programs at our 2014 annual meeting of stockholders, the Committee carefully considered specific feedback expressed by stockholders during our outreach efforts and made substantial changes to our executive compensation programs in 2014 in order to further strengthen and align our programs with our pay for performance principles. For additional details on the changes to our programs, see page 48. In addition, in 2015 the chairman of the Committee and senior management from our stockholder engagement team met in person with many of our top 12 stockholders and had discussions with ISS and Glass Lewis. At our 2015 annual meeting of stockholders, more than 86% of our stockholders who voted on the proposal voted in support of our executive compensation programs. We believe our stockholders' strong support reaffirmed the design and structure of our compensation programs.

Table of Contents

# Compensation Discussion and Analysis

***Track Record of Good Governance Practices.*** Through our commitment to good governance, including our continued stockholder engagement efforts, we have implemented the following practices over the past several years:

| | What We Do | | What We Don't Do |
|---|---|---|---|
| ✓ | We structure our executive officers' compensation so that more than 85% of pay is at risk | ✗ | We do not have employment contracts with our executive officers |
| ✓ | We emphasize long-term performance in our equity-based incentive awards | ✗ | We do not provide tax gross-ups on perquisites except with respect to the Company's standard relocation program available to all employees |
| ✓ | We provide for double-trigger equity acceleration upon a change of control | ✗ | We do not provide for excise tax gross-ups in key employee change-of-control contracts entered into after February 2011 for newly appointed and/or newly hired executive officers who are not otherwise subject to an existing agreement |
| ✓ | We maintain a competitive compensation package designed to attract, motivate and retain and reward experienced and talented executive officers | ✗ | We have a formal policy which does not permit directors or executive officers to pledge Company securities |
| ✓ | We require robust stock ownership of 6 times base salary for the CEO and 3 times base salary for the other executive officers | ✗ | We have a formal policy which does not permit short sales or derivative transactions in Company stock, including hedges |
| ✓ | We provide for clawback provisions so that our incentive awards are subject to forfeiture (see page 58 for more details) | ✗ | We do not pay current dividends or dividend equivalents on unvested awards — dividends are accrued and reinvested in Company stock and are paid upon vesting of the underlying award |
| ✓ | We consider deductibility when structuring compensation | ✗ | We do not allow repricing of stock options and stock appreciation rights unless approved by stockholders |

## HOW WE MAKE COMPENSATION DECISIONS

The Committee has overall responsibility for approving and evaluating the officer and director compensation plans, policies and programs of the Company. The Committee is also responsible for producing a report reviewing the Company's Compensation Discussion and Analysis. The Committee uses several different tools and resources in reviewing elements of executive compensation and making compensation decisions. These decisions, however, are not purely formulaic and the Committee exercises judgment and discretion as appropriate.

***Compensation Consultant.*** The Committee has retained FWC as an independent consultant to provide advice on executive compensation matters. The decision to engage FWC was made by the Committee and FWC reports directly and exclusively to the Committee; however, at the Committee's direction, the consultant works directly with management to review or prepare materials for the Committee's consideration. While engaged as the Committee's consultant, FWC did not perform any

Table of Contents



services for the Company outside the scope of its arrangement with the Committee. During 2015, the Committee reviewed FWC's independence and determined that there were no conflicts of interest as a result of the Committee's engagement of FWC. The Committee did not engage any consultant other than FWC during 2015 to provide executive compensation consulting services.

In 2015, FWC attended all of the Committee meetings and provided the Committee with market analyses, including Peer Proxy Data (defined on page 41), and an annual independent assessment of the risk associated with the Company's compensation programs. In addition, FWC advised the Committee on the following: market trends; regulatory and governance developments and how they may impact our executive compensation programs; the design and structure of our executive compensation programs to ensure linkage between pay and performance; setting the pay for our CEO; and compensation recommendations for the other executive officers, in consultation with the CEO.

***Benchmarking Peers.*** Within the oil and gas industry, there are a very limited number of companies that closely resemble us in size, scope and nature of business operations. Our industry peer group contains companies in our industry that vary in these respects because we compete with these companies for talent and believe the selected companies are currently the most appropriate with respect to executive compensation benchmarking. The differences and similarities between us and the companies in our industry peer group are taken into consideration when referencing benchmarks for executive compensation decisions.

Each year, FWC conducts an independent review of the Company's industry peer group for the Committee to use as a reference point for assessing competitive executive compensation data (including base salary, target annual incentives and annualized long-term incentive grant values). This review includes an evaluation of Anadarko's peers as designated by proxy advisors, peers of direct peers, and companies included in Anadarko's broad Global Industry Classification Standard Industry Group. In each case, FWC assesses whether there are companies that should be added to or deleted from Anadarko's existing peer group based on relevant size, scope and the nature of their business operations. Unless significant and material changes have affected the companies in our peer group such that a company is no longer an appropriate peer, the Committee prefers to maintain a high degree of continuity of the peer group to ensure consistent comparison for both pay and performance from year to year. Following this year's annual review, the Committee determined that Murphy Oil should be removed from the peer group due to being low in relative size after spinning off its retail marketing business, particularly with respect to market capitalization value and proved reserves. The Committee also determined that the remaining 11 companies included in the Company's industry peer group would be utilized for the 2015 executive compensation benchmarking comparison.

The Company's industry peer group used for conducting the 2015 executive compensation benchmarking assessment is listed below.

- Apache Corporation
- Chesapeake Energy Corporation
- Chevron Corporation
- ConocoPhillips
- Devon Energy Corporation
- EOG Resources, Inc.
- Hess Corporation
- Marathon Oil Corporation
- Noble Energy, Inc.
- Occidental Petroleum Corporation
- Pioneer Natural Resources Company

[Table of Contents](#)

## Compensation Discussion and Analysis

At the time of the Committee's 2015 review, the Company was between the median and the 75th percentile in market capitalization and above the 75th percentile in total assets and total proved reserves compared to this peer group, as illustrated by the chart below:




***Benchmarking Data.*** To assist in reviewing the design and structure of our executive compensation programs, FWC provides the Committee with an independent assessment of the compensation programs and practices of the companies in our industry peer group. This comprehensive analysis includes compensation data that is obtained from the latest peer proxy statements and updated, as applicable, with recent public filings for company-by-company detail on peer NEO positions (Peer Proxy Data) as well as supplemental third-party survey data.

Due to organizational differences in executive leadership structures and business strategies across our peers, it is difficult to benchmark comparable executive leadership positions for many of our NEOs. As a result, the Committee places emphasis on the Peer Proxy Data in making compensation decisions because this data provides greater transparency and insight into the comparability of our NEOs and executive leadership structure relative to the NEOs and executive leadership structure of our peers. The Peer Proxy Data includes individual incumbent data for each company in our industry peer group and illustrates the differences in job scope, incumbent tenure and overall experience level of peer NEOs compared to our NEOs. In assessing the Peer Proxy Data, the Committee reviewed data summarized by functional positions, by order of pay (i.e., second-highest paid, third-highest paid, etc.), and aggregated by the total direct compensation opportunity of the NEOs collectively as a management team at each peer company. Evaluating the total direct compensation opportunity for each peer company's executive management team as a whole allows the Committee to consider how each peer company structures the compensation opportunity for their management team regardless of individual functional responsibilities. This approach recognizes the differences in executive leadership structures and business strategies across our peers. When reviewing benchmarking data, the Committee reviews 25th, 50th, and 75th percentile data; however, the Committee does not target a specific percentile of the benchmark data and in making officer compensation decisions takes into account other considerations as noted below.

***Role of CEO and/or Other Executive Officers in Determining Executive Compensation.*** The Committee, after reviewing the information provided by FWC and considering other factors and with input from FWC, determines each element of compensation for our CEO. When making determinations about each element of compensation for the other executive officers, the Committee also considers recommendations from our CEO. Additionally, at the Committee's request, our

[Table of Contents](#)



executive officers may assess the design of, and make recommendations related to, our compensation and benefit programs, including recommendations related to the performance measures used in our incentive programs. The Committee is under no obligation to implement these recommendations. Executive officers and others may also attend Committee meetings when invited to do so, but the executive officers do not attend when their individual compensation is being discussed.

***Other Important Considerations.*** In addition to the above resources, the Committee strongly considers other factors when making compensation decisions, such as individual experience, individual performance, internal pay equity, development and succession status, and other individual or organizational circumstances, including the current market and business environment. With respect to equity-based awards, the Committee also considers the expense of such awards, the impact on dilution, and the relative value of each element comprising the executive officers' target total compensation opportunity.

***Tally Sheets.*** The Committee uses tally sheets in its annual executive compensation review to enhance the analytical data used by the Committee to evaluate our executive officer compensation and to provide the Committee with a consolidated source for viewing the aggregate value of all elements of executive compensation. The Committee does not assign a specific weighting to the tally sheets in their overall decision-making process, but uses them to gain additional perspective and as a reference in the decision-making process.

## ELEMENTS OF OUR COMPENSATION PROGRAMS

Our executive compensation programs include direct and indirect compensation elements. We believe that a majority of an executive officer's total compensation opportunity should be performance-based; however, we do not have a specified formula that dictates the overall weighting of each element.

As illustrated in the charts below, 79% of the current CEO and 75%, on average, of target total compensation opportunity for the other NEOs is provided through equity-based incentives that are dependent upon long-term corporate performance and stock-price appreciation. Any value ultimately realized for these long-term equity-based awards is directly tied to Anadarko's absolute and relative stock-price performance and will fluctuate along with stockholder returns.




**Percent of total direct compensation: At-Risk 91%, Long-Term 79%**




**Percent of total direct compensation: At-Risk 87%, Long-Term 75%**

*The charts above are based on the following: current base salaries, as discussed on page 44; target bonus opportunities approved by the Committee in 2015, as discussed on page 47; and the grant date value for the 2015 annual equity awards, as discussed on page 50.*

[Table of Contents](#)



### *Direct Compensation Elements*

The direct compensation elements are outlined in the table below. The indirect compensation elements are outlined in a table on page 52.

| | | Direct Compensation Element | Primary Purpose |
|---|---|---|---|
| Total Direct Compensation | *Fixed Pay* | Base Salary | • Provides a fixed level of competitive compensation to attract and retain executive talent<br>• Compensates executive officers for their level of responsibility, relative expertise and experience, and in some cases their potential for advancement |
| Total Direct Compensation | *Variable "At-Risk" Pay* | Annual Incentive Program | • Motivates and rewards executive officers for achieving annual Company objectives aligned with value creation<br>• Recognizes individual contributions to Company performance |
| Total Direct Compensation | *Variable "At-Risk" Pay* | Performance Units | • Recognizes Company performance relative to its industry peers under common external market conditions<br>• Motivates and rewards the achievement of long-term strategic Company objectives<br>• Provides a forfeitable long-term incentive to encourage executive retention |
| Total Direct Compensation | *Variable "At-Risk" Pay* | Stock Options | • Aligns the interests of executive officers with stockholders by rewarding long-term growth in our stock value<br>• Motivates and rewards the achievement of long-term strategic Company objectives<br>• Provides a forfeitable ownership stake to encourage executive retention |
| Total Direct Compensation | *Variable "At-Risk" Pay* | Restricted Stock Units | • Aligns the interests of executive officers with stockholders by emphasizing long-term share ownership and stock appreciation<br>• Provides a forfeitable ownership stake to encourage executive retention |

Table of Contents



## ANALYSIS OF 2015 COMPENSATION ACTIONS

The following is a discussion of the specific actions taken by the Committee in 2015 related to each of our direct compensation elements. Each element is reviewed annually, as well as at the time of a promotion, other change in responsibilities, other significant corporate events or a material change in market conditions.

As discussed above, the Committee determined that the target total compensation opportunity for the NEOs should remain flat year-over-year and that no changes should be made to the current base salaries, target bonus opportunities, and target grant value of annual long-term incentive awards.

### Base Salary

The table below reflects the base salaries for the NEOs that were approved by the Committee in 2015. As part of its annual review of executive compensation, in October 2015 the Committee determined that no changes should be made to the base salaries for the NEOs.

| Name | Salary as of January 1, 2015($) | Salary as of January 1, 2016($) | Increase |
|---|---|---|---|
| Mr. Walker | 1,300,000 | 1,300,000 | 0% |
| Mr. Gwin | 750,000 | 750,000 | 0% |
| Mr. Daniels | 700,000 | 700,000 | 0% |
| Mr. Reeves | 700,000 | 700,000 | 0% |
| Mr. Kleckner | 625,000 | 625,000 | 0% |

### Performance-Based Annual Cash Incentives (Bonuses)

The Annual Incentive Program (AIP) is designed to focus on key performance metrics and targeted levels of performance that are intended to drive differentiating performance year-over-year. All employees of the Company, including our executive officers, participate in the AIP, which is part of our 2012 Omnibus Incentive Compensation Plan (2012 Omnibus Plan) that was approved by our stockholders in May 2012. At the beginning of each plan year, the Committee reviews and approves the performance metrics and targeted levels of performance (the "performance goals"). These performance goals generally align with the Board-approved budget for the year and typically reflect the market and business environment in which we operate. The AIP performance goals are generally intended to work together so that the Company can achieve its long-term strategic performance objectives and provide the best, most direct means of aligning the actions of our executive officers and employees in the short term to position the company to deliver exceptional total stockholder returns over the long term.

***Challenges of Setting Performance Goals in a Volatile Environment.*** Within the exploration and production industry, revenues, operating results, cash flows from operations, capital spending, and future growth rates are highly dependent on the global commodity-price markets. When the AIP goals were set at the beginning of 2015, the duration and magnitude of the decline in commodity prices could not be accurately predicted and the Committee recognized the challenges of setting goals for the full year. At the time the 2015 AIP performance goals were approved, the Committee believed that the targets established were challenging and appropriately required our executive officers and employees to strive for strong performance on key metrics in a lower commodity-price environment.

During the years of higher commodity prices prior to 2015, the Committee established increasingly challenging annual AIP performance goals on key metrics, such as sales volumes and reserve additions, that were designed to generate competitive returns and advance our long-term growth

Table of Contents



objectives. For 2015, the Company substantially reduced its planned capital expenditures to balance investments with available cash in order to manage through the uncertainty of the current market conditions and commodity-price environment. As a result, the 2015 AIP performance goals reflected a more defensive strategy by the Company that focused on preserving and building value to position the Company for future success when the commodity-price environment recovers rather than emphasizing year-over-year growth. As such, unlike previous years, the 2015 AIP performance goals did not reflect higher year-over-year targeted performance.

The 2015 AIP included three additional performance goals and re-allocated the weighting of certain performance goals to provide increased focus on the key areas that are essential to delivering higher-margin sales volumes, improving cost efficiencies, and emphasizing financial discipline, while maintaining a safe work environment and creating stockholder alignment. The structural changes to the AIP for 2015 and the rationale for such changes are illustrated in the following chart.

| | Pre-2015 Performance Goals Growth Environment | | 2015 Performance Goals Preserving Value Environment | | |
|---|---|---|---|---|---|
| | Performance Goal | Weighting Factor | Performance Goal (1) | Weighting Factor | Rationale |
| Operational | Sales Volumes | 25% | Total Sales Volumes | 10% | Company-Operated Base Volume metric increases focus on minimizing decline rates from existing wells, encouraging behaviors to cost-effectively increase overall volume with minimal to no capital investment. |
| | | | Company-Operated Base Volumes | 15% | |
| | Reserve Additions | 25% | Reserve Additions | 20% | Reduced weighting to reflect less emphasis on Reserve Additions in low-growth environment. |
| Capital Expenditures | Capital Expenditures | 20% | Capital Expenditures | 10% | Capital Expenditures weighting reduced to reflect high uncertainty around absolute spending in volatile price environment. |
| Margin Optimization | EBITDAX/BOE | 20% | EBITDAX/BOE | 15% | Increased overall weighting on margin optimization to encourage financial discipline to more efficiently manage costs relative to grow margins. LOE and Controllable G&A metric further emphasizes importance of reducing operating expense and overhead costs in a low commodity price environment. |
| | | | LOE and Controllable G&A | 15% | |
| Safety | Total Recordable Incident Rate | 10% | Total Recordable Incident Rate | 10% | Continued focus and commitment to the health and safety of our employees. |
| | | | Total Shareholder Return | 5% | TSR metric creates employee alignment with stockholders. Anadarko is ranked against 11 peer companies. |
| | | Total 100% | | Total 100% | |

(1) For AIP purposes, Capital Expenditures excludes the capital expenditures of WES and WGP, non-cash investments or investments associated with assets expected to be divested and capital that is carried or subsequently reimbursed by another party. EBITDAX/BOE is calculated as earnings before interest, taxes, depreciation, depletion, amortization, and exploration expenses divided by sales volumes for the year. For AIP purposes, it excludes hedging arrangements, gains/losses on sales of assets, major legal-related settlements or expenses and other non-operating income/expense items. EBITDAX that results from acquired production, if any, or from the Company's planned divestment program is also excluded from the calculation. For AIP purposes, Lease Operating Expense (LOE) excludes the cost of offshore work-overs because of timing uncertainty and magnitude. Controllable General and Administrative Costs (G&A) excludes restricted stock, bonus plans and benefits costs.

Table of Contents

# Compensation Discussion and Analysis

***2015 Performance Results.*** The table below reflects the 2015 performance results against each of the specified targets prior to the Committee's exercise of significant downward discretion as further discussed below. Each performance goal is capped at 275% and the total AIP score cannot exceed 200%.

| 2015 AIP Performance Goals | Relative Weighting Factor | AIP Target Performance | AIP Performance Results(1) | AIP Performance Score(1) |
|---|---|---|---|---|
| Company-Operated Base Sales Volume, MMBOE | 15% | 157 | 163.1 | 34.4% |
| Total Sales Volume, MMBOE | 10% | 279 | 291.7 | 23.5% |
| Reserve Additions (before price revisions, acquisitions and divestitures), MMBOE | 20% | 279 | 407.0 | 55.0% |
| Capital Expenditures, $MM | 10% | 5,700 – 6,100 | 5,425 | 14.8% |
| LOE and Controllable G&A/BOE($) | 15% | 6.77 | 5.48 | 41.3% |
| EBITDAX/BOE($) | 15% | 13.40 – 19.05 | 15.91 | 15.0% |
| Total Recordable Incident Rate (Safety) | 10% | 0.34 | 0.34 | 10.0% |
| Total Stockholder Return | 5% | Relative to Peers | 9th | 2.5% |
| **Total** | **100%** | | | **196.5%** |

(1) The Committee did not make any adjustments to the measured 2015 AIP performance results or overall calculated 2015 AIP performance score. However, see below for a discussion of the Committee's exercise of significant downward discretion regarding the final approved AIP score.

The Company delivered very strong operating performance in 2015 despite the challenging commodity markets. The Company performed at or above the targets established for all AIP metrics, with the exception of TSR, while continuing to maintain our strong safety record. Notable performance highlights from 2015 include:

- *Sales Volumes* — To mitigate the impact of weaker gas prices, the Company delivered high-margin oil production from select core assets exceeding target performance.
- *Operated Base Sales Volumes* — The Company created special-projects teams to focus on and deliver improved base sales volume while minimizing capital investment.
- *Reserve Additions* — The Company exceeded target on reserve additions. However, extreme downward commodity price volatility during the year resulted in the growth of non-price reserve revisions. The positive non-price reserve revisions were due in part to the benefit of a more favorable service cost environment, resulting in an unintended positive impact on the reserve addition metric.
- *Capital Expenditures* — The Company successfully partnered with vendors to lower service and materials costs in all regions and made significant improvements in drilling efficiencies as well as sustainable process improvements.
- *LOE and Controllable G&A* — The Company exceeded target due to renegotiations with vendors, reductions in non-essential project spending, a reassessment of processes and procedures designed to reduce operating costs, and a reduction in contract labor and consultant expenses.

Table of Contents

# Compensation Discussion and Analysis

***Significant Downward Discretion Applied to 2015 AIP Award.*** As reflected in the table above, we exceeded our initial expectations on nearly every operating metric due largely to the hard work and innovation of our employees, including our executive officers. However the Committee recognized that, given the continued challenging commodity-price environment and its impact on stockholders, the uncertainty in setting goals, and the unintended positive impact related to the Reserve Additions metric discussed above, it was appropriate to exercise significant downward discretion to reduce the AIP payout. The Committee determined, with management's support, to substantially reduce the calculated score from 196.5% to 110% for the executive officers. Due to the significant efforts and contributions of the executive officers in achieving the strong operational performance, the Committee determined that an AIP payout slightly above target was appropriate.

The AIP awards for 2015 for the NEOs are shown in the table below and are reflected in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table. Individual target bonus opportunities are determined based on the executive officer's position. Executive officers may earn from 0% to 200% of their individual bonus target. Following its annual review of executive compensation in October 2015, the Committee made no changes to the NEO bonus targets for 2016.

| Name | Base Salary Earnings for 2015($) (1) | | Target Bonus % | | Approved AIP Performance Score | | Individual Performance Adjustments | | Actual Bonus Award ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Walker | 1,350,000 | X | 130% | X | 110% | ± | 0 | = | 1,930,500 |
| Mr. Gwin | 778,846 | X | 95% | X | 110% | ± | 0 | = | 813,894 |
| Mr. Daniels | 726,923 | X | 95% | X | 110% | ± | 0 | = | 759,635 |
| Mr. Reeves | 726,923 | X | 95% | X | 110% | ± | 0 | = | 759,635 |
| Mr. Kleckner | 649,039 | X | 95% | X | 110% | ± | 0 | = | 678,246 |

(1) Individual bonus payments are calculated based upon the actual base salary earnings for the year. The amounts reflected in this column include a total of 27 pay periods, rather than the usual 26, as a result of the Company's payroll schedule for 2015.

The Committee did not make individual performance adjustments for any NEO's 2015 bonus payments in recognition of the team effort necessary to drive the Company's success.

***Section 162(m) Performance Hurdle.*** In February 2015, the Committee established a baseline AIP performance hurdle for the NEOs of $750 million of Cash Flow from Operating Activities (Net cash provided by (used in) operating activities) as calculated in the Consolidated Statements of Cash Flows, but excluding the effect of any significant (i.e., $100 million or greater) legal settlements/satisfaction of judgments (as described in Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Sources of Cash — Operating Activities) for the fiscal year as published in the Company's Annual Report on Form 10-K for the year ended December 31, 2015. If this performance hurdle was not achieved, the NEOs subject to Section 162(m) of the IRC would earn no AIP bonuses for the year under the 2012 Omnibus Plan. If the performance hurdle was met, the bonus pool would be funded at the maximum bonus opportunity level for each NEO and the Committee would consider our performance against the AIP performance goals, as well as any other relevant factors, when determining the actual amount of the AIP bonuses to be paid to each NEO. As demonstrated in 2015, the Committee may apply negative discretion in determining actual awards. The Committee does not have the discretion to increase bonuses above funded amounts. The AIP bonus pool was funded for the 2015 performance year because the Company exceeded the established performance hurdle.

Table of Contents

# Compensation Discussion and Analysis

## *Equity Compensation*

Our equity-based long-term incentive program is designed to reward our executive officers for sustained long-term share performance. This program represents 75% or more of target total compensation opportunity and includes a combination of equity-based awards (performance units, stock options and restricted stock units) that we believe are performance-based in absolute and relative terms. Pursuant to our equity grant administration procedures established by the Committee, annual equity-based awards for executive officers are typically made at the regularly scheduled Committee meeting in the fall. Equity awards for newly hired executive officers or awards made in connection with promotions are made on the date such awards are approved by the Committee.

The 2015 targeted equity award value was allocated 50% in performance units that reward relative TSR performance and 25% in non-qualified stock options that reward absolute value creation (for a total of 75% long-term equity awards that are performance-based). The remaining 25% is granted in restricted stock units the value of which is tied to our share price and which we believe is necessary to retain executive talent. The Committee believes that this allocation provides a combination of equity-based awards that is performance-based in relative and absolute terms, while also providing a necessary retentive element. For additional details on the terms of these awards see page 61.

***Performance Units.*** The Committee has established TSR as the performance criterion for the Company's performance unit awards, and believes that a single focus on TSR as the performance criterion for the performance units is appropriate at this time and is consistent with most energy industry peers. TSR provides an effective relative comparison of our performance against an industry peer group. The Committee has discussed the extent to which certain operational or financial measures could be used as relative long-term performance criteria, such as return on capital employed. The Committee concluded that the performance measures included in our AIP are intended to capture the key drivers of the Company's business, and that such AIP metrics should drive TSR performance over time. However, the Committee will continue to consider whether to include additional performance metrics in the performance unit program.

***Performance Unit Peer Group.*** Following a review of the industry peer group for awards to be granted in 2015, the Committee removed Murphy Oil from the peer group, due to being low in relative size after spinning off its retail marketing business, and replaced it with Chesapeake Energy Corporation. As a result, the peer group for the 2015 performance unit awards was identical to the peer group that was used for conducting the 2015 compensation benchmarking assessment, which is listed on page 40.

If any of the peer companies undergoes a change in corporate capitalization or a corporate transaction (including, but not limited to, a going-private transaction, bankruptcy, liquidation, merger or consolidation) during the performance period, the Committee shall undertake an evaluation to determine whether such peer company will be replaced. At the time these awards were granted, the Committee pre-approved Southwestern Energy, Inc., Cabot Oil and Gas Corporation, Concho Resources, Inc. and Cimarex Energy as replacement companies (in that order).

***Performance Unit Performance Period and Payout Opportunity.*** Beginning with awards granted in November 2014, the Committee eliminated our two-year performance unit program so that all performance unit awards granted in or after 2014 are subject to a three-year performance period. In addition, the Committee reduced the payout opportunity for achievement of TSR performance at the 55th percentile from a payout of 110% to a payout of 100% and reduced the payout opportunities for achievement of all applicable TSR performance levels in the third quartile by 12% to 14% for all new awards. During our prior engagement discussions, certain stockholders suggested eliminating the

Table of Contents



payout opportunity for TSR performance below median. However, the Committee believes that completely eliminating any opportunity would place the Company at a competitive disadvantage in attracting and retaining executive talent as all of the companies in the industry peer group provide for some level of payout below median. The Committee has also considered placing a cap on earned awards at target if absolute TSR is negative for the performance period, regardless of relative TSR. However, as our business is highly dependent on the prices we receive for our oil, natural gas and natural gas liquids, the Committee believes that stockholders are best served by a management team that is highly incentivized to deliver differentiating performance in a challenging industry-wide environment. Accordingly, the Committee believes that placing such a cap on earned awards is not appropriate. In addition, the Committee maintains the ability to apply negative discretion to these awards should the Committee deem such discretionary adjustment necessary.

The following table reflects the payout scale for the annual performance unit program for awards granted in and after November 2014 as well as outstanding performance unit awards granted prior to November 2014:

| **Final TSR Ranking** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TSR Performance Percentile** | 100% | 91% | 82% | 73% | 64% | 55% | 46% | 36% | 27% | 18% | 9% | 0% |
| | **Payout as % of Target** | | | | | | | | | | | |
| ***Awards Granted in and after November 2014*** | 200% | 182% | 164% | 146% | 128% | 100% | 80% | 60% | 40% | 0% | 0% | 0% |
| ***Awards Granted Prior to November 2014*** | 200% | 182% | 164% | 146% | 128% | 110% | 92% | 72% | 54% | 0% | 0% | 0% |

The examples below illustrate how the performance unit payout scale works under two different TSR ranking outcomes, assuming an executive officer received a target award of 20,000 performance units in October 2015 subject to a three-year performance period. Each performance unit earned is a right to receive a cash payment equal to the closing price of one share of our common stock on the date the Committee certifies the performance results for the performance period.

| | **Relative TSR Ranking for Three-Year Performance Period** | **Payout Percentage** | **Number of Performance Units Earned** |
|---|---|---|---|
| **Example 1** | 3rd | 164% | 32,800 units (20,000 x 164%) |
| **Example 2** | 10th | 0% | 0 units (20,000 x 0%) |

***Stock Options.*** Stock options typically vest pro-rata annually over three years, beginning with the first anniversary of the date of grant, and have a term of seven years. The exercise price is not less than the market price on the date of grant and repricing of stock options to a lower exercise price is prohibited, unless approved by stockholders.

***Restricted Stock Units.*** The Committee establishes objective performance criteria for each calendar year that must be achieved before any restricted stock units are awarded the following year to executive officers subject to Section 162(m) of the IRC. If the performance criteria are achieved, the Committee may make awards of restricted stock units to the executive officers. The restricted stock units awarded vest pro-rata annually over three years, beginning with the first anniversary of the grant

Table of Contents



date. All of the restricted stock unit awards made in October 2015 were made after the Company's achievement of the 2014 performance criterion, which was to obtain at least $3.1 billion in Cash Flows from Operating Activities (Net cash provided by (used in) operating activities) as presented in the Consolidated Statements of Cash Flows in the Company's Annual Report on Form 10-K for the year ended December 31, 2014.

### *Equity Awards Made During 2015*

On October 26, 2015, the Committee approved the following awards under our 2012 Omnibus Plan for the NEOs. The target grant value of each of the awards was held flat as compared to awards granted in 2014. These awards, as well as a description of the methodology for calculating the grant date fair value, are included in the Grants of Plan-Based Awards Table on page 62.

| | Total LTI Grant | Performance Units (50%) | | Stock Options (25%) | | Restricted Stock Units (25%) | |
|---|---|---|---|---|---|---|---|
| Name | Date Value($) | Target # of Units | Grant Date Value($) | # of Stock Options | Grant Date Value($) | # of Units | Grant Date Value($) |
| Mr. Walker | 11,116,389 | 77,548 | 5,547,008 | 154,615 | 2,794,960 | 40,209 | 2,774,421 |
| Mr. Gwin | 4,457,621 | 31,096 | 2,224,297 | 62,000 | 1,120,768 | 16,124 | 1,112,556 |
| Mr. Daniels | 4,557,779 | 31,795 | 2,274,296 | 63,393 | 1,145,949 | 16,486 | 1,137,534 |
| Mr. Reeves | 3,475,942 | 24,248 | 1,734,459 | 48,346 | 873,946 | 12,573 | 867,537 |
| Mr. Kleckner | 3,626,154 | 25,296 | 1,809,423 | 50,436 | 911,727 | 13,116 | 905,004 |

### *Performance Units — Results for Performance Periods Ended December 31, 2015*

In January 2016, the Committee certified the performance results for the 2012 and 2013 annual performance unit awards for the three- and two-year performance periods, respectively, that ended December 31, 2015. Under the provisions of these awards, the targeted performance units were subject to our relative TSR performance against a defined TSR peer group. TSR performance is based on the difference between (1) the average closing stock price for the 30 trading days preceding the beginning of the performance period, and (2) the average closing stock price for the last 30 trading days of the performance period, plus dividends paid for the performance period, and further adjusted for any other distributions or stock splits, where applicable.

The Committee believes that these below-target payouts for below-median performance demonstrate that our performance unit program, which represents a significant portion of our overall executive compensation programs, is well-designed to link pay and performance. This year's payouts show that the values actually earned by the NEOs under our executive compensation programs can differ substantially from the grant date values required to be reported in the Summary Compensation Table and other proxy tables, as our program is designed to pay out at levels aligned with actual performance.

Table of Contents



For the performance periods ended December 31, 2015, the performance results and Anadarko's ranking, as highlighted, were as follows:

**2012 Annual Award — Three-Year Performance Period (January 1, 2013 to December 31, 2015)**

| Final TSR Ranking | 1 | 2 | 3 | 4 | 5 | 6 | 7 | APC 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TSR | 32.5% | 29.9% | 10.5% | 8.0% | 2.1% | -3.8% | -24.1% | **-24.3%** | -27.1% | -36.9% | -42.6% | -43.8% |
| Payout as % of Target | 200% | 182% | 164% | 146% | 128% | 110% | 92% | **72%** | 54% | 0% | 0% | 0% |

**2013 Annual Award — Two-Year Performance Period (January 1, 2014 to December 31, 2015)**

| Final TSR Ranking | 1 | 2 | 3 | 4 | 5 | 6 | APC 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TSR | -4.7% | -15.7% | -19.4% | -21.2% | -25.1% | -31.5% | **-34.4%** | -35.8% | -46.0% | -49.1% | -53.9% | -56.7% |
| Payout as % of Target | 200% | 182% | 164% | 146% | 128% | 110% | **92%** | 72% | 54% | 0% | 0% | 0% |

The following table lists the number of performance units awarded at minimum, target, and maximum levels and the actual number of performance units earned by the NEOs for the 2012 and 2013 annual performance unit awards for the three-year and two-year performance periods that ended December 31, 2015:

| | 2012 Annual Performance Unit Award | | | | 2013 Annual Performance Unit Award | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Minimum # Units | Target # Units | Maximum # Units | Actual # Units Earned | Minimum # Units | Target # Units | Maximum # Units | Actual # Units Earned |
| Mr. Walker | 0 | 17,168 | 34,336 | 12,361 | 0 | 21,998 | 43,996 | 20,238 |
| Mr. Gwin | 0 | 6,119 | 12,238 | 4,406 | 0 | 8,782 | 17,564 | 8,079 |
| Mr. Daniels | 0 | 6,282 | 12,564 | 4,523 | 0 | 8,981 | 17,962 | 8,263 |
| Mr. Reeves | 0 | 4,790 | 9,580 | 3,449 | 0 | 6,874 | 13,748 | 6,324 |
| Mr. Kleckner | 0 | 3,122 | 6,244 | 2,248 | 0 | 2,507 | 5,014 | 2,306 |

### *Performance Units — Results for 2012 CEO Appointment Award*

In connection with his appointment to CEO on May 15, 2012, Mr. Walker received a promotional equity award, including performance units (2012 CEO Appointment Award). The performance units were subject to the same performance criteria as performance unit awards for executive officers, except that the two- and three-year performance periods for the grant to Mr. Walker began on May 15, 2012 and ended on May 14, 2014 and May 14, 2015, respectively. In June 2015, the Committee certified the performance results for the three-year performance period that ended May 14, 2015. For such performance period, the performance result and Anadarko's ranking, as highlighted, was as follows:

**2012 CEO Appointment Award — Three-Year Performance Period (May 15, 2012 to May 14, 2015)**

| Final TSR Ranking | 1 | 2 | 3 | 4 | APC 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TSR | 83.0% | 57.0% | 42.6% | 35.6% | **26.5%** | 18.6% | 16.0% | 9.2% | 9.2% | 1.8% | 0.3% | -25.1% |
| Payout as % of Target | 200% | 182% | 164% | 146% | **128%** | 110% | 92% | 72% | 54% | 0% | 0% | 0% |

Table of Contents

# Compensation Discussion and Analysis

The following table lists the number of performance units awarded at minimum, target, and maximum levels and the actual number of performance units earned by Mr. Walker for the three-year performance period that ended May 14, 2015:

| | 2012 CEO Appointment Award | | | |
|---|---|---|---|---|
| Name | Minimum # Units | Target # Units | Maximum # Units | Actual # Units Earned |
| Mr. Walker | 0 | 5,254 | 10,508 | 6,725 |

## *Indirect Compensation Elements*

As identified in the table below, the Company provides certain benefits and perquisites (considered indirect compensation elements) that are considered typical within our industry and necessary to attract and retain executive talent. The value of each element of indirect compensation is generally structured to be competitive within our industry.

| Indirect Compensation Element | Primary Purpose |
|---|---|
| Retirement Benefits | • Attracts talented executive officers and rewards them for extended service<br>• Offers secure and tax-advantaged vehicles for executive officers to save effectively for retirement |
| Other Benefits (for example, health care, paid time off, disability and life insurance) and Perquisites | • Enhances executive welfare and financial security<br>• Provides a competitive package to attract and retain executive talent, but does not constitute a significant part of an executive officer's compensation |
| Severance Benefits | • Attracts and helps retain executives in a volatile and consolidating industry<br>• Provides transitional income following an executive's involuntary termination of employment |

## *Retirement Benefits*

Our executive officers participate in the following retirement and related plans:

***Anadarko Employee Savings Plans.*** The Anadarko Employee Savings Plan (401(k) Plan) is a tax-qualified retirement savings plan that allows participating U.S. employees to contribute up to 30% of eligible compensation, on a before-tax basis or on an after-tax basis (via a Roth or traditional after-tax contribution), into their 401(k) Plan accounts. Eligible compensation includes base salary and AIP bonus payments. Under the 401(k) Plan, we match an amount equal to one dollar for each dollar contributed by participants up to six percent of their total eligible compensation. The 401(k) Plan is subject to applicable IRC limitations regarding participant and Company contributions. Due to IRC limitations that restrict the amount of benefits payable under tax-qualified plans, we also sponsor a non-qualified Savings Restoration Plan. The Savings Restoration Plan accrues a benefit equal to the excess, if any, of Company matching and Personal Wealth Account (PWA) contributions that would have been allocated to a participant's 401(k) Plan account each year without regard to the IRC limitation over amounts that were, in fact, allocated to a participant's account. For additional details on the Savings Restoration Plan see page 70. Amounts deferred, if any, under the 401(k) Plan and the Savings Restoration Plan (collectively, the Savings Plans) by the NEOs are included, respectively, in

Table of Contents



the "Salary" and "Non-Equity Incentive Plan Compensation" columns of the Summary Compensation Table. Our matching contributions allocated to the NEOs under the Savings Plans are included in the "All Other Compensation" column of the Summary Compensation Table.

***Pension Plans.*** Anadarko provides funded, tax-qualified retirement benefits for all U.S. employees. Due to IRC limitations that restrict the amount of benefits payable under tax-qualified plans, we also sponsor non-qualified restoration plans that cover the executive officers and certain other employees. The pension plans do not require contributions by participants and a participant becomes vested in his or her benefit at the completion of three years of service as defined in the pension plans. Eligible compensation covered by the pension plans consists of base salary and AIP bonus payments.

Messrs. Walker and Reeves each have supplemental retirement benefits under our non-qualified Retirement Restoration Plan that provide for special service credits of eight years and five years, respectively, if they each remain employed by us until the age of 55. Messrs. Walker and Reeves vested in these benefits in 2012. The service credits are considered applicable service towards our retirement benefit programs, including pension and retiree medical and dental benefits, where applicable. These supplemental retirement benefits were provided to Messrs. Walker and Reeves in 2007 to recognize that they were mid-career hires that we would like to retain for the remainder of their careers. Providing them additional service credits recognizes a portion of their prior industry experience and service years which directly benefit us and our stockholders.

The accrued benefits for each of the NEOs, including the benefits related to any special service credits are discussed in the Pension Benefits Table on page 69. The Committee does not intend to grant any additional pension credits to executive officers and has not done so since 2007.

### Other Benefits

We provide other benefits such as medical, dental, and vision insurance, flexible spending and health savings accounts, paid time off, payments for certain relocation costs, disability coverage and life insurance to each executive officer. These benefits are also provided to all other eligible U.S.-based employees. Certain employees, including the executive officers, are eligible for participation in the Company's Management Life Insurance Plan, which provides an additional life insurance benefit of two times base salary, and the Deferred Compensation Plan, which allows participants to voluntarily defer receipt of up to 75% of their salary and/or up to 100% of their AIP bonus payments. Details regarding the Deferred Compensation Plan and participation in the plan by the NEOs are discussed beginning on page 70.

### Perquisites

We provide a limited number of perquisites to the executive officers. These perquisites are assessed annually by the Committee as part of the total competitive review. The expenses related to the perquisites are imputed and considered taxable income to the executive officers as applicable. We do not provide any tax gross-ups on these perquisites. The perquisites provided to the executive officers are as follows:

- Financial Counseling, Tax Preparation and Estate Planning
- Annual Physical Exam Program
- Personal Excess Liability Insurance

Table of Contents



- Limited Personal Use of Company Aircraft
- Club Memberships
- Limited Personal Use of Company Facilities and Event Venues

Mr. Walker has a personal usage limit of up to $300,000 that allows him to use Company aircraft for a limited amount of personal travel. To the extent his usage exceeds such amount, he is required to reimburse the Company pursuant to a time-sharing agreement. The prior year's aggregate incremental direct operating costs for each aircraft is used to calculate the value of personal usage.

The incremental costs of the various perquisites provided are included in the "All Other Compensation" column of the Summary Compensation Table on page 59 and in the All Other Compensation Table and supporting footnotes following the Summary Compensation Table on page 60.

### Severance Benefits

Post-termination and change-of-control severance benefits are typical within our industry. The Company currently provides the severance benefits described below to its executive officers. These plans are an essential component of our executive compensation programs and are necessary to attract and retain executive talent in a highly competitive market, provide continuity of management in the event of an actual or threatened change of control and provide executive officers with the security to make decisions that are in the best long-term interest of the stockholders. On a periodic basis, the Committee, in consultation with its executive compensation consultant, will review, consider and adjust, as necessary and appropriate, the provisions of post-termination and change-of-control severance benefits provided to executive officers to ensure that such arrangements serve the Company's interests in retaining key executives, are consistent with market practice and are reasonable.

***Officer Severance Plan.*** Our executive officers are eligible for benefits under the Officer Severance Plan with the exception of Mr. Walker whose severance benefits are included in his Severance Agreement, which is described on page 56. Benefits provided under the Officer Severance Plan may vary depending upon the executive officer's level within the organization and years of service with us and are made at the discretion of the Committee. Executive officers receiving benefits under the Officer Severance Plan are required to execute an agreement releasing us from any and all claims from any and all kinds of actions arising from the executive officer's employment with us or the termination of such employment. The typical severance benefits that may be provided for our executive officers following the occurrence of an involuntary termination event (as described on page 72) include the following:

- a payment equal to two times annual base salary plus one year's target bonus under our AIP;
- if provided, a pro-rata bonus under our AIP for the year of termination, which will be payable at the end of the performance period, based on actual Company performance as certified by the Committee;
- the option to continue existing medical and dental coverage levels at current active employee rates for up to six months. After six months, we will pay the cost of COBRA until the first to occur of (a) 18 months or (b) the officer obtaining comparable coverage as a result of employment with another employer;

Table of Contents



- the vesting of some or all unvested restricted stock, unvested restricted stock units and stock options; and
- a payout, if any, of outstanding performance units, which will be made at the end of the performance period based on actual Company performance results.

***Key Employee Change-of-Control Contracts.*** We have key employee change-of-control contracts with all of our executive officers, including the NEOs, with the exception of Mr. Walker, whose change-of-control severance benefits are included in his Severance Agreement, which is described on page 56.

If we experience a change of control (as defined on page 72) during the term of the contract, then the contract becomes operative for a specified protection period. These contracts generally provide that the executive officer's terms of employment (including position, work location, compensation and benefits) will not be adversely changed during the protection period. If we (or any successor in interest) terminate the executive officer's employment (other than for cause (as defined on page 72), death or disability), the executive officer terminates for good reason (as defined on page 73) during such protection period, or upon certain terminations prior to a change of control or in connection with or in anticipation of a change of control, the executive officer is generally entitled to receive certain payments and benefits. In 2015, no payments were paid under the change-of-control contracts.

In February 2011, the Committee approved changes to the contracts that reduced the level of post-change-of-control severance benefits under the Key Employee Change-of-Control Contracts, on a prospective basis, for newly appointed and newly hired executive officers who are not otherwise subject to an existing agreement. The table below summarizes the general provisions of the contracts (our current NEOs have contracts that were entered into prior to February 2011 with the exception of Mr. Walker, whose change-of-control severance benefits are included in his Severance Agreement, which is described on page 56).

| Key Employee Change-of-Control Contracts Entered Into Prior to February 2011 | Key Employee Change-of-Control Contracts Entered Into Post-February 2011 |
|---|---|
| • Initial three-year term automatically extended each year unless either party provides notice not to extend | • Initial three-year term automatically extended each year unless either party provides notice not to extend |
| • Modified single-trigger provision(1) | • Double-trigger provision(2) |
| • Three-year protection period | • Two-year protection period |
| • 2.9 times base salary plus AIP bonus (based on highest AIP bonus paid over last three years) | • Up to 2.9 times base salary plus AIP bonus (based on highest AIP bonus paid over last three years) |
| • Up to three additional years of matching contributions into the Savings Restoration Plan | • Up to three additional years of matching contributions into the Savings Restoration Plan |
| • Up to three additional years of age and service credits under the Company's retirement and pension plans | • Up to three additional years of age and service credits under the Company's retirement and pension plans |
| • Three years continuation of medical, dental, and life insurance benefits | • Up to three years continuation of medical, dental, and life insurance benefits |
| • Three years of financial planning benefits | • No continuation of financial planning benefits |

Table of Contents



| Key Employee Change-of-Control Contracts Entered Into Prior to February 2011 | Key Employee Change-of-Control Contracts Entered Into Post-February 2011 |
|---|---|
| • Excise tax gross-up(3) | • Best-of-net tax provision (i.e., no tax gross-up by the Company)(4) |
| • Outplacement services up to a maximum of $30,000 | • Outplacement services up to a maximum of $30,000 |
| • Officer is subject to a confidentiality provision | • Officer is subject to a confidentiality provision |

(1) A good reason provision allowing an executive officer to terminate for any reason during the 30-day period immediately following the first anniversary of a change of control and receive severance benefits.

(2) Severance payments are made only in the event of both a change of control and the termination of the executive officer's employment without cause or for good reason during the applicable protection period.

(3) The executive officer will be entitled to receive a payment in an amount sufficient to make the executive whole for any excise tax on excess parachute payments imposed under IRC Section 4999.

(4) Requires the Company to either (1) reduce the amount of certain severance benefits otherwise payable so that such severance benefits will not be subject to the tax imposed by IRC Section 4999, or alternatively (2) pay the full amount of severance benefits to the executive officer (but with no tax gross-up), whichever produces the better after-tax result for the executive officer.

As a condition to receipt of change-of-control severance benefits, the executive officer must remain employed by us and provide services commensurate with his or her position until the executive officer is terminated pursuant to the provisions of the contract. The executive officer must also agree to retain in confidence any and all confidential information known to him or her concerning us and our business so long as the information is not otherwise publicly disclosed.

***Change of Control — Treatment of Outstanding Unvested Equity Awards.*** The treatment of unvested outstanding equity awards upon a change of control of Anadarko is prescribed by the applicable plan document under which the awards were granted. The Company's 2008 Omnibus Incentive Compensation Plan (2008 Omnibus Plan), which governs awards made prior to May 15, 2012, included a single-trigger provision for the accelerated vesting of equity awards upon a change of control. All outstanding awards to the NEOs under the 2008 Omnibus Plan were fully vested by the end of 2014. The 2012 Omnibus Plan, which governs awards made on or after May 15, 2012, includes a double-trigger provision that provides that, unless otherwise specified in the award agreement, there is only accelerated vesting of awards in the event of both a change of control of the Company and the termination of the participant's employment without cause or for good reason during the applicable protection period. All equity awards issued under the 2012 Omnibus Plan contain this double-trigger feature.

## AGREEMENTS WITH EXECUTIVE OFFICERS

### *Mr. Walker — Severance Agreement*

In connection with Mr. Walker's appointment to CEO in 2012, the Committee determined that his employment should be continued on an at-will basis. On February 16, 2012, the Company and Mr. Walker entered into a Severance Agreement to combine and restructure certain severance benefits previously provided to him under the Officer Severance Plan and through his key employee change-of-control contract. Effective May 15, 2012, Mr. Walker was no longer eligible to receive benefits under the Officer Severance Plan and waived the severance benefits under his key employee change-of-control contract, thereby reducing the level of change-of-control severance benefits that he was

Table of Contents



formerly eligible to receive. The general provisions of the Severance Agreement are described in the tables below:

**Severance Benefits Outside of a Change of Control**

- Prorated annual bonus based on actual performance for the year of termination
- Two times the sum of his annual base salary and annual target bonus for the year of termination
- Up to six months continued participation in the Company's medical and dental care plans at active employee rates and reimbursement for the cost of up to 18 additional months of COBRA continuation coverage

**Change-of-Control Severance Benefits**

- Double-trigger provision (requiring both a change-of-control and a termination of employment)
- Three-year protection period following Change of Control
- 2.5 times salary plus the higher of target bonus for the year of termination or the average bonus for the last two years
- Up to three additional years of matching contributions into the Savings Restoration Plan
- Up to three additional years of age and service credits under the Company's retirement and pension plans
- Three years continuation of medical, dental, and life insurance benefits
- Best-of-net tax provision (i.e., no tax gross-up by the Company)
- Outplacement services up to a maximum of $30,000
- Subject to a confidentiality provision

The above description of Mr. Walker's Severance Agreement is not a full summary of all of the terms and conditions of the agreement and is qualified in its entirety by the full text of the agreement, which is on file with the SEC.

## DIRECTOR AND OFFICER INDEMNIFICATION AGREEMENTS

We have entered into indemnification agreements with our directors and certain executive officers, in part to enable us to attract and retain qualified directors and executive officers. These agreements require us, among other things, to indemnify such persons against certain liabilities that may arise by reason of their status or service as directors or officers, to advance their expenses for proceedings for which they may be indemnified, and to cover such person under any directors' and officers' liability insurance policy that we may maintain from time to time. These agreements are intended to provide indemnification rights to the fullest extent permitted under applicable Delaware law and are in addition to any other rights our directors and executive officers may have under our Restated Certificate of Incorporation, By-Laws and applicable law.

## STOCK OWNERSHIP GUIDELINES

We have maintained stock ownership guidelines for executive officers since 1993 with the goal of promoting equity ownership and aligning our executive officers' interests with those of our stockholders. These guidelines must be met within three years after becoming subject to them. Currently, all of our executive officers either meet or exceed their specified guidelines. The ownership guidelines are currently established at the following minimum levels:

| Position | Guideline | Ownership Status as of 12/31/2015 |
|---|---|---|
| Chief Executive Officer | 6 x base salary | Exceeds |
| Executive Vice Presidents | 3 x base salary | Exceeds |

Table of Contents



The Committee reviews the stock ownership levels annually. In determining stock ownership levels, we include shares of common stock held directly by the officer (including shares beneficially owned in a trust, by a limited liability company or partnership, and by a spouse and/or minor children, unless the officer expressly disclaims beneficial ownership of such shares); shares of common stock held indirectly through the Anadarko Employee Savings Plan; deferred share balances resulting from an investment in the Company Stock Fund as defined in the Anadarko Petroleum Corporation Deferred Compensation Plan provided such balance is payable in shares; and unvested restricted stock and restricted stock units. For those officers of Anadarko who are also officers of WES and/or WGP, any WES and/or WGP equity they own is also included in the calculation to determine their compliance. Outstanding performance units and unexercised stock options are not included. If an officer does not satisfy the stock ownership requirements, he or she must retain all shares acquired on the vesting of equity awards or the exercise of stock options (net of exercise costs and taxes) until compliance is achieved. Because of our robust ownership levels, other than as described above we do not maintain separate holding requirements for our equity awards.

## CLAWBACK POLICY

All awards granted under Anadarko's 2012 Omnibus Plan are conditioned on repayment or forfeiture in accordance with applicable laws, Company policy, and any relevant provisions in the related award agreement. Each award agreement under the 2012 Omnibus Plan specifically provides that the awards are subject to forfeiture or repayment if the Company is required to prepare an accounting restatement due to material noncompliance of the Company with applicable rules as a result of misconduct. In addition, the 2012 Omnibus Plan provides that the Committee may specify in an award agreement or otherwise that a recipient's rights, payment, and benefits with respect to the award shall be reduced, cancelled, forfeited or recouped upon the occurrence of certain specified events, including termination of employment for cause, violations of material Company policies, or other conduct by the recipient that is detrimental to the business or reputation of the Company.

## REGULATORY REQUIREMENTS

Together with the Committee, the Company carefully reviews and takes into account current tax, accounting and securities regulations as they relate to the design of our compensation programs and related decisions.

Section 162(m) of the IRC limits a company's ability to deduct compensation paid in excess of $1 million during any fiscal year to each of certain NEOs, unless the compensation is performance-based as defined under federal tax laws. The Committee reviews and considers the deductibility of our executive compensation programs; however, the Committee believes it is important to provide compensation that is not fully deductible when necessary to retain and motivate certain executive officers and when it is in the best interest of the Company and our stockholders.

The benefits payable under non-qualified plans for our executive officers and directors are unsecured obligations to pay. Assets to pay these benefits may be held under the Company's Benefits Trust, which is subject to the claims of the general creditors of the Company.

## CONCLUSION

We believe our executive compensation programs, together with the Committee's oversight, are designed to pay for performance and enable us to attract, retain and motivate a strong leadership team. The programs provide executive officers with the necessary motivation to maximize the long-term operational and financial performance of the Company, while using sound financial controls and maintaining high standards of integrity. Especially in these complex and volatile times, we believe our executive compensation programs continue to align the executive officers' interest, as well as the value they may ultimately realize, with the interests and returns of our stockholders.

Table of Contents



## SUMMARY COMPENSATION TABLE

The following table summarizes the compensation for the fiscal years ended December 31, 2015, 2014, and 2013 for our CEO, our Chief Financial Officer (CFO) and our three highest paid executive officers other than our CEO and CFO:

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($)(4) | All Other Compensation ($)(5) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| R. A. Walker<br>Chairman, President and Chief Executive Officer | 2015 | 1,350,000 | 0 | 8,321,429 | 2,794,960 | 1,930,500 | 2,200,242 | 487,251 | 17,084,382 |
| | 2014 | 1,300,000 | 0 | 8,317,674 | 2,779,856 | 2,551,900 | 5,205,613 | 565,144 | 20,720,187 |
| | 2013 | 1,300,000 | 0 | 7,190,878 | 3,848,495 | 2,923,700 | 1,154,412 | 501,944 | 16,919,429 |
| Robert G. Gwin<br>Executive Vice President, Finance and Chief Financial Officer | 2015 | 778,846 | 0 | 3,336,853 | 1,120,768 | 813,894 | 20,204 | 216,505 | 6,287,070 |
| | 2014 | 750,000 | 0 | 3,320,425 | 1,109,704 | 1,075,875 | 740,102 | 223,255 | 7,219,361 |
| | 2013 | 719,038 | 0 | 2,870,634 | 1,536,306 | 1,181,740 | — (6) | 236,592 | 6,544,310 |
| Robert P. Daniels<br>Executive Vice President, International and Deepwater Exploration | 2015 | 726,923 | 0 | 3,411,830 | 1,145,949 | 759,635 | 275,512 | 152,154 | 6,472,003 |
| | 2014 | 700,000 | 0 | 3,395,961 | 1,134,958 | 1,004,150 | 1,947,610 | 168,820 | 8,351,499 |
| | 2013 | 611,539 | 0 | 2,935,889 | 1,571,244 | 1,005,064 | — (6) | 173,942 | 6,297,678 |
| Robert K. Reeves<br>Executive Vice President, Law and Chief Administrative Officer | 2015 | 726,923 | 0 | 2,601,996 | 873,946 | 759,635 | 265,865 | 154,315 | 5,382,680 |
| | 2014 | 700,000 | 0 | 2,599,174 | 868,621 | 1,004,150 | 1,433,125 | 179,368 | 6,784,438 |
| | 2013 | 655,769 | 0 | 2,246,967 | 1,202,522 | 1,077,757 | — (6) | 174,495 | 5,357,510 |
| James J. Kleckner<br>Executive Vice President, International and Deepwater Operations | 2015 | 649,039 | 0 | 2,714,427 | 911,727 | 678,246 | 195,122 | 188,289 | 5,336,850 |

(1) The amounts reflected in this column for 2015 include a total of 27 pay periods, rather than the usual 26, as a result of the Company's payroll schedule for 2015. In most years, paying a bi-weekly pay schedule results in 26 pay periods. However, every 11 years, a 27th pay period occurs. The reported value does not represent any increase in base salary for any of the NEOs.

(2) The amounts included in these columns represent the aggregate grant date fair value of the awards made to NEOs in 2015 computed in accordance with FASB ASC Topic 718, disregarding estimated forfeitures. The value ultimately realized by the NEOs upon the actual vesting of the award(s) or the exercise of the stock option(s) may or may not be equal to this determined value. For a discussion of valuation assumptions, see Note 19 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2015. The values in the "Stock Awards" column represent the grant date fair values for both restricted stock unit and performance unit awards. The performance unit awards are subject to market conditions and have been valued based on the probable outcome of the market conditions as of the grant date.

Table of Contents



(3) The amounts in this column reflect the incentive cash bonus awards for 2015 that were determined by the Compensation Committee and paid out in February 2016 pursuant to the Company's AIP. These awards are discussed in further detail beginning on page 44.

(4) The amounts in this column reflect the annual aggregate change in the actuarial present value of each NEO's accumulated benefit, expressed as a lump sum, under the Company's pension plans described in more detail beginning on page 65. The amounts reported in this column are not a current cash payment but represent the year-over-year change in the value of the NEO's pension based on specified interest and discount rate assumptions for each year and include amounts that the NEO may not currently be entitled to receive because such amounts are not vested. The actual value of the pension will be determined at the time each NEO retires from the Company. The Company's Deferred Compensation Plan does not provide for above-market or preferential earnings so no such amounts are included.

(5) The amounts shown in this column are described further in the All Other Compensation Table below.

(6) Messrs. Gwin, Daniels, and Reeves each had a negative change in pension value for 2013 as follows: Mr. Gwin — $(222,912); Mr. Daniels — $(1,157,927); and Mr. Reeves — $(198,775).

### *All Other Compensation Table for 2015*

The following table describes each component of the "All Other Compensation" column for the fiscal year ended December 31, 2015 in the Summary Compensation Table:

| Name | Personal Use of Aircraft ($)(1) | Payments by the Company to Employee 401(k) Plan and Savings Restoration Plan ($) | Club Membership Dues ($)(2) | Financial/ Tax/Estate Planning ($) | Excess Liability Insurance ($) | Other ($)(3) | Totals ($) |
|---|---|---|---|---|---|---|---|
| R. A. Walker(4) | 201,912 | 240,114 | 34,489 | 5,710 | 1,675 | 3,351 | 487,251 |
| Robert G. Gwin | 43,493 | 122,360 | 28,135 | 15,425 | 1,675 | 5,417 | 216,505 |
| Robert P. Daniels | 3,137 | 115,403 | 16,514 | 15,425 | 1,675 | 0 | 152,154 |
| Robert K. Reeves | 15,437 | 115,403 | 16,920 | 4,880 | 1,675 | 0 | 154,315 |
| James J. Kleckner | 18,566 | 135,427 | 13,797 | 15,425 | 1,675 | 3,399 | 188,289 |

(1) The amount reported above reflects the value of personal aircraft use for 2015. The value of personal aircraft use is based on the Company's aggregate incremental direct operating costs, including cost of fuel, maintenance, landing and ramp fees, and other miscellaneous trip-related variable costs. Because the Company's aircraft are used predominantly for business purposes, fixed costs, which do not change based on use of the aircraft, are excluded. The value of travel to board meetings for companies other than Anadarko or its affiliates and civic organizations for which the NEOs serve as directors is considered personal use and is included in the amount reported above. Compensation is imputed for personal use of our aircraft by the NEOs and their guests.

(2) The amounts disclosed represent the payment of club membership fees. For those clubs not used exclusively for business, the entire amount has been included, although we believe that only a portion of this cost represents a perquisite.

(3) The amounts disclosed represent reimbursements to the executive officer for the cost of an executive physical.

(4) Mr. Walker has a personal usage limit of up to $300,000 that allows him to use Company aircraft for a limited amount of personal travel. To the extent his usage exceeds such amount, he is required to reimburse the Company pursuant to a time-sharing agreement.

Table of Contents



## GRANTS OF PLAN-BASED AWARDS IN 2015

The Grants of Plan-Based Awards Table sets forth information concerning annual incentive awards, performance units, stock options, and restricted stock units granted or modified during 2015 for each of the NEOs as described below.

***Non-Equity Incentive Plan Awards.*** Values disclosed reflect the estimated cash payouts under the Company's AIP, as discussed on page 44, based on actual salaries earned in 2015. If threshold levels of performance are not met, the payout can be zero. If maximum levels of performance are achieved, the payout can be 200% of each NEO's target. The amounts actually paid to the NEOs for 2015 are disclosed in the Summary Compensation Table in the "Non-Equity Incentive Plan Compensation" column.

***Equity Incentive Plan Awards.*** Awards reported reflect performance units, as discussed beginning on page 48, which are denominated as an equivalent of one share of Company common stock and, if earned, are paid in cash. Executive officers may earn from 0% to 200% of the targeted award based on the Company's relative TSR performance against a specified peer group over a three-year performance period. The threshold value reported represents the lowest earned amount, other than zero, based on a defined payout scale. Executive officers do not have voting rights with respect to performance units, and unless after a change of control the award has been converted into restricted stock units of the surviving company, no dividend equivalents are paid on the awards.

***Stock Awards.*** Awards reported reflect restricted stock unit awards that vest pro-rata annually over three years, beginning with the first anniversary of the grant date. Dividend equivalents are reinvested in shares of the Company's common stock and paid upon the applicable vesting of the underlying award. Awards are eligible to be voluntarily deferred.

[Table of Contents](#)

# Executive Compensation

***Stock option awards.*** Stock options vest pro-rata annually over three years, beginning with the first anniversary of the date of grant and have a term of seven years. The exercise price is not less than the market price on the date of grant and repricing of stock options to a lower exercise price is prohibited, unless approved by stockholders.

| | | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Name** | **Grant Date** | **Threshold ($)** | **Target ($)** | **Maximum ($)** | **Threshold (#)** | **Target (#)** | **Maximum (#)** | **All Other Stock Awards: Number of Shares of Stock or Units (#)** | **All Other Option Awards: Number of Securities Underlying Options (#)** | **Exercise or Base Price of Option Awards ($/Sh)** | **Grant Date Fair Value of Stock and Option Awards ($)(2)** |
| R. A. Walker | | 0 | 1,755,000 | 3,510,000 | — | — | — | — | — | — | — |
| | 10/26/2015 | — | — | — | — | — | — | — | 154,615 | 69.00 | 2,794,960 |
| | 10/26/2015 | — | — | — | — | — | — | 40,209 | — | — | 2,774,421 |
| | 10/26/2015 | — | — | — | 31,019 | 77,548 | 155,096 | — | — | — | 5,547,008 |
| Robert G. Gwin | | 0 | 739,904 | 1,479,807 | — | — | — | — | — | — | — |
| | 10/26/2015 | — | — | — | — | — | — | — | 62,000 | 69.00 | 1,120,768 |
| | 10/26/2015 | — | — | — | — | — | — | 16,124 | — | — | 1,112,556 |
| | 10/26/2015 | — | — | — | 12,438 | 31,096 | 62,192 | — | — | — | 2,224,297 |
| Robert P. Daniels | | 0 | 690,577 | 1,381,154 | — | — | — | — | — | — | — |
| | 10/26/2015 | — | — | — | — | — | — | — | 63,393 | 69.00 | 1,145,949 |
| | 10/26/2015 | — | — | — | — | — | — | 16,486 | — | — | 1,137,534 |
| | 10/26/2015 | — | — | — | 12,718 | 31,795 | 63,590 | — | — | — | 2,274,296 |
| Robert K. Reeves | | 0 | 690,577 | 1,381,154 | — | — | — | — | — | — | — |
| | 10/26/2015 | — | — | — | — | — | — | — | 48,346 | 69.00 | 873,946 |
| | 10/26/2015 | — | — | — | — | — | — | 12,573 | — | — | 867,537 |
| | 10/26/2015 | — | — | — | 9,699 | 24,248 | 48,496 | — | — | — | 1,734,459 |
| James J. Kleckner | | 0 | 616,587 | 1,233,174 | — | — | — | — | — | — | — |
| | 10/26/2015 | — | — | — | — | — | — | — | 50,436 | 69.00 | 911,727 |
| | 10/26/2015 | — | — | — | — | — | — | 13,116 | — | — | 905,004 |
| | 10/26/2015 | — | — | — | 10,118 | 25,296 | 50,592 | — | — | — | 1,809,423 |

(1) The amounts in the table were calculated based on the actual base salary earned during 2015, which amounts are slightly higher than each executive officer's annualized base salary because there were 27 pay periods, rather than the usual 26, in 2015 as a result of the Company's payroll schedule for 2015.

(2) Unless otherwise noted, the amounts in this column reflect the aggregate grant date fair value of awards made to NEOs in 2015 computed in accordance with FASB ASC Topic 718, disregarding estimated forfeitures. The value ultimately realized by each NEO upon the actual vesting of the award(s) or exercise of the stock option(s) may or may not be equal to this determined value. For a discussion of the valuation assumptions, see Note 19 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2015.

Table of Contents



## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END 2015

The following table reflects outstanding stock option awards and unvested and unearned stock awards (both time-based and performance-contingent) as of December 31, 2015, assuming a market value of $48.58 per share (the closing stock price of the Company's common stock on December 31, 2015).

| | Option Awards(1) | | | | Stock Awards(2)(3) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Restricted Stock/Units | | Equity Incentive Plan Awards Performance Units | |
| | Number of Securities Underlying Unexercised Options | | | | | | | |
| Name | Exercisable(#) | Unexercisable(#) | Option Exercise Price($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested(#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Number of Unearned Shares, Units or Other Rights That Have Not Vested(#) | Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested($) |
| R. A. Walker | | | | | | | 12,361 | 600,497 |
| | | | | | 10,274 | 499,111 | 40,477 | 1,966,373 |
| | 72,700 | 0 | 65.44 | 11/10/2016 | 20,060 | 974,515 | 22,242 | 1,080,516 |
| | 85,189 | 0 | 63.34 | 11/9/2017 | 40,419 | 1,963,555 | 77,548 | 3,767,282 |
| | 87,076 | 0 | 83.95 | 11/8/2018 | | | | |
| | 52,511 | 0 | 66.38 | 5/15/2019 | | | | |
| | 169,600 | 0 | 70.70 | 11/5/2019 | | | | |
| | 98,919 | 49,459 | 92.02 | 11/6/2020 | | | | |
| | 39,335 | 78,670 | 93.51 | 11/6/2021 | | | | |
| | 0 | 154,615 | 69.00 | 10/26/2022 | | | | |
| Robert G. Gwin | | | | | 4,102 | 199,275 | 4,406 | 214,043 |
| | | | | | 8,007 | 388,980 | 16,158 | 784,956 |
| | | | | | 16,208 | 787,385 | 8,879 | 431,342 |
| | 66,200 | 0 | 34.95 | 3/1/2016 | | | 31,096 | 1,510,644 |
| | 47,200 | 0 | 65.44 | 11/10/2016 | | | | |
| | 54,256 | 0 | 63.34 | 11/9/2017 | | | | |
| | 52,196 | 0 | 83.95 | 11/8/2018 | | | | |
| | 60,447 | 0 | 70.70 | 11/5/2019 | | | | |
| | 39,488 | 19,744 | 92.02 | 11/6/2020 | | | | |
| | 15,703 | 31,404 | 93.51 | 11/6/2021 | | | | |
| | 0 | 62,000 | 69.00 | 10/26/2022 | | | | |
| Robert P. Daniels | | | | | | | 4,523 | 219,727 |
| | | | | | 4,195 | 203,793 | 16,526 | 802,833 |
| | 28,610 | 0 | 65.44 | 11/10/2016 | 8,189 | 397,822 | 9,081 | 441,155 |
| | 48,586 | 0 | 63.34 | 11/9/2017 | 16,572 | 805,068 | 31,795 | 1,544,601 |
| | 53,585 | 0 | 83.95 | 11/8/2018 | | | | |
| | 62,054 | 0 | 70.70 | 11/5/2019 | | | | |
| | 40,386 | 20,193 | 92.02 | 11/6/2020 | | | | |
| | 16,060 | 32,119 | 93.51 | 11/6/2021 | | | | |
| | 0 | 63,393 | 69.00 | 10/26/2022 | | | | |
| Robert K. Reeves | | | | | | | 3,449 | 167,552 |
| | | | | | 3,211 | 155,990 | 12,648 | 614,440 |
| | 36,700 | 0 | 65.44 | 11/10/2016 | 6,268 | 304,499 | 6,950 | 337,631 |
| | 42,469 | 0 | 63.34 | 11/9/2017 | 12,638 | 613,954 | 24,248 | 1,177,968 |
| | 40,856 | 0 | 83.95 | 11/8/2018 | | | | |
| | 47,316 | 0 | 70.70 | 11/5/2019 | | | | |
| | 30,909 | 15,454 | 92.02 | 11/6/2020 | | | | |
| | 12,291 | 24,582 | 93.51 | 11/6/2021 | | | | |
| | 0 | 48,346 | 69.00 | 10/26/2022 | | | | |
| James J. Kleckner | | | | | | | 2,248 | 109,208 |
| | | | | | 3,960 | 192,377 | 4,612 | 224,051 |
| | 14,032 | 0 | 65.44 | 11/10/2016 | 1,172 | 56,936 | 7,254 | 352,399 |
| | 17,527 | 0 | 63.34 | 11/9/2017 | 6,541 | 317,762 | 25,296 | 1,228,880 |
| | 19,090 | 0 | 83.95 | 11/8/2018 | 13,184 | 640,479 | | |
| | 30,837 | 0 | 70.70 | 11/5/2019 | | | | |
| | 21,784 | 10,892 | 86.90 | 6/6/2020 | | | | |
| | 11,273 | 5,636 | 92.02 | 11/6/2020 | | | | |
| | 12,828 | 25,654 | 93.51 | 11/6/2021 | | | | |
| | 0 | 50,436 | 69.00 | 10/26/2022 | | | | |

Table of Contents



(1) The table below shows the vesting dates for the respective unexercisable stock options listed in the above Outstanding Equity Awards Table:

| Vesting Date | Mr. Walker | Mr. Gwin | Mr. Daniels | Mr. Reeves | Mr. Kleckner |
|---|---|---|---|---|---|
| 6/6/2016 | — | — | — | — | 10,892 |
| 10/26/2016 | 51,539 | 20,667 | 21,131 | 16,116 | 16,812 |
| 11/6/2016 | 49,459 | 19,744 | 20,193 | 15,454 | 5,636 |
| 11/6/2016 | 39,335 | 15,702 | 16,059 | 12,291 | 12,827 |
| 10/26/2017 | 51,538 | 20,666 | 21,131 | 16,115 | 16,812 |
| 11/6/2017 | 39,335 | 15,702 | 16,060 | 12,291 | 12,827 |
| 10/26/2018 | 51,538 | 20,667 | 21,131 | 16,115 | 16,812 |

(2) The table below shows the vesting dates for the respective restricted stock units, including any dividend equivalents accrued but unvested, listed in the above Outstanding Equity Awards Table:

| Vesting Date | Mr. Walker | Mr. Gwin | Mr. Daniels | Mr. Reeves | Mr. Kleckner |
|---|---|---|---|---|---|
| 6/6/2016 | — | — | — | — | 3,960 |
| 10/26/2016 | 13,473 | 5,403 | 5,524 | 4,212 | 4,394 |
| 11/6/2016 | 10,274 | 4,102 | 4,195 | 3,211 | 1,172 |
| 11/6/2016 | 10,030 | 4,003 | 4,094 | 3,134 | 3,270 |
| 10/26/2017 | 13,473 | 5,402 | 5,524 | 4,213 | 4,395 |
| 11/6/2017 | 10,030 | 4,004 | 4,095 | 3,134 | 3,271 |
| 10/26/2018 | 13,473 | 5,403 | 5,524 | 4,213 | 4,395 |

(3) The table below shows the performance periods for the respective performance units listed in the above Outstanding Equity Awards Table. The number of outstanding units and the estimated payout percentages disclosed for each award are calculated based on our relative performance ranking as of December 31, 2015 and are not necessarily indicative of what the payout percent earned will be at the end of the specified performance period. For awards that were granted in 2015 with performance periods beginning in 2016, target payout has been assumed.

| Performance Period | Performance to Date Payout | Mr. Walker | Mr. Gwin | Mr. Daniels | Mr. Reeves | Mr. Kleckner |
|---|---|---|---|---|---|---|
| 1/1/2013 to 12/31/2015 | 72% | 12,361 | 4,406 | 4,523 | 3,449 | 2,248 |
| 1/1/2014 to 12/31/2015 | 92% | 20,238 | 8,079 | 8,263 | 6,324 | 2,306 |
| 1/1/2014 to 12/31/2016 | 92% | 20,239 | 8,079 | 8,263 | 6,324 | 2,306 |
| 1/1/2015 to 12/31/2017 | 40% | 22,242 | 8,879 | 9,081 | 6,950 | 7,254 |
| 1/1/2016 to 12/31/2018 | 100% | 77,548 | 31,096 | 31,795 | 24,248 | 25,296 |

Table of Contents



## OPTION EXERCISES AND STOCK VESTED IN 2015

The following table provides information about the aggregate dollar value realized during 2015 by the NEOs for Anadarko awards, including option exercises, vesting of restricted stock units and performance unit payouts.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise(#) | Value Realized on Exercise($)(1) | Number of Shares Acquired on Vesting(#)(2) | Value Realized on Vesting($)(1) |
| R. A. Walker | 0 | 0 | 71,663 | 5,406,094 |
| Robert G. Gwin(3) | 78,600 | 2,668,470 | 22,998 | 1,694,600 |
| Robert P. Daniels(4) | 69,290 | 2,785,298 | 23,578 | 1,737,502 |
| Robert K. Reeves(5) | 115,300 | 4,067,784 | 18,001 | 1,326,416 |
| James J. Kleckner(6) | 29,800 | 1,084,124 | 15,564 | 1,184,476 |

(1) The value realized reflects the taxable value to the NEO as of the date of the option exercise, vesting of restricted stock units, or payment of performance unit awards.

(2) The numbers disclosed include restricted stock units and performance unit awards paid in shares and cash, respectively, for which restrictions lapsed during 2015.

(3) Mr. Gwin's value includes the exercise of expiring stock options purchased with shares of Company common stock previously held by Mr. Gwin. On October 7, 2015, Mr. Gwin transferred 56,192 shares of Company common stock to the Company (based on the applicable stock price of $69.13) as consideration for the exercise price and applicable tax withholding.

(4) Mr. Daniels's value includes the exercise of expiring stock options purchased with shares of Company common stock previously held by Mr. Daniels. On October 14, 2015 and October 15, 2015, respectively, Mr. Daniels transferred 10,870 and 10,786 shares of Company common stock to the Company (based on the applicable stock prices of $71.57 and $72.95) as consideration for the exercise price and applicable tax withholding.

(5) Mr. Reeves's value includes the exercise of expiring stock options purchased with shares of Company common stock previously held by Mr. Reeves. On October 6, 2015 and October 8, 2015, respectively, Mr. Reeves transferred 41,338 and 40,469 shares of Company common stock to the Company (based on the applicable stock prices of $68.63 and $72.29) as consideration for the exercise price and applicable tax withholding.

(6) Mr. Kleckner's value includes the exercise of expiring stock options purchased with shares of Company common stock previously held by Mr. Kleckner. On October 21, 2015, Mr. Kleckner transferred 21,005 shares of Company common stock to the Company (based on the applicable stock price of $71.56) as consideration for the exercise price and applicable tax withholding.

## PENSION BENEFITS FOR 2015

The Company maintains the Anadarko Retirement Plan (the APC Retirement Plan) and the Kerr-McGee Corporation Retirement Plan (the KMG Retirement Plan), both of which are funded tax-qualified defined benefit pension plans. In addition, the Company maintains the Anadarko Retirement Restoration Plan, or the APC Retirement Restoration Plan, and the Kerr-McGee Benefits Restoration Plan, or the KMG Restoration Plan, both of which are unfunded, non-qualified pension benefit plans that are designed to provide for supplementary pension benefits due to limitations imposed by the IRC that restrict the amount of benefits payable under tax-qualified plans.

### *APC Retirement Plan and APC Retirement Restoration Plan*

The APC Retirement Plan covers all U.S.-based Anadarko employees, except for legacy Kerr-McGee employees. The APC Retirement Restoration Plan covers certain U.S.-based Anadarko

Table of Contents



employees, except for legacy Kerr-McGee employees, who are affected by certain IRC limitations. For those employees hired prior to January 1, 2007, which includes all of the NEOs, benefits under these plans are based upon the employee's years of service and the average monthly earnings during the 36 highest paid consecutive months of the last 120 months of employment with the Company.

The APC Retirement Plan and the APC Retirement Restoration Plan (collectively, APC Retirement Plans) do not require contributions by employees. An employee becomes vested in his or her benefit at the completion of three years of service. Compensation covered by the APC Retirement Plans consists of base salary and payments under the AIP. The maximum amount of compensation for 2015 that may be considered in calculating benefits under the APC Retirement Plan was $265,000 due to the annual IRC limitation. Compensation in excess of $265,000 was recognized in determining benefits payable under the APC Retirement Restoration Plan.

For employees hired prior to January 1, 2007, benefits under the APC Retirement Plans are calculated as a life-only annuity (meaning that benefits end upon the participant's death) and are equal to the sum of the following:

- 1.4% x average compensation x years of service with the Company; plus
- 0.4% x (average compensation - covered compensation) x years of service with the Company (limited to 35 years).

Covered compensation is the average (without indexing) of the Social Security taxable wage base during the 35-year period ending with the last day of the year in which an individual reaches Social Security retirement age. Benefits are calculated based on a normal retirement age of 65; however, employees may receive a reduced early retirement benefit as early as age 55. Employees may choose to receive their benefits under several different forms provided under the APC Retirement Plan. Employees receive their benefits from the APC Retirement Restoration Plan in the form of a lump-sum payment.

As of December 31, 2015, Messrs. Walker, Daniels and Reeves were the only NEOs eligible for early retirement under the APC Retirement Plans. Early retirement benefits are calculated using the formula described above; however, the value is multiplied by an early retirement reduction factor as follows:

| Age | Early Retirement Factor |
|---|---|
| 62 and older | 100% |
| 61 | 97% |
| 60 | 94% |
| 59 | 91% |
| 58 | 88% |
| 57 | 85% |
| 56 | 82% |
| 55 | 79% |

### *KMG Retirement Plan and KMG Restoration Plan*

The KMG Retirement Plan covers all U.S.-based, legacy Kerr-McGee employees who have not incurred a break in service of greater than one year since the date Kerr-McGee was acquired by Anadarko. The KMG Restoration Plan covers certain legacy Kerr-McGee U.S.-based employees that are affected by the IRC limitations. Benefits under these plans are based upon the employee's years of

Table of Contents



service and the average monthly earnings during the 36 highest paid consecutive months of the last 120 months of employment.

The KMG Retirement Plan and the KMG Restoration Plan (collectively, KMG Retirement Plans) do not require contributions by employees. An employee becomes vested in his or her benefit at the completion of three years of service. Compensation covered by the KMG Retirement Plans includes base salary and payments under the AIP. The maximum amount of compensation for 2015 that may be considered in calculating benefits under the KMG Retirement Plan was $265,000 due to the annual IRC limitation. Compensation in excess of $265,000 was recognized in determining benefits payable under the KMG Restoration Plan.

Benefits under the KMG Retirement Plans are calculated as a life-only annuity for single participants, and a joint and 50% contingent annuity for married participants who are eligible for retirement. Benefits under this plan are equal to the sum of Part A and Part B:

Part A:

- 1.1% x average compensation x years of service prior to March 1, 1999; plus
- 0.5% x (average compensation - covered compensation) x years of service prior to March 1, 1999 (limited to 35 years).

Part B:

- 1.667% x average compensation x years of service on or after March 1, 1999 (limited to 30 years); plus
- 0.75% x average compensation x years of service on or after March 1, 1999 in excess of 30 years; less
- 1% x primary Social Security benefit x years of service on or after March 1, 1999 as of age 65 (limited to 30 years) x (years of service on or after March 1, 1999 divided by years of service on or after March 1, 1999 at age 65).

Covered compensation is the average (without indexing) of the Social Security taxable wage base during the 35-year period ending with the last day of the year in which an individual reaches Social Security retirement age. Benefits are calculated based on a normal retirement age of 65; however, employees may receive a reduced early retirement benefit as early as age 52. Employees may choose to receive their benefits under several different forms provided under the KMG Retirement Plan. Employees receive their benefits from the KMG Restoration Plan in the form of a lump-sum payment.

Table of Contents



Mr. Kleckner is eligible for early retirement under the KMG Retirement Plan. Early retirement benefits under the KMG Retirement Plans are calculated using the formula described above, however, the value is multiplied by an early retirement reduction factor as follows:

| Age Benefit Payments Start | First Formula Percentage of Normal Retirement Age Benefit Payable (Age Reductions for Benefits Earned Before March 1, 1999) Part A | Part B | Second Formula Percentage of Normal Retirement Age Benefit Payable (Age Reductions for Benefits Earned On or After March 1, 1999) |
|---|---|---|---|
| 62 and older | 100% | 100% | 100% |
| 61 | 100% | 95% | 100% |
| 60 | 100% | 90% | 100% |
| 59 | 95% | 85% | 95% |
| 58 | 90% | 80% | 90% |
| 57 | 85% | 75% | 85% |
| 56 | 80% | 67.5% | 80% |
| 55 | 75% | 60% | 75% |
| 54 | 70% | 55% | 70% |
| 53 | 65% | 50% | 65% |
| 52 | 60% | 45% | 60% |

As of December 31, 2011, recognizing the high percentage of employees eligible to retire and based upon a recommendation from the Compensation Committee, the Board provided legacy participants in both the APC and KMG Retirement Plans a one-time option to either (1) continue to accrue benefits as outlined above (Option 1) or (2) accrue future benefits under the PWA using the same cash balance formula as employees hired on or after January 1, 2007 (Option 2). This one-time election was designed to increase employee retention by minimizing the impact of interest rate fluctuations on early retirement decisions and to accelerate the migration of employees into the PWA. For participants electing Option 2, the above formulae were modified such that:

- Future accruals consist of pay credits (outlined in the table below, with points equal to the sum of age and years of service) and interest credits;
- Consistent with the treatment of employees hired on or after January 1, 2007, Anadarko will make an additional contribution each year to the Employee Savings Plan (and/or the Savings Restoration Plan, to the extent required) of four percent of eligible compensation;
- Service and average compensation used in determining benefits under the above final average pay formulae were frozen as of December 31, 2011;
- If retirement eligible on or before December 31, 2012, the lump sum interest rate used in determining the lump sum value of pre-2012 accruals would be no greater than 3.18%; and
- If not retirement eligible on or before December 31, 2012, the lump sum interest rate used in determining the lump sum value of pre-2012 accruals would be no greater than the rate in effect on the date the participant first becomes eligible for early retirement.

Table of Contents



Messrs. Walker, Gwin, Daniels, and Reeves chose to continue receiving benefits under Option 1. Mr. Kleckner chose to accrue benefits under the PWA beginning in 2012, according to Option 2. The current pay credits provided under the PWA (expressed as a percentage of eligible compensation) are as follows:

| Points | Pay Credit |
|---|---|
| 80 or more | 13% |
| 70 | 11% |
| 60 | 9% |
| 50 | 7% |
| 40 | 6% |
| Less than 40 | 5% |

The present values provided in the table below are based on the pension benefits accrued through December 31, 2015, assuming that such benefit is paid in the same form as reflected in the accounting valuation. The benefits are assumed to commence at the specified plan's earliest unreduced retirement age, which is age 62 for those NEOs under the APC Retirement Plans and age 60 for Mr. Kleckner under the KMG Retirement Plans. All pre-retirement decrements such as pre-retirement mortality and terminations have been ignored for the purposes of these calculations. The interest rate used for discounting payments back to December 31, 2015, is 4.75% in both the APC Retirement Restoration Plan and the APC Retirement Plan; and 4.50% in both the KMG Restoration Plan and the KMG Retirement Plan, consistent with the discount rates used in the accounting valuation. The long-term interest rate used for converting the benefit to a lump-sum form of payment is set at 100 basis points less than the discount rate, but not less than the most recently published 30-year Treasury rate. Lump sums for NEOs who have locked in or will lock in a known interest rate pursuant to Option 2 (PWA) choice are valued using such lock-in rate. The interest rates used for calculating the values below are 3.75% in both the APC Retirement Restoration Plan and the APC Retirement Plan; and 3.50% in both the KMG Restoration Plan and the KMG Retirement Plan.

## PENSION BENEFITS

| Name | Plan Name | Number of Years of Credited Service (#) | Present Value of Accumulated Benefit ($) | Payments During 2015 ($) |
|---|---|---|---|---|
| R. A. Walker(1) | APC Retirement Plan | 10.000 | 531,177 | 0 |
| | APC Retirement Restoration Plan | 18.000 | 14,932,514 | 0 |
| Robert G. Gwin | APC Retirement Plan | 10.000 | 393,526 | 0 |
| | APC Retirement Restoration Plan | 10.000 | 2,453,894 | 0 |
| Robert P. Daniels | APC Retirement Plan | 30.000 | 1,452,798 | 0 |
| | APC Retirement Restoration Plan | 30.000 | 8,614,247 | 0 |
| Robert K. Reeves(1) | APC Retirement Plan | 12.000 | 613,233 | 0 |
| | APC Retirement Restoration Plan | 17.000 | 5,561,090 | 0 |
| James J. Kleckner | KMG Retirement Plan | 34.333 | 1,879,838 | 0 |
| | KMG Restoration Plan | 34.333 | 7,174,386 | 0 |

(1) The value of Messrs. Walker's and Reeves's APC Retirement Restoration benefit in the table includes the effect of the additional pension service credits equal to eight and five years of credited service, respectively, provided in 2007 to recognize that they were mid-career hires that we would like to retain for the remainder

Table of Contents



of their careers. Providing them additional service credits recognized a portion of their prior industry and service years, which directly benefits us and our stockholders. Messrs. Walker and Reeves vested in these additional pension service credits on February 20, 2012 and December 12, 2012, respectively. Messrs. Walker's and Reeves's total pension values as of December 31, 2015, excluding these additional pension service credits are $8,059,763 and $3,745,113, respectively.

## NON-QUALIFIED DEFERRED COMPENSATION FOR 2015

The Company maintains a Deferred Compensation Plan for certain employees, including the NEOs. Under this Plan, certain employees may voluntarily defer receipt of up to 75% of their salary and/or up to 100% of their AIP payments. The Company does not match these deferred amounts. In general, deferred amounts are distributed to the participant upon separation from service or at a specific date as elected by the participant. At the time deferral elections are made, participants also elect to receive their distributions in either lump-sum or annual installments not exceeding 15 years.

Due to IRC limitations that restrict the amount of benefits payable under the tax-qualified 401(k) Plan, the Company sponsors a non-qualified Savings Restoration Plan. The Savings Restoration Plan accrues a benefit equal to the excess, if any, of Company matching and PWA contributions that would have been allocated to a participant's 401(k) Plan account each year without regard to IRC limitations over amounts that were, in fact, allocated to a participant's account. After a participant reaches the IRC limitations under the 401(k) Plan, the Company makes contributions on their behalf up to the six-percent match on eligible compensation they would have otherwise been entitled to receive under the 401(k) Plan and, if applicable, an additional four percent of eligible compensation for PWA participants. Eligible compensation includes base salary and AIP bonus payments. In general, deferred amounts are distributed to the participant in lump-sum upon separation from service.

Both the Deferred Compensation Plan and the Savings Restoration Plan permit participants to allocate the deferred amounts among a group of notional accounts that mirror the gains and/or losses of various investment funds provided in the 401(k) Plan (but excluding the Company stock fund). These notional accounts do not provide for above-market or preferential earnings. Each participant directs investments of the individual accounts set up for the participant under the plans and may make changes in the investments as often as daily. Since each executive officer chooses the investment vehicle or vehicles (including a selection of funds ranging from fixed income to emerging markets, as well as other equity, debt and mixed investment strategies in between) and may change their allocations from time to time, the return on the investment will depend on how well each underlying investment fund performed during the time the executive officer chose it as an investment vehicle. The aggregate performance of such investment is reflected in the "Aggregate Earnings/Losses in 2015" column.

Table of Contents



Executive officers were given the opportunity to make voluntary deferral elections for all of their annual restricted stock unit and performance unit awards granted under the Company's 1999 Stock Incentive Plan and the 2008 and 2012 Omnibus Plans. Any earnings and/or losses attributable to the deferred shares otherwise payable under these awards are based on the performance of the Company's stock over the deferral period. In general, deferred awards are distributed to the participant, in the form of Company common stock or cash, as designated by the Compensation Committee at the time of grant, upon termination or at a specific date as elected by the participant. The Company does not subsidize or match any deferrals of compensation into these plans.

| Name | Executive Contributions in 2015 ($) | Company Contributions in 2015 ($) | Aggregate Earnings/(Losses) in 2015 ($) | Aggregate Withdrawals / Distributions ($) | Aggregate Balance at End of 2015 ($) |
|---|---|---|---|---|---|
| **R. A. Walker** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 222,114 | (7,223) | 0 | 1,527,110 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Robert G. Gwin** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 104,360 | (44,137) | 0 | 925,805 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Robert P. Daniels** | | | | | |
| Deferred Compensation Plan(2) | 0 | 0 | (13,214) | 0 | 2,131,055 |
| Savings Restoration Plan(1) | 0 | 97,403 | (1,617) | 0 | 841,828 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Robert K. Reeves** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 97,403 | (2,035) | 0 | 972,918 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **James J. Kleckner** | | | | | |
| Deferred Compensation Plan | 0 | 0 | (2,781) | 0 | 276,539 |
| Savings Restoration Plan(1) | 0 | 135,427 | (3,651) | 0 | 701,661 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |

(1) Company contributions in the Savings Restoration Plan are reported in the Summary Compensation Table for each of the NEOs under the "All Other Compensation" column for the fiscal year 2015. The Savings Restoration Plan Aggregate Balance includes amounts reported in the "All Other Compensation" column of the Summary Compensation Table for 2015 as well as amounts previously reported in prior Summary Compensation Tables. The amounts currently or previously reported in the Summary Compensation Table for each NEO are as follows: Mr. Walker — $1,236,323; Mr. Gwin — $572,426; Mr. Daniels — $595,576; Mr. Reeves — $585,014; and Mr. Kleckner — $135,427.

(2) Mr. Daniels's balance in the Deferred Compensation Plan includes $366,203 previously reported in prior Summary Compensation Tables.

Table of Contents



## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE OF CONTROL

The following tables reflect potential payments to our NEOs under existing contracts, agreements, plans or arrangements, whether written or unwritten, for various scenarios involving a change of control or termination of employment of each NEO, assuming a termination date of December 31, 2015, and, where applicable, using the closing price of our common stock of $48.58 (as reported on the NYSE as of December 31, 2015).

The following are general definitions that apply to the termination scenarios detailed below. These definitions have been summarized and are qualified in their entirety by the full text of the applicable plans or agreements to which our NEOs are parties.

Involuntary Termination is generally defined as any termination that does not result from the following termination events: resignation; retirement; for cause; death; qualifying disability; extended leave of absence; continued failure to perform duties or responsibilities; a termination in connection with any corporate sale transaction where continued employment is available; or a termination if the NEO is eligible to receive benefits from a Key Employee Change-of-Control Contract, or under an employment or severance agreement.

For Cause is generally defined as the following:

- the willful and continued failure of the executive officer to perform substantially the executive officer's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness) or material breach of any material provision in an employment agreement (if applicable), after written demand for substantial performance is delivered to the executive officer by the Board or the CEO of the Company which specifically identifies the manner in which the Board or CEO believes that the executive officer has not substantially performed the executive officer's duties; or
- the willful engaging by the executive officer in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

A Change of Control is generally defined as any one of the following occurrences:

- any individual, entity or group acquires beneficial ownership of 20% or more of either the outstanding shares of our common stock or our combined voting power;
- individuals who constitute the Board (as of the date of either a given change-of-control contract or an award agreement under our equity plans, as applicable) cease to constitute a majority of the Board, provided that an individual whose election or nomination as a director is approved by a vote of at least a majority of the directors as of the date of either the change-of-control contract or an award agreement under our equity plans, as applicable, will be deemed a member of the incumbent Board;
- a reorganization, merger or consolidation or sale or other disposition of all or substantially all of our assets or the acquisition of assets of another entity, unless following the business combination,
  - all or substantially all of the beneficial owners of our outstanding common stock prior to the business combination own more than 60% of the outstanding common stock of the corporation resulting from the business combination;

Table of Contents



  – no person, entity or group owns 20% or more of the outstanding voting securities of the corporation resulting from the business combination; and

  – at least a majority of the board of the corporation resulting from the business combination were members of our Board prior to the business combination; or

- approval by our stockholders of our complete liquidation or dissolution.

Good Reason is generally defined as any one of the following occurrences within three years of a Change of Control:

- diminution in the executive officer's position, authority, duties or responsibilities that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer;

- any failure by the Company to provide compensation to the executive officer at levels that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer;

- any material change in the location, as defined in the applicable agreement, where the executive officer was employed immediately preceding the Change of Control, or the Company requiring the executive officer to travel on Company business to a substantially greater extent than required immediately prior to the Change of Control;

- any termination by the executive officer for any reason during the 30-day period immediately following the first anniversary of a Change of Control (such occurrence is not part of the good reason definition under Mr. Walker's Severance Agreement);

- any purported termination by the Company of the executive officer's employment otherwise than as expressly permitted in their Change-of-Control, Employment or Severance Agreement; or

- any failure by the Company to require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to assume the terms provided in the executive officer's Change-of-Control or Employment or Severance Agreement.

In February 2011, the Compensation Committee eliminated on a prospective basis the Good Reason provision allowing an executive officer to terminate for any reason during the 30-day period immediately following the first anniversary of a Change of Control for all key employee change-of-control contracts executed with any newly appointed and/or newly hired senior executive officers who are not otherwise subject to an existing agreement. Mr. Walker's Severance Agreement also excludes this modified single-trigger provision.

Disability is generally defined as the absence of the executive officer from his or her duties with the Company on a full-time basis for 180 business days as a result of incapacity due to mental or physical illness that is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the executive officer or the executive officer's legal representative.

Table of Contents



Additional details of the post-termination arrangements can be found beginning on page 54.

### Involuntary For Cause Termination

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** | **0** |

### Voluntary Termination (Including Retirement)

| | Mr. Walker($)(1) | Mr. Gwin($) | Mr. Daniels($)(1) | Mr. Reeves($)(1) | Mr. Kleckner($)(1) |
|---|---|---|---|---|---|
| Prorated Portion of Performance Unit Awards(2) | 1,015,655 | 0 | 414,680 | 317,366 | 192,158 |
| **Total** | **1,015,655** | **0** | **414,680** | **317,366** | **192,158** |

(1) As of December 31, 2015, Messrs. Walker, Daniels, Reeves and Kleckner were eligible for retirement.

(2) Under the terms of the performance unit agreements, retirement-eligible participants receive a prorated payout, paid after the end of the performance period, based on actual performance and the number of months worked during the performance period. Messrs. Walker's, Daniels's, Reeves's and Kleckner's values reflect an estimated payout based on performance to date through December 31, 2015, which is not indicative of the payout they will receive at the end of the performance period based on actual performance.

### Involuntary Not For Cause Termination

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Cash Severance(1) | 5,980,000 | 2,212,500 | 2,065,000 | 2,065,000 | 1,843,750 |
| Pro-rata AIP Bonus(2) | 1,930,500 | 813,894 | 759,635 | 759,635 | 678,246 |
| Accelerated Equity Compensation(3) | 9,268,213 | 3,710,134 | 3,793,886 | 2,897,286 | 2,900,859 |
| Retirement Restoration Plan Benefits(4) | 0 | 0 | 0 | 0 | 1,034,789 |
| Health and Welfare Benefits(5) | 181,987 | 83,988 | 117,313 | 97,035 | 73,393 |
| **Total** | **17,360,700** | **6,820,516** | **6,735,834** | **5,818,956** | **6,531,037** |

(1) Mr. Walker's value assumes two times the sum of his base salary in effect at the end of 2015 plus his target AIP bonus (with his target AIP calculated based on his salary in effect at the beginning of the year); all other NEO values assume two times base salary plus one times target AIP bonus, in each case calculated based on the NEO's base salary in effect at the end of 2015.

(2) All payments, if provided, will be paid at the end of the performance period following the Compensation Committee's certification of corporate performance. All NEO values in the table are based on base salary earnings for the year and reflect the actual bonuses awarded under the Company's 2015 AIP as discussed on page 47.

(3) Reflects the in-the-money value of unvested stock options, the estimated current value of unvested performance units (based on performance as of December 31, 2015) and the value of unvested restricted stock units, all as of December 31, 2015. In the event of an involuntary termination, unvested performance units would be paid after the end of the applicable performance periods based on actual performance.

(4) Reflects the lump-sum present value of additional benefits related to the Company's supplemental pension benefits which are contingent upon the termination event. All values include special pension credits, provided through an employment agreement, retention agreement, the APC Retirement Restoration Plan or the KMG Restoration Plan, respectively. On a case-by-case basis, the Compensation Committee may approve a special retirement benefit enhancement that is equivalent to the additional supplemental pension benefits

Table of Contents



that would have accrued assuming they were eligible for subsidized early retirement benefits. Messrs. Walker, Daniels, Reeves and Kleckner are not eligible for this supplemental benefit because they were eligible for early retirement as of December 31, 2015. If the Compensation Committee were to have approved this special benefit for the other NEOs, the incremental value as of December 31, 2015, to the Retirement Restoration Plan benefits disclosed above would have been $1,319,773 for Mr. Gwin.

(5) Reflects the value of a total of 24 months of health and welfare benefit coverage. All amounts are present values determined in accordance with FASB ASC Topic 715.

### *Change of Control: Involuntary Termination or Voluntary Termination For Good Reason*

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Cash Severance(1) | 10,094,500 | 5,602,046 | 4,944,686 | 5,155,495 | 4,136,528 |
| Pro-rata AIP Bonus(2) | 1,930,500 | 813,894 | 759,635 | 759,635 | 678,246 |
| Accelerated Equity Compensation(3) | 9,268,213 | 3,710,134 | 3,793,886 | 2,897,286 | 2,900,859 |
| Retirement Restoration Plan Benefits(4) | 2,260,730 | 2,829,972 | 866,348 | 911,876 | 1,034,789 |
| Nonqualified Deferred Compensation(5) | 693,180 | 328,658 | 306,747 | 306,747 | 427,917 |
| Health and Welfare Benefits(6) | 286,309 | 133,181 | 176,131 | 162,181 | 121,848 |
| Outplacement Assistance | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Financial Counseling(7) | 0 | 46,892 | 46,892 | 46,892 | 46,892 |
| Excise Tax and Gross-Up(8) | N/A | 0 | 0 | 0 | 3,131,705 |
| Best-of-Net Tax Adjustment(9) | 0 | N/A | N/A | N/A | N/A |
| **Total** | **24,563,432** | **13,494,777** | **10,924,325** | **10,270,112** | **12,508,784** |

(1) Mr. Walker's value assumes 2.5 times the sum of his base salary in effect at the end of 2015 plus the average of his two prior AIP bonus awards; all other NEO values assume 2.9 times the sum of base salary plus the highest AIP bonus paid in the past three years.

(2) Mr. Walker's value assumes payment of a pro-rata AIP bonus based on his target AIP bonus percentage in effect for the year of termination, his base salary in effect at the beginning of the year and the Company's actual performance under the Company's 2015 AIP; all other NEO values assume the full-year equivalent of the highest annual AIP bonus the officer received over the past three years.

(3) Includes the in-the-money value of unvested stock options, the value of unvested restricted stock units and the estimated current value of unvested performance units, all as of December 31, 2015. Upon a Change of Control, the value of any outstanding performance units would be calculated based on the Company's TSR performance and the price of the Company's Common Stock at the time of the Change of Control and converted into restricted stock units of the surviving company. In the event of an involuntary not for cause or voluntary for good reason termination within two years following a Change of Control, the units will generally be paid on the first business day that is at least six months and one day following the separation from service. In the event of an involuntary not for cause or voluntary for good reason termination that is more than two years following a Change of Control, the units will be paid at the end of the performance period. For performance units payable based on actual performance, current values reflect performance to date estimates as of December 31, 2015.

(4) Reflects the lump-sum present value of additional benefits related to the Company's supplemental pension benefits which are contingent upon the termination event. For Mr. Gwin, who as of December 31, 2015 was not retirement eligible, the values include a special retirement benefit enhancement that is equivalent to the additional supplemental pension benefits that would have accrued assuming the NEOs were eligible for subsidized early retirement benefits. All values include special pension credits, provided through an employment agreement, retention agreement, the APC Retirement Restoration Plan, the KMG Restoration Plan or a key employee change-of-control contract, respectively.

Table of Contents



(5) Includes the value of an additional three years of employer contributions into the Savings Restoration Plan based on each officer's current contribution rate to the Plan.

(6) Values represent 36 months of health and welfare benefit coverage. All amounts are present values determined in accordance with FASB ASC Topic 715.

(7) Values reflect the cost of continuation of financial counseling services for three years after termination. Per the terms of Mr. Walker's Severance Agreement, he is not eligible for post-termination financial counseling benefits.

(8) Values estimate the total payment required to make each executive officer whole for the 20% excise tax imposed by IRC Section 4999. Mr. Walker is not eligible for this excise tax gross-up benefit per the terms of his Severance Agreement.

(9) Reflects the aggregate impact of the best-of-net tax adjustment as prescribed under Mr. Walker's Severance Agreement (as discussed on page 56).

## *Disability*

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| Pro-rata AIP Bonus(1) | 1,690,000 | 712,500 | 665,000 | 665,000 | 593,750 |
| Accelerated Equity Compensation(2) | 9,268,213 | 3,710,134 | 3,793,886 | 2,897,286 | 2,900,859 |
| Health and Welfare Benefits(3) | 466,627 | 274,980 | 209,294 | 191,376 | 166,606 |
| **Total** | **11,424,840** | **4,697,614** | **4,668,180** | **3,753,622** | **3,661,215** |

(1) Represents payment of a pro-rata target AIP bonus based on target bonus percentages effective for the 2015 AIP and eligible earnings as of December 31, 2015.

(2) Includes the in-the-money value of unvested stock options, the value of unvested restricted stock units and the estimated current value of unvested performance units, all as of December 31, 2015. Performance units would be paid after the end of the applicable performance period, based on actual performance. For performance units payable based on actual performance, current values reflect performance to date estimates as of December 31, 2015.

(3) Reflects the cost of the continuation of additional death benefit coverage provided to executive officers of the Company until age 65. All amounts are present values determined in accordance with FASB ASC Topic 715.

## *Death*

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| Pro-rata AIP Bonus(1) | 1,690,000 | 712,500 | 665,000 | 665,000 | 593,750 |
| Accelerated Equity Compensation(2) | 10,974,513 | 4,391,292 | 4,490,541 | 3,430,477 | 3,439,173 |
| Life Insurance Proceeds(3) | 6,373,816 | 2,583,979 | 2,411,714 | 2,411,714 | 2,153,316 |
| **Total** | **19,038,329** | **7,687,771** | **7,567,255** | **6,507,191** | **6,186,239** |

(1) Represents payment of a pro-rata target AIP bonus based on target bonus percentages effective for the 2015 AIP and eligible earnings as of December 31, 2015.

(2) Includes the in-the-money value of unvested stock options, the target value of unvested performance units, and the value of unvested restricted stock units, all as of December 31, 2015.

(3) Includes amounts payable under additional death benefits provided to executive officers and other key employees of the Company. These liabilities are not insured, but are self-funded by the Company. Proceeds are not exempt from federal taxes; values shown include an additional tax gross-up amount to equate benefits with nontaxable life insurance proceeds. Values exclude death benefit proceeds from programs available to all employees.

Table of Contents



In addition to the benefits outlined above for each termination scenario, each of the NEOs would be paid following termination for any reason, the following vested amounts under our nonqualified benefit programs, which have been previously earned but not paid:

| | Mr. Walker($) | Mr. Gwin($) | Mr. Daniels($) | Mr. Reeves($) | Mr. Kleckner($) |
|---|---|---|---|---|---|
| Retirement Restoration Plan Benefits(1) | 18,489,864 | 2,459,122 | 11,443,800 | 7,106,317 | 7,556,192 |
| Non-Qualified Deferred Compensation(2) | 1,527,110 | 925,805 | 2,972,883 | 972,918 | 978,200 |
| Health and Welfare Benefits(3) | 0 | 0 | 340,570 | 0 | 0 |
| **Total** | **20,016,974** | **3,384,927** | **14,757,253** | **8,079,235** | **8,534,392** |

(1) Reflects the lump-sum present value of vested benefits related to the Company's supplemental pension benefits.

(2) Reflects the combined vested balances in the non-qualified Savings Restoration Plan and Deferred Compensation Plan.

(3) Values shown for Mr. Daniels reflect the value of his retiree death benefit in the Management Life Insurance Plan (MLIP). The MLIP provides for a retiree death benefit equal to one times final base salary. This retiree death benefit is only applicable to participants who were employed by the Company on June 30, 2003. Therefore, this benefit is only applicable to Mr. Daniels.

Table of Contents

# Transactions with Related Persons

The Company recognizes that related-person transactions can present potential or actual conflicts of interest and it is the Company's preference that related-person transactions are avoided as a general matter. However, the Company also recognizes that there are situations, including certain transactions negotiated on an arm's length basis, where related-person transactions may be in, or may not be inconsistent with, the best interest of the Company and our stockholders. Therefore, the Company has written procedures for the approval, ratification and review of ongoing related-person transactions. Either the Board's Governance and Risk Committee or the full Board (as determined by the Governance and Risk Committee) will review, ratify or approve, as necessary, any related-person transactions prior to the transaction being entered into, or ratify any related-person transactions that have not been previously approved, in which a director, five-percent owner, executive officer or immediate family member of any such person has a material interest, and where the transaction is in an amount in excess of $120,000, either individually or in the aggregate of several transactions during any calendar year. This review typically occurs in connection with regularly scheduled Board meetings.

In addition to those matters described above, the Governance and Risk Committee has approved in advance the following categories of related-person transactions: (i) the rates and terms involved in such transactions where the Company's standard rates and terms for such transactions apply; and (ii) the hiring of a related person (including immediate family members) as an employee of the Company (but not an officer), provided that total annual compensation (meaning base salary, annual incentive bonus and other amounts to be reported on a W-2) does not exceed $120,000.

Table of Contents

# Independent Auditor

## ITEM 2 — RATIFICATION OF THE APPOINTMENT OF THE INDEPENDENT AUDITOR

The Audit Committee is responsible for the appointment, compensation, retention and oversight of the work of the independent auditor employed by the Company and establishes guidelines for the retention of the independent auditor for any permissible services. In performing these responsibilities, among other things, the Audit Committee (1) reviews the qualifications, performance and independence of the independent auditor, (2) reviews and evaluates the lead partner of the independent auditor having primary responsibility for the Company's audit and ensures the rotation of such partners as required by law, and (3) considers whether the audit firm should be rotated in order to maintain the independence between the independent auditor and the Company.

The Audit Committee has appointed KPMG LLP, an independent registered public accounting firm, to audit the Company's consolidated financial statements for 2016. The Board believes that the continued retention of KPMG LLP to serve as the Company's independent auditor is in the best interests of the Company and its stockholders and at the request of the Audit Committee, is asking you to ratify that appointment.

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF KPMG LLP TO AUDIT THE COMPANY'S CONSOLIDATED FINANCIAL STATEMENTS FOR 2016**. If the stockholders do not ratify the appointment of KPMG LLP, the Audit Committee will make the final determination of the independent auditor for 2016.

KPMG LLP, an independent registered public accounting firm, served as the Company's independent auditor during 2015 and has served as the Company's independent auditor since its initial public offering in 1986. Representatives of KPMG LLP will be present at the Annual Meeting to make a statement, if they desire to do so, and to respond to appropriate questions from stockholders.

The Audit Committee adopted a Pre-Approval Policy with respect to services which may be performed by KPMG LLP. This policy lists specific audit, audit-related, and tax services as well as any other services that KPMG LLP is authorized to perform and sets out specific dollar limits for each specific service, which may not be exceeded without additional Audit Committee authorization. The Audit Committee receives quarterly reports on the status of expenditures pursuant to that Pre-Approval Policy.

The Audit Committee reviews the policy at least annually in order to approve services and limits for the current year. Any service that is not clearly enumerated in the policy must receive specific pre-approval by the Audit Committee or by its Chairperson, to whom such authority has been conditionally delegated, prior to engagement. During 2015, no fees for services outside the scope of audit, review, or attestation that exceed the waiver provisions of 17 CFR 210.2-01(c)(7)(i)(C) were requested of or approved by the Audit Committee.

The following table presents fees for the audits of the Company's annual consolidated financial statements for 2015 and 2014 and for other services provided by KPMG LLP.

| | 2015 | 2014 |
|---|---|---|
| Audit Fees | $ 7,041,000 | $ 6,790,000 |
| Audit-related Fees | 961,000 | 1,088,000 |
| Tax Fees | 23,000 | 348,000 |
| All Other Fees | — | — |
| Total | $ 8,025,000 | $ 8,226,000 |

Table of Contents

# Independent Auditor

Audit fees are primarily for the audit of the Company's consolidated financial statements included in the Form 10-K, including the audit of the effectiveness of the Company's internal control over financial reporting, and the reviews of the Company's consolidated financial statements included in the Forms 10-Q. KPMG LLP also served as the independent auditor of WES and fees for the audit of WES's annual consolidated financial statements were $1,309,000 for 2015 and $1,227,000 for 2014, which are not included in the table above. In addition, KPMG LLP served as the independent auditor of WGP and fees for the audit of WGP's annual consolidated financial statements were 325,000 for 2015 and $300,000 for 2014, which are not included in the table above.

Audit-related fees are primarily for the audits of the Company's benefit plans, other audits, consents, comfort letters and certain financial accounting consultation. Audit-related fees related to WES were $423,000 for 2015 and $491,000 for 2014, which are not included in the table above. Audit-related fees related to WGP were $175,000 for 2015 and $150,000 for 2014, which are not included in the table above.

Tax fees are primarily for tax compliance and consultation services. The Audit Committee has concluded that the provision of tax services is compatible with maintaining KPMG LLP's independence.

All other fees are primarily for consulting services. The Audit Committee has concluded that these services are compatible with maintaining KPMG LLP's independence.

Table of Contents



## ITEM 3 — APPROVAL OF AN AMENDMENT AND RESTATEMENT OF THE 2012 OMNIBUS INCENTIVE COMPENSATION PLAN

At the Annual Meeting, our stockholders are being asked to approve an amendment and restatement of the 2012 Omnibus Incentive Compensation Plan (Amended 2012 Omnibus Plan). The Company's stockholders approved the 2012 Omnibus Plan at the 2012 annual meeting of stockholders. The primary revisions included in the Amended 2012 Omnibus Plan are as follows:

- Increase the number of shares of common stock that the Company may issue under the 2012 Omnibus Plan by 25,500,000 shares. After taking into account this increase and subject to adjustment as provided in the Amended 2012 Omnibus Plan, as of the date of the Annual Meeting the total number of shares of common stock available for issuance under the Amended 2012 Omnibus Plan will equal 40,960,362 less the sum of (a) one share for every share subject to a stock option or stock appreciation right granted under the 2012 Omnibus Plan after December 31, 2015 and prior to the Annual Meeting and (b) 2.39 shares for every share subject to other awards that are settled in shares and granted under the 2012 Omnibus Plan after December 31, 2015 and prior to the Annual Meeting;
- Impose a limit on the amount of compensation, including cash and equity, that may be paid to a non-employee director in a single calendar year;
- Increase the amount by which the shares that remain available for issuance will be reduced in connection with the grant of a full value award (an award other than an option or stock appreciation right which is settled by the issuance of shares of common stock) from 1.80 shares to 2.39 shares as further discussed on page 85;
- Revise the annual, calendar-year limitations on various awards that may be granted under the Amended 2012 Omnibus Plan in order to qualify certain awards as "performance-based compensation" for purposes of Section 162(m) of the IRC;
- Extend the term of the 2012 Omnibus Plan until May 10, 2026,
- Impose minimum vesting requirements on stock options and stock appreciation rights granted under the Amended 2012 Omnibus Plan, subject to certain limited exceptions;
- Clarify that upon a qualifying termination following a change of control, performance-based awards will be vested based on actual performance; and
- Other clarifying and ministerial changes.

In February 2016, the Compensation Committee recommended and the Board approved the Amended 2012 Omnibus Plan, provided that the Amended 2012 Omnibus Plan is approved by the stockholders of the Company at the Annual Meeting. The effective date for the Amended 2012 Omnibus Plan will be the date it is approved by the stockholders of the Company. If the Amended 2012 Omnibus Plan is not approved by stockholders at the Annual Meeting, then the 2012 Omnibus Plan will continue in in its original form and the amendment and restatement will be null and void.

Table of Contents

# Amended and Restated 2012 Omnibus Incentive Compensation Plan

## *Why You Should Vote in Favor of the Amended and Restated Plan*

The Board believes that the 2012 Omnibus Plan plays an important role in our human resource and business strategy by allowing us to appropriately attract, motivate and retain experienced and highly qualified individuals who are in a position to contribute materially to the success and long-term objectives of the Company. Consistent with our compensation philosophy, we believe that stock-based compensation fosters and strengthens a sense of proprietorship and personal involvement in the Company's success. By holding a personal stake in Anadarko, these individuals are encouraged to devote their best efforts towards the achievement of our business objectives and our success, thereby advancing the interests of Anadarko and our stockholders.

With the approval of the Amended 2012 Omnibus Plan, we will be able to continue to use an array of equity compensation alternatives in structuring compensation arrangements. The use of equity as part of our compensation program is important because it fosters a pay-for-performance culture, which is an important element of our overall compensation philosophy. We believe that equity compensation motivates individuals to create stockholder value since the value realized from the equity compensation is based on our stock performance.

## *Outstanding Equity Information*

We believe we have demonstrated our commitment to sound equity compensation practices. For example, as set forth in the table below, our average three-year burn rate for 2013, 2014 and 2015 is 0.61%. Average three-year burn rate is calculated as the number of shares granted under the 2012 Omnibus Plan and the 2008 Director Compensation Plan in each fiscal year, including stock options, restricted stock awards, restricted stock units, and earned deferred shares, divided by the weighted average common shares outstanding. Management and our board are cognizant of the expense attributable to compensatory stock awards, as well as dilution, and strive to maintain both at appropriate levels.

| Year | Stock Options Granted | Full-Value Awards Granted | Total Granted | Weighted Average Common Shares Outstanding | Burn Rate |
|---|---|---|---|---|---|
| 2015 | 1,159,458 | 2,348,714 | 3,508,172 | 508,305,117 | 0.69% |
| 2014 | 949,867 | 2,051,672 | 3,001,539 | 506,628,172 | 0.59% |
| 2013 | 913,612 | 1,881,641 | 2,795,253 | 503,721,187 | 0.55% |
| Three-Year Average | 1,007,646 | 2,094,009 | 3,101,655 | 506,218,159 | 0.61% |

Table of Contents



The table below sets forth information relating to the number of shares available for issuance with respect to the equity compensation plans available to directors, officers, employees and consultants of the Company at December 31, 2015.

| Shares Subject to Outstanding Stock Options | Shares Subject to Outstanding Full-Value Awards | Shares Remaining Available for Future Grant | Total |
|---|---|---|---|
| 7,046,098 | 3,977,682 | 16,378,707 | 27,402,487 |

As of December 31, 2015, there were approximately 15,460,362 shares of our common stock reserved and available for future awards under the 2012 Omnibus Plan and 918,345 shares of our common stock reserved and available for future awards under the 2008 Director Compensation Plan. We have not made any significant grants of awards under the 2012 Omnibus Plan or the 2008 Director Compensation Plan since December 31, 2015. The 2008 Director Compensation Plan is also a flexible authorization plan and shares issued as full value awards (that is, awards settled by issuance of common stock other than stock options or stock appreciation rights) count against the plan's share authorization at a rate of 2.27 to 1.0, while shares issues pursuant to stock options or stock appreciation rights count against the share authorization at a rate of 1.0 to 1.0.

The aggregate total of 27,402,487 shares represents an overhang of approximately 5.1% of the Company's common shares outstanding as of December 31, 2015. If the Amended 2012 Omnibus Plan is approved, the additional 25,500,000 shares requested for issuance would increase the overhang to approximately 9.4%. Overhang is calculated as the total of (a) shares underlying outstanding awards plus shares available for issuance under future equity awards, divided by (b) the total number of shares outstanding, shares underlying outstanding awards and shares available for issuance under future equity awards.

### *Section 162(m) of the Internal Revenue Code*

The Board believes that it is in the best interests of the Company and its stockholders to provide for an equity incentive plan under which awards made to the Company's executive officers may be eligible to qualify for deductibility by the Company for federal income tax purposes. Accordingly, the Amended 2012 Omnibus Plan is designed to permit the grant of awards that are intended to qualify as "performance-based compensation" not subject to the $1,000,000 deductibility cap under Section 162(m) of the IRC ("Section 162(m)"), however, there is no guarantee that amounts payable under the Amended 2012 Omnibus Plan will be treated as qualified "performance-based compensation" under Section 162(m). In general, under Section 162(m), for the Company to be able to deduct compensation in excess of $1,000,000 paid in any one taxable year to the Company's chief executive officer or any of the Company's three other most highly compensated executive officers (other than the Company's chief financial officer), such compensation must qualify as "performance-based compensation." One of the requirements of "performance-based compensation" for purposes of Section 162(m) is that when the Company has discretion in setting performance goals under which compensation may be paid, the material terms of the performance goals must be disclosed to and approved by the Company's stockholders at least once every five years. For purposes of Section 162(m), the material terms include (i) the employees eligible to receive compensation; (ii) a description of the business criteria on which the performance goal is based; and (iii) the maximum amount of compensation that can be paid to an employee under the performance goal. With respect to the various types of awards under the Amended 2012 Omnibus Plan, each of these aspects is discussed below, and, as noted above, approval of the Amended 2012 Omnibus Plan itself will constitute

Table of Contents



stockholder approval of each of these aspects of the plan for purposes of the stockholder approval requirements of Section 162(m).

### *Description of the Amended 2012 Omnibus Plan*

The Amended 2012 Omnibus Plan provides for the granting of awards in any combination of the following:

- stock options;
- stock appreciation rights;
- restricted stock and/or restricted stock units;
- performance shares and/or performance units;
- incentive awards;
- cash awards; and
- other stock-based awards.

The terms of the Amended 2012 Omnibus Plan are substantially similar to the 2012 Omnibus Plan, and include the following provisions:

– a double-trigger change-of-control provision for the accelerated vesting of equity awards (with performance-based awards vesting at actual performance);

– a "no repricing" provision that expressly prohibits the cancellation of stock options and stock appreciation rights in exchange for cash or another award or any other action that would be treated as a repricing.

The Amended 2012 Omnibus Plan also includes a limit on the total amount of compensation, including both equity and cash, which may be awarded to non-employee directors under any of the Company's compensation plans (including, without limitation, under the Amended 2012 Omnibus Plan and the Company's 2008 Director Compensation Plan). The compensation awarded to any non-employee director for any single calendar year beginning on or after January 1, 2016 may not exceed $750,000 (without regard to compensation, if any, paid to a non-employee director during any period in which such individual was an employee or consultant of the Company).

Provisions have also been included to meet the requirements for deductibility of executive compensation under Section 162(m) with respect to performance-based compensation awarded to applicable participants.

*The following is a general summary of the material provisions of the Amended 2012 Omnibus Plan and is qualified in its entirety by the full text of the Amended 2012 Omnibus Plan, which is attached to this proxy statement as Appendix A. Capitalized terms not defined in the summary are defined in the plan document.*

***Term of Plan.*** The Amended 2012 Omnibus Plan will expire 10 years from the date of stockholder approval. The Compensation Committee may, however, terminate the Amended 2012 Omnibus Plan at any time with respect to any common stock or rights which are not at that time subject to an outstanding award.

***Participants.*** Employees or Consultants, including non-employee members of the Board, are considered eligible participants under the Amended 2012 Omnibus Plan. The selection of Employees and Consultants who will receive awards is within the discretion of the Plan Administrator. As of December 31, 2015, approximately 5,800 Employees and ten non-employee members of the Board were eligible to participate in the Amended Omnibus 2012 Plan.

Table of Contents



***Shares Authorized.*** Subject to stockholder approval, with the increase of 25,500,000 shares of common stock in the Amended 2012 Omnibus Plan, a total maximum share authorization of 40,960,362 shares of common stock is reserved for issuance under the Amended 2012 Omnibus Plan, less the sum of (a) one share of Common Stock for every one share that was subject to a stock option or stock appreciation right granted under the 2012 Omnibus Plan after December 31, 2015 and prior to the Annual Meeting and (b) 2.39 shares for every one share that was granted under the 2012 Omnibus Plan as a Full Value Award after December 31, 2015 and prior to the Annual Meeting. The shares to be delivered under the Amended 2012 Omnibus Plan may be made available from any combination of shares held in Anadarko's treasury or authorized but unissued shares of Anadarko's common stock.

The Amended 2012 Omnibus Plan is a flexible authorization plan. Under the Amended 2012 Omnibus Plan, the number of aggregate shares available for issuance will be reduced by 1.0 share for each share subject to an award in the form of a stock option or stock appreciation right or 2.39 shares for each share subject to an award in the form of any Full Value Award (an award that is not a stock option or stock appreciation right that is settled in stock).

Any shares related to awards (including awards granted under the 2012 Omnibus Plan) which, after December 31, 2015, terminate by expiration, forfeiture, cancellation, or otherwise without the issuance of such shares (restricted stock forfeited back to the plan will not be considered to have been issued for this purpose) or are settled in cash in lieu of shares will again be available for grant under the Amended 2012 Omnibus Plan. However, shares of common stock that are subject to stock appreciation rights but are not issued as a result of a net settlement in shares of stock of such stock appreciation rights will not be available again for grant under the Amended 2012 Omnibus Plan. Any shares of stock withheld to satisfy tax withholding obligations, shares tendered to pay the exercise price of an award and shares repurchased on the open market with the proceeds of an option exercise will not again be available for grant. Any shares that again become available for awards under the Amended 2012 Omnibus Plan as described in this paragraph will be added as (a) one share for every share subject to a stock option or stock appreciation right and (b) 2.39 shares for every share subject to other awards.

The number of shares authorized to be issued under the Amended 2012 Omnibus Plan, as well as individual limitations and exercise prices, will be subject to adjustments for stock dividends, stock splits, recapitalizations, mergers, or similar corporate events.

Table of Contents



***Limitations on Awards.*** The Amended 2012 Omnibus Plan imposes annual per-participant award limits. The annual per-participant limits are as follows:

| Award(s) | Individual Limit |
|---|---|
| Options and Stock Appreciation Rights | Maximum of 2,500,000 shares of common stock granted during any calendar year |
| Awards (other than Options or Stock Appreciation Rights) that are denominated in shares of common stock | Maximum of 1,500,000 shares of common stock may be earned for each twelve (12) months in the vesting period or Performance Period (with the aggregate limit tied to year of grant) |
| Awards that are not denominated in shares of common stock | Maximum of $10,000,000 (including the Fair Market Value of any shares of common stock paid in satisfaction of such Awards) may be earned for each twelve (12) months in the vesting or Performance Period (with the aggregate limit tied to year of grant) |

For a new employee, each of the limits above will be multiplied by two (2) with respect to awards granted during the first calendar year employment commences. In addition, the maximum number of shares that may be issued under the Amended 2012 Omnibus Plan through incentive stock options granted on or after the date of the Annual Meeting is 10,000,000.

The Amended 2012 Omnibus Plan also includes a limit on the total amount of compensation, including both equity and cash, which may be awarded to non-employee directors under any of the Company's compensation plans (including, without limitation, the Amended 2012 Omnibus Plan and the Company's 2008 Director Compensation Plan). The compensation awarded to any non-employee director for any single calendar year beginning on or after January 1, 2016 may not exceed $750,000 (without regard to compensation, if any, paid to a non-employee director during any period in which such individual was an employee or consultant of the Company).

***Administration.*** Unless otherwise specified by the Board, the Compensation Committee is the Plan Administrator with respect to all Covered Employees and all insiders under Section 16 of the Exchange Act and the Management Committee is the Plan Administrator with respect to all other employees. The Management Committee will consist of the CEO, provided that such individual is a member of the Board, and any other member of the Board as the Board may determine from time to time. The Plan Administrator is responsible for administering the Amended 2012 Omnibus Plan and has the discretionary power to interpret the terms and intent of the Amended 2012 Omnibus Plan and any related documentation, to determine eligibility for awards and the terms and conditions of awards, to adopt rules, regulations, forms, instruments and guidelines and to exercise such powers and perform such acts as are deemed necessary or advisable to promote the best interests of Anadarko with respect to the Amended 2012 Omnibus Plan. Determinations of the Plan Administrator made under the Amended 2012 Omnibus Plan are final and binding. The Plan Administrator may designate the appropriate employees or other agents of the Company to handle the day-to-day administrative matters of the Amended 2012 Omnibus Plan.

### Award Terms

All awards to participants under the Amended 2012 Omnibus Plan are subject to the terms, conditions and limitations as determined by the Plan Administrator.

Table of Contents



***Stock Options.*** Under the Amended 2012 Omnibus Plan, participants may be granted either incentive stock options that comply with the requirements of Section 422 of the IRC or nonqualified stock options that are not intended to be treated as incentive stock options. Stock options must have an exercise price per share that is not less than the fair market value of our common stock on the date of grant, except in the case of stock options granted in assumption of, or in substitution for, outstanding awards previously granted by an acquired company or a company with which Anadarko combines. Subject to certain adjustment provisions that only apply to specified corporate events or the approval of our stockholders, the exercise price of all stock options granted under the Amended 2012 Omnibus Plan may not be repriced downward. Specifically, except pursuant to certain equitable adjustments, the Plan Administrator may not amend the terms of an outstanding stock option to reduce the exercise price, cancel it and replace it with a new stock option with a lower exercise price, or cancel an outstanding option with an exercise price above the then-current fair market value of our common stock in exchange for another type of award or cash (other than in connection with a change of control). Stock options have a maximum term of ten years from the date of grant. Participants may pay the exercise price with cash or its equivalent, with previously acquired shares of our common stock, or by any other means approved by the Plan Administrator, including by means of a broker-assisted cashless exercise.

No stock option or stock appreciation right granted under the Amended 2012 Omnibus Plan may vest in less than one year from its date of grant; provided, however, that up to five percent of the available shares under the plan as of the date of the Annual Meeting may be subject to stock options or stock appreciation rights that vest (in full or in part) in less than one year from their date of grant. In addition, any stock option or stock appreciation right granted under the Amended 2012 Omnibus Plan may vest in full or in part upon death or disability of the participant, or upon a change of control, and such vesting will not count against the five percent exception described in the preceding sentence.

***Stock Appreciation Rights.*** Stock appreciation rights may be granted under the Amended 2012 Omnibus Plan in tandem with a stock option or other award, in whole or in part, or may be granted separately. The exercise price of a stock appreciation right may not be less than the fair market value of our common stock on the date of grant, except in the case of stock appreciation rights granted in assumption of, or in substitution for, outstanding awards previously granted by an acquired company or a company with which Anadarko combines. Subject to certain adjustment provisions that only apply to specified corporate events or the approval of our stockholders, the exercise price of all stock appreciation rights granted under the Amended 2012 Omnibus Plan may not be repriced downward. Specifically, except pursuant to certain equitable adjustments, the Plan Administrator may not amend the terms of an outstanding stock appreciation right to reduce the grant price, cancel it and replace it with a new stock appreciation right with a lower grant price, or cancel an outstanding stock appreciation right with a grant price above the then-current fair market value of our common stock in exchange for another type of award or cash (other than in connection with a change of control). Stock appreciation rights have a maximum term of ten years from the date of grant. Stock appreciation rights granted under the Amended 2012 Omnibus Plan are subject to the minimum vesting requirements described above under “Stock Options.”

***Restricted Stock.*** A restricted stock award consists of shares of stock that are transferred to the participant subject to restrictions that may result in forfeiture if specified conditions are not satisfied. A holder of restricted stock is treated as a current stockholder and is entitled to voting rights and to receive dividends. The Plan Administrator may require that the dividend be paid in cash or shares on the dividend payment date or accrued and/or reinvested in additional shares and paid at the time the

Table of Contents



restricted stock vests and settles. A restricted stock unit award results in the transfer of shares of stock or cash to the participant only after specified conditions are satisfied. Rights to dividend equivalents, payable in cash or shares on the dividend payment date or accrued and/or reinvested in additional shares and paid at the time the restricted stock units vest and are settled, may be extended to and made part of any restricted stock unit award, at the discretion of the Plan Administrator. A holder of a restricted stock unit award is treated as a stockholder with respect to the award only when the shares of common stock are delivered in the future. Cash, stock, and any other property distributed as a dividend or otherwise with respect to any award of restricted stock or restricted stock units that vest based on the achievement of performance measures shall either (a) not be paid or credited or (b) be accumulated, be subject to restrictions and risk of forfeiture to the same extent as the restricted stock or restricted stock units, as applicable, and be paid at the time such restrictions and risk of forfeiture lapse.

***Performance Awards.*** A performance award (whether granted as a performance share or a performance unit) consists of a grant made subject to the attainment of one or more performance goals for a specified performance period (as determined by the Plan Administrator but not less than one year) and may be intended to meet the requirements of qualified performance-based compensation under Section 162(m). At the discretion of the Plan Administrator and as prescribed in the award agreement, payment may be made in the form of cash, shares or a combination of cash and shares. Rights to dividend equivalents, payable in cash and/or shares (including reinvestment in additional shares) and paid at the time the performance award vests and settles or at such other time as provided in the applicable award agreement, may be extended to and made part of any performance award, at the discretion of the Plan Administrator.

***Incentive Awards.*** Incentive awards consist of grants denominated in cash and may be intended to meet the requirements of qualified performance-based compensation under Section 162(m). The Plan Administrator will determine the performance goals applicable to the payout for incentive awards to Covered Employees for each performance period. The Compensation Committee cannot adjust an incentive award upward for a participant, but retains the discretion to adjust the incentive award downward. At the discretion of the Plan Administrator, payment of incentive awards may be made in cash, shares of common stock and/or other equity-based awards as provided under the Amended 2012 Omnibus Plan and will be paid no later than March 15 following the end of the calendar year for which determinations with respect to the incentive awards are made.

For any awards intended to meet the requirements of Section 162(m), the grant or vesting of such awards may be based upon one or more performance goals that apply to the specified participant, one or more business units of the Company, or the Company as a whole. Prior to the payment of any award based on the achievement of performance goals intended to qualify under Section 162(m), the Compensation Committee must certify in writing that the applicable performance goals and any

Table of Contents



material terms were, in fact, satisfied. The performance goals intended to qualify compensation as performance-based compensation for purposes of Section 162(m) are:

| | | | |
|---|---|---|---|
| Financial Goals: | • Earnings<br>• Revenues<br>• Debt level<br>• Cost reduction targets<br>• Interest-sensitivity gap levels<br>• EBITDAX<br>• Debt/average daily production | • Earnings per share<br>• Cash flow from operations<br>• Equity ratios<br>• Capital expended<br>• Weighted average cost of capital<br>• Return on assets<br>• Debt/proved developed reserves | • Net income<br>• Free cash flow<br>• Expenses<br>• Working capital<br>• Operating or profit margin<br>• Return on equity or capital employed or investment<br>• Debt/proved reserves |
| Operating Goals: | • Amount of the oil and/or gas reserves<br>• Lease operating expense or lease operating expense/barrels of oil equivalent | • Oil and/or gas reserve additions<br>• Costs of finding and/or developing oil and/or gas reserves<br>• Operating costs | • Oil and/or gas replacement ratios<br>• Natural gas and/or oil production or sales |
| Corporate and Other Goals: | • Total stockholder return<br>• Asset quality levels<br>• Investments<br>• Satisfactory internal or external audits<br>• Achievement of balance sheet or income statement objectives<br>• General and administrative expenses | • Market share<br>• Assets<br>• Asset sale targets<br>• Value of assets<br>• Employee retention/attrition rates<br>• Improvement of financial ratings | • Charge-offs<br>• Non-performing assets<br>• Fair market value of common stock<br>• Regulatory compliance<br>• Safety targets<br>• Economic value added<br>• Production growth per net debt adjusted share |

The Plan Administrator may adjust the performance goals to include or exclude the impact of an event or occurrence which the administrator determines should appropriately be included or excluded, including, without limitation, extraordinary, unusual or infrequent items or events, charges, gains or losses on the disposition of business units, losses from discontinued operations, restatements and accounting changes and other unplanned special charges such as restructuring expenses, acquisitions, acquisition expenses, including expenses related to goodwill and other intangible assets, stock offerings, stock repurchases and loan loss provisions. The Plan Administrator may also provide for the manner in which performance will be measured against the performance goals (or may adjust the performance goals) to reflect the impact of specified corporate transactions, a change in capitalization, special charges, accounting policy changes and tax law changes. In addition, the Plan Administrator may make such adjustments to the performance goals applicable to participants who are not "covered employees" under Section 162(m) as it determines are appropriate. Such adjustments may occur at the time of the granting of an award, or at any time thereafter, but, in the case of "covered employees," only to the extent permitted by Section 162(m).

***Cash Awards and Other Stock-Based Awards.*** Cash awards may be made to participants as determined by the Plan Administrator. The Plan Administrator will determine the terms and conditions of such cash awards, including whether the payout of such awards is subject to the achievement of performance goals.

Table of Contents



Other stock-based awards may be equity-based or equity-related awards other than stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares or performance units. The terms and conditions of other stock-based awards will be determined by the Plan Administrator. Payment under any other stock-based awards may be made in common stock or cash, as determined by the Plan Administrator.

***Termination of Service.*** Unless otherwise specified in a participant's award agreement, all unvested and/or unexercisable awards will automatically be forfeited upon termination of service. With respect to options or stock appreciation rights, the participant will have at least three months following termination in which to exercise the vested portion of the awards (but in no event beyond the maximum term of such awards). In the event of a termination for cause (as defined in the Amended 2012 Omnibus Plan), all of a participant's awards, whether vested or unvested, exercisable or unexercisable, will automatically be forfeited unless provided otherwise in an award agreement. The Plan Administrator will have sole discretion for determining termination provisions for awards.

***Treatment of Awards Upon a Change of Control.*** The Amended 2012 Omnibus Plan contains a "double trigger" provision, such that awards will not vest unless a participant incurs a qualifying termination in connection with a change in control. Specifically, unless otherwise provided in a participant's award or other agreement, in the event of both the occurrence of a change of control of Anadarko and the termination of the participant's employment without cause or for good reason during the participant's applicable protection period, any outstanding stock option or stock appreciation right will become fully exercisable, and any outstanding performance share, performance unit, restricted stock, restricted stock unit, other stock-based award or other cash award that was forfeitable will become non-forfeitable and fully vest; provided, however, that any performance-based awards will vest only to the extent the underlying performance goals are satisfied, with the amount of vesting based on actual performance. Unless provided otherwise in an award agreement, all other stock-based awards held by a non-employee member of the Board will generally be paid to the participant within thirty days after the date of a change of control, except that no such awards will be paid to the participant if he or she continues to serve as a member of the Board or upon the board of directors of the Company's successor, until such time such awards would otherwise be paid.

***Clawback Provision.*** Each participant's award shall be conditioned on repayment or forfeiture in accordance with any Company policy, applicable law, including the Sarbanes-Oxley Act of 2002 and/or the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, and any relevant provisions in the related award agreement.

***Transferability of Awards.*** Award rights may not be transferred, assigned, pledged or hypothecated in any manner other than by will or by the applicable laws of descent and distribution unless the Participant has received the Plan Administrator's prior written consent. However, as outlined in the Amended 2012 Omnibus Plan, certain transfers may be made to permitted transferees upon approval of the Plan Administrator.

***Amendment to the Plan.*** Subject to approval of the Board under certain circumstances, the Compensation Committee may amend the Amended 2012 Omnibus Plan as it may deem proper and in the best interests of Anadarko, provided however that to the extent required by applicable law, regulation or stock exchange rule, stockholder approval will be required. No change can be made to any award granted under the Amended 2012 Omnibus Plan without the consent of the participant if such change would impair the right of the participant under the provisions of the award to acquire or retain common stock or cash that the participant may have otherwise acquired.

Table of Contents



## *United States Federal Income Tax Consequences*

The following is a brief description of the federal income tax treatment that will generally apply to awards made under the Amended 2012 Omnibus Plan, based on federal income tax laws currently in effect. The summary is not intended to be exhaustive and, among other things, does not describe state, local or foreign income and other tax consequences. The exact federal income tax treatment of an award will depend on the specific nature and form of such award.

***Incentive Stock Options.*** An employee generally will not recognize taxable income upon grant or exercise of an incentive stock option. However, the amount by which the fair market value of the shares on the exercise date of an incentive stock option exceeds the purchase price generally will constitute an item of adjustment for alternative minimum tax purposes, and may therefore result in alternative minimum tax liability to the option holder. Incentive stock option tax treatment will be available only if the participant has been an employee of Anadarko or its subsidiaries within three months of the date of exercise. Anadarko will not be entitled to any business expense deduction on the grant or exercise of an incentive stock option. If the employee has held the shares acquired upon exercise of an incentive stock option for at least two years after the date of grant and for at least one year after the date of exercise, upon disposition of the shares by the employee, the difference, if any, between the sales price of the shares and the exercise price of the option will be treated as a long-term capital gain or loss. If the employee does not satisfy these holding period requirements (a “disqualifying disposition”), the employee will generally recognize ordinary income for the year of disposition, in an amount equal to the excess of the fair market value of the shares on the date the option was exercised over the option exercise price (or, if less, the amount realized upon disposition over the exercise price). Any excess of the amount realized by the employee on the disqualifying disposition over the fair market value of the shares on the date of exercise of the option will be a short-term capital gain. Anadarko generally will be entitled to a deduction in the year of disposition equal to the amount of ordinary income recognized by the employee. The employee’s basis in the shares acquired upon exercise of an incentive stock option is equal to the exercise price paid, plus any amount includible as ordinary income as a result of a disqualifying disposition. A subsequent disqualifying disposition of shares acquired upon exercise of an incentive stock option will eliminate the alternative minimum taxable income adjustment if the disposition occurs in the same taxable year as the exercise. A disqualifying disposition in a subsequent taxable year will not affect the alternative minimum tax computation in the earlier year.

***Nonqualified Stock Options.*** An employee will not recognize any income at the time of grant of a nonqualified stock option and Anadarko will not be entitled to a tax deduction with respect to such grant. Generally, upon exercise of a nonqualified stock option, the employee will recognize ordinary income in an amount equal to the amount by which the fair market value of the shares on the date of exercise exceeds the exercise price of the option. Subject to any deduction limitation under Section 162(m) (which is discussed below), Anadarko will be entitled to a federal income tax deduction in the year of exercise in the same amount as the taxable compensation recognized by the employee. The employee’s basis in the stock for purposes of measuring the amount of gain will be the exercise price paid to Anadarko plus the amount of compensation includible in income at the time of exercise. An employee’s subsequent disposition of shares acquired upon the exercise of a nonqualified stock option will ordinarily result in long-term or short-term capital gain or loss, depending on the holding period of the shares.

Table of Contents



Generally, the shares received on exercise of an option or stock appreciation right under the Amended 2012 Omnibus Plan are not subject to restrictions on transfer or risks of forfeiture and, therefore, the participant will recognize income on the date of exercise of a nonqualified stock option or stock appreciation right. However, if the optionee is subject to Section 16(b) of the Exchange Act, the Section 16(b) restriction will be considered a substantial risk of forfeiture for tax purposes. Under current law, employees who are either directors or officers of the Company will be subject to restrictions under Section 16(b) of the Exchange Act during their term of service and for up to six months after termination of service. Exchange Act Rule 16b-3 provides an exemption from the restrictions of Section 16(b) for the grant of derivative securities, such as stock options, under qualifying plans. The Amended 2012 Omnibus Plan is intended to satisfy the requirements for exemption under Exchange Act Rule 16b-3. Therefore, the grant of awards will not be considered a purchase and the exercise of the awards to acquire the underlying shares of the Company common stock will not be considered a purchase or a sale. Thus, ordinary income will be recognized and measured on the date of exercise.

***Payment of Option Exercise Price in Shares.*** If a nonqualified option is exercised by tendering previously owned shares of Anadarko common stock in payment of the exercise price, then, instead of the treatment described above, the tender generally will not be considered a taxable disposition of the previously owned shares and no gain or loss will be recognized with respect to the equivalent number of new shares (the “exchanged shares”) acquired at the time of exercise. The employee’s basis and holding period for the exchanged shares will be the same as the previously owned shares exchanged. The employee will, however, have ordinary income equal to the fair market value on the date of exercise of the new additional shares received in excess of the number of exchanged shares. The employee’s basis in the new additional shares will be equal to the amount of such compensation income and the holding period will begin on the date of exercise. However, if an incentive stock option is exercised by tendering previously owned shares of Anadarko common stock in payment of the exercise price, if the previously owned shares were acquired on the exercise of an incentive stock option and have not satisfied statutory holding period requirements, a disqualifying disposition will occur and the employee will recognize income and be subject to other basis allocation and holding period adjustments with respect to the exchanged shares.

***Stock Appreciation Rights and Performance Awards.*** When stock appreciation rights are exercised or when performance awards are settled or paid, the amount of cash and the fair market value of property received by the employee (including shares) will be ordinary income, unless the property is subject to transfer restrictions or forfeiture.

***Restricted Stock.*** Restricted Stock granted under the Amended 2012 Omnibus Plan may, in the determination of the Plan Administrator, be subject to rights of repurchase, forfeiture and other transfer restrictions. The tax consequences of stock granted under the Amended 2012 Omnibus Plan depends on whether the stock is subject to restrictions and, if so, whether the restrictions are deemed to create a “substantial risk of forfeiture” under Section 83 of the IRC (for example, stock granted under the Amended 2012 Omnibus Plan that is subject to forfeiture if the employee terminates employment prior to the time the restrictions lapse, which right lapses over a period of continued employment, is considered a “substantial risk of forfeiture” under Section 83 of the IRC). If stock is not subject to a “substantial risk of forfeiture,” the employee normally will recognize taxable ordinary income equal to the value of the stock on the date on which the stock is granted less any amount paid for that stock. If the stock is subject to a “substantial risk of forfeiture,” the employee normally will

Table of Contents



recognize taxable ordinary income as and when the "substantial risk of forfeiture" lapses in the amount equal to the fair market value of the shares at the time they are no longer subject to the "substantial risk of forfeiture" less the amount paid for the stock. Upon disposition of the stock, the employee will recognize a capital gain or loss equal to the difference between the selling price and the sum of the amount paid for the stock plus any amount recognized as ordinary income upon grant or vesting of the stock. The gain or loss will be long- or short-term depending on how long the employee held the stock.

A recipient of stock subject to a "substantial risk of forfeiture" may make an election under IRC Section 83(b) to recognize ordinary income on the date the employee receives the restricted stock, rather than waiting until the "substantial risk of forfeiture" lapses. If the employee makes a Section 83(b) election, the employee will be required to recognize as ordinary income on the date the employee receives the stock grant the difference, if any, between the fair market value of the stock on the award date and the purchase price paid. If the employee makes a Section 83(b) election, the employee will not be required to recognize any income when the "substantial risk of forfeiture" lapses.

The shares acquired will have a cost basis equal to the fair market value on the date the restrictions lapse (or the date of grant if a Section 83(b) election is made). When the employee disposes of the shares acquired, any amount received in excess of the share's cost basis will be treated as long- or short-term capital gain, depending upon the holding period of the shares. If the amount the employee receives is less than the cost basis of the shares, the loss will be treated as long- or short-term capital loss, depending upon the holding period of the shares.

***Other Awards.*** In addition to the types of awards described above, the Amended 2012 Omnibus Plan authorizes certain other awards that may include payments in cash, common stock, or a combination of cash and common stock. The tax consequences of such awards will depend upon the specific terms of such awards. Generally, however, a participant who receives an award payable in cash will recognize ordinary income with respect to such award at the earliest time at which the participant has an unrestricted right to receive the amount of the cash payment, and the Company will be entitled to a corresponding deduction at that time. In general, the sale or grant of stock to a participant under the Amended 2012 Omnibus Plan will be a taxable event at the time of the sale or grant if such stock at that time is not subject to a substantial risk of forfeiture or is transferable within the meaning of Section 83 of the IRC in the hands of the participant. (For such purposes, stock is ordinarily considered to be transferable if it can be transferred to another person who takes the stock free of any substantial risk of forfeiture.) In such case, the participant will recognize ordinary income, and the Company will be entitled to a deduction, equal to the excess of the fair market value of such stock on the date of the sale or grant over the amount, if any, paid for such stock. Stock that at the time of receipt by a participant is subject to a substantial risk of forfeiture and that is not transferable within the meaning of Section 83 generally will be taxed under the rules applicable to Restricted Stock as described above.

***Other Tax Issues.*** The terms of awards granted under the Amended 2012 Omnibus Plan may provide for accelerated vesting or payment of an award in connection with a change of control of the Company. In that event and depending upon the individual circumstances of the recipient, certain amounts with respect to such awards may constitute "excess parachute payments" under the "golden parachute" provisions of the IRC. Pursuant to these provisions, a participant will be subject to a 20% excise tax on any "excess parachute payments" and the Company will be denied any deduction with respect to such payment.

Table of Contents



In general, Section 162(m) imposes a $1,000,000 limit on the amount of compensation that may be deducted by the Company in any tax year with respect to the Company's NEOs (excluding the Company's Chief Financial Officer), including any compensation relating to an award granted under the Amended 2012 Omnibus Plan. Compensation that is considered to be performance-based will not have to be taken into account for purposes of the $1,000,000 limitation, and accordingly, should be deductible by the Company without limitation under Section 162(m). Provided an option is approved by a committee comprised of two or more "outside directors," has an exercise price of at least fair market value on the date of grant, the plan under which the option is granted imposes a per person limit on the number of shares covered by awards and the material terms of the plan under which the option is granted have been disclosed to and approved by stockholders, any compensation deemed paid by the Company in connection with the disqualifying disposition of incentive stock option shares or the exercise of non-statutory options will qualify as performance-based compensation for purposes of Section 162(m). An award may also qualify as performance-based compensation if the administrator conditions the grant, vesting, or exercisability of such an award on the attainment of a pre-established objective performance goal.

If any award granted under the Amended 2012 Omnibus Plan is considered deferred compensation under IRC Section 409A, then certain requirements must be met for the deferral to be effective for federal tax purposes. These requirements include: ensuring that any election to defer made by the employee is done within the time period(s) permitted by Section 409A; certain limitations on distributions; and, the prohibition of accelerating the time or schedule of any payment of deferred amounts except in certain permitted circumstances. If these requirements are not met, the employee will be immediately taxable on such purportedly deferred amounts, a penalty of 20% will be imposed, and interest will accrue at the underpayment rate plus one percent on the underpayments that would have occurred had the compensation been includible in the taxable year in which first deferred or, if later, the first taxable year in which such deferred compensation is not subject to a substantial risk of forfeiture.

The taxable income resulting to employees from awards under the Amended 2012 Omnibus Plan, other than incentive stock options, will constitute wages subject to withholding and the Company will be required to make whatever arrangements are necessary to ensure that funds equaling the amount of tax required to be withheld are available for payment, including the deduction of required withholding amounts from the employee's other compensation and requiring payment of withholding amounts as part of the exercise price or as a condition to receiving shares pursuant to an award. The Company will generally be required to withhold applicable taxes with respect to any ordinary income recognized by an employee in connection with awards made under the Amended 2012 Omnibus Plan. Whether or not such withholding is required, the Company will report such information to the Internal Revenue Service as may be required with respect to any income attributable to transactions involving awards.

Unless an election has been made under Section 83(b) of the IRC, dividends paid on the restricted shares prior to the lapse of restrictions will be taxable as additional compensation income to the recipient in the year received and subject to withholding.

### *New Plan Benefits*

All awards granted under the Amended 2012 Omnibus Plan are subject to the discretion of Anadarko's Compensation Committee, Management Committee or the Board of Directors, as appropriate. Therefore, the total benefits that will be received by any particular person or group under the Amended 2012 Omnibus Plan are not determinable at this time. Therefore, the New Plan Benefits Table is not provided.

Table of Contents

# Amended and Restated 2012 Omnibus Incentive Compensation Plan

## 2012 Omnibus Plan Stock Options

The following table sets forth, for each of our named executive officers and certain groups, the number of shares of our common stock that are subject to outstanding stock option grants under the 2012 Omnibus Plan as of December 31, 2015. No stock option awards have been granted under the 2012 Omnibus Plan to any associate of a non-employee director, nominee or executive officer, and no other person has been granted five percent or more of the total amount of awards granted under the 2012 Omnibus Plan.

| | Number of Shares of Common Stock Subject to Stock Options |
|---|---|
| R. A. Walker<br>Chairman, President and Chief Executive Officer(1) | 643,109 |
| Robert G. Gwin<br>Executive Vice President, Finance and Chief Financial Officer | 228,786 |
| Robert P. Daniels<br>Executive Vice President, International and Deepwater Exploration | 234,205 |
| Robert K. Reeves<br>Executive Vice President, Law and Chief Administrative Officer | 178,898 |
| James J. Kleckner<br>Executive Vice President, International and Deepwater Operations | 169,340 |
| All current executive officers as a group (8 persons) | 1,578,947 |
| All current non-executive directors as a group (10 persons)(2) | 0 |
| All current employees, including all current officers who are not executive officers, as a group (approximately 5,800 persons) | 1,954,183 |

(1) Mr. Walker is also a nominee for election as a director.

(2) All current non-executive directors are nominees for election as a non-employee director, and there are no additional nominees for election as a non-employee director.

The approval of the Amended 2012 Omnibus Plan requires the affirmative vote of a majority of the stock entitled to vote and present in person or by proxy at the Annual Meeting. Abstentions are counted as votes present and entitled to vote and have the same effect as votes against the proposal. Broker non-votes are not counted as either votes for or votes against the proposal.

Table of Contents



## Equity Compensation Plans Table

The table below sets forth information relating to the number of shares authorized for issuance with respect to the equity compensation plans available to directors, officers, employees, and consultants of the Company at December 31, 2015. The closing price of a share of Anadarko common stock as reported by the NYSE on March 15, 2016, was $47.02.

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants, and rights | (b) Weighted-average exercise price of outstanding options, warrants, and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column(a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 7,046,098 | $71.86 | 16,378,707 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 7,046,098 | $71.86 | 16,378,707 |

**FOR THE REASONS STATED ABOVE, THE BOARD RECOMMENDS THAT YOU VOTE “FOR” THE APPROVAL OF AN AMENDMENT AND RESTATEMENT OF THE 2012 OMNIBUS INCENTIVE COMPENSATION PLAN.**

Table of Contents

# Advisory Vote to Approve Executive Compensation

## ITEM 4 — ADVISORY VOTE TO APPROVE THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, along with section 14A of the Exchange Act enacted thereunder, enables our stockholders to vote to approve, on a non-binding advisory basis, the compensation of the Company's NEOs, as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules. The Board recognizes the importance of our stockholders' opportunity for an advisory say-on-pay vote as a means of expressing views regarding the compensation practices and programs for our NEOs. Based upon the outcome of our 2011 say-on-pay frequency vote, the Company will hold an annual advisory say-on-pay vote at our annual meeting of stockholders until the next say-on-pay frequency vote, which, in accordance with applicable law, will occur no later than the Company's annual meeting of stockholders in 2017.

As described in detail in the Letter from the Chairman of the Compensation Committee on page 33 and under the heading Compensation Discussion and Analysis beginning on page 34, the Compensation Committee believes that the main objective of our executive compensation programs is to pay for performance and align executive officers' interests with stockholder interests. We structure pay to support our business objectives with appropriate rewards for short-term operating results and long-term stockholder value creation. Accordingly, our compensation philosophy recognizes the value of rewarding our executive officers for their performance and motivating them to continue to excel in the future.

The incentive compensation earned and paid to our NEOs and the decisions made by the Compensation Committee in 2015 reflect the pay-for-performance alignment of our executive compensation programs and adherence to our compensation philosophy. Specifically:

- While the Company's actual performance against each goal resulted in a near maximum payout, in light of the challenging commodity-price environment and its impact on stockholders, the uncertainty in setting AIP goals for 2015 and other factors, the Compensation Committee exercised significant downward discretion to reduce the payout under the AIP to slightly above target. In light of the significant efforts and contributions of the executive officers in achieving the strong operational performance, the Compensation Committee determined that an AIP payout slightly above target was appropriate.

- Under our long-term incentive program, the relative TSR performance for the two- and three-year performance periods ended December 31, 2015, was below the median of our peers and our NEOs earned below-target payouts of 92% and 72% (out of a maximum 200%) of their performance units for the respective periods.

- The Compensation Committee determined that the target total compensation opportunity for the NEOs should remain substantially flat year-over-year and that no changes should be made to their base salaries, target bonus opportunities, and the target grant value of annual long-term incentive awards.

Table of Contents

# Advisory Vote to Approve Executive Compensation

As described on page 39, our executive compensation programs consist of several practices that we believe contribute to good governance. These practices include the following:

| What We Do | What We Don't Do |
|---|---|
| ✓ Structure more than 85% Pay to Be At-Risk | ✗ No Employment Contracts |
| ✓ Emphasize Long-Term Performance | ✗ No Tax Gross-Ups on Perquisites |
| ✓ Provide for Double-Trigger Equity Acceleration Upon a Change of Control | ✗ No New Excise Tax Gross-Ups since 2011 |
| ✓ Maintain a Competitive Compensation Package | ✗ No Hedging or Pledging of Company Stock |
| ✓ Require Robust Stock Ownership | ✗ No Permitted Short Sales or Derivative Transactions in Company Stock |
| ✓ Provide for Clawback Provisions Applicable to Incentive Awards | ✗ No Payment of Current Dividends or Dividend Equivalents on Unvested Awards |
| ✓ Consider Deductibility When Structuring Compensation | ✗ No Repricing of Stock Options and Stock Appreciation Rights |

Please read the Compensation Discussion and Analysis beginning on page 34 for additional details about our executive compensation programs, including information about the compensation of our NEOs during 2015.

The Board has determined that the Company's NEO compensation aligns with our business strategy, focuses on long-term value creation for our stockholders and delivers competitive pay relative to our performance.

**THE BOARD RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE APPROVAL, ON AN ADVISORY BASIS, OF THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION AS DISCLOSED IN THIS PROXY STATEMENT PURSUANT TO THE COMPENSATION DISCLOSURE RULES OF THE SECURITIES AND EXCHANGE COMMISSION, WHICH DISCLOSURE SHALL INCLUDE THE COMPENSATION DISCUSSION AND ANALYSIS, THE SUMMARY COMPENSATION TABLE, AND THE RELATED TABLES AND DISCLOSURE IN THIS PROXY STATEMENT.**

Table of Contents



## ITEM 5 — STOCKHOLDER PROPOSAL — PROVIDE A REPORT ON CARBON RISK

The Park Foundation Inc., located at P.O. Box 550, Ithaca, NY 14851, telephone (607) 272-9124, is the beneficial owner of more than $2,000 worth of the Company's common stock, and has notified the Company that it intends to present the following resolution at the meeting for action by the stockholders.

### *What is the Proposal?*

**WHEREAS:**

Investors require information on how Anadarko Petroleum is preparing for the likelihood that demand for oil and gas may be significantly reduced due to regulation or other climate-associated drivers, increasing risk for stranding some portion of its reserves.

Recognizing the severe risks associated with a warming climate, global governments have agreed that increases in global temperature should be held below 2 degrees Celsius. (Cancun). To achieve this goal, the International Energy Agency states that "No more than one-third of proven reserves of fossil fuels can be consumed prior to 2050… ." (2012). HSBC notes that the equity valuation of oil producers could drop by 40 to 60 percent under such a low carbon consumption scenario. (2013). The Bank of England's Governor has also recognized carbon asset risk and the potential for 2 degree climate regulation to "render the vast majority of reserves 'stranded.'" (2015).

In addition to the increasing likelihood of global carbon agreements or treaties, demand for oil is being effected by carbon-related fuel economy standards, air quality policies, competition from renewables, and technology substitution as highlighted, for instance, by China's electric vehicle policy.

Further, global oil demand growth is projected to slow in 2016. (lEA Oil Market Report 2015). The International Energy Agency also forecasts global oil demand will peak by 2020 under a 2 degree scenario. (November, 2014).

Anadarko's investments in high cost projects, including a range of deep and ultra-deepwater projects, make its reserves increasingly less competitive and at higher risk of stranding in a carbon-constrained market. Of note, BlackRock warns that fossil fuel reserves are at risk of being devalued through climate risks and that it is "cautious on companies with high-cost reserves." (*Price of Climate Change*, 2015).

Given the likelihood of increased carbon regulation and associated demand reduction, Anadarko's investments in high cost projects are increasingly at risk of stranding, especially in an over-supplied world market. Investors are concerned that Anadarko is not adequately accounting for these risks, while competitors such as BHP Billiton have begun acknowledging the potential for stranded assets. Investors require additional information on whether and how the company is preparing for these changing market conditions.

**THEREFORE BE IT RESOLVED:**

Shareholders request Anadarko to prepare and publish a scenario analysis report by September 2016, omitting proprietary information, describing how the Company will address the risk of stranded assets presented by global climate change and associated demand reductions for oil and gas, including analysis of long and short term financial and operational risks to the company.

Table of Contents



**SUPPORTING STATEMENT:**

We recommend the report:

- Evaluate a range of low-carbon, low-demand scenarios, including a scenario where two thirds of current reserves cannot be monetized before 2050;
- Provide a range of capital allocation strategies for such low-demand scenarios, including diversifying capital investment or returning capital to shareholders;
- Provide information on carbon price and crude oil price assumptions used in each scenario.

### *What does the Board recommend?*

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "AGAINST" THE ABOVE STOCKHOLDER PROPOSAL FOR THE FOLLOWING REASONS:**

The Board believes that there is minimal risk to the Company arising from low carbon, low-demand scenarios. The International Energy Agency's (IEA) central reference scenario estimates that energy use worldwide is set to grow by one-third by 2040. In addition, the IEA projects that in 2040, just under 75 percent of global energy demand is expected to be met by fossil fuels. In the electricity sector in the U.S. as projected by the Energy Information Agency (EIA) under multiple scenarios, natural gas is expected to increase as a generation fuel. In light of the Company's current reporting on environmental stewardship, steps taken to assess various potential risks associated with climate change, and engagement in independent studies, combined with the important role the Company believes oil and natural gas are expected to continue to play for the next quarter-century and more in meeting the energy demands of our world, the Board believes that the requested report would result in an unnecessary and unproductive use of the Company's time and resources.

Strong Future Demand

Anadarko follows energy commodity markets and demand projections very closely. Current EIA projections in its Annual Energy Outlook 2015 indicate that the United States is expected to become a net exporter of natural gas over the next several years, with export growth continuing through 2040. The EIA states that the growth in U.S. energy production will be led by crude oil and natural gas and there will be an increase in reliance on domestic energy supplies. Further, the EIA states U.S. export growth will continue after 2017, with net exports in 2040 ranging from 3.0 trillion cubic feet (Tcf) in its low oil price case to 13.1 Tcf in its high oil and natural gas resource case. The Company continually evaluates various commodities pricing scenarios in its risk assessment processes, given current and pending regulations, state and federal administrations, and commodities demand for all existing and new projects.

Risk Assessment

Anadarko maintains a GHG and Air Quality Committee (GHG Committee) that is comprised of Company subject matter experts who report annually to the Governance and Risk Committee of the Board. The GHG Committee's charter can be found on the Company's website at: http://www.anadarko.com/content/documents/apc/Responsibility/GHG_and_Air_Quality_ Committee_Charter.pdf. Among other responsibilities and goals, the GHG Committee assists management with monitoring the science of climate change and the Company's measures to reduce

Table of Contents



GHG emissions, recommending assessment of various risks, and overseeing evaluation of GHG emission programs in an effort to maximize the commercial value of GHG emission management. During 2015, the GHG Committee supported the Company's continued focus on the following efforts to assess and reduce risk associated with GHG emissions.

*Evaluating and Reporting on Risk:* Anadarko annually reports climate-related risks and opportunities to the Carbon Disclosure Project (CDP) and will continue to do so in 2016, with respect to 2015 data. As part of this disclosure, for each identified risk, Anadarko reports potential financial implications, methods for mitigation, and costs of mitigation. Anadarko's reports can be found on the Company's website at http://www.anadarko.com/Responsibility/Sustainable-Development/HSE/Greenhouse-Gas-Management/.

Anadarko currently considers regulatory risks around air and GHG emissions to have no significant unmanageable impacts to its operations and revenues based on its strategy to address compliance requirements and its deep, balanced and diversified portfolio and the flexibility it affords. Specifically, Anadarko is among the largest producers of clean-burning natural gas in the U.S. Natural gas is a low-carbon alternative supported by state and federal administrations to reduce global GHG emissions, while providing reliable, efficient and affordable energy to consumers.

*Improving Data and Science:* We regularly evaluate and assess the emissions from key sources and work to develop strategies to reduce emissions. Based on a historical evaluation, Anadarko's GHG emissions were lower than the industry average. Anadarko also supports and participates in ongoing GHG emission-mitigation research. For example, Anadarko partnered with the Environmental Defense Fund (EDF) and university research teams to conduct studies based on sound scientific principles to assess emissions, find and more accurately measure leaks and releases across the natural gas supply chain, and ultimately reduce them. The final report summarizing all 16 methane studies is expected to be released in early 2016. For more information on Anadarko's efforts around improving data and science, visit Anadarko's GHG website noted above.

*Designing Facilities and Implementing Technologies to Reduce Emissions:* Anadarko's record of continuous environmental improvement is also demonstrated by its actions in the field, where best practices are incorporated into its operations. The Company recognizes that technology is key to reducing methane emissions and ensuring our product is captured and moved into the sales line. For more information on the specific projects, technologies and best practices employed, visit Anadarko's GHG and Air Quality websites noted above.

*Supporting Sound Public Policy and Effective Regulations:* We are committed to working with governmental agencies and other stakeholders in developing sound public policy that promotes appropriate and effective regulations, recognizing that oil and natural gas are essential to modern life and critical to the success of our economy. For more information on the specific projects, technologies and best practices employed, visit Anadarko's GHG and Air Quality websites noted above.

Conclusion

In light of EIA projections and our ongoing, leading practices to identify, assess, manage, and reduce GHG emissions, Anadarko anticipates that natural gas demand may increase as consumer preferences continue to shift toward it as a cleaner, more affordable and scalable option to meet growing energy needs. To implement the stockholder proposal, the Company would be required to engage in speculation on a variety of matters, including future possible restrictions on carbon

Table of Contents



emissions and the reaction and conduct of consumers in response to any such regulations. The assumptions resulting from such speculation could impact the practical value of any such report.

For these reasons, the Board believes that the risk to the Company arising from low carbon, low-demand scenarios is minimal and that the requested report would result in an unnecessary and unproductive use of the Company's time and resources and therefore negatively burden stockholder value.

**THE BOARD RECOMMENDS THAT YOU VOTE "AGAINST" THIS STOCKHOLDER PROPOSAL.**

BY ORDER OF THE BOARD OF DIRECTORS



Amanda M. McMillian
Senior Vice President, General Counsel,
Corporate Secretary and Chief Compliance Officer

Dated: March 18, 2016
The Woodlands, Texas

***See enclosed proxy card — please vote promptly***

Table of Contents

**ANADARKO PETROLEUM CORPORATION**

**2012 OMNIBUS INCENTIVE COMPENSATION PLAN**

**(As Amended and Restated Effective as of , 2016)**

## Appendix A

Table of Contents

# Appendix A

## TABLE OF CONTENTS


| | | |
|---|---|---|
| SECTION 1 PURPOSES; PRIOR PLAN | | A-1 |
| SECTION 2 DEFINITIONS | | A-1 |
| 2.1 | Award | A-1 |
| 2.2 | Award Agreement | A-1 |
| 2.3 | Beneficiary | A-2 |
| 2.4 | Board | A-2 |
| 2.5 | Cash Awards | A-2 |
| 2.6 | Cause | A-2 |
| 2.7 | Change in Capitalization | A-2 |
| 2.8 | Change of Control | A-2 |
| 2.9 | Code | A-4 |
| 2.10 | Common Stock | A-4 |
| 2.11 | Company | A-4 |
| 2.12 | Consultant | A-4 |
| 2.13 | Covered Employee | A-4 |
| 2.14 | Dividend Payment Date | A-4 |
| 2.15 | Effective Date | A-4 |
| 2.16 | Employee | A-4 |
| 2.17 | Employer | A-4 |
| 2.18 | Exchange Act | A-4 |
| 2.19 | Fair Market Value | A-4 |
| 2.20 | Full Value Award | A-5 |
| 2.21 | Good Reason | A-5 |
| 2.22 | Incentive Award | A-5 |
| 2.23 | Incentive Stock Option | A-5 |
| 2.24 | Management Committee | A-5 |
| 2.25 | Maximum Grant | A-5 |
| 2.26 | Nonqualified Option | A-5 |
| 2.27 | Option | A-5 |
| 2.28 | Option Price | A-5 |
| 2.29 | Other Stock-Based Award | A-6 |
| 2.30 | Participant | A-6 |
| 2.31 | Performance Goals | A-6 |
| 2.32 | Performance Period | A-7 |
| 2.33 | Performance Shares | A-7 |
| 2.34 | Performance Units | A-7 |
| 2.35 | Permitted Transferee | A-7 |
| 2.36 | Plan | A-7 |
| 2.37 | Plan Administrator | A-8 |
| 2.38 | Prior Plan | A-8 |
| 2.39 | Restricted Stock | A-8 |
| 2.40 | Restricted Stock Units | A-8 |
| 2.41 | Restriction Period | A-8 |
| 2.42 | Rule 16b-3 | A-8 |
| 2.43 | Section 16 Insider | A-8 |
| 2.44 | Section 162(m) | A-8 |

Table of Contents




| | | |
|---|---|---|
| 2.45 | Section 409A | A-8 |
| 2.46 | Securities Act | A-8 |
| 2.47 | Stock Appreciation Right | A-8 |
| 2.48 | Subsidiary | A-8 |
| 2.49 | Termination of Service | A-9 |
| SECTION 3 ADMINISTRATION | | A-9 |
| 3.1 | Plan Administrator | A-9 |
| 3.2 | Authority of Plan Administrator | A-9 |
| 3.3 | Indemnification of Plan Administrator | A-10 |
| 3.4 | Delegation to Management Committee | A-10 |
| SECTION 4 ELIGIBILITY | | A-11 |
| SECTION 5 SHARES AVAILABLE FOR THE PLAN | | A-11 |
| 5.1 | Aggregate Shares | A-11 |
| 5.2 | Individual Limitations | A-12 |
| 5.3 | Adjustments in Authorized Shares | A-13 |
| 5.4 | Effect of Certain Transactions | A-14 |
| 5.5 | Minimum Vesting Requirements for Options and Stock Appreciation Rights | A-14 |
| SECTION 6 AWARD AGREEMENTS | | A-15 |
| SECTION 7 STOCK OPTIONS | | A-15 |
| 7.1 | Grant of Options | A-15 |
| 7.2 | Special Provisions Applicable to Incentive Stock Options | A-15 |
| 7.3 | Terms of Options | A-16 |
| SECTION 8 STOCK APPRECIATION RIGHTS | | A-18 |
| 8.1 | Grant of Stock Appreciation Rights | A-18 |
| 8.2 | Exercise of Stock Appreciation Rights | A-19 |
| 8.3 | Special Provisions Applicable to Stock Appreciation Rights | A-19 |
| 8.4 | No Repricing or Exchange | A-19 |
| SECTION 9 PERFORMANCE SHARES AND PERFORMANCE UNITS | | A-20 |
| 9.1 | Grant of Performance Shares and Performance Units | A-20 |
| 9.2 | Value of Performance Shares and Performance Units | A-20 |
| 9.3 | Payment of Performance Shares and Performance Units | A-20 |
| 9.4 | Form and Timing of Payment | A-20 |
| 9.5 | Dividend Equivalents | A-21 |
| SECTION 10 RESTRICTED STOCK | | A-21 |
| 10.1 | Grant of Restricted Stock | A-21 |
| 10.2 | Restriction Period | A-21 |
| 10.3 | Other Restrictions | A-21 |
| 10.4 | Voting Rights; Dividends and Other Distributions | A-21 |
| 10.5 | Issuance of Shares; Settlement of Awards | A-22 |
| SECTION 11 RESTRICTED STOCK UNITS | | A-22 |
| 11.1 | Grant of Restricted Stock Units | A-22 |
| 11.2 | Restriction Period | A-22 |
| 11.3 | Other Restrictions | A-22 |
| 11.4 | Dividend Equivalents | A-23 |
| 11.5 | Issuance of Shares; Settlement of Awards | A-23 |
| SECTION 12 INCENTIVE AWARDS | | A-23 |
| 12.1 | Incentive Awards | A-23 |
| 12.2 | Performance Goal Certification | A-24 |

Table of Contents




| | | |
|---|---|---|
| 12.3 | Discretion to Reduce Awards; Participant's Performance | A-24 |
| 12.4 | Required Payment of Incentive Awards | A-24 |
| SECTION 13 CASH AWARDS AND OTHER STOCK-BASED AWARDS | | A-24 |
| 13.1 | Grant of Cash Awards | A-24 |
| 13.2 | Other Stock-Based Awards | A-24 |
| 13.3 | Value of Cash Awards and Other Stock-Based Awards | A-25 |
| 13.4 | Payment of Cash Awards and Other Stock-Based Awards | A-25 |
| SECTION 14 DEFERRAL ELECTIONS | | A-25 |
| SECTION 15 TERMINATION OF SERVICE | | A-25 |
| SECTION 16 EFFECT OF A CHANGE OF CONTROL | | A-26 |
| SECTION 17 REGULATORY APPROVALS AND LISTING | | A-27 |
| SECTION 18 GENERAL PROVISIONS | | A-28 |
| 18.1 | Clawback/Forfeiture Events | A-28 |
| 18.2 | Nontransferability | A-28 |
| 18.3 | No Individual Rights | A-29 |
| 18.4 | Other Compensation | A-29 |
| 18.5 | Leaves of Absence and Change in Status | A-29 |
| 18.6 | Transfers | A-29 |
| 18.7 | Unfunded Obligations | A-29 |
| 18.8 | Beneficiaries | A-30 |
| 18.9 | Governing Law | A-30 |
| 18.10 | Satisfaction of Tax Obligations | A-30 |
| 18.11 | Participants in Foreign Jurisdictions | A-31 |
| SECTION 19 REGULATORY COMPLIANCE | | A-31 |
| 19.1 | Rule 16b-3 of the Exchange Act and Section 162(m) | A-31 |
| 19.2 | Section 409A | A-31 |
| SECTION 20 ESTABLISHMENT AND TERM OF PLAN | | A-32 |
| SECTION 21 AMENDMENT, TERMINATION OR DISCONTINUANCE OF PLAN | | A-32 |
| 21.1 | Amendment of Plan | A-32 |
| 21.2 | Termination or Suspension of Plan | A-33 |
| 21.3 | Section 162(m) Approval | A-33 |

Table of Contents

# Appendix A

## ANADARKO PETROLEUM CORPORATION
## 2012 OMNIBUS INCENTIVE COMPENSATION PLAN

**(As Amended and Restated Effective as of , 2016)**

SECTION 1
PURPOSES; PRIOR PLAN

The purposes of the Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan (the "Plan") are to promote the interests of Anadarko Petroleum Corporation (the "Company") and its stockholders by strengthening its ability to attract, retain and motivate Employees and Consultants of the Company and any Subsidiary by furnishing suitable recognition of their performance, ability and experience, to align their interests and efforts to the long-term interests of the Company's stockholders, and to provide them with a direct incentive to achieve the Company's strategic and financial goals. In furtherance of these purposes, the Plan provides for the grant of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Incentive Awards, Cash Awards, and Other Stock-Based Awards to Participants in accordance with the terms and conditions set forth below.

The Plan as set forth herein constitutes an amendment and restatement of the Company's 2012 Omnibus Incentive Compensation Plan as in effect immediately prior to the Effective Date (the "Prior Plan"). The Prior Plan replaced the Company's 2008 Omnibus Incentive Compensation Plan effective as of May 15, 2012, and no further awards have or will be made under such 2008 Omnibus Incentive Compensation Plan from and after such date. The Plan shall supersede and replace in its entirety the Prior Plan; provided, however, that, notwithstanding any provisions herein to the contrary, each award granted under the Prior Plan prior to the Effective Date shall be subject to the terms and provisions applicable to such award under the Prior Plan as in effect immediately prior to the Effective Date.

SECTION 2
DEFINITIONS

Unless otherwise required by the context, the following terms when used in the Plan shall have the meanings set forth in this Section 2:

**2.1 Award**

Any Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Performance Share, Performance Unit, Incentive Award, Cash Award or Other Stock-Based Award, in each case payable in cash and/or in Common Stock as may be designated by the Plan Administrator.

**2.2 Award Agreement**

The written agreement or other documentation setting forth the terms, conditions, rights and duties applicable to an Award granted under the Plan (which, in the discretion of the Plan Administrator, need not be countersigned by a Participant). The Plan Administrator may, in its discretion, provide for the use of electronic, internet or other non-paper Award Agreements. The requirement for delivery of a written agreement is satisfied by electronic delivery of such agreement provided that evidence of the Participant's receipt of such electronic delivery is available to the Company and such delivery is not prohibited by applicable laws and regulations.

Table of Contents



**2.3 Beneficiary**

The person or persons designated by the Participant pursuant to Section 7.3(f) or Section 18.8 to whom payments are to be paid pursuant to the terms of the Plan in the event of the Participant's death.

**2.4 Board**

The Board of Directors of the Company.

**2.5 Cash Awards**

As defined in Section 13.1.

**2.6 Cause**

"Cause" shall have the meaning ascribed thereto in any employment, consulting or similar service agreement between a Participant and an Employer, or, in the absence of such agreement, a termination of a Participant's employment with the Company and its Subsidiaries resulting from (a) substandard work performance or repeated unreliability that has not been cured to the Employer's satisfaction; (b) workplace misconduct; (c) excessive absenteeism; (d) violation of safety rules; (e) violation of an Employer's policies, including without limitation, the Employer's "Code of Business Conduct and Ethics"; (f) fraud or other dishonesty against the Employer; (g) engagement in conduct that the Participant knows or should know is materially injurious to the business or reputation of the Employer; (h) falsifying Employer or Employee records (including an employment application); (i) on-the-job intoxication or being under the influence of alcohol or an illegal narcotic or a drug not being used as prescribed; (j) unauthorized use of Employer equipment or confidential information of an Employer or third party who has entrusted such information to the Employer; or (k) conviction of a misdemeanor involving moral turpitude or a felony. With respect to a Consultant, Cause shall also include a breach by the Consultant of the applicable consulting or similar service agreement. Whether a Participant has been terminated for Cause will be determined by the Board in its sole discretion with respect to a Section 16 Insider and, with respect to all other Participants, by the Vice President of Human Resources or the Company's General Counsel, each in his or her sole discretion.

**2.7 Change in Capitalization**

Any increase or reduction in the number of shares of Common Stock, any change (including, without limitation, in the case of a spin-off, dividend or other distribution in respect of shares, a change in value) in the shares of Common Stock or any exchange of shares of Common Stock for a different number or kind of shares of Common Stock or other securities of the Company or another corporation, by reason of a reclassification, recapitalization, merger, consolidation, reorganization, spin-off, split-up, issuance of warrants, rights or debentures, stock dividend, stock split or reverse stock split, extraordinary cash dividend, property dividend, combination or exchange of shares, repurchase of shares, change in corporate structure or otherwise.

**2.8 Change of Control**

The occurrence of any of the following after the Effective Date:

(a) any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) (a "Person") acquires beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (A) the then outstanding shares of Common Stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities");

Table of Contents



provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (1) any acquisition directly from the Company, (2) any acquisition by the Company, (3) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company or (4) any acquisition pursuant to a transaction which complies with clauses (A), (B) and (C) of Section 2.8(c); or

(b) individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(c) consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of Common Stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of Common Stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(d) approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

Notwithstanding the foregoing, with respect to an Award that (i) is subject to Section 409A and (ii) a Change of Control would accelerate the timing of payment thereunder, the term "Change of Control" shall mean a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the assets of the Company, as defined in Section 409A and the authoritative guidance issued thereunder, but only to the extent inconsistent with the above definition, and only to the minimum extent necessary to comply with Section 409A as determined by the Compensation and Benefits Committee of the Board.

Table of Contents



**2.9 Code**

The Internal Revenue Code of 1986, as amended and in effect from time to time, and the temporary or final regulations of the Secretary of the U.S. Treasury adopted pursuant to the Code.

**2.10 Common Stock**

The Common Stock of the Company, $0.10 par value per share, or such other class of shares or other securities as may be applicable pursuant to the provisions of Section 5.

**2.11 Company**

As defined in Section 1.

**2.12 Consultant**

Any consultant, agent, advisor or independent contractor (including a non-employee member of the Board) who renders services to the Company or any Subsidiary that qualifies as a consultant under the applicable rules of the Securities and Exchange Commission for registration of Common Stock on a Form S-8 Registration Statement.

**2.13 Covered Employee**

With respect to any grant of an Award, a Participant who the Plan Administrator deems is or may become a "covered employee" as defined in Section 162(m) for any year.

**2.14 Dividend Payment Date**

As defined in Section 9.5.

**2.15 Effective Date**

The effective date of the Plan is                    , 2016, the date on which this amendment and restatement was approved by the stockholders of the Company.

**2.16 Employee**

Any officer or other employee of the Company or of any Subsidiary. An Employee on a leave of absence for such periods and purposes conforming to the personnel policy of the Company may be considered still in the employ of the Company or a Subsidiary for purposes of eligibility for participation in the Plan.

**2.17 Employer**

As to any Participant on any date, the Company or a Subsidiary that employs or retains the Participant on such date.

**2.18 Exchange Act**

The Securities Exchange Act of 1934, as amended and rules promulgated thereunder.

**2.19 Fair Market Value**

As of any given date, the closing sales price at which Common Stock is sold on such date as reported in the NYSE-Composite Transactions by *The Wall Street Journal* or any other comparable service the Plan Administrator may determine is reliable for such date, or if no Common Stock was traded on such date, on the next preceding day on which Common Stock was so traded. If the Fair Market Value of the Common Stock cannot be determined pursuant to the preceding provisions, the "Fair Market Value" of the Common Stock shall be determined by the Plan Administrator in such a manner as it deems appropriate, consistent with the requirements of Section 409A.

Table of Contents



**2.20 Full Value Award**

An Award other than of Options or Stock Appreciation Rights, which is settled by the issuance of Common Stock.

**2.21 Good Reason**

Unless otherwise provided in an Award Agreement, the term "Good Reason" shall have the following meaning as applied to a Participant who is an Employee: (i) to the extent defined in an Employee's employment agreement, the term "Good Reason" shall have the same meaning as set forth in the employment agreement with respect to such Employee, (ii) in the case of an Employee covered by the Company's Key Employee Change-of-Control Contract, the term "Good Reason" shall have the same meaning as set forth in the Key Employee Change-of-Control Contract entered into with such Employee, (iii) in the case of an Employee covered by the Company's Key Manager Change-of-Control Agreement, the term "Good Reason" shall have the same meaning as set forth in the Key Manager Change-of-Control Agreement entered into with such Employee; and (iv) in the case of any Employee not covered by clause (i), (ii) or (iii) above, the term "Good Reason" shall have the same meaning as set forth in the Company's Change of Control Severance Plan, as it may be amended from time to time. With respect to a Participant who is not an Employee, "Good Reason" shall have the meaning ascribed thereto in the applicable Award Agreement and, in the absence of the definition of such term in such agreement, the provisions in Section 16 relating to "Good Reason" shall not be applicable to such Participant's Award evidenced by such agreement.

**2.22 Incentive Award**

A percentage of base salary, a fixed dollar amount or other measure of compensation which Participants are eligible to receive, in cash, Common Stock and/or other Awards under the Plan, at the end of a Performance Period if certain performance measures are achieved.

**2.23 Incentive Stock Option**

An option intended to meet the requirements of an "incentive stock option" as defined in Section 422 of the Code, as in effect at the time of grant of such Option, or any statutory provision that may hereafter replace such section.

**2.24 Management Committee**

A committee designated by the Board (either by resolution or by provisions contained in the Plan) and consisting of the Chief Executive Officer, provided that such officer is a member of the Board, and such other members of the Board as the Board may determine from time to time.

**2.25 Maximum Grant**

The maximum grants set forth in Section 5.2(a).

**2.26 Nonqualified Option**

An Option which is not intended to meet the requirements of an "incentive stock option" as defined in Section 422 of the Code.

**2.27 Option**

An Incentive Stock Option or a Nonqualified Option.

**2.28 Option Price**

The price per share of Common Stock at which an Option is exercisable.

Table of Contents



**2.29 Other Stock-Based Award**

As defined in Section 13.2.

**2.30 Participant**

An eligible Employee or a Consultant (which includes, for the avoidance of doubt, a non-employee member of the Board) to whom Awards are granted under the Plan as set forth in Section 4. References to a "Participant" in the Plan will be interpreted to mean an Employee, a Consultant, Employees or Consultants as individual groups or as one group in the aggregate, as the context so provides.

**2.31 Performance Goals**

The Plan Administrator may grant Awards subject to one or more Performance Goals set forth in the table below (collectively the "Performance Goals") to any Participant, including, without limitation, to any Covered Employee. As to any such Awards, the Plan Administrator shall establish one or more of the Performance Goals for each Performance Period in writing. Each Performance Goal selected for a particular Performance Period shall include any one or more of the following, either individually, alternatively or in any combination, applied to either the Company as a whole or to a Subsidiary or a business unit of the Company or any Subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of time, on an absolute basis or relative to the pre-established target, to previous years' results or to a designated comparison group, in each case as specified by the Plan Administrator:

| | | | |
|---|---|---|---|
| Financial Goals | • Earnings<br>• Revenues<br>• Debt level<br>• Cost reduction targets<br>• Interest-sensitivity gap levels<br>• EBITDAX<br>• Debt/average daily production | • Earnings per share<br>• Cash flow from operations<br>• Equity ratios<br>• Capital expended<br>• Weighted average cost of capital<br>• Return on assets<br>• Debt/proved developed reserves | • Net income<br>• Free cash flow<br>• Expenses<br>• Working capital<br>• Operating or profit margin<br>• Return on equity or capital employed or investment<br>• Debt/proved reserves |
| Operating Goals | • Amount of oil and/or gas reserves<br>• Lease operating expense or lease operating expense/barrels of oil equivalent | • Oil and/or gas reserve additions<br>• Costs of finding and/or developing oil and/or gas reserves<br>• Operating costs | • Oil and/or gas replacement ratios<br>• Natural gas and/or oil production or sales |
| Corporate and Other Goals | • Total stockholder return<br>• Asset quality levels<br>• Investments<br>• Satisfactory internal or external audits<br>• Achievement of balance sheet or income statement objectives<br>• General and administrative expenses | • Market share<br>• Assets<br>• Asset sale targets<br>• Value of assets<br>• Employee retention/attrition rates<br>• Improvement of financial ratings<br>• Production growth per net debt adjusted share | • Charge-offs<br>• Non-performing assets<br>• Fair Market Value of Common Stock<br>• Regulatory compliance<br>• Safety targets<br>• Economic value added |

Table of Contents



The Plan Administrator may adjust the Performance Goals to include or exclude the impact of an event or occurrence which the Plan Administrator determines should appropriately be included or excluded, including, without limitation, extraordinary, unusual or infrequent items or events, charges, gains or losses on the disposition of business units, losses from discontinued operations, restatements and accounting changes and other unplanned special charges such as restructuring expenses, acquisitions, acquisition expenses, including expenses related to goodwill and other intangible assets, stock offerings, stock repurchases and loan loss provisions. The Plan Administrator may also provide for the manner in which performance will be measured against the Performance Goals (or may adjust the Performance Goals) to reflect the impact of specified corporate transactions, a Change in Capitalization, special charges, accounting policy changes and tax law changes. In addition, the Plan Administrator may make such adjustments to the Performance Goals applicable to Participants who are not Covered Employees as it determines are appropriate. Such adjustments may occur at the time of the granting of an Award, or at any time thereafter, but, in the case of Covered Employees, only to the extent permitted by Section 162(m). Performance Goals may include a threshold level of performance below which no Awards shall be earned, target levels of performance at which specific Awards will be earned, and a maximum level of performance at which the maximum level of Awards will be earned.

With respect to "performance-based compensation" within the meaning of Section 162(m) for Covered Employees, the Plan Administrator shall establish the applicable Performance Goals within any time period required under Section 162(m) and the Plan Administrator may not in any event increase the amount of compensation payable to a Covered Employee upon the satisfaction of any Performance Goal. Prior to the payment of any "performance-based compensation" within the meaning of Section 162(m), the Plan Administrator shall certify in writing (which shall be satisfied upon the Plan Administrator's approval of preambles and resolutions regarding such performance results and payout and without condition with respect to any subsequent approval of the minutes of the meeting relating to such certification) the extent to which the applicable Performance Goals were, in fact, achieved and the amounts to be paid, vested or delivered as a result thereof; provided, that the Plan Administrator may reduce, but not increase, such amount.

**2.32 Performance Period**

That period of time during which Performance Goals are evaluated to determine the vesting or granting of Awards under the Plan, as the Plan Administrator may determine, provided that the period is no longer than ten (10) years.

**2.33 Performance Shares**

An Award granted under the Plan representing the right to receive a number of shares of Common Stock for each Performance Share granted, as the Plan Administrator may determine.

**2.34 Performance Units**

An Award granted under the Plan representing the right to receive a payment (either in cash or Common Stock) equal to the value of a Performance Unit, as the Plan Administrator may determine.

**2.35 Permitted Transferee**

As defined in Section 7.3(f).

**2.36 Plan**

As defined in Section 1.

Table of Contents



**2.37 Plan Administrator**

Those committees appointed and authorized pursuant to Section 3 to administer the Plan.

**2.38 Prior Plan**

As defined in Section 1.

**2.39 Restricted Stock**

Common Stock granted under the Plan that is subject to the requirements of Section 10 and such other restrictions as the Plan Administrator deems appropriate. References to Restricted Stock in the Plan shall include Restricted Stock awarded in conjunction with Incentive Awards pursuant to Section 12, unless the context otherwise requires.

**2.40 Restricted Stock Units**

An Award granted under the Plan representing a right to receive a payment (either in cash and/or Common Stock) equal to the value of a share of Common Stock.

**2.41 Restriction Period**

As defined in Sections 10.2 and 11.2, as applicable.

**2.42 Rule 16b-3**

Rule 16b-3 of the General Rules and Regulations under the Exchange Act.

**2.43 Section 16 Insider**

Any person who is selected by the Plan Administrator to receive an Award pursuant to the Plan and who is or is reasonably expected to become subject to the requirements of Section 16 of the Exchange Act, and the rules and regulations promulgated thereunder.

**2.44 Section 162(m)**

Section 162(m) of the Code.

**2.45 Section 409A**

Section 409A of the Code.

**2.46 Securities Act**

The Securities Act of 1933, as amended and rules promulgated thereunder.

**2.47 Stock Appreciation Right**

Any right granted under Section 8.

**2.48 Subsidiary**

An entity that is designated by the Plan Administrator as a subsidiary for purposes of the Plan and that is a corporation, partnership, joint venture, limited liability company, limited liability partnership, or other entity in which the Company owns directly or indirectly, fifty percent (50%) or more of the voting power or profit interests, or as to which the Company or one of its affiliates serves as general or managing partner or in a similar capacity. Notwithstanding the foregoing, for purposes of Options intended to qualify as Incentive Stock Options, the term "Subsidiary" shall mean a corporation (or other entity treated as a corporation for tax purposes) in which the Company directly or indirectly holds more than fifty percent (50%) of the voting power.

Table of Contents



**2.49 Termination of Service**

(a) As to an Employee, the time when the employee-employer relationship between a Participant and the Company or any Employer is terminated for any reason, including, without limitation, a termination by resignation, discharge, death, disability or retirement; but excluding terminations where the Participant simultaneously commences or remains in employment or service with the Company or any Employer.

(b) As to a Consultant, the time when the engagement of a Participant as a Consultant to the Company or any Employer is terminated for any reason, with or without Cause, including, without limitation, by resignation, discharge, death or retirement, but excluding terminations where the Consultant simultaneously commences or remains in employment or service with the Company or any Employer.

SECTION 3
ADMINISTRATION

**3.1 Plan Administrator**

(a) The Compensation and Benefits Committee of the Board shall be the Plan Administrator with respect to all Covered Employees and all Section 16 Insiders. As to these individuals, the Plan Administrator (including each individual that is a member thereof) shall be constituted at all times so as to (i) be "independent" as such term is defined pursuant to the rules of any stock exchange on which the Common Stock may then be listed, and (ii) meet the non-employee director standards of Rule 16b-3 and the outside director requirements of Section 162(m), so long as any of the Company's equity securities are registered pursuant to Section 12(b) or 12(g) of the Exchange Act.

(b) Other than as set forth in Section 3.1(a) and subject to Section 3.4 (and subject to applicable law), the Management Committee shall be the Plan Administrator. The Board may from time to time remove members from, or add members to, the Management Committee.

(c) Notwithstanding Sections 3.1(a) and 3.1(b), the Board may designate itself or the Compensation and Benefits Committee of the Board as the Plan Administrator as to any Participant or groups of Participants unless such designation with respect to a Participant or groups of Participants would not be in compliance with the requirements of the Code, the Exchange Act or the Securities Act.

(d) The above committees hereby designate the appropriate Employees or other agents of the Company to handle the day-to-day administrative matters of the Plan.

**3.2 Authority of Plan Administrator**

Subject to the express terms and conditions set forth herein, the Plan Administrator shall have the power from time to time to:

(a) select the Participants to whom Awards shall be granted under the Plan and the number of shares or amount of cash subject to such Awards and prescribe the terms and conditions (which need not be identical) of each such Award;

(b) set the terms and conditions of any Award consistent with the terms of the Plan (which may be based on Performance Goals or other performance measures as the Plan Administrator shall determine), and make any amendments, modifications or adjustments to such Awards;

Table of Contents



(c) construe and interpret the Plan and the Awards granted hereunder and establish, amend and revoke rules and regulations for the administration of the Plan, including, without limitation, correcting any defect or supplying any omission, or reconciling any inconsistency in the Plan or in any Award Agreement, in the manner and to the extent it shall deem necessary or advisable, including so that the Plan and the operation of the Plan comply with Rule 16b-3, the Code, to the extent applicable, and other applicable laws, and otherwise to make the Plan fully effective;

(d) exercise its discretion with respect to the powers and rights granted to it as set forth in the Plan; and

(e) generally, exercise such powers and perform such acts as are deemed necessary or advisable to promote the best interests of the Company with respect to the Plan.

All decisions and determinations by the Plan Administrator in the exercise of the above powers shall be final, binding and conclusive upon the Company, a Subsidiary, the Participants and all other persons having or claiming any interest therein. The Plan Administrator shall cause the Company at the Company's expense to take any action related to the Plan which may be necessary to comply with the provisions of any federal, state or foreign law or any regulations issued thereunder, which the Plan Administrator determines are intended to be complied with. All Awards and any administrative action taken by the Plan Administrator shall be in conformity with all applicable federal, state, and local laws and shall not discriminate on the basis of sex, race, color, religion, national origin, citizenship, age, disability, marital or veterans status, sexual orientation or any other legally protected categories.

Notwithstanding the foregoing, the Plan Administrator shall not be entitled to exercise any discretion otherwise authorized hereunder with respect to any Awards held by Covered Employees that are intended to qualify as performance-based compensation under Section 162(m) if the ability to exercise such discretion or the exercise of such discretion itself would cause the compensation attributable to such Awards to fail to so qualify.

**3.3 Indemnification of Plan Administrator**

Each member of any committee acting as Plan Administrator, while serving as such, shall be entitled, in good faith, to rely or act upon any advice of the Company's independent auditors, counsel or consultants hired by the committee, or other agents assisting in the administration of the Plan. The Plan Administrator and any Employee of the Company acting at the direction or on behalf of the Company shall not be personally liable for any action or determination taken or made, or not taken or made, in good faith with respect to the Plan, and shall, to the extent permitted by law, be fully indemnified and protected under the Company's charter or by-laws with respect to any such action or determination.

**3.4 Delegation to Management Committee**

To the maximum extent permitted by applicable law and subject to Section 3.1, the Board and the Compensation and Benefits Committee of the Board hereby delegate to the Management Committee the authority (i) to designate the Employees and Consultants who shall be Participants, (ii) to determine the Awards to be granted to any such Participants or (iii) both (i) and (ii); provided, however, that the Management Committee shall not have the authority to grant Awards to any member of the Management Committee, a Covered Employee or a Section 16 Insider and shall be subject to such other limitations set forth in the Plan. This provision shall be deemed to constitute a delegation from the Board to the Management Committee without further action by the Board. However, the Board or the Compensation and Benefits Committee of the Board may, from time to time, limit the total number of shares Common Stock subject to such delegation.

Table of Contents



SECTION 4
ELIGIBILITY

To be eligible to be a Participant, an individual must be an Employee or a Consultant of an Employer, as of the date on which the Plan Administrator grants to such individual an Award under the Plan. Members of the Board shall be eligible to participate in the Plan. Each grant of an Award under the Plan shall be evidenced by an Award Agreement.

SECTION 5
SHARES AVAILABLE FOR THE PLAN

**5.1 Aggregate Shares**

(a) Share Authorization

Subject to Section 5.1(b), Section 5.1(d) and adjustment as provided in Section 5.3, the maximum aggregate number of shares of Common Stock available for issuance under the Plan on or after the Effective Date shall be 40,960,362 shares, less the sum of (i) one (1) share for every one (1) share that was subject to an "Option" or "Stock Appreciation Right" granted under the Prior Plan after December 31, 2015 and prior to the Effective Date and (ii) 2.39 shares for every one (1) share that was granted under the Prior Plan as a "Full Value Award" after December 31, 2015 and prior to the Effective Date.

(b) Limit on Full Value Awards—Flexible Share Pool

Each share of Common Stock subject to a Full Value Award granted on or after the Effective Date shall reduce the shares that remain available for issuance under the Plan by 2.39 shares of Common Stock. Each share of Common Stock subject to an Award granted on or after the Effective Date other than a Full Value Award shall reduce the shares that remain available for issuance under the Plan by one (1) share of Common Stock.

(c) Limit on Incentive Stock Options

Subject to adjustment as provided in Section 5.3, the maximum aggregate number of shares that may be issued under the Plan through Incentive Stock Options granted under the Plan on or after the Effective Date shall be 10,000,000.

(d) Share Usage

Any shares of Common Stock related to Awards (or awards granted under the Prior Plan) which, after December 31, 2015, terminate by expiration, forfeiture, cancellation, or otherwise without the issuance of such shares of Common Stock or are settled in cash in lieu of shares of Common Stock shall be available again for grant under the Plan; provided, however, that shares of Restricted Stock issued under the Plan (or similar awards issued under the Prior Plan) and forfeited back to the Plan after December 31, 2015 shall not be considered to have been issued for purposes of this sentence and shall be available again for grant under the Plan. However, shares of Common Stock that are subject to Stock Appreciation Rights granted under the Plan (or that were subject to "Stock Appreciation Rights" (as defined in the Prior Plan) granted under the Prior Plan) but are not issued or delivered as a result of the net settlement in shares of Common Stock of such Stock Appreciation Rights (or such "Stock Appreciation Rights" granted under the Prior Plan) shall not be available again for grant under the Plan. Furthermore, any shares of Common Stock withheld to satisfy tax withholding obligations on an

Table of Contents



Award issued under the Plan (or withheld after December 31, 2015 on an award issued under the Prior Plan), shares of Common Stock tendered to pay the exercise price of an Award under the Plan (or tendered after December 31, 2015 to pay the exercise price of an award issued under the Prior Plan), and shares of Common Stock repurchased on the open market with the proceeds of an Option exercise (or so repurchased after December 31, 2015 with the proceeds of the exercise of an "Option" (as defined in the Prior Plan) granted under the Prior Plan) will no longer be eligible to be again available for grant under the Plan. In addition, the full number of Incentive Stock Options exercised shall be counted against the number of shares that may be issued under the Plan through Incentive Stock Options awarded under the Plan on or after the Effective Date pursuant to Section 5.1(c), regardless of the number of shares of Common Stock actually issued upon exercise of such Incentive Stock Options. The shares of Common Stock available for issuance under the Plan may be authorized and unissued shares of Common Stock or treasury shares of Common Stock.

Any shares of Common Stock that again become available for Awards under the Plan pursuant to the preceding provisions of this Section shall be added as (i) one (1) share for every one (1) share subject to Options or Stock Appreciation Rights granted under the Plan or options or stock appreciation rights granted under the Prior Plan, (ii) as 2.39 shares for every one (1) share subject to Awards granted on or after the Effective Date other than Options or Stock Appreciation Rights, and (iii) 2.39 shares for every one (1) share subject to awards granted under the Prior Plan prior to the Effective Date other than options or stock appreciation rights so granted under the Prior Plan.

Substitute Awards (as defined below) shall not reduce the shares authorized for issuance under the Plan or the limitations on grants to a Participant under Section 5.2, nor shall shares subject to a Substitute Award be added to the shares available for issuance under the Plan as provided above. Additionally, in the event that a company acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may, if and to the extent determined by the Board, be used for Awards under the Plan and shall not reduce the shares authorized for issuance under the Plan (and shares subject to such Awards shall not be added to the shares available for issuance under the Plan as provided above); provided that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not, prior to such acquisition or combination, employed by (and who were not non-employee directors or consultants of) the Company or any of its Subsidiaries immediately prior to such acquisition or combination. For purposes of this Section "Substitute Awards" shall mean Awards granted or shares issued by the Company in assumption of, or in substitution or exchange for, awards previously granted, or the right or obligation to make future awards, in each case by a company acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines.

**5.2 Individual Limitations**

(a) Maximum Grants

Subject to adjustment as provided in Section 5.3, no Participant may be granted (i) Options or Stock Appreciation Rights during any calendar year with respect to more than 2,500,000 shares of Common Stock and (ii) Awards (other than Options or Stock Appreciation Rights) during any calendar

Table of Contents



year that are denominated in shares of Common Stock under which more than 1,500,000 shares of Common Stock may be earned for each twelve (12) months in the vesting period or Performance Period (which vesting or Performance Period, as applicable, shall not exceed ten (10) years). No Participant may be granted Awards during any calendar year that are not denominated in shares of Common Stock under which more than $10,000,000 (including the Fair Market Value of any shares of Common Stock paid in satisfaction of such Awards) may be earned for each twelve (12) months in the vesting or Performance Period (which vesting or Performance Period, as applicable, shall not exceed ten (10) years). Each of the limitations in this paragraph shall be multiplied by two (2) with respect to Awards granted to a Participant during the first calendar year in which the Participant commences employment with the Company and its Subsidiaries. If an Award is cancelled, the cancelled Award shall continue to be counted toward the applicable limitation in this paragraph to the extent required by Section 162(m).

(b) Additional Limitation Applicable to Non-Employee Directors

Notwithstanding any provisions to the contrary in the Plan, in any other incentive compensation plan of the Company or any of its Subsidiaries (including, without limitation, the Company's 2008 Director Compensation Plan), or any other compensatory policy or program of the Company applicable to its non-employee directors (collectively, the "Director Programs"), the sum of "***A***" and "***B***" for any individual, non-employee director for any single calendar year beginning on or after January 1, 2016 shall not exceed $750,000, where:

"***A***" equals the aggregate grant date fair value (computed as of the date of grant in accordance with applicable financial accounting rules) of all awards granted under the Director Programs (other than with respect to compensation described in "***B***" below) to such director during such calendar year; and

"***B***" equals the aggregate cash value of such director's retainer, meeting attendance fees, committee assignment fees, lead director retainer, committee chair and member retainers and other Board fees related to service on the Board or committee(s) of the Board that are initially denominated as a cash amount or any other property other than Common Stock (whether paid currently or on a deferred basis or in cash or other property (including Common Stock)) for such calendar year;

provided, however, that the limitation described in this sentence shall be determined without regard to grants of awards under the Director Programs and compensation, if any, paid to a non-employee director during any period in which such individual was an Employee or Consultant (other than in the capacity of a non-employee director).

**5.3 Adjustments in Authorized Shares**

(a) In the event of a Change in Capitalization, the Plan Administrator shall make such adjustments, if any, as it determines are appropriate and equitable, and to the extent such an action does not conflict with Delaware or other applicable laws or securities exchange rules, to (i) the maximum number and class of shares of Common Stock or other stock or securities with respect to which Awards may be granted under the Plan, (ii) the maximum number and class of shares of Common Stock or other stock or securities that may be issued upon exercise of Nonqualified Options, Incentive Stock Options and Stock Appreciation Rights, (iii) the Maximum Grants, (iv) the number and class of shares of Common Stock or other stock or securities which are subject to outstanding Awards granted under the Plan and the Option Price or exercise price therefor, if applicable, and (v) the Performance Goals; provided, however, that in the case of an "equity restructuring" (within the meaning of the Financial Accounting Standards Board Accounting Standards No. Update Topic 718),

Table of Contents



the Board shall make an equitable or appropriate adjustment to outstanding Awards to reflect such equity restructuring. Any such adjustment shall be final, binding and conclusive on all persons claiming any right or interest under the Plan.

(b) If, by reason of a Change in Capitalization, a Participant shall be entitled to, or shall be entitled to exercise an Option or Stock Appreciation Right with respect to, new, additional or different shares of stock or securities of the Company or any other corporation, such new, additional or different shares shall thereupon be subject to all of the conditions, restrictions and performance criteria which were applicable to the shares of Common Stock that such shares replaced or to the Option or Stock Appreciation Right, as the case may be, prior to such Change in Capitalization.

**5.4 Effect of Certain Transactions**

Following (a) the liquidation or dissolution of the Company or (b) a merger or consolidation of the Company (a "Transaction"), (i) each outstanding Award shall be treated as provided for in the agreement entered into in connection with the Transaction (which treatment may be different as among different types of Awards and different holders thereof) or (ii) if not so provided in such agreement, each Participant shall be entitled to receive in respect of each share of Common Stock subject to any outstanding Awards, upon exercise of any Option or Stock Appreciation Right or payment or transfer in respect of any other Award, the same number and kind of stock, securities, cash, property or other consideration that each holder of a share of Common Stock was entitled to receive in the Transaction in respect of a share of Common Stock; provided, however, that such stock, securities, cash, property, or other consideration shall remain subject to all of the conditions, restrictions and performance criteria which were applicable to Awards prior to such Transaction, but giving effect to any applicable provision of the Plan or any Award Agreement if the Transaction is a Change of Control. Without limiting the generality of the foregoing, the treatment of outstanding Options and Stock Appreciation Rights pursuant to clause (i) of this Section 5.4 in connection with a Transaction may include the cancellation of outstanding Options and Stock Appreciation Rights upon consummation of the Transaction provided either (x) the holders of affected Options and Stock Appreciation rights have been given a period of at least fifteen (15) days prior to the date of the consummation of the Transaction to exercise the Options and Stock Appreciation Rights (whether or not they were otherwise exercisable) or (y) the holders of the affected Options and Stock Appreciation Rights are paid (in cash or cash equivalents) in respect of each share of Common Stock covered by the Options or Stock Appreciation Rights being cancelled an amount equal to the excess, if any, of the per share price paid or distributed to stockholders in the Transaction (the value of any non-cash consideration to be determined by the Plan Administrator in its sole discretion) over the exercise price thereof. For avoidance of doubt, (1) the cancellation of Options and Stock Appreciation Rights pursuant to clause (y) of the preceding sentence may be effected notwithstanding anything to the contrary contained in the Plan or any Award Agreement and (2) if the amount determined pursuant to clause (y) of the preceding sentence is zero or less, the affected Options and Stock Appreciation Rights may be cancelled without any payment therefor. The treatment of any Award as provided in this Section 5.4 shall be conclusively presumed to be appropriate for purposes of Section 5.3.

**5.5 Minimum Vesting Requirements for Options and Stock Appreciation Rights**

No Option or Stock Appreciation Right granted on or after the Effective Date may vest in less than one year from its date of grant. Notwithstanding the foregoing, up to 5% of the available shares of Common Stock authorized for issuance under the Plan as of the Effective Date may be subject to Options or Stock Appreciation Rights that vest (in full or in part) in less than one year from their date

Table of Contents



of grant (the "5% Basket"). Further, any Option or Stock Appreciation Right granted under the Plan may vest in full or in part upon death or disability of the Participant, or upon a Change of Control, and such vesting shall not count against the 5% Basket.

SECTION 6
AWARD AGREEMENTS

Upon a determination by the Plan Administrator that an Award is to be granted to a Participant pursuant to Section 7, 8, 9, 10, 11, 12 or 13, an Award Agreement shall be provided to such Participant as soon as practicable specifying, without limitation, the terms, conditions, rights and duties related thereto, including terms requiring forfeiture of Awards in the event of a Termination of Service by the Participant and terms relating to the Clawback/Forfeiture Events under Section 18.1. Each Award Agreement shall be subject to the terms and conditions of the Plan.

SECTION 7
STOCK OPTIONS

**7.1 Grant of Options**

Subject to the limitations in Sections 5.1 and 5.2, Options may be granted to eligible Participants in such number, and at such times during the term of the Plan, as the Plan Administrator shall determine. The Plan Administrator may grant an Option or provide for the grant of an Option, either from time to time in the discretion of the Plan Administrator or automatically upon the occurrence of specified events, including, without limitation, the achievement of Performance Goals or other performance measures, the satisfaction of an event or condition within the control of the recipient of the Option or within the control of others. The granting of an Option shall take place when the Plan Administrator by resolution, written consent or other appropriate action determines to grant such an Option to a particular Participant at the Option Price. Each Option granted under the Plan shall be identified in the Award Agreement as either an Incentive Stock Option or a Nonqualified Option (or if no such identification is made, then it shall be a Nonqualified Option). No Incentive Stock Option shall be granted to any Participant who is not an Employee of the Company or any "subsidiary corporation" of the Company (as defined in Section 424(f) of the Code).

**7.2 Special Provisions Applicable to Incentive Stock Options**

Each provision of the Plan and each Incentive Stock Option granted thereunder shall be construed so that each such Option shall qualify as an Incentive Stock Option, and any provision thereof that cannot be so construed shall be disregarded, unless the Employee agrees otherwise. Incentive Stock Options, in addition to complying with the other provisions of the Plan relating to Options generally, shall be subject to the following conditions:

(a) Ten Percent (10%) Stockholders

An Employee must not, immediately before an Incentive Stock Option is granted to him or her, own stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or of its parent or any subsidiary corporation (within the meaning of Section 424 of the Code). This requirement is waived if (i) the Option Price of the Incentive Stock Option to be granted is at least one hundred ten percent (110%) of the Fair Market Value of the stock subject to the Option, determined at the time the Option is granted, and (ii) the Option is not exercisable more than five (5) years from the date the Option is granted.

Table of Contents



(b) Annual Limitation

To the extent that the aggregate Fair Market Value (determined at the time of the grant of the Option) of the stock with respect to which Incentive Stock Options are exercisable for the first time by the Employee during any calendar year exceeds One Hundred Thousand Dollars ($100,000), such Options shall be treated as Nonqualified Options. In applying the limitation in the preceding sentence in the case of multiple Option grants, unless otherwise required by applicable law, Options which were intended to be Incentive Stock Options shall be treated as Nonqualified Options according to the order in which they were granted such that the most recently granted Options are first treated as Nonqualified Options.

(c) Additional Terms

Any other terms and conditions which the Plan Administrator determines, upon advice of counsel, must be imposed for the Option to be an Incentive Stock Option.

(d) Notice of Disqualifying Disposition

If an Employee shall make any disposition of shares of Common Stock issued pursuant to an Incentive Stock Option under the circumstances described in Section 421(b) of the Code (relating to disqualifying dispositions), the Employee shall notify the Company of such disposition within twenty (20) days thereof.

**7.3 Terms of Options**

Except as otherwise provided in the Award Agreement and Section 7.2, all Incentive Stock Options and Nonqualified Options under the Plan shall be granted subject to the following terms and conditions:

(a) Option Price

The Option Price shall be determined by the Plan Administrator in any reasonable manner, but shall not be less than the Fair Market Value of the Common Stock on the date the Option is granted, except in the case of Options that are granted in assumption of, or in substitution for, outstanding awards previously granted by (i) a company acquired by the Company or a Subsidiary, or (ii) a company with which the Company or a Subsidiary combines.

(b) Duration of Options

Options shall be exercisable at such time and under such conditions as set forth in the Award Agreement, but in no event shall any Option (whether a Nonqualified Option or an Incentive Stock Option) be exercisable later than the tenth (10th) anniversary of the date of its grant.

(c) Exercise of Options

Subject to the limitations in Section 5.5, Common Stock covered by an Option may be purchased at one time or in such installments over the option period as may be provided in the Award Agreement. Any Common Stock not purchased on an applicable installment date may be purchased thereafter at any time prior to the expiration of the Option in accordance with its terms. To the extent that the right to purchase Common Stock has accrued thereunder, an Option may be exercised from time to time by notice to the Company setting forth the amount of Common Stock with respect to which the Option is being exercised.

Table of Contents



(d) Payment

The purchase price of Common Stock purchased under Options shall be paid in full to the Company upon the exercise of the Option by delivery of consideration equal to the product of the Option Price and the Common Stock purchased (the "Purchase Price"). Such consideration may be either (i) in cash or (ii) at the discretion of the Plan Administrator, in Common Stock (by either actual delivery of Common Stock or by attestation presenting satisfactory proof of beneficial ownership of such Common Stock) already owned by the Participant, or any combination of cash and Common Stock. The Fair Market Value of such Common Stock as delivered shall be valued as of the day of exercise. The Plan Administrator can determine that additional forms of payment will be permitted. To the extent permitted by the Plan Administrator and applicable laws and regulations (including, without limitation, federal tax and securities laws, regulations and state corporate law), an Option may also be exercised in a "cashless" exercise by delivery of a properly executed exercise notice together with irrevocable instructions to a broker approved by the Company to promptly deliver to the Company sufficient proceeds to pay the Purchase Price. A Participant shall have none of the rights of a stockholder until the Common Stock is issued to the Participant.

The Plan Administrator may permit a Participant to pay all or a portion of the Purchase Price by having Common Stock with a Fair Market Value equal to all or a portion of the Purchase Price be withheld from the shares issuable to the Participant upon the exercise of the Option. The Fair Market Value of such Common Stock as is withheld shall be determined as of the same day as the exercise of the Option.

(e) Restrictions

The Plan Administrator shall determine and reflect in the Award Agreement, with respect to each Option, the nature and extent of the restrictions, if any, to be imposed on the Common Stock which may be purchased thereunder, including, without limitation, restrictions on the transferability of such Common Stock acquired through the exercise of such Options for such periods as the Plan Administrator may determine. In addition, to the extent permitted by applicable laws and regulations, the Plan Administrator may require that a Participant who wants to effectuate a "cashless" exercise of Options be required to sell the Common Stock acquired in the associated exercise to the Company, or in the open market through the use of a broker selected by the Company, at such price and on such terms as the Plan Administrator may determine at the time of grant, or otherwise. Without limiting the foregoing, the Plan Administrator may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any resales by the Participant or other subsequent transfers by the Participant of any Common Stock issued as a result of the exercise of an Option, including without limitation (i) restrictions under an insider trading policy, (ii) restrictions designed to delay and/or coordinate the timing and manner of sales by one or more Participants and (iii) restrictions as to the use of a specified brokerage firm for such resales or other transfers. No dividend equivalents may be granted in connection with any Option.

(f) Transferability of Options

Notwithstanding Section 18.2 and only if allowed by the Plan Administrator in its discretion, Nonqualified Options may be transferred to a Participant's immediate family members, directly or indirectly or by means of a trust, corporate entity or partnership (a person who thus acquires this option by such transfer, a "Permitted Transferee"). A transfer of a Nonqualified Option may only be effected by the Company at the request of the Participant and shall become effective upon the Permitted Transferee agreeing to such terms as the Plan Administrator may require and only when recorded in the Company's record of outstanding Options. In the event an Option is transferred as

Table of Contents



contemplated hereby, the Option may not be subsequently transferred by the Permitted Transferee except a transfer back to the Participant or by will or the laws of descent and distribution. A transferred Option may be exercised by a Permitted Transferee to the same extent as, and subject to the same terms and conditions as, the Participant (except as otherwise provided herein), as if no transfer had taken place. As used herein, "immediate family member" shall mean, with respect to any person, such person's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, and shall include adoptive relationships. In the event of exercise of a transferred Option by a Permitted Transferee, any amounts due to (or to be withheld by) the Company upon exercise of the Option shall be delivered by (or withheld from amounts due to) the Participant, the Participant's estate or the Permitted Transferee, in the reasonable discretion of the Company.

In addition, to the extent permitted by applicable law and Rule 16b-3, the Plan Administrator may permit a recipient of a Nonqualified Option to designate in writing during the Participant's lifetime a Beneficiary to receive and exercise the Participant's Nonqualified Options in the event of such Participant's death.

(g) Purchase for Investment

The Plan Administrator shall have the right to require that each Participant or other person who shall exercise an Option under the Plan, and each person into whose name the Common Stock shall be issued pursuant to the exercise of an Option, represent and agree that any and all Common Stock purchased pursuant to such Option is being purchased for investment only and not with a view to the distribution or resale thereof and that such Common Stock will not be sold except in accordance with such restrictions or limitations as may be set forth in the Option or by the Plan Administrator. This Section 7.3(g) shall be inoperative during any period of time when the Company has obtained all necessary or advisable approvals from governmental agencies and has completed all necessary or advisable registrations or other qualifications of the Common Stock as to which Options may from time to time be granted as contemplated in Section 17.

(h) No Repricing or Exchange

Other than pursuant to Section 5.3, the Plan Administrator may not take any action (i) to amend the terms of an outstanding Option to reduce the Option Price thereof, cancel an Option and replace it with a new Option with a lower Option Price, or that has an economic effect that is the same as any such reduction or cancellation or (ii) to cancel an outstanding Option having an Option Price above the then-current Fair Market Value of the Common Stock in exchange for the grant of another type of Award or cash (other than in connection with a Change of Control), without, in each such case, first obtaining approval of the Company's stockholders of such action.

## SECTION 8
## STOCK APPRECIATION RIGHTS

### 8.1 Grant of Stock Appreciation Rights

Subject to the limitations in Sections 5.1 and 5.2, Stock Appreciation Rights may be granted to Participants in such number, and at such times during the term of the Plan, as the Plan Administrator shall determine. The Plan Administrator may grant a Stock Appreciation Right or provide for the grant of a Stock Appreciation Right, either from time to time in the discretion of the Plan Administrator or automatically upon the occurrence of specified events, including, without limitation, the achievement

Table of Contents



of Performance Goals or other performance measures, the satisfaction of an event or condition within the control of the recipient of the Stock Appreciation Right or within the control of others. The granting of a Stock Appreciation Right shall take place when the Plan Administrator by resolution, written consent or other appropriate action determines to grant such a Stock Appreciation Right to a particular Participant at a particular price. A Stock Appreciation Right may be granted freestanding or in tandem or in combination with any other Award under the Plan.

**8.2 Exercise of Stock Appreciation Rights**

Subject to the limitations in Section 5.5, a Stock Appreciation Right may be exercised upon such terms and conditions and for such term as the Plan Administrator shall determine; provided, however, no Stock Appreciation Right shall be exercisable later than the tenth (10th) anniversary of the date of its grant. Upon exercise of a Stock Appreciation Right, a Participant shall be entitled to receive Common Stock, or the cash equivalent, with an aggregate Fair Market Value determined by multiplying (i) the difference between the Fair Market Value of a share of Common Stock on the date of exercise of the Stock Appreciation Right over the price determined by the Plan Administrator on the date of grant (which price shall not be less than 100% of the Fair Market Value of a share of Common Stock on the date of grant, except in the case of Stock Appreciation Rights that are granted in assumption of, or in substitution for, outstanding awards previously granted by (x) a company acquired by the Company or a Subsidiary, or (y) a company with which the Company or a Subsidiary combines) times (ii) the number of shares of Common Stock with respect to which the Stock Appreciation Right is exercised. The value of any fractional shares shall be paid in cash.

**8.3 Special Provisions Applicable to Stock Appreciation Rights**

Stock Appreciation Rights are subject to the following restrictions:

(a) A Stock Appreciation Right granted in tandem with any other Award under the Plan shall be exercisable at such time or times as the Award to which it relates shall be exercisable, or at such other times as the Plan Administrator may determine.

(b) The right of a Participant to exercise a Stock Appreciation Right granted in tandem with any other Award under the Plan shall be canceled if and to the extent the related Award is exercised or canceled. To the extent that a Stock Appreciation Right is exercised, the related Award shall be deemed to have been surrendered unexercised and canceled.

(c) A holder of Stock Appreciation Rights shall have none of the rights of a stockholder until the Common Stock, if any, is issued to such holder pursuant to such holder's exercise of such rights. No dividend equivalents may be granted in connection with any Stock Appreciation Right.

(d) The acquisition of Common Stock pursuant to the exercise of a Stock Appreciation Right shall be subject to the same restrictions as would apply to the acquisition of Common Stock acquired upon exercise of an Option, as set forth in Section 7.3.

**8.4 No Repricing or Exchange**

Other than pursuant to Section 5.3, the Plan Administrator may not take any action (i) to amend the terms of an outstanding Stock Appreciation Right to reduce the grant price thereof, cancel a Stock Appreciation Right and replace it with a new Stock Appreciation Right with a lower grant price, or that has an economic effect that is the same as any such reduction or cancellation or (ii) to cancel an outstanding Stock Appreciation Right having a grant price above the then-current Fair Market Value of the Common Stock in exchange for the grant of another type of Award or cash (other than in connection with a Change of Control), without, in each such case, first obtaining approval of the Company's stockholders of such action.

Table of Contents



SECTION 9
PERFORMANCE SHARES AND PERFORMANCE UNITS

**9.1 Grant of Performance Shares and Performance Units**

Subject to the limitations in Sections 5.1 and 5.2, (a) Performance Shares or Performance Units may be granted to Participants at any time and from time to time as the Plan Administrator shall determine, and (b) the Plan Administrator shall have complete discretion in determining the number of Performance Shares or Performance Units granted to each Participant and the terms and conditions thereof. Performance Shares and Performance Units may be granted alone or in combination with any other Award under the Plan.

**9.2 Value of Performance Shares and Performance Units**

The Plan Administrator shall establish Performance Goals for any specified Performance Periods. In no event shall a Performance Period be less than one (1) year with respect to grants of Performance Shares or Performance Units. Prior to each grant of Performance Shares or Performance Units, the Plan Administrator shall establish an initial amount of Common Stock for each Performance Share and an initial value for each Performance Unit granted to each Participant for that Performance Period. Prior to each grant of Performance Shares or Performance Units, the Plan Administrator also shall set the Performance Goals that will be used to determine the extent to which the Participant receives Common Stock for the Performance Shares or payment of the value of the Performance Units awarded for such Performance Period. With respect to each such Performance Goal utilized during a Performance Period, the Plan Administrator may assign percentages or other relative values to various levels of performance which shall be applied to determine the extent to which the Participant shall receive a payout of the number of Performance Shares or value of Performance Units awarded.

**9.3 Payment of Performance Shares and Performance Units**

After a Performance Period has ended, the holder of a Performance Share or Performance Unit shall be entitled to receive the value thereof as determined by the Plan Administrator. The Plan Administrator shall make this determination by first determining the extent to which the Performance Goals set pursuant to Section 9.2 have been met. The Plan Administrator shall then determine the applicable percentage or other relative value to be applied to, and will apply such percentage or other relative value to, the number of Performance Shares or value of Performance Units to determine the payout to be received by the Participant. In addition, with respect to Performance Shares and Performance Units granted to each Participant, no payout shall be made hereunder except upon written certification by the Plan Administrator that the applicable Performance Goals have been satisfied to a particular extent.

**9.4 Form and Timing of Payment**

The payment described in Section 9.3 shall be made in Common Stock, or in cash, or partly in Common Stock and partly in cash, at the discretion of the Plan Administrator and set forth in the Award Agreement. The value of any fractional shares shall be paid in cash. Payment shall be made in a lump sum or installments as prescribed in the applicable Award Agreement. If Common Stock is to be converted into an amount of cash on any date, or if an amount of cash is to be converted into Common Stock on any date, such conversion shall be done at the then-current Fair Market Value of the Common Stock on such date.

Table of Contents



**9.5 Dividend Equivalents**

The Plan Administrator may provide that Performance Shares or Performance Units awarded under the Plan shall be entitled to an amount per Performance Share or Performance Unit equal in value to the cash dividend, if any, paid per share of Common Stock on issued and outstanding shares, on the dividend payment dates ("Dividend Payment Date") occurring during the period between the date on which the Performance Shares or Performances Unit are granted to the Participant and the date on which such Performance Shares or Performance Units are settled under the Plan (or such other period as designated by the Plan Administrator). Such paid amounts called "dividend equivalents" shall be accrued and paid in cash and/or Common Stock (including reinvestment in additional shares of Common Stock) and paid at such time as the Performance Share or Performance Unit to which it relates vests and settles or at such other time as provided in the applicable Award Agreement (for the avoidance of doubt, such dividend equivalents shall also be subject to restrictions and risk of forfeiture to the same extent as the underlying Award). The number of shares of Common Stock to be issued and/or reinvested shall be determined based on the Fair Market Value on the Dividend Payment Date.

SECTION 10
RESTRICTED STOCK

**10.1 Grant of Restricted Stock**

Subject to the limitations in Sections 5.1 and 5.2, Restricted Stock may be granted to Participants in such number and at such times during the term of the Plan as the Plan Administrator shall determine. The Plan Administrator may grant Restricted Stock or provide for the grant of Restricted Stock, either from time to time in the discretion of the Plan Administrator or automatically upon the occurrence of specified events.

**10.2 Restriction Period**

Restricted Stock shall be subject to Section 18.2 for the period determined by the Plan Administrator and provided in the applicable Award Agreement (the "Restriction Period"). During the Restriction Period, the Plan Administrator shall evidence the restrictions on the shares of Restricted Stock in such a manner as it determines is appropriate (including, without limitation, (i) by means of appropriate legends on shares of Restricted Stock that have been certificated and (ii) by means of appropriate stop-transfer orders on shares of Restricted Stock credited to book-entry accounts).

**10.3 Other Restrictions**

The Plan Administrator shall impose such other restrictions on Restricted Stock granted pursuant to the Plan as it may deem advisable, including Performance Goals or other performance measures or vesting requirements. The Plan Administrator may require, under such terms and conditions as it deems appropriate or desirable, that the certificates for Restricted Stock delivered under the Plan may be held in custody by a bank or other institution, or that the Company may itself hold such shares in custody until the Restriction Period expires or until restrictions thereon otherwise lapse, and may require, as a condition of any issuance of Restricted Stock that the Participant shall have delivered a stock power endorsed in blank relating to the shares of Restricted Stock.

**10.4 Voting Rights; Dividends and Other Distributions**

A Participant receiving a grant of Restricted Stock shall be recorded as a stockholder of the Company. Except as otherwise provided under the terms of the Plan or an Award Agreement, a

Table of Contents



Participant who receives a grant of Restricted Stock shall have the rights of a stockholder with respect to such shares (except as provided in the restrictions on transferability), including the right to vote the shares and receive dividends and other distributions paid with respect to the underlying shares of Common Stock. The Plan Administrator may require that any cash dividend paid on a share of Common Stock subject to the Restricted Stock be (i) paid in cash on or about the Dividend Payment Date or accrued and paid at such time as the Restricted Stock to which it relates vests and settles, (ii) paid in Common Stock on or about the Dividend Payment Date or accrued and/or reinvested in additional shares of Common Stock and paid at such time as the Restricted Stock to which it relates vests and settles, or (iii) paid in any combination thereof of cash or Common Stock and paid at such times as the Plan Administrator shall determine. The number of shares of Common Stock to be issued and/or reinvested shall be determined based on the Fair Market Value on the Dividend Payment Date. Notwithstanding the preceding provisions of this Section, cash, stock and any other property distributed as a dividend or otherwise with respect to any award of Restricted Stock that vests based on achievement of Performance Goals or other performance measures shall either (x) not be paid or credited or (y) be accumulated, be subject to restrictions and risk of forfeiture to the same extent as the Restricted Stock with respect to which such cash, stock or other property has been distributed and be paid at the time such restrictions and risk of forfeiture lapse.

**10.5 Issuance of Shares; Settlement of Awards**

When the restrictions imposed by Sections 10.2 and 10.3 expire or otherwise lapse with respect to one or more shares of Restricted Stock, the Participant shall be obligated to return to the Company any certificate(s) representing shares of Restricted Stock (if applicable), and the Company shall deliver to the Participant one (1) share of Common Stock (which may be delivered in book-entry or certificated form) in satisfaction of each share of Restricted Stock, which shares so delivered shall not contain any legend. The delivery of shares pursuant to this Section 10.5 shall be subject to any required share withholding to satisfy tax withholding obligations pursuant to Section 18.10. Any fractional shares subject to such Restricted Stock shall be paid to the Participant in cash.

## SECTION 11
## RESTRICTED STOCK UNITS

**11.1 Grant of Restricted Stock Units**

Subject to the limitations in Sections 5.1 and 5.2, Restricted Stock Units may be granted to Participants in such number and at such times during the term of the Plan as the Plan Administrator shall determine. The Plan Administrator may grant Restricted Stock Units or provide for the grant of Restricted Stock Units, either from time to time in the discretion of the Plan Administrator or automatically upon the occurrence of specified events.

**11.2 Restriction Period**

Restricted Stock Units shall be subject to Section 18.2 for the period determined by the Plan Administrator and provided in the applicable Award Agreement (the “Restriction Period”).

**11.3 Other Restrictions**

The Plan Administrator shall impose such other restrictions on Restricted Stock Units granted pursuant to the Plan as it may deem advisable, including Performance Goals or other performance measures or vesting requirements. A Participant receiving a grant of Restricted Stock Units shall not be recorded as a stockholder of the Company and shall not acquire any rights of a stockholder unless or until the Participant is issued shares of Common Stock in settlement of such Restricted Stock Units.

Table of Contents



### 11.4 Dividend Equivalents

The Plan Administrator may provide that Restricted Stock Units awarded under the Plan shall be entitled to an amount per Restricted Stock Unit equal in value to the cash dividend, if any, paid per share of Common Stock on issued and outstanding shares, on the Dividend Payment Dates occurring during the period between the date on which the Restricted Stock Units are granted to the Participant and the date on which such Restricted Stock Units are settled, cancelled, forfeited, waived, surrendered or terminated under the Plan (or such other period designated by the Plan Administrator). Such paid amounts called "dividend equivalents" shall be (i) paid in cash on or about the Dividend Payment Date or accrued and paid at such time as the Restricted Stock Unit to which it relates vests and settles, (ii) paid in Common Stock on or about the Dividend Payment Date or accrued and/or reinvested in additional shares of Common Stock and paid at such time as the Restricted Stock Units to which it relates vests and settles, or (iii) paid in any combination thereof of cash or Common Stock and paid at such times as the Plan Administrator shall determine. The number of shares of Common Stock to be issued and/or reinvested shall be determined based on the Fair Market Value on the Dividend Payment Date. Notwithstanding the preceding provisions of this Section, cash, stock and any other property distributed as a dividend or otherwise with respect to any award of Restricted Stock Units that vests based on achievement of Performance Goals or other performance measures shall either (x) not be paid or credited or (y) be accumulated, be subject to restrictions and risk of forfeiture to the same extent as the Restricted Stock Units with respect to which such cash, stock or other property has been distributed and be paid at the time such restrictions and risk of forfeiture lapse.

### 11.5 Issuance of Shares; Settlement of Awards

When the restrictions imposed by Sections 11.2 and 11.3 expire or otherwise lapse with respect to one or more Restricted Stock Units, Restricted Stock Units shall be settled (i) in cash or (ii) by the delivery to the Participant of the number of shares of Common Stock equal to the number of the Participant's Restricted Stock Units that are vested, or any combination thereof, as the Plan Administrator shall determine. The delivery of shares pursuant to this Section 11.5 shall be subject to any required share withholding to satisfy tax withholding obligations pursuant to Section 18.10. Any fractional shares subject to such Restricted Stock Units shall be paid to the Participant in cash.

## SECTION 12
## INCENTIVE AWARDS

### 12.1 Incentive Awards

The Plan Administrator shall establish Performance Goals or other performance measures which must be achieved for any Participant to receive payment with respect to an Incentive Award for a particular Performance Period; provided, however, that, with respect to an Incentive Award that is intended to constitute "performance-based compensation" within the meaning of Section 162(m) for Covered Employees, the Plan Administrator shall establish the applicable Performance Goals within any time period required under Section 162(m). The Performance Goals or other performance measures may be based on any combination of corporate and business unit Performance Goals or other performance measures. The Plan Administrator may also establish one or more Company-wide Performance Goals or other performance measures which must be achieved for any Participant to receive payment with respect to an Incentive Award for that Performance Period. Such Performance Goals or other performance measures may include a threshold level of performance below which no Incentive Award shall be earned, target levels of performance at which specific Incentive Awards will

Table of Contents



be earned, and a maximum level of performance at which the maximum level of Incentive Awards will be earned. Each Incentive Award shall specify the amount of cash, Common Stock and/or the amount of any other Awards subject to such Incentive Award.

**12.2 Performance Goal Certification**

An Incentive Award shall become payable to the extent provided herein in the event that the Plan Administrator certifies in writing prior to payment of the Incentive Award that the Performance Goals or other performance measures selected for a particular Performance Period have been attained. In no event will an Incentive Award be payable under the Plan if the threshold level of performance set for each Performance Goal or other performance measure for the applicable Performance Period is not attained.

**12.3 Discretion to Reduce Awards; Participant's Performance**

The Plan Administrator, in its sole and absolute discretion and only prior to a Change of Control, may reduce the amount of any Incentive Award otherwise payable to a Participant upon attainment of any Performance Goal or other performance measure for the applicable Performance Period. A Participant's individual performance must be satisfactory as determined by the Plan Administrator, regardless of the Company's performance and the attainment of Performance Goals or other performance measures, before he or she may be paid an Incentive Award. In evaluating a Participant's performance, the Plan Administrator shall consider the Performance Goals or other performance measures, the Participant's responsibilities and accomplishments, and such other factors as it deems appropriate.

**12.4 Required Payment of Incentive Awards**

The Plan Administrator shall make a determination as soon as administratively possible after the information that is necessary to make such a determination is available for a particular Performance Period whether the Performance Goals or other performance measures for the Performance Period have been achieved, the amount of the Incentive Award for each Participant and whether the Incentive Award shall be paid in cash, Common Stock and/or other Awards under the Plan. The Plan Administrator shall certify the foregoing determinations in writing as provided in Section 2.31. In the absence of an election by the Participant pursuant to Section 14, the Incentive Award shall be paid as soon as practicable after the end of the calendar year, but in no event later than March 15 following the end of the calendar year, in which the foregoing determinations have been made.

## SECTION 13
## CASH AWARDS AND OTHER STOCK-BASED AWARDS

**13.1 Grant of Cash Awards**

Subject to the terms and provisions of the Plan, the Plan Administrator, at any time and from time to time, may grant cash awards to Participants in such amounts and upon such terms, including the achievement of Performance Goals or other specific performance measures, as the Plan Administrator may determine (each, a "Cash Award").

**13.2 Other Stock-Based Awards**

The Plan Administrator may grant other types of equity-based or equity-related Awards not otherwise described by the terms of the Plan (including the grant or offer for sale of unrestricted shares

Table of Contents



of Common Stock and Awards or shares of Common Stock in lieu of obligations to pay cash or deliver other property or Common Stock (including obligations to pay deferred compensation under any plan or program maintained by the Company or any Subsidiary or any other form of compensation)) in such amounts and subject to such terms and conditions, as the Plan Administrator shall determine (each, an "Other Stock-Based Award"). Such Other Stock-Based Awards may involve the transfer of Common Stock to Participants (either on a current or deferred basis), or payment in cash or otherwise of amounts based on or valued in whole or in part by reference to the value of Common Stock.

**13.3 Value of Cash Awards and Other Stock-Based Awards**

Each Cash Award granted pursuant to this Section 13 shall specify a payment amount or payment range as determined by the Plan Administrator. Each Other Stock-Based Award shall be expressed in terms of Common Stock or units based on Common Stock, as determined by the Plan Administrator. The Plan Administrator may establish performance measures applicable to such Awards in its discretion. If the Plan Administrator exercises its discretion to establish performance measures, the number and/or value of such Cash Awards or Other Stock-Based Awards that will be paid out to the Participant will depend on the extent to which the performance measures are met.

**13.4 Payment of Cash Awards and Other Stock-Based Awards**

Payment, if any, with respect to a Cash Award or an Other Stock-Based Award shall be made in accordance with the terms of the Award, in cash and/or Common Stock as the Plan Administrator determines and as set forth in the applicable Award Agreement. The value of any fractional shares shall be paid in cash.

SECTION 14
DEFERRAL ELECTIONS

The Plan Administrator may, to the extent permitted by applicable law, permit Employees and Consultants to defer Awards. Any such deferrals shall be subject to such terms, conditions and procedures that the Company may establish from time to time in its sole discretion and consistent with the advance and subsequent deferral election requirements of Section 409A.

SECTION 15
TERMINATION OF SERVICE

The Award Agreement applicable to each Award shall set forth the effect of a Termination of Service upon such Award; provided, however, that, unless explicitly set forth otherwise in an Award Agreement or as determined by the Plan Administrator, (i) all of a Participant's unvested and/or unexercisable Awards shall automatically be forfeited upon a Termination of Service for any reason, and, as to Awards consisting of Options or Stock Appreciation Rights, the Participant shall be permitted to exercise the vested portion of the Option or Stock Appreciation Right for at least three (3) months following his or her Termination of Service (but in no event beyond the maximum term of the Option or Stock Appreciation Right), and (ii) all of a Participant's Awards (whether vested or unvested, exercisable or unexercisable) shall automatically be forfeited upon the Participant's Termination of Service for Cause. Provisions relating to the effect of a Termination of Service upon an Award shall be determined in the sole discretion of the Plan Administrator and need not be uniform among all Awards or among all Participants. Unless the Plan Administrator determines otherwise, the

Table of Contents



transfer of employment of a Participant as between the Company and a Subsidiary shall not constitute a Termination of Service. The Plan Administrator shall have the discretion to determine the effect, if any, that a sale or other disposition of an Employer will have on the Participant's Awards.

SECTION 16
EFFECT OF A CHANGE OF CONTROL

Notwithstanding any other provision of the Plan to the contrary and unless otherwise provided in the Award Agreement or other agreement, in the event of a Change of Control:

(a) Any Options and Stock Appreciation Rights outstanding which are not then exercisable and vested shall become fully exercisable and vested upon the termination of the Participant's employment or service without Cause or for Good Reason during the Applicable Period.

(b) The restrictions applicable to any Restricted Stock or Restricted Stock Unit Award which are not performance based shall lapse and such Restricted Stock or Restricted Stock Unit shall become free of all restrictions and become fully vested and transferable upon the termination of the Participant's employment or service without Cause or for Good Reason during the Applicable Period.

(c) The restrictions applicable to any Performance Share or Performance Unit Award and any performance-based Restricted Stock or Restricted Stock Unit granted pursuant to Sections 9, 10 or 11 or any Award that is subject to the attainment of Performance Goals shall become free of all restrictions and become fully vested and transferable upon the termination of the Participant's employment or service without Cause or for Good Reason during the Applicable Period; provided, however, that any such Awards shall only vest to the extent the applicable Performance Goals have been achieved and the amount of vesting shall be based on actual performance.

(d) Any restrictions applicable to Cash Awards and Other Stock-Based Awards which are not performance based shall immediately lapse and become payable within twenty (20) days following the termination of the Participant's employment or service without Cause or for Good Reason during the Applicable Period.

(e) Notwithstanding subparagraph (d) above, all Other Stock-Based Awards held by a Participant who is a non-employee member of the Board (irrespective of other payment elections that may be applicable to such Awards) shall be paid to the Participant (or his or her Beneficiary in the case of his or her death) within thirty (30) days after the date of the Change of Control, or at such later time as may be required to enable the Participant to avoid liability under Section 16(b) of the Exchange Act; provided, however, no such Awards shall be paid to the Participant if he or she continues to serve as a member of the Board or upon the board of directors of the Company's successor, until such time said Awards would otherwise be paid.

For purposes of this Section 16 and unless otherwise provided in the Award Agreement, the term "Applicable Period" shall have the following meaning: (i) to the extent provided in an Employee's employment agreement, severance or other individual agreement, the term "Applicable Period" shall mean the protection period following a Change of Control provided in the such

Table of Contents



agreement with respect to such Employee, (ii) in the case of an Employee covered by the Company's Key Employee Change-of-Control Contract, the term "Applicable Period" shall mean the protection period following a Change of Control provided in the Key Employee Change-of-Control Contract entered into with such Employee, (iii) in the case of an Employee covered by the Company's Key Manager Change-of-Control Agreement, the term "Applicable Period" shall mean the protection period following a Change of Control provided in the Key Manager Change-of-Control Agreement entered into with such Employee; (iv) in the case of any Employee not covered by clause (i), (ii) or (iii) above, the term "Applicable Period" shall mean the protection period following a Change of Control provided in the Company's Change of Control Severance Plan, as it may be amended from time to time; and (v) in the case of a Participant who is not an Employee, the term "Applicable Period" shall mean the twelve-month period following a Change of Control.

In addition to the Plan Administrator's authority set forth in Sections 5.3, in order to maintain the Participants' rights in the event of any Change of Control, the Plan Administrator, as constituted before such Change of Control, is hereby authorized, and has sole discretion, as to any Award, either at the time such Award is made hereunder or any time thereafter, to take any one or more of the following actions: (i) cause any such Award then outstanding to be assumed, or new rights substituted therefor, by the acquiring or surviving corporation after such Change of Control; (ii) provide that Options and Stock Appreciation Rights outstanding as of the date of the Change of Control shall be cancelled and terminated without payment if the Fair Market Value of one share as of the date of the Change of Control is less than the per share Option exercise price or Stock Appreciation Right grant price; or (iii) provide that each Option and Stock Appreciation Right outstanding shall terminate within a specified number of days after notice to the Participant, and/or that each Participant shall receive, with respect to each share subject to such Option or Stock Appreciation Right, an amount equal to the excess of the Fair Market Value of such share immediately prior to the occurrence of such Change of Control over the exercise price per share of such Option and/or Stock Appreciation Right (such amount to be payable in cash, in one or more kinds of stock or property (including the stock or property, if any, payable in the transaction, if applicable) or in a combination thereof, as the Plan Administrator, in its discretion, shall determine).

## SECTION 17
## REGULATORY APPROVALS AND LISTING

The Company shall not be required to issue any certificate or create a book-entry account for shares of Common Stock under the Plan prior to:

(a) obtaining any approval or ruling from the Securities and Exchange Commission, the Internal Revenue Service or any other governmental agency which the Company, in its sole discretion, shall determine to be necessary or advisable;

(b) listing of such shares on any stock exchange on which the Common Stock may then be listed; and

(c) completing any registration or other qualification of such shares under any federal or state laws, rulings or regulations of any governmental body which the Company, in its sole discretion, shall determine to be necessary or advisable.

All certificates, or book-entry accounts, for shares of Common Stock delivered under the Plan shall also be subject to such stop-transfer orders and other restrictions as the Plan Administrator may deem

Table of Contents



advisable under the rules, regulations and other requirements of the Securities and Exchange Commission, any stock exchange upon which Common Stock is then listed and any applicable federal or state securities laws, and the Plan Administrator may cause a legend or legends to be placed on any such certificates, or notations on such book-entry accounts, to make appropriate reference to such restrictions. The foregoing provisions of this paragraph shall not be effective if and to the extent that the shares of Common Stock delivered under the Plan are covered by an effective and current registration statement under the Securities Act or if and so long as the Plan Administrator determines that application of such provisions are no longer required or desirable. In making such determination, the Plan Administrator may rely upon an opinion of counsel for the Company. Without limiting the foregoing, the Plan Administrator may impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any resales by a Participant or other subsequent transfers by a Participant of any shares of Common Stock issued under the Plan, including without limitation (i) restrictions under an insider trading policy, (ii) restrictions designed to delay and/or coordinate the timing and manner of sales by one or more Participants and (iii) restrictions as to the use of a specified brokerage firm for such resales or other transfers.

## SECTION 18
## GENERAL PROVISIONS

### 18.1 Clawback/Forfeiture Events

(a) Awards shall be subject to any clawback policy maintained by the Company, as it may exist or be amended from time to time, subject to the discretion of the Plan Administrator. Furthermore, if required by Company policy, by the Sarbanes-Oxley Act of 2002 and/or by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 or other applicable laws, each Participant's Award shall be conditioned on repayment or forfeiture in accordance with such applicable laws, Company policy, and any relevant provisions in the related Award Agreement.

(b) The Plan Administrator may specify in an Award Agreement or otherwise that a Participant's rights, payments, and benefits with respect to an Award shall be subject to reduction, cancellation, forfeiture, or recoupment upon the occurrence of certain specified events, in addition to any otherwise applicable vesting or performance conditions of an Award. Such events may include, without limitation, termination of employment or service for Cause, violation of material policies that may apply to the Participant, breach of noncompetition, confidentiality, or other restrictive covenants that may apply to the Participant, or other conduct by the Participant that is detrimental to the business or reputation of the Company or a Subsidiary.

### 18.2 Nontransferability

Unless otherwise provided in the Plan and permitted by law, including but not limited to the Code, the right of a Participant or Beneficiary to the payment of any Award granted under the Plan and the rights and privileges conferred thereby shall not be subject to execution, attachment or similar process and may not be transferred, assigned, pledged or hypothecated in any manner (whether by operation of law or otherwise) other than by will or by the applicable laws of descent and distribution unless the Participant has received the Plan Administrator's prior written consent. Except as otherwise provided for under the Plan, if any Participant attempts to transfer, assign, pledge, hypothecate or otherwise dispose of any Award under the Plan or of any right or privilege conferred thereby, contrary to the provisions of the Plan or such Award, or suffers the sale or levy or any attachment or similar process upon the rights and privileges conferred hereby, all affected Awards held by such Participant shall be immediately forfeited.

Table of Contents



**18.3 No Individual Rights**

Nothing contained in the Plan, or in any Award granted pursuant to the Plan, shall confer upon any Participant any right to continue in the employ of, or as a Consultant for, the Company or a Subsidiary, nor interfere in any way with the right of the Company or a Subsidiary to terminate the employment or service of such Participant at any time with or without assigning any reason therefor, except to the extent expressly provided otherwise in a written agreement between the Participant and the Company or any Employer.

**18.4 Other Compensation**

Unless determined otherwise by the Plan Administrator or required by contractual obligations, the grant, vesting or payment of Awards under the Plan shall not be considered as part of an Employee's salary or used for the calculation of any other pay, allowance, pension or other benefit unless otherwise permitted by other benefit plans provided by the Company or a Subsidiary, or required by law or by contractual obligations of the Company or a Subsidiary.

**18.5 Leaves of Absence and Change in Status**

Leaves of absence for such periods and purposes conforming to the personnel policy of the Company, or of a Subsidiary, as applicable, shall not be deemed a Termination of Service, unless a Participant commences a leave of absence from which he or she is not expected to return to active employment or service with the Company or a Subsidiary. The foregoing notwithstanding, with respect to Incentive Stock Options, employment shall not be deemed to continue beyond the first three (3) months of such leave unless the Participant's reemployment rights are guaranteed by statute or contract. With respect to any Participant who, after the date an Award is granted under the Plan, ceases to be employed by or provide services to the Company or a Subsidiary on a full-time basis but continues to be employed or provide services on a part-time basis, the Plan Administrator may make appropriate adjustments, as determined in its sole discretion, as to the number of shares issuable under, the vesting schedule of, or the amount payable under any unvested Awards held by such Participant.

**18.6 Transfers**

In the event a Participant is transferred from the Company to a Subsidiary, or vice versa, or is promoted or given different responsibilities, Awards granted to the Participant prior to such date shall not be affected.

**18.7 Unfunded Obligations**

Any amounts (deferred or otherwise) to be paid to Participants pursuant to the Plan are unfunded obligations. Neither the Company nor any Subsidiary is required to segregate any monies from its general funds, to create any trusts or to make any special deposits with respect to this obligation. The Plan Administrator, in its sole discretion, may direct the Company to share with a Subsidiary the costs of a portion of the Awards paid to Participants who are executives of those companies. Beneficial ownership of any investments, including trust investments which the Company may make to fulfill this obligation, shall at all times remain in the Company. Any investments and the creation or maintenance of any trust or any Participant account shall not create or constitute a trust or a fiduciary relationship between the Plan Administrator, the Company or any Subsidiary and a Participant, or otherwise create any vested or beneficial interest in any Participant or the Participant's Beneficiary or the Participant's creditors in any assets of the Company or a Subsidiary whatsoever. The Participants shall have no claim against the Company for any changes in the value of any assets which may be invested or reinvested by the Company with respect to the Plan.

Table of Contents



**18.8 Beneficiaries**

The designation of a Beneficiary shall be on a form provided by the Company, executed by the Participant (with the consent of the Participant's spouse, if required by the Company for reasons of community property or otherwise), and delivered to a designated representative of the Company. The Company may, in its discretion, utilize an electronic process for Beneficiary designations. A Participant may change his or her Beneficiary designation at any time. A designation by a Participant under any predecessor plans shall remain in effect under the Plan unless such designation is revoked or changed under the Plan. In the event that a Participant becomes divorced, a Beneficiary designation under the Plan or a predecessor plan in favor of his or her divorced spouse shall become void as of the effective date of the divorce, unless the Participant re-designates the former spouse as his or her Beneficiary following the effective date of the divorce. If no Beneficiary is designated, if the designation is ineffective, or if the Beneficiary dies before the balance of a Participant's benefit is paid, the balance shall be paid to the Participant's spouse, or if there is no surviving spouse, to the Participant's estate. Notwithstanding the foregoing, however, a Participant's Beneficiary shall be determined under applicable state law if such state law does not recognize Beneficiary designations under plans of this sort and is not preempted by laws which recognize the provisions of this Section 18.8. In the event that the Plan Administrator determines that two or more claims are made by claimed Beneficiaries against the Plan for an Award, the Plan Administrator may initiate an interpleader action in a court of competent jurisdiction to resolve the controversy.

In the event that an Award has vested, its restrictions have lapsed, or it has been exercised and the underlying shares of Common Stock relating to such award have been transferred to a brokerage account, it is the responsibility of the Participant to establish and maintain beneficiary designations with that broker.

**18.9 Governing Law**

The Plan shall be construed and governed in accordance with the laws of the State of Texas.

**18.10 Satisfaction of Tax Obligations**

Appropriate provision shall be made for all taxes required to be withheld in connection with the exercise, grant, vesting or other taxable event of Awards under the applicable laws and regulations of any governmental authority, whether federal, state or local and whether domestic or foreign, including, without limitation, the required withholding of a sufficient amount of Common Stock otherwise issuable to a Participant to satisfy the said required minimum tax withholding obligations. To the extent provided by the Plan Administrator, a Participant is permitted to deliver Common Stock (including shares acquired pursuant to the exercise of an Option or Stock Appreciation Right other than the Option or Stock Appreciation Right currently being exercised, to the extent permitted by applicable law) for payment of withholding taxes on the exercise of an Option or Stock Appreciation Right or upon the grant, vesting or payout of Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Incentive Awards or Other Stock-Based Awards. Common Stock may be required to be withheld from the shares issuable to a Participant upon the exercise of an Option or Stock Appreciation Right or upon the grant, vesting or payout of Restricted Stock, Restricted Stock Units, Performance Shares, Performance Units, Incentive Awards or Other Stock-Based Awards to satisfy such minimum required tax withholding obligations. Notwithstanding the preceding provisions of this Section 18.10, withholding taxes may be based on rates in excess of the minimum required tax withholding rates if (a) the Plan Administrator (i) determines that such withholding would not result in adverse accounting, tax or other consequences to the Company or any Employer (other than immaterial administrative, reporting or similar consequences) and (ii) authorizes

Table of Contents



withholding at such greater rates and (b) the holder of the Award consents to such withholding at such greater rates. The Fair Market Value of Common Stock as delivered pursuant to this Section 18.10 shall be determined as of the day of release, and shall be calculated in accordance with Section 2.19.

Any Participant who makes a Section 83(b) election under the Code shall, within ten (10) days of making such election, notify the Company in writing of such election and shall provide the Company or such Participant's Employer with a copy of such election form filed with the Internal Revenue Service.

A Participant is solely responsible for obtaining, or failing to obtain, tax advice with respect to participation in the Plan prior to the Participant's (i) entering into any transaction under or with respect to the Plan, (ii) designating or choosing the times of distributions under the Plan, or (iii) disposing of any Common Stock issued under the Plan.

**18.11 Participants in Foreign Jurisdictions**

The Plan Administrator shall have the authority to adopt such modifications, procedures and subplans as may be necessary or desirable to comply with provisions of the laws of any countries in which the Company or any Subsidiary may operate to ensure the viability of the benefits from Awards granted to Participants employed or providing services in such countries, to meet the requirements of local laws that permit the Plan to operate in a qualified or tax-efficient manner, to comply with applicable foreign laws and to meet the objectives of the Plan; provided, however, that no such action taken pursuant to this Section 18.11 shall result in a "material revision" of the Plan under applicable securities exchange governance rules.

## SECTION 19
## REGULATORY COMPLIANCE

**19.1 Rule 16b-3 of the Exchange Act and Section 162(m)**

The Company's intention is that, so long as any of the Company's equity securities are registered pursuant to Section 12(b) or 12(g) of the Exchange Act, the Plan shall comply in all respects with the rules of any exchange on which the Common Stock is traded and with Rule 16b-3. In addition, it is the Company's intention that, as to Covered Employees, unless otherwise indicated in an Award Agreement, Options, Stock Appreciation Rights, Performance Shares, Performance Units and Incentive Awards shall be designed to qualify as performance-based compensation under Section 162(m). If any Plan provision is determined not to be in compliance with the foregoing intentions, that provision shall be deemed modified as necessary to meet the requirements of any such exchange, Rule 16b-3 and Section 162(m).

**19.2 Section 409A**

The Plan is intended to be administered, operated and construed in compliance with Section 409A and any guidance issued thereunder. Notwithstanding this or any other provision of the Plan to the contrary, the Board or the Plan Administrator may amend the Plan in any manner, or take any other action, that either of them determines, in its sole discretion, is necessary, appropriate or advisable to cause the Plan to comply with Section 409A and any guidance issued thereunder. Any such action, once taken, shall be deemed to be effective from the earliest date necessary and applicable to avoid a violation of Section 409A and shall be final, binding and conclusive on all Employees, Consultants and other individuals having or claiming any right or interest under the Plan.

Table of Contents



Notwithstanding the provisions of the Plan or any Award Agreement, if a Participant is a "specified employee" upon his or her "separation from service" (within the meaning of such terms in Section 409A under such definitions and procedures as established by the Company in accordance with Section 409A), any portion of a payment, settlement or other distribution made upon such a "separation from service" that would cause the acceleration of, or an addition to, any taxes pursuant to Section 409A will not commence or be paid until a date that is six (6) months and one (1) day following the applicable "separation from service." Any payments, settlements or other distributions that are delayed pursuant to this Section 19.2 following the applicable "separation from service" shall be accumulated and paid to the Participant in a lump sum without interest on the first business day immediately following the required delay period.

## SECTION 20
## ESTABLISHMENT AND TERM OF PLAN

This amended and restated Plan was adopted by the Board on February 8, 2016, and is subject to approval by the Company's stockholders at the 2016 annual meeting of the Company's stockholders. If this amendment and restatement is not so approved by the stockholders, then this amendment and restatement shall be void *ab initio*, and the Prior Plan shall continue in effect as if this amendment and restatement had not occurred, and any awards previously granted under the Prior Plan shall continue in effect under the terms of the grant and the Prior Plan; provided, further, that thereafter awards may continue to be granted pursuant to the terms of the Prior Plan, as in effect prior to this amendment and restatement and as may be otherwise amended thereafter. This amended and restated Plan shall become effective on the Effective Date if it is approved on such date by the Company's stockholders, and the Plan shall remain in effect, subject to the right of the Board to terminate the Plan at any time pursuant to Section 21, until all Common Stock subject to it shall have been purchased or acquired according to the provisions herein. However, in no event may an Award be granted under the Plan on or after the tenth (10th) anniversary of the Effective Date. After the Plan is terminated, no future Awards may be granted pursuant to the Plan, but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and the Plan's terms and conditions.

## SECTION 21
## AMENDMENT, TERMINATION OR DISCONTINUANCE OF PLAN

### 21.1 Amendment of Plan

Subject to approval of the Board with respect to amendments that are required by law or regulation or stock exchange rules to be submitted to the stockholders of the Company for approval, the Compensation and Benefits Committee of the Board may from time to time make such amendments to the Plan as it may deem proper and in the best interest of the Company, including, without limitation, any amendment necessary to ensure that the Company may obtain any regulatory approval referred to in Section 17; provided, however, that (i) to the extent required by applicable law, regulation or stock exchange rule, and as provided in Sections 7.3(h) and 8.4, stockholder approval shall be required, and (ii) except as otherwise provided in the Plan, no change in any Award previously granted under the Plan may be made without the consent of the Participant if such change would impair the right of the Participant under the Award to acquire or retain Common Stock or cash that the Participant may have acquired as a result of the Plan.

[Table of Contents](#)



**21.2 Termination or Suspension of Plan**

The Compensation and Benefits Committee of the Board may at any time suspend the operation of or terminate the Plan with respect to any Common Stock or rights which are not at that time subject to any Award outstanding under the Plan.

**21.3 Section 162(m) Approval**

If so determined by the Plan Administrator, the provisions of the Plan relating to Performance Goals and Awards that are intended to constitute "performance-based compensation" under Section 162(m) shall be disclosed to, and reapproved by, the Company's stockholders no later than the first stockholder meeting that occurs in the fifth year following the year in which the Effective Date occurs (or at any such other time as may be required or allowed by Section 162(m)) in order for Awards that are intended to constitute "performance-based compensation" under Section 162(m) granted after such time to be exempt from the deduction limitations of Section 162(m).

IN WITNESS WHEREOF, the Company has caused the Plan to be executed effective as of , 2016.

ANADARKO PETROLEUM CORPORATION

______________________________

Julia A. Struble
Vice President, Human Resources

Table of Contents

Anadarko Petroleum Corporation

*1201 LAKE ROBBINS DRIVE*
*THE WOODLANDS, TX 77380*

SCAN TO VIEW MATERIALS & VOTE

**WE ENCOURAGE YOU TO TAKE ADVANTAGE OF INTERNET OR TELEPHONE VOTING.**
**BOTH ARE AVAILABLE 24 HOURS A DAY, 7 DAYS A WEEK**

**VOTE BY INTERNET - www.proxyvote.com or scan the QR Barcode above**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Daylight Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the website and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by Anadarko Petroleum Corporation in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Daylight Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Anadarko Petroleum Corporation, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

E01009-P75444-Z67366 KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

**ANADARKO PETROLEUM CORPORATION**

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ITEMS 1, 2, 3 AND 4.**

**Vote on Directors**

1. Election of Directors

| **Nominees:** | **For** | **Against** | **Abstain** |
|---|---|---|---|
| 1a. Anthony R. Chase | ☐ | ☐ | ☐ |
| 1b. Kevin P. Chilton | ☐ | ☐ | ☐ |
| 1c. H. Paulett Eberhart | ☐ | ☐ | ☐ |
| 1d. Peter J. Fluor | ☐ | ☐ | ☐ |
| 1e. Richard L. George | ☐ | ☐ | ☐ |
| 1f. Joseph W. Gorder | ☐ | ☐ | ☐ |
| 1g. John R. Gordon | ☐ | ☐ | ☐ |
| 1h. Sean Gourley | ☐ | ☐ | ☐ |
| 1i. Mark C. McKinley | ☐ | ☐ | ☐ |
| 1j. Eric D. Mullins | ☐ | ☐ | ☐ |
| 1k. R. A. Walker | ☐ | ☐ | ☐ |

For address changes and/or comments, please check this box and write them on the back where indicated. ☐

Please indicate if you plan to attend this meeting. ☐ **Yes** ☐ **No**

| **Vote on Proposals** | **For** | **Against** | **Abstain** |
|---|---|---|---|
| 2. Ratification of Appointment of KPMG LLP as Independent Auditor. | ☐ | ☐ | ☐ |
| 3. Approve an Amendment and Restatement of the Anadarko Petroleum Corporation 2012 Omnibus Incentive Compensation Plan | ☐ | ☐ | ☐ |
| 4. Advisory Vote to Approve Named Executive Officer Compensation. | ☐ | ☐ | ☐ |

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "AGAINST" ITEM 5.**

| | **For** | **Against** | **Abstain** |
|---|---|---|---|
| 5. Stockholder Proposal - Report on Carbon Risk. | ☐ | ☐ | ☐ |

The shares represented by this proxy, when properly executed, will be voted in the manner directed herein by the undersigned stockholder(s). **If no direction is made, this proxy will be voted FOR Items 1, 2, 3 and 4, and AGAINST Item 5.** If any other matters come properly before the meeting, or if cumulative voting is required, the person named in this proxy will vote in their discretion.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

**Each signatory to this proxy acknowledges receipt from Anadarko Petroleum Corporation, prior to execution of this proxy, of a notice of Annual Meeting of Stockholders and a proxy statement dated March 18, 2016.**

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Notice and Proxy Statement and 10-K/Annual Report are available at:
https://materials.proxyvote.com/032511

**↓ FOLD AND DETACH HERE ↓**

E01010-P75444-Z67366

**ANADARKO PETROLEUM CORPORATION**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

**ANNUAL MEETING OF STOCKHOLDERS**
**May 10, 2016**

The undersigned hereby appoint(s) R. A. Walker, Robert G. Gwin and Robert K. Reeves, and each of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and vote, as designated on the reverse side of this proxy, all of the shares of Common Stock of Anadarko Petroleum Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders to be held at 8:00 a.m., Central Daylight Time, on May 10, 2016, at The Woodlands Waterway Marriott Hotel and Convention Center, 1601 Lake Robbins Drive, The Woodlands, Texas 77380 and any adjournment or postponement thereof.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES LISTED ON THE REVERSE SIDE FOR THE BOARD OF DIRECTORS AND AS RECOMMENDED BY THE BOARD OF DIRECTORS FOR EACH PROPOSAL.**

**PLEASE MARK, SIGN, DATE AND RETURN THE PROXY CARD PROMPTLY USING THE ENCLOSED REPLY ENVELOPE.**

**Address Changes/Comments:** ______________________________

______________________________

(If you noted any Address Changes/Comments above, please mark the corresponding box on the reverse side.)

**(CONTINUED AND TO BE SIGNED ON THE REVERSE SIDE)**

# EXHIBIT 32

DEF 14A 1 d335961ddef14a.htm DEF 14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No. )**

Filed by the Registrant ☑ Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☑ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240, Rule 14a-12

# Anadarko Petroleum Corporation

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

# 2017 PROXY STATEMENT

## ANADARKO PETROLEUM CORPORATION

Notice of Annual Meeting of Stockholders
to be held on May 10, 2017

March 17, 2017

TO OUR STOCKHOLDERS:

The 2017 Annual Meeting of Stockholders of Anadarko Petroleum Corporation will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380 on Wednesday, May 10, 2017, at 8:00 a.m. (Central Daylight Time).

The attached Notice of Annual Meeting of Stockholders and proxy statement provide information concerning the matters to be considered at the Annual Meeting. The Annual Meeting will cover only the business contained in the proxy statement and will not include a management presentation.

Pursuant to rules promulgated by the U.S. Securities and Exchange Commission (SEC), we are also providing access to our proxy materials over the Internet. As a result, we are mailing to most of our stockholders a Notice of Internet Availability of Proxy Materials (Notice) instead of a paper copy of this proxy statement, a proxy card and our 2016 annual report. The Notice contains instructions on how to access those documents over the Internet, as well as instructions on how to request a paper copy of our proxy materials. All stockholders who do not receive a Notice should receive a paper copy of the proxy materials by mail. We believe that the Notice process will allow us to provide you with the information you need in a timelier manner, will save us the cost of printing and mailing documents to you, and will conserve natural resources.

Your vote is important and we encourage you to vote even if you are unable to attend the Annual Meeting. You may vote by Internet or by telephone using the instructions on the Notice, or, if you received a paper copy of the proxy card, by signing and returning it in the postage paid envelope provided for your convenience. You may also attend and vote at the Annual Meeting.

Very truly yours,

*R. A. WALKER*
*Chairman of the Board, President*
*and Chief Executive Officer*

Anadarko Petroleum Corporation

www.anadarko.com

Table of Contents

Anadarko Petroleum Corporation

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380-1046**

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**

The Annual Meeting of Stockholders of Anadarko Petroleum Corporation will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380 on Wednesday, May 10, 2017, at 8:00 a.m. (Central Daylight Time) to consider the following items:

(1) elect twelve directors;

(2) ratify the appointment of KPMG LLP as the Company's independent auditor for 2017;

(3) an advisory vote to approve the Company's named executive officer compensation;

(4) an advisory vote on the frequency of future advisory votes on the Company's named executive officer compensation; and

(5) transact such other business as may properly come before the Annual Meeting and any adjournments or postponements thereof.

If you are a holder of record of common stock at the close of business on March 14, 2017, the record date, then you are entitled to receive notice of and to vote at the Annual Meeting.

Please take the time to vote by following the Internet or telephone voting instructions provided. If you received a paper copy of the proxy card, you may also vote by completing and mailing the proxy card in the postage-paid envelope provided for your convenience. You may also attend and vote at the Annual Meeting. **You may revoke your proxy at any time before the vote is taken by following the instructions in this proxy statement.**

**As a stockholder, your vote is very important and the Company's Board of Directors strongly encourages you to exercise your right to vote.**

BY ORDER OF THE BOARD OF DIRECTORS

Amanda M. McMillian
*Senior Vice President, General Counsel,*
*Corporate Secretary and Chief Compliance Officer*

March 17, 2017
The Woodlands, Texas

**Important Notice Regarding the Availability of Proxy Materials**
**for the Annual Meeting of Stockholders to be Held on May 10, 2017:**
**The proxy statement and annual report for 2016 are available at**
**https://materials.proxyvote.com/032511**

**Table of Contents**

**TABLE OF CONTENTS**


| | |
|---|---|
| ANADARKO BOARD OF DIRECTORS | 2 |
| ITEM 1 — ELECTION OF DIRECTORS | 2 |
| CORPORATE GOVERNANCE | 10 |
| Director Compensation Table for 2016 | 21 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 23 |
| SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 26 |
| AUDIT COMMITTEE REPORT | 27 |
| COMPENSATION AND BENEFITS COMMITTEE REPORT ON 2016 EXECUTIVE COMPENSATION | 28 |
| LETTER FROM THE CHAIR OF THE COMPENSATION AND BENEFITS COMMITTEE | 29 |
| COMPENSATION DISCUSSION AND ANALYSIS | 30 |
| EXECUTIVE COMPENSATION | 58 |
| Summary Compensation Table | 58 |
| All Other Compensation Table for 2016 | 59 |
| Grants of Plan-Based Awards in 2016 | 60 |
| Outstanding Equity Awards at Fiscal Year-End 2016 | 62 |
| Option Exercises and Stock Vested in 2016 | 63 |
| Pension Benefits for 2016 | 63 |
| Non-Qualified Deferred Compensation for 2016 | 67 |
| Potential Payments Upon Termination or Change of Control | 69 |
| TRANSACTIONS WITH RELATED PERSONS | 76 |
| INDEPENDENT AUDITOR | 77 |
| ITEM 2 — RATIFICATION OF THE APPOINTMENT OF THE INDEPENDENT AUDITOR | 77 |
| ADVISORY VOTE TO APPROVE EXECUTIVE COMPENSATION | 79 |
| ITEM 3 — ADVISORY VOTE TO APPROVE THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION | 79 |
| ADVISORY VOTE ON THE FREQUENCY OF FUTURE ADVISORY VOTES ON EXECUTIVE COMPENSATION | 81 |
| ITEM 4 — ADVISORY VOTE ON THE FREQUENCY OF FUTURE ADVISORY VOTES ON THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION | 81 |
| GENERAL INFORMATION | 82 |
| Questions and Answers about the Annual Meeting | 82 |

Table of Contents

1201 Lake Robbins Drive
The Woodlands, Texas 77380-1046

**PROXY STATEMENT**
**ANNUAL MEETING OF STOCKHOLDERS**

**May 10, 2017**

We are furnishing you this proxy statement in connection with the solicitation of proxies by our Board of Directors (Board) to be voted at the 2017 Annual Meeting of Stockholders (Annual Meeting) of Anadarko Petroleum Corporation, a Delaware corporation, sometimes referred to herein as the Company, Anadarko, us, we or like terms. The Annual Meeting will be held on Wednesday, May 10, 2017, at 8:00 a.m. (Central Daylight Time). The proxy materials, including this proxy statement, proxy card or voting instructions and our 2016 annual report, are being distributed and made available on or about March 24, 2017.

We provide our stockholders access to our proxy materials on the Internet (https://materials.proxyvote.com/032511). Accordingly, a Notice of Internet Availability of Proxy Materials (Notice) will be mailed to most of our stockholders on or about March 24, 2017. Stockholders will have the ability to access the proxy materials on the website referred to in the Notice or request a printed set of the proxy materials to be sent to them by following the instructions in the Notice.

The Notice also provides instructions on how to inform us whether to send future proxy materials to you electronically by e-mail or in printed form by mail. If you choose to receive future proxy materials by e-mail, you will receive an e-mail next year with instructions containing a link to those materials and a link to the proxy voting site. Your election to receive proxy materials by e-mail or printed form will remain in effect until you terminate it.

Choosing to receive future proxy materials by e-mail will allow us to provide you with the information you need in a more timely manner, save us the cost of printing and mailing documents to you, and conserve natural resources.

Table of Contents

# Anadarko Board of Directors

## ITEM 1 — ELECTION OF DIRECTORS

Our Restated Certificate of Incorporation provides that all directors are to be elected annually and that any director (or the entire Board) may be removed with or without cause at and after the Annual Meeting at which he or she is elected.

At the Annual Meeting, the terms of our thirteen incumbent directors will expire. Twelve of those thirteen directors have each been nominated to stand for election and, if elected at the Annual Meeting, will hold office until the expiration in 2018 of each of their one-year terms.

The Board is not aware of any reason why the director nominees would not be able to serve as directors of the Company. However, if a nominee is unavailable for election, then the proxies will be voted for the election of another nominee proposed by the Board or, as an alternative, the Board may reduce the number of directors to be elected at the Annual Meeting.

Our By-Laws provide for the election of directors by the majority vote of stockholders in uncontested elections. This means the number of votes cast "for" a nominee's election must exceed the number of votes cast "against" such nominee's election in order for him or her to be elected to the Board. In addition, each incumbent nominee is required to provide an irrevocable letter of resignation stating that he or she will resign if that director does not receive the required majority vote. If a director were to fail to receive a majority of votes cast and the Board were to accept the resignation tendered, then that director would cease to be a director of Anadarko. Each of the twelve incumbent director nominees has submitted an irrevocable letter of resignation that becomes effective if he or she does not receive a majority of the votes cast for his or her election and the Board decides to accept such resignation.

As discussed in more detail on page 16 of this proxy statement, the Board considers several qualifications, characteristics and other factors when evaluating individual directors, as well as the composition of the Board as a whole. As part of this process, the Board and its Governance and Risk Committee review the particular experiences, qualifications, attributes and skills of each nominee to determine if that person should serve as a director of the Company. The biographies of each of the nominees contain information regarding the person's experience and director positions held currently or at any time during the last five years, and information regarding involvement in certain legal or administrative proceedings, to the extent applicable. They also highlight the particular experiences, qualifications, attributes or skills that caused the Governance and Risk Committee and the Board to conclude that the person should be nominated to serve as a director of the Company.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**

*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## ANTHONY R. CHASE

Mr. Chase, 62, is Chairman, Chief Executive Officer and owner of ChaseSource, L.P., a Houston-based staffing and real estate development firm. He served as an Executive Vice President of Crest Investment Company, a Houston-based private equity firm, from January 2009 until December 2009. Prior to these positions, he served as the Chairman and Chief Executive Officer of ChaseCom, L.P., a global customer relationship management and staffing services company that he founded and owned until its sale in 2007 to AT&T. Mr. Chase's entrepreneurial track record also includes two other successful business ventures, including Chase Radio Partners, which he founded, developed and ultimately sold, and Cricket Wireless, which he co-founded, developed and later sold. Mr. Chase has also been a Professor of Law at the University of Houston since 1991 and has published numerous environmental law and other law review articles during his tenure. Mr. Chase is on the board of directors of the Greater Houston Partnership, and served as its Chairman during 2012. From July 2004 to July 2008, he served as a director of the Federal Reserve Bank of Dallas, and also served as its Deputy Chairman from 2006 until his departure in July 2008. He is also on the board of directors of the Houston Endowment and the Texas Medical Center and serves on the Board of Trustees for St. John's School and KIPP Schools. Mr. Chase holds Bachelor of Arts, Master of Business Administration and Juris Doctor degrees from Harvard University. In addition to Mr. Chase's current public-company directorship noted in the box to the right, in the past five years he also served on the boards of Sarepta Therapeutics, Inc. (NASDAQ: SRPT) and Western Gas Holdings, LLC (NYSE: WES), a subsidiary of Anadarko.



**Director Since:**
**February 2014**
***Independent***

**Current Directorships:**
Paragon Offshore plc

***Key Contributions to the Board.*** Mr. Chase's unique experience as a successful and widely respected entrepreneur, business leader, and environmental and business legal scholar provides invaluable perspective to the Board. In addition, he has significant experience with strategic transactions and mergers and acquisitions.

## DAVID E. CONSTABLE

Mr. Constable, 55, has served as an advisor to Sasol Limited (JSE: SOL) (NYSE: SSL) (Sasol), an international integrated energy and chemicals company based in South Africa, since July 2016. Prior to that he served as Sasol's President and Chief Executive Officer from July 2014 through June 2016 and previously served as Chief Executive Officer from July 2011 through July 2014. Prior to Sasol, Mr. Constable spent nearly 30 years at Fluor Corporation (NYSE: FLR) (Fluor) where he lived on several continents and served in various leadership positions, primarily in the oil and gas, refining, chemical, power and mining industries. Prior to moving to Sasol, Mr. Constable served as Group President of Operations for Fluor. He is a member of The Business Council and a past member of the World Economic Forum International Business Council. He is also an advisor at Cerberus Capital Management, one of the world's leading private investment firms. Mr. Constable holds a bachelor's of science degree in civil engineering from the University of Alberta, and graduated from the International Management Program at the Thunderbird School of Global Management, as well as the Advanced Management Program at the Wharton School at the University of Pennsylvania. In addition to Mr. Constable's current public-company directorships noted in the box to the right, in the past five years he also served on the board of Sasol.



**Director Since:**
**July 2016**
***Independent***

**Current Directorships:**
ABB Ltd
Rio Tinto Limited
Rio Tinto plc

***Key Contributions to the Board.*** Mr. Constable's experience as a public company CEO, as well as his project-management expertise and broad international business experience, make him a valued addition to the Board.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## H. PAULETT EBERHART (Lead Director)

Ms. Eberhart, 63, currently serves as Chairman and Chief Executive Officer of HMS Ventures, a privately held business involved with technology services and the acquisition and management of real estate. From January 2011 through March 2014, she served as the President and Chief Executive Officer of CDI Corp. (NYSE: CDI) (CDI), a provider of engineering and information technology outsourcing and professional staffing services. She served as a consultant to CDI from April 2014 through December 2014. Ms. Eberhart also served as Chairman and Chief Executive Officer of HMS Ventures from January 2009 until January 2011. She served as President and Chief Executive Officer of Invensys Process Systems, Inc. (Invensys), a process automation company, from January 2007 to January 2009. From 1978 to 2004, she was an employee of Electronic Data Systems Corporation (EDS), an information technology and business process outsourcing company, and held roles of increasing responsibility over time, including senior level financial and operating roles. From 2003 until March 2004, Ms. Eberhart was President of Americas of EDS, and from 2002 to 2003 she served as President of Solutions Consulting at EDS. Ms. Eberhart is a Certified Public Accountant. In addition to Ms. Eberhart's current public-company directorships noted in the box to the right, in the past five years she also served on the boards of Cameron International Corporation, CDI and Advanced Micro Devices, Inc. (NASDAQ: AMD).

***Key Contributions to the Board.*** Ms. Eberhart brings a wealth of accounting and financial experience to the Board, as well as managerial, manufacturing and global experience, through her numerous years of service as an executive officer for EDS, Invensys and CDI. She also held various other operating and financial positions during her 26 years at EDS. In addition, she gained significant experience through her service on the boards of other public companies and her involvement with various civic and charitable organizations.



**Director Since:**
**August 2004**

***Independent***

**Current Directorships:**

Ciber, Inc.

LPL Financial Holdings Inc.

Valero Energy Corporation

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## CLAIRE S. FARLEY



**Director Since:**
**February 2017**

***Independent***

**Current Directorships:**

LyondellBasell Industries N.V.

TechnipFMC plc

Ms. Farley, 58, serves as Vice Chair of Energy, advising the Energy group for KKR & Co. L.P. (NYSE: KKR) (KKR), a global investment firm that manages investments including private equity, energy, infrastructure, real estate, credit strategies and hedge funds, since February 2017. Prior to that she served as Vice Chairman for KKR's energy and infrastructure business from 2015 through February 2017, as Partner for KKR's energy and infrastructure business from 2012 through 2015 and as Managing Director for KKR's energy and infrastructure business from November 2011 through December 2012. Prior to joining KKR, from September 2010 to October 2011, Ms. Farley co-founded and served as Co-Chief Executive Officer of RPM Energy, LLC, which partnered with KKR to invest in unconventional oil and gas resources. Prior to co-founding RPM Energy, Ms. Farley was a Senior Advisor at Jefferies Randall & Dewey, the global oil and natural gas industry advisory group at Jefferies Group, Inc., from August 2008 to September 2010 and was Co-President of Jefferies Randall & Dewey from February 2005 to July 2008. Prior to that, Ms. Farley served as Chief Executive Officer of Randall & Dewey, an oil and natural gas asset transaction advisory firm, from September 2002 until its acquisition by Jefferies Group, Inc. in February 2005. From January 2001 to May 2002 she served as Chief Executive Officer of Trade-Ranger Inc., a start-up-venture, and as Chief Executive Officer of Intelligent Diagnostics Corporation, also a start-up-venture, from October 1999 to January 2001. Prior to that, Ms. Farley spent 18 years (1981 to 1999) at Texaco, Inc. where her roles included Chief Executive Officer, Hydro Texaco; President, North American Production Division; and President, Worldwide Exploration & New Ventures. In addition to Ms. Farley's current public-company directorships noted in the box to the right, in the past five years she also served on the boards of Encana Corporation (TSX: ECA) (NYSE: ECA), FMC Technologies, Inc. and Samson Resources Corporation.

***Key Contributions to the Board.*** Ms. Farley is a respected leader in the energy industry with a strong track record of success, including extensive experience in finance, strategic investments, mergers and acquisitions, and exploration and new ventures.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## PETER J. FLUOR

Mr. Fluor, 69, has been Chairman and Chief Executive Officer of Texas Crude Energy, LLC, a private, independent oil and gas exploration company located in Houston, Texas, since 1990. He has been employed by Texas Crude Energy, LLC since 1972 and took over the responsibilities of President in 1980. Mr. Fluor serves as lead director of Fluor Corporation (NYSE: FLR). In addition to Mr. Fluor's current public-company directorship noted in the box to the right, in the past five years he also served on the board of Cameron International Corporation.

***Key Contributions to the Board.*** Mr. Fluor brings more than 40 years of exploration and production operations, exploration and production service, finance, banking and managerial experience to the Board as a result of his experience at Texas Crude Energy, LLC, as well as his service as a director of other public companies and involvement with various civic and charitable organizations.



**Director Since:**
**August 2007**

***Independent***

**Current Directorships:**

Fluor Corporation

## RICHARD L. GEORGE

Mr. George, 66, was appointed independent Chairman of the Board of Penn West Petroleum Ltd. (TSX: PWT) (NYSE: PWE), an exploration and production company based in Calgary, Alberta, in May 2013. He previously served as President and Chief Executive Officer of Suncor Energy Inc. (TSX: SU) (NYSE: SU) (Suncor), an integrated energy company, from 1991 to December 2011, at which time he relinquished the title of President but continued to serve as Chief Executive Officer until his retirement in May 2012. In 2011, Mr. George was named Canadian Energy Person of the Year by the Energy Council of Canada. He has also served on the board of directors of the Canadian Council of Chief Executives since 2003. In 2008, he was inducted into the Canadian Petroleum Hall of Fame. Mr. George was named a member of the Order of Canada in 2007 for his leadership in the development of Canada's natural resources sector, for his efforts to provide economic opportunities to Aboriginal communities and for his commitment to sustainable development. In addition to Mr. George's current public-company directorships noted in the box to the right, in the past five years he also served on the boards of Canadian Pacific Railway Limited (TSX: CP) (NYSE: CP) and Suncor.

***Key Contributions to the Board.*** Mr. George's extensive leadership roles and career experiences in the global energy industry provide invaluable insight to the Board and strategically assist Anadarko as it pursues its expanding business opportunities.



**Director Since:**
**May 2012**

***Independent***

**Current Directorships:**

Penn West Petroleum Ltd.

Royal Bank of Canada

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**

*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## JOSEPH W. GORDER

Mr. Gorder, 59, is Chairman, President and Chief Executive Officer of Valero Energy Corporation (NYSE: VLO) (Valero), an international manufacturer and marketer of transportation fuels, other petrochemical products and power. He served as President and Chief Operating Officer of Valero from November 2012, until he assumed the role of Chief Executive Officer on May 1, 2014. He assumed the role of Chairman of the Board effective December 31, 2014. Mr. Gorder previously served as Executive Vice President and Chief Commercial Officer beginning in January 2011, and formerly led Valero's European operations from its London office. He previously served as Executive Vice President – Marketing and Supply beginning in December 2005. Prior to that, he held several positions with Valero and Ultramar Diamond Shamrock Corporation with responsibilities for corporate development and marketing. Mr. Gorder is also Chairman and Chief Executive Officer of Valero Energy Partners LP (NYSE: VLP), a midstream logistics master limited partnership formed by Valero in 2013.

***Key Contributions to the Board.*** Mr. Gorder's nearly 30 years of career experience in and knowledge of global energy markets provides invaluable insight to the Board and strategically assists Anadarko as it pursues its expanding business opportunities.



**Director Since:**
**July 2014**

***Independent***

**Current Directorships:**

Valero Energy Corporation

Valero Energy Partners LP

## JOHN R. GORDON

Mr. Gordon, 68, is Senior Managing Director of Deltec Asset Management LLC, a registered investment firm located in New York, New York. He was President of Deltec Securities Corporation from 1988 until it was converted into Deltec Asset Management LLC. Prior to joining Deltec Asset Management LLC, Mr. Gordon was a managing director of Kidder, Peabody & Co., where he spent 12 years in the firm's corporate finance department.

***Key Contributions to the Board.*** Mr. Gordon's role as Senior Managing Director of Deltec Asset Management LLC since 1988 provides him with significant finance and banking experience (including in the energy industry) as well as considerable managerial expertise. He also has significant involvement in various civic and charitable organizations.



**Director Since:**
**April 1988**

***Independent***

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## SEAN GOURLEY

Dr. Gourley, 37, has served as Chief Executive Officer of Primer Technologies, Inc., a company building software to power artificial intelligence applications for the finance and military intelligence industries, since he founded it in February 2015. From March 2009 to January 2015, he was the Chief Technology Officer of Quid, Inc., a San Francisco-based augmented intelligence company he founded which builds software for strategic decision-making. Dr. Gourley studied at The University of Oxford as a Rhodes Scholar where he received a Ph.D. in physics, and he received both his Bachelor of Science and Master of Science in physics from the University of Canterbury in Christchurch, New Zealand. He was additionally a Post-Doctoral Research Fellow at the Said Business School at Oxford University and is currently an Equity Partner with Data Collective Venture Capital Fund, investing in key data and algorithmic technologies.



**Director Since:**
**September 2015**

***Independent***

***Key Contributions to the Board.*** As a highly successful executive and entrepreneur in the technology sector, Dr. Gourley brings a unique and valuable perspective to the Board. His leadership in big data, algorithmic technologies, information technology and software pertaining to artificial intelligence and strategic decision making adds new skill sets to the Board that can be beneficially applied and leveraged across the Company's global operations. Dr. Gourley's expertise complements and enhances the Company's ability to leverage technology as a competitive advantage.

## MARK C. McKINLEY

Mr. McKinley, 60, has served as Managing Partner of MK Resources LLC, a private oil and gas development company specializing in the recovery and production of crude oil and the development of unconventional resource projects, for more than ten years. He is also the founder and President of Labrador Oil Company, a private oil and natural gas exploration and development firm. In addition, Mr. McKinley is the Managing Partner of M Natural Resource Partners, LP, which holds mineral, royalty and real estate interests, both directly and indirectly through various partnerships. Mr. McKinley currently serves on the Boards of Directors of the Merrymac McKinley Foundation and the Tip of the Spear Foundation.



**Director Since:**
**February 2015**

***Independent***

**Current Directorships:**

Buckeye GP LLC

***Key Contributions to the Board.*** Mr. McKinley's entrepreneurial, operational and business achievements during his long career in domestic and international oil and natural gas development bring valuable perspective to the Board.

Table of Contents

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE NOMINEES LISTED BELOW.**
*Nominees for Director Nominated by the Board of Directors for Terms Expiring in 2018*

## ERIC D. MULLINS

Mr. Mullins, 54, serves as the Managing Director and Co-Chief Executive Officer of Lime Rock Resources, a company that he co-founded in 2005 which acquires, operates and improves lower-risk oil and natural gas properties. From May 2011 through October 2015, he also served as the Co-Chief Executive Officer and Chairman of the Board of Directors of LRE GP, LLC, the general partner of LRR Energy, L.P., an oil and natural-gas company. Prior to co-founding Lime Rock Resources, Mr. Mullins served as a Managing Director in the Investment Banking Division of Goldman Sachs (NYSE: GS) where he led numerous financing, structuring and strategic advisory transactions in the division's Natural Resources Group. In addition to his current public-company directorships noted in the box to the right, in the past five years he served on the board of LRE GP, LLC.

***Key Contributions to the Board.*** Mr. Mullins's career experiences and knowledge in financing and strategic mergers and acquisitions for exploration and production companies greatly assists and enhances the Board's ability to provide effective strategic oversight of a sustainable and growing enterprise.



**Director Since:**
**May 2012**

***Independent***

**Current Directorships:**

Pacific Gas and Electric Company

PG&E Corporation

## R. A. WALKER (Chairman of the Board)

Mr. Walker, 60, was named Chairman of the Board of the Company in May 2013, in addition to the role of Chief Executive Officer and director, both of which he assumed in May 2012, and the role of President, which he assumed in February 2010. He previously served as Chief Operating Officer from March 2009 until his appointment as Chief Executive Officer. He served as Senior Vice President, Finance and Chief Financial Officer from September 2005 until March 2009. Mr. Walker is a director of the Houston Branch of the Dallas Federal Reserve, a Trustee for the Houston Museum of Natural Science, a member of the Business Council (Executive Committee), Business Roundtable, All-American Wildcatters (Chairman 2017 and 2018), and the Board of Directors of the American Petroleum Institute (Executive Committee). He also serves as the Chairman of the Risk Committee at BOK Financial Corporation (NASDAQ: BOKF). In addition to his current public-company directorship noted in the box to the right, in the past five years Mr. Walker also served on the boards of Temple-Inland, Inc. and CenterPoint Energy, Inc. (NYSE: CNP), as well as Western Gas Equity Holdings, LLC (NYSE: WGP) and Western Gas Holdings, LLC (NYSE: WES), both of which are subsidiaries of Anadarko.

***Key Contributions to the Board.*** Mr. Walker has significant energy, banking and asset management experience, in addition to his role as Anadarko's Chairman, President and Chief Executive Officer. He has served on numerous boards of public, private, industry trade associations and philanthropic organizations.



**Director Since:**
**May 2012**

***Not Independent - Management***

**Current Directorships:**

BOK Financial Corporation

Table of Contents



## BOARD AND COMMITTEE GOVERNANCE

Our Board recognizes that excellence in corporate governance is essential in carrying out our responsibilities to our stakeholders, including our stockholders, employees, customers, communities, and creditors, as well as to the environment. Our Corporate Governance Guidelines, By-Laws, Code of Business Conduct and Ethics, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, and written charters for the Audit Committee, the Compensation and Benefits Committee (Compensation Committee), and the Governance and Risk Committee, all as amended from time to time, can be found on the Company's website at http://www.anadarko.com/responsibility/good-governance. These documents provide the framework for our corporate governance. Any of these documents will be furnished in print free of charge to any stockholder upon request. You can submit such a request to the Corporate Secretary at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046.

Under the Company's Corporate Governance Guidelines, directors are expected to attend regularly scheduled Board of Director meetings and meetings of committees on which they serve, as well as the annual meeting of stockholders. Each incumbent director who served on our Board during 2016 attended at least 75% of the meetings of the Board and the committees on which he or she served. There were six Board meetings and a total of 20 Board committee meetings in 2016. In addition, all of the incumbent directors attended the 2016 Annual Meeting of Stockholders (2016 Annual Meeting), other than Mr. Constable, who joined the Board in July 2016, Ms. Farley, who joined the Board in February 2017, and Mr. George.

## BOARD LEADERSHIP STRUCTURE

The Board believes that the combined Chairman and Chief Executive Officer (CEO) role ensures open communication between the Board and executive management and promotes consistent and effective leadership of both the Board and executive management. In addition, the Board believes that a combined Chairman and CEO role is currently the best approach to promote long-term stockholder value for the reasons listed below. Mr. Walker was initially elected Chairman of the Board effective following the Company's 2013 Annual Meeting and has been re-elected to such role each year since that time. As the Company's CEO, Mr. Walker works in concert with the rest of our majority-independent Board and the independent Lead Director, Ms. Eberhart, to oversee the execution of the Company's strategy.

- *Promotes Unified Approach on Corporate Strategy Development and Execution* — Maintaining a combined position enables the Company's CEO to act as a bridge between management and the Board, helping both to act with a common purpose. This also fosters consensus building and alignment on strategy and tactical execution of a Board-approved vision and strategy at the top levels within the Company.

- *Requires that the CEO Recognize Importance of Good Corporate Governance* — Maintaining a combined position requires that the CEO's responsibilities include a mastery of good corporate governance, a focus on broad stakeholder interests, and an open channel of communication, and requires the CEO to work together with the Lead Director as a team and to appreciate the vital importance of good governance practices in executing the Company's strategy.

- *Provides Clear Lines of Accountability* — A combined position has the practical effect of simplifying the accountability of the executive management team, thereby reducing potential confusion and fractured leadership.

Table of Contents



- *Provides Clear Roadmap for Stockholder/Stakeholder Communications* — A combined position provides the Company's stakeholders the opportunity to deal with a single point of overall authority, which we believe results in more efficient and effective communications with stakeholders.

***Role of Lead Director.*** Consistent with industry best practices, the Board has a strong and active Lead Director whose duties and responsibilities ensure the Company maintains a corporate governance structure with appropriate independence and balance. Our independent Lead Director's duties are closely aligned with the role of an independent, non-executive chairman. Ms. Eberhart was appointed as Lead Director effective February 9, 2016. As the Lead Director, elected exclusively by the independent directors, Ms. Eberhart's role is to assist the Chairman and the remainder of the Board in assuring effective corporate governance in managing the affairs of the Board and the Company. Ms. Eberhart, who has previously served as Chair of the Audit Committee and currently serves as Chair of the Governance and Risk Committee, serves as a liaison between the Chairman and the independent directors and works with the Chairman to approve all meeting agendas. She presides at executive sessions of the independent directors, which are held in conjunction with each regularly scheduled quarterly meeting of the Board, and any other meetings as she, in her capacity as the Lead Director, determines appropriate. Ms. Eberhart also approves information sent to the Board and approves meeting schedules to assure there is sufficient time for discussion of all agenda items. In addition, as Lead Director, Ms. Eberhart has authority to call special meetings of the Board and is also a member of the Board's Executive Committee, providing additional representation for the independent directors in all actions considered by the Executive Committee between Board meetings. Ms. Eberhart is required, if requested by major stockholders, to be available for consultation and direct communication.

## THE BOARD'S ROLE IN RISK OVERSIGHT

The Board's role in the identification, assessment, oversight and management of potential risks that could affect the Company's ability to achieve its strategic, operational and financial objectives consists of:

- reviewing and discussing the Company's risk framework and risk management policies;
- facilitating appropriate coordination among the Board's committees with respect to oversight of risk management by delegating oversight of the Company's enterprise risk management program to the Governance and Risk Committee, the risk assessment framework and risk management policies, including the framework with respect to significant financial risk exposures, to the Audit Committee, and compensation risk to the Compensation Committee; and
- periodically meeting with members of management, including members of the Company's internal Risk Council, to identify, review and assess the Company's major risk exposures and steps taken to monitor, mitigate and report such exposures.

***Role of the Board's Committees.*** The Governance and Risk Committee is responsible for oversight of the Company's significant risk exposures and periodically reviews and discusses with members of management those risk exposures and the steps being taken to identify, monitor and mitigate such exposures. With the assistance of the Compensation Committee's independent executive compensation consultant, the Compensation Committee is responsible for the oversight of the annual risk assessment of the Company's compensation programs. The Audit Committee is responsible for oversight of the Company's risk assessment framework and risk management policies, including the

Table of Contents



framework with respect to significant financial risk exposures, and periodically reviews and discusses such framework and policies with members of management.

***Role of the Internal Risk Council.*** In order to facilitate oversight of potential risk exposures to the Company that have not been specifically delegated to any Board committee, the Board periodically meets with members of the Company's internal Risk Council to review and assess the Company's risk-management processes and to discuss significant risk exposures. Members of senior management comprise the Company's internal Risk Council and provide periodic reports to the CEO, the Governance and Risk Committee and the full Board regarding the Company's risk profile and risk-management strategies. In addition, the Company's internal audit function regularly provides additional perspective and insight to the Audit Committee regarding potential risks facing the Company.

## COMPENSATION COMMITTEE RISK ASSESSMENT

The Compensation Committee reviewed a comprehensive compensation risk assessment conducted independently by Frederic W. Cook & Co., Inc. (FW Cook), the Compensation Committee's executive compensation consultant. The assessment focused on the design and application of the Company's executive and non-executive compensation programs and whether such programs encourage excessive risk taking by executive officers and other employees. Based on the outcomes of this assessment and the Compensation Committee's review, the Compensation Committee believes that the Company's compensation programs (i) do not motivate our executive officers or our non-executive employees to take excessive risks, (ii) are well designed to encourage behaviors aligned with the long-term interests of stockholders, and (iii) are not reasonably likely to have a material adverse effect on the Company.

Anadarko's compensation programs are designed to support and reward appropriate risk taking and include the following:

- an appropriate balance of fixed versus variable pay, cash and equity pay components, operating and financial performance measures, short-term and long-term performance periods, extended vesting schedules, and established formulas and discretion;
- established policies to mitigate compensation risk including significant stock ownership guidelines for officers of the Company, insider-trading prohibitions, clawback provisions, and specified caps on incentive awards; and
- independent Compensation Committee oversight, which also extends to incentive plans below the executive officer level.

Table of Contents



## COMMITTEES OF THE BOARD

The Board has four standing committees: (i) the Audit Committee; (ii) the Compensation Committee; (iii) the Governance and Risk Committee; and (iv) the Executive Committee. For each of the current committees of the Board, the table below shows the current membership, the principal functions and the number of meetings held in 2016:

| Name, Members and Meetings | Principal Functions |
|---|---|
| **AUDIT COMMITTEE(1)**<br>Eric D. Mullins (Chair)(2)<br>Kevin P. Chilton(3)<br>David E. Constable<br>Claire S. Farley<br>Mark C. McKinley<br><br>***Meetings in 2016: 8*** | • Discusses the integrity of the Company's accounting policies, internal controls, financial reporting practices and the financial statements with management, the independent auditor and internal audit.<br>• Reviews and discusses with management the Company's risk assessment framework and risk management policies, including the framework with respect to significant financial risk exposures.<br>• Monitors the qualifications, independence and performance of the Company's internal audit function and independent auditor, and meets periodically with management, internal audit and the independent auditor in separate executive sessions.<br>• Establishes and maintains procedures for the submission, receipt, retention and treatment of complaints and concerns received by the Company regarding accounting, internal controls or auditing matters, including those received through the confidential anonymous Anadarko Hotline.<br>• Monitors compliance with legal and regulatory requirements and the business practices and ethical standards of the Company.<br>• Approves the appointment, compensation, retention and oversight of the work of the Company's independent auditor and establishes guidelines for the retention of the independent auditor for any permissible services.<br>• Prepares the Audit Committee report, which is on page 27. |
| **COMPENSATION AND BENEFITS COMMITTEE(4)**<br>Joseph W. Gorder (Chair)<br>Peter J. Fluor<br>John R. Gordon<br><br>***Meetings in 2016: 7*** | • Approves and evaluates the Company's director and officer compensation plans, policies and programs.<br>• Conducts an annual review and evaluation of the CEO's performance in light of the Company's goals and objectives.<br>• Retains, and is directly responsible for the oversight of, compensation or other consultants to assist in the evaluation of director or executive compensation and otherwise to aid the Compensation Committee in meeting its responsibilities. For additional information on the role of compensation consultants, please see Compensation Discussion and Analysis beginning on page 30. |

Table of Contents



| Name, Members and Meetings | Principal Functions |
|---|---|
| **COMPENSATION AND BENEFITS COMMITTEE (Continued)** | • Annually reviews the Company's compensation-related risk profile to confirm that compensation-related risks are not reasonably likely to have a material adverse effect on the Company.<br>• Periodically reviews and discusses with its independent compensation consultants and senior management the Company's policy on executive severance arrangements, and recommends any proposed changes to the Board to the extent required by the Compensation Committee charter.<br>• Reviews the Compensation Discussion and Analysis, disclosures for advisory votes by stockholders on executive compensation, including frequency of such votes, and other relevant disclosures made in the proxy statement.<br>• Produces an annual Compensation Committee report, which is on page 28. |
| **GOVERNANCE AND RISK COMMITTEE(5)**<br>H. Paulett Eberhart (Chair)<br>Anthony R. Chase<br>Richard L. George<br>Sean Gourley<br><br>***Meetings in 2016: 5*** | • Recommends nominees for director to the full Board and, subject to the Board's power and authority to determine the eligibility of nominees nominated by stockholders pursuant to Section 2.9 of the Company's By-Laws, ensures such nominees possess the director qualifications set forth in the Company's Corporate Governance Guidelines.<br>• Reviews the qualifications of existing Board members before they are nominated for re-election to the Board.<br>• Recommends members of the Board for committee membership.<br>• Proposes Corporate Governance Guidelines for the Company and reviews them annually.<br>• Oversees the Company's compliance structure and programs.<br>• Develops and oversees an evaluation process for the Board and its committees.<br>• Reviews and approves related-person transactions in accordance with the Board's procedures.<br>• Reviews and investigates reports to the confidential anonymous Anadarko Hotline regarding material non-financial matters.<br>• Reviews and discusses with management the Company's significant risk exposures and the steps management has taken to identify, monitor and mitigate such exposures.<br>• Oversees the work of the Company's independent reserve engineering consultant.<br>• Oversees the Anadarko Petroleum Corporation Political and Public Engagement Policy and the Company's political activity, including annually reviewing the Company's political contributions and trade association payments.<br>• Reviews and discusses with management the Company's environmental, health and safety programs. |

Table of Contents



| Name, Members and Meetings | Principal Functions |
|---|---|
| **EXECUTIVE COMMITTEE**<br>R. A. Walker (Chair)<br>H. Paulett Eberhart<br>Joseph W. Gorder<br>Eric D. Mullins<br>***Meetings in 2016: 0*** | • Acts with the power and authority of the Board, in accordance with the Company's By-Laws, in the management of the business and affairs of the Company while the Board is not in session.<br>• Approves specific terms of financing or other transactions that have previously been approved by the Board. |

(1) The Board has determined that each member of the Audit Committee is independent as independence for audit committee members is defined in Rule 10A-3(b)(1) of the Securities Exchange Act of 1934, as amended (Exchange Act), and under the standards set forth by the NYSE. None of the Audit Committee members serve on the audit committee of more than two other public companies.

(2) The Board has determined that Mr. Mullins qualifies as an "audit committee financial expert" under the rules of the SEC based upon his education and employment experience.

(3) Gen. Chilton will retire from the Board effective as of the close of the Annual Meeting.

(4) The Board has determined that each member of the Compensation Committee is: (i) independent under the standards set forth by the NYSE that govern Compensation Committee membership; (ii) a "non-employee director" under Rule 16b-3 of the Exchange Act; and (iii) an "outside director" under Section 162(m) of the Internal Revenue Code of 1986, as amended (IRC).

(5) The Board has determined that each member of the Governance and Risk Committee is independent under the standards set forth by the NYSE that govern Board membership.

## BOARD OF DIRECTORS

### *Director Independence*

In accordance with NYSE rules, the Sarbanes-Oxley Act of 2002, the Exchange Act, and the rules and regulations adopted thereunder, and the Company's Corporate Governance Guidelines, the Board must affirmatively determine the independence of each director and director nominee in accordance with the Company's director independence standards, which are contained in the Company's Corporate Governance Guidelines found on the Company's website at http://www.anadarko.com/content/documents/apc/responsibility/governance_documents/corp_gov_guidelines_111016.pdf.

Based on the standards contained in our Corporate Governance Guidelines, and the recommendation by the Governance and Risk Committee, the Board has determined that each of the following non-employee director nominees is independent and has no material relationship with the Company that could impair such nominee's independence:

- Anthony R. Chase
- David E. Constable
- H. Paulett Eberhart
- Claire S. Farley
- Peter J. Fluor
- Richard L. George
- Joseph W. Gorder
- John R. Gordon
- Sean Gourley
- Mark C. McKinley
- Eric D. Mullins

Mr. Walker is not independent given his role as President and CEO of the Company.

For information regarding our policy on Transactions with Related Persons, please see page 76 of this proxy statement.

Table of Contents

# Corporate Governance

### *Director Nominee Selection Process*

The Company's Corporate Governance Guidelines require that with respect to Board vacancies, the Governance and Risk Committee (or a subcommittee thereof): (i) identify the personal characteristics needed in a director nominee so that the Board as a whole will possess such qualifications as more fully identified below; (ii) compile, through such means as the Governance and Risk Committee considers appropriate, a list of potential director nominees thought to possess the individual qualifications identified in the Corporate Governance Guidelines, as well as any additional specific qualifications the Board deems appropriate at the time; (iii) engage an outside consultant, as necessary, to assist in the search for qualified nominees; (iv) review the background, character, experience and temperament of each potential nominee; (v) conduct interviews, and if appropriate recommend that other members of the Board and/or management interview such potential nominee; and (vi) evaluate each potential nominee in relation to the culture of the Company and the Board, which emphasizes independent thinking and teamwork.

***Board Qualifications.*** As stated in our Corporate Governance Guidelines, one of the core competencies our Board has identified in assessing the qualifications of the Board as a whole is a diversity of experience, professional expertise, perspective and age. The Board recognizes that such diversity is an important factor in board composition and the Governance and Risk Committee ensures that such diversity considerations are discussed in connection with each candidate for director. For the past several years, our Board has reviewed a director skill set chart that identifies expertise, experience and other characteristics that the Board believes contribute to an effective and well-functioning board and that the Board as a whole should possess.

| Director Skill Sets | Independent | Other Public Boards - Current[1] | Other Public Boards - Past[1] | Current or Former CEO of Public Co. | Current Public Co. Executive Service | Former Public Co. Executive Service[2] | Financial Expertise[3] | Banking/Finance Experience[4] | E&P Operations Experience | E&P Service Experience | International Experience | Government Relations Experience | Commodity Marketing/Hedging Exp. | Manufacturing/Operations Exp. | Civic/Charitable Exp.[5] | Other Specialized Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anthony R. Chase | YES | ● | ● | ○ | ○ | ○ | ◐ | ◐ | ○ | ○ | ● | ◐ | ◐ | ◐ | ● | ●[6] |
| David E. Constable | YES | ● | ● | ● | ○ | ● | ◐ | ○ | ● | ● | ● | ● | ● | ◐ | ◐ | ○ |
| H. Paulett Eberhart | YES | ● | ● | ● | ○ | ● | ● | ● | ○ | ○ | ● | ◐ | ○ | ● | ● | ○ |
| Claire S. Farley | YES | ● | ● | ○ | ○ | ○ | ● | ● | ● | ● | ● | ○ | ● | ○ | ◐ | ○ |
| Peter J. Fluor | YES | ◐ | ● | ○ | ○ | ◐ | ◐ | ◐ | ● | ● | ● | ◐ | ○ | ◐ | ◐ | ○ |
| Richard L. George | YES | ● | ● | ● | ○ | ◐ | ◐ | ◐ | ● | ● | ● | ◐ | ● | ◐ | ◐ | ○ |
| Joseph W. Gorder | YES | ● | ○ | ● | ● | ◐ | ◐ | ◐ | ◐ | ◐ | ● | ○ | ● | ○ | ◐ | ○ |
| John R. Gordon | YES | ○ | ○ | ○ | ○ | ○ | ◐ | ● | ○ | ○ | ◐ | ○ | ○ | ○ | ● | ○ |
| Sean Gourley | YES | ○ | ○ | ○ | ○ | ○ | ◐ | ◐ | ○ | ○ | ● | ○ | ○ | ◐ | ○ | ●[7] |
| Mark C. McKinley | YES | ◐ | ○ | ○ | ○ | ○ | ○ | ◐ | ◐ | ◐ | ○ | ○ | ◐ | ○ | ◐ | ○ |
| Eric D. Mullins | YES | ● | ◐ | ● | ○ | ◐ | ● | ● | ● | ○ | ○ | ○ | ◐ | ○ | ◐ | ○ |
| R. A. Walker | NO | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ◐ | ◐ | ◐ | ○ |

○ = no significant experience
1 – ● = 2 or more other Boards; ◐ = 1 other Board
2 – ● = 2 or more companies; ◐ = 1 other company
3 – ● = deemed eligible to be designated an Audit Committee Financial Expert; ◐ = significant education or experience
4 – ● = significant banking or financial experience; ◐ = other banking or financial experience
5 – ● = very active; ◐ = moderately active
6 – Environmental experience and successful entrepreneurial track record.
7 – Big data analytics and artificial intelligence.

Table of Contents



The Governance and Risk Committee considers these and other factors and the extent to which such attributes can be represented when evaluating potential candidates for the Board. Other factors considered include board refreshment and director tenure. Together, this diversity of skill sets, experiences and personal backgrounds allows our directors to provide the diversity of thought that is critical to the Board's decision-making and oversight process.




### *Annual Board Evaluation Process*

The Board and each of the independent committees conducted self-evaluations related to their performance in 2016, including an evaluation of each director. The Governance and Risk Committee supervises the performance evaluations and uses various processes from year to year in order to solicit feedback, including periodic in-person interviews conducted by the Lead Director with each of the Board members. Following a discussion of the results of the evaluations, the Board and each committee review and discuss the evaluation results, and take this information into account when assessing the qualifications of the Board and further enhancing the effectiveness of the Board and its committees over time.

### *Communication with Directors of the Company*

The Board welcomes questions or comments about the Company and its operations. Interested parties who wish to communicate with the Board, including the Lead Director, the independent directors, or any individual director, may contact the Chair of the Governance and Risk Committee at governanceriskchair@anadarko.com or at Anadarko Petroleum Corporation, Attn: Corporate Secretary, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046. If requested, any questions or comments will be kept confidential to the extent reasonably possible. Depending on the subject matter, the Chair of the Governance and Risk Committee, with the assistance of the Corporate Secretary, will:

- forward the communication to the director or directors to whom it is addressed;
- refer the inquiry to the General Counsel for referral to the appropriate corporate department if it is a matter that does not appear to require direct attention by the Board or an individual director; or
- not forward the communication if it is primarily commercial in nature or if it relates to an improper or irrelevant topic.

These procedures may change from time to time, and you are encouraged to visit our website at http://www.anadarko.com for the most current means of contacting our directors. If you wish to request copies of any of our governance documents, please refer to page 10 of this proxy statement for instructions.

Table of Contents



### Stockholder Participation in the Selection of Director Nominees

***Proxy Access.*** In September 2015, the Board amended the Company's By-Laws to implement proxy access after conducting robust stockholder engagement. Eligible stockholders may nominate a candidate for election to the Board for inclusion in the Company's proxy materials in accordance with the proxy access provisions of Section 2.9(C) of our By-Laws. An eligible stockholder generally must deliver the Stockholder Notice (as defined in our By-Laws) to the Corporate Secretary at the principal executive offices of the Company not later than the close of business on the 120th day, nor earlier than the close of business on the 150th day, prior to the first anniversary of the date (as stated in the Company's proxy materials) the definitive proxy statement was first sent to stockholders in connection with the preceding year's annual meeting of stockholders and otherwise comply with all of the requirements of the By-Laws. For the 2018 annual meeting of stockholders, we must receive notice of the nomination for inclusion in the Company's proxy materials no earlier than October 25, 2017 and no later than November 24, 2017.

***Other Director Nominations.*** Our By-Laws also provide that any stockholder intending to nominate a candidate for election to the Board or proposing any business to be brought before an annual meeting of stockholders, which nomination is not submitted for inclusion in the Company's proxy materials pursuant to Section 2.9(C) of the By-Laws, generally must deliver written notice by mail to the Company's Corporate Secretary at the principal executive officers of the Company not later than the close of business on the 90th day, nor earlier than the close of business on the 120th day, prior to the first anniversary of the preceding year's annual meeting. The notice must include information specified in the By-Laws. For the 2018 annual meeting of stockholders, we must receive notice of your intention to nominate a director or to introduce an item of business at that meeting no earlier than January 10, 2018 and no later than February 9, 2018.

The Board will consider individuals identified by stockholders on the same basis as nominees identified from other sources. During the past year, no stockholder submitted names of individuals to the Governance and Risk Committee for nomination to the Company's Board pursuant to the procedures discussed above.

The Chairman of the meeting may disregard any nomination of a candidate for director or refuse to allow the transaction of any business under a proposal if such is not made in compliance with the procedures in our By-Laws or other requirements of rules under the Exchange Act. For more information on stockholder participation in the selection of director nominees, please refer to Section 2.9 in our By-Laws, which are posted on the Company's website at http://www.anadarko.com/content/documents/apc/responsibility/governance_documents/2015-09-21_by-laws.pdf.

### Director Continuing Education

The Company's Director Education Policy encourages all members of the Board to attend director education programs appropriate to their individual backgrounds to stay abreast of developments in corporate governance and best practices relevant to their contribution to the Board as well as their responsibilities in their specific committee assignments. The Director Education Policy provides that the Company will reimburse directors for the costs associated with attending any director education program.

### Compensation and Benefits Committee Interlocks and Insider Participation

The Compensation Committee is made up of three independent directors, Messrs. Fluor, Gorder and Gordon. None of our executive officers currently serve, or in the past year have served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our Board or our Compensation Committee.

Table of Contents



### Director Compensation

The Compensation Committee is responsible for determining the type and amount of compensation for non-employee directors. The program is reviewed annually to ensure that it is appropriately designed to attract qualified individuals who possess the expertise and skill set required by the Company's Board members. In setting non-employee director compensation, the Compensation Committee considers the competitive market as well as the significant amount of time that non-employee directors spend in fulfilling their duties to the Company and its stockholders. To assist in the 2016 annual review of director compensation, the Compensation Committee directly retained FW Cook as its outside independent compensation consultant to provide benchmark compensation data and recommendations for compensation program design.

Non-employee directors receive a combination of cash and stock-based compensation. In February 2016, the Compensation Committee adopted an amendment to the Anadarko Petroleum Corporation 2008 Director Compensation Plan to limit the total compensation, both cash and stock-based compensation, that non-employee directors may receive annually under any of the Company's compensation plans. Mr. Walker does not receive any compensation for his service as a director.

***Cash Compensation Program.*** The following is a schedule of annual retainers for non-employee directors in effect during 2016, payable on a quarterly basis:

| 2016 Cash Compensation | Amount($) |
|---|---|
| Annual Board Retainer | 110,000 |
| Additional Annual Retainer for Chair of Audit Committee, Compensation Committee and Governance and Risk Committee | 25,000 |
| Additional Annual Retainer for Lead Director | 35,000 |

Additionally, to compensate a director in a year when there is an unusually high level of service required, a per-meeting fee of $2,000 will be paid for each meeting attended in excess of 20 combined Board and committee meetings in a calendar year.

Non-employee directors may receive their cash compensation in cash or, if eligible, defer cash compensation into the Anadarko Deferred Compensation Plan (described below), or any combination thereof. Beginning in 2016, the Compensation Committee eliminated the non-employee directors' option to elect to receive their annual retainers in shares of common stock. Instead, non-employee directors may elect to receive, in lieu of all or a portion of their cash compensation, a number of deferred shares of common stock, the grant date fair value of which, calculated pursuant to FASB ASC Topic 718, is approximately equal to the forgone cash compensation. These deferred shares may not be distributed to the non-employee director earlier than one year from the date of grant (except in the event of a separation from the Board due to death, disability or a change of control). This election option to receive deferred shares of common stock, in lieu of cash compensation, provides non-employee directors a method to invest in the Company as a stockholder and further align their interests with the interests of the Company's stockholders.

***Deferred Compensation Plan for Non-Employee Directors.*** Non-employee directors who are resident in the U.S. may participate in the Company's Deferred Compensation Plan. The Deferred Compensation Plan allows non-employee directors to defer receipt of up to 100% of their cash compensation, and to allocate the deferred amounts among a group of notional accounts that mirror the gains and/or losses of various investment funds. Effective January 1, 2016, the Compensation

Table of Contents



Committee eliminated the Anadarko stock fund as an investment option under the Deferred Compensation Plan. The interest rate earned on the deferred amounts is not above-market or preferential. In general, deferred amounts are distributed to the participant upon leaving the Board or at a specific date as elected by the participant. Mr. Gordon is the only director who elected to defer compensation during 2016.

***Stock Plan for Non-Employee Directors.*** In addition to cash compensation, non-employee directors receive annual equity grants. Equity grants to non-employee directors are awarded each year on the date of the Company's annual meeting of stockholders. For 2016, each non-employee director who was elected at the 2016 Annual Meeting received an annual deferred share grant with a grant date fair value (calculated pursuant to FASB ASC Topic 718) of approximately $250,000. Mr. Constable and Ms. Farley each received a prorated equity grant when they were elected to the Board in July 2016 and February 2017, respectively. Non-employee directors may elect to receive their shares on a specific date, but not earlier than one year from the date of grant (except in the event of a separation from the Board due to death, disability or a change of control). Stock-based awards made to non-employee directors are made pursuant to the Anadarko Petroleum Corporation 2008 Director Compensation Plan.

***Stock Ownership Guidelines for Non-Employee Directors.*** Non-employee directors are required to hold stock with a value equivalent to seven times the annual Board retainer and have five years from the date of their initial election to the Board to comply with the guidelines. All non-employee directors exceeded their ownership guidelines at December 31, 2016, other than certain directors who are still within the five-year compliance period.




***Other Compensation.*** Non-employee directors are covered under the Company's Accidental Death & Dismemberment Plan and the Company pays the annual premium for such coverage on behalf of each non-employee director. The Company also provides each non-employee director with Personal Excess Liability coverage and pays the annual premium on their behalf. The Company maintains an Aid to Education Program under which certain gifts by employees, officers, non-employee directors and retired employees to qualified institutions of learning are matched on a two-to-one basis. The maximum contribution matched per donor, per calendar year is $2,500, resulting in a maximum Company yearly match of $5,000 per donor.

Table of Contents



## DIRECTOR COMPENSATION TABLE FOR 2016

The following table sets forth information concerning total non-employee director compensation earned during the 2016 fiscal year by each director who served on the Board in 2016, other than Mr. Walker, who does not receive any compensation for his service as a director:

| Name | Fees Earned or Paid in Cash($) | Stock Awards ($)(1) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($)(3) | Total($) |
|---|---|---|---|---|---|---|---|
| Anthony R. Chase(4) | 0 | 360,045 | 0 | 0 | 0 | 1,800 | 361,845 |
| Kevin P. Chilton(5) | 110,000 | 250,036 | 0 | 0 | 0 | 6,800 | 366,836 |
| David E. Constable(6) | 47,850 | 213,076 | 0 | 0 | 0 | 893 | 261,819 |
| H. Paulett Eberhart(4) | 0 | 416,243 | 0 | 0 | 0 | 1,800 | 418,043 |
| Peter J. Fluor(4) | 0 | 368,914 | 0 | 0 | 0 | 1,800 | 370,714 |
| Richard L. George(4) | 0 | 360,244 | 0 | 0 | 0 | 1,800 | 362,044 |
| Joseph W. Gorder(4) | 0 | 376,100 | 0 | 0 | 0 | 1,800 | 377,900 |
| John R. Gordon(7) | 113,763 | 250,036 | 0 | 0 | 0 | 1,800 | 365,599 |
| Sean Gourley | 110,000 | 250,036 | 0 | 0 | 0 | 1,800 | 361,836 |
| Mark C. McKinley | 110,000 | 250,036 | 0 | 0 | 0 | 1,800 | 361,836 |
| Eric D. Mullins(4) | 0 | 385,023 | 0 | 0 | 0 | 1,800 | 386,823 |

(1) The amounts included in this column represent the aggregate grant date fair value of the annual deferred shares granted to each non-employee director and the deferred shares granted to those directors who elected to receive deferred shares in lieu of their retainer. Messrs. Chase, Fluor, Gorder, Gordon, McKinley and Mullins, Dr. Gourley, Gen. Chilton, and Ms. Eberhart each received 6,156 deferred shares granted in connection with their election by stockholders on May 10, 2016, with the value of each grant computed in accordance with FASB ASC Topic 718 in the amount of $250,036. For Mr. Constable, the amount includes 4,610 deferred shares granted upon his appointment to the Board on July 25, 2016, which represents a pro-rata grant for his partial year of service from appointment through the Annual Meeting, in the amount of $213,076. For Mr. George, the amount includes a grant date fair value in the amount of $250,061 for a grant of 6,031 deferred shares, 798 of which were surrendered for Canadian withholding taxes. The value ultimately realized by each director may or may not be equal to this determined value. For a discussion of valuation assumptions, see Note 21 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2016. As of December 31, 2016, each of the non-employee directors had aggregate outstanding deferred shares as follows: Mr. Chase — 12,064; Gen. Chilton — 21,566; Mr. Constable — 4,610; Ms. Eberhart — 40,614; Mr. Fluor — 37,380; Mr. George — 19,205; Mr. Gorder — 13,519; Mr. Gordon — 50,019; Dr. Gourley — 8,693; Mr. McKinley — 9,788; and Mr. Mullins — 11,808.

(2) The non-employee directors did not receive any stock option awards in 2016; however, as of December 31, 2016, each of the non-employee directors had aggregate outstanding vested and exercisable stock options as follows: Mr. Chase — 0; Gen. Chilton — 0; Mr. Constable — 0; Ms. Eberhart — 0; Mr. Fluor — 5,650; Mr. George — 0; Mr. Gorder — 0; Mr. Gordon — 9,600; Dr. Gourley — 0; Mr. McKinley — 0; and Mr. Mullins — 0. There were no unvested options as of December 31, 2016.

(3) For all non-employee directors, except for Mr. Constable, the amounts in this column include annual premiums paid by the Company for each director's benefit in the amount of $119 and $1,681 for Accidental Death & Dismemberment (AD&D) coverage and Personal Excess Liability (PEL) coverage, respectively. Additionally, Gen. Chilton's amount includes a matching charitable donation of $5,000 to the "Aid to

Table of Contents



Education Program" made by the Company on his behalf. For Mr. Constable, the amount includes $52 for AD&D coverage and $841 for PEL coverage for his partial year of service on the Board for 2016.

(4) In lieu of this director's retainer, the director elected to receive a grant of deferred shares: Mr. Chase — 2,242; Ms. Eberhart — 3,371; Mr. Fluor — 2,466; Mr. George — 2,212 (204 of which were surrendered for Canadian withholding taxes); Mr. Gorder — 2,526; and Mr. Mullins — 2,751. The grant date fair value of these deferred shares, computed in accordance with FASB ASC Topic 718, is included in the "Stock Awards" column of this table: $110,009, $118,878, $110,183, $126,064, $134,988, and $166,207 for Messrs. Chase, Fluor, George, Gorder and Mullins and Ms. Eberhart, respectively.

(5) Gen. Chilton will retire from the Board effective as of the close of the Annual Meeting.

(6) Mr. Constable was appointed to the Company's Board effective July 25, 2016.

(7) Mr. Gordon deferred all of his retainer into the Company's Deferred Compensation Plan. He did not accrue any above-market or preferential earnings on his account balance in the Deferred Compensation Plan.

Table of Contents

# Security Ownership of Certain Beneficial Owners and Management

The information provided below summarizes the beneficial ownership of each named executive officer (NEO), each of our directors and director nominees, all of our directors, director nominees and executive officers as a group, and owners of more than five percent of our outstanding common stock. Generally, "beneficial ownership" includes those shares of common stock held by someone who has investment and/or voting authority of such shares or has the right to acquire such common stock within 60 days. The ownership includes common stock that is held directly and also stock held indirectly through a relationship, a position as a trustee, or under a contract or understanding.

## DIRECTORS, DIRECTOR NOMINEES AND EXECUTIVE OFFICERS

The following table sets forth the number and percentage of Anadarko common stock beneficially owned by our NEOs, each of our directors and director nominees, and all of our executive officers, directors and director nominees as a group as of March 1, 2017. None of the common stock beneficially owned as set forth below is pledged as security.

| | Amount and Nature of Beneficial Ownership | | | |
|---|---|---|---|---|
| Name of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned(1)(2) | Stock Acquirable Within 60 Days | Total Beneficial Ownership(3)(4)(5) | Percent of Class |
| R. A. Walker(6) | 265,418 | 672,963 | 938,381 | * |
| Robert G. Gwin | 112,474 | 278,203 | 390,677 | * |
| Mitchell W. Ingram | 13,409 | — | 13,409 | * |
| Ernest A. Leyendecker | 17,441 | 98,001 | 115,442 | * |
| Robert K. Reeves(7) | 213,457 | 217,702 | 431,159 | * |
| Anthony R. Chase | 16,385 | — | 16,385 | * |
| Kevin P. Chilton | 21,566 | — | 21,566 | * |
| David E. Constable | 4,610 | — | 4,610 | * |
| H. Paulett Eberhart | 40,614 | — | 40,614 | * |
| Claire S. Farley | 1,018 | — | 1,018 | * |
| Peter J. Fluor | 132,407 | 5,650 | 138,057 | * |
| Richard L. George | 29,960 | — | 29,960 | * |
| Joseph W. Gorder | 13,519 | — | 13,519 | * |
| John R. Gordon | 171,079 | 9,600 | 180,679 | * |
| Sean Gourley | 8,693 | — | 8,693 | * |
| Mark C. McKinley | 10,700 | — | 10,700 | * |
| Eric D. Mullins | 20,871 | — | 20,871 | * |
| All directors, director nominees and executive officers as a group (19 persons) | 1,121,704 | 1,416,278 | 2,537,982 | * |

* Less than one percent.

(1) This column does not include shares of common stock that the directors or executive officers of the Company have the right to acquire within 60 days of March 1, 2017. This column does include shares of common stock held in the Company's Benefits Trust as a result of the director compensation and deferral elections made in accordance with our benefit plans described elsewhere in this proxy statement. Those shares are subject to shared voting power with the trustee under that Trust and receive dividend equivalents on such shares, but

Table of Contents



the individuals do not have the power to dispose of, or direct the disposition of, such shares until such shares are distributed to them. In addition, some shares of common stock reflected in this column for certain individuals are subject to restrictions.

(2) This column does not include the following number of restricted stock units, which are payable (after taxes are withheld) in the form of Company common stock: Mr. Walker — 81,497; Mr. Gwin — 32,658; Mr. Ingram — 57,854; Mr. Leyendecker — 17,284; and Mr. Reeves — 25,478. The restricted stock units do not have voting rights but do receive dividend equivalents which are reinvested in Company stock and paid upon vesting of the underlying award.

(3) In addition to the Anadarko common stock reported in the table, as of December 31, 2016, the directors and executive officers beneficially owned common units of Western Gas Partners, LP (WES) as follows: Mr. Walker — 6,900; Mr. Gwin — 10,000; Mr. Reeves — 9,000; Ms. Eberhart — 1,000; and Mr. McKinley — 9,000. The Company owns a majority interest in WES indirectly through its wholly-owned subsidiaries. As of December 31, 2016, there were 130,671,970 common units of WES outstanding. The directors and executive officers, individually and as a group, beneficially own less than one percent of WES's outstanding common units.

(4) In addition to the Anadarko common stock reported in the table, as of December 31, 2016, the directors and executive officers beneficially owned common units of Western Gas Equity Partners, LP (WGP) as follows: Mr. Walker — 9,900; Mr. Gwin — 200,000; Mr. Reeves — 9,000; Gen. Chilton — 900; Mr. Fluor — 61,118; and Mr. George — 5,000. Mr. Fluor disclaims beneficial ownership with respect to 61,117 common units that are owned by his spouse. As of December 31, 2016, there were 218,928,570 common units of WGP outstanding. The directors and executive officers, individually and as a group, beneficially own less than one percent of WGP's outstanding common units.

(5) In addition to the Anadarko common stock reported in the table, as of December 31, 2016 Mr. Walker owned 2,500 tangible equity units (TEUs). In June 2015, the Company issued 9.2 million TEUs. Each TEU is comprised of a prepaid equity purchase contract for common units of WGP and a senior amortizing note. Anadarko has a right to elect to issue and deliver shares of Anadarko common stock in lieu of delivering WGP common units at settlement, which, unless settled earlier at the holder's option, is June 7, 2018. The directors and executive officers, individually and as a group, beneficially own less than one percent of the outstanding TEUs.

(6) Includes 108,000 shares of common stock held by a limited liability company (LLC) over which Mr. Walker and his spouse exercise investment control. The membership interests in the LLC are held by Mr. Walker, his spouse and family trusts of which he is the trustee.

(7) Includes 95,000 shares of common stock held by an FLP. Two LLCs serve as the general partners of the FLP. Mr. Reeves serves as the sole manager of one of the LLCs and his spouse serves as the sole manager of the other. The limited partner interests in the FLP are held by family trusts of which Mr. Reeves is the trustee. Mr. Reeves disclaims beneficial ownership of these shares.

Table of Contents

# Security Ownership of Certain Beneficial Owners and Management

## CERTAIN BENEFICIAL OWNERS

The following table shows the beneficial owners of more than five percent of the Company's common stock as of December 31, 2016, based on information available as of February 14, 2017:

| Title of Class | Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|---|
| Common Stock | BlackRock, Inc.<br>55 East 52nd Street<br>New York, NY 10055 | 42,431,757(1) | 7.60% |
| Common Stock | The Vanguard Group<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 37,643,758(2) | 6.73% |
| Common Stock | FMR LLC<br>245 Summer Street<br>Boston, MA 02210 | 35,291,542(3) | 6.31% |
| Common Stock | State Street Corporation<br>State Street Financial Center<br>One Lincoln Street<br>Boston, MA 02111 | 28,410,712(4) | 5.08% |

(1) Based upon its Schedule 13G/A filed January 19, 2017, with the SEC with respect to Company securities held as of December 31, 2016, BlackRock, Inc. has sole voting power as to 37,521,969 shares of common stock, shared voting power as to 13,144 shares of common stock, sole dispositive power as to 42,418,613 shares of common stock and shared dispositive power as to 13,144 shares of common stock.

(2) Based upon its Schedule 13G/A filed February 9, 2017, with the SEC with respect to Company securities held as of December 31, 2016, The Vanguard Group has sole voting power as to 879,516 shares of common stock, shared voting power as to 99,685 shares of common stock, sole dispositive power as to 36,687,889 shares of common stock and shared dispositive power as to 955,869 shares of common stock.

(3) Based upon its Schedule 13G filed February 14, 2017, with the SEC with respect to Company securities held as of December 31, 2016, FMR LLC has sole voting power as to 2,060,049 shares of common stock and sole dispositive power as to 35,291,542 shares of common stock.

(4) Based upon its Schedule 13G filed February 9, 2017, with the SEC with respect to Company securities held as of December 31, 2016, State Street Corporation has shared voting power as to 28,410,712 shares of common stock, and shared dispositive power as to 28,410,712 shares of common stock.

Table of Contents

## Section 16(A) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's directors and executive officers, and persons who own more than 10% of a registered class of the Company's equity securities, to file with the SEC and any exchange or other system on which such securities are traded or quoted, initial reports of ownership and reports of changes in ownership of the Company's common stock and other equity securities. Officers, directors and more than 10% stockholders are required by the SEC's regulations to furnish the Company and any exchange or other system on which such securities are traded or quoted with copies of all Section 16(a) forms they filed with the SEC.

To the Company's knowledge, based solely on a review of the copies of such reports furnished to the Company and written representations that no other reports were required, the Company believes that all reporting obligations of the Company's officers, directors and more than 10% stockholders under Section 16(a) were satisfied during the year ended December 31, 2016.

Table of Contents

# Audit Committee Report

*The following report of the Audit Committee of the Company, dated February 8, 2017, shall not be deemed to be "soliciting material" or to be "filed" with the Securities and Exchange Commission, nor shall this report be incorporated by reference into any filing made by the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.*

The Audit Committee of the Board is responsible for independent, objective oversight of the Company's accounting functions and internal control over financial reporting. The Audit Committee is composed of three directors, each of whom is independent as defined by the New York Stock Exchange (NYSE) listing standards. The Audit Committee operates under a written charter approved by the Board of Directors, which is available on the Company's website at http://www.anadarko.com/content/documents/apc/responsibility/governance_documents/2013-11-07_audit_committee_charter.pdf.

Management is responsible for the Company's internal control over financial reporting. The independent auditor is responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted auditing standards in the United States of America and issuing a report thereon. The independent auditor is also responsible for performing an independent audit of the Company's internal control over financial reporting. The Audit Committee's responsibility is to monitor and oversee these processes.

KPMG LLP served as the Company's independent auditor during 2016 and was appointed by the Audit Committee to serve in that capacity for 2017 (and we are seeking ratification by the Company's stockholders at this Annual Meeting of such appointment). KPMG LLP has served as the Company's independent auditor since its initial public offering in 1986.

In connection with these responsibilities, the Audit Committee met with management and the independent auditor to review and discuss the December 31, 2016 audited consolidated financial statements and management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. The Audit Committee also discussed with the independent auditor the matters required to be discussed by standards of the Public Company Accounting Oversight Board (PCAOB).

The Audit Committee also received the written disclosures and the letter from the independent auditor required by the PCAOB regulating the independent auditor's communications with the audit committee concerning independence and has discussed with the independent auditor that firm's independence.

Based upon the Audit Committee's review and discussions with management and the independent auditor referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016 filed with the SEC.

THE AUDIT COMMITTEE
Eric D. Mullins, Chair
Kevin P. Chilton
Mark C. McKinley

Table of Contents

# Compensation and Benefits Committee Report on 2016 Executive Compensation

The Compensation Committee, the members of which are listed below, is responsible for establishing and administering the executive compensation programs of the Company. The Compensation Committee of the Company has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on such review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this proxy statement.

THE COMPENSATION AND BENEFITS COMMITTEE
Joseph W. Gorder, Chair
Peter J. Fluor
John R. Gordon

[Table of Contents](#)

# Letter from the Chair of the Compensation and Benefits Committee

The Compensation and Benefits Committee values the feedback of our investors related to our executive compensation programs, and while we think they have been thoughtfully constructed, we also understand there is always room for improvement. During 2016, the Company actively engaged with stockholders following our 2016 say on pay vote in which we received approximately 62% support. Based on feedback we received from stockholders, the Company reviewed our compensation programs to identify features that could be improved to strengthen alignment with stockholder interests. As a result, the Compensation Committee made changes to the Company's Annual Incentive Program (AIP), which are discussed in detail beginning on page 30.

We believe that Anadarko's executive compensation programs are well designed for a cyclical, commodity driven and capital intensive industry that must focus and retain top talent throughout periods of rising and falling commodity prices. As you will see by the disclosure that follows, the Compensation Committee believes that the compensation programs we have established are operating as intended to align the pay that executives may realize with stockholder returns. We appreciate your ongoing engagement, feedback and support as we continue our efforts to structure programs aligned with long-term stockholder value.

THE COMPENSATION AND BENEFITS COMMITTEE



Joseph W. Gorder, Chair



Table of Contents

# Compensation Discussion and Analysis

## EXECUTIVE SUMMARY

### *Committee Response to 2016 Advisory Vote on Executive Compensation.*

We have a strong track record of engaging with stockholders and responding to the feedback received. At the 2016 Annual Meeting, our executive compensation program received the support of approximately 62% of the votes cast. Acknowledging our vote result and in line with our commitment to ongoing stockholder engagement, during the spring of last year we solicited feedback from our top stockholders representing approximately 62% of the Company's outstanding common stock. In the fall we again solicited feedback from stockholders representing approximately 60% of the Company's outstanding common stock. See page 36 for more details on our active engagement with stockholders.

WHERE TO FIND IT


| | |
|---|---|
| Executive Summary | 30 |
| Stockholder Engagement | 36 |
| Governance Practices | 36 |
| Performance-Based Annual Cash Incentives | 39 |
| Equity Compensation | 44 |
| Retirement Benefits | 50 |
| Perquisites | 51 |


Based on specific feedback expressed by stockholders during our outreach efforts, the Compensation Committee (referred to in this section of the proxy statement as the Committee) commissioned FW Cook, the Committee's executive compensation consultant, to develop and present a thorough analysis outlining various design alternatives in response to stockholder concerns. The Committee sought an appropriate balance to best serve the interests of our stockholders while continuing to attract and retain the talent necessary to achieve the Company's strategic goals, taking into account standards in our industry and peer group, along with appropriate decisions for our business. Following multiple meetings with FW Cook and management and extensive discussions regarding the merits and issues associated with various design alternatives, the Committee approved the following changes to the AIP for 2017 in response to stockholder feedback:

### AIP Enhancements in Response to Stockholder Feedback

| What We Heard | What We Did | Why |
|---|---|---|
| A desire for structural changes in our AIP design | Reduced the cap for each AIP performance goal payout from 275% to 200% for both the 2016 and 2017 AIP | Provides balance in the overall payout curve and more evenly balances the weighting of the performance goals, preventing a higher bonus payout for strong achievement on only a few goals |
| | Flattened the payout curve on the Reserve Additions and Capital Expenditures performance goals by requiring a wider range of performance to exceed target | Reduces the volatility and unpredictability of outcomes in setting target performance and requires higher absolute performance to achieve above target payout |

Table of Contents

## Compensation Discussion and Analysis

| What We Heard | What We Did | Why |
|---|---|---|
| The AIP should include a financial goal | Added an additional financial goal, Cash Operating Income/BOE, with a weighting of 25% | Addresses stockholder requests for the AIP to include financial performance and further aligns AIP goals with stockholders' interests; Defined as operating income (loss) plus non-cash items as reflected on the Statement of Cash Flows (limited to those non-cash items used to derive operating income), divided by sales volumes for the year |
| More transparency regarding goal setting process | Enhanced the disclosure regarding the rigorous process utilized to develop strategic AIP performance goals | Better illustrates the strategic alignment of the budget, which is tied to the current commodity-price environment, and resulting AIP performance goals |

For a full discussion of the AIP and the results for 2016, see pages 39 - 44.

***Reduction to Severance Payout Multiple.*** The Committee also modified the form of change-of-control contract used for newly appointed executive officers, whether or not they were subject to an existing agreement prior to their appointment, in order to reduce the severance multiple from 2.9 to 2.5 and to implement other changes. The Company entered into these new change-of-control contracts with Messrs. Ingram and Leyendecker. The key employee change-of-control contracts are discussed in more detail beginning on page 52.

***Operational and Financial Accomplishments in 2016.*** The Company successfully managed through the challenging commodity environment of recent years. It took certain steps during 2016 in order to position the Company for growth and value appreciation as the commodity price environment improves. These included:

- **delivering strong sales volume performance** representing 3% growth (on an acquisition and divestiture adjusted basis) while investing nearly 50% less capital than 2015, largely driven by high-margin opportunities in core assets in the DJ and Delaware basins as well as Algeria, and an ongoing portfolio shift towards higher margin crude oil production;

- **continuing to high-grade the portfolio** by closing more than $4 billion of asset divestitures during the year and announcing transactions for the sale of an additional $3.5 billion in non-core assets to close in the first half of 2017;

- **completing a successful strategic acquisition** of deepwater Gulf of Mexico assets, which doubled the Company's production in the Gulf of Mexico and is expected to generate substantial future free cash flow that the Company plans to deploy to accelerate the development of core assets in the Delaware and DJ basins, which was attractively

Table of Contents

# Compensation Discussion and Analysis

financed through the issuance of common stock that was favorably received by the market;

- **significantly enhancing liquidity and balance sheet strength** by reducing net debt; and
- **implementing actions which reduced the Company's cost structure** by approximately $800 million annually.

These accomplishments improve the Company's ability to deliver strong performance in a volatile commodity environment for price discovery and provide a greater line of sight to future growth as the industry's fundamental outlook improves.

***TSR Performance.*** The Company had strong top-quartile stock price performance during 2016, driving an absolute one-year Total Stockholder Return (TSR) of close to 44%. This TSR performance placed us fourth within our 12 company peer group at year end. On a three-year basis, our TSR performance was in the top half of our peer group.




Copyright© 2017 Standard & Poors, a division of S&P Global. All rights reserved.

***Pay For Performance.*** The Committee believes that the Company's executive compensation programs are appropriately designed to pay for performance and align the executive officers' interests with those of stockholders. As demonstrated in the charts on page 37, the vast majority of our executive officers' target total compensation opportunity is delivered in at-risk compensation components tied to the achievement of short- and long-term performance criteria aligned with our business objectives. For 2016, the payouts under our at-risk programs were as follows:

☑ ***Long-Term Equity Based Incentives*** — The executive officers earned 128% payouts (out of a maximum 200%) based on second-quartile TSR performance for the three-year performance period ended December 31, 2016. See page 44 for more details regarding our performance units.

☑ ***Annual Incentive Program*** — As a result of the Company's strong operating and financial performance in 2016 despite the challenging commodity markets, the executive officers were awarded above-target bonuses equivalent to a 158% performance score to recognize their successful execution of the Company's strategic goals.

Table of Contents

# Compensation Discussion and Analysis

A detailed description of the Company's executive compensation programs and the compensation decisions made by the Committee for 2016 are reported beginning on page 38.

***The AIP performance goals are directly tied to the Company's annual budget, which is largely driven by commodity prices.***

***2016 AIP Performance Goals Designed to Increase Stockholder Value Over Time.*** The AIP performance goals are designed to motivate and reward exceptional near-term operational performance on key metrics that work together to achieve long-term strategic performance objectives intended to drive differentiating performance year-over-year and increase stockholder value. The Committee believes that the AIP's annual performance goals, although short-term in nature, should position the Company for exceptional TSR performance over the long term.

**2016 AIP Performance Goals**




The AIP is directly tied to the Company's annual budget. The budget is driven to a large degree by the prevailing market price for oil and natural gas, which we do not control or influence. The Company is committed to investing within cash flow over a multi-year period and commodity prices impact our cash inflows more than any other single variable. Considering the relatively weak commodity market environment facing the Company during our budgeting process for 2016 and its impact on our expected cash inflows, the Board approved a 2016 budget that was nearly 50 percent lower than actual 2015 capital investment and almost 70 percent lower than 2014. The overarching goal was to preserve stockholder value for a time when the Company could achieve better returns as commodity prices improved, thereby preserving and ultimately enhancing stockholder value over the long term. The Committee believes that structuring incentive programs to simply reward increased absolute performance on operational goals does not support our long-term strategy nor does it necessarily drive strong returns for our stockholders.

Because of the Company's significantly reduced budget for 2016 and asset sales during 2015, the Committee approved performance targets that were challenging in the prevailing commodity-price environment but were also lower than actual performance compared to the prior year. Setting 2016 performance goals that were numerically lower than actual 2015 performance does not indicate a lack

Table of Contents



of rigor; instead, it reflects the realities of a challenging commodity-price environment and a focus on preserving stockholder value in the near term to increase long-term stockholder returns.

See pages 39 - 44 for a full discussion of the AIP and the results for 2016.

***CEO Realized Pay***. Consistent with our pay-for-performance philosophy, 91% of the CEO's total direct compensation is at-risk. Accordingly, the value that is intended to be received by the CEO is aligned with the Company's actual operational and financial performance, including absolute and relative stock-price performance. The value actually received by the CEO can differ substantially from the grant date values required to be reported in the Summary Compensation Table (SCT) and related proxy tables. To illustrate the actual difference between compensation reported in the SCT and the actual pay realized by the CEO in 2014, 2015 and 2016, the chart below compares reported pay and realized pay during those years. The chart compares each direct compensation element comprised of: Salary; Non-Equity Incentive Plan Compensation; and Stock Awards and Option Awards (performance units, restricted stock units and non-qualified stock options). The reported pay column in the chart depicts the data reported in the 2016 SCT and related proxy tables, while the realized pay column depicts the actual value received (or vested) by the CEO in each year. The calculation for realized pay for purposes of this chart is more fully described and calculated in the table below.

***CEO Compensation - Reported Pay vs. Realized Pay***




The following table illustrates the calculations used to determine the differences between the amount reported in the 2016 SCT and the amount actually realized, or received, by the CEO in 2016 for each of the following direct compensation elements: Salary; Non-Equity Incentive Plan Compensation; and Long-Term Incentive Awards (Stock Awards and Option Awards):

| | **CEO Reported Pay(1)** | **CEO Realized Pay*** |
|---|---|---|
| | **2016 Summary Compensation Table ($)** | **2016 Actual Compensation Paid ($)** |
| Salary | 1,300,000 | 1,300,000 |
| Non-Equity Incentive Plan Compensation(2) | 2,670,200 | 1,930,500 |
| Stock Awards - Performance Units(3) | 5,587,116 | 1,156,617 |
| Option Awards(4) | 2,828,445 | 0 |
| Stock Awards - Restricted Stock Units(5) | 2,775,055 | 2,016,323 |
| **Total 2016 Compensation** | **15,160,816** | **6,403,440** |

* **Includes actual performance-based compensation paid to CEO in 2016 as determined in footnotes 2 – 5 below.**

Table of Contents



(1) The amounts indicated as reported pay in the table reflect the total direct compensation (calculated as Salary, Non-Equity Incentive Plan Compensation, and the grant value of Long-Term Incentive Awards) for 2016 as reported in the 2016 SCT on page 58. The grant date fair values for performance units, restricted stock units and options are described in footnote (2) to the 2016 SCT.

(2) The realized pay column reflects the Non-Equity Incentive Plan Compensation Mr. Walker earned under the Company's AIP for the 2015 performance year, which was paid in February 2016.

(3) The realized pay column reflects the amount Mr. Walker received in January 2016 for his 2012 performance unit award for the three-year performance period commencing January 1, 2013 and ending December 31, 2015 (12,361 units valued at vesting of $438,567), and his 2013 performance unit award for the two-year performance period commencing January 1, 2014 and ending December 31, 2015 (20,238 units valued at vesting of $718,050). See the Option Exercises and Stock Vested in 2016 Table on page 63 for more details.

(4) The realized pay column reflects the intrinsic value at vesting of any in-the-money stock options that vested during the performance year. The vesting price of each of the three tranches of stock options which vested during 2016 were below the respective exercise price.

(5) The realized pay column reflects the value at vesting of restricted stock units that vested during 2016 (33,871 units valued at vesting of $2,016,323). See the Options Exercises and Stock Vested in 2016 Table on page 63 for more details.

***CEO Target Total Compensation Opportunity Unchanged Since 2012. NEO Target Compensation Held Flat.*** As part of its annual review of executive compensation in November 2016, for the third consecutive year the Committee determined that the target total compensation opportunity for the executive officers (other than for two recently appointed executive officers) should remain substantially flat year-over-year and that no changes should be made to the current base salaries, target bonus opportunities, and target grant value of annual long-term incentive awards. Mr. Walker's target total compensation opportunity has remained the same since his appointment to CEO in May 2012, at which time the Committee positioned him at the median of CEOs of our industry peer group. The Committee believes that the pay opportunity provided by the current levels of fixed and at-risk compensation components (1) properly reflects the scope and responsibilities associated with each executive officer's position, (2) is appropriately aligned with the industry peer group and (3) serves to retain and motivate a highly experienced and cohesive executive team to successfully manage the operations of a global company of our scope and complexity.

As CEO, Mr. Walker's compensation is higher than the compensation of the other NEOs. This difference in compensation is supported by the industry peer group benchmark data, which is substantially higher for the CEO role than for the other NEO positions, and is indicative of the greater responsibility the CEO position entails for the strategic direction, financial condition, operating results and reputation of the Company.

Table of Contents

# Compensation Discussion and Analysis

***Active Engagement with Stockholders — We Listen and Respond.*** We regularly engage with our stockholders, reaching out specifically to the governance and voting teams, to solicit feedback on Anadarko's executive compensation programs, as well as corporate governance, sustainability and environmental issues and other matters. Since 2012, we have held more than 140 separate engagements with our stockholders as well as several meetings with proxy advisory firms. Our stockholder engagement team consists of senior management from our Human Resources, Legal, Investor Relations, and Health, Safety and Environment departments and has also included the chair of the Committee. Members of our engagement team also participate in various governance forums with our stockholders. We generally reach out to our top 50 stockholders each spring and fall, with engagement also occurring at other times throughout the year. Our stockholders' views on executive compensation and corporate governance are important to us, and we value and use their feedback and insights.

***We have a robust stockholder engagement program and, based on feedback received, have made several changes to our executive compensation program and governance practices over the years, including the changes to the AIP for 2016 and 2017 discussed on pages 30 -31.***

The Board and its committees regularly discuss and consider the significant concerns that are identified through this engagement process as well as the outcome of the annual advisory vote on executive compensation. As a result, we have made several changes to our executive compensation program and governance practices over the years, including the changes to the AIP for 2016 and 2017 discussed on pages 30 - 31. The Board and our Investor Relations team welcome questions or comments about the Company and its operations. See page 17 for more details on Communication with Directors of the Company or email Investor Relations at investor@anadarko.com.

***Track Record of Good Governance Practices.*** Through our commitment to good governance, including our continued stockholder engagement efforts, we have implemented the following practices over the past several years:

| What We Do | What We Don't Do |
|---|---|
| ✓ Structure our executive officer compensation so that more than 85% of pay is at risk | ✗ No employment contracts with our executive officers |
| ✓ Emphasize long-term performance in our equity-based incentive awards | ✗ No tax gross-ups on perquisites except with respect to the Company's standard relocation program available to all employees |
| ✓ Provide for double-trigger equity acceleration upon a change of control | ✗ No excise tax gross-ups in key employee change-of-control contracts entered into by newly appointed and/or newly hired executive officers, irrespective of an existing agreement |
| ✓ Maintain a competitive compensation package | ✗ No pledging of Company securities |
| ✓ Require robust stock ownership for executive officers and directors | ✗ No short sales or derivative transactions in Company stock, including hedges |
| ✓ Provide for clawback provisions | ✗ No current payment of dividends or dividend equivalents on unvested awards |
| ✓ Consider deductibility when structuring compensation | ✗ No repricing of stock options and stock appreciation rights unless approved by stockholders |

[Table of Contents](#)



## ELEMENTS OF OUR 2016 COMPENSATION PROGRAMS

Our executive compensation programs include direct and indirect compensation elements. We believe that a majority of an executive officer's total compensation opportunity should be performance-based; however, we do not have a specified formula that dictates the overall weighting of each element.

As illustrated in the charts below, 79% of the current CEO and 75%, on average, of target total compensation opportunity for the other NEOs is provided through equity-based incentives that are dependent upon long-term corporate performance and stock-price appreciation. Any value ultimately realized for these long-term equity-based awards is directly tied to Anadarko's absolute and relative stock-price performance and will fluctuate along with stockholder returns.




Percent of total direct compensation: At-Risk 91%, Long-Term 79%




Percent of total direct compensation: At-Risk 87%, Long-Term 75%

*The charts above are based on the following: current base salaries, as discussed on page 39; target bonus opportunities approved by the Committee in 2016, as discussed on page 43; and the grant date value for the 2016 annual equity awards, as discussed on page 46.*

Table of Contents

# Compensation Discussion and Analysis

## *Direct Compensation Elements*

The direct compensation elements are described below. The indirect compensation elements are outlined in the table on page 50.




### 2016 COMPENSATION DECISIONS AND LINK TO STRATEGY

The following is a discussion of the specific actions taken by the Committee in 2016 related to each of our direct compensation elements. Each element is reviewed annually, as well as at the time of a promotion, other change in responsibilities, other significant corporate events or a material change in market conditions.

As discussed above, the Committee determined that the target total compensation opportunity for the NEOs should remain flat year-over-year (other than for two recently appointed executive officers) and that no changes should be made to the current base salaries, target bonus opportunities, and target grant value of annual long-term incentive awards.

Table of Contents

# Compensation Discussion and Analysis

## Base Salary

The table below reflects the base salaries for the NEOs. As part of its annual review of executive compensation, in November 2016 the Committee determined that no changes should be made to the base salaries for the NEOs.

| Name | Salary as of January 1, 2016($) | Salary as of January 1, 2017($) | Increase |
|---|---|---|---|
| Mr. Walker | 1,300,000 | 1,300,000 | 0% |
| Mr. Gwin | 750,000 | 750,000 | 0% |
| Mr. Ingram | 625,000 | 625,000 | 0% |
| Mr. Reeves | 700,000 | 700,000 | 0% |
| Mr. Leyendecker | (1) | 575,000 | 0% |

(1) Mr. Leyendecker served as a senior vice president of the Company on January 1, 2016 and was not appointed as an executive vice president until August 2016, at which time his base salary was increased to $575,000.

## Performance-Based Annual Cash Incentives (Bonus)

The AIP is designed to focus on key performance goals and targeted levels of performance that are intended to drive differentiating performance year-over-year. All employees of the Company, including our executive officers, participate in the AIP, which is part of our 2012 Omnibus Incentive Compensation Plan, as amended and restated (2012 Omnibus Plan), that was approved by our stockholders in May 2016. At the beginning of each year, the Committee reviews and approves the performance goals and targeted levels of performance. These performance goals align with the Board-approved budget for the year and reflect the market and business environment in which we operate.

The following 2016 AIP performance goals are intended to work together to achieve long-term strategic performance objectives and provide the best, most direct means of aligning the actions of our executive officers and employees in the short term to position the company to deliver exceptional total stockholder returns over the long term.

| 2016 AIP Performance Goals | Purpose |
|---|---|
| *Operational:*<br>• Reserve Additions<br>• Sales Volumes | Proved reserves are the single most important asset of an exploration and production company. Since this asset depletes by nature, the cost-effective addition of new proved reserves is key to increasing the underlying intrinsic value of the Company and ultimately the stock price. The Company also focuses on sales volumes since it is the means by which reserves are converted into cash flow. |
| *Financial:*<br>• Capital Expenditures<br>• Controllable Cash Costs | These goals focus on financial discipline. The Company allocates the majority of its capital to assets that generate strong economic returns while a portion is allocated to long-term projects that are intended to provide future reserves and sales volumes. The Controllable Cash Costs performance goal incentivizes employees to manage and reduce costs to maximize margins and profitability. |
| *Safety:*<br>• Total Recordable Incident Rate | The health and safety of employees is very important to the Company and critical to success. Accordingly, the performance goals include a target total recordable incident rate per 100 employees so that employees are focused on maintaining a safe work environment. |

Table of Contents



***2016 AIP Performance Goals Designed to Enhance Returns and Increase Stockholder Value.*** Within the exploration and production industry, revenues, operating results, cash flow, capital spending, and future growth rates are highly dependent on the global commodity markets. During the years of higher commodity prices prior to 2015, the Committee established increasingly challenging annual AIP performance goals on key metrics, such as sales volumes and reserve additions, that were designed to advance long-term growth objectives. In a low-commodity price environment, the market rewards exploration and production companies that focus investment on accretive projects and exercise financial discipline. The 2016 performance goals were strategically designed in order to enhance stockholder value during a low commodity price environment by focusing on competitive returns and disciplined investment.

***Structuring incentive programs to simply reward increased absolute performance on operational goals does not support the Company's long-term strategy nor does it necessarily drive strong stockholder returns.***

When the AIP performance goals were set at the beginning of 2016, oil was trading at less than $30 per barrel and the duration and magnitude of the decline in commodity prices could not be accurately predicted. As a result, the Company substantially reduced its planned capital expenditures to balance capital spending with the reduced cash flow resulting from lower commodity prices. To enhance value and maximize the reduced budget, the Company strategically allocated most of its capital (~70%) to core assets in the DJ and Delaware basins as well as high margin opportunities in the deepwater Gulf of Mexico and other international operations. Accordingly, the Company allocates capital to opportunities with the highest rates of return seeking to optimize value accretion for its stockholders. The 2016 AIP performance goals were directly tied to the strategic approach of a reduced budget and this, as well as asset sales which occurred in 2015, resulted in target performance levels which were lower in absolute terms than previous years. The Committee determined at the time the 2016 AIP performance goals were approved that the targets established were challenging in the prevailing commodity price environment and appropriately required our executive officers and employees to strive for strong performance on key metrics.

***Rigorous Process Utilized to Develop Strategic AIP Performance Goals.*** The Company employs a rigorous and robust process to establish the annual capital budget, which directly promotes the Company's strategic objectives and is the basis for developing the AIP performance goals. A Company-wide portfolio evaluation and asset optimization effort, led by the Company's Corporate Planning team, is the foundation for establishing the annual budget. By definition, assets which do not generate accretive rates of return compared to the Company's weighted average cost of capital are not considered. The budget is then "built up" from the asset level to a consolidated corporate budget, and includes a detailed analysis, including each asset's capital efficiency and return metrics. The analysis also includes consideration of the Company's long-term strategy, prior performance, service cost and commodity prices. Multiple reviews are conducted with executive management as well as the full Board during the budget cycle and prior to approval to ensure a comprehensive understanding of all assumptions. The Committee approves the associated AIP performance goals to align with the short- and long-term strategic objectives of the budget. Once the goals have been established, the Committee monitors progress during the year through quarterly updates and then reviews and certifies the final corporate-wide results in February of the following year. From time to time, the Committee may

Table of Contents



exercise appropriate discretionary adjustments depending on various internal/external factors, including stock performance.




***Changes to Performance Goals for 2016.*** While the 2016 AIP performance goals were similar to 2015, the Committee simplified the overall design and re-allocated the weighting of the performance goals to provide increased focus on the key areas that were essential to delivering higher returns and emphasizing financial discipline, while maintaining a safe work environment and creating stockholder alignment. The LOE and Controllable G&A performance goal from the 2015 AIP was renamed Controllable Cash Costs and expanded to include gathering, processing and marketing costs and oil and gas transportation costs. The Committee believed that such modifications would focus the executive officers' efforts on the controllable aspects of the business performance to maximize operational and financial results during a challenging commodity-price environment.

The performance goals are intended to work together to achieve the Company's short-term and long-term objectives. For example, the 2016 financial performance goals, Controllable Cash Costs and Capital Expenditures which each had the strongest weighting of 25%, worked together to ensure the Company exercised financial discipline. To the extent the Company was successful in achieving its target on Controllable Cash Costs, resulting in reduced expenses, more cash flow was available to invest in projects that provide strong economic returns and enhance sales volumes or increase reserves in a cost-efficient manner.

Operating Base Volumes were excluded from the 2016 AIP performance goals as a result of potential difficulties in isolating direct performance-related effects on the score. EBITDAX/BOE was eliminated due to unusually high commodity price uncertainty and volatility, which made it particularly difficult to set an appropriate target. Since the AIP applies to all employees of the Company, TSR was excluded as results can be heavily influenced by corporate actions or factors outside of direct employee control. In addition, most of our executive officers' compensation opportunity is delivered in equity-based incentives that are tied to TSR.

Table of Contents



***Impact of Divestitures and Variance with Guidance.*** At the time the Committee approved the 2016 AIP performance goals, the Company intended to monetize certain non-core assets throughout the year. Due to the uncertainty regarding both the timing and execution of these divestitures, the assets were initially included in the Company's budget as well as the AIP targets. However, the Committee excluded the effects of the asset divestitures closed during the year by removing them from the AIP targets, performance results and the calculated performance score. This was done to ensure that neither the timing nor execution of the divestiture program had any impact on the final AIP performance score. As a result of this methodology, the target performance goals differed from the Company's initial public guidance provided at the beginning of 2016.

***The Committee made changes to the AIP for 2016 and 2017 based on stockholder feedback to improve and strengthen the alignment of the program with stockholder interests. See further discussion on pages 30 - 31.***

***2016 Performance Results.*** The table below reflects the 2016 performance results against each of the specified targets. Each performance goal and the total AIP score was capped at 200%.

| 2016 AIP Performance Goals | Relative Weighting Factor | AIP Target Performance(1) | AIP Target Performance Adjusted for Divestitures(2) | AIP Performance Results Adjusted for Divestitures(3) | AIP Performance Score(3) |
|---|---|---|---|---|---|
| Reserve Additions (before price revisions, acquisitions and divestitures), MMBOE | 20% | 164.1 | 164.1 | 278.7 | 40.0% |
| Sales Volumes, MMBOE | 20% | 285.6 | 254.9 | 265.7 | 40.0% |
| Capital Expenditures, $MM(4) | 25% | 2,946 | 2,929 | 2,932 | 24.8% |
| Controllable Cash Costs ($/BOE)(5) | 25% | 13.35 | 13.56 | 12.70 | 44.8% |
| Total Recordable Incident Rate (Safety) | 10% | 0.34 | 0.34 | 0.36 | 8.0% |
| **Total** | **100%** | | | | **158.0%** |

(1) The 2016 AIP performance goals were directly tied to the Company's reduced budget. As a result of this and asset sales that occurred in 2015, certain target performance levels for 2016 were lower in absolute terms than the previous year. See page 40 for additional discussion.

(2) The Committee excluded the effects of the asset divestitures executed during the year by removing them from the AIP targets, performance results and calculated AIP performance score to ensure that neither the timing nor execution of the divestiture program had any impact on the final AIP score. In addition, the Controllable Cash Costs performance goal was adjusted following the completion of a workforce reduction program.

(3) The Committee did not make any adjustments to the measured 2016 AIP performance results or overall calculated 2016 AIP performance score other than to exclude the effects of the asset divestitures executed during the year by removing them from the performance results and performance score. In addition, the AIP performance results do not include any impact from the acquisition of assets in the deepwater Gulf of Mexico in December 2016.

(4) For AIP purposes, Capital Expenditures excludes the capital expenditures of WES and WGP, expenditures for acquisitions, non-cash investments or investments associated with the divestment program and capital that is carried or subsequently reimbursed by another party.

Table of Contents



(5) Controllable Cash Costs is the sum of lease operating expense (LOE), controllable general and administrative (G&A) costs, oil and gas transportation costs and gathering, marketing and processing costs per barrel of oil equivalent sales volume. LOE excludes the cost of deepwater work-overs because of timing uncertainty and magnitude. Controllable G&A includes costs that are subsequently reclassified to exploration expense for accounting purposes and excludes restricted stock, severance costs, bonus plans and benefits costs.

The Company delivered very strong operating performance in 2016 despite the challenging commodity markets by delivering 3% sales volume growth (on an acquisition and divestiture adjusted basis) while investing nearly 50% less capital than in 2015. The Company performed above the targets established for three AIP performance goals (Reserve Additions, Sales Volumes and Controllable Cash Costs). Highlights from 2016 include:

- *Reserve Additions* — The Company delivered maximum performance for reserve additions driven by reservoir performance in core assets, cost reductions that extended the economic limit in certain fields, and infill drilling results and extensions/discoveries in the Company's key development areas.

- *Sales Volumes* — The Company delivered maximum performance on sales volumes driven largely by core assets in the DJ and Delaware basins as well as Algeria. As a result of improvements in both efficiency and absolute cost, the Company was able to drill and complete more wells in the DJ and Delaware basins than expected, while investing largely within budget. The Company also continued to focus on delivering high-margin oil and liquids production.

- *Controllable Cash Costs* — Performance exceeded target due to strong cost control efforts, continued renegotiations with vendors, and reductions in non-essential project spending. Performance on this goal was also enhanced by higher volumes which were produced without associated incremental cost, driving improved profitability on a unit basis.

The AIP awards for 2016 for the NEOs are shown in the table below and are reflected in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table. Individual target bonus opportunities are determined based on the executive officer's position. Executive officers may earn from 0% to 200% of their individual bonus target. Following its annual review of executive compensation in November 2016, the Committee made no changes to the NEO bonus targets for 2017.

| Name | Base Salary Earnings for 2016($) | | Target Bonus % | | Approved AIP Performance Score | | Individual Performance Adjustments | | Actual Bonus Award ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Walker | 1,300,000 | X | 130% | X | 158% | ± | 0 | = | 2,670,200 |
| Mr. Gwin | 750,000 | X | 95% | X | 158% | ± | 0 | = | 1,125,750 |
| Mr. Ingram | 625,000 | X | 95% | X | 158% | ± | 0 | = | 938,150 |
| Mr. Reeves | 700,000 | X | 95% | X | 158% | ± | 0 | = | 1,050,700 |
| Mr. Leyendecker(1) | 473,654 | X | 85.19% | X | 158% | ± | 0 | = | 637,550 |

(1) Mr. Leyendecker's bonus target was prorated as a result of his appointment as executive vice president in August 2016. For 2017, his bonus target will be 95%.

The Committee did not make individual performance adjustments for any NEO's 2016 bonus payments in recognition of the team effort necessary to drive the Company's success.

Table of Contents

## Compensation Discussion and Analysis

***Section 162(m) Performance Hurdle.*** In March 2016, the Committee established a baseline AIP performance hurdle for the NEOs of the Company's attainment during 2016 of positive Cash Flow from Operating Activities (Net cash provided by (used in) operating activities) as calculated in the Consolidated Statements of Cash Flows of the Company's financial statement published in the Company's annual report on Form 10-K, but excluding the effect of any legal settlements/satisfaction of judgments that are $1 million or greater. If this performance hurdle was not achieved, the NEOs subject to Section 162(m) of the IRC would earn no AIP bonuses for the year under the 2012 Omnibus Plan. If the performance hurdle was met, the bonus pool would be funded at the maximum bonus opportunity level for each NEO and the Committee would consider our performance against the AIP performance goals, as well as any other relevant factors, when determining the actual amount of the AIP bonuses to be paid to each NEO. The Committee may apply negative discretion in determining actual awards. The Committee does not have the discretion to increase bonuses above funded amounts. The AIP bonus pool was funded for the 2016 performance year because the Company exceeded the established performance hurdle.

### *Equity Compensation*

Our equity-based long-term incentive program is designed to reward our executive officers for sustained long-term share performance. This program represents 75% or more of target total compensation opportunity and includes a combination of equity-based awards (performance units, stock options and restricted stock units) that we believe are performance-based in absolute and relative terms. Pursuant to our equity grant administration procedures established by the Committee, annual equity-based awards for executive officers are typically made at the regularly scheduled Committee meeting in the fall. Equity awards for newly hired executive officers or awards made in connection with promotions are made on the date such awards are approved by the Committee.

The 2016 targeted equity award value was allocated 50% in performance units that reward relative TSR performance and 25% in non-qualified stock options that reward absolute value creation (for a total of 75% long-term equity awards that are performance-based). The remaining 25% is granted in restricted stock units, the value of which is tied to our share price and which we believe is necessary to retain executive talent. The Committee believes that this allocation provides a combination of equity-based awards that is performance-based in relative and absolute terms, while also providing a necessary retentive element. For additional details on the terms of these awards see page 60.

***Performance Units.*** The Committee has established TSR as the performance criterion for the Company's performance unit awards, and believes that a single focus on TSR as the performance criterion for the performance units is appropriate at this time and is consistent with most energy industry peers. TSR provides an effective relative comparison of our performance against an industry peer group. The Committee has discussed the extent to which certain operational or financial measures could be used as relative long-term performance criteria, such as return on capital employed. The Committee concluded that the performance measures included in our AIP are intended to capture the key drivers of the Company's business, and that such AIP performance goals should drive TSR performance over time. However, the Committee will continue to consider whether to include additional performance goals in the performance unit program.

***Performance Unit Peer Group.*** The peer group for the 2016 performance unit awards was identical to the peer group that was used for conducting the 2016 compensation benchmarking assessment, which is listed on page 48. If any of the peer companies undergoes a change in corporate capitalization or a corporate transaction (including, but not limited to, a going-private transaction, bankruptcy, liquidation, merger or consolidation) during the performance period, the Committee shall

Table of Contents

# Compensation Discussion and Analysis

undertake an evaluation to determine whether such peer company will be replaced. At the time the 2016 awards were granted, the Committee pre-approved Southwestern Energy, Inc., Cabot Oil and Gas Corporation, Concho Resources, Inc. and Cimarex Energy as replacement companies (in that order).

***Performance Unit Performance Period and Payout Opportunity.*** Beginning with awards granted in November 2014, the Committee eliminated our two-year performance unit program so that all performance unit awards granted in or after 2014 are subject to a three-year performance period. In addition, the Committee reduced the payout opportunity for achievement of TSR performance at the 55th percentile from a payout of 110% to a payout of 100% and reduced the payout opportunities for achievement of all applicable TSR performance levels in the third quartile by 12% to 14% for all new awards. During our prior engagement discussions, certain stockholders suggested eliminating the payout opportunity for TSR performance below median. However, the Committee believes that completely eliminating any opportunity would place the Company at a competitive disadvantage in attracting and retaining executive talent as all of the companies in the industry peer group provide for some level of payout below median.

The following table reflects the payout scale for the annual performance unit program for awards granted in and after November 2014 as well as outstanding performance unit awards granted prior to November 2014:

| **Final TSR Ranking** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TSR Performance Percentile** | 100% | 91% | 82% | 73% | 64% | 55% | 46% | 36% | 27% | 18% | 9% | 0% |
| | **Payout as % of Target** | | | | | | | | | | | |
| ***Awards Granted in and after November 2014*** | 200% | 182% | 164% | 146% | 128% | 100% | 80% | 60% | 40% | 0% | 0% | 0% |
| ***Awards Granted Prior to November 2014*** | 200% | 182% | 164% | 146% | 128% | 110% | 92% | 72% | 54% | 0% | 0% | 0% |

The examples below illustrate how the performance unit payout scale works under two different TSR ranking outcomes, assuming an executive officer received a target award of 20,000 performance units in November 2016 subject to a three-year performance period. Each performance unit earned is a right to receive a cash payment equal to the closing price of one share of our common stock on the date the Committee certifies the performance results for the performance period.

| | **Relative TSR Ranking for Three-Year Performance Period** | **Payout Percentage** | **Number of Performance Units Earned** |
|---|---|---|---|
| **Example 1** | 3rd | 164% | 32,800 units (20,000 x 164%) |
| **Example 2** | 10th | 0% | 0 units (20,000 x 0%) |

***Caps on Earned Performance Unit Awards for Negative TSR.*** The Committee once again considered placing a cap on earned awards at target if absolute TSR is negative for the performance period, regardless of relative TSR, as well as other mechanisms for capping payout if TSR is negative. After robust review and discussion, the Committee determined that placing such a cap on earned awards is not appropriate in our business which is highly dependent on the market-driven prices we

Table of Contents



receive for our oil, natural gas and natural gas liquids. The Committee strongly believes that stockholders are best served by a management team that is highly incentivized to deliver differentiating performance in a challenging industry-wide environment, including focusing on items that are within management's direct control, and that the current design of the long-term incentive awards is achieving the desired results. In addition, the Committee maintains the ability to apply negative discretion to these awards should the Committee deem such discretionary adjustment necessary.

***Stock Options.*** Stock options typically vest pro-rata annually over three years, beginning with the first anniversary of the date of grant, and have a term of seven years. The exercise price is not less than the market price on the date of grant and repricing of stock options to a lower exercise price is prohibited, unless approved by stockholders.

***Restricted Stock Units.*** The Committee establishes objective performance criteria for each calendar year that must be achieved before any restricted stock units are awarded the following year to executive officers expected to be subject to Section 162(m) of the IRC. If the performance criteria are achieved, the Committee may make awards of restricted stock units to the executive officers. The restricted stock units awarded vest pro-rata annually over three years, beginning with the first anniversary of the grant date. All of the restricted stock unit awards made in November 2016 were made after the Company's achievement of the 2015 performance criterion, which was to obtain at least $750 million of Cash Flow from Operating Activities (Net cash provided by (used in) operating activities) as calculated in the Consolidated Statements of Cash Flows but excluding the effect of any significant (i.e., $100 million or greater) legal settlements/satisfaction of judgments (as described in Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Sources of Cash — Operating Activities) for the fiscal year as published in the Company's Annual Report on Form 10-K for the year ended December 31, 2015.

### Equity Awards Granted During 2016

In 2016, the Committee approved the following awards under our 2012 Omnibus Plan for the NEOs. The target grant value of each of the awards was held flat as compared to awards granted in 2015, other than for Mr. Ingram, who did not receive an equity award in 2015, and Mr. Leyendecker, who was not an executive officer in 2015. These awards, as well as a description of the methodology for calculating the grant date fair value, are included in the Grants of Plan-Based Awards Table on page 60.

| | Total LTI Grant Date Value($) | Performance Units (50%) | | Stock Options (25%) | | Restricted Stock Units (25%) | |
|---|---|---|---|---|---|---|---|
| Name | | Target # of Units | Grant Date Value($) | # of Stock Options | Grant Date Value($) | # of Units | Grant Date Value($) |
| Mr. Walker | 11,190,616 | 79,385 | 5,587,116 | 136,661 | 2,828,445 | 44,853 | 2,775,055 |
| Mr. Gwin | 4,486,396 | 31,826 | 2,239,914 | 54,788 | 1,133,936 | 17,982 | 1,112,546 |
| Mr. Ingram(1) | 5,669,976 | 62,826 | 3,423,494 | 54,788 | 1,133,936 | 17,982 | 1,112,546 |
| Mr. Reeves | 3,498,370 | 24,817 | 1,746,620 | 42,722 | 884,209 | 14,022 | 867,541 |
| Mr. Leyendecker | 2,520,453 | 17,880 | 1,258,394 | 30,780 | 637,048 | 10,102 | 625,011 |

(1) Since Mr. Ingram was not employed with the Company in October 2015 and did not receive an annual long-term incentive award at the same time as the other NEOs, he received a similar performance unit award in February 2016 for the three-year performance period ended December 31, 2018. He also received the annual long-term incentive award in November 2016 for the three-year performance period ended December 31, 2019. As a result, he received two performance unit awards in 2016.

Table of Contents

# Compensation Discussion and Analysis

### Performance Units — Results for Performance Period Ended December 31, 2016

In January 2017, the Committee certified the performance results for the 2013 annual performance unit awards for the three-year performance period that ended December 31, 2016. Under the provisions of these awards, the targeted performance units were subject to our relative TSR performance against a defined TSR peer group. TSR performance is based on the difference between (1) the average closing stock price for the 30 trading days preceding the beginning of the performance period, and (2) the average closing stock price for the last 30 trading days of the performance period, plus dividends paid for the performance period, and further adjusted for any other distributions or stock splits, where applicable.

For the performance period ended December 31, 2016, the performance results and Anadarko's ranking, as highlighted, were as follows:

**2013 Annual Award — Three-Year Performance Period (January 1, 2014 to December 31, 2016)**

| Final TSR Ranking | 1 | 2 | 3 | 4 | APC 5 | 6 | 7 | **8** | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TSR** | 24.9% | 4.0% | 1.2% | -12.1% | **-16.8%** | -20.2% | -21.1% | -23.5% | -23.6% | -42.2% | -43.5% | -46.6% |
| **Payout as % of Target** | 200% | 182% | 164% | 146% | **128%** | 110% | 92% | 72% | 54% | 0% | 0% | 0% |

The following table lists the number of performance units awarded at minimum, target, and maximum levels and the actual number of performance units earned by the NEOs for the 2013 annual performance unit awards for the three-year performance period that ended December 31, 2016:

| | 2013 Annual Performance Unit Award | | | |
|---|---|---|---|---|
| Name | Minimum # Units | Target # Units | Maximum # Units | Actual # Units Earned |
| Mr. Walker | 0 | 21,999 | 43,998 | 28,158 |
| Mr. Gwin | 0 | 8,782 | 17,564 | 11,240 |
| Mr. Ingram(1) | 0 | 0 | 0 | 0 |
| Mr. Reeves | 0 | 6,874 | 13,748 | 8,798 |
| Mr. Leyendecker | 0 | 2,795 | 5,590 | 3,577 |

(1) Mr. Ingram began employment with the Company in November 2015 and did not receive performance unit awards for the three-year performance period ended December 31, 2016.

## HOW WE MAKE COMPENSATION DECISIONS

The Committee has overall responsibility for evaluating and approving the officer and director compensation plans, policies and programs of the Company. The Committee is also responsible for producing a report reviewing the Company's Compensation Discussion and Analysis. The Committee uses several different tools and resources in reviewing elements of executive compensation and making compensation decisions. These decisions, however, are not purely formulaic and the Committee exercises judgment and discretion as appropriate.

***Compensation Consultant.*** The Committee has retained FW Cook as an independent consultant to provide advice on executive compensation matters. The decision to engage FW Cook was made by the Committee and FW Cook reports directly and exclusively to the Committee; however, at the Committee's direction, the consultant works directly with management to review or prepare materials for the Committee's consideration. While engaged as the Committee's consultant, FW Cook did not

Table of Contents



perform any services for the Company outside the scope of its arrangement with the Committee. During 2016, the Committee reviewed FW Cook's independence and determined that there were no conflicts of interest as a result of the Committee's engagement of FW Cook. The Committee did not engage any consultant other than FW Cook during 2016 to provide executive compensation consulting services.

In 2016, FW Cook attended all of the Committee meetings and provided the Committee with market analyses, including Peer Proxy Data (defined below), and an annual independent assessment of the risk associated with the Company's compensation programs. In addition, FW Cook advised the Committee on the following: market trends; regulatory and governance developments and how they may impact our executive compensation programs; the design and structure of our executive compensation programs to ensure linkage between pay and performance; setting the pay for our CEO; and compensation recommendations for the other executive officers, in consultation with the CEO.

***Benchmarking Peers.*** Within the oil and gas industry, there are a very limited number of companies that closely resemble us in size, scope and nature of business operations. Our industry peer group contains companies in our industry that vary in these respects because we compete with these companies for talent and believe the selected companies are currently the most appropriate with respect to executive compensation benchmarking. The differences and similarities between us and the companies in our industry peer group are taken into consideration when referencing benchmarks for executive compensation decisions.

Each year, FW Cook conducts an independent review of the Company's industry peer group for the Committee to use as a reference point for assessing competitive executive compensation data (including base salary, target annual incentives and annualized long-term incentive grant values). This review includes an evaluation of Anadarko's peers as designated by proxy advisors, peers of direct peers, and companies included in Anadarko's broad Global Industry Classification Standard Industry Group. In each case, FW Cook assesses whether there are companies that should be added to or deleted from Anadarko's existing peer group based on relevant size, scope and the nature of their business operations. Unless significant and material changes have affected the companies in our peer group such that a company is no longer an appropriate peer, the Committee prefers to maintain a high degree of continuity of the peer group to ensure consistent comparison for both pay and performance from year to year. Following this year's annual review, the Committee determined that the 11 companies included in the Company's industry peer group remain appropriate for the 2016 executive compensation benchmarking comparison.

The Company's industry peer group used for conducting the 2016 executive compensation benchmarking assessment is listed below.

- Apache Corporation
- Chesapeake Energy Corporation
- Chevron Corporation
- ConocoPhillips
- Devon Energy Corporation
- EOG Resources, Inc.
- Hess Corporation
- Marathon Oil Corporation
- Noble Energy, Inc.
- Occidental Petroleum Corporation
- Pioneer Natural Resources Company

***Benchmarking Data.*** To assist in reviewing the design and structure of our executive compensation programs, FW Cook provides the Committee with an independent assessment of the compensation programs and practices of the companies in our industry peer group. This comprehensive analysis includes compensation data that is obtained from the latest peer proxy statements and updated, as applicable, with recent public filings for company-by-company detail on peer NEO positions (Peer Proxy Data) as well as supplemental third-party survey data.

Table of Contents



Due to organizational differences in executive leadership structures and business strategies across our peers, it is difficult to benchmark comparable executive leadership positions for many of our NEOs. As a result, the Committee places emphasis on the Peer Proxy Data in making compensation decisions because this data provides greater transparency and insight into the comparability of our NEOs and executive leadership structure relative to the NEOs and executive leadership structure of our peers. When reviewing benchmarking data, the Committee reviews 25th, 50th, and 75th percentile data; however, the Committee does not target a specific percentile of the benchmark data and in making officer compensation decisions takes into account other considerations as noted below.

***Role of CEO and/or Other Executive Officers in Determining Executive Compensation.*** The Committee, after reviewing the information provided by FW Cook and considering other factors and with input from FW Cook, determines each element of compensation for our CEO. When making determinations about each element of compensation for the other executive officers, the Committee also considers recommendations from our CEO. Additionally, at the Committee's request, our executive officers may assess the design of, and make recommendations related to, our compensation and benefit programs, including recommendations related to the performance measures used in our incentive programs. The Committee is under no obligation to implement these recommendations. Executive officers and others may also attend Committee meetings when invited to do so, but the executive officers do not attend when their individual compensation is being discussed.

***Other Important Considerations.*** In addition to the above resources, the Committee strongly considers other factors when making compensation decisions, such as individual experience, individual performance, internal pay equity, development and succession status, and other individual or organizational circumstances, including the current market and business environment. With respect to equity-based awards, the Committee also considers the expense of such awards, the impact on dilution, and the relative value of each element comprising the executive officers' target total compensation opportunity.

***Tally Sheets.*** The Committee uses tally sheets in its annual executive compensation review to enhance the analytical data used by the Committee to evaluate our executive officer compensation and to provide the Committee with a consolidated source for viewing the aggregate value of all elements of executive compensation. The Committee does not assign a specific weighting to the tally sheets in their overall decision-making process, but uses them to gain additional perspective and as a reference in the decision-making process.

Table of Contents



## INDIRECT COMPENSATION ELEMENTS

As identified in the table below, the Company provides certain benefits and perquisites (considered indirect compensation elements) that are considered typical within our industry and necessary to attract and retain executive talent. The value of each element of indirect compensation is generally structured to be competitive within our industry.

| Indirect Compensation Element | Primary Purpose |
|---|---|
| Retirement Benefits | • Attracts talented executive officers and rewards them for extended service<br>• Offers secure and tax-advantaged vehicles for executive officers to save effectively for retirement |
| Other Benefits (for example, health care, paid time off, disability and life insurance) and Perquisites | • Enhances executive welfare and financial security<br>• Provides a competitive package to attract and retain executive talent, but does not constitute a significant part of an executive officer's compensation |
| Severance Benefits | • Attracts and helps retain executives in a volatile and consolidating industry<br>• Provides transitional income following an executive's involuntary termination of employment |

### *Retirement Benefits*

Our executive officers participate in the following retirement and related plans:

***Anadarko Employee Savings Plans.*** The Anadarko Employee Savings Plan (401(k) Plan) is a tax-qualified retirement savings plan that allows participating U.S. employees to contribute up to 30% of eligible compensation, on a before-tax basis or on an after-tax basis (via a Roth or traditional after-tax contribution), into their 401(k) Plan accounts. Eligible compensation includes base salary and AIP bonus payments. Under the 401(k) Plan, we match an amount equal to one dollar for each dollar contributed by participants up to six percent of their total eligible compensation. The 401(k) Plan is subject to applicable IRC limitations regarding participant and Company contributions. Due to IRC limitations that restrict the amount of benefits payable under tax-qualified plans, we also sponsor a non-qualified Savings Restoration Plan. The Savings Restoration Plan accrues a benefit equal to the excess, if any, of Company matching and Personal Wealth Account (PWA) contributions that would have been allocated to a participant's 401(k) Plan account each year without regard to the IRC limitation over amounts that were, in fact, allocated to a participant's account. For additional details on the Savings Restoration Plan see page 67. Amounts deferred, if any, under the 401(k) Plan and the Savings Restoration Plan (collectively, the Savings Plans) by the NEOs are included, respectively, in the "Salary" and "Non-Equity Incentive Plan Compensation" columns of the Summary Compensation Table. Our matching contributions allocated to the NEOs under the Savings Plans are included in the "All Other Compensation" column of the Summary Compensation Table.

***Pension Plans.*** Anadarko provides funded, tax-qualified retirement benefits for all U.S. employees. Due to IRC limitations that restrict the amount of benefits payable under tax-qualified plans, we also sponsor non-qualified restoration plans that cover the executive officers and certain other employees. The pension plans do not require contributions by participants and a participant becomes vested in his or her benefit at the completion of three years of service as defined in the pension plans. Eligible compensation covered by the pension plans consists of base salary and AIP bonus payments.

Table of Contents

# Compensation Discussion and Analysis

Messrs. Walker and Reeves each have supplemental retirement benefits under our non-qualified Retirement Restoration Plan that provide for special service credits of eight years and five years, respectively, if they each remain employed by us until the age of 55. Messrs. Walker and Reeves vested in these benefits in 2012. The service credits are considered applicable service towards our retirement benefit programs, including pension and retiree medical and dental benefits, where applicable. These supplemental retirement benefits were provided to Messrs. Walker and Reeves in 2007 to recognize that they were mid-career hires that we would like to retain for the remainder of their careers. Providing them additional service credits recognizes a portion of their prior industry experience and service years which directly benefit us and our stockholders.

The accrued benefits for each of the NEOs, including the benefits related to any special service credits are discussed in the Pension Benefits Table on page 67. The Committee does not intend to grant any additional pension credits to executive officers and has not done so since 2007.

### *Other Benefits*

We provide other benefits such as medical, dental, and vision insurance, flexible spending and health savings accounts, paid time off, payments for certain relocation costs, disability coverage and life insurance to each executive officer. These benefits are also provided to all other eligible U.S.-based employees. Certain employees, including the executive officers, are eligible for participation in the Company's Management Life Insurance Plan, which provides an additional life insurance benefit of two times base salary, and the Deferred Compensation Plan, which allows participants to voluntarily defer receipt of up to 75% of their salary and/or up to 100% of their AIP bonus payments. Details regarding the Deferred Compensation Plan and participation in the plan by the NEOs are discussed beginning on page 67.

### *Perquisites*

We provide a limited number of perquisites to the executive officers. These perquisites are assessed annually by the Committee as part of the total competitive review. The expenses related to the perquisites are imputed and considered taxable income to the executive officers as applicable. We do not provide any tax gross-ups on these perquisites. The perquisites provided to the executive officers are as follows: financial counseling; tax preparation and estate planning; annual physical exam; personal excess liability insurance; limited personal use of the company aircraft; club memberships; and limited personal use of Company facilities and event venues.

Mr. Walker has a personal usage limit of up to $300,000 that allows him to use Company aircraft for a limited amount of personal travel. To the extent his usage exceeds such amount, he is required to reimburse the Company pursuant to a time-sharing agreement. The prior year's aggregate incremental direct operating costs for each aircraft is used to calculate the value of personal usage.

The incremental costs of the various perquisites provided are included in the "All Other Compensation" column of the Summary Compensation Table on page 58 and in the All Other Compensation Table and supporting footnotes following the Summary Compensation Table on page 59.

### *Severance Benefits*

Post-termination and change-of-control severance benefits are typical within our industry. The Company currently provides the severance benefits described below to its executive officers. These plans are an essential component of our executive compensation programs and are necessary to attract and retain executive talent in a highly competitive market, provide continuity of management in the event of an actual or threatened change of control and provide executive officers with the security to make decisions that are in the best long-term interest of the stockholders. On a periodic basis, the

Table of Contents



Committee, in consultation with its executive compensation consultant, will review, consider and adjust, as necessary and appropriate, the provisions of post-termination and change-of-control severance benefits provided to executive officers to ensure that such arrangements serve the Company's interests in retaining key executives, are consistent with market practice and are reasonable.

***Officer Severance Plan.*** Our executive officers are eligible for benefits under the Officer Severance Plan with the exception of Mr. Walker whose severance benefits are included in his Severance Agreement, which is described on page 54. Benefits provided under the Officer Severance Plan may vary depending upon the executive officer's level within the organization and years of service with us and are made at the discretion of the Committee. Executive officers receiving benefits under the Officer Severance Plan are required to execute an agreement releasing us from any and all claims from any and all kinds of actions arising from the executive officer's employment with us or the termination of such employment. The typical severance benefits that may be provided for our executive officers following the occurrence of an involuntary termination event (as described on page 69) include the following:

- a payment equal to two times annual base salary plus one year's target bonus under our AIP;
- if provided, a pro-rata bonus under our AIP for the year of termination, which will be payable at the end of the performance period, based on actual Company performance as certified by the Committee;
- the option to continue existing medical and dental coverage levels at current active employee rates for up to six months;
- the vesting of some or all unvested restricted stock units and stock options; and
- a payout, if any, of outstanding performance units, which will be made at the end of the performance period based on actual Company performance results.

***Key Employee Change-of-Control Contracts.*** We have key employee change-of-control contracts with all of our executive officers other than Mr. Walker, whose change-of-control severance benefits are included in his Severance Agreement, which is described on page 54.

If we experience a change of control (as defined on page 69) during the term of the contract, then the contract becomes operative for a specified protection period. These contracts generally provide that the executive officer's terms of employment (including position, work location, compensation and benefits) will not be adversely changed during the protection period. If we (or any successor in interest) terminate the executive officer's employment (other than for cause (as defined on page 69), death or disability), the executive officer terminates for good reason (as defined on page 70) during such protection period, or upon certain terminations prior to a change of control or in connection with or in anticipation of a change of control, the executive officer is generally entitled to receive certain payments and benefits. In 2016, no payments were paid under the change-of-control contracts.

In February 2011, the Committee approved changes to the form contracts that reduced the level of post-change-of-control severance benefits under the Key Employee Change-of-Control Contracts, on a prospective basis, for newly appointed and newly hired executive officers who are not otherwise subject to an existing agreement. In November 2016, the Committee determined that the revised contract should be entered into with all newly appointed executive officers, regardless of whether or not they were subject to an existing agreement prior to their appointment as an executive officer. In

Table of Contents



addition, the Committee determined that the form contracts should align with the significant provisions of Mr. Walker's Severance Agreement, including reducing the severance multiple from 2.9 to 2.5 (2016 Key Employee Change-of-Control Contract).

The table below summarizes the general provisions of the contracts with Messrs. Gwin and Reeves that were entered into prior to February 2011 and the 2016 Key Employee Change-of-Control Contracts with Messrs. Ingram and Leyendecker. Mr. Walker's change-of-control severance benefits are included in his Severance Agreement, which is described on page 54.

| **Key Employee Change-of-Control Contracts Entered Into Prior to February 2011** | **2016 Key Employee Change-of-Control Contracts** |
|---|---|
| • Initial three-year term automatically extended each year unless either party provides notice not to extend | • Initial two-year term automatically extended each year unless either party provides notice not to extend |
| • Modified single-trigger provision(1) | • Double-trigger provision(2) |
| • Three-year protection period | • Three-year protection period |
| • 2.9 times base salary plus AIP bonus (based on highest AIP bonus paid over last three years) | • 2.5 times annual base salary plus the higher of target bonus for the year of termination or the average bonus for the last two years |
| • Prorated annual bonus (based on highest AIP bonus paid over last three years) | • Prorated annual bonus (based on the higher of target performance or actual performance) |
| • Up to three additional years of matching contributions into the Savings Restoration Plan | • Up to three additional years of matching contributions into the Savings Restoration Plan |
| • Up to three additional years of age and service credits under the Company's retirement and pension plans | • Up to three additional years of age and service credits under the Company's retirement and pension plans |
| • Three years continuation of medical, dental, and life insurance benefits | • Three years continuation of medical, dental, and life insurance benefits |
| • Three years of financial planning benefits | • No continuation of financial planning benefits |
| • Excise tax gross-up(3) | • Best-of-net tax provision (i.e., no tax gross-up by the Company)(4) |
| • Outplacement services up to a maximum of $30,000 | • Outplacement services up to a maximum of $30,000 |
| • Officer is subject to a confidentiality provision | • Officer is subject to a confidentiality provision |

(1) A good reason provision allowing an executive officer to terminate for any reason during the 30-day period immediately following the first anniversary of a change of control and receive severance benefits.

(2) Severance payments are made only in the event of both a change of control and the termination of the executive officer's employment without cause or for good reason during the applicable protection period.

(3) The executive officer will be entitled to receive a payment in an amount sufficient to make the executive whole for any excise tax on excess parachute payments imposed under IRC Section 4999.

(4) Requires the Company to either (1) reduce the amount of certain severance benefits otherwise payable so that such severance benefits will not be subject to the tax imposed by IRC Section 4999, or alternatively (2) pay the full amount of severance benefits to the executive officer (but with no tax gross-up), whichever produces the better after-tax result for the executive officer.

Table of Contents



As a condition to receipt of change-of-control severance benefits, the executive officer must remain employed by us and provide services commensurate with his or her position until the executive officer is terminated pursuant to the provisions of the contract. The executive officer must also agree to retain in confidence any and all confidential information known to him or her concerning us and our business so long as the information is not otherwise publicly disclosed.

The above descriptions of the Key Employee Change-of-Control Contracts are not a full summary of all of the terms and conditions of these agreements and are qualified in their entirety by the full text of the agreements, which are on file with the SEC.

***Change of Control — Treatment of Outstanding Unvested Equity Awards.*** The treatment of unvested outstanding equity awards upon a change of control of Anadarko is prescribed by the applicable plan document under which the awards were granted. The 2012 Omnibus Plan, which governs awards made on or after May 15, 2012, includes a double-trigger provision that provides that, unless otherwise specified in the award agreement, there is only accelerated vesting of awards in the event of both a change of control of the Company and the termination of the participant's employment without cause or for good reason during the applicable protection period. All equity awards issued under the 2012 Omnibus Plan contain this double-trigger feature.

## AGREEMENTS WITH EXECUTIVE OFFICERS

### *Mr. Walker — Severance Agreement*

In connection with Mr. Walker's appointment to CEO in 2012, the Committee determined that his employment should be continued on an at-will basis. On February 16, 2012, the Company and Mr. Walker entered into a Severance Agreement to combine and restructure certain severance benefits previously provided to him under the Officer Severance Plan and through his key employee change-of-control contract. Effective May 15, 2012, Mr. Walker was no longer eligible to receive benefits under the Officer Severance Plan and waived the severance benefits under his key employee change-of-control contract, thereby reducing the level of change-of-control severance benefits that he was formerly eligible to receive. The general provisions of the Severance Agreement are described in the tables below:

**Severance Benefits Outside of a Change of Control**

- Pro-rated annual bonus based on actual performance for the year of termination
- Two times the sum of his annual base salary and annual target bonus for the year of termination
- Up to six months continued participation in the Company's medical and dental care plans at active employee rates and reimbursement for the cost of up to 18 additional months of COBRA continuation coverage

**Change-of-Control Severance Benefits**

- Double-trigger provision (requiring both a change-of-control and a termination of employment)
- Three-year protection period following Change of Control
- 2.5 times annual salary plus the higher of target bonus for the year of termination or the average bonus for the last two years
- Prorated annual bonus (based on the higher of target performance or actual performance)
- Up to three additional years of matching contributions into the Savings Restoration Plan
- Up to three additional years of age and service credits under the Company's retirement and pension plans

Table of Contents



- Three years continuation of medical, dental, and life insurance benefits
- Best-of-net tax provision (i.e., no tax gross-up by the Company)
- Outplacement services up to a maximum of $30,000
- Subject to a confidentiality provision

### *Mr. Ingram — Retention Agreement*

When Mr. Ingram began employment with the Company on November 1, 2015, he entered into a retention agreement (Retention Agreement) with the Company as part of his employment package. The Compensation Committee determined that the Retention Agreement was necessary to ensure retention of Mr. Ingram's services and leadership during a critical period of the Company's LNG development project in Mozambique, especially since competition for talented executive leadership in the LNG industry is highly competitive. Under the terms of the agreement, Mr. Ingram received a cash retention award of $800,000, less applicable taxes, payable in two equal installments. The first installment was paid in November 2016. The second installment is due on November 1, 2017 provided Mr. Ingram remains with the Company through such date. As set forth in the terms of the Retention Agreement, if Mr. Ingram's employment is terminated prior to November 1, 2017 due to death, disability, Involuntary Termination by the Company (as defined in the Retention Agreement), or a termination that entitles him to receive benefits under his Key Employee Change of Control Contract, then he will receive the unpaid portion of the retention award within 60 days following his termination. If Mr. Ingram's employment terminates for any other reason prior to November 1, 2017, he will forfeit the remaining balance of the cash retention payment. Mr. Ingram will continue to be subject to confidentiality and non-solicitation provisions following a termination of employment, as provided in the Retention Agreement.

The above descriptions of Mr. Walker's Severance Agreement and Mr. Ingram's Retention Agreement are not a full summary of all of the terms and conditions of these agreements and are qualified in their entirety by the full text of the agreements, which are on file with the SEC.

## DIRECTOR AND OFFICER INDEMNIFICATION AGREEMENTS

We have entered into indemnification agreements with our directors and certain executive officers, in part to enable us to attract and retain qualified directors and executive officers. These agreements require us, among other things, to indemnify such persons against certain liabilities that may arise by reason of their status or service as directors or officers, to advance their expenses for proceedings for which they may be indemnified, and to cover such person under any directors' and officers' liability insurance policy that we may maintain from time to time. These agreements are intended to provide indemnification rights to the fullest extent permitted under applicable Delaware law and are in addition to any other rights our directors and executive officers may have under our Restated Certificate of Incorporation, By-Laws and applicable law.

Table of Contents



## STOCK OWNERSHIP GUIDELINES

We have maintained stock ownership guidelines for executive officers since 1993 with the goal of promoting equity ownership and aligning our executive officers' interests with those of our stockholders. These guidelines must be met within three years after becoming subject to them. Currently, all of our executive officers either meet or exceed their specified guidelines. The ownership guidelines are currently established at the following minimum levels:

| Position | Guideline | Meets Ownership Requirement as of 12/31/2016? |
|---|---|---|
| Chief Executive Officer | 6 x base salary | Yes |
| Executive Vice Presidents | 3 x base salary | Yes |

The Committee reviews the stock ownership levels annually. In determining stock ownership levels, we include shares of common stock held directly by the officer (including shares beneficially owned in a trust, by a limited liability company or partnership, and by a spouse and/or minor children, unless the officer expressly disclaims beneficial ownership of such shares); shares of common stock held indirectly through the Anadarko Employee Savings Plan; deferred share balances resulting from an investment in the Company Stock Fund as defined in the Anadarko Petroleum Corporation Deferred Compensation Plan provided such balance is payable in shares; and unvested restricted stock and restricted stock units. For those officers of Anadarko who are also officers of WES and/or WGP, any WES and/or WGP equity they own is also included in the calculation to determine their compliance. Outstanding performance units and unexercised stock options are not included. If an officer does not satisfy the stock ownership requirements, he or she must retain all shares acquired on the vesting of equity awards or the exercise of stock options (net of exercise costs and taxes) until compliance is achieved. Because of our robust ownership levels, other than as described above we do not maintain separate holding requirements for our equity awards.

## CLAWBACK POLICY

All awards granted under Anadarko's 2012 Omnibus Plan are conditioned on repayment or forfeiture in accordance with applicable laws, Company policy, and any relevant provisions in the related award agreement. Each award agreement under the 2012 Omnibus Plan specifically provides that the awards are subject to forfeiture or repayment if the Company is required to prepare an accounting restatement due to material noncompliance of the Company with applicable rules as a result of misconduct. In addition, the 2012 Omnibus Plan provides that the Committee may specify in an award agreement or otherwise that a recipient's rights, payment, and benefits with respect to the award shall be reduced, cancelled, forfeited or recouped upon the occurrence of certain specified events, including termination of employment for cause, violations of material Company policies, or other conduct by the recipient that is detrimental to the business or reputation of the Company.

## REGULATORY REQUIREMENTS

Together with the Committee, the Company carefully reviews and takes into account current tax, accounting and securities regulations as they relate to the design of our compensation programs and related decisions.

Section 162(m) of the IRC limits a company's ability to deduct compensation paid in excess of $1 million during any fiscal year to each of certain NEOs, unless the compensation is performance-based as defined under federal tax laws. The Committee reviews and considers the deductibility of our executive compensation programs; however, the Committee believes it is important to provide

Table of Contents



compensation that is not fully deductible when necessary to retain and motivate certain executive officers and when it is in the best interest of the Company and our stockholders.

The benefits payable under non-qualified plans for our executive officers and directors are unsecured obligations to pay. Assets to pay these benefits may be held under the Company's Benefits Trust, which is subject to the claims of the general creditors of the Company.

## CONCLUSION

We believe our executive compensation programs, together with the Committee's oversight, are designed to pay for performance and enable us to attract, retain and motivate a strong leadership team. The programs provide executive officers with the necessary motivation to maximize the long-term operational and financial performance of the Company, while using sound financial controls and maintaining high standards of integrity. Especially in these complex and volatile times, we believe our executive compensation programs continue to align the executive officers' interest, as well as the value they may ultimately realize, with the interests and returns of our stockholders.

Table of Contents



## SUMMARY COMPENSATION TABLE

The following table summarizes the compensation for the fiscal years ended December 31, 2016, and, if the individual was an NEO for the applicable fiscal year, for the fiscal years ended December 31, 2015, and 2014 for our CEO, our Chief Financial Officer (CFO) and our three highest paid executive officers other than our CEO and CFO:

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($)(4) | All Other Compensation ($)(5) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| R. A. Walker | 2016 | 1,300,000 | 0 | 8,362,171 | 2,828,445 | 2,670,200 | 3,019,011 | 470,425 | 18,650,252 |
| Chairman, President | 2015 | 1,350,000 | 0 | 8,321,429 | 2,794,960 | 1,930,500 | 2,200,242 | 487,251 | 17,084,382 |
| and Chief | 2014 | 1,300,000 | 0 | 8,317,674 | 2,779,856 | 2,551,900 | 5,205,613 | 565,144 | 20,720,187 |
| Executive Officer | | | | | | | | | |
| Robert G. Gwin | 2016 | 750,000 | 0 | 3,352,460 | 1,133,936 | 1,125,750 | 929,080 | 192,813 | 7,484,039 |
| EVP, Finance and Chief | 2015 | 778,846 | 0 | 3,336,853 | 1,120,768 | 813,894 | 20,204 | 216,505 | 6,287,070 |
| Financial Officer | 2014 | 750,000 | 0 | 3,320,425 | 1,109,704 | 1,075,875 | 740,102 | 223,255 | 7,219,361 |
| Mitchell W. Ingram | 2016 | 625,000 | 400,000(6) | 4,536,040(7) | 1,133,936 | 938,150 | 47,687 | 304,060 | 7,984,873 |
| EVP, Global LNG | | | | | | | | | |
| Robert K. Reeves | 2016 | 700,000 | 0 | 2,614,161 | 884,209 | 1,050,700 | 1,265,737 | 121,004 | 6,635,811 |
| EVP, Law and Chief | 2015 | 726,923 | 0 | 2,601,996 | 873,946 | 759,635 | 265,865 | 154,315 | 5,382,680 |
| Administrative Officer | 2014 | 700,000 | 0 | 2,599,174 | 868,621 | 1,004,150 | 1,433,125 | 179,368 | 6,784,438 |
| Ernest A. Leyendecker | 2016 | 473,654 | 0 | 1,883,405 | 637,048 | 637,550 | 698,025 | 71,694 | 4,401,376 |
| EVP, International and Deepwater Exploration | | | | | | | | | |

(1) As part of its annual review of executive compensation in November 2016, the Committee determined that no changes should be made to the base salaries for the NEOs. The amounts reflected in this column for 2015 include a total of 27 pay periods, rather than the usual 26, as a result of the Company's payroll schedule for 2015. In most years, paying a bi-weekly pay schedule results in 26 pay periods. However, every 11 years, a 27th pay period occurs. The reported value in 2016 does not represent a change in base salary for any of the NEOs. Mr. Leyendecker's amount represents salary earned prior to and upon his appointment as executive vice president in August 2016.

(2) The amounts included in these columns represent the aggregate grant date fair value of the awards granted to NEOs in 2016 computed in accordance with FASB ASC Topic 718, disregarding estimated forfeitures. The value ultimately realized by the NEOs upon the actual vesting of the award(s) or the exercise of the stock option(s) may or may not be equal to this determined value. For a discussion of valuation assumptions, see Note 21 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2016. The values in the "Stock Awards" column represent the grant date fair values for both restricted stock unit and performance unit awards. The performance unit awards are subject to market conditions and have been valued based on the probable outcome of the market conditions as of the grant date.

(3) The amounts in this column reflect the incentive cash bonus awards for 2016 that were determined by the Compensation Committee and paid out in February 2017 pursuant to the Company's AIP. These awards are discussed in further detail beginning on page 39.

Table of Contents



(4) The amounts in this column reflect the annual aggregate change in the actuarial present value of each NEO's accumulated benefit, expressed as a lump sum, under the Company's pension plans described in more detail beginning on page 63. The amounts reported in this column are not a current cash payment but represent the year-over-year change in the value of the NEO's pension based on specified interest and discount rate assumptions for each year and include amounts that the NEO may not currently be entitled to receive because such amounts are not vested. As of December 31, 2016, Mr. Ingram was not vested in his PWA balance. The actual value of the pension will be determined at the time each NEO retires from the Company. The Company's Deferred Compensation Plan does not provide for above-market or preferential earnings so no such amounts are included.

(5) The amounts shown in this column are described further in the All Other Compensation Table below.

(6) The $400,000 reflected in the "Bonus" column for Mr. Ingram in 2016 is a cash retention award paid to him as part of his Retention Agreement entered into on November 1, 2015. The details of this agreement are discussed on page 55.

(7) This column includes the performance unit grant awarded to Mr. Ingram in February 2016, in addition to the annual grant he received in November 2016. Since Mr. Ingram was not employed with the Company in October 2015 and did not receive an annual long-term incentive award at the same time as the other NEOs, he received two performance unit awards in 2016. Details are provided in the Grants of Plan-Based Awards in 2016 Table.

### *All Other Compensation Table for 2016*

The following table describes each component of the "All Other Compensation" column for the fiscal year ended December 31, 2016 in the Summary Compensation Table:

| Name | Personal Use of Aircraft ($)(1) | Payments by the Company to Employee 401(k) Plan and Savings Restoration Plan ($) | Club Membership Dues ($)(2) | Financial/ Tax/Estate Planning ($) | Excess Liability Insurance ($) | Other ($)(3) | Totals ($) |
|---|---|---|---|---|---|---|---|
| R. A. Walker(4) | 241,969 | 193,830 | 30,910 | 2,035 | 1,681 | 0 | 470,425 |
| Robert G. Gwin | 36,951 | 93,834 | 44,922 | 15,425 | 1,681 | 0 | 192,813 |
| Mitchell W. Ingram | 0 | 73,804 | 12,377 | 27,992 | 1,681 | 188,206 | 304,060 |
| Robert K. Reeves | 20,082 | 87,578 | 7,933 | 3,730 | 1,681 | 0 | 121,004 |
| Ernest A. Leyendecker | 0 | 54,588 | 0 | 15,425 | 1,681 | 0 | 71,694 |

(1) The amount reported above reflects the value of personal aircraft use for 2016. The value of personal aircraft use is based on the Company's aggregate incremental direct operating costs, including cost of fuel, maintenance, landing and ramp fees, and other miscellaneous trip-related variable costs. Because the Company's aircraft are used predominantly for business purposes, fixed costs, which do not change based on use of the aircraft, are excluded. The value of travel to board meetings for companies other than Anadarko or its affiliates and civic organizations for which the NEOs serve as directors is considered personal use and is included in the amount reported above. Compensation is imputed for personal use of our aircraft by the NEOs and their guests.

(2) The amounts disclosed represent the payment of club membership fees. For those clubs not used exclusively for business, the entire amount has been included, although we believe that only a portion of this cost represents a perquisite.

(3) The amount for Mr. Ingram represents reimbursements for the cost of relocation assistance with associated gross-up payments in the amount of $183,207 and an executive physical in the amount of $4,999. The relocation assistance and associated gross-up payments were in accordance with the general relocation policy provided to employees.

[Table of Contents](#)



(4) Mr. Walker has a personal usage limit of up to $300,000 that allows him to use Company aircraft for a limited amount of personal travel. To the extent his usage exceeds such amount, he is required to reimburse the Company pursuant to a time-sharing agreement.

## GRANTS OF PLAN-BASED AWARDS IN 2016

The Grants of Plan-Based Awards Table sets forth information concerning annual incentive awards, performance units, stock options, and restricted stock units granted or modified during 2016 for each of the NEOs as described below.

***Non-Equity Incentive Plan Awards (AIP).*** Values disclosed reflect the estimated cash payouts under the Company's AIP, as discussed beginning on page 39, based on actual salaries earned in 2016. If threshold levels of performance are not met, the payout can be zero. If maximum levels of performance are achieved, the payout can be 200% of each NEO's target. The amounts actually paid to the NEOs for 2016 are disclosed in the Summary Compensation Table in the "Non-Equity Incentive Plan Compensation" column.

***Equity Incentive Plan Awards (PU).*** Awards reported reflect performance units, as discussed beginning on page 44, which are denominated as an equivalent of one share of Company common stock and, if earned, are paid in cash. Executive officers may earn from 0% to 200% of the targeted award based on the Company's relative TSR performance against a specified peer group over a three-year performance period. The threshold value reported represents the lowest earned amount, other than zero, based on a defined payout scale. Executive officers do not have voting rights with respect to performance units, and unless after a change of control the award has been converted into restricted stock units of the surviving company, no dividend equivalents are paid on the awards.

***Stock Awards (RSU).*** Awards reported reflect restricted stock unit awards that vest pro-rata annually over three years, beginning with the first anniversary of the grant date. Dividend equivalents are reinvested in shares of the Company's common stock and paid upon the applicable vesting of the underlying award. Awards are eligible to be voluntarily deferred.

***Stock option awards (NQSO).*** Stock options vest pro-rata annually over three years, beginning with the first anniversary of the date of grant and have a term of seven years. The exercise price is not less than the market price on the date of grant and repricing of stock options to a lower exercise price is prohibited, unless approved by stockholders.

Table of Contents

# Executive Compensation

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards Threshold ($) | Target ($) | Maximum ($) | Estimated Future Payouts Under Equity Incentive Plan Awards Threshold (#) | Target (#) | Maximum (#) | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards ($)(1) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| R. A. Walker | | | | | | | | | | | |
| AIP | | — | 1,690,000 | 3,380,000 | — | — | — | — | — | — | — |
| PU | 11/10/2016 | — | — | — | 31,754 | 79,385 | 158,770 | — | — | — | 5,587,116 |
| RSU | 11/10/2016 | — | — | — | — | — | — | 44,853 | — | — | 2,775,055 |
| NQSO | 11/10/2016 | — | — | — | — | — | — | — | 136,661 | 61.87 | 2,828,445 |
| Robert G. Gwin | | | | | | | | | | | |
| AIP | | — | 712,500 | 1,425,000 | — | — | — | — | — | — | — |
| PU | 11/10/2016 | — | — | — | 12,730 | 31,826 | 63,652 | — | — | — | 2,239,914 |
| RSU | 11/10/2016 | — | — | — | — | — | — | 17,982 | — | — | 1,112,546 |
| NQSO | 11/10/2016 | — | — | — | — | — | — | — | 54,788 | 61.87 | 1,133,936 |
| Mitchell W. Ingram | | | | | | | | | | | |
| AIP | | — | 593,750 | 1,187,500 | — | — | — | — | — | — | — |
| PU | 11/10/2016 | — | — | — | 12,730 | 31,826 | 63,652 | — | — | — | 2,239,914 |
| PU | 02/08/2016 | — | — | — | 12,400 | 31,000 | 62,000 | — | — | — | 1,183,580 |
| RSU | 11/10/2016 | — | — | — | — | — | — | 17,982 | — | — | 1,112,546 |
| NQSO | 11/10/2016 | — | — | — | — | — | — | — | 54,788 | 61.87 | 1,133,936 |
| Robert K. Reeves | | | | | | | | | | | |
| AIP | | — | 665,000 | 1,330,000 | — | — | — | — | — | — | — |
| PU | 11/10/2016 | — | — | — | 9,927 | 24,817 | 49,634 | — | — | — | 1,746,620 |
| RSU | 11/10/2016 | — | — | — | — | — | — | 14,022 | — | — | 867,541 |
| NQSO | 11/10/2016 | — | — | — | — | — | — | — | 42,722 | 61.87 | 884,209 |
| Ernest A. Leyendecker | | | | | | | | | | | |
| AIP | | — | 403,506 | 807,012 | — | — | — | — | — | — | — |
| PU | 11/10/2016 | — | — | — | 7,152 | 17,880 | 35,760 | — | — | — | 1,258,394 |
| RSU | 11/10/2016 | — | — | — | — | — | — | 10,102 | — | — | 625,011 |
| NQSO | 11/10/2016 | — | — | — | — | — | — | — | 30,780 | 61.87 | 637,048 |

(1) Unless otherwise noted, the amounts in this column reflect the aggregate grant date fair value of awards made to NEOs in 2016 computed in accordance with FASB ASC Topic 718, disregarding estimated forfeitures. The value ultimately realized by each NEO upon the actual vesting of the award(s) or exercise of the stock option(s) may or may not be equal to this determined value. For a discussion of the valuation assumptions, see Note 21 — Share-Based Compensation of the Notes to Consolidated Financial Statements included under Item 8 in our Annual Report on Form 10-K for the year ended December 31, 2016.

Table of Contents



## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END 2016

The following table reflects outstanding stock option awards and unvested and unearned stock awards (both time-based and performance-contingent) as of December 31, 2016, assuming a market value of $69.73 per share (the closing stock price of the Company's common stock on December 30, 2016).

| | | Option Awards(1) | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Restricted Stock/Units(2) | | Equity Incentive Plan Awards Performance Units(3) | |
| | | Number of Securities Underlying Unexercised Options | | | | | | | |
| Name | Grant Date | Exercisable(#) | Unexercisable(#) | Option Exercise Price($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested(#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Number of Unearned Shares, Units or Other Rights That Have Not Vested(#) | Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested($) |
| R. A. Walker | 11/09/2010 | 85,189 | 0 | 63.34 | 11/09/2017 | | | | |
| | 11/08/2011 | 87,076 | 0 | 83.95 | 11/08/2018 | | | | |
| | 05/15/2012 | 52,511 | 0 | 66.38 | 05/15/2019 | | | | |
| | 11/05/2012 | 169,600 | 0 | 70.70 | 11/05/2019 | | | | |
| | 11/06/2013 | 148,378 | 0 | 92.02 | 11/06/2020 | | | 28,159 | 1,963,527 |
| | 11/06/2014 | 78,670 | 39,335 | 93.51 | 11/06/2021 | 10,066 | 701,902 | 55,606 | 3,877,406 |
| | 10/26/2015 | 51,539 | 103,076 | 69.00 | 10/26/2022 | 27,041 | 1,885,569 | 77,548 | 5,407,422 |
| | 11/10/2016 | 0 | 136,661 | 61.87 | 11/10/2023 | 44,884 | 3,129,761 | 79,385 | 5,535,516 |
| Robert G. Gwin | 11/09/2010 | 54,256 | 0 | 63.34 | 11/09/2017 | | | | |
| | 11/08/2011 | 52,196 | 0 | 83.95 | 11/08/2018 | | | | |
| | 11/05/2012 | 60,447 | 0 | 70.70 | 11/05/2019 | | | | |
| | 11/06/2013 | 59,232 | 0 | 92.02 | 11/06/2020 | | | 11,241 | 783,835 |
| | 11/06/2014 | 31,405 | 15,702 | 93.51 | 11/06/2021 | 4,018 | 280,175 | 22,198 | 1,547,867 |
| | 10/26/2015 | 20,667 | 41,333 | 69.00 | 10/26/2022 | 10,843 | 756,082 | 31,096 | 2,168,324 |
| | 11/10/2016 | 0 | 54,788 | 61.87 | 11/10/2023 | 17,994 | 1,254,722 | 31,826 | 2,219,227 |
| Mitchell W. Ingram | 11/01/2015 | | | | | 40,223 | 2,804,750 | | |
| | 02/08/2016 | | | | | | | 31,000 | 2,161,630 |
| | 11/10/2016 | 0 | 54,788 | 61.87 | 11/10/2023 | 17,994 | 1,254,722 | 31,826 | 2,219,227 |
| Robert K. Reeves | 11/09/2010 | 42,469 | 0 | 63.34 | 11/09/2017 | | | | |
| | 11/08/2011 | 40,856 | 0 | 83.95 | 11/08/2018 | | | | |
| | 11/05/2012 | 47,316 | 0 | 70.70 | 11/05/2019 | | | | |
| | 11/06/2013 | 46,363 | 0 | 92.02 | 11/06/2020 | | | 8,799 | 613,554 |
| | 11/06/2014 | 24,582 | 12,291 | 93.51 | 11/06/2021 | 3,145 | 219,301 | 17,376 | 1,211,628 |
| | 10/26/2015 | 16,116 | 32,230 | 69.00 | 10/26/2022 | 8,456 | 589,637 | 24,248 | 1,690,813 |
| | 11/10/2016 | 0 | 42,722 | 61.87 | 11/10/2023 | 14,031 | 978,382 | 24,817 | 1,730,489 |
| Ernest A. Leyendecker | 03/05/2010 | 3,025 | 0 | 72.11 | 03/05/2017 | | | | |
| | 05/03/2010 | 5,803 | 0 | 64.03 | 05/03/2017 | | | | |
| | 11/09/2010 | 13,059 | 0 | 63.34 | 11/09/2017 | | | | |
| | 11/08/2011 | 13,397 | 0 | 83.95 | 11/08/2018 | | | | |
| | 11/05/2012 | 18,502 | 0 | 70.70 | 11/05/2019 | | | | |
| | 11/06/2013 | 18,847 | 0 | 92.02 | 11/06/2020 | | | 3,578 | 249,494 |
| | 11/06/2014 | 14,965 | 7,483 | 93.51 | 11/06/2021 | 1,368 | 95,391 | 6,045 | 421,518 |
| | 10/26/2015 | 10,403 | 20,806 | 69.00 | 10/26/2022 | 3,899 | 271,877 | 8,945 | 623,735 |
| | 11/10/2016 | 0 | 30,780 | 61.87 | 11/10/2023 | 10,109 | 704,901 | 17,880 | 1,246,772 |

(1) Stock options have a 7-year term and will vest ratably over three years in equal installments on the first, second, and third anniversaries of the date of grant. Stock options awards do not accrue dividends or dividend equivalents.

(2) The restricted stock units will vest pro-rata annually over three years, beginning with the first anniversary of the grant date. At the end of each Vesting Period, unless deferred, the number of restricted stock units that vest are converted into shares of unrestricted Common Stock, less applicable withholding taxes. The shares reflected in these columns include dividend equivalents, which are accrued and reinvested in additional shares of Common Stock and paid upon the applicable vesting of the underlying award, less applicable withholding taxes.

Table of Contents



(3) The number of outstanding units and the estimated payout percentages disclosed for each award are calculated based on our relative performance ranking as of December 31, 2016 and are not necessarily indicative of what the payout percent earned will be at the end of the specified performance period. The relative performance rankings as of December 31, 2016 were: 128% for the 2013 grant, 100% for the 2014 grant, and 100% for the 2015 grant. For awards that were granted in 2016 with performance periods beginning in 2017, target payout has been assumed.

## OPTION EXERCISES AND STOCK VESTED IN 2016

The following table provides information about the aggregate dollar value realized during 2016 by the NEOs for Anadarko awards, including option exercises, vesting of restricted stock units and performance unit payouts.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise(#) | Value Realized on Exercise($)(1) | Number of Shares Acquired on Vesting(#)(2) | Value Realized on Vesting($)(1) |
| R. A. Walker | 0 | 0 | 66,470 | 3,172,940 |
| Robert G. Gwin(3) | 66,200 | 198,600 | 26,032 | 1,249,450 |
| Mitchell W. Ingram | 0 | 0 | 20,097 | 1,204,815 |
| Robert K. Reeves | 0 | 0 | 20,360 | 976,982 |
| Ernest A. Leyendecker | 0 | 0 | 8,543 | 414,548 |

(1) The value realized reflects the taxable value to the NEO as of the date of the option exercise, vesting of restricted stock units, or payment of performance unit awards.

(2) The numbers disclosed include restricted stock units and performance unit awards paid in shares and cash, respectively, for which restrictions lapsed during 2016.

(3) Mr. Gwin's value includes the exercise of expiring stock options purchased with shares of Company common stock previously held by Mr. Gwin. On February 29, 2016, Mr. Gwin transferred 63,161 shares of Company common stock to the Company (based on the applicable stock price of $37.95) as consideration for the exercise price and applicable tax withholding.

## PENSION BENEFITS FOR 2016

The Company maintains the Anadarko Retirement Plan (the APC Retirement Plan) and the Kerr-McGee Corporation Retirement Plan (the KMG Retirement Plan), both of which are funded tax-qualified defined benefit pension plans. In addition, the Company maintains the Anadarko Retirement Restoration Plan, or the APC Retirement Restoration Plan, and the Kerr-McGee Benefits Restoration Plan, or the KMG Restoration Plan, both of which are unfunded, non-qualified pension benefit plans that are designed to provide for supplementary pension benefits due to limitations imposed by the IRC that restrict the amount of benefits payable under tax-qualified plans.

### *APC Retirement Plan and APC Retirement Restoration Plan*

The APC Retirement Plan covers all U.S.-based Anadarko employees, except for legacy Kerr-McGee employees. The APC Retirement Restoration Plan covers certain U.S.-based Anadarko employees, except for legacy Kerr-McGee employees, who are affected by certain IRC limitations.

For those employees hired prior to January 1, 2007, which includes all of the NEOs (except for Mr. Leyedencker, who participates in the KMG Retirement Plan and the KMG Restoration Plan, and Mr. Ingram, who was hired in November 2015), benefits under these plans are based upon the employee's years of service and the average monthly earnings during the 36 highest paid consecutive months of the last 120 months of employment with the Company.

Table of Contents

# Executive Compensation

The APC Retirement Plan and the APC Retirement Restoration Plan (collectively, APC Retirement Plans) do not require contributions by employees. An employee becomes vested in his or her benefit at the completion of three years of service. Compensation covered by the APC Retirement Plans consists of base salary and payments under the AIP. The maximum amount of compensation for 2016 that may be considered in calculating benefits under the APC Retirement Plan was $265,000 due to the annual IRC limitation. Compensation in excess of $265,000 was recognized in determining benefits payable under the APC Retirement Restoration Plan.

For employees hired prior to January 1, 2007, benefits under the APC Retirement Plans are calculated as a life-only annuity (meaning that benefits end upon the participant's death) and are equal to the sum of the following:

- 1.4% x average compensation x years of service with the Company; plus
- 0.4% x (average compensation - covered compensation) x years of service with the Company (limited to 35 years).

Covered compensation is the average (without indexing) of the Social Security taxable wage base during the 35-year period ending with the last day of the year in which an individual reaches Social Security retirement age. Benefits are calculated based on a normal retirement age of 65; however, employees may receive a reduced early retirement benefit as early as age 55. Employees may choose to receive their benefits under several different forms provided under the APC Retirement Plan. Employees receive their benefits from the APC Retirement Restoration Plan in the form of a lump-sum payment.

As of December 31, 2016, Messrs. Walker and Reeves were the only NEOs eligible for early retirement under the APC Retirement Plans. Early retirement benefits are calculated using the formula described above; however, the value is multiplied by an early retirement reduction factor as follows:

| Age | Early Retirement Factor |
|---|---|
| 62 and older | 100% |
| 61 | 97% |
| 60 | 94% |
| 59 | 91% |
| 58 | 88% |
| 57 | 85% |
| 56 | 82% |
| 55 | 79% |

Table of Contents

# Executive Compensation

For employees hired on or after January 1, 2007, such as Mr. Ingram, benefits under the APC Retirement Plans are calculated as a Retirement Income benefit. An employee becomes vested in his or her benefit at the completion of three years of service. Mr. Ingram, who was hired in November 2015, is not yet vested in his benefits under the APC Retirement Plan. The PWA is an Anadarko Retirement Plan benefit program that consists of company contributions to a notional account based on age and length of service, plus weekly interest credits. The current pay credits provided under the PWA (expressed as a percentage of eligible compensation) are as follows:

| Points | Pay Credit |
|---|---|
| 80 or more | 13% |
| 70 | 11% |
| 60 | 9% |
| 50 | 7% |
| 40 | 6% |
| Less than 40 | 5% |

A participant is also entitled to interest credits, which are applied weekly, at an interest rate that is equal to the annual effective rate of the variable interest rate; however, the annual interest credit will never be less than a 3.24% annual rate, unless a lower rate is required to comply with any requirement that the rate of interest be reasonable or market rate, or unless the minimum interest rate is otherwise impermissible by law.

### *KMG Retirement Plan and KMG Restoration Plan*

The KMG Retirement Plan covers all U.S.-based, legacy Kerr-McGee employees who have not incurred a break in service of greater than one year since the date Kerr-McGee was acquired by Anadarko. The KMG Restoration Plan covers certain legacy Kerr-McGee U.S.-based employees that are affected by the IRC limitations. Mr. Leyendecker is the only NEO who participates in the KMG Retirement Plan and the KMG Restoration Plan. Benefits under these plans are based upon the employee's years of service and the average monthly earnings during the 36 highest paid consecutive months of the last 120 months of employment.

The KMG Retirement Plan and the KMG Restoration Plan (collectively, KMG Retirement Plans) do not require contributions by employees. An employee becomes vested in his or her benefit at the completion of three years of service. Compensation covered by the KMG Retirement Plans includes base salary and payments under the AIP. The maximum amount of compensation for 2016 that may be considered in calculating benefits under the KMG Retirement Plan was $265,000 due to the annual IRC limitation. Compensation in excess of $265,000 was recognized in determining benefits payable under the KMG Restoration Plan.

Benefits under the KMG Retirement Plans are calculated as a life-only annuity for single participants, and a joint and 50% contingent annuity for married participants who are eligible for retirement. Benefits under this plan are equal to the sum of Part A and Part B:

Part A:

- 1.1% x average compensation x years of service prior to March 1, 1999; plus
- 0.5% x (average compensation - covered compensation) x years of service prior to March 1, 1999 (limited to 35 years).

Table of Contents



Part B:

- 1.667% x average compensation x years of service on or after March 1, 1999 (limited to 30 years); plus
- 0.75% x average compensation x years of service on or after March 1, 1999 in excess of 30 years; less
- 1% x primary Social Security benefit x years of service on or after March 1, 1999 as of age 65 (limited to 30 years) x (years of service on or after March 1, 1999 divided by years of service on or after March 1, 1999 at age 65).

Covered compensation is the average (without indexing) of the Social Security taxable wage base during the 35-year period ending with the last day of the year in which an individual reaches Social Security retirement age. Benefits are calculated based on a normal retirement age of 65; however, employees may receive a reduced early retirement benefit as early as age 52. Employees may choose to receive their benefits under several different forms provided under the KMG Retirement Plan. Employees receive their benefits from the KMG Restoration Plan in the form of a lump-sum payment.

Mr. Leyendecker is eligible for early retirement under the KMG Retirement Plan. Early retirement benefits under the KMG Retirement Plans are calculated using the formula described above, however, the value is multiplied by an early retirement reduction factor as follows:

| | First Formula Percentage of Normal Retirement Age Benefit Payable (Age Reductions for Benefits Earned Before March 1, 1999) | | Second Formula Percentage of Normal Retirement Age Benefit Payable (Age Reductions for Benefits Earned On or After March 1, 1999) |
|---|---|---|---|
| **Age Benefit Payments Start** | **Part A** | **Part B** | |
| 62 and older | 100% | 100% | 100% |
| 61 | 100% | 95% | 100% |
| 60 | 100% | 90% | 100% |
| 59 | 95% | 85% | 95% |
| 58 | 90% | 80% | 90% |
| 57 | 85% | 75% | 85% |
| 56 | 80% | 67.5% | 80% |
| 55 | 75% | 60% | 75% |
| 54 | 70% | 55% | 70% |
| 53 | 65% | 50% | 65% |
| 52 | 60% | 45% | 60% |

The present values provided in the table below are based on the pension benefits accrued through December 31, 2016, assuming that such benefit is paid in the same form as reflected in the accounting valuation. The benefits are assumed to commence at the specified plan's earliest unreduced retirement age, which is age 62 for those NEOs under the APC Retirement Plans and age 60 for Mr. Leyendecker under the KMG Retirement Plans. All pre-retirement decrements such as pre-retirement mortality and terminations have been ignored for the purposes of these calculations. The interest rate used for discounting payments back to December 31, 2016, is 4.11% in the APC Retirement Restoration Plan and 4.20% in the APC Retirement Plan; and 4.06% in both the KMG Restoration Plan and the KMG Retirement Plan, consistent with the discount rates used in the accounting valuation. The long-term

Table of Contents



interest rate used for converting the benefit to a lump-sum form of payment is set at 100 basis points less than the discount rate, but not less than the most recently published 30-year Treasury rate. The interest rates used for calculating the values below are 3.11% in the APC Retirement Restoration Plan and 3.20% in the APC Retirement Plan; and 3.11% in both the KMG Restoration Plan and the KMG Retirement Plan.

## PENSION BENEFITS

| Name | Plan Name | Number of Years of Credited Service (#) | Present Value of Accumulated Benefit ($) | Payments During 2016 ($) |
|---|---|---|---|---|
| R. A. Walker(1) | APC Retirement Plan | 11.000 | 663,634 | 0 |
| | APC Retirement Restoration Plan | 19.000 | 17,819,068 | 0 |
| Robert G. Gwin | APC Retirement Plan | 11.000 | 508,173 | 0 |
| | APC Retirement Restoration Plan | 11.000 | 3,268,327 | 0 |
| Mitchell W. Ingram(2) | APC Retirement Plan | 1.167 | 22,755 | 0 |
| | APC Retirement Restoration Plan | 1.167 | 31,700 | 0 |
| Robert K. Reeves(1) | APC Retirement Plan | 13.000 | 757,861 | 0 |
| | APC Retirement Restoration Plan | 18.000 | 6,682,199 | 0 |
| Ernest A. Leyendecker | KMG Retirement Plan | 14.500 | 897,619 | 0 |
| | KMG Restoration Plan | 14.500 | 2,778,223 | 0 |

(1) The value of Messrs. Walker's and Reeves's APC Retirement Restoration benefit in the table includes the effect of the additional pension service credits equal to eight and five years of credited service, respectively, provided in 2007 to recognize that they were mid-career hires that we would like to retain for the remainder of their careers. Providing them additional service credits recognized a portion of their prior industry and service years, which directly benefits us and our stockholders. Messrs. Walker and Reeves vested in these additional pension service credits on February 20, 2012 and December 12, 2012, respectively. Messrs. Walker's and Reeves's total pension values as of December 31, 2016, excluding these additional pension service credits are $10,697,370 and $5,370,856, respectively.

(2) Mr. Ingram was not vested in the PWA as of December 31, 2016.

## NON-QUALIFIED DEFERRED COMPENSATION FOR 2016

The Company maintains a Deferred Compensation Plan for certain employees, including the NEOs. Under this Plan, certain employees may voluntarily defer receipt of up to 75% of their salary and/or up to 100% of their AIP payments. The Company does not match these deferred amounts. In general, deferred amounts are distributed to the participant upon separation from service or at a specific date as elected by the participant. At the time deferral elections are made, participants also elect to receive their distributions in either lump-sum or annual installments not exceeding 15 years.

Due to IRC limitations that restrict the amount of benefits payable under the tax-qualified 401(k) Plan, the Company sponsors a non-qualified Savings Restoration Plan. The Savings Restoration Plan accrues a benefit equal to the excess, if any, of Company matching and PWA contributions that would have been allocated to a participant's 401(k) Plan account each year without regard to IRC limitations over amounts that were, in fact, allocated to a participant's account. After a participant reaches the IRC limitations under the 401(k) Plan, the Company makes contributions on their behalf up to the six-percent match on eligible compensation they would have otherwise been entitled to receive under the 401(k) Plan and, if applicable, an additional four percent of eligible compensation for PWA participants. Eligible compensation includes base salary and AIP bonus payments. In general, deferred amounts are distributed to the participant in lump-sum upon separation from service.

Table of Contents



Both the Deferred Compensation Plan and the Savings Restoration Plan permit participants to allocate the deferred amounts among a group of notional accounts that mirror the gains and/or losses of various investment funds provided in the 401(k) Plan (but excluding the Company stock fund). These notional accounts do not provide for above-market or preferential earnings. Each participant directs investments of the individual accounts set up for the participant under the plans and may make changes in the investments as often as daily. Since each executive officer chooses the investment vehicle or vehicles (including a selection of funds ranging from fixed income to emerging markets, as well as other equity, debt and mixed investment strategies in between) and may change their allocations from time to time, the return on the investment will depend on how well each underlying investment fund performed during the time the executive officer chose it as an investment vehicle. The aggregate performance of such investment is reflected in the "Aggregate Earnings/Losses in 2016" column.

Executive officers were given the opportunity to make voluntary deferral elections for all of their annual restricted stock unit and performance unit awards granted under the Company's 1999 Stock Incentive Plan and the 2008 and 2012 Omnibus Plans. Any earnings and/or losses attributable to the deferred shares otherwise payable under these awards are based on the performance of the Company's stock over the deferral period. In general, deferred awards are distributed to the participant, in the form of Company common stock or cash, as designated by the Compensation Committee at the time of grant, upon termination or at a specific date as elected by the participant. The Company does not subsidize or match any deferrals of compensation into these plans.

| Name | Executive Contributions in 2016 ($) | Company Contributions in 2016 ($) | Aggregate Earnings/(Losses) in 2016 ($) | Aggregate Withdrawals / Distributions ($) | Aggregate Balance at End of 2016 ($) |
|---|---|---|---|---|---|
| **R. A. Walker** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 184,830 | 119,466 | 0 | 1,818,845 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Robert G. Gwin** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 88,641 | 213,008 | 0 | 1,209,355 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Mitchell W. Ingram** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 47,304 | 1,512 | 0 | 48,816 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Robert K. Reeves** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 82,732 | 68,541 | 0 | 1,116,726 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| **Ernest A. Leyendecker** | | | | | |
| Deferred Compensation Plan | 0 | 0 | 0 | 0 | 0 |
| Savings Restoration Plan(1) | 0 | 51,681 | 26,061 | 0 | 344,185 |
| 1999 Stock Incentive Plan | 0 | 0 | 0 | 0 | 0 |
| 2008 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |
| 2012 Omnibus Plan | 0 | 0 | 0 | 0 | 0 |

Table of Contents



(1) Company contributions in the Savings Restoration Plan are reported in the Summary Compensation Table for each of the NEOs under the "All Other Compensation" column for the fiscal year 2016. The Savings Restoration Plan Aggregate Balance includes amounts reported in the "All Other Compensation" column of the Summary Compensation Table for 2016 as well as amounts previously reported in prior Summary Compensation Tables. The amounts disclosed in the Summary Compensation Table, both as currently and previously reported, for each NEO are as follows: Mr. Walker — $1,421,153; Mr. Gwin — $661,067; Mr. Ingram — $47,304; Mr. Reeves — $667,746; and Mr. Leyendecker — $51,681.

## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE OF CONTROL

The following tables reflect potential payments to our NEOs under existing contracts, agreements, plans or arrangements, whether written or unwritten, for various scenarios involving a change of control or termination of employment of each NEO, assuming a termination date of December 31, 2016, and, where applicable, using the closing price of our common stock of $69.73 (as reported on the NYSE as of December 30, 2016).

The following are general definitions that apply to the termination scenarios detailed below. These definitions have been summarized and are qualified in their entirety by the full text of the applicable plans or agreements to which our NEOs are parties.

Involuntary Termination is generally defined as any termination that does not result from the following termination events: resignation; retirement; for cause; death; qualifying disability; extended leave of absence; continued failure to perform duties or responsibilities; a termination in connection with any corporate sale transaction where continued employment is available; or a termination if the NEO is eligible to receive benefits from a Key Employee Change-of-Control Contract, or under an employment or severance agreement.

For Cause is generally defined as the following:

- the willful and continued failure of the executive officer to perform substantially the executive officer's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness) or material breach of any material provision in an employment agreement (if applicable), after written demand for substantial performance is delivered to the executive officer by the Board or the CEO of the Company which specifically identifies the manner in which the Board or CEO believes that the executive officer has not substantially performed the executive officer's duties; or

- the willful engaging by the executive officer in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

A Change of Control is generally defined as any one of the following occurrences:

- any individual, entity or group acquires beneficial ownership of 20% or more of either the outstanding shares of our common stock or our combined voting power;

- individuals who constitute the Board (as of the date of either a given change-of-control contract or an award agreement under our equity plans, as applicable) cease to constitute a majority of the Board, provided that an individual whose election or nomination as a director is approved by a vote of at least a majority of the directors as of the date of either the change-of-control contract or an award agreement under our equity plans, as applicable, will be deemed a member of the incumbent Board;

Table of Contents



- a reorganization, merger or consolidation or sale or other disposition of all or substantially all of our assets or the acquisition of assets of another entity, unless following the business combination,
  - all or substantially all of the beneficial owners of our outstanding common stock prior to the business combination own more than 60% of the outstanding common stock of the corporation resulting from the business combination;
  - no person, entity or group owns 20% or more of the outstanding voting securities of the corporation resulting from the business combination; and
  - at least a majority of the board of the corporation resulting from the business combination were members of our Board prior to the business combination; or
- approval by our stockholders of our complete liquidation or dissolution.

Good Reason is generally defined as any one of the following occurrences within three years of a Change of Control:

- diminution in the executive officer's position, authority, duties or responsibilities that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer;
- any failure by the Company to provide compensation to the executive officer at levels that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer;
- any material change in the location, as defined in the applicable agreement, where the executive officer was employed immediately preceding the Change of Control, or the Company requiring the executive officer to travel on Company business to a substantially greater extent than required immediately prior to the Change of Control;
- any termination by the executive officer for any reason during the 30-day period immediately following the first anniversary of a Change of Control (such occurrence is not part of the good reason definition under Mr. Walker's Severance Agreement or under the Key Employee Change of Control Contracts with Messrs. Ingram and Leyendecker);
- any purported termination by the Company of the executive officer's employment otherwise than as expressly permitted in their Change-of-Control, Employment or Severance Agreement; or
- any failure by the Company to require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to assume the terms provided in the executive officer's Change-of-Control or Employment or Severance Agreement.

In February 2011, the Compensation Committee eliminated on a prospective basis the Good Reason provision allowing an executive officer to terminate for any reason during the 30-day period immediately following the first anniversary of a Change of Control for all key employee change-of-control contracts executed with any newly appointed and/or newly hired senior executive

Table of Contents



officers who are not otherwise subject to an existing agreement. Mr. Walker's Severance Agreement and the Key Employee Change of Control Contracts with Messrs. Ingram and Leyendecker also excludes this modified single-trigger provision.

Disability is generally defined as the absence of the executive officer from his or her duties with the Company on a full-time basis for 180 business days as a result of incapacity due to mental or physical illness that is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the executive officer or the executive officer's legal representative.

Additional details of the post-termination arrangements can be found beginning on page 51.

### Involuntary For Cause Termination

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **0** | **0** | **0** | **0** |

### Voluntary Termination (Including Retirement)

| | Mr. Walker($)(1) | Mr. Gwin | Mr. Ingram | Mr. Reeves($)(1) | Mr. Leyendecker($)(1) |
|---|---|---|---|---|---|
| Prorated Portion of Performance Unit Awards(2) | 4,387,412 | 0 | 0 | 1,371,357 | 488,924 |
| **Total** | **4,387,412** | **0** | **0** | **1,371,357** | **488,924** |

(1) As of December 31, 2016, Messrs. Walker, Reeves and Leyendecker were eligible for retirement.

(2) Under the terms of the performance unit agreements, retirement-eligible participants receive a prorated payout, paid after the end of the performance period, based on actual performance and the number of months worked during the performance period. However, the performance unit awards granted on November 10, 2016 are not included in the table above as the treatment described in the preceding sentence only applies to such awards if they have been held for at least 180 days after the grant date, which would not be the case in the event of a retirement that occurred on December 31, 2016. Messrs. Walker's, Reeves's and Leyendecker's values reflect an estimated payout based on performance to date through December 31, 2016, which is not indicative of the payout they will receive at the end of the performance period based on actual performance.

### Involuntary Not For Cause Termination

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Cash Severance(1) | 5,980,000 | 2,212,500 | 1,843,750 | 2,065,000 | 1,639,843 |
| Pro-rata AIP Bonus(2) | 2,670,200 | 1,125,750 | 938,150 | 1,050,700 | 637,550 |
| Accelerated Equity Compensation(3) | 13,021,700 | 5,213,255 | 5,397,013 | 4,070,702 | 1,669,640 |
| Retirement Restoration Plan Benefits(4) | 0 | 0 | 35,222 | 0 | 1,323,926 |
| Health and Welfare Benefits(5) | 202,158 | 86,063 | 55,411 | 107,296 | 104,617 |
| Retention Award(6) | 0 | 0 | 400,000 | 0 | 0 |
| **Total** | **21,874,058** | **8,637,568** | **8,669,546** | **7,293,698** | **5,375,576** |

(1) Mr. Walker's value assumes two times the sum of his base salary in effect at the end of 2016 plus his target AIP bonus (with his target AIP calculated based on his salary in effect at the beginning of the year); all other NEO values assume two times base salary plus one times target AIP bonus, in each case calculated based on the NEO's base salary in effect at the end of 2016.

Table of Contents



(2) All payments, if provided, will be paid at the end of the performance period following the Compensation Committee's certification of corporate performance. All NEO values in the table are based on base salary earnings for the year and reflect the actual bonuses awarded under the Company's 2016 AIP as discussed on page 43.

(3) Reflects the in-the-money value of unvested stock options (subject to Board approval), the estimated current value of unvested performance units (based on performance as of December 31, 2016) and the value of unvested restricted stock units, all as of December 31, 2016. In the event of an involuntary termination, unvested performance units would be paid after the end of the applicable performance periods based on actual performance. However, the performance unit awards and the restricted stock unit awards granted on November 10, 2016, are not included in the table above as accelerated vesting upon an involuntary not for cause termination only applies to such awards if they have been held for at least 180 days after the grant date, which would not be the case in the event of such a termination that occurred on December 31, 2016. Further, while the terms of the outstanding stock options do not require the Company to accelerate the vesting of the stock options upon an involuntary termination not for cause, the Committee has a historic practice of doing so and, as such, the value of acceleration of the outstanding stock option awards is included above. The stock option awards granted on November 10, 2016 also contain a non-disclosure covenant (indefinite duration) and non-disparagement and employee non-solicitation covenants (one year).

(4) Reflects the lump-sum present value of additional benefits related to the Company's supplemental pension benefits which are contingent upon the termination event. All values include special pension credits, provided through an employment agreement, retention agreement, the APC Retirement Restoration Plan or the KMG Restoration Plan, respectively. On a case-by-case basis, the Compensation Committee may approve a special retirement benefit enhancement that is equivalent to the additional supplemental pension benefits that would have accrued assuming they were eligible for subsidized early retirement benefits. Messrs. Walker and Reeves are not eligible for this supplemental benefit because they were eligible for early retirement as of December 31, 2016. If the Compensation Committee were to have approved this special benefit for the other NEOs, the incremental value as of December 31, 2016, to the Retirement Restoration Plan benefits disclosed above would have been $1,525,988 for Mr. Gwin. Mr. Ingram's value represents the accelerated vesting of his PWA balance as of December 31, 2016.

(5) Reflects the value of a total of 24 months of health and welfare benefit coverage. All amounts are present values determined in accordance with FASB ASC Topic 715.

(6) Per the terms of Mr. Ingram's November 1, 2015 Retention Agreement, if Mr. Ingram's employment is terminated prior to November 1, 2017 due to death, disability, Involuntary Termination by the Company (as defined in the Retention Agreement), or a termination that entitles him to receive benefits under his Key Employee Change of Control Contract, then he will receive the unpaid portion of the retention award within 60 days following his termination.

### *Change of Control: Involuntary Termination or Voluntary Termination For Good Reason*

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Cash Severance(1) | 8,853,000 | 5,602,046 | 3,046,875 | 5,155,495 | 2,662,106 |
| Pro-rata AIP Bonus(2) | 2,670,200 | 1,181,740 | 938,150 | 1,077,757 | 565,321 |
| Accelerated Equity Compensation(3) | 21,686,978 | 8,687,204 | 8,870,962 | 6,779,573 | 3,621,313 |
| Retirement Restoration Plan Benefits(4) | 1,254,184 | 2,671,717 | 192,134 | 879,090 | 1,323,926 |
| Nonqualified Deferred Compensation(5) | 581,490 | 281,501 | 221,412 | 262,734 | 182,008 |
| Health and Welfare Benefits(6) | 302,425 | 132,855 | 85,316 | 169,121 | 157,701 |
| Outplacement Assistance | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Financial Counseling(7) | 0 | 50,070 | 0 | 50,070 | 0 |
| Excise Tax and Gross-Up(8) | N/A | 0 | N/A | 0 | N/A |
| Best-of-Net Tax Adjustment(9) | 0 | N/A | 0 | N/A | 0 |
| Retention Award(10) | 0 | 0 | 400,000 | 0 | 0 |
| **Total** | **35,378,277** | **18,637,133** | **13,784,849** | **14,403,840** | **8,542,375** |

Table of Contents



(1) Messrs. Walker's and Ingram's values assume 2.5 times the sum of base salary in effect at the end of 2016 plus the average of two prior AIP bonus awards; Mr. Leyendecker's value assumes 2.5 times the sum of base salary in effect at the end of 2016 plus his target annual bonus for the year in which the date of termination occurs; Messrs. Gwin's and Reeves's values assume 2.9 times the sum of base salary plus the highest AIP bonus paid in the past three years.

(2) Messrs. Walker's, Ingram's and Leyendecker's values assume payment of a pro-rata AIP bonus based on target AIP bonus percentage in effect for the year of termination, base salary in effect at the beginning of the year and the Company's actual performance under the Company's 2016 AIP; Messrs. Gwin's and Reeves's values assume the full-year equivalent of the highest annual AIP bonus the officer received over the past three years.

(3) Includes the in-the-money value of unvested stock options, the value of unvested restricted stock units and the estimated current value of unvested performance units, all as of December 31, 2016. Upon a Change of Control, the value of any outstanding performance units would be calculated based on the Company's TSR performance and the price of the Company's Common Stock at the time of the Change of Control and converted into restricted stock units of the surviving company. In the event of an involuntary not for cause or voluntary for good reason termination within two years following a Change of Control, the units will generally be paid on the first business day that is at least six months and one day following the separation from service. In the event of an involuntary not for cause or voluntary for good reason termination that is more than two years following a Change of Control, the units will be paid at the end of the performance period. For performance units payable based on actual performance, current values reflect performance to date estimates as of December 31, 2016. The equity awards granted on November 10, 2016 also contain a non-disclosure covenant (indefinite duration) and non-disparagement and employee non-solicitation covenants (one year).

(4) Reflects the lump-sum present value of additional benefits related to the Company's supplemental pension benefits which are contingent upon the termination event. For Mr. Gwin, who as of December 31, 2016 was not retirement eligible, the value includes a special retirement benefit enhancement that is equivalent to the additional supplemental pension benefits that would have accrued assuming he was eligible for subsidized early retirement benefits. For Mr. Ingram, who as of December 31, 2016 was not vested in the PWA, the value is calculated as if he were fully vested, and with three years of additional pay credits, with no interest. All values include special pension credits, provided through an employment agreement, retention agreement, the APC Retirement Restoration Plan, the KMG Restoration Plan or a key employee change-of-control contract.

(5) Includes the value of an additional three years of employer contributions into the Savings Restoration Plan based on each officer's current contribution rate to the Plan.

(6) Values represent 36 months of health and welfare benefit coverage. All amounts are present values determined in accordance with FASB ASC Topic 715.

(7) Values reflect the cost of continuation of financial counseling services for three years after termination. Per the terms of Mr. Walker's Severance Agreement, and the Key Employee Change of Control Contracts with Messrs. Ingram and Leyendecker, they are not eligible for post-termination financial counseling benefits.

(8) Values estimate the total payment required to make each executive officer whole for the 20% excise tax imposed by IRC Section 4999. Mr. Walker is not eligible for this excise tax gross-up benefit per the terms of his Severance Agreement, and Messrs. Ingram and Leyendecker are not eligible for this benefit pursuant to the terms of their respective Key Employee Change of Control Contracts.

(9) Reflects the aggregate impact of the best-of-net tax adjustment as prescribed under Mr. Walker's Severance Agreement, and the Key Employee Change of Control Contracts with Messrs. Ingram and Leyendecker (as discussed on pages 52 - 55).

(10) Per the terms of Mr. Ingram's November 1, 2015 Retention Agreement, if Mr. Ingram's employment is terminated prior to November 1, 2017 due to death, disability, Involuntary Termination by the Company (as defined in the Retention Agreement), or a termination that entitles him to receive benefits under his Key Employee Change of Control Contract, then he will receive the unpaid portion of the retention award within 60 days following his termination.

Table of Contents



### Disability

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| Pro-rata AIP Bonus(1) | 1,690,000 | 712,500 | 593,750 | 665,000 | 403,506 |
| Accelerated Equity Compensation(2) | 21,686,978 | 8,687,204 | 8,870,962 | 6,779,573 | 3,621,313 |
| Health and Welfare Benefits(3) | 448,175 | 289,388 | 236,473 | 187,762 | 193,275 |
| Retention Award(4) | 0 | 0 | 400,000 | 0 | 0 |
| **Total** | **23,825,153** | **9,689,092** | **10,101,185** | **7,632,335** | **4,218,094** |

(1) Represents payment of a pro-rata target AIP bonus based on target bonus percentages effective for the 2016 AIP and eligible earnings as of December 31, 2016.

(2) Includes the in-the-money value of unvested stock options, the value of unvested restricted stock units and the estimated current value of unvested performance units, all as of December 31, 2016. Performance units would be paid after the end of the applicable performance period, based on actual performance. For performance units payable based on actual performance, current values reflect performance to date estimates as of December 31, 2016. The equity awards granted on November 10, 2016, also contain a non-disclosure covenant (indefinite duration) and non-disparagement and employee non-solicitation covenants (one year).

(3) Reflects the cost of the continuation of additional death benefit coverage provided to executive officers of the Company until age 65. All amounts are present values determined in accordance with FASB ASC Topic 715.

(4) Per the terms of Mr. Ingram's November 1, 2015 Retention Agreement, if Mr. Ingram's employment is terminated prior to November 1, 2017 due to death, disability, Involuntary Termination by the Company (as defined in the Retention Agreement), or a termination that entitles him to receive benefits under his Key Employee Change of Control Contract, then he will receive the unpaid portion of the retention award within 60 days following his termination.

### Death

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Cash Severance | 0 | 0 | 0 | 0 | 0 |
| Pro-rata AIP Bonus(1) | 1,690,000 | 712,500 | 593,750 | 665,000 | 403,506 |
| Accelerated Equity Compensation(2) | 21,686,978 | 8,687,204 | 8,870,962 | 6,779,573 | 3,621,313 |
| Life Insurance Proceeds(3) | 6,373,816 | 2,583,979 | 2,153,316 | 2,411,714 | 1,981,051 |
| Retention Award(4) | 0 | 0 | 400,000 | 0 | 0 |
| **Total** | **29,750,794** | **11,983,683** | **12,018,028** | **9,856,287** | **6,005,870** |

(1) Represents payment of a pro-rata target AIP bonus based on target bonus percentages effective for the 2016 AIP and eligible earnings as of December 31, 2016.

(2) Includes the in-the-money value of unvested stock options, the target value of unvested performance units, and the value of unvested restricted stock units, all as of December 31, 2016.

(3) Includes amounts payable under additional death benefits provided to executive officers and other key employees of the Company. These liabilities are not insured, but are self-funded by the Company. Proceeds are not exempt from federal taxes; values shown include an additional tax gross-up amount to equate benefits with nontaxable life insurance proceeds. Values exclude death benefit proceeds from programs available to all employees.

(4) Per the terms of Mr. Ingram's November 1, 2015 Retention Agreement, if Mr. Ingram's employment is terminated prior to November 1, 2017 due to death, disability, Involuntary Termination by the Company (as defined in the Retention Agreement), or a termination that entitles him to receive benefits under his Key

Table of Contents



Employee Change of Control Contract, then he will receive the unpaid portion of the retention award within 60 days following his termination.

In addition to the benefits outlined above for each termination scenario, each of the NEOs would be paid following termination for any reason, the following vested amounts under our nonqualified benefit programs, which have been previously earned but not paid:

| | Mr. Walker($) | Mr. Gwin($) | Mr. Ingram($) | Mr. Reeves($) | Mr. Leyendecker($) |
|---|---|---|---|---|---|
| Retirement Restoration Plan Benefits(1) | 20,994,192 | 3,255,958 | 0 | 8,109,034 | 3,097,288 |
| Non-Qualified Deferred Compensation(2) | 1,818,845 | 1,209,355 | 29,290 | 1,116,726 | 344,185 |
| **Total** | **22,813,037** | **4,465,313** | **29,290** | **9,225,760** | **3,441,473** |

(1) Reflects the lump-sum present value of vested benefits related to the Company's supplemental pension benefits.

(2) Reflects the combined vested balances in the non-qualified Savings Restoration Plan and Deferred Compensation Plan.

Table of Contents

# Transactions with Related Persons

The Company recognizes that related-person transactions can present potential or actual conflicts of interest and it is the Company's preference that related-person transactions are avoided as a general matter. However, the Company also recognizes that there are situations, including certain transactions negotiated on an arm's length basis, where related-person transactions may be in, or may not be inconsistent with, the best interest of the Company and our stockholders. Therefore, the Company has written procedures for the approval, ratification and review of ongoing related-person transactions. Either the Board's Governance and Risk Committee or the full Board (as determined by the Governance and Risk Committee) will review, ratify or approve, as necessary, any related-person transactions prior to the transaction being entered into, or ratify any related-person transactions that have not been previously approved, in which a director, five-percent owner, executive officer or immediate family member of any such person has a material interest, and where the transaction is in an amount in excess of $120,000, either individually or in the aggregate of several transactions during any calendar year. This review typically occurs in connection with regularly scheduled Board meetings.

In addition to those matters described above, the Governance and Risk Committee has approved in advance the following categories of related-person transactions: (i) the rates and terms involved in such transactions where the Company's standard rates and terms for such transactions apply; and (ii) the hiring of a related person (including immediate family members) as an employee of the Company (but not an officer), provided that total annual compensation (meaning base salary, annual incentive bonus and other amounts to be reported on a W-2) does not exceed $120,000.

Table of Contents



## ITEM 2 — RATIFICATION OF THE APPOINTMENT OF THE INDEPENDENT AUDITOR

The Audit Committee is responsible for the appointment, compensation, retention and oversight of the work of the independent auditor employed by the Company and establishes guidelines for the retention of the independent auditor for any permissible services. In performing these responsibilities, among other things, the Audit Committee (1) reviews the qualifications, performance and independence of the independent auditor, (2) reviews and evaluates the lead partner of the independent auditor having primary responsibility for the Company's audit and ensures the rotation of such partners as required by law, and (3) considers whether the audit firm should be rotated in order to maintain the independence between the independent auditor and the Company.

The Audit Committee has appointed KPMG LLP, an independent registered public accounting firm, to audit the Company's consolidated financial statements for 2017. The Board believes that the continued retention of KPMG LLP to serve as the Company's independent auditor is in the best interests of the Company and its stockholders and at the request of the Audit Committee, is asking you to ratify that appointment.

**THE BOARD RECOMMENDS THAT YOU VOTE "FOR" RATIFICATION OF THE APPOINTMENT OF KPMG LLP TO AUDIT THE COMPANY'S CONSOLIDATED FINANCIAL STATEMENTS FOR 2017.** If the stockholders do not ratify the appointment of KPMG LLP, the Audit Committee will make the final determination of the independent auditor for 2017.

KPMG LLP, an independent registered public accounting firm, served as the Company's independent auditor during 2016 and has served as the Company's independent auditor since its initial public offering in 1986. Representatives of KPMG LLP will be present at the Annual Meeting to make a statement, if they desire to do so, and to respond to appropriate questions from stockholders.

The Audit Committee adopted a Pre-Approval Policy with respect to services which may be performed by KPMG LLP. This policy lists specific audit and audit-related services that KPMG LLP is authorized to perform and sets out specific dollar limits for each specific service, which may not be exceeded without additional Audit Committee authorization. The Audit Committee receives quarterly reports on the status of expenditures pursuant to that Pre-Approval Policy.

The Audit Committee reviews the policy at least annually in order to approve services and limits for the current year. Any service that is not clearly enumerated in the policy must receive specific pre-approval by the Audit Committee or by its Chair, to whom such authority has been conditionally delegated, prior to engagement. During 2016, no fees for services outside the scope of audit, review, or attestation that exceed the waiver provisions of 17 CFR 210.2-01(c)(7)(i)(C) were requested of or approved by the Audit Committee.

The following table presents fees for the audits of the Company's annual consolidated financial statements for 2016 and 2015 and for other services provided by KPMG LLP.

| | 2016 | 2015 |
|---|---|---|
| Audit Fees | $ 6,117,000 | $ 7,041,000 |
| Audit-related Fees | 1,294,000 | 961,000 |
| Tax Fees | 80,000 | 23,000 |
| All Other Fees | — | — |
| **Total** | **$ 7,491,000** | **$ 8,025,000** |

Table of Contents

# Independent Auditor

Audit fees are primarily for the audit of the Company's consolidated financial statements included in the Form 10-K, including the audit of the effectiveness of the Company's internal control over financial reporting, and the reviews of the Company's consolidated financial statements included in the Forms 10-Q. KPMG LLP also served as the independent auditor of WES and fees for the audit of WES's annual consolidated financial statements were $1,020,000 for 2016 and $1,309,000 for 2015, which are not included in the table above. In addition, KPMG LLP served as the independent auditor of WGP and fees for the audit of WGP's annual consolidated financial statements were $225,000 for 2016 and $325,000 for 2015, which are not included in the table above.

Audit-related fees are primarily for statutory and other audits, consents, comfort letters and certain financial accounting consultation. Audit-related fees related to WES were $690,000 for 2016 and $423,000 for 2015, which are not included in the table above. Audit-related fees related to WGP were 250,000 for 2016 and $175,000 for 2015, which are not included in the table above.

Tax fees are primarily for tax compliance and consultation services. The Audit Committee has concluded that the provision of tax services is compatible with maintaining KPMG LLP's independence.

KPMG LLP did not provide any "other services" during the years ended December 31, 2015 and 2016.

Table of Contents

# Advisory Vote to Approve Executive Compensation

## ITEM 3 — ADVISORY VOTE TO APPROVE THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, along with section 14A of the Exchange Act enacted thereunder, enables our stockholders to vote to approve, on a non-binding advisory basis, the compensation of the Company's NEOs, as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules. The Board recognizes the importance of our stockholders' opportunity for an advisory say-on-pay vote as a means of expressing views regarding the compensation practices and programs for our NEOs. The Company has held an advisory say-on-pay vote at our annual meeting of stockholders every year since 2011.

As described in detail in the Letter from the Chair of the Compensation Committee on page 29 and under the heading Compensation Discussion and Analysis beginning on page 30, the Compensation Committee believes that the main objective of our executive compensation programs is to pay for performance and align executive officers' interests with stockholder interests. We structure pay to support our business objectives with appropriate rewards for short-term operating results and long-term stockholder value creation. Accordingly, our compensation philosophy recognizes the value of rewarding our executive officers for their performance and motivating them to continue to excel in the future.

At the 2016 Annual Meeting, our executive compensation program received the support of approximately 62% of the votes cast. Based on specific feedback expressed by stockholders during outreach efforts, the Compensation Committee commissioned FW Cook to develop and present a thorough analysis outlining various design alternatives to address stockholder concerns. The Compensation Committee sought an appropriate balance to best serve the interests of our stockholders while continuing to attract and retain the talent necessary to achieve the Company's strategic goals, taking into account standards in our industry and peer group and the appropriate decisions for our business. Following extensive discussions regarding the merits and issues associated with various design alternatives, in February 2017 the Compensation Committee approved changes to the AIP for 2016 and 2017 in response to stockholder feedback.

The incentive compensation earned and paid to our NEOs and the decisions made by the Compensation Committee in 2016 and 2017, including changes made in consideration of stockholder feedback, reflect the pay-for-performance alignment of our compensation programs and adherence to our compensation philosophy. Specifically:

- The Compensation Committee reduced the cap for each AIP performance goal payout from 275% to 200% for the 2016 and 2017 AIP. This provides balance in the overall payout curve and more evenly balances the weighting of the performance goals, preventing a higher bonus payout for strong achievement on only a few goals.
- The Compensation Committee flattened the payout curve on certain 2017 AIP performance goals, Reserve Additions and Capital Expenditures, by requiring a wider range of performance to exceed target. This reduces the volatility and unpredictability of outcomes in setting target performance and requires higher absolute performance to achieve above target payout.
- The Compensation Committee added an additional financial goal to the 2017 AIP, Cash Operating Income/BOE, with a weighting of 25%.

Table of Contents

# Advisory Vote to Approve Executive Compensation

- The Compensation Committee modified the form of change-of-control contract used for newly appointed executive officers, whether or not they were subject to an existing agreement prior to their appointment, to reduce the severance multiple from 2.9 to 2.5 and other changes.

- As a result of second-quarter TSR performance for the three-year performance period ended December 31, 2016, the NEOs earned a 128% payout (out of a maximum of 200%).

- The Compensation Committee strategically set the 2016 AIP performance goals to enhance returns and increase stockholder value. As a result of the Company's strong operating and financial performance in 2016 despite the challenging commodity market, the NEOs were awarded above-target bonuses equivalent to a 158% performance score to recognize their successful execution of the Company's strategic goals.

- The Compensation Committee determined that the target total compensation opportunity for the NEOs (other than for newly appointed executive officers) should remain substantially flat year-over-year and that no changes should be made to the current base salaries, target bonus opportunities, and target grant values of annual long-term incentive awards.

As described on page 36, our executive compensation programs consist of several practices that we believe contribute to good governance. These practices include the following:

| What We Do | What We Don't Do |
|---|---|
| ✓ Structure more than 85% of Pay to Be At Risk | ✗ No Employment Contracts |
| ✓ Emphasize Long-Term Performance | ✗ No Tax Gross-Ups on Perquisites |
| ✓ Provide for Double-Trigger Equity Acceleration Upon a Change of Control | ✗ No New Excise Tax Gross-Ups since 2011 |
| ✓ Maintain a Competitive Compensation Package | ✗ No Hedging or Pledging of Company Stock |
| ✓ Require Robust Stock Ownership | ✗ No Permitted Short Sales or Derivative Transactions in Company Stock |
| ✓ Provide for Clawback Provisions Applicable to Incentive Awards | ✗ No Current Payment of Dividends or Dividend Equivalents on Unvested Awards |
| ✓ Consider Deductibility When Structuring Compensation | ✗ No Repricing of Stock Options and Stock Appreciation Rights |

Please read the Compensation Discussion and Analysis beginning on page 30 for additional details about our executive compensation programs, including information about the compensation of our NEOs during 2016.

The Board has determined that the Company's NEO compensation aligns with our business strategy, focuses on long-term value creation for our stockholders and delivers competitive pay relative to our performance.

**THE BOARD RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE APPROVAL, ON AN ADVISORY BASIS, OF THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION AS DISCLOSED IN THIS PROXY STATEMENT PURSUANT TO THE COMPENSATION DISCLOSURE RULES OF THE SEC, WHICH DISCLOSURE SHALL INCLUDE THE COMPENSATION DISCUSSION AND ANALYSIS, THE SUMMARY COMPENSATION TABLE, AND THE RELATED TABLES AND DISCLOSURE IN THIS PROXY STATEMENT.**

Table of Contents

# Advisory Vote on the Frequency of Future Advisory Votes on Executive Compensation

## ITEM 4 — ADVISORY VOTE ON THE FREQUENCY OF FUTURE ADVISORY VOTES ON THE COMPANY'S NAMED EXECUTIVE OFFICER COMPENSATION

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, together with section 14A of the Exchange Act enacted thereunder, enables our stockholders to indicate how frequently we should seek an advisory vote on the compensation of the NEOs, as disclosed pursuant to the SEC's compensation disclosure rules, such as Item 3 included in this proxy statement. By voting on this Item 4, stockholders may indicate whether the advisory vote should occur every three years, every two years or every year, or abstain on this matter.

At our 2011 Annual Meeting of Stockholders, our stockholders voted on a proposal regarding the frequency of holding advisory votes on executive compensation. At that time, approximately 67% of our stockholders approved, on an advisory basis, an annual advisory vote on compensation for our NEOs. After considering the stockholder vote, the Board determined that we would hold an advisory vote on executive compensation every year until the next stockholders advisory vote on this matter.

After careful consideration of this Item 4, the Board has determined that an advisory vote on executive compensation that occurs every year (an annual vote) is appropriate as described further below.

Holding an annual vote on executive compensation will enhance transparency and give stockholders an opportunity to express their concerns with our compensation program other than through director elections. An annual vote will provide a clear, simple and effective means for us to obtain information on investor sentiment about our executive compensation philosophy and react thereto.

We have in the past been, and will in the future continue to be, proactively engaged with our stockholders on a number of topics, including executive compensation. Thus, we view the advisory vote on executive compensation as an additional, but not exclusive, opportunity for our stockholders to communicate with us regarding their views on the Company's executive compensation programs.

This advisory vote on the frequency of future advisory votes on executive compensation is non-binding on the Board. Notwithstanding the Board's recommendation and the outcome of the stockholder vote, the Board may in the future decide to conduct advisory votes on alternative bases and may vary its practice based on factors such as discussions with stockholders and the adoption of material changes to our executive compensation programs. Under applicable law, the next advisory vote on the frequency of future advisory votes on executive compensation will occur no later than the Company's annual meeting of stockholders in 2023.

You may cast your vote on your preferred voting frequency by choosing the option of three years, two years, one year or abstain from voting when you vote in response to this Item 4.

**THE BOARD RECOMMENDS THAT STOCKHOLDERS VOTE FOR A FREQUENCY OF "ONE YEAR" FOR FUTURE NON-BINDING STOCKHOLDER ADVISORY VOTES ON COMPENSATION OF THE NAMED EXECUTIVE OFFICERS.**

Table of Contents

# General Information

## QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING

### *Where and when is the Annual Meeting?*

The Annual Meeting will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380 on Wednesday, May 10, 2017, at 8:00 a.m. (Central Daylight Time).

### *Who may vote?*

You may vote if you were a holder of record of Anadarko common stock as of the close of business on March 14, 2017, the record date for the Annual Meeting. Each share of Anadarko common stock is entitled to one vote at the Annual Meeting. On the record date, there were 558,701,782 shares of common stock outstanding and entitled to vote at the Annual Meeting. There are no cumulative voting rights associated with Anadarko common stock.

### *May I attend the Annual Meeting?*

Yes. Attendance is limited to stockholders of record as of the record date for the Annual Meeting, Company employees, and certain guests invited by the Company. Admission will be on a first-come, first-served basis. You may be asked to present valid picture identification, such as a driver's license or passport. If your shares of common stock are held in the name of a bank, broker, or other holder of record and you plan to attend the Annual Meeting, you must present proof of your ownership, such as a current bank or brokerage account statement reflecting ownership as of the record date for the Annual Meeting, to be admitted. Cameras, recording devices, cell phones and other electronic devices may not be used during the Annual Meeting.

### *Why did I receive a Notice in the mail regarding the Internet availability of proxy materials instead of a full set of proxy materials?*

In accordance with SEC rules, we are providing access to our proxy materials over the Internet. As a result, we have sent to most of our stockholders a Notice instead of a paper copy of the proxy materials. The Notice contains instructions on how to access the proxy materials over the Internet and how to request a paper copy. In addition, stockholders may request to receive future proxy materials in printed form by mail or electronically by e-mail. A stockholder's election to receive proxy materials by mail or e-mail will remain in effect until the stockholder terminates it.

### *Why didn't I receive a Notice in the mail regarding the Internet availability of proxy materials?*

We are providing certain stockholders, including those who have previously requested to receive paper copies of the proxy materials, with paper copies of the proxy materials instead of a Notice. If you would like to reduce the costs incurred by Anadarko in mailing proxy materials, you can consent to receive all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions provided with your proxy materials and on your proxy card or voting instruction card to vote using the Internet. When prompted, indicate that you agree to receive or access stockholder communications electronically in the future.

### *Can I vote my stock by filling out and returning the Notice?*

No. The Notice will, however, provide instructions on how to vote by Internet, by telephone, by requesting and returning a paper proxy card, or by submitting a ballot in person at the Annual Meeting.

Table of Contents

# General Information

### How can I access the proxy materials over the Internet?

Your Notice or proxy card will contain instructions on how to view our proxy materials for the Annual Meeting on the Internet. Our proxy materials are also available at https://materials.proxyvote.com/032511.

### What am I voting on and how does the Board recommend that I vote?

| Proposal | Board Vote Recommendation |
|---|---|
| Election of Directors | FOR EACH DIRECTOR NOMINEE |
| **Management Proposals** | |
| Ratification of KPMG LLP as Independent Auditor for 2017 | FOR |
| Advisory Vote to Approve the Company's Named Executive Officer 2016 Compensation | FOR |
| Advisory Vote on the Frequency of Future Advisory Votes on Named Executive Officer Compensation | ONE YEAR |

### What is the effect of an "advisory" vote?

Because your vote with respect to approval of our NEO compensation and the frequency of future advisory votes on the approval of our NEO compensation are advisory, they will not be binding upon the Board. However, our Compensation Committee and the Board will carefully consider the outcomes of the votes when reviewing future compensation arrangements for our executive officers and when determining the frequency of future advisory votes on the approval of NEO compensation that the Board will adopt, respectively.

### Why should I vote?

Your vote is very important regardless of the amount of stock you hold. The Board strongly encourages you to exercise your right to vote as a stockholder of the Company.

### How do I vote?

You may vote by any of the following four methods:

(i) ***Internet.*** Vote on the Internet at http://www.proxyvote.com. This website also allows electronic proxy voting using smartphones, tablets and other web-connected mobile devices (additional charges may apply pursuant to your service provider plan). Simply follow the instructions on the Notice, or if you received a proxy card by mail, follow the instructions on the proxy card and you can confirm that your vote has been properly recorded. In addition, we have included a Quick Response code (QR code) on the Notice and proxy card. When you scan the QR code with your web-connected mobile device, you will be sent directly to a personalized webpage where you can indicate how you would like to vote. If you vote on the Internet, you can request electronic delivery of future proxy materials. Internet voting facilities for stockholders of record will be available 24 hours a day and will close at 11:59 p.m. (Eastern Daylight Time) on May 9, 2017.

(ii) ***Telephone.*** Vote by telephone by following the instructions on the Notice or, if you received a proxy card, by following the instructions on the proxy card. Easy-to-follow voice prompts allow you to vote your stock and confirm that your vote has been properly recorded. Telephone voting facilities for stockholders of record will be available 24 hours a day and will close at 11:59 p.m. (Eastern Daylight Time) on May 9, 2017.

(iii) ***Mail.*** If you received a proxy card by mail, vote by mail by completing, signing, dating and returning your proxy card in the pre-addressed, postage-paid envelope provided.

Table of Contents



If you vote by mail and your proxy card is returned unsigned, then your vote cannot be counted. If you vote by mail and the returned proxy card is signed without indicating how you want to vote, then your proxy will be voted as recommended by the Board. If mailed, your completed and signed proxy card must be received by May 9, 2017.

(iv) ***Meeting.*** You may attend and vote at the Annual Meeting.

The Board recommends that you vote using one of the first three methods discussed above, as it is not practical for most stockholders to attend and vote at the Annual Meeting. Using one of the first three methods discussed above to vote will not limit your right to vote at the Annual Meeting if you later decide to attend in person. If your stock is held in street name (for example, held in the name of a bank, broker, or other holder of record), you must obtain a proxy executed in your favor from your bank, broker or other holder of record to be able to attend and vote at the Annual Meeting.

### *If I vote by telephone or Internet and received a proxy card in the mail, do I need to return my proxy card?*

No.

### *If I vote by mail, telephone or Internet, may I still attend the Annual Meeting?*

Yes.

### *Can I revoke my proxy?*

Yes. You may revoke your proxy before the voting polls are closed at the Annual Meeting, by the following methods:

- voting at a later time by Internet or telephone until 11:59 p.m. (Eastern Daylight Time) on May 9, 2017;
- voting in person at the Annual Meeting;
- delivering to Anadarko's Corporate Secretary a proxy with a later date or a written revocation of your most recent proxy; or
- giving notice to the inspector of elections at the Annual Meeting.

If you are a street name stockholder (for example, if your shares are held in the name of a bank, broker, or other holder of record) and you vote by proxy, you may later revoke your proxy by informing the holder of record in accordance with that entity's procedures.

### *How many votes must be present to hold the Annual Meeting?*

Your stock is counted as present at the Annual Meeting if you attend the Annual Meeting and vote in person or if you properly return a proxy by Internet, telephone or mail. In order for us to hold our Annual Meeting, holders of a majority of our common stock entitled to vote must be present in person or by proxy at the Annual Meeting. This is referred to as a quorum. Abstentions and broker non-votes will be counted as present for purposes of determining a quorum.

### *What is a broker non-vote?*

The NYSE permits brokers to vote their customers' stock held in street name on routine matters when the brokers have not received voting instructions from their customers. The NYSE does not, however, allow brokers to vote their customers' stock held in street name on non-routine matters unless they have received voting instructions from their customers. In such cases, the uninstructed shares for which the broker is unable to vote are called broker non-votes.

### *What routine matters will be voted on at the Annual Meeting?*

The ratification of the independent auditor is the only routine matter on which brokers may

Table of Contents



vote in their discretion on behalf of customers who have not provided voting instructions.

### *What non-routine matters will be voted on at the Annual Meeting?*

The election of directors, the advisory vote to approve our NEO compensation and the advisory vote on the frequency of future advisory votes on NEO compensation are non-routine matters on which brokers are not allowed to vote unless they have received voting instructions from their customers.

### *How many votes are needed to approve each of the proposals or, with respect to the advisory votes, to be considered the recommendation of the stockholders?*

The election of each director requires the affirmative vote of a majority of the votes cast for such director. Under our By-Laws, a majority of votes are cast for the election of a director if the number of votes cast “for” the director exceeds the number of votes cast “against” the director. Abstentions will not be taken into account in director elections. The frequency of future advisory votes on our NEO compensation receiving the greatest number of votes (every one, two or three years) will be considered the frequency recommended by stockholders in an advisory manner. For this purpose, abstentions and broker non-votes are not counted as a vote cast “for” any of a one, two or three year frequency. Each of the other proposals will be approved if it receives the affirmative vote of a majority of the stock entitled to vote and present in person or by proxy at the Annual Meeting. Although the advisory votes on our NEO compensation and the frequency of such vote are non-binding, the Board will review the results of such votes and, consistent with our record of stockholder engagement, will take the results into account when making decisions going forward. Except as otherwise provided above, abstentions are counted as votes present and entitled to vote and have the same effect as votes against a proposal. Broker non-votes are not counted as either votes for or votes against a proposal. Both abstentions and broker non-votes are counted in determining that a quorum is present for the meeting.

### *Could other matters be decided at the Annual Meeting?*

We are not aware of any matters that will be considered at the Annual Meeting other than those set forth in this proxy statement. However, if any other matters arise at the Annual Meeting, the persons named in your proxy will vote in accordance with their best judgment.

### *Where can I find the voting results of the Annual Meeting?*

We will announce the preliminary voting results at the Annual Meeting and disclose the final voting results in a current report on Form 8-K filed with the SEC within four business days of the date of the Annual Meeting unless only preliminary voting results are available at that time. To the extent necessary, we will file an amended report on Form 8-K to disclose the final voting results within four business days after the final voting results are known. You may access or obtain a copy of these and other reports free of charge on the Company’s website at http://www.anadarko.com, or by contacting our investor relations department at investor@anadarko.com. Also, the referenced Form 8-K, any amendments thereto and other reports filed with or furnished to the SEC by the Company are available to you over the Internet at the SEC’s website at http://www.sec.gov.

### *How can I view the stockholder list?*

A complete list of stockholders of record entitled to vote at the Annual Meeting will be available for viewing during ordinary business hours for a period of ten days before the Annual Meeting at our offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046.

Table of Contents

# General Information

### *Who pays for the proxy solicitation related to the Annual Meeting?*

We do. In addition to sending you these materials or otherwise providing you access to these materials, some of our directors and officers as well as management and non-management employees may contact you by telephone, mail, e-mail or in person. You may also be solicited by means of press releases issued by Anadarko, postings on our website at http://www.anadarko.com, advertisements in periodicals, or other media forms. None of our officers or employees will receive any extra compensation for soliciting you. We have retained Morrow Sodali LLC (Morrow Sodali), 470 West Avenue, Stamford, Connecticut 06902, to assist us in soliciting your proxy for an estimated fee of $12,500, plus reasonable out-of-pocket expenses. Morrow Sodali ensures that brokers, custodians and nominees will supply additional copies of the proxy materials for distribution to the beneficial owners. We will also reimburse banks, nominees, fiduciaries, brokers and other custodians for their costs of sending the proxy materials to the beneficial owners of Anadarko common stock.

### *Who will tabulate and certify the vote?*

Broadridge Financial Solutions, Inc., an independent third party, will tabulate and certify the vote, and will have a representative to act as the independent inspector of elections for the Annual Meeting.

### *If I want to submit a stockholder proposal for the 2018 Annual Meeting, when is that proposal due?*

If you are an eligible stockholder and want to submit a proposal for possible inclusion in the proxy statement relating to the 2018 Annual Meeting, your proposal must be delivered to the attention of our Corporate Secretary and must be received at our principal office, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, no later than November 24, 2017. We will only consider proposals that meet the requirements of the applicable rules of the SEC and our By-Laws.

### *If I want to nominate a director for the 2018 Annual Meeting, when is that nomination due?*

Eligible stockholders may nominate a candidate for election to the Board for inclusion in the Company's proxy materials in accordance with the "proxy access" provisions of our By-Laws. Our By-Laws require that you provide notice in writing to our Corporate Secretary (at the same address noted above) no later than the close of business on November 24, 2017, and no earlier than the close of business on October 25, 2017. For more information regarding the "proxy access" provisions of our By-Laws, see page 18.

Our By-Laws also provide that any stockholder may nominate a candidate for election to the Board or propose any business to be brought before an annual meeting of stockholders, which nomination or proposal is not submitted for inclusion in the Company's proxy materials. Assuming that our Annual Meeting is held on schedule, our By-Laws require that you provide notice in writing to our Corporate Secretary (at the same address noted above) no later than the close of business on February 9, 2018, and no earlier than the close of business on January 10, 2018. For additional information, see page 18.

### *How can I obtain a copy of the Annual Report on Form 10-K?*

Stockholders may request a free copy of our Annual Report on Form 10-K by submitting such request to Investor Relations, Anadarko Petroleum Corporation, P.O. Box 1330, Houston, Texas 77251-1330. Stockholders may also submit such request via e-mail at investor@anadarko.com or by calling (855) 820-6605. Alternatively, stockholders can access our Annual Report on Form 10-K on Anadarko's website at http://www.anadarko.com. Also, our Annual

[Table of Contents](#)

## General Information

Report on Form 10-K and other reports filed by the Company with the SEC are available to you over the Internet at the SEC's website at http://www.sec.gov.

### *Will I get more than one copy of the proxy statement, annual report or Notice if there are multiple stockholders at my address?*

In some cases, only one copy of this proxy statement, annual report or Notice is being delivered to multiple stockholders sharing an address unless we have received contrary instructions from one or more of the stockholders. We will deliver promptly, upon a written or oral request, a separate copy of this proxy statement, annual report or Notice to a stockholder at a shared address to which a single copy of the document was delivered. Stockholders sharing an address may also submit requests for delivery of a single copy of the proxy statement, annual report or Notice, but in such event will still receive separate proxies for each account. To request separate or single delivery of these materials now or in the future, a stockholder may submit a written request to the Corporate Secretary, Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046 or a stockholder may make a request by calling the Corporate Secretary at (832) 636-1000 or by contacting our transfer agent, Computershare, P.O. Box 30170, College Station, Texas 77842-3170.

BY ORDER OF THE BOARD OF DIRECTORS



Amanda M. McMillian
Senior Vice President, General Counsel,
Corporate Secretary and Chief Compliance Officer

Dated: March 17, 2017
The Woodlands, Texas

***See enclosed proxy card — please vote promptly***

Table of Contents

Anadarko Petroleum Corporation
*1201 LAKE ROBBINS DRIVE*
*THE WOODLANDS, TX 77380*

**SCAN TO**
**VIEW MATERIALS & VOTE**

**WE ENCOURAGE YOU TO TAKE ADVANTAGE OF INTERNET OR TELEPHONE VOTING.**
**BOTH ARE AVAILABLE 24 HOURS A DAY, 7 DAYS A WEEK**

**VOTE BY INTERNET - www.proxyvote.com or scan the QR Barcode above**
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 p.m. Eastern Daylight Time the day before the cut-off date or meeting date. Have your proxy card in hand when you access the website and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by Anadarko Petroleum Corporation in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 p.m. Eastern Daylight Time the day before the cut-off date or meeting date. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Anadarko Petroleum Corporation, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

E19045-P87972 KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

**ANADARKO PETROLEUM CORPORATION**

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ITEMS 1, 2 and 3.**

**Vote On Directors**

1. Election of Directors

| **Nominees:** | **For** | **Against** | **Abstain** |
|---|---|---|---|
| 1a. Anthony R. Chase | ☐ | ☐ | ☐ |
| 1b. David E. Constable | ☐ | ☐ | ☐ |
| 1c. H. Paulett Eberhart | ☐ | ☐ | ☐ |
| 1d. Claire S. Farley | ☐ | ☐ | ☐ |
| 1e. Peter J. Fluor | ☐ | ☐ | ☐ |
| 1f. Richard L. George | ☐ | ☐ | ☐ |
| 1g. Joseph W. Gorder | ☐ | ☐ | ☐ |
| 1h. John R. Gordon | ☐ | ☐ | ☐ |
| 1i. Sean Gourley | ☐ | ☐ | ☐ |
| 1j. Mark C. McKinley | ☐ | ☐ | ☐ |
| 1k. Eric D. Mullins | ☐ | ☐ | ☐ |
| 1l. R. A. Walker | ☐ | ☐ | ☐ |

For address changes and/or comments, please check this box and write them on the back where indicated. ☐

Please indicate if you plan to attend this meeting. ☐ **Yes** ☐ **No**

**Vote On Proposals**

| | **For** | **Against** | **Abstain** |
|---|---|---|---|
| 2. Ratification of Appointment of KPMG LLP as Independent Auditor. | ☐ | ☐ | ☐ |
| 3. Advisory Vote to Approve Named Executive Officer Compensation. | ☐ | ☐ | ☐ |

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR "1 YEAR" FOR ITEM 4.**

| | **3 Years** | **2 Years** | **1 Year** | **Abstain** |
|---|---|---|---|---|
| 4. Advisory Vote on the Frequency of Future Advisory Votes on Named Executive Officer Compensation. | ☐ | ☐ | ☐ | ☐ |

The shares represented by this proxy, when properly executed, will be voted in the manner directed herein by the undersigned stockholder(s). **If no direction is made, this proxy will be voted FOR Items 1, 2 and 3, and FOR "1 Year" for Item 4.** If any other matters come properly before the meeting, or if cumulative voting is required, the person named in this proxy will vote in their discretion.

**Each signatory to this proxy acknowledges receipt from Anadarko Petroleum Corporation, prior to execution of this proxy, of a notice of Annual Meeting of Stockholders and a proxy statement dated March 17, 2017.**

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|
| | | | |

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting**
The Notice and Proxy Statement and 10-K/Annual Report are available at:
https://materials.proxyvote.com/032511

**↓ FOLD AND DETACH HERE ↓**

E19046-P87972

**ANADARKO PETROLEUM CORPORATION**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

**ANNUAL MEETING OF STOCKHOLDERS**
**May 10, 2017**

The undersigned hereby appoint(s) R. A. Walker, Robert G. Gwin and Robert K. Reeves, and each of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and vote, as designated on the reverse side of this proxy, all of the shares of Common Stock of Anadarko Petroleum Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders to be held at 8:00 a.m., Central Daylight Time, on May 10, 2017, at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas 77380 and any adjournment or postponement thereof.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES LISTED ON THE REVERSE SIDE FOR THE BOARD OF DIRECTORS AND AS RECOMMENDED BY THE BOARD OF DIRECTORS FOR EACH PROPOSAL.**

**PLEASE MARK, SIGN, DATE AND RETURN THE PROXY CARD PROMPTLY USING THE ENCLOSED REPLY ENVELOPE.**

**Address Changes/Comments:** ______________________________

______________________________

(If you noted any Address Changes/Comments above, please mark the corresponding box on the reverse side.)

**(CONTINUED AND TO BE SIGNED ON THE REVERSE SIDE)**

# EXHIBIT 33

Anadarko Petroleum Corporation

NEWS

# ANADARKO ANNOUNCES FIRST-QUARTER 2017 RESULTS

**HOUSTON**, May 2, 2017 – Anadarko Petroleum Corporation (NYSE: APC) today announced its first-quarter 2017 results, reporting a net loss attributable to common stockholders of $318 million, or $0.58 per share (diluted). These results include certain items typically excluded by the investment community in published estimates. In total, these items increased the net loss by $12 million, or $0.02 per share (diluted), on an after-tax basis.(1) Net cash provided by operating activities in the first quarter of 2017 was $1.12 billion.

**FIRST-QUARTER HIGHLIGHTS**

- Increased total year-over-year sales volume by approximately 20 percent on a divestiture-adjusted basis(2)
- Achieved oil production of 353,000 barrels per day on a divestiture-adjusted basis, bolstered by record oil sales volume in the Deepwater Gulf of Mexico and Delaware Basin(2)
- Enhanced liquids product mix to 61 percent versus 53 percent year over year, contributing to significantly improved margins
- Completed Eagleford and Marcellus asset divestitures for net cash proceeds of $2.8 billion, prior to final closing adjustments

"The first quarter of 2017 provides a clear picture of the power of our streamlined portfolio and the three 'Ds', with record oil sales volume, significantly improved margins and strong cash flow," said Al Walker, Anadarko Chairman, President and CEO. "We have largely completed our divestiture program and ended the quarter with nearly $6 billion of cash on hand. These actions have increased our liquids product mix which, combined with the strengthening of commodity prices, substantially expanded our margins year over year. During the quarter, we continued to increase activity in the Delaware and DJ basins, adding six rigs to bring our current total to 21 across the U.S. onshore. In March, we also announced a 1.5-billion-barrel increase to our estimated net resources in the two basins, which now total

more than 5 billion BOE. This proven performance, continuing efficiency gains and financial flexibility have us well positioned to deliver a compound annual oil growth rate of better than 15 percent over the next five years at current commodity prices while spending within cash inflows."

**OPERATIONS SUMMARY**

Anadarko's first-quarter 2017 sales volume of oil, natural gas and natural gas liquids (NGLs) totaled 72 million BOE, or an average of 795,000 BOE per day. On a divestiture-adjusted basis, sales volume totaled approximately 61 million BOE, or 672,000 BOE per day.(2)

**OPERATIONAL HIGHLIGHTS**

During the first quarter of 2017, Anadarko continued to accelerate drilling activity in the U.S. onshore. The company achieved an all-time high for oil sales volume in the Delaware Basin, averaging approximately 31,000 barrels of oil per day. The company added five operated rigs during the quarter and has added one more subsequent to quarter-end, bringing the total number of operated rigs in the Delaware Basin to 15. The company continues to take action to establish operatorship in sections where it was not previously determined and expects these activities to result in operatorship of approximately 70 percent within the Area of Mutual Interest. In the DJ Basin, Anadarko's sales volume averaged 242,000 BOE per day. The company added one rig, bringing its total operated rig count to six, all drilling multi-well development pads.

In the Deepwater Gulf of Mexico, Anadarko's sales volume more than doubled year over year to approximately 160,000 BOE per day, reflecting the benefit of last December's property acquisition from Freeport-McMoRan and the continued strong performance at Lucius and Caesar/Tonga. The company continued to advance its hub-and-spoke opportunities, with field production at K2 reaching a nine-year record. Anadarko also drilled the first development well at Horn Mountain, encountering more than 70 net feet of oil pay, and expects to bring it on line later this year. In addition, the Calpurnia exploration well encountered nearly 60 net feet of oil pay in Miocene-aged sands. Calpurnia is expected to be tied back to one of Anadarko's nearby operated facilities in the Green Canyon protraction area. Anadarko recently completed drilling operations at the Shenandoah-6 appraisal and sidetrack well, which did not

encounter the oil-water contact in the eastern portion of the field. The company has currently suspended appraisal activity in the field while it evaluates the path forward.

Internationally, the company increased sales volume by approximately 17 percent year over year, driven by oil volumes from the TEN project offshore Ghana, which achieved first oil in August 2016. During the quarter, Anadarko also announced the Purple Angel discovery offshore Colombia, which is located approximately three miles from its previously announced Kronos discovery. Subsequent to quarter-end, the company made its third discovery offshore Colombia at the Gorgon prospect, which encountered 260-360 net feet of natural gas pay. The drillship in Colombia will be mobilized to West Africa in the second quarter to continue the company's exploration and appraisal program offshore Côte d'Ivoire.

## OPERATIONS REPORT

For additional details on Anadarko's first-quarter 2017 operations and exploration program, please refer to the comprehensive Operations Report available at www.anadarko.com.

## CONFERENCE CALL *TOMORROW* AT 8 A.M. CDT, 9 A.M. EDT

Anadarko will host a conference call on Wednesday, May 3, 2017, at 8 a.m. Central (9 a.m. Eastern) to discuss first-quarter results. The dial-in number is 877.883.0383 in the U.S. or 412.902.6506 internationally. The confirmation number is 3348513. For complete instructions on how to participate in the conference call, or to listen to the live audio webcast and slide presentation, please visit www.anadarko.com. A replay of the call will be available on the website for approximately 30 days following the conference call.

## FINANCIAL DATA

Ten pages of summary financial data follow, including current hedge positions, a reconciliation of "divestiture-adjusted" or "same-store" sales, and updated financial and production guidance.

(1) See the accompanying table for details of certain items affecting comparability.

(2) See the accompanying table for a reconciliation of divestiture-adjusted volumes, which are intended to present performance of Anadarko's continuing asset base, giving effect to recent divestitures.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2016, the company had 1.72 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visit www.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to realize its expectations regarding performance, including Anadarko's ability to successfully execute upon its capital program; to meet financial and operating guidance contained in this news release; to meet the long-term goals identified in this news release; to successfully drill, complete, test and produce the wells identified in this news release; and to timely complete and commercially operate the projects and drilling prospects identified in this news release. See "Risk Factors" in the company's 2016 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

*Cautionary Note to Investors -The U.S. Securities and Exchange Commission (SEC) permits oil and gas companies, in their filings with the SEC, to disclose only proved, probable and possible reserves that meet the SEC's definitions for such terms. We may use terms in this presentation, such as "estimated net resources," and similar terms and quantities of "estimated proved reserves" using underlying management assumptions that the SEC's guidelines strictly prohibit us from including in filings with the SEC. These quantities may not constitute "reserves" within the meaning of the SEC's rules. Estimates and drilling locations have not been risked by our management. Actual quantities that may be ultimately recovered from our interests may differ substantially. Factors affecting ultimate recovery include the scope of our ongoing drilling program, which will be directly affected by the availability of capital, drilling and production costs, availability of drilling services and equipment, drilling results, lease expirations, transportation constraints, regulatory approvals and other factors; and our actual drilling results, including geological and mechanical factors affecting recovery rates. Such estimates may change significantly as development of our oil and gas assets provide additional data.*

*U.S. Investors are urged to consider closely the oil and gas disclosures in our Form 10-K for the year ended December 31, 2016, File No. 001-08968, available from us at www.anadarko.com or by writing to us at: Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380 Attn: Investor Relations. You can also obtain this form from the SEC by calling 1-800-SEC-0330.*

# # #

**Anadarko Contacts**

**MEDIA:**
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Stephanie Moreland, stephanie.moreland@anadarko.com, 832.636.2912

**INVESTORS:**
Robin Fielder, robin.fielder@anadarko.com, 832.636.1462
Jim Grant, james.grant@anadarko.com, 832.636.8320
Pete Zagrzecki, pete.zagrzecki@anadarko.com, 832.636.7727

**Anadarko Petroleum Corporation**
**Reconciliation of GAAP to Non-GAAP Financial Measures**

Below are reconciliations of certain GAAP to non-GAAP financial measures, each as required under Regulation G of the Securities Exchange Act of 1934. This non-GAAP information should be considered by the reader in addition to, but not instead of, the financial statements prepared in accordance with GAAP. The non-GAAP financial information presented may be determined or calculated differently by other companies and may not be comparable to similarly titled measures.

Management uses adjusted net income (loss) to evaluate operating and financial performance and believes the measure is useful to investors because it eliminates the impact of certain noncash and/or other items that management does not consider to be indicative of the Company's performance from period to period. Management also believes this non-GAAP measure is useful to investors to evaluate and compare the Company's operating and financial performance across periods, as well as facilitating comparisons to others in the Company's industry.

| | Quarter Ended March 31, 2017 | | |
|---|---|---|---|
| *millions except per-share amounts* | Before Tax | After Tax | Per Share (diluted) |
| **Net income (loss) attributable to common (GAAP)** | | **$ (318)** | **$ (0.58)** |
| Adjustments for certain items affecting comparability | | | |
| Total gains (losses) on derivatives, net, less net cash from settlement of commodity derivatives* | **$ 155** | **99** | **0.18** |
| Gains (losses) on divestitures, net | **804** | **509** | **0.92** |
| Impairments | | | |
| Producing and general properties | **(373)** | **(237)** | **(0.43)** |
| Exploration assets | **(532)** | **(338)** | **(0.61)** |
| Change in uncertain tax positions (FIN 48) | **—** | **(21)** | **(0.04)** |
| Certain items affecting comparability | **$ 54** | **12** | **0.02** |
| **Adjusted net income (loss) (Non-GAAP)** | | **$ (330)** | **$ (0.60)** |

* Includes $12 million related to interest-rate derivatives, $141 million related to commodity derivatives, and $2 million related to gathering, processing, and marketing sales.

| | Quarter Ended March 31, 2016 | | |
|---|---|---|---|
| *millions except per-share amounts* | Before Tax | After Tax | Per Share (diluted) |
| **Net income (loss) attributable to common stockholders (GAAP)** | | $ (1,034) | $ (2.03) |
| Adjustments for certain items affecting comparability | | | |
| Total gains (losses) on derivatives, net, less net cash from settlement of commodity derivatives* | $ (404) | (255) | (0.50) |
| Gains (losses) on divestitures, net | 2 | 1 | — |
| Impairments | (16) | (10) | (0.02) |
| Restructuring charges | (203) | (128) | (0.25) |
| Change in uncertain tax positions (FIN 48) | — | (73) | (0.14) |
| Certain items affecting comparability | $ (621) | (465) | (0.91) |
| **Adjusted net income (loss) (Non-GAAP)** | | $ (569) | $ (1.12) |

* Includes $(325) million related to interest-rate derivatives, $(75) million related to commodity derivatives, and $(4) million related to gathering, processing, and marketing sales.

## Anadarko Petroleum Corporation
## Reconciliation of GAAP to Non-GAAP Measures

Management uses net debt to determine the Company's outstanding debt obligations that would not be readily satisfied by its cash and cash equivalents on hand. Management believes that using net debt in the capitalization ratio is useful to investors in determining the Company's leverage since the Company could choose to use its cash and cash equivalents to retire debt. In addition, management believes that presenting Anadarko's net debt excluding WGP is useful because WGP is a separate public company with its own capital structure.

| *millions* | March 31, 2017 Anadarko Consolidated | March 31, 2017 WGP* Consolidated | March 31, 2017 Anadarko excluding WGP |
|---|---|---|---|
| **Total debt (GAAP)** | $ 15,326 | $ 3,120 | $ 12,206 |
| Less cash and cash equivalents | 5,831 | 123 | 5,708 |
| **Net debt (Non-GAAP)** | $ 9,495 | $ 2,997 | $ 6,498 |

| *millions* | Anadarko Consolidated | Anadarko excluding WGP |
|---|---|---|
| Net debt | $ 9,495 | $ 6,498 |
| Total equity | 15,079 | 11,856 |
| **Adjusted capitalization** | $ 24,574 | $ 18,354 |
| | | |
| **Net debt to adjusted capitalization ratio** | 39% | 35% |

* Western Gas Equity Partners, LP (WGP) is a publicly traded consolidated subsidiary of Anadarko, and Western Gas Partners, LP (WES) is a consolidated subsidiary of WGP.

**Anadarko Petroleum Corporation**
**Cash Flow Information**
**(Unaudited)**

| *millions* | Quarter Ended March 31, **2017** | Quarter Ended March 31, 2016 |
|---|---|---|
| **Cash Flows from Operating Activities** | | |
| Net income (loss) | $ **(275)** | $ (998) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities | | |
| Depreciation, depletion, and amortization | **1,115** | 1,149 |
| Deferred income taxes | **(660)** | (413) |
| Dry hole expense and impairments of unproved properties | **1,012** | 35 |
| Impairments | **373** | 16 |
| (Gains) losses on divestitures, net | **(804)** | (2) |
| Total (gains) losses on derivatives, net | **(147)** | 299 |
| Operating portion of net cash received (paid) in settlement of derivative instruments | **(8)** | 105 |
| Other | **83** | 115 |
| Changes in assets and liabilities | **434** | (443) |
| Net Cash Provided by (Used in) Operating Activities* | $ **1,123** | $ (137) |
| Net Cash Provided by (Used in) Investing Activities | $ **1,722** | $ (973) |
| Net Cash Provided by (Used in) Financing Activities | $ **(198)** | $ 3,119 |
| **Capital Expenditures**** | $ **1,255** | $ 896 |

* Restructuring charges (excluding share-based compensation) were $180 million for the quarter ended March 31, 2016. Cash payments for restructuring charges were $19 million for the quarter ended March 31, 2017, and $79 million for the quarter ended March 31, 2016.

** Includes Western Gas Partners, LP (WES) capital expenditures of $286 million for the quarter ended March 31, 2017, and $140 million for the quarter ended March 31, 2016.

**Anadarko Petroleum Corporation**
**(Unaudited)**

| **Summary Financial Information** *millions except per-share amounts* | | **Quarter Ended March 31, 2017** | | **2016** |
|---|---|---|---|---|
| **Consolidated Statements of Income** | | | | |
| **Revenues and Other** | | | | |
| Oil sales | $ | **1,663** | $ | 850 |
| Natural-gas sales | | **502** | | 366 |
| Natural-gas liquids sales | | **289** | | 178 |
| Gathering, processing, and marketing sales | | **444** | | 240 |
| Gains (losses) on divestitures and other, net | | **869** | | 40 |
| Total | | **3,767** | | 1,674 |
| **Costs and Expenses** | | | | |
| Oil and gas operating | | **258** | | 208 |
| Oil and gas transportation | | **249** | | 242 |
| Exploration | | **1,085** | | 126 |
| Gathering, processing, and marketing | | **351** | | 215 |
| General and administrative | | **269** | | 449 |
| Depreciation, depletion, and amortization | | **1,115** | | 1,149 |
| Other taxes | | **155** | | 117 |
| Impairments | | **373** | | 16 |
| Other operating expense | | **22** | | 16 |
| Total | | **3,877** | | 2,538 |
| **Operating Income (Loss)** | | **(110)** | | (864) |
| **Other (Income) Expense** | | | | |
| Interest expense | | **223** | | 220 |
| (Gains) losses on derivatives, net | | **(147)** | | 297 |
| Other (income) expense, net | | **(8)** | | — |
| Total | | **68** | | 517 |
| **Income (Loss) Before Income Taxes** | | **(178)** | | (1,381) |
| Income tax expense (benefit) | | **97** | | (383) |
| **Net Income (Loss)** | | **(275)** | | (998) |
| Net income (loss) attributable to noncontrolling interests | | **43** | | 36 |
| **Net Income (Loss) Attributable to Common Stockholders** | $ | **(318)** | $ | (1,034) |
| **Per Common Share** | | | | |
| Net income (loss) attributable to common stockholders—basic | $ | **(0.58)** | $ | (2.03) |
| Net income (loss) attributable to common stockholders—diluted | $ | **(0.58)** | $ | (2.03) |
| **Average Number of Common Shares Outstanding—Basic** | | **551** | | 509 |
| **Average Number of Common Shares Outstanding—Diluted** | | **551** | | 509 |
| | | | | |
| **Exploration Expense** | | | | |
| Dry hole expense | $ | **476** | $ | 11 |
| Impairments of unproved properties | | **537** | | 24 |
| Geological and geophysical expense | | **37** | | 37 |
| Exploration overhead and other | | **35** | | 54 |
| Total | $ | **1,085** | $ | 126 |

**Anadarko Petroleum Corporation**
**(Unaudited)**

| *millions* | | March 31, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| **Condensed Balance Sheets** | | | | |
| Cash and cash equivalents | $ | **5,831** | $ | 3,184 |
| Accounts receivable, net of allowance | | **1,577** | | 1,728 |
| Other current assets | | **299** | | 354 |
| Net properties and equipment | | **29,065** | | 32,168 |
| Other assets | | **2,182** | | 2,226 |
| Goodwill and other intangible assets | | **5,739** | | 5,904 |
| Total Assets | $ | **44,693** | $ | 45,564 |
| Short-term debt | | **42** | | 42 |
| Other current liabilities | | **3,720** | | 3,286 |
| Long-term debt | | **15,284** | | 15,281 |
| Deferred income taxes | | **3,664** | | 4,324 |
| Asset retirement obligations | | **2,684** | | 2,802 |
| Other long-term liabilities | | **4,220** | | 4,332 |
| Common stock | | **57** | | 57 |
| Paid-in capital | | **11,914** | | 11,875 |
| Retained earnings | | **1,330** | | 1,704 |
| Treasury stock | | **(1,054)** | | (1,033) |
| Accumulated other comprehensive income (loss) | | **(391)** | | (391) |
| Total stockholders' equity | | **11,856** | | 12,212 |
| Noncontrolling interests | | **3,223** | | 3,285 |
| Total Equity | | **15,079** | | 15,497 |
| Total Liabilities and Equity | $ | **44,693** | $ | 45,564 |
| **Capitalization** | | | | |
| Total debt | $ | **15,326** | $ | 15,323 |
| Total equity | | **15,079** | | 15,497 |
| Total | $ | **30,405** | $ | 30,820 |

| | | |
|---|---|---|
| **Capitalization Ratios** | | |
| Total debt | **50%** | 50% |
| Total equity | **50%** | 50% |

# Anadarko Petroleum Corporation
# (Unaudited)

**Sales Volumes and Prices**

| | Average Daily Sales Volumes | | | Sales Volumes | | | Average Sales Price | | |
|---|---|---|---|---|---|---|---|---|---|
| | Oil MBbls/d | Natural Gas MMcf/d | NGLs MBbls/d | Oil MMBbls | Natural Gas Bcf | NGLs MMBbls | Oil Per Bbl | Natural Gas Per Mcf | NGLs Per Bbl |
| **Quarter Ended March 31, 2017** | | | | | | | | | |
| **United States** | **269** | **1,859** | **112** | **24** | **167** | **10** | **$ 49.23** | **$ 3.00** | **$ 26.57** |
| **Algeria** | **70** | **—** | **6** | **6** | **—** | **1** | **53.20** | **—** | **37.57** |
| **Other International** | **28** | **—** | **—** | **3** | **—** | **—** | **53.77** | **—** | **—** |
| **Total** | **367** | **1,859** | **118** | **33** | **167** | **11** | **$ 50.34** | **$ 3.00** | **$ 27.17** |
| Quarter Ended March 31, 2016 | | | | | | | | | |
| United States | 232 | 2,303 | 122 | 21 | 210 | 11 | $ 28.04 | $ 1.75 | $ 14.98 |
| Algeria | 65 | — | 6 | 6 | — | — | 34.62 | — | 22.78 |
| Other International | 18 | — | — | 2 | — | — | 32.27 | — | — |
| Total | 315 | 2,303 | 128 | 29 | 210 | 11 | $ 29.65 | $ 1.75 | $ 15.32 |

| | Average Daily Sales Volumes MBOE/d | Sales Volumes MMBOE |
|---|---|---|
| **Quarter Ended March 31, 2017** | **795** | **72** |
| Quarter Ended March 31, 2016 | 827 | 75 |

**Sales Revenue and Commodity Derivatives**

| | Sales | | | Net Cash Received (Paid) from Settlement of Commodity Derivatives | | |
|---|---|---|---|---|---|---|
| *millions* | Oil | Natural Gas | NGLs | Oil | Natural Gas | NGLs |
| **Quarter Ended March 31, 2017** | | | | | | |
| **United States** | **$ 1,191** | **$ 502** | **$ 267** | **$ 1** | **$ (4)** | **$ (3)** |
| **Algeria** | **334** | **—** | **22** | **—** | **—** | **—** |
| **Other International** | **138** | **—** | **—** | **—** | **—** | **—** |
| **Total** | **$ 1,663** | **$ 502** | **$ 289** | **$ 1** | **$ (4)** | **$ (3)** |
| Quarter Ended March 31, 2016 | | | | | | |
| United States | $ 591 | $ 366 | $ 167 | $ 88 | $ 13 | $ 2 |
| Algeria | 206 | — | 11 | — | — | — |
| Other International | 53 | — | — | — | — | — |
| Total | $ 850 | $ 366 | $ 178 | $ 88 | $ 13 | $ 2 |

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**As of May 2, 2017**

**Note: Guidance excludes 2017 sales volumes associated with the Eagleford and Marcellus divestitures.**

| | 2nd-Qtr Guidance (see Note) Units | | | Full-Year Guidance (see Note) Units | | |
|---|---|---|---|---|---|---|
| **Total Sales Volumes (MMBOE)** | 57 | — | 59 | 235 | — | 239 |
| **Total Sales Volumes (MBOE/d)** | 626 | — | 648 | 644 | — | 655 |
| **Oil (MBbl/d)** | 336 | — | 342 | 357 | — | 362 |
| United States | 248 | — | 252 | 273 | — | 276 |
| Algeria | 61 | — | 62 | 59 | — | 60 |
| Ghana | 27 | — | 28 | 25 | — | 26 |
| **Natural Gas (MMcf/d)** | | | | | | |
| United States | 1,215 | — | 1,250 | 1,170 | — | 1,200 |
| **Natural Gas Liquids (MBbl/d)** | | | | | | |
| United States | 89 | — | 93 | 91 | — | 94 |
| Algeria | 5 | — | 6 | 5 | — | 6 |

| | $ / Unit | | | $ / Unit | | |
|---|---|---|---|---|---|---|
| **Price Differentials vs NYMEX (w/o hedges)** | | | | | | |
| **Oil ($/Bbl)** | (4.20) | — | (0.20) | (4.30) | — | (0.30) |
| United States | (5.00) | — | (1.00) | (5.00) | — | (1.00) |
| Algeria | (2.00) | — | 2.00 | (2.00) | — | 2.00 |
| Ghana | (2.00) | — | 2.00 | (2.00) | — | 2.00 |
| **Natural Gas ($/Mcf)** | | | | | | |
| United States | (0.50) | — | (0.30) | (0.40) | — | (0.20) |

**Anadarko Petroleum Corporation**
**Financial and Operating External Guidance**
**As of May 2, 2017**

**Note: Guidance excludes items affecting comparability.**

| | 2nd-Qtr Guidance (see Note) | | | Full-Year Guidance (see Note) | | |
|---|---|---|---|---|---|---|
| | $ MM | | | $ MM | | |
| **Other Revenues** | | | | | | |
| Marketing and Gathering Margin | 95 | — | 105 | 400 | — | 420 |
| Minerals and Other | 40 | — | 60 | 180 | — | 200 |
| | $ / BOE | | | $ / BOE | | |
| **Costs and Expenses** | | | | | | |
| Oil & Gas Direct Operating | 4.15 | — | 4.35 | 3.90 | — | 4.40 |
| Oil & Gas Transportation | 3.40 | — | 3.60 | 3.50 | — | 3.65 |
| Depreciation, Depletion, and Amortization | 18.15 | — | 18.40 | 17.70 | — | 17.80 |
| Production Taxes (% of Product Revenue) | 7.0% | — | 8.0% | 6.5% | — | 7.5% |
| | $ MM | | | $ MM | | |
| General and Administrative (excludes restructuring charges) | 260 | — | 280 | 1,000 | — | 1,050 |
| Other Operating Expense | 5 | — | 10 | 30 | — | 40 |
| Exploration Expense | | | | | | |
| Non-Cash | 95 | — | 125 | 885 | — | 985 |
| Cash | 55 | — | 75 | 235 | — | 255 |
| Interest Expense (net) | 215 | — | 230 | 880 | — | 900 |
| Other (Income) Expense | (5) | — | 5 | (15) | — | — |
| **Taxes** | | | | | | |
| Algeria (100% Deferred for Q2 and 100% Current for Total Year) | 60% | — | 70% | 60% | — | 70% |
| Rest of Company ((10)% Current/110% Deferred for Q2 and (150)% Current/250% Deferred for Total Year) | 25% | — | 35% | 25% | — | 35% |
| Noncontrolling Interest | 45 | — | 55 | 205 | — | 225 |
| **Avg. Shares Outstanding (MM)** | | | | | | |
| Basic | 552 | — | 554 | 552 | — | 554 |
| Diluted | 552 | — | 554 | 553 | — | 555 |
| **Capital Investment (Excluding Western Gas Partners, LP)** | $ MM | | | $ MM | | |
| APC Capital Expenditures | 1,050 | — | 1,250 | 4,500 | — | 4,700 |

**Anadarko Petroleum Corporation**
**Commodity Hedge Positions**
**As of May 2, 2017**

| | Volume (MBbls/d) | Weighted Average Price per barrel | | |
|---|---|---|---|---|
| | | Floor Sold | Floor Purchased | Ceiling Sold |
| **Oil** | | | | |
| **Three-Way Collars** | | | | |
| 2017 | | | | |
| WTI | 68 | $ 40.00 | $ 50.00 | $ 58.84 |
| Brent | 23 | $ 40.00 | $ 50.00 | $ 62.64 |
| | 91 | $ 40.00 | $ 50.00 | $ 59.80 |

| | Volume (thousand MMBtu/d) | Weighted Average Price per MMBtu | | |
|---|---|---|---|---|
| | | Floor Sold | Floor Purchased | Ceiling Sold |
| **Natural Gas** | | | | |
| **Three-Way Collars** | | | | |
| 2017 | 682 | $ 2.00 | $ 2.75 | $ 3.60 |
| 2018 | 250 | $ 2.00 | $ 2.75 | $ 3.54 |

**Interest-Rate Derivatives**
**As of May 2, 2017**

| Instrument | Notional Amt. | Reference Period | Mandatory Termination Date | Rate Paid | Rate Received |
|---|---|---|---|---|---|
| Swap | $500 Million | Sept. 2016 – 2046 | Sept. 2018 | 6.559% | 3M LIBOR |
| Swap | $300 Million | Sept. 2016 – 2046 | Sept. 2020 | 6.509% | 3M LIBOR |
| Swap | $450 Million | Sept. 2017 – 2047 | Sept. 2018 | 6.445% | 3M LIBOR |
| Swap | $100 Million | Sept. 2017 – 2047 | Sept. 2020 | 6.891% | 3M LIBOR |
| Swap | $250 Million | Sept. 2017 – 2047 | Sept. 2021 | 6.570% | 3M LIBOR |

## Anadarko Petroleum Corporation
## Reconciliation of Same-Store Sales

**Average Daily Sales Volumes**

| | Quarter Ended March 31, 2017 | | | | Quarter Ended March 31, 2016 | | | |
|---|---|---|---|---|---|---|---|---|
| | Oil MBbls/d | Natural Gas MMcf/d | NGLs MBbls/d | Total MBOE/d | Oil MBbls/d | Natural Gas MMcf/d | NGLs MBbls/d | Total MBOE/d |
| U.S. Onshore | **119** | **1,146** | **88** | **398** | 130 | 1,128 | 71 | 389 |
| Deepwater Gulf of Mexico | **125** | **129** | **12** | **159** | 58 | 85 | 7 | 79 |
| International and Alaska | **109** | **—** | **6** | **115** | 93 | — | 6 | 99 |
| Same-Store Sales | **353** | **1,275** | **106** | **672** | 281 | 1,213 | 84 | 567 |
| Divestitures* | **14** | **584** | **12** | **123** | 34 | 1,090 | 44 | 260 |
| Total | **367** | **1,859** | **118** | **795** | 315 | 2,303 | 128 | 827 |

* Includes East Chalk, Wamsutter, Ozona, Elm Grove, Hugoton, Hearne, Carthage, Eagleford, and Marcellus.

# EXHIBIT 33A

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant ☒ Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under § 240.14a-12

**Anadarko Petroleum Corporation**

**(Name of Registrant as Specified in Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Exhibit
467

TABLE OF CONTENTS

Anadarko Petroleum Corporation

**TRANSACTION PROPOSED-YOUR VOTE IS VERY IMPORTANT**

Dear Stockholders of Anadarko Petroleum Corporation:

On May 9, 2019, Anadarko Petroleum Corporation ("Anadarko"), Occidental Petroleum Corporation ("Occidental") and Baseball Merger Sub 1, Inc., an indirect wholly owned subsidiary of Occidental, entered into a merger agreement that provides, upon the terms and subject to the conditions set forth therein, for Anadarko to become an indirect wholly owned subsidiary of Occidental (the "merger"). If the merger is completed, Anadarko stockholders will receive, in exchange for each share of Anadarko common stock, par value $0.10 per share ("Anadarko common stock"), held immediately prior to the merger, (1) $59.00 in cash and (2) 0.2934 of a share of Occidental common stock, par value $0.20 per share ("Occidental common stock"), subject to potential adjustments as specified in the merger agreement and as described herein. The Anadarko board of directors has unanimously approved the merger agreement, and recommends that Anadarko stockholders vote in favor of adopting the merger agreement.

Based on Occidental's closing stock price on July 8, 2019, the most recent practicable date for which such information was available, the merger consideration represented approximately $73.46 in value per share of Anadarko common stock, which represents a premium of approximately 57% over Anadarko's closing stock price on April 11, 2019, the last trading day before Anadarko announced it had entered into a merger agreement with Chevron Corporation, which merger agreement was subsequently terminated by Anadarko, and a discount of approximately 3% to Anadarko's closing stock price on May 8, 2019, the last day before the public announcement of the execution of the merger agreement with Occidental. The value of the stock portion of the merger consideration to be received in exchange for each share of Anadarko common stock will fluctuate with the market value of Occidental common stock until the transaction is complete. The common stock of each of Occidental and Anadarko is listed on the New York Stock Exchange under the symbol "OXY" and "APC", respectively. Upon completion of the merger, former Anadarko stockholders are expected to own approximately 16% of the then outstanding Occidental common stock, based on Occidental's outstanding equity as of May 2, 2019 (without giving effect to the exercise of the warrant to be issued pursuant to the Berkshire Hathaway investment described herein).

**The merger cannot be completed without approval of the proposal to adopt the merger agreement by the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon.** Because of this, Anadarko is holding a special meeting of its stockholders on August 8, 2019 to vote on the proposal necessary to complete the merger. Information about the meeting, the merger, the merger agreement, and the other business to be considered by stockholders at the special meeting is contained in this proxy statement/prospectus. The Anadarko board of directors has fixed the close of business on July 11, 2019 as the record date for the determination of Anadarko stockholders entitled to notice of, and to vote at, the special meeting. Any stockholder entitled to attend and vote at the special meeting is entitled to appoint a proxy to attend and vote on such stockholder's behalf. Such proxy need not be a holder of Anadarko common stock. We urge you to read this proxy statement/prospectus and the annexes and documents incorporated by reference carefully. **You should also carefully consider the risks that are described in the "Risk Factors" section beginning on page 32.**

**The Anadarko board of directors has unanimously determined that the merger agreement and the transactions contemplated thereby, including the merger, are advisable, fair to and in the best interests of Anadarko and the Anadarko stockholders, approved the merger agreement and the merger, and directed that the adoption of the merger agreement be submitted to a vote at a meeting of the Anadarko stockholders and unanimously recommends that Anadarko stockholders vote "FOR" the proposal to adopt the merger agreement.**

**Your vote is very important regardless of the number of shares of Anadarko common stock that you own.**

**Whether or not you plan to attend the special meeting, please submit your proxy as soon as possible to make sure that your shares are represented at the meeting.** If your shares are held in the name of a broker, bank or other nominee, please follow the instructions on the voting instruction card furnished by the broker, bank or other nominee. **You must provide voting instructions by filling out the voting instruction card in order for your shares to be voted.**

Thank you for your continued support, interest and investment in Anadarko.

Very truly yours,

Al Walker
Chairman of the Board and
Chief Executive Officer

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the merger or the other transactions described in this proxy statement/prospectus or the securities to be issued in connection with the merger or determined if this proxy statement/prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

This proxy statement/prospectus is dated July 11, 2019, and is first being mailed to stockholders of Anadarko on or about July 11, 2019.

TABLE OF CONTENTS

Anadarko Petroleum Corporation

**1201 Lake Robbins Drive**
**The Woodlands, Texas 77380**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**
**To be held on August 8, 2019**

To the Stockholders of Anadarko Petroleum Corporation:

We are pleased to invite you to attend the special meeting of stockholders of Anadarko Petroleum Corporation, a Delaware corporation ("Anadarko"), which will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380, on August 8, 2019, at 8:00 a.m., local time, for the following purposes:

- to vote on a proposal to adopt the Agreement and Plan of Merger, dated as of May 9, 2019, by and among Occidental Petroleum Corporation ("Occidental"), a Delaware corporation, Baseball Merger Sub, 1 Inc., an indirect wholly owned subsidiary of Occidental ("Merger Subsidiary"), and Anadarko (as it may be amended from time to time, the "merger agreement"), which is further described in the sections titled "The Merger" and "The Merger Agreement", beginning on pages 41 and 101, respectively, and a copy of which is attached as Annex A to the proxy statement/prospectus of which this notice is a part (the "merger proposal"); and

- to vote on an advisory (non-binding) proposal to approve the compensation that may be paid or become payable to Anadarko's named executive officers that is based on or otherwise related to the merger (the "merger-related compensation proposal").

Anadarko will transact no other business at the special meeting except such business as may properly be brought before the special meeting or any adjournment or postponement thereof by or at the direction of the Anadarko board of directors. Please refer to the proxy statement/prospectus of which this notice is a part for further information with respect to the business to be transacted at the special meeting.

The Anadarko board of directors has fixed the close of business on July 11, 2019 as the record date for the special meeting. Only Anadarko stockholders of record at the record date are entitled to receive notice of, and to vote at, the special meeting or any adjournment or postponement thereof. A complete list of stockholders entitled to vote at the special meeting will be available for viewing by any Anadarko stockholder during ordinary business hours for a period of ten days before the meeting, for purposes pertaining to the special meeting, at Anadarko's offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380. The eligible Anadarko stockholder list will also be available at the special meeting for examination by any stockholder of record present at such meeting.

Completion of the merger is conditioned on adoption of the merger agreement by the Anadarko stockholders, which requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon.

**The Anadarko board of directors has unanimously determined that the merger agreement and the transactions contemplated thereby, including the merger, are advisable, fair to and in the best interests of Anadarko and the Anadarko stockholders, approved the merger agreement and the merger, and directed that the adoption of the merger agreement be submitted to a vote at a meeting of the holders of Anadarko common stock and unanimously recommends that Anadarko stockholders vote "FOR" the merger proposal and "FOR" the merger-related compensation proposal.**

**Your vote is very important regardless of the number of shares of Anadarko common stock that you own. Whether or not you expect to attend the special meeting in person, we urge you to submit your vote in advance of the meeting.** If your shares are held in the name of a broker, bank or other nominee, please vote by following the instructions on the voting instruction card furnished by the broker, bank or other nominee. **If you hold your shares in your own name, submit a proxy to vote your shares as promptly as possible by**

TABLE OF CONTENTS

**(i) visiting the internet site listed on the proxy card, (ii) calling the toll-free number listed on the proxy card or (iii) submitting your proxy card by mail by using the provided self-addressed, stamped envelope.** Submitting a proxy will not prevent you from voting in person, but it will help to secure a quorum and avoid added solicitation costs. Any eligible holder of Anadarko common stock who is present at the special meeting may vote in person, thereby revoking any previous proxy. In addition, a proxy may also be revoked in writing before the special meeting in the manner described in the proxy statement/prospectus of which this notice is a part.

The proxy statement/prospectus of which this notice is a part provides a detailed description of the merger and the merger agreement and the other matters to be considered at the special meeting. We urge you to carefully read this proxy statement/prospectus, including any documents incorporated by reference herein, and the annexes in their entirety. **In particular, we urge you to carefully read the section entitled "Risk Factors" beginning on page 32.** If you have any questions concerning the merger or this proxy statement/prospectus, would like additional copies or need help voting your shares of Anadarko common stock, please contact either of Anadarko's proxy solicitors:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, NY 10022
Stockholders in the U.S. and Canada may call toll free: (877) 456-3524
Stockholders in other locations may call direct: (412) 232-3651
Banks and brokers may call collect: (212) 750-5833

or

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Phone: (203) 658-9400

By Order of the Anadarko Board of Directors,



Philip H. Peacock
Vice President, Deputy General Counsel,
Corporate Secretary and Chief Compliance Officer

July 11, 2019
The Woodlands, Texas

TABLE OF CONTENTS

## REFERENCES TO ADDITIONAL INFORMATION

This proxy statement/prospectus incorporates by reference important business and financial information about Occidental and Anadarko from other documents that are not included in or delivered with this proxy statement/prospectus. For a listing of the documents incorporated by reference into this proxy statement/prospectus, see “Where You Can Find More Information” beginning on page 167.

You can obtain any of the documents incorporated by reference into this proxy statement/prospectus without charge by requesting them in writing or by telephone as follows:

For information related to Anadarko:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, NY 10022
Stockholders in the U.S. and Canada may call toll free: (877) 456-3524
Stockholders in other locations may call direct: (412) 232-3651
Banks and brokers may call collect: (212) 750-5833

or

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Phone: (203) 658-9400

For information related to Occidental:

Occidental Petroleum Corporation
5 Greenway Plaza, Suite 110
Houston, Texas 77046
Attention: Investor Relations
Telephone: (713) 215-7000

**To receive timely delivery of the documents in advance of the special meeting of Anadarko stockholders, you should make your request no later than August 1, 2019, which is five business days before the meeting.**

You may also obtain any of the documents incorporated by reference into this proxy statement/prospectus without charge through the Securities and Exchange Commission (the “SEC”) website at *www.sec.gov*. In addition, you may obtain copies of documents filed by Occidental with the SEC by accessing Occidental’s website at *www.oxy.com* under the tab “Investors” and then under the heading “SEC Filings”. You may also obtain copies of documents filed by Anadarko with the SEC by accessing Anadarko’s website at *www.anadarko.com* under the tab “Investors” and then under the heading “Financial Information”.

We are not incorporating the contents of the websites of the SEC, Occidental, Anadarko or any other entity into this proxy statement/prospectus. We are providing the information about how you can obtain certain documents that are incorporated by reference into this proxy statement/prospectus at these websites only for your convenience.

TABLE OF CONTENTS

## ABOUT THIS PROXY STATEMENT/PROSPECTUS

This document, which forms part of a registration statement on Form S-4 filed with the SEC by Occidental (File No. 333-232001), constitutes a prospectus of Occidental under Section 5 of the Securities Act of 1933, as amended (the “Securities Act”), with respect to the shares of common stock, par value $0.20 per share, of Occidental (“Occidental common stock”) to be issued to Anadarko stockholders pursuant to the merger agreement. This document also constitutes a proxy statement of Anadarko under Section 14(a) of the Securities Exchange Act of 1934, as amended (the “Exchange Act”). It also constitutes a notice of meeting with respect to the special meeting, at which Anadarko stockholders will be asked to consider and vote on the adoption of the merger agreement.

Occidental has supplied all information contained in, and incorporated by reference into, this proxy statement/prospectus relating to Occidental and Merger Subsidiary, and Anadarko has supplied all such information relating to Anadarko.

You should rely only on the information contained in, and incorporated by reference into, this proxy statement/prospectus. Occidental and Anadarko have not authorized anyone to provide you with information other than the information that is contained in, or incorporated by reference into, this proxy statement/prospectus. Occidental and Anadarko take no responsibility for, and can provide no assurances as to the reliability of, any other information that others may give you. This proxy statement/prospectus is dated July 11, 2019, and you should not assume that the information contained in this proxy statement/prospectus is accurate as of any date other than such date. Further, you should not assume that the information incorporated by reference into this proxy statement/prospectus is accurate as of any date other than the date of the incorporated document. Neither the mailing of this proxy statement/prospectus to Anadarko stockholders nor the issuance by Occidental of shares of Occidental common stock pursuant to the merger agreement will create any implication to the contrary.

TABLE OF CONTENTS

TABLE OF CONTENTS


| | |
|---|---|
| QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING | 1 |
| SUMMARY | 10 |
| Information about the Companies | 10 |
| The Merger | 11 |
| Merger Consideration | 11 |
| Treatment of Anadarko Stock Options and Other Stock-Based Awards | 12 |
| Recommendations of the Anadarko Board of Directors | 13 |
| Opinions of Anadarko’s Financial Advisors | 13 |
| Interests of Directors and Executive Officers of Anadarko in the Merger | 14 |
| Material U.S. Federal Income Tax Consequences of the Merger | 14 |
| Accounting Treatment of the Merger | 15 |
| Litigation Relating to the Merger | 15 |
| Appraisal Rights | 15 |
| Regulatory Approvals Required for the Merger | 15 |
| Conditions to Completion of the Merger | 15 |
| Financing of the Merger and Treatment of Existing Debt | 16 |
| Sale of Anadarko Assets to TOTAL S.A. | 17 |
| No Solicitation | 17 |
| Termination of the Merger Agreement | 18 |
| Special Meeting | 20 |
| Risk Factors | 21 |
| SELECTED HISTORICAL FINANCIAL DATA | 22 |
| SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL DATA | 25 |
| COMPARATIVE HISTORICAL AND UNAUDITED PRO FORMA COMBINED PER SHARE INFORMATION | 26 |
| COMPARATIVE PER SHARE MARKET PRICE AND DIVIDEND INFORMATION | 27 |
| Market Prices | 27 |
| Dividends | 27 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 29 |
| RISK FACTORS | 32 |
| Risks Related to the Merger | 32 |
| Risks Relating to the Combined Company After Completion of the Merger | 37 |
| Other Risk Factors of Occidental and Anadarko | 40 |
| THE MERGER | 41 |
| Background of the Merger | 41 |
| Occidental’s Rationale for the Transaction | 54 |
| Recommendations of the Anadarko Board of Directors and Its Reasons for the Transaction | 55 |
| Opinions of Anadarko’s Financial Advisors | 58 |
| Certain Unaudited Prospective Information | 74 |
| Interests of Directors and Executive Officers of Anadarko in the Merger | 79 |
| Share Ownership of Directors, Executive Officers and Certain Beneficial Owners of Anadarko | 86 |
| Director and Officer Indemnification | 88 |
| Accounting Treatment of the Merger | 88 |
| Litigation Relating to the Merger | 88 |
| Regulatory Approvals Required for the Merger | 88 |
| Financing of the Merger and Treatment of Existing Debt | 89 |
| Sale of Anadarko Assets to TOTAL S.A. | 91 |
| Treatment of Anadarko Stock Options and Other Stock-Based Awards | 91 |
| Appraisal Rights | 92 |

TABLE OF CONTENTS


| | |
|---|---|
| NYSE Listing of Occidental Common Stock; Delisting and Deregistration of Anadarko Common Stock | 96 |
| Material U.S. Federal Income Tax Consequences | 96 |
| Restrictions on Sales of Shares of Occidental Common Stock Received in the Merger | 100 |
| Certain Contracts between Occidental and Anadarko | 100 |
| THE MERGER AGREEMENT | 101 |
| Explanatory Note Regarding the Merger Agreement | 101 |
| Structure of the Merger | 101 |
| Timing of Closing | 101 |
| Merger Consideration | 102 |
| Covenants and Agreements | 105 |
| Representations and Warranties | 117 |
| Conditions to Completion of the Merger | 120 |
| Termination of the Merger Agreement | 120 |
| Expenses | 122 |
| Amendments; Waivers | 123 |
| Governing Law; Jurisdiction; Waiver of Jury Trial | 123 |
| Specific Performance | 123 |
| Third-Party Beneficiaries | 123 |
| INFORMATION ABOUT THE COMPANIES | 125 |
| Occidental | 125 |
| Anadarko | 125 |
| Merger Subsidiary | 126 |
| SPECIAL MEETING | 127 |
| Date, Time and Place | 127 |
| Purpose of the Special Meeting | 127 |
| Recommendation of the Anadarko Board | 127 |
| Record Date; Stockholders Entitled to Vote | 127 |
| Voting by Anadarko’s Directors and Executive Officers | 128 |
| Quorum; Adjournment | 128 |
| Required Vote | 128 |
| Voting of Proxies by Holders of Record | 129 |
| Attendance at the Special Meeting and Voting in Person | 129 |
| Revocability of Proxies | 130 |
| Solicitation | 130 |
| Assistance | 130 |
| Tabulation of Votes | 130 |
| ANADARKO PROPOSALS | 131 |
| Item 1. The Merger Proposal | 131 |
| Item 2. The Merger-Related Compensation Proposal | 131 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL DATA | 132 |
| NON-BINDING, ADVISORY VOTE ON MERGER-RELATED COMPENSATION FOR ANADARKO’S NAMED EXECUTIVE OFFICERS | 152 |
| DESCRIPTION OF OCCIDENTAL CAPITAL STOCK | 153 |
| COMPARISON OF RIGHTS OF STOCKHOLDERS OF OCCIDENTAL AND ANADARKO | 155 |
| VALIDITY OF COMMON STOCK | 164 |
| EXPERTS | 164 |
| STOCKHOLDER PROPOSALS AND NOMINATIONS FOR ANADARKO’S 2019 ANNUAL MEETING OF STOCKHOLDERS | 164 |
| HOUSEHOLDING OF PROXY STATEMENT/PROSPECTUS | 166 |

TABLE OF CONTENTS


| | |
|---|---|
| WHERE YOU CAN FIND MORE INFORMATION | 167 |
| Occidental SEC Filings | 167 |
| Anadarko SEC Filings | 167 |

Annex A: Agreement and Plan of Merger
Annex B: Opinion of Evercore Group L.L.C.
Annex C: Opinion of Goldman Sachs & Co. LLC
Annex D: Section 262 of the Delaware General Corporation Law

TABLE OF CONTENTS

## QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING

*The following questions and answers briefly address some commonly asked questions about the merger and the special meeting of Anadarko stockholders (the "special meeting"). They may not include all the information that is important to stockholders of Anadarko. Anadarko stockholders should carefully read this entire proxy statement/prospectus, including the annexes and the other documents referred to or incorporated by reference in this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167 of this proxy statement/prospectus.*

**Q: What is the merger?**

Occidental Petroleum Corporation ("Occidental"), Baseball Merger Sub 1, Inc., an indirect wholly owned subsidiary of Occidental ("Merger Subsidiary"), and Anadarko Petroleum Corporation ("Anadarko") have entered into an Agreement and Plan of Merger, dated May 9, 2019 (as it may be amended from time to time, the "merger agreement"). A copy of the merger agreement is attached as Annex A to this proxy statement/prospectus. The merger agreement contains the terms and conditions of the proposed acquisition of Anadarko by Occidental. Under the merger agreement, subject to satisfaction (or, to the extent permitted by law and in accordance with the merger agreement, waiver) of the conditions to the merger set forth in the merger agreement and described in this proxy statement/prospectus, Merger Subsidiary will merge with and into Anadarko, with Anadarko continuing as the surviving corporation and an indirect wholly owned subsidiary of Occidental (the "merger" or the "transaction").

As a result of the merger, Anadarko will no longer be a publicly held company. Following the merger, Anadarko common stock will be delisted from the New York Stock Exchange (the "NYSE") and will be deregistered under the Exchange Act, after which Anadarko will no longer be required under SEC rules and regulations to file periodic reports with the SEC in respect of Anadarko common stock.

**Q: Why am I receiving these materials?**

Occidental and Anadarko are sending these materials to Anadarko stockholders to help them decide how to vote their shares of Anadarko common stock with respect to the merger and other matters to be considered at the special meeting.

The merger cannot be completed unless Anadarko stockholders adopt the merger agreement with the affirmative vote of the holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon. Anadarko is holding a special meeting of its stockholders to vote on the proposals necessary to complete the merger. Information about this special meeting, the merger and the other business to be considered by stockholders at the special meeting is contained in this proxy statement/prospectus.

This proxy statement/prospectus constitutes both a proxy statement of Anadarko and a prospectus of Occidental. It is a proxy statement because the board of directors of Anadarko (the "Anadarko Board") is soliciting proxies from its stockholders. It is a prospectus because Occidental will issue shares of its common stock in exchange for outstanding shares of Anadarko common stock in the merger.

**Q: What will Anadarko stockholders receive in the merger?**

In the merger, Anadarko stockholders will receive $59.00 in cash, without interest (as such amount of cash may potentially be adjusted pursuant to the merger agreement as described below, the "per share cash consideration"), and 0.2934 (as such amount may potentially be adjusted pursuant to the merger agreement as described below, the "exchange ratio") of a validly issued, fully paid and non-assessable share of Occidental common stock (such cash consideration and stock consideration together, as they may potentially be adjusted pursuant to the merger agreement as described below, the "merger consideration") for each share of Anadarko common stock (other than (i) shares held by Occidental, Anadarko, Merger Subsidiary or any of their respective direct or indirect wholly owned subsidiaries ("cancelled shares"), (ii) certain shares of Anadarko common stock subject to stock-based awards that will be treated in the manner described under the heading "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards" and (iii) shares of Anadarko common stock with respect to which appraisal rights are properly demanded and not withdrawn ("dissenting shares") under the General Corporation Law of the State of Delaware (the "DGCL")).

TABLE OF CONTENTS

If the merger would otherwise result in the issuance of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) in excess of 19.99% of the outstanding shares of Occidental common stock immediately prior to the closing of the merger (the "share cap"), (i) the exchange ratio will be reduced by the smallest number (rounded up to the nearest 0.0001) that causes the total number of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) issuable in the merger to not exceed the share cap (the "exchange ratio reduction number") and (ii) the per share cash consideration will be increased by an amount in cash equal to (x) the exchange ratio reduction number multiplied by (y) the closing price per share of Occidental common stock on the NYSE on the last trading day immediately preceding the closing date of the merger (the "Parent Closing Price").

The exchange ratio is otherwise fixed and will not be adjusted to reflect changes in the stock price of either company before the merger is complete. No fractional shares of Occidental common stock will be issued in connection with the merger. Each holder of Anadarko common stock that otherwise would have been entitled to receive a fractional share of Occidental common stock immediately prior to the effective time of the merger will receive an amount in cash, without interest, rounded to the nearest cent, in lieu of such fractional share. The value of such cash payment will be calculated by the exchange agent and will represent the holder's proportionate interest in a trust of proceeds established from the open-market sale of that number of shares of Occidental common stock equal to the excess of (x) the aggregate number of shares of Occidental common stock delivered to the exchange agent by Occidental pursuant to the terms of the merger agreement over (y) the aggregate number of whole shares of Occidental common stock distributed to the holders of certificates or book-entry shares previously representing shares of Anadarko common stock pursuant to the merger agreement. Occidental stockholders will continue to own their existing shares of Occidental common stock, the form of which will not be changed by the transaction. For more details on the merger consideration, see "The Merger Agreement-Merger Consideration" beginning on page 102.

The merger will be treated as a taxable transaction for U.S. federal income tax purposes. Therefore, a U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will recognize capital gain or loss equal to the difference between (1) the sum of the cash and the fair market value of any shares of Occidental common stock received by such U.S. holder in the merger and (2) the U.S. holder's adjusted tax basis in its Anadarko common stock. Except in certain circumstances described in "The Merger-Material U.S. Federal Income Tax Consequences-The Merger", a Non-U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will not be subject to U.S. federal income or withholding tax on any gain recognized on the exchange of Anadarko common stock for any shares of Occidental common stock and cash in the merger. You are strongly urged to consult with a tax advisor to determine the particular U.S. federal, state or local or foreign income or other tax consequences of the merger to you. For additional information, see "The Merger-Material U.S. Federal Income Tax Consequences" beginning on page 96.

**Q: What equity stake will Anadarko stockholders hold in Occidental immediately following the merger?**

Upon the completion of the merger, based on the exchange ratio, the estimated number of shares of Occidental common stock issuable as the stock portion of the merger consideration is approximately 146.3 million shares, which will result in former Anadarko stockholders holding approximately 16% of the outstanding fully diluted Occidental common stock based on the number of outstanding shares of common stock and outstanding stock-based awards of Occidental and Anadarko as of May 2, 2019, the most recent practicable date for which such information was available.

For more details on the merger consideration and the treatment of Anadarko stock options and stock-based awards, see "The Merger Agreement-Merger Consideration" beginning on page 102 and "The Merger Agreement-Merger Consideration-Treatment of Anadarko Stock Options and Other Stock-Based Awards" beginning on page 104, respectively.

TABLE OF CONTENTS

**Q: When do Anadarko and Occidental expect to complete the merger?**

Occidental and Anadarko are working to complete the merger as soon as practicable and currently expect that the transaction will be completed in the second half of 2019. Neither Occidental nor Anadarko can predict, however, the actual date on which the transaction will be completed because it is subject to conditions beyond each company's control. See "The Merger Agreement-Conditions to Completion of the Merger" beginning on page 120.

**Q: Is Occidental's obligation to complete the merger subject to Occidental receiving financing?**

No. Occidental's obligations under the merger agreement are not subject to any condition regarding its ability to finance, or obtain financing for, the merger. For more information regarding financing of the merger, see "The Merger-Financing of the Merger and Treatment of Existing Debt" beginning on page 89.

**Q: What happens if the merger is not completed?**

If the merger agreement is not adopted by Anadarko stockholders or if the merger is not completed for any other reason, Anadarko stockholders will not receive any consideration for their shares of Anadarko common stock. Instead, Anadarko will remain an independent public company, Anadarko common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act and Anadarko will continue to file periodic reports with the SEC. Under specific circumstances, Anadarko or Occidental may be required to pay the other party a termination fee of $1 billion. See "The Merger Agreement-Termination of the Merger Agreement" beginning on page 120.

**Q: Will the shares of Occidental common stock I acquire in the merger receive a dividend?**

After the closing of the merger, as a holder of Occidental common stock, you will receive the same dividends on shares of Occidental common stock that all other holders of shares of Occidental common stock will receive with any dividend record date that occurs after the closing of the merger.

**Q: Will I continue to receive dividends in respect of my shares of Anadarko common stock?**

Prior to the closing of the merger, Anadarko and Occidental will coordinate regarding the declaration and payment of dividends in respect of their common stock and the record dates and payment dates relating thereto, so as to ensure that you do not receive two dividends, or fail to receive one dividend, in any quarter with respect to your shares of Anadarko common stock and the Occidental common stock that you receive in exchange therefor in the merger.

After the closing of the merger, former Anadarko stockholders who hold Anadarko share certificates will not be entitled to be paid dividends otherwise payable on the shares of Occidental common stock into which their shares of Anadarko common stock are exchangeable until they surrender their Anadarko share certificates according to the instructions provided to them. Dividends will be accrued for these stockholders and they will receive the accrued dividends when they surrender their Anadarko share certificates.

After the closing of the merger, all Occidental dividends will remain subject to approval by Occidental's board of directors (the "Occidental Board").

**Q: What am I being asked to vote on, and why is this approval necessary?**

Anadarko stockholders are being asked to vote on the following proposals:

1. a proposal to adopt the merger agreement, a copy of which is attached as Annex A to this proxy statement/prospectus, which is further described in the sections titled "The Merger" and "The Merger Agreement", beginning on pages 41 and 101, respectively (the "merger proposal"); and
2. an advisory (non-binding) proposal to approve the compensation that may be paid or become payable to Anadarko's named executive officers that is based on or otherwise related to the merger (the "merger-related compensation proposal").

Approval of the merger proposal by the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon is required for completion of the merger.

TABLE OF CONTENTS

**Q: What vote is required to approve each proposal at the special meeting?**

*The merger proposal*: The affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon is required to approve the merger proposal (the “Anadarko stockholder approval”).

*The merger-related compensation proposal*: The affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy at the special meeting and entitled to vote thereon is required to approve the merger-related compensation proposal. Because the vote on the merger-related compensation proposal is advisory only, it will not be binding on either Anadarko or Occidental. Accordingly, if the merger agreement is adopted and the merger is completed, the merger-related compensation will be payable to Anadarko’s named executive officers, subject only to the conditions applicable thereto, regardless of the outcome of the non-binding, advisory vote of Anadarko’s stockholders.

**Q: What happens if the non-binding, advisory merger-related compensation proposal is not approved?**

Because the vote on the merger-related compensation proposal is advisory only, it will not be binding on either Anadarko or Occidental. Accordingly, if the merger proposal is approved and the merger is completed, the merger-related compensation will be payable to Anadarko’s named executive officers, subject only to the conditions applicable thereto, regardless of the outcome of the approval of the merger-related compensation proposal.

**Q: What constitutes a quorum?**

The presence at the special meeting, in person or by proxy, of the holders of a majority of the outstanding shares of Anadarko common stock entitled to vote at the special meeting will constitute a quorum for the transaction of business at the special meeting. Abstentions will count as votes present and entitled to vote for the purpose of determining the presence of a quorum for the transaction of business at the special meeting. Brokers, banks or other nominees that hold shares for beneficial owners do not have discretionary authority to vote the shares as to any matter at the meeting without receiving voting instructions from the beneficial owners. Such shares will be considered to be broker non-votes and will not be counted as present for quorum purposes.

A quorum is necessary to transact business at the special meeting. The Anadarko by-laws and the DGCL provide that if a quorum fails to attend any meeting, the chairman of the meeting or the holders of a majority of the votes entitled to be cast by the stockholders who are present in person or by proxy may adjourn the meeting from time to time, without notice other than by announcement at the meeting, to another date, place, if any, and time until a quorum is present, unless the adjournment is for more than 30 days or, after adjournment, a new record date is fixed for the adjourned meeting.

**Q: How does the Anadarko Board recommend that I vote?**

The Anadarko Board unanimously recommends that Anadarko stockholders vote “**FOR**” the merger proposal and “**FOR**” the merger-related compensation proposal.

**Q: What do I need to do now?**

After carefully reading and considering the information contained in, and incorporated by reference into, this proxy statement/prospectus, please vote your shares as soon as possible so that your shares will be represented at the special meeting. Please follow the instructions set forth on the proxy card or on the voting instruction form provided by the record holder if your shares are held in the name of your broker, bank or other nominee.

**Please do not submit your Anadarko stock certificates at this time. After the merger is completed, you will receive instructions for surrendering your Anadarko stock certificates in exchange for shares of Occidental common stock from the exchange agent.**

**Please carefully consider the information contained in, and incorporated by reference into, this proxy statement/prospectus. Whether or not you plan to attend the special meeting, Anadarko encourages you to submit your proxy to vote via the internet, by telephone or by mail so that your shares will be voted in accordance with your wishes even if you later decide not to attend the special meeting.**

TABLE OF CONTENTS

**Q: How do I vote?**

If you are a stockholder of record of Anadarko as of July 11, 2019 (the "record date"), you may submit your proxy before the special meeting in one of the following ways:

- **Telephone**-use the toll-free number shown on your proxy card;
- **Internet**-visit the website shown on your proxy card to vote via the internet; or
- **Mail**-complete, sign, date and return the enclosed proxy card in the enclosed postage-paid envelope.

If you are a stockholder of record, you may also cast your vote in person at the special meeting. If you decide to attend the special meeting and vote in person, your vote by ballot will revoke any proxy previously submitted.

If your shares are held in "street name", through a broker, bank or other nominee, that institution will send you separate instructions describing the procedure for voting your shares. "Street name" stockholders who wish to vote at the meeting will need to obtain a "legal proxy" form from their broker, bank or other nominee.

**Q: When and where is the special meeting of stockholders? What must I bring to attend the special meeting?**

The special meeting of Anadarko stockholders will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380 at 8:00 a.m., local time, on August 8, 2019. Subject to space availability, all Anadarko stockholders as of the record date, or their duly appointed proxies, may attend the meeting. Since seating is limited, admission to the meeting will be on a first-come, first-served basis. Registration and seating will begin at 7:30 a.m., local time.

If you wish to attend the special meeting, you must bring valid photo identification, such as a driver's license or passport. If you hold your shares of Anadarko common stock in street name, such as through a broker, bank or other nominee, you must also bring proof of ownership such as the voting instruction card from your broker or other nominee or an account statement showing your ownership as of the record date. In addition, no cameras, recording equipment, electronic devices, large bags, briefcases or packages will be permitted in the special meeting.

**Q: What is the difference between holding shares as a stockholder of record and as a beneficial owner?**

If your shares of Anadarko common stock are registered directly in your name with the transfer agent of Anadarko, Computershare, you are considered the stockholder of record with respect to those shares. As the stockholder of record, you have the right to vote or to grant a proxy for your vote directly to Anadarko or to a third party to vote at the special meeting.

If your shares are held by a broker, bank or other nominee, you are considered the beneficial owner of shares held in "street name", and your broker, bank or other nominee is considered the stockholder of record with respect to those shares. Your broker, bank or other nominee will send you, as the beneficial owner, voting instructions for you to use in directing the broker, bank or other nominee in how to vote your shares. You should follow the instructions provided by them to vote your shares. You are invited to attend the special meeting; however, you may not vote these shares in person at the special meeting unless you obtain a "legal proxy" from your broker, bank or other nominee that holds your shares, giving you the right to vote the shares at the special meeting.

**Q: If my shares are held in "street name" by a broker, bank or other nominee, will my broker, bank or other nominee vote my shares for me?**

If your shares are held in "street name" in a stock brokerage account or by a broker, bank or other nominee, you must provide the record holder of your shares with instructions on how to vote your shares. Please follow the voting instructions provided by your broker, bank or other nominee. Please note that you may not vote shares held in street name by returning a proxy card directly to Anadarko or by voting in person at the special meeting unless you provide a "legal proxy", which you must obtain from your broker, bank or other nominee. Your broker, bank or other nominee is obligated to provide you with a voting instruction card for you to use.

The NYSE permits brokers to vote their customers' stock held in street name on routine matters when the brokers have not received voting instructions from their customers. The NYSE does not, however, allow brokers to vote their customers' stock held in street name on non-routine matters unless they have received voting instructions from their customers. In such cases, the uninstructed shares for which the broker is unable to vote are called broker non-votes. The merger proposal and the merger-related compensation proposal are non-routine matters on which brokers are not allowed to vote unless they have received voting instructions from their customers.

TABLE OF CONTENTS

If you are an Anadarko stockholder and you do not instruct your broker, bank or other nominee on how to vote your shares:

- your broker, bank or other nominee may not vote your shares on the merger proposal, which broker non-votes, if any, will have the same effect as a vote cast "AGAINST" this proposal; and
- your broker, bank or other nominee may not vote your shares on the merger-related compensation proposal, which broker non-votes, if any, will have no effect on the vote for this proposal (assuming a quorum is present).

**Q: What if I fail to vote or abstain?**

For purposes of the special meeting, an abstention occurs when a stockholder attends the special meeting in person and does not vote or returns a proxy with an "abstain" instruction.

*Merger proposal*: An abstention or failure to vote will have the same effect as a vote cast "AGAINST" the merger proposal.

*Merger-related compensation proposal*: An abstention will have the same effect as a vote cast "AGAINST" the merger-related compensation proposal. If an Anadarko stockholder is not present in person at the special meeting and does not respond by proxy, it will have no effect on the vote for the merger-related compensation proposal (assuming a quorum is present).

**Q: What will happen if I return my proxy or voting instruction card without indicating how to vote?**

If you sign and return your proxy or voting instruction card without indicating how to vote on any particular proposal, the Anadarko common stock represented by your proxy will be voted as recommended by the Anadarko Board with respect to that proposal.

**Q: May I change or revoke my vote after I have delivered my proxy or voting instruction card?**

Yes. If you are a record holder, you may change or revoke your vote before your proxy is voted at the special meeting as described herein. You may do this in one of four ways:

(1) submitting a proxy at a later time by internet or telephone until **11:59 p.m. Eastern Time on August 7, 2019**;

(2) voting in person at the special meeting;

(3) delivering, before **6:00 p.m. Eastern Time on August 7, 2019**, to Anadarko's Corporate Secretary at Anadarko's executive offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, a proxy with a later date or a written revocation of your most recent proxy; or

(4) giving written revocation to the inspector of election at the special meeting.

If you are a street name stockholder (for example, if your shares are held in the name of a broker, bank or other holder of record) and you vote by proxy, you may later revoke your proxy by informing the holder of record in accordance with that entity's procedures.

**Q: What are the material U.S. federal income tax consequences of the merger?**

The merger will be treated as a taxable transaction for U.S. federal income tax purposes. Therefore, a U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will recognize capital gain or loss equal to the difference between (1) the sum of the cash and the fair market value of any shares of Occidental common stock received by such U.S. holder in the merger and (2) the U.S. holder's adjusted tax basis in its Anadarko common stock.

Except in certain circumstances described in "The Merger-Material U.S. Federal Income Tax Consequences-The Merger", a Non-U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will not be subject to U.S. federal income or withholding tax on any gain recognized on the exchange of Anadarko common stock for any shares of Occidental common stock and cash in the merger.

TABLE OF CONTENTS

In certain circumstances, Anadarko stockholders who expect to own an equal or greater percentage interest in Occidental following the merger than their percentage interest in Anadarko prior to the merger, taking into account the application of certain constructive ownership rules, may have tax consequences that differ materially from those described above as a result of the application of Section 304 of the Internal Revenue Code of 1986, as amended (the "Code"). All references in this proxy statement/prospectus to "Section 304" are to Section 304 of the Code. As described further below under "The Merger-Material U.S. Federal Income Tax Consequences-The Merger-Special Consequences of the Merger to Holders of Anadarko Common Stock That Also Own Occidental Common Stock", such stockholders may be required to include the entire amount of the consideration received as dividend income. Non-U.S. holders may be subject to U.S. federal income and withholding tax on such dividend income. In addition, withholding agents may withhold on consideration payable to all Non-U.S. holders because they may not be able to determine whether any particular Non-U.S. holder is subject to withholding as a result of these rules. Any such stockholders who expect to own an equal or greater percentage interest in Occidental following the merger than their percentage interest in Anadarko prior to the merger and all Non-U.S. holders should consult their own tax advisors regarding the application of Section 304 to the merger.

**Please refer to "The Merger-Material U.S. Federal Income Tax Consequences-The Merger" contained in this proxy statement/prospectus for a description of the material U.S. federal income tax consequences of the merger. Determining the actual tax consequences of the merger to you may be complex and will depend on your specific situation. You are urged to consult your tax advisor for a full understanding of the tax consequences of the merger to you.**

**Q: Am I entitled to exercise appraisal rights in connection with the merger instead of receiving the merger consideration for my shares of Anadarko common stock?**

Under Delaware law, if the merger is completed, holders of Anadarko common stock who do not vote in favor of the adoption of the merger agreement and otherwise comply with the requirements and procedures of Section 262 of the DGCL may exercise their rights of appraisal, which generally entitle stockholders to receive a cash payment equal to the fair value of their Anadarko common stock exclusive of any element of value arising from the accomplishment or expectation of the merger, as determined by the Delaware Court of Chancery. The "fair value" could be higher or lower than, or the same as, the merger consideration. For a more detailed description of the appraisal rights available to Anadarko stockholders and the procedures required to exercise appraisal rights, see "The Merger-Appraisal Rights" beginning on page 92. A copy of the full text of Section 262 of the DGCL is attached as Annex D to this proxy statement/prospectus.

**Q: What will happen to Anadarko stock options and other stock-based awards?**

Upon completion of the merger:

- Each outstanding option to purchase shares of Anadarko common stock, whether or not vested (an "Anadarko stock option"), will be cancelled and converted into the right to receive a cash amount equal to the product of:
  - the excess, if any, of (i) the sum, rounded to the nearest whole cent, of (x) the product of the exchange ratio and the Parent Closing Price and (y) the per share cash consideration (the amount in this clause (i), the "Option Consideration") over (ii) the per share exercise price of such Anadarko stock option; and
  - the aggregate number of shares of Anadarko common stock subject to such Anadarko stock option.

Each Anadarko stock option with an exercise price equal to or greater than the Option Consideration will be cancelled and terminated, without any payment in respect thereof.

- Each outstanding award of restricted stock units that corresponds to shares of Anadarko common stock (an "Anadarko RSU award") will convert into a restricted stock and cash unit award of Occidental (an "Occidental restricted stock/cash unit award") with respect to both:
  - the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (i) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (ii) the exchange ratio, and

TABLE OF CONTENTS

- the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (i) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (ii) the per share cash consideration.

The Occidental restricted stock/cash unit award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RSU award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

- Each outstanding restricted stock award (an "Anadarko RS award") will convert into a restricted stock and cash award of Occidental (an "Occidental restricted stock/cash award") with respect to both:
  - the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (i) the number of shares of Anadarko common stock subject to such Anadarko RS award by (ii) the exchange ratio, and
  - the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (i) the number of shares of Anadarko common stock subject to such Anadarko RS award by (ii) the per share cash consideration.

The Occidental restricted stock/cash award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RS award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

- Each outstanding award of performance units (an "Anadarko PU award") will immediately vest and will be cancelled and converted into the right to receive a cash amount equal to the product of (i) 200% of the target number of shares of Anadarko common stock subject to such Anadarko PU award multiplied by (ii) $76.00, less applicable tax withholdings. This amount will be payable on the earliest date that would not result in the imposition of any tax under Section 409A of the Code.
- Each outstanding deferred share award (an "Anadarko deferred share award") will be cancelled and converted into the right to receive the merger consideration in respect of each share of Anadarko common stock subject to such Anadarko deferred share award. This amount will be payable within five business days following the completion of the merger or, if later, the earliest date that would not result in the imposition of tax under Section 409A of the Code.

**Q: What happens if I sell my shares of Anadarko common stock after the record date but before the special meeting?**

The record date for the special meeting (the close of business on July 11, 2019) is earlier than the date of the special meeting and earlier than the date that the merger is expected to be completed. If you sell or otherwise transfer your shares of Anadarko common stock after the record date but before the date of the special meeting, you will retain your right to vote at the special meeting. However, you will not have the right to receive the merger consideration to be received by Anadarko stockholders in the merger or to demand appraisal rights. In order to receive the merger consideration or demand appraisal rights, you must hold your shares through completion of the merger.

**Q: Are there any risks that I should consider in deciding whether to vote in favor of the merger proposal?**

Yes. You should read and carefully consider the risk factors set forth in the section entitled "Risk Factors" beginning on page 32. You also should read and carefully consider the risk factors of Occidental and Anadarko contained in the documents that are incorporated by reference into this proxy statement/prospectus.

TABLE OF CONTENTS

**Q: What should I do if I receive more than one set of voting materials?**

If you hold shares of Anadarko common stock in "street name" and also directly as a record holder or otherwise or if you hold shares of Anadarko common stock in more than one brokerage account, you may receive more than one set of voting materials relating to the special meeting. Please complete, sign, date and return each proxy card (or cast your vote by telephone or internet as provided on your proxy card) or otherwise follow the voting instructions provided in this proxy statement/prospectus in order to ensure that all of your shares of Anadarko common stock are voted. If you hold your shares in "street name" through a broker, bank or other nominee, you should follow the procedures provided by your broker, bank or other nominee to vote your shares.

**Q: Who will tabulate and certify the vote?**

Broadridge Financial Solutions, Inc. ("Broadridge"), an independent third party, will tabulate and certify the vote, and will have a representative to act as the independent inspector of election for the special meeting.

**Q: Where can I find the voting results of the special meeting?**

The preliminary voting results will be announced at the special meeting. In addition, within four business days following certification of the final voting results, Anadarko intends to file the final voting results with the SEC on a Current Report on Form 8-K.

**Q: Whom should I contact if I have any questions about the proxy materials or voting?**

If you have any questions about the proxy materials, or if you need assistance submitting your proxy or voting your shares or need additional copies of this proxy statement/prospectus or the enclosed proxy card, you should contact the proxy solicitation agents for Anadarko, at:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, NY 10022
Stockholders in the U.S. and Canada may call toll free: (877) 456-3524
Stockholders in other locations may call direct: (412) 232-3651
Banks and brokers may call collect: (212) 750-5833

or

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Phone: (203) 658-9400

TABLE OF CONTENTS

## SUMMARY

*This summary highlights selected information contained in this proxy statement/prospectus and does not contain all the information that may be important to you. Occidental and Anadarko urge you to read carefully this proxy statement/prospectus in its entirety, including the annexes. Additional important information, which Occidental and Anadarko also urge you to read, is contained in the documents incorporated by reference into this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167. Unless stated otherwise, all references in this proxy statement/prospectus to Occidental are to Occidental Petroleum Corporation, all references to Anadarko are to Anadarko Petroleum Corporation and all references to the merger agreement are to the Agreement and Plan of Merger, dated as of May 9, 2019, by and among Occidental Petroleum Corporation, Baseball Merger Sub 1, Inc. and Anadarko Petroleum Corporation, a copy of which is attached as Annex A to this proxy statement/prospectus.*

### Information about the Companies

#### *Occidental*

Occidental is an international oil and gas exploration and production company with operations in the United States, Middle East and Latin America. Headquartered in Houston, Occidental is one of the largest U.S. oil and gas companies, based on equity market capitalization. Occidental's principal businesses consist of three segments as follows:

**Oil and Gas**-This segment explores for, develops and produces oil and condensate, natural gas liquids ("NGLs") and natural gas. Occidental's oil and gas assets are located in some of the world's highest-margin basins and are characterized by an advantaged mix of short- and long-cycle, high-return development opportunities. In the United States, Occidental holds a leading position in the Permian Basin. Other core operations are in the Middle East (Oman, United Arab Emirates ("UAE") and Qatar) and Latin America (Colombia).

**Chemical (OxyChem)**-This segment primarily manufactures and markets basic chemicals and vinyls. OxyChem is a leading North American manufacturer of PVC resins, chlorine and caustic soda − key building blocks of products such as pharmaceuticals, water treatment chemicals and durable, long-life plastics. OxyChem has manufacturing facilities in the United States, Canada and Latin America.

**Midstream and Marketing**-This segment purchases, markets, gathers, processes, transports and stores oil, condensate, NGL, natural gas, carbon dioxide and power. It also trades around its assets, including transportation and storage capacity, and invests in entities that conduct similar activities. Also within the midstream and marketing segment is Oxy Low Carbon Ventures ("OLCV"). OLCV seeks to capitalize on Occidental's enhanced oil recovery leadership by developing carbon capture, utilization and storage projects that source anthropogenic carbon dioxide and promote innovative technologies that drive cost efficiencies and grow Occidental's business while reducing emissions.

Occidental is incorporated in Delaware. Its principal executive offices are located at 5 Greenway Plaza, Suite 110, Houston, Texas 77046 and its telephone number is (713) 215-7000. Occidental's website address is *www.oxy.com*. Information contained on Occidental's website does not constitute part of this proxy statement/prospectus. Occidental's common stock is publicly traded on the NYSE, under the ticker symbol "OXY". Additional information about Occidental is included in documents incorporated by reference in this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167.

#### *Anadarko*

Anadarko is among the world's largest independent exploration and production companies, with approximately 1.5 billion barrels of oil equivalent ("BOE") of proved reserves at December 31, 2018. Anadarko's asset portfolio combines cash-generating conventional oil developments in the Gulf of Mexico, Algeria and Ghana with a large inventory of significant and proven high-growth unconventional resources in the U.S. onshore. Anadarko's U.S. onshore assets include the Delaware and Denver-Julesburg ("DJ") basins and an emerging play in the Powder River basin. Anadarko's asset portfolio also includes a world-class natural-gas discovery in Mozambique as well as other worldwide exploration and development opportunities.

On February 28, 2019, Anadarko completed the previously announced contribution and sale of substantially all of its midstream assets to Western Midstream Partners, LP, a publicly traded limited partnership and

consolidated subsidiary of Anadarko and formerly known as Western Gas Equity Partners, LP. Due to this contribution and sale, as of the filing on May 8, 2019 of its Quarterly Report on Form 10-Q for the three months ended March 31, 2019, Anadarko no longer reports an Other Midstream segment and now has two reporting segments as follows:

**Exploration and Production**-This segment is engaged in the exploration, development, production and sale of oil, natural gas and NGLs and in advancing its Mozambique LNG project toward a final investment decision ("FID") in the first half of 2019.

**WES Midstream**-This segment engages in gathering, processing, treating, and transporting Anadarko and third-party oil, natural gas and NGL production, as well as gathering and disposal of produced water. The WES Midstream segment consists of assets owned by Western Midstream Partners, LP.

Anadarko is incorporated in Delaware. Anadarko's corporate headquarters is located at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, and its telephone number is (832) 636-1000. Anadarko's website address is *www.anadarko.com*. Information contained on Anadarko's website does not constitute part of this proxy statement/prospectus. Anadarko's common stock is publicly traded on the NYSE under the ticker symbol "APC". Additional information about Anadarko is included in documents incorporated by reference in this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167.

### *Merger Subsidiary*

Merger Subsidiary, an indirect wholly owned subsidiary of Occidental, is a Delaware corporation incorporated on April 5, 2019 for the purpose of effecting the merger. Merger Subsidiary has not conducted any activities other than those incidental to its formation and the matters contemplated by the merger agreement, including the preparation of applicable regulatory filings in connection with the merger. The principal executive offices of Merger Subsidiary are located at 5 Greenway Plaza, Suite 110, Houston, Texas 77046, and its telephone number is (713) 215-7000.

### The Merger

On May 9, 2019, Occidental, Merger Subsidiary and Anadarko entered into the merger agreement, which provides that upon the terms and subject to the conditions set forth therein and in accordance with the DGCL, Merger Subsidiary will merge with and into Anadarko, with Anadarko continuing as the surviving corporation and an indirect wholly owned subsidiary of Occidental.

### Merger Consideration

In the merger, each share of Anadarko common stock that is issued and outstanding immediately prior to the effective time of the merger (other than (i) cancelled shares, (ii) certain shares of Anadarko common stock subject to stock-based awards that will be treated in the manner described under the heading "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards" and (iii) dissenting shares (if any)) will be converted into the right to receive the merger consideration, consisting of $59.00 in cash (as such amount of cash may potentially be adjusted pursuant to the merger agreement as described below, the "per share cash consideration"), without interest, and 0.2934 (as such amount may potentially be adjusted pursuant to the merger agreement as described below, the "exchange ratio") of a validly issued, fully paid and non-assessable share of Occidental common stock (such cash consideration and stock consideration together, as they may potentially be adjusted pursuant to the merger agreement as described below, the "merger consideration"). If the merger would otherwise result in the issuance of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) in excess of 19.99% of the outstanding shares of Occidental common stock immediately prior to the closing of the merger (the "share cap"), (i) the exchange ratio will be reduced by the smallest number (rounded up to the nearest 0.0001) that causes the total number of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) issuable in the merger to not exceed the share cap (the "exchange ratio reduction number") and (ii) the per share cash consideration will be increased by the amount in cash equal to (x) the exchange ratio reduction number multiplied by (y) the Parent Closing Price.

The exchange ratio is otherwise fixed and will not be adjusted to reflect changes in the stock price of either company prior to the closing of the merger. The exchange ratio will, however, be adjusted appropriately to fully

TABLE OF CONTENTS

reflect the effect of any reclassification, recapitalization, stock split or combination, exchange or readjustment of shares, or any stock dividend thereon, with respect to outstanding shares of capital stock of either Occidental or Anadarko with a record date between the date of the merger agreement and the completion of the merger. No fractional shares of Occidental common stock will be issued in connection with the merger. Each holder of Anadarko common stock that otherwise would have been entitled to receive a fractional share of Occidental common stock immediately prior to the effective time of the merger will receive an amount in cash, without interest, rounded to the nearest cent, in lieu of such fractional share. The value of such cash payment will be calculated by the exchange agent and will represent the holder's proportionate interest in a trust of proceeds established from the open-market sale of that number of shares of Occidental common stock equal to the excess of (i) the aggregate number of shares of Occidental common stock delivered to the exchange agent by Occidental pursuant to the terms of the merger agreement over (ii) the aggregate number of whole shares of Occidental common stock distributed to the holders of certificates or book-entry shares previously representing shares of Anadarko common stock pursuant to the merger agreement.

Occidental stockholders will continue to own their existing shares of Occidental common stock, the form of which will not be changed by the transaction.

**Treatment of Anadarko Stock Options and Other Stock-Based Awards**

***Anadarko Stock Options.*** Upon completion of the merger, each outstanding Anadarko stock option will be cancelled and converted into the right to receive a cash amount equal to the product of (i) the excess, if any, of (1) the Option Consideration over (2) the per share exercise price of such Anadarko stock option; and (ii) the aggregate number of shares of Anadarko common stock subject to such Anadarko stock option. Each Anadarko stock option with an exercise price equal to or greater than the Option Consideration will be cancelled and terminated, without any payment in respect thereof.

***Anadarko RSU Awards.*** Upon completion of the merger, each outstanding Anadarko RSU award will convert into an Occidental restricted stock/cash unit award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RSU award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

***Anadarko RS Awards.*** Upon completion of the merger, each outstanding Anadarko RS award will convert into an Occidental restricted stock/cash award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RS award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RS award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RS award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

***Anadarko PU Awards.*** Upon completion of the merger, each outstanding Anadarko PU award will immediately vest and will be cancelled and converted into the right to receive a cash amount equal to the product of (i) 200% of the target number of shares of Anadarko common stock subject to such Anadarko PU award multiplied by (ii) $76.00, less applicable tax withholdings. This amount will be payable on the earliest date that would not result in the imposition of any tax under Section 409A of the Code.

***Anadarko Deferred Share Awards.*** Upon completion of the merger, each outstanding Anadarko deferred share award will be cancelled and converted into the right to receive the merger consideration in respect of each share of Anadarko common stock subject to such Anadarko deferred share award. This amount will be payable

TABLE OF CONTENTS

within five business days following the completion of the merger or, if later, the earliest date that would not result in the imposition of tax under Section 409A of the Code.

For a more complete discussion of the treatment of Anadarko stock options and other Anadarko stock-based awards, see "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards" beginning on page 91.

**Recommendations of the Anadarko Board of Directors**

After careful consideration, the Anadarko Board unanimously recommends that holders of Anadarko common stock vote "**FOR**" the merger proposal.

After careful consideration, the Anadarko Board unanimously recommends that holders of Anadarko common stock vote "**FOR**" the merger-related compensation proposal.

For a more complete description of the Anadarko Board's reasons for the transaction and the recommendation of the Anadarko Board, see "The Merger-Occidental's Rationale for the Transaction" and "The Merger-Recommendations of the Anadarko Board of Directors and Its Reasons for the Transaction" beginning on pages 54 and 55, respectively.

**Opinions of Anadarko's Financial Advisors**

***Opinion of Evercore Group L.L.C.***

Pursuant to an engagement letter dated as of February 15, 2019, Anadarko engaged Evercore Group L.L.C. ("Evercore") to act as its financial advisor in connection with a study of potential strategic alternatives available to Anadarko, including a possible sale of Anadarko. As part of this engagement, Anadarko requested that Evercore evaluate the fairness of the merger consideration, from a financial point of view, to the holders of the shares of Anadarko common stock.

At a meeting of the Anadarko Board held on May 9, 2019, Evercore rendered to the Anadarko Board its oral opinion, subsequently confirmed in writing, that as of May 9, 2019 and based upon and subject to the assumptions, limitations, qualifications and conditions described in Evercore's written opinion, the merger consideration was fair, from a financial point of view, to the holders of Anadarko common stock entitled to receive such merger consideration.

**The full text of the written opinion of Evercore, dated as of May 9, 2019, which sets forth, among other things, the procedures followed, assumptions made, matters considered and qualifications and limitations on the scope of review undertaken in rendering its opinion, is attached as Annex B to this proxy statement/prospectus and is incorporated by reference in its entirety into this proxy statement/prospectus. You are urged to read this opinion carefully and in its entirety. Evercore's opinion was addressed to, and provided for the information and benefit of, the Anadarko Board in connection with their evaluation of the merger. The opinion does not constitute a recommendation to the Anadarko Board or to any other person in respect of the merger, including as to how any holder of shares of Anadarko common stock should vote or act in respect of the merger. Evercore's opinion does not address the relative merits of the merger as compared to other business or financial strategies that might be available to Anadarko, nor does it address the underlying business decision of Anadarko to engage in the merger.**

For further information, see "The Merger-Opinions of Anadarko's Financial Advisors-Opinion of Evercore Group L.L.C." beginning on page 58 and the full text of the written opinion of Evercore attached as Annex B to this proxy statement/prospectus.

***Opinion of Goldman Sachs & Co. LLC***

At a meeting of the Anadarko Board, Goldman Sachs & Co. LLC ("Goldman Sachs") rendered to the Anadarko Board its oral opinion, subsequently confirmed by delivery of a written opinion, dated May 9, 2019, to the Anadarko Board, to the effect that, as of the date of Goldman Sachs' written opinion and based upon and subject to the factors and assumptions set forth in Goldman Sachs' written opinion, the merger consideration to be paid to the holders (other than Occidental, Berkshire Hathaway and their respective affiliates) of shares of Anadarko common stock pursuant to the merger agreement was fair from a financial point of view to such holders.

TABLE OF CONTENTS

**The full text of the written opinion of Goldman Sachs, dated May 9, 2019, which sets forth the assumptions made, procedures followed, matters considered, qualifications and limitations on the review undertaken in connection with the opinion, is attached to this proxy statement/prospectus as Annex C. The summary of Goldman Sachs' opinion contained in this proxy statement/prospectus is qualified in its entirety by reference to the full text of Goldman Sachs' written opinion. Goldman Sachs' advisory services and opinion were provided for the information and assistance of the Anadarko Board in connection with its consideration of the merger and the opinion does not constitute a recommendation as to how any Anadarko stockholder should vote with respect to the merger or any other matter.**

For more information, see "The Merger-Opinions of Anadarko's Financial Advisors-Opinion of Goldman Sachs & Co. LLC" beginning on page 66 and the full text of the written opinion of Goldman Sachs attached as Annex C to this proxy statement/prospectus.

**Interests of Directors and Executive Officers of Anadarko in the Merger**

You should be aware that some of the directors and executive officers of Anadarko have interests in the merger that are different from, or are in addition to, the interests of stockholders generally. These interests include the following:

- Executive officers and directors of Anadarko have arrangements with Anadarko that provide for certain benefits upon completion of the merger and/or if their employment or service is terminated under certain circumstances following the completion of the merger, including (i) in the case of executive officers, severance and accelerated vesting of certain equity awards, and (ii) in the case of non-executive directors, distribution of deferred share awards.
- Executive officers and directors of Anadarko have rights to indemnification, advancement of expenses and directors' and officers' liability insurance that will survive the completion of the merger.

The Anadarko Board was aware of these additional interests of their directors and executive officers and considered these potential interests, among other matters, in evaluating and negotiating the merger agreement and the merger, in approving the merger agreement and in recommending the applicable merger-related proposals.

For a further discussion of the interests of Anadarko's directors and executive officers in the merger, see "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79.

**Material U.S. Federal Income Tax Consequences of the Merger**

The merger will be treated as a taxable transaction for U.S. federal income tax purposes. Therefore, a U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will recognize capital gain or loss equal to the difference between (i) the sum of the cash and the fair market value of any shares of Occidental common stock received by such U.S. holder in the merger and (ii) the U.S. holder's adjusted tax basis in its Anadarko common stock.

Except in certain circumstances described in "The Merger-Material U.S. Federal Income Tax Consequences-The Merger", a Non-U.S. holder (as defined below in the section entitled "The Merger-Material U.S. Federal Income Tax Consequences-General") generally will not be subject to U.S. federal income or withholding tax on any gain recognized on the exchange of Anadarko common stock for any shares of Occidental common stock and cash in the merger.

In certain circumstances, Anadarko stockholders who expect to own an equal or greater percentage interest in Occidental following the merger than their percentage interest in Anadarko prior to the merger, taking into account the application of certain constructive ownership rules, may have tax consequences that differ materially from those described above as a result of the application of Section 304. As described further below under "The Merger-Material U.S. Federal Income Tax Consequences-The Merger-Special Consequences of the Merger to Holders of Anadarko Common Stock That Also Own Occidental Common Stock", such stockholders may be required to include the entire amount of the consideration received as dividend income. Non-U.S. holders may be subject to U.S. federal income and withholding tax on such dividend income. In addition, withholding agents may withhold on consideration payable to all Non-U.S. holders because they may not be able to determine whether any particular Non-U.S. holder is subject to withholding as a result of these rules. Any such stockholders who expect to own an equal or greater percentage interest in Occidental following the merger than their

TABLE OF CONTENTS

percentage interest in Anadarko prior to the merger and all Non-U.S. holders should consult their own tax advisors regarding the application of Section 304 to the merger.

**Please refer to "The Merger-Material U.S. Federal Income Tax Consequences-The Merger" contained in this proxy statement/prospectus for a description of the material U.S. federal income tax consequences of the merger. Determining the actual tax consequences of the merger to you may be complex and will depend on your specific situation. You are urged to consult your tax advisor for a full understanding of the tax consequences of the merger to you.**

**Accounting Treatment of the Merger**

The merger will be accounted for as an acquisition of Anadarko by Occidental under the acquisition method of accounting in accordance with accounting principles generally accepted in the U.S. ("GAAP"). For additional information, see "The Merger-Accounting Treatment of the Merger" beginning on page 88.

**Litigation Relating to the Merger**

On May 30, 2019, Anadarko received a demand letter from counsel to a purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL. On May 9, 2019, Anadarko received a demand letter from counsel to a different purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL.

On May 30, 2019, a complaint was filed in the Court of Chancery of the State of Delaware by purported Occidental stockholders High River Limited Partnership, Icahn Partners Master Fund LP and Icahn Partners LP, seeking inspection of Occidental's books and records pursuant to Section 220 of the DGCL. On June 14, 2019, Occidental filed an answer to the complaint in the Court of Chancery of the State of Delaware.

**Appraisal Rights**

Under Delaware law, if the merger is completed, holders of Anadarko common stock who do not vote in favor of the adoption of the merger agreement and who otherwise comply with the requirements and procedures of Section 262 of the DGCL will be entitled to seek appraisal for, and obtain payment in cash for the judicially determined fair value of, their shares of Anadarko common stock, in lieu of receiving the merger consideration. The "fair value" could be higher or lower than, or the same as, the merger consideration. A copy of the full text of Section 262 of the DGCL is included as Annex D to this proxy statement/prospectus. Anadarko stockholders are encouraged to read Section 262 of the DGCL carefully and in its entirety. Moreover, due to the complexity of the procedures for exercising the right to seek appraisal, Anadarko stockholders who are considering exercising that right are encouraged to seek the advice of legal counsel. Failure to comply with Section 262 of the DGCL may result in loss of the right of appraisal. For a more detailed description of Anadarko stockholder's appraisal rights, see "The Merger-Appraisal Rights" beginning on page 92.

**Regulatory Approvals Required for the Merger**

The merger is subject to the requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), under which Occidental and Anadarko may not complete the merger until notification and report forms are furnished to the Antitrust Division of the U.S. Department of Justice ("DOJ") and the U.S. Federal Trade Commission ("FTC") and the HSR Act waiting period is terminated or expires. On May 23, 2019, Occidental and Anadarko each filed their respective requisite notification and report form under the HSR Act with the DOJ and the FTC. The FTC granted early termination of the applicable waiting period under the HSR Act on June 3, 2019.

**Conditions to Completion of the Merger**

The parties expect to complete the merger after all of the conditions to the merger in the merger agreement are satisfied or waived, including after the merger agreement has been adopted by the stockholders of Anadarko. The parties currently expect to complete the transaction in the second half of 2019. However, it is possible that factors outside of each company's control could require them to complete the transaction at a later time or not to complete it at all.

In addition to the approval of the merger proposal by Anadarko stockholders and the expiration or termination of the applicable waiting period under the HSR Act, each as described above, each party's obligation to complete the merger is also subject to the satisfaction (or, to the extent permitted by law and in accordance with the merger agreement, waiver) of other conditions, including: the effectiveness of the registration statement on Form S-4 of which this proxy statement/prospectus forms a part (and the absence of any stop order by the SEC), approval of the listing on the NYSE of the Occidental common stock to be issued in the merger, the absence of an injunction prohibiting the merger, the accuracy of the representations and warranties of the other party under the merger agreement (subject to the materiality standards set forth in the merger agreement), the performance by the other party of its respective obligations under the merger agreement in all material respects and delivery of an officer's certificate by the other party certifying satisfaction of the two preceding conditions.

Neither Occidental nor Anadarko can be certain when, or if, the conditions to the merger will be satisfied or waived, or that the merger will be completed. For a more complete summary of the conditions that must be satisfied or waived prior to completion of the merger, see "The Merger Agreement-Conditions to Completion of the Merger" beginning on page 120.

**Financing of the Merger and Treatment of Existing Debt**

Occidental's obligation to close the merger is not conditioned on its ability to obtain financing. Occidental and Merger Subsidiary have represented to Anadarko that proceeds from the debt and equity financing described below, together with cash and marketable securities of Occidental, will be sufficient to enable Occidental to pay at the closing of the merger the cash portion of the merger consideration and to consummate the transactions contemplated by the merger agreement. Occidental estimates that the total amount of cash required to complete the transactions contemplated by the merger, including the cash portion of the merger consideration and payment of fees, expenses and other related amounts incurred in connection with the merger, will be approximately $30.3 billion. Occidental expects to finance the cash portion of the merger consideration and these fees, expenses and amounts with the proceeds of debt and equity financing, including proceeds from the Berkshire Hathaway investment described below.

In connection with its entry into the merger agreement, Occidental entered into a second amended and restated debt commitment letter, dated May 9, 2019 (the "debt commitment letter"), with Citigroup Global Markets Inc. ("CGMI"), Bank of America, N.A. ("BofA") and Merrill Lynch, Pierce, Fenner & Smith Incorporated (together with its assignee, BofA Securities, Inc., "BAML"), pursuant to which, subject to the terms and conditions set forth therein, CGMI (on behalf of itself and certain affiliates) and BofA (collectively, the "initial bridge commitment parties") committed to provide a 364-day senior unsecured bridge loan facility in an aggregate principal amount of up to $21.8 billion. Such commitments were reduced by an aggregate principal amount of $8.8 billion, to an aggregate principal amount of $13.0 billion, upon Occidental's entry into the term loan credit agreement described below and will be further reduced to the extent that Occidental obtains certain other long-term debt financing or debt financing commitments, completes certain issuances of equity, equity-linked or hybrid debt-equity securities or completes certain asset sales (subject to customary reinvestment rights), including asset sales pursuant to the Total transaction. On June 3, 2019, Occidental and the initial bridge commitment parties entered into a joinder agreement to the debt commitment letter (the "bridge joinder agreement"), with certain additional commitment parties (the "additional bridge commitment parties"). The bridge joinder agreement amended the debt commitment letter and reallocated the commitments of the initial bridge commitment parties to fund loans under the bridge loan facility among the initial bridge commitment parties and the additional bridge commitment parties (collectively, the "bridge commitment parties"). The bridge commitment parties' obligations to fund the bridge loan facility are subject to several limited conditions as set forth in the debt commitment letter, including, among others, the completion of the merger, the absence of a material adverse effect (as defined in the merger agreement) on Anadarko, the accuracy in all material respects of certain representations and warranties related to Anadarko, as set forth in the merger agreement, and to Occidental, the absence of certain events of default and the delivery of certain financial statements of Occidental and Anadarko.

On June 3, 2019, Occidental entered into an $8.8 billion term loan credit agreement (the "term loan credit agreement") with Citibank, N.A., as agent, and certain financial institutions party thereto, as lenders (the "term loan lenders"), pursuant to which, subject to the terms and conditions set forth therein, the term loan lenders committed to provide (i) a 364-day senior unsecured term loan facility in an aggregate principal amount of up to $4.4 billion and (ii) a two-year senior unsecured term loan facility in an aggregate principal amount of up to

$4.4 billion, for the purposes of financing the merger and paying related fees and expenses. The term loan lenders' obligations to fund term loans under the term loan credit agreement are subject to several limited conditions as set forth in the term loan credit agreement, including, among others, the completion of the merger, the absence of a material adverse effect (as defined in the merger agreement) on Anadarko, the accuracy in all material respects of certain representations and warranties related to Anadarko, as set forth in the merger agreement, and to Occidental, the absence of certain events of default and (to the extent also provided to the lead arrangers under the bridge loan facility) the delivery of certain financial statements of Occidental and Anadarko. The term loan credit agreement contains certain customary covenants and events of default, including a customary negative pledge and a covenant that Occidental will maintain, as of the last day of each fiscal quarter, a ratio not in excess of 0.65 to 1.00 of consolidated debt to total capitalization (as such terms are defined in the term loan credit agreement).

On April 30, 2019, Occidental and Berkshire Hathaway Inc. ("Berkshire Hathaway") entered into a securities purchase agreement, pursuant to which Berkshire Hathaway agreed to purchase newly issued Occidental preferred stock (the "series A preferred stock") and a warrant to purchase Occidental common stock for an aggregate purchase price of $10 billion in cash (the "Berkshire Hathaway investment"). Berkshire Hathaway's purchase of such series A preferred stock and warrant is subject to certain conditions, including completion of the merger.

For more information regarding the financing of the merger, see "The Merger-Financing of the Merger and Treatment of Existing Debt" beginning on page 89.

**Sale of Anadarko Assets to TOTAL S.A.**

In connection with the merger, Occidental and TOTAL S.A. ("Total") entered into a binding memorandum of understanding, dated May 3, 2019, pursuant to which Occidental has agreed to sell to Total all of the assets, liabilities, businesses and operations of Anadarko in Algeria, Ghana, Mozambique and South Africa for $8.8 billion in cash, on a cash-free, debt-free basis (the "Total transaction"). The Total transaction is conditioned on the completion of the merger, the execution and delivery of a definitive purchase agreement, and the receipt of required regulatory approvals, as well as other customary closing conditions.

For more information regarding the Total transaction, see "The Merger-Sale of Anadarko Assets to TOTAL S.A." beginning on page 91.

**No Solicitation**

In the merger agreement, Anadarko has agreed that it and its subsidiaries will not, and that it will direct and use its reasonable best efforts to cause its and its subsidiaries' respective officers, directors, employees, investment bankers, consultants, attorneys, accountants, agents and other representatives not to, directly or indirectly:

- take any action to solicit, initiate or knowingly encourage or facilitate the making of any acquisition proposal (as defined on page 109) or any inquiry with respect to an acquisition proposal;
- engage in discussions or negotiations with any person with respect to an acquisition proposal (except to notify them of the existence of the applicable provisions of the merger agreement);
- disclose any nonpublic information or afford access to properties, books or records to any person that has made, or to Anadarko's knowledge is considering making, an acquisition proposal;
- approve or recommend, propose to approve or recommend, or execute or enter into any agreement relating to an acquisition proposal; or
- propose publicly or agree to do any of the foregoing.

The merger agreement includes customary exceptions such that, prior to obtaining the Anadarko stockholder approval of the merger proposal (the "Anadarko stockholder approval"), Anadarko may furnish information and access, and may engage in discussions and negotiations regarding an acquisition proposal, if (i) the Anadarko Board concludes in good faith, after (x) receipt of the advice of a financial advisor of nationally recognized reputation and outside legal counsel, that such acquisition proposal constitutes or could reasonably be expected to result in a superior proposal (as defined on page 110) and (y) taking into account any revised terms proposed by

Occidental after Occidental is notified of such acquisition proposal pursuant to the terms of the merger agreement, that failure to do so would be reasonably likely to be inconsistent with its fiduciary duties to Anadarko's stockholders under applicable law and (ii) Anadarko receives from the person making such an acquisition proposal an executed confidentiality agreement and complies with certain specified procedures. For a discussion of the limitations on solicitation of acquisition proposals, see "The Merger Agreement-Covenants and Agreements-No Solicitation" beginning on page 108.

**Termination of the Merger Agreement**

*Termination*

The merger agreement may be terminated and the merger may be abandoned at any time prior to the effective time of the merger in any of the following ways:

- By the mutual written consent of Occidental and Anadarko.
- By either Occidental or Anadarko:
  - if the merger has not been completed by February 9, 2020 (or, if the reason for not closing by February 9, 2020 is that the regulatory conditions specified in the merger agreement have not been satisfied by that date or because of an injunction prohibiting completion of the merger, and all other closing conditions of the parties have been satisfied, duly waived or are then capable of being satisfied, May 9, 2020) (such date, as it may be extended, the "end date"), provided that neither Occidental nor Anadarko can terminate the merger agreement due to the occurrence of the end date if its failure to fulfill any obligation under the merger agreement has principally caused or resulted in the failure to complete the merger on or before such end date;
  - if the Anadarko stockholder approval has not been obtained by reason of the failure to obtain the required vote at a duly held meeting of stockholders or at any adjournment thereof;
  - if there is any law or regulation that makes completion of the merger illegal or otherwise prohibited or if any judgment, injunction, order or decree enjoining Occidental or Anadarko from consummating the merger is entered and such judgment, injunction, order or decree becomes final and nonappealable; provided that this right to terminate the merger agreement will not be available to any party whose failure to fulfill any obligation under the covenant to use best efforts has principally caused or resulted in the imposition of such restraint or the failure of such restraint to be resisted, resolved or lifted; or
  - if there has been a breach by the other party of any of its representations, warranties, covenants or agreements contained in the merger agreement, which breach results in the failure to satisfy certain conditions to the obligations of Occidental and Merger Subsidiary (in the case of a breach by Anadarko) or certain conditions to the obligations of Anadarko (in the case of a breach by Occidental) to the merger, and such breach is incapable of being cured or, if capable of being cured, has not been cured within 30 days after written notice thereof to the party alleged to be in breach.
- By Occidental:
  - prior to receipt of the Anadarko stockholder approval, if there has been a change in the Anadarko recommendation (as defined on page 110), whether or not permitted by the terms of the merger agreement (or the Anadarko Board or any committee thereof resolves to effect a change in the Anadarko recommendation).
- By Anadarko:
  - in order to enter into a definitive agreement with respect to a superior proposal, only if Anadarko has complied with the specific procedures and requirements set out in the merger agreement with regard to the superior proposal and has paid the applicable termination fee.

If the merger agreement is terminated as described above, the merger agreement will be void and have no effect, and there will be no liability or obligation on the part of any party, except that:

- certain provisions contained in the merger agreement with respect to the effect of termination, the allocation of costs and expenses and the termination fee will survive the termination of the merger agreement;
- the agreements contained in the confidentiality agreement between Occidental and Anadarko will survive the termination of the merger agreement; and
- no termination will relieve any party of any liability or damages resulting from any material and intentional breach by that party of the merger agreement.

In addition, none of the financing sources (as defined on page 121) will have any liability to Anadarko or any of its affiliates, and neither Anadarko nor any of its affiliates will have any rights or claims against any financing sources, relating to or arising out of the merger agreement, the debt commitment letters, the financing for the transactions contemplated by the merger agreement or otherwise.

*Termination Fees*

The merger agreement further provides that Anadarko will pay or cause to be paid to Occidental a termination fee of $1 billion in connection with a termination of the merger agreement under the following circumstances:

- if Occidental terminates the merger agreement pursuant to a change in the Anadarko recommendation, then Anadarko will pay or cause to be paid $1 billion not later than the date of termination of the merger agreement;
- if (i) the merger agreement is terminated by Anadarko or Occidental pursuant to not having obtained the Anadarko stockholder approval by reason of the failure to obtain the required vote at a duly held meeting of stockholders or any adjournment thereof and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the special meeting, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal (found on page 109) being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination;
- if (i) the merger agreement is terminated by Anadarko or Occidental due to the failure to consummate the merger by the end date and the Anadarko stockholder approval has not been obtained and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the date of such termination, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination;
- if (i) the merger agreement is terminated by Occidental pursuant to a breach by Anadarko of any of its representations, warranties, covenants or agreements, which breach resulted in the failure to satisfy one or more of certain additional conditions to the obligations of Occidental and Merger Subsidiary to the merger, and the Anadarko stockholder approval has not been obtained and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the date of such termination, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination; or
- if the merger agreement is terminated by Anadarko pursuant to its entry into a definitive agreement with respect to a superior proposal, then Anadarko will pay or cause to be paid $1 billion not later than the date of termination of the merger agreement.

TABLE OF CONTENTS

The merger agreement further provides that Occidental will pay or cause to be paid to Anadarko a termination fee of $1 billion if the merger agreement is terminated by Anadarko pursuant to a breach by Occidental of any of its representations, warranties, covenants or agreements, which breach resulted in the failure to satisfy certain conditions to the obligations of Anadarko to the merger. In such circumstances, Occidental will pay or cause to be paid $1 billion within two business days after the date of termination of the merger agreement.

For a more detailed discussion of each party's termination rights and the related termination fee obligations, see "The Merger Agreement-Termination of the Merger Agreement" beginning on page 120.

**Special Meeting**

*Date, Time, Place and Purpose*

The special meeting will be held on August 8, 2019, at 8:00 a.m., local time, at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380. At the special meeting, Anadarko stockholders will be asked to consider and vote on the merger proposal and the merger-related compensation proposal. Completion of the merger is conditioned on the approval of the merger proposal.

*Record Date; Stockholders Entitled to Vote*

Only holders of record of Anadarko common stock at the close of business on July 11, 2019, the record date, will be entitled to notice of, and to vote at, the special meeting or any adjournment or postponement thereof.

At the close of business on July 8, 2019, the most recent practicable date for which such information was available, there were 502,401,622 shares of Anadarko common stock outstanding and entitled to vote at the special meeting. The number of shares of Anadarko common stock outstanding and entitled to vote at the special meeting as of the record date is not expected to be meaningfully different from the number as of July 8, 2019. Each share of Anadarko common stock outstanding on the record date entitles the holder thereof to one vote on each proposal to be considered at the special meeting. Anadarko stockholders may vote in person or by proxy through the internet or by telephone or by a properly executed and delivered proxy card with respect to the special meeting.

A complete list of stockholders entitled to vote at the special meeting will be available for viewing by any Anadarko stockholder during ordinary business hours for a period of ten days before the meeting, for purposes pertaining to the special meeting, at Anadarko's offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, and at the time and place of the special meeting during the full duration of the meeting.

*Quorum; Abstentions and Broker Non-Votes*

A quorum of Anadarko stockholders is necessary for Anadarko to hold the special meeting. The holders of a majority of the outstanding shares of Anadarko common stock entitled to vote at the special meeting must be present in person or represented by proxy in order to constitute a quorum.

If you submit a properly executed proxy card, even if you do not vote for the proposal or vote to "abstain" in respect of the proposal, your shares of Anadarko common stock will be counted for purposes of calculating whether a quorum is present for the transaction of business at the special meeting. Anadarko common stock held in "street name" with respect to which the beneficial owner fails to give voting instructions to the broker, bank or other nominee, and Anadarko common stock with respect to which the beneficial owner otherwise fails to vote, will not be considered present at the special meeting for the purpose of determining the presence of a quorum.

A broker non-vote occurs when a broker, bank or other nominee holding shares for a beneficial owner has not received voting instructions from the beneficial owner and the broker, bank or other nominee does not have discretionary authority to vote the shares. If you hold your shares of Anadarko common stock in street name and do not provide voting instructions to your broker, bank or other nominee, your shares will be considered to be broker non-votes and will not be considered to be present at the special meeting for the purpose of determining the presence of a quorum.

TABLE OF CONTENTS

*Required Vote to Approve the Merger Proposal*

Approval of the merger proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon. Failures to vote, broker non-votes and abstentions will have the same effect as a vote cast "AGAINST" the merger proposal.

*Required Vote to Approve the Merger-Related Compensation Proposal*

Approval of the merger-related compensation proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy at the special meeting and entitled to vote thereon. Failures to vote and broker non-votes will have no effect on the vote for this proposal (assuming a quorum is present); abstentions will have the same effect as a vote cast "AGAINST" the approval of this proposal.

*Voting by Anadarko's Directors and Executive Officers*

At the close of business on July 8, 2019, the most recent practicable date for which such information was available, directors and executive officers of Anadarko and their respective affiliates owned and were entitled to vote 1,163,013 shares of Anadarko common stock, representing less than 1% of the shares of Anadarko common stock outstanding on that date. The number and percentage of shares of Anadarko common stock owned by directors and executive officers of Anadarko and their respective affiliates as of the record date are not expected to be meaningfully different from the number and percentage as of July 8, 2019. Anadarko currently expects its directors and executive officers to vote their shares of Anadarko common stock in favor of each of the proposals to be voted on at the special meeting, but no director or executive officer has entered into any agreement obligating him or her to do so.

**Risk Factors**

You should consider all the information contained in, and incorporated by reference into, this proxy statement/prospectus in deciding how to vote for the proposals presented in the proxy statement/prospectus. In particular, you should consider the factors described under "Risk Factors" beginning on page 32.

TABLE OF CONTENTS

## SELECTED HISTORICAL FINANCIAL DATA

The following selected historical financial information is being provided to assist you in your analysis of the financial aspects of the transaction.

The Occidental annual historical information is derived from the audited consolidated financial statements of Occidental as of and for each of the years in the five-year period ended December 31, 2018. The Occidental data as of and for the three months ended March 31, 2019 and 2018 has been derived from the unaudited interim financial statements of Occidental and, in the opinion of Occidental's management, includes all normal and recurring adjustments that are considered necessary for the fair presentation of the results for those interim periods.

The Anadarko annual historical information is derived from the audited consolidated financial statements of Anadarko as of and for each of the years in the five-year period ended December 31, 2018. The Anadarko data as of and for the three months ended March 31, 2019 and 2018 has been derived from the unaudited interim financial statements of Anadarko and, in the opinion of Anadarko's management, includes all normal and recurring adjustments that are considered necessary for the fair presentation of the results for those interim periods.

The information is only a summary and should be read in conjunction with each company's historical consolidated financial statements and related notes contained in Occidental's and Anadarko's respective Annual Reports on Form 10-K for the year ended December 31, 2018 and Quarterly Reports on Form 10-Q for the quarter ended March 31, 2019, which are incorporated by reference into this proxy statement/prospectus, as well as other information that has been filed with the SEC, including the Form 8-K which Anadarko filed on May 15, 2019 in order to recast the segment information included in Anadarko's Annual Report on Form 10-K for the year ended December 31, 2018, following a change in its reportable segments during the quarter ended March 31, 2019. For information on where you can obtain copies of this information, see "Where You Can Find More Information" beginning on page 167. The historical results included below and elsewhere in this proxy statement/prospectus or incorporated by reference herein are not necessarily indicative of the future performance of Occidental, Anadarko or the combined company after the transaction.

### Occidental Petroleum Corporation(1)

| (in millions, except per-share amounts) | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 | Year Ended December 31, 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|
| | (unaudited) | | | | | | |
| **Results of Operations(2)** | | | | | | | |
| Net sales | $ 4,004 | $ 3,763 | $ 17,824 | $ 12,508 | $ 10,090 | $ 12,480 | $ 19,312 |
| Income (loss) from continuing operations | $ 631 | $ 708 | $ 4,131 | $ 1,311 | $ (1,002 ) | $ (8,146 ) | $ (130 ) |
| Net income (loss) attributable to common stock | $ 631 | $ 708 | $ 4,131 | $ 1,311 | $ (574 ) | $ (7,829 ) | $ 616 |
| Basic earnings (loss) per common share from continuing operations | $ 0.84 | $ 0.92 | $ 5.40 | $ 1.71 | $ (1.31 ) | $ (10.64 ) | $ (0.18 ) |
| Basic earnings (loss) per common share | $ 0.84 | $ 0.92 | $ 5.40 | $ 1.71 | $ (0.75 ) | $ (10.23 ) | $ 0.79 |
| Diluted earnings (loss) per common share | $ 0.84 | $ 0.92 | $ 5.39 | $ 1.70 | $ (0.75 ) | $ (10.23 ) | $ 0.79 |
| **Dividends Per Common Share** | $ 0.78 | $ 0.77 | $ 3.10 | $ 3.06 | $ 3.02 | $ 2.97 | $ 2.88 |
| **Weighted Average Basic Shares Outstanding (millions)** | 749 | 766 | 762 | 765 | 764 | 766 | 781 |

TABLE OF CONTENTS

| | As of March 31, | | As of December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2018 | 2017 | 2016 | 2015 | 2014 |
| **Financial Position**(2) | | | | | | | |
| Total assets | $ 44,380 | $ 42,808 | $ 43,854 | $ 42,026 | $ 43,109 | $ 43,409 | $ 56,237 |
| Long-term debt, net | $ 10,203 | $ 10,309 | $ 10,201 | $ 9,328 | $ 9,819 | $ 6,855 | $ 6,816 |
| Stockholders' equity | $ 21,236 | $ 20,722 | $ 21,330 | $ 20,572 | $ 21,497 | $ 24,350 | $ 34,959 |
| **Market Capitalization**(3) | $ 49,509 | $ 49,745 | $ 45,998 | $ 56,357 | $ 54,437 | $ 51,632 | $ 62,119 |
| **Cash Flow from Continuing Operations** | | | | | | | |
| Operating: | | | | | | | |
| Cash flow from continuing operations | $ 948 | $ 1,009 | $ 7,669 | $ 4,861 | $ 2,520 | $ 3,251 | $ 8,879 |
| Investing: | | | | | | | |
| Capital expenditures | $ (1,259 ) | $ (1,032 ) | $ (4,975 ) | $ (3,599 ) | $ (2,717 ) | $ (5,272 ) | $ (8,930 ) |
| Cash provided (used) by all other investing activities, net | $ (156 ) | $ 61 | $ 1,769 | $ 520 | $ (2,026 ) | $ (148 ) | $ 2,678 |
| Financing: | | | | | | | |
| Cash dividends paid | $ (591 ) | $ (592 ) | $ (2,374 ) | $ (2,346 ) | $ (2,309 ) | $ (2,264 ) | $ (2,210 ) |
| Purchases of treasury stock | $ (237 ) | $ - | $ (1,248 ) | $ (25 ) | $ (22 ) | $ (593 ) | $ (2,500 ) |
| Cash provided by all other financing activities, net | $ 14 | $ 488 | $ 520 | $ 28 | $ 1,529 | $ 1,515 | $ 6,403 |

(1) Consolidated for Occidental and its subsidiaries. The statements of income and cash flows related to California Resources have been treated as discontinued operations for all periods presented. The assets and liabilities of California Resources were removed from Occidental's consolidated balance sheet as of November 30, 2014.

(2) See the MD&A of Occidental's Annual Report on Form 10-K for the year ended December 31, 2018 and the Notes to the Consolidated Financial Statements contained therein for information regarding acquisitions and dispositions, discontinued operations and other items affecting comparability.

(3) Market capitalization is calculated by multiplying the year-end total shares of common stock outstanding, net of shares held as treasury stock, by the year-end closing stock price.

**Anadarko Petroleum Corporation**(1)

| (in millions, except share amounts) | Three Months Ended March 31, 2019 | Three Months Ended March 31, 2018 | Year Ended December 31, 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|
| | (unaudited) | | | | | | |
| Sales Revenues(2): | $ 3,126 | $ 3,026 | $ 13,070 | $ 10,969 | $ 8,447 | $ 9,486 | $ 16,375 |
| Gains (Losses) on Divestitures and Other, net | $ 92 | $ 19 | $ 312 | $ 939 | $ (578 ) | $ (788 ) | $ 2,095 |
| Total Revenues and Other | $ 3,218 | $ 3,045 | $ 13,382 | $ 11,908 | $ 7,869 | $ 8,698 | $ 18,470 |
| Operating Income (Loss) | $ 834 | $ 551 | $ 2,619 | $ (565 ) | $ (2,372 ) | $ (8,743 ) | $ 5,438 |
| Net Income (Loss)(3) | $ 96 | $ 174 | $ 752 | $ (211 ) | $ (2,808 ) | $ (6,812 ) | $ (1,563 ) |
| Net Income (Loss) Attributable to Common Stockholders | $ (15 ) | $ 121 | $ 615 | $ (456 ) | $ (3,071 ) | $ (6,692 ) | $ (1,750 ) |
| Per Common Share (amounts attributable to common stockholders) | | | | | | | |
| Net Income (Loss)-Basic | $ (0.03 ) | $ 0.23 | $ 1.20 | $ (0.85 ) | $ (5.90 ) | $ (13.18 ) | $ (3.47 ) |
| Net Income (Loss)-Diluted | $ (0.03 ) | $ 0.22 | $ 1.20 | $ (0.85 ) | $ (5.90 ) | $ (13.18 ) | $ (3.47 ) |
| Dividends | $ 0.30 | $ 0.25 | $ 1.05 | $ 0.20 | $ 0.20 | $ 1.08 | $ 0.99 |
| Average Number of Common Shares Outstanding-Basic | $ 490 | $ 518 | $ 504 | $ 548 | $ 522 | $ 508 | $ 506 |
| Average Number of Common Shares Outstanding-Diluted | $ 490 | $ 519 | $ 504 | $ 548 | $ 522 | $ 508 | $ 506 |

TABLE OF CONTENTS

| (in millions, except share amounts) | Three Months Ended March 31, 2019 | 2018 | Year Ended December 31, 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|
| | (unaudited) | | | | | | |
| Net Cash Provided by (Used in) Operating Activities(4) | $ 1,129 | $ 1,430 | $ 5,929 | $ 4,009 | $ 3,000 | $ (1,877 ) | $ 8,466 |
| Net Cash Provided by (Used in) Investing Activities | $ (1,528 ) | $ (1,113 ) | $ (5,982 ) | $ (1,030 ) | $ (2,742 ) | $ (4,771 ) | $ (6,472 ) |
| Net Cash Provided by (Used in) Financing Activities | $ 1,129 | $ (1,507 ) | $ (3,177 ) | $ (1,613 ) | $ 2,008 | $ 220 | $ 1,675 |
| Capital Expenditures | $ 1,296 | $ 1,704 | $ 6,185 | $ 5,300 | $ 3,314 | $ 5,888 | $ 9,256 |
| | As of March 31, 2019 | 2018 | As of December 31, 2018 | 2017 | 2016 | 2015 | 2014 |
| Long-term debt-Anadarko(5) | $ 10,695 | $ 11,467 | $ 10,683 | $ 12,054 | $ 12,162 | $ 12,945 | $ 12,595 |
| Long-term debt-Western Midstream Partners, LP and Western Midstream Operating, LP | $ 5,208 | $ 4,176 | $ 4,787 | $ 3,493 | $ 3,119 | $ 2,691 | $ 2,409 |
| Total Stockholders' Equity | $ 8,928 | $ 8,741 | $ 8,496 | $ 10,696 | $ 12,212 | $ 12,819 | $ 19,725 |
| Total Assets | $ 41,993 | $ 41,076 | $ 40,376 | $ 42,086 | $ 45,564 | $ 46,331 | $ 60,879 |

(1) Consolidated for Anadarko and its subsidiaries. Certain amounts for prior years have been reclassified to conform to the current presentation.

(2) 2018 includes impact of adopting ASU 2014-09.

(3) Includes a $1.2 billion one-time deferred tax benefit in 2017 related to Tax Reform Legislation and a $4.4 billion Tronox Incorporated-related contingent loss in 2014.

(4) Includes Tronox Incorporated settlement payment of $5.2 billion in 2015.

(5) Excludes Western Midstream Partners, LP and Western Midstream Operating, LP.

TABLE OF CONTENTS

## SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL DATA

The selected unaudited pro forma condensed combined financial statements (the "selected pro forma financial statements") presented below have been prepared from the respective historical consolidated financial statements of Occidental and Anadarko and have been adjusted to reflect (i) the completion of the merger, (ii) Occidental's incurrence of $21.8 billion of new indebtedness to finance a portion of the cash merger consideration, (iii) the Berkshire Hathaway investment (but excluding the exercise of the warrant issued pursuant to the Berkshire Hathaway investment) and (iv) the Total transaction (collectively, the "transactions"). The selected pro forma financial statements have been prepared as if those transactions had been completed on January 1, 2018, for statement of income purposes, and on March 31, 2019, for balance sheet purposes. The selected pro forma financial statements do not include the realization of cost savings from operating efficiencies, revenue synergies or other integration costs expected to result from the merger.

The selected pro forma financial statements, which are preliminary in nature, have been prepared from, and should be read in conjunction with, (i) the more detailed unaudited pro forma combined financial information and the related notes appearing in the section entitled "Unaudited Pro Forma Condensed Combined Financial Data" beginning on page 132 and (ii) the separate historical consolidated financial statements and related notes of each of Occidental and Anadarko included elsewhere in this proxy statement/prospectus and incorporated by reference herein (see "Where You Can Find More Information" beginning on page 167).

The selected pro forma financial statements are provided for illustrative purposes only and do not purport to represent what the actual consolidated results of operations or consolidated financial position of Occidental would have been had the transactions occurred on the dates assumed, nor are they necessarily indicative of future consolidated results of operations or consolidated financial position.

| (in millions, except per-share amounts) | Three Months Ended March 31, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| **Results of Operations** | | |
| Net sales | $ 6,517 | $ 28,246 |
| Net income attributable to common shareholders | $ 126 | $ 2,824 |
| Basic earnings per common share | $ 0.14 | $ 3.09 |
| Diluted earnings per share | $ 0.14 | $ 3.04 |
| **Weighted Average Basic Shares Outstanding** | 893.3 | 906.2 |
| **Weighted Average Diluted Shares Outstanding** | 899.1 | 921.3 |

| | As of March 31, 2019 |
|---|---|
| **Financial Position** | |
| Total assets | $ 119,218 |
| Long-term debt, net | $ 40,809 |
| Stockholders' equity | $ 37,685 |

TABLE OF CONTENTS

## COMPARATIVE HISTORICAL AND UNAUDITED PRO FORMA COMBINED PER SHARE INFORMATION

The following table sets forth selected historical per share information of Occidental and Anadarko and unaudited pro forma combined consolidated per share information reflecting the transaction between Occidental and Anadarko, under the acquisition method of accounting, including the issuance of 0.2934 of a validly issued, fully paid and non-assessable share of Occidental common stock in exchange for each share of Anadarko common stock. You should read this information in conjunction with (i) the selected historical financial information and the related notes included elsewhere in this proxy statement/prospectus, (ii) the historical financial statements of Occidental and Anadarko and related notes contained in Occidental's and Anadarko's respective Annual Reports on Form 10-K for the year ended December 31, 2018 and Quarterly Reports on Form 10-Q for the quarter ended March 31, 2019, which are incorporated by reference into this proxy statement/prospectus, and (iii) the financial information contained in the "Unaudited Pro Forma Condensed Combined Financial Data" and the related notes thereto beginning on page 132. The historical per share information is derived from audited financial statements of each of Occidental and Anadarko as of and for the year ended December 31, 2018 and their respective unaudited financial statements for the three months ended March 31, 2019.

The unaudited pro forma combined consolidated per share information has been presented for illustrative purposes only and is based on assumptions and estimates considered appropriate by Occidental's management. The pro forma data presented does not represent what the actual results of operations and financial position would have been had the companies actually been combined as of the beginning of the periods presented and is not necessarily indicative of the future consolidated results of operations or financial position of the combined company. For example, the unaudited pro forma combined consolidated per share information does not reflect cost savings or other future financial impacts that may result from the transaction.

Occidental and Anadarko declared and paid dividends during the periods presented. For more information on dividends of Occidental and Anadarko, see "Comparative Per Share Market Price and Dividend Information" beginning on page 27.

| | As of/For the Three Months Ended March 31, 2019 | As of/For the Year Ended December 31, 2018 |
|---|---|---|
| Occidental Historical per Common Share Data: | | |
| Net income-basic | $ 0.84 | $ 5.40 |
| Net income-diluted | $ 0.84 | $ 5.39 |
| Book value(1) | $ 28.39 | $ 28.48 |
| Anadarko Historical per Common Share Data: | | |
| Net income-basic | $ (0.03) | $ 1.20 |
| Net income-diluted | $ (0.03) | $ 1.20 |
| Book value(1) | $ 18.22 | $ 17.34 |
| Unaudited Pro Forma Combined per Occidental Common Share Data: | | |
| Net income-basic | $ 0.14 | $ 3.09 |
| Net income-diluted | $ 0.14 | $ 3.04 |
| Book value(2) | $ 42.14 | N/A |
| Unaudited Pro Forma Combined per Anadarko Equivalent Share Data: | | |
| Net income-basic(3) | $ 0.04 | $ 0.91 |
| Net income-diluted(3) | $ 0.04 | $ 0.89 |
| Book value(2)(3) | $ 12.36 | N/A |

(1) Amount is calculated by dividing stockholders' equity by the number of common shares outstanding as of the end of the applicable period.

(2) Amount is calculated by dividing pro forma stockholders' equity as of March 31, 2019 by the pro forma number of common shares outstanding as of May 2, 2019. Pro forma book value per share as of December 31, 2018, is not meaningful as the estimated pro forma adjustments were calculated as of March 31, 2019.

(3) Amounts calculated by multiplying unaudited pro forma combined per share amounts by the exchange ratio in the merger of 0.2934 of a share of Occidental common stock for each share of Anadarko common stock.

TABLE OF CONTENTS

## COMPARATIVE PER SHARE MARKET PRICE AND DIVIDEND INFORMATION

### Market Prices

On April 11, 2019, the last trading day before Anadarko announced it had entered into a merger agreement with Chevron Corporation, which merger agreement was subsequently terminated by Anadarko, the closing sale price per share of Occidental common stock was $67.18 and the closing sale price per share of Anadarko common stock was $46.80, in each case on the NYSE. On May 3, 2019, the last trading day before the public announcement of Occidental's final proposal to acquire Anadarko, the closing sale price per share of Occidental common stock was $57.95 and the closing sale price per share of Anadarko common stock was $72.72, in each case on the NYSE. On May 8, 2019, the last trading day before the public announcement of the merger, the closing sale price per share of Occidental common stock was $60.21 and the closing sale price per share of Anadarko common stock was $75.86, in each case on the NYSE. On July 8, 2019, the latest practicable date before the date of this proxy statement/prospectus, the closing sale price per share of Occidental common stock was $49.30 and the closing sale price per share of Anadarko common stock was $70.91, in each case on the NYSE. The table below sets forth the equivalent market value per share of Anadarko common stock on April 11, 2019, May 3, 2019, May 8, 2019 and July 8, 2019, as determined by multiplying the closing prices of shares of Occidental common stock on those dates by the exchange ratio of 0.2934 and adding the cash portion of the merger consideration of $59.00 per share, without interest.

| | Occidental Common Stock | Anadarko Common Stock | Implied Per Share Value of Merger Consideration |
|---|---|---|---|
| April 11, 2019 | $ 67.18 | $ 46.80 | $ 78.71 |
| May 3, 2019 | $ 57.95 | $ 72.72 | $ 76.00 |
| May 8, 2019 | $ 60.21 | $ 75.86 | $ 76.67 |
| July 8, 2019 | $ 49.30 | $ 70.91 | $ 73.46 |

The market prices of Occidental common stock and Anadarko common stock have fluctuated since the dates set forth above and will continue to fluctuate from the date of this proxy statement/prospectus to the date of the special meeting and the date the merger is completed and thereafter. No assurance can be given concerning the market prices of Occidental common stock or Anadarko common stock before completion of the merger or Occidental common stock after completion of the merger. The exchange ratio is fixed (except for adjustments in limited circumstances pursuant to the merger agreement as described in the "The Merger Agreement-Merger Consideration-Share Cap Adjustment" beginning on page 102) and will not be adjusted to reflect changes in the stock price of either company prior to the closing of the merger, but the market price of Occidental common stock (and therefore the value of the merger consideration) when received by Anadarko stockholders after the merger is completed will depend on the closing price of Occidental common stock on the day such stockholders receive their shares of Occidental common stock pursuant to the merger agreement. Such market price could be greater than, less than or the same as shown in the table above. Accordingly, Anadarko stockholders are advised to obtain current market quotations for Occidental common stock and Anadarko common stock in deciding whether to vote for adoption of the merger agreement.

### Dividends

Occidental currently pays a quarterly dividend on shares of Occidental common stock and last paid a dividend on April 15, 2019 of $0.78 per share. On May 9, 2019, Occidental announced a dividend of $0.78 per share, to be paid on July 15, 2019 to Occidental stockholders of record as of June 10, 2019. On July 11, 2019, Occidental announced a dividend of $0.79 per share, to be paid on October 15, 2019 to Occidental stockholders of record as of September 10, 2019. Under the terms of the merger agreement, during the period before completion of the merger, Occidental is not permitted to declare, set aside or pay any dividend or other distribution other than its regular cash dividend in the ordinary course of business consistent with past practice, including increases in such dividends consistent with past practice, and in any event will not include any special dividend.

Anadarko currently pays a quarterly dividend on shares of Anadarko common stock and last paid a dividend on March 27, 2019 of $0.30 per share to stockholders of record at the close of business on March 13, 2019. On May 15, 2019, Anadarko announced a dividend of $0.30 per share, which was paid on June 26, 2019 to

Anadarko stockholders of record as of June 12, 2019. Under the terms of the merger agreement, during the period before completion of the merger, Anadarko is not permitted to declare, set aside or pay any dividend or other distribution other than its regular cash dividend in the ordinary course of business consistent with past practice, which, (i) in the case of Anadarko, will not exceed $0.30 per share of Anadarko common stock per fiscal quarter and (ii) in the case of Western Midstream Partners, LP, may include increases to the extent consistent with financial guidance published prior to the date of the merger agreement, and in any case will not include any special dividend.

Furthermore, under the merger agreement, Occidental and Anadarko have agreed to coordinate with each other regarding the declaration and payment of dividends in respect of their common stock and the record dates and payment dates relating thereto, so as to ensure that Anadarko stockholders do not receive two dividends, or fail to receive one dividend, in any quarter with respect to shares of Anadarko common stock and the Occidental common stock that such holders receive in exchange therefor in the merger. Anadarko will ensure that the date on which any quarterly dividend is declared and the record date with respect to any quarterly dividend will be no later than five business days following the one-year anniversary of such dates for the corresponding quarter of the preceding year. In the quarter in which the closing of the merger occurs, if the record date of Occidental's quarterly dividend has been declared and is a date prior to the effective time of the merger, then the quarterly dividend declaration date and record date of Anadarko must occur no later than such date as is necessary to ensure that holders of Anadarko common stock receive a quarterly dividend in accordance with the first sentence of this paragraph.

After completion of the merger, each former Anadarko stockholder who holds shares of Occidental common stock into which shares of Anadarko common stock have been converted in connection with the merger will receive all dividends or other distributions declared and paid on shares of Occidental common stock with a record date on or after the completion of the merger. However, no dividend or other distribution having a record date after completion of the merger will actually be paid with respect to any shares of Occidental common stock into which shares of Anadarko common stock have been converted in connection with the merger until the certificates formerly representing shares of Anadarko common stock have been surrendered or the book-entry shares formerly representing shares of Anadarko common stock have been transferred to the exchange agent in accordance with the merger agreement, at which time any such accrued dividends and other distributions on those shares of Occidental common stock will be paid without interest. Subject to the limitations set forth in the merger agreement described above, any future dividends by Occidental will be made at the discretion of the Occidental Board. Subject to the limitations set forth in the merger agreement described above, any future dividends by Anadarko will be made at the discretion of the Anadarko Board. There can be no assurance that any future dividends will be declared or paid by Occidental or Anadarko or as to the amount or timing of those dividends, if any.

For more details regarding dividends, see "The Merger Agreement-Covenants and Agreements-Conduct of Business-Coordination of Dividends" beginning on page 114.

TABLE OF CONTENTS

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This document contains certain forward-looking statements with respect to the financial condition, results of operations and business of Occidental and Anadarko, the combined businesses of Occidental and Anadarko and certain plans and objectives of Occidental and Anadarko with respect thereto, including statements about the merger and the Total transaction and the expected benefits of the transactions. These statements may be made directly in this proxy statement/prospectus or may be incorporated by reference to other documents and may include statements for the period after completion of the merger. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "anticipate", "target", "expect", "estimate", "intend", "plan", "goal", "believe", "hope", "aim", "continue", "will", "may", "would", "could" or "should" or other words of similar meaning. There are several factors which could cause actual plans and results to differ materially from those expressed or implied in forward-looking statements. Such factors include, but are not limited to, the following:

- the ability of Occidental and Anadarko to consummate the merger, including the ability to receive the required regulatory approvals (and the risk that such approvals may result in the imposition of conditions that could adversely affect the combined company or the expected benefits of the merger) and approval by the Anadarko stockholders and to satisfy the other conditions to the closing of the merger on a timely basis or at all;
- the occurrence of events that may give rise to a right of one or both of the parties to terminate the merger agreement, including under circumstances that might require Anadarko to pay or cause to be paid a termination fee of $1 billion to Occidental or under circumstances that might require Occidental to pay or cause to be paid a termination fee of $1 billion to Anadarko;
- the possibility that the merger is delayed or does not occur;
- Occidental's ability to finance the merger, including completion of any contemplated debt financing or equity investment;
- the possibility that the anticipated benefits from the merger cannot be realized in full or at all or may take longer to realize than expected, including risks associated with achieving expected synergies, cost savings, capital spending reductions and operating efficiencies from the merger;
- negative effects of the announcement of Occidental's proposal to acquire Anadarko or the announcement or completion of the merger on the market price of Occidental's and/or Anadarko's common stock, their respective financial performance and their respective ability to maintain relationships with suppliers and customers;
- the risks related to Anadarko and Occidental being restricted in the operation of their respective businesses while the merger agreement is in effect;
- risks relating to the value of Occidental's shares to be issued in the merger, significant merger costs and/or unknown liabilities;
- risks associated with third-party contracts containing change in control consent requirements and/or other provisions that may be triggered by the merger or the transactions;
- risks associated with merger-related litigation or appraisal proceedings;
- the ability of Occidental and Anadarko, or the combined company, to retain and hire key personnel;
- future levels of capital spending;
- Occidental's indebtedness and other payment obligations, including the substantial indebtedness Occidental expects to incur in connection with the merger and the need to generate sufficient cash flows to service and repay such debt and to pay dividends on the series A preferred stock to be issued pursuant to the Berkshire Hathaway investment;
- Occidental's ability to consummate the Total transaction, including the ability to receive the required regulatory approvals;

TABLE OF CONTENTS

- the timing and scope of future repurchases of Occidental's common stock, which may be suspended at any time due to a variety of factors, including the market price of Occidental's shares, general market conditions, transaction-related restrictions, failure to pay dividends on or make required redemptions of the series A preferred stock and the level of other investing activities and uses of cash, including in connection with the merger;
- changing crude oil, natural gas and NGL prices;
- changing marketing and chemicals margins;
- actions of competitors or regulators;
- advances in the competitiveness of alternate-energy sources or product substitutes;
- the timing of exploration expenses and crude oil liftings;
- technological developments;
- the results of operations and financial condition of the suppliers, vendors, partners and equity affiliates of Occidental, Anadarko or the combined company, particularly during extended periods of low prices for crude oil and natural gas;
- the inability or failure of Occidental's, Anadarko's or the combined company's joint-venture partners to fund their share of operations and development activities;
- the potential failure to achieve expected net production from existing and future crude oil and natural gas development projects;
- potential delays in the development, construction or start-up of planned projects;
- the potential disruption or interruption of the operations of Occidental, Anadarko or the combined company due to natural or human causes beyond such company's control, including crude oil production quotas or other actions that might be imposed by the Organization of Petroleum Exporting Countries;
- changing economic, regulatory and political environments in the various countries in which Occidental, Anadarko or the combined company operates;
- the potential liability for remedial actions or assessments under existing or future environmental regulations and litigation;
- significant operational, investment or product changes required by existing or future environmental statutes and regulations;
- the potential liability resulting from pending or future litigation;
- government-mandated sales, divestitures, recapitalizations, industry-specific taxes, tariffs, sanctions, changes in fiscal terms or restrictions on the scope of company operations;
- foreign currency movements compared with the U.S. dollar; and
- other risk factors as detailed from time to time in Occidental's and Anadarko's reports filed with the SEC, including Occidental's and Anadarko's respective Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and other documents filed with the SEC, including the risks and uncertainties set forth in, or incorporated by reference into, this proxy statement/prospectus in the section entitled "Risk Factors" beginning on page 32. See "Where You Can Find More Information" beginning on page 167.

These forward-looking statements reflect Occidental's and Anadarko's current views with respect to future events and are based on numerous assumptions and assessments made by Occidental and Anadarko in light of their experience and perception of historical trends, current conditions, business strategies, operating environments, future developments and other factors they believe appropriate. By their nature, forward-looking statements involve known and unknown risks and uncertainties because they relate to events and depend on circumstances that will occur in the future. The factors described in the context of such forward-looking statements in this document could cause Occidental's and Anadarko's plans with respect to the merger, actual

TABLE OF CONTENTS

results, performance or achievements, industry results and developments to differ materially from those expressed in or implied by such forward-looking statements. Although it is believed that the expectations reflected in such forward-looking statements are reasonable, no assurance can be given that such expectations will prove to have been correct and persons reading this document are therefore cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this proxy statement/prospectus or, in the case of a document incorporated by reference, as of the date of that document. Neither Occidental nor Anadarko assumes any obligation to update the information contained in this document (whether as a result of new information, future events or otherwise), except as required by applicable law.

TABLE OF CONTENTS

## RISK FACTORS

*In addition to the other information included in and incorporated by reference into this proxy statement/prospectus, including the matters addressed in "Cautionary Note Regarding Forward-Looking Statements" beginning on page 29, Anadarko stockholders should carefully consider the following risk factors before deciding whether to vote for the proposal to adopt the merger agreement. In addition, you should read and consider the risks associated with each of the businesses of Anadarko and Occidental because these risks will relate to the combined company following the completion of the merger. Descriptions of some of these risks can be found in the respective Annual Reports of Occidental and Anadarko on Form 10-K for the fiscal year ended December 31, 2018, as such risks may be updated or supplemented in each company's subsequently filed Quarterly Reports on Form 10-Q or Current Reports on Form 8-K, which are incorporated by reference into this proxy statement/prospectus. You should also consider the other information in this document and the other documents incorporated by reference into this document. See "Where You Can Find More Information" beginning on page 167.*

### Risks Related to the Merger

***The merger is subject to conditions, some or all of which may not be satisfied or completed on a timely basis, if at all. Failure to complete the merger in a timely manner or at all could have material adverse effects on Occidental and Anadarko.***

The completion of the merger is subject to a number of conditions, including, among others, (i) the adoption by Anadarko stockholders of the merger agreement, (ii) the termination or expiration of the waiting period under the HSR Act and (iii) the absence of an injunction prohibiting completion of the merger, which make the completion and timing of the completion of the merger uncertain. For a more detailed discussion regarding conditions to the merger, see "The Merger Agreement-Conditions to Completion of the Merger" beginning on page 120. Also, either Occidental or Anadarko may terminate the merger agreement if the merger has not been consummated by February 9, 2020 (or, if the reason for not closing by February 9, 2020 is that the regulatory conditions specified in the merger agreement have not been satisfied by that date or because of an injunction prohibiting completion of the merger, and all other closing conditions of the parties have been satisfied, duly waived or are then capable of being satisfied, May 9, 2020), except that this right to terminate the merger agreement due to the occurrence of the end date will not be available to any party whose failure to perform any obligation under the merger agreement has principally caused or resulted in the failure of the merger to be consummated on or before that date.

If the merger is not completed, Occidental's and Anadarko's respective ongoing businesses, financial condition, financial results and stock prices may be materially adversely affected and, without realizing any of the benefits of having completed the merger, Occidental and Anadarko will be subject to a number of risks, including the following:

- the market price of Occidental common stock or Anadarko common stock could decline to the extent that the current market price reflects a market assumption that the transaction will be completed;
- each party could owe substantial termination fees to the other party under certain circumstances (see "The Merger Agreement-Termination of the Merger Agreement" beginning on page 120);
- if the merger agreement is terminated and the Occidental Board or the Anadarko Board seeks another business combination, Occidental stockholders and Anadarko stockholders cannot be certain that Occidental or Anadarko will be able to find a party willing to enter into a transaction on terms equivalent to or more attractive than the terms that the other party has agreed to in the merger agreement;
- time and resources committed by Occidental's and Anadarko's respective management to matters relating to the merger could otherwise have been devoted to pursuing other beneficial opportunities for their respective companies;
- Occidental or Anadarko may experience negative reactions from the financial markets or from their respective customers, suppliers or employees; and
- Occidental and Anadarko will be required to pay their respective costs relating to the merger, such as legal, accounting, financial advisory and printing fees, whether or not the merger is completed.

TABLE OF CONTENTS

In addition, if the merger is not completed, Occidental or Anadarko could be subject to litigation related to any failure to complete the merger or related to any enforcement proceeding commenced against Occidental or Anadarko to perform their respective obligations under the merger agreement. The materialization of any of these risks could adversely impact Occidental and Anadarko's respective ongoing businesses, financial condition, financial results and stock price.

Similarly, delays in the completion of the merger could, among other things, result in additional transaction costs, loss of revenue or other negative effects associated with uncertainty about completion of the merger.

***The merger is subject to the requirements of the HSR Act, and regulatory authorities may impose conditions that could have an adverse effect on Anadarko, Occidental or the combined company or that could delay, prevent or increase the costs associated with completion of the merger.***

Before the merger may be completed, any waiting period (or extension thereof) applicable to the merger under the HSR Act must have expired or been terminated. On May 23, 2019, Occidental and Anadarko each filed their respective requisite notification and report form under the HSR Act with the DOJ and the FTC. The FTC granted early termination of the applicable waiting period under the HSR Act on June 3, 2019. Occidental and Anadarko are not currently aware of any material governmental consents, approvals or filings that are required prior to the parties' completion of the transaction other than those under the HSR Act. If additional approvals, consents, clearances or filings are required to complete the transaction, Occidental and Anadarko intend to seek such consents and approvals and make such filings. Regulators may impose conditions, terms, obligations or restrictions in connection with granting approvals or consents for the merger, and such conditions, terms, obligations or restrictions may delay completion of the merger or impose additional material costs on or materially limit the revenues of the combined company following the completion of the merger. There can be no assurance that regulators will choose not to impose such conditions, terms, obligations or restrictions, and, if imposed, such conditions, terms, obligations or restrictions may delay or lead to the abandonment of the merger.

Under the merger agreement, Occidental and Anadarko have agreed to use their respective best efforts to obtain as soon as practicable all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any third party or governmental body, agency, authority or official which are necessary, proper or advisable to consummate the merger, except that Occidental may not be required to undertake, or to request or authorize Anadarko to undertake, any efforts or to take any action if such efforts or action would, or would reasonably be expected to, result in changes or effects which would, individually or in the aggregate, result in, or be reasonably likely to result in, a substantial detriment. As used in this proxy statement/prospectus "substantial detriment" means changes or effects which would, individually or in the aggregate (and after giving effect to any reasonably expected proceeds of any divestiture or sale of assets), result in, or be reasonably likely to result in, a material adverse effect on Anadarko and its subsidiaries, taken as a whole, at or after the effective time of the merger. Any requirement to divest, hold separate or limit the operation of any division, subsidiary, interest, business, product line, asset or property relating to the operations conducted by Occidental and its subsidiaries prior to the effective time of the merger will be deemed to result in a substantial detriment if such action with respect to a comparable amount of assets or businesses of Anadarko and its subsidiaries, taken together with all other such actions taken, would be reasonably likely, in the aggregate, to have a material adverse effect on Anadarko and its subsidiaries, taken as a whole, at or after the effective time of the merger.

For a more detailed description of the regulatory review process under the HSR Act, see "The Merger-Regulatory Approvals Required for the Merger" beginning on page 88.

***The exchange ratio is fixed (except for adjustments in limited circumstances pursuant to the merger agreement) and will not be adjusted in the event of any change in either Occidental's or Anadarko's stock price. As a result, the stock portion of the merger consideration payable to Anadarko's stockholders may be subject to change if Occidental's stock price fluctuates.***

Upon completion of the merger, each share of Anadarko common stock will be converted into the right to receive $59.00 in cash and 0.2934 of a validly issued, fully paid and non-assessable share of Occidental common stock, subject to adjustment only in the event that the merger would otherwise result in the issuance of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) in excess of 19.99% of the outstanding shares of Occidental common stock immediately prior to the closing of the merger. See "The Merger Agreement-Merger Consideration" beginning

on page 102. The exchange ratio will not be adjusted for changes in the market price of either Occidental common stock or Anadarko common stock between the date the merger agreement was signed and completion of the merger. Due to the fixed exchange ratio, fluctuations in the price of Occidental common stock will drive corresponding changes in the value of the stock portion of the merger consideration payable to each Anadarko stockholder. As a result, changes in the price of Occidental common stock prior to the completion of the merger will affect the value of Occidental common stock that Anadarko common stockholders will receive pursuant to the merger.

The price of Occidental common stock has fluctuated during the period between the date the merger agreement was executed and the date of this proxy statement/prospectus, and may continue to change through the date of the special meeting and the date the merger is completed. For example, based on the range of closing prices of Occidental common stock during the period from April 11, 2019, the last trading day before Anadarko announced it had entered into a merger agreement with Chevron Corporation, which merger agreement was subsequently terminated by Anadarko, through July 8, 2019, the latest practicable trading date before the date of this proxy statement/prospectus, the exchange ratio represented a value of the stock portion of the merger consideration ranging from a high of $19.71 to a low of $13.92 for each share of Anadarko common stock. The actual market value of the Occidental common stock received by holders of Anadarko common stock upon completion of the merger may be outside this range.

These variations could result from changes in the business, operations or prospects of Occidental or Anadarko prior to or following the completion of the merger, regulatory considerations, general market and economic conditions and other factors both within and beyond the control of Occidental or Anadarko. At the time of the special meeting, Anadarko stockholders will not know with certainty the value of the shares of Occidental common stock that they will receive upon completion of the merger.

***The merger agreement contains provisions that limit Anadarko's ability to pursue alternatives to the merger, could discourage a potential competing acquiror of Anadarko from making a favorable alternative transaction proposal and, in specified circumstances, could require Anadarko to pay a substantial termination fee to Occidental.***

The merger agreement contains certain provisions that restrict Anadarko's ability to initiate, solicit, knowingly encourage or facilitate or, subject to certain exceptions, engage in discussions or negotiations with respect to, or approve or recommend, any third-party proposal for an alternative transaction. Further, even if the Anadarko Board withdraws or qualifies its recommendation with respect to the adoption of the merger agreement, unless the merger agreement has been terminated in accordance with its terms, Anadarko will still be required to submit each of its merger-related proposals to a vote at the special meeting. In addition, Occidental generally has an opportunity to offer to modify the terms of the transactions contemplated by the merger agreement in response to any third-party alternative transaction proposal before the Anadarko Board may withdraw or qualify its recommendation with respect to the merger-related proposals or otherwise terminate the merger agreement.

In some circumstances, upon termination of the merger agreement, Anadarko will be required to pay a termination fee of $1 billion to Occidental. See "The Merger Agreement-Covenants and Agreements-No Solicitation" beginning on page 108 and "The Merger Agreement-Termination of the Merger Agreement" beginning on page 120.

These provisions could discourage a potential third-party acquiror or merger partner that might have an interest in acquiring all or a significant portion of Anadarko or pursuing an alternative transaction from considering or proposing such a transaction, even if it were prepared to pay consideration with a higher per share cash or market value than the per share cash or market value proposed to be received or realized in the merger. In particular, the termination fee payable by Anadarko, if applicable, is substantial, and could result in a potential third-party acquiror or merger partner proposing to pay a lower price to the Anadarko stockholders than it might otherwise have proposed to pay absent such a fee.

If the merger agreement is terminated and Anadarko determines to seek another business combination, Anadarko may not be able to negotiate a transaction with another party on terms comparable to, or better than, the terms of the merger.

TABLE OF CONTENTS

***Members of the Anadarko Board and management have interests in the merger that are different from, or in addition to, those of other stockholders.***

In considering whether to adopt the merger agreement and approve the transactions contemplated thereby, Anadarko stockholders should recognize that members of management and the Anadarko Board have interests in the merger that differ from, or are in addition to, their interests as stockholders of Anadarko.

The executive officers and directors of Anadarko have arrangements with Anadarko that provide for severance, accelerated vesting of certain rights and other benefits upon completion of the merger and/or if their employment or service is terminated under certain circumstances following the completion of the merger. Executive officers and directors of Anadarko also have rights to indemnification, advancement of expenses and directors' and officers' liability insurance that will survive the completion of the merger. The Anadarko Board was aware of these interests and considered them, among other matters, in approving the merger agreement and making its recommendation that the Anadarko stockholders vote "**FOR**" the merger proposal and "**FOR**" the merger-related compensation proposal.

These interests are further described in "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79.

***Each party is subject to business uncertainties and contractual restrictions while the proposed merger is pending, which could adversely affect each party's business and operations.***

In connection with the pendency of the merger, it is possible that some customers, suppliers and other persons with whom Occidental or Anadarko has a business relationship may delay or defer certain business decisions or might decide to seek to terminate, change or renegotiate their relationships with Occidental or Anadarko, as the case may be, as a result of the merger, which could negatively affect Occidental's or Anadarko's respective revenues, earnings and cash flows, as well as the market price of Occidental common stock or Anadarko common stock, regardless of whether the merger is completed.

Under the terms of the merger agreement, each of Occidental or Anadarko is subject to certain restrictions on the conduct of its business prior to completing the merger, which may adversely affect its ability to execute certain of its business strategies, including the ability in certain cases to enter into or amend contracts, acquire or dispose of assets, incur indebtedness or incur capital expenditures. Such limitations could adversely affect each party's businesses and operations prior to the completion of the merger. See "The Merger Agreement-Covenants and Agreements-Conduct of Business" beginning on page 105.

Each of the risks described above may be exacerbated by delays or other adverse developments with respect to the completion of the merger.

***Uncertainties associated with the merger may cause a loss of management personnel and other key employees, which could adversely affect the future business and operations of the combined company.***

Occidental and Anadarko are dependent on the experience and industry knowledge of their officers and other key employees to execute their business plans. The combined company's success after the completion of the merger will depend in part upon the ability of the combined company to retain key management personnel and other key employees of Occidental and Anadarko. Prior to completion of the merger, current and prospective employees of Occidental and Anadarko may experience uncertainty about their roles within the combined company following the completion of the merger, which may have an adverse effect on the ability of each of Occidental and Anadarko to attract or retain key management and other key personnel. In addition, no assurance can be given that the combined company will be able to attract or retain key management personnel and other key employees of Occidental and Anadarko to the same extent that Occidental and Anadarko have previously been able to attract or retain their own employees.

***Potential litigation against Occidental and Anadarko could result in an injunction preventing the completion of the merger or a judgment resulting in the payment of damages.***

On May 30, 2019, Anadarko received a demand letter from counsel to a purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL. On May 9, 2019, Anadarko received a demand letter from counsel to a different purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL. On May 30, 2019, a

TABLE OF CONTENTS

complaint was filed in the Court of Chancery of the State of Delaware by purported Occidental stockholders High River Limited Partnership, Icahn Partners Master Fund LP and Icahn Partners LP, seeking inspection of Occidental's books and records pursuant to Section 220 of the DGCL. On June 14, 2019, Occidental filed an answer to the complaint in the Court of Chancery of the State of Delaware.

In addition, other stockholders of Occidental or Anadarko may file lawsuits against Occidental, Anadarko and/or the directors and officers of either company in connection with the merger. These lawsuits, including the matters described above, could prevent or delay the completion of the merger and result in significant costs to Anadarko and/or Occidental, including any costs associated with the indemnification of directors and officers. The defense or settlement of any lawsuit or claim, including the matters described above, that remains unresolved at the time the merger is completed may adversely affect Occidental's business, financial condition, results of operations and cash flows.

***Completion of the merger may trigger change in control or other provisions in certain agreements to which Anadarko is a party, which may have an adverse impact on the combined company's business and results of operations.***

The completion of the merger may trigger change in control and other provisions in certain agreements to which Anadarko is a party. If Occidental and Anadarko are unable to negotiate waivers of those provisions, the counterparties may exercise their rights and remedies under the agreements, potentially terminating the agreements or seeking monetary damages. Even if Occidental and Anadarko are able to negotiate waivers, the counterparties may require a fee for such waivers or seek to renegotiate the agreements on terms less favorable to Anadarko or the combined company. Any of the foregoing or similar developments may have an adverse impact on the combined company's business and results of operations.

***The shares of Occidental common stock to be received by Anadarko stockholders upon completion of the merger will have different rights from shares of Anadarko common stock.***

Upon completion of the merger, Anadarko stockholders will no longer be stockholders of Anadarko but will instead become stockholders of Occidental, and their rights as Occidental stockholders will be governed by the terms of Occidental's restated certificate of incorporation and amended and restated by-laws, as amended. The terms of Occidental's restated certificate of incorporation and amended and restated by-laws, as amended, are in some respects materially different than the terms of Anadarko's restated certificate of incorporation and by-laws, which currently govern the rights of Anadarko stockholders. See "Comparison of Rights of Stockholders of Occidental and Anadarko" beginning on page 155 for a discussion of the different rights associated with shares of Anadarko common stock and shares of Occidental common stock.

***The unaudited pro forma condensed combined financial data included in this proxy statement/prospectus are presented for illustrative purposes only and the actual financial condition and results of operations of Occidental following the completion of the merger may differ materially.***

The unaudited pro forma condensed combined financial data contained in this proxy statement/prospectus are presented for illustrative purposes only, are based on various adjustments, assumptions and preliminary estimates and may not be an indication of Occidental's financial condition or results of operations following the merger and the other transactions for several reasons. The actual financial condition and results of operations of Occidental following the completion of the merger may not be consistent with, or evident from, these unaudited pro forma condensed combined financial data. In addition, the assumptions used in preparing the unaudited pro forma financial information may not prove to be accurate, and other factors may affect Occidental's financial condition or results of operations following the transactions. Any potential decline in Occidental's financial condition or results of operations may cause significant variations in the stock price of Occidental. For more information, see "Unaudited Pro Forma Condensed Combined Financial Data" beginning on page 132.

***Occidental's and Anadarko's respective by-laws have been amended to designate the Court of Chancery of the State of Delaware (or in some cases, other state or federal courts in Delaware) as the sole and exclusive forum for certain disputes between each of Occidental and Anadarko and their respective stockholders, which could limit the ability of Occidental stockholders or Anadarko stockholders to choose the judicial forum for certain proceedings relating to Occidental or Anadarko, as applicable.***

Occidental's and Anadarko's respective by-laws provide that, unless Occidental or Anadarko, as applicable, consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or,

if and only if the Court of Chancery of the State of Delaware lacks subject matter jurisdiction, any state court located within the State of Delaware or, if and only if all such state courts lack subject matter jurisdiction, the federal district court for the District of Delaware) will, to the fullest extent permitted by law, be the sole and exclusive forum for:

- any derivative action brought on behalf of Occidental or Anadarko, as applicable;
- any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or stockholder of Occidental or Anadarko as applicable, to Occidental or Anadarko, as applicable, or their respective stockholders;
- any action asserting a claim arising pursuant to, or seeking to enforce any right, obligation or remedy under, the DGCL;
- any action as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware; and
- any action asserting a claim governed by the internal affairs doctrine.

This forum selection by-law may limit the ability of Occidental stockholders or Anadarko stockholders to bring a claim in a judicial forum that it finds favorable or cost-efficient for disputes with Occidental or Anadarko, as applicable, or any of their respective directors, officers or other employees, which may discourage lawsuits with respect to such claims.

**Risks Relating to the Combined Company After Completion of the Merger**

***Occidental may not achieve the intended benefits and the merger may disrupt its current plans or operations.***

There can be no assurance that Occidental will be able to successfully integrate Anadarko's assets or otherwise realize the expected benefits of the potential transaction (including anticipated annual operating cost and capital synergies). Difficulties in integrating Anadarko into Occidental may result in the combined company performing differently than expected, in operational challenges or in the failure to realize anticipated synergies and efficiencies in the expected timeframe or at all. The integration of the two companies may result in material challenges, including the diversion of management's attention from ongoing business concerns; retaining key management and other employees; retaining existing business and operational relationships, including customers, suppliers and employees and other counterparties, and attracting new business and operational relationships; the possibility of faulty assumptions underlying expectations regarding the integration process and associated expenses; consolidating corporate and administrative infrastructures and eliminating duplicative operations; coordinating geographically separate organizations; unanticipated issues in integrating information technology, communications and other systems; as well as unforeseen expenses or delays associated with the acquisition.

***Occidental will incur a substantial amount of indebtedness and other payment obligations in connection with the financing for the merger.***

Occidental expects to fund the cash portion of the consideration by incurring up to $21.8 billion of third-party indebtedness and issuing the series A preferred stock and a warrant to acquire common stock pursuant to the Berkshire Hathaway investment. In addition, Occidental expects to assume approximately $11.9 billion aggregate principal amount of Anadarko's outstanding long-term debt, excluding finance lease liabilities, as well as approximately $7.3 billion aggregate principal amount of Western Midstream Operating, LP's outstanding short- and long-term debt, in the merger. Occidental cannot guarantee that it will be able to generate sufficient cash flow to service and repay this indebtedness or to pay the dividends required to be paid on the series A preferred stock, or that it will be able to refinance such indebtedness on favorable terms, or at all. The failure to so repay or refinance such indebtedness, or to pay dividends on such series A preferred stock, could have a material adverse effect on Occidental's business, financial condition, results of operations, cash flows and/or share price. If Occidental is unable to service such indebtedness and fund its operations, Occidental may be forced to reduce or delay capital expenditures, seek additional capital, sell assets or refinance Occidental's indebtedness. Any such action may not be successful and Occidental may be unable to service such indebtedness and its operations, which could have a material adverse effect on Occidental's business, financial condition, results of operations, cash flows and/or share price. For more information about the financing of the merger, see "The Merger-Financing of the Merger and Treatment of Existing Debt" beginning on page 89.

TABLE OF CONTENTS

***Occidental's significant additional indebtedness following the merger could adversely affect Occidental's financial position and prevent Occidental from fulfilling its obligations with respect to such indebtedness. Any refinancing of this debt could be at significantly higher interest rates. Occidental's substantial indebtedness could lead to adverse consequences. Any resulting downgrades in Occidental's credit ratings could increase the cost of further borrowings or refinancings of Occidental's indebtedness, limit access to sources of financing in the future or lead to other adverse consequences.***

Occidental's increased indebtedness following the completion of the merger could have adverse consequences, including but not limited to:

- increasing its vulnerability to general adverse economic and industry conditions;
- requiring it to dedicate a substantial portion of its cash flow from operations to make debt service payments, thereby reducing the availability of cash flow to fund working capital, capital expenditures, acquisitions and investments and other general corporate purposes;
- limiting its flexibility in planning for, or reacting to, challenges and opportunities, and changes in its businesses and the markets in which it operates;
- limiting its ability to obtain additional financing to fund working capital, capital expenditures, acquisitions and debt service requirements and other financing needs;
- increasing its vulnerability to increases in interest rates in general because a substantial portion of its indebtedness bears, and in the future may bear, interest at floating rates; and
- placing it at a competitive disadvantage to competitors that have less debt.

In addition, although Occidental is expected to maintain an investment grade credit rating, Occidental's increased indebtedness following the completion of the merger could result in a downgrade in the credit rating of Occidental or any indebtedness of Occidental or its subsidiaries. A downgrade in the credit rating of Occidental or any indebtedness of Occidental or its subsidiaries could increase the cost of further borrowings or refinancings of such indebtedness, limit access to sources of financing in the future or lead to other adverse consequences.

The terms of Occidental's indebtedness currently impose, and any additional indebtedness it incurs in the future may impose, significant operating and financial restrictions on it. These restrictions limit Occidental's ability to, among other things, incur additional indebtedness, make investments, pay certain dividends, prepay other indebtedness, sell assets, incur certain liens and enter into agreements with its affiliates, and also restrict Occidental's subsidiaries' ability to pay dividends, merge or consolidate. In addition, certain of Occidental's credit facilities and other financing arrangements require, and following the merger certain agreements governing Anadarko's and its subsidiaries' indebtedness will require, Occidental (or certain of its subsidiaries) to maintain specified financial ratios. A breach of any of these covenants or Occidental's (or such subsidiaries') inability to maintain the required financial ratios could result in a default under the related indebtedness. If a default occurs, the relevant lenders could elect to declare such indebtedness, together with accrued interest and other fees, to be immediately due and payable. These factors could have a material adverse effect on Occidental's business, financial condition, results of operations, cash flows and/or stock price.

***Occidental may not be able to obtain its preferred form of debt financing in connection with the merger on anticipated terms or at all.***

Occidental expects to fund a portion of the cash consideration and the payment of fees and expenses related to the merger using the proceeds of long-term financing, which Occidental currently expects to include borrowings under a new term loan facility and the issuance of debt securities through a public offering or in a private placement, in addition to proceeds from the Berkshire Hathaway investment. However, there is a risk that market conditions will not be conducive to Occidental executing this financing plan with respect to the long-term financing, or that the long-term financing will not be available on favorable terms. As a result, Occidental may need to pursue other options, including borrowings under a bridge loan credit facility, which may result in less favorable financing terms that could increase costs and/or adversely impact the operations of Occidental. For additional information, see "The Merger-Financing of the Merger and Treatment of Existing Debt" beginning on page 89.

TABLE OF CONTENTS

***Occidental may not be able to consummate the sale to Total of the assets, liabilities, businesses and operations of Anadarko in Algeria, Ghana, Mozambique and South Africa or complete its planned divestitures of certain assets on favorable terms or at all.***

The Total transaction is conditioned on the completion of the merger, the execution and delivery of a definitive purchase agreement, and the receipt of required regulatory approvals, as well as other customary closing conditions. Occidental may not be able to consummate the Total transaction on the terms described herein or at all, or obtain the proceeds that could be realized from it, and those cash proceeds may not be adequate to meet any debt service obligations then due. In addition, although Occidental intends to complete $10-15 billion of divestitures of certain assets within 24 months after completion of the merger (including the Total transaction), Occidental may not be able to complete its planned divestitures on favorable terms or at all. Any difficulties with respect to the completion of the Total transaction or other planned divestitures could have a material adverse effect on Occidental's business, financial condition, results of operations, cash flows and/or stock price.

For more information regarding the Total transaction, see "The Merger-Sale of Anadarko Assets to TOTAL S.A." beginning on page 91.

***Anadarko stockholders will have a reduced ownership and voting interest after the merger and will exercise less influence over the policies of the combined company than they now have on the policies of Anadarko.***

Occidental stockholders currently have the right to vote in the election of the Occidental Board and on other matters affecting Occidental. Anadarko stockholders currently have the right to vote in the election of the Anadarko Board and on other matters affecting Anadarko. Immediately after the merger is completed, it is expected that current Occidental stockholders will own approximately 84% of the combined company's common stock outstanding and current Anadarko stockholders will own approximately 16% of the combined company's common stock outstanding, respectively (without giving effect to the exercise of the warrant to be issued pursuant to the Berkshire Hathaway investment).

As a result, current Anadarko stockholders will have less influence on the policies of Occidental than they now have on the policies of Anadarko.

***The market price of the combined company's common stock may be affected by factors different from those affecting the price of Occidental or Anadarko common stock.***

Upon completion of the merger, holders of Occidental common stock and Anadarko common stock will be holders of common stock of Occidental. As the businesses of Occidental and Anadarko are different, the results of operations as well as the price of the combined company's common stock may in the future be affected by factors different from those factors affecting Occidental and Anadarko as independent stand-alone companies. The combined company will face additional risks and uncertainties that Occidental or Anadarko may currently not be exposed to as independent companies.

***The market price of Occidental's common stock may decline as a result of the merger.***

The market price of Occidental common stock may decline as a result of the merger if, among other things, the combined company is unable to achieve the expected benefits of the potential transaction (including anticipated annual operating cost and capital synergies) in connection with the integration of Occidental's and Anadarko's businesses, or if the transaction costs related to the merger are greater than expected. The market price also may decline if the combined company does not achieve the perceived benefits of the transaction as rapidly or to the extent anticipated by financial or industry analysts or if the effect of the merger on the combined company's financial position, results of operations or cash flows is not consistent with the expectations of financial or industry analysts.

The issuance of shares of Occidental common stock in the merger or upon the exercise of the warrant to be issued pursuant to the Berkshire Hathaway investment could on its own have the effect of depressing the market price for Occidental common stock. In addition, many Anadarko stockholders may decide not to hold the shares of Occidental common stock they receive as a result of the merger. Other Anadarko stockholders, such as funds with limitations on their permitted holdings of stock in individual issuers, may be required to sell the shares of Occidental common stock they receive as a result of the merger. Such sales of Occidental common stock may take place shortly following the completion of the merger and could have the effect of depressing the market price for Occidental common stock.

TABLE OF CONTENTS

Additionally, under the terms of the series A preferred stock to be issued pursuant to the Berkshire Hathaway investment, Occidental may elect to pay dividends on the preferred stock in the form of Occidental common stock. If Occidental chooses to do so, it may have an adverse effect on the market price of Occidental common stock.

***The merger may not be accretive, and may be dilutive, to Occidental's cash flow per share and free cash flow per share, which may negatively affect the market price of Occidental common stock.***

Occidental currently expects the merger to be accretive to its cash flow per share (calculated as cash flow from operations before working capital, less distributions attributable to noncontrolling interest, divided by total common diluted shares outstanding) and free cash flow per share (calculated as cash flow from operations before working capital, less distributions attributable to non-controlling interest, capex, preferred dividends and common dividends, divided by total common diluted shares outstanding), within twelve months after the completion of the merger. This expectation, however, is based on preliminary estimates that may materially change. In addition, Occidental could fail to realize all the benefits anticipated in the transaction or experience delays or inefficiencies in realizing such benefits. Such factors could, when combined with the issuance of shares of Occidental common stock in the merger, result in the transaction being dilutive to Occidental's cash flow per share and/or free cash flow per share, which could negatively affect the market price of shares of Occidental common stock.

***Occidental cannot assure you that it will be able to continue paying dividends at the current rate.***

Occidental plans to continue its current dividend practices following the merger. However, based on the number of issued and outstanding shares of Anadarko common stock as of July 8, 2019, the most recent practicable date for which such information was available, Occidental will issue approximately 146,470,009 shares of Occidental common stock in connection with the merger. The number of shares of Anadarko common stock issued and outstanding as of the record date is not expected to be meaningfully different from the number as of July 8, 2019. Continuing Occidental's current dividend practices following the merger will require additional cash to pay such dividends, which it may not have. In addition, the series A preferred stock to be issued pursuant to the Berkshire Hathaway investment will require Occidental to pay substantial dividends following the closing of the merger. So long as any share of the series A preferred stock remains outstanding, Occidental may not declare or pay dividends on Occidental common stock unless all accrued and unpaid dividends on all outstanding shares of series A preferred stock have been, or are contemporaneously, declared and paid in full and Occidental has paid, or will contemporaneously pay, in full any portion of the redemption price required to be paid in respect of the series A preferred stock. See "The Merger-Financing of the Merger and Treatment of Existing Debt-Berkshire Hathaway Investment" beginning on page 90. For these and other reasons generally affecting the ability to pay dividends, stockholders of the combined company may not receive the same dividends following the merger. Stockholders also should be aware that they have no contractual or other legal right to dividends that have not been declared.

**Other Risk Factors of Occidental and Anadarko**

Occidental's and Anadarko's businesses are and will be subject to the risks described above. In addition, Occidental and Anadarko are and will continue to be subject to the risks described in Occidental's and Anadarko's respective Annual Reports on Form 10-K for the fiscal year ended December 31, 2018, as updated by subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, all of which are filed with the SEC and incorporated by reference into this proxy statement/prospectus. For the location of information incorporated by reference into this proxy statement/prospectus, see "Where You Can Find More Information" beginning on page 167.

TABLE OF CONTENTS

## THE MERGER

*The following is a discussion of the transaction and the material terms of the merger agreement between Occidental and Anadarko. You are urged to read the merger agreement carefully and in its entirety. A copy of the merger agreement is attached as Annex A to this proxy statement/prospectus and incorporated by reference herein. This summary does not purport to be complete and may not contain all of the information about the merger that is important to you. This section is not intended to provide you with any factual information about Occidental or Anadarko. Such information can be found elsewhere in this proxy statement/prospectus and in the public filings Occidental and Anadarko make with the SEC that are incorporated by reference into this document, as described in "Where You Can Find More Information" beginning on page 167.*

**Background of the Merger**

The Anadarko Board and Anadarko's management regularly review Anadarko's performance, prospects and strategy in light of current business and economic conditions, as well as developments in the oil and gas exploration and production sector. These regular reviews have, from time-to-time, included evaluation of potential strategic combination and acquisition opportunities.

In July 2017, Ms. Vicki Hollub, President, Chief Executive Officer and a director of Occidental, contacted Mr. Al Walker, at the time Anadarko's Chairman, President and Chief Executive Officer and now its Chairman and Chief Executive Officer, in order to express Occidental's interest in pursuing an acquisition of Anadarko. Mr. Walker indicated to Ms. Hollub that the Anadarko Board would consider any transaction proposal which Occidental might make.

On August 22, 2017, Ms. Hollub and Mr. Walker met to discuss their companies' respective assets in general and the potential synergies that could be realized in a combination of Anadarko and Occidental.

On September 26, 2017, Ms. Hollub called Mr. Walker to again discuss making a proposal to acquire Anadarko. Subsequent to the call, on September 27, 2017, Mr. Walker received an offer letter from Ms. Hollub, in which Occidental expressed an interest in acquiring Anadarko in an all-stock transaction, with an exchange ratio of 0.9500 of a share of Occidental common stock for each share of Anadarko common stock, equivalent to $61.22 per share based on Occidental's last closing price at the time and representing a 23% premium to Anadarko's September 26 closing price of $49.88 per share. The letter also stated that Occidental anticipated maintaining its then-current per share dividend, and undertaking a significant share repurchase, following the closing of the proposed transaction. Shortly following receipt of the letter, Mr. Walker had a discussion with Ms. Hollub, during which Mr. Walker stated that the Anadarko Board would consider Occidental's proposal and requested clarification as to whether the proposal set forth in Ms. Hollub's letter had received the approval of Occidental's board of directors (the "Occidental Board").

On October 5, 2017, Ms. Hollub verbally confirmed to Mr. Walker that the Occidental Board had authorized the proposal described in her September 27 letter. On October 13, 2017, Mr. Walker received a letter from Ms. Hollub affirming Occidental's proposal (including the proposed exchange ratio of 0.9500) and confirming, in response to Mr. Walker's earlier inquiry, that the proposal had been authorized by the Occidental Board. Anadarko's October 13, 2017 closing stock price was $47.79 per share.

On or about October 17, 2017, Mr. Walker discussed with Ms. Hollub his questions regarding, among other matters, the strategic logic of combining Anadarko with Occidental in light of what Anadarko believed to be significant differences in the two companies' asset profiles and strategies.

On November 6, 2017, Ms. Hollub sent Mr. Walker a letter reiterating Occidental's interest in acquiring Anadarko at the previously proposed exchange ratio of 0.9500, and its belief in the merits of the combination. The letter also indicated Occidental's willingness to substitute an unspecified amount of cash for a portion of the stock consideration and proposed that Anadarko enter into a mutual non-disclosure agreement with Occidental in order to facilitate due diligence.

On November 14, 2017, the Anadarko Board had a regularly scheduled meeting at which it discussed Occidental's transaction proposal. Representatives of Anadarko management, Evercore Group L.L.C. ("Evercore"), Anadarko's financial advisor in connection with the Occidental proposal, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), Anadarko's legal advisor in connection with the Occidental proposal, and Winston Strawn LLP ("Winston Strawn"), Anadarko's legal advisor in connection with the evaluation of Occidental's 2014 spin-off of California Resources Corporation (the "2014 Spin-Off"), were in attendance. A representative

TABLE OF CONTENTS

of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors in the context of considering an acquisition proposal, a representative of Evercore discussed financial aspects of Occidental's proposal and a representative of Winston Strawn discussed legal matters in respect of the 2014 Spin-Off. After discussion, the Anadarko Board reached a unanimous conclusion that the combination of two companies with such distinct and disparate strategies as Anadarko and Occidental was unlikely to optimize value for Anadarko's stockholders. Further, the Anadarko Board expressed concern with respect to Occidental's pro forma ability to maintain and increase its dividend, as well as the potential need for Occidental to execute significant asset sales in a difficult market environment in connection with its proposed transaction. Accordingly, the Anadarko Board determined that Anadarko should reject Occidental's proposal and instructed Mr. Walker to convey such rejection to Ms. Hollub, which Mr. Walker did by letter on November 17, 2017. Anadarko's November 14, 2017 closing stock price was $48.05 per share.

On November 21, 2017, Ms. Hollub sent Mr. Walker a letter emphasizing Occidental's belief in the merits of its proposed transaction and expressing disagreement with the concerns underpinning Anadarko's rejection of Occidental's proposal. The letter proposed a meeting between the parties so that Occidental could explain in greater detail Occidental's dividend outlook and its view on potential synergies in the proposed transaction, and Anadarko could explain its views regarding the potential value of Anadarko's Mozambique project and other assets.

On November 30, 2017, Mr. Walker called Ms. Hollub and then sent her a letter reiterating the rationale underlying the Anadarko Board's decision to reject Occidental's proposal, including, among other things, concerns with the proposed operating model, the supportability of the combined company's pro forma dividend policy, and execution and integration challenges in the proposed combination.

On January 19, 2018, Ms. Hollub sent Mr. Walker a letter setting forth a revised proposal for Occidental to acquire Anadarko. The stated purchase price based on Occidental's trading value at that time was $76 per share, representing a 30% premium to Anadarko's January 18 closing price of $58.29 per share, with a proposed mechanism enabling Anadarko's stockholders to elect to receive stock or cash consideration, subject to proration ensuring the aggregate consideration would consist of not more than 50% cash. The letter indicated that Occidental planned to maintain its existing dividend after the closing of the proposed transaction and was open to the principle of board representation at the combined company proportional to ownership of the combined company by the parties' respective pre-transaction stockholders. It also included a request for a meeting with Anadarko's executive team and the Anadarko Board, a request that the parties sign a mutual non-disclosure agreement and a request for a formal response by February 5, 2018.

On February 1, 2018, Mr. Robert G. Gwin, then Anadarko's Executive Vice President, Finance and Chief Financial Officer and now its President, met with Mr. Cedric W. Burgher, Occidental's Senior Vice President and Chief Financial Officer, for a discussion focused on financial considerations relating to Occidental's proposal. Representatives of Evercore and BAML, financial advisor to Occidental, were also in attendance.

On February 4, 2018, Mr. Walker met with Ms. Hollub for a discussion which focused on timing and process considerations and potential next steps.

On February 12, 2018, the Anadarko Board held a regularly scheduled meeting. At the meeting, with representatives of Anadarko management, Evercore and Wachtell Lipton in attendance, the Anadarko Board received an update on the recent discussions with Occidental and considered how Anadarko should respond to Occidental's most recent transaction proposal. The Anadarko Board determined that Anadarko should reject Occidental's proposal and instructed Mr. Walker to convey such rejection and its rationale to Ms. Hollub. Fundamental to the Anadarko Board's decision to reject Occidental's proposal was its confidence in Anadarko's future prospects as a standalone company. Anadarko's February 12, 2018 closing stock price was $57.82 per share.

On February 13, 2018, Mr. Walker sent a letter to Ms. Hollub setting forth Anadarko's rejection of Occidental's revised transaction proposal and summarizing the Anadarko Board's rationale for such rejection, while also conveying the Anadarko Board's belief that the risks it had identified would be mitigated by an all-cash transaction.

TABLE OF CONTENTS

During the balance of 2018, at various industry trade meetings and similar forums, Ms. Hollub informally discussed with Mr. Walker Occidental's continued interest in a combination with Anadarko. During 2018, Anadarko's stock traded in a range of $40.57 to $75.47 per share.

On February 6, 2019, Mr. Michael K. Wirth, Chairman and Chief Executive Officer of Chevron Corporation ("Chevron"), delivered to Mr. Walker a letter dated February 5, 2019 setting forth Chevron's proposal to acquire Anadarko for $64 per share, consisting of 25% cash and 75% Chevron common stock and representing a 31% premium to Anadarko's February 5 closing price of $49.08 per share, with the exchange ratio for the stock portion of the merger consideration to be fixed upon signing of a definitive agreement. Shortly following receipt of the letter, Anadarko management informed the Anadarko Board of Chevron's proposal and reached out to Wachtell Lipton, Vinson & Elkins LLP, Evercore and Goldman Sachs & Co. LLC ("Goldman Sachs") to request that they act as legal advisors and financial advisors, respectively, to Anadarko. Anadarko's February 6, 2019 closing stock price was $45.45 per share.

On February 12, 2019, the Anadarko Board held a regularly scheduled meeting. At the meeting, with representatives of Anadarko management, Evercore, Goldman Sachs and Wachtell Lipton in attendance, the Anadarko Board discussed, among other matters, Chevron's transaction proposal and how Anadarko should respond to it. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors in the context of considering an acquisition proposal. Mr. Walker reviewed Chevron's proposal, and representatives of Evercore and Goldman Sachs provided preliminary views regarding certain financial aspects of the proposal and other potentially interested transaction counterparties (including, among others, Occidental). Following discussion, the Anadarko Board determined that, based on its preliminary analysis of Chevron's proposal, it would be in the best interests of Anadarko's stockholders for Anadarko to further explore a combination with Chevron, and accordingly authorized and instructed management and the advisors to enter into a non-disclosure agreement and commence initial due diligence in order to better understand the merits of a combination. The Anadarko Board also discussed whether it would be in the best interests of Anadarko's stockholders for Anadarko to proactively reach out to other potentially interested transaction counterparties at that time, and elected to defer a final decision on the matter until Anadarko had developed a clearer view regarding the likelihood of a potential transaction with Chevron. Anadarko's February 12, 2019 closing stock price was $42.80 per share.

On February 14, 2019, Messrs. Walker and Wirth had a discussion regarding, among other matters, Anadarko's and Chevron's respective assets and the complementary nature thereof, and Chevron's track record with respect to the integration of acquired companies and major LNG project experience. They also discussed the potential transaction process going forward, subject to achieving mutually acceptable terms and conditions set forth in a merger agreement to be negotiated.

On February 15, 2019, Mr. Gwin and Mr. Jay R. Pryor, Chevron's Vice President of Business Development, had a discussion regarding transaction process, timing, next steps and related matters.

On February 18, 2019, the Anadarko Board held a special telephonic meeting, with representatives of Anadarko management and Wachtell Lipton in attendance, in order to receive an update regarding the recent discussions with Chevron and to discuss next steps.

On February 20, 2019, Anadarko and Chevron entered into a mutual non-disclosure agreement to facilitate due diligence and continued transaction discussions. The non-disclosure agreement included a standstill provision applicable to Chevron that would terminate if Anadarko were to enter into a definitive agreement for a sale or business combination transaction with a third party (a "Fall-Away Provision"). Anadarko's February 20, 2019 closing stock price was $45.16 per share.

On February 28, 2019, representatives of Anadarko's and Chevron's respective management teams had a meeting at which Anadarko management presented an overview of various aspects of Anadarko's business in order to facilitate Chevron's due diligence efforts. Follow-up due diligence sessions involving Anadarko and Chevron management occurred on March 7, March 13 and March 19, 2019, the latter two sessions telephonically.

On March 11, 2019, Chevron sent a draft merger agreement to Anadarko. Among other things, the draft included provisions that would have required Anadarko to present the Chevron transaction to Anadarko's stockholders for their approval even if a third party had proposed an alternative transaction that the Anadarko

TABLE OF CONTENTS

Board determined was a superior proposal ("Force the Vote Provisions"). The Chevron draft also proposed that the fiduciary termination fee payable by Anadarko in certain circumstances, including if the Anadarko Board withdrew its recommendation in favor of the Chevron transaction in response to a superior proposal from a third party, would be equal to 3.5% of Anadarko's equity value implied by the transaction.

On March 18, 2019, Anadarko sent Chevron a revised draft merger agreement that, among other revisions, eliminated the Force the Vote Provisions and proposed a fiduciary termination fee of 2.5% of Anadarko's equity value implied by the transaction. Later on March 18, 2019, Messrs. Gwin and Pryor had a discussion regarding the draft merger agreement and transaction process and timing matters.

On March 19, 2019, Mr. Walker and Ms. Hollub attended the American Petroleum Institute conference, where they discussed, among other matters, Occidental's continued interest in a transaction with Anadarko.

On March 19 and March 20, 2019, Messrs. Walker and Wirth had discussions regarding transaction pricing, process and timing matters, during which Mr. Walker encouraged Mr. Wirth to increase Chevron's proposed purchase price. Mr. Wirth conveyed to Mr. Walker that Chevron would be willing to pursue a transaction with an increased purchase price of $65 per share and the same consideration mix as previously proposed. Anadarko's March 20, 2019 closing stock price was $45.40 per share.

Later on March 20, 2019, the Anadarko Board held a previously scheduled meeting, with representatives of Anadarko management, Evercore, Goldman Sachs and Wachtell Lipton in attendance. The Anadarko Board received an update regarding the discussions with Chevron and had a further discussion regarding whether it would be in the best interests of Anadarko's stockholders for Anadarko to contact other potentially interested parties prior to entering into an agreement with Chevron (assuming such an agreement could be finalized). After discussion, the Anadarko Board determined that it would not be advisable to contact third parties at that time. In reaching this conclusion, the Anadarko Board noted that Anadarko's ability to achieve a transaction with Chevron and to accomplish another significant project that Anadarko was then pursuing could be put at significant risk if the fact that Anadarko was engaged in transaction discussions (whether with Chevron or a third party) became known to the public. In addition, following discussion with its advisors, the Anadarko Board concluded that the fiduciary termination fee that was expected to be included in a merger agreement with Chevron was unlikely to present a material impediment to any credible third party that might wish to make an alternative acquisition proposal following announcement of a transaction with Chevron. The Anadarko Board authorized and instructed Anadarko's management and advisors to continue negotiations with Chevron.

Also on March 20, 2019, Mr. Wirth and Mr. Mitchell W. Ingram, Anadarko's Executive Vice President of International, Deepwater & Exploration, met to discuss the potential transaction.

On March 21, 2019, Messrs. Wirth and Walker discussed the current status of negotiations, including certain terms and provisions on which the parties had not reached agreement. Also on March 21, 2019, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to Chevron, sent Wachtell Lipton a revised draft merger agreement which, among other things, reinstated the Force the Vote Provisions and proposed that Anadarko's fiduciary termination fee would be equal to 3.25% of its equity value implied by the transaction.

Also on March 21, 2019, Ms. Hollub called Mr. Walker to discuss matters related to the American Petroleum Institute and also conveyed Occidental's continued interest in a transaction with Anadarko.

On March 22, 2019, Messrs. Gwin and Pryor had a discussion regarding open points in the draft merger agreement and transaction pricing, process and timing matters. Later that day, representatives of Wachtell Lipton and Paul Weiss had a discussion regarding the merger agreement, and Wachtell Lipton subsequently sent Paul Weiss a revised draft that, among other matters, eliminated the Force the Vote Provisions and left open the amount of Anadarko's fiduciary termination fee.

In the evening of March 22, 2019, Ms. Hollub called Mr. Walker to inform him that Occidental would like to re-engage in discussions regarding a combination of the companies and would be sending Anadarko a letter setting forth a new proposal from Occidental to acquire Anadarko.

On March 23, 2019, Ms. Hollub called Mr. Walker and subsequently sent a letter which proposed an acquisition of Anadarko for consideration consisting of $19 in cash plus 0.8737 of a share of Occidental common stock per share of Anadarko stock, which equated to a total value of $76 per Anadarko share based on

TABLE OF CONTENTS

Occidental's last closing stock price of $65.24 per share. Anadarko's last closing stock price, on March 22, was $43.23 per share. The letter also indicated that the proposed transaction would not be subject to any financing condition, that Occidental was flexible with respect to structuring the transaction, and that the proposal set forth therein had been approved by the Occidental Board.

Also on March 23, 2019, Messrs. Gwin and Pryor had a discussion in which Mr. Gwin informed Mr. Pryor of the proposal that Anadarko had received from Occidental. Mr. Gwin noted that Anadarko's Board and management team intended to evaluate the proposal in accordance with their fiduciary duties, which would necessarily affect the timing of any further negotiations with Chevron.

On March 24, 2019, Messrs. Gwin and Pryor had a follow-up discussion in which Mr. Pryor stated that Chevron had considered the new information, confirmed its proposed purchase price of $65 per share, and would continue to insist on including Force the Vote Provisions in any merger agreement with Anadarko. Mr. Pryor also stated that if a merger agreement between Anadarko and Chevron could not be finalized and executed within a matter of days, Chevron would strongly consider withdrawing its proposal entirely.

Later on March 24, 2019, the Anadarko Board had a special telephonic meeting, with representatives of Anadarko management, Evercore, Goldman Sachs and Wachtell Lipton in attendance. Messrs. Walker and Gwin updated the Anadarko Board on recent developments, including the proposal received from Occidental and discussions with Chevron. The Anadarko Board noted that because of the significant equity component of Occidental's proposed transaction consideration, many of the concerns it had identified in analyzing Occidental's earlier proposals appeared to remain applicable to Occidental's current proposal. The Anadarko Board further noted that the proposal was subject to significant risks and uncertainties not present in the Chevron proposal, including the requirement for approval of (i) the issuance of Occidental common stock and (ii) a charter amendment by Occidental's stockholders, as well as Occidental's need to rely on third-party transaction financing. The Anadarko Board also discussed the risk of permanently losing the opportunity to achieve a transaction with Chevron given Chevron's indication that it would strongly consider withdrawing its proposal if Anadarko was unwilling to sign a merger agreement with Chevron within a matter of days. Having carefully considered these concerns, the Anadarko Board determined that the nominal price offered by Occidental, despite the risks associated with the proposal, could prove to be sufficiently high relative to both Anadarko's current stock price and Chevron's proposed acquisition price that it would be in the best interests of Anadarko's stockholders for Anadarko to explore whether Anadarko and Occidental could achieve a transaction that provided both superior value and sufficient closing certainty to Anadarko's stockholders.

In the evening of March 24, 2019, Messrs. Walker and Wirth had a discussion in which Mr. Wirth confirmed Chevron's unwillingness to raise its proposed purchase price above $65 per share and reiterated Mr. Wirth's view of the potential benefits of Chevron's proposal and that Chevron might withdraw its proposal in light of the Anadarko Board's decision to engage in discussions with Occidental.

On March 25, 2019, Anadarko suspended Chevron's access to the due diligence information included in a virtual data room previously made available to Chevron. On the same day, members of Anadarko senior management had a call with members of Occidental senior management to discuss Occidental's proposal and to confirm that entering into a mutual non-disclosure agreement was the appropriate next step. During that discussion, Mr. Gwin asked Mr. Oscar K. Brown, Occidental's Senior Vice President, Strategy, Business Development and Integrated Supply about the meaning of the reference to structural flexibility that was indicated in Occidental's proposal letter, and the potential use of a collar on the exchange ratio was discussed in that regard. Mr. Gwin noted that the collar would be an important factor in evaluating any potential transaction with Occidental. Later that day, Anadarko sent a proposed form of mutual non-disclosure agreement to Occidental. Anadarko's March 25, 2019 closing stock price was $43.60 per share.

On March 26, 2019, Anadarko and Occidental executed the mutual non-disclosure agreement, which included a standstill provision applicable to Occidental with a Fall-Away Provision.

On March 27, 2019, Anadarko granted Occidental access to due diligence information provided in a virtual data room.

On March 28 and 29, 2019, representatives of Anadarko's and Occidental's respective management teams had meetings at which Anadarko management presented an overview of various aspects of Anadarko's business in order to facilitate Occidental's due diligence efforts.

TABLE OF CONTENTS

On March 30, 2019, Cravath, Swaine & Moore LLP ("Cravath"), counsel to Occidental, sent a draft merger agreement to Wachtell Lipton. The draft provided that closing of the merger would be conditioned upon Occidental's stockholders approving both (i) the issuance of Occidental shares upon closing of the merger pursuant to NYSE rules (which would require the affirmative vote of a majority of the shares voting at a meeting of Occidental stockholders), and (ii) an amendment to Occidental's certificate of incorporation (which would require the approval of a majority of Occidental's outstanding shares) that would increase Occidental's authorized capital stock, which was necessary because Occidental did not have sufficient capital stock authorized to issue the full amount of Occidental common stock contemplated by the proposed transaction (the "Occidental Charter Amendment"). The draft also provided for a fixed exchange ratio with no collar or other value-protection mechanism, did not provide for compensation to Anadarko if either of the Occidental stockholder votes failed absent a change in recommendation by the Occidental Board (an "Acquiror Vote-Down Payment"), and included a mutual fiduciary termination fee equal to 3.95% of Anadarko's equity value implied by the transaction if either party's board, as applicable, elected to withdraw its recommendation in favor of the transaction or elected to terminate the transaction in favor of a superior proposal. The draft also contemplated that Occidental would obtain committed financing and that the closing of the transaction would not be subject to a financing condition.

On April 1, 2019, representatives of Anadarko's and Occidental's respective management teams had meetings at which Anadarko management conducted reverse due diligence on Occidental. The parties agreed to continue the reverse due diligence sessions on April 3, 2019, with a focus on Occidental's strategic rationale for the merger and its communications plans in connection with announcing the potential transaction.

On April 2, 2019, Wachtell Lipton sent a revised draft merger agreement to Cravath. Among other things, the revised draft contemplated a mechanism to protect the value of the stock portion of the merger consideration, noted that the financing-related provisions of the draft would be subject to Anadarko's review of Occidental's commitment letters, and included several provisions which attempted to address the concerns of Anadarko and its advisors regarding the ability of Occidental to successfully close a transaction given the higher stockholder approval threshold associated with the Occidental Charter Amendment. These provisions included an Acquiror Vote-Down Payment equal to 7.5% of Occidental's pre-transaction equity value and a requirement that, if Occidental failed to obtain stockholder approval for the Occidental Charter Amendment, the cash portion of the merger consideration would be increased such that the Occidental Charter Amendment would no longer be necessary to complete the transaction (the "Initial Closing Certainty Proposal"). Both the Initial Closing Certainty Proposal and Anadarko's demand for a value protection mechanism arose from Anadarko's concern that the announcement of the proposed merger with Occidental could result in potentially significant downward pressure on Occidental's stock price relative to Occidental's then-current trading levels, which would in turn reduce the value to be received by Anadarko's stockholders and could make the required Occidental stockholder approvals more challenging to obtain.

On April 3, 2019, at the beginning of what would have been the second day of Anadarko's reverse due diligence sessions with management of Occidental, Ms. Hollub requested a separate discussion with Mr. Gwin in order to express Occidental's strong disagreement with the terms of the draft merger agreement sent the prior day by Wachtell Lipton. Ms. Hollub then cancelled the reverse due diligence session. Mr. Gwin indicated to Ms. Hollub that the terms included in the draft merger agreement delivered by Wachtell Lipton were consistent with Anadarko's focus on delivering a transaction to its stockholders with sufficient value and closing certainty. Mr. Gwin suggested that Occidental instruct Cravath to revise the draft merger agreement in a manner more acceptable to Occidental while addressing Anadarko's concerns.

Later on April 3, 2019, Mr. Walker had a call with Ms. Hollub and recommended that each party's General Counsel and their respective outside legal advisors have a meeting to attempt to explain the parties' respective positions and determine whether the differences on merger agreement terms could be narrowed. Ms. Hollub agreed to facilitate such a discussion.

On April 4, 2019, Cravath sent a revised draft merger agreement to Wachtell Lipton, which, among other things, replaced Anadarko's general reference to the need for a value protection mechanism with a more specific value-protective collar provision (without proposing specific pricing parameters associated therewith), rejected the Initial Closing Certainty Proposal and removed any reference to an Acquiror Vote-Down Payment.

TABLE OF CONTENTS

Later on April 4, 2019, the respective General Counsels of Anadarko and Occidental, along with representatives of Wachtell Lipton and Cravath, had a conference call regarding open points in the draft merger agreement, including the Initial Closing Certainty Proposal and the proposed Acquiror Vote-Down Payment.

On April 5, 2019, Wachtell Lipton sent a revised draft merger agreement to Cravath. Later that day, representatives of Wachtell Lipton and Cravath had a conference call regarding open points in the draft merger agreement. At that time, a number of material terms remained unresolved, including the parameters of a collar mechanism, whether there would be any mechanism to eliminate the need for a closing condition tied to the approval of the Occidental Charter Amendment, and whether there would be any Acquiror Vote-Down Payment. Also on April 5, 2019, representatives of management of Occidental and Anadarko held the due diligence meeting that was originally scheduled for April 3, at which they reviewed a draft of the Occidental investor presentation to be used in connection with the announcement of the proposed merger and discussed Occidental's proposed potential synergies and its views regarding integration issues.

Later on April 5, 2019, in light of Anadarko's perception of a growing risk that negotiations with Occidental would not result in a transaction offering sufficient value protection and closing certainty, Mr. Gwin contacted Mr. Pryor to seek confirmation that Chevron's proposal remained outstanding, as Anadarko had not received an indication that the prior offer had been withdrawn. Mr. Pryor indicated that Chevron's proposal to acquire Anadarko at a purchase price of $65 per share remained outstanding. He also indicated that Chevron was willing to demonstrate some flexibility on key contractual terms, including the Force the Vote Provisions. In addition, Mr. Pryor informed Mr. Gwin that if Anadarko were to enter into a definitive merger agreement with a third party, Chevron would promptly terminate its efforts to acquire Anadarko and would not submit any competing acquisition proposal thereafter.

On April 6, 2019, Messrs. Gwin and Brown, as well as the respective General Counsels of Anadarko and Occidental, met to discuss the terms of the proposed transaction between Anadarko and Occidental. During that meeting, the representatives of Occidental indicated that Occidental continued to object to the Initial Closing Certainty Proposal and that, in their view, there was little risk to Occidental obtaining stockholder approval of the Occidental Charter Amendment. In addition, the representatives of Occidental indicated that (i) Occidental could consider increasing the cash portion of the merger consideration mix in order to mitigate the voting risk, but only at a lower purchase price and (ii) the value-protective collar provision was likewise only acceptable to Occidental at a lower purchase price. Mr. Gwin stated, among other things, that any reduction of the purchase price would be unacceptable and would place the transaction at risk, and further reminded the Occidental representatives that a price protection mechanism had been previously identified by Anadarko management as a key deal term.

Later on April 6, 2019, Mr. Walker communicated to Ms. Hollub that, before they confirmed the meeting they had tentatively scheduled for the next day, Anadarko needed to receive a written response concerning how Occidental intended to address the risk to closing certainty associated with Occidental's need to secure stockholder approval of the Occidental Charter Amendment, given Occidental's objection to the Initial Closing Certainty Proposal as well as to a second proposal Anadarko had made involving the substitution of Occidental participating preferred stock (instead of cash) for Occidental common stock (the "Second Closing Certainty Proposal"). Ms. Hollub and Mr. Walker then exchanged several messages in which Ms. Hollub expressed a desire to meet for in-person negotiations, while Mr. Walker emphasized that a written response from Occidental regarding how it intended to address the closing certainty risk associated with the Occidental Charter Amendment was a significant gating item that needed resolution. Mr. Walker stated that this risk should not be borne by Anadarko's stockholders and indicated his willingness to clear his calendar over the next week to finalize a mutually agreeable transaction as soon as that gating item was satisfactorily addressed. Ms. Hollub attempted to schedule an in-person meeting with Mr. Walker during the following week, but Mr. Walker maintained his position that Anadarko's stated concerns regarding closing certainty would need to be addressed in a satisfactory manner before any such meeting would occur.

Later that day, Wachtell Lipton sent Cravath a term sheet relating to the Second Closing Certainty Proposal. The Second Closing Certainty Proposal contemplated that participating preferred stock with substantially similar rights to Occidental's common stock would be automatically substituted for Occidental common stock to the extent necessary to permit the transaction to close if Occidental failed to obtain stockholder approval of the

TABLE OF CONTENTS

Occidental Charter Amendment. However, on April 7, 2019, Mr. Gwin had a discussion with Mr. Brown, who informed Mr. Gwin that neither the Initial Closing Certainty Proposal nor the Second Closing Certainty Proposal was acceptable to Occidental, and reiterated Occidental's belief that the Occidental stockholder votes presented no meaningful risk to the proposed transaction.

Later on April 7, 2019, Mr. Gwin had a meeting with Mr. Pryor in which Mr. Gwin suggested that Chevron instruct Paul Weiss to provide a response to the draft merger agreement sent by Wachtell Lipton to Paul Weiss on March 22, 2019. Mr. Pryor agreed to instruct Paul Weiss accordingly. Mr. Pryor also indicated that Chevron remained firm at a purchase price of $65 per share. Later that day, Paul Weiss sent a revised draft merger agreement to Wachtell Lipton. The draft identified the Force the Vote Provisions as an item to be discussed, and proposed a fiduciary termination fee of 3.1% of Anadarko's equity value implied by the transaction.

On the morning of April 8, 2019, Cravath sent a revised draft merger agreement to Wachtell Lipton that, among other things, contemplated a taxable transaction, and eliminated the Acquiror Vote-Down Payment. The revised draft also proposed that Anadarko's fiduciary termination fee would be equal to 3.5% of its equity value implied by the transaction, and Occidental's fiduciary termination fee (payable if, among other circumstances, Occidental were to terminate the Anadarko transaction to pursue a transaction in which Occidental would instead be acquired by a third party) would be equal to 3.5% of Occidental's pre-transaction equity value. In addition, Cravath provided a revised draft of the term sheet relating to the Second Closing Certainty Proposal and made associated revisions in the draft merger agreement, while noting that such revisions should not be construed as acceptance of the Second Closing Certainty Proposal.

In the late afternoon of April 8, 2019, Ms. Hollub emailed a letter to Mr. Walker which stated that its purpose was to provide Anadarko with a revised proposal to address some of Anadarko's concerns with regard to deal certainty and price protection. The revised proposal reduced the proposed transaction consideration to $72.00 per share and stated that the merger consideration would consist of 40% cash and 60% Occidental common stock, which would eliminate the need for the approval of the Occidental Charter Amendment but would maintain the requirement under NYSE rules for a stockholder vote to approve the issuance of shares of Occidental common stock in connection with the proposed transaction. Anadarko's April 5 closing price was $47.01 per share. The revised Occidental proposal also stated there would be no collar. Mr. Walker indicated by return email that he would share the revised proposal with the Anadarko Board.

On April 9, 2019, Messrs. Gwin and Pryor and other representatives of Anadarko and Chevron, joined telephonically by representatives of Wachtell Lipton and Paul Weiss, met to discuss the remaining open points in the parties' draft merger agreement. Subsequently, Wachtell Lipton sent a revised draft of the merger agreement to Paul Weiss reflecting the parties' discussion at the meeting, including the removal of the Force the Vote Provisions and reflecting an Anadarko fiduciary termination fee of $1 billion, equivalent to approximately 3.0% of Anadarko's equity value implied by the transaction.

Later on April 9, 2019, Messrs. Gwin and Pryor had another meeting at which Mr. Gwin proposed that Chevron increase its proposed purchase price. Mr. Pryor indicated that he would provide a response to Mr. Gwin by the next day.

On April 10, 2019, Mr. Pryor informed Mr. Gwin that Chevron's proposed purchase price would not be increased above $65 per share.

Also on April 10, 2019, the Anadarko Board had a special telephonic meeting, with representatives of Anadarko management, Evercore, Goldman Sachs and Wachtell Lipton in attendance. Messrs. Walker and Gwin updated the Anadarko Board on the current status of discussions with each of Chevron and Occidental. Representatives of Wachtell Lipton discussed legal matters, including the fiduciary duties of directors in the context of considering the proposed transactions. Representatives of Wachtell Lipton also reviewed the terms of the draft merger agreements with each of Chevron and Occidental. Representatives of Evercore and Goldman Sachs reviewed their respective preliminary financial analyses of the proposed transactions. After discussion, the Anadarko Board unanimously determined that Anadarko's management and advisors should focus their efforts on bringing the Chevron transaction to fruition in light of its strategic benefits (including, among others, the complementary nature of the two companies' asset portfolios), long-term value to Anadarko's stockholders and certainty of consummation, each of which the Anadarko Board viewed as comparing favorably to Occidental's most recent proposal.

TABLE OF CONTENTS

On the morning of April 11, 2019, Ms. Hollub continued to seek to speak to Mr. Walker regarding the outstanding issues and indicated Occidental's belief that the parties could sign the merger agreement expeditiously and potentially as soon as that night. Mr. Walker decided not to negotiate with Ms. Hollub at this time in light of Occidental's significant reduction in its proposed purchase price on April 8 and the Anadarko Board's determination the previous day that Anadarko's management and advisors should focus their efforts on bringing to fruition the Chevron transaction. Later that morning, Ms. Hollub sent a brief email to Mr. Walker (followed by a voicemail) to the effect that, based on a thorough review of Occidental's share count and that of Anadarko, Occidental was prepared to increase its offer back to $76 per share consisting of not less than 40% cash, and offer seats on the Occidental Board to Mr. Walker and two other Anadarko directors. Ms. Hollub also stated a desire to address the other unresolved issues and sign a merger agreement no later than Sunday, April 14, 2019 in advance of a transaction announcement on Monday, April 15, 2019. Mr. Walker acknowledged receipt of Ms. Hollub's email and indicated that he would share it with the Anadarko Board.

On April 11, 2019, substantially concurrently with Mr. Walker's receipt of the email from Ms. Hollub, the Anadarko Board met telephonically, together with members of Anadarko management and representatives of Evercore, Goldman Sachs and Wachtell Lipton. Prior to the meeting, Evercore and Goldman Sachs delivered disclosure letters regarding certain relationships with Anadarko, Chevron and Occidental. Mr. Walker reported on the contents of Ms. Hollub's email, and a lengthy discussion ensued. In determining the appropriate next steps for Anadarko, the directors considered, among other things, the following factors:

- the Anadarko Board's concerns regarding whether it would be able to reach an agreement with Occidental offering Anadarko's stockholders both superior value and sufficient closing certainty in light of (i) the stockholder vote which Occidental's proposed transaction (unlike the Chevron transaction) would require, (ii) Occidental's significant reduction in its proposed purchase price on April 8 and (iii) the absence of any collar provision in Occidental's most recent proposal, which was an important term to Anadarko;
- in analyzing the short-term value of the revised Occidental proposal, Anadarko believed, after discussion with its financial advisors, that Occidental's stock price could encounter negative pressure upon announcement of the transaction and that, although this potential negative reaction would be partially mitigated by the increase in the cash portion of the merger consideration contemplated by Occidental's revised proposal, it would be exacerbated by the higher financial leverage and increased need to sell assets to retire debt which would result from such increase;
- the Anadarko Board's view that Chevron's stock represented an attractive currency that would benefit in both the near and longer term from Chevron's financial strength and the compelling strategic rationale of the combination of Anadarko and Chevron;
- the draft merger agreement with Chevron and related documents were in substantially final form and reflected more favorable terms relating to closing certainty than the draft transaction documents then proposed by Occidental, Occidental had not yet provided draft financing commitment documentation and Anadarko's advisors estimated that it could take several days to resolve the remaining open issues in the Occidental documents;
- the Anadarko Board's perception that the combination of Chevron and Anadarko had certain strategic advantages relative to a combination with Occidental, including (i) Chevron's significant experience and expertise in operating offshore assets and LNG projects, (ii) Chevron's relatively low pro forma financial leverage post-transaction which would provide the combined company with a lower cost of capital and (iii) Chevron's lesser need for post-transaction asset sales;
- the fact that Chevron's proposed transaction was intended to qualify for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code, whereas Occidental was proposing a fully taxable transaction;
- the email from Ms. Hollub on April 11, 2019 which said Occidental was reversing Occidental's April 8 purchase price reduction did not state whether such reversal had been approved by Occidental's Board;
- the risk that continued discussions with Occidental could result in permanently losing the opportunity to achieve a transaction with Chevron, which had stated that it would not pursue a competing

TABLE OF CONTENTS

acquisition proposal if Anadarko were to enter into a definitive agreement with a third party. In this regard, because Anadarko believed that it would not be able to finalize a transaction with Occidental as promptly as a transaction with Chevron, which was on schedule to be executed later that day, the Anadarko Board was concerned that:

  - a transaction with Chevron on the terms which had been negotiated would cease to be available if Anadarko sought to suspend its negotiations with Chevron for a second time to further explore the proposals from Occidental; and
  - in view of Occidental's April 8 purchase price reduction, if Occidental were to perceive that it did not face meaningful competition for the acquisition of Anadarko, the terms of a transaction with Occidental offering superior value and sufficient closing certainty might not be achievable and in that event Anadarko's options could be considerably less appealing than the options that were previously available;

- the Anadarko Board's belief that (i) based on each company's conduct and previous statements, if Anadarko were to enter into a transaction with Occidental, Chevron would terminate its efforts to acquire Anadarko, whereas if Anadarko entered into a transaction with Chevron, there was a substantial likelihood that Occidental would continue its pursuit of Anadarko and (ii) were such a sequence of events to occur, Anadarko's stockholders would benefit significantly; and
- the fact that Chevron was prepared to agree to a merger agreement without Force the Vote Provisions and with a fiduciary termination fee of 3.0% of Anadarko's equity value implied by the transaction, equivalent to approximately $2 per Anadarko share, which the Anadarko Board did not believe would meaningfully discourage Occidental or any other credible third party from making an alternative proposal after the announcement of a transaction with Chevron should they be willing and able to do so.

Following discussion, representatives of Evercore and Goldman Sachs reviewed with the Anadarko Board their respective financial analyses. The Anadarko Board then formed an ad hoc committee that would meet later that day, following finalization of the exchange ratio based on the day's closing stock prices, to receive the respective oral opinions of the financial advisors described below (which committee, like the ad hoc committee subsequently created by the Anadarko Board on May 6, 2019, was formed solely for administrative convenience and did not conduct any substantive deliberations regarding the proposed transactions with Chevron or Occidental; rather, all substantive board-level discussions were held by the Anadarko Board as a whole or in executive session, an opportunity for which was provided at each meeting of the Anadarko Board in accordance with its customary practice). After carefully considering the proposed terms of the transaction with Chevron, and taking into consideration the matters discussed during that meeting and prior meetings of the Anadarko Board, the Anadarko Board unanimously (i) determined the Chevron merger agreement and the transactions contemplated thereby, including the merger with Chevron, were fair to and in the best interests of Anadarko stockholders, (ii) approved and declared advisable the Chevron merger agreement and the transactions contemplated thereby (including the merger with Chevron), (iii) directed that the adoption of the Chevron merger agreement be submitted to a vote at a meeting of the Anadarko stockholders and (iv) resolved (subject to certain exceptions set forth in the merger agreement) to recommend the adoption of the Chevron merger agreement by the Anadarko stockholders. Also on April 11, 2019 in connection with the approval of the Chevron transaction, the Compensation and Benefits Committee of the Anadarko Board reviewed and approved compensation-related actions including certain changes to the bonus, severance and other compensation arrangements of Anadarko's officers and the treatment of Anadarko PU awards as described on the Current Report on Form 8-K filed by Anadarko on April 17, 2019. Later that day, following finalization of the exchange ratio based on Anadarko's and Chevron's respective closing stock prices, representatives of each of Evercore and Goldman Sachs rendered their respective oral opinions, subsequently confirmed by delivery of their respective written opinions dated April 11, 2019, to the Anadarko Board, to the effect that, as of such date and based upon and subject to the assumptions made, procedures followed, factors considered and limitations and qualifications on the review undertaken described in each financial advisor's written opinion, the merger consideration in the Chevron transaction was fair, from a financial point of view, to holders of Anadarko common stock. Anadarko's April 11, 2019 closing stock price was $46.80 per share.

TABLE OF CONTENTS

Following the Anadarko Board meeting, representatives of Wachtell Lipton and Anadarko management worked throughout the afternoon and early evening of April 11th with representatives of Paul Weiss and Chevron management to finalize the merger agreement.

In the evening of April 11th, Cravath sent a revised draft merger agreement to Wachtell Lipton. In addition, Ms. Hollub indicated to Mr. Walker Occidental's belief that the parties could sign the merger agreement as soon as that night. However, in Anadarko's view, there was a meaningful risk that the Occidental transaction would require additional time to be finalized given the material issues that remained open between the parties at that time, including the fact that the parties had not exchanged draft disclosure schedules associated with the draft merger agreement. Ms. Hollub's communications did not alleviate the concerns which the Anadarko Board had articulated at its meeting earlier that day regarding the relative risks and benefits of continuing to explore Occidental's latest proposal versus entering into a definitive agreement with Chevron at that time.

In the evening of April 11th, Anadarko and Chevron executed the Chevron merger agreement.

On April 12, 2019, Chevron and Anadarko issued a press release announcing execution of the Chevron merger agreement.

On April 24, 2019, Occidental publicly announced that it had delivered a letter to the Anadarko Board setting forth the terms of a revised proposal to acquire Anadarko for $76 per share (based on Occidental's last closing price of $62.36 per share), consisting of $38 in cash and 0.6094 of a share of Occidental common stock per share of Anadarko common stock (the "April 24 Occidental Proposal"), and representing a 19% premium to Anadarko's April 23 closing price of $63.99 per share and a 20% premium to implied value of the merger consideration under the Chevron merger agreement as of April 23. On that same day, Ms. Hollub sent the proposal letter to Ms. H. Paulett Eberhart, Anadarko's Lead Director, and Mr. Walker. The letter outlined Occidental's strategic and financial rationale for the proposal including, among other reasons, the potential to generate significant cost and capital synergies, attractive organic growth and a stable, sustainable and growing dividend. Also on that day, Cravath sent Wachtell Lipton a draft merger agreement and Occidental's financing commitment documents supporting its proposal. As required by the merger agreement with Chevron, Anadarko informed Chevron of receipt of the April 24 Occidental Proposal and provided Chevron with copies of associated documents. Anadarko also issued a press release confirming receipt of the April 24 Occidental Proposal and stating that the Anadarko Board would carefully review it to determine the course of action that it believed was in the best interest of Anadarko's stockholders.

On April 25, 2019, the Anadarko Board met telephonically, together with members of Anadarko management and representatives of Evercore, Goldman Sachs and Wachtell Lipton. Mr. Walker updated the other directors on recent developments and provided an overview of the April 24 Occidental Proposal. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors in the context of considering the proposal and applicable provisions of the merger agreement with Chevron. Representatives of Evercore and Goldman Sachs provided preliminary analyses regarding financial aspects of the proposal. Following discussion, the directors concluded that the April 24 Occidental Proposal was superior to Occidental's prior proposals in a number of material respects, including, among others:

- the substantially higher amount of cash consideration, which obviated the need for the Occidental Charter Amendment vote;
- the fact that the equity portion of the merger consideration was priced based on an Occidental trading value of $62.36, nearly 10% lower than the Occidental trading prices on which its earlier proposals had been based; and
- the fact that Occidental had provided its financing commitment documents.

The Anadarko Board further determined that, in the absence of Chevron materially increasing the purchase price contemplated by the existing Chevron merger agreement, it would be in the best interests of Anadarko's stockholders for Anadarko to pursue discussions with Occidental regarding the April 24 Occidental Proposal. In that regard, the directors also concluded that in the first instance Anadarko should request a waiver by Chevron of certain provisions of the Chevron merger agreement to enable Anadarko to pursue negotiations with Occidental without the need for the Anadarko Board to make the formal threshold determinations that otherwise would be required under the Chevron merger agreement (a "Limited Non-Solicit Waiver").

TABLE OF CONTENTS

On April 26, 2019, Mr. Gwin spoke with Mr. Pryor regarding recent developments and to raise the possibility of a Limited Non-Solicit Waiver. Mr. Pryor indicated that Chevron was potentially amenable to granting such a waiver with respect to discussions between Anadarko and Occidental, but the matter would require further consideration.

On April 27, 2019, Messrs. Walker and Wirth had a meeting to discuss recent developments and potential next steps. Mr. Wirth indicated to Mr. Walker that he was discussing with other members of the Chevron board and management team the possibility of providing Anadarko with a Limited Non-Solicit Waiver, as well as potential revisions to the terms of the Chevron/Anadarko merger. Mr. Wirth advised that he would follow up with Mr. Walker following conclusion of these internal discussions. On the same day, Messrs. Gwin and Pryor had a meeting to similar effect.

On April 28, 2019, Messrs. Walker and Wirth had a call to further discuss recent developments and potential next steps, including the possibility of a Limited Non-Solicit Waiver. Mr. Wirth informed Mr. Walker that Chevron would not provide such a waiver. On the same day, Messrs. Gwin and Pryor had a call to similar effect.

Later on April 28, 2019, the Anadarko Board met telephonically, together with members of Anadarko management and representatives of Evercore, Goldman Sachs and Wachtell Lipton. Messrs. Walker and Gwin updated the Anadarko Board on recent developments and their discussions with Messrs. Wirth and Pryor, respectively. Representatives of Evercore and Goldman Sachs reviewed with the Anadarko Board their respective preliminary financial analyses regarding the April 24 Occidental Proposal and the pending transaction with Chevron. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors under the circumstances and applicable provisions of the merger agreement with Chevron. Following discussion, the Anadarko Board determined that (i) the April 24 Occidental Proposal could reasonably be expected to result in a Superior Proposal (as defined in the Chevron merger agreement) and (ii) failure to engage with Occidental with respect to the April 24 Occidental Proposal would be reasonably likely to be inconsistent with the Anadarko Board’s fiduciary duties to Anadarko’s stockholders under applicable law. Accordingly, the Anadarko Board authorized and instructed Anadarko’s management and advisors to resume negotiations with Occidental after notifying Chevron of Anadarko’s intention to do so. Following the meeting, Mr. Walker called Mr. Wirth in order to update him regarding the Anadarko Board’s determinations and Anadarko formally notified Chevron of Anadarko’s intention to engage in negotiations with Occidental.

On April 29, 2019, Anadarko publicly announced its intention to resume negotiations with Occidental, after which Wachtell Lipton sent a revised draft merger agreement and comments on Occidental’s debt commitment letter to Cravath, and Anadarko’s General Counsel sent these same documents as well as a due diligence request list to Occidental’s General Counsel. Anadarko’s April 29, 2019 closing stock price was $72.93 per share.

On April 30, 2019, Occidental announced that Berkshire Hathaway, Inc. (“Berkshire Hathaway”) had committed to invest $10 billion in Occidental, in exchange for 100,000 shares of series A preferred stock and a warrant to purchase 80 million shares of Occidental common stock, contingent upon Occidental entering into and completing its proposed acquisition of Anadarko. See “-Financing of the Merger and Treatment of Existing Debt-Berkshire Hathaway Investment” beginning on page 90.

On April 30, 2019 and May 1, 2019, respectively, an independent member of the Occidental Board and the Independent Chairman of Occidental each contacted Anadarko’s Lead Director, who in each case indicated that Mr. Walker, as Chairman of Anadarko, was the appropriate contact point and would be happy to speak with them.

Also on May 1, 2019, representatives of Anadarko’s and Occidental’s respective senior management teams had a conference call in order to exchange due diligence information.

On May 2, 2019, Wachtell Lipton and Cravath had a conference call regarding the draft merger agreement.

Later on May 2, 2019, Cravath sent an email to Wachtell Lipton, which Occidental’s General Counsel subsequently forwarded to Anadarko’s General Counsel, stating that Occidental was working toward providing Anadarko with a comprehensive revised proposal responding to all issues raised by Anadarko with respect to the draft transaction documents and reflecting other changes that would make Occidental’s transaction even more favorable to Anadarko’s stockholders than the April 24 Occidental Proposal. Also on May 2, 2019, Wachtell

TABLE OF CONTENTS

Lipton contacted Cravath to confirm that the Anadarko Board would deliberate on the revised proposal once it had been received and to communicate that the revised proposal should include certain provisions with respect to the number of seats on the Occidental Board to be filled with Anadarko directors and certain broad-based employee benefits matters.

On May 3, 2019, representatives of Anadarko and Occidental senior management as well as Wachtell Lipton and Cravath had a conference call to discuss Anadarko's draft disclosure schedules associated with the merger agreement and due diligence matters.

Also on May 3, 2019, Wachtell Lipton replied to Cravath's May 2 email in order to clarify that Anadarko would need to receive fully negotiated and mutually satisfactory transaction documents in order to be in a position to determine whether Occidental's proposal constituted a Superior Proposal (as defined in the Chevron merger agreement). Later that day, Cravath sent a reply email stating that Occidental was considering Anadarko's responses to the April 24 Occidental Proposal and intended to respond comprehensively.

On May 4, 2019, each of Mr. Gwin and a representative of Jefferies LLC ("Jefferies"), which Anadarko had engaged as an additional financial advisor, had separate discussions with Mr. Pryor in order to discuss recent developments in the negotiations between Anadarko and Occidental. Mr. Pryor indicated that while Chevron was considering its alternatives, it did not intend to take any action with respect to a potential revised transaction proposal unless and until Anadarko formally declared the Occidental proposal to be a Superior Proposal.

On May 5, 2019, the Anadarko Board met, together with members of Anadarko management and representatives of Evercore, Goldman Sachs, Jefferies and Wachtell Lipton. Members of management updated the Anadarko Board on recent developments and negotiations with Occidental. Representatives of Evercore and Goldman Sachs reviewed with the Anadarko Board their respective updated preliminary financial analyses regarding the April 24 Occidental Proposal and the pending transaction with Chevron. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors under the circumstances and a review of potential next steps in the context of the applicable provisions of the Chevron merger agreement. Following discussion, the Anadarko Board authorized and instructed Anadarko's management and advisors to continue negotiations with Occidental.

Later on May 5, 2019, Occidental issued a press release announcing that it had entered into a binding agreement to sell Anadarko's assets in Algeria, Ghana, Mozambique and South Africa to TOTAL S.A. ("Total") for $8.8 billion in cash, on a cash-free, debt-free basis (i.e., based on an assumption for purposes of calculating the purchase price that no cash or debt will be transferred as part of the transaction), contingent upon Occidental entering into and completing its proposal to acquire Anadarko. Subsequent to this announcement, Ms. Hollub sent the Anadarko Board, care of Mr. Walker and Ms. Eberhart, a letter setting forth a revised proposal pursuant to which Occidental would acquire Anadarko for $76 per share (based on Occidental's last closing price of $57.95 per share), consisting of $59 in cash and 0.2934 of a share of Occidental common stock per Anadarko share (the "May 5 Occidental Proposal"). The letter affirmed Occidental's belief that Occidental is uniquely positioned to create significant and sustainable growth and value from Anadarko's asset portfolio. It also noted that the significantly increased cash component would provide value and closing certainty. Unlike any prior Occidental proposal, the May 5 Occidental Proposal was not subject to any vote or approval by Occidental's stockholders. The revised proposal was also accompanied by transaction documents which Occidental represented it was prepared to execute, as well as evidence of financing commitments for the entire amount of the aggregate cash consideration contemplated thereby. Occidental also issued a press release announcing the proposal and attaching a copy of the proposal letter.

In the morning of May 6, 2019, the Anadarko Board met, together with members of Anadarko management and representatives of Evercore, Goldman Sachs, Jefferies and Wachtell Lipton. Messrs. Walker and Gwin updated the Anadarko Board on recent developments and discussions with each of Occidental and Chevron. Representatives of Evercore and Goldman Sachs reviewed with the Anadarko Board their respective preliminary financial analyses regarding the May 5 Occidental Proposal, including as compared with the pending transaction with Chevron. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors under the circumstances and a review of potential next steps in the context of the applicable provisions of the Chevron merger agreement. Following discussion, the Anadarko Board reached the unanimous conclusion that the May 5 Occidental Proposal constituted a Superior Proposal (as defined in the Chevron merger agreement), and formed an ad hoc committee solely for the purpose of making the associated

formal determination later that day following confirmation from Anadarko's management and Wachtell Lipton that the definitive documents associated with the May 5 Occidental Proposal were in satisfactory final form. Anadarko's May 6, 2019 closing stock price was $75.49 per share.

In the afternoon of May 6, 2019, representatives of Anadarko management and Wachtell Lipton worked with representatives of Occidental management and Cravath to finalize the forms of the merger agreement and disclosure schedules associated with the May 5 Occidental Proposal. After the definitive documents were finalized, the ad hoc committee of the Anadarko Board met and formally determined on behalf of the Anadarko Board that the May 5 Occidental Proposal constituted a Superior Proposal. Anadarko subsequently issued a press release announcing this determination and related matters, including its intention to terminate the Chevron merger agreement in order to enter into a definitive agreement with Occidental, subject to Chevron's right to revise its transaction during the four business days ending May 10, 2019.

In the morning of May 9, 2019, Mr. Wirth informed Mr. Walker, and Chevron subsequently announced publicly, that it did not intend to propose any revisions to the Chevron merger agreement and accordingly anticipated that Anadarko would terminate that agreement. At Anadarko's request, Chevron also agreed to permit Anadarko to terminate the Chevron merger agreement that same day, subject to payment of the termination fee (rather than waiting until May 10, 2019, as the Chevron merger agreement otherwise would have required).

Also on May 9, 2019, the Anadarko Board met telephonically, together with members of Anadarko management and representatives of Evercore, Goldman Sachs, Jefferies and Wachtell Lipton. Prior to the meeting, Goldman Sachs delivered a disclosure letter regarding certain relationships with Berkshire Hathaway. Members of Anadarko management updated the Anadarko Board on recent developments with each of Occidental and Chevron. Representatives of Evercore and Goldman Sachs reviewed with the Anadarko Board their respective financial analyses and rendered their respective oral opinions, subsequently confirmed by delivery of their respective written opinions, dated May 9, 2019, to the Anadarko Board, to the effect that, as of such date and based upon and subject to the assumptions made, procedures followed, factors considered and limitations and qualifications on the review undertaken described in each financial advisor's written opinion, the merger consideration was fair, from a financial point of view, to holders of Anadarko common stock. Representatives of Wachtell Lipton discussed legal matters with the Anadarko Board, including the fiduciary duties of directors under the circumstances and material provisions of the merger agreement with Occidental. After carefully considering the proposed terms of the transaction with Occidental, and taking into consideration the matters discussed during that meeting and prior meetings of the Anadarko Board (for additional detail, see "-Recommendations of the Anadarko Board of Directors and Its Reasons for the Transaction" beginning on page 55), the Anadarko Board determined that Occidental's proposed transaction continued to constitute a Superior Proposal under the Chevron merger agreement, and also (i) determined the Occidental merger agreement and the transactions contemplated thereby, including the merger with Occidental, were fair to and in the best interests of Anadarko stockholders, (ii) approved and declared advisable the Occidental merger agreement and the transactions contemplated thereby (including the merger with Occidental), (iii) directed that the adoption of the Occidental merger agreement be submitted to a vote at a meeting of the Anadarko stockholders and (iv) resolved (subject to certain exceptions set forth in the merger agreement) to recommend the adoption of the Occidental merger agreement by the Anadarko stockholders. Anadarko's May 9, 2019 closing stock price was $73.39 per share.

Also on May 9, 2019, in connection with the approval of the Occidental transaction, the Compensation and Benefits Committee of the Anadarko Board approved the compensation and benefits-related matters which are described in greater detail under the heading "-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79, which reconfirmed earlier approvals made in connection with the Chevron transaction, adjusted to reflect the Occidental transaction's terms including its purchase price.

Later on May 9, 2019, Anadarko paid Chevron the $1 billion termination fee, and Anadarko and Occidental entered into the merger agreement and each issued press releases announcing the transaction.

**Occidental's Rationale for the Transaction**

Occidental believes that its acquisition of Anadarko will:

- permit Occidental to apply its proven technology and operational excellence to Anadarko's global asset portfolio;

- enhance Occidental's Permian Basin leadership position and bolster its portfolio with additional free cash flow generating assets;
- create a global energy leader with enhanced scale and expertise to lead energy into a low-carbon future;
- be accretive to cash flow per share and free cash flow per share (each as defined on page 40) within twelve months after the completion of the merger;
- generate significant cost and capital synergies and capital spending efficiency; and
- enhance its dividend growth strategy while maintaining balance sheet strength.

**Recommendations of the Anadarko Board of Directors and Its Reasons for the Transaction**

By unanimous vote, the Anadarko Board, at a meeting held on May 9, 2019, (i) determined the merger agreement and the transactions contemplated thereby, including the merger, are fair to and in the best interests of Anadarko stockholders, (ii) approved and declared advisable the merger agreement and the transactions contemplated thereby (including the merger), (iii) directed that the adoption of the merger agreement be submitted to a vote at a meeting of the Anadarko stockholders and (iv) resolved (subject to certain exceptions set forth in the merger agreement) to recommend the adoption of the merger agreement by the Anadarko stockholders. **The Anadarko Board unanimously recommends that Anadarko stockholders vote "FOR" the merger proposal and "FOR" the non-binding compensation advisory proposal.**

In reaching its determinations and recommendations, the Anadarko Board consulted with Anadarko's management and financial and legal advisors and considered a number of factors, including the following factors that weighed in favor of the merger:

- *Compelling Value on both a Relative and Absolute Basis*. The aggregate value and nature of the consideration to be received in the merger by Anadarko stockholders, including the fact that:
  - based on the closing trading price of Occidental common stock of $60.21 on May 8, 2019, the last trading day prior to public announcement of the merger, the merger consideration represented an implied value of $76.66 per share of Anadarko common stock and a premium of (i) 24% to the implied value of the merger consideration under the Chevron merger agreement on that same date and (ii) 64% to the $46.80 trading price of Anadarko common stock on April 11, 2019, the day prior to the public announcement of Anadarko's agreement to be acquired by Chevron;
  - the substantial cash component of the merger consideration provides Anadarko stockholders with immediate and relatively certain value in respect of their shares; and
  - following the merger, Anadarko stockholders will also have the opportunity as stockholders of Occidental to participate in the upside of the combined company, including future growth and anticipated synergies, particularly in the Permian Basin in which the acreage positions of the two companies are highly complementary to each other.
- *Superior Alternative to Continuing to Pursue Chevron Transaction*. The Anadarko Board determined that entering into the merger agreement with Occidental provided a more attractive alternative for creating stockholder value when compared to continuing to pursue its previously agreed transaction with Chevron in light of the (i) substantially higher price offered by the Occidental transaction relative to the Chevron transaction, (ii) greater certainty of value provided by the substantially higher cash component of the Occidental transaction and (iii) acceptable closing certainty in light of the absence of an Occidental stockholder vote and the inability for Occidental to terminate the merger agreement in order to accept a superior proposal for Occidental (which, prior to the May 5 Occidental Proposal, had been a meaningful advantage of the Chevron transaction);
- *Material Improvements Relative to Prior Occidental Proposals*. The Anadarko Board noted that the Occidental May 5 Proposal, which formed the basis of the ultimately agreed transaction, reflected significant improvement in comparison to prior Occidental proposals in a number of respects, including that it (i) enhanced certainty of closing by removing the requirement for any Occidental stockholder vote and the ability of the Occidental Board to terminate the merger agreement in order to accept a superior proposal for Occidental, (ii) enhanced certainty of value by materially increasing the cash portion of the merger consideration and decreasing the stock portion, (iii) valued the stock portion of

TABLE OF CONTENTS

the merger consideration based upon Occidental's closing stock price on May 3, 2019 of $57.95 per share, which was nearly 14% lower than Occidental's stock price at the time Anadarko had entered into the Chevron transaction. Further, the Anadarko Board believed that this significant decrease in Occidental's stock price constituted a meaningful portion of the decline which, following discussion with its advisors, it had anticipated could occur upon public announcement of a transaction with Occidental. The Anadarko Board concluded that the combination of the much higher cash portion of the merger consideration and lower Occidental stock price reflected in the Occidental May 5 Proposal largely obviated the need for a collar mechanism in the merger agreement, which Anadarko had considered an important transaction term in its negotiations with respect to earlier Occidental proposals.

- *Opportunity to Receive Alternative Acquisition Proposals and to Terminate the Merger in Order to Accept a Superior Proposal.* The Anadarko Board considered the terms of the merger agreement related to Anadarko's ability to respond to unsolicited acquisition proposals and determined that third parties would be unlikely to be deterred from making a competing proposal by the provisions of the merger agreement, and the Anadarko Board may, under certain circumstances, furnish information and enter into discussions and negotiations in connection with a competing proposal. In this regard, the Anadarko Board considered that:
  - subject to its compliance with the applicable provisions of merger agreement, the Anadarko Board can change its recommendation to Anadarko stockholders with respect to the adoption of the merger agreement prior to Anadarko stockholders' adoption of the merger agreement if the Anadarko Board determines in good faith (after consultation with its financial and legal advisors) that a competing proposal is a superior proposal or, with respect to an intervening event, the failure to take such action would be reasonably likely to be inconsistent with the Anadarko Board's fiduciary duties;
  - subject to its compliance with the applicable provisions of the merger agreement, the Anadarko Board may terminate the merger agreement in order to enter into a superior proposal; and
  - while the merger agreement contains a termination fee of $1 billion that Anadarko would be required to pay to Occidental in certain circumstances, including if (i) Occidental terminates the merger agreement in connection with a change in the Anadarko Board's recommendation to its stockholders with respect to adoption of the merger agreement or (ii) Anadarko terminates the merger agreement in order to enter into a definitive agreement with respect to a superior proposal, the Anadarko Board believed that the termination fee is reasonable in light of the circumstances and the overall terms of the merger agreement, consistent with fees in comparable transactions, and would not discourage competing acquisition proposals from credible third parties willing and able to make such proposals.
- *Receipt of Fairness Opinions and Presentations from Evercore and Goldman Sachs.* The Anadarko Board considered the respective financial analyses reviewed and discussed with representatives of each of Evercore and Goldman Sachs, as well as the respective oral opinions of Evercore and Goldman Sachs rendered to the Anadarko Board on May 9, 2019, which opinions were subsequently confirmed by delivery of their respective written opinions, each dated as of May 9, 2019, to the Anadarko Board, to the effect that, based upon and subject to the limitations, qualifications and assumptions set forth in each opinion, as of the date of each such opinion, from a financial point of view, the merger consideration was fair to holders of Anadarko common stock, as more fully described below under the heading "-Opinions of Anadarko's Financial Advisors" beginning on page 58.
- *Terms of the Merger Agreement.* The Anadarko Board reviewed and considered the terms of the merger agreement, taken as a whole, including the parties' representations, warranties and covenants, and the circumstances under which the merger agreement may be terminated, and concluded that such terms are reasonable and fair to Anadarko. The Anadarko Board also reviewed and considered the conditions to the completion of the merger, including regulatory approvals, which it believes are likely to be satisfied on a timely basis. The Anadarko Board noted in particular that the completion of the merger is not subject to any financing condition or any condition based upon Occidental stockholder approval, which enhances the likelihood of the merger's consummation.

TABLE OF CONTENTS

In the course of its deliberations, the Anadarko Board also considered a variety of risks and other potentially negative factors, including the following:

- *Fixed Exchange Ratio.* The Anadarko Board considered that, although a significant majority of the merger consideration consists of cash, because the stock portion of the merger consideration is based on a fixed exchange ratio rather than a fixed value, Anadarko stockholders bear the risk of a decrease in the trading price of Occidental common stock during the pendency of the merger and the merger agreement does not provide Anadarko with a collar or a value-based termination right.
- *Risks Associated with the Pendency of the Merger.* The risks and contingencies relating to the announcement and pendency of the merger, including the potential for diversion of management and employee attention and the potential effect of the combination on the businesses of both companies and the restrictions on the conduct of Anadarko's business during the period between the execution of the merger agreement and the completion of the transactions contemplated thereby as set forth in the merger agreement.
- *Possible Failure to Achieve Synergies.* The potential challenges and difficulties in integrating the operations of Anadarko and Occidental and the risk that anticipated cost savings and operational efficiencies between the two companies, or other anticipated benefits of the merger, might not be realized or might take longer to realize than expected.
- *Termination Fee.* The Anadarko Board considered that Anadarko would be required to pay to Occidental a termination fee of $1 billion in the event the Anadarko Board were to terminate the merger agreement in order for Anadarko to enter into a superior proposal, should one be made, or if the merger agreement were to be terminated by Occidental in connection with a change in the Anadarko Board's recommendation to its stockholders with respect to adoption of the merger agreement. Such a termination fee would be in addition to, and not net of, the $1 billion termination fee which Anadarko previously paid to Chevron in connection with the termination of the Chevron merger agreement.
- *Restrictions on Third-Party Discussions.* The Anadarko Board considered that the merger agreement required Anadarko to terminate all discussions with potential alternative transaction counterparties, including Chevron, while noting that Anadarko would have the right to respond to alternative proposals that might be made by such parties pursuant to and in accordance with the applicable terms of the merger agreement.
- *Other Risks.* The Anadarko Board considered risks of the type and nature described under the sections entitled "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors" beginning on pages 29 and 32, respectively.

The Anadarko Board believed that, overall, the potential benefits of the merger to Anadarko stockholders outweighed the risks and uncertainties of the merger.

In addition, the Anadarko Board was aware of and considered that Anadarko's directors and executive officers may have interests in the merger that may be different from, or in addition to, their interests as stockholders of Anadarko generally, as described below under the heading "-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79.

The foregoing discussion of factors considered by the Anadarko Board is not intended to be exhaustive, but includes the material factors considered by the Anadarko Board. In light of the variety of factors considered in connection with its evaluation of the merger, the Anadarko Board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching its determinations and recommendations. Moreover, each member of the Anadarko Board applied his or her own personal business judgment to the process and may have given different weight to different factors. The Anadarko Board did not undertake to make any specific determination as to whether any factor, or any particular aspect of any factor, supported or did not support its ultimate determination. The Anadarko Board based its recommendation on the totality of the information presented.

TABLE OF CONTENTS

## Opinions of Anadarko's Financial Advisors

### *Opinion of Evercore Group L.L.C.*

At a meeting of the Anadarko Board held on May 9, 2019, Evercore rendered to the Anadarko Board its oral opinion, subsequently confirmed in writing, that as of May 9, 2019 and based upon and subject to the assumptions, limitations, qualifications and conditions described in Evercore's written opinion, the merger consideration was fair, from a financial point of view, to the holders of Anadarko common stock entitled to receive such merger consideration.

**The full text of the written opinion of Evercore, dated as of May 9, 2019, which sets forth, among other things, the procedures followed, assumptions made, matters considered and qualifications and limitations on the scope of review undertaken in rendering its opinion, is attached as Annex B to this proxy statement/prospectus and is incorporated by reference in its entirety into this proxy statement/prospectus. You are urged to read this opinion carefully and in its entirety. Evercore's opinion was addressed to, and provided for the information and benefit of, the Anadarko Board in connection with their evaluation of the merger. The opinion does not constitute a recommendation to the Anadarko Board or to any other person in respect of the merger, including as to how any holder of shares of Anadarko common stock should vote or act in respect of the merger. Evercore's opinion does not address the relative merits of the merger as compared to other business or financial strategies that might be available to Anadarko, nor does it address the underlying business decision of Anadarko to engage in the merger.**

In connection with rendering its opinion Evercore had, among other things:

- reviewed certain publicly available business and financial information relating to Anadarko and Occidental that Evercore deemed to be relevant, including publicly available research analysts' estimates;
- reviewed certain non-public historical financial statements and other non-public historical financial and operating data relating to Anadarko and Occidental prepared and furnished to Evercore by the management of Anadarko and Occidental, respectively;
- reviewed certain non-public projected financial and operating data relating to Anadarko under alternative commodities pricing assumptions prepared and furnished to Evercore by the management of Anadarko, reflecting management production and commodities pricing estimates ("Management Strip Forecasts") and management production estimates and analyst consensus pricing estimates ("Management Consensus Forecasts") and which are summarized in the section entitled "The Merger-Certain Unaudited Prospective Information" of this proxy statement/prospectus;
- reviewed certain non-public projected financial and operating data relating to Occidental prepared and furnished to Evercore by the management of Occidental, as adjusted by the management of Anadarko and approved for Evercore's use by Anadarko, and which are summarized in the section entitled "The Merger-Certain Unaudited Prospective Information" of this proxy statement/prospectus;
- discussed the past and current operations, financial projections and current financial condition of each of Anadarko and Occidental with the management of Anadarko and Occidental (including their views on the risks and uncertainties of achieving such projections);
- reviewed the reported prices and the historical trading activity of each of Anadarko common stock and Occidental common stock;
- compared the financial performance of each of Anadarko and Occidental and their respective stock market trading multiples with those of certain other publicly traded companies that Evercore deemed relevant;
- compared the financial performance of Anadarko and the valuation multiples relating to the merger with those of certain other transactions that Evercore deemed relevant;
- reviewed the merger agreement; and
- performed such other analyses and examinations and considered such other factors that Evercore deemed appropriate.

TABLE OF CONTENTS

For purposes of its analysis and opinion, Evercore assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by Evercore, and Evercore assumed no liability therefor. With respect to the projected financial data relating to Anadarko referred to above, Evercore assumed that they were reasonably prepared on bases reflecting the best currently available estimates and good faith judgment of the management of Anadarko, as to the future financial performance of Anadarko, under the alternative commodities pricing assumptions reflected therein. Evercore expressed no view as to any projected financial data relating to Anadarko, or the assumptions on which they were based.

For purposes of rendering its opinion, Evercore assumed, in all respects material to its analysis, that the representations and warranties of each party contained in the merger agreement were true and correct, that each party would perform all of the covenants and agreements required to be performed by it under the merger agreement and that all conditions to the consummation of the merger would be satisfied without material waiver or modification thereof. Evercore further assumed that all governmental, regulatory or other consents, approvals or releases necessary for the consummation of the merger would be obtained without any material delay, limitation, restriction or condition that would have an adverse effect on Anadarko or the consummation of the merger or materially reduce the benefits of the merger to the holders of Anadarko common stock.

Evercore did not make or assume any responsibility for making any independent valuation or appraisal of the assets or liabilities of Anadarko or Occidental, nor was Evercore furnished with any such appraisals, nor did Evercore evaluate the solvency or fair value of Anadarko or Occidental under any state or federal laws relating to bankruptcy, insolvency or similar matters. Evercore's opinion is necessarily based upon information made available to Evercore as of May 9, 2019, and financial, economic, market and other conditions as they existed and as could be evaluated as of that date. Subsequent developments may affect Evercore's opinion and Evercore does not have any obligation to update, revise or reaffirm its opinion.

Evercore was not asked to pass upon, and expressed no opinion with respect to, any matter other than the fairness, from a financial point of view, of the merger consideration to the holders of Anadarko common stock entitled to receive such merger consideration. Evercore did not express any view on, and its opinion did not address, the fairness of the merger to, or any consideration received in connection therewith by, the holders of any other securities, creditors or other constituencies of Anadarko, nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Anadarko, or any class of such persons, whether relative to the merger consideration or otherwise. Evercore assumed that any modification to the structure of the merger would not vary in any respect material to its analysis. Evercore's opinion does not address the relative merits of the merger as compared to other business or financial strategies that might be available to Anadarko, nor does Evercore's opinion address the underlying business decision of Anadarko to engage in the merger. In arriving at its opinion, Evercore was not authorized to solicit, and did not solicit, interest from any third party with respect to the acquisition of any or all of Anadarko's common stock or any business combination or other extraordinary transaction involving Anadarko. Evercore's opinion does not constitute a recommendation to the Anadarko Board or to any other person in respect of the merger, including as to how any holder of shares of Anadarko common stock should vote or act in respect of the merger. Evercore expressed no opinion as to the price at which shares of Anadarko common stock or Occidental common stock will trade at any time. Evercore is not a legal, regulatory, accounting or tax expert and has assumed the accuracy and completeness of assessments by Anadarko and its advisors with respect to legal, regulatory, accounting and tax matters.

Set forth below is a summary of the material financial analyses reviewed by Evercore with the Anadarko Board on May 9, 2019, in connection with rendering its opinion. The following summary, however, does not purport to be a complete description of the analyses performed by Evercore. The order of the analyses described and the results of these analyses do not represent relative importance or weight given to these analyses by Evercore. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data that existed on or before May 9, 2019, and is not necessarily indicative of current market conditions.

**The following summary of Evercore's financial analyses includes information presented in tabular format. In order to fully understand the analyses, the tables must be read together with the full text of each summary. The tables are not intended to stand-alone and alone do not constitute a complete description of Evercore's financial analyses. Considering the tables below without considering the full narrative description of Evercore's financial analyses, including the methodologies and assumptions underlying such analyses, could create a misleading or incomplete view of such analyses.**

TABLE OF CONTENTS

*Summary of Evercore's Financial Analysis*

Discounted Cash Flow Analysis

Evercore performed a discounted cash flow analysis to calculate ranges of implied present values per share of Anadarko common stock as of April 1, 2019, utilizing estimates of the standalone, unlevered, after-tax free cash flows Anadarko was expected to generate over the period from 2019 through 2025 based on the Management Strip Forecasts.

For purposes of its discounted cash flow analysis, unlevered free cash flow was defined as earnings before interest and taxes, less unlevered taxes, plus depreciation and amortization, plus (less) changes in working capital, less capital expenditures (excluding capitalized interest expense), plus non-cash exploration expense, plus other non-cash items.

Evercore calculated ranges of terminal values for Anadarko (i) using the perpetual growth rate method by applying an assumed perpetuity growth rate range of 1.5% to 2.5% to the estimate of terminal year unlevered free cash flow reflected in the Management Strip Forecasts and (ii) using the earnings before interest, taxes, depreciation, amortization and exploration expense ("EBITDAX") exit multiple method by applying terminal year enterprise value to last-twelve-month ("LTM") EBITDAX multiples ranging from 5.5x to 6.5x to estimated 2025 EBITDAX.

Evercore then discounted Anadarko's projected, unlevered free cash flows over the period from 2019 through 2025 and the ranges of terminal values for Anadarko it calculated using the perpetuity growth rate method and the EBITDAX exit multiple method, in each case, to present value as of April 1, 2019, using discount rates ranging from 9.0% to 10.0%, to derive ranges of implied enterprise values for Anadarko. The discount rates were based on Evercore's judgment of the estimated range of Anadarko's weighted average cost of capital. Evercore then deducted from the ranges of implied enterprise values Anadarko management's estimate of Anadarko's net debt (calculated as total debt less available cash and cash equivalents of Anadarko and Western Midstream Partners, L.P.) as of March 31, 2019 as reflected in Anadarko's consolidated balance sheet as of that date and adjusted for the payment of the $1 billion termination fee by Anadarko in connection with the termination of its prior merger agreement with Chevron (the "Chevron termination fee"), plus non-controlling interests in Western Midstream Partners, L.P. as of May 7, 2019, calculated using publicly available information and information provided to Evercore by Anadarko management, and divided the results by the fully diluted outstanding shares of Anadarko common stock calculated based on information provided to Evercore by Anadarko management, to derive a range of implied equity values per share of Anadarko common stock as follows:

| Method | Implied Per Share Equity Value Reference Ranges |
|---|---|
| Perpetuity Growth Rate Method | $ 53.80 - $83.72 |
| EBITDAX Exit Multiple Method | $ 56.41 - $76.48 |

TABLE OF CONTENTS

Selected Public Company Trading Analysis

Evercore reviewed and compared certain financial information of Anadarko and Occidental to corresponding financial multiples and ratios for the following selected publicly traded companies in the energy industry (referred to in this section as the "selected companies"):

- Apache Corporation
- ConocoPhillips
- Devon Energy Corporation
- Hess Corporation
- Marathon Oil Corporation
- Noble Energy, Inc.

Although none of these companies are directly comparable to Anadarko or Occidental, Evercore selected these companies based on its professional judgment because they are exploration and production companies with business characteristics that for purposes of its analysis Evercore considered similar to the business characteristics of Anadarko and Occidental.

For Anadarko, Occidental and each of the selected companies identified above, Evercore calculated (i) enterprise value (defined as equity market capitalization plus total debt (for Anadarko, including Western Midstream Partners, L.P.'s total debt), less available cash and cash equivalents (for Anadarko, including Western Midstream Partners, L.P.'s cash and cash equivalents), plus non-controlling interests) as a multiple of estimated EBITDAX for calendar years 2019 and 2020, and (ii) the closing share prices as of May 7, 2019 as a multiple of estimated cash flow per share ("CFPS"). The financial multiples and ratios for Occidental and the selected companies were based on closing share prices as of May 7, 2019, financial data as reflected in the most recent public filings made by such company and consensus estimates for 2019 and 2020 obtained from publicly available equity research analysts' projections made available by FactSet as of May 7, 2019.

The results of these calculations were as follows:

| Company | Enterprise Value / EBITDAX | | Price / CFPS | | Net Debt / EBITDAX |
|---|---|---|---|---|---|
| | 2019E | 2020E | 2019E | 2020E | 2018A |
| **Selected Companies** | | | | | |
| Apache Corporation | 4.9x | 4.4x | 3.5x | 3.1x | 1.7x |
| ConocoPhillips | 4.8x | 4.7x | 5.7x | 5.6x | 0.5x |
| Devon Energy Corporation | 5.2x | 4.9x | 4.5x | 4.0x | 1.4x |
| Hess Corporation | 8.8x | 6.9x | 8.5x | 6.2x | 1.7x |
| Marathon Oil Corporation | 4.5x | 4.1x | 4.0x | 3.6x | 1.2x |
| Noble Energy, Inc. | 6.6x | 4.9x | 5.0x | 3.6x | 2.6x |
| **Median** | **5.1x** | **4.8x** | **4.8x** | **3.8x** | **1.6x** |
| **Mean** | **5.8x** | **5.0x** | **5.2x** | **4.3x** | **1.5x** |
| Anadarko Petroleum Corporation | 7.6x | 6.7x | 6.0x | 5.3x | 2.1x |
| Occidental Petroleum Corporation | 6.0x | 5.9x | 6.3x | 5.9x | 1.0x |

Based on the multiples it derived for the selected companies and its professional judgment and experience, Evercore applied (i) an enterprise value to EBITDAX multiple reference range of 5.0x to 6.0x to Anadarko management's estimate of consolidated 2019 EBITDAX for Anadarko under the Management Consensus Forecasts, and (ii) an enterprise value to EBITDAX multiple reference range of 4.5x to 5.5x to Anadarko management's estimate of consolidated 2020 EBITDAX for Anadarko under the Management Consensus Forecasts, in each case, to derive ranges of implied enterprise values for Anadarko. Evercore then deducted from the ranges of implied enterprise values Anadarko management's estimate of Anadarko's net debt (calculated as total debt less available cash and cash equivalents of Anadarko and Western Midstream Partners, L.P.) as of March 31, 2019 as reflected in Anadarko's consolidated balance sheet as of that date and adjusted for the payment of the Chevron termination fee, plus non-controlling interests in Western Midstream Partners, L.P. as of

TABLE OF CONTENTS

May 7, 2019, calculated using publicly available information and information provided to Evercore by Anadarko management, and divided the results by the fully diluted outstanding shares of Anadarko common stock calculated based on information provided to Evercore by Anadarko management, to derive a range of implied equity values per share of Anadarko common stock.

Based on the multiples it derived for the selected companies and its professional judgment and experience, Evercore also applied (i) a price to CFPS multiple reference range of 3.75x to 5.25x to Anadarko management's estimate of 2019 CFPS for Anadarko under the Management Consensus Forecasts, and (ii) a price to CFPS multiple reference range of 3.25x to 4.25x to Anadarko management's estimate of 2020 CFPS for Anadarko under the Management Consensus Forecasts to derive a range of implied equity values per share of Anadarko common stock.

The results of these calculations were as follows:

| Metric | Implied Equity Value Range Per Share |
|---|---|
| Enterprise Value / EBITDAX | $ 39.19 - $61.45 |
| Price / CFPS | $ 47.77 - $67.96 |

Precedent Transaction Analysis

Evercore reviewed publicly available information related to selected precedent acquisition transactions involving publicly traded companies in the energy industry announced since 1998 with a total enterprise value greater than $5 billion. For each selected precedent transaction, Evercore calculated (i) the implied equity value (based on transaction consideration) as a multiple of cash flow for the target company for each of the first fiscal year and the second fiscal year after the announcement of the applicable transaction based on mean consensus estimates for 2019 and 2020 obtained from publicly available equity research analysts' projections, and (ii) the implied enterprise value (based on transaction consideration) as a multiple of EBITDAX for the target company for each of the first fiscal year and the second fiscal year after the announcement of the applicable transaction based on mean consensus estimates for 2019 and 2020 obtained from publicly available equity research analysts' projections. The selected precedent transactions reviewed by Evercore and the implied equity value to cash flow multiples and implied enterprise value to EBITDAX multiples calculated by Evercore with respect to those target companies were:

| | | | Equity Value / Cash Flow multiples | | Enterprise Value / EBITDAX multiples | |
|---|---|---|---|---|---|---|
| Date Announced | Buyer | Seller | Fiscal Year 1 | Fiscal Year 2 | Fiscal Year 1 | Fiscal Year 2 |
| 11-01-18 | Encana Oil & Gas (USA) Inc. | Newfield Exploration Company | 3.8x | 3.1x | 5.0x | 4.1x |
| 08-14-18 | Diamondback Energy, Inc. | Energen Corporation | 8.3x | 6.1x | 8.9x | 6.8x |
| 03-28-18 | Concho Resources Inc. | RSP Permian, Inc. | 9.4x | 6.8x | 10.0x | 7.8x |
| 06-19-17 | EQT Corporation | Rice Energy Inc. | 7.0x | 5.5x | 7.9x | 6.3x |
| 04-08-15 | Royal Dutch Shell plc | BG Group plc | 12.7x | 9.9x | 13.0x | 8.9x |
| 12-15-14 | Repsol Oil & Gas Canada Inc. | Talisman Energy, Inc. | 4.0x | 4.6x | 4.7x | 5.7x |
| 09-29-14 | Encana Corporation | Athlon Energy Inc. | 15.9x | 8.6x | 15.6x | 9.0x |
| 12-05-12 | Freeport-McMoRan Copper & Gold Inc. | Plains Exploration & Production Company | 4.6x | 2.5x | 6.7x | 3.6x |
| 07-23-12 | CNOOC Limited | Nexen Inc. | 6.0x | 5.3x | 4.3x | 3.9x |
| 07-14-11 | BHP Billiton Group | Petrohawk Energy Corporation | 10.2x | 7.2x | 10.5x | 7.6x |
| 12-14-09 | ExxonMobil Corporation | XTO Energy Inc. | 5.0x | 5.7x | 6.0x | 6.7x |
| 06-24-09 | Sinopec Group Company | Addax Petroleum Corporation | 6.5x | 4.8x | 5.5x | 4.0x |
| 03-23-09 | Suncor Energy Inc. | Petro-Canada | 5.1x | 4.1x | 4.2x | 3.4x |

TABLE OF CONTENTS

| Date Announced | Buyer | Seller | Equity Value / Cash Flow multiples Fiscal Year 1 | Fiscal Year 2 | Enterprise Value / EBITDAX multiples Fiscal Year 1 | Fiscal Year 2 |
|---|---|---|---|---|---|---|
| 10-31-07 | Penn West Energy Trust | Canetic Resources Trust | 5.1x | 5.5x | 6.7x | 5.2x |
| 06-23-06 | Anadarko Petroleum Corporation | Western Gas Resources, Inc. | 10.6x | 9.7x | 10.2x | 8.7x |
| 06-23-06 | Anadarko Petroleum Corporation | Kerr-McGee Corporation | 6.6x | 5.4x | 7.1x | 5.7x |
| 12-12-05 | ConocoPhilips | Burlington Resources Inc. | 7.6x | 6.3x | 6.4x | 5.2x |
| 04-04-05 | Chevron Corporation | Unocal Corporation | 5.9x | 6.0x | 5.2x | 5.1x |
| 04-02-02 | Shell Resources plc | Enterprise Oil plc | 5.5x | 5.2x | 5.2x | 4.9x |
| 01-27-02 | PanCanadian Energy Corporation (nka Encana) | Alberta Energy Company Ltd. | 4.9x | 5.7x | 4.6x | 5.2x |
| 11-18-01 | Phillips Petroleum Co. | Conoco Inc. | 4.1x | 4.5x | 4.1x | NA |
| 05-29-01 | Conoco Inc. | Gulf Canada Resources Ltd. | 4.1x | 4.7x | 4.7x | 5.6x |
| 10-16-00 | Chevron Corporation | Texaco Inc. | NA | NA | NA | NA |
| 04-03-00 | Anadarko Petroleum Corporation | Union Pacific Resources Group Inc. | 3.9x | 4.1x | 4.9x | 5.3x |
| 04-01-99 | BP Amoco Company | Atlantic Richfield Company | 9.0x | 9.2x | NA | NA |
| 12-01-98 | Exxon Corporation | Mobil Corporation | 6.1x | 6.0x | NA | NA |
| 08-11-98 | British Petroleum Company p.l.c. | Amoco Corporation | 10.6x | 9.5x | NA | NA |
| **Median** | | | **6.1x** | **5.6x** | **6.0x** | **5.5x** |
| **Mean** | | | **7.0x** | **6.0x** | **7.0x** | **5.9x** |
| **Median (excluding high growth shale transaction)** | | | **5.7x** | **5.5x** | **5.2x** | **5.2x** |
| **Mean (excluding high growth shale transaction)** | | | **6.3x** | **5.8x** | **6.1x** | **5.4x** |

Although none of the target companies above is directly comparable to Anadarko and none of the precedent transactions is directly comparable to the merger, Evercore selected these transactions based on its professional judgment because they involve target companies that are exploration and production companies with business characteristics that for purposes of its analysis Evercore considered similar to the business characteristics of Anadarko.

Based on the multiples it derived from the selected precedent transactions and based on its professional judgment and experience, Evercore (i) selected a reference range of enterprise value to EBITDAX multiples of 5.0x to 7.0x and applied this range of multiples to Anadarko's estimated consolidated EBITDAX for 2019, as provided to Evercore by the management of Anadarko under the Management Consensus Forecasts, and (ii) selected a reference range of enterprise value to EBITDAX multiples of 4.0x to 6.0x and applied this range of multiples to Anadarko's estimated consolidated EBITDAX for 2020, as provided to Evercore by the management of Anadarko under the Management Consensus Forecasts, in each case to calculate an implied enterprise value for Anadarko. Evercore then deducted from the ranges of implied enterprise values Anadarko management's estimate of Anadarko's net debt (calculated as total debt less available cash and cash equivalents of Anadarko and Western Midstream Partners, L.P.) as of March 31, 2019 as reflected in Anadarko's consolidated balance sheet as of that date and adjusted for payment of the Chevron termination fee, plus non-controlling interests in Western Midstream Partners, L.P. as of as of May 7, 2019, calculated using publicly available information and information provided to Evercore by Anadarko management, and divided the results by the fully diluted outstanding shares of Anadarko common stock calculated based on information provided to Evercore by Anadarko management, to derive a range of implied equity values per share of Anadarko common stock.

TABLE OF CONTENTS

Based on the multiples it derived from the selected precedent transactions and based on its professional judgment and experience, Evercore also (i) selected a reference range of equity value to CFPS multiples of 4.0x to 6.0x and applied this range of multiples to Anadarko's estimated CFPS for 2019, as provided to Evercore by the management of Anadarko under the Management Consensus Forecasts, and (ii) selected a reference range of equity value to CFPS multiples of 3.5x to 5.5x and applied this range of multiples to Anadarko's estimated CFPS for 2020, as provided to Evercore by the management of Anadarko under the Management Consensus Forecasts, to derive a range of implied equity values per share of Anadarko common stock.

The results of the calculations were as follows:

| Metric | | Implied Equity Value Range Per Share |
|---|---|---|
| Enterprise Value / EBITDAX | $ | 32.33 - $72.99 |
| Equity Value / CFPS | $ | 50.95 - $87.94 |

Other Financial Analysis

The analysis and data described below were presented to the Anadarko Board for informational and reference purposes only and did not provide the basis for, and were not otherwise material to, the rendering of Evercore's fairness opinion.

*Premia Paid Analysis*

Evercore reviewed and analyzed premia paid in transactions above $10 billion involving publicly traded U.S.-based companies announced since January 2010 (excluding transactions with target companies in banking, financial institutions, insurance and real estate investment trust industries). Based on its professional judgment and experience and the premia reviewed in the selected transactions, Evercore applied reference ranges of premia of 25% to 35% to the closing price of shares of Anadarko common stock as of April 11, 2019, the last trading day prior to announcement of the previously proposed acquisition of Anadarko by Chevron. This analysis implied a per share equity value reference range of approximately $58.50 to $63.18 for Anadarko.

*Analysts' Price Targets*

Evercore reviewed selected publicly available share price targets of research analysts' estimates known to Evercore as of May 7, 2019, noting that the low and high share price targets ranged from $60.00 to $79.00 for Anadarko common stock.

*52-Week Trading Range Analysis*

Evercore reviewed historical trading prices of Anadarko common stock during the 52-week period ended April 11, 2019, the date prior to announcement of the previously proposed acquisition of Anadarko by Chevron, noting that low and high closing prices during such period ranged from $40.57 to $75.47 per share of Anadarko common stock.

*Selected Public Company Trading Analysis*

Based on the multiples it derived for Occidental and the selected companies under the selected public company trading analysis described above and its professional judgment and experience, Evercore applied (i) an enterprise value to EBITDAX multiple reference range of 5.0x to 6.0x to publicly available equity research analysts' estimate of consolidated 2019 EBITDAX for Anadarko, (ii) an enterprise value to EBITDAX multiple reference range of 4.5x to 5.5x to publicly available equity research analysts' estimate of consolidated 2020 EBITDAX for Anadarko, (iii) a price to CFPS multiple reference range of 3.75x to 5.25x to publicly available equity research analysts' estimate of 2019 CFPS for Anadarko, and (iv) a price to CFPS multiple reference range of 3.25x to 4.25x to publicly available equity research analysts' estimate of 2020 CFPS for Anadarko, to derive ranges of implied equity values per share of Anadarko common stock.

The results of these calculations were as follows:

| Metric | | Implied Equity Value Range Per Share |
|---|---|---|
| Enterprise Value / EBITDAX | $ | 33.34 - $51.83 |
| Price / CFPS | $ | 46.38 - $66.53 |

TABLE OF CONTENTS

*Miscellaneous*

The foregoing summary of certain material financial analyses does not purport to be a complete description of the analyses or data presented by Evercore. In connection with the evaluation of the merger by the Anadarko Board, Evercore performed a variety of financial and comparative analyses for purposes of rendering its opinion. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary described above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Evercore's opinion. In arriving at its fairness determination, Evercore considered the results of all the analyses and did not draw, in isolation, conclusions from or with regard to any one analysis or factor considered by it for purposes of its opinion. Rather, Evercore made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all the analyses. In addition, Evercore may have given various analyses and factors more or less weight than other analyses and factors, and may have deemed various assumptions more or less probable than other assumptions. As a result, the ranges of valuations resulting from any particular analysis or combination of analyses described above should not be taken to be the view of Evercore with respect to the actual value of the shares of Anadarko common stock. Further, Evercore's analyses involve complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the acquisition, public trading or other values of the companies used, including judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Anadarko or its advisors.

Evercore prepared these analyses for the purpose of providing an opinion to the Anadarko Board as to the fairness, from a financial point of view, of the merger consideration to the holders of Anadarko common stock entitled to receive such merger consideration. These analyses do not purport to be appraisals or to necessarily reflect the prices at which the business or securities actually may be sold. Any estimates contained in these analyses are not necessarily indicative of actual future results, which may be significantly more or less favorable than those suggested by such estimates. Accordingly, estimates used in, and the results derived from, Evercore's analyses are inherently subject to substantial uncertainty, and Evercore assumes no responsibility if future results are materially different from those forecasted in such estimates.

The issuance of the fairness opinion was approved by a Fairness Opinion Committee of Evercore.

Pursuant to the terms of Evercore's engagement letter with Anadarko, Evercore is entitled to receive a fee estimated, based on the information available as of the date of announcement, at approximately $53 million if the merger is completed, against which a fee of $2.5 million that was payable upon delivery of Evercore's fairness opinion is fully creditable. Anadarko has also agreed to reimburse Evercore for its reasonable and documented out-of-pocket expenses (including reasonable outside legal fees, expenses and disbursements) and to indemnify Evercore for certain liabilities arising out of its engagement.

During the two-year period prior to the date of its written opinion, Evercore provided financial advisory services to Anadarko and its affiliates, for which Evercore received fees of less than $1 million. During the two-year period prior to the date of its written opinion, neither Evercore nor its affiliates have provided financial services to Occidental and its affiliates for which Evercore received fees, including the reimbursement of expenses. During the two-year period prior to the date of its written opinion, neither Evercore nor its affiliates have provided financial services to Berkshire Hathaway for which Evercore received fees, including the reimbursement of expenses. In the future, Evercore may provide financial or other services to Anadarko, Occidental and Berkshire Hathaway and their respective affiliates and in connection with any such services Evercore may receive compensation.

In the ordinary course of business, Evercore or its affiliates may actively trade the securities, or related derivative securities, or financial instruments of Anadarko, Occidental and their respective affiliates, for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities or instruments.

Anadarko engaged Evercore to act as a financial advisor based on Evercore's qualifications, experience and reputation. Evercore is an internationally recognized investment banking firm and is regularly engaged in the valuation of businesses in connection with mergers and acquisitions, leveraged buyouts, competitive biddings, private placements and valuations for corporate and other purposes.

***Opinion of Goldman Sachs & Co. LLC***

At a meeting of the Anadarko Board, Goldman Sachs rendered to the Anadarko Board its oral opinion, subsequently confirmed by delivery of a written opinion, dated May 9, 2019, to the Anadarko Board, to the effect that, as of the date of Goldman Sachs' written opinion and based upon and subject to the factors and assumptions set forth in Goldman Sachs' written opinion, the merger consideration to be paid to the holders (other than Occidental, Berkshire Hathaway and their respective affiliates) of shares of Anadarko common stock pursuant to the merger agreement was fair from a financial point of view to such holders.

**The full text of the written opinion of Goldman Sachs, dated May 9, 2019, which sets forth the assumptions made, procedures followed, matters considered, qualifications and limitations on the review undertaken in connection with the opinion, is attached to this proxy statement/prospectus as Annex C. The summary of Goldman Sachs' opinion contained in this proxy statement/prospectus is qualified in its entirety by reference to the full text of Goldman Sachs' written opinion. Goldman Sachs' advisory services and opinion were provided for the information and assistance of the Anadarko Board in connection with its consideration of the merger and the opinion does not constitute a recommendation as to how any Anadarko stockholder should vote with respect to the merger or any other matter.**

In connection with delivering the opinion described above and performing its related financial analyses, Goldman Sachs reviewed, among other things:

- the merger agreement;
- annual reports to stockholders and Annual Reports on Form 10-K of Anadarko and Occidental for the five years ended December 31, 2018;
- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of Anadarko and Occidental;
- certain other communications from Anadarko and Occidental to their respective stockholders;
- certain publicly available research analyst reports for Anadarko and Occidental;
- certain internal financial analyses and forecasts for Occidental on a stand-alone basis (the "adjusted Occidental standalone forecast") and on a pro forma basis giving effect to the merger (the "adjusted Occidental pro forma forecast" and, together with the "adjusted Occidental standalone forecast", the "adjusted Occidental forecasts"), in each case, prepared by its management, as adjusted by the management of Anadarko and approved for Goldman Sachs' use by Anadarko, including certain synergies projected by the management of Occidental to result from the merger, as adjusted by the management of Anadarko and approved for Goldman Sachs' use by Anadarko (the "Synergies") (as described in "The Merger-Certain Unaudited Prospective Financial Information" beginning on page 74); and
- certain internal financial analyses and forecasts for Anadarko prepared by its management, as approved for Goldman Sachs' use by Anadarko (the "Anadarko management forecast") (as described in "The Merger-Certain Unaudited Prospective Financial Information" beginning on page 74).

Goldman Sachs also held discussions with members of the senior managements of Anadarko and Occidental regarding their assessment of the strategic rationale for, and the potential benefits of, the merger and the past and current business operations, financial condition and future prospects of Occidental and with members of the senior management of Anadarko regarding their assessment of the past and current business operations, financial condition and future prospects of Anadarko; reviewed the reported price and trading activity for the shares of Anadarko common stock and the shares of Occidental common stock; compared certain financial and stock market information for Anadarko and Occidental with similar information for certain other companies the securities of which are publicly traded; reviewed the financial terms of certain recent business combinations in the oil and gas exploration and production industry; and performed such other studies and analyses, and considered such other factors, as Goldman Sachs deemed appropriate.

TABLE OF CONTENTS

For purposes of rendering its opinion, Goldman Sachs, with the consent of the Anadarko Board, relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by, Goldman Sachs, without assuming any responsibility for independent verification thereof. In that regard, Goldman Sachs assumed with the consent of the Anadarko Board that the adjusted Occidental forecasts, the Anadarko management forecast and the Synergies were reasonably prepared on a basis reflecting the best then available estimates and judgments of the management of Anadarko. Goldman Sachs did not make an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or other off-balance-sheet assets and liabilities) of Anadarko or Occidental or any of their respective subsidiaries and Goldman Sachs was not furnished with any such evaluation or appraisal. Goldman Sachs assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the merger would be obtained without any adverse effect on Anadarko or Occidental or on the expected benefits of the merger in any way meaningful to Goldman Sachs' analysis. Goldman Sachs also assumed that the merger would be consummated on the terms set forth in the merger agreement, without the waiver or modification of any term or condition the effect of which would be in any way meaningful to its analysis.

Goldman Sachs' opinion did not address the underlying business decision of Anadarko to engage in the merger, or the relative merits of the merger as compared to any strategic alternatives that may be available to Anadarko; nor did it address any legal, regulatory, tax or accounting matters. Goldman Sachs' opinion addressed only the fairness from a financial point of view to the holders (other than Occidental, Berkshire Hathaway and their respective affiliates) of shares of Anadarko common stock, as of the date of its written opinion, of the merger consideration to be paid to such holders pursuant to the merger agreement. Goldman Sachs did not express any view on, and its opinion did not address, any other term or aspect of the merger agreement or merger or any term or aspect of any other agreement or instrument contemplated by the merger agreement or entered into or amended in connection with the merger, including, the fairness of the merger to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors, or other constituencies of Anadarko; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Anadarko, or any class of such persons, in connection with the merger, whether relative to the merger consideration to be paid to the holders (other than Occidental, Berkshire Hathaway and their respective affiliates) of shares of Anadarko common stock pursuant to the merger agreement or otherwise. Goldman Sachs did not express any opinion as to the prices at which shares of Occidental common stock would trade at any time or as to the impact of the merger on the solvency or viability of Anadarko or Occidental or the ability of Anadarko or Occidental to pay their respective obligations when they come due. Goldman Sachs' opinion was necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to Goldman Sachs as of, the date of its written opinion and Goldman Sachs assumed no responsibility for updating, revising or reaffirming its opinion based on circumstances, developments or events occurring after the date of its written opinion. Goldman Sachs' advisory services and its opinion were provided for the information and assistance of the Anadarko Board in connection with its consideration of the merger and the opinion does not constitute a recommendation as to how any holder of shares of Anadarko common stock should vote with respect to the merger or any other matter. Goldman Sachs' opinion was approved by a fairness committee of Goldman Sachs.

*Summary of Financial Analyses*

The following is a summary of the material financial analyses presented by Goldman Sachs to the Anadarko Board in connection with rendering to the Anadarko Board the opinion described above. The following summary, however, does not purport to be a complete description of the financial analyses performed by Goldman Sachs, nor does the order of analyses described represent relative importance or weight given to those analyses by Goldman Sachs. Some of the summaries of the financial analyses include information presented in tabular format. The tables must be read together with the full text of each summary and are alone not a complete description of Goldman Sachs' financial analyses. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before May 8, 2019 and is not necessarily indicative of current or future market conditions.

Implied Premia and Multiple Analysis

Goldman Sachs calculated and compared certain implied premia and multiples using the closing price for the shares of Anadarko common stock on April 11, 2019, the last trading day prior to announcement of the previously proposed acquisition of Anadarko by Chevron, the closing price for the shares of Occidental common

TABLE OF CONTENTS

stock on April 11, 2019, the closing price for the shares of Occidental common stock on May 8, 2019, the last trading day prior to announcement of the merger with Occidental, and the implied value of the merger consideration to be paid by Occidental for each share of Anadarko common stock pursuant to the merger agreement. For purposes of its analysis, Goldman Sachs calculated an implied value for the merger consideration of $76.67 (the "Implied Merger Consideration Value") by adding (i) an implied value for the stock consideration per share (calculated by multiplying the exchange ratio of 0.2934 pursuant to the merger agreement by $60.21, the closing price for the shares of Occidental common stock on May 8, 2019), and (ii) the cash consideration of $59.00 per share of Anadarko common stock.

Goldman Sachs calculated the following:

- The premium represented by the Implied Merger Consideration Value of $76.67 per share of Anadarko common stock relative to:
  - $46.80, the closing price of the shares of Anadarko common stock on April 11, 2019 (the "Anadarko Undisturbed Closing Price");
  - $45.25, the volume weighted average price ("VWAP") of shares of Anadarko common stock over the 20-trading-day period ended April 11, 2019 (the "Anadarko 20-Day VWAP");
  - $44.78, the VWAP of shares of Anadarko common stock over the 30-trading-day period ended April 11, 2019 (the "Anadarko 30-Day VWAP");
  - $75.86, the highest daily closing price of shares of Anadarko common stock over the 52-week period ended May 8, 2019 (the "Anadarko 52-Week High"); and
  - $40.57, the lowest daily closing price of shares of Anadarko common stock over the 52-week period ended May 8, 2019 (the "Anadarko 52-Week Low").

The results of these calculations are as follows:

| Anadarko Reference Share Price | Implied Premium Represented by the Implied Merger Consideration Value of $76.67 per Anadarko Share |
|---|---|
| Anadarko Undisturbed Closing Price of $46.80 | 63.8 % |
| Anadarko 20-Day VWAP of $45.25 | 69.4 % |
| Anadarko 30-Day VWAP of $44.78 | 71.2 % |
| Anadarko 52-Week High of $75.86 | 1.1 % |
| Anadarko 52-Week Low of $40.57 | 89.0 % |

In addition, Goldman Sachs calculated implied equity values for Occidental by multiplying each of $67.18, the closing price for the shares of Occidental common stock on April 11, 2019 ("Occidental Undisturbed Closing Price"), and $60.21, the closing price for the shares of Occidental common stock on May 8, 2019 ("Occidental Pre-Announcement Closing Price"), by the total number of fully diluted shares of Occidental common stock outstanding as of April 30, 2019, calculated based on the Occidental Undisturbed Closing Price and the Occidental Pre-Announcement Closing Price, as applicable, and outstanding equity information for Occidental provided and approved for Goldman Sachs' use by Anadarko management. Goldman Sachs then calculated implied enterprise values for Occidental by adding to each of the implied equity values calculated for Occidental, Occidental's net debt (calculated as debt less cash and cash equivalents ("net debt")) and non-controlling interests, each as of March 31, 2019, as reflected in Occidental's consolidated balance sheet as of that date.

Goldman Sachs also calculated implied equity values for Anadarko by multiplying each of the Anadarko Undisturbed Closing Price and the Implied Merger Consideration Value, by the total number of fully diluted shares of Anadarko common stock outstanding as of May 2, 2019, calculated based on the Anadarko Undisturbed Closing Price and the Implied Merger Consideration Value, as applicable, and outstanding equity information for Anadarko provided and approved for Goldman Sachs' use by Anadarko management. Goldman Sachs then calculated implied enterprise values for Anadarko by adding to each of the implied equity values calculated for Anadarko, Anadarko's (i) consolidated net debt as of March 31, 2019, as reflected in Anadarko's consolidated balance sheet as of that date and (ii) non-controlling interests in Western Midstream Partners, L.P. as of May 8, 2019, calculated using publicly available information and information provided by Anadarko management.

TABLE OF CONTENTS

Using the foregoing, Goldman Sachs calculated the following multiples:

- The implied enterprise value for Occidental, based on both the Occidental Undisturbed Closing Price and the Occidental Pre-Announcement Closing Price, as a multiple of the EBITDAX of Occidental on a stand-alone basis for calendar years 2019 and 2020, as reflected in (i) the median estimates published by the Institutional Brokers' Estimate System ("IBES Estimates") for Occidental and (ii) the adjusted Occidental standalone forecast.

The results of these calculations are as follows:

| | Occidental Enterprise Value / EBITDAX | |
|---|---|---|
| Metric | Occidental Undisturbed Closing Price | Occidental Pre-Announcement Closing Price |
| 2019E EBITDAX (IBES Estimates) | 6.9x | 6.3x |
| 2020E EBITDAX (IBES Estimates) | 6.7x | 6.1x |
| 2019E EBITDAX (Adjusted Occidental Standalone Forecast) | 8.2x | 7.5x |
| 2020E EBITDAX (Adjusted Occidental Standalone Forecast) | 7.6x | 6.9x |

- The implied enterprise value for Anadarko based on both the Anadarko Undisturbed Closing Price and the Implied Merger Consideration Value as a multiple of the estimated EBITDAX of Anadarko for calendar years 2019 and 2020, as reflected in (i) the IBES Estimates for Anadarko and (ii) the Anadarko management forecast.

The results of these calculations are as follows:

| | Anadarko Enterprise Value / EBITDAX | |
|---|---|---|
| Metric | Anadarko Undisturbed Closing Price | Implied Merger Consideration Value |
| 2019E EBITDAX (IBES Estimates) | 5.6x | 7.4x |
| 2020E EBITDAX (IBES Estimates) | 5.2x | 7.0x |
| 2019E EBITDAX (Anadarko Management Forecast) | 5.9x | 7.9x |
| 2020E EBITDAX (Anadarko Management Forecast) | 5.3x | 7.0x |

Based on the foregoing, Goldman Sachs also calculated the following multiples:

- Each of the Occidental Undisturbed Closing Price and the Occidental Pre-Announcement Closing Price as a multiple of estimated CFPS of Occidental on a stand-alone basis for calendar years 2019 and 2020, as reflected in (i) the IBES Estimates for Occidental and (ii) the adjusted Occidental standalone forecast.

The results of these calculations are as follows:

| | Occidental Price / CFPS | |
|---|---|---|
| Metric | Occidental Undisturbed Closing Price | Occidental Pre-Announcement Closing Price |
| 2019E CFPS (IBES Estimates) | 6.4x | 5.8x |
| 2020E CFPS (IBES Estimates) | 6.5x | 5.8x |
| 2019E CFPS (Adjusted Occidental Standalone Forecast) | 7.6x | 6.8x |
| 2020E CFPS (Adjusted Occidental Standalone Forecast) | 7.3x | 6.5x |

- Each of the Anadarko Undisturbed Closing Price and the Implied Merger Consideration Value as a multiple of estimated CFPS of Anadarko for calendar years 2019 and 2020, as reflected in (i) the IBES Estimates for Anadarko and (ii) the Anadarko management forecast.

TABLE OF CONTENTS

The results of these calculations are as follows:

| | Anadarko Price / CFPS | |
|---|---|---|
| Metric | Anadarko Undisturbed Closing Price | Implied Merger Consideration Value |
| 2019E CFPS (IBES Estimates) | 3.5x | 5.8x |
| 2020E CFPS (IBES Estimates) | 3.4x | 5.6x |
| 2019E CFPS (Anadarko Management Forecast) | 4.2x | 6.9x |
| 2020E CFPS (Anadarko Management Forecast) | 3.4x | 5.5x |

Illustrative Discounted Cash Flow Analysis

Goldman Sachs performed an illustrative discounted cash flow analysis of Anadarko to derive a range of illustrative present values per share of Anadarko common stock, as of March 31, 2019.

Using mid-year convention and discount rates ranging from 8.5% to 9.5%, reflecting estimates of Anadarko's weighted average cost of capital, Goldman Sachs discounted to present value as of March 31, 2019 (i) estimates of the unlevered free cash flows to be generated by Anadarko for the period from April 1, 2019 to December 31, 2025, as reflected in the Anadarko management forecast, and (ii) a range of illustrative terminal values for Anadarko as of December 31, 2025, calculated by applying terminal year multiples of enterprise value to LTM EBITDAX ranging from 5.0x to 6.5x to estimated EBITDAX of Anadarko for 2025, as reflected in the Anadarko management forecast (which analysis implied perpetuity growth rates ranging from negative 0.6% to positive 2.3%). Goldman Sachs derived the discount rates referenced above by application of the capital asset pricing model ("CAPM"), which requires certain company-specific inputs, including the company's target capital structure weightings, the cost of long-term debt, future applicable marginal cash tax rate and a beta for the company, as well as certain financial metrics for the United States financial markets generally. The range of terminal year multiples of enterprise value to EBITDAX was estimated by Goldman Sachs utilizing its professional judgment and experience, taking into account the Anadarko management forecast and the Anadarko Undisturbed Closing Price 2019E EBITDAX multiples as calculated by Goldman Sachs and as set forth above under "-Implied Premia and Multiple Analysis".

Goldman Sachs derived a range of illustrative enterprise values for Anadarko by adding the ranges of present values it derived as described above. Goldman Sachs then subtracted from the range of illustrative enterprise values it derived (i) the net debt of Anadarko (including pension shortfall and post-retirement and asset retirement obligations) as of March 31, 2019, as reflected in Anadarko's consolidated balance sheet as of that date, both with and without giving effect to the impact of the $1 billion termination fee paid by Anadarko in connection with the termination of its prior merger agreement with Chevron (the "Chevron termination fee"), and (ii) the midpoint valuation of the non-controlling interests in Western Midstream Partners, L.P. Goldman Sachs valued the non-controlling interests in Western Midstream Partners, L.P. using the Anadarko management forecast and information provided by Anadarko management by performing a dividend discount analysis using discount rates ranging from 8.0% to 9.5%, reflecting estimates of Western Midstream Partners, L.P.'s cost of equity, to discount to present value, as of March 31, 2019 (i) the estimated distributions to Western Midstream Partners, L.P.'s unitholders for the period from April 1, 2019 to December 31, 2025, reflected in the Anadarko management forecast, and (ii) a range of illustrative terminal values for Western Midstream Partners, L.P. as of December 31, 2025, calculated by applying LTM dividend yields ranging from 7.0% to 9.0% to the estimated distributions to Western Midstream Partners, L.P.'s unitholders in 2025, as reflected in the Anadarko management forecast, which analysis resulted in a range of illustrative equity values of Western Midstream Partners, L.P. of $16.9 billion to $21.4 billion. Goldman Sachs derived the discount rates referenced above by application of the CAPM, which requires certain company-specific inputs, including a beta for the company, as well as certain financial metrics for the United States financial markets generally. The range of LTM dividend yields was estimated by Goldman Sachs utilizing its professional judgment and experience, taking into account Western Midstream Partners, L.P.'s historical LTM dividend yields over the five-year period ending May 8, 2019.

Goldman Sachs then divided the range of illustrative equity values it derived for Anadarko as described above by the fully diluted shares of Anadarko common stock outstanding as of May 2, 2019, calculated based on equity information for Anadarko as provided by Anadarko management, to derive a range of illustrative present values per share of Anadarko common stock of $41.92 to $69.48 (calculated without reflecting the impact of the Chevron termination fee) and $39.93 to $67.50 (calculated reflecting the impact of the Chevron termination fee).

TABLE OF CONTENTS

Illustrative Present Value of Future Stock Price Analysis

Goldman Sachs performed an illustrative analysis to derive a range of illustrative present values per share of Anadarko common stock as of March 31, 2019 based on theoretical future prices calculated by Goldman Sachs for the shares of Anadarko common stock (the “Illustrative Present Value of Future Stock Price Analysis”).

Goldman Sachs derived a range of theoretical future values per share for the shares of Anadarko common stock as of December 31, 2019, 2020, 2021, 2022, 2023 and 2024 by applying illustrative one-year forward price to CFPS multiples of 3.5x to 5.5x to estimates of the CFPS of Anadarko for 2020, 2021, 2022, 2023, 2024 and 2025, respectively, as reflected in the Anadarko management forecast. By applying a discount rate of 10.8%, reflecting an estimate of Anadarko’s cost of equity, and, for the dividends only, using a mid-year convention, Goldman Sachs discounted to present value as of March 31, 2019 both the theoretical future values per share it derived for Anadarko and the estimated dividends to be paid per share of Anadarko common stock through the end of the applicable year as reflected in the Anadarko management forecast, to yield illustrative present values per share of Anadarko common stock ranging from $44.63 to $71.92 (calculated without reflecting the impact of the Chevron termination fee) and $42.65 to $69.94 (calculated reflecting the impact of the Chevron termination fee).

The illustrative one-year forward price to CFPS multiples used in the foregoing analysis were derived by Goldman Sachs using its professional judgement and experience, taking into account historical CFPS multiples for Anadarko and the 2019E CFPS multiples for Anadarko based on the Anadarko Undisturbed Closing Price as calculated by Goldman Sachs and as set forth above under “-Implied Premia and Multiple Analysis”. Goldman Sachs derived the discount rate used in the foregoing analysis by application of the CAPM, which requires certain company-specific inputs, including a beta for the company, as well as certain financial metrics for the United States financial markets generally.

Premia Paid Analysis

Goldman Sachs analyzed the premia paid in certain acquisition transactions listed below announced since August 1998 with a transaction enterprise value of $3 billion or greater involving publicly traded target companies in the oil and gas exploration and production industry. With respect to each of these transactions, Goldman Sachs calculated the implied premium of the price paid in the transactions relative to the last undisturbed closing share price of the target company. The following table presents the results of this analysis:

| Announcement Date | Target | Acquirer | Premium to 1-Day Prior to Announcement |
|---|---|---|---|
| **All-Stock Consideration Transactions:** | | | |
| 5/11/15 | Rosetta Resources Inc. | Noble Energy, Inc. | 37.7 % |
| 3/28/18 | RSP Permian, Inc. | Concho Resources Inc. | 29.1 % |
| 4/1/99 | Atlantic Richfield Company | BP Amoco Company | 26.0 % |
| 12/14/09 | XTO Energy Inc. | ExxonMobil Corporation | 24.6 % |
| 8/11/98 | Amoco Corporation | British Petroleum Company p.l.c. | 22.7 % |
| 2/21/13 | Berry Petroleum Company | Linn Energy, LLC | 19.8 % |
| 8/14/18 | Energen Corporation | Diamondback Energy, Inc. | 19.0 % |
| 5/16/16 | Memorial Resource Development Corp. | Range Resources Corporation | 17.1 % |
| 12/1/98 | Mobil Corporation | Exxon Corporation | 15.1 % |
| **Mixed Consideration Transactions:** | | | |
| 4/4/05 | Unocal Corporation | Chevron Corporation | 50.7 % |
| 4/15/10 | Mariner Energy, Inc. | Apache Corporation | 44.9 % |
| 12/5/12 | Plains Exploration & Production Company | Freeport-McMoRan Copper & Gold Inc. | 38.7 % |
| 6/19/17 | Rice Energy Inc. | EQT Corporation | 37.3 % |
| 11/9/10 | Atlas Energy, Inc. | Chevron Corporation | 36.6 % |
| 11/1/09 | Encore Acquisition Company | Denbury Resources Inc. | 34.9 % |
| 1/16/17 | Clayton Williams Energy, Inc. | Noble Energy, Inc. | 33.7 % |

TABLE OF CONTENTS

Although none of the selected transactions is directly comparable to the transaction contemplated by the merger agreement, the target companies in the selected transactions were companies with operations that, for the purposes of analysis, may be considered similar to certain of Anadarko's results and product candidate profile, and as such, for purposes of analysis, the selected transactions may be considered similar to the transaction contemplated by the merger agreement.

Based on its review of the foregoing data and its professional judgment and experience, Goldman Sachs applied a range of illustrative premia of 15.1% to 50.7% to the Anadarko Undisturbed Closing Price of $46.80. This analysis resulted in a range of implied values per share of Anadarko common stock of $53.88 to $70.52 (calculated without reflecting the impact of the Chevron termination fee) and $51.90 to $68.54 (calculated reflecting the impact of the Chevron termination fee).

Illustrative Present Value of Future Stock Price - Occidental Pro Forma

Goldman Sachs performed an illustrative Present Value of Future Stock Price analysis by comparing (i) a range of illustrative present values of 0.2934 of a share of Occidental common stock on a pro forma basis giving effect to the merger, as of March 31, 2019, based on theoretical future prices calculated by Goldman Sachs for 0.2934 of a share of Occidental common stock as of December 31, 2019, 2020 and 2021 plus, in each case, the $59.00 per share of Anadarko common stock to be received for each share of Anadarko common stock in the proposed merger, to (ii) a range of illustrative present values per share of Anadarko common stock derived by performing the Illustrative Present Value of Future Stock Price Analysis for Anadarko on a standalone basis calculated as described above based on theoretical future prices for a share of Anadarko common stock as of December 31, 2019, 2020 and 2021 (without reflecting the impact of the Chevron termination fee).

Goldman Sachs derived a range of theoretical future values per share for the shares of Occidental common stock on a pro forma basis giving effect to the merger, as of December 31 of each of 2019, 2020 and 2021 by applying illustrative one-year forward price to CFPS multiples of 3.5x to 5.5x to estimates of the CFPS of Occidental on a pro forma basis for each of 2020, 2021 and 2022, the years for which estimates of the CFPS of Occidental on a pro forma basis were reflected in the adjusted Occidental pro forma forecast. By applying a discount rate of 9.0%, reflecting an estimate of Occidental's cost of equity on a pro forma basis, Goldman Sachs discounted to present value as of March 31, 2019 both the theoretical future values per share it derived for Occidental on a pro forma basis and the estimated dividends to be paid per share of Occidental common stock on a pro forma basis through the end of the applicable year as reflected in the adjusted Occidental pro forma forecast, to yield illustrative present values per share of Occidental common stock on a pro forma basis. Goldman Sachs then multiplied this range by the exchange ratio of 0.2934 pursuant to the merger agreement and added to the results the cash consideration of $59.00 per share pursuant to the merger agreement to yield illustrative present values ranging from $73.02 to $80.36 for the 0.2934 of a share of Occidental common stock and the $59.00 in cash to be received for each share of Anadarko common stock in the merger. Goldman Sachs compared the resulting range of illustrative present values with the range of illustrative present values per share of Anadarko common stock on a standalone basis of $44.83 to $71.92 derived by performing the Illustrative Present Value of Future Stock Price Analysis for Anadarko on a standalone basis described above based on theoretical future prices for a share of Anadarko common stock as of December 31, 2019, 2020 and 2021 using estimates of the CFPS of Anadarko for years 2020, 2021 and 2022 (calculated without reflecting the impact of the Chevron termination fee).

The illustrative one-year forward price to CFPS multiples used in the foregoing analysis were derived by Goldman Sachs using its professional judgement and experience, taking into account the CFPS multiples calculated by Goldman Sachs as set forth above under "-Implied Premia and Multiple Analysis". Goldman Sachs derived the discount rate used in the foregoing analysis by application of the CAPM, which requires certain company-specific inputs, including a beta for the company, as well as certain financial metrics for the United States financial markets generally.

*General*

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Goldman Sachs' opinion. In arriving at its fairness determination, Goldman Sachs considered the results of all of its

analyses and did not attribute any particular weight to any factor or analysis considered by it. Rather, Goldman Sachs made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of its analyses. No company or transaction used in the above analyses as a comparison is directly comparable to Anadarko or the merger.

Goldman Sachs prepared these analyses for purposes of providing its opinion to the Anadarko Board as to the fairness from a financial point of view to the holders (other than Occidental, Berkshire Hathaway and their respective affiliates) of shares of Anadarko common stock, as of the date of its written opinion, of the merger consideration to be paid to such holders pursuant to the merger agreement. These analyses do not purport to be appraisals nor do they necessarily reflect the prices at which businesses or securities actually may be sold. Analyses based upon projections of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by these analyses. Because these analyses are inherently subject to uncertainty, being based upon numerous factors or events beyond the control of the parties or their respective advisors, none of Anadarko, Goldman Sachs or any other person assumes responsibility if future results are materially different from those forecast.

The merger consideration was determined through arm's-length negotiations between Anadarko and Occidental and was approved by the Anadarko Board. Goldman Sachs provided advice to Anadarko during these negotiations. Goldman Sachs did not, however, recommend any specific consideration to Anadarko or the Anadarko Board or that any specific consideration constituted the only appropriate consideration for the merger.

As described above, Goldman Sachs' opinion was one of many factors taken into consideration by the Anadarko Board in making its determination to approve the merger agreement. The foregoing summary does not purport to be a complete description of the analyses performed by Goldman Sachs in connection with the delivery of its fairness opinion to the Anadarko Board and is qualified in its entirety by reference to the written opinion of Goldman Sachs attached as Annex C to this proxy statement/prospectus.

Goldman Sachs and its affiliates are engaged in advisory, underwriting and financing, principal investing, sales and trading, research, investment management and other financial and non-financial activities and services for various persons and entities. Goldman Sachs and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of Anadarko, Occidental, any of their respective affiliates and third parties, including Berkshire Hathaway and its affiliates and portfolio companies, or any currency or commodity that may be involved in the merger. Goldman Sachs acted as financial advisor to Anadarko in connection with, and has participated in certain of the negotiations leading to, the merger. Goldman Sachs expects to receive fees for its services in connection with the merger, the principal portion of which is contingent upon completion of the merger, and Anadarko has agreed to reimburse certain of Goldman Sachs' expenses arising, and indemnify Goldman Sachs against certain liabilities that may arise, out of Goldman Sachs' engagement. Goldman Sachs has provided certain financial advisory and/or underwriting services to Anadarko and/or its affiliates from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as co-financial advisor in connection with a restructuring transaction involving Western Gas Equity Partners, LP (now known as Western Midstream Partners, LP) and Western Gas Partners LP (now known as Western Midstream Operating, LP), subsidiaries of Anadarko, in February 2019. During the two-year period ended May 9, 2019, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Anadarko and/or its affiliates of approximately $500,000. During the two-year period ended May 9, 2019, Goldman Sachs has not recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Occidental and/or its affiliates. Goldman Sachs also has provided certain financial advisory and/or underwriting services to Berkshire Hathaway and/or its affiliates from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as co-financial advisor in connection with a sale of USG Corporation, a subsidiary of Berkshire Hathaway, in April 2019; as joint bookrunner with respect to the offering of Berkshire Hathaway's 4.250% Guaranteed Global Notes due 2049 (aggregate principal amount $750,000,000) in March 2019; as joint bookrunner with respect to the offering of Berkshire Hathaway's 4.250% Guaranteed Global Notes due 2049 (aggregate principal amount $1,250,000,000) in January 2019; as joint bookrunner with respect to the offering of Berkshire Hathaway's 4.200% Guaranteed Global Notes due 2048 (aggregate principal amount $2,350,000,000) in August 2018; as joint bookrunner with

respect to the offering of Burlington Northern Santa Fe Corporation, a subsidiary of Berkshire Hathaway, 4.150% Debentures due 2048 (aggregate principal amount $750,000,000) in July 2018; as joint bookrunner with respect to the offering of The Kraft Heinz Company, a subsidiary of Berkshire Hathaway, 4.625% Guaranteed Global Notes due 2029, 4.0% Guaranteed Global Notes due 2023, 3.375% Guaranteed Global Notes due 2021 and 4.050% Debentures due 2048 (aggregate principal amount $3,000,000,000) in June 2018; as joint bookrunner with respect to the offering of Burlington Northern Santa Fe Corporation's 4.050% Debentures due 2048 (aggregate principal amount $750,000,000) in February 2018; and as joint bookrunner with respect to the offering of The Kraft Heinz Company's Guaranteed Senior Notes due 2022, 2021 and 2019 (aggregate principal amount $1,500,000,000) in June 2018. During the two-year period ended May 9, 2019, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Berkshire Hathaway and/or its affiliates of approximately $45 million. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to Anadarko, Occidental, Berkshire Hathaway and their respective affiliates and, as applicable, portfolio companies, for which its Investment Banking Division may receive compensation. Affiliates of Goldman Sachs also may have co-invested with Berkshire Hathaway and its affiliates from time to time and may do so in the future.

The Anadarko Board selected Goldman Sachs as its financial advisor because it is an internationally recognized investment banking firm that has substantial experience in transactions similar to the merger. Pursuant to an engagement letter dated February 17, 2019, Anadarko engaged Goldman Sachs to act as its financial advisor in connection with the merger. The engagement letter between Anadarko and Goldman Sachs provides for a fee estimated, based on the information available as of the date of announcement, at approximately $53 million, $2.5 million of which was payable to Goldman Sachs upon announcement of the merger and the remainder of which is contingent upon completion of the merger. In addition, Anadarko agreed to reimburse Goldman Sachs for certain of its expenses, including reasonable attorneys' fees and disbursements, and to indemnify Goldman Sachs and related persons against various liabilities, including certain liabilities under the federal securities laws.

**Certain Unaudited Prospective Information**

***Summary Unaudited Prospective Financial Information Prepared by Anadarko***

*Anadarko Unaudited Prospective Financial Information*

Anadarko does not, as a matter of course, publicly disclose long-term consolidated forecasts as to future performance, earnings or other results given, among other reasons, the uncertainty, unpredictability and subjectivity of the underlying assumptions and estimates. In connection with the Anadarko Board's consideration of the transaction, Anadarko's management prepared certain unaudited financial projections regarding Anadarko's future performance for the years 2019 through 2025 on a standalone basis without giving effect to the merger (the "Anadarko management forecast"), and provided the Anadarko management forecast to Occidental and the Anadarko Board and to Anadarko's financial advisors for their use in connection with their respective financial analyses (see the sections described above in this proxy statement/prospectus entitled "The Merger-Opinions of Anadarko's Financial Advisors" beginning on page 58 of this proxy statement/prospectus). The unaudited financial projections were based upon the internal financial model that Anadarko has historically used in connection with strategic planning.

The summaries of these projections are being included in this proxy statement/prospectus to give Anadarko's stockholders access to non-public information that was provided to Anadarko's financial advisors in the course of evaluating the proposed merger, and are not intended to influence your decision whether to vote in favor of the merger proposal or any other proposal at the special meeting. The inclusion of this information should not be regarded as an indication that any of Anadarko or its advisors or other representatives or any other recipient of this information considered, or now considers, it to be necessarily predictive of actual future performance or events, or that it should be construed as financial guidance, and such summary projections set forth below should not be relied on as such.

While presented with numeric specificity, the unaudited prospective financial and operating information reflects numerous estimates and assumptions that are inherently uncertain and may be beyond the control of Anadarko, including, among others, Anadarko's assumptions about energy markets, production and sales volume levels, levels of oil, natural-gas and NGL reserves, operating results, competitive conditions, technology, availability of capital resources, levels of capital expenditures, and other contractual obligations, supply and

demand for, the price of, and the commercialization and transporting of oil, natural gas, NGLs and other products or services and other matters described in the sections entitled “Cautionary Note Regarding Forward-Looking Statements”, “Where You Can Find More Information”, and “Risk Factors”, beginning on pages 29, 167 and 32, respectively. The unaudited prospective financial and operating information reflects both assumptions as to certain business decisions that are subject to change and, in many respects, subjective judgment, and thus is susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. Anadarko can give no assurance that the unaudited prospective financial and operating information and the underlying estimates and assumptions will be realized. In addition, since the unaudited prospective financial and operating information covers multiple years, such information by its nature becomes more speculative with each successive year. This information constitutes “forward-looking statements” and actual results may differ materially and adversely from those projected.

The unaudited prospective financial and operating information was not prepared with a view toward public disclosure, nor was it prepared with a view toward compliance with GAAP, published guidelines of the SEC or the guidelines established by the Public Company Accounting Oversight Board for preparation and presentation of prospective financial information. Neither Anadarko’s independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the unaudited prospective financial and operating information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability. The report of the independent registered public accounting firm to Anadarko contained in its Annual Report on Form 10-K for the year ended December 31, 2018, and in the Current Report on Form 8-K filed by Anadarko on May 15, 2019, which is incorporated by reference into this proxy statement/prospectus, relates to historical financial information of Anadarko, and such report does not extend to the projections included below and should not be read to do so.

Furthermore, the unaudited prospective financial and operating information does not take into account any circumstances or events occurring after the date it was prepared. Anadarko can give no assurance that, had the unaudited prospective financial and operating information been prepared as of the date of this proxy statement/prospectus, similar estimates and assumptions would be used. Except as required by applicable securities laws, Anadarko does not intend to, and disclaims any obligation to, make publicly available any update or other revision to the unaudited prospective financial and operating information to reflect circumstances existing since its preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error or to reflect changes in general economic or industry conditions. The unaudited prospective financial and operating information does not take into account all the possible financial and other effects on Anadarko of the merger, the effect on Anadarko of any business or strategic decision or action that has been or will be taken as a result of the merger agreement having been executed, or the effect of any business or strategic decisions or actions that would likely have been taken if the merger agreement had not been executed, but which were instead altered, accelerated, postponed or not taken in anticipation of the merger. Further, the unaudited prospective financial and operating information does not take into account the effect on Anadarko of any possible failure of the merger to occur. None of Anadarko or its affiliates, officers, directors, advisors or other representatives has made, makes or is authorized in the future to make any representation to any Anadarko stockholder or other person regarding Anadarko’s ultimate performance compared to the information contained in the unaudited prospective financial and operating information or to the effect that the forecasted results will be achieved. The inclusion of the unaudited prospective financial and operating information herein should not be deemed an admission or representation by Anadarko or its advisors or any other person that it is viewed as material information of Anadarko, particularly in light of the inherent risks and uncertainties associated with such forecasts.

In light of the foregoing, and considering that the special meeting will be held several months after the unaudited prospective financial and operating information was prepared, as well as the uncertainties inherent in any forecasted information, Anadarko stockholders are cautioned not to place undue reliance on such information, and Anadarko urges all Anadarko stockholders to review Anadarko’s most recent SEC filings for a description of Anadarko’s reported financial results. See “Where You Can Find More Information” beginning on page 167.

TABLE OF CONTENTS

*Certain Assumptions*

In preparing the prospective financial and operating information for Anadarko described below, the management team of Anadarko used the following commodity price assumptions, which are based on oil and gas strip pricing and Wall Street consensus pricing, each as of February 25, 2019:

| | Strip pricing | | | | |
|---|---|---|---|---|---|
| | 2019E | 2020E | 2021E | 2022E | 2023E-2025E |
| **Commodity Prices** | | | | | |
| Brent oil ($/Bbl) | $ 63.07 | $ 63.31 | $ 61.84 | $ 60.87 | $ 60.61 |
| WTI oil ($/MMBtu) | $ 55.00 | $ 56.77 | $ 55.22 | $ 54.15 | $ 53.72 |
| Henry Hub gas ($/MMBtu) | $ 2.80 | $ 2.75 | $ 2.63 | $ 2.63 | $ 2.69 |

| | Wall Street consensus pricing | | | | |
|---|---|---|---|---|---|
| | 2019E | 2020E | 2021E | 2022E | 2023E-2025E |
| **Commodity Prices** | | | | | |
| Brent oil ($/Bbl) | $ 66.34 | $ 70.00 | $ 69.59 | $ 68.57 | $ 68.57 |
| WTI oil ($/MMBtu) | $ 59.30 | $ 63.00 | $ 64.80 | $ 64.50 | $ 64.50 |
| Henry Hub gas ($/MMBtu) | $ 3.13 | $ 3.03 | $ 3.00 | $ 3.00 | $ 3.00 |

In addition to the assumptions with respect to commodity prices, the Anadarko unaudited forecasted financial and operating information is based on various other assumptions, including, but not limited to, the following principal assumptions:

- DJ Basin capital expenditures declining from $1.3 billion in 2019 to $900 million in 2021, then approximately $1.0 billion per year thereafter ranging from $900 million to $1.3 billion per year;
- Delaware Basin capital expenditures increasing from $1.4 billion in 2019 to $2.2 billion in 2025;
- Gulf of Mexico and international capital expenditures remaining relatively consistent across periods;
- Consistent levels of general and administrative expense; and
- Retirement of all debt maturing within the periods.

The Anadarko unaudited forecasted financial and operating information also reflects assumptions regarding the continuing nature of ordinary course operations that may be subject to change.

The following table summarizes the Anadarko management forecast as of April 2019 for the fiscal years 2019 through 2025 ($ in millions):

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| **Strip pricing case** | | | | | | | |
| Total Net Production (Mboe/d) | 728 | 774 | 834 | 912 | 973 | 1,086 | 1,198 |
| Consolidated EBITDAX(1) | $ 7,691 | $ 8,641 | $ 9,023 | $ 9,945 | $ 10,538 | $ 11,687 | $ 12,874 |
| Consolidated Capital Expenditures(2) | $ 6,042 | $ 5,781 | $ 6,048 | $ 6,366 | $ 5,806 | $ 5,371 | $ 5,260 |
| Unlevered Free Cash Flow(3) | $ 49 | $ 1,951 | $ 1,965 | $ 2,492 | $ 3,646 | $ 5,076 | $ 6,227 |
| **Wall Street consensus pricing case** | | | | | | | |
| Total Net Production (Mboe/d) | 728 | 774 | 834 | 912 | 973 | 1,086 | 1,198 |
| Consolidated EBITDAX(1) | $ 8,519 | $ 9,785 | $ 10,813 | $ 12,068 | $ 12,890 | $ 14,292 | $ 15,690 |
| Consolidated Capital Expenditures(2) | $ 6,042 | $ 5,781 | $ 6,048 | $ 6,366 | $ 5,806 | $ 5,371 | $ 5,260 |

(1) Consolidated EBITDAX is defined as net income (loss) before income taxes; interest expense; depreciation, depletion and amortization; exploration expense; gains (losses) on divestitures, net; impairments; total (gains) losses on derivatives, net, less net cash from settlement of commodity derivatives; and certain items not related to Anadarko's normal operations. Consolidated EBITDAX is a non-GAAP financial measure as it excludes amounts included in net income (loss), the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to net income (loss) or other measures derived in accordance with GAAP. Consolidated EBITDAX differs from Adjusted EBITDAX historically reported by Anadarko due to its exclusion of amounts of net income attributable to noncontrolling interests.

(2) Consolidated capital expenditures includes the following assumed capital expenditures of Western Midstream Partners, LP: 2019 - $1,157; 2020 - $984; 2021 - $839; 2022 - $1,037; 2023 - $752; 2024 - $625; 2025 - $641.

TABLE OF CONTENTS

(3) Unlevered Free Cash Flow is defined as net income (loss) before interest and taxes, less unlevered taxes, plus depreciation and amortization, plus (less) changes in working capital, less capital expenditures (and other investing cash flows excluding capitalized interest expense), plus non-cash exploration expense, plus other non-cash items. Unlevered Free Cash Flow is a non-GAAP financial measure as it excludes amounts included in net income (loss), the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to net income (loss) or other measures derived in accordance with GAAP. Unlevered Free Cash Flow differs from the definition of Adjusted Free Cash Flow historically provided by Anadarko due to its exclusion of interest expenses and associated tax shield when including impact of tax expenses.

**Anadarko does not intend to update or otherwise revise the above unaudited financial and operating forecasts to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying such unaudited financial and operating forecasts are no longer appropriate, except as may be required by applicable law.**

***Summary Unaudited Prospective Financial Information Relating to Occidental***

In connection with their respective financial analyses, Anadarko's financial advisors reviewed certain non-public projected financial and operating data relating to Occidental on a stand-alone basis prepared and furnished to Anadarko's financial advisors by the management of Occidental, as adjusted by Anadarko's management and approved by Anadarko for use by Anadarko's financial advisors (the "adjusted Occidental standalone forecast"). For more information on the respective analyses of Anadarko's financial advisors, see "-Opinions of Anadarko's Financial Advisors" beginning on page 58.

The following table summarizes the adjusted Occidental standalone forecast ($ in millions):

| | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|
| Total Net Production (Mboe/d) | 735 | 788 | 863 | 968 |
| Consolidated EBITDAX[1] | $ 6,976 | $ 7,602 | $ 8,065 | $ 8,957 |
| Consolidated Capital Expenditures | $ 4,500 | $ 4,830 | $ 5,190 | $ 5,410 |
| Free Cash Flow Pre-Dividends[2] | $ 2,196 | $ 2,158 | $ 2,166 | $ 2,824 |

(1) Consolidated EBITDAX is defined as earnings before interest, tax, depreciation, amortization and exploration expense. Consolidated EBITDAX is a non-GAAP financial measure as it excludes amounts included in net income (loss), the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to net income (loss) or other measures derived in accordance with GAAP.

(2) Free Cash Flow Pre-Dividends is defined as cash flow from operations less consolidated capital expenditures. Free Cash Flow Pre-Dividends is a non-GAAP financial measure as it excludes amounts included in cash flow from operations, the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to cash flow from operations or other measures derived in accordance with GAAP.

In connection with its financial analyses, Goldman Sachs reviewed certain internal financial analyses and forecasts for Occidental on a pro forma basis giving effect to the merger prepared and furnished to Goldman Sachs by the management of Occidental, as adjusted by Anadarko's management and approved by Anadarko for use by Goldman Sachs (the "adjusted Occidental pro forma forecast"). For more information on Goldman Sachs' analyses, see "-Opinions of Anadarko's Financial Advisors-Opinion of Goldman Sachs & Co. LLC" beginning on page 66.

The following table summarizes the adjusted Occidental pro forma forecast ($ in millions):

| | 2020E | 2021E | 2022E |
|---|---|---|---|
| Total Net Production (Mboe/d) | 1,475 | 1,494 | 1,580 |
| Consolidated EBITDAX[1] | $ 15,397 | $ 15,185 | $ 15,812 |
| Consolidated Capital Expenditures | $ 8,070 | $ 7,390 | $ 7,500 |
| Free Cash Flow Post-Dividends[2] | $ 1,200 | $ 2,059 | $ 2,473 |

(1) Consolidated EBITDAX is defined as earnings before interest, tax, depreciation, amortization and exploration expense. Consolidated EBITDAX is a non-GAAP financial measure as it excludes amounts included in net income (loss), the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to net income (loss) or other measures derived in accordance with GAAP.

(2) Free Cash Flow Post-Dividends is defined as cash flow from operations less consolidated capital expenditures and dividends. Free Cash Flow Post-Dividends is a non-GAAP financial measure as it excludes amounts included in cash flow from operations, the most directly comparable measure calculated in accordance with GAAP. This measure should not be considered as an alternative to cash flow from operations or other measures derived in accordance with GAAP.

TABLE OF CONTENTS

While presented with numeric specificity, the unaudited prospective financial and operating information set forth above reflects numerous estimates and assumptions that are inherently uncertain and may be beyond the control of Occidental, including, among others, Occidental's assumptions about energy markets, production and sales volume levels, levels of oil, natural-gas and NGL reserves, operating results, competitive conditions, technology, availability of capital resources, levels of capital expenditures, and other contractual obligations, supply and demand for, the price of, and the commercialization and transporting of oil, natural gas, NGLs and other products or services and other matters described in the sections entitled "Cautionary Note Regarding Forward-Looking Statements", "Where You Can Find More Information", and "Risk Factors", beginning on pages 29, 167 and 32, respectively. The unaudited prospective financial and operating information reflects both assumptions as to certain business decisions that are subject to change and, in many respects, subjective judgment, and thus is susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. Occidental can give no assurance that the unaudited prospective financial and operating information and the underlying estimates and assumptions will be realized. In addition, since the unaudited prospective financial and operating information covers multiple years, such information by its nature becomes more speculative with each successive year. This information constitutes "forward-looking statements" and actual results may differ materially and adversely from those projected.

The unaudited prospective financial and operating information was not prepared with a view toward public disclosure, nor was it prepared with a view toward compliance with GAAP, published guidelines of the SEC or the guidelines established by the Public Company Accounting Oversight Board for preparation and presentation of prospective financial information. Neither Occidental's independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the unaudited prospective financial and operating information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability. The report of the independent registered public accounting firm to Occidental contained in its Annual Report on Form 10-K for the year ended December 31, 2018, which is incorporated by reference into this proxy statement/prospectus, relates to historical financial information of Occidental, and such report does not extend to the projections included below and should not be read to do so.

Furthermore, the unaudited prospective financial and operating information does not take into account any circumstances or events occurring after the date it was prepared. Occidental can give no assurance that, had the unaudited prospective financial and operating information been prepared as of the date of this proxy statement/prospectus, similar estimates and assumptions would be used. Except as required by applicable securities laws, Occidental does not intend to, and disclaims any obligation to, make publicly available any update or other revision to the unaudited prospective financial and operating information to reflect circumstances existing since its preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error or to reflect changes in general economic or industry conditions. The unaudited prospective financial and operating information does not take into account all the possible financial and other effects on Occidental of the merger, the effect on Occidental of any business or strategic decision or action that has been or will be taken as a result of the merger agreement having been executed, or the effect of any business or strategic decisions or actions that would likely have been taken if the merger agreement had not been executed, but which were instead altered, accelerated, postponed or not taken in anticipation of the merger. Further, the unaudited prospective financial and operating information does not take into account the effect on Occidental of any possible failure of the merger to occur. None of Occidental or its affiliates, officers, directors, advisors or other representatives has made, makes or is authorized in the future to make any representation to any Anadarko stockholder or other person regarding Occidental's or the combined company's ultimate performance compared to the information contained in the unaudited prospective financial and operating information or to the effect that the forecasted results will be achieved. The inclusion of the unaudited prospective financial and operating information herein should not be deemed an admission or representation by Occidental or its advisors or any other person that it is viewed as material information of Occidental, particularly in light of the inherent risks and uncertainties associated with such forecasts.

TABLE OF CONTENTS

In light of the foregoing, and considering that the special meeting will be held several months after the unaudited prospective financial and operating information was prepared, as well as the uncertainties inherent in any forecasted information, Anadarko stockholders are cautioned not to place undue reliance on such information, and all Anadarko stockholders should review Occidental's most recent SEC filings for a description of Occidental and Occidental's reported financial results. See "Where You Can Find More Information" beginning on page 167.

**Occidental and Anadarko do not intend to update or otherwise revise the above unaudited financial and operating forecasts to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying such unaudited financial and operating forecasts are no longer appropriate, except as may be required by applicable law.**

### Interests of Directors and Executive Officers of Anadarko in the Merger

**In considering the recommendation of the Anadarko Board that Anadarko stockholders vote "FOR" the merger proposal and the merger-related compensation proposal, Anadarko stockholders should be aware that Anadarko's directors and executive officers have interests in the merger that may be different from, or in addition to, those of Anadarko stockholders generally. The Anadarko Board was aware of and considered these interests, among other matters, in evaluating and negotiating the merger agreement and the merger, in approving the merger agreement and in recommending the applicable merger-related proposals.**

The following discussion sets forth certain of these interests in the merger of each person who has served as a non-executive director or executive officer of Anadarko since January 1, 2018.

***Accelerated Vesting of Certain Awards***

The amounts described in the equity award tables below have been calculated assuming that (a) the closing price of a share of Anadarko common stock on the completion of the merger is $72.88, which is equal to the average closing price of a share of Anadarko common stock over the first five business days following the first public announcement of the merger (such assumed value, the "Estimated Closing Date Value"), (b) the closing date of the merger is September 30, 2019, and (c) all executive officers experience a qualifying termination of employment as of the closing date of the merger.

*Anadarko Stock Options*

As described below under "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards-Anadarko Stock Options", each in-the-money Anadarko stock option will be cashed out based on the cash value of the merger consideration (equal to the per share cash consideration plus the exchange ratio times the closing share price of Occidental common stock on the last trading day prior to closing), less the applicable option exercise price, and each out-of-the-money Anadarko stock option will be cancelled for no consideration.

The following table provides information for each of the executive officers of Anadarko regarding the aggregate number of shares of Anadarko common stock underlying outstanding Anadarko stock options as of the assumed closing date of the merger of September 30, 2019 and the estimated value of such stock options, including the value of the accelerated vesting of the unvested portion of such stock options. However, the actual value of the Anadarko stock options cannot be determined with any certainty until the closing date of the merger. Anadarko estimates that the value that would become payable on the closing date of the merger to Anadarko's executive officer who is not a named executive officer would be $605,017 in respect of vested Anadarko stock options and $1,373,658 in respect of unvested Anadarko stock options. None of Anadarko's non-executive directors currently holds Anadarko stock options or is expected to hold any Anadarko stock options as of the assumed closing date of the merger.

| Name | Shares Covered by Vested Anadarko Stock Options | Estimated Value of Vested Anadarko Stock Options($)(1) | Shares Covered by Unvested Anadarko Stock Options | Estimated Value of Unvested Anadarko Stock Options($)(1) |
|---|---|---|---|---|
| Al Walker | 743,427 | $ 3,505,280 | 341,203 | $ 6,557,865 |
| Robert G. Gwin(2) | 169,813 | $ 1,085,373 | 149,752 | $ 2,865,523 |
| Benjamin M. Fink | 90,690 | $ 813,163 | 100,379 | $ 1,968,827 |

TABLE OF CONTENTS

| Name | Shares Covered by Vested Anadarko Stock Options | Estimated Value of Vested Anadarko Stock Options($)(1) | Shares Covered by Unvested Anadarko Stock Options | Estimated Value of Unvested Anadarko Stock Options($)(1) |
|---|---|---|---|---|
| Daniel E. Brown | 128,494 | $ 1,034,062 | 140,274 | $ 2,721,700 |
| Mitchell W. Ingram | 61,270 | $ 1,016,559 | 145,322 | $ 2,777,278 |
| Amanda McMillian | 76,231 | $ 606,424 | 88,023 | $ 1,695,481 |
| Robert K. Reeves(3) | 228,231 | $ 1,122,062 | 109,034 | $ 2,114,460 |
| Ernest A. Leyendecker(4) | 103,779 | $ 1,126,098 | - | - |

(1) The estimated value of the Anadarko stock options is equal to the product of (i) the difference between (A) the Estimated Closing Date Value of $72.88, minus (B) the applicable per share exercise price of each such stock option, and (ii) the number of shares underlying each such stock option.

(2) Mr. Gwin transferred the economic interest in certain Anadarko stock options pursuant to a domestic relations order. The Anadarko stock options reported reflect only the awards for which Mr. Gwin retained beneficial ownership.

(3) Mr. Reeves retired effective as of December 31, 2018. The Anadarko stock options that were held by Mr. Reeves at his retirement will be cashed out or cancelled, as applicable, on the same terms as other outstanding Anadarko stock options.

(4) Mr. Leyendecker's employment with Anadarko ended effective as of June 1, 2018. The Anadarko stock options that were held by Mr. Leyendecker at his termination of employment will be cashed out or cancelled, as applicable, on the same terms as other outstanding Anadarko stock options.

*Anadarko RSU Awards*

As described below under "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards-Anadarko RSU Awards", each Anadarko RSU award covering shares of Anadarko common stock will be converted into an Occidental restricted stock/cash unit award covering cash and shares of Occidental common stock equal to: (1) for the cash portion of such award, the number of shares of Anadarko common stock covered by the award immediately prior to the effective time of the merger multiplied by the per share cash consideration, and (2) for the share portion of such award, the number of shares of Anadarko common stock covered by the award immediately prior to the effective time of the merger multiplied by the exchange ratio. Any unvested Anadarko RSU awards held by Anadarko's executive officers (other than Mr. Reeves) will become fully vested upon a qualifying termination of employment, in accordance with their terms.

The following table provides information for each of the executive officers of Anadarko regarding the number of shares of Anadarko common stock covered by unvested Anadarko RSU awards held as of the assumed closing date of the merger of September 30, 2019 and the estimated value of such Anadarko RSU awards. However, the actual value of the outstanding Anadarko RSU awards cannot be determined with any certainty until the actual vesting event occurs. Anadarko estimates that the value that would become payable on the closing date of the merger to Anadarko's executive officer who is not a named executive officer would be $2,372,244 in respect of outstanding Anadarko RSU awards, including dividend equivalent units accrued with respect to such Anadarko RSU awards. None of Anadarko's non-executive directors currently holds Anadarko RSU awards or is expected to hold any Anadarko RSU awards as of the assumed closing date of the merger.

| Name | Number of Outstanding Anadarko RSU Awards (1) | Estimated Value of Outstanding Anadarko RSU Awards (1)(2) |
|---|---|---|
| Al Walker | 106,031 | $ 7,727,539 |
| Robert G. Gwin(3) | 46,280 | $ 3,372,886 |
| Benjamin M. Fink | 42,993 | $ 3,133,330 |
| Daniel E. Brown | 58,752 | $ 4,281,846 |
| Mitchell W. Ingram | 45,030 | $ 3,281,786 |
| Amanda McMillian | 40,129 | $ 2,924,602 |
| Robert K. Reeves(4) | 31,996 | $ 2,331,868 |
| Ernest A. Leyendecker | - | - |

(1) The number of outstanding Anadarko RSU awards and the estimated value of the acceleration of the Anadarko RSU awards account for all dividends issued with respect to shares of Anadarko common stock prior to the date hereof.

TABLE OF CONTENTS

(2) The estimated value of the acceleration of the Anadarko RSU awards is equal to the product of (i) the number of outstanding Anadarko RSU awards for each executive officer, including dividend equivalent units accrued with respect to such Anadarko RSU awards, and (ii) the Estimated Closing Date Value.

(3) Mr. Gwin transferred the economic interest in certain Anadarko RSU awards pursuant to a domestic relations order. The Anadarko RSU awards reported reflect only the awards for which Mr. Gwin retained beneficial ownership.

(4) Mr. Reeves retired effective as of December 31, 2018. The Anadarko RSU awards that were held by Mr. Reeves at his retirement will continue to vest pursuant to their terms following the merger.

*Anadarko PU Awards*

As described below under "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards-Anadarko PU Awards", each outstanding Anadarko PU award will be converted into the right to receive an amount in cash equal to the product of (x) 200% of the target number of shares of Anadarko common stock subject to such Anadarko PU award and (y) $76.

The following table provides information for each of the executive officers of Anadarko regarding the number of outstanding Anadarko PU awards held as of the assumed closing date of the merger of September 30, 2019 and the estimated value such Anadarko PU awards. Anadarko estimates that the value that would become payable on the closing date of the merger to Anadarko's executive officer who is not a named executive officer would be $4,795,448 in respect of outstanding Anadarko PU awards. None of Anadarko's non-executive directors currently holds Anadarko PU awards or is expected to hold any Anadarko PU award as of the assumed closing date of the merger.

| Name | Number of Target Anadarko PU Awards | Performance Factor | Value of Anadarko PU Awards |
|---|---|---|---|
| Al Walker | 270,193 | 200 % | $ 41,069,336 |
| Robert G. Gwin(1) | 112,924 | 200 % | $ 17,164,448 |
| Benjamin M. Fink | 55,251 | 200 % | $ 8,398,152 |
| Daniel E. Brown | 94,064 | 200 % | $ 14,297,728 |
| Mitchell W. Ingram | 112,730 | 200 % | $ 17,134,960 |
| Amanda McMillian | 49,023 | 200 % | $ 7,451,496 |
| Robert K. Reeves(2) | 83,270 | 200 % | $ 12,657,040 |
| Ernest A. Leyendecker(3) | 40,821 | 200 % | $ 6,204,792 |

(1) Mr. Gwin transferred the economic interest in certain Anadarko PU awards pursuant to a domestic relations order. The Anadarko PU awards reported reflect only the awards for which Mr. Gwin retained beneficial ownership.

(2) Mr. Reeves retired effective as of December 31, 2018. The Anadarko PU awards that were held by Mr. Reeves at his retirement will be converted as described above, but will be paid pursuant to their terms.

(3) Mr. Leyendecker's employment with Anadarko ended effective as of June 1, 2018. The Anadarko PU awards that were held by Mr. Leyendecker at his retirement will be converted as described above, but will be paid pursuant to their terms.

*Anadarko Deferred Share Awards*

As described below under "The Merger-Treatment of Anadarko Stock Options and Other Stock-Based Awards-Anadarko Deferred Share Awards," each Anadarko deferred share award that is outstanding immediately prior to the effective time of the merger shall, by virtue of the merger and without any action on the part of the holder thereof, be cancelled and converted into the right to receive the merger consideration in respect of each share of Anadarko common stock subject to such award immediately prior to the effective time of the merger.

TABLE OF CONTENTS

The following table provides information for each of the non-employee members of the Anadarko Board as of the assumed closing date of the merger of September 30, 2019 regarding (i) the aggregate number of shares of Anadarko common stock underlying outstanding Anadarko deferred share awards and (ii) the estimated value of such Anadarko deferred share awards at the effective time of the merger. However, the actual value of the Anadarko deferred share awards cannot be determined with any certainty until the closing of the merger. None of Anadarko's executive officers currently holds Anadarko deferred share awards or is expected to hold any Anadarko deferred share awards as of the assumed closing date of the merger.

| Name | Number of Shares Underlying Outstanding Anadarko Deferred Share Awards | Estimated Value of Outstanding Anadarko Deferred Share Awards[1] |
|---|---|---|
| Anthony R. Chase | 25,195 | $ 1,836,212 |
| David E. Constable | 17,741 | $ 1,292,964 |
| H. Paulett Eberhart | 57,377 | $ 4,181,636 |
| Claire S. Farley | 14,149 | $ 1,031,179 |
| Peter J. Fluor | 56,016 | $ 4,082,446 |
| Joseph W. Gorder | 33,405 | $ 2,434,556 |
| John R. Gordon | 63,150 | $ 4,602,372 |
| Sean Gourley | 21,824 | $ 1,590,533 |
| Michael K. Grimm | 6,301 | $ 459,217 |
| Mark C. McKinley | 24,649 | $ 1,796,419 |
| Eric D. Mullins | 31,694 | $ 2,309,859 |
| Alexandra Pruner | 7,408 | $ 539,895 |

(1) The estimated value of the Anadarko deferred share awards is equal to the product of (i) the number of outstanding Anadarko deferred share awards for each non-executive director and (ii) the Estimated Closing Date Value.

***Potential Severance Payments in Connection with the Merger***

The arrangements described below reflect the following actions approved by the Compensation and Benefits Committee of the Anadarko Board on April 11, 2019:

- amendments to the Walker Severance Agreement (defined below) and the Key Employee Change of Control Contracts (defined below) to provide that (1) the bonus for the year of termination under such agreement will be calculated on an annualized basis and (2) the bonus component of the severance calculation and the bonus for the year of termination will be determined using the higher of (a) the bonus performance percentage for the fiscal year in which an executive's termination of employment occurs and (b) the bonus performance percentage for the most recently completed year prior to the employment termination date; and
- an amendment to the Walker Severance Agreement to eliminate the provision that reduces severance based on the number of years remaining until Mr. Walker reaches age 65.

*Walker Severance Agreement*

Mr. Walker is party to a severance agreement with the Company (the "Walker Severance Agreement"). The Walker Severance Agreement provides for the following severance benefits in connection with Mr. Walker's termination of employment without Cause or for Good Reason (each, as defined below) in connection with or within three years following a change of control: (i) an annualized bonus (the "CIC Bonus"), based on the higher of actual performance for the year of termination (as determined by the Anadarko Board) or performance for the year prior to the year of termination (the "Higher Annual Bonus"); (ii) 2.5 times the sum of his annual base salary and the Higher Annual Bonus; (iii) three additional years (or if earlier, the period through the first day of the month next following the date that Mr. Walker reaches age 65) of matching contributions into the Anadarko Savings Restoration Plan; (iv) three additional years (or if earlier, the period through the first day of the month next following the date that Mr. Walker reaches age 65) of age and service credits under Anadarko's retirement and retirement restoration plans; (v) continuation of medical, dental and life insurance benefits for up to three years; and (vi) outplacement services up to a maximum of $30,000.

TABLE OF CONTENTS

The merger will constitute a "change of control" for purposes of the Walker Severance Agreement. Payments due to Mr. Walker pursuant to the terms of the Walker Severance Agreement are subject to Mr. Walker entering into a release agreement substantially in the form attached to the Walker Severance Agreement. Mr. Walker is also subject to a one-year restriction on soliciting employees and a confidentiality covenant.

*Key Employee Change of Control Contracts*

Anadarko has entered into key employee change of control contracts with each of its executive officers other than Mr. Walker (the "Key Employee Contracts"). The Key Employee Contracts for Anadarko's executive officers, other than Mr. Gwin, provide for certain payments and benefits in the event of the executive's termination of employment without Cause or for Good Reason (each, defined below) in connection with or within three years (two years in the case of Anadarko's executive officer who is not an NEO (defined below)) following a change of control. In general, these benefits include (i) an annualized bonus (the "CIC Bonus"), based on the Higher Annual Bonus; (ii) 2.5 (2.0 in the case of Anadarko's non-NEO executive officer) times the sum of the applicable officer's annual base salary and the applicable officer's Higher Annual Bonus; (iii) three (two in the case of Anadarko's non-NEO executive officer) additional years of matching contributions into the Anadarko Savings Restoration Plan; (iv) three (two in the case of Anadarko's non-NEO executive officer) additional years of age and service credits under Anadarko's retirement and retirement restoration plans; (v) continuation of medical, dental and life insurance benefits for up to three (two in the case of Anadarko's non-NEO executive officer) years; and (vi) outplacement services up to a maximum of $30,000.

The Key Employee Contract applicable to Mr. Gwin is generally the same as the agreement applicable to other Anadarko named executive officers (as noted above) with the following exceptions: (i) severance is calculated as 2.9 times the sum of Mr. Gwin's annual base salary and the Higher Annual Bonus; (ii) continuing financial counseling is provided for a period of three years; and (iii) Mr. Gwin is entitled to a make-whole payment for any negative economic impact resulting from the application of Section 4999 of the Code.

"Cause" is generally defined as the following: (i) the willful and continued failure of the executive officer to perform substantially the executive officer's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness) or material breach of any material provision in an employment agreement (if applicable), after written demand for substantial performance is delivered to the executive officer by the Board or the CEO of the Company which specifically identifies the manner in which the Board or CEO believes that the executive officer has not substantially performed the executive officer's duties; or (ii) the willful engaging by the executive officer in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

"Good Reason" is generally defined as any one of the following occurrences within three years of a Change of Control (or two years in the case of Anadarko's non-NEO executive officer): (i) diminution in the executive officer's position, authority, duties or responsibilities that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer; (ii) any failure by the Company to provide compensation to the executive officer at levels that were effective immediately prior to the Change of Control, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the executive officer; (iii) any material change in the location, as defined in the applicable agreement, where the executive officer was employed immediately preceding the Change of Control, or the Company requiring the executive officer to travel on Company business to a substantially greater extent than required immediately prior to the Change of Control; (iv) any termination by the executive officer for any reason during the 30-day period immediately following the first anniversary of a Change of Control (such occurrence is not part of the Good Reason definition under Mr. Walker's Severance Agreement or under the Key Employee Contract with Messrs. Fink, Ingram and Brown, Ms. McMillian and Anadarko's non-NEO executive officer); (v) any purported termination by the Company of the executive officer's employment otherwise than as expressly permitted in their Change of Control, Employment or Severance Agreement; or (vi) any failure by the Company to require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to assume the terms provided in the executive officer's Change-of-Control or Employment or Severance Agreement.

TABLE OF CONTENTS

The merger will constitute a "change of control" under the Key Employee Contracts. Each Key Employee Contract contains a confidentiality covenant. For the quantification of the value of the severance payments and benefits described above that would be payable to Anadarko's named executive officers upon a qualifying termination in connection with the merger, see the section entitled "Golden Parachute Compensation Table" below. Anadarko estimates that Anadarko's executive officer who is not a named executive officer would receive payments and benefits equal to approximately $3,988,360 upon a qualifying termination on the closing date of the merger under the applicable Key Employee Contract.

***Additional Benefits***

On April 11, 2019, the Anadarko Compensation and Benefits Committee approved the following additional benefits, which approval was ratified by the Anadarko Board. The same benefits were re-approved by the Anadarko Compensation and Benefits Committee and re-ratified by the Anadarko Board in the context of the proposed transaction on May 9, 2019:

- payment, if and as determined by the Compensation and Benefits Committee of the Anadarko Board, to each of Anadarko's executive officers, of a bonus equal to 200% of the executive's target bonus for fiscal year 2019 (each, a "2019 Bonus");
- a make-whole payment to each of Anadarko's named executive officers (other than for Mr. Gwin, who is already entitled to such payment under his Key Employee Contract, described above), for any negative economic impact resulting from the application of Section 4999 of the Code in connection with the merger; and
- payment, immediately prior to the effective time, of a one million dollar transaction bonus to each of Messrs. Fink and Gwin and Ms. McMillian, in recognition of the extraordinary efforts required to negotiate and complete the merger.

Anadarko estimates that Anadarko's executive officer who is not a named executive officer would receive a 2019 Bonus equal to approximately $824,000 upon a qualifying termination on the closing date of the merger.

Executive officers who are not named executive officers may be eligible for a retention award in connection with the merger, not to exceed the amount of such officer's base salary plus target bonus (unless mutually agreed between Anadarko's and Occidental's chief executive officers) which may be payable on the closing date of the merger or later. No retention award has been granted to any Anadarko executive officer who is not a named executive officer as of the date of this filing.

*Share Ownership*

As described below under "Share Ownership of Directors, Executive Officers and Certain Beneficial Owners of Anadarko" and "The Merger-Merger Consideration-Conversion of Shares", non-executive directors and executive officers of Anadarko beneficially own shares of Anadarko common stock, which will be entitled to receive the merger consideration in respect of each share of Anadarko common stock beneficially owned by them.

*Indemnification and Insurance*

The merger agreement provides that the directors and officers of Anadarko and its subsidiaries will have the right to indemnification and continued coverage under directors' and officers' liability insurance policies for at least six years following the merger.

*New Compensation Arrangements with Occidental*

Any executive officers and directors who become officers, directors or employees or who otherwise are retained to provide services to Occidental or the surviving corporation may enter into new individualized compensation arrangements and may participate in cash or equity incentive or other benefit plans maintained by Occidental. As of the date of this proxy statement/prospectus, no compensation arrangements between such persons and Occidental and/or its affiliates have been established.

TABLE OF CONTENTS

*Quantification of Potential Payments*

For an estimate of the value of the payments and benefits described above that would be payable to Anadarko's named executive officers upon a qualifying termination in connection with the merger, see the section entitled "Golden Parachute Compensation Table" below.

*Golden Parachute Compensation Table*

The following tables set forth the information required by Item 402(t) of Regulation S-K regarding the compensation for each of the named executive officers (whom we refer to as NEOs) of Anadarko that is based on or otherwise becomes payable immediately prior to, or upon the effectiveness of, the merger, assuming (i) the closing of the merger occurs on September 30, 2019, (ii) each of the NEOs experiences a qualifying termination as of the closing date of the merger, (iii) the NEOs' base salary rate and annual target bonus remain unchanged from those that were in effect as of the date of this filing, (iv) Anadarko stock options, Anadarko RSU awards and Anadarko PU awards outstanding as of the date hereof do not otherwise vest prior to the completion of the merger, (v) for purposes of determining the value of Anadarko stock-based awards (other than Anadarko PU awards), the value of a share of Anadarko common stock is equal to the Estimated Closing Date Value, (vi) for purposes of determining the value of Anadarko PU awards, the value of a share of Anadarko common stock is $76, (vii) no NEO receives any additional equity grants prior to completion of the merger and (viii) each NEO has properly executed any required releases and complied with all requirements (including any applicable restrictive covenants) necessary in order to receive the payments and benefits. Some of the assumptions used in the table below are based upon information not currently available and, as a result, the actual amounts to be received by any of the individuals below may materially differ from the amounts set forth below.

The payments described in the table below are made pursuant to the arrangements discussed in "-Potential Severance Payments in Connection with the Merger".

| Name | Cash[(1)] | Equity[(2)] | Pension/ NQDC[(3)] | Perquisites/ Benefits[(4)] | Tax Reimbursement (5) | Total |
|---|---|---|---|---|---|---|
| Al Walker | $ 20,800,000 | $ 58,827,224 | $ 690,300 | $ 364,154 | $ 17,415,358 | $ 98,097,036 |
| Robert G. Gwin | $ 14,680,000 | $ 24,473,800 | $ 3,566,605 | $ 191,824 | $ 12,088,474 | $ 55,000,703 |
| Benjamin M. Fink | $ 7,906,250 | $ 14,300,208 | $ 800,211 | $ 142,033 | $ 6,238,561 | $ 29,387,263 |
| Daniel E. Brown | $ 8,370,000 | $ 22,317,189 | $ 3,405,971 | $ 126,549 | $ 9,394,883 | $ 43,614,592 |
| Mitchell W. Ingram | $ 9,610,000 | $ 24,196,736 | $ 1,062,945 | $ 153,548 | $ 8,902,456 | $ 43,925,685 |
| Amanda M. McMillian | $ 7,906,250 | $ 12,665,613 | $ 2,917,531 | $ 157,069 | $ 6,947,439 | $ 30,593,902 |

(1) Amounts shown reflect (a) cash severance payments under the Walker Severance Agreement and the applicable Key Employee Contracts, (b) a bonus for calendar year 2019, and (c) in the case of Messrs. Fink and Gwin and Ms. McMillian, a one million dollar transaction bonus, each as described in more detail above and as set forth in more detail below. The cash severance payments and the 2019 Bonus included in this column are considered to be "double-trigger" payments, which means that both a change in control, such as the merger, and another event (*i.e.*, a qualifying termination of employment within three years of the change in control or, in case of the 2019 Bonus, continued employment through the end of 2019 for any named executive officer who does not experience an earlier qualifying termination) must occur prior to any payment being provided to the named executive officer. The transaction bonus for Messrs. Fink and Gwin and Ms. McMillian included in this column are considered to be "single-trigger" payments, which means that they become payable upon the occurrence of the merger.

| Name | Cash Severance | CIC Bonus | 2019 Bonus | Transaction Bonus | Total |
|---|---|---|---|---|---|
| Al Walker | $ 13,000,000 | $ 3,900,000 | $ 3,900,000 | - | $ 20,800,000 |
| Robert G. Gwin | $ 9,280,000 | $ 2,200,000 | $ 2,200,000 | $ 1,000,000 | $ 14,680,000 |
| Benjamin M. Fink | $ 4,531,250 | $ 1,187,500 | $ 1,187,500 | $ 1,000,000 | $ 7,906,250 |
| Daniel E. Brown | $ 5,400,000 | $ 1,485,000 | $ 1,485,000 | - | $ 8,370,000 |
| Mitchell W. Ingram | $ 6,200,000 | $ 1,705,000 | $ 1,705,000 | - | $ 9,610,000 |
| Amanda M. McMillian | $ 4,531,250 | $ 1,187,500 | $ 1,187,500 | $ 1,000,000 | $ 7,906,250 |

(2) Amounts shown reflect the value provided in respect of Anadarko stock options, Anadarko RSU awards and Anadarko PU awards, as more fully described above under "-Accelerated Vesting of Certain Awards". The amounts attributable to the Anadarko stock options and Anadarko PU awards are considered "single trigger" and will become vested upon the consummation of the merger. The amount in this column attributable to Anadarko RSU awards are considered to be "double-trigger", which means that both a change in control, such as the merger, and a qualifying termination of employment within three years of the change in control (or continued employment through the applicable vesting date) must occur prior to any payment being provided to the named executive officer.

TABLE OF CONTENTS

(3) Amounts shown include enhanced benefits under Anadarko's pension and non-qualified deferred compensation plans pursuant to the terms of the Walker Severance Agreement and the applicable Key Employee Contracts. These amounts are considered to be "double-trigger", which means that both a change in control, such as the merger, and a qualifying termination of employment within three years of the change in control must occur prior to any payment being provided to the named executive officer.

(4) Amounts shown include: (i) continuation of health and welfare benefits for a period of three years; (ii) outplacement benefits, up to a maximum of $30,000; and (iii) for Mr. Gwin, three years of continued financial counseling. The amounts associated with health and welfare benefits are calculated using current benefit rates, a discount rate of 4.43% and medical trend, dental trend, and morbidity rates identical to those used in the December 31, 2018 FAS 106 Disclosure valuations. These amounts are considered to be "double-trigger", which means that both a change in control, such as the merger, and a qualifying termination of employment within three years of the change in control must occur prior to any payment being provided to the named executive officer.

(5) Amounts shown reflect make-whole payments for the negative economic impact resulting from the application of Section 4999 of the Code in connection with the merger.

### Share Ownership of Directors, Executive Officers and Certain Beneficial Owners of Anadarko

#### *Anadarko's Directors and Executive Officers*

The following table sets forth the number of shares and percentage of Anadarko common stock beneficially owned by Anadarko's named executive officers, each of its directors, and all of its executive officers and directors as a group as of July 8, 2019, the most recent practicable date for which such information was available. None of the common stock beneficially owned as set forth below is pledged as security.

| | Amount and Nature of Beneficial Ownership | | | |
|---|---|---|---|---|
| Name of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned(1)(2) | Stock Acquirable Within 60 Days | Total Beneficial Ownership(3) | Percent of Class |
| Al Walker(4) | 337,694 | 743,427 | 1,081,121 | * |
| Benjamin M. Fink | 19,896 | 90,690 | 110,586 | * |
| Robert G. Gwin(5) | 72,027 | 169,813 | 241,840 | * |
| Mitchell W. Ingram | 50,709 | 61,270 | 111,979 | * |
| Daniel E. Brown | 27,329 | 128,494 | 155,823 | * |
| Amanda M. McMillian | 18,892 | 76,231 | 95,123 | * |
| Anthony R. Chase | 31,421 | - | 31,421 | * |
| David E. Constable | 17,741 | - | 17,741 | * |
| H. Paulett Eberhart | 57,377 | - | 57,377 | * |
| Claire S. Farley | 14,149 | - | 14,149 | * |
| Peter J. Fluor | 174,824 | - | 174,824 | * |
| Joseph W. Gorder | 33,405 | - | 33,405 | * |
| John R. Gordon | 191,560 | - | 191,560 | * |
| Sean Gourley | 21,824 | - | 21,824 | * |
| Michael K. Grimm | 6,301 | - | 6,301 | * |
| Mark C. McKinley | 25,561 | - | 25,561 | * |
| Eric D. Mullins | 40,757 | - | 40,757 | * |
| Alexandra Pruner | 7,408 | - | 7,408 | * |
| All directors and executive officers as a group (19 persons) | 1,163,013 | 1,351,258 | 2,514,271 | * |

* Less than one percent.

(1) This column does not include shares of Anadarko common stock that the directors or executive officers of Anadarko have the right to acquire within 60 days of July 8, 2019. This column does include shares of Anadarko common stock held in Anadarko's Benefits Trust (the "Trust") as a result of the director compensation and deferral elections made in accordance with Anadarko's benefit plans. Those shares are subject to shared voting power with the trustee under the Trust and receive dividend equivalents on such shares, but the individuals do not have the power to dispose of, or direct the disposition of, such shares until such shares are distributed to them. In addition, some shares of Anadarko common stock reflected in this column for certain individuals are subject to restrictions.

(2) This column does not include the following number of Anadarko RSU awards, which are payable (after taxes are withheld) in the form of Anadarko common stock: Mr. Walker - 103,444; Mr. Fink - 41,815; Mr. Gwin - 45,166; Mr. Brown - 57,215; Mr. Ingram - 43,948; and Ms. McMillian - 39,037. The Anadarko RSU awards do not have voting rights but do receive dividend equivalents which are reinvested in Anadarko common stock and paid upon vesting of the underlying award.

(3) In addition to the Anadarko common stock reported in the table, as of December 31, 2018, the directors and executive officers beneficially owned common units of Western Gas Partners, LP (as used in this footnote, "WES") as follows: Mr. Fink - 2,213;

TABLE OF CONTENTS

Mr. Gwin - 5,000; Ms. McMillian - 1,470; and Mr. McKinley - 9,000. In addition, as of December 31, 2018, the directors and executive officers beneficially owned common units of Western Gas Equity Partners, LP (as used in this footnote, “WGP”) as follows: Mr. Fink - 18,683; Mr. Gwin - 100,000; Ms. McMillian - 10,000; and Mr. Fluor - 61,118. On February 28, 2019, a wholly owned subsidiary of WGP merged with WES, with WES continuing as the surviving entity and becoming a consolidated subsidiary of WGP (the “simplification”). In connection with the simplification, each WES common unit outstanding (other than certain common units held by certain Anadarko affiliates) was converted into the right to receive 1.525 WGP common units, and following the simplification, WGP changed its name to “Western Midstream Partners, LP”. Based upon the WES and WGP ownership described above, and assuming that the simplification had been consummated on December 31, 2018, the directors and executive officers would have beneficially owned common units of Western Midstream Partners, LP as follows: Mr. Fink - 22,058; Mr. Gwin - 107,625; Ms. McMillian - 12,242; Mr. Fluor - 61,118; and Mr. McKinley - 13,725. Mr. Fluor disclaims beneficial ownership with respect to 61,117 common units that are owned by his spouse. Anadarko owns a majority interest in Western Midstream Partners, LP through its wholly owned subsidiaries. As of July 8, 2019, there were approximately 453,008,854 common units of Western Midstream Partners, LP outstanding. The directors and executive officers, individually and as a group, beneficially own less than one percent of the outstanding common units of Western Midstream Partners, LP.

(4) Includes 108,000 shares of Anadarko common stock held by a limited liability company (the “LLC”) over which Mr. Walker and his spouse exercise investment control. The membership interests in the LLC are held by Mr. Walker, his spouse and family trusts of which he is the trustee.

(5) In 2017, Mr. Gwin transferred the economic interest in certain Anadarko stock options and Anadarko RSU awards pursuant to a domestic relations order. The shares reported do not reflect the Anadarko stock options or Anadarko RSU awards in which he has no economic or beneficial interest.

### *Certain Beneficial Owners of Anadarko Common Stock*

The following table shows certain information regarding the beneficial ownership of Anadarko common stock as of July 8, 2019, the most recent practicable date for which such information was available, by each person who is known by Anadarko to beneficially own more than five percent of the outstanding Anadarko common stock.

As of July 8, 2019, 502,401,622 shares of Anadarko common stock were outstanding.

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| BlackRock, Inc.<br>55 East 52nd Street<br>New York, NY 10055 | 44,409,389 (1) | 8.85 % |
| Dodge & Cox<br>555 California Street, 40th Floor<br>San Francisco, California 94104 | 44,065,467 (2) | 8.78 % |
| The Vanguard Group<br>100 Vanguard Blvd.<br>Malvern, PA 19355 | 39,501,506 (3) | 7.87 % |
| State Street Corporation<br>State Street Financial Center<br>One Lincoln Street<br>Boston, MA 02111 | 25,251,281 (4) | 5.03 % |

(1) Based upon its Schedule 13G/A filed February 11, 2019, with the SEC with respect to Anadarko securities held as of December 31, 2018, BlackRock, Inc. has sole voting power as to 39,977,558 shares of Anadarko common stock, shared voting power as to 0 shares of Anadarko common stock, sole dispositive power as to 44,409,389 shares of Anadarko common stock and shared dispositive power as to 0 shares of Anadarko common stock.

(2) Based upon its Schedule 13G/A filed February 14, 2019, with the SEC with respect to Anadarko securities held as of December 31, 2018, Dodge & Cox has sole voting power as to 41,952,082 shares of Anadarko common stock and sole dispositive power as to 44,065,467 shares of Anadarko common stock.

(3) Based upon its Schedule 13G/A filed February 11, 2019, with the SEC with respect to Anadarko securities held as of December 31, 2018, The Vanguard Group has sole voting power as to 595,905 shares of Anadarko common stock, shared voting power as to 117,977 shares of Anadarko common stock, sole dispositive power as to 38,803,492 shares of Anadarko common stock and shared dispositive power as to 698,014 shares of Anadarko common stock.

(4) Based upon its Schedule 13G filed February 13, 2019, with the SEC with respect to Anadarko securities held as of December 31, 2018, State Street Corporation has shared voting power as to 22,993,346 shares of Anadarko common stock and shared dispositive power as to 25,246,671 shares of Anadarko common stock.

TABLE OF CONTENTS

### Director and Officer Indemnification

Under the merger agreement, certain indemnification and insurance rights exist in favor of Anadarko and its subsidiaries' current and former directors and officers. For information about these rights, see "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger-Indemnification and Insurance" beginning on page 84.

### Accounting Treatment of the Merger

In accordance with current accounting guidance, the merger will be accounted for using the acquisition method. As a result, the recorded assets and liabilities of Occidental will be carried forward at their recorded amounts, the historical operating results will be unchanged for the prior periods being reported on and the assets and liabilities of Anadarko will be adjusted to their respective estimated fair values at the closing date of the merger. In addition, all identified intangible assets will be recorded at estimated fair value and included as part of the net assets acquired. Any excess of the purchase price, consisting of cash plus the number of shares of Occidental common stock to be issued to former Anadarko stockholders and holders of Anadarko stock options, Anadarko RSU awards, Anadarko RS awards, Anadarko PU awards and Anadarko deferred share awards, as applicable, at fair value, over the fair value of the net assets acquired including identified intangible assets of Anadarko on the closing date of the merger will be accounted for as goodwill. In accordance with current accounting guidance, goodwill will not be amortized but will be evaluated for impairment annually. Identified finite life intangible assets will be amortized over their estimated lives. Further, the acquisition method of accounting will result in the operating results of Anadarko being included in the operating results of Occidental beginning from the closing date of the merger.

### Litigation Relating to the Merger

On May 30, 2019, Anadarko received a demand letter from counsel to a purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL. On May 9, 2019, Anadarko received a demand letter from counsel to a different purported Anadarko stockholder, seeking inspection of Anadarko's books and records pursuant to Section 220 of the DGCL.

On May 30, 2019, a complaint was filed in the Court of Chancery of the State of Delaware by purported Occidental stockholders High River Limited Partnership, Icahn Partners Master Fund LP and Icahn Partners LP, seeking inspection of Occidental's books and records pursuant to Section 220 of the DGCL. On June 14, 2019, Occidental filed an answer to the complaint in the Court of Chancery of the State of Delaware.

### Regulatory Approvals Required for the Merger

The merger is subject to the requirements of the HSR Act and the related rules and regulations, which provide that certain transactions may not be completed until notification and report forms have been furnished to the DOJ and the FTC and until certain waiting periods have been terminated or have expired. The HSR Act requires Occidental and Anadarko to observe a 30-calendar-day waiting period after the submission of their respective HSR filings before consummating their transaction, unless the waiting period is earlier terminated. If either agency issues a Request for Additional Information and Documentary Material prior to the expiration of the initial waiting period, the parties must observe a second 30-calendar-day waiting period, which begins to run only after each of the parties has substantially complied with the request for additional information.

On May 23, 2019, Occidental and Anadarko each filed a notification and report form under the HSR Act with the DOJ and the FTC, which filings started the initial 30-calendar-day waiting period required by the HSR Act. The FTC granted early termination of the applicable waiting period under the HSR Act on June 3, 2019.

Occidental and Anadarko are not currently aware of any material governmental consents, approvals or filings that are required prior to the parties' completion of the transaction other than those under the HSR Act described above. If additional approvals, consents, clearances or filings are required to complete the transaction, Occidental and Anadarko intend to seek such consents and approvals and make such filings.

Occidental and Anadarko expect to complete the transaction in the second half of 2019. Although Occidental and Anadarko believe that they will receive the required consents and approvals to complete the transaction, neither can give any assurance as to the timing of these consents and approvals or as to Occidental's and Anadarko's ultimate ability to obtain such consents or approvals (or any additional consents or approvals which

TABLE OF CONTENTS

may otherwise become necessary) or that such consents or approvals will be obtained on terms and subject to conditions satisfactory to Occidental and Anadarko. The expiration or termination of any applicable waiting period under the HSR Act relating to the merger is a condition to the obligation of each of Occidental and Anadarko to complete the merger.

**Financing of the Merger and Treatment of Existing Debt**

Occidental's obligation to close the merger is not conditioned on its ability to obtain financing. Occidental and Merger Subsidiary have represented to Anadarko that proceeds from the debt and equity financing described below, together with cash and marketable securities of Occidental, will be sufficient to enable Occidental to pay at the closing of the merger the cash portion of the merger consideration and to consummate the transactions contemplated by the merger agreement. Occidental estimates that the total amount of cash required to complete the transactions contemplated by the merger, including the cash portion of the merger consideration and payment of fees, expenses and other related amounts incurred in connection with the merger, will be approximately $30.3 billion. Occidental expects to finance the cash portion of the merger consideration and these fees, expenses and amounts with the proceeds of debt and equity financing, including proceeds from the Berkshire Hathaway investment described below.

In connection with the merger, Occidental currently intends to terminate Anadarko's existing revolving credit facility, but to maintain Western Midstream Operating, LP's existing revolving credit facilities. Occidental is expected to assume approximately $11.9 billion aggregate principal amount of Anadarko's (and its subsidiaries') outstanding long-term debt, excluding finance lease liabilities, as well as approximately $7.3 billion aggregate principal amount of Western Midstream Operating, LP's outstanding short- and long-term debt, in the merger.

***Debt Financing***

On May 9, 2019, Occidental entered into the debt commitment letter with the initial bridge commitment parties, pursuant to which, subject to the terms and conditions set forth therein, the initial bridge commitment parties committed to provide a 364-day senior unsecured bridge loan facility in an aggregate principal amount of up to $21.8 billion. Such commitments were reduced by an aggregate principal amount of $8.8 billion, to an aggregate principal amount of $13.0 billion, upon Occidental's entry into the term loan credit agreement described below and will be further reduced to the extent that Occidental obtains certain other long-term debt financing or debt financing commitments, completes certain issuances of equity, equity-linked or hybrid debt-equity securities or completes certain asset sales (subject to customary reinvestment rights), including asset sales pursuant to the Total transaction. On June 3, 2019, Occidental and the initial bridge commitment parties entered into the bridge joinder agreement with the additional bridge commitment parties. The bridge joinder agreement amended the debt commitment letter and reallocated the commitments of the initial bridge commitment parties to fund loans under the bridge loan facility among the bridge commitment parties. The bridge commitment parties' obligations to fund the bridge loan facility are subject to several limited conditions as set forth in the debt commitment letter, including, among others, the completion of the merger, the absence of a material adverse effect (as defined in the merger agreement) on Anadarko, the accuracy in all material respects of certain representations and warranties related to Anadarko, as set forth in the merger agreement, and to Occidental, the absence of certain events of default and the delivery of certain financial statements of Occidental and Anadarko.

On June 3, 2019, Occidental entered into the term loan credit agreement with Citibank, N.A., as agent, and the term loan lenders, pursuant to which, subject to the terms and conditions set forth therein, the term loan lenders committed to provide (i) a 364-day senior unsecured term loan facility in an aggregate principal amount of up to $4.4 billion and (ii) a two-year senior unsecured term loan facility in an aggregate principal amount of up to $4.4 billion, for the purposes of financing the merger and paying related fees and expenses. The term loan lenders' obligations to fund term loans under the term loan credit agreement are subject to several limited conditions as set forth in the term loan credit agreement, including, among others, the completion of the merger, the absence of a material adverse effect (as defined in the merger agreement) on Anadarko, the accuracy in all material respects of certain representations and warranties related to Anadarko, as set forth in the merger agreement, and to Occidental, the absence of certain events of default and (to the extent also provided to the lead arrangers under the bridge loan facility) the delivery of certain financial statements of Occidental and Anadarko.

TABLE OF CONTENTS

The term loan credit agreement contains certain customary covenants and events of default, including a customary negative pledge and a covenant that Occidental will maintain, as of the last day of each fiscal quarter, a ratio not in excess of 0.65 to 1.00 of consolidated debt to total capitalization (as such terms are defined in the term loan credit agreement).

***Berkshire Hathaway Investment***

On April 30, 2019, Occidental and Berkshire Hathaway entered into a securities purchase agreement, pursuant to which Occidental has agreed to issue and sell to Berkshire Hathaway, and Berkshire Hathaway has agreed to purchase from Occidental for an aggregate purchase price of $10 billion, on the closing date of the merger: (i) 100,000 shares of a new series of cumulative perpetual preferred stock of Occidental, with a face value of $100,000 per share (the "series A preferred stock"), and (ii) a warrant to purchase 80 million shares of Occidental common stock at an exercise price of $62.50 per share (the "warrant"). Dividends on the series A preferred stock will accrue on the face value at a rate per annum of 8% but will be paid only when, as and if declared by the Occidental Board out of legally available funds. Dividends will be payable in cash, but subject to certain conditions to be specified in the certificate of designations for the series A preferred stock, dividends may be paid in shares of Occidental common stock or a combination of cash and shares of Occidental common stock. Shares of Occidental common stock so issued will be valued for these purposes at 90% of the average of the per share volume-weighted average price of Occidental common stock over each of the ten consecutive trading days immediately following the date on which the applicable dividend is declared. At any time when such dividends have not been paid in full, the unpaid amounts will accrue dividends, compounded quarterly, at a rate per annum of 9%. Following the payment in full of any accrued but unpaid dividends, the dividend rate will remain at 9% per annum. Commencing on the tenth anniversary of the issue date of the series A preferred stock, the series A preferred stock will be redeemable at Occidental's option in whole or from time to time in part, at a redemption price of 105% of the face value to be redeemed plus any accrued and unpaid dividends (whether or not declared). Occidental is required to repurchase shares of the series A preferred stock if it makes specified excess distributions or otherwise returns capital to holders of junior or parity stock, including Occidental common stock, in excess of specified amounts at a redemption price of 110% of the face value to be redeemed plus any accrued and unpaid dividends (whether or not declared). The series A preferred stock has no maturity date and is generally non-voting (except with respect to issuances of senior stock and certain other transactions or modifications affecting the rights of the series A preferred stock). The series A preferred stock will rank senior to the outstanding shares of Occidental common stock with respect to the payment of dividends and distributions in liquidation and has a liquidation price of 105% of the face value plus any accrued and unpaid dividends (whether or not declared). So long as any share of the series A preferred stock remains outstanding, Occidental may not declare or pay dividends on Occidental common stock and Occidental may not purchase, redeem or otherwise acquire for consideration any Occidental common stock unless all accrued and unpaid dividends on all outstanding shares of series A preferred stock have been, or are contemporaneously, declared and paid in full and Occidental has paid, or will contemporaneously pay, in full any portion of the redemption price required to be paid pursuant to the certificate of designations for the series A preferred stock.

The warrant will be exercisable at the holder's option, in whole or in part, until the first anniversary of the date on which no shares of the series A preferred stock remain outstanding. However, if any stockholder approvals are required for the issuance of Occidental common stock upon exercise of the warrant, then unless and until such required approvals have been received, Berkshire Hathaway will not be permitted to exercise the warrant for shares of Occidental common stock. Instead, if any required stockholder approvals are not obtained at the first annual meeting of Occidental stockholders following the issuance of the warrant then, at any time from the 30th day after such meeting until such approvals are obtained, Berkshire Hathaway will have the right to sell the warrant to Occidental (in whole or in part) for an amount in cash equal to the option value of such warrant (or portion thereof that Berkshire Hathaway elects to sell), taking into account (i) the intrinsic value thereof, calculated as the product of (x) the number of shares of Occidental common stock underlying such warrant (or portion thereof) and (y) the market price of the Occidental common stock minus the exercise price and (ii) the time value thereof, assuming (solely for purposes of this calculation) that the expiration date of such warrant is the tenth anniversary of its issue date, and based on certain other specified assumptions. The exercise price and the number of shares of Occidental common stock issuable upon exercise of the warrant are subject to

TABLE OF CONTENTS

certain antidilution adjustments. Occidental has agreed to enter into a registration rights agreement affording Berkshire Hathaway certain registration rights in respect of the Occidental common stock for which the warrant is exercisable. The completion of the Berkshire Hathaway investment is subject to certain conditions, including completion of the merger.

**Sale of Anadarko Assets to TOTAL S.A.**

In connection with the merger, Occidental and Total have entered into a binding memorandum of understanding, dated May 3, 2019 (the "MOU"), pursuant to which Occidental has agreed to sell to Total all of the assets, liabilities, businesses and operations of Anadarko in Algeria, Ghana, Mozambique and South Africa for $8.8 billion in cash, on a cash-free, debt-free basis. The Total transaction is conditioned on the completion of the merger, the execution and delivery of a definitive purchase agreement, and the receipt of required regulatory approvals, as well as other customary closing conditions. Occidental and Total intend to enter into a definitive purchase agreement with respect to the Total transaction prior to the completion of the merger. Either party may terminate the MOU if the Total transaction is not consummated by December 1, 2020, or if an order permanently restraining, enjoining or otherwise prohibiting completion of the Total transaction becomes final and non-appealable.

**Treatment of Anadarko Stock Options and Other Stock-Based Awards**

***Anadarko Stock Options.*** Upon completion of the merger, each outstanding Anadarko stock option will be cancelled and converted into the right to receive a cash amount equal to the product of (i) the excess, if any, of (1) the Option Consideration over (2) the per share exercise price of such Anadarko stock option; and (ii) the aggregate number of shares of Anadarko common stock subject to such Anadarko stock option. Each Anadarko stock option with an exercise price equal to or greater than the Option Consideration will be cancelled and terminated, without any payment in respect thereof.

***Anadarko RSU Awards.*** Upon completion of the merger, each outstanding Anadarko RSU award will convert into an Occidental restricted stock/cash unit award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RSU award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

***Anadarko RS Awards.*** Upon completion of the merger, each outstanding Anadarko RS award will convert into an Occidental restricted stock/cash award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RS award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RS award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RS award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

***Anadarko PU Awards.*** Upon completion of the merger, each outstanding Anadarko PU award will immediately vest and will be cancelled and converted into the right to receive a cash amount equal to the product of (i) 200% of the target number of shares of Anadarko common stock subject to such Anadarko PU award multiplied by (ii) $76.00, less applicable tax withholdings. This amount will be payable on the earliest date that would not result in the imposition of any tax under Section 409A of the Code.

***Anadarko Deferred Share Awards***. Upon completion of the merger, each outstanding Anadarko deferred share award will be cancelled and converted into the right to receive the merger consideration in respect of each

share of Anadarko common stock subject to such Anadarko deferred share award. This amount will be payable within five business days following the completion of the merger or, if later, the earliest date that would not result in the imposition of tax under Section 409A of the Code.

For additional information on Anadarko's stock-based awards, see "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79.

**Appraisal Rights**

***Anadarko Stockholders' Appraisal Rights***

Under Delaware law, holders of Anadarko common stock may be entitled to receive payment in cash for the fair value of their shares of Anadarko common stock as determined by the Delaware Court of Chancery, together with interest, if any, as determined by the court, in lieu of the consideration Anadarko stockholders would otherwise be entitled to pursuant to the merger agreement. These rights are known as appraisal rights.

Anadarko stockholders electing to exercise appraisal rights must comply with the provisions of Section 262 of the DGCL in order to perfect their appraisal rights under Delaware law.

The following is intended as a brief summary of the material provisions of the Delaware statutory procedures required to be followed by an Anadarko stockholder to exercise appraisal rights in connection with the merger, does not constitute any legal or other advice and does not constitute a recommendation that holders of Anadarko common stock exercise their appraisal rights under Section 262 of the DGCL. This summary, however, is not a complete statement of all applicable requirements and is qualified in its entirety by reference to Section 262 of the DGCL, a copy of the full text of which appears in Annex D to this proxy statement/prospectus and is incorporated by reference herein. Failure to follow any of the statutory procedures set forth in Section 262 of the DGCL may result in a termination or waiver of appraisal rights. All references in this summary to a "stockholder" are to the record holder of shares of Anadarko common stock unless otherwise indicated, and all references in this summary to "Section 262" are to Section 262 of the DGCL.

Where a proposed merger for which appraisal rights are available is to be submitted for approval at a meeting of stockholders, Section 262 requires the corporation to notify each of its stockholders (as of the record date for notice of such meeting) not less than 20 days before the meeting that appraisal rights are available. A copy of Section 262 must be included with such notice. **This proxy statement/prospectus constitutes the notice to Anadarko stockholders required by Section 262 of the availability of appraisal rights, and the required copy of Section 262 is contained in Annex D to this proxy statement/prospectus.** If an Anadarko stockholder wishes to consider exercising appraisal rights, such stockholder should carefully review the text of Section 262, a copy of which is contained in Annex D to this proxy statement/prospectus, because failure to comply with the requirements of Section 262 may result in the loss of appraisal rights under Delaware law.

If you are a record holder of shares of Anadarko common stock and wish to exercise your right to seek an appraisal of your shares, you must satisfy each of the following conditions:

- You must properly deliver to Anadarko an effective written demand for appraisal of your shares before the vote with respect to the merger proposal in compliance with the requirements of Section 262. This written demand for appraisal must be in addition to and separate from any proxy or vote abstaining from or voting against the adoption of the merger agreement. Voting against or failing to vote for the adoption of the merger agreement by itself does not constitute a demand for appraisal within the meaning of Section 262.
- You must not vote in favor of, or consent in writing to, the adoption of the merger agreement or otherwise withdraw, waive or lose your appraisal rights. A vote in favor of adoption of the merger agreement, by proxy or in person, will constitute a waiver of your appraisal rights in respect of the shares so voted and will nullify any previously delivered written demands for appraisal. A proxy which does not contain voting instructions will, unless revoked, be voted in favor of the adoption of the merger agreement. Therefore, an Anadarko stockholder who votes by proxy and who wishes to exercise appraisal rights must vote against the merger proposal or abstain from voting on the merger proposal.

TABLE OF CONTENTS

- You must continue to hold your shares of Anadarko common stock through the effective date of the merger. Therefore, a stockholder who is the record holder of shares of Anadarko common stock on the date the written demand for appraisal is made but who thereafter transfers the shares prior to the effective date of the merger will lose any right to appraisal with respect to such shares.
- Unless Anadarko or another Anadarko stockholder (or any other person who is the beneficial owner of shares of Anadarko common stock held either in a voting trust or by a nominee on behalf of such person) who has complied with the requirements of Section 262 and who is otherwise entitled to appraisal rights has done so, you must file a petition in the Delaware Court of Chancery demanding a determination of the fair value of the shares held by all Anadarko stockholders entitled to appraisal within 120 days after the effective date of the merger. Anadarko is under no obligation to file any petition and has no intention of doing so. Accordingly, if you wish to have your shares of Anadarko common stock appraised, you should initiate all necessary action to perfect your appraisal rights in respect of your shares of Anadarko common stock within the time period and in the manner prescribed in Section 262.

In addition, Section 262 requires the Delaware Court of Chancery to dismiss appraisal proceedings as to all shares of Anadarko capital stock if, immediately before the merger, such shares were listed on a national securities exchange unless (i) the total number of shares entitled to appraisal exceeds 1% of the outstanding shares of Anadarko stock eligible for appraisal, or (ii) the value of the consideration provided in the merger for such total number of shares entitled to appraisal exceeds $1 million (such conditions, the "ownership thresholds"). Because Anadarko's common stock is listed on a national securities exchange and is expected to continue to be listed on such exchange immediately before the merger, at least one of the ownership thresholds must be met in order for Anadarko stockholders to be entitled to seek appraisal with respect to such shares of common stock.

If you fail to comply with any of these conditions or at least one of the ownership thresholds is not met and the merger is completed, you will be entitled to receive the merger consideration, but you will have no appraisal rights with respect to your shares of Anadarko common stock. All demands for appraisal should be addressed to Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, Attention: Corporate Secretary, and must be delivered before the vote on the merger proposal is taken at the special meeting and should be executed by, or on behalf of, the record holder of the shares of Anadarko common stock. The demand must reasonably inform Anadarko of the identity of the stockholder and the intention of the stockholder to demand appraisal of his, her or its shares.

Only a holder of record of shares of Anadarko common stock immediately prior to the effective time of the merger may assert appraisal rights for the shares of stock registered in that holder's name. To be effective, a demand for appraisal by a holder of Anadarko common stock must be made by, or in the name of, such registered stockholder, fully and correctly, as the stockholder's name appears on his, her or its Anadarko stock certificate(s) (or in the stock ledger). Beneficial owners who do not also hold the shares of record may not directly make appraisal demands to Anadarko. The beneficial holder must, in such cases, have the registered owner, such as a broker, bank or other nominee, submit the required demand in respect of those shares. If shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, execution of a demand for appraisal should be made by or for the fiduciary; and if the shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand should be executed by or for all joint owners. An authorized agent, including an authorized agent for two or more joint owners, may execute the demand for appraisal for a stockholder of record; however, the agent must identify the record owner or owners and expressly disclose the fact that, in executing the demand, he or she is acting as authorized agent for the record owner. A record owner, such as a broker, who holds shares as a nominee for others, may exercise his, her or its right of appraisal with respect to the shares held for one or more beneficial owners, while not exercising this right for other beneficial owners. In that case, the written demand should state the number of shares as to which appraisal is sought. Where no number of shares is expressly mentioned, the demand will be presumed to cover all shares held in the name of the record owner.

If an Anadarko stockholder holds shares of Anadarko common stock in a brokerage account or in other nominee form and wishes to exercise appraisal rights, such stockholder should consult with his, her or its broker or the other nominee to determine the appropriate procedures to cause the broker or other nominee to make a demand for appraisal of those shares.

TABLE OF CONTENTS

If the merger is completed, Anadarko (which is the surviving corporation in the merger) must, within ten days after the effective date of the merger, give written notice that the merger has become effective to each former Anadarko stockholder who has properly delivered a written demand for appraisal and who did not vote in favor of the merger proposal. Within 120 days after the effective date of the merger, any Anadarko stockholder who has complied with Section 262 will, upon written request to Anadarko, be entitled to receive a written statement setting forth the aggregate number of shares not voted in favor of the merger proposal and with respect to which demands for appraisal rights have been received and the aggregate number of holders of such shares. A person who is the beneficial owner of shares of Anadarko common stock held in a voting trust or by a nominee on behalf of such person may, in such person's own name, request from Anadarko the statement described in the previous sentence. Such written statement will be mailed to the requesting Anadarko stockholder or beneficial owner within ten days after such written request is received by Anadarko or within ten days after expiration of the period for delivery of demands for appraisal, whichever is later. Within 120 days after the effective date of the merger, either Anadarko or any Anadarko stockholder who has complied with the requirements of Section 262 and who is otherwise entitled to appraisal rights may file a petition in the Delaware Court of Chancery demanding a determination of the fair value of the shares held by all Anadarko stockholders entitled to appraisal. A person who is the beneficial owner of shares of Anadarko common stock held in a voting trust or by a nominee on behalf of such person may, in such person's own name, file the petition described in the previous sentence. Upon the filing of the petition by an Anadarko stockholder or beneficial owner, service of a copy of such petition shall be made upon Anadarko. Anadarko has no obligation to file such a petition in the event any Anadarko stockholders exercise appraisal rights, there is no present intent on the part of Anadarko to file an appraisal petition, and Anadarko stockholders seeking to exercise appraisal rights should not assume that Anadarko will file such a petition or that it will initiate any negotiations with respect to the fair value of such shares. Accordingly, the failure of an Anadarko stockholder to file such a petition within the period specified could result in the loss or termination of appraisal rights, and Anadarko stockholders who desire to have their shares appraised should initiate any petitions necessary for the perfection of their appraisal rights within the time periods and in the manner prescribed by Section 262.

If a petition for appraisal is duly filed by an Anadarko stockholder or beneficial owner and a copy of the petition is served on Anadarko, Anadarko will then be obligated, within 20 days after receiving service of a copy of the petition, to file with the office of the Register in Chancery in which such petition was filed a duly verified list containing the names and addresses of all Anadarko stockholders who have demanded an appraisal of their shares and with whom agreements as to the value of their shares have not been reached by Anadarko. The Delaware Court of Chancery is empowered to conduct a hearing upon the petition, and to determine those Anadarko stockholders who have complied with Section 262 and who have become entitled to the appraisal rights provided thereby. The Delaware Court of Chancery may require the Anadarko stockholders who have demanded appraisal for their shares represented by certificates (if any) to submit their certificates to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any such Anadarko stockholder fails to comply with that direction, the Delaware Court of Chancery may dismiss the proceedings as to that stockholder. The Delaware Court of Chancery will also dismiss proceedings as to all Anadarko stockholders if neither of the ownership thresholds described above is met.

Where the proceedings are not dismissed or all demands for appraisal are not successfully withdrawn (as discussed further below in this summary), the appraisal proceedings will be conducted as to the shares of Anadarko common stock owned by all stockholders entitled to appraisal, in accordance with the rules of the Delaware Court of Chancery, including any rules specifically governing appraisal proceedings. The Delaware Court of Chancery will thereafter determine the fair value of the shares of Anadarko common stock at the effective time of the merger held by all Anadarko stockholders who have properly demanded appraisal rights, exclusive of any element of value arising from the accomplishment or expectation of the merger, together with interest, if any. Unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. Notwithstanding the foregoing, at any time before the entry of judgment in the proceedings, Anadarko may make a voluntary cash payment to each stockholder entitled to and seeking appraisal (which will be treated as an advance against the payment due to such Anadarko stockholder), in which case interest shall accrue thereafter only upon the sum of (i) the difference, if any, between the amount so paid and the fair value

TABLE OF CONTENTS

of the shares as determined by the Delaware Court of Chancery, and (ii) interest theretofore accrued, unless paid at that time. When the value is determined, the Delaware Court of Chancery will direct the payment of such value, with interest thereon accrued during the pendency of the proceeding, if the Delaware Court of Chancery so determines, to the Anadarko stockholders entitled to receive the same, upon surrender by such holders of the certificates representing those shares or, in the case of book-entry shares, forthwith. Anadarko is under no obligation to make such voluntary cash payment prior to such entry of judgment.

In determining fair value and a fair rate of interest, if any, the Delaware Court of Chancery is required to take into account all relevant factors. In *Weinberger v. UOP, Inc.*, the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that “proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court” should be considered, and that “fair price obviously requires consideration of all relevant factors involving the value of a company”.

Section 262 provides that fair value is to be “exclusive of any element of value arising from the accomplishment or expectation of the merger”. In *Cede & Co. v. Technicolor, Inc.*, the Delaware Supreme Court stated that such exclusion is a “narrow exclusion [that] does not encompass known elements of value”, but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Delaware Supreme Court construed Section 262 to mean that “elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered”.

Anadarko stockholders should be aware that the fair value of shares of Anadarko common stock as determined under Section 262 could be more than, the same as, or less than the value that such Anadarko stockholder is entitled to receive under the terms of the merger agreement. An opinion of an investment banking firm as to the fairness from a financial point of view of the consideration payable in a merger is not an opinion as to, and does not in any manner address, fair value under Section 262. Occidental and Anadarko do not anticipate offering more than the per share merger consideration to any Anadarko stockholder exercising appraisal rights and reserve the right to assert in any appraisal proceeding that, for purposes of Section 262, the fair value of a share of Anadarko common stock is less than the per share merger consideration. No representation is made as to the outcome of the appraisal of fair value as determined by the Delaware Court of Chancery.

Costs of the appraisal proceeding may be imposed upon Anadarko and the Anadarko stockholders participating in the appraisal proceeding by the Delaware Court of Chancery as the Court deems equitable in the circumstances. Each Anadarko stockholder party to the appraisal proceeding is responsible for its own attorneys’ fees and expert witnesses’ fees and expenses, although, upon the application of an Anadarko stockholder, the Delaware Court of Chancery may order all or a portion of the expenses incurred by any Anadarko stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorneys’ fees and the fees and expenses of experts, to be charged pro rata against the value of all shares entitled to appraisal. Any Anadarko stockholder who had demanded appraisal rights will not, after the effective time of the merger, be entitled to vote shares subject to that demand for any purpose or to receive payments of dividends or any other distribution with respect to those shares, other than with respect to payment as of a record date prior to the effective time of the merger.

If no petition for appraisal is filed within 120 days after the effective date of the merger, or if an Anadarko stockholder (other than an Anadarko stockholder who has commenced an appraisal proceeding or joined that proceeding as a named party) delivers a written withdrawal of such stockholder’s demand for appraisal and an acceptance of the terms of the merger within 60 days after the effective date of the merger, then the right of that Anadarko stockholder to appraisal will cease and that Anadarko stockholder will be entitled to receive the merger consideration pursuant to the merger agreement. No appraisal proceeding in the Delaware Court of Chancery will be dismissed as to any Anadarko stockholder without the prior approval of the Court, and such approval may be conditioned upon such terms as the Delaware Court of Chancery deems just; provided, however, that any Anadarko stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party will maintain the right to withdraw its demand for appraisal and to accept the merger consideration that such holder would have received pursuant to the merger agreement within 60 days after the effective date of the merger.

TABLE OF CONTENTS

In view of the complexity of Section 262 of the DGCL relating to appraisal rights, Anadarko stockholders that consider making a demand for appraisal in accordance with Delaware law should seek the advice of their own legal advisor. To the extent there are any inconsistencies between the foregoing summary and Section 262 of the DGCL, Section 262 of the DGCL will govern.

**Failure to comply with all the procedures set forth in Section 262 may result in the loss of a stockholder's statutory appraisal rights. Consequently, if you wish to exercise your appraisal rights, you are strongly urged to consult a legal advisor before attempting to exercise your appraisal rights.**

### NYSE Listing of Occidental Common Stock; Delisting and Deregistration of Anadarko Common Stock

Prior to the completion of the merger, Occidental has agreed to use its reasonable best efforts to cause the shares of Occidental common stock to be issued in the merger to be approved for listing on the NYSE subject to official notice of issuance. The listing of the shares of Occidental common stock is also a condition to completion of the merger.

If the merger is completed, Anadarko common stock will cease to be listed on the NYSE and will be deregistered under the Exchange Act, after which Anadarko will no longer be required under SEC rules and regulations to file periodic reports with the SEC with respect to Anadarko common stock.

### Material U.S. Federal Income Tax Consequences

#### *General*

The following is a general discussion of the material U.S. federal income tax consequences of the merger to holders of Anadarko common stock that exchange their Anadarko common stock for the merger consideration.

This discussion is based upon the Code, U.S. Treasury regulations promulgated under the Code and court and administrative rulings and decisions, all as in effect on the date of this proxy statement/prospectus. These authorities may change, possibly retroactively, or be subject to differing interpretations, and any such change or differing interpretation could affect the accuracy of the statements and conclusions set forth in this discussion.

This discussion addresses only those holders of Anadarko common stock that hold their Anadarko common stock as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Code. This discussion is not a complete description of all of the U.S. federal income tax consequences of the merger and, in particular, does not address any tax consequences arising under the unearned income Medicare contribution tax enacted pursuant to the Health Care and Education Reconciliation Act of 2010, nor does it address any tax consequences arising under the laws of any state, local or non-U.S. jurisdiction, or under any U.S. federal laws other than those pertaining to the income tax. Further, this discussion does not address all aspects of U.S. federal income taxation that may be relevant to you in light of your individual circumstances or that may be applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- a bank or other financial institution;
- a tax-exempt organization;
- a real estate investment trust or real estate mortgage investment conduit;
- an entity or arrangement classified as a partnership for U.S. federal income tax purposes or other pass-through entity such as a subchapter S corporation (or an investor in such an entity or arrangement);
- an insurance company;
- a regulated investment company or a mutual fund;
- a broker-dealer or trader in stocks and securities, or currencies;
- a trader in securities that elects the mark-to-market method of accounting for its securities;
- a person subject to the alternative minimum tax provisions of the Code;
- a person that received Anadarko common stock through the exercise of an employee stock option, through a tax qualified retirement plan or otherwise as compensation;

TABLE OF CONTENTS

- a person that has a functional currency other than the U.S. dollar;
- an accrual-method taxpayer that is required to accelerate the recognition of any item of gross income with respect to Anadarko common stock as a result of such income being recognized on an applicable financial statement;
- a person that holds Anadarko common stock as part of a hedge, straddle, constructive sale, conversion or other integrated transaction;
- a person who owns or has owned (directly, indirectly or constructively) 5% or more of shares of Anadarko common stock or Occidental common stock (by vote or value) or otherwise exercises control over Anadarko's or Occidental's corporate affairs;
- a grantor trust;
- a controlled foreign corporation or passive foreign investment company; or
- a U.S. expatriate.

No ruling has been requested from the Internal Revenue Service (the "IRS") in connection with the merger or related transactions. Accordingly, the discussion below neither binds the IRS nor precludes it from adopting a contrary position. Furthermore, no opinion of counsel has been or will be rendered with respect to the tax consequences of the merger or related transactions.

For purposes of this discussion, the term "U.S. holder" means a beneficial owner of shares of Anadarko common stock that is, for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;
- a corporation (including any entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust if (i) its administration is subject to the primary supervision of a court within the United States and one or more U.S. persons, within the meaning of Section 7701(a)(30) of the Code, have the authority to control all substantial decisions of the trust or (ii) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person for U.S. federal income tax purposes.

A "Non-U.S. holder" is any beneficial owner of Anadarko common stock or, after the completion of the merger, Occidental common stock that, for U.S. federal income tax purposes, is an individual, corporation, estate, or trust that is not a U.S. holder.

If an entity or an arrangement treated as a partnership for U.S. federal income tax purposes holds shares of Anadarko common stock, the U.S. federal income tax consequences to a partner in such partnership (or owner of such entity) generally will depend on the status of the partner and the activities of the partnership (or entity). Any entity treated as a partnership for U.S. federal income tax purposes that holds shares of Anadarko common stock, and any partners in such partnership, should consult their own tax advisors with respect to the tax consequences of the merger in their specific circumstances.

**All holders of Anadarko common stock are urged to consult their tax advisors regarding the particular federal, state, local and non-U.S. tax consequences to them of the merger.**

***The Merger***

*U.S. Holders*

The merger will be a taxable transaction for U.S. federal income tax purposes. Therefore, a U.S. holder generally will recognize capital gain or loss equal to the difference, if any, between (i) the sum of any cash, including any cash received in lieu of fractional shares of Occidental common stock, and the fair market value of any Occidental common stock as of the merger received by such U.S. holder in the merger and (ii) the U.S. holder's adjusted tax basis in its Anadarko common stock.

TABLE OF CONTENTS

Capital gains of a non-corporate U.S. holder will generally be eligible for the preferential U.S. federal income tax rates applicable to long-term capital gains if the U.S. holder has held its Anadarko common stock for more than one year as of the merger. The deductibility of capital losses is subject to limitations. If a U.S. holder acquired different blocks of Anadarko common stock at different times or different prices, the U.S. holder must determine its tax basis and holding period separately for each block of Anadarko common stock.

A U.S. holder's aggregate tax basis in Occidental common stock received in the merger will equal the fair market value of such stock as of the merger. A U.S. holder's holding period in any shares of Occidental common stock received in the merger will begin the day after the merger.

**U.S. holders who hold shares of both Anadarko common stock and Occidental common stock at the time of the merger may be subject to different U.S. federal income tax treatment in the merger, as described below under "-Special Consequences of the Merger to Holders of Anadarko Common Stock that Also Own Occidental Common Stock".**

**U.S. holders are urged to consult their own tax advisors as to the particular tax consequences of the merger, including the effect of U.S. federal state and local tax laws or foreign tax laws.**

*Non-U.S. Holders*

Subject to the discussion below under the section entitled "-Information Reporting and Backup Withholding", a Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax on the exchange of Anadarko common stock for Occidental common stock and cash in the merger unless:

- any gain recognized on the exchange is effectively connected with the Non-U.S. holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. holder); or
- the Non-U.S. holder is an individual who is present in the United States for 183 days or more during the taxable year that includes the date of the merger, and certain other conditions are satisfied.

If the Non-U.S. holder's gain is described in the first bullet, then the Non-U.S. holder will generally be subject to U.S. federal income tax under the rules described above as if it were a U.S. holder of Anadarko common stock and, in the case of a foreign corporation, may be subject to an additional "branch profits tax" at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty).

If the Non-U.S. holder is described in the second bullet, then such Non-U.S. holder will generally be subject to U.S. federal income tax at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty) on the gain, which may be offset by certain U.S. source capital losses of the Non-U.S. holder.

Non-U.S. holders are urged to consult their own tax advisors regarding the potential applicability of these rules as well as any income tax treaty that may be applicable in their particular circumstances.

**Non-U.S. holders who hold shares of both Anadarko and Occidental at the time of the merger may be subject to different treatment in the merger, as described below under "-Special Consequences of the Merger to Holders of Anadarko Common Stock that Also Own Occidental Common Stock".**

**All Non-U.S. holders may be subject to withholding at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty) on the full amount of the consideration received in the merger, as described below under "-Special Consequences of the Merger to Holders of Anadarko Common Stock that Also Own Occidental Common Stock".**

**Non-U.S. holders are urged to consult their own tax advisors as to the particular tax consequences of the merger, including the effect of U.S. federal, state and local tax laws or foreign tax laws.**

*Special Consequences of the Merger to Holders of Anadarko Common Stock that Also Own Occidental Common Stock*

If Section 304 applies to the merger, a holder of Anadarko common stock may be subject to U.S. federal income tax treatment that differs materially from that described above if a holder's percentage interest in Occidental following the merger is the same as or greater than the holder's percentage interest in Anadarko before the merger (the "Section 304 Holder Test"). Section 304 will apply to the merger if holders of Anadarko

TABLE OF CONTENTS

common stock, taken together, own 50% or more of Occidental shares, by vote or value, following the completion of the merger. Certain constructive attribution rules apply to determine ownership for purposes of the ownership tests described in this paragraph. Because the application of Section 304 to the merger depends on the ownership of Anadarko common stock and Occidental common stock following the merger and is determined after the application of various constructive ownership rules, we are not, and will not, be able to determine whether Section 304 applies to the merger. However, we believe it is possible Section 304 may apply to the merger.

**Holders that expect to own (including by attribution) a percentage interest in Occidental after the completion of the merger that is equal to or greater than the holder's percentage interest in Anadarko immediately before the merger are urged to consult their own tax advisors.**

If Section 304 applies to the merger and a holder of Anadarko common stock meets the Section 304 Holder Test, such holder may be treated as receiving a distribution in respect of Occidental common stock. Such distribution would be taxable as a dividend (in an amount equal to the cash consideration and the fair market value of the Occidental common stock received) to the extent of the holder's allocable share of the earnings and profits of Anadarko and Occidental. To the extent that the amount of cash consideration exceeds Anadarko's and Occidental's current and accumulated earnings and profits for the taxable year of the merger, the distribution would first be treated as a tax-free return of capital, to the extent of the holder's adjusted tax basis in its Anadarko common stock, and to the extent the amount of the distribution exceeds such tax basis, the excess would be taxed as capital gain recognized on a sale or exchange of such holder's Anadarko common stock. The amount of any such gain would be taxed as described above under "-U.S. Holders" and "-Non-U.S. Holders", as applicable.

For U.S. holders, dividends are generally taxable as ordinary income. However, non-corporate U.S. holders may be eligible for a reduced rate of taxation on dividends, including dividends arising by operation of Section 304, subject to exceptions for short-term and hedged positions. For corporate U.S. holders, dividends (a) may be eligible for a dividends-received deduction (subject to certain requirements and limitations) and (b) may be subject to the "extraordinary dividend" provisions of the Code.

For Non-U.S. holders, the receipt of any amounts treated as a dividend generally will be subject to U.S. withholding tax at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty), unless such dividend is effectively connected with a Non-U.S. holder's conduct of a trade or business within the United States (and, if an applicable income tax treaty so requires, is attributable to a permanent establishment). However, because the application of Section 304 depends on a holder's particular circumstances, withholding agents may not be able to determine whether any particular holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, withholding agents may withhold against all Non-U.S. holders at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty) on the full amount of the cash consideration and the fair market value of the stock consideration received. If a withholding agent withholds any amount with respect to consideration to be received by a Non-U.S. holder that is exempt from such withholding, the Non-U.S. holder may apply for a refund.

In order to obtain a reduced rate of withholding under an income tax treaty, a Non-U.S. holder claiming such reduced rates will be required to deliver a properly completed IRS Form W-8BEN or W-8BEN-E (or other successor form), as applicable, certifying such Non-U.S. holder's entitlement to benefits under the income tax treaty to the applicable withholding agent before cash consideration is paid pursuant to the merger. Non-U.S. holders may seek a refund from the IRS of amounts withheld on distributions in excess of their allocable share of Anadarko's and Occidental's current and accumulated earnings and profits, to the extent such amounts are not otherwise subject to U.S. federal income tax.

In addition, for Non-U.S. holders, the receipt of any amounts treated as a dividend will generally be subject to Sections 1471 through 1474 of the Code and the U.S. Treasury regulations and administrative guidance issued thereunder ("FATCA"). Non-U.S. holders are urged to consult their own tax advisors regarding the application of FATCA.

The receipt of the consideration in the merger may be subject to backup withholding, as described below in "-Information Reporting and Backup Withholding".

TABLE OF CONTENTS

**Section 304 and the regulations and guidance thereunder are complex. Holders that actually or constructively own, or expect to own at the time of the completion of the merger, both Anadarko common stock and Occidental common stock are urged to consult their own tax advisors with respect to the application of Section 304 in their particular circumstances (including as to their tax basis in the shares subject to Section 304) and any actions that may be taken to mitigate any potential adverse tax consequences.**

*Information Reporting and Backup Withholding*

Any shares of Occidental common stock and/or cash received by a U.S. holder or a Non-U.S. holder in the merger may be subject to information reporting and backup withholding. To avoid backup withholding, a U.S. holder that does not otherwise establish an exemption should timely complete and return to Occidental or the exchange agent an IRS Form W-9 (or other successor form), certifying under penalties of perjury that such U.S. holder is a "United States person" (within the meaning of the Code), that the taxpayer identification number provided is correct and that such U.S. holder is not subject to backup withholding. A Non-U.S. holder generally may establish an exemption from backup withholding by certifying its non-U.S. person status under penalties of perjury on a properly completed applicable IRS Form W-8 (or other successor form).

Any amounts withheld under the backup withholding rules are not additional tax and may be allowed as a refund or credit against the holder's U.S. federal income tax liability, provided that the required information is timely furnished to the IRS.

**The preceding discussion is intended only as a summary of the material United States federal income tax consequences of the merger and does not purport to be a complete analysis or discussion of all potential income tax effects relevant thereto or a discussion of any other type of taxes. All holders of Anadarko common stock are urged to consult their own tax advisors as to the specific tax consequences to them of the merger, including tax return reporting requirements, the applicability and effect of non-U.S., federal, state, local and other applicable tax laws, and the effect of any proposed changes in the tax laws.**

**Restrictions on Sales of Shares of Occidental Common Stock Received in the Merger**

All shares of Occidental common stock received by Anadarko stockholders in the merger will be freely tradable for purposes of the Securities Act and the Exchange Act except for shares of Occidental common stock received by any Anadarko stockholder who becomes an "affiliate" of Occidental after completion of the merger (such as Anadarko directors or executive officers who become directors or executive officers of Occidental after the merger). This proxy statement/prospectus does not cover resales of shares of Occidental common stock received by any person upon completion of the merger, and no person is authorized to make any use of this proxy statement/prospectus in connection with any resale.

**Certain Contracts between Occidental and Anadarko**

Occidental and Anadarko are party to a number of commercial arrangements with one another, which are not material, individually or in the aggregate, to either company.

TABLE OF CONTENTS

# THE MERGER AGREEMENT

## Explanatory Note Regarding the Merger Agreement

This section of this proxy statement/prospectus describes the material provisions of the merger agreement, but does not describe all of the terms of the merger agreement and may not contain all of the information about the merger agreement that is important to you. The following summary is qualified by reference to the complete text of the merger agreement, which is attached as Annex A to this proxy statement/prospectus and incorporated by reference herein. The rights and obligations of Occidental, Anadarko and Merger Subsidiary are governed by the express terms and conditions of the merger agreement and not by this summary or any of the other information contained in this proxy statement/prospectus. You are urged to read the full text of the merger agreement because it is the legal document that governs the merger.

The merger agreement contains representations, warranties and covenants by each of the parties to the agreement, which were made only for purposes of the agreement, as of specified dates. The representations, warranties and covenants in the merger agreement were made solely for the benefit of the parties to the merger agreement; may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the merger agreement instead of establishing these matters as facts; and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors should not rely on representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of Occidental, Merger Subsidiary, Anadarko or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of the representations, warranties and covenants contained in the merger agreement or any other agreement between such parties may change after the date of each such agreement, which subsequent information may or may not be fully reflected in Occidental's or Anadarko's public disclosures or the public disclosures of any of their respective subsidiaries or affiliates. Each such agreement should not be read alone, but should instead be read in conjunction with the other information regarding the respective agreement, the merger, Occidental, Anadarko and their respective affiliates and businesses, which is contained in, or incorporated by reference into, this proxy statement/prospectus, as well as in the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and other filings that each of Occidental and Anadarko has made or will make with the SEC. See "Where You Can Find More Information" beginning on page 167.

## Structure of the Merger

The merger agreement provides, upon the terms and subject to the conditions set forth therein and in accordance with the DGCL, for Merger Subsidiary to merge with and into Anadarko, with Anadarko continuing as the surviving corporation and an indirect wholly owned subsidiary of Occidental.

At the effective time of the merger, the certificate of incorporation of Anadarko, as in effect immediately prior to the completion of the merger, will be amended and restated in its entirety as set forth in Exhibit A to the merger agreement and, as so amended and restated, will be the certificate of incorporation of the surviving corporation, except with respect to the name of the surviving corporation, which will be Anadarko Petroleum Corporation. The by-laws of Merger Subsidiary, as in effect immediately prior to the completion of the merger, will be the by-laws of the surviving corporation. As used herein, the "effective time" of the merger means the time at which the certificate of merger with respect to the merger is duly filed with the Secretary of State of the State of Delaware or at such later time as Occidental and Anadarko may agree and specify in such certificate of merger.

## Timing of Closing

Unless another place and time is agreed to in writing by Occidental and Anadarko, the closing of the merger will occur on the second business day following the day on which the last of the conditions (other than those conditions that by their nature are to be fulfilled at the closing, but subject to the waiver or fulfillment of such conditions) set forth in the merger agreement has been fulfilled or waived. Immediately after the closing of the merger, Anadarko will file a certificate of merger with respect to the merger with the Secretary of State of the State of Delaware, at which time the merger will be effective.

TABLE OF CONTENTS

## Merger Consideration

### *Conversion of Shares*

At the effective time of the merger, each outstanding share of Anadarko common stock (other than the cancelled shares, dissenting shares (if any) and certain shares of Anadarko common stock subject to stock awards that will be treated in the manner described under the heading "Treatment of Anadarko Stock Options and Other Stock-Based Awards") will automatically be cancelled and retired and will cease to exist and each holder thereof will thereafter have no rights with respect to such securities other than the right to receive:

- $59.00 in cash (as such amount of cash may potentially be adjusted as described under the heading "-Share Cap Adjustment", the "per share cash consideration"), without interest, and 0.2934 (as such amount may potentially be adjusted as described under the heading "-Share Cap Adjustment", the "exchange ratio") of a validly issued, fully paid and non-assessable share of Occidental common stock (such cash consideration and stock consideration together, as they may potentially be adjusted as described under the heading "-Share Cap Adjustment", the "merger consideration");
- any dividends or other distributions with a record date prior to the effective time of the merger which are declared by Anadarko in accordance with the merger agreement and which remain unpaid at the effective time of the merger;
- (i) at the time of delivery of the Occidental common stock by the exchange agent, the amount of dividends or other distributions, if any, with a record date after the effective time of the merger paid with respect to such shares of Occidental common stock and a payment date on or before the date of delivery of the Occidental common stock and not previously paid and (ii) at the appropriate payment date, the amount of dividends or other distributions, if any, with a record date after the effective time of the merger but before the delivery of Occidental common stock by the exchange agent and a payment date subsequent to such delivery of such Occidental common stock by the exchange agent pursuant to the merger agreement, payable with respect to such shares of Occidental common stock, in each case without interest; and
- any cash to be paid in lieu of any fractional share of Occidental common stock as described under the heading "-Treatment of Fractional Shares".

Shares of Anadarko common stock owned by Anadarko, Occidental, Merger Subsidiary or any of their respective direct or indirect wholly owned subsidiaries will be cancelled in the merger without payment of any consideration, as described under the heading "-Cancelled Shares".

Following the effective time of the merger, Occidental will make available to the exchange agent, as needed, the merger consideration to be delivered in respect of certificates and book-entry shares formerly representing shares of Anadarko common stock.

### *Share Cap Adjustment*

If the merger would otherwise result in the issuance of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) in excess of 19.99% of the outstanding shares of Occidental common stock immediately prior to the closing of the merger (the "share cap") then:

- the exchange ratio will be reduced by the smallest number (rounded up to the nearest 0.0001) that causes the total number of shares of Occidental common stock (including shares that would be deliverable pursuant to converted stock-based awards pursuant to the merger agreement) issuable in the merger to not exceed the share cap (the "exchange ratio reduction number"); and
- the per share cash consideration will be increased by the amount in cash equal to (x) the exchange ratio reduction number multiplied by (y) the Parent Closing Price.

### *Cancelled Shares*

At the effective time of the merger, all shares of Anadarko common stock that are owned by Occidental, Merger Subsidiary or Anadarko or any of their respective direct or indirect wholly owned subsidiaries will be cancelled and retired and will cease to exist and no stock of Occidental, cash or other consideration will be

TABLE OF CONTENTS

delivered in exchange therefor. For the avoidance of doubt, shares of Anadarko common stock held in trust or otherwise set aside from shares held in Anadarko's treasury pursuant to any Anadarko benefit plan will not be cancelled shares and will be converted, at the effective time of the merger, into the right to receive the merger consideration.

### *Treatment of Fractional Shares*

Anadarko stockholders will not receive any fractional shares of Occidental common stock pursuant to the merger. Each holder of Anadarko common stock that otherwise would have been entitled to receive a fractional share of Occidental common stock immediately prior to the effective time of the merger will receive an amount in cash, without interest, rounded to the nearest cent, in lieu of such fractional share. The value of such cash payment will be calculated by the exchange agent and will represent the holder's proportionate interest in a trust of proceeds established from the open-market sale of that number of shares of Occidental common stock equal to the excess of (i) the aggregate number of shares of Occidental common stock delivered to the exchange agent by Occidental pursuant to the terms of the merger agreement over (ii) the aggregate number of whole shares of Occidental common stock distributed to the holders of certificates or book-entry shares previously representing shares of Anadarko common stock pursuant to the merger agreement.

### *Exchange of Anadarko Stock Certificates and Book-Entry Shares*

Promptly after the effective time of the merger, Occidental will send, or will cause the exchange agent to send, to each holder of record of Anadarko common stock converted into the right to receive the merger consideration, a letter of transmittal for use in the exchange and instructions explaining how to surrender Anadarko shares to the exchange agent. Anadarko stockholders should not return stock certificates with the enclosed proxy card. Exchange of any book-entry shares of Anadarko common stock will be effected in accordance with Occidental's customary procedures with respect to securities represented by book entry. Holders of unexchanged shares of Anadarko common stock will not be entitled to receive the merger consideration or any dividends or other distributions payable by Occidental after the closing until their shares are properly surrendered. No interest will be paid or will accrue for the benefit of holders of the certificates or book-entry shares that formerly represented outstanding shares of Anadarko common stock on the cash or other merger consideration payable pursuant to the merger agreement, any cash in lieu of fractional shares or any unpaid dividends and distributions payable pursuant to the merger agreement to such holders of certificates or book-entry shares that formerly represented outstanding shares of Anadarko common stock.

### *Withholding*

Each of Anadarko, the surviving corporation, Occidental and the exchange agent will be entitled to deduct and withhold from any amounts otherwise payable pursuant to the merger agreement to any person such amounts as are required to be deducted and withheld with respect to the making of such payment under any provision of federal, state, local or foreign tax law. To the extent that amounts are so deducted or withheld by Anadarko, the surviving corporation, Occidental or the exchange agent, any amounts so withheld will be treated for all purposes of the merger agreement as having been paid to the person in respect of which such deduction and withholding was made.

### *Appraisal Rights*

No dissenting Anadarko stockholders will be entitled to the right to receive the merger consideration unless and until the stockholder has failed to perfect or has effectively withdrawn or lost the holder's right to seek appraisal in connection with the merger under the DGCL. Dissenting Anadarko stockholders who properly comply with the provisions of Section 262 of the DGCL as to appraisal rights and do not withdraw or otherwise lose these rights will be entitled to receive payment, solely from the surviving corporation, of the appraisal value of the dissenting shares to the extent permitted by and in accordance with the provisions of Section 262 of the DGCL. If an Anadarko stockholder (i) affirmatively withdraws its demand for appraisal of such dissenting shares under the circumstances provided by and in accordance with the DGCL, (ii) fails to establish its entitlement to appraisal as provided in the DGCL or (iii) takes or fails to take any action the consequences of which is that such holder is not entitled to payment for its shares under the DGCL, then such holder will forfeit the right to appraisal of such shares of Anadarko common stock and such shares of Anadarko common stock will thereupon cease to constitute dissenting shares, and if such forfeiture occurs following the effective time of the merger,

TABLE OF CONTENTS

each such share of Anadarko common stock will thereafter be deemed to have been converted into and to have become, as of the effective time of the merger, the right to receive, without interest thereon, the merger consideration. Anadarko may not, except with the prior written consent of Occidental, settle, make any payments with respect to, offer to settle, approve the withdrawal of any claim or agree to any of the foregoing with respect to the dissenting shares. As used herein, dissenting shares means shares of Anadarko common stock with respect to which appraisal rights are properly demanded and not withdrawn under the DGCL.

***Lost Certificates***

If a certificate representing shares of Anadarko common stock has been lost, stolen or destroyed, then, before an Anadarko stockholder will be entitled to receive the merger consideration to be paid in respect of the shares of Anadarko common stock represented by such lost, stolen or destroyed certificate, the holder will need to deliver an affidavit of that fact and, if required by Occidental or the surviving corporation, post a bond, in such reasonable amount as the surviving corporation may direct, as indemnity against any claim that may be made against it with respect to such certificate.

***Potential Adjustment to Merger Consideration to Prevent Dilution***

In the event that, before the completion of the merger, any change in the outstanding shares of capital stock of Occidental or Anadarko occurs as a result of any reclassification, recapitalization, stock split or combination, exchange or readjustment of shares, or any stock dividend thereon with a record date during such period, the relevant components of the merger consideration will be appropriately adjusted in order to provide Anadarko stockholders with the economic effect contemplated by the parties in the merger agreement. No such adjustment will be made for cash dividends or grants of equity compensation not prohibited by the merger agreement.

***Treatment of Anadarko Stock Options and Other Stock-Based Awards***

*Anadarko Stock Options.* Upon completion of the merger, each outstanding Anadarko stock option will be cancelled and converted into the right to receive a cash amount equal to the product of (i) the excess, if any, of (1) the Option Consideration over (2) the per share exercise price of such Anadarko stock option; and (ii) the aggregate number of shares of Anadarko common stock subject to such Anadarko stock option. Each Anadarko stock option with an exercise price equal to or greater than the Option Consideration will be cancelled and terminated, without any payment in respect thereof.

*Anadarko RSU Awards.* Upon completion of the merger, each outstanding Anadarko RSU award will convert into an Occidental restricted stock/cash unit award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RSU award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RSU award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

*Anadarko RS Awards.* Upon completion of the merger, each outstanding Anadarko RS award will convert into an Occidental restricted stock/cash award with respect to both (i) the number (rounded to the nearest whole number) of shares of Occidental common stock determined by multiplying (x) the number of shares of Anadarko common stock subject to such Anadarko RS award by (y) the exchange ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares of Anadarko common stock subject to such Anadarko RS award by (2) the per share cash consideration. Such converted award will otherwise continue on the same terms and conditions as were applicable under such Anadarko RS award, including any provisions for acceleration of vesting. Such terms and conditions include "double-trigger" protection of the converted award, meaning that upon certain qualifying terminations of employment during the applicable protection period following the closing of the merger, the award will immediately vest and become unrestricted as of such termination.

*Anadarko PU Awards.* Upon completion of the merger, each outstanding Anadarko PU award will immediately vest and will be cancelled and converted into the right to receive a cash amount equal to the

TABLE OF CONTENTS

product of (x) 200% of the target number of shares of Anadarko common stock subject to such Anadarko PU award multiplied by (y) $76.00, less applicable tax withholdings. This amount will be payable on the earliest date that would not result in the imposition of any tax under Section 409A of the Code.

*Anadarko Deferred Share Awards.* Upon completion of the merger, each outstanding Anadarko deferred share award will be cancelled and converted into the right to receive the merger consideration in respect of each share of Anadarko common stock subject to such Anadarko deferred share award. This amount will be payable within five business days following the completion of the merger or, if later, the earliest date that would not result in the imposition of tax under Section 409A of the Code.

For additional information on Anadarko's stock-based awards, see "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79.

**Covenants and Agreements**

***Conduct of Business***

Each of Occidental and Anadarko has agreed to certain covenants in the merger agreement restricting the conduct of its business between May 9, 2019 and the earlier of the completion of the merger and the termination of the merger agreement.

*Interim Operations of Anadarko*. The merger agreement provides that until the effective time of the merger, except with the prior written consent of Occidental (such consent not to be unreasonably withheld, conditioned or delayed), Anadarko and its subsidiaries will conduct their business in the ordinary course consistent with past practice and in a manner not involving entry into businesses that are materially different from the business of Anadarko and its subsidiaries on the date of the merger agreement. Anadarko has also agreed that during this period it and its subsidiaries will use their commercially reasonable efforts to preserve intact their business organizations and relationships with third parties. In addition, Anadarko has agreed to the following specific restrictions on the conduct of its business during this period, which are subject to exceptions described in the merger agreement. Anadarko generally has agreed that, except with the prior written consent of Occidental (such consent not to be unreasonably withheld, conditioned or delayed), it will not, and will not permit any of its subsidiaries to:

- adopt or propose any change in its certificate of incorporation or by-laws;
- adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization;
- issue, sell, transfer, pledge, dispose of or encumber any shares of, or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights of any kind to acquire, any shares of capital stock of any class or series of Anadarko or its subsidiaries, with certain exceptions;
- effect a stock split or combine, subdivide, reclassify or otherwise adjust its outstanding shares of capital stock (including any shares of capital stock underlying options or other stock or stock-based awards), or declare any dividends, other than regular quarterly cash dividends consistent with past practice (which may not exceed $0.30 per share with respect to Anadarko dividends but, with respect to Western Midstream Partners, LP dividends, may include increases to the extent consistent with financial guidance published prior to the date of the merger agreement) and intra-group dividends among Anadarko and its subsidiaries;
- redeem, purchase or otherwise acquire, directly or indirectly, any of its or its subsidiaries' capital stock, with certain exceptions for repurchases, redemptions or acquisitions (i) required by the terms of its capital stock or any securities outstanding as of the date of the merger agreement, (ii) required by or in connection with the respective terms, as of the date of the merger agreement, of any company benefit plan or any dividend reinvestment plan in the ordinary course of the operations of such plan and consistent with past practice or (iii) in satisfaction of applicable tax withholdings and/or the exercise price of any Anadarko stock-based awards;
- amend the terms of any outstanding options to purchase shares of Anadarko common stock or of any outstanding restricted stock, stock units or stock appreciation rights (provided that such covenant will not limit the administration of the relevant plans in accordance with past practices and interpretations of the Anadarko Board and the Compensation and Benefits Committee of the Anadarko Board);

TABLE OF CONTENTS

- make or authorize any capital expenditures except in amounts that are not in excess of (i) the aggregate budgeted amount indicated in the capital budget provided to Occidental and (ii) with respect to any line item in such capital budget, in an amount not to exceed the amount budgeted to such line item by more than the percentage specified therein; provided, however, that if the effective time of the merger does not occur in 2019, with respect to capital expenditures in future periods that are not covered by such capital budget, such maximum amounts will be based on a reasonable extrapolation of permissible expenditures from the capital budget; and provided, further, that Western Midstream Partners, LP will not make or authorize capital expenditures outside the ordinary course of business consistent with past practice;
- increase the compensation or benefits of any director, officer or employee (except for normal increases in the ordinary course of business consistent with past practice or as required under applicable law or any company benefit plan existing on the date of the merger agreement) or enter into, adopt, extend or renew (with respect to extension or renewal only, for a term in excess of one year) (or waive or amend any performance or vesting criteria or accelerate funding under) any employment, change in control, severance, bonus, profit sharing, retirement, restricted stock, stock option, deferred compensation or other director, executive or employee benefit plan, policy, agreement or arrangement (except as required by applicable law or the terms of an agreement or arrangement existing on the date of the merger agreement or, with respect to individual non-U.S. payroll employees, in the ordinary course of business consistent with past practice or as required by applicable law);
- acquire (i) any business or person or division thereof (whether by merger or consolidation, by purchase of all or a substantial portion of the assets or equity or voting interest in such persons, businesses or divisions or by any other manner) or (ii) any other assets (except certain E&P assets or any non-E&P assets acquired in the ordinary course of business consistent with past practice);
- make any acquisition of any assets, property or securities of any person if such acquisition would, individually or in the aggregate, reasonably be expected to prevent, materially impede, materially interfere with or materially delay the completion of the merger;
- sell, lease, license, encumber or otherwise dispose of any material assets or property, except pursuant to existing contracts or commitments or in the ordinary course of business consistent with past practice and in no event in an amount exceeding $100 million in the aggregate (provided that in no event will Anadarko, directly or indirectly, sell, lease, license, encumber or otherwise dispose of any equity interest in Western Midstream Partners, LP);
- incur any indebtedness for borrowed money, guarantee or assume any such indebtedness of another person, issue or sell warrants or other rights to acquire any debt securities of Anadarko or any of its subsidiaries, enter into any “keep well” or other agreement to maintain any financial condition of another person, or enter into any arrangement having the economic effect of any of the foregoing (other than (i) any such indebtedness among any person and its wholly owned subsidiaries, among any person’s wholly owned subsidiaries, and guarantees thereof, (ii) additional borrowings under Anadarko’s existing credit facility or existing credit facilities of its subsidiaries, in each case in accordance with the terms thereof or (iii) any such indebtedness incurred to replace, renew, extend, refinance or refund any indebtedness of Anadarko or any of its subsidiaries, in the case of clauses (ii) and (iii), subject to certain limitations);
- modify, amend, terminate or waive any material rights under any material contract or enter into any agreement that would constitute a material contract, other than as expressly contemplated in the merger agreement or in the ordinary course of business consistent with past practice with respect to certain contracts (provided that Anadarko will not enter into any contracts or extensions of existing contracts relating to Anadarko’s U.S. offshore business with terms extending beyond December 31, 2019);
- settle or compromise any claim, demand, lawsuit or state or federal regulatory proceeding, or waive, release or assign any rights or claims, in any such case (i) in an amount in excess of $25 million, (ii) that is otherwise qualitatively material to Anadarko or (iii) that imposes any material obligation to be performed by, or material restriction imposed against, Anadarko or its subsidiaries after the closing date of the merger (provided that Anadarko may not settle or propose to settle or compromise any transaction litigation except as permitted by the terms of the merger agreement);

TABLE OF CONTENTS

- change any method of financial accounting or financial accounting practice (except for changes that are not material or are required by concurrent changes in GAAP or applicable law);
- enter into any joint venture, partnership, participation or other similar arrangement with respect to its U.S.-onshore business and operations other than in the ordinary course of business consistent with past practice and in an aggregate amount of assets contributed by Anadarko or any of its subsidiaries not exceeding $100 million;
- enter into any joint venture, partnership, participation or other similar arrangement with respect to its U.S.-offshore business and operations;
- make any loan, capital contribution or advance to or investment in any other person (other than Anadarko or any wholly owned subsidiary of Anadarko in the ordinary course of business consistent with past practice and other than pursuant to capital calls required pursuant to the terms of existing equity investments) except for advances for reimbursable employee expenses in the ordinary course of business consistent with past practice;
- take any action that would limit Occidental's or Anadarko's freedom to license, cross-license or otherwise dispose of any of Anadarko's intellectual property;
- except as required by law, make, revoke or amend any material election relating to taxes or change any of its tax accounting or procedures currently in effect, settle any tax proceeding or file any amended tax return, in each case, that is reasonably likely to result in an increase to a tax liability, if that increase is material to Anadarko and its subsidiaries taken as a whole;
- enter into any agreement that limits in any material respect the ability of Anadarko or its subsidiaries or would limit in any material respect the ability of Occidental or its subsidiaries after the merger to compete in any line of business or geographic area;
- take any action that would reasonably be expected to prevent, materially impede, interfere with or delay the completion of the merger and the transactions contemplated by the merger agreement;
- (i) except in the case of Western Midstream Partners, LP and its subsidiaries, enter into any new interest rate hedges other than extensions or replacements of existing hedges in the ordinary course of business entered into no earlier than September 1, 2019 or any new commodity hedges and (ii) in the case of Western Midstream Partners, LP and its subsidiaries, enter into any new interest rate hedges or commodity hedges other than in the ordinary course of business consistent with past practice;
- incur any third-party capital in respect of any non-consented AFEs without the prior written consent of Occidental (such consent not to be unreasonably withheld, conditioned or delayed);
- take other specified actions agreed to by the parties; or
- agree or commit to do any of the foregoing.

*Interim Operations of Occidental.* The merger agreement provides that until the effective time of the merger, except with the prior written consent of Anadarko (such consent not to be unreasonably withheld, conditioned or delayed), Occidental and its subsidiaries will conduct their business in a manner not involving the entry by Occidental or its subsidiaries into lines of business that are materially different from the lines of business of Occidental and its subsidiaries as of the date of the merger agreement. Occidental generally has agreed that, except with the prior written consent of Anadarko (such consent not to be unreasonably withheld, conditioned or delayed), it will not, and will not permit any of its subsidiaries to:

- adopt or propose any change in the certificate of incorporation or by-laws of Occidental (other than any certificate of designations adopted in connection with the Berkshire Hathaway investment);
- adopt a plan of liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of Occidental;
- except as contemplated by the Berkshire Hathaway investment, effect a stock split or combine, subdivide or reclassify Occidental's outstanding shares of capital stock, or declare any dividends on Occidental's capital stock, other than regular quarterly cash dividends consistent with past practice

TABLE OF CONTENTS

(including increases in such dividends consistent with past practice), and in any case not including any special dividend (provided, however, that Occidental will not declare, set aside or pay any dividend except in accordance with the terms of the merger agreement, described under the heading "-Coordination of Dividends");

- acquire any assets, property or securities if, individually or in the aggregate, such acquisition or acquisitions would reasonably be expected to prevent, materially impede, materially interfere with or materially delay the completion of the merger and the transactions contemplated by the merger agreement; or
- agree or commit to do any of the foregoing.

*Anadarko Stockholder Meeting*. The merger agreement requires Anadarko, as promptly as practicable after Occidental's registration statement on Form S-4, of which this proxy statement/prospectus forms a part, is declared effective, to duly call, give notice of, convene and hold a meeting of its stockholders (the "Anadarko stockholder meeting") for the purpose of obtaining the required approval of the merger proposal by the Anadarko stockholders (the "Anadarko stockholder approval"). Matters contemplated by the Anadarko stockholder approval are the only matters (other than matters of procedure and matters required by law to be voted on by Anadarko's stockholders in connection therewith or, with Occidental's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), matters contemplated to otherwise have been submitted to the Anadarko stockholders at Anadarko's 2019 annual stockholder meeting) that Anadarko may propose to be voted on by the Anadarko stockholders at the Anadarko stockholders meeting.

Anadarko may not adjourn, postpone or otherwise delay the Anadarko stockholder meeting without the prior written consent of Occidental unless (i) after consultation with Occidental, Anadarko believes in good faith that such adjournment or postponement is reasonably necessary to allow reasonable additional time to (x) solicit additional proxies necessary to obtain the Anadarko stockholder approval, or (y) distribute any supplement or amendment to the Anadarko proxy statement the distribution of which the Anadarko Board has determined in good faith to be necessary under applicable law after consultation with, and taking into account the advice of, outside legal counsel or (ii) for an absence of a quorum. Notwithstanding the foregoing, Anadarko may not, without the prior written consent of Occidental (such consent not to be unreasonably withheld, conditioned or delayed), postpone the Anadarko stockholder meeting more than a total of three times pursuant to clause (i)(x) or (ii) of the immediately preceding sentence, and no such postponement or adjournment pursuant to clause (i)(x) or (ii) of the immediately preceding sentence will be, without the prior written consent of Occidental (such consent not to be unreasonably withheld, conditioned or delayed), for a period exceeding ten business days and in no event may Anadarko postpone the Anadarko stockholder meeting without the written consent of Occidental if doing so would require the setting of a new record date. Anadarko will otherwise coordinate and cooperate with Occidental with respect to the timing of the Anadarko stockholder meeting and will otherwise comply with all legal requirements applicable to the Anadarko stockholder meeting.

*No Solicitation*. Anadarko has agreed that it and its subsidiaries will not, and that it will direct and use its reasonable best efforts to cause its and its subsidiaries' respective officers, directors, employees, investment bankers, consultants, attorneys, accountants, agents and other representatives not to, directly or indirectly:

- take any action to solicit, initiate or knowingly encourage or facilitate the making of any acquisition proposal (as defined below) or any inquiry with respect to an acquisition proposal;
- engage in discussions or negotiations with any person with respect to an acquisition proposal (except to notify them of the existence of the applicable provisions of the merger agreement);
- disclose any nonpublic information or afford access to properties, books or records to any person that has made, or to Anadarko's knowledge is considering making, an acquisition proposal;
- approve or recommend, propose to approve or recommend, or execute or enter into any agreement relating to an acquisition proposal; or
- propose publicly or agree to do any of the foregoing.

TABLE OF CONTENTS

An “acquisition proposal” is any bona fide written offer or proposal for, or bona fide written indication of interest in, any:

- direct or indirect acquisition or purchase of any business or assets of Anadarko or any of its subsidiaries that constitutes, either individually or in the aggregate, 20% or more of the net revenues, net income, EBITDA or assets of Anadarko and its subsidiaries, taken as a whole;
- direct or indirect acquisition or purchase of 20% or more of any class of equity securities of Anadarko or of any of its subsidiaries whose business constitutes 20% or more of the net revenue, net income, EBITDA or assets of Anadarko and its subsidiaries, taken as a whole;
- tender offer or exchange offer that, if completed, would result in any person owning 20% or more of any class of equity securities of Anadarko, or any of its subsidiaries whose business constitutes 20% or more of the net revenues, net income, EBITDA or assets of Anadarko and its subsidiaries, taken as a whole; or
- merger, consolidation, business combination, joint venture, partnership, recapitalization, liquidation, dissolution or similar transaction involving Anadarko or any of its subsidiaries whose business constitutes 20% or more of the net revenues, net income, EBITDA or assets of Anadarko and its subsidiaries, taken as a whole, other than the transactions contemplated by the merger agreement.

The Anadarko Board may, however, make any disclosure if, in the good faith judgment of the Anadarko Board, after consultation with outside counsel, the failure to make such disclosure would be reasonably likely to be inconsistent with the Anadarko directors’ exercise of their fiduciary duties to Anadarko’s stockholders under applicable law. If the disclosure relates to an acquisition proposal, it will be deemed to constitute a change in the Anadarko Board’s recommendation in favor of the adoption of the merger agreement unless the Anadarko Board reaffirms its recommendation in that disclosure. In addition but subject to the terms and conditions contained in the merger agreement, prior to the adoption of the merger agreement by the Anadarko stockholders, Anadarko may:

- furnish information and access, but only in response to a request, to a person making a bona fide, written acquisition proposal to the Anadarko Board that was not obtained in breach of the non-solicitation provisions or certain other deal-protection provisions of the merger agreement; and
- participate in discussions and negotiate with the person or its representatives making the acquisition proposal.

Anadarko may only furnish information and participate in discussions as described above, however, if Anadarko first delivers to Occidental written notice advising Occidental that Anadarko intends to take such action, and:

- the Anadarko Board concludes in good faith, after (i) receipt of the advice of a financial advisor of nationally recognized reputation and outside legal counsel, that such acquisition proposal constitutes or could reasonably be expected to result in a superior proposal (as defined below) and (ii) taking into account any revised terms proposed by Occidental after Occidental is notified of such acquisition proposal pursuant to the terms of the merger agreement, that failure to do so would be reasonably likely to be inconsistent with its fiduciary duties to Anadarko’s stockholders under applicable law;
- prior to any engagement or disclosure otherwise permitted by the merger agreement, Anadarko receives from the person making the acquisition proposal an executed confidentiality agreement whose material confidentiality terms are, in all material respects, no less favorable to Anadarko and no less restrictive to the person making the acquisition proposal than those contained in the existing confidentiality agreement between Anadarko and Occidental, and any information provided to such person is provided to Occidental prior to or substantially concurrently with the time it is provided to such person.

In the event that on or after the date of the merger agreement Anadarko receives an acquisition proposal or any request for nonpublic information relating to Anadarko or any of its subsidiaries or for access to the properties, books or records of Anadarko or any of its subsidiaries by any person that has made, or to Anadarko’s knowledge may be considering making an acquisition proposal, Anadarko will (i) promptly (and in no event later than 24 hours after receipt thereof) notify (which notice will be provided orally and in writing and will identify the person making such acquisition proposal or request and set forth the material terms thereof) Occidental

thereof, (ii) keep Occidental reasonably and promptly informed of the status and material terms of (including changes to the status or material terms of) any such acquisition proposal or request and (iii) as promptly as practicable (but in no event later than 24 hours after receipt) provide Occidental unredacted copies of all material correspondence and written materials sent or provided to Anadarko or any of its subsidiaries that describes any terms or conditions thereof (including any proposed transaction agreements and schedules and exhibits thereto and any financing commitments related thereto as well as written summaries of any material oral communications relating to the terms and conditions thereof).

A "superior proposal" is a bona fide written acquisition proposal for or in respect of at least a majority of the outstanding shares of Anadarko common stock or Anadarko's and its subsidiaries' assets:

- on terms that the Anadarko Board determines, in its good faith judgment (after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel), taking into account all the terms and conditions of such acquisition proposal, including any break-up fees, expense reimbursement provisions and conditions to consummation, as well as any revisions to the terms of the merger or the merger agreement proposed by Occidental, are more favorable to Anadarko's stockholders than the merger and other transactions contemplated by the merger agreement; and
- constitutes a transaction that is reasonably likely to be consummated on the terms proposed, taking into account all legal, financial, regulatory and other aspects of that proposal.

*Anadarko Board's Recommendation to Stockholders*. Anadarko has agreed that the Anadarko Board will recommend the adoption of the merger agreement to Anadarko's stockholders and to include such recommendation in this proxy statement/prospectus. The merger agreement provides that, subject to the exceptions described below, neither the Anadarko Board nor any committee thereof will (i) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in any manner adverse to Occidental, the approval of the merger agreement, the merger or the recommendation of the Anadarko Board (any action referred to in this clause (i), a "change in the Anadarko recommendation") or (ii) approve or recommend, or propose publicly to approve or recommend, any acquisition proposal. For purposes of the merger agreement, a change in the Anadarko recommendation includes (x) any approval or recommendation of (or public proposal to approve or recommend) an acquisition proposal by the Anadarko Board or any committee thereof and (y) any failure by Anadarko to include the Anadarko Board recommendation in this proxy statement/prospectus. Notwithstanding the foregoing restrictions, prior to obtaining the Anadarko stockholder approval:

- the Anadarko Board is permitted, in response to a superior proposal received after the date of the merger agreement and not resulting from a breach of the merger agreement, to not make the Anadarko Board recommendation or to withdraw or modify, in a manner adverse to Occidental, the Anadarko Board recommendation, or to cause Anadarko to terminate the merger agreement in accordance with its terms to enter into a definitive agreement providing for a superior proposal, if:
  - the Anadarko Board determines in its good faith judgment, after consulting with outside legal counsel, that making the Anadarko Board recommendation or failing to effect a change in the Anadarko recommendation would be reasonably likely to be inconsistent with the exercise of its fiduciary duties;
  - Anadarko has given Occidental advance written notice of its decision to take such action, including the reasons for the change and specifying the material terms and conditions of the applicable acquisition proposal and the identity of the person making the proposal;
  - for a period of four business days following the notice delivered pursuant to the immediately preceding bullet (the "superior proposal match period"), Occidental is given the opportunity to propose revisions to the terms of the merger agreement (or to make another proposal) in response to such acquisition proposal and during such period Anadarko has made its representatives reasonably available to negotiate with Occidental (to the extent Occidental wishes to negotiate) with respect to such proposed revisions or other proposal, if any (provided that any amendment or modification (other than immaterial amendments or modifications) of such acquisition proposal will require a new notice period with a new superior proposal match period of three business days); and

TABLE OF CONTENTS

- the Anadarko Board determines in good faith that the acquisition proposal is a superior proposal at the end of the superior proposal match period (as may be extended) and after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel, as well as any revisions to the terms of the merger or the merger agreement proposed by Occidental;

- the Anadarko Board is permitted, in response to an intervening event (as defined below) occurring after the date of the merger agreement and not relating to an acquisition proposal, to not make the Anadarko Board recommendation, or to effect a change in the Anadarko recommendation, if:

  - the Anadarko Board determines in its good faith judgment, as a result of the intervening event, after consulting with outside legal counsel, that making the recommendation or failing to effect a change in the Anadarko recommendation would be reasonably likely to be inconsistent with the exercise of its fiduciary duties to stockholders;

  - for a period of five business days following the notice delivered by Anadarko to Occidental of the decision of the Anadarko Board to take such action (the "intervening event match period"), which notice will describe the intervening event in reasonable detail, Occidental is given the opportunity to propose revisions to the merger agreement (or to make another proposal) in response to such intervening event and during such period Anadarko has made its representatives reasonably available to negotiate with Occidental (to the extent Occidental wishes to negotiate) with respect to such proposed revisions or other proposal, if any (provided that any change in fact (other than an immaterial change) relating to such intervening event will require a new notice period with a new intervening event match period of three business days); and

  - Occidental does not make, within the intervening event match period (as may be extended) a proposal that the Anadarko Board determines, in good faith, after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel, would obviate the need to not make or withdraw or modify the Anadarko Board recommendation.

An "intervening event" means any event, development or change in circumstances that was not known to the Anadarko Board, or the consequences of which were not reasonably foreseeable as of the date of the merger agreement, which event, change or development becomes known to the Anadarko Board prior to obtaining the approval of the Anadarko stockholders. However, the following events, changes or developments will not constitute an intervening event:

- the receipt, existence or terms of an acquisition proposal or any matter relating to, or consequences of, such acquisition proposal; or

- any change in the price or trading volume of Anadarko's common stock, Occidental's common stock or any other securities of Anadarko, Occidental or any of their respective subsidiaries (provided that the underlying causes of such changes may constitute, or be taken into account in determining whether there has been, an intervening event).

Even if the Anadarko Board changes its recommendation in favor of the merger agreement in a manner adverse to Occidental (but provided that Anadarko does not terminate the merger agreement in order to accept a superior proposal), Anadarko must still call a stockholder meeting as otherwise required by the merger agreement and submit the adoption of the merger agreement and the merger to the vote of Anadarko's stockholders.

*Best Efforts Covenant.* Occidental and Anadarko have agreed to cooperate with each other and use their best efforts to promptly:

- take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable under the merger agreement and applicable laws to consummate and make effective the merger and the other transactions contemplated by the merger agreement as soon as practicable, including, without limitation, preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents; and

TABLE OF CONTENTS

- obtain as soon as practicable all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any third party or governmental body, agency, authority or official which are necessary, proper or advisable to consummate the merger and the other transactions contemplated by the merger agreement.

Occidental and Anadarko have submitted the notifications required under the HSR Act relating to the merger. The FTC granted early termination of the applicable waiting period under the HSR Act on June 3, 2019. Prior to closing, Occidental and Anadarko have each agreed to keep the other apprised of the status of matters relating to the completion of the merger and work cooperatively in connection with obtaining all required approvals or consents of any governmental agency, body, authority or entity in connection with the merger. Occidental and Anadarko have certain rights to review and be informed of filings or written materials made or submitted by the other party to any governmental agency, body, authority or entity in connection with the transactions contemplated by the merger agreement, and are required to provide the other party with the opportunity to participate in any meeting with any governmental agency, body, authority or entity in respect of any filing, investigation or other inquiry in connection with the transactions contemplated by the merger agreement, provided that Occidental is entitled to lead all such processes.

Without limiting the foregoing, Occidental and Anadarko have also agreed to use their best efforts to:

- avoid the entry of, or to have vacated or terminated, any decree, order, or judgment that would restrain, prevent or delay the closing, on or before the end date (as defined under "-Termination of the Merger Agreement" below), including without limitation defending through litigation on the merits any claim asserted in any court by any person; and
- avoid or eliminate each and every impediment under any antitrust, competition or trade regulation law that may be asserted by any governmental agency, body, authority or entity with respect to the merger so as to enable the closing to occur as soon as reasonably possible (and in any event no later than the end date), including, without limitation, (i) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of such businesses, product lines or assets of Occidental, Anadarko and their respective subsidiaries and (ii) otherwise taking or committing to take actions that after the closing would limit Occidental or its subsidiaries' freedom of action with respect to, or its or their ability to retain, one or more of the businesses, product lines or assets of Occidental, Anadarko and their respective subsidiaries, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any suit or proceeding, which would otherwise have the effect of preventing or materially delaying the closing.

Occidental and, if requested by Occidental, Anadarko will agree to divest, sell, dispose of, hold separate or otherwise take or commit to take any action that limits its freedom of action with respect to, or Occidental or Occidental's subsidiaries' ability to retain, any of the businesses, product lines or assets of Occidental, Anadarko or any of their respective subsidiaries, but only if such action is conditioned upon the completion of the merger. Neither Anadarko nor any of its subsidiaries may, without Occidental's prior written consent, sell, divest or dispose of any assets, license any specified Anadarko intellectual property, commit to any sale, divestiture or disposal of businesses, product lines or assets of Anadarko and Anadarko's subsidiaries or any license of specified Anadarko intellectual property or take any other action or commit to take any action that would limit Anadarko's, Occidental's or any of their respective subsidiaries' freedom of action with respect to, or their ability to retain any of, their businesses, product lines or assets or specified Anadarko intellectual property.

However, notwithstanding the foregoing, Occidental is not required to take (or to request or authorize Anadarko or any of Anadarko's subsidiaries to undertake) any action if it would reasonably be expected to result in a substantial detriment. For this purpose, "substantial detriment" means changes or effects which would, individually or in the aggregate (and after giving effect to any reasonably expected proceeds of any divestiture or sale of assets), result in, or be reasonably likely to result in, a material adverse effect on Anadarko and its subsidiaries, taken as a whole, at or after the effective time of the merger. Any requirement to divest, hold separate or limit the operation of any division, subsidiary, interest, business, product line, asset or property relating to the operations conducted by Occidental and its subsidiaries prior to the effective time of the merger

TABLE OF CONTENTS

will be deemed to result in a substantial detriment if such action with respect to a comparable amount of assets or businesses of Anadarko and its subsidiaries, taken together with all other such actions taken, would be reasonably likely, in the aggregate, to have a material adverse effect on Anadarko and its subsidiaries, taken as a whole, at or after the effective time of the merger.

*Certain Employee Benefits Matters*. For one year following the effective time of the merger, Occidental will continue to provide to each individual who is employed by Anadarko and its subsidiaries as of the effective time of the merger who remains employed with Occidental or any of its subsidiaries (each an “affected employee”), for so long as such affected employee remains employed by Occidental or any of its subsidiaries during such one-year period:

- base compensation that is no less favorable than that which was provided to the affected employee immediately before the effective time of the merger;
- short- and long-term incentive compensation opportunities that are no less favorable in the aggregate than those which were provided to the affected employee immediately before the effective time of the merger, and
- all other compensation and employee benefits (excluding severance) that are no less favorable in the aggregate than those which were provided to the affected employee immediately before the effective time of the merger.

For purposes of determining whether compensation and employee benefits are no less favorable in the aggregate, (i) retention, sale, stay or change-in-control payments or awards or any similar compensation or benefit will not be taken into account, (ii) in lieu of stock-based awards, Occidental may substitute other forms of cash-based compensation having substantially equivalent value and equivalent vesting terms and (iii) Occidental may determine the value of defined benefit pension plan benefits provided immediately prior to the effective time of the merger in its good faith discretion; provided, however, that defined benefit pension plan benefits will not be taken into account for purposes of determining whether all other compensation and employee benefits are no less favorable in the aggregate for any particular affected employee, if Occidental provides such affected employee with retirement benefits (excluding retiree welfare benefits) that are no less favorable than those provided to similarly situated employees of Occidental and its subsidiaries. However, notwithstanding the foregoing, the terms and conditions of employment for any affected employees who are covered by a collective bargaining agreement, works council agreement, or other contract or agreement with any labor union, works council or other employee representative organization will continue to be governed by such contract or agreement.

Occidental will, or will cause the surviving corporation to, give affected employees full credit for purposes of eligibility, vesting and benefit accrual (other than benefit accruals under any defined benefit pension or eligibility or benefit accruals under any post-employment or retiree health or welfare plan that, in each case, is not an Anadarko benefit plan) under any employee benefit plans or arrangements maintained by Occidental or any subsidiary of Occidental for such affected employees’ service with Anadarko or any of its subsidiaries (including any predecessor or acquired entity or any other entity for which Anadarko and its subsidiaries have given credit for prior service) to the same extent recognized by Anadarko immediately prior to the effective time of the merger, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

Occidental will, or will cause the surviving corporation to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the affected employees under any welfare benefit plans in which such employees may be eligible to participate after the effective time of the merger, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the effective time of the merger under any welfare plan maintained for the affected employees immediately prior to the effective time of the merger, and (ii) for the year in which the effective time of the merger occurs, provide each affected employee with credit for any co-payments and deductibles paid prior to the effective time of the merger in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans in which such employees are eligible to participate after the effective time of the merger.

TABLE OF CONTENTS

*Indemnification and Insurance of Anadarko Directors and Officers.* Occidental has agreed that:

- for six years after the effective time of the merger, it will cause the surviving corporation and each of its subsidiaries (other than Western Midstream Partners, LP and its subsidiaries) to indemnify, defend and hold harmless each person who is now, or has been at any time prior to the date of the merger agreement or who becomes, prior to the effective time of the merger, a director, officer or employee of Anadarko or of any such subsidiary, as applicable, or who acts as a fiduciary under any Anadarko benefit plan or is or was serving at the request of Anadarko or of such subsidiary as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other enterprise against all losses, claims, damages, costs, fines, penalties, expenses (including attorneys' and other professionals' fees and expenses), liabilities or judgments or amounts that are paid in settlement of, or incurred in connection with, any threatened or actual claim (including a claim of a violation of applicable law) or other proceeding, whether civil, criminal, administrative, investigative or otherwise and whether or not such claim or proceeding results in a formal civil or criminal litigation or regulatory action to which such person is involved based, in whole or in part, on or arising, in whole or in part, out of such service or by reason of anything done or not done by such person in any such capacity, whether pertaining to any act or omission occurring or existing prior to, at or after the effective time of the merger and whether asserted or claimed prior to, at or after the effective time of the merger, in each case to the fullest extent permitted by applicable law;
- it will cause the surviving corporation to put in place, and Occidental will fully prepay no later than immediately prior to the closing of the merger, "tail" insurance policies with a claims reporting or discovery period of at least six years from the effective time of the merger with terms and conditions no less favorable than the current directors' and officers' liability insurance policies maintained by Anadarko with respect to matters, acts or omissions existing or occurring at or prior to the effective time of the merger; provided that Occidental may elect in its sole discretion, but will not be required, to spend more than 300% of the last annual premium paid by Anadarko prior to the date of the merger agreement for the six years of coverage under such "tail" policy.

*Coordination of Dividends*. Occidental and Anadarko have agreed to coordinate the record and payment dates for their regular quarterly dividends to ensure that (i) Anadarko stockholders will not receive two dividends, or fail to receive one dividend, in any quarter with respect to their Anadarko common stock and Occidental common stock that such holders receive in exchange therefor in the merger and (ii) without limiting clause (i), that the date on which any quarterly dividend is declared and the record date with respect to any quarterly dividend is no later than five business days following the one-year anniversary of such dates for the corresponding quarter of the preceding year (provided that in the quarter in which the closing of the merger occurs, if the record date of Anadarko's quarterly dividend has been declared and is a date prior to the effective time of the merger, then such quarterly dividend declaration date and record date of Anadarko will occur no later than such date as is necessary to ensure that holders of Anadarko common stock receive a quarterly dividend in accordance with clause (i)).

*Financing*. Occidental and Anadarko have agreed to cooperate with each other with respect to customary actions that are reasonably requested by Occidental to be taken by Anadarko or its subsidiaries under Anadarko's existing credit facility or with respect to any of Anadarko's outstanding debt securities in connection with the merger, subject to certain exceptions and requirements.

Occidental and Merger Subsidiary have agreed to, and have agreed to cause their respective subsidiaries to, use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to arrange and obtain the committed financing (as defined below) on the terms and conditions set forth in the commitment letters (as defined below), including using reasonable best efforts to:

- maintain in effect the commitment letters until the completion of the transactions contemplated by the merger agreement (provided that the commitments under the commitment letters may be reduced in accordance with certain specific conditions); and
- unless Occidental reduces the commitments under the commitment letters to zero pursuant to certain commitment reductions permitted by the merger agreement, (i) timely (and in any event by the effective time of the merger) negotiate and enter into definitive agreements with respect to the facilities

TABLE OF CONTENTS

contemplated by the commitment letters on the terms and conditions set forth therein, (ii) satisfy or cause to be waived on a timely basis (and in any event by the effective time of the merger) all conditions to funding applicable to Occidental set forth in the commitment letters or such definitive agreements that are within its (or any of its affiliates') control and otherwise comply with its obligations thereunder and (iii) upon the satisfaction or waiver of such conditions, consummate, and cause the financing sources to fund, the committed financing at the effective time of the merger (including using reasonable best efforts to enforce all of its rights under the commitment letters).

"Commitment letters" means (i) the commitment letter dated as of May 9, 2019 from BofA, BAML and CGMI, pursuant to which BofA and CGMI have agreed, subject to the terms and conditions therein, to provide Occidental with debt financing in connection with the merger and the other transactions contemplated by the merger agreement and (ii) the executed fee letters referenced therein. "Committed financing" means the debt financing committed pursuant to the commitment letters. If Occidental obtains substitute commitment letters or alternative financing commitment letters, the terms "commitment letters" and "committed financing" will include such substitute commitment letters and alternative financing commitment letters and the substitute financing and alternative financing contemplated thereby, as applicable.

Occidental may substitute one or more commitments from financial institutions to provide substitute debt financing for all or any portion of the committed financing if such substitute financing satisfies certain conditions set forth in the merger agreement. Further, if any portion of the committed financing becomes unavailable, and such unavailable amount is reasonably required for Occidental and Merger Subsidiary to satisfy their obligations under the merger agreement at the effective time of the merger, Occidental will promptly notify Anadarko in writing of such unavailable financing and Occidental will use its reasonable best efforts to arrange and obtain, as promptly as reasonably practicable, alternative financing from alternative sources that satisfies certain conditions set forth in the merger agreement.

Occidental has agreed not to permit any amendment or modification to or waiver of any provision or remedy under, the commitment letters, any other definitive agreement related to the committed financing or the securities purchase agreement governing the Berkshire Hathaway investment, with certain exceptions. Occidental has also agreed to keep Anadarko reasonably informed on a timely basis of the status of Occidental's efforts to obtain the committed financing, to satisfy the conditions of the committed financing and to give Anadarko prompt notice of any fact, change, event or circumstance that is reasonably likely to have, individually or in the aggregate, a material adverse impact on the committed financing, and of certain other occurrences specified in the merger agreement relating to the committed financing.

Until the effective time of the merger (or the earlier termination of the merger agreement), Anadarko has agreed to, and has agreed to cause each of its subsidiaries (other than Western Midstream Partners, LP and its subsidiaries) to, use its and their reasonable best efforts to cause its and their representatives to, use their respective reasonable best efforts to provide such customary cooperation as is reasonably requested by Occidental in writing to assist Occidental in the arrangement, syndication and completion of the committed financing or other bank financing or capital markets financing entered into to finance Occidental's and Merger Subsidiary's obligations under the merger agreement (collectively, the "financing"), including by using reasonable best efforts to take certain actions specified in the merger agreement.

Notwithstanding the foregoing, in connection with the financing or any cooperation contemplated by the financing covenant in the merger agreement, none of Anadarko or its subsidiaries or any of their respective representatives will:

- be required to provide any cooperation pursuant to the financing covenant to the extent such cooperation would reasonably be expected to interfere unreasonably with the ongoing business or operations of Anadarko and its subsidiaries;
- be required to pass resolutions or consents to approve or authorize the execution of the financing or any other cooperation contemplated by the financing covenant, or execute or deliver any certificate, document, legal opinion, instrument or agreement or agree to any change or modification of any existing certificate, document, instrument or agreement in connection therewith, in each case, that (i) is effective prior to the effective time of the merger or that would be effective if the effective time of the merger does not occur (other than certain authorization letters) or (ii) would be inaccurate in light of the facts and circumstances at the time approved, authorized, executed or delivered, as applicable;

TABLE OF CONTENTS

- become bound by any terms of the financing prior to the effective time of the merger;
- be required to pay any commitment or other similar fee or incur any other cost or expense for which it has not received simultaneous or prior reimbursement or, with respect to immaterial costs or expenses, for which it is not indemnified by or on behalf of Occidental in connection with the financing or any other cooperation contemplated by the financing covenant prior to the effective time of the merger;
- be required to disclose or provide any information in connection with the financing or any other cooperation contemplated by the financing covenant, the disclosure of which, in the judgment of Anadarko, is restricted by contract or applicable law, is subject to attorney-client privilege (except that such person will use reasonable best efforts to disclose such information in a way that would not jeopardize such privilege) or could result in the disclosure of any trade secrets or the violation of any confidentiality obligation; provided, in each case, that Anadarko will, to the extent practicable and not prohibited by contract or applicable law, inform Occidental promptly of such contract, law, privilege or potential disclosure or violation;
- be required to prepare or deliver (i) any financial information in a form not customarily prepared by Anadarko or its subsidiaries in the ordinary course of their business and not readily available to it, (ii) any financial information with respect to a fiscal period that has not yet ended or (iii) any pro forma financial information or projections;
- be required to deliver any legal opinion or negative assurance letter in connection with the financing or any other cooperation contemplated by the financing covenant;
- be required to take any action that would reasonably be expected to conflict with, result in any violation or breach of, or default (with or without notice, lapse of time, or both) under, any of their respective organizational or governing documents, or any applicable law or contracts;
- be required to take any action that would cause Anadarko or any of its subsidiaries to breach any representation, warranty, covenant or agreement in the merger agreement;
- be required to take any action that could reasonably be expected to cause any director, officer or employee or stockholder of Anadarko or any of its subsidiaries to incur any personal liability; or
- be an issuer or other obligor with respect to the financing prior to the effective time of the merger.

Occidental has agreed to indemnify and hold harmless Anadarko and each of its subsidiaries and their respective representatives from and against any and all liabilities, losses, damages, claims, costs, expenses (including reasonable attorney’s fees), interest, awards, judgments and penalties suffered or incurred in connection with any and all of the matters contemplated by the financing covenant (other than arising from fraud or willful misconduct on the part of Anadarko or its subsidiaries), whether or not the merger is consummated or the merger agreement is terminated. Occidental will also, promptly upon request by Anadarko, reimburse Anadarko for all reasonable out-of-pocket costs (including reasonable attorneys’ fees) incurred by Anadarko or its subsidiaries in connection with the financing covenant, whether or not the merger is consummated or the merger agreement is terminated.

Anadarko has agreed that, from and after January 1, 2020 until the effective time of the merger, none of Anadarko or any of its subsidiaries (other than Western Midstream Partners, LP or its subsidiaries) will, without the prior written consent of Occidental (not to be unreasonably withheld or delayed), file any prospectus supplement or registration statement or consummate any offering of securities that requires registration under the Securities Act or that includes any actual or contingent commitment to register such securities under the Securities Act in the future (provided that Anadarko and its subsidiaries may file any Form S-8 registration statement and consummate any transaction under such Form S-8 registration statement).

Occidental and Merger Subsidiary have also acknowledged and agreed that obtaining or consummating any or all of the committed financing or any other financing is not a condition to the merger, and that if any of the committed financing or other financing is not obtained or consummated, Occidental and Merger Subsidiary will

TABLE OF CONTENTS

each continue to be obligated to consummate the merger, subject to the conditions described under "-Conditions to the Completion of the Merger" below.

*Other Covenants*. The merger agreement contains certain other covenants and agreements, including covenants relating to, among other matters:

- the resignations of Anadarko directors;
- Occidental taking all necessary actions to cause the shares of Occidental common stock issuable in connection with the merger to be approved for listing on the NYSE (subject to official notice of issuance);
- Occidental causing Merger Subsidiary to comply with its obligations under the merger agreement;
- cooperation between Anadarko and Occidental regarding additional filings with governmental entities;
- cooperation between Anadarko and Occidental in the preparation of this proxy statement/prospectus;
- confidentiality and access by each party to certain information about the other party during the period before the effective time of the merger;
- cooperation between Anadarko and Occidental in connection with public announcements;
- further assurances regarding actions necessary to vest, perfect or confirm of record in the surviving corporation any and all right, title and interest in the rights, properties or assets of Anadarko as a result of the merger;
- notification to the other party of any notices from governmental entities or any actions commenced or threatened in connection with the merger;
- taking all actions as are legally permissible to eliminate or minimize the effects of takeover laws on the merger and the transactions contemplated thereby;
- causing any dispositions of Anadarko common stock resulting from the merger and any acquisitions of Occidental common stock resulting from the merger by each individual who may become subject to reporting requirements of Section 16(a) of the Exchange Act to be exempt under Rule 16b-3 promulgated under the Exchange Act;
- cooperation between the parties and the use of Anadarko's reasonable best efforts to cause (i) the delisting of the Anadarko common stock from the NYSE as promptly as practicable after the effective time of the merger and (ii) deregistration of the Anadarko common stock pursuant to the Exchange Act as promptly as practicable after such delisting;
- cooperation between the parties with respect to the treatment of certain indebtedness of Anadarko; and
- cooperation between Anadarko and Occidental in the defense or settlement of any stockholder litigation relating to the merger.

**Representations and Warranties**

Anadarko makes various representations and warranties to Occidental in the merger agreement that are subject in some cases to exceptions and qualifications set forth in the merger agreement. These representations and warranties relate to, among other things:

- corporate authorization to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;
- the stockholder vote and governmental approvals required in connection with the contemplated transactions;
- absence of any breach of organizational documents, law or certain material agreements as a result of the contemplated transactions;
- capitalization;
- ownership of subsidiaries;

TABLE OF CONTENTS

- matters relating to Western Midstream Partners, LP;
- filings with the SEC;
- financial statements;
- accuracy of information provided for inclusion in this proxy statement/prospectus;
- disclosure controls and procedures and internal control over financial reporting;
- absence of material changes since December 31, 2018;
- absence of undisclosed material liabilities;
- litigation;
- tax matters;
- employee benefits and labor matters;
- compliance with laws;
- regulatory matters, including compliance with (i) anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act of 1977 and the U.K. Bribery Act 2010, (ii) money laundering related laws, such as the U.S. Currency and Foreign Transaction Reporting Act of 1970 and the U.S. Money Laundering Control Act of 1986 and (iii) economic sanctions/trade laws;
- environmental matters;
- title to properties;
- material contracts and contracts relating to Anadarko’s exploration and production operations;
- intellectual property;
- confidentiality agreements;
- finders’ or advisors’ fees;
- receipt by the Anadarko Board of opinions of Anadarko’s financial advisors as to the fairness, from a financial point of view, of the merger consideration to be received by Anadarko stockholders pursuant to the merger agreement;
- inapplicability of the Delaware anti-takeover statute; and
- termination of the Agreement and Plan of Merger, dated as of April 11, 2019, by and among Chevron Corporation, Justify Merger Sub 1 Inc., Justify Merger Sub 2 Inc. and Anadarko, and payment of the related termination fee.

In addition, Occidental and Merger Subsidiary make representations and warranties to Anadarko. These representations and warranties relate to, among other things:

- corporate authorization to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;
- the governmental approvals required in connection with the contemplated transactions;
- absence of any breach of organizational documents, law or certain material agreements as a result of the contemplated transactions;
- capitalization;
- filings with the SEC;
- financial statements;
- accuracy of information provided for inclusion in this proxy statement/prospectus;
- disclosure controls and procedures and internal control over financial reporting;

TABLE OF CONTENTS

- absence of material changes since December 31, 2018;
- absence of undisclosed material liabilities;
- litigation;
- compliance with laws;
- regulatory matters, including compliance with (i) anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act of 1977 and the U.K. Bribery Act 2010, (ii) money laundering related laws, such as the U.S. Currency and Foreign Transaction Reporting Act of 1970 and the U.S. Money Laundering Control Act of 1986 and (iii) economic sanctions/trade laws;
- the commitment letters and sufficiency of funds;
- capitalization of Merger Subsidiary; and
- ownership of Anadarko common stock.

The representations and warranties in the merger agreement do not survive the closing or termination of the merger agreement.

Certain of the representations and warranties made by the parties are qualified as to "knowledge", "materiality" or "material adverse effect". For purposes of the merger agreement, "material adverse effect" means, with respect to either Occidental or Anadarko, as applicable, any state of facts, change, development, event, effect, condition or occurrence (each, an "effect") that, individually or in the aggregate, would reasonably be expected to result in a material adverse effect on the financial condition, business, assets or continuing results of operations of the relevant company and its subsidiaries, taken as a whole. However, in no event will any of the following effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a material adverse effect:

- any changes in general U.S. or global economic conditions or securities, credit, financial or other capital markets conditions;
- any changes or conditions affecting the oil and gas industry in general (including changes to commodity prices, general market prices and regulatory changes affecting the industry);
- any weather-related or other force majeure event (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters);
- acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing;
- the negotiation, execution, announcement, pendency, compliance with or performance of the merger agreement, the transactions contemplated thereby or the terms thereof or the completion of the transactions contemplated thereby, including the impact thereof on the relationships of the relevant company and its subsidiaries with customers, suppliers, partners, employees or governmental bodies, agencies, officials or authorities (provided that this clause will not apply to any representation or warranty made by the relevant company in the section entitled "Non-Contravention" of the merger agreement (and, solely with respect to Anadarko, certain representations and warranties set forth in the merger agreement related to the entitlement of any current or former employee, consultant or officer of Anadarko or any of its subsidiaries as a result of the completion of the transactions contemplated by the merger agreement to severance pay, unemployment compensation or any other payment (except as provided in the merger agreement or as required by law) or the acceleration of the time of payment or vesting, increase in the amount of compensation due to any such employee, consultant or officer or triggering of any other material obligation pursuant to any company benefit plan, except as provided in the merger agreement) (or any condition to any party's obligation to consummate the merger relating to such representation and warranty) to the extent the purpose of such representation and warranty is to address the consequences resulting from the execution and delivery of the merger agreement or the completion of the merger);
- any action taken or failure to take action that the other party has requested in writing;

TABLE OF CONTENTS

- changes in applicable law or regulation or in GAAP or in accounting standards, or any changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions;
- any decline in the market price, or change in trading volume, of such party's capital stock; or
- any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position (it being understood that the exceptions in this clause and the clause immediately prior to this clause will not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein (if not otherwise falling within any of the exceptions provided in the merger agreement) is a material adverse effect);

provided that, in the case of the first four clauses listed above, to the extent the impact on the relevant company and its subsidiaries, taken as a whole, is disproportionate to the impact on other similarly situated entities, the incrementally disproportionate impact or impacts will be taken into account in determining whether there has been, or would reasonably be expected to be, a material adverse effect.

**Conditions to Completion of the Merger**

The obligations of each of Occidental, Anadarko and Merger Subsidiary to complete the merger are subject to the satisfaction or, to the extent permitted by law and in accordance with the merger agreement, waiver of the following conditions:

- adoption by the Anadarko stockholders of the merger agreement;
- expiration or termination of the HSR Act waiting period;
- absence of any legal or regulatory prohibition on completion of the merger;
- Occidental's registration statement on Form S-4, which includes this proxy statement/prospectus, being effective and not subject to any stop order by the SEC; and
- approval for the listing on the NYSE of the shares of Occidental common stock to be issued in the merger.

In addition, the obligations of each of Occidental, Anadarko and Merger Subsidiary to complete the merger are subject to the satisfaction or, to the extent permitted by law and in accordance with the merger agreement, waiver of the following conditions:

- accuracy as of closing of the representations and warranties made by the other party to the extent specified in the merger agreement;
- performance in all material respects of all of the obligations of the other party required to be performed by it in the merger agreement prior to the closing date of the merger; and
- receipt of a certificate executed by an authorized officer of the other party certifying that the conditions above have been satisfied.

**Termination of the Merger Agreement**

*Right to Terminate*. The merger agreement may be terminated at any time prior to the effective time of the merger, even if the Anadarko stockholders have previously approved the merger, in any of the following ways:

- By the mutual written consent of Occidental and Anadarko.
- By either Occidental or Anadarko:
  - if the merger has not been completed by February 9, 2020 (or, if the reason for not closing by February 9, 2020 is that the regulatory conditions specified in the merger agreement have not been satisfied by that date or because of an injunction prohibiting completion of the merger, and all other closing conditions of the parties have been satisfied, duly waived or are then capable of

TABLE OF CONTENTS

being satisfied, May 9, 2020), provided that neither Occidental nor Anadarko can terminate the merger agreement due to the occurrence of the end date if its failure to fulfill any obligation under the merger agreement has principally caused or resulted in the failure to complete the merger on or before such end date; or

- if the Anadarko stockholder approval has not been obtained by reason of the failure to obtain the required vote at a duly held meeting of stockholders or at any adjournment thereof; or
- if there is any law or regulation that makes completion of the merger illegal or otherwise prohibited or if any judgment, injunction, order or decree enjoining Occidental or Anadarko from consummating the merger is entered and such judgment, injunction, order or decree becomes final and nonappealable; provided that this right to terminate the merger agreement will not be available to any party whose failure to fulfill any obligation under the covenant to use best efforts has principally caused or resulted in the imposition of such restraint or the failure of such restraint to be resisted, resolved or lifted; or
- if there has been a breach by the other party of any of its representations, warranties, covenants or agreements contained in the merger agreement, which breach results in the failure to satisfy certain conditions to the obligations of Occidental and Merger Subsidiary (in the case of a breach by Anadarko) or certain conditions to the obligations of Anadarko (in the case of a breach by Occidental) to the merger, and such breach is incapable of being cured or, if capable of being cured, has not been cured within 30 days after written notice thereof to the party alleged to be in breach.

- By Occidental:
  - prior to receipt of the Anadarko stockholder approval, if there has been a change in the Anadarko recommendation, whether or not permitted by the terms of the merger agreement (or the Anadarko Board or any committee thereof resolves to effect a change in the Anadarko recommendation).
- By Anadarko:
  - in order to enter into a definitive agreement with respect to a superior proposal, only if Anadarko has complied with the specific procedures and requirements set out in the merger agreement with regard to the superior proposal and has paid the applicable termination fee.

If the merger agreement is terminated as described above, the merger agreement will be void and have no effect, and there will be no liability or obligation on the part of any party, except that:

- certain provisions contained in the merger agreement with respect to the effect of termination, the allocation of costs and expenses and the termination fees will survive the termination of the merger agreement;
- the agreements contained in the confidentiality agreement between Occidental and Anadarko will survive the termination of the merger agreement; and
- no termination will relieve any party of any liability or damages resulting from any material and intentional breach by that party of the merger agreement.

In addition, none of the financing sources will have any liability to Anadarko or any of its affiliates, and neither Anadarko nor any of its affiliates will have any rights or claims against any financing sources, relating to or arising out of the merger agreement, the debt commitment letters, the financing for the transactions contemplated by the merger agreement or otherwise. “Financing sources” means any agent, arranger, lender or other entity that has committed to provide or arrange, or has entered into definitive agreements related to, the committed financing or any other financing, or any of such person’s affiliates or its or their respective officers, directors, employees, partners, trustees, shareholders, controlling persons, agents, representatives, successors or assigns.

TABLE OF CONTENTS

*Termination Fees Payable by Anadarko.* Anadarko has agreed to pay or cause to be paid to Occidental $1 billion in connection with a termination of the merger agreement under the following circumstances:

- if Occidental terminates the merger agreement pursuant to a change in the Anadarko recommendation, then Anadarko will pay or cause to be paid $1 billion not later than the date of termination of the merger agreement;
- if (i) the merger agreement is terminated by Anadarko or Occidental pursuant to not having obtained the Anadarko stockholder approval by reason of the failure to obtain the required vote at a duly held meeting of stockholders or any adjournment thereof and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the special meeting, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal (found on page 109) being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination;
- if (i) the merger agreement is terminated by Anadarko or Occidental due to the failure to consummate the merger by the end date and the Anadarko stockholder approval has not been obtained and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the date of such termination, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination;
- if (i) the merger agreement is terminated by Occidental pursuant to a breach by Anadarko of any of its representations, warranties, covenants or agreements, which breach resulted in the failure to satisfy one or more of certain additional conditions to the obligations of Occidental and Merger Subsidiary to the merger, and the Anadarko stockholder approval has not been obtained and (ii) on or before the date of such termination an acquisition proposal has been made and become publicly known, whether or not withdrawn, prior to the date of such termination, then Anadarko will pay or cause to be paid $1 billion not later than the date an acquisition proposal (defined for this purpose with all references to “20%” in the definition of acquisition proposal being replaced with references to “50%”) is consummated or a definitive agreement is entered into by Anadarko providing for any such acquisition proposal, so long as such acquisition proposal is consummated or such definitive agreement is executed within 12 months after the date of termination; or
- if the merger agreement is terminated by Anadarko pursuant to its entry into a definitive agreement with respect to a superior proposal, then Anadarko will pay or cause to be paid $1 billion not later than the date of termination of the merger agreement.

*Termination Fees Payable by Occidental.* Occidental has agreed to pay or cause to be paid to Anadarko $1 billion if the merger agreement is terminated by Anadarko pursuant to a breach by Occidental of any of its representations, warranties, covenants or agreements, which breach resulted in the failure to satisfy certain conditions to the obligations of Anadarko to the merger. In such circumstances, Occidental will pay or cause to be paid $1 billion within two business days after the date of termination of the merger agreement.

**Expenses**

Except as described above, all costs and expenses incurred in connection with the merger agreement and related transactions will be paid by the party incurring such costs or expenses, except that Occidental will pay (i) expenses incurred in connection with printing, mailing and filing this proxy statement/prospectus, (ii) fees paid in respect of the HSR Act in connection with the merger and (iii) all reasonable and documented fees, costs and expenses incurred (x) in connection with any cooperation provided or action taken in connection with the treatment of Anadarko’s existing credit agreement or any of Anadarko’s outstanding debt securities in connection with the merger or (y) in connection with the financing.

TABLE OF CONTENTS

**Amendments; Waivers**

Any provision of the merger agreement may be amended or waived prior to the effective time of the merger if the amendment or waiver is in writing and signed, in the case of an amendment, by Occidental, Anadarko and Merger Subsidiary or, in the case of a waiver, by the party against whom the waiver is to be effective. After the adoption of the merger agreement by the stockholders of Anadarko, no amendment or waiver may, without the further approval of Anadarko's stockholders, alter or change the amount or kind of merger consideration or any term of Occidental's certificate of incorporation. Notwithstanding the foregoing, no amendments or modifications to the provision to which the financing sources are expressly made third-party beneficiaries pursuant to the merger agreement may be made in a manner adverse to any financing source without the prior written consent of the financing sources.

**Governing Law; Jurisdiction; Waiver of Jury Trial**

The merger agreement will be construed in accordance with and governed by the law of the State of Delaware, without regard to principles of conflicts of laws. However, matters relating to claims, controversies, or disputes of any kind or nature against any financing sources that are in any way related to the merger agreement or the merger, including any dispute arising out of or relating in any way to any debt financing to be consummated by Occidental or any of its subsidiaries in connection with the merger, will be construed and governed by the law of the state of New York, without regard to the principles of conflicts of laws thereof. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, the merger agreement or the transactions contemplated thereby may only be brought in the Court of Chancery of the State of Delaware (or, only if such court declines to accept jurisdiction over a particular matter, then in the United States District Court for the District of Delaware or, if jurisdiction is not then available in the United States District Court for the District of Delaware (but only in such event), then in any court of the State of Delaware sitting in New Castle County) and any appellate court from any of such courts (the "Delaware Courts") and each party irrevocably consents to the exclusive jurisdiction of the Delaware Courts in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, the parties, with respect to matters relating to claims, controversies or disputes of any kind or nature against any financing source that are in any way related to the merger agreement or the merger, including any dispute arising out of or relating in any way to any committed financing, irrevocably submit exclusively to the jurisdiction of the courts of any federal court sitting in the Borough of Manhattan in the City of New York (or, only if such court lacks subject matter jurisdiction, in any New York State court sitting in the Borough of Manhattan in the City of New York), and waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement of the merger agreement or of any such document, that it is not subject to the merger agreement or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue of such action, suit or proceeding may not be appropriate or that the merger agreement or any such document may not be enforced in or by such courts, and the parties irrevocably agree that all claims relating to such action, suit or proceeding will be heard and determined in such a state or federal court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any of the Delaware Courts. Each of the parties to the merger agreement irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to the merger agreement or the transactions contemplated thereby.

**Specific Performance**

The parties will be entitled to an injunction or injunctions to prevent breaches of the merger agreement and to enforce specifically the terms and provisions of the merger agreement in addition to any other remedy to which they are entitled at law or in equity.

**Third-Party Beneficiaries**

Neither the merger agreement nor any other agreement contemplated thereby is intended to confer on any person other than the parties thereto any rights or remedies, except for:

- the provisions of the merger agreement relating to indemnification and exculpation from liability for the directors and officers of Anadarko;

TABLE OF CONTENTS

- from and after the completion of the merger, the holders of Anadarko common stock and Anadarko stock-based awards (solely with respect to the provisions governing such holders' rights to receive the merger consideration or related payments in respect of stock-based awards); and
- certain specified provisions of the merger agreement applicable to the financing sources that are intended to benefit and be enforceable by the financing sources.

TABLE OF CONTENTS

## INFORMATION ABOUT THE COMPANIES

### Occidental

Occidental is an international oil and gas exploration and production company with operations in the United States, Middle East and Latin America. Headquartered in Houston, Occidental is one of the largest U.S. oil and gas companies, based on equity market capitalization. Occidental's principal businesses consist of three segments as follows:

**Oil and Gas**-This segment explores for, develops and produces oil and condensate, NGLs and natural gas. Occidental's oil and gas assets are located in some of the world's highest-margin basins and are characterized by an advantaged mix of short- and long-cycle, high-return development opportunities. In the United States, Occidental holds a leading position in the Permian Basin. Other core operations are in the Middle East (Oman, UAE and Qatar) and Latin America (Colombia).

**Chemical (OxyChem)**-This segment primarily manufactures and markets basic chemicals and vinyls. OxyChem is a leading North American manufacturer of PVC resins, chlorine and caustic soda − key building blocks of products such as pharmaceuticals, water treatment chemicals and durable, long-life plastics. OxyChem has manufacturing facilities in the United States, Canada and Latin America.

**Midstream and Marketing**-This segment purchases, markets, gathers, processes, transports and stores oil, condensate, NGL, natural gas, carbon dioxide and power. It also trades around its assets, including transportation and storage capacity, and invests in entities that conduct similar activities. The midstream and marketing operations primarily support and enhance Occidental's oil and gas and chemical businesses and also provide similar services for third parties. Also within the midstream and marketing segment is Oxy Low Carbon Ventures ("OLCV"). OLCV seeks to capitalize on Occidental's enhanced oil recovery leadership by developing carbon capture, utilization and storage projects that source anthropogenic carbon dioxide and promote innovative technologies that drive cost efficiencies and grow Occidental's business while reducing emissions.

Occidental is incorporated in Delaware. Its principal executive offices are located at 5 Greenway Plaza, Suite 110, Houston, Texas 77046 and its telephone number is (713) 215-7000. Occidental's website address is *www.oxy.com*. Information contained on Occidental's website does not constitute part of this proxy statement/prospectus. Occidental's common stock is publicly traded on the NYSE, under the ticker symbol "OXY". Additional information about Occidental is included in documents incorporated by reference in this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167.

### Anadarko

Anadarko is among the world's largest independent exploration and production companies, with approximately 1.5 billion BOE of proved reserves at December 31, 2018. Anadarko's asset portfolio combines cash-generating conventional oil developments in the Gulf of Mexico, Algeria and Ghana, with a large inventory of significant and proven high-growth unconventional resources in the U.S. onshore. Anadarko's U.S. onshore assets include the Delaware and DJ basins and an emerging play in the Powder River basin. Anadarko's asset portfolio also includes a world-class natural-gas discovery in Mozambique as well as other worldwide exploration and development opportunities.

Anadarko's Exploration and Production and WES Midstream business segments are managed separately when making operating and capital allocation decisions due to distinct operational differences. On February 28, 2019, Anadarko completed the previously announced contribution and sale of substantially all of its midstream assets to Western Midstream Partners, LP, formerly known as Western Gas Equity Partners, LP. Due to this contribution and sale, as of the filing on May 8, 2019 of its Quarterly Report on Form 10-Q for the three months ended March 31, 2019, Anadarko no longer reports an Other Midstream segment and now has two reporting segments as follows:

**Exploration and Production**-This segment is engaged in the exploration, development, production and sale of oil, natural gas and NGLs and in advancing its Mozambique LNG project toward an FID in the first half of 2019.

**WES Midstream**-This segment engages in gathering, processing, treating and transporting Anadarko and third-party oil, natural gas and NGL production, as well as gathering and disposal of produced water. The WES

Midstream segment consists of assets owned by Western Midstream Partners, LP, a publicly traded limited partnership, which is a consolidated subsidiary of Anadarko.

For the year ended December 31, 2018, Anadarko's sales revenues were $13.1 billion and net income attributable to Anadarko's common stockholders was $615 million.

Anadarko is incorporated in Delaware. Anadarko's corporate headquarters is located at 1201 Lake Robbins Drive, The Woodlands, Texas 77380-1046, and its telephone number is (832) 636-1000. Anadarko's website address is *www.anadarko.com*. Information contained on Anadarko's website does not constitute part of this proxy statement/prospectus. Anadarko's common stock is publicly traded on the NYSE under the ticker symbol "APC". Additional information about Anadarko is included in documents incorporated by reference in this proxy statement/prospectus. See "Where You Can Find More Information" beginning on page 167.

**Merger Subsidiary**

Merger Subsidiary, an indirect wholly owned subsidiary of Occidental, is a Delaware corporation incorporated on April 5, 2019 for the purpose of effecting the merger. Merger Subsidiary has not conducted any activities other than those incidental to its formation and the matters contemplated by the merger agreement, including the preparation of applicable regulatory filings in connection with the merger. The principal executive offices of Merger Subsidiary are located at 5 Greenway Plaza, Suite 110, Houston, Texas 77046, and its telephone number is (713) 215-7000.

TABLE OF CONTENTS

## SPECIAL MEETING

*This proxy statement/prospectus is being provided to the Anadarko stockholders as part of a solicitation of proxies by the Anadarko Board for use at the special meeting to be held at the time and place specified below and at any properly convened meeting following an adjournment or postponement thereof. This proxy statement/prospectus provides Anadarko stockholders with information they need to know to be able to vote or instruct their vote to be cast at the special meeting.*

### Date, Time and Place

The special meeting of Anadarko stockholders will be held at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380, on August 8, 2019, at 8:00 a.m., local time. On or about July 11, 2019, Anadarko commenced mailing this proxy statement/prospectus and the enclosed form of proxy to its stockholders entitled to vote at the special meeting.

### Purpose of the Special Meeting

At the special meeting, Anadarko stockholders will be asked to consider and vote on the following:

- the merger proposal-a proposal to adopt the merger agreement, a copy of which is attached as Annex A to this proxy statement/prospectus, which is further described in the sections titled “The Merger” and “The Merger Agreement”, beginning on pages 41 and 101, respectively; and
- the merger-related compensation proposal-an advisory (non-binding) proposal to approve the compensation that may be paid or become payable to Anadarko’s named executive officers that is based on or otherwise related to the merger.

Completion of the merger is conditioned on the approval of the merger proposal.

### Recommendation of the Anadarko Board

At a special meeting held on May 9, 2019, the Anadarko Board unanimously determined that the merger agreement and the transactions contemplated thereby, including the merger, are advisable, fair to and in the best interests of Anadarko and the Anadarko stockholders, approved the merger agreement and the merger, and directed that the adoption of the merger agreement be submitted to a vote at a meeting of the Anadarko stockholders. **Accordingly, the Anadarko Board unanimously recommends that Anadarko stockholders vote “FOR” the merger proposal and “FOR” the merger-related compensation proposal.**

Anadarko stockholders should carefully read this proxy statement/prospectus, including any documents incorporated by reference, and the annexes in their entirety for more detailed information concerning the merger and the transactions contemplated by the merger agreement.

### Record Date; Stockholders Entitled to Vote

Only holders of record of Anadarko common stock at the close of business on July 11, 2019, the record date, will be entitled to notice of, and to vote at, the special meeting or any adjournment or postponement thereof.

At the close of business on July 8, 2019, the most recent practicable date for which such information was available, there were 502,401,622 shares of Anadarko common stock outstanding and entitled to vote at the special meeting. The number of shares of Anadarko common stock outstanding and entitled to vote at the special meeting as of the record date is not expected to be meaningfully different from the number as of July 8, 2019. Each share of Anadarko common stock outstanding on the record date entitles the holder thereof to one vote on each proposal to be considered at the special meeting. Anadarko stockholders may vote in person or by proxy through the internet or by telephone or by a properly executed and delivered proxy card with respect to the special meeting.

A complete list of stockholders entitled to vote at the special meeting will be available for viewing by any Anadarko stockholder during ordinary business hours for a period of ten days before the meeting, for purposes pertaining to the special meeting, at Anadarko’s offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, and at the time and place of the special meeting during the full duration of the meeting.

TABLE OF CONTENTS

### Voting by Anadarko's Directors and Executive Officers

At the close of business on July 8, 2019, the most recent practicable date for which such information was available, directors and executive officers of Anadarko and their respective affiliates owned and were entitled to vote 1,163,013 shares of Anadarko common stock, representing less than 1% of the shares of Anadarko common stock outstanding on that date. The number and percentage of shares of Anadarko common stock owned by directors and executive officers of Anadarko and their respective affiliates as of the record date are not expected to be meaningfully different from the number and percentage as of July 8, 2019. Anadarko currently expects its directors and executive officers to vote their shares of Anadarko common stock in favor of each of the proposals to be voted on at the special meeting, but no director or executive officer has entered into any agreement obligating him or her to do so.

### Quorum; Adjournment

The Anadarko by-laws require that the holders of a majority of the outstanding shares of Anadarko common stock entitled to vote at the special meeting be present in person or represented by proxy in order for the business of the special meeting to be transacted. Whether or not a quorum is present, the special meeting may be adjourned to allow additional time for obtaining additional proxies if the adjournment is approved by the chairman of the meeting or the holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy and entitled to vote at the meeting. Notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, unless:

- the adjournment is for more than 30 days, in which case a notice of the adjourned meeting will be given to each stockholder of record entitled to vote at the meeting; or
- a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, in which case a notice of the adjourned meeting must be given to each stockholder of record entitled to vote at the meeting.

At any adjourned meeting, all proxies will be voted in the same manner as they would have been voted at the original convening of the special meeting, except for any proxies that have been effectively revoked or withdrawn prior to the adjourned meeting.

Abstentions will count as votes present and entitled to vote for the purpose of determining the presence of a quorum for the transaction of business at the special meeting. Broker non-votes will not be counted for the purpose of determining the presence of a quorum.

### Required Vote

The required votes to approve the proposals at the special meeting are as follows:

- The merger proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon. Each share of Anadarko common stock outstanding on the record date of the special meeting is entitled to one vote on this proposal. Failures to vote, broker non-votes and abstentions will have the same effect as a vote cast "AGAINST" the approval of such proposal.
- The merger-related compensation proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy at the special meeting and entitled to vote thereon. Each share of Anadarko common stock outstanding on the record date is entitled to one vote on this proposal. Failures to vote and broker non-votes will have no effect on the vote for this proposal (assuming a quorum is present); abstentions will have the same effect as a vote cast "AGAINST" the approval of this proposal. Because the vote on the merger-related compensation proposal is advisory only, it will not be binding on either Anadarko or Occidental. Accordingly, if the merger proposal is approved and the merger is completed, the merger-related compensation will be payable to Anadarko's named executive officers, subject only to the conditions applicable thereto, regardless of the outcome of the approval of the merger-related compensation proposal.

TABLE OF CONTENTS

**Voting of Proxies by Holders of Record**

*How to Vote by Proxy if You are the Record Holder of Your Shares*

If you were the record holder of your shares as of the record date, you may submit your proxy to vote by mail, by telephone or via the internet.

**Voting via the Internet or by Telephone.**

- **Internet**-To submit your proxy via the internet, go to *www.proxyvote.com*. Have your proxy card in hand when you access the website and follow the instructions to vote your shares. If you vote via the internet, you must do so no later than 11:59 p.m. Eastern Time on August 7, 2019.
- **Telephone**-To submit your proxy by telephone, call 1-800-690-6903. Have your proxy card in hand when you call and then follow the instructions to vote your shares. If you vote by telephone, you must do so no later than 11:59 p.m. Eastern Time on August 7, 2019.

**Voting by Mail**. As an alternative to submitting your proxy via the internet or by telephone, you may submit your proxy by mail.

- **Mail**-To submit your proxy by mail, simply mark your proxy card, date and sign it and return it in the postage-paid envelope. If you do not have the postage-paid envelope, please mail your completed proxy card to the following address: Anadarko Petroleum Corporation, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717. If you vote by mail, your proxy card must be received no later than 6:00 p.m. Eastern Time on August 7, 2019.

*How to Vote Your Shares if You are a "Street Name" Holder*

If you hold your shares through a broker, bank or other nominee, also referred to as a "street name" holder, check the instructions provided by that entity to determine which options are available to you with respect to voting your shares.

*General*

Please be aware that any costs related to voting via the internet, such as internet access charges, will be your responsibility.

All properly signed proxies that are timely received and that are not revoked will be voted at the special meeting according to the instructions indicated on the proxies or, if no direction is indicated, they will be voted as recommended by the Anadarko Board. The proxy holders may use their discretion to vote on other matters that properly come before the special meeting.

**Attendance at the Special Meeting and Voting in Person**

Stockholders who wish to attend the special meeting will be required to present verification of ownership of Anadarko common stock, such as a bank or brokerage firm account statement, and will be required to present a valid government-issued photo identification, such as a driver's license or passport, to gain admittance to the special meeting.

If you are a stockholder of record and plan to attend the special meeting and wish to vote in person, you will be given a ballot at the special meeting. You must bring valid government-issued photo identification, such as a driver's license or passport. Please note, however, that if you hold your shares of Anadarko common stock in street name, such as through a broker, bank or other nominee, and you wish to vote in person at the special meeting, you must bring to the special meeting a legal proxy from the record holder of the shares (your broker, bank or other nominee) authorizing you to vote at the special meeting.

**No cameras, recording equipment, electronic devices, large bags, briefcases or packages will be permitted in the special meeting.**

TABLE OF CONTENTS

**Revocability of Proxies**

Any stockholder giving a proxy has the power to revoke it at any time before the proxy is voted at the special meeting. If you are a stockholder of record, you may revoke your proxy in any of the following ways:

(1) submitting a proxy at a later time by internet or telephone until **11:59 p.m. Eastern Time on August 7, 2019**;

(2) voting in person at the special meeting;

(3) delivering, before **6:00 p.m. Eastern Time on August 7, 2019**, to Anadarko's Corporate Secretary at Anadarko's executive offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, a proxy with a later date or a written revocation of your most recent proxy; or

(4) giving a written revocation to the inspector of election at the special meeting.

If you are a street name stockholder (for example, if your shares are held in the name of a bank, broker or other holder of record) and you vote by proxy, you may later revoke your proxy by informing the holder of record in accordance with that entity's procedures.

**Solicitation**

The Anadarko Board is soliciting proxies for the special meeting from its stockholders. Anadarko will bear the entire cost of the solicitation of proxies, including preparation, assembly and delivery, as applicable, of this proxy statement, the proxy card and any additional materials furnished to stockholders. Proxies may be solicited by directors, officers and a small number of Anadarko's regular employees personally or by mail, telephone or facsimile, but such persons will not be specially compensated for such service. Anadarko has retained Innisfree M&A Incorporated ("Innisfree") and Morrow Sodali LLC ("Morrow"), two proxy solicitation firms, to assist in the solicitation of proxies for an estimated fee of approximately $50,000 and $75,000, respectively, plus reasonable out-of-pocket costs and expenses for the services of each firm. As appropriate, copies of solicitation material will be furnished to brokerage houses, fiduciaries and custodians that hold shares of Anadarko common stock of record for beneficial owners for forwarding to such beneficial owners. Anadarko may also reimburse persons representing beneficial owners for their costs of forwarding the solicitation material to such owners.

**Assistance**

If you need assistance with voting via the internet, voting by telephone or completing your proxy card, or have questions regarding the special meeting, please contact Anadarko's proxy solicitors at the following addresses and telephone numbers:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, NY 10022
Stockholders in the U.S. and Canada may call toll free: (877) 456-3524
Stockholders in other locations may call direct: (412) 232-3651
Banks and brokers may call collect: (212) 750-5833

or

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Phone: (203) 658-9400

You may also contact Anadarko's Investor Relations department at 832-636-1000 or investor@anadarko.com.

**Your vote is very important regardless of the number of shares of Anadarko common stock that you own. Please submit a proxy to vote your shares via the internet, vote by telephone or sign, date and return a proxy card promptly so your shares can be represented, even if you plan to attend the special meeting in person.**

**Tabulation of Votes**

Anadarko has appointed Broadridge to serve as the Inspector of Election for the special meeting. Broadridge will independently tabulate affirmative and negative votes and abstentions.

TABLE OF CONTENTS

## ANADARKO PROPOSALS

### Item 1. The Merger Proposal

(Item 1 on Anadarko Proxy Card)

In the merger proposal, Anadarko is asking its stockholders to adopt the merger agreement. Approval of the merger proposal by Anadarko stockholders is required for completion of the merger. The merger proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock entitled to vote thereon. Each share of Anadarko common stock outstanding on the record date of the special meeting is entitled to one vote on this proposal. Failures to vote, broker non-votes and abstentions will have the same effect as a vote cast "AGAINST" the approval of such proposal.

**The Anadarko Board unanimously recommends a vote "FOR" the merger proposal (Item 1).**

### Item 2. The Merger-Related Compensation Proposal

(Item 2 on Anadarko Proxy Card)

In the merger-related compensation proposal, Anadarko is asking its stockholders to approve, on an advisory (non-binding) basis, the compensation that may be paid or become payable to Anadarko's named executive officers that is based on or otherwise relates to the merger. The merger-related compensation proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy at the special meeting and entitled to vote thereon. Failures to vote and broker non-votes will have no effect on the vote for this proposal (assuming a quorum is present); abstentions will have the same effect as a vote cast "AGAINST" the approval of this proposal.

Because the vote on the merger-related compensation proposal is advisory only, it will not be binding on either Anadarko or Occidental. Accordingly, if the merger proposal is approved and the merger is completed, the merger-related compensation will be payable to Anadarko's named executive officers, subject only to the conditions applicable thereto, regardless of the outcome of the approval of the merger-related compensation proposal.

**The Anadarko Board unanimously recommends a vote "FOR" the merger-related compensation proposal (Item 2).**

TABLE OF CONTENTS

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL DATA

The unaudited pro forma condensed combined financial statements (the "pro forma financial statements") presented below have been prepared from the respective historical consolidated financial statements of Occidental and Anadarko and have been adjusted to reflect (i) the completion of the merger, (ii) Occidental's incurrence of $21.8 billion of new indebtedness to finance a portion of the cash merger consideration, (iii) the Berkshire Hathaway investment and (iv) the Total transaction (collectively, the "transactions"). The unaudited pro forma condensed combined balance sheet (the "pro forma balance sheet") is presented as if the transactions had been completed on March 31, 2019. The unaudited pro forma combined statements of operations (the "pro forma statements of operations") for the year ended December 31, 2018, and for the three months ended March 31, 2019, are presented as if the transactions had been completed on January 1, 2018.

The pro forma financial statements have been prepared from, and should be read in conjunction with, (i) the unaudited consolidated financial statements of Occidental contained in its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019, (ii) the unaudited consolidated financial statements of Anadarko contained in its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019, (iii) the audited consolidated financial statements of Occidental contained in its Annual Report on Form 10-K for the year ended December 31, 2018, (iv) the audited consolidated financial statements of Anadarko contained in its Annual Report on Form 10-K for the year ended December 31, 2018 and (v) Anadarko's Form 8-K filed on May 15, 2019 in order to recast the segment information included in Anadarko's Annual Report on Form 10-K for the year ended December 31, 2018, following a change in its reportable segments during the quarter ended March 31, 2019, each of which are incorporated by reference herein. Certain of Anadarko's historical amounts have been reclassified to conform to Occidental's financial statement presentation.

The pro forma financial statements have been prepared to reflect adjustments to Occidental's historical consolidated financial information that are (i) directly attributable to the merger, (ii) factually supportable and (iii) with respect to the statements of operations only, expected to have a continuing impact on Occidental's results.

The pro forma financial statements reflect the following pro forma adjustments, based on available information and certain assumptions that Occidental believes are reasonable:

- The merger contemplated by the merger agreement under the acquisition method of accounting;
- the assumed conversion of each share of Anadarko common stock into $59.00 in cash (without interest) and 0.2934 of a share of Occidental common stock in accordance with the merger agreement;
- the conversion of Anadarko's outstanding stock-based awards into Occidental stock-based awards, merger consideration and/or cash in accordance with the merger agreement (see "The Merger Agreement-Merger Consideration-Treatment of Anadarko Stock Options and Other Stock-Based Awards" beginning on page 104);
- the assumption of liabilities for expenses related to the transactions;
- the incurrence by Occidental of $21.8 billion of new indebtedness to finance a portion of the cash merger consideration, consisting of (i) $8.8 billion in term loans incurred under the term loan credit agreement, with maturities of 364 days and two years, and (ii) $13 billion in long-term debt issued or incurred in lieu of borrowings pursuant to, and which would reduce to $0 the commitments under, the bridge loan commitment letter, with maturities of up to thirty years;
- the issuance and sale by Occidental pursuant to the Berkshire Hathaway investment of 100,000 shares of series A preferred stock and a warrant to acquire 80,000,000 shares of Occidental common stock for an aggregate purchase price of $10 billion; and
- the sale of Anadarko's assets, liabilities, businesses and operations in Algeria, Ghana, Mozambique and South Africa to Total for $8.0 billion, net of a transfer tax liability of $0.8 billion, on a cash-free, debt-free basis pursuant to the Total transaction, presented initially as held for sale for preliminary purchase price allocations, and the use of proceeds therefrom to pay down indebtedness.

The pro forma financial statements do not include the realization of cost savings from operating efficiencies, revenue synergies or other integration costs expected to result from the merger.

TABLE OF CONTENTS

The pro forma financial statements have been prepared using the acquisition method of accounting using the accounting guidance in Accounting Standards Codification 805, Business Combinations ("ASC 805"), with Occidental treated as the acquirer. The acquisition method of accounting is dependent upon certain valuations and other studies that, as of the date of this proxy statement/prospectus, have yet to commence or progress to a stage where there is sufficient information for a definitive measure. As indicated in the pro forma financial statements and under "-Estimated Purchase Price and Allocation" below, Occidental has performed a preliminary valuation analysis of the fair value of Anadarko's assets to be acquired and liabilities to be assumed and has made certain adjustments to the historical book values of the assets and liabilities of Anadarko to reflect preliminary estimates of the fair values necessary to prepare the pro forma financial statements, with the excess of the purchase price over the adjusted historical net assets of Anadarko recorded as goodwill. Occidental will perform a detailed review of Anadarko's accounting policies in connection with the completion of the merger and, as of the date of this proxy statement/prospectus, has not yet identified all adjustments, if any, necessary to conform Anadarko's financial records to Occidental's accounting policies. Accordingly, the pro forma financial statements and pro forma adjustments are preliminary and have been made solely for the purpose of providing the pro forma financial statements. Amounts used in these pro forma financial statements will differ from ultimate amounts once Occidental has determined the final allocation of the purchase price and has completed the valuation studies necessary to finalize the required purchase price allocations and identified any necessary conforming accounting policy changes for Anadarko. Differences between these preliminary estimates and the final acquisition accounting may have a material impact on the pro forma financial statements and the combined company's future results of operations and financial position.

The pro forma financial statements are provided for illustrative purposes only and do not purport to represent what the actual consolidated results of operations or consolidated financial position of Occidental would have been had the transactions occurred on the dates assumed, nor are they necessarily indicative of future consolidated results of operations or consolidated financial position. See "Risk Factors-The unaudited pro forma condensed combined financial data included in this proxy statement/prospectus are presented for illustrative purposes only and the actual financial condition and results of operations of Occidental following the completion of the merger may differ materially" beginning on page 36.

The pro forma financial statements and related notes should be read in conjunction with the separate historical consolidated financial statements and related notes of each of Occidental and Anadarko included elsewhere in this proxy statement/prospectus and incorporated herein. For more information, see "Where You Can Find More Information" beginning on page 167.

TABLE OF CONTENTS

**Estimated Purchase Price and Allocation**

The estimated aggregate value of the purchase price is approximately $37.2 billion based on the closing price of Occidental common stock of $52.28 on May 28, 2019, the last practicable trading date prior to the filing of this proxy statement/prospectus, and assuming an exchange ratio of 0.2934 of a share of Occidental common stock per share of Anadarko common stock. The value of the purchase price will fluctuate based upon changes in the share price of Occidental's common stock and the number of Anadarko's common shares, stock options and other stock-based awards outstanding on the closing date. In addition, the exchange ratio may be decreased, and the cash portion of the merger consideration may be increased, in certain limited circumstances described in the merger agreement (see "The Merger Agreement-Merger Consideration-Share Cap Adjustment" beginning on page 102).

*Estimated Purchase Price*

The following table summarizes the estimated common stock outstanding including shares underlying Anadarko stock-based awards and the components of the estimated purchase price:

| in millions of dollars and shares, except for per share amounts and exchange ratio* | | Total shares outstanding |
|---|---|---|
| Estimated shares of Anadarko common stock outstanding | | 502.1 |
| Plus: estimated shares underlying Anadarko stock-based awards | | 1.5 |
| | | 503.6 |
| Less: estimated shares underlying Anadarko stock-based awards-unvested | | (4.8 ) |
| **Total shares of common stock and shares underlying Anadarko stock-based awards eligible for merger consideration**** | | **498.8** |
| Total shares of common stock and shares underlying Anadarko stock-based awards eligible for merger consideration | | 498.8 |
| Cash consideration (per share of common stock and shares underlying Anadarko stock-based awards eligible for merger consideration) | $ | 59.00 |
| **Estimated cash portion of aggregate merger consideration** | **$** | **29,429** |
| **Estimated cash paid to settle shares underlying Anadarko stock-based awards per the merger agreement***** | **$** | **130** |
| **Cash portion of estimated purchase price** | **$** | **29,559** |
| Total shares of common stock and shares underlying Anadarko stock-based awards eligible for merger consideration | | 498.8 |
| Exchange ratio (per share of Anadarko common stock) | | 0.2934 |
| Estimated total shares of Occidental common stock to be issued | | 146.3 |
| Assumed share price of Occidental common stock | $ | 52.28 |
| **Stock portion of estimated purchase price** | **$** | **7,651** |
| **Total estimated purchase price** | **$** | **37,210** |

* The final purchase price per share and corresponding total consideration will be determined on the closing date of the merger.

** Includes vested Anadarko RSU awards and Anadarko RS awards.

*** The estimated cash payable to settle shares underlying Anadarko stock-based awards per the merger agreement is based on the amounts attributable to pre-merger service.

Occidental anticipates incurring approximately $21.8 billion of new indebtedness and issuing the series A preferred stock and a warrant to acquire Occidental common stock for an aggregate purchase price of $10 billion pursuant to the Berkshire Hathaway investment to finance a portion of the cash purchase price. See "The Merger-Financing of the Merger and Treatment of Existing Indebtedness" beginning on page 89.

TABLE OF CONTENTS

*Purchase Price Sensitivity*

The table below illustrates the potential impact to the total estimated purchase price resulting from a 10% increase or decrease in the assumed share price of Occidental's common stock of $52.28. For purposes of this calculation, the stock portion of the estimated purchase price is based on the number of shares of Anadarko common stock outstanding and the estimated shares underlying Anadarko stock-based awards, in each case reflected in the table above, but is subject to change based on the actual outstanding shares of Anadarko common stock and Anadarko stock based awards at the time of the closing of the merger.

| in millions | 10% increase in Occidental share price | 10% decrease in Occidental share price |
|---|---|---|
| Cash portion of estimated purchase price | $ 29,559 | $ 29,559 |
| Stock portion of estimated purchase price | 8,416 | 6,886 |
| Total estimated purchase price | $ 37,975 | $ 36,445 |

From May 3, 2019, the last trading day before the public announcement of Occidental's final proposal to acquire Anadarko, to May 28, 2019, the last practicable trading day prior to the filing of this proxy statement/prospectus, the preliminary value of the purchase price to be transferred decreased by approximately $830 million, as a result of the decrease in the share price for Occidental's common stock from $57.95 to $52.28. Changes in the purchase price would result in a re-evaluation of the preliminary purchase price allocation; specifically to the values determined for property, plant and equipment, intangibles and goodwill.

*Preliminary Purchase Price Allocation*

The preliminary allocation of the estimated purchase price to the fair values of assets acquired and liabilities assumed includes pro forma adjustments for the fair value of Anadarko's assets and liabilities. The final allocation will be determined as of the closing of the merger once Occidental has determined the final purchase price and completed the detailed valuation analysis and calculations necessary to finalize the required purchase price allocations. The final allocation could differ materially from the preliminary allocation used in these pro forma financial statements and related pro forma adjustments.

Occidental has performed a preliminary valuation analysis of the fair market value of the Anadarko assets to be acquired and liabilities to be assumed and the related allocations to such items of the estimated purchase price. The following table summarizes the allocation of the preliminary estimated purchase price:

| in millions | As of March 31, 2019 | |
|---|---|---|
| **Fair value of assets acquired:** | | |
| Cash[1] | | $ 984 |
| Current held for sale assets related to Anadarko's Africa assets | $ 699 | |
| Property, plant and equipment held for sale related to Anadarko's Africa assets | 9,384 | |
| Total assets held for sale[2] | $ 10,083 | 10,083 |
| Trade receivables, net | | 1,878 |
| Inventories | | 585 |
| Other current assets | | 82 |
| Executives and Directors Benefits Trust | | 483 |
| Investment in unconsolidated entities | | 1,379 |
| Property, plant and equipment attributable to Anadarko, excluding WES | | 47,891 |
| Property, plant and equipment attributable to WES | | 10,500 |
| Operating lease assets | | 482 |
| Intangible assets | | 3,168 |
| Long-term receivables and other assets, net | | 346 |
| **Amount attributable to assets acquired** | | **77,861** |

TABLE OF CONTENTS

| in millions | | As of March 31, 2019 |
|---|---|---|
| **Fair value of liabilities assumed:** | | |
| Current liabilities | | $ 3,107 |
| Current held for sale liabilities related to Anadarko's Africa liabilities | $ 1,283 | |
| Fair value adjustment for Anadarko's Africa liabilities held for sale | 800 | |
| Liabilities held for sale(2) | $ 2,083 | 2,083 |
| Debt attributable to Anadarko, excluding WES | | 12,628 |
| Debt attributable to WES | | 7,225 |
| Deferred income taxes, net | | 9,338 |
| Asset retirement obligations | | 2,722 |
| Other long term liabilities | | 3,964 |
| **Amount attributable to liabilities assumed** | | **$ 41,067** |
| **Fair value of noncontrolling interests in WES(3):** | | $ 6,059 |
| **Fair value of net assets acquired:** | | $ 30,735 |
| **Goodwill as of March 31, 2019:** | | $ 6,475 |
| **Total Estimated Purchase Price:** | | $ 37,210 |

(1) Reflects the $1 billion termination fee (the "Chevron termination fee") paid to Chevron Corporation by Anadarko on May 9, 2019, in connection with the termination of a merger agreement between Anadarko and Chevron Corporation.

(2) Anadarko's liabilities, businesses and operations in Algeria, Ghana, Mozambique, and South Africa held for sale pursuant to the Total transaction ("Anadarko's Africa assets" or "Anadarko's Africa liabilities", as applicable) totals to $8.0 billion, net of a transfer tax liability of $0.8 billion.

(3) Noncontrolling interests associated with Anadarko's consolidated subsidiary, Western Midstream Partners, LP ("WES"), a publicly traded limited partnership. Net assets acquired from WES were valued using a share price of $28.97; fluctuations in WES' share price could result in changes to the net assets and noncontrolling interests above.

The preliminary pro forma fair value of crude oil and natural gas properties to be acquired includes the following:

| in millions | As of March 31, 2019 |
|---|---|
| Proved properties | $ 19,829 |
| Unproved properties | 26,265 |
| Pro forma fair value of properties acquired | $ 46,094 |

Changes in future commodity prices, reserve estimates, other changes in cost assumptions and other facts and circumstances existing on the closing date of the merger compared to the filing date of the pro forma financial statements could result in changes to the fair value of the assets identified above.

Occidental estimated the fair value adjustment to increase Anadarko's consolidated debt to fair value would be $2.1 billion based on prevailing market prices. Occidental has estimated that the fair value adjustment to increase deferred tax liabilities, net would be $7 billion, relating to estimated fair value adjustments at the estimated statutory tax rate for the combined company. Goodwill is calculated as the difference between the acquisition date fair value of the consideration expected to be transferred and the values assigned to the identified assets to be acquired and liabilities assumed. Goodwill is not amortized, but rather is subject to impairment testing on at least an annual basis.

Total assets held for sale and liabilities held for sale represent the anticipated divestiture of Anadarko's Africa assets in the Total transaction for $8.0 billion, net of a transfer tax liability of $0.8 billion. The Total transaction is conditioned on the completion of the merger, the execution and delivery of a definitive purchase agreement, and the receipt of required regulatory approvals, as well as other customary closing conditions.

TABLE OF CONTENTS

**OCCIDENTAL PETROLEUM CORPORATION**
**UNAUDITED PRO FORMA COMBINED BALANCE SHEET**
**MARCH 31, 2019**

| in millions | Occidental historical | Anadarko historical | Reclassified balances | Issuance of debt and preferred shares | Acquisition accounting | Anadarko's Africa assets sale and debt settlement | Occidental combined pro forma |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash and cash equivalents | $ 1,752 | $ 2,026 | $ - | $ 21,562 (a) | $ (469 )(a) | $ 8,000 (a) | $ 3,804 |
| | | | - | 9,950 (a) | (30,175 ) (a) | (8,800 )(a) | |
| | | | | | | (42 )(b) | |
| Trade receivables, net | 5,310 | 2,065 | - | - | - | (187 )(b) | 7,188 |
| Assets held for sale | - | - | - | - | - | 10,083 (b) | - |
| | | | | | | (10,083 )(b) | |
| Inventories | 1,484 | 254 | 416 (c) | - | - | (85 )(b) | 2,069 |
| Other current assets | 724 | 84 | - | - | - | (2 )(b) | 806 |
| **Total current assets** | 9,270 | 4,429 | 416 | 31,512 | (30,644 ) | (1,116 ) | 13,867 |
| Investments in unconsolidated entities | 1,725 | - | 1,379 (c) | - | - | - | 3,104 |
| Property, plant and equipment, net | 31,900 | 28,936 | - | - | 38,839 (d) | (9,384 )(b) | 90,291 |
| Operating lease assets | 684 | - | 534 (c) | - | | (52 )(b) | 1,166 |
| Intangible assets | - | 833 | - | - | 2,335 (d) | - | 3,168 |
| Goodwill | - | 4,789 | - | - | 1,686 (d) | - | 6,475 |
| Long-term receivables and other assets, net | 801 | 3,006 | (2,329 )(c) | - | | (331 )(b) | 1,147 |
| **Total Assets** | $ 44,380 | $ 41,993 | $ - | $ 31,512 | $ 12,216 | $ (10,883 ) | $ 119,218 |

See accompanying notes to unaudited pro forma financial statements.

TABLE OF CONTENTS

**OCCIDENTAL PETROLEUM CORPORATION**
**UNAUDITED PRO FORMA COMBINED BALANCE SHEET**
**MARCH 31, 2019**

| in millions | Occidental historical | Anadarko historical | Reclassified balances | Issuance of debt and preferred shares | Acquisition accounting | Anadarko's Africa assets sale and debt settlement | Occidental combined pro forma |
|---|---|---|---|---|---|---|---|
| **Current liabilities** | | | | | | | |
| Current maturities of long-term debt | $ 116 | $ 2,021 | - | $ 4,400 (e) | - | $ (4,400 )(a) | $ 2,125 |
| | | | | | | (12 )(b) | |
| Current lease liabilities | 240 | - | 245 (c) | - | - | (12 )(b) | $ 473 |
| Accounts payable | 5,261 | 2,111 | - | - | - | (265 )(b) | $ 7,107 |
| Accrued liabilities | 1,920 | 1,340 | 32 (c) | - | 716 (d) | (1,060 )(b) | $ 2,948 |
| Liabilities held for sale | - | - | - | - | - | (2,083 )(b) | - |
| | | | | | | 2,083 (b) | |
| Current asset retirement obligation | - | 277 | (277 )(c) | - | - | - | $ - |
| **Total current liabilities** | 7,537 | 5,749 | - | 4,400 | 716 | (5,749 ) | 12,653 |
| **Long-term Debt, net** | 10,203 | 15,903 | - | 17,162 (e) | 2,133 (d) | (4,400 )(a) | 40,809 |
| | | | | | | (192 )(b) | |
| **Deferred Credits and other liabilities** | | | | | | | |
| Deferred domestic and foreign income taxes, net | 918 | 2,624 | - | - | 7,009 (f) | (295 )(b) | 10,256 |
| Asset retirement obligations | 1,430 | 2,876 | - | - | - | (154 )(b) | 4,152 |
| Pension and postretirement obligations | 816 | - | 870 (c) | - | - | - | 1,686 |
| Environmental remediation reserves | 755 | - | 84 (c) | - | - | - | 839 |
| Lease liabilities | 465 | - | 306 (c) | - | - | (39 )(b) | 732 |
| Other | 1,020 | 4,308 | (1,260 )(c) | 584 (g) | (251 )(d) | (54 )(b) | 4,347 |
| | 5,404 | 9,808 | - | 584 | 6,758 | (542 ) | 22,012 |
| **Stockholders Equity** | | | | | | | |
| Common stock, at par value | 179 | 57 | - | - | (28 )(h) | - | 208 |
| Treasury stock | (10,653 ) | (4,881 ) | - | - | 4,782 (h) | - | (10,752 ) |
| Preferred stock, at par value | - | - | - | - (g) | - | - | - |
| Additional paid-in capital | 8,083 | 13,057 | - | 9,366 (g) | (5,435 )(h) | - | 25,071 |
| Retained earnings | 23,795 | 1,024 | - | - | (1,493 )(h) | - | 23,326 |
| Accumulated other comprehensive loss | (168 ) | (329 ) | - | - | 329 (h) | - | (168 ) |
| Total stockholders' equity | 21,236 | 8,928 | - | 9,366 | (1,845 ) | - | 37,685 |
| Noncontrolling interests | - | 1,605 | - | - | 4,454 (h) | - | 6,059 |
| **Total Equity** | 21,236 | 10,533 | - | 9,366 | 2,609 | - | 43,744 |
| **Total Liabilities and Equity** | $ 44,380 | $ 41,993 | $ - | $ 31,512 | $ 12,216 | $ (10,883 ) | $ 119,218 |

See accompanying notes to unaudited pro forma financial statements.

TABLE OF CONTENTS

**OCCIDENTAL PETROLEUM CORPORATION**
**UNAUDITED PRO FORMA STATEMENT OF COMBINED OPERATIONS**
**THREE MONTHS ENDED MARCH 31, 2019**

| in millions | Occidental historical | Anadarko historical | Reclassified balances | Issuance of debt and preferred shares | Acquisition accounting | Anadarko's Africa assets sale and debt settlement | Occidental combined pro forma |
|---|---|---|---|---|---|---|---|
| **Revenues and other income** | | | | | | | |
| Net Sales | $ 4,004 | $ 3,126 | $ (149 )(c) | $ - | $ (5 )(i) | $ (459 )(b) | $ 6,517 |
| Interest, dividends and other income | 78 | - | 14 (c) | - | - | - | $ 92 |
| Gain on sale of assets, net | 7 | 92 | (64 )(c) | - | - | (2 )(b) | $ 33 |
| | 4,089 | 3,218 | (199 ) | - | (5 ) | (461 ) | 6,642 |
| Costs and other deductions | | | | | | | |
| Cost of sales | 1,345 | - | 732 (c) | - | (5 )(i) | - | 2,072 |
| Purchased commodities | 365 | - | - | - | - | - | 365 |
| Oil and gas operating | - | 289 | (262 )(c) | - | - | (27 )(b) | - |
| Oil and gas transportation | - | 222 | (214 )(c) | - | - | (8 )(b) | - |
| Gathering, processing and marketing | - | 256 | (256 )(c) | - | - | - | - |
| Selling, general and administrative expenses | 140 | 267 | (157 )(c) | - | - | (11 )(b) | 239 |
| Other operating and non-operating expenses | 238 | 21 | 347 (c) | - | - | - | 606 |
| Taxes other than on income | 111 | 199 | - | - | - | (93 )(b) | 217 |
| Depreciation, depletion and amortization | 973 | 1,081 | - | - | 94 (j) | (98 )(b) | 2,050 |
| Exploration expense | 36 | 49 | - | - | - | (2 )(b) | 83 |
| Interest and debt expense, net | 98 | - | 245 (c) | 154 (e) | 19 (e) | - | 516 |
| | 3,306 | 2,384 | 435 | 154 | 108 | (239 ) | 6,148 |
| Income before income taxes and other items | 783 | 834 | (634 ) | (154 ) | (113 ) | (222 ) | 494 |
| Interest expense | - | (253 ) | 245 (c) | - | - | 8 (b) | - |
| Losses on derivatives, net | - | (313 ) | 313 (c) | - | - | - | - |
| Other expense | - | (6 ) | 12 (c) | - | - | (6 )(b) | - |
| (Provision) benefit for domestic and foreign income taxes | (225 ) | (166 ) | - | 35 (m) | 23 (m) | 128 (b) | (205 ) |
| Income from equity investments | 73 | - | 64 (c) | - | - | - | 137 |
| **Net income** | $ 631 | $ 96 | $ - | $ (119 ) | $ (90 ) | $ (92 ) | $ 426 |
| Net income (loss) attributable to noncontrolling interests | - | 111 | - | - | (11 )(d,j) | - | 100 |
| Preferred stock dividend | $ - | $ - | $ - | $ 200 (g) | $ - | $ - | 200 |
| **Net income (loss) attributable to Common Shareholders** | $ 631 | $ (15 ) | $ - | $ (319 ) | $ (79 ) | $ (92 ) | $ 126 |
| Basic Earnings per Common Share(k) | $ 0.84 | | | | | | $ 0.14 |
| Diluted Earnings per Share(k) | $ 0.84 | | | | | | $ 0.14 |
| Weighted Average Number of Shares Outstanding: | | | | | | | |
| Basic | 748.9 | | | | 144.4 (k) | | 893.3 |
| Diluted | 750.5 | | | | 148.6 (k) | | 899.1 |

See accompanying notes to unaudited pro forma financial statements.

TABLE OF CONTENTS

**OCCIDENTAL PETROLEUM CORPORATION**
**UNAUDITED PRO FORMA STATEMENT OF COMBINED OPERATIONS**
**YEAR ENDED DECEMBER 31, 2018**

| in millions | Occidental historical | Anadarko historical | Reclassified balances | Issuance of debt and preferred shares | Acquisition accounting | Anadarko's Africa assets sale and debt settlement | Occidental combined pro forma |
|---|---|---|---|---|---|---|---|
| **Revenues and other income** | | | | | | | |
| Net Sales | $ 17,824 | $ 13,070 | $ (213) (c) | $ - | (2) (i) | $ (2,433) (b,l) | $ 28,246 |
| Interest, dividends and other income | 136 | - | 50 (c) | - | - | - | 186 |
| Gain (loss) on sale of assets, net | 974 | 312 | (180) (c) | - | - | 43 (b,l) | 1,149 |
| | 18,934 | 13,382 | (343) | - | (2) | (2,390) | 29,581 |
| **Costs and other deductions** | | | | | | | |
| Cost of sales | 6,515 | - | 2,791 (c) | - | (2) (i) | - | 9,304 |
| Purchased commodities | 53 | - | - | - | - | - | 53 |
| Oil and gas operating | - | 1,153 | (900) (c) | - | - | (253) (b,l) | - |
| Oil and gas transportation | - | 878 | (844) (c) | - | - | (34) (b) | - |
| Gathering, processing and marketing | - | 1,047 | (1,047) (c) | - | - | - | - |
| Selling, general and administrative expenses | 585 | 1,084 | (497) (c) | - | - | (27) (b) | 1,145 |
| Other operating and non-operating expenses | 1,028 | 262 | 525 (c) | - | - | (29) (b,l) | 1,786 |
| Taxes other than on income | 439 | 826 | - | - | - | (411) (b,l) | 854 |
| Depreciation, depletion and amortization | 3,977 | 4,254 | - | - | 345 (j) | (601) (b) | 7,975 |
| Asset impairments and related items | 561 | 800 | - | - | - | - | 1,361 |
| Exploration expense | 110 | 459 | - | - | - | (6) (b) | 563 |
| Interest and debt expense, net | 389 | - | 884 (c) | 615 (e) | 75 (e) | - | 1,963 |
| | 13,657 | 10,763 | 912 | 615 | 418 | (1,361) | 25,004 |
| Income before income taxes and other items | 5,277 | 2,619 | (1,255) | (615) | (420) | (1,029) | 4,577 |
| Interest expense | - | (947) | 884 (c) | - | - | 63 (b,l) | - |
| Losses on derivatives | - | (130) | 130 (c) | - | - | - | - |
| Other expense, net | - | (57) | 61 (c) | - | - | (4) (b) | - |
| (Provision) benefit for domestic and foreign income taxes | (1,477) | (733) | - | 141 (m) | 73 (m) | 572 (b,l) | (1,424) |
| Income from equity investments | 331 | - | 180 (c) | - | - | - | 511 |
| **Net income** | 4,131 | 752 | - | (474) | (347) | (398) | 3,664 |
| Net income (loss) attributable to noncontrolling interests | - | 137 | - | - | (97) (d,j) | - | 40 |
| Preferred stock dividend | - | - | - | 800 (g) | - | - | 800 |
| **Net income (loss) attributable to Common Shareholders** | 4,131 | 615 | - | (1,274) | (250) | (398) | 2,824 |
| Basic Earnings per Common Share (k) | $ 5.40 | | | | | | $ 3.09 |
| Diluted Earnings per Share (k) | $ 5.39 | | | | | | $ 3.04 |
| Weighted Average Number of Shares Outstanding: | | | | | | | |
| Basic | 761.7 | | | | 144.5 (k) | | 906.2 |
| Diluted | 763.3 | | | | 158.0 (k) | | 921.3 |

See accompanying notes to unaudited pro forma financial statements.

TABLE OF CONTENTS

## NOTES TO PRO FORMA FINANCIAL STATEMENTS

a) Reflects sources of/(uses of) cash upon the completion of the merger as follows:

| in millions | | As of March 31, 2019 |
|---|---|---|
| Issuance of $21.8 billion in new indebtedness | $ | 21,800 |
| Issuance costs related to new indebtedness | | (238 ) |
| Net cash from issuance of indebtedness | $ | 21,562 |
| Issuance of $10 billion of shares of series A preferred stock | $ | 10,000 |
| Issuance costs related to series A of preferred stock | | (50 ) |
| Net cash from issuance of series A preferred stock | $ | 9,950 |
| Merger-related transaction costs(1) | $ | (310 ) |
| Post-merger consideration paid in respect of Anadarko stock-based awards | | (159 ) |
| Merger related costs | $ | (469 ) |
| Cash portion of estimated purchase price | $ | (29,559 ) |
| Estimated cash portion of purchase price to Anadarko's consolidated Executives and Directors Benefits Trust | | 384 |
| Chevron termination fee paid by Anadarko before merger, see merger consideration discussion | | (1,000 ) |
| Cash portion of estimated purchase price plus Chevron termination fee | $ | (30,175 ) |
| Estimated net proceeds from anticipated divestiture of Anadarko's Africa assets pursuant to the Total transaction | $ | 8,000 |
| Use of proceeds from anticipated divestiture and other sources to pay down indebtedness-current | $ | (4,400 ) |
| Use of proceeds from anticipated divestiture and other sources to pay down indebtedness-long term | $ | (4,400 ) |
| Total use of proceeds from anticipated divestiture and other sources to pay down indebtedness | | (8,800 ) |

(1) Represents an estimate of merger-related transaction costs, including fees related to advisory, legal, investment banking and other professional services, all of which are directly attributable to the merger. These are non-recurring charges and have been excluded from the unaudited pro forma condensed combined statements of operations.

TABLE OF CONTENTS

b) Reflects the anticipated divestiture of Anadarko's Africa assets pursuant to the Total transaction which are initially classified as held for sale in the preliminary purchase price allocation:

| in millions | As of March 31, 2019 |
|---|---|
| Cash and cash equivalents | $ 42 |
| Trade receivables, net | 187 |
| Inventories | 85 |
| Other current assets | 2 |
| Property, plant and equipment, net | 9,384 |
| Operating lease assets | 52 |
| Long-term receivables and other assets, net | 331 |
| Assets held for sale | $ 10,083 |
| Current maturities of long-term debt-finance leases | $ 12 |
| Current lease liabilities | 12 |
| Accounts payable | 265 |
| Accrued liabilities | 1,060 |
| Long-term debt, net-finance leases | 192 |
| Deferred domestic and foreign income taxes | 295 |
| Asset retirement obligations | 154 |
| Lease liabilities | 39 |
| Other | 54 |
| Liabilities held for sale | $ 2,083 |
| Net held for sale | $ 8,000 |

The following table includes the elimination of revenue and expense items for the three months ended March 31, 2019 and year ended December 31, 2018 related to Anadarko's Africa assets:

| in millions | Three months ended March 31, 2019 | Year ended December 31, 2018 |
|---|---|---|
| **Revenues and other income** | | |
| Net sales | $ (459 ) | $ (2,411 ) |
| Loss (gain) on sale of assets, net | (2 ) | 10 |
| | (461 ) | (2,401 ) |
| **Costs and other deductions** | | |
| Oil and gas operating | (27 ) | (246 ) |
| Oil and gas transportation | (8 ) | (34 ) |
| Selling, general and administrative expenses | (11 ) | (27 ) |
| Other operating and non-operating expenses | - | (8 ) |
| Taxes other than on income | (93 ) | (405 ) |
| Depreciation, depletion and amortization | (98 ) | (601 ) |
| Exploration expense | (2 ) | (6 ) |
| | (239 ) | (1,327 ) |
| Income before income taxes and other items | (222 ) | (1,074 ) |
| Interest expense | 8 | 61 |
| Other expense | (6 ) | (4 ) |
| Provision for domestic and foreign income taxes | 128 | 583 |
| Total effect to net income | $ (92 ) | $ (434 ) |

TABLE OF CONTENTS

c) The following reclassifications were made to conform Anadarko's historical financial results to Occidental's presentation on the pro forma financial statements:

| Balance Sheet in millions | As of March 31, 2019 Reclassification from | Reclassification to |
|---|---|---|
| **Assets** | | |
| Inventories | - | 416 |
| Investments in unconsolidated entities | - | 1,379 |
| Operating lease assets | - | 534 |
| Long-term receivables and other assets, net-investments in unconsolidated entities | $ (1,379 ) | $ - |
| Long-term receivables and other assets, net-operating lease assets | (534 ) | - |
| Long-term receivables and other assets, net-inventories | (416 ) | - |
| **Liabilities** | | |
| Current lease liabilities | - | 245 |
| Accrued liabilities | (245 ) | 277 |
| Current asset retirement obligations | (277 ) | - |
| Pension and postretirement obligations | - | 870 |
| Environmental remediation reserves | - | 84 |
| Lease liabilities | - | 306 |
| Other-lease liabilities | (306 ) | - |
| Other-pension and postretirement obligations/environmental remediation reserves | (954 ) | |
| Total | $ (4,111 ) | $ 4,111 |

| Summary of Balance Sheet reclassifications | Decrease, net | Increase, net |
|---|---|---|
| **Assets** | | |
| Inventories | - | 416 |
| Investments in unconsolidated entities | - | 1,379 |
| Operating lease assets | - | 534 |
| Long-term receivables and other assets, net | $ (2,329 ) | $ - |
| **Liabilities** | | |
| Current lease liabilities | - | 245 |
| Accrued liabilities | - | 32 |
| Current asset retirement obligations | (277 ) | - |
| Pension and postretirement obligations | - | 870 |
| Environmental remediation reserves | - | 84 |
| Lease liabilities | - | 306 |
| Other | (1,260 ) | - |

TABLE OF CONTENTS

| Income Statement | For the three months ended March 31, 2019 | | For the year ended December 31, 2018 | |
|---|---|---|---|---|
| in millions | Reclassification from | Reclassification to | Reclassification from | Reclassification to |
| **Revenues and other income** | | | | |
| Net Sales | $ - | $ (149 ) | $ - | $ (213 ) |
| Interest, dividends and other income | - | 14 | - | 50 |
| Gain on sale of assets & equity investments | (64 ) | - | (180 ) | - |
| **Costs and other deductions** | | | | |
| Cost of sales | - | 732 | - | 2,791 |
| Oil and gas operating | (262 ) | - | (900 ) | - |
| Oil and gas transportation | (214 ) | - | (844 ) | - |
| Gathering, processing and marketing | (256 ) | - | (1,047 ) | - |
| Selling, general, and administrative expenses | (157 ) | - | (497 ) | - |
| Other operating and non-operating expenses | - | 347 | | 525 |
| Interest and debt expense, net | - | 245 | - | 884 |
| Income before income taxes and other items | 825 | (1,459 ) | 3,108 | (4,363 ) |
| Interest Expense | (245 ) | - | (884 ) | - |
| Losses on derivatives | (313 ) | - | (130 ) | - |
| Other expense, net | (12 ) | - | (61 ) | - |
| Income from equity investments | - | 64 | - | 180 |
| **Total Reclassification** | $ 1,395 | $ (1,395 ) | $ 4,183 | $ (4,183 ) |

d) Reflects the fair value adjustments to Anadarko's property, plant and equipment, intangible assets, held for sale assets and liabilities related to Anadarko's Africa assets and other assets and liabilities, including debt and goodwill. See "-Estimated Purchase Price and Allocation" above.

e) Represents pro forma adjustments to current and long-term debt, which includes:

i. Issuance of $21.8 billion of new indebtedness, with an estimated average annual interest rate of 4.3%, yielding net proceeds of $4.4 billion and $17.2 billion in short- and long-term debt, respectively. Anticipated proceeds are net of $238 million in debt issuance costs. After giving effect to the pay down of $8.8 billion in aggregate principal amount of term loans with the proceeds from the anticipated divestiture and other sources, the estimated average annual interest rate of the remaining $13 billion of new indebtedness is 4.6%. Estimated interest rates are based on underlying U.S. Treasury rates adjusted for Occidental's anticipated credit spreads across a range of maturities.

ii. After giving effect to the pay down of $8.8 billion in aggregate principal amount of term loans, the associated pro forma interest expense and amortization on the remaining $13 billion of new indebtedness is approximately $154 million and $615 million for the three months ended March 31, 2019 and for the year ended December 31, 2018, respectively. A one percent change in the assumed interest rate of the $13 billion in new indebtedness would increase or decrease the interest expense by $33 million and $130 million for the three months ended March 31, 2019 and for the year ended December 31, 2018, respectively. In the event the $8.8 billion of term loans are not repaid and remain outstanding, pro forma interest expense would increase by approximately $84 million and $336 million for the three months ended March 31, 2019 and for the year ended December 31, 2018, respectively.

iii. Fair value adjustment of $2.1 billion to historical Anadarko debt results in additional debt discount amortization of $19 million and $75 million for the three months ended March 31, 2019 and for the year ended December 31, 2018, respectively.

TABLE OF CONTENTS

f) Represents an adjustment to deferred tax liabilities, net based on the estimated statutory tax rate for the combined entity multiplied by the fair value adjustments made to assets and liabilities acquired, calculated below:

| in millions | | As of March 31, 2019 |
|---|---|---|
| Fair value of Anadarko property, plant and equipment excluding Anadarko's Africa assets | $ | 47,891 |
| Less: Anadarko historical value property, plant and equipment excluding Anadarko's Africa assets | | (17,613 ) |
| **Fair value adjustment to increase Anadarko property, plant and equipment, net of Anadarko's Africa assets** | | 30,278 |
| Fair value of property and equipment held for sale related to Anadarko's Africa assets | | 9,384 |
| Less: Anadarko historical value property and equipment related to Africa assets | | (2,693 ) |
| Fair value adjustment to increase value related to Anadarko's Africa assets(1) | | 6,691 |
| Fair value of WES property, plant and equipment | | 10,500 |
| Less: WES historical property, plant and equipment | | (8,630 ) |
| Fair value adjustment to increase WES property, plant and equipment | | 1,870 |
| Fair value adjustment to Anadarko's property, plant and equipment per Note (d) | $ | 38,839 |
| Fair value of Intangible assets | $ | 3,168 |
| Less: WES historical intangible assets | | (833 ) |
| Fair value adjustment to increase Intangible assets per Note (d) | $ | 2,335 |
| Fair value adjustment to increase WES property, plant and equipment | $ | 1,870 |
| Fair value adjustment to increase Intangible assets | | 2,335 |
| Less: fair value adjustment attributable to noncontrolling interests | | (1,892 ) |
| **Fair value adjustment to increase WES property, plant and equipment and intangibles** | $ | 2,313 |
| Fair value of debt attributable to Anadarko, excluding WES, assumed by Occidental | $ | 12,628 |
| Less: Anadarko historical debt, excluding WES | | (10,512 ) |
| **Fair value adjustment to Anadarko debt, excluding WES, assumed by Occidental** | $ | 2,116 |
| Fair value adjustment for WES debt | | 17 |
| Fair value adjustment to increase debt per Note (d) | $ | 2,133 |

(1) For additional information regarding the assumed transfer tax liability associated with Anadarko's Africa assets, see "-Preliminary Purchase Price Allocation" above.

| in millions | | As of March 31, 2019 |
|---|---|---|
| Fair value adjustment to increase Anadarko property, plant and equipment, net of Anadarko's Africa assets | $ | 30,278 |
| Fair value adjustment to increase WES property, plant and equipment and intangibles | | 2,313 |
| Fair value adjustment to Anadarko's debt, excluding WES debt, assumed by Occidental | | (2,116 ) |
| | $ | 30,475 |
| Estimated statutory domestic tax rate for the combined entity | | 23 % |
| | $ | 7,009 |

(2) Excludes fair value adjustment to WES debt of $17 million because the impact to deferred tax liabilities net of noncontrolling interests and the estimated statutory domestic tax rate was immaterial.

TABLE OF CONTENTS

g) Reflects the proceeds of $9.95 billion, net of $50 million in issuance costs, related to the issuance pursuant to the Berkshire Hathaway investment of 100,000 shares of series A preferred stock (par value $1.00), and a warrant (the “warrant”) to purchase 80 million shares of Occidental common stock at an exercise price of $62.50. Of this amount, $9.366 billion was allocated to the issuance of the series A preferred stock, which is reflected in additional paid-in capital, and $584 million was allocated to the warrant liability classified in other liabilities. The warrant will be remeasured at fair value each reporting period with the adjustment flowing through earnings.

h) Reflects adjustments to eliminate Anadarko’s historical equity balances and record estimated purchase price at fair value:

| in millions | | As of March 31, 2019 |
|---|---|---|
| **Estimated stock portion of purchase price:** | | |
| Common stock, $0.20 per share par value, expected to be issued in the merger | $ | 29 |
| Pro forma adjustment to paid-in capital in excess of par value for common stock expected to be issued in the merger | | 7,622 |
| Estimated stock portion of purchase price of 146.3 million shares at $52.28 per share | $ | 7,651 |
| **Equity issued for merger and elimination of Anadarko historical equity balances:** | | |
| Common stock issued as part of stock consideration expected to be issued in the merger | $ | 29 |
| Elimination of Anadarko’s historical common stock | | (57 ) |
| Pro forma adjustment to common stock | $ | (28 ) |
| Elimination of Anadarko’s historical treasury stock | $ | 4,881 |
| Equity consideration to Anadarko’s consolidated Executives and Directors Benefits Trust | | (99 ) |
| Pro forma adjustment to treasury stock | $ | 4,782 |
| Pro forma adjustment to paid-in capital in excess of par value for common stock expected to be issued in the merger | $ | 7,622 |
| Elimination of Anadarko historical paid-in capital in excess of par value | | (13,057 ) |
| Pro forma adjustment to paid-in capital in excess of par value | $ | (5,435 ) |
| Retained earnings impact for estimated merger-related transaction costs | $ | (310 ) |
| Retained earnings impact for post-combination expense of stock-based awards | | (159 ) |
| Anadarko historical retained earnings impact for Chevron termination fee | | (1,000 ) |
| Elimination of Anadarko historical retained earnings | | (24 ) |
| Pro forma adjustment to retained earnings | $ | (1,493 ) |
| Elimination of Anadarko historical accumulated other comprehensive income | $ | 329 |
| Fair value of noncontrolling interests | $ | 6,059 |
| Elimination of Anadarko historical noncontrolling interests | | (1,605 ) |
| Pro forma adjustment to noncontrolling interests | $ | 4,454 |

i) The following pro forma adjustments eliminate historical transactions between Anadarko and Occidental that would be treated as intercompany transactions after the merger:

i. Elimination of $5 million in net sales and corresponding cost of sales in the pro forma statement of operations for the period ended March 31, 2019.

ii. Elimination of $2 million in net sales and corresponding cost of sales in the pro forma statement of operations for the year ended December 31, 2018.

TABLE OF CONTENTS

j) Reflects adjustments to historical depreciation, depletion and amortization ("DD&A") expense related to the step up of property, plant and equipment to estimated fair value. Pro forma DD&A expense related to the assets acquired through the merger, excluding Anadarko's Africa assets, is $1.1 billion and $4.0 billion for the three months ended March 31, 2019 and for the year ended December 31, 2018, respectively.

k) Reflects the elimination of Anadarko's weighted-average shares outstanding and the issuance of Occidental common stock to Anadarko stockholders as part of the stock portion of the purchase price. The effect of the issuance of the warrant has been included in diluted shares. Basic and Diluted earnings per share have been reduced by $200 million and $800 million for the three months ended March 31, 2019 and the year ended December 31, 2018, respectively, for pro forma dividends on the series A preferred stock.

| in millions except per share amounts | Three months ended March 31, 2019 | Year ended December 31, 2018 |
|---|---|---|
| Basic EPS | | |
| Combined pro forma net income | $ 426 | $ 3,664 |
| Less: Income attributable to noncontrolling interests | (100 ) | (40 ) |
| Less: Pro forma preferred stock dividend | (200 ) | (800 ) |
| Combined pro forma net income attributable to Occidental common stock | 126 | 2,824 |
| Less: Income allocated to pro forma participating securities | (1 ) | (20 ) |
| Combined pro forma net income attributable to Occidental common stock, net of participating securities | $ 125 | $ 2,804 |
| Historical weighted average number of basic shares - Occidental | 748.9 | 761.7 |
| Pro forma shares issued to Anadarko stockholders | 144.4 | 144.4 |
| Pro forma weighted average common shares outstanding | 893.3 | 906.2 |
| Basic EPS | $ 0.14 | $ 3.09 |
| Diluted EPS | | |
| Combined pro forma net income | $ 426 | $ 3,664 |
| Less: Income attributable to noncontrolling interests | (100 ) | (40 ) |
| Less: Pro forma preferred stock dividend | (200 ) | (800 ) |
| Combined pro forma net income attributable to Occidental common stock | 126 | 2,824 |
| Less: Income allocated to pro forma participating securities | (1 ) | (20 ) |
| Combined pro forma net income attributable to Occidental common stock, net of participating securities | $ 125 | $ 2,804 |
| Pro forma weighted average common shares outstanding | 893.3 | 906.2 |
| Pro forma dilutive effect of potential shares | 5.8 | 15.1 |
| Total Pro forma diluted weighted average common shares | 899.1 | 921.3 |
| Diluted EPS | $ 0.14 | $ 3.04 |

TABLE OF CONTENTS

l) The following table includes the elimination of revenue and expense items for the year ended December 31, 2018 related to Anadarko's Alaska assets sold in the three months ended March 31, 2018:

| in millions | Year ended December 31, 2018 |
| --- | --- |
| **Revenues and other income** | |
| Net sales | $ (22 ) |
| Loss on sale of assets, net | 33 |
| | 11 |
| **Costs and other deductions** | |
| Oil and gas operating | (7 ) |
| Other operating and non-operating expenses | (21 ) |
| Taxes other than on income | (6 ) |
| | (34 ) |
| Income before income taxes and other items | 45 |
| Interest expense | 2 |
| Provision for domestic and foreign income taxes | (11 ) |
| Total effect to net income | $ 36 |

m) The pro forma income tax adjustments included in the pro forma statements of operations for the periods ended March 31, 2019 and December 31, 2018 reflect the income tax effects of the pro forma adjustments presented. The effective tax rate of the combined company could be significantly different from what is presented in these pro forma financial statements for a variety of reasons, including post-merger activities.

TABLE OF CONTENTS

**Supplemental Pro Forma Crude Oil, Natural Gas Liquids (“NGLs”) and Natural Gas Reserves Information**

The following tables present the estimated pro forma combined net proved developed and undeveloped, crude oil, NGLs and natural gas reserves as of December 31, 2018, along with a summary of changes in quantities of net remaining proved reserves during the year ended December 31, 2018.

The following estimated pro forma reserve information is not necessarily indicative of the results that might have occurred had the transactions been completed on January 1, 2018 and is not intended to be a projection of future results. Future results may vary significantly from the results reflected because of various factors, including those discussed in the section entitled “Risk Factors”, beginning on page 32.

The pro forma adjustments below reflect the elimination of amounts related to Anadarko’s Africa assets.

| **Oil Reserves**<br>in millions of barrels (MMbbl)<br>**PROVED DEVELOPED AND UNDEVELOPED RESERVES** | Occidental Historical | Anadarko Historical | Anadarko’s Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| **Balance at December 31, 2017** | 1,515 | 658 | (157 ) | 2,016 |
| Revisions of previous estimates | 6 | 77 | (12 ) | 71 |
| Improved recovery | 189 | - | - | 189 |
| Extensions and discoveries | 6 | 104 | - | 110 |
| Purchases of proved reserves | 32 | - | - | 32 |
| Sales of proved reserves | (12 ) | (34 ) | - | (46 ) |
| Production | (153 ) | (138 ) | 31 | (260 ) |
| **Balance at December 31, 2018** | 1,583 | 667 | (138 ) | 2,112 |
| **DOMESTIC PROVED RESERVES** | 1,186 | 529 | - | 1,715 |
| **INTERNATIONAL PROVED RESERVES** | 397 | 138 | (138 ) | 397 |
| **PROVED DEVELOPED RESERVES** | | | | |
| December 31, 2017 | 1,128 | 497 | (136 ) | 1,489 |
| December 31, 2018 | 1,160 | 515 | (123 ) | 1,552 |
| **PROVED UNDEVELOPED RESERVES** | | | | |
| December 31, 2017 | 387 | 161 | (21 ) | 527 |
| December 31, 2018 | 423 | 152 | (15 ) | 560 |

| **NGL Reserves**<br>in millions of barrels (MMbbl)<br>**PROVED DEVELOPED AND UNDEVELOPED RESERVES** | Occidental Historical | Anadarko Historical | Anadarko’s Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| **Balance at December 31, 2017** | 445 | 243 | (11 ) | 677 |
| Revisions of previous estimates | 22 | 35 | (1 ) | 56 |
| Improved recovery | 47 | - | - | 47 |
| Extensions and discoveries | - | 28 | - | 28 |
| Purchases of proved reserves | 11 | - | - | 11 |
| Sales of proved reserves | (3 ) | - | - | (3 ) |
| Production | (36 ) | (38 ) | 2 | (72 ) |
| **Balance at December 31, 2018** | 486 | 268 | (10 ) | 744 |
| **DOMESTIC PROVED RESERVES** | 284 | 258 | - | 542 |
| **INTERNATIONAL PROVED RESERVES** | 202 | 10 | (10 ) | 202 |
| **PROVED DEVELOPED RESERVES** | | | | |
| December 31, 2017 | 314 | 186 | (10 ) | 490 |
| December 31, 2018 | 341 | 202 | (10 ) | 533 |
| **PROVED UNDEVELOPED RESERVES** | | | | |
| December 31, 2017 | 131 | 57 | (1 ) | 187 |
| December 31, 2018 | 145 | 66 | - | 211 |

TABLE OF CONTENTS

| Natural Gas Reserves<br>in billions of cubic feet (Bcf)<br>PROVED DEVELOPED AND UNDEVELOPED RESERVES | Occidental Historical | Anadarko Historical | Anadarko's Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| **Balance at December 31, 2017** | 3,831 | 3,230 | (37 ) | 7,024 |
| Revisions of previous estimates | 166 | 220 | - | 386 |
| Improved recovery | 347 | - | - | 347 |
| Extensions and discoveries | 4 | 190 | - | 194 |
| Purchases of proved reserves | 69 | - | - | 69 |
| Sales of proved reserves | (14 ) | (15 ) | - | (29 ) |
| Production | (308 ) | (395 ) | 5 | (698 ) |
| **Balance at December 31, 2018** | 4,095 | 3,230 | (32 ) | 7,293 |
| **DOMESTIC PROVED RESERVES** | 1,445 | 3,198 | - | 4,643 |
| **INTERNATIONAL PROVED RESERVES** | 2,650 | 32 | (32 ) | 2,650 |
| **PROVED DEVELOPED RESERVES** | | | | |
| December 31, 2017 | 2,924 | 2,664 | (24 ) | 5,564 |
| December 31, 2018 | 3,004 | 2,588 | (24 ) | 5,568 |
| **PROVED UNDEVELOPED RESERVES** | | | | |
| December 31, 2017 | 907 | 566 | (13 ) | 1,460 |
| December 31, 2018 | 1,091 | 642 | (8 ) | 1,725 |

| Total Reserves<br>in millions of BOE (MMBOE)<br>PROVED DEVELOPED AND UNDEVELOPED RESERVES | Occidental Historical | Anadarko Historical | Anadarko's Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| **Balance at December 31, 2017** | 2,598 | 1,439 | (174 ) | 3,863 |
| Revisions of previous estimates | 56 | 149 | (13 ) | 192 |
| Improved recovery | 294 | - | - | 294 |
| Extensions and discoveries | 7 | 164 | - | 171 |
| Purchases of proved reserves | 54 | - | - | 54 |
| Sales of proved reserves | (17 ) | (37 ) | - | (54 ) |
| Production | (240 ) | (242 ) | 34 | (448 ) |
| **Balance at December 31, 2018** | 2,752 | 1,473 | (153 ) | 4,072 |
| **DOMESTIC PROVED RESERVES** | 1,711 | 1,320 | - | 3,031 |
| **INTERNATIONAL PROVED RESERVES** | 1,041 | 153 | (153 ) | 1,041 |
| **PROVED DEVELOPED RESERVES** | | | | |
| December 31, 2017 | 1,928 | 1,127 | (150 ) | 2,905 |
| December 31, 2018 | 2,002 | 1,148 | (137 ) | 3,013 |
| **PROVED UNDEVELOPED RESERVES** | | | | |
| December 31, 2017 | 670 | 312 | (24 ) | 958 |
| December 31, 2018 | 750 | 325 | (16 ) | 1,059 |

TABLE OF CONTENTS

**Standardized measure of discounted future net cash flows**

The following tables present the estimated pro forma discounted future net cash flows at December 31, 2018. The pro forma standardized measure information set forth below gives effect to the transactions as if the transactions had been completed on January 1, 2018. The disclosures below were determined by referencing the "Standardized Measure of Discounted Future Net Cash Flows" reported in Anadarko's and Occidental's respective Annual Reports on Form 10-K for the year ended December 31, 2018; an explanation of the underlying methodology applied, as required by SEC regulations, can be found within the applicable Annual Report on Form 10-K. See "Where You Can Find More Information" beginning on page 167. The calculations assume the continuation of existing economic, operating and contractual conditions at December 31, 2018.

Therefore, the following estimated pro forma standardized measure is not necessarily indicative of the results that might have occurred had the transactions been completed on January 1, 2018 and is not intended to be a projection of future results. Future results may vary significantly from the results reflected because of various factors, including those discussed in the section entitled "Risk Factors", beginning on page 32.

The pro forma adjustments below reflect the elimination of amounts related to the contingent sale of Anadarko's Africa assets.

| in millions | Occidental Historical | Anadarko Historical | Anadarko's Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| **AT DECEMBER 31, 2018** | | | | |
| Future cash inflows | $ 112,575 | $ 59,598 | $ (10,058 ) | $ 162,115 |
| Future costs | | | | |
| Production costs and other operating expenses | (45,655 ) | (22,788 ) | 3,073 | (65,370 ) |
| Development costs | (11,963 ) | (5,660 ) | 444 | (17,179 ) |
| Future income tax expense | (8,633 ) | (7,596 ) | 2,728 | (13,501 ) |
| **Future net cash flows** | 46,324 | 23,554 | (3,813 ) | 66,065 |
| Ten percent discount factor | (22,863 ) | (6,412 ) | 806 | (28,469 ) |
| **Standardized measure of discounted future net cash flows** | $ 23,461 | $ 17,142 | $ (3,007 ) | $ 37,596 |

**Changes in the standardized measure of discounted future net cash flows from proved reserve quantities**

The changes in the pro forma standardized measure of discounted future net cash flows relating to proved crude oil, NGLs and natural gas reserves for the year ended December 31, 2018 are as follows:

| in millions | Occidental Historical | Anadarko Historical | Anadarko's Africa asset sale Adjustments | Occidental Pro Forma Combined |
|---|---|---|---|---|
| Beginning of year | $ 16,220 | $ 11,660 | $ (2,172 ) | $ 25,708 |
| Sales and transfers of oil and gas produced, net of production costs and other operating expenses | (7,828 ) | (8,360 ) | 1,703 | (14,485 ) |
| Net change in prices received per barrel, net of production costs and other operating expenses | 9,482 | 6,198 | (2,351 ) | 13,329 |
| Extensions, discoveries and improved recovery, net of future production and development costs | 3,378 | 3,429 | - | 6,807 |
| Change in estimated future development costs | (3,463 ) | (1,833 ) | (124 ) | (5,420 ) |
| Revisions of quantity estimates | 664 | 4,352 | (329 ) | 4,687 |
| Previously estimated development costs incurred during the period | 1,943 | 2,763 | (86 ) | 4,620 |
| Accretion of discount | 1,551 | 1,543 | (382 ) | 2,712 |
| Net change in income taxes | (1,182 ) | (1,729 ) | 461 | (2,450 ) |
| Purchases and sales of reserves in place, net[(a)] | 347 | (412 ) | - | (65 ) |
| Changes in production rates and other | 2,349 | (469 ) | 273 | 2,153 |
| Net change | 7,241 | 5,482 | (835 ) | 11,888 |
| End of year | $ 23,461 | $ 17,142 | $ (3,007 ) | $ 37,596 |

(a) Purchases of $5 million and sales of $417 million for Anadarko Historical combined above.

TABLE OF CONTENTS

## NON-BINDING, ADVISORY VOTE ON MERGER-RELATED COMPENSATION FOR ANADARKO'S NAMED EXECUTIVE OFFICERS

The Dodd-Frank Wall Street Reform and Consumer Protection Act and Rule 14a-21(c) promulgated under the Exchange Act require that Anadarko seek a non-binding, advisory vote from its stockholders to approve the merger-related compensation described in this proxy statement/prospectus under "The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger" beginning on page 79. The approval, on a non-binding, advisory basis, of the merger-related compensation proposal requires the affirmative vote of holders of a majority of the outstanding shares of Anadarko common stock present in person or represented by proxy at the special meeting and entitled to vote thereon. Each share of Anadarko common stock outstanding on the record date is entitled to one vote on this proposal. Failures to vote and broker non-votes will have no effect on the vote for this proposal (assuming a quorum is present); abstentions will have the same effect as a vote cast "AGAINST" the approval of this proposal. Accordingly, Anadarko is asking its stockholders to vote in favor of the following resolution, on a non-binding, advisory basis:

"RESOLVED, that the compensation that may be paid or become payable to Anadarko's named executive officers that is based on or otherwise relates to the merger, and the agreements or understandings pursuant to which such compensation may be paid or become payable, in each case as disclosed pursuant to Item 402(t) of Regulation S-K in 'The Merger-Interests of Directors and Executive Officers of Anadarko in the Merger' are hereby APPROVED".

The Anadarko Board recommends that its stockholders approve, on a non-binding, advisory basis, the merger-related compensation described in this proxy statement/prospectus by voting "**FOR**" the above proposal.

Approval of this proposal is not a condition to completion of the merger, and the vote with respect to this proposal is advisory only and will not be binding on Anadarko or Occidental. If the merger proposal is adopted by the Anadarko stockholders and the merger is completed, the merger-related compensation will be payable to Anadarko's named executive officers, subject only to the conditions applicable thereto, regardless of the outcome of the approval of the merger-related compensation proposal.

TABLE OF CONTENTS

## DESCRIPTION OF OCCIDENTAL CAPITAL STOCK

The following describes the material terms of the capital stock of Occidental. This description is qualified in its entirety by reference to the restated certificate of incorporation, as amended on May 5, 2006, May 1, 2009 and May 2, 2014 ("Occidental's certificate of incorporation"), and amended and restated by-laws, as adopted on May 5, 2019 ("Occidental's by-laws"), of Occidental, which are incorporated by reference into this proxy statement/prospectus. For more information about the documents incorporated by reference into this proxy statement/prospectus, see "Where You Can Find More Information" on page 167.

The authorized capital stock of Occidental currently consists of one billion and one hundred million shares of common stock, par value $0.20 per share, and fifty million shares of preferred stock, par value $1.00 per share. As of July 8, 2019, the most recent practicable date for which such information was available, there were 748,306,455 shares of Occidental common stock outstanding and no shares of Occidental preferred stock outstanding.

### Occidental Common Stock

Subject to the dividend rights of the holders of any outstanding series of preferred stock to be issued in the future, including the series A preferred stock to be issued at the closing of the merger pursuant to the Berkshire Hathaway investment, holders of Occidental common stock will be entitled to receive dividends when, as and if declared by the Occidental Board. Occidental will pay those dividends either in cash, shares of common stock, or otherwise, at the rate and on the date or dates as declared by the Occidental Board. Accruals of dividends will not bear interest. As a Delaware corporation, Occidental is subject to statutory limitations on the declaration and payment of dividends.

In the event of any voluntary or involuntary liquidation, dissolution or winding up of Occidental's affairs, holders of Occidental common stock would be entitled to share ratably in Occidental's assets that are legally available for distribution to stockholders after payment of liabilities, and after the payment in full of the amounts required to be paid to the holders of any outstanding class or series of preferred stock, including the series A preferred stock. Because Occidental is a holding company, holders of common stock may not receive assets of Occidental's subsidiaries in the event of Occidental's liquidation until the claims of creditors of Occidental's subsidiaries are paid, except to the extent that Occidental is a creditor of, and may have recognized claims against, such subsidiaries. Each holder of common stock entitled to vote will have one vote for each one share of common stock held on all matters to be voted upon by Occidental stockholders, including elections of directors. Holders of Occidental common stock have no conversion, redemption, preemptive, subscription or similar rights.

All outstanding shares of Occidental common stock are, and the shares of Occidental common stock to be issued in the merger will be, validly issued, fully paid and non-assessable. At July 8, 2019, the most recent practicable date for which such information was available, there were approximately 22,933 holders of record of Occidental common stock.

Occidental has also agreed to issue and sell to Berkshire Hathaway on the closing date of the merger, subject to certain conditions, a warrant to acquire 80 million shares of Occidental common stock at an exercise price of $62.50 per share and, in connection therewith, to enter into a registration rights agreement with respect to such Occidental common stock. See "The Merger-Financing of the Merger and Treatment of Existing Debt-Berkshire Hathaway Investment" beginning on page 90.

### Occidental Preferred Stock

Occidental's certificate of incorporation expressly authorizes the Occidental Board to issue preferred stock in one or more series, to fix, from time to time, before issuance, the number of shares to be included in any series and the designation, relative powers, preferences and rights and qualifications, limitations or restrictions of all shares of such series.

Occidental has agreed to issue and sell to Berkshire Hathaway on the closing date of the merger, subject to certain conditions, 100,000 shares of a new series of cumulative perpetual preferred stock of Occidental, with a face value of $100,000 per share (the "series A preferred stock"). The series A preferred stock has no maturity date and is generally non-voting (except with respect to issuances of senior stock and certain other transactions or modifications affecting the rights of the series A preferred stock). The series A preferred stock will rank senior to the outstanding shares of Occidental common stock with respect to the payment of dividends and distributions

in liquidation and has a liquidation price of 105% of the face value plus any accrued and unpaid dividends (whether or not declared). So long as any share of the series A preferred stock remains outstanding, Occidental may not declare or pay dividends on Occidental common stock and Occidental may not purchase, redeem or otherwise acquire for consideration any Occidental common stock unless all accrued and unpaid dividends on all outstanding shares of series A preferred stock have been, or are contemporaneously, declared and paid in full and Occidental has paid, or will contemporaneously pay, in full any portion of the redemption price required to be paid pursuant to the certificate of designations for the series A preferred stock. For more information about the series A preferred stock and the Berkshire Hathaway investment, see “The Merger-Financing of the Merger and Treatment of Existing Debt-Berkshire Hathaway Investment” beginning on page 90.

TABLE OF CONTENTS

## COMPARISON OF RIGHTS OF STOCKHOLDERS OF OCCIDENTAL AND ANADARKO

Both Occidental and Anadarko are incorporated under the laws of the State of Delaware and, accordingly, the rights of the stockholders of each are governed by the DGCL. Occidental will continue to be a Delaware corporation following completion of the merger and will be governed by the DGCL.

Upon completion of the merger, the Anadarko stockholders immediately prior to the effective time of the merger will become Occidental common stockholders. The rights of the former Anadarko stockholders and the Occidental stockholders will thereafter be governed by the DGCL and by Occidental's certificate of incorporation and Occidental's by-laws.

The following description summarizes certain of the material terms and differences between the rights of the stockholders of Occidental and Anadarko, but is not a complete statement of all such terms or differences, or a complete description of the specific provisions referred to in this summary. Stockholders should read carefully the relevant provisions of the DGCL and the respective certificates of incorporation and by-laws of Occidental and Anadarko. For more information on how to obtain the documents that are not attached to this proxy statement/prospectus, see "Where You Can Find More Information" beginning on page 167.

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| **Authorized Capital Stock** | The authorized capital stock of Occidental consists of 1,100,000,000 shares of common stock, par value $0.20 per share, and 50,000,000 shares of preferred stock, par value $1.00 per share. | The authorized capital stock of Anadarko consists of 1,000,000,000 shares of common stock, par value $0.10 per share, and 2,000,000 shares of preferred stock, par value $1.00 per share. |
| **Special Meetings of Stockholders; Action by Written Consent** | Under the DGCL, a special meeting of stockholders may be called by the board of directors or by any other person authorized to do so in the certificate of incorporation or by-laws. | |
| | Under Occidental's by-laws and certificate of incorporation, special meetings of stockholders may be called by the Occidental Board or the chairman of the Occidental Board. In addition, subject to certain procedural requirements contained in Occidental's certificate of incorporation and by-laws, special meetings of stockholders shall be called by the secretary of Occidental upon the written request of record holders of at least 25% of the outstanding common stock of Occidental.<br><br>Stockholders are permitted to take action without a meeting by written consent, subject to certain procedures specified in Occidental's certificate of incorporation and by-laws. | Under Anadarko's by-laws, special meetings of stockholders may only be called by a majority of the Anadarko Board, the chairman of the Anadarko Board or Anadarko's chief executive officer or president. Stockholders are not permitted to call special meetings.<br><br>Stockholders are not permitted to take action without a meeting by written consent. |
| **Stockholder Proposals and Nominations of Candidates for Election to the Board of Directors** | Occidental's by-laws generally allow stockholders who are record holders on the date of notice and on the record date for the determination of stockholders entitled to vote at such annual meeting to nominate candidates for election to the Occidental Board and propose other business to be brought before an annual meeting. | Anadarko's by-laws generally allow stockholders who are record holders on the date of notice and on the record date for the determination of stockholders entitled to vote at such annual meeting to nominate candidates for election to the Anadarko Board and propose other business to be brought before an annual meeting. |

TABLE OF CONTENTS

| Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|
| Such proposals (other than proposals included in the notice of meeting pursuant to Rule 14a-8 promulgated under the Exchange Act) and nominations, however, may only be brought by a stockholder who has given timely notice in proper written form to Occidental's secretary prior to the meeting. | Such proposals (other than proposals included in the notice of meeting pursuant to Rule 14a-8 promulgated under the Exchange Act) and nominations, however, may only be brought by a stockholder who has given timely notice in proper written form to Anadarko's secretary prior to the meeting. |
| In connection with an annual meeting, to be timely, notice of such proposals other than the election of directors must be received at the principal executive offices of Occidental not later than the 70th day nor earlier than the 90th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is not within 30 days of such date, notice by the stockholder must be delivered not later than the close of business on the 10th day following the day on which (i) such notice of the date of the annual meeting was mailed or (ii) such public disclosure was made, whichever first occurs.<br><br>In connection with an annual meeting, to be timely, notice of nominations of persons for election to the Occidental Board must be received at the principal executive offices of Occidental between September 1 and November 30 of the year preceding the annual meeting. The stockholder notice must also include specific information regarding the stockholder and the director nominee or business to be brought before the annual meeting, as described in Occidental's by-laws. | In connection with an annual meeting, to be timely, an Anadarko stockholder must deliver written notice by mail to Anadarko's secretary not later than the close of business on the 90th day and not earlier than the 120th day prior to the first anniversary date of the preceding year's annual meeting; provided, however, that if the date of the annual meeting is more than 30 days before or more than 60 days after the anniversary date of the preceding year's annual meeting, or if no annual meeting was held in the preceding year, the stockholder notice must be delivered no earlier than the close of business on the 120th day prior to the annual meeting and not later than the close of business on the later of (i) the 90th day prior to the annual meeting or (ii) if the first public announcement of the date of the annual meeting is less than 100 days prior to the date of the annual meeting, the 10th day following the day on which Anadarko publicly announces the date of the annual meeting. The stockholder notice must also include specific information regarding the stockholder and the director nominee or business to be brought before the annual meeting, as described in Anadarko's by-laws. |
| In addition, Occidental's by-laws permit any stockholder or group of up to 20 stockholders who have maintained continuous qualifying ownership of 3% or more of Occidental's outstanding common stock for at least three years to include up to a specified number of director nominees in Occidental's proxy materials for an annual meeting, subject to satisfying notice requirements and other conditions set forth in the by-laws. | In addition, Anadarko's by-laws permit any stockholder or group of up to 20 stockholders who have maintained continuous qualifying ownership of 3% or more of Anadarko's outstanding common stock for at least three years to include up to a specified number of director nominees in Anadarko's proxy materials for an annual meeting, subject to satisfying notice requirements and other conditions set forth in the by-laws. |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| | The maximum number of stockholder nominees permitted under such proxy access provisions of Occidental's by-laws is the greater of two or 20% of the number of Occidental's directors on the last day a notice of nomination may be submitted. Notice of a nomination under Occidental's proxy access by-law provisions must be submitted to the secretary of Occidental not later than the 120th day, nor earlier than the 150th day, prior to the anniversary of the date that Occidental mailed its proxy statement for the preceding year's annual meeting. If the date of the annual meeting is more than 30 days before or after the first anniversary date of the preceding year's annual meeting, notice by the stockholder must be given by the later of the close of business on the date that is (i) 180 days prior to such other meeting date or (ii) the 10th day following the date such other meeting date is first publicly announced or disclosed. | The maximum number of stockholder nominees permitted under such proxy access provisions of Anadarko's by-laws is the greater of two or 20% of the number of Anadarko's directors on the last day a notice of nomination may be submitted. Notice of a nomination under Anadarko's proxy access by-law provisions must be delivered by a stockholder to the secretary of Anadarko at its principal executive offices not later than the close of business on the 120th day, nor earlier than the close of business on the 150th day, prior to the first anniversary of the date the definitive proxy statement was first sent to stockholders in connection with the preceding year's annual meeting of stockholders. If the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be so delivered (i) not earlier than the close of business on the 150th day prior to such annual meeting and (ii) not later than the close of business on the later of (a) the 120th day prior to such annual meeting or (b) if the first public announcement of the date of such annual meeting is less than 100 days prior to the date of such annual meeting, the 10th day following the day on which Anadarko publicly announced the date of the annual meeting. |
| **Number of Directors** | The DGCL provides that the board of directors of a Delaware corporation must consist of one or more directors, with the number of directors fixed by or in the manner provided in the corporation's by-laws unless the certificate of incorporation fixes the number of directors. | |
| | Occidental's certificate of incorporation and by-laws provide that, subject to the rights, if any, of holders of preferred stock issued by Occidental to elect directors thereof, the Occidental Board will consist of one or more directors and the authorized number of directors will be determined from time to time by resolution adopted by the Occidental Board.<br><br>There are currently nine positions authorized and nine directors serving on the Occidental Board. | Anadarko's certificate of incorporation and by-laws provide that the number of directors will be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Anadarko Board.<br><br>There are currently 13 positions authorized and 13 directors serving on the Anadarko Board. |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| **Election of Directors** | The DGCL provides that, unless the certificate of incorporation or by-laws provide otherwise, directors will be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. | |
| | Occidental's by-laws provide that in an uncontested election, a director nominee is elected by a majority of the votes cast at an annual meeting at which a quorum is present; provided, however, that directors will be elected by a plurality of the votes cast at any meeting of the stockholders for which the number of nominees exceeds the number of directors to be elected. In an uncontested election, any nominee for director who receives a greater number of votes "against" his or her election than votes "for" such election must promptly tender his or her resignation following certification of the stockholder vote.<br><br>Holders of Occidental common stock do not have cumulative voting rights in the election of directors or otherwise.<br><br>Occidental does not have a classified board. Occidental's by-laws require that all directors be elected at each annual meeting of stockholders for a term of one year and until his or her successor is duly elected. | Anadarko's by-laws provide that in an uncontested election, a director nominee is elected if the votes cast for such nominee's election exceed the votes cast against such nominee's election at a meeting at which a quorum is present; provided, however, that if, as of the 10th day preceding the date Anadarko first mails its notice of meeting for such meeting to the stockholders, the number of nominees exceeds the number of directors to be elected, director nominees will be elected by a plurality of votes cast.<br><br>Anadarko's certificate of incorporation provides that directors will be elected by cumulative voting in any election on or after the date on which any 30% stockholder becomes a 30% stockholder, and until the time as no 30% stockholder exists. A 30% stockholder is defined in Anadarko's certificate of incorporation as any person, other than Anadarko, its subsidiaries or any Anadarko employee stock ownership/benefit plan, who beneficially owns 30% or more of the outstanding shares of Anadarko's voting stock or who, at any time within the two-year period immediately prior to the date in question, beneficially owned 30% or more of the then-outstanding shares of Anadarko's voting stock.<br><br>Anadarko does not have a classified board. Anadarko's certificate of incorporation requires that all directors be elected at each annual meeting of stockholders for a term expiring at the next annual meeting of stockholders. |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| **Removal of Directors; Vacancies** | Section 141(k) of the DGCL provides that any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors. | |
| | Occidental's by-laws and certificate of incorporation do not expressly provide for the removal of directors, and so Section 141(k) of the DGCL governs.<br><br>Vacancies resulting from any increase in the number of directors or from death, resignation, disqualification, removal or other cause may be filled by the affirmative vote of a majority of the directors then in office, even if less than a quorum. | Anadarko's certificate of incorporation provides that Anadarko stockholders may remove directors with or without cause by the affirmative vote of the holders of a majority of the shares then entitled to vote at an election of directors.<br><br>Vacancies resulting from any increase in the number of directors or from death, resignation, disqualification, removal or other cause may be filled solely by the affirmative vote of a majority of the directors then in office, even if less than a quorum. |
| **Limitation on Liability of Directors** | Occidental's certificate of incorporation provides that no director will be personally liable to Occidental or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to Occidental to its stockholders, (ii) for acts and omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of DGCL, which addresses liability of directors for unlawful payment of dividend or unlawful stock purchase or redemption, or (iv) for any transaction from which the director derived an improper benefit. | Anadarko's certificate of incorporation provides that no director will be personally liable to Anadarko or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to Anadarko or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, which addresses liability of directors for unlawful payment of dividend or unlawful stock purchase or redemption or (iv) for any transaction from which the director derived an improper benefit. |
| **Indemnification of Directors and Officers; Expenses** | Under the DGCL, a Delaware corporation may indemnify its present or former directors and officers against expenses (including attorneys' fees) actually and reasonably incurred to the extent that the officer or director has been successful on the merits or otherwise in defense of any action, suit or proceeding brought against him or her by reason of the fact that he or she is or was a director or officer of the corporation.<br><br>Delaware law provides that a corporation may indemnify its present and former directors, officers, employees and agents, as well as any individual serving with another corporation in that capacity at the corporation's request against expenses (including attorney's fees), judgments, fines and amounts paid in settlement of actions taken, if the individual acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interests of the corporation and, in the case of a criminal proceeding, the individual had no reasonable cause to believe the individual's conduct was unlawful; except that no indemnification may be paid for judgments and settlements in actions by or in the right of the corporation.<br><br>A corporation may not indemnify a current or former director or officer of the corporation against expenses to the extent the person is adjudged to be liable to the corporation unless a court approves the indemnity. | |

TABLE OF CONTENTS

| Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|
| Occidental's by-laws require Occidental to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal or administrative by reason of the fact that such person is or was a director, officer, employee or agent of Occidental, or is or was serving at the request of Occidental as a director, officer, manager, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust or other organization or enterprise, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, if such person acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of Occidental, and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful.<br><br>Occidental's by-laws provide that Occidental may advance expenses incurred by such person in connection with any such action, suit or proceeding prior to its final disposition upon receipt of an undertaking to repay any advanced amounts if it is ultimately determined that he or she is not entitled to be indemnified. | Anadarko's by-laws require Anadarko to indemnify any person who was or is a party or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal or administrative by reason of the fact that such person, or a person for whom he or she is the legal representative, (i) is or was a director or officer of Anadarko or, while a director or officer of Anadarko, is or was serving at Anadarko's request as a director, officer, manager, partner, employee or agent of another corporation partnership, limited liability company, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans (a "Covered Person") or (ii) is or was an employee of Anadarko or, while an employee of Anadarko, is or was serving at Anadarko's request as a director, officer, manager, partner, employee or agent of another corporation, partnership, limited liability company, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans (a "Covered Employee"), in each case, against all liability and loss suffered and expenses reasonably incurred by such Covered Person or Covered Employee.<br><br>Anadarko is required under its by-laws to advance expenses incurred by a Covered Person in connection with any such action, suit or proceeding prior to its final disposition so long as the person undertakes to repay any advanced amounts if it is ultimately determined that he or she is not entitled to be indemnified. The by-laws also permit Anadarko, in its discretion, to advance expenses incurred by a Covered Employee in connection with any such action, suit or proceeding prior to its final disposition upon such terms and conditions as Anadarko deems appropriate. |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| **Amendments to Certificate of Incorporation** | Occidental's certificate of incorporation provides that Occidental reserves the right to amend, alter, change or repeal any provision contained in the certificate of incorporation, in the manner prescribed by statute, and all rights conferred upon stockholders in the certificate of incorporation are granted subject to such reservation.<br><br>As provided under the DGCL, subject to limited exceptions, any amendment to Occidental's certificate of incorporation requires (i) the approval of the Occidental Board, (ii) the approval of a majority of the voting power of the outstanding stock entitled to vote upon the proposed amendment and (iii) the approval of the holders of a majority of the outstanding stock of each class entitled to vote thereon as a class, if any. | Anadarko's certificate of incorporation may be amended if the change is proposed by the Anadarko Board and approved by the holders of a majority of outstanding voting stock. However, the vote of at least 80% of the votes entitled to be cast by the holders of all outstanding shares of voting stock is required to amend various provisions of Anadarko's certificate of incorporation, including provisions relating to: (i) the number of directors constituting the Anadarko Board, (ii) the classification of the Anadarko Board, (iii) the removal of directors, (iv) the procedures for filling vacancies on the Anadarko Board, (v) the liability of directors for monetary damages for breach of fiduciary duty, (vi) certain business combinations with any interested stockholder, (vii) the cumulative voting for election of directors upon a 30% stockholder becoming a 30% stockholder and (viii) the prohibitions on stockholder action by written consent. |
| **Amendments to By-laws** | Occidental's certificate of incorporation provides that the Occidental by-laws may be adopted, amended or repealed by the affirmative vote of the majority of the Occidental Board. In addition, Section 109 of the DGCL provides that stockholders have the power to adopt, amend or repeal by-laws. | Anadarko's certificate of incorporation and by-laws provide that the by-laws generally may be amended (i) at any regular or special meeting of Anadarko stockholders by the affirmative vote of the holders of a majority in voting power of the shares of capital stock of Anadarko issued and outstanding and entitled to vote thereat or (ii) by the affirmative vote of a majority of the Anadarko Board. |
| **Certain Business Combinations** | Section 203 of the DGCL prohibits a Delaware corporation from engaging in a business combination with a stockholder acquiring more than 15% but less than 85% of the corporation's outstanding voting stock for three years following the time that person becomes an "interested stockholder", unless prior to such date the board of directors approves either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder or the business combination is approved by the board of directors and by the affirmative vote of at least two-thirds of the outstanding voting stock that is not owned by the interested stockholder or certain other exceptions are met. The DGCL allows a corporation's certificate of incorporation to contain a provision expressly electing not to be governed by Section 203. | |
| | Occidental's certificate of incorporation does not contain a provision electing not to be governed by Section 203, and so Occidental is subject to such provision. | Anadarko's certificate of incorporation does not contain a provision electing not to be governed by Section 203, and so Anadarko is subject to such provision. |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| | | In addition, Anadarko's certificate of incorporation provides that, with some exceptions, a business combination with a person, other than Anadarko, its subsidiaries or any Anadarko employee stock ownership/benefit plan, that is the beneficial owner of voting stock representing 5% or more of the votes entitled to be cast by the holders of all outstanding voting stock, or who was at any point within the two-year period immediately prior to the date in question, requires the affirmative vote of at least 80% of the votes entitled to be cast by the holders of all outstanding voting stock. |
| **Stockholder Rights Plan** | Occidental currently does not have a stockholder rights plan. | Anadarko currently does not have a stockholder rights plan. |
| **Forum Selection** | Occidental's by-laws provide that, unless Occidental consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if and only if the Court of Chancery lacks subject matter jurisdiction, any state court located within the State of Delaware or, if and only if all such state courts lack subject matter jurisdiction, the federal district court for the District of Delaware) will, to the fullest extent permitted by law, be the sole and exclusive forum for any derivative action, action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or stockholder of Occidental to Occidental or its stockholders, action asserting a claim arising pursuant to, or seeking to enforce any right, obligation or remedy under, the DGCL, Occidental's certificate of incorporation or Occidental's by-laws (as each may be amended from time to time), action to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware or action asserting a claim governed by the internal affairs doctrine. | Anadarko's by-laws provide that, unless Anadarko consents in writing to the selection of an alternative forum, the sole and exclusive forum for any derivative action, action asserting a claim for or based on a breach of a fiduciary duty owed by any current or former director or officer or other employee of Anadarko to Anadarko or Anadarko's stockholders, including a claim alleging the aiding and abetting of such a breach of fiduciary duty, action asserting a claim against Anadarko or any current or former director or officer or other employee of Anadarko arising pursuant to the DGCL or Anadarko's certificate of incorporation or Anadarko's by-laws (as either may be amended from time to time), action asserting a claim related to or involving Anadarko that is governed by the internal affairs doctrine or action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL will be a state court within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware). |

TABLE OF CONTENTS

| | Rights of Occidental Stockholders | Rights of Anadarko Stockholders |
|---|---|---|
| | Any person or entity purchasing or otherwise acquiring or holding or owning (or continuing to hold or own) any interest in Occidental common stock is deemed to have received notice of and consented to the foregoing forum selection by-law, which could limit Occidental stockholders' ability to choose the judicial forum for disputes with Occidental. The enforceability of similar forum clauses in other companies' by-laws or similar governing documents has been challenged in legal proceedings, and it is possible that in connection with any action a court could find the forum selection clause contained in Occidental's by-laws to be inapplicable or unenforceable in such action. | The enforceability of similar forum clauses in other companies' by-laws or similar governing documents has been challenged in legal proceedings, and it is possible that in connection with any action a court could find the forum selection clause contained in Anadarko's by-laws to be inapplicable or unenforceable in such action. |

TABLE OF CONTENTS

## VALIDITY OF COMMON STOCK

The validity of the Occidental common stock to be issued in the merger will be passed upon for Occidental by Cravath, Swaine & Moore LLP.

## EXPERTS

The consolidated financial statements of Occidental Petroleum Corporation and subsidiaries as of December 31, 2018 and 2017, and for each of the years in the three-year period ended December 31, 2018, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2018 have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered public accounting firm, and upon the authority of said firm as experts in accounting and auditing.

The consolidated financial statements of Anadarko Petroleum Corporation and subsidiaries as of December 31, 2018 and 2017, and for each of the years in the three-year period ended December 31, 2018, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2018 have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered public accounting firm, and upon the authority of said firm as experts in accounting and auditing. The audit report covering the December 31, 2018 consolidated financial statements refers to a change in the method of accounting for revenue recognition in 2018.

Certain information with respect to the oil and gas reserves associated with Occidental's oil and gas properties is confirmed in the process review letter of Ryder Scott Company, L.P., independent petroleum engineering consultants, and has been incorporated by reference into this document, upon the authority of said firm as experts with respect to the matters covered by such process review letter and in giving such process review letter.

Certain information with respect to the oil and gas reserves associated with Anadarko's oil and gas properties is confirmed in the procedures and methods review letter of Miller and Lents, Ltd., an independent petroleum consulting firm, and has been incorporated by reference into this document, upon the authority of said firm as experts with respect to the matters covered by such procedures and methods review letter and in giving such procedures and methods review letter.

## STOCKHOLDER PROPOSALS AND NOMINATIONS FOR ANADARKO'S 2019 ANNUAL MEETING OF STOCKHOLDERS

If the transaction is completed in 2019, Anadarko will become an indirect wholly owned subsidiary of Occidental and, consequently, will not hold an annual meeting of its stockholders in 2019. If the transaction is not adopted by the requisite vote of the Anadarko stockholders or if the merger is not completed for any other reason, Anadarko intends to hold an annual meeting of its stockholders in 2019 (the "Anadarko 2019 annual meeting"). The Anadarko 2019 annual meeting has been indefinitely postponed by the Anadarko Board pending the outcome of the merger.

Stockholder proposals submitted for inclusion in Anadarko's proxy statement and proxy card for the Anadarko 2019 annual meeting pursuant to Rule 14a-8 promulgated under the Exchange Act would have to have been received by Anadarko's corporate secretary no later than November 30, 2018 if the Anadarko 2019 annual meeting were to be held within 30 days of May 15, 2019. However, given the pendency of the merger, Anadarko does not currently expect to hold the Anadarko 2019 annual meeting more than 30 days before or after May 15, 2019, and, accordingly, such stockholder proposals will have to be received by Anadarko a reasonable time before Anadarko begins to print and send its proxy materials for the Anadarko 2019 annual meeting.

If the Anadarko 2019 annual meeting occurs, the Anadarko by-laws allow Anadarko stockholders of record to present proposals that are proper subjects for consideration at an annual meeting and/or nominate persons to serve on the Anadarko Board at an annual meeting or special meeting of Anadarko stockholders at which directors are to be elected. The Anadarko by-laws require all stockholders who intend to make such proposals or nominations at an annual stockholder meeting or special stockholder meeting to provide a written notice, including the information specified in the Anadarko by-laws, to Anadarko's corporate secretary not earlier than the close of business on the 120th day and not later than the 90th day prior to the first anniversary of the preceding year's annual meeting of Anadarko stockholders. To be eligible for consideration at the Anadarko 2019 annual meeting, notices would have to have been received by Anadarko between January 15, 2019 and

TABLE OF CONTENTS

February 14, 2019. In the event that the Anadarko 2019 annual meeting is scheduled to be held on or after July 15, 2019, such stockholder notice to be timely must be so delivered not earlier than the close of business on the 120th day prior to the date of such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or, if the first public announcement of the date of such annual meeting is less than 100 days prior to the date of such annual meeting, the 10th day following the day on which public announcement of the date of such meeting is first made by Anadarko.

In addition, the Anadarko by-laws permit any stockholder or group of up to 20 stockholders who have maintained continuous qualifying ownership of 3% or more of the outstanding Anadarko common stock for at least three years as of the date of the stockholder notice, and thereafter continue to own such required shares through such annual meeting of stockholders, to include up to a specified number of director nominees in Anadarko's proxy materials for an annual meeting. To be eligible for consideration at the Anadarko 2019 annual meeting, notice of a nomination under Anadarko's proxy access by-law provisions would have to have been delivered by a stockholder to Anadarko's corporate secretary not later than the close of business on the 120th day, nor earlier than the close of business on the 150th day, prior to the first anniversary of the date the proxy statement was first sent to stockholders in connection with the preceding year's annual meeting. In the event that Anadarko is required to hold a 2019 annual meeting, if the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be so delivered not earlier than the close of business on the 150th day prior to the Anadarko 2019 annual meeting and not later than the close of business on the later of the 120th day prior to the Anadarko 2019 annual meeting or, if the first public announcement of the date of the Anadarko 2019 annual meeting is less than 100 days prior to the date of such meeting, the 10th day following the day on which Anadarko publicly announces the date of the Anadarko 2019 annual meeting.

TABLE OF CONTENTS

## HOUSEHOLDING OF PROXY STATEMENT/PROSPECTUS

The SEC has adopted rules that permit companies and intermediaries such as brokers to satisfy delivery requirements for proxy statements and annual reports with respect to two or more stockholders sharing the same address by delivering a single proxy statement or annual report, as applicable, addressed to those stockholders. As permitted by the Exchange Act, only one copy of this proxy statement/prospectus is being delivered to stockholders residing at the same address, unless stockholders have notified Anadarko of their desire to receive multiple copies of the proxy statement/prospectus. This process, which is commonly referred to as "householding", potentially provides extra convenience for stockholders and cost savings for companies. If, at any time, you no longer wish to participate in householding and would prefer to receive a separate proxy statement/prospectus, or if you are receiving multiple copies of this proxy statement/prospectus and wish to receive only one, please contact Anadarko at its address identified below. Anadarko will promptly deliver, upon oral or written request, a separate copy of this proxy statement/prospectus to any stockholder residing at an address to which only one copy was mailed. Requests for additional copies should be directed to Investor Relations, Anadarko Petroleum Corporation, 1201 Lake Robbins Drive, The Woodlands, Texas 77380, or contact Anadarko Investor Relations by telephone at 832-636-1000 or by email at investor@anadarko.com.

TABLE OF CONTENTS

## WHERE YOU CAN FIND MORE INFORMATION

Occidental and Anadarko file annual, quarterly and current reports, proxy statements and other information with the SEC. You may access this information at the SEC's internet website that contains reports, proxy statements and other information regarding issuers, including Occidental and Anadarko, who file electronically with the SEC. The address of that site is *www.sec.gov*. The information contained on the SEC's website is not incorporated by reference into this proxy statement/prospectus.

Occidental has filed with the SEC a registration statement on Form S-4 of which this proxy statement/prospectus forms a part. The registration statement registers the shares of Occidental common stock to be issued to Anadarko stockholders in connection with the merger. The registration statement, including the attached exhibits and annexes, contains additional relevant information about Occidental and Anadarko, respectively. The rules and regulations of the SEC allow Occidental and Anadarko to omit certain information included in the registration statement from this proxy statement/prospectus.

In addition, the SEC allows Occidental and Anadarko to disclose important information to you by referring you to other documents filed separately with the SEC. This information is considered to be a part of this proxy statement/prospectus, except for any information that is superseded by information included directly in this proxy statement/prospectus or incorporated by reference subsequent to the date of this proxy statement/prospectus as described below.

This proxy statement/prospectus incorporates by reference the documents listed below that Occidental and Anadarko have previously filed with the SEC. They contain important information about the companies and their financial condition.

**Occidental SEC Filings**

- Annual report on Form 10-K for the year ended December 31, 2018;
- Definitive proxy statement on Schedule 14A for the 2019 annual meeting of stockholders;
- Quarterly report on Form 10-Q for the quarter ended March 31, 2019;
- Current reports on Form 8-K filed on April 24, 2019, May 3, 2019, May 6, 2019 (Film No.: 19798226), May 6, 2019 (Film No.: 19797991), May 10, 2019 (Film No.: 19813015) and May 10, 2019 (Film No.: 19815863) (other than the portions of those documents not deemed to be filed pursuant to the rules promulgated under the Exchange Act); and
- The description of Occidental common stock contained in the registration statement on Form 8-B dated June 26, 1986 (as amended by Form 8, dated December 22, 1986, Form 8, dated February 3, 1988, Form 8-B/A, dated July 12, 1993, Form 8-B/A, dated March 21, 1994, and Form 8-B/A, dated November 2, 1995, and including any amendment or report filed with the SEC for the purpose of updating this description).

**Anadarko SEC Filings**

- Annual report on Form 10-K for the year ended December 31, 2018;
- Definitive proxy statement on Schedule 14A for the 2019 annual meeting of stockholders (which meeting has been postponed indefinitely);
- Quarterly report on Form 10-Q for the quarter ended March 31, 2019;
- Current reports on Form 8-K filed on February 19, 2019, April 12, 2019, April 17, 2019, May 10, 2019 and May 15, 2019 (other than the portions of those documents not deemed to be filed pursuant to the rules promulgated under the Exchange Act); and
- The description of the Anadarko common stock contained in Anadarko's registration statement on Form S-3ASR filed with the SEC on February 21, 2019 under the heading "Description of Capital Stock—Common Stock" (including any amendment or report filed with the SEC for the purpose of updating this description).

TABLE OF CONTENTS

To the extent that any information contained in any report on Form 8-K, or any exhibit thereto, was furnished to, rather than filed with, the SEC, such information or exhibit is specifically not incorporated by reference.

In addition, Occidental and Anadarko incorporate by reference any future filings they make with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act after the date of this proxy statement/prospectus and before the date of the special meeting (excluding any current reports on Form 8-K to the extent disclosure is furnished and not filed). Those documents are considered to be a part of this proxy statement/prospectus, effective as of the date they are filed. In the event of conflicting information in these documents, the information in the latest filed document should be considered correct.

You can obtain any of the other documents listed above from the SEC, through the SEC's website at the address indicated above, or from Occidental or Anadarko, as applicable, by requesting them in writing or by telephone as follows:

| | |
|---|---|
| Occidental Petroleum Corporation<br>Attention: Corporate Secretary<br>5 Greenway Plaza, Suite 110<br>Houston, Texas 77046<br>Telephone: (713) 215-7000 | Anadarko Petroleum Corporation<br>Attention: Corporate Secretary<br>1201 Lake Robbins Drive<br>The Woodlands, Texas 77380<br>Telephone: (832) 636-1000 |

These documents are available from Occidental or Anadarko, as the case may be, without charge, excluding any exhibits to them unless the exhibit is specifically listed as an exhibit to the registration statement of which this proxy statement/prospectus forms a part. You can also find information about Occidental and Anadarko at their internet websites at *www.oxy.com* and *www.anadarko.com*, respectively. Information contained on these websites does not constitute part of this proxy statement/prospectus.

You may also obtain documents incorporated by reference into this document by requesting them in writing or by telephone from Innisfree or Morrow, Anadarko's proxy solicitors, at the following addresses and telephone numbers:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, NY 10022
Stockholders in the U.S. and Canada may call toll free: (877) 456-3524
Stockholders in other locations may call direct: (412) 232-3651
Banks and brokers may call collect: (212) 750-5833

or

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Phone: (203) 658-9400

If you are a stockholder of Anadarko and would like to request documents, please do so by August 1, 2019 to receive them before the special meeting. If you request any documents from Occidental or Anadarko, Occidental or Anadarko, as applicable, will mail them to you by first class mail, or another equally prompt means, within one business day after Occidental or Anadarko, as the case may be, receives your request.

This proxy statement/prospectus is a prospectus of Occidental and a proxy statement of Anadarko for the special meeting. Neither Occidental nor Anadarko has authorized anyone to give any information or make any representation about the merger or Occidental or Anadarko that is different from, or in addition to, that contained in this proxy statement/prospectus or in any of the materials that Occidental or Anadarko has incorporated by reference into this proxy statement/prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this document or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this document does not extend to you. This proxy statement/prospectus is dated July 11, 2019. You should not assume that the information is accurate as of any date other than that date, and neither its mailing to Anadarko stockholders nor the issuance of shares of Occidental common stock in the merger will create any implication to the contrary.

TABLE OF CONTENTS

**Annex A**
**EXECUTION VERSION**

AGREEMENT AND PLAN OF MERGER

dated as of

May 9, 2019

among

OCCIDENTAL PETROLEUM CORPORATION,

BASEBALL MERGER SUB 1, INC.

and

ANADARKO PETROLEUM CORPORATION

TABLE OF CONTENTS

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | ARTICLE I<br>THE MERGER | |
| Section 1.1 | The Merger | A-1 |
| Section 1.2 | Certificate of Incorporation and By-Laws of the Surviving Corporation | A-2 |
| Section 1.3 | Directors and Officers of the Surviving Corporation | A-2 |
| Section 1.4 | Effect on Capital Stock | A-2 |
| Section 1.5 | Dissenting Shares | A-3 |
| Section 1.6 | Stock Options and Equity Awards | A-4 |
| | ARTICLE II<br>EXCHANGE OF CERTIFICATES | |
| Section 2.1 | Surrender and Payment | A-5 |
| Section 2.2 | Fractional Shares | A-7 |
| Section 2.3 | Lost Certificates | A-7 |
| Section 2.4 | Withholding Rights | A-7 |
| | ARTICLE III<br>REPRESENTATIONS AND WARRANTIES OF THE COMPANY | |
| Section 3.1 | Corporate Existence and Power | A-8 |
| Section 3.2 | Corporate Authorization | A-9 |
| Section 3.3 | Governmental Authorization | A-9 |
| Section 3.4 | Non-Contravention | A-9 |
| Section 3.5 | Capitalization | A-10 |
| Section 3.6 | Subsidiaries | A-10 |
| Section 3.7 | SEC Filings | A-12 |
| Section 3.8 | Financial Statements | A-13 |
| Section 3.9 | Disclosure Documents | A-13 |
| Section 3.10 | Controls and Procedures | A-13 |
| Section 3.11 | Absence of Certain Changes | A-14 |
| Section 3.12 | No Undisclosed Material Liabilities | A-14 |
| Section 3.13 | Litigation | A-14 |
| Section 3.14 | Taxes | A-14 |
| Section 3.15 | Employee Benefit Plans; Employment | A-15 |
| Section 3.16 | Compliance with Laws | A-17 |
| Section 3.17 | Regulatory Matters | A-17 |
| Section 3.18 | Environmental Matters | A-18 |
| Section 3.19 | Title to Properties | A-19 |
| Section 3.20 | Hydrocarbon Contracts | A-20 |
| Section 3.21 | Material Contracts | A-20 |
| Section 3.22 | Intellectual Property | A-21 |
| Section 3.23 | Confidentiality and Other Agreements | A-22 |
| Section 3.24 | Brokers; Financial Advisors | A-22 |
| Section 3.25 | Opinions of Financial Advisors | A-22 |
| Section 3.26 | Takeover Statutes | A-22 |
| Section 3.27 | Termination of Chevron Agreement | A-22 |
| Section 3.28 | No Additional Representations | A-22 |

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| | ARTICLE IV<br><br>REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUBSIDIARY | |
| Section 4.1 | Corporate Existence and Power | A-23 |
| Section 4.2 | Corporate Authorization | A-24 |
| Section 4.3 | Governmental Authorization | A-24 |
| Section 4.4 | Non-Contravention | A-24 |
| Section 4.5 | Capitalization | A-25 |
| Section 4.6 | SEC Filings | A-25 |
| Section 4.7 | Financial Statements | A-26 |
| Section 4.8 | Disclosure Documents | A-26 |
| Section 4.9 | Controls and Procedures | A-26 |
| Section 4.10 | Absence of Certain Changes | A-27 |
| Section 4.11 | No Undisclosed Material Liabilities | A-27 |
| Section 4.12 | Litigation | A-28 |
| Section 4.13 | Compliance with Laws | A-28 |
| Section 4.14 | Regulatory Matters | A-28 |
| Section 4.15 | Financing | A-29 |
| Section 4.16 | Capitalization of Merger Subsidiary | A-30 |
| Section 4.17 | [Reserved] | A-30 |
| Section 4.18 | Ownership of Company Common Stock | A-30 |
| Section 4.19 | No Additional Representations | A-30 |
| | ARTICLE V<br><br>COVENANTS OF THE COMPANY | |
| Section 5.1 | Conduct of the Company | A-31 |
| Section 5.2 | Company Stockholder Meeting; Proxy Material | A-34 |
| Section 5.3 | Resignation of Company Directors | A-37 |
| Section 5.4 | Other Actions | A-37 |
| | ARTICLE VI<br><br>COVENANTS OF PARENT | |
| Section 6.1 | Conduct of Parent | A-37 |
| Section 6.2 | Obligations of Merger Subsidiary | A-37 |
| Section 6.3 | Director and Officer Liability | A-38 |
| Section 6.4 | Form S-4 | A-39 |
| Section 6.5 | Stock Exchange Listing | A-39 |
| Section 6.6 | Employee Benefits | A-39 |
| | ARTICLE VII<br><br>COVENANTS OF PARENT AND THE COMPANY | |
| Section 7.1 | Best Efforts | A-41 |
| Section 7.2 | Certain Filings | A-42 |
| Section 7.3 | Access to Information | A-42 |
| Section 7.4 | [Reserved] | A-43 |
| Section 7.5 | Public Announcements | A-43 |

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Section 7.6 | Further Assurances | A-43 |
| Section 7.7 | Notices of Certain Events | A-43 |
| Section 7.8 | No Solicitation | A-43 |
| Section 7.9 | Takeover Statutes | A-45 |
| Section 7.10 | Section 16(b) | A-45 |
| Section 7.11 | Coordination of Quarterly Dividends | A-45 |
| Section 7.12 | Stock Exchange Delisting; Deregistration | A-46 |
| Section 7.13 | Financing | A-46 |
| Section 7.14 | Transaction Litigation | A-50 |
| | ARTICLE VIII<br><br>CONDITIONS TO THE MERGER | |
| Section 8.1 | Conditions to the Obligations of Each Party | A-50 |
| Section 8.2 | Additional Conditions to the Obligations of Parent and Merger Subsidiary | A-51 |
| Section 8.3 | Additional Conditions to the Obligations of the Company | A-51 |
| Section 8.4 | Frustration of Closing Conditions | A-52 |
| | ARTICLE IX<br><br>TERMINATION | |
| Section 9.1 | Termination | A-52 |
| Section 9.2 | Effect of Termination | A-53 |
| | ARTICLE X<br><br>MISCELLANEOUS | |
| Section 10.1 | Notices | A-53 |
| Section 10.2 | Non-Survival of Representations and Warranties | A-54 |
| Section 10.3 | Amendments; No Waivers | A-54 |
| Section 10.4 | Expenses | A-54 |
| Section 10.5 | Termination Fees | A-55 |
| Section 10.6 | Successors and Assigns | A-55 |
| Section 10.7 | Governing Law | A-55 |
| Section 10.8 | Enforcement; Jurisdiction | A-56 |
| Section 10.9 | Waiver of Jury Trial | A-56 |
| Section 10.10 | Counterparts; Effectiveness | A-56 |
| Section 10.11 | Entire Agreement | A-56 |
| Section 10.12 | Captions | A-56 |
| Section 10.13 | Severability | A-57 |
| Section 10.14 | Interpretation | A-57 |

EXHIBITS

Exhibit A-Form of Certificate of Incorporation of Merger Subsidiary

TABLE OF CONTENTS

## DEFINED TERMS


| Term | Section |
|---|---|
| Acquisition Proposal | 7.8(b) |
| Affected Employees | 6.6(b) |
| Agreement | Preamble |
| Alternative Commitment Letter(s) | 7.13(d) |
| Alternative Financing | 7.13(d) |
| Anti-Corruption Laws | 3.17(d)(i) |
| Anti-Discrimination Laws | 3.15(i) |
| Antitrust Laws | 7.1(b)(ii) |
| Bank of America | 4.15(a) |
| Book-Entry Shares | 1.4(b) |
| Brokers and Finders Fees | 3.24 |
| Cancelled Shares | 1.4(d) |
| Cap Amount | 6.3(d) |
| Capital Budget | 5.1(g) |
| CERCLA | 3.18(b) |
| Certificate | 1.4(b) |
| Certificate of Merger | 1.1(b) |
| Change in Control | 6.6(a) |
| Change in the Company Recommendation | 5.2(a) |
| Chevron | Recitals |
| Chevron Agreement | Recitals |
| Chevron Termination Fee | Recitals |
| Citi | 4.15(a) |
| Closing | 1.1(d) |
| Closing Date | 1.1(d) |
| Code | 1.6(c) |
| Commitment Letters | 4.15(a) |
| Committed Financing | 4.15(a) |
| Common Shares Trust | 2.2(b) |
| Company | Preamble |
| Company 10-K | 3.7(a) |
| Company Balance Sheet | 3.8 |
| Company Balance Sheet Date | 3.8 |
| Company Benefit Plans | 3.15(a) |
| Company By-Laws | 3.1 |
| Company Capital Stock | 3.5 |
| Company Charter | 3.1 |
| Company Common Stock | Recitals |
| Company Credit Agreement | 5.1(l) |
| Company Deferred Stock Award | 1.6(e) |
| Company Disclosure Schedules | III |
| Company Environmental Permits | 3.18(a) |
| Company Intellectual Property | 3.22(a) |
| Company Material Adverse Effect | 3.1 |
| Company Pension Plan | 3.15(e) |
| Company Preferred Stock | 3.5 |
| Company Proxy Statement | 3.9(a) |
| Company PU Award | 1.6(c) |
| Company Recommendation | 5.2(f) |

TABLE OF CONTENTS


| Term | Section |
|---|---|
| Company RS Award | 1.6(d) |
| Company RSU Award | 1.6(b) |
| Company SEC Documents | 3.7(a) |
| Company Securities | 3.5 |
| Company Stock Option | 1.6(a) |
| Company Stockholder Approval | 3.2(a) |
| Company Stockholder Meeting | 5.2(f) |
| Company Subsidiary Securities | 3.6(b) |
| Confidentiality Agreement | 7.3 |
| Contract | 3.21(a) |
| Creditors' Rights | 3.2(a) |
| De Minimis Inaccuracies | 8.2(a) |
| Debt Commitment Letters | 4.15(a) |
| Debt Fee Letters | 4.15(a) |
| Delaware Court | 10.8 |
| DGCL | Recitals |
| Dissenting Share | 1.5 |
| Economic Sanctions/Trade Laws | 3.17(d)(ii) |
| Effect | 3.1 |
| Effective Time | 1.1(b) |
| End Date | 9.1(b)(i) |
| Environmental Laws | 3.18(b) |
| Equity Investment | 4.15(c) |
| Equity Purchase Agreement | 4.15(c) |
| ERISA | 3.15(a) |
| ERISA Affiliate | 3.15(d) |
| Excess Shares | 2.2(a) |
| Exchange Act | 3.3 |
| Exchange Agent | 2.1(a) |
| Exchange Ratio | 1.4(a) |
| Exchange Ratio Reduction Number | 1.4(f) |
| Exercise Price | 1.6(a) |
| Financial Advisors | 3.24 |
| Financing | 7.13(g) |
| Financing Sources | 9.2 |
| Foreign Company Benefit Plan | 3.15(a) |
| Form S-4 | 4.8(a) |
| GAAP | 3.8 |
| Government Official | 3.17(a) |
| Hazardous Substance | 3.18(b) |
| HSR Act | 3.3 |
| Hydrocarbon Contract | 3.20(a) |
| Hydrocarbons | 3.20(a) |
| Indemnified Liabilities | 6.3(a) |
| Indemnified Persons | 6.3(a) |
| Intellectual Property | 3.22(a) |
| Intervening Event | 5.2(b)(ii) |
| Intervening Event Match Period | 5.2(b)(ii) |
| Intervening Event Notice | 5.2(b)(ii) |
| knowledge | 3.10(e) |

TABLE OF CONTENTS


| Term | Section |
|---|---|
| Lien | 3.4 |
| Material Contract | 3.21(b) |
| Measurement Date | 3.5 |
| Merger | Recitals |
| Merger Consideration | 1.4(a) |
| Merger Subsidiary | Preamble |
| MLP | 3.6(a) |
| MLP 10-K | 3.7(b) |
| MLP Balance Sheet | 3.8 |
| MLP Common Units | 3.6(c) |
| MLP Partnership Agreement | 3.6(c) |
| MLP Partnership Interests | 3.6(c) |
| MLP SEC Documents | 3.7(b) |
| MLP Securities | 3.6(c) |
| Money Laundering Laws | 3.17(d)(iii) |
| NYSE | 1.4(f) |
| OFAC | 3.17(d)(ii) |
| Operating Partnership | 3.6(a) |
| Option Consideration | 1.6(a) |
| Original Financing Failure | 7.13(d) |
| Parent | Preamble |
| Parent 10-K | 4.6(a) |
| Parent Balance Sheet | 4.7 |
| Parent Balance Sheet Date | 4.7 |
| Parent Closing Price | 1.6(a) |
| Parent Common Stock | Recitals |
| Parent Common Stock Issuance | Recitals |
| Parent Disclosure Schedules | IV |
| Parent Material Adverse Effect | 4.1 |
| Parent Measurement Date | 4.5 |
| Parent Preferred Stock | 4.5 |
| Parent SEC Documents | 4.6(a) |
| Parent Securities | 4.5 |
| Parent Stock/Cash Award | 1.6(d) |
| Parent Stock/Cash Unit Award | 1.6(b) |
| PATRIOT Act | 7.13(g) |
| Payor | 10.5(c) |
| Per Share Cash Amount | 1.4(a) |
| Permitted Commitment Reductions | 7.13(b) |
| Person | 2.1(c) |
| Personal Data | 3.22(b) |
| Privacy Policies | 3.22(b) |
| Proceeding | 6.3(a) |
| RCRA | 3.18(b) |
| Recipient | 10.5(c) |
| Release | 3.18(b) |
| Sanctions Target | 3.17(d)(iv) |
| Sarbanes-Oxley Act | 3.10(a) |
| SEC | 1.6(g) |
| Securities Act | 3.3 |

TABLE OF CONTENTS


| Term | Section |
|---|---|
| Share Cap | 1.4(f) |
| Significant Subsidiaries | 3.6(a) |
| Subsidiary | 3.6(a) |
| Substantial Detriment | 7.1(c) |
| Substitute Commitment Letter(s) | 7.13(c) |
| Substitute Financing | 7.13(c) |
| Superior Proposal | 7.8(b) |
| Superior Proposal Match Period | 5.2(b)(i) |
| Superior Proposal Notice | 5.2(b)(i) |
| Surviving Corporation | 1.1(a) |
| Tax Proceeding | 3.14 |
| Tax Returns | 3.14 |
| Taxes | 3.14 |
| Termination Fee | 10.5(a)(ii) |
| Transaction Litigation | 7.14 |
| Transaction Uses | 4.15(g) |
| Transactions | Recitals |
| WES GP | 3.6(a) |
| WES GP Interest | 3.6(c) |

TABLE OF CONTENTS

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement") dated as of May 9, 2019 is by and among Occidental Petroleum Corporation, a Delaware corporation ("Parent"), Baseball Merger Sub 1, Inc., a newly formed Delaware corporation and an indirect, wholly-owned Subsidiary of Parent ("Merger Subsidiary"), and Anadarko Petroleum Corporation, a Delaware corporation (the "Company").

**W I T N E S S E T H:**

WHEREAS, it is proposed that, upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Merger Subsidiary will be merged with and into the Company (the "Merger") in accordance with the applicable provisions of the Delaware General Corporation Law (the "DGCL"), with the Company surviving the Merger as the Surviving Corporation (as defined below) and an indirect, wholly-owned subsidiary of Parent;

WHEREAS, the Board of Directors of Parent, at a meeting duly called and held on or prior to the date hereof, has unanimously (a) determined that this Agreement and the issuance of the shares of common stock of Parent, par value $0.20 per share ("Parent Common Stock"), pursuant to this Agreement (the "Parent Common Stock Issuance") and the other transactions contemplated hereby (the "Transactions"), are fair to, and in the best interests of, Parent and Parent's stockholders and (b) approved and declared advisable this Agreement and the Transactions;

WHEREAS, the Board of Directors of the Company, at a meeting duly called and held on or prior to the date hereof, has unanimously (a) determined that this Agreement and the transactions contemplated hereby (including the Merger) are fair to and in the best interests of the Company's stockholders, (b) approved and declared advisable this Agreement and the transactions contemplated hereby (including the Merger), (c) directed that the adoption of this Agreement be submitted to a vote at a meeting of the holders of shares of common stock, par value $0.10 per share, of the Company (the "Company Common Stock") and (d) resolved (subject to Section 5.2) to recommend the adoption of this Agreement by the holders of Company Common Stock;

WHEREAS, the Board of Directors of Merger Subsidiary has by unanimous vote (a) determined that this Agreement and the Transactions are fair to, and in the best interests of, Merger Subsidiary's sole stockholder, (b) approved and declared advisable this Agreement and the Transactions and (c) submitted this Agreement to the sole stockholder of Merger Subsidiary for adoption thereby and recommended that such sole stockholder approve and adopt this Agreement and the Transactions; and

WHEREAS, prior to the execution and delivery of this Agreement, the Company has paid to Chevron Corporation ("Chevron") the $1,000,000,000 termination fee (the "Chevron Termination Fee") payable pursuant to Section 9.1(f) and Section 10.5(iii) of the Agreement and Plan of Merger, dated as of April 11, 2019 (the "Chevron Agreement"), by and among Chevron, a Delaware corporation, Justify Merger Sub 1 Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Chevron, Justify Merger Sub 2 Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Chevron, and the Company.

NOW, THEREFORE, in consideration of the promises and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER

Section 1.1 The Merger.

(a) Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time (as defined below), Merger Subsidiary shall be merged with and into the Company in accordance with the requirements of the DGCL, whereupon the separate existence of Merger Subsidiary shall cease, and the Company shall be the surviving corporation in the Merger (the "Surviving Corporation"), such that following the Merger, the Surviving Corporation will be an indirect, wholly-owned subsidiary of Parent.

(b) On the Closing Date, immediately after the Closing, the Company will file a certificate of merger with respect to the Merger with the Secretary of State of the State of Delaware (the "Certificate of Merger") and the parties shall make all other filings or recordings required by the DGCL in connection with the Merger. The

TABLE OF CONTENTS

Merger shall become effective at such time as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware or at such later time as Parent and the Company may agree and is specified in the Certificate of Merger (the "Effective Time").

(c) From and after the Effective Time, the Surviving Corporation shall possess all the rights, privileges, powers and franchises and be subject to all of the restrictions, disabilities and duties of the Company and Merger Subsidiary, all as provided under the DGCL.

(d) The closing of the Merger (the "Closing") shall take place (i) at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York, 10019 or remotely by exchange of documents and signatures (or their electronic counterparts) as soon as practicable on the second (2nd) Business Day following the day on which the last to be fulfilled or waived of the conditions set forth in Article VIII (other than those conditions that by their nature are to be fulfilled at the Closing, but subject to the fulfillment or waiver of such conditions) shall be fulfilled or waived in accordance with this Agreement or (ii) at such other place and time as the Company and Parent may agree in writing (the "Closing Date").

Section 1.2 Certificate of Incorporation and By-Laws of the Surviving Corporation. Subject to Section 6.3:

(a) At the Effective Time, the certificate of incorporation of the Surviving Corporation shall be the certificate of incorporation of Merger Subsidiary as set forth in Exhibit A, except for Article FIRST thereof which shall be amended to read as follows: "The name of the corporation (hereinafter called the "Corporation") is Anadarko Petroleum Corporation."

(b) The by-laws of Merger Subsidiary, as in effect immediately prior to the Effective Time, shall be the by-laws of the Surviving Corporation until thereafter amended or changed as provided therein or by the DGCL, except that all references therein to Merger Subsidiary shall be automatically amended and shall become references to the Surviving Corporation.

Section 1.3 Directors and Officers of the Surviving Corporation. The directors of Merger Subsidiary immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation, each to hold office in accordance with the certificate of incorporation and by-laws of the Surviving Corporation, and the officers of Merger Subsidiary immediately prior to the Effective Time shall be the initial officers of the Surviving Corporation, in each case until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal.

Section 1.4 Effect on Capital Stock.

(a) At the Effective Time, subject to the other provisions of Articles I and II, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than shares of Company Common Stock to be cancelled pursuant to Section 1.4(d) and except for any Dissenting Shares or any shares of Company Common Stock covered under Section 1.6) shall, by virtue of this Agreement and without any action on the part of the holder thereof, be converted into and shall thereafter represent the right to receive the following consideration (collectively, the "Merger Consideration"): (x) $59.00 in cash, without interest (as may be adjusted pursuant to Section 1.4(f), the "Per Share Cash Amount") and (y) 0.2934 of a share of validly issued, fully paid and non-assessable shares of Parent Common Stock (as may be adjusted pursuant to Section 1.4(f), the "Exchange Ratio").

(b) From and after the Effective Time, all of the shares of Company Common Stock converted into the right to receive the Merger Consideration pursuant to this Article I shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of (x) a certificate (each a "Certificate") or (y) non-certificated shares represented by book-entry ("Book-Entry Shares") previously representing any such shares of Company Common Stock shall thereafter cease to have any rights with respect to such securities, except the right to receive (i) the Merger Consideration, (ii) any dividends or other distributions with a record date prior to the Effective Time which have been declared by the Company in accordance with this Agreement and which remain unpaid at the Effective Time, and any dividends and other distributions in accordance with Section 2.1(f) and (iii) any cash to be paid in lieu of any fractional share of Parent Common Stock in accordance with Section 2.2.

TABLE OF CONTENTS

(c) If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of Parent or the Company shall occur by reason of any reclassification, recapitalization, stock split or combination, exchange or readjustment of shares, or any stock dividend thereon with a record date during such period, the Merger Consideration, the Per Share Cash Amount, the Exchange Ratio and any other similarly dependent items, as the case may be, shall be appropriately adjusted to provide the holders of shares of Company Common Stock the same economic effect as contemplated by this Agreement prior to such event; provided that (i) nothing in this Section 1.4 shall be construed to permit the Company or Parent to take any action with respect to its securities that is otherwise prohibited by the terms of this Agreement and (ii) cash dividends and grants of equity compensation not prohibited by the terms hereof shall not result in any adjustment to the Exchange Ratio.

(d) At the Effective Time, all shares of Company Common Stock that are owned by Parent, Merger Subsidiary or the Company or any of their respective direct or indirect wholly-owned Subsidiaries (the "Cancelled Shares") shall be cancelled and retired and shall cease to exist and no stock of Parent, cash or other consideration shall be delivered in exchange therefor. For the avoidance of doubt, this Section 1.4(d) shall not apply to shares of Company Common Stock held in trust or otherwise set aside from shares held in the Company's treasury pursuant to a Company Benefit Plan (as such term is defined in Section 3.15).

(e) At the Effective Time, each issued and outstanding share of common stock, par value $0.01 per share, of Merger Subsidiary issued and outstanding immediately prior to the Effective Time shall remain outstanding as one fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

(f) If the Merger would otherwise result in the issuance of shares of Parent Common Stock (including shares that would be deliverable pursuant to converted equity awards pursuant to Section 1.6) in excess of 19.99% of the outstanding shares of Parent Common Stock immediately prior to the Closing (the "Share Cap"), the Exchange Ratio shall be reduced by the smallest number (rounded up to the nearest 0.0001) that causes the total number of shares of Parent Common Stock (including shares that would be deliverable pursuant to converted equity awards pursuant to Section 1.6) issuable in the Merger to not exceed the Share Cap (the "Exchange Ratio Reduction Number"), and the Per Share Cash Amount shall be increased by an amount in cash equal to (x) the Exchange Ratio Reduction Number multiplied by (y) the closing price per share of the Parent Common Stock on the New York Stock Exchange (the "NYSE") on the last trading day immediately preceding the Closing Date.

Section 1.5 Dissenting Shares. Notwithstanding anything in this Agreement to the contrary, with respect to each share of Company Common Stock as to which the holder thereof shall have properly complied with the provisions of Section 262 of the DGCL as to appraisal rights (each, a "Dissenting Share"), if any, such holder shall be entitled to payment, solely from the Surviving Corporation, of the appraisal value of the Dissenting Shares to the extent permitted by and in accordance with the provisions of Section 262 of the DGCL; provided, however, that if any holder of Dissenting Shares (a) affirmatively withdraws his demand for appraisal of such Dissenting Shares under the circumstances permitted by and in accordance with the DGCL, (b) fails to establish his entitlement to appraisal rights as provided in the DGCL or (c) takes or fails to take any action the consequence of which is that such holder is not entitled to payment for his shares under the DGCL, such holder or holders (as the case may be) shall forfeit the right to appraisal of such shares of Company Common Stock and such shares of Company Common Stock shall thereupon cease to constitute Dissenting Shares and if such forfeiture shall occur following the Effective Time, each such share of Company Common Stock shall thereafter be deemed to have been converted into and to have become, as of the Effective Time, the right to receive, without interest thereon, the Merger Consideration. The Company shall give Parent prompt notice of any demands received by the Company for appraisal of shares of Company Common Stock or any written threats thereof, any written withdrawal or purported withdrawal of any such demand and any other demand, notice or instrument delivered to the Company prior to the Effective Time that relates to such demand, and Parent shall have the right to participate in and direct all negotiations and proceedings with respect to such demands. The Company shall not settle, make any payments with respect to, offer to settle, approve the withdrawal of any claim or agree to any of the foregoing with respect to Dissenting Shares, in each case, without the written consent of Parent.

TABLE OF CONTENTS

Section 1.6 Stock Options and Equity Awards.

(a) At the Effective Time, (x) each option to purchase shares of Company Common Stock, whether or not vested or exercisable (each, a Company Stock Option"), that is outstanding immediately prior to the Effective Time and that has an exercise price per share of Company Common Stock subject to such Company Stock Option immediately prior to the Effective Time (the "Exercise Price") less than the Option Consideration (as defined below) shall, without any further action on the part of the holder thereof, be cancelled and converted at the Effective Time into the right to receive from the Surviving Corporation an amount in cash, without interest, equal to the product of (I) the number of shares of Company Common Stock subject to such Company Stock Option immediately prior to the Effective Time and (II) the excess of the Option Consideration over the Exercise Price of such Company Stock Option; and (y) each Company Stock Option that is outstanding immediately prior to the Effective Time and that has an Exercise Price equal to or greater than the Option Consideration shall be cancelled and terminated at the Effective Time, without any payment in respect thereof. At the Effective Time, each holder of a Company Stock Option shall cease to be a holder of Company Stock Options, such holder's name shall be removed from the applicable register, and all award agreements relating to the Company Stock Options shall be terminated and be of no further force and effect. Promptly after the Effective Time (but in any event not later than the second payroll date following the Effective Time), the Surviving Corporation shall pay to holders of Company Stock Options, through the Surviving Corporation's payroll systems, any amounts due pursuant to this Section 1.6(a), subject to Section 2.4. For purposes of this Section 1.6, "Option Consideration" means the U.S. dollar amount, rounded to the nearest whole cent, equal to the sum of (A) the product of the Exchange Ratio and the closing price per share of the Parent Common Stock on the NYSE on the last trading day immediately preceding the Closing Date (the "Parent Closing Price") plus (B) the Per Share Cash Amount.

(b) At the Effective Time, each award of restricted stock units that corresponds to shares of Company Common Stock (each, a "Company RSU Award") that is outstanding as of the Effective Time, whether or not vested, shall cease to represent a Company RSU Award with respect to Company Common Stock and be converted into a restricted stock and cash unit award of Parent (a "Parent Stock/Cash Unit Award"), with respect to both (i) the number (rounded to the nearest whole number) of shares of Parent Common Stock determined by multiplying (x) the number of shares of Company Common Stock subject to such Company RSU Award immediately prior to the Effective Time by (y) the Exchange Ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares described in clause (x) above by (2) the Per Share Cash Amount. Such converted award shall, except as set forth in this Section 1.6(b), continue on the same terms and conditions as were applicable under such Company RSU Award immediately prior to the Effective Time, including any provisions for acceleration of vesting. Any amount delivered upon any settlement date of a Parent Stock/Cash Unit Award shall be in shares of Parent Common Stock and cash in the same proportion as clauses (i) and (ii) above.

(c) At the Effective Time, each performance unit (a "Company PU Award") that was granted under any Company Benefit Plan and that is outstanding as of the Effective Time, whether or not vested, shall immediately vest, shall cease to represent a Company PU Award with respect to Company Common Stock and shall thereafter represent the right to receive, at the earliest date that would not result in the imposition of any Tax under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), an amount in cash equal to the product of (i) 200% of the target number of shares of Company Common Stock subject to such Company PU Award and (ii) $76.00, less applicable Tax withholdings in accordance with Section 2.4.

(d) At the Effective Time, each award of shares of restricted Company Common Stock (each, a "Company RS Award") granted under any Company Benefit Plan, outstanding as of the Effective Time, whether or not vested, shall cease to represent a Company RS Award with respect to Company Common Stock and be converted into a restricted stock and cash award of Parent (a "Parent Stock/Cash Award"), with respect to both (i) the number (rounded to the nearest whole number) of shares of Parent Common Stock determined by multiplying (x) the number of shares of Company Common Stock subject to such Company RS Award immediately prior to the Effective Time by (y) the Exchange Ratio and (ii) the U.S. dollar amount (rounded to the nearest whole cent) determined by multiplying (1) the number of shares described in clause (x) above by (2) the Per Share Cash Amount. Such converted award shall, except as set forth in this Section 1.6(d), continue on the same terms and conditions and be subject to the same restrictions as were applicable under such Company RS Award immediately prior to the Effective Time, including any provisions for acceleration of vesting.

TABLE OF CONTENTS

(e) At the Effective Time, each deferred stock award granted or deferred under any Company Benefit Plan (each, a "Company Deferred Stock Award") granted to a non-employee member of the Company's Board of Directors that is outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and converted into the right to receive, within five Business Days following the Effective Time, the Merger Consideration in respect of each share of Company Common Stock subject to such Company Deferred Stock Award immediately prior to the Effective Time. Notwithstanding the foregoing, with respect to any Company Deferred Stock Award that constitutes nonqualified deferred compensation subject to Section 409A of the Code, and that is not permitted to be paid as described in the immediately preceding sentence without triggering a Tax under Section 409A of the Code, such payment shall be made at the earliest time permitted under the applicable Company Benefit Plan and award agreement that will not trigger a Tax under Section 409A of the Code.

(f) Prior to the Effective Time, the Board of Directors of the Company and/or the Compensation and Benefits Committee of the Board of Directors of the Company shall (i) adopt resolutions approving the treatment of the Company equity awards pursuant to the terms of this Section 1.6 and (ii) take all actions to ensure that, following the Effective Time, no holder of a Company Stock Option, Company RSU Award, Company PU Award, Company RS Award or Company Deferred Stock Award or other employee, consultant, officer or director will have any right under any Company Benefit Plan to acquire any capital stock or other equity interests (including any "phantom" stock or stock appreciation rights) in the Company, the Surviving Corporation or any respective Subsidiary thereof.

(g) (i) Parent shall take all corporate action necessary to assume as of the Effective Time the Company's obligations under the Company RSU Awards, Company PU Awards and Company RS Awards and reserve for issuance a sufficient number of shares of Parent Common Stock for delivery pursuant to the terms set forth in this Section 1.6. (ii) As soon as practicable after the Effective Time and in any event no later than five days after the Effective Time, Parent shall file with the U.S. Securities and Exchange Commission (the "SEC") a registration statement on an appropriate form or a post-effective amendment to a previously filed registration statement under the Securities Act with respect to the Parent Common Stock subject to the applicable equity-based awards described in this Section 1.6 and shall use its reasonable best efforts to maintain the current status of the prospectus contained therein, as well as comply with any applicable state securities or "blue sky" laws, for so long as such equity-based awards remain outstanding.

## ARTICLE II

## EXCHANGE OF CERTIFICATES

Section 2.1 Surrender and Payment.

(a) Prior to the Effective Time, Parent shall appoint a bank, trust company or nationally recognized stockholder services provider or such other Person reasonably acceptable to the Company as the exchange agent (the "Exchange Agent") for the purpose of exchanging Certificates and Book-Entry Shares representing shares of Company Common Stock. Parent will make available to the Exchange Agent, as needed, the Merger Consideration to be delivered in respect of the shares of Company Common Stock. Promptly after the Effective Time, Parent will send, or will cause the Exchange Agent to send, to each holder of record of shares of Company Common Stock as of the Effective Time, a letter of transmittal for use in such exchange (which shall specify that the delivery shall be effected, and risk of loss and title shall pass, only upon proper delivery of the Certificates to the Exchange Agent) in such form as the Company and Parent may reasonably agree, for use in effecting delivery of shares of Company Common Stock to the Exchange Agent. Exchange of any Book-Entry Shares shall be effected in accordance with Parent's customary procedures with respect to securities represented by book entry.

(b) Each holder of shares of Company Common Stock that have been converted into a right to receive the Merger Consideration, upon surrender to the Exchange Agent of a Certificate or Book-Entry Share, together with a properly completed letter of transmittal, will be entitled to receive (A) one or more shares of Parent Common Stock (which shall be in non-certificated book-entry form unless a physical certificate is requested) representing, in the aggregate, the whole number of shares of Parent Common Stock, if any, that such holder has the right to receive pursuant to Section 1.4 and (B) a check in the amount equal to the cash portion of the Merger Consideration that such holder has the right to receive pursuant to Section 1.4 and this Article II, including cash payable in lieu of fractional shares pursuant to Section 2.2 and dividends and other distributions pursuant to

Section 2.1(f). No interest shall be paid or accrued on any Merger Consideration, cash in lieu of fractional shares or unpaid dividends and distributions payable to holders of Certificates or Book-Entry Shares. Until so surrendered, each such Certificate or Book-Entry Share shall, after the Effective Time, represent for all purposes only the right to receive such Merger Consideration.

(c) If any portion of the Merger Consideration is to be registered in the name of a Person other than the Person in whose name the applicable surrendered Certificate is registered, it shall be a condition to the registration thereof that the surrendered Certificate shall be properly endorsed or otherwise be in proper form for transfer and that the Person requesting such delivery of the Merger Consideration shall pay to the Exchange Agent any transfer or other similar Taxes required as a result of such registration in the name of a Person other than the registered holder of such Certificate or establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable. Delivery of the aggregate Merger Consideration, as applicable, with respect to Book-Entry Shares shall only be made to the Person in whose name such Book-Entry Shares are registered. For purposes of this Agreement, "Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or any agency or instrumentality thereof.

(d) After the Effective Time, there shall be no further registration of transfers of shares of Company Common Stock. If, after the Effective Time, Certificates or Book-Entry Shares are presented to the Exchange Agent, the Surviving Corporation or the Parent, they shall be cancelled and exchanged for the consideration provided for, and in accordance with the procedures set forth, in this Article II.

(e) Any portion of the Merger Consideration made available to the Exchange Agent pursuant to Section 2.1(a) that remains unclaimed by the holders of shares of Company Common Stock one year after the Effective Time shall be returned to Parent, upon demand, and any such holder who has not exchanged his shares of Company Common Stock for the Merger Consideration in accordance with this Section 2.1 prior to that time shall thereafter look only to Parent for delivery of the Merger Consideration in respect of such holder's shares. Notwithstanding the foregoing, Parent shall not be liable to any holder of shares for any Merger Consideration delivered to a public official pursuant to applicable abandoned property laws. Any Merger Consideration remaining unclaimed by holders of shares of Company Common Stock three years after the Effective Time (or such earlier date immediately prior to such time as such amounts would otherwise escheat to or become property of any governmental body, agency, authority or entity) shall, to the extent permitted by applicable law, become the property of Parent free and clear of any claims or interest of any Person previously entitled thereto.

(f) No dividends or other distributions with respect to shares of Parent Common Stock issued in the Merger shall be paid to the holder of any unsurrendered Certificates or Book-Entry Shares until such Certificates or Book-Entry Shares are surrendered as provided in this Section 2.1. Following such surrender, there shall be paid, without interest, to the record holder of the shares of Parent Common Stock issued in exchange therefor (i) at the time of such surrender, all dividends and other distributions payable in respect of such shares of Parent Common Stock with a record date after the Effective Time and a payment date on or prior to the date of such surrender and not previously paid and (ii) at the appropriate payment date, the dividends or other distributions payable with respect to such shares of Parent Common Stock with a record date after the Effective Time but with a payment date subsequent to such surrender. For purposes of dividends or other distributions in respect of shares of Parent Common Stock, all shares of Parent Common Stock to be issued pursuant to the Merger shall be entitled to dividends pursuant to the immediately preceding sentence as if issued and outstanding as of the Effective Time.

(g) The Exchange Agent shall invest the aggregate cash portion of the Merger Consideration delivered by Parent pursuant to Section 2.1(a) as directed by Parent; provided that no losses on such investments shall affect the cash payable to former holders of shares of Company Common Stock pursuant to this Article II. Any interest and other income resulting from such investments shall be paid promptly to Parent. Any portion of the Merger Consideration deposited with the Exchange Agent pursuant to Section 2.1 to pay for shares for which appraisal rights shall have been perfected shall be returned to Parent, upon demand.

TABLE OF CONTENTS

Section 2.2 Fractional Shares.

(a) No fractional shares of Parent Common Stock shall be issued in the Merger, but in lieu thereof each holder of shares of Company Common Stock otherwise entitled to a fractional share of Parent Common Stock will be entitled to receive, from the Exchange Agent in accordance with the provisions of this Section 2.2 and subject to the provisions of Section 2.1, a cash payment (without interest and rounded to the nearest cent) in lieu of such fractional shares of Parent Common Stock representing such holder's proportionate interest, if any, in the proceeds from the sale by the Exchange Agent in one or more transactions of shares of Parent Common Stock equal to the excess of (x) the aggregate number of shares of Parent Common Stock to be delivered to the Exchange Agent by Parent pursuant to Section 2.1(a) over (y) the aggregate number of whole shares of Parent Common Stock to be distributed to the holders of Certificates or Book-Entry Shares pursuant to Section 2.1(b) (such excess being herein called the "Excess Shares"). The parties acknowledge that payment of the cash consideration in lieu of issuing fractional shares was not separately bargained-for consideration but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience to Parent that would otherwise be caused by the issuance of fractional shares. As soon as practicable after the Effective Time, the Exchange Agent, as agent for the holders of the Certificates and Book-Entry Shares representing shares of Company Common Stock, shall sell the Excess Shares at then prevailing prices on the NYSE in the manner provided in the following paragraph.

(b) The sale of the Excess Shares by the Exchange Agent, as agent for the holders that would otherwise receive fractional shares, shall be executed on the NYSE through one or more member firms of the NYSE and shall be executed in round lots to the extent practicable. Until the proceeds of such sale or sales have been distributed to the holders of shares of Company Common Stock, the Exchange Agent shall hold such proceeds in trust for the holders of shares of Company Common Stock (the "Common Shares Trust"). The Exchange Agent shall determine the portion of the Common Shares Trust to which each holder of shares of Company Common Stock shall be entitled, if any, by multiplying the amount of the aggregate proceeds comprising the Common Shares Trust by a fraction, the numerator of which is the amount of the fractional share interest to which such holder of shares of Company Common Stock would otherwise be entitled and the denominator of which is the aggregate amount of fractional share interests to which all holders of shares of Company Common Stock would otherwise be entitled.

(c) As soon as practicable after the determination of the amount of cash, if any, to be paid to holders of shares of Company Common Stock in lieu of any fractional shares of Parent Common Stock, the Exchange Agent shall make available such amounts to such holders of shares of Company Common Stock without interest, subject to and in accordance with Section 2.1.

Section 2.3 Lost Certificates. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent or the Surviving Corporation, the posting by such Person of a bond, in such reasonable amount as the Surviving Corporation may direct, as indemnity against any claim that may be made against it with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the Merger Consideration to be paid in respect of the shares of Company Common Stock represented by such Certificate as contemplated by this Article II.

Section 2.4 Withholding Rights. Each of the Company, the Surviving Corporation, Parent and the Exchange Agent shall be entitled to deduct and withhold from any amounts otherwise payable to any Person pursuant to Articles I and II such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign tax law. To the extent that amounts are so deducted or withheld by the Company, the Surviving Corporation, Parent or the Exchange Agent, as the case may be, and paid over to the applicable governmental body, agency, authority or entity, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by the Company, the Surviving Corporation, Parent or the Exchange Agent, as the case may be.

TABLE OF CONTENTS

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Parent that, except as disclosed (i) in the Company SEC Documents or the MLP SEC Documents (as hereinafter defined) filed or furnished prior to the date hereof (excluding any disclosures in such Company SEC Documents or MLP SEC Documents in any risk factors section, in any section related to forward looking statements and other disclosures that are predictive or forward-looking in nature) or (ii) in the correspondingly numbered section of the disclosure schedules delivered by the Company to Parent simultaneously with the execution of this Agreement (the "Company Disclosure Schedules") (it being agreed that disclosure of any item in any section or subsection of the Company Disclosure Schedules shall be deemed disclosure with respect to any other section or subsection of this Agreement to which the relevance of such item is reasonably apparent, notwithstanding the omission of a cross-reference to such other section or subsection):

Section 3.1 Corporate Existence and Power. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect (as defined below). The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect. For purposes of this Agreement, the term "Company Material Adverse Effect" means any state of facts, change, development, event, effect, condition or occurrence (each, an "Effect") that, individually or in the aggregate, would reasonably be expected to result in a material adverse effect on the financial condition, business, assets or continuing results of operations of the Company and its Subsidiaries, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Company Material Adverse Effect: (A) any changes in general United States or global economic conditions or securities, credit, financial or other capital markets conditions, (B) any changes or conditions affecting the oil and gas industry in general (including changes to commodity prices, general market prices and regulatory changes affecting the industry), (C) any weather-related or other *force majeure* event (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters), (D) acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing, (E) the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the transactions contemplated hereby or the terms hereof or the consummation of the transactions contemplated hereby, including the impact thereof on the relationships of the Company and its Subsidiaries with customers, suppliers, partners, employees or governmental bodies, agencies, officials or authorities; provided that this clause (E) shall not apply to any representation or warranty set forth in Section 3.4 or Section 3.15(g) (or any condition to any party's obligation to consummate the Merger relating to such representation and warranty) to the extent the purpose of such representation and warranty is to address the consequences resulting from the execution and delivery of this Agreement or the consummation of the Merger, (F) any action taken or failure to take action which Parent has requested in writing, (G) changes in applicable law or regulation or in GAAP or in accounting standards, or any changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions, (H) any decline in the market price, or change in trading volume, of the Company's capital stock or (I) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Company Material Adverse Effect); provided that, in the case of clauses (A), (B), (C) and (D), to the extent the impact on the Company and its Subsidiaries, taken as a whole, is disproportionate to the impact on other similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect. The Company has

TABLE OF CONTENTS

heretofore made available to Parent true and complete copies of the Certificate of Incorporation of the Company, as amended to the date of this Agreement (as so amended, the "Company Charter"), and the By-Laws of the Company, as amended to the date of this Agreement (as so amended, the "Company By-Laws").

Section 3.2 Corporate Authorization.

(a) The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby are within the Company's corporate powers and, except for any required approval by the Company's stockholders in connection with the consummation of the Merger, have been duly authorized by all necessary corporate action. The affirmative vote of holders of a majority of the outstanding shares of Company Common Stock in favor of the adoption of this Agreement (the "Company Stockholder Approval") is the only vote of the holders of any of the Company's capital stock or the capital stock of any of its Subsidiaries necessary in connection with consummation of the Merger. Assuming due authorization, execution and delivery of this Agreement by Parent and Merger Subsidiary, this Agreement constitutes a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law) (collectively, "Creditors' Rights").

(b) The Board of Directors of the Company, at a meeting duly called and held on or prior to the date hereof, has (i) determined that this Agreement and the transactions contemplated hereby (including the Merger) are fair to and in the best interests of the Company's stockholders, (ii) approved this Agreement and the transactions contemplated hereby (including the Merger), (iii) directed that the adoption of this Agreement be submitted to a vote of the holders of Company Common Stock and (iv) resolved (subject to Section 5.2) to recommend the adoption of this Agreement by the holders of Company Common Stock.

Section 3.3 Governmental Authorization. The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby require no action by or in respect of, or filing with, any governmental body, agency, official or authority other than (a) the filing of a certificate of merger in accordance with the DGCL, (b) compliance with any applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (c) compliance with any applicable requirements of laws, rules and regulations in foreign jurisdictions governing antitrust or merger control matters, (d) compliance with any applicable requirements of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), (e) compliance with any applicable requirements of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act"), (f) the appropriate filings and approvals under the rules of the NYSE and (g) other actions or filings the absence or omission of which would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.

Section 3.4 Non-Contravention. The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby do not and will not, assuming compliance with the matters referred to in Sections 3.2 and 3.3, (a) contravene or conflict with the Company Charter or the Company By-Laws or the organizational documents of any Company Subsidiary, (b) contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to the Company or any of its Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Company or any of its Subsidiaries or to a loss of any benefit to which the Company or any of its Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon the Company or any of its Subsidiaries or any license, franchise, permit or other similar authorization held by the Company or any of its Subsidiaries or (d) result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except for such contraventions, conflicts or violations referred to in clause (b) or defaults, rights of termination, cancellation or acceleration, losses or Liens referred to in clause (c) or (d) that would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect. For purposes of this Agreement, "Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset other than any such mortgage, lien, pledge, charge, security interest or encumbrance (i) for Taxes (as defined in Section 3.14) not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Parent Balance Sheet or the Company Balance

TABLE OF CONTENTS

Sheet, as the case may be) or (ii) which is a carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like lien arising in the ordinary course of business. To the Company's knowledge as of the date of this Agreement, there is no Effect that would reasonably be expected to prevent, materially impede or materially interfere with the consummation by the Company of the Merger and the Transactions.

Section 3.5 Capitalization. The authorized capital stock of the Company consists of 1,000,000,000 shares of Company Common Stock and 2,000,000 shares of preferred stock, par value $1.00 per share ("Company Preferred Stock", and together with the Company Common Stock, the "Company Capital Stock"). As of May 2, 2019 (the "Measurement Date"), there were outstanding (i) 502,052,625 shares of Company Common Stock (including 4,536,604 shares covered by Company RS Awards), (ii) no shares of Company Preferred Stock and (iii) no other shares of capital stock or other voting securities of the Company. All outstanding shares of Company Capital Stock have been duly authorized and validly issued and are fully paid and nonassessable. As of the Measurement Date, there were outstanding (A) Company Stock Options to purchase 6,064,195 shares of Company Common Stock, (B) Company RSU Awards with respect to 1,242,041 shares of Company Common Stock, (C) Company PU Awards with respect to 1,359,839 shares of Company Common Stock (assuming such Company PU Awards were earned at target level of performance) and (D) Company Deferred Stock Awards with respect to 310,374 shares of Company Common Stock. Except as set forth in this Section 3.5 and except for changes since the close of business on the Measurement Date resulting from the exercise of employee stock options outstanding on such date, or the payment or redemption of other stock-based awards outstanding on such date or other securities issued as permitted by Section 5.1, there are outstanding (a) no shares of capital stock or other voting securities of the Company and (b) (1) no options, warrants or other rights to acquire from the Company any capital stock or voting securities of the Company or securities convertible into or exchangeable for capital stock or voting securities of the Company, (2) no bonds, debentures, notes or other indebtedness of the Company or any of its Subsidiaries, in each case, that are linked to, or the value of which is in any way based upon or derived from, the value of the Company, any of its Subsidiaries or any part thereof, or any dividends or other distributions declared or paid on any shares of capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries, or which have or which by their terms may have at any time (whether actual or contingent) the right to vote (or which are convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of the Company or any of its Subsidiaries may vote and (3) no preemptive or similar rights, subscription or other rights, convertible securities, or other agreements, arrangements or commitments of any character relating to the capital stock of the Company, obligating the Company to issue, transfer or sell any capital stock or voting securities of the Company or securities convertible into or exchangeable for capital stock or voting securities of the Company or obligating the Company to grant, extend or enter into any such option, warrant, subscription or other right, convertible security, agreement, arrangement or commitment (the items in the foregoing subclauses (a) and (b) being referred to collectively as "Company Securities"). Except as permitted by Section 5.1(e) with respect to any Company Stock Options, Company RSU Awards, Company RS Awards, Company PU Awards and Company Deferred Stock Awards, there are no outstanding obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any Company Securities.

Section 3.6 Subsidiaries.

(a) Each Subsidiary of the Company is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all powers and all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect. For purposes of this Agreement, the term "Subsidiary," when used with respect to any Person, means any other Person, whether incorporated or unincorporated, of which (i) more than fifty percent of the voting securities or other ownership interests is owned by such Person or one or more of its Subsidiaries, (ii) such Person or one or more of its Subsidiaries is a general partner or holds a majority of the voting interests of a partnership or (iii) securities or other interests having by their terms ordinary voting power to elect more than fifty percent of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly owned or controlled by such Person or by any one or more of its Subsidiaries. For the avoidance of doubt, for all purposes of this Agreement, the MLP and its Subsidiaries shall be deemed to be Subsidiaries of the Company. The MLP consummated the transactions contemplated by that certain Contribution Agreement and Agreement and Plan of Merger, dated as of November 7, 2018, by and among Western Midstream Partners, LP (formerly known as Western Gas Equity Partners, LP) (the "MLP"), Western Midstream

TABLE OF CONTENTS

Holdings, LLC (formerly known as Western Gas Equity Holdings, LLC) ("WES GP"), Western Midstream Operating, LP (formerly known as Western Gas Partners, LP) (the "Operating Partnership"), the Company, WGR Asset Holding Company LLC and certain of their affiliates on February 28, 2019 in accordance with the terms thereof as disclosed in the Company SEC Documents and the MLP SEC Documents. Each Subsidiary of the Company is duly qualified to do business and is in good standing in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities makes such qualification necessary, except for those jurisdictions where failure to be so qualified would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect. All "significant subsidiaries" (as such term is defined in Section 1.1-02 of Regulation S-X under the Exchange Act) of the Company and all entities listed on Exhibit 21 to the Company 10-K (collectively, and including, for the avoidance of doubt, the MLP, "Significant Subsidiaries") and their respective jurisdictions of organization are identified in Section 3.6(a) of the Company Disclosure Schedules.

(b) Except for directors' qualifying shares, all of the outstanding capital stock of, or other ownership interests in, each Significant Subsidiary of the Company (other than the MLP and its Subsidiaries) is wholly-owned by the Company, directly or indirectly, free and clear of any material Lien and free of any other material limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such capital stock or other ownership interests). There are no outstanding (i) securities of the Company or any of its Significant Subsidiaries convertible into or exchangeable for shares of capital stock or other voting securities or ownership interests in any Significant Subsidiary of the Company or (ii) (A) options, warrants or other rights to acquire from the Company or any of its Significant Subsidiaries any capital stock, voting securities or other ownership interests in, or any securities convertible into or exchangeable for any capital stock, voting securities or ownership interests in, any Significant Subsidiary of the Company, (B) bonds, debentures, notes or other indebtedness of any Significant Subsidiary of the Company that are linked to, or the value of which is in any way based upon or derived from, the value of the Company, any of its Subsidiaries or any part thereof, or any dividends or other distributions declared or paid on any shares of capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries, or which have or which by their terms may have at any time (whether actual or contingent) the right to vote (or which are convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of the Company or any of its Subsidiaries may vote or (C) preemptive or similar rights, subscription or other rights, convertible securities, or other agreements, arrangements or commitments of any character relating to the capital stock of any Significant Subsidiary of the Company, obligating the Company or any of its Significant Subsidiaries to issue, transfer or sell any capital stock, voting securities or other ownership interests in, or any securities convertible into or exchangeable for any capital stock, voting securities or ownership interests in, any Significant Subsidiary of the Company or obligating the Company or any Significant Subsidiary of the Company to grant, extend or enter into any such option, warrant, subscription or other right, convertible security, agreement, arrangement or commitment (the items in the foregoing subclauses (i) and (ii) being referred to collectively as "Company Subsidiary Securities"). There are no outstanding obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any outstanding Company Subsidiary Securities. Other than the MLP and the Operating Partnership, no Subsidiary of the Company is, or since January 1, 2016 has been, subject to any requirement to file periodic reports under the Exchange Act. No Subsidiary of the Company owns any shares of Company Common Stock.

(c) As of the Measurement Date, the issued and outstanding limited partner interests and general partner interests of the MLP consisted of (i) 452,990,862 "Common Units" (as defined in the First Amended and Restated Agreement of Limited Partnership of the MLP, dated as of December 12, 2012, as amended or supplemented from time to time (the "MLP Partnership Agreement")) (the "MLP Common Units"), (ii) 19,360 unvested awards of phantom units that are outstanding under any employee or director equity plans or arrangements of MLP and (iii) a 0.0% non-economic general partner interest held by WES GP (the "WES GP Interest"). All of the issued and outstanding MLP Common Units have been duly authorized and validly issued and are fully paid (to the extent required by the MLP Partnership Agreement) and nonassessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of the Delaware Revised Uniform Limited Partnership Act) and, except as set forth in the MLP Partnership Agreement, free of preemptive rights. WES GP is a wholly-owned Subsidiary of the Company and is the sole general partner of the MLP. WES GP is the sole record and beneficial owner of the WES GP Interest, and such WES GP Interest has been duly authorized and validly issued in accordance with applicable law and the MLP Partnership Agreement. WES GP owns the WES GP Interest free and clear of any Liens. Except (x) as set forth above in this Section 3.6(c) or

(y) as otherwise expressly permitted by this Agreement, as of the date of this Agreement, there are no outstanding, and as of the Effective Time there will not be outstanding, (A) any "Partnership Interests" (as defined in the MLP Partnership Agreement) (the "MLP Partnership Interests") or other equity or voting securities of the MLP, (B) (1) options, warrants or other rights to acquire from the MLP any Partnership Interests, voting securities or other ownership interests in, or any securities convertible into or exchangeable for MLP Partnership Interests, voting securities or ownership interests in, the MLP or (2) preemptive or similar rights, subscription or other rights, convertible securities, or other agreements, arrangements or commitments of any character relating to MLP Partnership Interests or other equity or voting securities of the MLP, obligating the MLP to issue, transfer or sell any MLP Partnership Interests or other equity or voting securities of the MLP, or any securities convertible into or exchangeable for MLP Partnership Interests or other equity or voting securities of the MLP, or obligating the MLP to grant, extend or enter into any such option, warrant, subscription or other right, convertible security, or other agreement, arrangement or commitment or (C) bonds, debentures, notes or other debt of the MLP that are linked to, or the value of which is in any way based upon or derived from, the value of the MLP or any part thereof, or any dividends or other distributions declared or paid on any WGP Partnership Interests, capital stock of, or other equity or voting interests in, the MLP, or which have or which by their terms may have at any time (whether actual or contingent) the right to vote (or which are convertible into, or exchangeable for, securities having the right to vote) on any matters on which unitholders of the MLP may vote (the items in the foregoing subclauses (A), (B) and (C) being referred to collectively as "MLP Securities"). Except as required by the terms of the MLP Partnership Agreement in effect as of the date hereof or amended as to the extent permitted by Section 5.1, there are no outstanding obligations of the MLP or any of its Subsidiaries to repurchase, redeem or otherwise acquire any MLP Securities. Each Subsidiary of the MLP is wholly-owned by the MLP.

Section 3.7 SEC Filings.

(a) The Company has made available to Parent (i) its annual reports on Form 10-K for its fiscal years ended December 31, 2017 and 2018, (ii) its proxy or information statements relating to meetings of, or actions taken without a meeting by, the stockholders of the Company held since December 31, 2017 and (iii) all of its other reports, statements, schedules and registration statements filed with the SEC since December 31, 2017 (the documents referred to in this Section 3.7(a) being referred to collectively as the "Company SEC Documents"). The Company's annual report on Form 10-K for its fiscal year ended December 31, 2018 is referred to herein as the "Company 10-K."

(b) The Company has made available to Parent (i) the annual reports on Form 10-K for the MLP and the Operating Partnership for the fiscal years ended December 31, 2017 and 2018, (ii) the proxy or information statements relating to meetings of, or actions taken without a meeting by, the unitholders of the MLP and the Operating Partnership held since December 31, 2017 and (iii) all of the other reports, statements, schedules and registration statements filed by the MLP and the Operating Partnership with the SEC since December 31, 2017 (the documents referred to in this Section 3.7(b) being referred to collectively as the "MLP SEC Documents"). The MLP's annual report on Form 10-K for its fiscal year ended December 31, 2018 is referred to herein as the "MLP 10-K."

(c) As of its filing date, each Company SEC Document and MLP SEC Document complied as to form in all material respects with the applicable requirements of the Exchange Act, the Securities Act and the Sarbanes-Oxley Act and the rules and regulations thereunder.

(d) As of its filing date, each Company SEC Document and MLP SEC Document filed pursuant to the Exchange Act did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(e) Each registration statement, as amended or supplemented, if applicable, filed by the Company or the MLP since January 1, 2017, pursuant to the Securities Act, as of the date such statement or amendment became effective, did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

(f) Each of the Company and the MLP has timely filed with or furnished to the SEC all forms, reports, schedules, registration statements, proxy statements and other documents required to be filed with or furnished to the SEC by the Company since January 1, 2017.

TABLE OF CONTENTS

Section 3.8 Financial Statements. The audited consolidated financial statements of the Company and the MLP (including any related notes and schedules) included in their annual reports on Form 10-K referred to in Section 3.7 present fairly, in all material respects, the consolidated financial position of the Company and its consolidated Subsidiaries or the MLP and its consolidated Subsidiaries, as applicable, as of the dates thereof and the consolidated results of their operations and their cash flows for the periods then ended, in each case, in conformity with United States generally accepted accounting principles ("GAAP") applied on a consistent basis (except as may be indicated in the notes thereto). For purposes of this Agreement, "Company Balance Sheet" means the consolidated balance sheet of the Company, as of December 31, 2018, set forth in the Company 10-K and "Company Balance Sheet Date" means December 31, 2018. For purposes of this Agreement, "MLP Balance Sheet" means the consolidated balance sheet of the MLP, as of December 31, 2018, set forth in the MLP 10-K.

Section 3.9 Disclosure Documents.

(a) Neither the proxy statement of the Company (the "Company Proxy Statement") to be filed with the SEC in connection with the Merger, nor any amendment or supplement thereto, will, at the date the Company Proxy Statement or any such amendment or supplement thereto is first mailed to stockholders of the Company or at the time such stockholders vote on the adoption and approval of this Agreement and the transactions contemplated hereby, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Company Proxy Statement, including all amendments or supplements thereto, will, when filed, comply as to form in all material respects with the requirements of the Exchange Act. Notwithstanding the foregoing, no representation or warranty is made by the Company in this Section 3.9 with respect to statements made or incorporated by reference therein based on information supplied by Parent or Merger Subsidiary for inclusion or incorporation by reference in the Company Proxy Statement.

(b) None of the information supplied or to be supplied by the Company for inclusion or incorporation by reference in the Form S-4 (as defined in Section 4.8(a)) or any amendment or supplement thereto will, at the time the Form S-4 or any such amendment or supplement becomes effective under the Securities Act or at the Effective Time, as the case may be, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 3.10 Controls and Procedures.

(a) Each of the principal executive officer and the principal financial officer of the Company and the MLP, as applicable (or each former principal executive officer and former principal financial officer of the Company and the MLP, as applicable) has made all certifications required under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 and the related rules and regulations promulgated thereunder and under the Exchange Act (collectively, the "Sarbanes-Oxley Act") with respect to Company SEC Documents and the MLP SEC Documents, as applicable. For purposes of the preceding sentence, "principal executive officer" and "principal financial officer" shall have the meanings given to such terms in the Sarbanes-Oxley Act.

(b) Each of the Company and the MLP has (i) designed and maintained disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) to ensure that material information required to be disclosed by the Company and the MLP, as applicable, in the reports it files or furnishes under the Exchange Act is communicated to its management by others within those entities as appropriate to allow timely decisions regarding required disclosure, (ii) disclosed, based on its most recent evaluation, to its auditors and the audit committee of its Board of Directors (A) any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting which could adversely affect its ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in its internal controls over financial reporting and (iii) identified for the Company's or the MLP's, as applicable, auditors any material weaknesses in internal controls. The Company has provided to Parent true and correct copies of any of the foregoing disclosures to the auditors or audit committee of the Company and of the MLP that have been made in writing from January 1, 2017 through the date hereof, and will promptly provide to Parent true and correct copies of any such disclosure that is made after the date hereof.

(c) The Company has designed and maintains a system of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) sufficient to provide reasonable assurance concerning the

TABLE OF CONTENTS

reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including reasonable assurance (i) that transactions are executed in accordance with management's general or specific authorizations and recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability and (ii) regarding prevention or timely detection of any unauthorized acquisition, use or disposition of assets that could have a material effect on the Company's financial statements or the MLP's financial statements. The Company's management and the MLP's management (as applicable), with the participation of the Company's (or the MLP's, as applicable) principal executive and financial officers, has completed an assessment of the effectiveness of the Company's internal controls over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the year ended December 31, 2018, and such assessment concluded that such internal controls were effective using the framework specified in the Company 10-K or the MLP 10-K, as applicable.

(d) No personal loan or other extension of credit by the Company or any Subsidiary to any of its or their executive officers or directors has been made or modified in violation of Section 13 of the Exchange Act and Section 402 of the Sarbanes-Oxley Act since January 1, 2017.

(e) Since January 1, 2017, neither the Company nor any of its Subsidiaries (including the MLP) nor, to the Company's knowledge, any director, officer, employee, auditor, accountant or representative of the Company or any of its Subsidiaries has received any written complaint, allegation, assertion, or claim that the Company or any of its Subsidiaries has engaged in improper or illegal accounting or auditing practices or maintains improper or inadequate internal accounting controls. For purposes of this Agreement, "knowledge" means, with respect to the Company or Parent, the actual knowledge of any individual identified as an executive officer of such party in the Form 10-K filed most recently by such party with the SEC.

Section 3.11 Absence of Certain Changes.

(a) From the Company Balance Sheet Date to the date hereof, the Company and its Subsidiaries have conducted their business in the ordinary course of business consistent with past practice in all material respects.

(b) From the Company Balance Sheet Date, there has not been any event, occurrence, change or development of a state of circumstances or facts which, individually or in the aggregate, has had, or would be reasonably likely to have, a Company Material Adverse Effect.

Section 3.12 No Undisclosed Material Liabilities. As of the date hereof, there are no material liabilities of the Company or any Subsidiary of the Company of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than:

(a) liabilities disclosed or provided for in the Company Balance Sheet, the MLP Balance Sheet or the notes thereto;

(b) liabilities incurred since the Company Balance Sheet Date in the ordinary course of business consistent with past practice and which, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect;

(c) liabilities disclosed in the Company SEC Documents or the MLP SEC Documents filed prior to the date of this Agreement;

(d) liabilities or obligations that have been discharged or paid in full in the ordinary course of business consistent with past practice; and

(e) liabilities under this Agreement.

Section 3.13 Litigation. There is no action, suit, investigation or proceeding pending against, or, to the knowledge of the Company, threatened against or affecting, the Company, any of its Subsidiaries, any of their respective properties or any of their respective officers or directors before any court, arbitrator or any governmental body, agency, authority or official except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.

Section 3.14 Taxes. Except as set forth in the Company Balance Sheet (including the notes thereto) and except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, (i) all Tax Returns required to be filed with any taxing authority by, or with respect to, the Company and its Subsidiaries have been filed in accordance with all applicable laws; (ii) the Company and its Subsidiaries

TABLE OF CONTENTS

have timely paid all Taxes shown as due and payable on the Tax Returns that have been so filed, and, as of the time of filing, the Tax Returns correctly reflected the facts regarding the income, business, assets, operations, activities and the status of the Company and its Subsidiaries (other than, in the case of clause (i) or clause (ii) hereof, with respect to Taxes and Tax Returns for which the position has been taken in good faith and for which adequate reserves are reflected on the Company Balance Sheet, as adjusted for operations in the ordinary course of business consistent with past practice since the date of the Company Balance Sheet); (iii) the Company and its Subsidiaries have made provision for all Taxes payable by the Company and its Subsidiaries for which no Tax Return has yet been filed; (iv) the charges, accruals and reserves for Taxes with respect to the Company and its Subsidiaries reflected on the Company Balance Sheet are adequate under GAAP to cover the Tax liabilities accruing through the date thereof; (v) there is no action, suit, proceeding, audit or claim (each, a "Tax Proceeding") now proposed in writing or pending against or with respect to the Company or any of its Subsidiaries in respect of any Tax or Tax Return; (vi) to the knowledge of the Company, neither the Company nor any of its Subsidiaries is liable for any Tax imposed on any entity other than such Person, except as the result of the application of Treas. Reg. section 1.1502-6 (and any comparable provision of the tax laws of any state, local or foreign jurisdiction) to the affiliated group of which the Company or any of its Subsidiaries is or was the common parent; (vii) neither the Company nor any of its Subsidiaries has constituted either a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock qualifying or intended to qualify for tax-free treatment, in whole or in part, under Section 355 of the Code in the two years prior to the date of this Agreement; (viii) neither the Company nor any of its Subsidiaries has granted any currently effective requests, agreements, consents or waivers to extend the statutory period of limitations applicable to the assessment or collection of any Taxes with respect to any Tax Returns of the Company or any of its Subsidiaries; (ix) neither the Company nor any of its Subsidiaries is a party to any closing agreement described in Section 7121 of the Code or any predecessor provision thereof or any similar agreement under the tax laws of any state, local, or foreign jurisdiction; (x) neither the Company nor any of its Subsidiaries is a party to, is bound by, or has any obligation under, any tax sharing, allocation or indemnity agreement or any similar agreement or arrangement, except for any such agreement or arrangement solely between or among any of the Company and its Subsidiaries; (xi) neither the Company nor any of its Subsidiaries has participated in any "listed transaction," within the meaning of Treas. Reg. section 1.6011-4(b)(2); (xii) there are no Liens for Taxes other than Taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Company Balance Sheet) upon any of the assets of the Company or any of its Subsidiaries; and (xiii) no claim has been made in the last three years by an authority in a jurisdiction in which the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation in that jurisdiction. For purposes of this Agreement, "Taxes" shall mean any and all taxes, charges, fees, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, excise, stamp, real or personal property, *ad valorem*, withholding, social security (or similar), unemployment, occupation, use, production, service, service use, license, net worth, payroll, franchise, severance, transfer, recording, employment, premium, windfall profits, environmental, customs duties, capital stock, profits, disability, sales, registration, value added, alternative or add-on minimum, estimated or other taxes, assessments or charges imposed by any federal, state, local or foreign governmental body, agency, authority or entity and any interest, penalties, or additions to tax attributable thereto. For purposes of this Agreement, "Tax Returns" shall mean any return, report, form or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax.

Section 3.15 Employee Benefit Plans; Employment.

(a) The Company has provided Parent with a list (set forth in Section 3.15(a) of the Company Disclosure Schedules) identifying each material "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), each material employment, consulting, severance, change in control or similar contract, plan, funding arrangement or policy applicable to any director, former director, employee or former employee of the Company or any Company Subsidiary, and each material plan, funding vehicle or arrangement (written or oral), providing for compensation, bonuses, profit-sharing, stock option or other stock-related rights or other forms of incentive or deferred compensation, vacation benefits, insurance coverage (including any self-insured arrangements), health or medical benefits, death benefits, disability benefits, workers' compensation, supplemental unemployment benefits, severance benefits, change in control benefits and post-employment or retirement benefits (including compensation, pension, health, medical or

life insurance benefits) which is maintained, administered or contributed to by the Company or its Subsidiaries and covers any employee or director or former employee or director of the Company or any of its Subsidiaries; provided, however, that such list need not include any Company Benefit Plan that constitutes a Foreign Company Benefit Plan (as defined below). The material plans, agreements or arrangements of the Company and its Subsidiaries referred to in the first sentence of this paragraph (a) (excluding any such plan that is a "multiemployer plan," as defined in section 3(37) of ERISA, but including Foreign Company Benefit Plans) are referred to collectively herein as the "Company Benefit Plans." "Foreign Company Benefit Plan" means any Company Benefit Plan primarily maintained for the benefit of employees and former employees in jurisdictions other than the United States. To the extent practicable, the Company shall have provided and delivered to Parent a list of Foreign Company Benefit Plans within thirty (30) days following the date hereof.

(b) The Company has made available to Parent true, complete and correct copies of (i) each Company Benefit Plan, other than any Foreign Company Benefit Plan, (or, in the case of any unwritten Company Benefit Plan, a description thereof) and any amendments thereto, (ii) the most recent annual report on Form 5500 and Schedule B thereto (including any related actuarial valuation report) filed with the Internal Revenue Service with respect to each Company Benefit Plan (if any such report was required) and (iii) the most recent summary plan description for each Company Benefit Plan for which such summary plan description is required. The Company shall have made available to Parent no later than thirty (30) days following the date hereof true, complete and correct copies of each Foreign Company Benefit Plan (or, in the case of any unwritten Foreign Company Benefit Plan, a description thereof) and any amendments thereto.

(c) Each Company Benefit Plan has been established and maintained in material compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations (including, but not limited to, the extent applicable, ERISA and the Code) which are applicable to such plan.

(d) (i) Neither the Company nor any other entity which is a member of a controlled group of entities (within the meaning of Sections 414(b), (c), (m) or (o) of the Code) of which the Company is a member (each, an "ERISA Affiliate") has incurred a material liability under Title IV of ERISA or Section 412 of the Code that has not been satisfied in full, and no reasonably foreseeable condition exists that presents a material risk to the Company or any ERISA Affiliate of incurring any such liability; and (ii) all material insurance premiums with respect to Company Benefit Plans, including premiums to the Pension Benefit Guaranty Corporation, have been paid when due.

(e) All "employee pension benefit plans" (as defined in Section 3(2) of ERISA) that are Company Benefit Plans (each, a "Company Pension Plan") intended to be qualified under Section 401(a) of the Code have received a favorable determination letter or opinion letter, if applicable, from the Internal Revenue Service to the effect that such Company Pension Plans are qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code. Neither the Company nor any of its ERISA Affiliates contributes to a "multiemployer plan," as defined in Section 3(37) of ERISA.

(f) The Company or the applicable Subsidiary has reserved the right to amend, terminate or modify at any time each Company Benefit Plan that provides for retiree health benefits or retiree life benefits (other than such benefits required by Section 4980B of the Code or Section 601 of ERISA or similar state law).

(g) The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) entitle any current or former employee, consultant or officer of the Company or any its Subsidiaries to severance pay, unemployment compensation or any other payment, except as expressly provided in this Agreement or as required by applicable law, or (ii) accelerate the time of payment or vesting, increase the amount of compensation due any such employee, consultant or officer or trigger any other material obligation pursuant to any Company Benefit Plan, except as expressly provided in this Agreement. Section 3.15(g) of the Company Disclosure Schedules lists all the agreements, arrangements and other instruments which give rise to an obligation to make or set aside amounts payable to or on behalf of the officers of the Company and its Subsidiaries as a result of the transactions contemplated by this Agreement and/or any subsequent employment termination, true and complete copies of which have been previously provided to Parent.

(h) Except as disclosed on Section 3.15(a) of the Company Disclosure Schedules, Section 5.01 of the Company Disclosure Schedules or Section 6.6(e) of the Company Disclosure Schedules, there has been no

TABLE OF CONTENTS

amendment to, written interpretation by the Company, or adoption of, any Company Benefit Plan (other than a Foreign Company Benefit Plan) which would increase materially the expense of maintaining the Company Benefit Plans above the level of expense incurred in respect thereof for the twelve (12) months ended on the Company Balance Sheet Date.

(i) Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, the Company and its Subsidiaries are in compliance with all collective bargaining agreements and all applicable Federal, state and local laws, rules and regulations respecting employment, employment practices, labor, occupational safety and health, and wages and hours, including Section 8 of the National Labor Relations Act and all civil rights and anti-discrimination laws, rules and regulations (collectively, "Anti-Discrimination Laws"). Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, no work stoppage, slowdown or labor strike against the Company or any of its Subsidiaries is pending or, to the Company's knowledge, threatened, nor is the Company or any of its Subsidiaries involved in or, to the Company's knowledge, threatened with material labor disputes, grievances or litigation relating to labor matters, including with respect to Anti-Discrimination Laws.

(j) No Company Benefit Plan provides a gross-up for any Taxes which may be imposed (i) for failure to comply with the requirements of Section 409A of the Code or (ii) under Section 4999 of the Code.

Section 3.16 Compliance with Laws. To the Company's knowledge, neither the Company nor any of its Subsidiaries is in violation of, or has since January 1, 2017, violated, any applicable provisions of any laws, statutes, ordinances or regulations except for any violations that, individually or in the aggregate, have not had, and would not be reasonably likely to have, a Company Material Adverse Effect.

Section 3.17 Regulatory Matters.

(a) Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, since January 1, 2016, (i) none of the Company, any of its Subsidiaries, nor any Company or Subsidiary director, officer, employee, nor, to the knowledge of the Company, any representative, agent, or any other person acting on behalf of the Company or any of its Subsidiaries, has violated any Anti-Corruption Law, and (ii) none of the Company, any of its Subsidiaries nor any Company or Subsidiary director, officer, employee, nor, to the knowledge of the Company, any representative, agent or any other person acting on behalf of the Company or any of its Subsidiaries, has offered, paid, given, promised, or authorized the payment of, anything of value (including, but not limited to, money, checks, wire transfers, tangible and intangible gifts, favors, services, or those entertainment and travel) directly or indirectly to any employee, officer, or representative of, or any person otherwise acting in an official capacity for or on behalf of a governmental body, agency, authority or entity, whether elected or appointed, including an officer or employee of a state-owned or state-controlled enterprise, a political party, political party official or employee, candidate for public office, or an officer or employee of a public international organization (such as the World Bank, United Nations, International Monetary Fund, or Organization for Economic Cooperation and Development) (any such person, a "Government Official") (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any governmental body, agency, authority or entity or (5) assisting the Company, any Subsidiary of the Company, or any Company or Subsidiary director, officer employee, agent, representative, or any other person acting on behalf of the Company or any of its Subsidiaries in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b) Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, (i) the Company, each of its Subsidiaries and their respective directors, officers, employees, and, to the knowledge of the Company, agents, representatives and other persons acting for or on behalf of any of the foregoing persons, are, and at all times since January 1, 2016 have been, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) neither the Company nor any of its Subsidiaries carries on, or has carried on since January 1, 2016, any business, directly or knowingly indirectly, involving Cuba, Iran, Syria, Sudan, North Korea, the Crimea region of Ukraine or any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c) Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, since January 1, 2016 (i) neither the Company nor any of its Subsidiaries has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any governmental body, agency, authority or entity or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) neither the Company nor any of its Subsidiaries, nor any of their respective directors, officers, employees, nor, to the knowledge of the Company, any agents, representatives, or any other person acting on behalf of the Company or any of its Subsidiaries has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) the Company and its Subsidiaries have implemented and have at all times maintained internal controls, policies and procedures designed to detect, prevent and deter violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) the Company and each of its Subsidiaries have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

(d) For purposes of this Agreement:

(i) "Anti-Corruption Laws" means any applicable law for the prevention or punishment of public or commercial corruption and bribery, including the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act 2010 and any applicable anti-corruption or anti-bribery law of any other applicable jurisdiction.

(ii) "Economic Sanctions/Trade Laws" means all applicable laws relating to anti-terrorism, the importation of goods, export controls, antiboycott, and Sanctions Targets, including prohibited or restricted international trade and financial transactions and lists maintained by any governmental body, agency, authority or entity targeting certain countries, territories, entities or persons. For the avoidance of doubt, the applicable laws referenced in the foregoing sentence include (1) any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, or any regulations of the U.S. Treasury Department Office of Foreign Assets Controls ("OFAC"), or any export control law applicable to U.S.-origin goods, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the U.S. Government at the prevailing point in time, (2) any U.S. sanctions related to or administered by the U.S. Department of State and (3) any sanctions measures or embargoes imposed by the United Nations Security Council, Her Majesty's Treasury or the European Union.

(iii) "Money Laundering Laws" means any law governing financial recordkeeping and reporting requirements, including the U.S. Currency and Foreign Transaction Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, and any applicable money laundering-related laws of other jurisdictions where the Company and its Subsidiaries conduct business, conduct financial transactions or own assets.

(iv) "Sanctions Target" means: (1) any country or territory that is the target of country-wide or territory-wide Economic Sanctions/Trade Laws, including, as of the date of this Agreement, Iran, Cuba, Syria, the Crimea region of Ukraine, and North Korea; (2) a person that is on the list of Specially Designated Nationals and Blocked Persons or any of the other sanctions persons lists published by OFAC, or any equivalent list of sanctioned persons issued by the U.S. Department of State; (3) a person that is located in or organized under the laws of a country or territory that is identified as the subject of country-wide or territory-wide Economic Sanctions/Trade Laws; or (4) an entity owned fifty percent (50%) or more or controlled by a country or territory identified in clause (1) or person in clause (2) above.

Section 3.18 Environmental Matters.

(a) Except as set forth in the Company SEC Documents filed prior to the date hereof and with such exceptions as, individually or in the aggregate, would not be reasonably likely to have a Company Material Adverse Effect, (i) no notice, notification, demand, request for information, citation, summons, complaint or order has been received by, and no investigation, action, claim, suit, proceeding or review is pending or, to the knowledge of the Company, threatened by any Person against the Company or any of its Subsidiaries, and no penalty has been assessed or outstanding consent decree or order issued by a court, governmental body, agency, authority or tribunal against the Company or any of its Subsidiaries, in each case, with respect to any matters arising out of any Environmental Law; (ii) the Company and its Subsidiaries are, and since January 1, 2017 have

TABLE OF CONTENTS

been, in compliance with all Environmental Laws; (iii) (x) the Company and each of its Subsidiaries have obtained and have been and are in compliance with all permits, licenses, certifications, variations, exemptions, orders, franchises and approvals of all governmental bodies, agencies and authorities required under Environmental Laws for the conduct of their respective businesses (the "Company Environmental Permits") and (y) all Company Environmental Permits are in full force and effect, and the Company has no notice or knowledge that such Company Environmental Permits will not be renewed in the ordinary course after the Effective Time; (iv) no governmental body, agency or authority has begun, or to the knowledge of the Company, threatened in writing to begin, any action to terminate, cancel or reform any Company Environmental Permit; (v) to the knowledge of the Company, there are no Hazardous Substances at, in, under or migrating to or from properties owned or leased by the Company or any Subsidiary that require investigation, control, monitoring, removal or remediation under Environmental Laws; (vi) there are no liabilities of the Company or any of its Subsidiaries arising out of any Environmental Law, whether accrued, contingent, absolute, or determined, and, to the knowledge of the Company, there is no existing condition, situation or set of circumstances which would reasonably be expected to result in such a liability; and (vii) there has been no material environmental investigation, study, audit, test, review or other analysis conducted since January 1, 2017 of which the Company has knowledge in relation to any current or prior business of the Company or any of its Subsidiaries or any property or facility now or previously owned, leased or operated by the Company or any of its Subsidiaries which has not been delivered to Parent prior to the date hereof.

(b) For purposes of this Section 3.18, the term "Environmental Laws" means federal, state, provincial, local and foreign statutes, laws (including, without limitation, common law), judicial decisions, regulations, ordinances, rules, judgments, orders, codes, injunctions, permits, governmental agreements or governmental restrictions relating to: (A) the protection, investigation or restoration of the environment or natural resources, (B) the handling, use, storage, presence, disposal, transport, Release or threatened Release of any Hazardous Substance or (C) noise, odor, indoor air, employee exposure, electromagnetic fields, wetlands, pollution, contamination or any injury or threat of injury to persons or property relating to any Hazardous Substance. As used herein, the term "Hazardous Substance" means any "hazardous substance" and any "pollutant or contaminant" as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"); any "hazardous waste" as that term is defined in the Resource Conservation and Recovery Act ("RCRA"); and any "hazardous material" as that term is defined in the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), as amended (including as those terms are further defined, construed, or otherwise used in rules, regulations, standards, orders, guidelines, directives, and publications issued pursuant to, or otherwise in implementation of, said laws); and including, without limitation, any other substance defined, listed, classified or regulated as "hazardous", "toxic", a "waste", a "contaminant" or words of similar meaning or import, including petroleum product or byproduct, solvent, flammable or explosive material, radioactive material, asbestos, lead paint, polychlorinated biphenyls (or PCBs), dioxins, dibenzofurans, heavy metals, radon gas, mold, mold spores, and mycotoxins. As used herein, the term "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, discarding, abandonment, or disposing into the environment (including the placing, discarding or abandonment of any barrel, container or other receptacle containing any Hazardous Substance or other material).

Section 3.19 Title to Properties. Except in each case as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and its Subsidiaries has good title to, or valid leasehold or other ownership interests or rights in, all its material properties and assets except: (i) for such interest or rights as are no longer used or useful in the conduct of its businesses or as have been disposed of in the ordinary course of business consistent with past practice, and (ii) for defects in title, easements, restrictive covenants and similar encumbrances or impediments that, in the aggregate, do not and will not interfere with its ability to conduct its business as currently conducted. As of the date of this Agreement, none of the properties and assets of the Company or any of its Subsidiaries are subject to any Liens that, in the aggregate, interfere with the ability of the Company and the Company Subsidiaries to conduct business as currently conducted to an extent that have had or would reasonably be expected to have a Company Material Adverse Effect.

TABLE OF CONTENTS

Section 3.20 Hydrocarbon Contracts.

(a) Except in each case as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect; (i) the Hydrocarbon Contracts are in full force and effect in accordance with their respective terms; (ii) all royalties, rentals and other payments due thereunder have been properly and timely paid; (iii) there are currently pending no written requests or demands for payments, adjustments of payments or performance pursuant thereto; (iv) none of the Company or any of its Subsidiaries is in breach of any of its obligations under any Hydrocarbon Contracts; and (v) to the knowledge of the Company, no other party to any Hydrocarbon Contract is in breach of any of its obligations thereunder. The term "Hydrocarbon Contract" means a material Hydrocarbon production sharing contract, lease or license, permit or other similar agreement or right permitting the Company or any of its Subsidiaries to explore for, develop, use, produce, sever, process, operate and occupy Hydrocarbon interests and associated fixtures or structures for a specified period of time. The term "Hydrocarbon Contract" also includes any farm-out or farm-in agreement, operating agreement, unit agreement, pooling or communitization agreement, declaration or order, joint venture, option or acquisition agreement, any oil and gas production, sales, marketing, transportation, exchange and processing contract and agreement, or any other contract affecting the ownership or operation of properties held for exploration or production of Hydrocarbons, or the disposition of the Hydrocarbons produced therefrom, in each case to which the Company or any of its Subsidiaries is a party. The term "Hydrocarbons" means any of oil, bitumen and products derived therefrom, synthetic crude oil, petroleum, natural gas, natural gas liquids, coal bed methane, and any and all other substances produced in association with any of the foregoing, whether liquid, solid or gaseous.

(b) Except in each case as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and its Subsidiaries have filed with the applicable government authorities all applications and obtained all licenses, permits and other authorizations required for operations under the Hydrocarbon Contracts, and (ii) the Company and its Subsidiaries have complied with all rules and regulations of any applicable government authority with respect to operations under the Hydrocarbon Contracts.

Section 3.21 Material Contracts.

(a) Except for this Agreement, as of the date hereof, neither the Company nor any of its Subsidiaries is a party to or bound by any agreement, lease, easement, license, contract, note, mortgage, indenture or other legally binding obligation ("Contract") that:

(i) would be required to be filed by the Company as a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the SEC);

(ii) includes any continuing or other contingent payment obligations (including any "earn-out" or indemnification obligations) arising in connection with the acquisition or disposition by the Company or any of its Subsidiaries of any business which payment obligations are or would reasonably be expected to be material to the Company;

(iii) (A) limits in any material respect either the type of business in which the Company or its Subsidiaries (or in which Parent or any of its Subsidiaries after the Effective Time) may engage or the manner or locations in which any of them may so engage in any business (including through "non-competition" or "exclusivity" provisions), (B) would require the disposition of any material assets or line of business of the Company or its Subsidiaries or, after the Effective Time, Parent or its Subsidiaries or (C) grants "most favored nation" status with respect to any material obligations that, after the Effective Time, would apply to Parent or any of its Subsidiaries, including the Company and its Subsidiaries;

(iv) (A) is an indenture, loan or credit Contract, loan note, mortgage Contract or other Contract representing, or any guarantee of, indebtedness for borrowed money of the Company or any Subsidiary of the Company in excess of $100 million or (B) is a guarantee by the Company or any of its Subsidiaries of such indebtedness of any person other than the Company or a wholly-owned Subsidiary of the Company in excess of $100 million;

(v) grants (A) rights of first refusal, rights of first negotiation or similar pre-emptive rights, or (B) puts, calls or similar rights, to any person (other than the Company, a wholly-owned Subsidiary of the Company or a wholly-owned Subsidiary of the MLP) with respect to any asset that is material to the Company;

TABLE OF CONTENTS

(vi) was entered into to settle any material litigation and which imposes material ongoing obligations on the Company or any of its Subsidiaries;

(vii) limits or restricts the ability of the Company or any of its Subsidiaries to declare or pay dividends or make distributions in respect of their capital stock, partner interests, membership interests or other equity interests;

(viii) is a material partnership, limited liability company, joint venture or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership, limited liability company or joint venture in which the Company owns, directly or indirectly, any voting or economic interest of 15% or more and has invested or is contractually required to invest in excess of $100 million, other than with respect to any wholly-owned Subsidiary of the Company or wholly-owned Subsidiary of the MLP;

(ix) relates to the acquisition or disposition of any business or assets (other than the purchase and sale of crude oil and products in the ordinary course of business consistent with past practice) pursuant to which the Company or any of its Subsidiaries has any liability in excess of $100 million in any transaction or series of related transactions;

(x) (A) is a material joint operating agreement (JOA) or (B) defines any material area of mutual interest (AMI); or

(xi) is a Contract required to be set forth on Section 3.21(a)(xi) of the Company Disclosure Schedules.

(b) Each such Contract described in clauses (i) through (x) above is referred to herein as a "Material Contract". Each Material Contract is a valid and legally binding obligation of the Company and its Subsidiaries as applicable and, to the knowledge of the Company, each other party thereto, and is in full force and effect and enforceable by the Company or the applicable Subsidiary, in each case, subject to Creditors' Rights, except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, and neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any other party to a Material Contract is in breach or violation of any provision of, or in default under, any Material Contract, and no event has occurred that, with or without notice, lapse of time or both, would constitute such a breach, violation or default, except for breaches, violations or defaults that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. A copy of each Material Contract has previously been delivered to Parent.

Section 3.22 Intellectual Property.

(a) Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and its Subsidiaries possess the valid right to use, license and enforce all patents, patent rights, trademarks, trade names, trade dress, service marks, Internet domain names, copyrights, applications for any of the foregoing, computer software programs or applications, geophysical data, trade secrets, know-how, data and other proprietary rights (collectively, "Intellectual Property") that are necessary for the conduct of the business of the Company and its Subsidiaries as currently conducted (collectively, the "Company Intellectual Property"); (ii) to the knowledge of the Company, since January 1, 2017, the conduct of the business of the Company and its Subsidiaries and use of the Company Intellectual Property does not and has not infringed upon or otherwise violated any Intellectual Property rights of any other Person; (iii) to the knowledge of the Company, no third party is challenging, infringing or otherwise violating any right of the Company and its Subsidiaries in the Company Intellectual Property; (iv) neither the Company nor any of its Subsidiaries has received written notice of any pending claim, order or proceeding with respect to any alleged or potential infringement or other violation of Intellectual Property rights of any other Person or with respect to any Company Intellectual Property; (v) to the knowledge of the Company, no Company Intellectual Property is being used or enforced by the Company or any of its Subsidiaries in a manner that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Company Intellectual Property; and (vi) the Company and its Subsidiaries have taken commercially reasonable measures to maintain the confidentiality of any material proprietary information or trade secrets included in their respective rights in Company Intellectual Property.

TABLE OF CONTENTS

(b) Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) to the knowledge of the Company, the Company and its Subsidiaries have not, since January 1, 2017, experienced any unauthorized access to or other breach of security with respect to the information technology systems that are material to the Company and its Subsidiaries; (ii) the Company and its Subsidiaries have complied in all material respects with all applicable laws and with their own respective privacy policies ("Privacy Policies")relating to the collection, storage, use, disclosure and transfer of any information held by the Company or its Subsidiaries that can reasonably be used to identify an individual natural person, including name, street address, telephone number, email address, photograph, social security number or tax identification number, driver's license number, passport number, credit card number, bank information, or biometric identifiers or any other piece of information, or any other information defined as "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" under any applicable law and that is regulated by such applicable law (collectively, "Personal Data") and neither the Company nor any of its Subsidiaries has received a complaint from any governmental body, agency, authority or entity or any other third party regarding its collection, storage, use, disclosure or transfer of Personal Data that is pending or unresolved and, to the knowledge of the Company, there are no facts or circumstances that would give rise to any such complaints; and (iii) the Company and its Subsidiaries have reasonably designed security measures in place to protect any Personal Data stored in their respective information technology systems from unlawful use or access by any third party or any other access or use that would violate applicable law or the Privacy Policies.

Section 3.23 Confidentiality and Other Agreements. None of the confidentiality agreements or standstill agreements the Company has entered into with any third party (or any agent thereof) that is in effect on the date hereof contains any exclusivity or standstill provisions that are or will be binding on the Company, any of its Subsidiaries or, after the Effective Time, Parent or any of its Subsidiaries.

Section 3.24 Brokers; Financial Advisors. No broker, investment banker, financial advisor or other Person, other than Evercore Group L.L.C. and Goldman Sachs & Co. LLC (the "Financial Advisors") and Jeffries LLC, the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar based fee or commission (collectively, "Brokers and Finders Fees") in connection with the Merger as a result of being engaged by the Company or any Subsidiary or affiliate of the Company. The Company has delivered to Parent complete and correct copies of all agreements under which such fee, commission, or other like payment is payable and all indemnification and other agreements under which any such fee or commission is payable.

Section 3.25 Opinions of Financial Advisors. The Company has received the opinion of each of the Financial Advisors to the effect that, as of the date of this Agreement, the consideration to be received in the Merger by the holders of the shares of Company Common Stock is fair to the Company's stockholders from a financial point of view.

Section 3.26 Takeover Statutes. The Board of Directors of the Company has taken the necessary action to render Section 203 of the DGCL, any other potentially applicable antitakeover or similar statute or regulation and the provisions of Article NINTH of the Company Charter inapplicable to this Agreement and the transactions contemplated hereby.

Section 3.27 Termination of Chevron Agreement. Prior to the execution and delivery of this Agreement, (a) the Chevron Agreement has been duly and validly terminated in accordance with its terms and (b) the Company has paid to Chevron the Chevron Termination Fee pursuant to the Chevron Agreement by wire transfer of immediately available funds and the Company has paid no other termination fee to Chevron and has no other liability or obligation under the Chevron Agreement, including with respect to the payment of any other termination fees or any other fees and expenses. As of the date of this Agreement, the Company has not received notice of any breach of the Chevron Agreement.

Section 3.28 No Additional Representations.

(a) Except for the representations and warranties made in this Article III, the Company Disclosure Schedules or any certificate delivered pursuant to this Agreement, neither the Company nor any other Person makes any express or implied representation or warranty with respect to the Company or its Subsidiaries or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement, the Merger or the Transactions, and the Company hereby disclaims any such other representations or

warranties. In particular, without limiting the foregoing disclaimer, except as expressly provided in this Article III, the Company Disclosure Schedules or any certificate delivered pursuant to this Agreement, neither the Company nor any other Person makes or has made any representation or warranty to Parent or any of its affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospect information relating to the Company or any of its Subsidiaries or their respective businesses; or (ii) except for the representations and warranties made in this Article III, the Company Disclosure Schedules or any certificate delivered pursuant to this Agreement, any oral or written information presented to Parent or any of its affiliates or representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or in the course of the Merger or the Transactions.

(b) Notwithstanding anything contained in this Agreement to the contrary, the Company acknowledges and agrees that neither Parent nor any other Person has made or is making, and the Company expressly disclaims reliance upon, any representations, warranties or statements relating to Parent or its Subsidiaries whatsoever, express or implied, beyond those expressly given by Parent and Merger Subsidiary in Article IV, the Parent Disclosure Schedules or any certificate delivered pursuant to this Agreement, including any implied representation or warranty as to the accuracy or completeness of any information regarding Parent furnished or made available to the Company, or any of its representatives. Without limiting the generality of the foregoing, the Company acknowledges that, except as expressly provided in Article IV, the Parent Disclosure Schedules or any certificate delivered pursuant to this Agreement, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to the Company or any of its representatives.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUBSIDIARY

Parent and Merger Subsidiary represent and warrant to the Company that, except as disclosed (i) in the Parent SEC Documents (as hereinafter defined) filed or furnished prior to the date hereof (excluding any disclosures in such Parent SEC Documents in any risk factors section, in any section related to forward looking statements and other disclosures that are predictive or forward-looking in nature) or (ii) in the correspondingly numbered section of the disclosure schedules delivered by Parent to the Company simultaneously with the execution of this Agreement (the "Parent Disclosure Schedules") (it being agreed that disclosure of any item in any section or subsection of the Parent Disclosure Schedules shall be deemed disclosure with respect to any other section or subsection of this Agreement to which the relevance of such item is reasonably apparent, notwithstanding the omission of a cross-reference to such other section or subsection):

Section 4.1 Corporate Existence and Power. Each of Parent and Merger Subsidiary is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all governmental franchises, licenses, permits, authorizations, consents and approvals required to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted, except for those the absence of which would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect (as defined below). Parent is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the property owned or leased by it or the nature of its activities or the ownership or leasing of its properties make such qualification necessary, except for those jurisdictions where the failure to be so qualified would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect. For purposes of this Agreement, the term "Parent Material Adverse Effect" means any Effect that, individually or in the aggregate, would reasonably be expected to result in a material adverse effect on the financial condition, business, assets or continuing results of operations of Parent and its Subsidiaries, taken as a whole; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Parent Material Adverse Effect: (A) any changes in general United States or global economic conditions or securities, credit, financial or other capital markets conditions, (B) any changes or conditions affecting the oil and gas industry in general (including changes to commodity prices, general market prices and regulatory changes affecting the industry), (C) any weather-related or other *force majeure* event (including earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters), (D) acts of war (whether or not declared), armed hostility (by recognized governmental forces or otherwise), sabotage, terrorism or cyber-attack, and any escalation or general worsening of any of the foregoing, (E) the negotiation, execution, announcement, pendency, compliance with or performance of this Agreement, the

TABLE OF CONTENTS

transactions contemplated hereby or the terms hereof or the consummation of the transactions contemplated hereby, including the impact thereof on the relationships of Parent and its Subsidiaries with customers, suppliers, partners, employees or governmental bodies, agencies, officials or authorities; provided that this clause (E) shall not apply to any representation or warranty set forth in Section 4.4 (or any condition to any party's obligation to consummate the Merger relating to such representation and warranty) to the extent the purpose of such representation and warranty is to address the consequences resulting from the execution and delivery of this Agreement or the consummation of the Merger, (F) any action taken or failure to take action which the Company has requested in writing, (G) changes in applicable law or regulation or in GAAP or in accounting standards, or any changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions, (H) any decline in the market price, or change in trading volume, of Parent's capital stock or (I) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, or budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position (it being understood that the exceptions in clauses (H) and (I) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein (if not otherwise falling within any of the exceptions provided hereof) is a Parent Material Adverse Effect); provided that, in the case of clauses (A), (B), (C) and (D), to the extent the impact on Parent and its Subsidiaries, taken as a whole, is disproportionate to the impact on other similarly situated entities, the incrementally disproportionate impact or impacts shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Parent Material Adverse Effect. Since the date of its incorporation, Merger Subsidiary has not engaged in any activities other than in connection with or as contemplated by this Agreement. Parent has heretofore delivered to the Company true and complete copies of Parent's and Merger Subsidiary's certificate of incorporation and by-laws as currently in effect.

Section 4.2 Corporate Authorization.

(a) The execution, delivery and performance by Parent and Merger Subsidiary of this Agreement and the consummation by Parent and Merger Subsidiary of the transactions contemplated hereby are within the corporate powers of Parent and Merger Subsidiary and have been duly authorized by all necessary corporate action. Assuming due authorization, execution and delivery of this Agreement by the Company, this Agreement constitutes a valid and binding agreement of each of Parent and Merger Subsidiary, enforceable against such party in accordance with its terms, subject to Creditors' Rights. The shares of Parent Common Stock issued pursuant to the Merger, when issued in accordance with the terms hereof, will be duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive rights.

(b) The Board of Directors of Parent, at a meeting duly called and held on or prior to the date hereof, has (i) determined that this Agreement and the issuance of Parent Common Stock pursuant to this Agreement and the other Transactions are fair to, and in the best interests of, Parent and Parent's stockholders and (ii) approved and declared advisable this Agreement and the Transactions.

(c) The Board of Directors of Merger Subsidiary has (i) determined that this Agreement and the Transactions are fair to, and in the best interests of, Merger Subsidiary's sole stockholder, (ii) approved and declared advisable this Agreement and the Transactions and (iii) submitted this Agreement to the sole stockholder of Merger Subsidiary for adoption thereby and recommended that such sole stockholder approve and adopt this Agreement and the Transactions.

Section 4.3 Governmental Authorization. The execution, delivery and performance by Parent and Merger Subsidiary of this Agreement and the consummation by Parent and Merger Subsidiary of the transactions contemplated hereby require no action by or in respect of, or filing with, any governmental body, agency, official or authority other than (a) the filing of a certificate of merger in accordance with the DGCL, (b) compliance with any applicable requirements of the HSR Act, (c) compliance with any applicable requirements of laws, rules and regulations in foreign jurisdictions governing antitrust or merger control matters, (d) compliance with any applicable requirements of the Exchange Act, (e) compliance with any applicable requirements of the Securities Act, (f) the appropriate filings and approvals under the rules of the NYSE and (g) other actions or filings the absence or omission of which would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect.

Section 4.4 Non-Contravention. The execution, delivery and performance by Parent and Merger Subsidiary of this Agreement and the consummation by Parent and Merger Subsidiary of the transactions contemplated

hereby do not and will not, assuming compliance with the matters referred to in Sections 4.2 and 4.3, (a) contravene or conflict with the certificate of incorporation or by-laws of Parent or Merger Subsidiary, (b) contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to Parent or any of its Subsidiaries, (c) constitute a default (or an event which with notice or the passage of time would become a default) under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Parent or any of its Subsidiaries or to a loss of any benefit to which Parent or any of its Subsidiaries is entitled under any provision of, any agreement, contract or other instrument binding upon Parent or any of its Subsidiaries or any license, franchise, permit or other similar authorization held by Parent or any of its Subsidiaries or (d) result in the creation or imposition of any Lien on any asset of Parent or any of its Subsidiaries, except for such contraventions, conflicts or violations referred to in clause (b) or defaults, rights of termination, cancellation or acceleration, losses or Liens referred to in clause (c) or (d) that would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect. The approval of the stockholders of Parent is not required by applicable law or the rules of the NYSE to effect the transactions contemplated by this Agreement. To Parent's knowledge as of the date of this Agreement, there is no Effect that would reasonably be expected to prevent, materially impede or materially interfere with the consummation by Parent or Merger Subsidiary of the Merger and the Transactions.

Section 4.5 Capitalization. The authorized capital stock of Parent consists of 1,100,000,000 shares of Parent Common Stock, and 50,000,000 shares of preferred stock, par value $1.00 per share ("Parent Preferred Stock"). As of the close of business on April 30, 2019 (the "Parent Measurement Date"), there were outstanding (i) 748,020,282 shares of Parent Common Stock, (ii) no shares of Parent Preferred Stock and (iii) no other shares of capital stock or other voting securities of Parent. All outstanding shares of capital stock of Parent have been duly authorized and validly issued and are fully paid and nonassessable. As of the close of business on the Parent Measurement Date, there were outstanding (A) options to purchase 530,167 shares of Parent Common Stock and (B) other stock-based awards (other than shares of restricted stock or other equity based awards included in the number of shares of Parent Common Stock outstanding set forth above) with respect to 6,373,278 shares of Parent Common Stock (assuming performance-based awards were earned at target level of performance). As of the date of this Agreement, except as set forth in this Section 4.5 and except for changes since the close of business on the Parent Measurement Date resulting from the exercise of stock options outstanding on such date, or the payment or redemption of other stock-based awards outstanding on such date and except for the shares to be issued in connection with the Merger and except as contemplated by the Equity Investment, there are outstanding (a) no shares of capital stock or other voting securities of Parent, and (b) except for securities issuable pursuant to employee benefit plans or arrangements, including options issued pursuant to Parent stock-based plans and awards payable in Parent Common Stock, (1) no options, warrants or other rights to acquire from Parent any capital stock or voting securities of Parent or securities convertible into or exchangeable for capital stock or voting securities of Parent, (2) no bonds, debentures, notes or other indebtedness of Parent or any of its Subsidiaries, in each case, that are linked to, or the value of which is in any way based upon or derived from, the value of Parent, any of its Subsidiaries or any part thereof, or any dividends or other distributions declared or paid on any shares of capital stock of, or other equity or voting interests in, Parent or any of its Subsidiaries, or which have or which by their terms may have at any time (whether actual or contingent) the right to vote (or which are convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of Parent or any of its Subsidiaries may vote and (3) no preemptive or similar rights, subscription or other rights, convertible securities, or other agreements, arrangements or commitments of any character relating to the capital stock of Parent, obligating Parent to issue, transfer or sell any capital stock or voting securities of Parent or securities convertible into or exchangeable for capital stock or voting securities of Parent or obligating Parent to grant, extend or enter into any such option, warrant, subscription or other right, convertible security, agreement, arrangement or commitment (the items in the foregoing subclauses (a) and (b) being referred to collectively as "Parent Securities"). As of the date of this Agreement, except as required by the terms of any employee or director options or other stock based awards or the Equity Investment, there are no outstanding obligations of Parent or any of its Subsidiaries to repurchase, redeem or otherwise acquire any Parent Securities.

Section 4.6 SEC Filings.

(a) Parent has made available to the Company (i) its annual reports on Form 10-K for its fiscal years ended December 31, 2017 and 2018, (ii) its proxy or information statements relating to meetings of, or actions taken without a meeting by, the stockholders of Parent held since December 31, 2017 and (iii) all of its other

reports, statements, schedules and registration statements filed with the SEC since December 31, 2017 (the documents referred to in this Section 4.6(a) being referred to collectively as the "Parent SEC Documents"). Parent's annual report on Form 10-K for its fiscal year ended December 31, 2018 is referred to herein as the "Parent 10-K."

(b) As of its filing date, each Parent SEC Document complied as to form in all material respects with the applicable requirements of the Exchange Act, the Securities Act and the Sarbanes-Oxley Act and the rules and regulations thereunder.

(c) As of its filing date, each Parent SEC Document filed pursuant to the Exchange Act did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(d) Each registration statement, as amended or supplemented, if applicable, filed by Parent since January 1, 2017 pursuant to the Securities Act, as of the date such statement or amendment became effective, did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

(e) Parent has timely filed with or furnished to the SEC all forms, reports, schedules, registration statements, proxy statements and other documents required to be filed with or furnished to the SEC by Parent since January 1, 2017.

Section 4.7 Financial Statements. The audited consolidated financial statements of Parent (including any related notes and schedules) included in the annual reports on Form 10-K referred to in Section 4.6 present fairly, in all material respects, the consolidated financial position of Parent and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and their cash flows for the periods then ended, in each case, in conformity with GAAP applied on a consistent basis (except as may be indicated in the notes thereto). For purposes of this Agreement, "Parent Balance Sheet" means the consolidated balance sheet of Parent, as of December 31, 2018, set forth in the Parent 10-K and "Parent Balance Sheet Date" means December 31, 2018.

Section 4.8 Disclosure Documents.

(a) The Registration Statement on Form S-4 of Parent (the "Form S-4") to be filed under the Securities Act relating to the issuance of Parent Common Stock in the Merger, and any amendments or supplements thereto, will, when filed, subject to the last sentence of Section 4.8(b), comply as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act.

(b) Neither the Form S-4 nor any amendment or supplement thereto will at the time it becomes effective under the Securities Act or at the Effective Time contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, no representation or warranty is made by Parent in this Section 4.8 with respect to statements made or incorporated by reference therein based on information supplied by the Company for inclusion or incorporation by reference in the Form S-4.

(c) None of the information supplied or to be supplied by Parent for inclusion or incorporation by reference in the Company Proxy Statement or any amendment or supplement thereto will, at the date the Company Proxy Statement or any such amendment or supplement thereto is first mailed to stockholders of the Company or at the time such stockholders vote on the adoption and approval of this Agreement and the transactions contemplated hereby, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.9 Controls and Procedures.

(a) Each of the principal executive officer and the principal financial officer of Parent (or each former principal executive officer and former principal financial officer of Parent, as applicable) has made all certifications required under Sections 302 and 906 of the Sarbanes-Oxley Act with respect to Parent SEC Documents. For purposes of the preceding sentence, "principal executive officer" and "principal financial officer" shall have the meanings given to such terms in the Sarbanes-Oxley Act.

TABLE OF CONTENTS

(b) Parent has (i) designed and maintained disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) to ensure that material information required to be disclosed by Parent in the reports it files or furnishes under the Exchange Act is communicated to its management by others within those entities as appropriate to allow timely decisions regarding required disclosure, (ii) disclosed, based on its most recent evaluation, to its auditors and the audit committee of its Board of Directors (A) any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting which could adversely affect its ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in its internal controls over financial reporting and (iii) identified for Parent's auditors any material weaknesses in internal controls. Parent has provided to the Company true and correct copies of any of the foregoing disclosures to the auditors or audit committee that have been made in writing from January 1, 2017 through the date hereof, and will promptly provide to the Company true and correct copies of any such disclosure that is made after the date hereof.

(c) Parent has designed and maintains a system of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) sufficient to provide reasonable assurance concerning the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including reasonable assurance (i) that transactions are executed in accordance with management's general or specific authorizations and recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability and (ii) regarding prevention or timely detection of any unauthorized acquisition, use or disposition of assets that could have a material effect on Parent's financial statements. Parent's management, with the participation of Parent's principal executive and financial officers, has completed an assessment of the effectiveness of Parent's internal controls over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the year ended December 31, 2018, and such assessment concluded that such internal controls were effective using the framework specified in the Parent 10-K.

(d) No personal loan or other extension of credit by Parent or any Subsidiary to any of its or their executive officers or directors has been made or modified in violation of Section 13 of the Exchange Act and Section 402 of the Sarbanes-Oxley Act since January 1, 2017.

(e) Since January 1, 2017, neither Parent nor any of its Subsidiaries nor, to Parent's knowledge, any director, officer, employee, auditor, accountant or representative of Parent or any of its Subsidiaries has received any written complaint, allegation, assertion, or claim that Parent or any of its Subsidiaries has engaged in improper or illegal accounting or auditing practices or maintains improper or inadequate internal accounting controls.

Section 4.10 Absence of Certain Changes.

(a) From the Parent Balance Sheet Date to the date hereof, Parent and its Subsidiaries have conducted their business in the ordinary course of business consistent with past practice in all material respects.

(b) From the Parent Balance Sheet Date, there has not been any event, occurrence, change or development of a state of circumstances or facts which, individually or in the aggregate, has had, or would be reasonably likely to have, a Parent Material Adverse Effect.

Section 4.11 No Undisclosed Material Liabilities. As of the date hereof, there are no material liabilities of Parent or any Subsidiary of Parent of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than:

(a) liabilities disclosed or provided for in the Parent Balance Sheet or the notes thereto;

(b) liabilities incurred since the Parent Balance Sheet Date in the ordinary course of business consistent with past practice and which, individually or in the aggregate, would not be reasonably likely to have a Parent Material Adverse Effect;

(c) liabilities disclosed in the Parent SEC Documents filed prior to the date of this Agreement;

(d) liabilities or obligations that have been discharged or paid in full in the ordinary course of business consistent with past practice; and

TABLE OF CONTENTS

(e) liabilities under this Agreement.

Section 4.12 Litigation. There is no action, suit, investigation or proceeding pending against, or, to the knowledge of Parent, threatened against or affecting, Parent, any of its Subsidiaries, any of their respective properties or any of their respective officers or directors before any court, arbitrator or any governmental body, agency, authority or official except as would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect.

Section 4.13 Compliance with Laws. To Parent's knowledge, neither Parent nor any of its Subsidiaries is in violation of, or has since January 1, 2017 violated, any applicable provisions of any laws, statutes, ordinances or regulations except for any violations that, individually or in the aggregate, have not had, and would not be reasonably likely to have, a Parent Material Adverse Effect.

Section 4.14 Regulatory Matters.

(a) Except as would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect, since January 1, 2016, (i) none of Parent, any of its Subsidiaries, nor any Parent or Subsidiary director, officer, employee, nor, to the knowledge of Parent, any representative, agent, or any other person acting on behalf of Parent or any of its Subsidiaries, has violated any Anti-Corruption Law, and (ii) none of Parent, any of its Subsidiaries nor any Parent or Subsidiary director, officer, employee, nor, to the knowledge of Parent, any representative, agent or any other person acting on behalf of Parent or any of its Subsidiaries, has offered, paid, given, promised, or authorized the payment of, anything of value (including, but not limited to, money, checks, wire transfers, tangible and intangible gifts, favors, services, or those entertainment and travel) directly or indirectly to any Government Official (A) for the purpose of (1) influencing any act or decision of a Government Official or any other person in his or her official capacity, (2) inducing a Government Official or any other person to do or omit to do any act in violation of his or her lawful duties, (3) securing any improper advantage, (4) inducing a Government Official or any other person to influence or affect any act or decision of any governmental body, agency, authority or entity or (5) assisting Parent, any Subsidiary of Parent, or any Parent or Subsidiary director, officer employee, agent, representative, or any other person acting on behalf of Parent or any of its Subsidiaries in obtaining or retaining business, or (B) in a manner which would constitute or have the purpose or effect of public or commercial bribery or corruption, acceptance of, or acquiescence in extortion, kickbacks, or other unlawful or improper means of obtaining or retaining business or any improper advantage.

(b) Except as would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect, (i) Parent, each of its Subsidiaries and their respective directors, officers, employees, and, to the knowledge of Parent, agents, representatives and other persons acting for or on behalf of any of the foregoing persons, are, and at all times since January 1, 2016 have been, in compliance with all applicable Economic Sanctions/Trade Laws and all applicable Money Laundering Laws and (ii) neither Parent nor any of its Subsidiaries carries on, or has carried on since January 1, 2016, any business, directly or knowingly indirectly, involving Cuba, Iran, Syria, Sudan, North Korea, the Crimea region of Ukraine or any Sanctions Target in violation of applicable Economic Sanctions/Trade Laws.

(c) Except as would not, individually or in the aggregate, be reasonably likely to have a Parent Material Adverse Effect, since January 1, 2016 (i) neither Parent nor any of its Subsidiaries has conducted or initiated any internal investigation, review or audit, or made a voluntary, directed, or involuntary disclosure to any governmental body, agency, authority or entity or third party with respect to any alleged or suspected act or omission arising under or relating to any potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law, or Money Laundering Law, (ii) neither Parent nor any of its Subsidiaries, nor any of their respective directors, officers, employees, nor, to the knowledge of Parent, any agents, representatives, or any other person acting on behalf of Parent or any of its Subsidiaries has received any written notice, request or citation for any actual or potential noncompliance with any applicable Anti-Corruption Law, Economic Sanctions/Trade Law or Money Laundering Law, (iii) Parent and its Subsidiaries have implemented and have at all times maintained internal controls, policies and procedures designed to detect, prevent and deter violations of Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, and (iv) Parent and each of its Subsidiaries have at all times made and maintained accurate books and records in material compliance with all applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws or Money Laundering Laws.

TABLE OF CONTENTS

Section 4.15 Financing.

(a) Parent has delivered to the Company true, complete and correct copies of (i) an executed commitment letter dated as of May 5, 2019 (together with all exhibits, schedules and annexes thereto, the "Debt Commitment Letters") from Bank of America, N.A. ("Bank of America"), Merrill Lynch, Pierce, Fenner & Smith Incorporated and Citigroup Global Markets Inc. ("Citi"), pursuant to which Bank of America and Citi have agreed, subject to the terms and conditions therein, to provide Parent with the debt financing set forth therein in connection with the Merger and the other transactions contemplated hereby and (ii) the executed fee letters referenced therein (together with all exhibits, schedules and annexes thereto, the "Debt Fee Letters", and together with the Debt Commitment Letters, subject to the last sentence of Section 7.13(c) and the last sentence of Section 7.14(d), the "Commitment Letters") redacted solely for confidential provisions related to fees, "pricing flex" and other economic terms, none of which (x) subject the funding of the Committed Financing (as defined below) to any additional conditions precedent or (y) could reduce the total amount of the Committed Financing available to Parent on the Closing Date (other than as a result of changes to fees or original issue discount in accordance with the "flex" terms of the Debt Fee Letters) . Subject to the last sentence of Section 7.13(c) and the last sentence of Section 7.13(d), the debt financing committed pursuant to the Commitment Letters shall be referred to herein as the "Committed Financing".

(b) Other than the Commitment Letters, there are no side letters or other agreements, contracts, understandings or arrangements related to the Committed Financing to which Parent or any of its affiliates is a party.

(c) Parent has delivered to the Company a true, complete and correct copy of an executed securities purchase agreement dated as of April 30, 2019 (together with all exhibits, schedules and annexes thereto, the "Equity Purchase Agreement") between Parent and Berkshire Hathaway Inc., pursuant to which Berkshire Hathaway Inc. has agreed, subject to the terms and conditions therein, to invest the amount set forth therein in connection with the Merger and the other transactions contemplated hereby (the "Equity Investment").

(d) As of the date of this Agreement, the Commitment Letters and the Equity Purchase Agreement are in full force and effect and are legal, valid and binding obligations of Parent and, to the knowledge of Parent, the other parties thereto, and are enforceable in accordance with their terms against Parent and, to the knowledge of Parent, the other parties thereto, subject to Creditors' Rights.

(e) As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would reasonably be expected to constitute a default or breach on the part of Parent, or to the knowledge of Parent, the other parties thereto, under any term or condition of the Commitment Letters or the Equity Purchase Agreement.

(f) There are no conditions or contingencies relating to the funding of the full amount of the Committed Financing or the Equity Investment other than as set forth in the Commitment Letters or the Equity Purchase Agreement, as applicable, delivered to the Company on the date hereof. As of the date of this Agreement, Parent has no reason to believe that any of the conditions relating to the funding of the full amount of the Committed Financing or the Equity Investment will not be satisfied at or prior to the Effective Time or that the Committed Financing, the Equity Investment or any other funds necessary to satisfy the Transaction Uses (as defined below) will not be available to Parent at the Effective Time.

(g) Parent has fully paid any and all commitment fees or other fees required by the Commitment Letters and the Equity Purchase Agreement to be paid on or prior to the date of this Agreement and shall in the future pay any such fees as they become due. Parent has otherwise satisfied all of the other items and conditions required to be satisfied by Parent on or prior to the date of this Agreement pursuant to the terms of the Commitment Letters and the Equity Purchase Agreement that are within its (or any affiliate's) control.

(h) Assuming the funding of the full amount of the Committed Financing in accordance with and subject to the satisfaction of the conditions of the Commitment Letters, the aggregate proceeds of the Committed Financing will be sufficient, when taken together with the proceeds of the Equity Investment and cash and marketable securities of Parent to enable Parent at the Closing to pay in cash all amounts required to be paid by

TABLE OF CONTENTS

Parent and Merger Subsidiary in cash on the Closing Date, including the aggregate cash portion of the Merger Consideration, and all payments, fees and expenses payable by them related to or arising out of the consummation of the transactions contemplated by this Agreement that are required to be paid as of such date (collectively, the "Transaction Uses").

(i) Notwithstanding anything elsewhere in this Agreement to the contrary, in no event shall the receipt or availability of any funds or financing (including the Equity Investment, the Committed Financing and the Financing (as defined below)) be a condition to any of Parent's or Merger Subsidiary's obligations hereunder.

Section 4.16 Capitalization of Merger Subsidiary. The authorized capital stock of Merger Subsidiary consists solely of 1,000 shares of common stock, par value $0.01 per share, all of which are validly issued and outstanding. All of the issued and outstanding capital stock of Merger Subsidiary is, and at the Effective Time will be, directly or indirectly owned by Parent. Merger Subsidiary has not conducted any business prior to the date hereof and has, and prior to the Effective Time will have, no assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and the other transactions contemplated by this Agreement.

Section 4.17 [Reserved]

Section 4.18 Ownership of Company Common Stock. Neither Parent nor any of its Subsidiaries (including Merger Subsidiary) owns or has owned at any time in the three years preceding the date of this Agreement any shares of Company Common Stock beneficially or of record.

Section 4.19 No Additional Representations.

(a) Except for the representations and warranties made in this Article IV, the Parent Disclosure Schedules or any certificate delivered pursuant to this Agreement, neither Parent nor any other Person makes any express or implied representation or warranty with respect to Parent or its Subsidiaries or their respective businesses, operations, assets, liabilities or conditions (financial or otherwise) in connection with this Agreement, the Merger or the Transactions, and Parent hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except as expressly provided in this Article IV, the Parent Disclosure Schedules or any certificate delivered pursuant to this Agreement, neither Parent nor any other Person makes or has made any representation or warranty to the Company or any of its affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospect information relating to Parent or any of its Subsidiaries or their respective businesses; or (ii) except for the representations and warranties made in this Article IV, the Parent Disclosure Schedules or any certificate delivered pursuant to this Agreement, any oral or written information presented to the Company or any of its affiliates or representatives in the course of their due diligence investigation of Parent, the negotiation of this Agreement or in the course of the Merger or the Transactions.

(b) Notwithstanding anything contained in this Agreement to the contrary, each of Parent and Merger Subsidiary acknowledges and agrees that neither the Company nor any other Person has made or is making, and each of Parent and Merger Subsidiary expressly disclaims reliance upon, any representations, warranties or statements relating to the Company or its Subsidiaries whatsoever, express or implied, beyond those expressly given by the Company in Article III, the Company Disclosure Schedules or any certificate delivered pursuant to this Agreement, including any implied representation or warranty as to the accuracy or completeness of any information regarding the Company or its Subsidiaries furnished or made available to Parent or Merger Subsidiary or any of their respective representatives. Without limiting the generality of the foregoing, each of Parent and Merger Subsidiary acknowledge that, except as expressly provided in Article III, the Company Disclosure Schedules or any certificate delivered pursuant to this Agreement, no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospect information that may have been made available to Parent or Merger Subsidiary or any of their respective representatives.

TABLE OF CONTENTS

## ARTICLE V

## COVENANTS OF THE COMPANY

The Company agrees that:

Section 5.1 Conduct of the Company. From the date of this Agreement until the Effective Time, except with the prior written consent of Parent (such consent not to be unreasonably withheld, conditioned or delayed), as expressly permitted by this Agreement or as set forth in Section 5.1 of the Company Disclosure Schedules, the Company and its Subsidiaries shall conduct their business in the ordinary course consistent with past practice and in a manner not involving the entry by the Company or its Subsidiaries into businesses that are materially different from the businesses of the Company and its Subsidiaries on the date hereof, and shall use their commercially reasonable efforts to preserve intact their business organizations and relationships with third parties. Without limiting the generality of the foregoing, except with the prior written consent of Parent (such consent not to be unreasonably withheld, conditioned or delayed), as expressly permitted by this Agreement or as set forth in Section 5.1 of the Company Disclosure Schedules, from the date hereof until the Effective Time:

(a) the Company will not, and will not permit any of its Subsidiaries to, adopt or propose any change in its certificate of incorporation or by-laws;

(b) the Company will not, and will not permit any Subsidiary of the Company to, adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries;

(c) the Company will not, and will not permit any Subsidiary of the Company to, issue, sell, transfer, pledge, dispose of or encumber any shares of, or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights of any kind to acquire, any shares of capital stock of any class or series of the Company or its Subsidiaries other than (i) issuances pursuant to the exercise of convertible securities outstanding on the date hereof or issuances pursuant to Company equity awards that are outstanding on the date hereof or are granted in accordance with this clause (c), (ii) if the Effective Time does not occur prior to November 1, 2019, annual grants of Company equity awards (including Company PU Awards) to be made on such date consistent with past practice (including with respect to the review and approval of the Board of Directors of the Company and its Compensation and Benefits Committee, aggregate and per-employee amounts, vesting terms, and other terms and conditions), but subject to the Company disclosing such grants in advance to Parent and consulting in advance with Parent with respect thereto, and (iii) grants of Company equity awards made to directors of the Company and newly hired and promoted employees in the ordinary course of business in accordance with past practice (including with respect to aggregate and per employee amounts), provided, however, that, at Parent's election, any equity award granted pursuant to clause (ii) or (iii) of this Section 5.1(c), other than any cash-settled Company PU Award, shall be granted in the form of an equivalent cash-settled award;

(d) the Company will not, and will not permit any Subsidiary of the Company to, (i) split, combine, subdivide, reclassify or otherwise adjust its outstanding shares of capital stock, including any shares of capital stock underlying options or other equity or equity-based awards or (ii) declare, set aside or pay any dividend or other distribution payable in cash, stock or property with respect to its capital stock other than (x) regular quarterly cash dividends or distributions payable by the Company or such Subsidiary consistent with past practice, which, (A) in the case of the Company, will not exceed $0.30 per share of Company Common Stock per fiscal quarter, and (B) in the case of the MLP, may include increases to the extent consistent with financial guidance published prior to the date hereof, and in any case will not include any special dividend, or (y) dividends paid by any Subsidiary of the Company to the Company or any wholly-owned Subsidiary of the Company; provided, however, that the Company shall not declare, set aside or pay any dividend except in accordance with Section 7.11;

(e) the Company will not, and will not permit any Subsidiary of the Company to, redeem, purchase or otherwise acquire directly or indirectly any of the Company's or any Subsidiary's capital stock, except for repurchases, redemptions or acquisitions (x) required by the terms of its capital stock or any securities outstanding on the date hereof, (y) required by or in connection with the respective terms, as of the date hereof, of any Company Benefit Plan or any dividend reinvestment plan as in effect on the date hereof in the ordinary course of the operations of such plan consistent with past practice or (z) in satisfaction of applicable Tax withholdings and/or the exercise price of any Company equity awards;

TABLE OF CONTENTS

(f) the Company will not amend the terms (including the terms relating to accelerating the vesting or lapse of repurchase rights or obligations) of any outstanding options to purchase shares of Company Common Stock or of any outstanding restricted stock, stock units or stock appreciation rights (which, it is understood, will not limit the administration of the relevant plans in accordance with past practices and interpretations of the Company's Board of Directors and the Company's Compensation Committee);

(g) the Company will not, and will not permit any Subsidiary of the Company to, make or authorize any capital expenditures except in amounts that are not in excess of (A) the aggregate budgeted amount indicated in the capital budget set forth in Section 5.1(g) of the Company Disclosure Schedules (the "Capital Budget") and (B) with respect to any line item in the Capital Budget, in an amount not to exceed the amount budgeted to such line item by more than the percentage specified therein; provided, however, if the Effective Time does not occur in 2019, with respect to capital expenditures in future periods that are not covered by such Capital Budget, as based on a reasonable extrapolation of permissible expenditures from the Capital Budget; and provided, further, the MLP shall not make or authorize capital expenditures outside the ordinary course of business consistent with past practice;

(h) the Company will not, and will not permit any Subsidiary of the Company to, (1) increase the compensation or benefits of any director, officer or employee, except for normal increases in the ordinary course of business consistent with past practice or as required under applicable law or any Company Benefit Plan existing on the date hereof, or (2) (i) enter into, (ii) adopt, (iii) extend or renew (with respect to clause (iii) only, for a term in excess of one year) (or waive or amend any performance or vesting criteria or accelerate funding under) any employment, change in control, severance, bonus, profit sharing, retirement, restricted stock, stock option, deferred compensation or other director, executive or employee benefit plan, policy, agreement or arrangement except as required by applicable law or the terms of an agreement or arrangement existing on the date hereof or, with respect to individual non-U.S. payroll employees, in the ordinary course of business consistent with past practice or as required by applicable law;

(i) the Company will not, and will not permit any of its Subsidiaries to, acquire (for cash or other assets) or agree to acquire (i) by merging or consolidating with, or by purchasing all or a substantial portion of the assets of, or by purchasing all or a substantial equity or voting interest in, or by any other manner, any business or Person or division thereof or (ii) any other assets (including E&P Assets), except, in the case of this clause (ii), the Company and its Subsidiaries shall be permitted to acquire (x) E&P Assets in accordance with Section 5.1(i) of the Company Disclosure Schedules or (y) any non-E&P Assets acquired in the ordinary course of business consistent with past practice. For purposes of this Agreement, the term "E&P Assets" means land and mineral interests or rights therein used for the exploration, development and production of oil and gas and other hydrocarbons;

(j) notwithstanding anything to the contrary contained herein, the Company will not, and will not permit any of its Subsidiaries to, make any acquisition of any assets, property or securities of any Person if such acquisition would, individually or in the aggregate, reasonably be expected to prevent, materially impede, materially interfere with or materially delay the consummation of the Merger and the Transactions;

(k) except as expressly permitted by Section 7.1, the Company will not, and will not permit any of its Subsidiaries to, sell, lease, license, encumber (including by the grant of any option thereon) or otherwise dispose of any material assets or property (which shall include any sale of any capital stock of any Subsidiary of the Company) except pursuant to existing contracts or commitments or except in the ordinary course of business consistent with past practice and in no event in an amount exceeding $100 million in the aggregate; provided, that, in no event will the Company, directly or indirectly, sell, lease, license, encumber (including by grant of any option thereon) or otherwise dispose of any equity interest in the MLP;

(l) the Company will not, and will not permit any of its Subsidiaries to, incur any indebtedness for borrowed money, guarantee or assume any such indebtedness of another Person, issue or sell warrants or other rights to acquire any debt securities of the Company or any of its Subsidiaries, enter into any "keep well" or other agreement to maintain any financial condition of another Person, or enter into any arrangement having the economic effect of any of the foregoing (other than (i) any such indebtedness among any Person and its wholly-owned Subsidiaries, among any Person's wholly-owned Subsidiaries, and guarantees thereof, (ii) additional borrowings under that certain Credit Agreement, dated as of June 17, 2014, among the Company, the lenders and other parties thereto from time to time and JPMorgan Chase Bank, N.A. as administrative agent

TABLE OF CONTENTS

(as amended from time to time, the "Company Credit Agreement") or other existing credit facilities of the Company's Subsidiaries, in each case in accordance with the terms thereof or (iii) any such indebtedness incurred to replace, renew, extend, refinance or refund any indebtedness of the Company or any of its Subsidiaries; provided, however, that in the case of each of clauses (ii) and (iii) such indebtedness either (A) is prepayable or redeemable at the Closing or at any time (subject to customary notice requirements) without premium or penalty (other than customary eurocurrency rate breakage) or (B) does not (x) impose or result in any additional restrictions or limitations in any material respect on the Company or any of its Subsidiaries or, following the Closing, Parent or any of its Subsidiaries, or (y) subject the Company or any of its Subsidiaries or, following the Closing, Parent or any of its Subsidiaries, to any additional covenants or obligations in any material respect (other than the obligations to make payment on such indebtedness), in the case of this clause (B), to which the Company or any of its Subsidiaries, or Parent or any of its Subsidiaries, as applicable, is not otherwise subject under the terms of any indebtedness outstanding as of the date hereof);

(m) the Company will not, and will not permit any of its Subsidiaries to, (i) modify, amend, terminate or waive any material rights under any Material Contract or (ii) enter into any agreement that would constitute a Material Contract if entered into as of the date of this Agreement, other than (x) as otherwise expressly contemplated by this Agreement and (y) for purposes of this clause (ii) (except with respect to any Contract of the type set forth in Section 3.21(a)(iii), Section 3.21(a)(v) or Section 3.21(a)(x)(B)), in the ordinary course of business, consistent with past practice; provided, that, the Company will not, and will not permit any of its Subsidiaries to, enter into any Contracts or extensions of existing Contracts relating to the Company's U.S. offshore business and operations with terms extending beyond December 31, 2019;

(n) the Company will not, and will not permit any of its Subsidiaries to, settle or compromise any claim, demand, lawsuit or state or federal regulatory proceeding, whether now pending or hereafter made or brought, or waive, release or assign any rights or claims, in any such case (x) in an amount in excess of $25 million, (y) that is otherwise qualitatively material to the Company or (z) that imposes (1) any material obligation to be performed by, or (2) material restriction imposed against, the Company or any of its Subsidiaries following the Closing Date; provided, however, that, notwithstanding the foregoing, the Company may not settle or propose to settle or compromise any Transaction Litigation except as expressly permitted by Section 7.14;

(o) except for any such change which is not material or which is required by reason of a concurrent change in GAAP or applicable law, the Company will not, and will not permit any Subsidiary of the Company to, change any method of financial accounting or financial accounting practice (other than any change for Tax purposes) used by it;

(p) the Company will not, and will not permit any Subsidiary of the Company to, (i) enter into any joint venture, partnership, participation or other similar arrangement with respect to its U.S.-onshore business and operations other than (x) in the ordinary course of business consistent with past practice and (y) in an aggregate amount of assets contributed by the Company or any of its Subsidiaries not exceeding $100 million, (ii) enter into any joint venture, partnership, participation or other similar arrangement with respect to its U.S.-offshore business and operations or (iii) make any loan, capital contribution or advance to or investment in any other Person (other than the Company or any wholly-owned Subsidiary of the Company in the ordinary course of business consistent with past practice and other than pursuant to capital calls required pursuant to the terms of existing equity investments) except for advances for reimbursable employee expenses in the ordinary course of business consistent with past practice;

(q) the Company will not, and will not permit any of its Subsidiaries to, take any action which would limit Parent's or the Company's freedom to license, cross-license or otherwise dispose of any Company Intellectual Property;

(r) except as required by law, the Company will not, and will not permit any of its Subsidiaries to, (i) make, revoke or amend any material election relating to Taxes, including an election under Section 965(h) of the Code or change any of its Tax accounting or procedures currently in effect, (ii) settle any Tax Proceeding or (iii) file any amended Tax Return, in each case, that is reasonably likely to result in an increase to a Tax liability, which increase is material to the Company and its Subsidiaries, taken as a whole (it being understood that the settlement of any Tax Proceeding pending in the United States Tax Court as of the date hereof as to which the Company or any of its Subsidiaries is a party shall be considered material to the Company and its Subsidiaries, taken as a whole);

TABLE OF CONTENTS

(s) except as contemplated by Section 7.1, the Company will not, and will not permit any of its Subsidiaries to, enter into any agreement that limits in any material respect the ability of the Company or any Subsidiary of the Company, or would limit in any material respect the ability of Parent or any Subsidiary of Parent after the Effective Time, to compete in or conduct any line of business or compete with any Person in any geographic area or during any period;

(t) the Company will not, and will not permit any of its Subsidiaries to, take any action that would reasonably be expected to prevent, materially impede, interfere with or delay the consummation of the Merger and the Transactions;

(u) the Company will not, and will not permit any of its Subsidiaries (other than the MLP and its Subsidiaries, but subject to the final proviso of this Section 5.1(u)) to, enter into (A) any new interest rate hedges other than extensions or replacements of existing hedges in the ordinary course of business entered into no earlier than September 1, 2019 or (B) any new commodity hedges; provided that the MLP and its Subsidiaries shall only enter into new interest rate hedges or commodity hedges in the ordinary course of business consistent with past practice;

(v) the Company will not, and will not permit any of its Subsidiaries to, incur any third party capital in respect of any non-consented AFEs without the prior written consent of Parent, such consent not to be unreasonably withheld, conditioned or delayed;

(w) the Company will not, and will not permit any of its Subsidiaries to, agree or commit to do any of the foregoing; and

(x) the Company will not, and will cause its Subsidiaries not to, take any of the actions set forth in Section 5.1(x) of the Company Disclosure Schedules.

Notwithstanding the foregoing, the obligations of the Company and its Subsidiaries under this Section 5.1 to take an action or not to take an action shall only apply (i) to the extent permitted by the organizational documents of the MLP and its Subsidiaries, (ii) to the extent the Company is authorized and empowered to bind the MLP and its Subsidiaries or has the direct or indirect contractual or other legal authority to cause the MLP and its Subsidiaries to take such action or not take such action, as applicable, and (iii) to the extent such action or inaction would not breach any contractual or other duty to the MLP or any of its equity holders.

Section 5.2 Company Stockholder Meeting; Proxy Material.

(a) Except as permitted by Section 5.2(b) below, the Board of Directors of the Company shall recommend adoption of this Agreement by the Company's stockholders, and unless permitted by Section 5.2(b), neither the Board of Directors of the Company nor any committee thereof shall (i) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in any manner adverse to Parent, the approval of this Agreement, the Merger or the Company Recommendation (as defined in Section 5.2(f) below) (any of the foregoing, a "Change in the Company Recommendation"), or (ii) approve or recommend, or propose publicly to approve or recommend, any Acquisition Proposal. For purposes of this Agreement, a Change in the Company Recommendation shall include (x) any approval or recommendation (or public proposal to approve or recommend) of an Acquisition Proposal by the Board of Directors of the Company or any committee thereof, or (y) any failure by the Company to include the Company Recommendation in the Company Proxy Statement.

(b)

(i) The Board of Directors of the Company shall be permitted, in response to a Superior Proposal received after the date of this Agreement and not resulting from a breach of this Section 5.2 or Section 7.8, to not make the Company Recommendation, or to withdraw or modify in a manner adverse to Parent the Company Recommendation, or to cause the Company to terminate this Agreement pursuant to Section 9.1(f), in each case, only if and to the extent that all of the following conditions are met: (A) the Company Stockholder Approval has not been obtained; (B) the Board of Directors of the Company determines in good faith, after consulting with outside legal counsel, that making the Company Recommendation or failing to take such action would be reasonably likely to be inconsistent with the directors' exercise of their fiduciary duties under applicable law; (C) before taking any such action, the Company promptly gives Parent written notice advising Parent of the decision of the Board of Directors of the Company to take such action (a "Superior Proposal Notice"), including the reasons therefor and

TABLE OF CONTENTS

specifying the material terms and conditions of the applicable Acquisition Proposal and the identity of the Person making such Acquisition Proposal (and the Company will also promptly give Parent such a notice with respect to any subsequent change in such proposal) and the Company has given Parent at least four (4) Business Days (as modified, extended or continued by this Section 5.2(b)(i), the "Superior Proposal Match Period") after delivery of such notice to propose revisions to the terms of this Agreement (or to make another proposal) in response to such Acquisition Proposal and during such period has made its representatives reasonably available to negotiate with Parent (to the extent Parent wishes to negotiate) with respect to such proposed revisions or other proposal, if any (it being understood and agreed that any amendment or modification (other than immaterial amendments or modifications) of such Acquisition Proposal shall require a new notice period with a new Superior Proposal Match Period of three (3) Business Days); and (D) the Board of Directors of the Company determines in good faith that such Acquisition Proposal constitutes a Superior Proposal (as defined in Section 7.8(b)) at the end of such Superior Proposal Match Period after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel, as well as any revisions to the terms of the Merger or this Agreement proposed by Parent after being notified pursuant to this Section 5.2(b)(i).

(ii) The Board of Directors of the Company shall be permitted, in response to an Intervening Event occurring after the date of this Agreement and not relating to an Acquisition Proposal, to not make the Company Recommendation or to withdraw or modify in a manner adverse to Parent the Company Recommendation, only if and to the extent that all of the following conditions are met: (A) the Company Stockholder Approval has not been obtained; (B) the Board of Directors of the Company determines in good faith, as a result of the Intervening Event, after consulting with outside legal counsel, that making the Company Recommendation or failing to so withdraw or modify the Company Recommendation would be reasonably likely to be inconsistent with the directors' exercise of their fiduciary duties to stockholders under applicable law; (C) before taking any such action, the Company promptly gives Parent written notice advising Parent of the decision of the Board of Directors of the Company to take such action (an "Intervening Event Notice"), which notice will describe the Intervening Event in reasonable detail, and the Company has given Parent at least five (5) Business Days (as modified, extended or continued by this Section 5.2(b)(ii), the "Intervening Event Match Period") after delivery of such notice to propose revisions to the terms of this Agreement (or to make another proposal) in response to such Intervening Event and during such period has made its representatives reasonably available to negotiate with Parent (to the extent Parent wishes to negotiate) with respect to such proposed revisions or other proposal, if any (it being understood and agreed that any change in fact (other than an immaterial change) relating to such Intervening Event shall require a new notice period with a new Intervening Event Match Period of three (3) Business Days); and (D) Parent does not make, within the Intervening Event Match Period, a proposal that the Board of Directors of the Company determines in good faith after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel, would obviate the need to not make or withdraw or modify the Company Recommendation. For purposes of this Agreement, "Intervening Event" means any event, development or change in circumstances that was not known to the Company's Board of Directors, or the consequences of which were not reasonably foreseeable as of the date of this Agreement, which event, change or development becomes known to the Company's Board of Directors prior to obtaining the Company Stockholder Approval; provided that in no event shall the following events, changes or developments constitute an Intervening Event: (A) the receipt, existence or terms of an Acquisition Proposal or any matter relating thereto or consequence thereof or (B) any change in the price or trading volume of the Company Common Stock, the Parent Common Stock or any other securities of the Company, Parent or any of their respective Subsidiaries (provided that the underlying causes of such changes may constitute, or be taken into account in determining whether there has been, an Intervening Event).

(iii) For the avoidance of doubt, without limiting the Company's right to terminate this Agreement in the circumstances set forth in Section 9.1, a Change in the Company Recommendation shall not limit the Company's obligation to submit this Agreement to the stockholders of the Company for the purpose of obtaining the Company Stockholder Approval at the Company Stockholder Meeting.

(c) As promptly as practicable following the date of this Agreement, Parent and the Company shall prepare, and Parent shall file with the SEC, the Form S-4, in which the Company Proxy Statement will be included as a prospectus. Each of Parent and the Company shall use all reasonable efforts to have the Form S-4

TABLE OF CONTENTS

declared effective under the Securities Act, and for the Company Proxy Statement to be cleared by the SEC and its staff under the Exchange Act, in each case, as promptly as practicable after such filing. Without limiting any other provision herein, the Form S-4 and the Company Proxy Statement will contain such information and disclosure reasonably requested by either Parent or the Company so that the Form S-4 conforms in form and substance to the requirements of the Securities Act and the Company Proxy Statement conforms in form and substance to the requirements of the Exchange Act. The Company shall use its reasonable best efforts to cause the Company Proxy Statement to be mailed to holders of Company Common Stock as promptly as practicable after the Form S-4 is declared effective.

(d) If at any time prior to the Effective Time there shall occur (i) any event with respect to the Company or any of its Subsidiaries, or with respect to information supplied by Company for inclusion in the Form S-4 or the Company Proxy Statement, or (ii) any event with respect to Parent, or with respect to information supplied by Parent for inclusion in the Form S-4 or the Company Proxy Statement, in either case, which event is required to be described in an amendment of or a supplement to the Form S-4 or the Company Proxy Statement, such event shall be so described, and such amendment or supplement shall be promptly filed with the SEC and, as required by law, disseminated to the stockholders of the Company.

(e) Each of the Company and Parent shall (i) promptly notify the other of the receipt of any comments from the SEC or its staff or any other applicable government official and of any requests by the SEC or its staff or any other applicable government official for amendments or supplements to any of the filings with the SEC in connection with the Merger and other transactions contemplated hereby or for additional information and (ii) promptly supply the other with copies of all correspondence between the Company or any of its representatives, or Parent or any of its representatives, as the case may be, on the one hand, and the SEC or its staff or any other applicable government official, on the other hand, with respect thereto. The Company and Parent shall use their respective reasonable best efforts to respond to any comments of the SEC or its staff with respect to the Form S-4 and the Company Proxy Statement as promptly as practicable. The Company and Parent shall cooperate with each other and provide to each other all information necessary in order to prepare the Form S-4 and the Company Proxy Statement as expeditiously as practicable, and each of them shall provide promptly to the other party any information that such party may obtain that could necessitate an amendment or supplement to any such document.

(f) The Company shall, as promptly as practicable after the Form S-4 is declared effective under the Securities Act, duly call, give notice of, convene and hold a meeting of its stockholders (the "Company Stockholder Meeting") for the purpose of obtaining the Company Stockholder Approval, and the Board of Directors of the Company shall recommend to the Company's stockholders the adoption of this Agreement (the "Company Recommendation") and shall include such recommendation in the Company Proxy Statement; provided, however, that the Board of Directors of the Company may fail to make such Company Recommendation or make a Change in the Company Recommendation if permitted by, and in accordance with, Section 5.2(b). Without limiting the generality of the foregoing, but subject to Section 5.2(b) and the Company's rights to terminate this Agreement under the circumstances set forth in Section 9.1, the Company agrees that its obligations pursuant to the first sentence of this Section 5.2(f) or its other obligations under this Section 5.2 shall not be affected by the commencement, public proposal, public disclosure or communication to the Company or its stockholders or representatives of any Acquisition Proposal. The Company shall use its reasonable best efforts to hold the Company Stockholder Meeting as soon as practicable after the Form S-4 becomes effective and (subject to any Change in the Company Recommendation permitted by, and in accordance with, Section 5.2(b)) to obtain the Company Stockholder Approval. The Company shall not, without the prior written consent of Parent, adjourn, postpone or otherwise delay the Company Stockholder Meeting; provided that the Company may, notwithstanding the foregoing, without the prior written consent of Parent, adjourn or postpone the Company Stockholder Meeting (A) if, after consultation with Parent, the Company believes in good faith that such adjournment or postponement is reasonably necessary to allow reasonable additional time to (1) solicit additional proxies necessary to obtain the Company Stockholder Approval, or (2) distribute any supplement or amendment to the Company Proxy Statement the distribution of which the Board of Directors of the Company has determined in good faith to be necessary under applicable law after consultation with, and taking into account the advice of, outside legal counsel or (B) for an absence of a quorum. Notwithstanding the foregoing, the Company may not, without the prior written consent of Parent (such consent not to be unreasonably withheld, conditioned or delayed), postpone the Company Stockholder Meeting more than a total of three (3) times pursuant to clause (A)(1) or (B) of the immediately preceding sentence, and no such postponement or

TABLE OF CONTENTS

adjournment pursuant to clause (A)(1) or (B) of the immediately preceding sentence shall be, without the prior written consent of Parent (such consent not to be unreasonably withheld, conditioned or delayed), for a period exceeding ten (10) Business Days and in no event may the Company postpone the Company Stockholder Meeting without the written consent of Parent if doing so would require the setting of a new record date. Without the prior written consent of Parent, the matters contemplated by the Company Stockholder Approval shall be the only matters (other than (x) matters of procedure and matters required by applicable law to be voted on by the Company's stockholders in connection therewith or (y) with Parent's prior written consent (not to be unreasonably withheld, conditioned or delayed), matters contemplated to otherwise have been submitted to the stockholders of the Company at the Company's 2019 annual stockholder meeting) that the Company shall propose to be voted on by the stockholders of the Company at the Company Stockholder Meeting. The Company shall otherwise coordinate and cooperate with Parent with respect to the timing of the Company Stockholder Meeting and will otherwise comply with all legal requirements applicable to the Company Stockholder Meeting.

Section 5.3 Resignation of Company Directors. In order to fulfill the requirements of Section 1.3, the Company shall (a) cause each director of the Company to deliver a written resignation to the Company effective at the Effective Time and (b) cause the vacancies resulting from such resignations to be filled by Persons who are directors of Merger Subsidiary immediately prior to the Effective Time.

Section 5.4 Other Actions. Subject to and in accordance with the provisions of Article VII, the Company and Parent shall cooperate with each other to lift any injunctions or remove any other impediment to the consummation of the transactions contemplated herein.

## ARTICLE VI

## COVENANTS OF PARENT

Parent agrees that:

Section 6.1 Conduct of Parent. From the date of this Agreement until the Effective Time, except with the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed), as expressly permitted by this Agreement or as set forth in Section 6.1 of the Parent Disclosure Schedules, Parent and its Subsidiaries shall conduct their business in a manner not involving the entry by Parent or its Subsidiaries into lines of businesses that are materially different from the lines of businesses of Parent and its Subsidiaries on the date hereof. Without limiting the generality of the foregoing, except with the prior written consent of the Company (such consent not to be unreasonably withheld, conditioned or delayed), as expressly permitted by this Agreement or as set forth in Section 6.1 of the Parent Disclosure Schedules, from the date hereof until the Effective Time, Parent shall not, nor shall Parent permit any of its Subsidiaries to:

(a) adopt or propose any change in the certificate of incorporation or by-laws of Parent (other than any certificate of designations adopted in connection with the Equity Investment);

(b) adopt a plan or agreement of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of Parent;

(c) except as contemplated by the Equity Investment, (i) split, combine, subdivide or reclassify Parent's outstanding shares of capital stock, or (ii) declare, set aside or pay any dividend or other distribution payable in cash, stock or property with respect to Parent's capital stock other than regular quarterly cash dividends payable by Parent consistent with past practice (including increases in such dividends consistent with past practice), and in any case not including any special dividend; provided, however, that Parent shall not declare, set aside or pay any dividend except in accordance with Section 7.11;

(d) acquire (or agree to acquire) any assets, property or securities if, individually or in the aggregate, such acquisition or acquisitions would reasonably be expected to prevent, materially impede, materially interfere with or materially delay the consummation of the Merger and the Transactions; or

(e) agree or commit to do any of the foregoing.

Section 6.2 Obligations of Merger Subsidiary. Parent will take all action necessary to cause Merger Subsidiary to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement.

TABLE OF CONTENTS

Section 6.3 Director and Officer Liability.

(a) Without limiting any other rights that any Indemnified Person may have pursuant to any employment agreement or indemnification agreement, from the Effective Time and until the six (6) year anniversary of the Effective Time, Parent shall cause the Surviving Corporation and each of its Subsidiaries, other than the MLP and its Subsidiaries, to indemnify, defend and hold harmless each Person who is now, or has been at any time prior to the date of this Agreement or who becomes prior to the Effective Time, a director, officer or employee of the Company or of such Subsidiary, as applicable, or who acts as a fiduciary under any Company Benefit Plan or is or was serving at the request of the Company or of such Subsidiary as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other enterprise (the "Indemnified Persons") against all losses, claims, damages, costs, fines, penalties, expenses (including attorneys' and other professionals' fees and expenses), liabilities or judgments or amounts that are paid in settlement, of or incurred in connection with any threatened or actual claim (including a claim of a violation of applicable law), action, audit, demand, suit, proceeding, investigation or other proceeding at law or in equity or order or ruling, in each case whether civil, criminal, administrative, investigative or otherwise and whether or not such claim, action, audit, demand, suit, proceeding, investigation or other proceeding or order or ruling results in a formal civil or criminal litigation or regulatory action ("Proceeding") to which such Indemnified Person is a party or is otherwise involved (including as a witness) based, in whole or in part, on or arising, in whole or in part, out of the fact that such Person is or was a director, officer or employee of the Company or of such Subsidiary, a fiduciary under any Company Benefit Plan or is or was serving at the request of the Company or of such Subsidiary as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other enterprise or by reason of anything done or not done by such Person in any such capacity, whether pertaining to any act or omission occurring or existing prior to, at or after the Effective Time and whether asserted or claimed prior to, at or after the Effective Time ("Indemnified Liabilities"), including all Indemnified Liabilities based in whole or in part on, or arising in whole or in part out of, or pertaining to, this Agreement or the Transactions, in each case to the fullest extent permitted under applicable law (and Parent shall cause the Surviving Corporation or such Subsidiary to pay expenses incurred in advance of the final disposition of any such Proceeding to each Indemnified Person to the fullest extent permitted under applicable law). Any Indemnified Person wishing to claim indemnification or advancement of expenses under this Section 6.3(a), upon learning of any such Proceeding, shall notify the Surviving Corporation (but the failure so to notify shall not relieve a party from any obligations that it may have under this Section 6.3(a) except to the extent such failure materially prejudices such party's position with respect to such claims). Parent will have the right, upon written notice to any applicable Indemnified Person, to assume the defense of any Proceeding in respect of which indemnification is or would be sought hereunder employing counsel reasonably satisfactory to such Indemnified Person. Notwithstanding anything to the contrary in this Section 6.3, an Indemnified Person shall only be entitled to the rights provided in this Section 6.3 after providing a written undertaking by or on behalf of such Indemnified Person to repay such amounts if it is ultimately determined under applicable law that such Indemnified Person is not entitled to be indemnified.

(b) Parent and the Surviving Corporation shall not amend, repeal or otherwise modify any provision in the organizational documents of the Surviving Corporation or its Subsidiaries other than the MLP and its Subsidiaries (and Parent shall not authorize or consent to any such amendment, repeal or other modification of the organizational documents of the MLP or any of its Subsidiaries) in any manner that would adversely affect the rights thereunder of any Indemnified Person to indemnification, exculpation or expense advancement, except to the extent required by applicable law. Parent shall cause the Surviving Corporation and its Subsidiaries other than the MLP and its Subsidiaries to fulfill and honor any indemnification, expense advancement or exculpation agreements between the Company or any of such Subsidiaries and any of its or their directors, officers or employees existing immediately prior to the Effective Time.

(c) To the fullest extent permitted under applicable law, Parent shall cause the Surviving Corporation and each of its Subsidiaries (other than the MLP and its Subsidiaries) to indemnify any Indemnified Person against all reasonable costs and expenses (including reasonable attorneys' fees and expenses), such amounts to be payable in advance upon request as provided in this Section 6.3, relating to the enforcement of such Indemnified Person's rights under this Section 6.3; provided, that, any such Indemnified Person shall only be entitled to the rights provided in this Section 6.3(c) after providing a written undertaking by or on behalf of such Indemnified Person to repay such amounts if it is ultimately determined under applicable law that such Indemnified Person is not entitled to be indemnified.

TABLE OF CONTENTS

(d) Parent shall cause the Surviving Corporation to put in place, and Parent shall fully prepay no later than immediately prior to the Closing, “tail” insurance policies with a claims reporting or discovery period of at least six (6) years from the Effective Time placed with insurance companies having the same or better AM Best Financial rating as the Company’s current directors’ and officers’ liability insurance companies with terms and conditions providing retentions, limits and other material terms no less favorable than the current directors’ and officers’ liability insurance policies maintained by the Company with respect to matters, acts or omissions existing or occurring at or prior to the Effective Time; provided, however, that Parent may elect in its sole discretion, but shall not be required, to spend more than 300% (the “Cap Amount”) of the last annual premium paid by the Company prior to the date hereof for the six (6) years of coverage under such “tail” policy; provided, further, that if the cost of such insurance exceeds the Cap Amount, and Parent elects not to spend more than the Cap Amount for such purpose, then Parent shall purchase as much coverage as is reasonably available for the Cap Amount.

(e) In the event that Parent or the Surviving Corporation (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, in each such case, proper provisions shall be made so that the successors and assigns of the Surviving Corporation, as the case may be, shall assume the obligations set forth in this Section 6.3. Parent and the Surviving Corporation shall not sell, transfer, distribute or otherwise dispose of any of their assets or the assets of any Subsidiary in a manner that would reasonably be expected to render Parent or Surviving Corporation unable to satisfy their obligations under this Section 6.3. The provisions of this Section 6.3 are intended to be for the benefit of, and shall be enforceable by, the parties and any and all Persons entitled to indemnification or insurance coverage or expense advancement pursuant to this Section 6.3, and their heirs and representatives.

Section 6.4 Form S-4. Subject to the terms and conditions of this Agreement, Parent shall prepare and file with the SEC under the Securities Act the Form S-4, and shall use its reasonable best efforts to cause the Form S-4 to be declared effective by the SEC a sufficient time prior to the Company Stockholder Meeting to allow the Company to mail the Company Proxy Statement to the Company stockholders, as required by the rules and regulations of the SEC, prior to the Company Stockholder Meeting. Parent shall take any action required to be taken under foreign or state securities or Blue Sky laws in connection with the issuance of Parent Common Stock in connection with the Merger.

Section 6.5 Stock Exchange Listing. Parent shall take all necessary action to cause the shares of Parent Common Stock to be issued in connection with the Merger to be listed on the NYSE, subject to official notice of issuance.

Section 6.6 Employee Benefits.

(a) From and after the Effective Time, Parent shall cause the Surviving Corporation to honor in accordance with their terms all benefits and obligations, subject to Section 6.6(b) hereof, under the Company Benefit Plans, each as in effect on the date hereof (or as amended to the extent permitted by Section 5.1), to the extent that entitlements or rights, actual or contingent (whether such entitlements or rights are vested as of the Effective Time or become vested or payable only upon the occurrence of a further event) exist in respect thereof as of the Effective Time. Parent and the Company hereby agree that the consummation of the Merger shall constitute a “Change in Control” for purpose of any employee arrangement and all other Company Benefit Plans, pursuant to the terms of such plans in effect on the date hereof. No provision of this Section 6.6(a) shall be construed as a limitation on the right of Parent to amend or terminate any Company Benefit Plans which the Company would otherwise have under the terms of such Company Benefit Plan, and no provision of this Section 6.6(a) shall be construed to create a right in any employee or beneficiary of such employee under a Company Benefit Plan that such employee or beneficiary would not otherwise have under the terms of such plan.

(b) For a period of one (1) year following the Effective Time, Parent shall continue to provide to each individual who is employed by the Company and the Company Subsidiaries as of the Effective Time who remains employed with Parent or any Subsidiary of Parent (“Affected Employees”), for so long as such Affected Employee remains employed by Parent or any Subsidiary of Parent during such one (1) year period, with: (i) base compensation that is no less favorable than was provided to the Affected Employee immediately before the Effective Time, (ii) short- and long-term incentive compensation opportunities that are no less favorable in the aggregate than were provided to the Affected Employee immediately before the Effective Time and (iii) all

TABLE OF CONTENTS

other compensation and employee benefits (excluding severance) that are no less favorable in the aggregate than were provided to the Affected Employee immediately before the Effective Time; provided, that for purposes of determining whether such compensation and employee benefits are no less favorable in the aggregate, (x) retention, sale, stay or change in control payments or awards or any similar compensation or benefit, shall not be taken into account, (y) in lieu of equity awards, Parent may substitute other forms of cash-based compensation having substantially equivalent value and equivalent vesting terms and (z) Parent may determine the value of defined benefit pension plan benefits provided immediately prior to the Effective Time in its good faith discretion; provided, however, that defined benefit pension plan benefits shall not be taken into account for purposes of determining under clause (iii) whether compensation and employee benefits are no less favorable in the aggregate for any particular Affected Employee, if Parent provides such Affected Employee with retirement benefits (excluding retiree welfare benefits) that are no less favorable than those provided to similarly situated employees of Parent and its Subsidiaries (it being understood that an employee of Parent and its Subsidiaries who participates in a frozen defined benefit pension plan shall not be deemed to be similarly situated to an Affected Employee). Notwithstanding the foregoing, the terms and conditions of employment for any Affected Employees who are covered by a collective bargaining agreement, works council agreement, or other contract or agreement with any labor union, works council or other employee representative organization shall be governed by such contract or agreement and the foregoing provisions of this Section 6.6(b) or the provisions of Section 6.6(a), Section 6.6(c) or Section 6.6(d) shall be inapplicable thereto.

(c) Parent will, or will cause the Surviving Corporation to, give Affected Employees full credit for purposes of eligibility, vesting and benefit accrual (other than benefit accruals under any defined benefit pension or eligibility or benefit accruals under any post-employment or retiree health or welfare plan that, in each case, is not a Company Benefit Plan) under any employee benefit plans or arrangements maintained by Parent or any Subsidiary of Parent for such Affected Employees' service with the Company or any Subsidiary (including any predecessor or acquired entity or any other entity for which the Company and its Subsidiaries have given credit for prior service) to the same extent recognized by the Company immediately prior to the Effective Time, except to the extent that such credit would result in a duplication of benefits or compensation for the same period of service.

(d) Parent will, or will cause the Surviving Corporation to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Affected Employees under any welfare benefit plans that such employees may be eligible to participate in after the Effective Time, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Effective Time under any welfare plan maintained for the Affected Employees immediately prior to the Effective Time, and (ii) for the year in which the Effective Time occurs, provide each Affected Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such employees are eligible to participate in after the Effective Time.

(e) Parent and the Company agree to the additional items set forth on Section 6.6(e) of the Company Disclosure Schedules.

(f) Nothing contained in this Section 6.6, express or implied, shall (i) be construed to establish, amend, or modify any benefit or compensation plan, program, agreement, contract, policy or arrangement, (ii) limit the ability of Parent or the Company or any of their Subsidiaries or affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement, contract, policy or arrangement at any time assumed, established, sponsored or maintained by any of them, except as permitted by the terms of such plan, program, agreement, contract, policy or arrangement, (iii) create any third-party beneficiary rights or obligations in any person (including any employee) or any right to employment or services or continued employment or service or to a particular term or condition of employment or service with Parent or the Company or any of their Subsidiaries, or any of their respective affiliates or (iv) limit the right of Parent or the Company (or any of their Subsidiaries or their respective affiliates) to terminate the employment or service of any employee or other service provider following the Closing at any time and for any or no reason.

(g) As soon as practicable after the date of this Agreement, the Company shall have reasonably cooperated with Parent to provide to Parent such information reasonably requested by Parent to enable Parent to calculate the impact of Sections 280G and 4999 of the Code with respect to the consummation of the transactions contemplated by this Agreement, either alone or in combination with another event.

TABLE OF CONTENTS

## ARTICLE VII

## COVENANTS OF PARENT AND THE COMPANY

The parties hereto agree that:

Section 7.1 Best Efforts.

(a) Subject to Sections 5.2, 7.1(b) and 7.1(c), the Company and Parent shall each cooperate with the other and use (and shall cause their respective Subsidiaries to use) their respective best efforts to promptly (i) take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable under this Agreement and applicable laws to consummate and make effective the Merger and the other transactions contemplated by this Agreement as soon as practicable, including, without limitation, preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtain as soon as practicable all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any third party or governmental body, agency, authority or official which are necessary, proper or advisable to consummate the Merger and the other transactions contemplated by this Agreement. The Company and Parent shall submit the notifications required under the HSR Act relating to the Merger within ten (10) Business Days of the date of this Agreement. Prior to Closing, and subject to applicable laws relating to the exchange of information, the Company and Parent shall each keep the other apprised of the status of matters relating to the completion of the Merger and work cooperatively in connection with obtaining all required approvals or consents of any governmental agency, body, authority or entity in connection with the Merger. The Company and Parent shall have the right to review in advance, and each will consult the other to provide any necessary information with respect to all filings made with, or written materials submitted to, any third party and/or any governmental agency, body, authority or entity in connection with the Merger and the other transactions contemplated by this Agreement. The Company and Parent shall each promptly inform the other party, and if in writing, furnish the other party with copies of (or, in the case of oral communications, advise the other party orally of) any communication from any governmental agency, body, authority or entity regarding the Merger, and provide the other party with the opportunity to participate in any meeting with any governmental agency, body, authority or entity in respect of any filing, investigation or other inquiry in connection with the transactions contemplated hereby; provided that Parent will lead all such processes; but provided, further, that the foregoing shall not limit in any respect any party's obligations under this Agreement. If either party receives a request for additional information or documentary material from any governmental agency, body, authority or entity with respect to the Merger, then such party will use its reasonable best efforts to make, or cause to be made, promptly and after consultation with the other party, an appropriate response in compliance with such request. Subject to applicable laws or any request made by any applicable governmental agency, body, authority or entity (including the staff thereof), the Company and Parent shall each furnish to each other copies of all correspondence, filings and written communications between it and any such governmental agency, body, authority or entity with respect to this Agreement and the Merger, and furnish the other party with such necessary information and reasonable assistance as the other party may reasonably request in connection with its preparation of filings or submissions of information to any such governmental agency, body, authority or entity; provided that materials provided pursuant to this Section 7.1(a) may be redacted (i) to remove references concerning the valuation of the Company, (ii) as necessary to comply with contractual obligations, and (iii) as necessary to address reasonable privilege concerns.

(b) Without limiting Section 7.1(a), Parent and the Company shall, subject to Section 7.1(c), as applicable:

(i) each use its best efforts to avoid the entry of, or to have vacated or terminated, any decree, order, or judgment that would restrain, prevent or delay the Closing, on or before the End Date (as defined in Section 9.1(b)(i)), including without limitation defending through litigation on the merits any claim asserted in any court by any Person; and

(ii) each use its best efforts to avoid or eliminate each and every impediment under any antitrust, competition or trade regulation law that may be asserted by any governmental agency, body, authority or entity with respect to the Merger (collectively, "Antitrust Laws") so as to enable the Closing to occur as soon as reasonably possible (and in any event no later than the End Date), including, without limitation, (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of such businesses, product lines or assets of Parent, the Company and

TABLE OF CONTENTS

their respective Subsidiaries and (y) otherwise taking or committing to take actions that after the Closing Date would limit Parent or its Subsidiaries' freedom of action with respect to, or its or their ability to retain, one or more of the businesses, product lines or assets of Parent, the Company and their respective Subsidiaries, in each case as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any suit or proceeding, which would otherwise have the effect of preventing or materially delaying the Closing. Parent and, if requested by Parent, the Company shall agree to divest, sell, dispose of, hold separate, or otherwise take or commit to take any action that limits its freedom of action with respect to, or Parent or Parent's Subsidiaries' ability to retain, any of the businesses, product lines or assets of Parent, the Company or any of their respective Subsidiaries; provided that any such action is conditioned upon the consummation of the Merger. The Company agrees and acknowledges that, notwithstanding anything to the contrary in this Section 7.1, in connection with any filing or submission required, action to be taken or commitment to be made by Parent, the Company or any of their respective Subsidiaries to consummate the Merger or other transactions contemplated by this Agreement, neither the Company nor any of the Company's Subsidiaries shall, without Parent's prior written consent, sell, divest, or dispose of any assets, license of any Company Intellectual Property, commit to any sale, divestiture or disposal of businesses, product lines or assets of the Company and the Company's Subsidiaries or any license of Company Intellectual Property or take any other action or commit to take any action that would limit the Company's, Parent's or any of their respective Subsidiaries' freedom of action with respect to, or their ability to retain any of, their businesses, product lines or assets or Company Intellectual Property; provided that the foregoing shall not relieve any party of its obligations under this Agreement.

(c) Notwithstanding anything else contained herein, neither the provisions of this Section 7.1 nor any other provision of this Agreement shall be construed to require Parent or any of Parent's Subsidiaries to undertake (or to request or authorize the Company or any of the Company's Subsidiaries to undertake) any efforts or to take any action if such efforts or action would, or would reasonably be expected to, result in a Substantial Detriment. "Substantial Detriment" shall mean changes or effects which would, individually or in the aggregate (and after giving effect to any reasonably expected proceeds of any divestiture or sale of assets), result in, or be reasonably likely to result in, a Company Material Adverse Effect, at or after the Effective Time; provided that any requirement to divest or hold separate, or limit the operation of, any division, Subsidiary, interest, business, product line, asset or property relating to the operations conducted by Parent and its Subsidiaries prior to the Effective Time shall be deemed to result in a Substantial Detriment if such action with respect to a comparable amount of assets or businesses of the Company and its Subsidiaries, taken together with all other actions taken pursuant to this Section 7.1, would be reasonably likely, in the aggregate, to have a Company Material Adverse Effect, at or after the Effective Time.

Section 7.2 Certain Filings. The Company and Parent shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any governmental body, agency, authority or official is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in seeking any such actions, consents, approvals or waivers or making any such filings, furnishing information required in connection therewith or with the Company Proxy Statement or the Form S-4 and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.3 Access to Information. From the date of this Agreement until the Effective Time, to the extent permitted by applicable law, the Company and Parent will, during normal business hours and upon reasonable request, (a) give the other party and its counsel, financial advisors, auditors and other authorized representatives access to the offices, properties, books and records of such party and its Subsidiaries, (b) furnish to the other party and its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request and (c) instruct its employees, counsel and financial advisors to cooperate with the other party in its investigation of the business of the Company or Parent, as the case may be; provided that such investigation shall not disrupt the Company's or Parent's operations; and provided, further, that no such investigation shall affect any representation or warranty given by either party hereunder. Notwithstanding the foregoing, neither the Company, on the one hand, nor Parent, on the other hand, shall be required to provide any information which it reasonably believes it may not provide to the other by reason of any applicable law, which constitutes information protected by attorney/client privilege, or which it is required to keep confidential by reason of contract or agreement with any third Person.

TABLE OF CONTENTS

Each party shall use reasonable efforts to make reasonable and appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply. All information obtained by Parent or the Company pursuant to this Section 7.3 shall be kept confidential in accordance with, and shall otherwise be subject to the terms of, the Confidentiality Agreement dated as of March 26, 2019, between Parent and the Company (the "Confidentiality Agreement"). Without limiting the foregoing, from the date of the Agreement to the Effective Time, the Company shall, subject to the terms and limitations of this Section 7.3, cooperate in good faith to provide Parent as promptly as practicable with the information described in Section 7.3 of the Company Disclosure Schedules.

Section 7.4 [Reserved]

Section 7.5 Public Announcements. Parent and the Company will consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, (a) any press release or public statement as may be required by applicable law or any listing agreement with any national securities exchange may be issued prior to such consultation, if the party making the release or statement has used its reasonable best efforts to consult with the other party, and (b) a party may, without such consultation, issue a press release or make a public statement that is consistent with prior press releases issued or public statements made in compliance with this Section 7.5 or any communication plan or strategy previously agreed to by Parent and the Company. For the avoidance of doubt, nothing in this Section 7.5 shall prevent Parent or the Company from issuing any press release or making any public statement in the ordinary course that does not relate specifically to this Agreement or the transactions contemplated hereby.

Section 7.6 Further Assurances. At and after the Effective Time, the officers and directors of the Surviving Corporation will be authorized to execute and deliver, in the name and on behalf of the Company or Merger Subsidiary, any deeds, bills of sale, assignments or assurances and to take any other actions and do any other things, in the name and on behalf of the Company or Merger Subsidiary, reasonably necessary to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets of the Company acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger.

Section 7.7 Notices of Certain Events.

(a) Each of the Company and Parent shall promptly notify the other party of:

(i) any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii) any notice or other written communication from any governmental agency, body, authority or entity in connection with the transactions contemplated by this Agreement; and

(iii) any actions, suits, claims, investigations or proceedings (A) commenced or (B) to the best of its knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to the consummation of the transactions contemplated by this Agreement;

provided, however, that no such notification (and no other notification required to be given under any other Section of this Agreement) shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement.

Section 7.8 No Solicitation.

(a) The Company and its Subsidiaries will not, and the Company will direct and use its reasonable best efforts to cause its and its Subsidiaries' respective officers, directors, employees, investment bankers, consultants, attorneys, accountants, agents and other representatives not to, directly or indirectly, take any action to solicit, initiate, or knowingly encourage or facilitate the making of any Acquisition Proposal (including without limitation by amending, or granting any waiver under, Article NINTH of the Company Charter or Section 203 of the DGCL) or any inquiry with respect thereto or engage in discussions or negotiations with any Person with respect thereto (except to notify such Person of the existence of the provisions of this Section 7.8), or disclose any nonpublic information or afford access to properties, books or records to any Person that has made, or to the Company's knowledge is considering making, any Acquisition Proposal, or approve or recommend, or propose to

approve or recommend, or execute or enter into any letter of intent, agreement in principle, merger agreement, option agreement, acquisition agreement or other similar agreement relating to an Acquisition Proposal, or propose publicly or agree to do any of the foregoing relating to an Acquisition Proposal. Nothing contained in this Agreement shall prevent the Board of Directors of the Company from (i) complying with Rule 14e-2 under the Exchange Act with regard to an Acquisition Proposal or (ii) making any disclosure if, in the case of this clause (ii), in the good faith judgment of the Company's Board of Directors, after consultation with outside counsel, the failure to make such disclosure would be reasonably likely to be inconsistent with the directors' exercise of their fiduciary duties to the Company's stockholders under applicable law; provided, however, that any such disclosure that relates to an Acquisition Proposal shall be deemed to be a Change in the Company Recommendation unless the Company's Board of Directors reaffirms the Company Recommendation in such disclosure. Notwithstanding anything to the contrary in this Agreement but subject to the first sentence of Section 7.8(b), prior to (but not after) the date of the Company Stockholder Approval, the Company may, directly or indirectly through its advisors, agents or other intermediaries, (A) furnish information and access, but only in response to a request for information or access, to any Person making a *bona fide*, written Acquisition Proposal to the Board of Directors of the Company after the date hereof which was not obtained in breach of Section 5.2 or this Section 7.8 and (B) participate in discussions and negotiate with such Person or its representatives concerning any such unsolicited Acquisition Proposal, if and only if, in any such case set forth in clause (A) or (B) of this sentence, (1) the Board of Directors of the Company concludes in good faith, after (x) receipt of the advice of a financial advisor of nationally recognized reputation and outside legal counsel, that such Acquisition Proposal constitutes or could reasonably be expected to result in a Superior Proposal and (y) taking into account any revisions to the terms of the Merger or this Agreement proposed by Parent after being notified pursuant to Section 5.2(b), that failure to do so would be reasonably likely to be inconsistent with its fiduciary duties to the Company's stockholders under applicable law and (2) (x) the Company receives from the Person making such an Acquisition Proposal, prior to engaging in any of the activities described in clause (A) or (B) of this sentence, an executed confidentiality agreement the material terms of which, as they relate to confidentiality, are (without regard to the terms of such Acquisition Proposal) in all material respects (i) no less favorable to the Company and (ii) no less restrictive to the Person making such Acquisition Proposal than those contained in the Confidentiality Agreement and (y) any information provided to such Person has previously been provided to Parent or is provided to Parent prior to or substantially concurrently with the time it is provided to such Person. The Board of Directors of the Company shall not take any of the actions referred to in the foregoing clauses (A) and (B) unless the Company shall have first delivered to Parent written notice advising Parent that the Company intends to take such action.

(b) In the event that on or after the date of this Agreement the Company receives an Acquisition Proposal, or any request for nonpublic information relating to the Company or any Subsidiary of the Company or for access to the properties, books or records of the Company or any Subsidiary of the Company by any Person that has made, or to the Company's knowledge may be considering making, an Acquisition Proposal, the Company will (A) promptly (and in no event later than twenty-four (24) hours after receipt thereof) notify (which notice shall be provided orally and in writing and shall identify the Person making such Acquisition Proposal or request and set forth the material terms thereof) Parent thereof, (B) keep Parent reasonably and promptly informed of the status and material terms of (including with respect to changes to the status or material terms of) any such Acquisition Proposal or request and (C) as promptly as practicable (but in no event later than twenty-four (24) hours after receipt) provide to Parent unredacted copies of all material correspondence and written materials (whether or not electronic) sent or provided to the Company or any of its Subsidiaries that describes any terms or conditions thereof, including any proposed transaction agreements (along with all schedules and exhibits thereto and any financing commitments related thereto), as well as written summaries of any material oral communications relating to the terms and conditions thereof. The Company (x) shall, and shall cause its Subsidiaries to, immediately cease and cause to be terminated and shall use reasonable best efforts to cause its and their officers, directors, employees, investment bankers, consultants, attorneys, accountants, agents and other representatives to, immediately cease and cause to be terminated, all discussions and negotiations, if any, that have taken place prior to the date hereof with any Persons with respect to any Acquisition Proposal or the possibility thereof, (y) shall promptly request each Person, if any, that has executed a confidentiality agreement within the nine (9) months prior to the date hereof in connection with its consideration of any Acquisition Proposal to return or destroy all confidential information heretofore furnished to such Person by or on behalf of it or any of its Subsidiaries and (z) immediately terminate all physical and electronic data room access for such Person and their representatives to diligence or other information regarding the Company or any of its

Subsidiaries. The Company shall not modify, amend or terminate, or waive, release or assign, any provisions of any confidentiality or standstill agreement (or any similar agreement) to which the Company or any of its Subsidiaries is a party relating to any such Acquisition Proposal and shall enforce the provisions of any such agreement; provided that the Company shall be permitted on a confidential basis, upon written request by a relevant party thereto or without prior notice to Parent disclosing the party and the circumstances, release or waive any standstill obligations solely to the extent necessary to permit the party referred therein to submit an Acquisition Proposal to the Board of Directors of the Company on a confidential basis. The Company shall provide written notice to Parent of waiver or release of any standstill by the Company, including disclosure of the identities of the parties thereto and circumstances relating thereto.

For purposes of this Agreement, "Acquisition Proposal" means any *bona fide* written offer or proposal for, or any *bona fide* written indication of interest in, any (i) direct or indirect acquisition or purchase of any business or assets of the Company or any of its Subsidiaries that, individually or in the aggregate, constitutes 20% or more of the net revenues, net income, EBITDA or assets of the Company and its Subsidiaries, taken as a whole, (ii) direct or indirect acquisition or purchase of 20% or more of any class of equity securities of the Company or any of its Subsidiaries whose business constitutes 20% or more of the net revenues, net income, EBITDA or assets of the Company and its Subsidiaries, taken as a whole, (iii) tender offer or exchange offer that, if consummated, would result in any Person beneficially owning 20% or more of any class of equity securities of the Company or any of its Subsidiaries whose business constitutes 20% or more the net revenues, net income, EBITDA or assets of the Company and its Subsidiaries, taken as a whole, or (iv) merger, consolidation, business combination, joint venture, partnership, recapitalization, liquidation, dissolution or similar transaction involving the Company or any of its Subsidiaries whose business constitutes 20% or more of the net revenue, net income, EBITDA or assets of the Company and its Subsidiaries, taken as a whole, other than the transactions contemplated by this Agreement. For purposes of this Agreement, "Superior Proposal" means any *bona fide* written Acquisition Proposal for or in respect of at least a majority of the outstanding shares of Company Common Stock or the Company's and its Subsidiaries' assets on terms that the Board of Directors of the Company determines in its good faith judgment (after consultation with, and taking into account the advice of, a financial advisor of nationally recognized reputation and outside legal counsel, taking into account all the terms and conditions of such Acquisition Proposal, including any break-up fees, expense reimbursement provisions and conditions to consummation, as well as any revisions to the terms of the Merger or this Agreement proposed by Parent after being notified pursuant to Section 5.2(b)) (i) is more favorable to the Company's stockholders than the Merger and the Transactions and (ii) constitutes a transaction that is reasonably likely to be consummated on the terms so proposed, taking into account all legal, financial, regulatory and other aspects of such proposal.

(c) The Company agrees that it will take the necessary steps promptly to inform its Subsidiaries and its officers, directors, investment bankers, consultants, attorneys, accountants, agents and other representatives of the obligations undertaken in this Section 7.8.

Section 7.9 Takeover Statutes. If (a) the restrictions on business combinations set forth in Article NINTH of the Company Charter or (b) any anti-takeover or similar statute or regulation is or may become applicable to the transactions contemplated hereby, each of the parties and its Board of Directors shall grant such approvals and take all such actions as are legally permissible so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any such restriction, statute or regulation on the transactions contemplated hereby.

Section 7.10 Section 16(b). Each of Parent and the Company shall take all such steps as may be reasonably necessary to cause the transactions contemplated hereby and any other dispositions of equity securities of the Company (including derivative securities) or acquisitions of equity securities of Parent (including derivative securities) in connection with this Agreement by each individual who (a) is a director or officer of the Company or (b) at the Effective Time will become a director or officer of Parent, to be exempt under Rule 16b-3 promulgated under the Exchange Act.

Section 7.11 Coordination of Quarterly Dividends. Parent and the Company shall each coordinate their record and payment dates for their regular quarterly dividends to ensure that the holders of Company Common Stock shall not receive two dividends, or fail to receive one dividend, in any quarter with respect to their Company Common Stock and the Parent Common Stock that such holders receive in exchange therefor in the Merger. In addition, and without limiting the requirements of the previous sentence, the Company shall ensure that the date on which any quarterly dividend is declared and the record date with respect to any quarterly

TABLE OF CONTENTS

dividend shall be no later than five (5) Business Days following the one year anniversary of such dates for the corresponding quarter of the preceding year; provided, however, that in the quarter in which the Closing occurs, if the record date of Parent's quarterly dividend has been declared and is a date prior to the Effective Time, then such quarterly dividend declaration date and record date of the Company shall occur no later than such date as is necessary to ensure that holders of Company Common Stock receive a quarterly dividend in accordance with the first sentence of this Section 7.11.

Section 7.12 Stock Exchange Delisting; Deregistration. Prior to the Effective Time, the Company shall cooperate with Parent and use its reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable on its part pursuant to applicable law and the rules and regulations of NYSE to cause (a) the delisting of the Company Common Stock from NYSE as promptly as practicable after the Effective Time and (b) the deregistration of the Company Common Stock pursuant to the Exchange Act as promptly as practicable after such delisting.

Section 7.13 Financing.

(a) The Company and Parent shall cooperate with each other with respect to customary actions for transactions of this type that are reasonably requested by Parent to be taken by the Company or its Subsidiaries under the Company Credit Agreement or any of the Company's outstanding debt securities in connection with the Merger; provided that (i) none of the Company, its Subsidiaries or their representatives shall be required to execute or deliver, or agree to any change or modification of, any agreement that is effective prior to the Closing or that would be effective if the Closing does not occur, or deliver or cause to be delivered any opinion of counsel in connection therewith and (ii) Parent shall provide a customary indemnity in connection therewith.

(b) Parent and Merger Subsidiary shall, and shall cause their respective Subsidiaries to, use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to arrange and obtain the Committed Financing on the terms and conditions set forth in the Commitment Letters, including using reasonable best efforts to (i) maintain in effect the Commitment Letters until the Merger and the other transactions contemplated by this Agreement are consummated (it being acknowledged that the commitments under the Commitment Letters may be reduced to the extent that Parent receives cash proceeds from any Financing at or prior to the Effective Time, which cash proceeds are (x) segregated and limited in use to the consummation of the Merger and the other transactions contemplated by this Agreement or (y) funded into an escrow account with release provisions not less favorable to Parent than the conditions contained in the Commitment Letters ("Permitted Commitment Reductions")) and (ii) unless Parent shall have reduced the commitments under the Commitment Letters to zero pursuant to Permitted Commitment Reductions, (x) timely (and in any event by the Effective Time) negotiate and enter into definitive agreements with respect to the facilities contemplated by the Commitment Letters on the terms and conditions set forth therein, (y) satisfy or cause to be waived on a timely basis (and in any event by the Effective Time) all conditions to funding applicable to Parent set forth in the Commitment Letters or such definitive agreements that are within its (or any Affiliate's) control and otherwise comply with its obligations thereunder and (z) upon the satisfaction or waiver of such conditions, consummate, and cause the Financing Sources to fund, the Committed Financing at the Effective Time (including using reasonable best efforts to enforce all of its rights under the Commitment Letters).

(c) Nothing herein shall prevent Parent from substituting all or any portion of the Committed Financing provided for in the Commitment Letters with one or more commitments from financial institutions to provide substitute debt financing (i) in an amount, together with any cash and marketable securities of Parent and any then-available Committed Financing, sufficient for Parent and Merger Subsidiary to satisfy the Transaction Uses at the Effective Time, (ii) that does not impose new or additional conditions to the Committed Financing or otherwise expand, amend, modify or waive any conditions to the Committed Financing and (iii) that would not reasonably be expected to (A) make the timely funding of the Committed Financing or the satisfaction of the conditions to obtaining the Committed Financing materially less likely to occur or (B) materially and adversely affect the ability of Parent to enforce its rights against other parties to the Commitment Letters or the definitive agreements relating thereto (the "Substitute Financing"), and to obtain new financing commitment letter(s) with respect to such Substitute Financing (the "Substitute Commitment Letter(s)"). Parent shall promptly provide true, complete and correct copies of such Substitute Commitment Letter(s) to the Company. In the event Substitute

TABLE OF CONTENTS

Commitment Letter(s) are obtained, the definitions of “Commitment Letters” and “Committed Financing” set forth in this Agreement shall be deemed to have been modified as appropriate to reflect such Substitute Commitment Letter(s) and such Substitute Financing contemplated thereby.

(d) If any portion of the Committed Financing becomes unavailable, and such unavailable amount is reasonably required for Parent and Merger Subsidiary to satisfy the Transaction Uses at the Effective Time (such event, an “Original Financing Failure”), Parent shall promptly notify the Company in writing of the Original Financing Failure and Parent shall use its reasonable best efforts to arrange and obtain, as promptly as reasonably practicable, alternative financing from alternative sources (i) in an amount, together with any cash and marketable securities of Parent and any then-available Committed Financing, sufficient for Parent and Merger Subsidiary to satisfy the Transaction Uses at the Effective Time, (ii) that does not impose new or additional conditions to the Committed Financing or otherwise expand, amend, modify or waive any conditions to the Committed Financing and (iii) that would not reasonably be expected to (A) make the timely funding of the Committed Financing or the satisfaction of the conditions to obtaining the Committed Financing materially less likely to occur or (B) materially and adversely affect the ability of Parent to enforce its rights against other parties to the Commitment Letters or the definitive agreements relating thereto (the “Alternative Financing”), and to obtain new financing commitment letter(s) with respect to such Alternative Financing (the “Alternative Commitment Letter(s)”). Parent shall promptly provide true, complete and correct copies of such Alternative Commitment Letter(s) to the Company. In the event Alternative Commitment Letter(s) are obtained, the definitions of “Commitment Letters” and “Committed Financing” set forth in this Agreement shall be deemed to have been modified as appropriate to reflect such Alternative Commitment Letter(s) and such Alternative Financing contemplated thereby.

(e) Parent shall not permit any amendment, modification to, or any waiver of any provision or remedy under, any of the Commitment Letters or the Equity Purchase Agreement or any definitive agreement related to the Committed Financing unless (i) such amendment, modification or waiver would not impose new or additional conditions to the Committed Financing or Equity Investment or otherwise expand, amend, modify or waive any conditions to the Committed Financing or the Equity Investment and (ii) such amendment, modification or waiver would not reasonably be expected to (A) make the timely funding of the Committed Financing or the Equity Investment or the satisfaction of the conditions to obtaining the Committed Financing or the Equity Investment materially less likely to occur, (B) reduce the aggregate amount of the Committed Financing or the Equity Investment to an amount, together with the proceeds of the Equity Investment (in the case of a reduction to the Committed Financing) or the Committed Financing (in the case of a reduction to the Equity Investment) and any cash and marketable securities of Parent, less than the amount necessary for Parent and Merger Subsidiary to satisfy the Transaction Uses at the Effective Time or (C) materially and adversely affect the ability of Parent to enforce its rights against other parties to the Commitment Letters or the Equity Purchase Agreement or such definitive agreements. Parent shall promptly provide true, complete and correct copies of each amendment, modification and waiver to any of the Commitment Letters or the Equity Purchase Agreement or any definitive agreement related to the Committed Financing to the Company.

(f) Parent shall keep the Company reasonably informed on a timely basis of the status of Parent’s efforts to obtain the Committed Financing and to satisfy the conditions thereof and shall give the Company prompt notice of any fact, change, event or circumstance that is reasonably likely to have, individually or in the aggregate, a material adverse impact on the Committed Financing. Parent shall give the Company prompt notice of (x) any material breach or material default by any party to the Commitment Letters, or any definitive agreements related to the Committed Financing, in each case of which Parent becomes aware, (y) actual or, to the knowledge of Parent, threatened in writing withdrawal, repudiation, or termination of any of the Commitment Letters or such definitive agreements and (z) the receipt of any written notice or other communication, in each case received from any Financing Source with respect to any (1) material breach of Parent’s obligations under the Commitment Letters or definitive agreements related to the Committed Financing, or breach, default, withdrawal, termination or repudiation by any party to the Commitment Letters or definitive agreements related to the Committed Financing, (2) material dispute or disagreement between or among any parties to the Commitment Letter or definitive agreements related to the Committed Financing or any provisions of the Commitment Letters, in each case, with respect to the obligation to fund any amount of the Committed Financing to be funded at the Effective Time; or (3) failure or anticipated failure by such Financing Source to fund any part of its commitments under any Commitment Letter or definitive agreement related to the

TABLE OF CONTENTS

Committed Financing to be funded at the Effective Time; provided that in no event shall Parent be under any obligation to disclose any information pursuant to clauses (1), (2) or (3) that would waive the protection of attorney-client privilege, but Parent shall use reasonable best efforts to disclose such information in a way that would not jeopardize such privilege.

(g) From and after the date of this Agreement, and through the earlier of the Effective Time and the date on which this Agreement is terminated in accordance with Article IX, the Company shall, and the Company shall cause each of its Subsidiaries (other than the MLP and its Subsidiaries) to, use its and their reasonable best efforts to cause its and their representatives to, use their respective reasonable best efforts to provide such customary cooperation as is reasonably requested by Parent in writing to assist Parent in the arrangement, syndication and consummation of the Committed Financing or other bank financing or capital markets financing entered into to finance the Transaction Uses (the "Financing"), including using reasonable best efforts to (A) cause the management team of the Company to participate in a reasonable number of requested meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies in connection with the Financing, in each case upon reasonable notice and at mutually agreed upon dates and times, (B) reasonably assist Parent and the Financing Sources with their preparation of (1) materials for rating agency presentations and investor and road show presentations, (2) bank information memoranda (including a public-side version thereof), syndication documents, registration statements, prospectuses, offering memoranda and private placement memoranda and (3) similar documents and materials, in each case necessary, customary or advisable in connection with any portion the Financing to the extent reasonably requested by Parent and limited to information to be contained therein with respect to the Company and its Subsidiaries, (C) subject to customary confidentiality provisions and disclaimers, provide customary authorization letters to the Financing Sources authorizing the distribution of information to prospective lenders and containing a customary representation that such information does not contain a material misstatement or omission and containing a representation to the Financing Sources that the public side versions of such documents, if any, do not include material non-public information about the Company or its Subsidiaries or their respective securities, (D) provide the Financing Sources, at least three business days prior to the closing date of the applicable Financing (to the extent requested in writing at least 10 business days prior to the closing date of the applicable Financing) with all documentation and other information required with respect to the Company and its Subsidiaries by applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, Title III of Pub. L. 107-56 (the "PATRIOT Act") and 31 C.F.R. § 1010.230, and applicable Anti-Corruption Laws, Economic Sanctions/Trade Laws and Money Laundering Laws, (E) following written request therefor, provide information concerning the Company and its Subsidiaries reasonably necessary for the preparation and completion of the definitive documents governing or relating to the Financing (including any schedules, customary certificates, annexes or exhibits thereto and other pertinent and customary information as Parent shall reasonably request in order to market, syndicate and consummate the Financing), (F) provide (i) audited consolidated balance sheets and related audited consolidated statements of income, comprehensive income, equity and cash flows of the Company for each of the three fiscal years most recently ended more than sixty (60) days prior to the Closing Date, (ii) unaudited consolidated balance sheets and related unaudited consolidated statements of income, comprehensive income and cash flows of the Company for each subsequent fiscal quarter ended more than forty (40) days prior to the Closing Date and (iii) other historical financial information regarding the Company and its Subsidiaries reasonably necessary to permit Parent to prepare pro forma financial statements customarily included in marketing and offering documents for an offering of debt securities of Parent on a registration statement filed with the SEC, (G) cause its independent accountants and independent petroleum consultants to provide customary assistance and cooperation reasonably requested by Parent with any offering of debt securities, including (i) providing any necessary written consents to use their audit or other reports relating to financial statements or reserve information of the Company and its Subsidiaries and to be named as an "Expert" in any document related to any applicable Financing and (ii) participating in customary due diligence sessions and providing any customary "comfort" letters (including customary "negative assurance" comfort for any applicable Financing), (H) cause its independent petroleum consultants to provide any customary letters and consents regarding customary and appropriate reserve information of the Company and its Subsidiaries and (I) cooperate with the Financing Sources' due diligence, to the extent customary and reasonable.

TABLE OF CONTENTS

(h) Notwithstanding anything to the contrary set forth in this Section 7.13, in connection with the Committed Financing, the Financing or any other cooperation contemplated by this Section 7.13:

(i) none of the Company or its Subsidiaries or any of their respective representatives shall be required to provide any cooperation pursuant to this Section 7.13 to the extent such requested cooperation would reasonably be expected to interfere unreasonably with the ongoing business or operations of the Company and its Subsidiaries;

(ii) none of the Company or its Subsidiaries or any of their respective representatives shall be required to pass resolutions or consents to approve or authorize the execution of the Committed Financing, the Financing or any other cooperation contemplated by this Section 7.13, or execute or deliver any certificate, document, legal opinion, instrument or agreement or agree to any change or modification of any existing certificate, document, instrument or agreement in connection therewith, in each case, that (A) is effective prior to the Effective Time or that would be effective if the Effective Time does not occur (other than authorization letters contemplated by Section 7.13(g)(C)) or (B) would be inaccurate in light of the facts and circumstances at the time approved, authorized, executed or delivered, as applicable;

(iii) none of the Company or its Subsidiaries or any of their respective representatives shall become bound by any terms of the Committed Financing or the Financing prior to the Effective Time;

(iv) none of the Company or its Subsidiaries or any of their respective representatives shall be required to pay any commitment or other similar fee or incur any other cost or expense for which it has not received simultaneous or prior reimbursement or, with respect to immaterial costs or expenses, for which it is not indemnified by or on behalf of Parent in connection with the Committed Financing, the Financing or any other cooperation contemplated by this Section 7.13 prior to the Effective Time;

(v) none of the Company or its Subsidiaries or any of their respective representatives shall be required to disclose or provide any information in connection with the Committed Financing, the Financing or any other cooperation contemplated by this Section 7.13, the disclosure of which, in the judgment of the Company, is restricted by Contract or applicable law, is subject to attorney-client privilege (except that such person shall use reasonable best efforts to disclose such information in a way that would not jeopardize such privilege) or could result in the disclosure of any trade secrets or the violation of any confidentiality obligation; provided, in each case, that the Company shall, to the extent practicable and not prohibited by Contract or applicable law, inform Parent promptly of such Contract, law, privilege or potential disclosure or violation;

(vi) none of the Company or its Subsidiaries or any of their respective representatives shall be required to prepare or deliver (x) any financial information in a form not customarily prepared by the Company or its Subsidiaries in the ordinary course of their business and not readily available to it, (y) any financial information with respect to a fiscal period that has not yet ended or (z) any pro forma financial information or projections;

(vii) none of the Company or its Subsidiaries or any of their respective representatives shall be required to deliver any legal opinion or negative assurance letter in connection with the Committed Financing, the Financing or any other cooperation contemplated by this Section 7.13;

(viii) none of the Company or its Subsidiaries or any of their respective representatives shall be required to take any action that would reasonably be expected to conflict with, result in any violation or breach of, or default (with or without notice, lapse of time, or both) under, any of their respective organizational or governing documents, or any applicable law or Contracts;

(ix) none of the Company or its Subsidiaries or any of their respective representatives shall be required to take any action that would cause the Company or any of its Subsidiaries to breach any representation, warranty, covenant or agreement in this Agreement;

(x) none of the Company or its Subsidiaries or any of their respective representatives shall be required to take any action that could reasonably be expected to cause any director, officer or employee or stockholder of the Company or any of its Subsidiaries to incur any personal liability; and

(xi) none of the Company or its Subsidiaries, prior to the Effective Time, shall be an issuer or other obligor with respect to the Committed Financing or the Financing.

TABLE OF CONTENTS

(i) Subject to Parent's indemnification obligations under Section 7.13(j) below, the Company hereby consents to the customary use of its and its Subsidiaries' marks, designs, names, logos, trademarks, copyrights, service marks and other intellectual property in connection with the Financing; provided that such marks and logos are used solely in a manner that is not intended to or would not reasonably be expected to harm or disparage the Company or any of its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries.

(j) Parent shall indemnify and hold harmless the Company and each of its Subsidiaries and their respective representatives from and against any and all liabilities, losses, damages, claims, costs, expenses (including reasonable attorney's fees), interest, awards, judgments and penalties suffered or incurred in connection with any and all of the matters contemplated by this Section 7.13 (other than arising from fraud or willful misconduct on the part of the Company or its Subsidiaries), whether or not the Merger is consummated or this Agreement is terminated. Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable out-of-pocket costs (including reasonable attorneys' fees) incurred by the Company or its Subsidiaries in connection with this Section 7.13, whether or not the Merger is consummated or this Agreement is terminated.

(k) The Company agrees that, from and after January 1, 2020 until the Effective Time, none of the Company or any of its Subsidiaries (other than the MLP or its Subsidiaries) shall, without the prior written consent of Parent (not to be unreasonably withheld or delayed), file any prospectus supplement or registration statement or consummate any offering of securities that requires registration under the Securities Act or that includes any actual or contingent commitment to register such securities under the Securities Act in the future; provided that the foregoing shall not prohibit the Company or its Subsidiaries from filing any Form S-8 registration statement or consummating any transaction under such Form S-8 registration statement.

(l) All non-public information exchanged pursuant to this Section 7.13 shall be subject to the Confidentiality Agreement.

(m) Parent and Merger Subsidiary hereby acknowledge and agree that obtaining or consummating any or all of the Committed Financing or Financing is not a condition to the Merger, and that if any of the foregoing is not obtained or consummated, as applicable, Parent and Merger Subsidiary will each continue to be obligated, subject to the satisfaction or waiver of the conditions set forth in Article VIII and the other terms hereof, to consummate the Merger.

Section 7.14 Transaction Litigation. The Company shall promptly notify Parent, and Parent shall promptly notify the Company, of any stockholder demands, litigations, arbitrations or other similar action (including derivative claims) commencing against their respective directors or officers relating to this Agreement or any of the transactions contemplated by this Agreement (collectively, the "Transaction Litigation") and shall keep each other informed regarding any Transaction Litigation. The Company and Parent shall cooperate with the other in the defense or settlement of any Transaction Litigation and shall in good faith consult with each other on a regular basis regarding the defense or settlement of such Transaction Litigation and shall give each other's advice with respect to such Transaction Litigation reasonable consideration. None of the Company, Parent or any of their respective Subsidiaries shall settle or offer to settle any Transaction Litigation without the prior written consent of Parent or the Company, as applicable (such consent not to be unreasonably withheld, conditioned or delayed).

## ARTICLE VIII

## CONDITIONS TO THE MERGER

Section 8.1 Conditions to the Obligations of Each Party. The obligations of the Company, Parent and Merger Subsidiary to consummate the Merger are subject to the satisfaction (or, to the extent permitted by law, waiver) of the following conditions:

(a) this Agreement shall have been adopted by the stockholders of the Company in accordance with the DGCL;

(b) any applicable waiting period under the HSR Act relating to the Merger shall have expired or been terminated;

(c) no provision of any applicable law or regulation and no judgment, injunction, order or decree shall prohibit or enjoin the consummation of the Merger;

TABLE OF CONTENTS

(d) the Form S-4 shall have been declared effective by the SEC under the Securities Act and no stop order suspending the effectiveness of the Form S-4 shall be in effect and no proceedings for such purpose shall be pending before or threatened by the SEC; and

(e) the shares of Parent Common Stock to be issued in the Merger shall have been approved for listing on the NYSE, subject to official notice of issuance.

Section 8.2 Additional Conditions to the Obligations of Parent and Merger Subsidiary. The obligations of Parent and Merger Subsidiary to consummate the Merger are subject to the satisfaction (or, to the extent permitted by law, waiver) of the following further conditions:

(a) (i) The Company shall have performed in all material respects all of its obligations hereunder required to be performed by it as of or prior to the Closing Date and (ii) (A) the representations and warranties of the Company set forth in Section 3.11(b) of this Agreement shall be true and correct in all respects at and as of the Closing Date as though made at and as of the Closing Date, (B) the representations and warranties of the Company set forth in the first three sentences of Section 3.5 shall be true and correct at and as of the Closing Date as though made at and as of the Closing Date except for De Minimis Inaccuracies, (C) the representations and warranties of the Company set forth in the last sentence of Section 3.4, Section 3.5 (other than the first three sentences thereof) and the first two sentences of Section 3.6(c) shall be true and correct in all material respects at and as of the Closing Date as though made at and as of the Closing Date, (D) the representations and warranties of the Company set forth in this Agreement other than those described in the preceding clauses (A)-(C) that are qualified by "Company Material Adverse Effect" shall be true and correct as so qualified at and as of the Closing Date as though made at and as of the Closing Date; provided, however, that if all such "Company Material Adverse Effect" qualifications are disregarded and any resulting individual failure of any such representation or warranty to be true and correct at and as of the Closing Date, when aggregated with up to four other (x) individual such failures or (y) individual failures of any representation or warranty of the Company set forth in this Agreement that is not qualified by "Company Material Adverse Effect", to be true and correct at and as of the Closing Date, would reasonably be expected to have a Company Material Adverse Effect, then the condition set forth in this Section 8.2(a) shall be deemed unsatisfied; and (E) the representations and warranties of the Company set forth in this Agreement other than those described in the preceding clauses (A)-(D) shall be true and correct at and as of the Closing Date as though made at and as of the Closing Date except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect; provided, however, that, with respect to clauses (A), (B), (C), (D) and (E) above, representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clause (A), (B), (C), (D) or (E) as applicable) only as of such date or period. For purposes of this Agreement, "De Minimis Inaccuracies" means any inaccuracies that individually or in the aggregate are *de minimis* relative to the total fully diluted equity capitalization of the Company or Parent, as the case may be.

(b) Parent shall have received a certificate of the Company, executed on its behalf by an authorized officer of the Company, dated the Closing Date, certifying that the conditions set forth in Section 8.2(a)(i) and Section 8.2(a)(ii) have been satisfied.

Section 8.3 Additional Conditions to the Obligations of the Company. The obligation of the Company to consummate the Merger is subject to the satisfaction (or, to the extent permitted by law, waiver) of the following further conditions:

(a) (i) Parent shall have performed in all material respects all of its obligations hereunder required to be performed by it as of or prior to the Closing Date and (ii) (A) the representations and warranties of Parent and Merger Subsidiary set forth in Section 4.10(b) of this Agreement shall be true and correct in all respects at and as of the Closing Date as though made at and as of the Closing Date, (B) the representations and warranties of Parent and Merger Subsidiary set forth in the first three sentences of Section 4.5 shall be true and correct at and as of the Closing Date as though made at and as of the Closing Date except for De Minimis Inaccuracies, (C) the representations and warranties of Parent and Merger Subsidiary set forth in the last sentence of Section 4.4, Section 4.5 (other than the first three sentences thereof) shall be true and correct in all material respects at and as of the Closing Date as though made at and as of the Closing Date, (D) the representations and warranties of Parent and Merger Subsidiary set forth in this Agreement other than those described in the preceding clauses (A)-(C) that are qualified by "Company Material Adverse Effect" shall be true and correct as

so qualified at and as of the Closing Date as though made at and as of the Closing Date; provided, however, that if all such "Parent Material Adverse Effect" qualifications are disregarded and any resulting individual failure of any such representation or warranty to be true and correct at and as of the Closing Date, when aggregated with up to four other (x) individual such failures or (y) individual failures of any representation or warranty of Parent or Merger Subsidiary set forth in this Agreement that is not qualified by "Parent Material Adverse Effect", to be true and correct at and as of the Closing Date, would reasonably be expected to have a Parent Material Adverse Effect, then the condition set forth in this Section 8.3(a) shall be deemed unsatisfied; and (E) the representations and warranties of Parent and Merger Subsidiary set forth in this Agreement other than those described in the preceding clauses (A)-(D) shall be true and correct at and as of the Closing Date as though made at and as of the Closing Date, except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect; provided, however, that, with respect to clauses (A), (B), (C), (D) and (E) above, representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clause (A), (B), (C), (D) or (E) as applicable) only as of such date or period.

(b) The Company shall have received a certificate of Parent, executed on its behalf by an authorized officer of Parent, dated the Closing Date, certifying that the conditions set forth in Section 8.3(a)(i) and Section 8.3(a)(ii) have been satisfied.

Section 8.4 Frustration of Closing Conditions. None of the parties may rely, either as a basis for not consummating the Merger or for terminating this Agreement, on the failure of any condition set forth in Section 8.1, 8.2 or 8.3, as the case may be, to be satisfied if such failure was caused by such party's breach in any material respect of any provision of this Agreement.

## ARTICLE IX

## TERMINATION

Section 9.1 Termination. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time (notwithstanding the obtaining of the Company Stockholder Approval):

(a) by mutual written consent of the Company and Parent;

(b) by either the Company or Parent:

(i) if the Merger has not been consummated by February 9, 2020 (the "End Date"); provided, however, that if (x) the Effective Time has not occurred by such date by reason of nonsatisfaction of the condition set forth in Section 8.1(b) or Section 8.1(c) and (y) all other conditions in Article VIII have theretofore been satisfied or (to the extent permitted by law) waived or are then capable of being satisfied, the End Date will be May 9, 2020; provided, further, that the right to terminate this Agreement under this Section 9.1(b)(i) shall not be available to any party whose failure to fulfill any obligation under this Agreement has principally caused or resulted in the failure of the Effective Time to occur on or before the End Date; or

(ii) if the Company Stockholder Approval shall not have been obtained by reason of the failure to obtain the required vote at a duly held meeting of stockholders or any adjournment thereof;

(c) by either the Company or Parent, if there shall be any law or regulation that makes consummation of the Merger illegal or otherwise prohibited or if any judgment, injunction, order or decree enjoining Parent or the Company from consummating the Merger is entered and such judgment, injunction, order or decree shall become final and nonappealable; provided that the right to terminate this Agreement under this Section 9.1(c) shall not be available to any party whose failure to fulfill any obligation under Section 7.1 hereof has principally caused or resulted in the imposition of such legal restraint or the failure of such legal restraint to be resisted, resolved or lifted;

(d) by Parent, prior to receipt of the Company Stockholder Approval, if there shall have been a Change in the Company Recommendation, whether or not permitted by the terms hereof (or the Board of Directors of the Company or any committee thereof shall resolve to effect a Change in the Company Recommendation);

(e) by either Parent or the Company, if there shall have been a breach by the other of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in

TABLE OF CONTENTS

the failure to satisfy one or more of the conditions set forth in Section 8.2(a) (in the case of a breach by the Company) or Section 8.3(a) (in the case of a breach by Parent), and in any such case such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 30 days after written notice thereof shall have been received by the party alleged to be in breach; or

(f) by the Company, in accordance with Section 5.2(b)(i), in order to enter into a definitive agreement with respect to a Superior Proposal; provided, however, that a termination pursuant to this Section 9.1(f) shall not become effective until the Termination Fee has been paid in accordance with Section 10.5(a)(iii).

The party desiring to terminate this Agreement pursuant to clause (b), (c), (d), (e) or (f) of this Section 9.1 shall give written notice of such termination to the other party in accordance with Section 10.1, specifying the provision hereof pursuant to which such termination is effected.

Section 9.2 Effect of Termination. If this Agreement is terminated pursuant to Section 9.1, this Agreement shall become void and of no effect with no liability on the part of any party hereto, except that (a) the agreements contained in this Section 9.2, in Section 10.4 and Section 10.5 hereof and in the Confidentiality Agreement shall survive the termination hereof and (b) no such termination shall relieve any party of any liability or damages resulting from any material and intentional breach by that party of this Agreement. Notwithstanding anything to the contrary in this Agreement, none of the Financing Sources shall have any liability to the Company or any Person that is an Affiliate of the Company relating to or arising out of this Agreement, the Committed Financing or any other Financing or otherwise, whether at law, or equity, in contract, in tort or otherwise, and neither the Company nor any Person that is an Affiliate of the Company shall have any rights or claims against any Financing Sources hereunder or thereunder. As used in this Agreement, the term "Financing Sources" means any agent, arranger, lender or other entity that has committed to provide or arrange, or has entered into definitive agreements related to, the Committed Financing or any other Financing, or any of such Person's affiliates or its or their respective officers, directors, employees, partners, trustees, shareholders, controlling persons, agents, representatives, successors or assigns.

## ARTICLE X

## MISCELLANEOUS

Section 10.1 Notices. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile, email or similar writing) and shall be given,

if to Parent or Merger Subsidiary, to:

Occidental Petroleum Corporation
5 Greenway Plaza, Suite 110
Houston, TX 77046
Attention: General Counsel, Marcia E. Backus
Email: Marcia_E._Backus@oxy.com

with a copy to:

Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
Attention: Faiza J. Saeed
George F. Schoen
Allison M. Wein
Facsimile: (212) 474-3700
Email: fsaeed@cravath.com
gschoen@cravath.com
awein@cravath.com

TABLE OF CONTENTS

if to the Company, to:

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380-1046
Attention: General Counsel
Facsimile: (832) 636-0574
Email: Amanda.McMillian@anadarko.com

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention: Daniel A. Neff
Gregory E. Ostling
Facsimile: (212) 403-2000
Email: DANeff@wlrk.com
GEOstling@wlrk.com

or such other address, email or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. Each such notice, request or other communication shall be effective (a) if given by facsimile or email, when such facsimile or email is transmitted to the facsimile number or email specified in this Section 10.1 and, in the case of a facsimile, the appropriate facsimile confirmation is received and, in the case of an email, (i) a duplicate copy of such email notice is promptly given by one of the other methods described in this Section 10.1 or (ii) the receiving party delivers a written confirmation of receipt of such notice by email or any other method described in this Section 10.1 or (b) if given by any other means, when delivered at the address specified in this Section 10.1.

Section 10.2 Non-Survival of Representations and Warranties. The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall not survive the Effective Time or any termination of this Agreement.

Section 10.3 Amendments; No Waivers.

(a) Any provision of this Agreement (including the Exhibits and Schedules hereto) may be amended or waived prior to the Effective Time if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, Parent and Merger Subsidiary, or in the case of a waiver, by the party against whom the waiver is to be effective; provided that after the adoption of this Agreement by the stockholders of the Company, no such amendment or waiver shall, without the further approval of such stockholders, alter or change (i) the amount or kind of consideration to be received in exchange for any shares of capital stock of the Company or (ii) any term of the certificate of incorporation of Parent. Notwithstanding the foregoing, no amendments or modifications to the provisions which the Financing Sources are expressly made third-party beneficiaries pursuant to Section 10.11 shall be permitted in a manner adverse to any Financing Source without the prior written consent of the Financing Sources.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 10.4 Expenses. Except as otherwise specified in Section 10.5 or as otherwise agreed to in writing by the parties, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such cost or expense, except that those expenses incurred in connection with printing, mailing and filing the Registration Statement, all fees paid in

TABLE OF CONTENTS

respect of HSR in connection with the Merger, and all reasonable and documented fees, costs and expenses incurred in connection with any cooperation provided or action taken pursuant to Section 7.13 or in connection with any financing to be obtained by Parent relating to the Merger shall in each case be borne by Parent.

Section 10.5 Termination Fees.

(a) If:

(i) Parent shall terminate this Agreement pursuant to Section 9.1(d);

(ii) (A) this Agreement is terminated by the Company or Parent pursuant to Section 9.1(b)(ii), (B) this Agreement is terminated by the Company or Parent pursuant to Section 9.1(b)(i) and the Company Stockholder Approval shall not theretofore have been obtained or (C) this Agreement is terminated by Parent pursuant to Section 9.1(e) and the Company Stockholder Approval shall not theretofore have been obtained, and after the date hereof but on or before the date of any such termination an Acquisition Proposal shall have been made and become publicly known, whether or not withdrawn, (x) prior to the Company Stockholder Meeting (in the case of a termination contemplated by clause (ii)(A)) or (y) prior to the date of such termination (in the case of a termination contemplated by clause (ii)(B) or (ii)(C)); or

(iii) the Company shall terminate this Agreement pursuant to Section 9.1(f), then in any case as described in clause (i), (ii) or (iii) the Company shall pay (or cause to be paid) to Parent (by wire transfer of immediately available funds), (x) in the case described in clause (i) or (iii), $1,000,000,000 (the “Termination Fee”) not later than the date of termination of this Agreement and (y) in the case described in clause (ii), the Company shall pay (or cause to be paid) an amount equal to the Termination Fee not later than the date an Acquisition Proposal is consummated or a definitive agreement is entered into by the Company providing for any Acquisition Proposal, as long as such Acquisition Proposal is consummated or such definitive agreement is executed within 12 months after the date of termination of this Agreement; provided, however, that for the purpose of this clause (y), all references in the definition of Acquisition Proposal to 20% shall instead refer to 50%.

(b) If this Agreement is terminated by the Company pursuant to Section 9.1(e), then Parent shall pay (or cause to be paid) to the Company (by wire transfer of immediately available funds) an amount equal to the Chevron Termination Fee within two Business Days after the date of such termination.

(c) Each party acknowledges that the agreements contained in this Section 10.5 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, no party would have entered into this Agreement. Accordingly, if the Company or Parent fails to pay timely any amount due pursuant to this Section 10.5 and, in order to obtain such payment, the other party (the “Recipient”) commences a suit which results in a judgment against the party obligated to make such payment (the “Payor”) for the amount payable to the Recipient pursuant to this Section 10.5, the Payor shall pay to the Recipient its reasonable costs and expenses (including attorneys’ fees and expenses) in connection with such suit, together with interest on the amount so payable at the rate on six (6)-month United States Treasury obligations (as of the date such payment was required to be made pursuant to this Agreement) plus three percent (3%).

Section 10.6 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other parties hereto except that Merger Subsidiary may transfer or assign, in whole or from time to time in part, to one or more of its affiliates, its rights under this Agreement, but any such transfer or assignment will not relieve Merger Subsidiary of its obligations hereunder.

Section 10.7 Governing Law. This Agreement shall be construed in accordance with and governed by the law of the State of Delaware, without regard to principles of conflicts of law, except that matters relating to claims, controversies, or disputes of any kind or nature against any Financing Sources that are in any way related to this Agreement or the Merger, including any dispute arising out of or relating in any way to any debt financing to be consummated by Parent or any of its Subsidiaries in connection with the Merger, shall be interpreted, construed and governed by and in accordance with the law of the state of New York without regard to the conflict of law principles thereof.

TABLE OF CONTENTS

Section 10.8 Enforcement; Jurisdiction. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, for which monetary damages would not be an adequate remedy, and accordingly, each party agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which the parties are entitled at law or in equity. Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby or thereby may only be brought in the Court of Chancery of the State of Delaware (or, only if such court declines to accept jurisdiction over a particular matter, then in the United States District Court for the District of Delaware or, if jurisdiction is not then available in the United States District Court for the District of Delaware (but only in such event), then in any court sitting of the State of Delaware in New Castle County) and any appellate court from any of such courts (in any case, the "Delaware Court"), and each of the parties hereby irrevocably consents to the exclusive jurisdiction of the Delaware Courts in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum; provided that the parties, with respect to matters relating to claims, controversies, disputes of any kind or nature against any Financing Sources that is in any way related to this Agreement or the Merger including any dispute arising out of or relating in any way to any Committed Financing to be consummated by Parent or any of its Subsidiaries in connection with the Merger, irrevocably submit exclusively to the jurisdiction of the courts of any federal court sitting in the Borough of Manhattan in The City of New York (or, only if such court lacks subject matter jurisdiction, in any New York State court sitting in the Borough of Manhattan in the City of New York), and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims relating to such action, suit or proceeding shall be heard and determined in such a state or federal court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any of the Delaware Courts. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 10.1 shall be deemed effective service of process on such party when deemed given pursuant to Section 10.1; provided that nothing herein shall affect the right of any party to serve process in any other manner permitted by applicable law.

Section 10.9 Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.10 Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.

Section 10.11 Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and the Confidentiality Agreement, constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof and thereof. Except for the provisions of (a) Articles II and III (including, for the avoidance of doubt, the rights of the former holders of Company Common Stock to receive the Merger Consideration), (b) Section 6.3 (which from and after the Effective Time are intended for the benefit of, and shall be enforceable by, the Persons referred to therein and by their respective heirs and representatives) and (c) Sections 9.2, 10.3, 10.6, 10.7, 10.8 and 10.9 which, to the extent applicable to the Financing Sources, are intended to benefit and be enforceable by the Financing Sources, no provision of this Agreement or any other agreement contemplated hereby is intended to confer on any Person other than the parties hereto any rights or remedies.

Section 10.12 Captions. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

TABLE OF CONTENTS

Section 10.13 Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.14 Interpretation. Unless the context otherwise requires, words describing the singular number shall include the plural and vice versa, words denoting any gender shall include all genders, and words denoting natural persons shall include corporations, limited liability companies and partnerships and vice versa. When a reference is made in this Agreement to Articles, Sections, Exhibits or Schedules, such reference shall be to an Article, Section, Exhibit or Schedule, as applicable, of this Agreement unless otherwise indicated. Whenever the words “include,” “includes” or “including” are used in this Agreement, they shall be deemed to be followed by the words “without limitation.” The words “hereof,” “hereto,” “hereby,” “herein” and “hereunder” and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The words “the date hereof”, “the date of this Agreement” and words of similar import mean the day and year first set forth above in the preamble to this Agreement. Unless the context otherwise requires, the terms “neither,” “nor,” “any,” “either” and “or” are not exclusive. The word “extent” in the phrase “to the extent” means the degree to which a subject or other thing extends, and such phrase does not mean simply “if.” References to “days” shall mean “calendar days” unless expressly stated otherwise. When used in this Agreement, “Business Day” means any day other than (i) a Saturday or a Sunday, (ii) a day on which commercial banks in New York City or the Secretary of State of the State of Delaware is authorized or required by law to be closed or (iii) any day on which the SEC’s Electronic Data Gathering and Retrieval system is not open to accept filings. References to “from” or “through” any date mean, unless otherwise specified, from and including or through and including such date, respectively. Any reference in this Agreement to a date or time shall be deemed to be such date or time in the City of New York, New York, U.S.A., unless otherwise specified. Except with respect to any disclosure in the Company Disclosure Schedules or Parent Disclosure Schedules, any contract referred to herein means such contract, instrument or law as from time to time amended, modified or supplemented. References to any statute shall be deemed to refer to such statute and any rules or regulations promulgated thereunder. References to a person are also to its permitted successors and assigns. The words “provided to”, “delivered” or “made available” and words of similar import refer to documents which were delivered in person or electronically to the other party or its representatives prior to the execution of this Agreement or, prior to the calendar day immediately preceding the date hereof, posted to the data site maintained by the disclosing party or its representatives in connection with the transactions contemplated hereby (provided that, in the case of delivery via such data site, the other party had access to such documents in such data site and such documents were not removed from such data site prior to the execution hereof) and, for the avoidance of doubt, includes any documents filed or furnished by the disclosing party or its Subsidiaries with the SEC and publicly available on the SEC’s Electronic Data Gathering and Retrieval system as an exhibit after December 31, 2016 and prior to the date that was the calendar day prior to the execution of this Agreement. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

[*Signature Page Follows*]

TABLE OF CONTENTS

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

OCCIDENTAL PETROLEUM CORPORATION

By: /s/ Vicki Hollub

Name: Vicki Hollub

Title: President and Chief Executive Officer

BASEBALL MERGER SUB 1, INC.

By: /s/ Oscar K. Brown

Name: Oscar K. Brown

Title: President

ANADARKO PETROLEUM CORPORATION

By: /s/ R. A. Walker

Name: R. A. Walker

Title: Chairman and Chief Executive Officer

[Signature Page to Agreement and Plan of Merger]

TABLE OF CONTENTS

**Annex B**

EVERCORE

**May 9, 2019**

The Board of Directors of
Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, TX 77380

Members of the Board of Directors:

We understand that Anadarko Petroleum Corporation, a Delaware corporation (the "Company"), proposes to enter into an Agreement and Plan of Merger, dated as of the date hereof (the "Merger Agreement"), with Occidental Petroleum Corporation, a Delaware corporation ("Parent") and Baseball Merger Sub 1, Inc., a Delaware corporation and an indirect, wholly-owned subsidiary of Parent ("Merger Sub"), pursuant to which Merger Sub will merge with and into the Company (the "Merger"). As a result of the Merger, each outstanding share of common stock, par value $0.10 per share (the "Company Common Stock"), of the Company, other than shares owned by the Company, Parent, or Merger Sub, or their respective subsidiaries and Dissenting Shares (as defined in the Merger Agreement), will be converted into the right to receive (i) $59.00 in cash, without interest (the "Cash Consideration") and (ii) 0.2934 a share of common stock, par value $0.20 per share ("Parent Common Stock"), of Parent (the "Stock Consideration" and, together with the Cash Consideration, the "Merger Consideration"), subject to adjustment to the Cash Consideration and the Stock Consideration contained in Section 1.4(f) of the Merger Agreement with respect to which we express no opinion. The terms and conditions of the Merger are more fully set forth in the Merger Agreement and terms used but not defined herein have the meanings ascribed thereto in the Merger Agreement.

The Board of Directors of the Company has asked us whether, in our opinion, the Merger Consideration is fair, from a financial point of view, to the holders of shares of Company Common Stock entitled to receive such Merger Consideration.

In connection with rendering our opinion, we have, among other things:

(i) reviewed certain publicly available business and financial information relating to the Company and Parent that we deemed to be relevant, including publicly available research analysts' estimates;

(ii) reviewed certain non-public historical financial statements and other non-public historical financial and operating data relating to the Company and Parent prepared and furnished to us by the management of the Company and Parent, respectively;

(iii) reviewed certain non-public projected financial and operating data relating to the Company under alternative commodities pricing assumptions prepared and furnished to us by the management of the Company;

(iv) reviewed certain non-public projected financial and operating data relating to Parent prepared and furnished to us by the management of Parent;

(v) discussed the past and current operations, financial projections and current financial condition of each of the Company and Parent with the management of the Company and Parent (including their views on the risks and uncertainties of achieving such projections);

(vi) reviewed the reported prices and the historical trading activity of each of the Company Common Stock and the Parent Common Stock;

(vii) compared the financial performance of each of the Company and Parent and their respective stock market trading multiples with those of certain other publicly traded companies that we deemed relevant;

(viii) compared the financial performance of the Company and the valuation multiples relating to the Merger with those of certain other transactions that we deemed relevant;

(ix) reviewed the Merger Agreement; and

(x) performed such other analyses and examinations and considered such other factors that we deemed appropriate.

TABLE OF CONTENTS



For purposes of our analysis and opinion, we have assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by us, and we assume no liability therefor. With respect to the projected financial data relating to the Company referred to above, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgment of the management of the Company, as to the future financial performance of the Company, under the alternative commodities pricing assumptions reflected therein. We express no view as to any projected financial data relating to the Company, or the assumptions on which they are based.

For purposes of rendering our opinion, we have assumed, in all respects material to our analysis, that the representations and warranties of each party contained in the Merger Agreement are true and correct, that each party will perform all of the covenants and agreements required to be performed by it under the Merger Agreement and that all conditions to the consummation of the Merger will be satisfied without material waiver or modification thereof. We have further assumed that all governmental, regulatory or other consents, approvals or releases necessary for the consummation of the Merger will be obtained without any material delay, limitation, restriction or condition that would have an adverse effect on the Company or the consummation of the Merger or materially reduce the benefits of the Proposed Merger to the holders of the Company Common Stock of the Merger.

We have not made nor assumed any responsibility for making any independent valuation or appraisal of the assets or liabilities of the Company or Parent, nor have we been furnished with any such appraisals, nor have we evaluated the solvency or fair value of the Company or Parent under any state or federal laws relating to bankruptcy, insolvency or similar matters. Our opinion is necessarily based upon information made available to us as of the date hereof and financial, economic, market and other conditions as they exist and as can be evaluated on the date hereof. It is understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise or reaffirm this opinion.

We have not been asked to pass upon, and express no opinion with respect to, any matter other than the fairness, from a financial point of view, of the Merger Consideration to the holders of the Company Common Stock entitled to receive such Merger Consideration. We do not express any view on, and our opinion does not address, the fairness of the Merger to, or any consideration received in connection therewith by, the holders of any other securities, creditors or other constituencies of the Company, nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of the Company, or any class of such persons, whether relative to the Merger Consideration or otherwise. We have assumed that any modification to the structure of the Merger will not vary in any respect material to our analysis. Our opinion does not address the relative merits of the Merger as compared to other business or financial strategies that might be available to the Company, nor does it address the underlying business decision of the Company to engage in the Merger. In arriving at our opinion, we were not authorized to solicit, and did not solicit, interest from any third party with respect to the acquisition of any or all of the Company Common Stock or any business combination or other extraordinary transaction involving the Company. This letter, and our opinion, does not constitute a recommendation to the Board of Directors of the Company or to any other persons in respect of the Merger, including as to how any holder of shares of Company Common Stock should vote or act in respect of the Merger. We express no opinion herein as to the price at which shares of the Company or Parent will trade at any time. We are not legal, regulatory, accounting or tax experts and have assumed the accuracy and completeness of assessments by the Company and its advisors with respect to legal, regulatory, accounting and tax matters.

We will receive a fee for our services upon the rendering of this opinion. The Company has also agreed to reimburse our expenses and to indemnify us against certain liabilities arising out of our engagement. We will also be entitled to receive a success fee if the Merger is consummated. During the two year period prior to the date hereof, no material relationship existed between Evercore Group L.L.C. and its affiliates and Parent pursuant to which compensation was received by Evercore Group L.L.C. or its affiliates as a result of such a relationship. We may provide financial or other services to the Company and Parent and their respective affiliates in the future and in connection with any such services we may receive compensation.

TABLE OF CONTENTS



In the ordinary course of business, Evercore Group L.L.C. or its affiliates may actively trade the securities, or related derivative securities, or financial instruments of the Company, Parent and their respective affiliates, for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities or instruments.

This letter, and the opinion expressed herein is addressed to, and for the information and benefit of, the Board of Directors of the Company in connection with their evaluation of the proposed Merger. The issuance of this opinion has been approved by an Opinion Committee of Evercore Group L.L.C.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Merger Consideration is fair, from a financial point of view, to the holders of the shares of Company Common Stock entitled to receive such Merger Consideration.

Very truly yours,

EVERCORE GROUP L.L.C.

By: /s/ Dan Ward
*Dan Ward*
Senior Managing Director

TABLE OF CONTENTS

**Annex C**

**PERSONAL AND CONFIDENTIAL**

May 9, 2019

Board of Directors
Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, TX 77380

Ladies and Gentlemen:

You have requested our opinion as to the fairness from a financial point of view to the holders (other than Occidental Petroleum Corporation (“Occidental”), Berkshire Hathaway Inc. (“Berkshire”) and their respective affiliates) of the outstanding shares of common stock, par value $0.10 per share (the “Shares”), of Anadarko Petroleum Corporation (the “Company”) of the Consideration (as defined below) to be paid to such holders pursuant to the Agreement and Plan of Merger, dated as of May 9, 2019 (the “Agreement”), by and among Occidental, Baseball Merger Sub 1, Inc., a wholly owned subsidiary of Occidental (“Acquisition Sub”), and the Company. The Agreement provides that Acquisition Sub will be merged with and into the Company and each outstanding Share will be converted into $59.00 in cash (the “Cash Consideration”) and 0.2934 shares of common stock, par value $0.20 per share (“Occidental Common Stock”), of Occidental (the “Stock Consideration”; together with the Cash Consideration, the “Consideration”), subject to adjustment to the Stock Consideration and the Cash Consideration pursuant to Section 1.4(f) of the Agreement, as to which adjustment we express no opinion.

Goldman Sachs & Co. LLC and its affiliates are engaged in advisory, underwriting and financing, principal investing, sales and trading, research, investment management and other financial and non-financial activities and services for various persons and entities. Goldman Sachs & Co. LLC and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of the Company, Occidental, any of their respective affiliates and third parties, including Berkshire, a party to the Equity Purchase Agreement (as defined in the Agreement), and its affiliates and portfolio companies, or any currency or commodity that may be involved in the transaction contemplated by the Agreement (the “Transaction”). We have acted as financial advisor to the Company in connection with, and have participated in certain of the negotiations leading to, the Transaction. We expect to receive fees for our services in connection with the Transaction, the principal portion of which is contingent upon consummation of the Transaction, and the Company has agreed to reimburse certain of our expenses arising, and indemnify us against certain liabilities that may arise, out of our engagement. We have provided certain financial advisory and/or underwriting services to the Company and/or its affiliates from time to time for which our Investment Banking Division has received, and may receive, compensation, including having acted as co-financial advisor in connection with a restructuring transaction involving Western Gas Equity Partners LP and Western Gas Partners LP, subsidiaries of the Company, in February 2019. We also have provided certain financial advisory and/or underwriting services to Berkshire and/or its affiliates from time to time for which our Investment Banking Division has received, and may receive, compensation, including having acted as co-financial advisor in connection with a sale of USG Corporation, a subsidiary of Berkshire, in April 2019; as joint bookrunner with respect to the offering of Berkshire’s 4.250% Guaranteed Global Notes due 2049 (aggregate principal amount $750,000,000) in March 2019; as joint bookrunner with respect to the offering of Berkshire’s 4.250% Guaranteed Global Notes due 2049 (aggregate principal amount $1,250,000,000) in January 2019; as joint bookrunner with respect to the offering of Berkshire’s 4.200% Guaranteed Global Notes due 2048 (aggregate principal amount $2,350,000,000) in August 2018; as joint bookrunner with respect to the offering of Burlington Northern Santa Fe Corporation, a subsidiary of Berkshire, 4.150% Debentures due 2048 (aggregate principal amount $750,000,000) in July 2018; as joint bookrunner with respect to the offering of The Kraft Heinz Company, a subsidiary of Berkshire, 4.625% Guaranteed Global Notes due 2029, 4.0% Guaranteed Global Notes due 2023, 3.375% Guaranteed Global Notes due 2021 and 4.050% Debentures due 2048 (aggregate principal amount $3,000,000,000) in June 2018; as joint bookrunner with respect to the offering of Burlington Northern Santa Fe Corporation’s 4.050% Debentures due 2048 (aggregate principal amount $750,000,000) in February 2018; and as joint bookrunner with respect to the offering of The Kraft Heinz Company’s Guaranteed Senior Notes due 2022, 2021 and 2019 (aggregate principal amount $1,500,000,000) in June 2018. We may also in the future provide financial advisory and/or underwriting services to the Company, Occidental, Berkshire

TABLE OF CONTENTS



and their respective affiliates and, as applicable, portfolio companies, for which our Investment Banking Division may receive compensation. Affiliates of Goldman Sachs & Co. LLC also may have co-invested with Berkshire and its affiliates from time to time and may do so in the future.

In connection with this opinion, we have reviewed, among other things, the Agreement; annual reports to stockholders and Annual Reports on Form 10-K of the Company and Occidental for the five years ended December 31, 2018; certain interim reports to stockholders and Quarterly Reports on Form 10-Q of the Company and of Occidental; certain other communications from the Company and Occidental to their respective stockholders; certain publicly available research analyst reports for the Company and Occidental; certain internal financial analyses and forecasts for Occidental on a stand-alone basis and on a pro forma basis for the Transaction, in each case, prepared by its management, as adjusted by management of the Company and approved for our use by the Company (the “Occidental Forecasts”), including certain synergies projected by the management of Occidental to result from the Transaction, as adjusted by the management of the Company and approved for our use by the Company (the “Synergies”); and certain internal financial analyses and forecasts for the Company prepared by its management, as approved for our use by the Company (the “Company Forecasts”). We have also held discussions with members of the senior managements of the Company and Occidental regarding their assessment of the strategic rationale for, and the potential benefits of, the Transaction and the past and current business operations, financial condition and future prospects of Occidental and with members of the senior management of the Company regarding their assessment of the past and current business operations, financial condition and future prospects of the Company; reviewed the reported price and trading activity for the Shares and shares of Occidental Common Stock; compared certain financial and stock market information for the Company and Occidental with similar information for certain other companies the securities of which are publicly traded; reviewed the financial terms of certain recent business combinations in the oil and gas exploration and production industry; and performed such other studies and analyses, and considered such other factors, as we deemed appropriate.

For purposes of rendering this opinion, we have, with your consent, relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by, us, without assuming any responsibility for independent verification thereof. In that regard, we have assumed with your consent that the Occidental Forecasts, the Company Forecasts and the Synergies have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of the Company. We have not made an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or other off-balance-sheet assets and liabilities) of the Company or Occidental or any of their respective subsidiaries and we have not been furnished with any such evaluation or appraisal. We have assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the Transaction will be obtained without any adverse effect on the Company or Occidental or on the expected benefits of the Transaction in any way meaningful to our analysis. We have assumed that the Transaction will be consummated on the terms set forth in the Agreement, without the waiver or modification of any term or condition the effect of which would be in any way meaningful to our analysis.

Our opinion does not address the underlying business decision of the Company to engage in the Transaction, or the relative merits of the Transaction as compared to any strategic alternatives that may be available to the Company; nor does it address any legal, regulatory, tax or accounting matters. This opinion addresses only the fairness from a financial point of view to the holders (other than Occidental, Berkshire and their respective affiliates) of Shares, as of the date hereof, of the Consideration to be paid to such holders pursuant to the Agreement. We do not express any view on, and our opinion does not address, any other term or aspect of the Agreement or Transaction or any term or aspect of any other agreement or instrument contemplated by the Agreement or entered into or amended in connection with the Transaction, including, the fairness of the Transaction to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors, or other constituencies of the Company; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of the Company, or class of such persons, in connection with the Transaction, whether relative to the Consideration to be paid to the holders (other than Occidental, Berkshire and their respective affiliates) of Shares pursuant to the Agreement or otherwise. We are not expressing any opinion as to the prices at which shares of Occidental Common Stock will trade at any time or as to the impact of the

TABLE OF CONTENTS



Transaction on the solvency or viability of the Company or Occidental or the ability of the Company or Occidental to pay their respective obligations when they come due. Our opinion is necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof and we assume no responsibility for updating, revising or reaffirming this opinion based on circumstances, developments or events occurring after the date hereof. Our advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the Transaction and such opinion does not constitute a recommendation as to how any holder of Shares should vote with respect to the Transaction or any other matter. This opinion has been approved by a fairness committee of Goldman Sachs & Co. LLC

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Consideration to be paid to holders (other than Occidental, Berkshire and their respective affiliates) of Shares pursuant to the Agreement is fair from a financial point of view to such holders.

Very truly yours,

/s/ GOLDMAN SACHS & CO. LLC
(GOLDMAN SACHS & CO. LLC)

TABLE OF CONTENTS

**Annex D**

**§ 262 Appraisal rights**

**[For application of this section, see 79 Del. Laws, c. 72, § 22; 79 Del. Laws, c. 122, § 12; 80 Del. Laws, c. 265, § 18; and 81 Del. Laws, c. 354, § 17]**

(a) Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b) Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263 or § 264 of this title:

(1) Provided, however, that, except as expressly provided in § 363(b) of this title, no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of the meeting of stockholders to act upon the agreement of merger or consolidation (or, in the case of a merger pursuant to § 251(h), as of immediately prior to the execution of the agreement of merger), were either: (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in § 251(f) of this title.

(2) Notwithstanding paragraph (b)(1) of this section, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 255, 256, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a. Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b. Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or held of record by more than 2,000 holders;

c. Cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a. and b. of this section; or

d. Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a., b. and c. of this section.

(3) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 or § 267 of this title is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(4) In the event of an amendment to a corporation's certificate of incorporation contemplated by § 363(a) of this title, appraisal rights shall be available as contemplated by § 363(b) of this title, and the procedures of this section, including those set forth in subsections (d) and (e) of this section, shall apply as nearly as practicable, with the word "amendment" substituted for the words "merger or consolidation," and the word "corporation" substituted for the words "constituent corporation" and/or "surviving or resulting corporation."

TABLE OF CONTENTS

(c) Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the provisions of this section, including those set forth in subsections (d), (e), and (g) of this section, shall apply as nearly as is practicable.

(d) Appraisal rights shall be perfected as follows:

(1) If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for notice of such meeting (or such members who received notice in accordance with § 255(c) of this title) with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) of this section that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Each stockholder electing to demand the appraisal of such stockholder’s shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder’s shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder’s shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2) If the merger or consolidation was approved pursuant to § 228, § 251(h), § 253, or § 267 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of mailing of such notice or, in the case of a merger approved pursuant to § 251(h) of this title, within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of mailing of such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder’s shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder’s shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder’s shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after

TABLE OF CONTENTS

the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e) Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) of this section hereof and who is otherwise entitled to appraisal rights, may commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party shall have the right to withdraw such stockholder’s demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon written request, shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation (or, in the case of a merger approved pursuant to § 251(h) of this title, the aggregate number of shares (other than any excluded stock (as defined in § 251(h)(6)d. of this title)) that were the subject of, and were not tendered into, and accepted for purchase or exchange in, the offer referred to in § 251(h)(2)), and, in either case, with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such written statement shall be mailed to the stockholder within 10 days after such stockholder’s written request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) of this section hereof, whichever is later. Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person’s own name, file a petition or request from the corporation the statement described in this subsection.

(f) Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g) At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder. If immediately before the merger or consolidation the shares of the class or series of stock of the constituent corporation as to which appraisal rights are available were listed on a national securities exchange, the Court shall dismiss the proceedings as to all holders of such shares who are otherwise entitled to appraisal rights unless (1) the total number of shares entitled to appraisal exceeds 1% of the outstanding shares of the class or series eligible for appraisal, (2) the value of the consideration provided in the merger or consolidation for such total number of shares exceeds $1 million, or (3) the merger was approved pursuant to § 253 or § 267 of this title.

(h) After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value,

TABLE OF CONTENTS

the Court shall take into account all relevant factors. Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each stockholder entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i) The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j) The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k) From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just; provided, however that this provision shall not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation within 60 days after the effective date of the merger or consolidation, as set forth in subsection (e) of this section.

(l) The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

8 Del. C. 1953, § 262; 56 Del. Laws, c. 50; 56 Del. Laws, c. 186, § 24; 57 Del. Laws, c. 148, §§ 27-29; 59 Del. Laws, c. 106, § 12; 60 Del. Laws, c. 371, §§ 3-12; 63 Del. Laws, c. 25, § 14; 63 Del. Laws, c. 152, §§ 1, 2; 64 Del. Laws, c. 112, §§ 46-54; 66 Del. Laws, c. 136, §§ 30-32; 66 Del. Laws, c. 352, § 9; 67 Del. Laws, c. 376, §§ 19, 20; 68 Del. Laws, c. 337, §§ 3, 4; 69 Del. Laws, c. 61, § 10; 69 Del. Laws, c. 262, §§ 1-9; 70 Del. Laws, c. 79, § 16; 70 Del. Laws, c. 186, § 1; 70 Del. Laws, c. 299, §§ 2, 3; 70 Del. Laws, c. 349, § 22; 71 Del. Laws, c. 120, § 15; 71 Del. Laws, c. 339, §§ 49-52; 73 Del. Laws, c. 82, § 21; 76 Del. Laws, c. 145, §§ 11-16; 77 Del. Laws, c. 14, §§ 12, 13; 77 Del. Laws, c. 253, §§ 47-50; 77 Del. Laws, c. 290, §§ 16, 17; 79 Del. Laws, c. 72, §§ 10, 11; 79 Del. Laws, c. 122, §§ 6, 7; 80 Del. Laws, c. 265, §§ 8-11; 81 Del. Laws, c. 354, §§ 9, 10, 17.;

TABLE OF CONTENTS

Anadarko Petroleum Corporation

*1201 LAKE ROBBINS DRIVE*
*THE WOODLANDS, TX 77380*

**SCAN TO**
**VIEW MATERIALS & VOTE**

**WE ENCOURAGE YOU TO TAKE ADVANTAGE OF INTERNET OR TELEPHONE VOTING. BOTH ARE AVAILABLE 24 HOURS A DAY, 7 DAYS A WEEK**

**VOTE BY INTERNET - www.proxyvote.com or scan the QR Barcode above**
Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 p.m. Eastern Time on August 7, 2019. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by Anadarko Petroleum Corporation in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 p.m. Eastern Time on August 7, 2019. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Anadarko Petroleum Corporation, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

E82046-S88150 KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

**ANADARKO PETROLEUM CORPORATION**

| THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" PROPOSALS 1 AND 2. | For | Against | Abstain |
|---|---|---|---|
| 1. To adopt the Agreement and Plan of Merger, dated as of May 9, 2019, by and among Occidental Petroleum Corporation, Baseball Merger Sub 1, Inc. and Anadarko Petroleum Corporation ("Anadarko"). | ☐ | ☐ | ☐ |
| 2. To approve, on a non-binding advisory basis, the compensation that may be paid or become payable to Anadarko's named executive officers that is based on or otherwise related to the proposed transactions. | ☐ | ☐ | ☐ |

The shares represented by this proxy, when properly executed, will be voted in the manner directed herein by the undersigned stockholder(s). **If no direction is made, this proxy will be voted "FOR" proposals 1 and 2.**

For address changes and/or comments, please check this box and write them on the back where indicated. ☐

Please indicate if you plan to attend this meeting. ☐ Yes ☐ No

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

Signature [PLEASE SIGN WITHIN BOX] Date

Signature (Joint Owners) Date

TABLE OF CONTENTS

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting:**
The Notice and Proxy Statement/Prospectus are available at:
https://materials.proxyvote.com/032511

FOLD AND DETACH HERE

E82007-S88150

**ANADARKO PETROLEUM CORPORATION**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

**SPECIAL MEETING OF STOCKHOLDERS**

**August 8, 2019**

The undersigned hereby appoint(s) R. A. Walker, Robert G. Gwin and Amanda M. McMillian and any of them, as proxies, each with the power to appoint his or her substitute, and hereby authorize(s) them to represent and vote, as designated on the reverse side of this proxy, all of the shares of Common Stock of Anadarko Petroleum Corporation that the undersigned is/are entitled to vote at the Special Meeting of Stockholders to be held at 8:00 a.m., local time, on August 8, 2019, at The Westin at The Woodlands, 2 Waterway Square Place, The Woodlands, Texas, 77380, and any adjournment or postponement thereof.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED "FOR" EACH OF THE PROPOSALS AS RECOMMENDED BY THE BOARD OF DIRECTORS. BY EXECUTING THIS PROXY, THE UNDERSIGNED STOCKHOLDER AUTHORIZES THE PROXIES TO VOTE IN THEIR DISCRETION ON ANY OTHER MATTERS AS MAY PROPERLY COME BEFORE THE SPECIAL MEETING AND ANY POSTPONEMENTS OR ADJOURNMENTS THEREOF.**

**PLEASE MARK, SIGN, DATE AND RETURN THE PROXY CARD PROMPTLY USING THE ENCLOSED REPLY ENVELOPE.**

**Address Changes/Comments:** ______________________________

______________________________

(If you noted any Address Changes/Comments above, please mark corresponding box on the reverse side.)

**(CONTINUED AND TO BE SIGNED ON THE REVERSE SIDE)**

# EXHIBIT 34

Anadarko Petroleum Corp.

# Shenandoah: major discovery confirmed valued at ~$4/share

Company Update BUY

Equity | United States | Oil & Gas Producers
19 March 2013

Bank of America Merrill Lynch


**Doug Leggate** +1 713 247 6013
Research Analyst
MLPF&S
doug.leggate@baml.com

**Jason Smith** +1 646 855 2602
Research Analyst
MLPF&S
jsmith51@baml.com

**Abhishek Sinha** +1 713 247 6090
Research Analyst
MLPF&S
sinha.abhishek@baml.com


## Shenandoah: 500mm - 1bn boe potential

On our recent bus tour we suggested that news on Anadarko's Shenandoah well was imminent, pending closing of the latest GoM lease round on 3/18. Right on time, APC has announced the result the appraisal well – and it looks huge. With 1,000ft of net oil pay across multiple lower tertiary reservoirs and good rock properties management has taken the rare step of describing Shenandoah as a potential giant, meaning possibly more than 500mm bbls. However, from data released by APC so far, we contend that a simple reservoir engineering approach to the potential scale of the discovery could reasonably lie between 500mm – 1bn boe, more than double the range we had previously assumed.

## Shenandoah sets up APC's 3rd major US GoM development

Multiple parallel development schemes now come into play although rig limitations may defer further appraisal drilling until 2014. Still, even with a 4/5 year timeline to first oil, we now believe fair value for Shenandoah net to APC could reasonably be ~$2bn, or $4 per share – some 2x our prior estimate. As noted in our recent note APC: News flow starts now, the line of sight on high margin operated developments in the US GoM is a catalyst that can force market recognition of embedded exploration value.

## Taking the steps to release value: still our top pick

We continue to believe management is taking steps to release value. Exploration value that has long been embedded in the stock is transitioning to a development pipeline that provides the catalyst to drive APC's multiple lower. Put simply we believe APC is bridging the gap between a value play and a growth stock. Watch for news on a potential partial Mozambique monetization following the bid deadline for APC's 10% stake on March 14th. APC remains our sector top pick, and pending confirmation on the timeline to development, risks to our $120 PO look skewed higher.

### Stock Data

| | |
|---|---|
| Price | US$83.28 |
| Price Objective | US$120.00 |
| Date Established | 6-Jun-2012 |
| Investment Opinion | C-1-7 |
| Volatility Risk | HIGH |
| 52-Week Range | US$56.42-85.70 |
| Mrkt Val / Shares Out (mn) | US$41,640 / 500.0 |
| BofAML Ticker / Exchange | APC / NYS |
| Bloomberg / Reuters | APC US / APC.N |
| ROE (2013E) | 10.1% |
| Total Dbt to Cap (Dec-2012A) | 39.1% |
| Est. 5-Yr EPS / DPS Growth | 20.5% / 0% |

### Estimates (Dec)

| (US$) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| EPS | 3.37 | 4.10 | 4.33 | 5.81 | 6.36 |
| GAAP EPS | (5.31) | 4.75 | 4.33 | 5.81 | 6.36 |
| EPS Change (YoY) | 86.2% | 21.7% | 5.6% | 34.2% | 9.5% |
| Consensus EPS (Bloomberg) | | | 4.01 | 5.10 | 6.19 |
| DPS | 0.36 | 0.36 | 0.36 | 0.36 | 0.36 |

### Valuation (Dec)

| | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| P/E | 24.7x | 20.3x | 19.2x | 14.3x | 13.1x |
| GAAP P/E | NM | 17.5x | 19.2x | 14.3x | 13.1x |
| Dividend Yield | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| EV / EBITDA* | 21.7x | 6.8x | 6.6x | 5.6x | 5.2x |
| Free Cash Flow Yield* | -7.6% | 2.6% | 1.8% | 5.3% | 7.4% |

* For full definitions of *iQmethod* SM measures, see page 8.

Exhibit 530

**BofA Merrill Lynch does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.**

**Refer to important disclosures on page 9 to 11. Analyst Certification on Page 7. Price Objective Basis/Risk on page 7. Link to Definitions on page 7.** 11258839

# iQprofile[SM] Anadarko Petroleum Corp.

## iQmethod[SM] – Bus Performance*

| (US$ Millions) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| Return on Capital Employed | -3.0% | 5.3% | 5.2% | 6.4% | 6.6% |
| Return on Equity | 8.7% | 10.6% | 10.1% | 12.2% | 11.9% |
| Operating Margin | -14.6% | 30.1% | 33.3% | 37.2% | 37.9% |
| Free Cash Flow | (3,145) | 1,097 | 749 | 2,213 | 3,085 |

## iQmethod[SM] – Quality of Earnings*

| (US$ Millions) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| Cash Realization Ratio | 1.5x | 4.1x | 3.7x | 3.2x | 3.2x |
| Asset Replacement Ratio | 1.5x | 1.8x | 1.7x | 1.6x | 1.5x |
| Tax Rate | 24.4% | 31.9% | 44.8% | 44.4% | 44.2% |
| Net Debt-to-Equity Ratio | 66.0% | 49.3% | 39.8% | 28.1% | 15.4% |
| Interest Cover | -2.2x | 5.0x | 6.4x | 8.2x | 8.9x |

## Income Statement Data (Dec)

| (US$ Millions) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| Sales | 12,834 | 12,396 | 14,077 | 16,122 | 17,093 |
| % Change | 28.2% | -3.4% | 13.6% | 14.5% | 6.0% |
| Gross Profit | NA | NA | NA | NA | NA |
| % Change | NA | NA | NA | NA | NA |
| EBITDA | 3,036 | 9,637 | 9,968 | 11,666 | 12,582 |
| % Change | -53.0% | 217.4% | 3.4% | 17.0% | 7.8% |
| Net Interest & Other Income | (1,554) | (216) | (690) | (690) | (690) |
| **Net Income (Adjusted)** | **1,681** | **2,057** | **2,184** | **2,930** | **3,210** |
| **% Change** | **86.8%** | **22.4%** | **6.2%** | **34.1%** | **9.6%** |

## Free Cash Flow Data (Dec)

| (US$ Millions) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| Net Income from Cont Operations (GAAP) | (2,649) | 2,391 | 2,184 | 2,930 | 3,210 |
| Depreciation & Amortization | 3,830 | 3,964 | 4,159 | 4,547 | 4,705 |
| Change in Working Capital | (778) | (847) | 0 | 0 | 0 |
| Deferred Taxation Charge | (1,461) | 164 | 831 | 1,163 | 1,400 |
| Other Adjustments, Net | 3,563 | 2,667 | 824 | 824 | 1,020 |
| Capital Expenditure | (5,650) | (7,242) | (7,250) | (7,250) | (7,250) |
| **Free Cash Flow** | **-3,145** | **1,097** | **749** | **2,213** | **3,085** |
| **% Change** | **NM** | **NM** | **-31.7%** | **195.4%** | **39.4%** |

## Balance Sheet Data (Dec)

| (US$ Millions) | 2011A | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|---|
| Cash & Equivalents | 2,697 | 2,471 | 3,740 | 5,773 | 8,677 |
| Trade Receivables | 3,259 | 2,747 | 2,747 | 2,747 | 2,747 |
| Other Current Assets | 975 | 1,577 | 877 | 877 | 877 |
| Property, Plant & Equipment | 37,501 | 38,398 | 40,073 | 40,829 | 40,994 |
| Other Non-Current Assets | 7,347 | 7,396 | 7,196 | 7,196 | 7,196 |
| **Total Assets** | **51,779** | **52,589** | **54,633** | **57,422** | **60,491** |
| Short-Term Debt | 170 | 0 | 0 | 0 | 0 |
| Other Current Liabilities | 4,729 | 3,994 | 3,994 | 3,994 | 3,994 |
| Long-Term Debt | 15,060 | 13,269 | 13,269 | 13,269 | 13,269 |
| Other Non-Current Liabilities | 12,837 | 13,444 | 13,444 | 13,444 | 13,444 |
| **Total Liabilities** | **32,796** | **30,707** | **30,707** | **30,707** | **30,707** |
| **Total Equity** | **18,983** | **21,882** | **23,926** | **26,715** | **29,784** |
| **Total Equity & Liabilities** | **51,779** | **52,589** | **54,633** | **57,422** | **60,491** |

* For full definitions of iQmethod[SM] measures, see page 8.

## Company Description

APC is a large cap E&P with 2.53 BBOE of reserves (86% US, 11% Algeria, 4% other, 59% natural gas) with its production focused in the Rocky Mountains, Texas and the mid-continent, deepwater Gulf of Mexico, Alaska and Algeria. It has exploratory activities in West Africa, Mozambique, GOM, Brazil, China. Production growth in 2012-2014 is derived from its three mega projects: Jubilee (Ghana), Caesar/Tonga (GOM) and El Merk (Algeria) and the US unconventional shale plays.

## Investment Thesis

APCs asset value can be uniquely benchmarked vs multiple 3rd parties. In the past year this has been overshadowed by ongoing Tronox litigation which is approaching conclusion but where multiples of a reasonable worst case is discounted. In 2013 mgt has signaled asset sales we believe can release value. At the same time Brent levered production steps higher and together provides the catalyst for outperformance in the next year.

## Stock Data

| | |
|---|---|
| Average Daily Volume | 3,312,827 |

## Quarterly Earnings Estimates

| | 2012 | 2013 |
|---|---|---|
| Q1 | 0.92A | 0.98E |
| Q2 | 1.43A | 0.96E |
| Q3 | 0.84A | 1.09E |
| Q4 | 0.91A | 1.31E |

# Shenandoah Major Discovery

## Initial look: this could be 500mm - 1bn boe

On our recent bus tour we suggested that news on Anadarko's Shenandoah well was imminent, pending closing of the latest GoM lease round on 3/18. Right on time, APC has announced the result the appraisal well – and it looks huge. With 1,000ft of net oil pay across multiple lower tertiary reservoirs and good rock properties management has taken the rare step of describing Shenandoah as a potential giant, meaning possibly more than 500mm bbls. The discovery has also been described as one of APC's largest discoveries in the US GoM. From data released by APC so far we, we contend that a simple reservoir engineering approach to the potential scale of the discovery could reasonably lie between 500mm – 1bn boe. Multiple parallel development schemes now come into play although rig limitations may defer further appraisal drilling until 2014. Still, even with a 4/5 year timeline to first oil, we now believe fair value for Shenandoah net to APC could reasonably be ~$2bn, or $4 per share – some 2x our prior estimate. As noted in our recent note APC: News flow starts now, the line of sight on high margin operated developments in the US GoM is a catalyst that can force market recognition of embedded exploration value. APC remains our sector top pick, and pending confirmation on the timeline to development, risks to our $120 PO look skewed higher.

Chart 1: The Shenandoah sub basin




Source: Anadarko

## Shenandoah: our assessment, this could be 500 - 1bn boe

Anadarko announced the Shenandoah discovery In Feb 2009 with the discovery well encountering over 300ft of net oil pay in the lower tertiary 'Wilcox' formation in Walker Ridge Block 52. The well was drilled to a total depth of ~30,000ft in water depths of ~5,750ft. At the time, reservoir properties were described as much higher quality than had previously been seen in the Lower-Tertiary.

**With confirmation of a successful appraisal the scale of the discovery stands potentially as one of the largest in the US GoM, with initial reservoir modeling approaches to scale suggesting it could exceed 1bn boe.**

The Shenandoah appraisal well was drilled in the adjacent block 51, over 1 mile SW of the discovery well and 1,700ft down dip on the structure to test the extent of the reservoir accumulation. The well encountered 1,000 ft of net pay but did not encounter an oil water contact, with sands full to base. Accordingly, the lateral extent of the field has still not been established and will require additional appraisal drilling, which from discussions with management may not occur until 2014.

Table 1: US GoM location of Shenandaoh




Source: Anadarko

Anadarko operates Shenandoah with a 30% working interest. Co-owners are ConocoPhillips (30%), Cobalt International Energy (20%), Marathon (10%) and Venari Resources LLC (10%).

## How big could it be?

Shenandoah straddles two blocks, and based on representations by management, the structure appears to cover a lateral area equivalent to an entire US GoM block, or ~5,500 acres.

While it is perhaps too early to speculate on average sand thickness, taking a simple average of the first two wells, would imply ~650ft. To be conservative we will round down to 500ft. Management commentary on log and pressure data describes Shenandoah as having 'excellent quality reservoirs and fluid properties', which similar to the discovery well were of much higher quality than has previously been encountered in lower tertiary reservoirs. In discussion with management it has suggested porosity of ~20%, and interstitial water content also around ~20%.

The table below shows a simple standard tank model approach to assessing oil in place, using the formula

- OOIP = 7,758 * A * d * Φ * (1-Sw) * 1/Bo

Where 'Φ' is % porosity, 'Sw' is interstitial water, 'A' is areal extent in acres and 'd' is reservoir thickness in feet. 7,758 is the conversion factor for barrels per acre foot. The theoretical 'Original Oil In Place' calculation under a high and low scenario is shown below.

**Table 2: Standard tank model suggests range could reasonably be 500mm - 1.4bn boe**

| | Lo | Hi |
|---|---|---|
| API Bbl / acre ft | 7,758 | 7,758 |
| Areal extent acres | 4,000 | 5,000 |
| Depth ft | 300 | 500 |
| Porosity Φ | 20% | 20% |
| Intersticial water (Sw) | 20% | 20% |
| Original Oil In Place mm boe | 1,490 | 3,103 |
| Recovery factor | 35% | 45% |
| Resource size bn boe | 521 | 1,396 |

Source: BofA Merrill Lynch Global Research

Recovery factors can't be known at this time – but for a standard US GoM well under water drive, a range of 25% - 35% would not be unusual.

**On this basis we suggest that an initial range for the discovery could reasonably be in a range of 500 – 1.4bn boe.**

When running this analysis past management, APC is not currently prepared to suggest anything beyond the 'giant' scale mentioned in the press release, meaning at least 500 million boe. But even at this level we believe any development scenario for Shenandoah most likely includes more than one facility – and may well allow for a repeat of the 'design one, build many' approach already taken with the Lucius and Heidelberg developments. As we noted in our recent Bus Tour note, any development plan may incorporate adjacent prospects in the Shenandoah mini basin – namely Chevron's operated Coronado prospect (APC 15%) and Shell's Yucatan target (APC 15%). Note that APC has also confirmed Coronado as a discovery, although the operator has yet to provide any color.

**Table 3: Shenandoah notional value by player**

| | | Phase 1 | Phase 2 | Total | per share |
|---|---|---|---|---|---|
| APC | 30% | 974 | 882 | 1,856 | 3.71 |
| COP | 30% | 974 | 882 | 1,856 | 1.51 |
| CIE | 20% | 649 | 588 | 1,237 | 3.04 |
| MRO | 10% | 325 | 294 | 619 | 0.87 |

Source: BofA Merrill Lynch Global Research

## What's the potential value?

We previously assessed the potential value of Shenandoah on the assumption of a single development, and 400 million boe. With the scale of the appraisal well and subsequent analysis, we suggest this is likely conservative – and present an alternative valuation based on twin, staggered development with first oil in 2017 and 2018 respectively, each at 80,000 boepd. This is shown in the tables below.

**Table 4: Assumed Shenandoah phase 1: onstream 2017**



Source: BofA Merrill Lynch Global Research

**Table 5: Assumed Shenandoah phase 1: onstream 2017**



Source: BofA Merrill Lynch Global Research

While it is clearly too early to be definitive on the precise development scenarios, it is equally unreasonable to ignore the scale of the Shenandoah and associated value net to APC. On this basis we suggest that a twin development that assumes total resource of 700 mm boe would reasonably have value net to APC of ~$1.9bn, or ~$4 per APC share.

If confirmed this would be the latest in a series of potential development hubs operated by Anadarko which we believe will contribute some 74,000 boepd net by 2017 and 100,000 boepd by 2018. Critically, 2/3 of this volume will be achieved at no cost to Anadarko.

- In mid 2012, APC farmed down 7.2% of its interest in the 300mm bbl Lucius discovery for $556mm. APC retained 27.8% and remains operator. However the implied value of the transaction underlines associated value of ~$2.7bn for the field which is within sight of the value we are carrying in our NPV.
- In March 2013, APC secured a 2nd JV carry agreement – this time on the Heidelberg development, which is a lookalike to the 80,000 bpd Lucius spar, and is due on-stream in 2016. APC farmed out 12.75% for 860 mmboe, retained 31.5%, with an implied total value net to Anadarko of ~$3bn.

**Chart 2: Heidelberg: APC NPV $3 / share before carry**



Source: BofA Merrill Lynch Global Research

**Chart 3: Lucius: APC NPV $4 / share before carry**



Source: BofA Merrill Lynch Global Research

Assuming that Shenandoah achieves line of sight for first oil in 2017, as is currently projected by management, we estimate the total NPV associated with these three major developments is around $6bn, or $12 per APC share.

**Alongside other major exploration successes, that have long dated lines of sight to development, we maintain our view that APC is, simply amongst the most undervalued of the large cap US oils.**

The margin chart summarizes the most significant assets that fall in this category. With the confirmed scale of Shenandoah, the value we associate with undeveloped exploration moves up slightly from $45 / share to $47 / share and underpins again our view that the value of exploration is a significant differentiating factor versus peers.

Table 6: Undeveloped exploration now $47 / sh

| Asset | $value |
|---|---|
| Brazil | 2,500 |
| *US GoM* | |
| Vito | 1,090 |
| Lucius | 2,005 |
| Lucius Carry | 556 |
| Shenandoah | 1,856 |
| Heidelberg | 1,614 |
| Heidelberg carry | 860 |
| Samurai | 417 |
| **Total GoM** | **8,398** |
| Kosmos | 4,000 |
| Mozambique | 8,588 |
| **Total undeveloped exploration** | **23,486** |
| *per share* | *$ 47.00* |

Source: BofA Merrill Lynch Global Research

# Summary

## Option value still lies ahead

Management is taking steps to accelerate the release of value for shareholders. Exploration value that has long been embedded in the stock, is transitioning to a visible development pipeline providing the catalyst to drive APC's forward multiple lower as the portfolio skews hard towards international oil. If exploration value is excluded, APC screens as one of the most undervalued stocks in the sector. Over the next weeks and months we expect the process to accelerate with multiple exploration well results likely disclosed to the market and the very real possibility that the long awaited Mozambique monetization will be confirmed. A deep bench of additional exploration results over the balance of 2013 promises to extend project line of sight; but so to does the prospect of ongoing portfolio hi-grading that we believe will similarly accelerate value recognition by the market. Put simply we believe APC is bridging the gap between a value play and growth stock; with the catalysts emerging that can release this value, APC remains our top sector pick. Buy. PO remains $120.

## Price objective basis & risk

### Anadarko Petroleum Corp. (APC)

Our price objective of $120 share is based on an aggregate of two measures: Discounted Cash Flow (DCF) and Net Asset Value (NAV). Our estimated NAV of the existing portfolio, and for the key P1 value, we use the SEC declared proven reserves and projected capital to bring PUDs to production. Our DCF valuation assumes long-term Brent and WTI oil prices of $100.00 and $90.00/bbl, respectively, and assumes a WACC of 11%.

Risks to our price objective: E&P companies, in general, are subject to commodity price volatility, operating risk, regulatory risk, and uncertainty of reserve estimates. Company-specific risks to achieving our price objective are: (1) About 22% of APC's production is derived from the Gulf of Mexico, which could be affected by weather-related or mechanical downtime. (2) Disappointing results in APC's exploratory program in the Gulf of Mexico, Brazil, or West Africa could invalidate our NAV assumptions and the longer-term growth outlook. (3) A weak commodity price environment could undermine the assumptions in our valuation.

## Link to Definitions

### Energy

Click here for definitions of commonly used terms.

## Analyst Certification

I, Doug Leggate, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers. I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.

**US - Large Cap Oils Coverage Cluster**

| Investment rating | Company | BofA Merrill Lynch ticker | Bloomberg symbol | Analyst |
|---|---|---|---|---|
| BUY | | | | |
| | Anadarko Petroleum Corp. | APC | APC US | Doug Leggate |
| | Chesapeake Energy Corp. | CHK | CHK US | Doug Leggate |
| | Devon Energy Corp. | DVN | DVN US | Doug Leggate |
| | ExxonMobil Corp. | XOM | XOM US | Doug Leggate |
| | Hess Corp. | HES | HES US | Doug Leggate |
| | Marathon Oil Corp. | MRO | MRO US | Doug Leggate |
| | Marathon Petroleum Company | MPC | MPC US | Doug Leggate |
| | Noble Energy | NBL | NBL US | Doug Leggate |
| | Northern Tier Energy LP | NTI | NTI US | Jason Smith |
| | Occidental Petroleum Corp. | OXY | OXY US | Doug Leggate |
| | Range Resources Corp | RRC | RRC US | Doug Leggate |
| | Tesoro Corp. | TSO | TSO US | Doug Leggate |
| | Valero Energy Corp. | VLO | VLO US | Doug Leggate |

### US - Large Cap Oils Coverage Cluster

| Investment rating | Company | BofA Merrill Lynch ticker | Bloomberg symbol | Analyst |
|---|---|---|---|---|
| NEUTRAL | | | | |
| | Apache Corp | APA | APA US | Doug Leggate |
| | Cabot Oil & Gas Corp. | COG | COG US | Doug Leggate |
| | Calumet Specialty Products Partners | CLMT | CLMT US | Jason Smith |
| | Chevron Corp. | CVX | CVX US | Doug Leggate |
| | EOG Resources | EOG | EOG US | Doug Leggate |
| | HollyFrontier Corp | HFC | HFC US | Doug Leggate |
| | Phillips 66 | PSX | PSX US | Doug Leggate |
| | Southwestern Energy Corp. | SWN | SWN US | Doug Leggate |
| UNDERPERFORM | | | | |
| | ConocoPhillips | COP | COP US | Doug Leggate |

### *iQmethod*SM Measures Definitions

| Business Performance | Numerator | Denominator |
|---|---|---|
| Return On Capital Employed | NOPAT = (EBIT + Interest Income) * (1 - Tax Rate) + Goodwill Amortization | Total Assets – Current Liabilities + ST Debt + Accumulated Goodwill Amortization |
| Return On Equity | Net Income | Shareholders' Equity |
| Operating Margin | Operating Profit | Sales |
| Earnings Growth | Expected 5-Year CAGR From Latest Actual | N/A |
| Free Cash Flow | Cash Flow From Operations – Total Capex | N/A |
| **Quality of Earnings** | | |
| Cash Realization Ratio | Cash Flow From Operations | Net Income |
| Asset Replacement Ratio | Capex | Depreciation |
| Tax Rate | Tax Charge | Pre-Tax Income |
| Net Debt-To-Equity Ratio | Net Debt = Total Debt, Less Cash & Equivalents | Total Equity |
| Interest Cover | EBIT | Interest Expense |
| **Valuation Toolkit** | | |
| Price / Earnings Ratio | Current Share Price | Diluted Earnings Per Share (Basis As Specified) |
| Price / Book Value | Current Share Price | Shareholders' Equity / Current Basic Shares |
| Dividend Yield | Annualised Declared Cash Dividend | Current Share Price |
| Free Cash Flow Yield | Cash Flow From Operations – Total Capex | Market Cap. = Current Share Price * Current Basic Shares |
| Enterprise Value / Sales | EV = Current Share Price * Current Shares + Minority Equity + Net Debt + Other LT Liabilities | Sales |
| EV / EBITDA | Enterprise Value | Basic EBIT + Depreciation + Amortization |

*iQmethod* SM is the set of BofA Merrill Lynch standard measures that serve to maintain global consistency under three broad headings: Business Performance, Quality of Earnings, and validations. The key features of iQmethod are: A consistently structured, detailed, and transparent methodology. Guidelines to maximize the effectiveness of the comparative valuation process, and to identify some common pitfalls.

*iQdatabase* ® is our real-time global research database that is sourced directly from our equity analysts' earnings models and includes forecasted as well as historical data for income statements, balance sheets, and cash flow statements for companies covered by BofA Merrill Lynch.

*iQprofile* SM, *iQmethod* SM are service marks of Merrill Lynch & Co., Inc. *iQdatabase* ® is a registered service mark of Merrill Lynch & Co., Inc.

# Important Disclosures

## APC Price Chart




B : Buy, N : Neutral, U : Underperform, PO : Price objective, NA : No longer valid, NR: No Rating

The Investment Opinion System is contained at the end of the report under the heading "Fundamental Equity Opinion Key". Dark grey shading indicates the security is restricted with the opinion suspended. Medium grey shading indicates the security is under review with the opinion withdrawn. Light grey shading indicates the security is not covered. Chart is current as of February 28, 2013 or such later date as indicated.

**Investment Rating Distribution: Energy Group (as of 01 Jan 2013)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 145 | 45.89% | Buy | 111 | 81.62% |
| Neutral | 105 | 33.23% | Neutral | 75 | 84.27% |
| Sell | 66 | 20.89% | Sell | 37 | 64.91% |

**Investment Rating Distribution: Global Group (as of 01 Jan 2013)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 1961 | 49.47% | Buy | 1299 | 71.85% |
| Neutral | 1013 | 25.55% | Neutral | 640 | 70.18% |
| Sell | 990 | 24.97% | Sell | 543 | 59.15% |

* Companies that were investment banking clients of BofA Merrill Lynch or one of its affiliates within the past 12 months. For purposes of this distribution, a stock rated Underperform is included as a Sell.

**FUNDAMENTAL EQUITY OPINION KEY: Opinions include a Volatility Risk Rating, an Investment Rating and an Income Rating. *VOLATILITY RISK RATINGS*, indicators of potential price fluctuation, are: A - Low, B - Medium and C - High. *INVESTMENT RATINGS* reflect the analyst's assessment of a stock's: (i) absolute total return potential and (ii) attractiveness for investment relative to other stocks within its *Coverage Cluster* (defined below). There are three investment ratings: 1 - Buy stocks are expected to have a total return of at least 10% and are the most attractive stocks in the coverage cluster; 2 - Neutral stocks are expected to remain flat or increase in value and are less attractive than Buy rated stocks and 3 - Underperform stocks are the least attractive stocks in a coverage cluster. Analysts assign investment ratings considering, among other things, the 0-12 month total return expectation for a stock and the firm's guidelines for ratings dispersions (shown in the table below). The current price objective for a stock should be referenced to better understand the total return expectation at any given time. The price objective reflects the analyst's view of the potential price appreciation (depreciation).**

| Investment rating | Total return expectation (within 12-month period of date of initial rating) | Ratings dispersion guidelines for coverage cluster* |
|---|---|---|
| Buy | ≥ 10% | ≤ 70% |
| Neutral | ≥ 0% | ≤ 30% |
| Underperform | N/A | ≥ 20% |

* Ratings dispersions may vary from time to time where BofA Merrill Lynch Research believes it better reflects the investment prospects of stocks in a Coverage Cluster.

***INCOME RATINGS*, indicators of potential cash dividends, are: 7 - same/higher (dividend considered to be secure), 8 - same/lower (dividend not considered to be secure) and 9 - pays no cash dividend.** *Coverage Cluster* is comprised of stocks covered by a single analyst or two or more analysts sharing a common industry, sector, region or other classification(s). A stock's coverage cluster is included in the most recent BofA Merrill Lynch Comment referencing the stock.

Price charts for the securities referenced in this research report are available at http://pricecharts.ml.com, or call 1-800-MERRILL to have them mailed.
MLPF&S or one of its affiliates acts as a market maker for the equity securities recommended in the report: Anadarko Petro.
The company is or was, within the last 12 months, an investment banking client of MLPF&S and/or one or more of its affiliates: Anadarko Petro.
MLPF&S or an affiliate has received compensation from the company for non-investment banking services or products within the past 12 months: Anadarko Petro.
The company is or was, within the last 12 months, a non-securities business client of MLPF&S and/or one or more of its affiliates: Anadarko Petro.
MLPF&S or an affiliate has received compensation for investment banking services from this company within the past 12 months: Anadarko Petro.
MLPF&S or an affiliate expects to receive or intends to seek compensation for investment banking services from this company or an affiliate of the company within the next three months: Anadarko Petro.

MLPF&S together with its affiliates beneficially owns one percent or more of the common stock of this company. If this report was issued on or after the 8th day of the month, it reflects the ownership position on the last day of the previous month. Reports issued before the 8th day of a month reflect the ownership position at the end of the second month preceding the date of the report: Anadarko Petro.

MLPF&S or one of its affiliates is willing to sell to, or buy from, clients the common equity of the company on a principal basis: Anadarko Petro.

The company is or was, within the last 12 months, a securities business client (non-investment banking) of MLPF&S and/or one or more of its affiliates: Anadarko Petro.

BofA Merrill Lynch Research personnel (including the analyst(s) responsible for this report) receive compensation based upon, among other factors, the overall profitability of Bank of America Corporation, including profits derived from investment banking revenues.

## Other Important Disclosures

Officers of MLPF&S or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.

From time to time, research analysts may conduct site visits of companies under their coverage. BofA Merrill Lynch does not accept payment or reimbursement from companies of travel expenses incurred by research analysts in connection with site visits

**BofA Merrill Lynch Global Research policies relating to conflicts of interest are described at http://www.ml.com/media/43347.pdf.**

**"BofA Merrill Lynch" includes Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") and its affiliates. Investors should contact their BofA Merrill Lynch representative or Merrill Lynch Global Wealth Management financial advisor if they have questions concerning this report. "BofA Merrill Lynch" and "Merrill Lynch" are each global brands for BofA Merrill Lynch Global Research.**

**Information relating to Non-US affiliates of BofA Merrill Lynch and Distribution of Affiliate Research Reports:**

MLPF&S distributes, or may in the future distribute, research reports of the following non-US affiliates in the US (short name: legal name): Merrill Lynch (France): Merrill Lynch Capital Markets (France) SAS; Merrill Lynch (Frankfurt): Merrill Lynch International Bank Ltd., Frankfurt Branch; Merrill Lynch (South Africa): Merrill Lynch South Africa (Pty) Ltd.; Merrill Lynch (Milan): Merrill Lynch International Bank Limited; MLI (UK): Merrill Lynch International; Merrill Lynch (Australia): Merrill Lynch Equities (Australia) Limited; Merrill Lynch (Hong Kong): Merrill Lynch (Asia Pacific) Limited; Merrill Lynch (Singapore): Merrill Lynch (Singapore) Pte Ltd.; Merrill Lynch (Canada): Merrill Lynch Canada Inc; Merrill Lynch (Mexico): Merrill Lynch Mexico, SA de CV, Casa de Bolsa; Merrill Lynch (Argentina): Merrill Lynch Argentina SA; Merrill Lynch (Japan): Merrill Lynch Japan Securities Co., Ltd.; Merrill Lynch (Seoul): Merrill Lynch International Incorporated (Seoul Branch); Merrill Lynch (Taiwan): Merrill Lynch Securities (Taiwan) Ltd.; DSP Merrill Lynch (India): DSP Merrill Lynch Limited; PT Merrill Lynch (Indonesia): PT Merrill Lynch Indonesia; Merrill Lynch (Israel): Merrill Lynch Israel Limited; Merrill Lynch (Russia): OOO Merrill Lynch Securities, Moscow; Merrill Lynch (Turkey I.B.): Merrill Lynch Yatirim Bank A.S.; Merrill Lynch (Turkey Broker): Merrill Lynch Menkul Değerler A.Ş.; Merrill Lynch (Dubai): Merrill Lynch International, Dubai Branch; MLPF&S (Zurich rep. office): MLPF&S Incorporated Zurich representative office; Merrill Lynch (Spain): Merrill Lynch Capital Markets Espana, S.A.S.V.; Merrill Lynch (Brazil): Bank of America Merrill Lynch Banco Multiplo S.A.; Merrill Lynch KSA Company, Merrill Lynch Kingdom of Saudi Arabia Company.

This research report has been approved for publication and is distributed in the United Kingdom to professional clients and eligible counterparties (as each is defined in the rules of the Financial Services Authority) by Merrill Lynch International and Banc of America Securities Limited (BASL), which are authorized and regulated by the Financial Services Authority and has been approved for publication and is distributed in the United Kingdom to retail clients (as defined in the rules of the Financial Services Authority) by Merrill Lynch International Bank Limited, London Branch, which is authorized by the Central Bank of Ireland and is subject to limited regulation by the Financial Services Authority – details about the extent of its regulation by the Financial Services Authority are available from it on request; has been considered and distributed in Japan by Merrill Lynch Japan Securities Co., Ltd., a registered securities dealer under the Financial Instruments and Exchange Act in Japan; is distributed in Hong Kong by Merrill Lynch (Asia Pacific) Limited, which is regulated by the Hong Kong SFC and the Hong Kong Monetary Authority; is issued and distributed in Taiwan by Merrill Lynch Securities (Taiwan) Ltd.; is issued and distributed in India by DSP Merrill Lynch Limited; and is issued and distributed in Singapore by Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd. (Company Registration No.'s F 06872E and 198602883D respectively) and Bank of America Singapore Limited (Merchant Bank). Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd. are regulated by the Monetary Authority of Singapore. Bank of America N.A., Australian Branch (ARBN 064 874 531), AFS License 412901 (BANA Australia) and Merrill Lynch Equities (Australia) Limited (ABN 65 006 276 795), AFS License 235132 (MLEA) distributes this report in Australia only to 'Wholesale' clients as defined by s.761G of the Corporations Act 2001. With the exception of BANA Australia, neither MLEA nor any of its affiliates involved in preparing this research report is an Authorised Deposit-Taking Institution under the Banking Act 1959 nor regulated by the Australian Prudential Regulation Authority. No approval is required for publication or distribution of this report in Brazil and its local distribution is made by Bank of America Merrill Lynch Banco Múltiplo S.A. in accordance with applicable regulations. Merrill Lynch (Dubai) is authorized and regulated by the Dubai Financial Services Authority (DFSA). Research reports prepared and issued by Merrill Lynch (Dubai) are prepared and issued in accordance with the requirements of the DFSA conduct of business rules.

Merrill Lynch (Frankfurt) distributes this report in Germany. Merrill Lynch (Frankfurt) is regulated by BaFin.

This research report has been prepared and issued by MLPF&S and/or one or more of its non-US affiliates. MLPF&S is the distributor of this research report in the US and accepts full responsibility for research reports of its non-US affiliates distributed to MLPF&S clients in the US. Any US person receiving this research report and wishing to effect any transaction in any security discussed in the report should do so through MLPF&S and not such foreign affiliates.

**General Investment Related Disclosures:**

This research report provides general information only. Neither the information nor any opinion expressed constitutes an offer or an invitation to make an offer, to buy or sell any securities or other financial instrument or any derivative related to such securities or instruments (e.g., options, futures, warrants, and contracts for differences). This report is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of any specific person. Investors should seek financial advice regarding the appropriateness of investing in financial instruments and implementing investment strategies discussed or recommended in this report and should understand that statements regarding future prospects may not be realized. Any decision to purchase or subscribe for securities in any offering must be based solely on existing public information on such security or the information in the prospectus or other offering document issued in connection with such offering, and not on this report.

Securities and other financial instruments discussed in this report, or recommended, offered or sold by Merrill Lynch, are not insured by the Federal Deposit Insurance Corporation and are not deposits or other obligations of any insured depository institution (including, Bank of America, N.A.). Investments in general and, derivatives, in particular, involve numerous risks, including, among others, market risk, counterparty default risk and liquidity risk. No security, financial instrument or derivative is suitable for all investors. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. Investors should note that income from such securities and other financial instruments, if any, may fluctuate and that price or value of such securities and instruments may rise or fall and, in some cases, investors may lose their entire principal investment. Past performance is not necessarily a guide to future performance. Levels and basis for taxation may change.

This report may contain a short-term trading idea or recommendation, which highlights a specific near-term catalyst or event impacting the company or the market that is anticipated to have a short-term price impact on the equity securities of the company. Short-term trading ideas and recommendations are different from and do not affect a stock's fundamental equity rating, which reflects both a longer term total return expectation and attractiveness for investment relative to other stocks within its Coverage Cluster. Short-term trading ideas and recommendations may be more or less positive than a stock's fundamental equity rating.

BofA Merrill Lynch is aware that the implementation of the ideas expressed in this report may depend upon an investor's ability to "short" securities or other financial instruments and that such action may be limited by regulations prohibiting or restricting "shortselling" in many jurisdictions. Investors are urged to seek advice regarding the applicability of such regulations prior to executing any short idea contained in this report.

Foreign currency rates of exchange may adversely affect the value, price or income of any security or financial instrument mentioned in this report. Investors in such securities and instruments, including ADRs, effectively assume currency risk.

UK Readers: The protections provided by the U.K. regulatory regime, including the Financial Services Scheme, do not apply in general to business coordinated by BofA Merrill Lynch entities located outside of the United Kingdom. BofA Merrill Lynch Global Research policies relating to conflicts of interest are described at http://www.ml.com/media/43347.pdf.

Officers of MLPF&S or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.

MLPF&S or one of its affiliates is a regular issuer of traded financial instruments linked to securities that may have been recommended in this report. MLPF&S or one of its affiliates may, at any time, hold a trading position (long or short) in the securities and financial instruments discussed in this report.

BofA Merrill Lynch, through business units other than BofA Merrill Lynch Global Research, may have issued and may in the future issue trading ideas or recommendations that are inconsistent with, and reach different conclusions from, the information presented in this report. Such ideas or recommendations reflect the different time frames, assumptions, views and analytical methods of the persons who prepared them, and BofA Merrill Lynch is under no obligation to ensure that such other trading ideas or recommendations are brought to the attention of any recipient of this report.

In the event that the recipient received this report pursuant to a contract between the recipient and MLPF&S for the provision of research services for a separate fee, and in connection therewith MLPF&S may be deemed to be acting as an investment adviser, such status relates, if at all, solely to the person with whom MLPF&S has contracted directly and does not extend beyond the delivery of this report (unless otherwise agreed specifically in writing by MLPF&S). MLPF&S is and continues to act solely as a broker-dealer in connection with the execution of any transactions, including transactions in any securities mentioned in this report.

**Copyright and General Information regarding Research Reports:**

Copyright 2013 Merrill Lynch, Pierce, Fenner & Smith Incorporated. All rights reserved. iQmethod, iQmethod 2.0, iQprofile, iQtoolkit, iQworks are service marks of Merrill Lynch & Co., Inc. iQanalytics®, iQcustom®, iQdatabase® are registered service marks of Merrill Lynch & Co., Inc. This research report is prepared for the use of BofA Merrill Lynch clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of BofA Merrill Lynch. BofA Merrill Lynch Global Research reports are distributed simultaneously to internal and client websites and other portals by BofA Merrill Lynch and are not publicly-available materials. Any unauthorized use or disclosure is prohibited. Receipt and review of this research report constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained in this report (including any investment recommendations, estimates or price targets) without first obtaining expressed permission from an authorized officer of BofA Merrill Lynch.

Materials prepared by BofA Merrill Lynch Global Research personnel are based on public information. Facts and views presented in this material have not been reviewed by, and may not reflect information known to, professionals in other business areas of BofA Merrill Lynch, including investment banking personnel. BofA Merrill Lynch has established information barriers between BofA Merrill Lynch Global Research and certain business groups. As a result, BofA Merrill Lynch does not disclose certain client relationships with, or compensation received from, such companies in research reports. To the extent this report discusses any legal proceeding or issues, it has not been prepared as nor is it intended to express any legal conclusion, opinion or advice. Investors should consult their own legal advisers as to issues of law relating to the subject matter of this report. BofA Merrill Lynch Global Research personnel's knowledge of legal proceedings in which any BofA Merrill Lynch entity and/or its directors, officers and employees may be plaintiffs, defendants, co-defendants or co-plaintiffs with or involving companies mentioned in this report is based on public information. Facts and views presented in this material that relate to any such proceedings have not been reviewed by, discussed with, and may not reflect information known to, professionals in other business areas of BofA Merrill Lynch in connection with the legal proceedings or matters relevant to such proceedings.

This report has been prepared independently of any issuer of securities mentioned herein and not in connection with any proposed offering of securities or as agent of any issuer of any securities. None of MLPF&S, any of its affiliates or their research analysts has any authority whatsoever to make any representation or warranty on behalf of the issuer(s). BofA Merrill Lynch Global Research policy prohibits research personnel from disclosing a recommendation, investment rating, or investment thesis for review by an issuer prior to the publication of a research report containing such rating, recommendation or investment thesis.

Any information relating to the tax status of financial instruments discussed herein is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.

The information herein (other than disclosure information relating to BofA Merrill Lynch and its affiliates) was obtained from various sources and we do not guarantee its accuracy. This report may contain links to third-party websites. BofA Merrill Lynch is not responsible for the content of any third-party website or any linked content contained in a third-party website. Content contained on such third-party websites is not part of this report and is not incorporated by reference into this report. The inclusion of a link in this report does not imply any endorsement by or any affiliation with BofA Merrill Lynch. Access to any third-party website is at your own risk, and you should always review the terms and privacy policies at third-party websites before submitting any personal information to them. BofA Merrill Lynch is not responsible for such terms and privacy policies and expressly disclaims any liability for them.

Subject to the quiet period applicable under laws of the various jurisdictions in which we distribute research reports and other legal and BofA Merrill Lynch policy-related restrictions on the publication of research reports, fundamental equity reports are produced on a regular basis as necessary to keep the investment recommendation current.

Certain outstanding reports may contain discussions and/or investment opinions relating to securities, financial instruments and/or issuers that are no longer current. Always refer to the most recent research report relating to a company or issuer prior to making an investment decision.

In some cases, a company or issuer may be classified as Restricted or may be Under Review or Extended Review. In each case, investors should consider any investment opinion relating to such company or issuer (or its security and/or financial instruments) to be suspended or withdrawn and should not rely on the analyses and investment opinion(s) pertaining to such issuer (or its securities and/or financial instruments) nor should the analyses or opinion(s) be considered a solicitation of any kind. Sales persons and financial advisors affiliated with MLPF&S or any of its affiliates may not solicit purchases of securities or financial instruments that are Restricted or Under Review and may only solicit securities under Extended Review in accordance with firm policies.

Neither BofA Merrill Lynch nor any officer or employee of BofA Merrill Lynch accepts any liability whatsoever for any direct, indirect or consequential damages or losses arising from any use of this report or its contents.

# EXHIBIT 35

COWEN AND COMPANY

Energy

# Cobalt International Energy

COWEN CREDIT RESEARCH & TRADING

Credit Research

Company Note

May 3, 2017

**Price: $0.37** (05/2/2017)

**David Epstein, CFA**
646.616.3050
david.epstein@cowen.com

**Jack Chan**
646.616.3054
jack.chan@cowen.com

**Key Data**

| | |
|---|---|
| Symbol | NYSE: CIE |
| Market Cap (MM) | $166.6 |

## *Shenandoah Results A Negative*

### The Cowen Insight

Anadarko's news yesterday afternoon on Shenandoah, combined with weak oil prices and Cobalt's bonds trading within ~10% of recent highs, leads us to believe that Cobalt bonds are likely to trade down in coming days from yesterday's levels. We believe the bonds are all generally now in the realm of fair to fully valued and that there are better values elsewhere in energy.

The 2 5/8% Convert TRACED yesterday at $38.75 (45.4% YTW) and the 10.75% 1L's TRACED in the high $90's (mid 11%'s YTW). The 3 1/8% Converts had been just under $30 recently (~25% YTW) and the 7 ¾% 2L's had been in the $64 ballpark (17.1% YTW). The 1L's are close to recent highs and the other three bonds are all within 10% or so.

It is important to point out that this will be a fluid situation, as might be our view, with Anadarko's earnings call at 9 AM EST on 05/03/17, Cobalt's earnings release and conference call on 05/08/17, and the company's bonds likely to remain volatile. We should also point out that nothing negative has occurred with respect to North Platte and Anchor, both of which had already been known to be more important than Shenandoah (certain news, discussed below, has actually been positive with respect to Anchor).

Valuation/asset coverage is clearly an imprecise exercise for Cobalt, but based on the aforementioned factors and the potential for sentiment to be weak, we just don't have conviction in the bonds/see a reason to be involved at current levels. April 25th was our most recent note where we updated our leverage metrics in terms of debt/barrel. Hopefully we can update that table again based on any details that come out of Cobalt's upcoming earnings.

### Shenandoah

We and our equity colleague Charles Robertson II, who covers Anadarko, both believe that Anadarko put out disappointing news yesterday afternoon with respect to Shenandoah. Anadarko, the operator at Shenandoah, announced in yesterday's earnings release that it recently completed drilling operations at the Shenandoah-6 appraisal and sidetrack wells, "which did not encounter the oil-water contract in the eastern portion of the field. The company has currently suspended appraisal activity in the field while it evaluates the path forward." The fact that the appraisal well was a disappointment became apparent in March when partner Cobalt released its Q4 results. However, the sidetrack well results is new news and we believe will be a disappointment to Cobalt investors, as the field is likely smaller/less economic than folks expected a few months ago.

Per the 10Q, Anadarko took a $467 million impairment on Shenandoah in Q1. Note 5 in the 10-Q puts in doubt "the economic or operational viability" of the project. The 10-Q states that "given the results of this well and the present commodity-price environment, the company has currently suspended further appraisal activities. Accordingly, the company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs." We think there's a meaningful chance that Anadarko will not remain active on the prospect within the 180 day window and that the lease is lost.

The market knew previously that Shenandoah was less valuable than the North Platte or Anchor prospects in the Gulf of Mexico. However, we believe that Cobalt and the market (including us) had been hoping that its 20% Shenandoah stake, which is for sale, would generate material proceeds ($100 - $200 million, possibly more). After the latest news, however, we would not ascribe any meaningful value to Shenandoah.

### North Platte and Anchor

Recall that the company has discussed previously that North Platte represents 300 million of the company's 500 million barrels of net risked resource in the Gulf of Mexico. Producing field Heidleberg probably represented a couple tens of millions or less, with Shenandoah and Anchor making up the rest. Shenandoah was previously considered sizable but there was little visibility provided on the relative size of it versus Anchor. Based on the latest Shenandoah news, there may be downside to the 500 million net figure for the Gulf.

We continue to believe that the company can monetize North Platte, likely at a very material value, but the margin for error has now decreased. As for Anchor, while that's not for sale yet, we note that there was somewhat positive news from Upstream recently. Upstream reported that Chevron will probably move forward with Anchor in terms of facility designs. If the oil price cooperates, our equity colleague Sam Margolin, who covers Chevron, believes that Anchor could be sanctioned by YE18.

# Valuation Methodology And Risks

## Valuation Methodology

Credit & Cross Capital:

Our valuation is based on a number of factors, including but not limited to, an issuer's underlying business prospects and credit profile as well as current market conditions. Our view of an issuer's business outlook includes, but is not limited to: (1) an assessment of relevant industry trends, (2) the issuer's position within its industry and how its position might change over time, (3) management's strategy and the likelihood that management will be able to execute its strategy. Our view of the issuer's credit profile includes, but is not limited to, the issuer's: (1) overall leverage as well as the composition of its leverage, (2) liquidity and its ability to meet its obligations as they come due, and (3) the value of its assets. Our valuation of a specific security includes, but is not limited to: (1) the potential recovery in a variety of scenarios, including financial restructurings, and the probability of each, and (2) its liquidity relative to other securities. Our valuation contemplates a variety of capital market environments.

## Investment Risks

Credit & Cross Capital:

Investment risks include, but are not limited to: (1) industry trends, (2) changes in the issuer's competitive position, (3) management's strategy and its ability to execute its strategy, (4) the issuer's financial and operational leverage, (5) the issuer's liquidity versus its cash requirements, (6) changes in the issuer's ability to access the capital markets, and (7) changes in the liquidity of a particular security.

# Addendum

## Stocks Mentioned In Important Disclosures

| Ticker | Company Name |
|---|---|
| CIE | Cobalt International Energy |

## Analyst Certification

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

## Important Disclosures

Cowen and Company, LLC and or its affiliates make a market in the stock of Cobalt International Energy securities.

Cowen and Company, LLC trades or may trade as principal in the debt securities of Cobalt International Energy.

Cowen and Company, LLC compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking, sales and trading or principal trading revenues. Cowen and Company, LLC does not compensate research analysts based on specific investment banking transactions or specific sales and trading or principal trading revenues.

## Disclaimer

Our research reports are simultaneously available to all clients are on our client website. Research reports are for our clients only. Not all research reports are disseminated, e-mailed or made available to third-party aggregators. Cowen and Company, LLC is not responsible for the redistribution of research by third party aggregators. Selected research reports are available in printed form in addition to an electronic form. All published research reports can be obtained on the firm's client website, https://cowenlibrary.bluematrix.com/client/library.jsp.

The information, opinions, estimates and forecasts are as of the date of this report and subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Research reports are published at irregular intervals as appropriate in the analyst's judgement.

Further information on subject securities may be obtained from our offices. This research report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Other than disclosures relating to Cowen and Company, LLC, the information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. The opinions and recommendations herein do not take into account individual client circumstances, objectives or needs and are not intended as recommendations of investment strategy. The recipients of this report must make their own independent decisions regarding any securities subject to this research report. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. To the extent that this report discusses any legal proceedings or issues, it has not been prepared to express or intended to express any legal conclusion, opinion or advice. Our salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions that are contrary to the opinions expressed in our research. Our principal trading area and investing businesses may make investment decisions that are inconsistent with recommendations or views expressed in our research. Cowen and Company, LLC maintains physical, electronic and procedural information barriers to address the flow of information between and among departments within Cowen and Company, LLC in order to prevent and avoid conflicts of interest with respect to analyst recommendations.

For important disclosures regarding the companies that are the subject of this research report, please contact Compliance Department, Cowen and Company, LLC, 599 Lexington Avenue, 20th Floor, New York, NY 10022. In addition, the same important disclosures, with the exception of the valuation methods and risks, are available on the Firm's disclosure website at https://cowen.bluematrix.com/sellside/Disclosures.action.

**Equity Research Price Targets:** Cowen and Company, LLC assigns price targets on all companies covered in equity research unless noted otherwise. The equity research price target for an issuer's stock represents the value that the analyst reasonably expects the stock to reach over a performance period of twelve months. Any price targets in equity securities in this report should be considered in the context of all prior published Cowen and Company, LLC equity research reports (including the disclosures in any such equity report or on the Firm's disclosure website), which may or may not include equity research price targets, as well as developments relating to the issuer, its industry and the financial markets. For equity research price target valuation methodology and risks associated with the achievement of any given equity research price target, please see the analyst's equity research report publishing such targets.

**Cowen Credit Research and Trading:** Due to the nature of the fixed income market, the issuers or debt securities of the issuers discussed in "Cowen Credit Research and Trading" research reports do not assign ratings and price targets and may not be continuously followed. Accordingly, investors must regard such branded reports as providing stand-alone analysis and reflecting the analyst's opinion as of the date of the report and should not expect continuing analysis or additional reports relating to such issuers or debt securities of the issuers.

From time to time "Cowen Credit Research and Trading" research analysts provide investment recommendations on securities that are the subject of this report. These recommendations are intended only as of the time and date of publication and only within the parameters specified in each individual report. "Cowen Credit Research and Trading" investment recommendations are made strictly on a case-by-case basis, and no recommendation is provided as part of an overarching rating system or other set of consistently applied benchmarks. The views expressed in this report may differ from the views offered in the firm's equity research reports prepared for our clients.

**Notice to UK Investors:** This publication is produced by Cowen and Company, LLC which is regulated in the United States by FINRA. It is to be communicated only to persons of a kind described in Articles 19 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. It must not be further transmitted to any other person without our consent.

**Notice to European Union Investors:** Individuals producing recommendations are required to obtain certain licenses by the Financial Regulatory Authority (FINRA). You can review the author's current licensing status and history, employment history and, if any, reported regulatory, customer dispute, criminal and other matters via "Brokercheck by FINRA" at http://brokercheck.finra.org/. An individual's licensing status with FINRA should not be construed as an endorsement by FINRA. General biographical information is also available for each Research Analyst at www.cowen.com.

Additionally, the complete preceding 12-month recommendations history related to recommendation in this research report is available at https://cowen.bluematrix.com/sellside/Disclosures.action

The recommendation contained in this report was produced at May 03, 2017, 06:47 ET. and disseminated at May 03, 2017, 06:47 ET.

**Copyright, User Agreement and other general information related to this report**

© 2017 Cowen and Company, LLC. Member NYSE, FINRA and SIPC. All rights reserved. This research report is prepared for the exclusive use of Cowen clients and may not be reproduced, displayed, modified, distributed, transmitted or disclosed, in whole or in part, or in any form or manner, to others outside your organization without the express prior written consent of Cowen. Cowen research reports are distributed simultaneously to all clients eligible to receive such research reports. Any unauthorized use or disclosure is prohibited. Receipt and/or review of this research constitutes your agreement not to reproduce, display, modify, distribute, transmit, or disclose to others outside your organization the contents, opinions, conclusion, or information contained in this report (including any investment recommendations, estimates or price targets). All Cowen trademarks displayed in this report are owned by Cowen and may not be used without its prior written consent.

**Cowen and Company, LLC. New York** (646) 562-1010 **Boston** (617) 946-3700 **San Francisco** (415) 646-7200 **Chicago** (312) 577-2240 **Cleveland** (440) 331-3531 **Atlanta** (866) 544-7009 **Stamford** (646) 616-3000 **Washington D.C.** (202) 868-5300 **London** (affiliate) 44-207-071-7500

**COWEN AND COMPANY EQUITY RESEARCH RATING DEFINITIONS**

**Outperform (1):** The stock is expected to achieve a total positive return of at least 15% over the next 12 months

**Market Perform (2):** The stock is expected to have a total return that falls between the parameters of an Outperform and Underperform over the next 12 months

**Underperform (3):** Stock is expected to achieve a total negative return of at least 10% over the next 12 months

**Assumption:** The expected total return calculation includes anticipated dividend yield

## Cowen and Company Equity Research Rating Distribution

**Distribution of Ratings/Investment Banking Services (IB) as of 03/31/17**

| Rating | Count | Ratings Distribution | Count | IB Services/Past 12 Months |
|---|---|---|---|---|
| Buy (a) | 441 | 58.57% | 86 | 19.50% |
| Hold (b) | 303 | 40.24% | 14 | 4.62% |
| Sell (c) | 9 | 1.20% | 0 | 0.00% |

(a) Corresponds to "Outperform" rated stocks as defined in Cowen and Company, LLC's equity research rating definitions. (b) Corresponds to "Market Perform" as defined in Cowen and Company, LLC's equity research ratings definitions. (c) Corresponds to "Underperform" as defined in Cowen and Company, LLC's equity research ratings definitions. Cowen and Company Equity Research Rating Distribution Table does not include any company for which the equity research rating is currently suspended or any debt security followed by Cowen Credit Research and Trading.

Note: "Buy", "Hold" and "Sell" are not terms that Cowen and Company, LLC uses in its ratings system and should not be construed as investment options. Rather, these ratings terms are used illustratively to comply with FINRA regulation.

# Points Of Contact

## Analyst Profiles



**David Epstein, CFA**
Stamford
646.616.3050
david.epstein@cowen.com

David Epstein is an analyst with Cowen Credit Research & Trading. He earned his MBA from UCLA and is a CFA charterholder.



**Jack Chan**
Stamford
646.616.3054
jack.chan@cowen.com

Jack Chan is an associate with Cowen Credit Research & Trading. He is a graduate of Cornell University.

## Reaching Cowen

### Main U.S. Locations

**New York**
599 Lexington Avenue
New York, NY 10022
646.562.1010
800.221.5616

**Boston**
Two International Place
Boston, MA 02110
617.946.3700
800.343.7068

**Cleveland**
20006 Detroit Road
Suite 100
Rocky River, OH 44116
440.331.3531

**San Francisco**
One Maritime Plaza, 9th Floor
San Francisco, CA 94111
415.646.7200
800.858.9316

**Atlanta**
3399 Peachtree Road NE
Suite 417
Atlanta, GA 30326
866.544.7009

**Chicago**
181 West Madison Street
Suite 3135
Chicago, IL 60602
312.577.2240

**Stamford**
262 Harbor Drive
Stamford, CT 06902
646.616.3000

**Washington D.C.**
2900 K Street, NW
Suite 520
Washington, DC 20007
202.868.5300

### International Location

**Cowen International Limited**

**London**
1 Snowden Street - 11th Floor
London EC2A 2DQ
United Kingdom
44.20.7071.7500

@CowenResearch

Cowen and Company

# EXHIBIT 36

EVERCORE ISI

Energy | Oil & Gas Exploration & Production

May 3, 2017

# ANADARKO PETROLEUM

APC | $70.18

OUTPERFORM | TARGET PRICE: $80.00

**Earnings Report - Change in Price Target**

**Stephen Richardson**
212-446-5639
stephen.richardson@evercoreisi.com

**Daniel Walk**
212-446-5616
daniel.walk@evercoreisi.com

**Jaclyn Hourihan**
212-446-9466
jaclyn.hourihan@evercoreisi.com

**Company Statistics**

| | |
|---|---|
| Market Capitalization (M): | $36,780 |
| Average 10-Day Volume (000s): | 5 |
| 52-Week Range: | $58.10 - $95.98 |
| Fiscal Year End | Dec |

**1 Year Price History**




*Source: FactSet*

## In the Teeth of the Transition

### 1Q Outlook Poses Challenges to the Thesis

Transitions in E&P are challenging, and in many ways 1H17 was likely to prove the apex of the transition for APC. Integrating disparate assets in the Gulf of Mexico (a challenging operating environment, particularly when energy investors crave predictability), completing major asset divestitures which muddle a clear view of the go forward asset base, and transitioning to growth from the core of the US onshore (Delaware) where big growth off a small base will be needed to drive corporate level results were the hurdles. Add to this headlines and fears surrounding a tragic residential explosion two weeks ago in CO that saw APC pre-emptively shut-in legacy production in the region, a bumpy 2Q oil guide driven by outages and tie-ins in the GoM, and a massive (not completely unexpected) write down at Shenandoah all suggest 1Q was likely a perfect storm of negatives for the stock. While a more supportive macro backdrop may have seen the stock (still a go to E&P name for many) defended, we suspect sentiment could be reaching new lows. Our view remains that the core asset proposition (3-Ds) is compelling, as is relative valuation, and the optionality associated with cash on hand ($6 Bn at 3/31). **We reduce our PT from $88 to $80** based on revisions to undeveloped GoM resource + a more risked US onshore volume ramp but **maintain our Outperform rating** post 1Q results.

**1Q Results.** APC reported 1Q17 production of 795 mboed, slightly above our 791 mboed estimate, driven by higher natural gas volumes. Proforma volumes of 672 mboe/d were slightly above our 671 mboe/d. Realized pricing came in mixed. Per-unit LOE and G&A were ~10% and ~2% below our estimates, respectively, with CFPS of $2.04/shr beating our $1.93/shr by ~5%. Delaware Basin volumes reached 31 mbo/d with five rigs total added (reaching 15 rigs), while DJ Basin volumes averaged 242 mboe/d where APC added one rig (ending at 6 total).

**What to look for on the call? 1) Delaware JV expiration and 2017 capital impact.** APC added 5 rigs throughout 1Q, bringing total rig count to 15. APC has previously indicated rig count would be higher in 1H17 as it works to secure operatorship across the Delaware Basin with fewer rigs (but more completions) in 2H as development gets underway. While likely a 2H decision based on confidence in the commodity outlook, we look for detail on the possible expansion of the 2017 capital program to accelerate activity in the Delaware Basin with 1Q17 closing cash nearing $6 Bn. **2) Colorado.** Last week APC issued a statement that it had voluntarily shut in 3,000 legacy vertical wells in Colorado following a home explosion near an APC owned legacy well last month. Press reports earlier today indicated the investigation (being led by the local fire department) concluded the cause was a cut gas line near the home's foundation. **3) GoM.** Today's update included several notable datapoints in the GoM, including the integration of FCX, strong performance from Caesar/Tonga, and success at Calpurnia. While we (and the street) had viewed as heavily risked, APC announced the Shenandoah-6 appraisal well did not encounter the oil-water contact and recorded a one-time GoM-related impairment of over $500mm ($467mm Shenandoah).

**CC tomorrow 9:00 a.m. ET. Dial in: (877) 883-0383; Pwd: 3348513.**

Please see the analyst certification and important disclosures on page 4 of this report. Evercore ISI and affiliates do and seek to do business with companies covered in its research reports. Investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

# APC 1Q17 Results

## Figure 1. Quarterly Summary

| Quarterly Snapshot | ISI (E) Q117 | Actual Q117 | Diff. | Actual Q416 | Actual Q116 | Seq. | Y/Y |
|---|---|---|---|---|---|---|---|
| **Income Statement ($ in Millions)** | | | | | | | |
| Oil & Gas Revenues | 2,394 | 2,454 | 3% | 2,178 | 1,394 | 13% | 76% |
| Depreciation Expense | 1,127 | 1,115 | -1% | 1,099 | 1,149 | 1% | -3% |
| Clean Net Income | (249) | (330) | 32% | (272) | (569) | 21% | -42% |
| *Per Share:* | | | | | | | |
| **Adjusted EPS** | **($0.45)** | **($0.60)** | **33%** | **($0.50)** | **($1.12)** | **19%** | **-46%** |
| **Operating CFPS*** | **$1.93** | **$2.04** | **5%** | **$1.97** | **$0.95** | **3%** | **113%** |
| Shares Outstanding (Diluted) | 553 | 551 | 0% | 551 | 509 | 0% | 8% |
| **Cash Flow Statement ($ in Millions)** | | | | | | | |
| CFO* | 1,069 | 1,123 | 5% | 1,123 | (137) | 0% | -920% |
| Capital Expenditures* | (1,073) | (1,255) | 17% | (887) | (896) | 41% | 40% |
| **Free Cash Flow (FCF)** | **(4)** | **(132)** | **3508%** | **199** | **(410)** | **-166%** | **-68%** |
| **Production** | | | | | | | |
| Oil (Mbbl/d) | 366 | 367 | 0% | 336 | 315 | 9% | 17% |
| NGLs (Mbbl/d) | 119 | 118 | -1% | 124 | 128 | -5% | -8% |
| Natural Gas (MMcf/d) | 1,835 | 1,859 | 1% | 1,881 | 2,303 | -1% | -19% |
| **Total Production (Mboe/d)** | **791** | **795** | **0%** | **774** | **827** | **3%** | **-4%** |
| **Unhedged Realizations** | | | | | | | |
| Oil ($/bbl) | $49.30 | $51.48 | 4% | $47 01 | $29.64 | 10% | 74% |
| NGL ($/bbl) | $24.22 | $27.13 | 12% | $24 62 | $15.35 | 10% | 77% |
| Gas ($/mcf) | $3.09 | $3.00 | -3% | $2 56 | $1.75 | 17% | 71% |
| **Unit Costs (US$/boe)** | | | | | | | |
| LOE | $3.99 | $3.61 | -10% | $2 85 | $2.76 | 26% | 30% |
| Production Taxes | $2.35 | $2.17 | -8% | $1 60 | $1.55 | 35% | 39% |
| Transportation | $3.49 | $3.48 | 0% | $3 63 | $3.22 | -4% | 8% |
| SG&A | $3.79 | $3.76 | -1% | $4 55 | $5.97 | -17% | -37% |
| DD&A | $15.83 | $15.59 | -2% | $15.44 | $15.27 | 1% | 2% |
| **Operating Costs** | **$29.46** | **$28.60** | **-3%** | **$28.08** | **$28.77** | **2%** | **-1%** |

*estimates APC only (not consolidated)

*Source: Company data, Evercore ISI Research*

## Figure 2. 1Q17 Results Overview

| APC 1Q17 Results | Evercore ISI estimates | Reported Results | Consensus | Delta vs. Estimates |
|---|---|---|---|---|
| **Production** | 791 | 795 | 691* | Production slightly exceeded our estimates on both a proforma and total basis (795 vs our 791 mboe/d; 672 vs our 671 mboe/d). |
| **Cash flow per share** | $1.93 | $2.04 | $1.99 | CFPS beat our estimate driven by the production beat and lower than expected LOE, G&A, and production tax expense. |
| **Costs** | | Costs came in generally lower than expected (LOE, G&A, production tax, DD&A) | | |

| Outlook | Change to Guidance | Commentary |
|---|---|---|
| **Production** | + | Absolute production of 795 mboe/d was slightly above our estimate and the midpoint of guidance. |
| **Capital** | + | Total APC-only capex of $969mm was below our $1,073mm estimate. |
| **Assets** | + | **Delaware Basin:** Increased activity to 15 rigs with daily production averaging 31 mboe/d. Continuing to work to establish operatorship where previously undetermined with expected 70% operatorship ultimately in the AMI. |
| | | **DJ Basin**: Sales volumes averaged 242 mboe/d. One rig added in 1Q (bringing total to 6), with all rigs drilling multi-well pads. |
| | | **GoM:** FCX acquisition closed at end of 4Q16, with volumes doubling to ~160 mboe/d. Caesar/Tonga also bolstered production. Calpurnia exploration well encountered 60' net oil pay; expected to tie back to Constitution or Heidelberg. Shenandoah written down; did not encounter oil-water contact. |
| | | **Int'l & Frontier:** Sales volumes increased 17% y/y, driven by TEN offshore Ghana. Made 3rd discovery offshore Columbia at Gorgon, encountered 260-360' gas pay. Drillship will move to W. Africa in 2Q. |
| **Change to Estimates / Thesis** | = | We are reducing our PT to **$80/shr** but **maintain our Overweight rating**. |

*pro forma EF and Marcellus divestitures

*Source: Company data, Evercore ISI Research*



APC-01334946

**Our $80/shr PT is supported by our Net Asset Value model.** Our NAV considers year end 2015 proved developed reserves, credits APC's onshore undeveloped resource, major offshore discoveries in the GoM under development and in process major projects (e.g. Mozambique). We also assign market implied value to APC's interest in WGP (the HoldCo MLP that holds APC's LP & GP units in Western Gas, WES).

**Risks to Our View.** Beyond the commodity, the primary risk to our view is the continued ability of APC to transact the portfolio to unlock value. This includes access to the MLP market (WGP sell down) and a firming market for international upstream assets. Well performance in the Wattenberg and Permian are likely the most significant onshore risks.

## Figure 3. APC NAV Summary

**Valuation Summary**

| | | Price Deck: 1. ISI | | | | NYMEX Strip | |
|---|---|---|---|---|---|---|---|
| | Risked Res. (mmboe) | Value | $/Boe | $/Share | $/Acre | Value | $/Share |
| **Proved Developed Reserves (PV10)** | | | | | | | |
| PDP | 1,186 | $13,497 | $11.38 | $24.49 | NA | $9,236 | $16.78 |
| Total | 1,186 | $13,497 | $11.38 | $24.49 | NA | $9,236 | $16.78 |
| **North America Onshore** | | | | | | | |
| Wattenberg Hz | 10,937 | $3,656 | $0.33 | $6.64 | $10,446 | $1,745 | $3.17 |
| Greater DJ Basin | 1,462 | $464 | $0.32 | $0.84 | $844 | $208 | $0.38 |
| Delaware Basin - Avalon | 2,604 | $1,353 | $0.52 | $2.45 | $11,271 | $793 | $1.44 |
| Delaware Basin - Bone Spring | 1,140 | $807 | $0.71 | $1.47 | $13,456 | $504 | $0.91 |
| Delaware Basin - Wolfcamp | 22,048 | $10,206 | $0.46 | $18.52 | $37,439 | $6,297 | $11.44 |
| Greater Natural Buttes | 1,328 | $254 | $0.19 | $0.46 | $1,342 | $271 | $0.49 |
| Powder River Basin | 209 | $38 | $0.18 | $0.07 | $52 | $60 | $0.11 |
| Haynesville | 1 363 | $89 | $0.07 | $0.16 | $1 108 | $5 | $0.01 |
| Total | 41,092 | $16,867 | $0.41 | $30.61 | $9,359 | $9,881 | $17.95 |
| **Offshore US** | | | | | | | |
| Gulf of Mexico | 594 | $3,876 | $6.52 | $7.03 | | $3,641 | $6.61 |
| **International** | | | | | | | |
| Ghana - Jubilee (current phase) | 135 | $1,285 | $9.49 | $2.33 | | $0 | $0.00 |
| Ghana - TEN | 89 | $454 | $5.09 | $0.82 | | $5 | $0.01 |
| Algeria (El Merk) | 73 | $659 | $9.06 | $1.20 | | ($66) | ($0.12) |
| Brazil | 143 | $898 | $6.27 | $1.63 | | ($76) | ($0.14) |
| Mozambique (LNG Dev.) | 1 219 | $1 790 | $1.47 | $3.25 | | $0 | $0.00 |
| **Total Offshore Discovered Value** | 1,659 | $5,085 | $3.07 | $9.23 | | ($137) | ($0.25) |
| **Other Assets** | | | | | | | |
| Midstream - WGP Units | | $9,443 | | $17.14 | | $9,443 | $17 |
| APC c-corp held midstream | | $1,050 | | $1.91 | | $1,050 | $2 |
| Mineral Interests | | $1,000 | | $1.81 | | $1,000 | $1.82 |
| **Balance Sheet Adjustments/Other** | | | | | | | |
| 1Q 2017 Cash | | $5,831 | | $10.58 | | $3,184 | $5.78 |
| 1Q 2017 Debt | | ($15,284) | | ($27.74) | | ($15,281) | ($27.76) |
| Equity Investees Notes Payable Adj. | | $2,935 | | $5.33 | | $2,935 | $5.33 |
| Eaglebine JV Carry | | $200 | | $0.36 | | $200 | $0.36 |
| TEU PV | | ($290) | | ($0.53) | | ($290) | ($0.53) |
| Total | | ($6,608) | | ($11.99) | | ($5,871) | ($11) |
| **Net Equity Value** | | **$44,211** | | **$80.00** | | **$28,244** | **$51** |

**Operational Summary and Assumptions**

| Asset | Net Acres | Risked % | Risked Acres | Spacing | Risked Wells | Well Cost ($M) | Avg. IP (boepd) | EUR / well (mmboe) | % Liq. |
|---|---|---|---|---|---|---|---|---|---|
| Wattenberg | 350,000 | 65% | 227,500 | 80 | 2,264 | $3,000 | 767 | 565 | 65.0% |
| Greater DJ Ba | 550,000 | 25% | 137,500 | 160 | 859 | $3,200 | 590 | 385 | 70.0% |
| Avalon | 120,000 | 50% | 60,000 | 160 | 375 | $7,300 | 1,210 | 999 | 70.0% |
| Bone Spring | 60,000 | 50% | 30,000 | 160 | 163 | $7,300 | 1,258 | 975 | 80.0% |
| Delaware Wolf | 272,600 | 65% | 177,190 | 65 | 2,726 | $7,200 | 1,739 | 1,146 | 79.7% |
| Greater Natur | 189,000 | 81% | 153,090 | 20 | 3,432 | $1,150 | 550 | 418 | 17.0% |
| Powder River | 738,000 | 75% | 553,500 | 40 | 13,838 | $150 | 51 | 57 | 10.0% |
| Haynesville | 80 000 | 50% | 40 000 | 80 | 415 | $6 000 | 1 667 | 1 635 | 0.0% |
| Total | 2,009,600 | | 430,280 | | 20,948 | $4,614 | 1,009 | 802 | |

| Gross Rig Program - By Play | Year: 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Wattenberg Hz. | 5.0 | 5.0 | 6.0 | 6.0 |
| Greater DJ Basin | 1.0 | 2.0 | 2.0 | 2.0 |
| Avalon | 1.0 | 1.0 | 2.0 | 2.0 |
| Bone Spring | 1.0 | 1.0 | 2.0 | 2.0 |
| Delaware Wolfcamp | 10.0 | 10.0 | 12.0 | 12.0 |
| Greater Natural Buttes | 0.0 | 0.0 | 0.5 | 0.5 |
| Powder River Basin | 0.0 | 0.0 | 1.0 | 1.0 |
| Haynesville | 0.0 | 0.0 | 1.0 | 1.0 |
| Total | 18.0 | 19.0 | 26.5 | 26.5 |

| Net Wells By Play | Year: 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Wattenberg Hz. | 280 | 280 | 336 | 336 |
| Greater DJ Basin | 11 | 22 | 22 | 22 |
| Avalon | 9 | 10 | 20 | 21 |
| Bone Spring | 7 | 7 | 16 | 17 |
| Delaware Wolfcamp | 107 | 113 | 143 | 150 |
| Greater Natural Buttes | 0 | 0 | 23 | 24 |
| Powder River Basin | 0 | 0 | 28 | 28 |
| Haynesville | 0 | 0 | 15 | 15 |
| Total | 415 | 432 | 603 | 613 |

**ASSUMPTIONS**

| Prices | ISI | | NYMEX Strip | | Other | | Choosen Deck | |
|---|---|---|---|---|---|---|---|---|
| | Oil | Gas | Oil | Gas | Oil | Gas | 1. ISI | 1 |
| **2016** | $55.43 | $3.33 | $52.05 | $3.41 | $70.00 | $3.50 | $55 43 | $3.33 |
| **2017** | $65.00 | $3.25 | $53.04 | $3.11 | $70.00 | $3.50 | $65.00 | $3.25 |
| **2018** | $70.00 | $3.25 | $52.48 | $2.87 | $70.00 | $3.50 | $70.00 | $3.25 |
| **2019** | $70.00 | $3.25 | $52.48 | $2.87 | $70.00 | $3.50 | $70 00 | $3.25 |
| **Long term** | $70.00 | $3.25 | $52.48 | $2 87 | $70 00 | $3.50 | $70.00 | $3.25 |

| Inflation Outlook | | | |
|---|---|---|---|
| Production Costs | 0.0% | **Discount Rate** | 10.0% |
| Service/Drilling Costs | 0.0% | **Depreciation Rate** | 80.0% |
| Commodity Price | 0.0% | **Shares Outstanding (MM)** | 551 |

*Source: Company data, Evercore ISI Research*



APC-01334947

## COMPANIES UNDER COVERAGE BY AUTHOR

| Symbol | Company | Rating | Price (2017-05-02) | Evercore ISI Target |
|---|---|---|---|---|
| APC | Anadarko Petroleum | Outperform | $70.18 | $88.00 |
| AR | Antero Resources | In Line | $21.48 | $28.00 |
| APA | Apache | In Line | $62.22 | $67.00 |
| COG | Cabot Oil & Gas | In Line | $23.80 | $28.00 |
| CPE | Callon Petroleum Company | In Line | $11.82 | $16.00 |
| CHK | Chesapeake Energy | In Line | $5.31 | $8.00 |
| XEC | Cimarex Energy | Outperform | $116.33 | $157.00 |
| CXO | Concho Resources | Outperform | $125.38 | $165.00 |
| CLR | Continental Resources | Outperform | $41.78 | $58.00 |
| DVN | Devon Energy | Outperform | $39.31 | $50.00 |
| FANG | Diamondback Energy, Inc. | Outperform | $98.96 | $132.00 |
| ECR | Eclipse Resources Corporation | In Line | $2.02 | $4.00 |
| ECA | Encana Corp | In Line | 10.66 | 15.00 |
| EGN | Energen Corporation | In Line | $51.88 | $65.00 |
| EOG | EOG Resources | Outperform | $92.03 | $110.00 |
| EPE | EP Energy Corporation | In Line | $4.48 | $6.00 |
| EQT | EQT | Outperform | $58.11 | $84.00 |
| JAG | Jagged Peak Energy Inc. | Outperform | $11.15 | $18.00 |
| MRO | Marathon Oil Corporation | Coverage Suspended | $14.82 | $NA |
| NFX | Newfield Exploration | In Line | $34.61 | $45.00 |
| NBL | Noble Energy | Outperform | $32.30 | $40.00 |
| OAS | Oasis | In Line | $11.91 | $16.00 |
| PE | Parsley Energy, Inc. | Outperform | $29.42 | $45.00 |
| PXD | Pioneer Natural Resources | Outperform | $172.43 | $215.00 |
| QEP | QEP Resources, Inc. | In Line | $11.68 | $17.00 |
| RRC | Range Resources | Outperform | $26.53 | $40.00 |
| RSPP | RSP Permian, Inc. | Outperform | $38.14 | $50.00 |
| SWN | Southwestern Energy | In Line | $7.53 | $10.00 |
| WLL | Whiting Petroleum Corp. | In Line | $8.54 | $14.00 |
| WPX | WPX Energy, Inc. | Outperform | $11.85 | $16.00 |

## TIMESTAMP
**(Article 3(1)e and Article 7 of MAR)**

Time of dissemination: May 03, 2017, 02:12 ET.

## ANALYST CERTIFICATION

The analysts, Stephen Richardson, Jaclyn Hourihan and Daniel Wa k, primarily respons ble for the preparation of this research report attest to the following: (1) that the views and opinions rendered in this research report reflect his or her personal views about the subject companies or issuers; and (2) that no part of the research analyst's compensation was, is, or will be directly related to the specific recommendations or views in this research report.

## DISCLOSURES

This report is approved and/or distributed by Evercore Group LLC ("Evercore Group"), a U.S. licensed broker-dealer regulated by the Financial Industry Regulatory Authority ("FINRA"), and International Strategy & Investment Group (UK) Limited ("ISI UK"), which is authorised and regulated in the United Kingdom by the Financial Conduct Authority. The institutional sales, trading and research businesses of Evercore Group and ISI UK collectively operate under the global marketing brand name Evercore ISI ("Evercore ISI"). Both Evercore Group and ISI UK are subsidiaries of Evercore Partners Inc. ("Evercore Partners"). The trademarks, logos and service marks shown on this report are registered trademarks of Evercore Partners.

The analysts and associates responsible for preparing this report receive compensation based on various factors, including Evercore Partners' total revenues, a portion of which is generated by affiliated investment banking transactions. Evercore ISI seeks to update its research as appropriate, but various regulations may prevent this from happening in certain instances. Aside from certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Evercore ISI generally prohibits analysts, associates and members of their households from maintaining a financial interest in the securities of any company in the analyst's area of coverage. Any exception to this policy requires specific approval by a member of our Compliance Department. Such ownership is subject to compliance with applicable regulations and disclosure. Evercore ISI also proh bits analysts, associates and members of their households from serving as an officer, director, advisory board member or employee of any company that the analyst covers.

This report may include a Tactical Call, which describes a near-term event or catalyst affecting the subject company or the market overall and which is expected to have a short-term price impact on the equity shares of the subject company. This Tactical Call is separate from the analyst's long-term recommendation (Outperform, In Line or Underperform) that reflects a stock's forward 12-month expected return, is not a formal rating and may differ from the target prices and recommendations reflected in the analyst's long-term view.

**Applicable current disclosures regarding the subject companies covered in this report are available at the offices of Evercore ISI, and can be obtained by writing to Evercore Group LLC, Attn. Compliance, 666 Fifth Avenue, 11th Floor, New York, NY 10103.**

Evercore Partners and its affiliates, and / or their respective directors, officers, members and employees, may have, or have had, interests or qualified holdings on issuers mentioned in this report. Evercore Partners and its affiliates may have, or have had, business relationships with the companies mentioned in this report..

Additional information on securities or financial instruments mentioned in this report is available upon request.

---

**Ratings Definitions**

**Current Ratings Definition**

Evercore ISI's recommendations are based on a stock's total forecasted return over the next 12 months. Total forecasted return is equal to the expected percentage price return plus gross dividend yield. We divide our stocks under coverage into three primary ratings categories, with the following return guidelines:

**Outperform** – the total forecasted return is expected to be greater than the expected total return of the analyst's coverage universe
**In Line** – the total forecasted return is expected to be in line with the expected total return of the analyst's universe
**Underperform** – the total forecasted return is expected to be less than the expected total return of the analyst's universe
**Coverage Suspended** – the rating and target price have been removed pursuant to Evercore ISI policy when Evercore is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances.*
**Rating Suspended** - Evercore ISI has suspended the rating and target price for this stock because there is not sufficient fundamental basis for determining, or there are legal, regulatory or policy constraints around publishing, a rating or target price. The previous rating and target price, if any, are no longer in effect for this company and should not be relied upon.*

* Prior to October 10, 2015, the "Coverage Suspended" and "Rating Suspended" categories were included in the category "Suspended."

**FINRA requires that members who use a ratings system with terms other than "Buy," "Hold/Neutral" and "Sell" to equate their own ratings to these categories. For this purpose, and in the Evercore ISI ratings distribution below, our Outperform, In Line, and Underperform ratings can be equated to Buy, Hold and Sell, respectively.**

**Historical Ratings Definitions**

Prior to March 2, 2017, Evercore ISI's recommendations were based on a stock's total forecasted return over the next 12 months:

**Buy** – the total forecasted return is expected to be greater than 10%
**Hold** – the total forecasted return is expected to be greater than or equal to 0% and less than or equal to 10%
**Sell** – the total forecasted return is expected to be less than 0%

On October 31, 2014, Evercore Partners acquired International Strategy & Investment Group LLC ("ISI Group") and ISI UK (the "Acquisition") and transferred Evercore Group's research, sales and trading businesses to ISI Group. On December 31, 2015, the combined research, sales and trading businesses were transferred back to Evercore Group in an internal reorganization. Since the Acquisition, the combined research, sales and trading businesses have operated under the global marketing brand name Evercore ISI.

**ISI Group and ISI UK:**

Prior to October 10, 2014, the ratings system of ISI Group LLC and ISI UK which was based on a 12-month risk adjusted total return:

Strong Buy - Return > 20%
Buy - Return 10% to 20%
Neutral - Return 0% to 10%
Cautious - Return -10% to 0%
Sell - Return < -10%

For disclosure purposes, ISI Group and ISI UK ratings were viewed as follows: Strong Buy and Buy equate to Buy, Neutral equates to Hold, and Cautious and Sell equate to Sell.

**Evercore Group:**

Prior to October 10, 2014, the rating system of Evercore Group was based on a stock's expected total return relative to the analyst's coverage universe over the following 12 months. Stocks under coverage were divided into three categories:

Overweight – the stock is expected to outperform the average total return of the analyst's coverage universe over the next 12 months.

Equal-Weight – the stock is expected to perform in line with the average total return of the analyst's coverage universe over the next 12 months.
Underweight – the stock is expected to underperform the average total return of the analyst's coverage universe over the next 12 months.
Suspended – the company rating, target price and earnings estimates have been temporarily suspended.

For disclosure purposes, Evercore Group's prior "Overweight," "Equal-Weight" and "Underweight" ratings were viewed as "Buy," "Hold" and "Sell," respectively.

**Ratings Definitions for Portfolio-Based Coverage**

Evercore ISI utilizes an alternate rating system for companies covered by analysts who use a model portfolio-based approach to determine a company's investment recommendation. Covered companies are included or not included as holdings in the analyst's Model Portfolio, and have the following ratings:

**Long –** the stock is a positive holding in the model portfolio; the total forecasted return is expected to be greater than 0%.
**Short –** the stock is a negative holding in the model portfolio; the total forecasted return is expected to be less than 0%.
**No Position –** the stock is not included in the model portfolio.
**Coverage Suspended –** the rating and target price have been removed pursuant to Evercore ISI policy when Evercore is acting in an advisory capacity in a merger or strategic transaction involving this company, and in certain other circumstances; a stock in the model portfolio is removed.
**Rating Suspended -** Evercore ISI has suspended the rating and target price for this stock because there is not sufficient fundamental basis for determining, or there are legal, regulatory or policy constraints around publishing, a rating or target price. The previous rating and target price, if any, are no longer in effect for this company and should not be relied upon; a stock in the model portfolio is removed.

Stocks included in the model portfolio will be weighted from 0 to 100% for Long and 0 to -100% for Short. A stock's weight in the portfolio reflects the analyst's degree of conviction in the stock's rating relative to other stocks in the portfolio. The model portfolio may also include a cash component. At any given time the aggregate weight of the stocks included in the portfolio and the cash component must equal 100%.

Stocks assigned ratings under the alternative model portfolio-based coverage system cannot also be rated by Evercore ISI's Current Ratings definitions of Outperform, In Line and Underperform.

**FINRA requires that members who use a ratings system with terms other than "Buy," "Hold/Neutral" and "Sell," to equate their own ratings to these categories. For this purpose, and in the Evercore ISI ratings distribution below, our Long, No Position and Short ratings can be equated to Buy, Hold and Sell respectively.**

**Evercore ISI ratings distribution (as of 05/03/2017)**

| **Coverage Universe** | | | **Investment Banking Services / Past 12 Months** | | |
|---|---|---|---|---|---|
| Ratings | Count | Pct. | Rating | Count | Pct. |
| Buy | 341 | 49% | Buy | 39 | 11% |
| Hold | 268 | 38% | Hold | 10 | 4% |
| Sell | 62 | 9% | Sell | 2 | 3% |
| Coverage Suspended | 23 | 3% | Coverage Suspended | 4 | 17% |
| Rating Suspended | 8 | 1% | Rating Suspended | 2 | 25% |

## Issuer-Specific Disclosures (as of May 3, 2017)

Evercore ISI or an affiliate expects to receive or intends to seek compensation for investment banking services from this subject company Anadarko Petroleum within the next three months.

## Price Charts

**Anadarko Petroleum Rating History as of 05/01/2017**






APC-01334950

## General Disclosures

This report is provided for informational purposes only. It is not to be construed as an offer to buy or sell or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy in any jurisdiction. The information and opinions in this report were prepared by registered employees of Evercore ISI. The information herein is believed by Evercore ISI to be reliable and has been obtained from public sources believed to be reliable, but Evercore ISI makes no representation as to the accuracy or completeness of such information. Opinions, estimates and projections in this report constitute the current judgment of the author as of the date of this report. They do not necessarily reflect the opinions of Evercore and are subject to change without notice. In addition, opinions, estimates and projections in this report may differ from or be contrary to those expressed by other business areas or groups of Evercore and its affiliates. Evercore ISI has no obligation to update, modify or amend this report or to otherwise notify a reader thereof in the event that any matter stated herein, or any opinion, projection, forecast or estimate set forth herein, changes or subsequently becomes inaccurate. Facts and views in Evercore ISI research reports and notes have not been reviewed by, and may not reflect information known to, professionals in other Evercore affiliates or business areas, including investment banking personnel.

Evercore ISI does not provide individually tailored investment advice in research reports. This report has been prepared without regard to the particular investments and circumstances of the recipient. The financial instruments discussed in this report may not suitable for all investors and investors must make their own investment decisions using their own independent advisors as they believe necessary and based upon their specific financial situations and investment objectives. Securities and other financial instruments discussed in this report, or recommended or offered by Evercore ISI, are not insured by the Federal Deposit Insurance Corporation and are not deposits of or other obligations of any insured depository institution. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the price or value of, or the income derived from the financial instrument, and such investor effectively assumes such currency risk. In addition, income from an investment may fluctuate and the price or value of financial instruments described in this report, either directly or indirectly, may rise or fall. Estimates of future performance are based on assumptions that may not be realized. Furthermore, past performance is not necessarily indicative of future performance.

Evercore ISI salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions that are contrary to the opinions expressed in this research. Our asset management affiliates and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

Electronic research is simultaneously available to all clients. This report is provided to Evercore ISI clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of Evercore ISI. Receipt and review of this research report constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion or information contained in this report (including any investment recommendations, estimates or target prices) without first obtaining express permission from Evercore ISI.

This report is not intended for distribution to, or use by any person or entity in any jurisdiction or country where such distribution or use would be contrary to local law or regulation.

For investors in the UK: In making this report available, Evercore makes no recommendation to buy, sell or otherwise deal in any securities or investments whatsoever and you should neither rely or act upon, directly or indirectly, any of the information contained in this report in respect of any such investment activity. This report is being directed at or distributed to, (a) persons who fall within the definition of Investment Professionals (set out in Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order")); (b) persons falling within the definition of high net worth companies, unincorporated associations, etc. (set out in Article 49(2) of the Order); (c) other persons to whom it may otherwise lawfully be communicated (all such persons together being referred to as "relevant persons"). This report must not be acted on or relied on by persons who are not relevant persons.

In compliance with the European Securities and Markets Authority's Market Abuse Regulation, a list of all Evercore ISI recommendations disseminated in the preceding 12 months for the subject companies herein, may be found at the following site: https://evercore.bluematrix.com/sellside/MAR.action.

# EXHIBIT 37

May 3, 2017

Goldman Sachs

COMPANY UPDATE

# Anadarko Petroleum Corp. (APC)

Buy

Equity Research

## On track to meet 2017 outlook; lower asset sale proceeds negative

### What's changed

APC reported 1Q adj. EPS/EBITDA of -$0.60/$1.61 bn vs. our -$0.35/$1.53 bn and Bloomberg consensus -$0.23/$1.45 bn. We update our 2017E-19E EPS on production/costs to -$1.31/-$0.85/-$0.69 from -$0.99/-$0.73/-$0.46.

### Implications

**On track to meet 2017 outlook; asset sale proceeds below expected.** APC reported above our/consensus EBITDA from lower costs/higher revenues. We believe APC is on track to meet its 2017 outlook, led by strong ramp-up in Permian/DJ Basin and flat GOM production. Notably, initial results from optimized completions in the DJ were positive with wells outperforming type curve by >10%. While operating results were strong, net proceeds from Eagle Ford/Marcellus asset sales were below expected, driving our NAV down by $2/shr (greater detail in note).

**Tie-back opportunity from existing infrastructure in Gulf of Mexico remains robust; greenfield Shenandoah development unlikely.** APC continues to see robust performance from wells that can be tied-back to existing infrastructure in GOM. APC continues to enhance GOM tie-back opportunity: (1) Calpurnia exploration well encountered 60 net feet of oil pay; and (2) APC successfully bid on 16 blocks near existing platforms. Following unfavorable result from the Shenandoah well, APC is unlikely to pursue development of the project at current oil prices (consistent with previous commentary). We lower our NAV by $1/shr associated with the Shenandoah prospect.

### Valuation

APC trades at 6.9x/5.9x 2018E/19E EV/ DACF vs. 7.0x/6.5x for int'l/diversified peers. We lower our 12-month DCF-M&A based target price to $84 (from $86.50), due to lower asset sale proceeds and lower Shenandoah value offset by greater credit to APC's WGP ownership.

### Key risks

Commodity volatility, well results, costs, government pronouncements.

**INVESTMENT LIST MEMBERSHIP**

Americas Buy List

**Investment Profile**




Anadarko Petroleum Corp. (APC)

Americas E&P Peer Group Average

* Returns = Return on Capital. For a complete description of the investment profile measures please refer to the disclosure section of this document.

| Key data | Current |
|---|---|
| Price ($) | 58.28 |
| 12 month price target ($) | 84.00 |
| Market cap ($ mn) | 31,010.3 |

| | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Revenue ($ mn) New | 7,625.0 | 9,682.2 | 11,315.0 | 13,069.4 |
| Revenue ($ mn) Old | 7,625.0 | 9,727.5 | 11,213.3 | 12,057.4 |
| EPS ($) New | (3.10) | (1.31) | (0.85) | (0.69) |
| EPS ($) Old | (3.10) | (0.99) | (0.73) | (0.46) |
| P/E (X) | NM | NM | NM | NM |
| EV/EBITDA (X) | 10.6 | 7.6 | 6.6 | 5.7 |
| ROE (%) | NM | NM | NM | NM |

| | 3/17 | 6/17E | 9/17E | 12/17E |
|---|---|---|---|---|
| EPS ($) | (0.60) | (0.16) | (0.30) | (0.23) |

**Price performance chart**




| Share price performance (%) | 3 month | 6 month | 12 month |
|---|---|---|---|
| Absolute | (18.6) | (6.4) | 9.3 |
| Rel. to S&P 500 | (22.3) | (17.8) | (6.7) |

Source: Company data, Goldman Sachs Research estimates, FactSet. Price as of 5/02/2017 close

**Coverage View: Attractive**


**Brian Singer, CFA**
(212) 902-8259 brian.singer@gs.com Goldman Sachs and Co. LLC

**Umang Choudhary**
(212) 357-2642 umang.choudhary@gs.com Goldman Sachs and Co. LLC

**Nick DeValeria**
(801) 741-5538 nick.devaleria@gs.com Goldman Sachs and Co. LLC

**Caroline Shavel**
(917) 343-2034 caroline.shavel@gs.com Goldman Sachs and Co. LLC


Goldman Sachs does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. For Reg AC certification and other important disclosures, see the Disclosure Appendix, or go to www.gs.com/research/hedge.html. Analysts employed by non-US affiliates are not registered/qualified as research analysts with FINRA in the U.S.



Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

# Anadarko Petroleum Corp.: Summary Financials

| Profit model ($ mn) | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Total revenue | 7,625.0 | 9,682.2 | 11,315.0 | 13,069.4 |
| Cost of goods sold | (3,295.0) | (4,205.4) | (3,947.7) | (4,609.1) |
| SG&A | (1,237.0) | (1,094.0) | (1,140.0) | (1,168.5) |
| R&D | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating profit/(expense) | 0.0 | 0.0 | 0.0 | 0.0 |
| ESO expense | 0.0 | 0.0 | 0.0 | 0.0 |
| **EBITDA** | **4,039.0** | **5,992.9** | **7,027.3** | **8,280.2** |
| Depreciation & amortization | (4,201.0) | (4,380.7) | (5,248.9) | (6,118.9) |
| **EBIT** | **(1,206.0)** | **2.1** | **978.4** | **1,172.9** |
| Net interest income/(expense) | (890.0) | (859.7) | (898.9) | (869.3) |
| Income/(loss) from associates | 0.0 | 0.0 | 0.0 | 0.0 |
| Others | (264.0) | 563.0 | (40.0) | (40.0) |
| **Pretax profits** | **(3,029.0)** | **(292.6)** | **49.5** | **243.6** |
| Provision for taxes | 1,021.0 | (192.5) | (220.4) | (296.1) |
| Minority interest | (263.0) | (223.0) | (300.0) | (332.9) |
| **Net income pre-preferred dividends** | **(3,071.0)** | **(708.1)** | **(470.9)** | **(385.4)** |
| Preferred dividends | 0.0 | 0.0 | 0.0 | 0.0 |
| **Net income (pre-exceptionals)** | **(1,604.0)** | **(720.1)** | **(470.9)** | **(385.4)** |
| Post tax exceptionals | (1,467.0) | 12.0 | 0.0 | 0.0 |
| **Net income (post-exceptionals)** | **(3,071.0)** | **(708.1)** | **(470.9)** | **(385.4)** |
| | | | | |
| **EPS (basic, pre-except) ($)** | **(3.10)** | **(1.31)** | **(0.85)** | **(0.70)** |
| **EPS (diluted, pre-except) ($)** | **(3.10)** | **(1.31)** | **(0.85)** | **(0.69)** |
| **EPS (basic, post-except) ($)** | **(5.93)** | **(1.28)** | **(0.85)** | **(0.70)** |
| **EPS (diluted, post-except) ($)** | **(5.93)** | **(1.28)** | **(0.85)** | **(0.70)** |
| Common dividends paid | (105.0) | (110.8) | (112.2) | (112.4) |
| DPS ($) | 0.20 | 0.20 | 0.20 | 0.20 |
| Dividend payout ratio (%) | (6.5) | (15.4) | (23.4) | (28.6) |

| Growth & margins (%) | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Sales growth | (13.0) | 27.0 | 16.9 | 15.5 |
| EBITDA growth | (15.7) | 48.4 | 17.3 | 17.8 |
| EBIT growth | 50.8 | 100.2 | NM | 19.9 |
| Net income (pre-except) growth | (57.2) | 55.1 | 34.6 | 18.2 |
| EPS growth | (54.0) | 57.8 | 34.7 | 18.0 |
| Gross margin | 56.8 | 56.6 | 65.1 | 64.7 |
| EBITDA margin | 53.0 | 61.9 | 62.1 | 63.4 |
| EBIT margin | (15.8) | 0.0 | 8.6 | 9.0 |

| Cash flow statement ($ mn) | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Net income | (3,071.0) | (708.1) | (470.9) | (385.4) |
| D&A add-back (incl. ESO) | 4,301.0 | 4,380.7 | 5,248.9 | 6,118.9 |
| Minority interest add-back | 263.0 | 223.0 | 300.0 | 332.9 |
| Net (inc)/dec working capital | 92.0 | 111.0 | 0.0 | 0.0 |
| Other operating cash flow | 1,415.0 | 650.1 | 739.3 | 1,009.1 |
| **Cash flow from operations** | **3,000.0** | **4,656.8** | **5,817.3** | **7,075.5** |
| | | | | |
| Capital expenditures | (3,505.0) | (5,615.5) | (6,259.6) | (7,631.6) |
| Acquisitions | (1,740.0) | 0.0 | 0.0 | 0.0 |
| Divestitures | 2,769.0 | 2,728.0 | 500.0 | 500.0 |
| Others | 0.0 | 0.0 | 0.0 | 0.0 |
| **Cash flow from investing** | **(2,476.0)** | **(2,887.5)** | **(5,759.6)** | **(7,131.6)** |
| | | | | |
| Dividends paid (common & pref) | (105.0) | (110.8) | (110.4) | (112.4) |
| Inc/(dec) in debt | (428.0) | 3.0 | 0.0 | 1,496.6 |
| Other financing cash flows | 2,254.0 | (482.3) | (542.6) | (595.9) |
| **Cash flow from financing** | **1,721.0** | **(590.1)** | **(653.0)** | **788.3** |
| **Total cash flow** | **2,245.0** | **1,179.1** | **(595.3)** | **732.2** |

| Balance sheet ($ mn) | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Cash & equivalents | 3,184.0 | 4,363.1 | 3,767.8 | 4,500.0 |
| Accounts receivable | 1,728.0 | 1,577.0 | 1,577.0 | 1,577.0 |
| Inventory | 0.0 | 0.0 | 0.0 | 0.0 |
| Other current assets | 354.0 | 299.0 | 299.0 | 299.0 |
| **Total current assets** | **5,266.0** | **6,239.1** | **5,643.8** | **6,376.0** |
| Net PP&E | 32,188.0 | 29,679.5 | 29,670.2 | 30,441.7 |
| Net intangibles | 5,904.0 | 5,739.0 | 5,739.0 | 5,739.0 |
| Total investments | 0.0 | 0.0 | 0.0 | 0.0 |
| Other long-term assets | 2,226.0 | 2,182.0 | 2,182.0 | 2,182.0 |
| **Total assets** | **45,564.0** | **43,839.6** | **43,235.1** | **44,738.7** |
| | | | | |
| Accounts payable | 2,286.0 | 1,979.0 | 1,979.0 | 1,979.0 |
| Short-term debt | 42.0 | 0.0 | 0.0 | 0.0 |
| Other current liabilities | 998.0 | 1,418.0 | 1,418.0 | 1,418.0 |
| **Total current liabilities** | **3,328.0** | **3,397.0** | **3,397.0** | **3,397.0** |
| Long-term debt | 15,281.0 | 15,326.0 | 15,326.0 | 16,822.6 |
| Other long-term liabilities | 11,458.0 | 10,330.5 | 10,007.2 | 10,179.1 |
| **Total long-term liabilities** | **26,739.0** | **25,656.5** | **25,333.2** | **27,001.7** |
| **Total liabilities** | **30,067.0** | **29,053.5** | **28,730.2** | **30,398.7** |
| | | | | |
| **Preferred shares** | **0.0** | **0.0** | **0.0** | **0.0** |
| **Total common equity** | **12,212.0** | **11,383.1** | **10,801.8** | **10,304.0** |
| **Minority interest** | **3,285.0** | **3,403.0** | **3,703.0** | **4,035.9** |
| | | | | |
| **Total liabilities & equity** | **45,564.0** | **43,839.6** | **43,235.1** | **44,738.7** |

| Additional financials | 12/16 | 12/17E | 12/18E | 12/19E |
|---|---|---|---|---|
| Net debt/equity (%) | 78.3 | 74.1 | 79.7 | 85.9 |
| Interest cover (X) | (1.4) | 0.0 | 1.1 | 1.3 |
| Inventory days | -- | -- | -- | -- |
| Receivable days | 100.5 | 62.3 | 50.9 | 44.0 |
| BVPS ($) | 22.16 | 20.65 | 19.60 | 18.69 |
| | | | | |
| ROA (%) | (3.5) | (1.6) | (1.1) | (0.9) |
| CROCI (%) | 4.8 | 6.3 | 7.9 | 9.0 |
| | | | | |
| Dupont ROE (%) | (18.4) | (4.9) | (3.2) | (2.7) |
| Margin (%) | (21.0) | (7.4) | (4.2) | (2.9) |
| Turnover (X) | 0.2 | 0.2 | 0.3 | 0.2 |
| Leverage (X) | 2.9 | 3.0 | 3.0 | 3.1 |
| | | | | |
| Free cash flow per share ($) | (0.97) | (1.74) | (0.90) | (1.01) |
| Free cash flow yield (%) | (1.8) | (3.1) | (1.4) | (1.8) |

Note: Last actual year may include reported and estimated data.
*Source: Company data, Goldman Sachs Research estimates.*


**Analyst Contributors**

**Brian Singer, CFA**
brian.singer@gs.com

**Caroline Shavel**
caroline.shavel@gs.com

**Umang Choudhary**
umang.choudhary@gs.com

**Nick DeValeria**
nick.devaleria@gs.com



Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

# Updated estimates and target price methodology

**Asset sale proceeds surprise substantially to the downside due to tax considerations.** Management in 1Q closed asset sales in the Marcellus Shale and Eagle Ford Shale with previously-announced gross proceeds of $3.54 bn. However, proceeds received as asset sales booked during 1Q were $2.85 bn, and management expects an additional $0.20 bn in 2Q. Cash tax and other offsets associated with the transaction appear to have surprised meaningfully to the upside. 1Q 2017 current taxes on the income statement were reported at $0.76 bn, of which based on company expectations prior to the quarter we believe about $0.11 bn is associated with Algeria. Management indicated that of the remaining amount of cash taxes booked with 1Q, $0.32 bn will still need to be paid (part of a working capital gain associated with higher current liabilities). Our conversation with management did not provide clarity on whether the additional $0.32 bn of cash tax is related to the Marcellus/Eagle Ford acquisitions. If it is related, then the $3.05 bn of proceeds less $0.65 bn of cash taxes will net APC $2.4 bn. We expect management will provide further clarity.

**Updated estimates:** We update our estimates for cost/production/realized price/hedges following 1Q 2017 results.

**Price target methodology:** Our DCF/M&A-based 12-month price target of $84 (from $86.50) reflects an 85% weighting of our $80.50 (vs. $83 previously) fundamental value and 15% weighting of our $104 (vs. $105 previously) M&A value. In turn, the fundamental value is based on a 25% weighting of our $73 (vs. $76 previously) base value and 75% weighting of our $83 (vs. $86 previously) shale efficiency scenario value. The base/shale efficiency/M&A valuations are based on $60/$55/$75 per bbl WTI oil price respectively and $3.25/$3.00/$3.50 per MMBtu Henry Hub gas price respectively. The shale efficiency scenario assumes 0%-10% annual productivity improvement (vs. year-end 2016 assumptions) through 2020 for various North American shale plays.


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

**Exhibit 1: APC 1Q 2017 results vs. our estimates**
Millions of dollars, unless noted

| | 1Q 2017 Actual | 1Q 2017 Estimate | 1Q 2016 Actual | 4Q 2016 Actual | Change vs. est. | Change YoY | Change QoQ |
|---|---|---|---|---|---|---|---|
| **Earnings** | | | | | | | |
| Revenues | 2,541 | 2,479 | 1,522 | 2,287 | 3% | 67% | 11% |
| EBITDA | 1,610 | 1,532 | 709 | 1,388 | 5% | 127% | 16% |
| Op. Cash Flow | 1,085 | 1,306 | 397 | 1,190 | -17% | 173% | -9% |
| EPS (reported) | ($0.58) | ($0.35) | ($2.03) | ($0.93) | -64% | 72% | 38% |
| EPS (adjusted) | ($0.60) | ($0.35) | ($1.12) | ($0.49) | -70% | 46% | -21% |
| **Production** | | | | | | | |
| Natural gas (MMcf/d) | 1,859 | 1,809 | 2,303 | 1,881 | 3% | -19% | -1% |
| Oil (Mb/d) | 367.0 | 373.2 | 315 | 336.0 | -2% | 17% | 9% |
| NGLs (Mb/d) | 118.0 | 118.6 | 128 | 124.0 | -1% | -8% | -5% |
| **Total production (MBOE/d)** | 795 | 793 | 827 | 774 | 0% | -4% | 3% |
| **Realized prices** | | | | | | | |
| Natural gas ($/Mcf) | $2.98 | $2.99 | $1.81 | $2.56 | 0% | 65% | 16% |
| Oil ($/bbl) | $50.38 | $49.64 | $32.72 | $48.30 | 1% | 54% | 4% |
| NGLs ($/bbl) | $26.89 | $24.82 | $15.49 | $24.62 | 8% | 74% | 9% |
| **Costs ($/BOE)** | | | | | | | |
| Lease operating | $7.09 | $6.90 | $5.98 | $6.48 | 3% | 19% | 9% |
| Production taxes | $2.17 | $2.51 | $1.55 | $1.60 | -14% | 39% | 35% |
| G&A | $3.76 | $3.85 | $3.27 | $4.55 | -2% | 15% | -17% |
| **Total cash costs** | **$13.01** | **$13.26** | **$10.81** | **$12.63** | **-2%** | **20%** | **3%** |
| Exploration Expense | $15.17 | $3.85 | $1.67 | $6.18 | 294% | 806% | 145% |
| DD&A | $15.59 | $15.90 | $15.27 | $15.44 | -2% | 2% | 1% |
| **All-in costs** | **$43.77** | **$33.01** | **$27.75** | **$34.26** | **33%** | **58%** | **28%** |
| Net Debt ($ mn) | 9,495 | 8,687 | 15,804 | 12,139 | 9% | -40% | -22% |
| Current taxes | (757) | (87) | (30) | (53) | NM | NM | NM |

*Source: Company data, Goldman Sachs Global Investment Research*


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

**Exhibit 2: Updated estimates for APC**
Millions of dollars, unless noted

| | EPS | | | Adjusted EBITDA ($ millions) | | |
|---|---|---|---|---|---|---|
| | New | Old | % change | New | Old | % change |
| 2QE | ($0.18) | ($0.15) | -21% | $1,433 | $1,520 | -6% |
| 3QE | ($0.30) | ($0.27) | -10% | $1,407 | $1,413 | 0% |
| 4QE | ($0.23) | ($0.22) | -4% | $1,543 | $1,518 | 2% |
| 2017E | ($1.31) | ($0.99) | -32% | $5,993 | $5,983 | 0% |
| 1QE | ($0.25) | ($0.23) | -6% | $1,645 | $1,611 | 2% |
| 2QE | ($0.23) | ($0.21) | -13% | $1,734 | $1,717 | 1% |
| 3QE | ($0.22) | ($0.18) | -22% | $1,768 | $1,767 | 0% |
| 4QE | ($0.16) | ($0.11) | -39% | $1,880 | $1,885 | 0% |
| 2018E | ($0.85) | ($0.73) | -17% | $7,027 | $6,980 | 1% |
| 2019E | ($0.69) | ($0.46) | -48% | $8,280 | $8,313 | 0% |
| 2020E | ($1.34) | ($1.05) | -28% | $8,569 | $8,598 | 0% |
| 2021E | ($1.07) | ($0.74) | -46% | $9,441 | $9,472 | 0% |
| 2022E | ($0.77) | ($0.40) | -95% | $9,947 | $9,974 | 0% |
| 2023E | ($0.64) | ($0.22) | -188% | $10,377 | $10,401 | 0% |

**note, Adjusted EBITDA adds back exploration expense*

*Source: Goldman Sachs Global Investment Research*


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

**Exhibit 3: APC model summary**
Millions of dollars, unless noted

| | 2013 | 2014 | 2015 | 2016 | 2017E | 2018E | 2019E | 2020N | 2021N | 2022N | 2023N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Earnings and cash flow:* | | | | | | | | | | | |
| EPS | $4.01 | $4.11 | ($2.01) | ($3.10) | ($1 31) | ($0.85) | ($0.69) | ($1.34) | ($1 07) | ($0.77) | ($0.64) |
| Cash flow from operations per share | $16.92 | $17.24 | $7.75 | $6.21 | $8.70 | $11.05 | $13.02 | $13.72 | $15.21 | $16 06 | $16.88 |
| Operating free cash flow (ex. acq) per share | $2.32 | ($2 06) | ($5.38) | ($0.97) | ($1.74) | ($0.80) | ($0.99) | ($1.43) | ($0 00) | $2.07 | $3.73 |
| Revenues | $14,084 | $15,722 | $8,767 | $7,625 | $9,682 | $11,315 | $13,069 | $13,800 | $15,068 | $15,823 | $16,481 |
| EBITDA | $9,803 | $10,807 | $4,794 | $4,039 | $5,993 | $7,027 | $8,280 | $8,569 | $9,441 | $9,947 | $10,377 |
| Operating cash flow | $8,528 | $8,731 | $3,935 | $3,241 | $4,803 | $6,097 | $7,323 | $7,714 | $8,553 | $9,031 | $9,488 |
| Capital program | $8,225 | $9,902 | $6,444 | $3,838 | $5,872 | $6,540 | $7,879 | $8,519 | $8,553 | $7,867 | $7,388 |
| *Benchmark prices:* | | | | | | | | | | | |
| WTI spot oil ($ per bbl) | $97.96 | $93.13 | $48.71 | $43.24 | $54.80 | $55.00 | $55 00 | $50.00 | $50.00 | $50 00 | $50.00 |
| Henry Hub spot gas ($ per MMBtu) | $3.67 | $4 37 | $2.67 | $2.43 | $3.14 | $3.00 | $3.00 | $3.00 | $3 00 | $3.00 | $3.00 |
| *Balance sheet:* | | | | | | | | | | | |
| Cash | $3,698 | $7,369 | $939 | $3,184 | $4,363 | $3,768 | $4,500 | $3,500 | $2,500 | $2,500 | $2,500 |
| Total debt | $13,565 | $15,092 | $15,751 | $15,323 | $15,326 | $15,326 | $16,823 | $16,879 | $16,674 | $16,350 | $15,136 |
| Minority interests | $1,793 | $2,593 | $2,638 | $3,285 | $3,403 | $3,703 | $4,036 | $4,395 | $4,775 | $5,174 | $5,594 |
| Shareholder's equity | $21,857 | $19,725 | $12,819 | $12,212 | $11,383 | $10,802 | $10,304 | $9,440 | $8,713 | $8,143 | $7,634 |
| Goodwill | $5,662 | $6,569 | $6,331 | $5,904 | $5,739 | $5,739 | $5,739 | $5,739 | $5,739 | $5,739 | $5,739 |
| Tangible equity | $16,195 | $13,156 | $6,488 | $6,308 | $5,644 | $5,063 | $4,565 | $3,701 | $2,974 | $2,404 | $1,895 |
| Net debt/tangible capital | 35% | 33% | 62% | 56% | 55% | 57% | 59% | 62% | 65% | 65% | 63% |
| Gross cash invested | $80,893 | $84,973 | $79,198 | $79,123 | $78,278 | $81,673 | $87,508 | $92,152 | $96,825 | $101,918 | $106,606 |
| *% change (y-o-y)* | *9.6%* | *5.0%* | *-6.8%* | *-0.1%* | *-1.1%* | *4.3%* | *7.1%* | *5.3%* | *5.1%* | *5.3%* | *4.6%* |
| *Returns:* | | | | | | | | | | | |
| CROCI | 9 6% | 8.1% | 2.2% | 3 6% | 4.8% | 7.3% | 8.2% | 8 0% | 8.5% | 8.7% | 8 8% |
| free CROCI | 2.1% | -0.7% | -2.7% | 0.1% | -0 5% | 0.2% | 0.0% | -0 2% | 0.6% | 1.8% | 2 6% |
| ROCE | 4.1% | -4.0% | -22.1% | -10.0% | -0.5% | 0.4% | 0.8% | -0 6% | 0.0% | 0.7% | 0 9% |
| ROE | 3 8% | -8.4% | -41.1% | -24.5% | -6.0% | -4.2% | -3.7% | -7 6% | -6.6% | -5.2% | -4 6% |
| *E&P production:* | | | | | | | | | | | |
| Oil (mb/d) | 247 0 | 291.1 | 317.3 | 316 0 | 359.1 | 435.6 | 504.4 | 575.7 | 630.4 | 660.7 | 683.4 |
| Gas (MMcf/d) | 2651.8 | 2589 3 | 2334.3 | 2092.9 | 1457.6 | 1577.9 | 1839.1 | 2119.9 | 2357 5 | 2511.6 | 2716.5 |
| NGLs (mb/d) | 90.8 | 119.6 | 129.7 | 128 0 | 107.7 | 120.9 | 140.2 | 160.4 | 177.8 | 188.6 | 196 9 |
| MBOE/d | 779 8 | 842.3 | 836.0 | 794 9 | 709.7 | 819.5 | 951.1 | 1092.4 | 1201.1 | 1267.9 | 1333.0 |
| *% change (y-o-y)* | *6.6%* | *8.0%* | *-0.7%* | *-4.9%* | *-10.7%* | *15.5%* | *16.1%* | *14.9%* | *10.0%* | *5.6%* | *5.1%* |
| % gas | 57% | 51% | 47% | 44% | 34% | 32% | 32% | 32% | 33% | 33% | 34% |
| *E&P cost structure ($ per BOE):* | | | | | | | | | | | |
| BOE differential to WTI | $49.15 | $42.56 | $20 55 | $17.68 | $18.56 | $18.18 | $18.32 | $16.30 | $16.49 | $16 67 | $16.99 |
| Production costs (incl. prod. taxes) | 11.20 | 11.71 | 9.02 | 8 09 | 10 02 | 10 52 | 10.43 | 10.11 | 10 04 | 9.98 | 9 89 |
| Exploration expense | 5 37 | 8.05 | 8.66 | 3 26 | 6.22 | 2.67 | 2.85 | 2.73 | 2.49 | 2.13 | 1 87 |
| DD&A | 13.78 | 14 80 | 15.08 | 14.82 | 16 91 | 17 55 | 17.63 | 17.24 | 17 04 | 16.83 | 16.82 |
| G&A | 3 83 | 4.28 | 4.00 | 4 26 | 4.22 | 3.81 | 3.37 | 3 00 | 2.80 | 2.72 | 2 65 |
| Total | $83.32 | $81.40 | $57 31 | $48.12 | $55.93 | $52.73 | $52 59 | $49.38 | $48.86 | $48 33 | $48.22 |
| *Cash costs* | *$64.18* | *$58.55* | *$33.57* | *$30.04* | *$32.80* | *$32.51* | *$32.12* | *$29.42* | *$29.33* | *$29.37* | *$29.53* |
| *E&P oil and gas reserves:* | | | | | | | | | | | |
| Proved reserves (MMBOE) | 2792.0 | 2857.7 | 2056.3 | 1722.2 | 1341.4 | 1456.2 | 1660.7 | 1890.4 | 2079 6 | 2196.1 | 2263.5 |
| *% change (y-o-y)* | *9 2%* | *2.4%* | *-28.0%* | *-16.3%* | *-22.1%* | *8.6%* | *14.0%* | *13.8%* | *10 0%* | *5.6%* | *3.1%* |
| % proved developed | 72% | 69% | 79% | 77% | 82% | 82% | 82% | 82% | 83% | 83% | 83% |
| Reserve replacement (3-year avg.): | | | | | | | | | | | |
| Drillbit | 157% | 157% | 86% | 48% | | | | | | | |
| Acquisitions | 5% | 5% | 4% | 11% | | | | | | | |
| "All-in" | 162% | 162% | 90% | 59% | 41% | 116% | 142% | 153% | 153% | 141% | 127% |
| Cost of reserves added (3-year avg.): | | | | | | | | | | | |
| Drillbit | $15.35 | $16.36 | $27.73 | $40.05 | | | | | | | |
| Acquisitions | $8.13 | $8 21 | $11 08 | $26.17 | | | | | | | |
| "All-in" | $15.13 | $16.12 | $26 98 | $37.50 | $44.28 | $15.05 | $12.01 | $11.38 | $11.15 | $10 97 | $10.83 |
| Reserves/production | 9.8 | 9.1 | 6.7 | 5.9 | 5 2 | 4 9 | 4.8 | 4.7 | 4.7 | 4.7 | 4.7 |
| PDP reserves/production | 7.1 | 6 3 | 5.3 | 4.6 | 4 2 | 4.0 | 3.9 | 3.9 | 3 9 | 3.9 | 3.9 |

*Source: Company data, Goldman Sachs Global Investment Research*


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

# Disclosure Appendix

## Reg AC

I, Brian Singer, CFA, hereby certify that all of the views expressed in this report accurately reflect my personal views about the subject company or companies and its or their securities. I also certify that no part of my compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

Unless otherwise stated, the individuals listed on the cover page of this report are analysts in Goldman Sachs' Global Investment Research division.

## GS Factor Profile

The Goldman Sachs Factor Profile provides investment context for a security by comparing key attributes of that security to its conviction sector and the market. The four key attributes depicted are: growth, returns, multiple and an integrated IP score. Growth returns and multiple are indexed based on composites of several methodologies to determine the stocks percentile ranking within the region's coverage universe. The precise calculation of each metric may vary depending on the fiscal year, industry and region but the standard approach is as follows:

**Growth** is a composite of next year's estimate over current year's estimate, e.g. EPS, EBITDA, Revenue. **Return** is a year one prospective aggregate of various return on capital measures, e.g. CROCI, ROACE, and ROE. **Multiple** Multiple is a composite of one-year forward valuation ratios, e.g. P/E, dividend yield, EV/FCF, EV/EBITDA, EV/DACF, Price/Book. **Integrated IP score** is a composite of Growth, Return and Multiple scores.

## Quantum

Quantum is Goldman Sachs' proprietary database providing access to detailed financial statement histories, forecasts and ratios. It can be used for in-depth analysis of a single company, or to make comparisons between companies in different sectors and markets.

## GS SUSTAIN

GS SUSTAIN is a global investment strategy aimed at long-term, long-only performance with a low turnover of ideas. The GS SUSTAIN focus list includes leaders our analysis shows to be well positioned to deliver long term outperformance through sustained competitive advantage and superior returns on capital relative to their global industry peers. Leaders are identified based on quantifiable analysis of three aspects of corporate performance: cash return on cash invested, industry positioning and management quality (the effectiveness of companies' management of the environmental, social and governance issues facing their industry).

## Disclosures

### Coverage group(s) of stocks by primary analyst(s)

Brian Singer, CFA: America-Exploration & Production.

America-Exploration & Production: Anadarko Petroleum Corp., Antero Resources Corp., Apache Corp., Cabot Oil & Gas Corp., California Resources Corp., Chesapeake Energy Corp., Concho Resources Inc., Continental Resources Inc., Devon Energy Corp., Encana Corp., EOG Resources Inc., EP Energy Corp., EQT Corp., Hess Corp., Laredo Petroleum Inc., Marathon Oil Corp., Murphy Oil Corp., Newfield Exploration Co., Noble Energy, Occidental Petroleum Corp., Pioneer Natural Resources Co., Range Resources Corp., Southwestern Energy Co..

### Company-specific regulatory disclosures

The following disclosures relate to relationships between The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs") and companies covered by the Global Investment Research Division of Goldman Sachs and referred to in this research.

Goldman Sachs beneficially owned 1% or more of common equity (excluding positions managed by affiliates and business units not required to be aggregated under US securities law) as of the second most recent month end: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs has received compensation for investment banking services in the past 12 months: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs expects to receive or intends to seek compensation for investment banking services in the next 3 months: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs had an investment banking services client relationship during the past 12 months with: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs had a non-investment banking securities-related services client relationship during the past 12 months with: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs had a non-securities services client relationship during the past 12 months with: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs makes a market in the securities or derivatives thereof: Anadarko Petroleum Corp. ($56.28)

Goldman Sachs is a specialist in the relevant securities and will at any given time have an inventory position, "long" or "short," and may be on the opposite side of orders executed on the relevant exchange: Anadarko Petroleum Corp. ($56.28)

### Distribution of ratings/investment banking relationships

Goldman Sachs Investment Research global Equity coverage universe

| | Rating Distribution | | | Investment Banking Relationships | | |
|---|---|---|---|---|---|---|
| | Buy | Hold | Sell | Buy | Hold | Sell |
| Global | 33% | 53% | 14% | 63% | 57% | 50% |

As of April 1, 2017, Goldman Sachs Global Investment Research had investment ratings on 2,857 equity securities. Goldman Sachs assigns stocks as Buys and Sells on various regional Investment Lists; stocks not so assigned are deemed Neutral. Such assignments equate to Buy, Hold and Sell for the purposes of the above disclosure required by the FINRA Rules. See 'Ratings, Coverage groups and views and related definitions' below. The Investment Banking Relationships chart reflects the percentage of subject companies within each rating category for whom Goldman Sachs has provided investment banking services within the previous twelve months.


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

## Price target and rating history chart(s)




The price targets shown should be considered in the context of all prior published Goldman Sachs research, which may or may not have included price targets, as well as developments relating to the company, its industry and financial markets.

## Regulatory disclosures

### Disclosures required by United States laws and regulations

See company-specific regulatory disclosures above for any of the following disclosures required as to companies referred to in this report: manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/co-managed public offerings in prior periods; directorships; for equity securities, market making and/or specialist role. Goldman Sachs trades or may trade as a principal in debt securities (or in related derivatives) of issuers discussed in this report.

The following are additional required disclosures: **Ownership and material conflicts of interest:** Goldman Sachs policy prohibits its analysts, professionals reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage. **Analyst compensation:** Analysts are paid in part based on the profitability of Goldman Sachs, which includes investment banking revenues. **Analyst as officer or director:** Goldman Sachs policy prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director, advisory board member or employee of any company in the analyst's area of coverage. **Non-U.S. Analysts:** Non-U.S. analysts may not be associated persons of Goldman, Sachs & Co. and therefore may not be subject to FINRA Rule 2241 or FINRA Rule 2242 restrictions on communications with subject company, public appearances and trading securities held by the analysts.

**Distribution of ratings:** See the distribution of ratings disclosure above. **Price chart:** See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the Goldman Sachs website at http://www.gs.com/research/hedge.html.

### Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, except to the extent already made above pursuant to United States laws and regulations. **Australia:** Goldman Sachs Australia Pty Ltd and its affiliates are not authorised deposit-taking institutions (as that term is defined in the Banking Act 1959 (Cth)) in Australia and do not provide banking services, nor carry on a banking business, in Australia. This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act, unless otherwise agreed by Goldman Sachs. In producing research reports, members of the Global Investment Research Division of Goldman Sachs Australia may attend site visits and other meetings hosted by the issuers the subject of its research reports. In some instances the costs of such site visits or meetings may be met in part or in whole by the issuers concerned if Goldman Sachs Australia considers it is appropriate and reasonable in the specific circumstances relating to the site visit or meeting. **Brazil:** Disclosure information in relation to CVM Instruction 483 is available at http://www.gs.com/worldwide/brazil/area/gir/index.html. Where applicable, the Brazil-registered analyst primarily responsible for the content of this research report, as defined in Article 16 of CVM Instruction 483, is the first author named at the beginning of this report, unless indicated otherwise at the end of the text. **Canada:** Goldman Sachs Canada Inc. is an affiliate of The Goldman Sachs Group Inc. and therefore is included in the company specific disclosures relating to Goldman Sachs (as defined above). Goldman Sachs Canada Inc. has approved of, and agreed to take responsibility for, this research report in Canada if and to the extent that Goldman Sachs Canada Inc. disseminates this research report to its clients. **Hong Kong:** Further information on the securities of covered companies referred to in this research may be obtained on request from Goldman Sachs (Asia) L.L.C. **India:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (India) Securities Private Limited, Research Analyst - SEBI Registration Number INH000001493, 951-A, Rational House, Appasaheb Marathe Marg, Prabhadevi, Mumbai 400 025, India, Corporate Identity Number U74140MH2006FTC160634, Phone +91 22 6616 9000, Fax +91 22 6616 9001. Goldman Sachs may beneficially own 1% or more of the securities (as such term is defined in clause 2 (h) the Indian Securities Contracts (Regulation) Act, 1956) of the subject company or companies referred to in this research report. **Japan:** See below. **Korea:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (Asia) L.L.C., Seoul Branch. **New Zealand:** Goldman Sachs New Zealand Limited and its affiliates are neither "registered banks" nor "deposit takers" (as defined in the Reserve Bank of New Zealand Act 1989) in New Zealand. This research, and any access to it, is intended for "wholesale clients" (as defined in the Financial Advisers Act 2008) unless otherwise agreed by Goldman Sachs. **Russia:** Research reports distributed in the Russian Federation are not advertising as defined in the Russian legislation, but are information and analysis not having product promotion as their main purpose and do not provide appraisal within the meaning of the Russian legislation on appraisal activity. **Singapore:** Further information on the covered companies referred to in this research may be obtained from Goldman Sachs (Singapore) Pte. (Company Number: 198602165W). **Taiwan:** This material is for reference only and must not be reprinted without permission. Investors should carefully consider their own investment risk. Investment results are the responsibility of the individual investor. **United Kingdom:** Persons who would be categorized as retail clients in the United Kingdom, as such term is defined in the rules of the Financial Conduct Authority, should read this research in conjunction with prior Goldman Sachs research on the covered companies referred to herein and should refer to the risk warnings that have been sent to them by Goldman Sachs International. A copy of these risks warnings, and a glossary of certain financial terms used in this report, are available from Goldman Sachs International on request.

**European Union:** Disclosure information in relation to Article 4 (1) (d) and Article 6 (2) of the European Commission Directive 2003/125/EC is available at http://www.gs.com/disclosures/europeanpolicy.html which states the European Policy for Managing Conflicts of Interest in Connection with Investment Research.

**Japan:** Goldman Sachs Japan Co., Ltd. is a Financial Instrument Dealer registered with the Kanto Financial Bureau under registration number Kinsho 69, and a member of Japan Securities Dealers Association, Financial Futures Association of Japan and Type II Financial Instruments Firms


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 28-Apr-2021 01:44 PM.

Association. Sales and purchase of equities are subject to commission pre-determined with clients plus consumption tax. See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

## Ratings, coverage groups and views and related definitions

**Buy (B), Neutral (N), Sell (S)** -Analysts recommend stocks as Buys or Sells for inclusion on various regional Investment Lists. Being assigned a Buy or Sell on an Investment List is determined by a stock's return potential relative to its coverage group as described below. Any stock not assigned as a Buy or a Sell on an Investment List is deemed Neutral. Each regional Investment Review Committee manages various regional Investment Lists to a global guideline of 25%-35% of stocks as Buy and 10%-15% of stocks as Sell; however, the distribution of Buys and Sells in any particular coverage group may vary as determined by the regional Investment Review Committee. Additionally, the regional Investment Review Committees each manage regional Conviction lists which represent investment recommendations focused on either the size of the potential return or the l kelihood of the realization of the return. Addition or removal of stocks from such Conviction lists do not represent a change in the analysts' investment rating for such stocks.

**Total return potential** represents the upside or downside differential between the current share price and the price target, including all paid or anticipated dividends, expected during the time horizon associated with the price target. Price targets are required for all covered stocks. The total return potential, price target and associated time horizon are stated in each report adding or reiterating an Investment List membership.

**Coverage groups and views:** A list of all stocks in each coverage group is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html. The analyst assigns one of the following coverage views which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and/or valuation. **Attractive (A).** The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. **Neutral (N).** The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. **Cautious (C).** The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

**Not Rated (NR).** The investment rating and target price have been removed pursuant to Goldman Sachs policy when Goldman Sachs is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances. **Rating Suspended (RS).** Goldman Sachs Research has suspended the investment rating and price target for this stock, because there is not a sufficient fundamental basis for determining, or there are legal, regulatory or policy constraints around publishing, an investment rating or target. The previous investment rating and price target, if any, are no longer in effect for this stock and should not be relied upon. **Coverage Suspended (CS).** Goldman Sachs has suspended coverage of this company. **Not Covered (NC).** Goldman Sachs does not cover this company. **Not Available or Not Applicable (NA).** The information is not available for display or is not applicable. **Not Meaningful (NM).** The information is not meaningful and is therefore excluded.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs on a global basis. Analysts based in Goldman Sachs offices around the world produce equity research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy. This research is disseminated in Australia by Goldman Sachs Australia Pty Ltd (ABN 21 006 797 897); in Brazil by Goldman Sachs do Brasil Corretora de Títulos e Valores Mobiliários S.A.; in Canada by either Goldman Sachs Canada Inc. or Goldman, Sachs & Co.; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs New Zealand Limited; in Russia by OOO Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman, Sachs & Co. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom and European Union.

**European Union:** Goldman Sachs International authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority, has approved this research in connection with its distribution in the European Union and United Kingdom; Goldman Sachs AG and Goldman Sachs International Zweigniederlassung Frankfurt, regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht, may also distribute research in Germany.

## General disclosures

This research is for our clients only. Other than disclosures relating to Goldman Sachs, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management, and brokerage business. We have investment banking and other business relationships with a substantial percentage of the companies covered by our Global Investment Research Division. Goldman, Sachs & Co., the United States broker dealer, is a member of SIPC (http://www.sipc.org).

Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. Our asset management area, principal trading desks and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

The analysts named in this report may have from time to time discussed with our clients, including Goldman Sachs salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the equity securities discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such stocks. Any such trading strategies are distinct from and do not affect the analyst's fundamental equity rating for such stocks, which rating reflects a stock's return potential relative to its coverage group as described herein.

We and our affiliates, officers, directors, and employees, excluding equity and credit analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives, if any, referred to in this research.

The views attributed to third party presenters at Goldman Sachs arranged conferences, including individuals from other parts of Goldman Sachs, do not necessarily reflect those of Global Investment Research and are not an official view of Goldman Sachs.

Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report.

This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

appropriate, seek professional advice, including tax advice. The price and value of investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors. Investors should review current options disclosure documents which are available from Goldman Sachs sales representatives or at http://www.theocc.com/about/publications/character-risks.jsp. Transaction costs may be significant in option strategies calling for multiple purchase and sales of options such as spreads. Supporting documentation will be supplied upon request.

All research reports are disseminated and available to all clients simultaneously through electronic publication to our internal client websites. Not all research content is redistributed to our clients or available to third-party aggregators, nor is Goldman Sachs responsible for the redistribution of our research by third party aggregators. For research, models or other data available on a particular security, please contact your sales representative or go to http://360.gs.com.

Disclosure information is also available at http://www.gs.com/research/hedge.html or from Research Compliance, 200 West Street, New York, NY 10282.

**© 2017 Goldman Sachs.**

**No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.**


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

# EXHIBIT 38

Macquarie Research | MACQUARIE

Equities

**UNITED STATES**

| | | |
|---|---|---|
| **APC US** | | **Neutral** |
| **Price** (at 03:29, 03 May 2017 GMT) | | **US$56.28** |
| **Valuation** - DCF (WACC 10.0%) | **US$** | **60.00** |
| **12-month target** | **US$** | **60.00** |
| **12-month TSR** | **%** | **+7.0** |
| **GICS sector** | | **Energy** |
| **Market cap** | **US$m** | **31,444** |
| **30-day avg turnover** | **US$m** | **197.7** |
| **Number shares on issue** | **m** | **558.7** |

**Investment fundamentals**

| Year end 31 Dec | | 2016A | 2017E | 2018E | 2019E |
|---|---|---|---|---|---|
| Revenue | m | 7,152 | 9,283 | 9,792 | 12,179 |
| EBIT | m | -1549 | 2,284 | 1,326 | 2,304 |
| Reported profit | m | -3072 | -398 | -271 | 268 |
| Adjusted profit | m | -1605 | -410 | -271 | 268 |
| Gross cashflow | m | 2,709 | 4,011 | 4,780 | 6,130 |
| CFPS | US$ | 5.89 | 8.13 | 9.70 | 12.61 |
| CFPS growth | % | -35.7 | 38.0 | 19.2 | 30.0 |
| PGCFPS | x | 10.8 | 7.8 | 6.6 | 5.2 |
| EPS adj | US$ | -3.10 | -0.74 | -0.49 | 0.48 |
| EPS adj growth | % | -54.9 | 76.0 | 34.4 | nmf |
| PER adj | x | nmf | nmf | nmf | 118.1 |
| Total DPS | US$ | 0.20 | 0.20 | 0.20 | 0.20 |
| Total div yield | % | 0.4 | 0.4 | 0.4 | 0.4 |
| ROA | % | -3.8 | 1.3 | 0.8 | 2.8 |
| ROE | % | -10.4 | -2.7 | -1.8 | 1.8 |
| EV/EBITDA | x | 15.0 | 6.2 | 6.6 | 5.2 |
| Net debt/equity | % | 79.9 | 72.6 | 77.6 | 73.0 |
| P/BV | x | 2.0 | 2.1 | 2.1 | 2.1 |

**APC US vs S&P 500, & rec history**




Note: Recommendation timeline - if not a continuous line, then there was no Macquarie coverage at the time or there was an embargo period.

Source: FactSet, Macquarie Capital (USA), May 2017

(all figures in USD unless noted)


**Analyst(s)**

**Paul Grigel, CFA**
+1 303 952 2754 paul.grigel@macquarie.com

**Matt Henske, CFA**
+1 303 952 2725 matt.henske@macquarie.com


3 May 2017

Macquarie Capital (USA) Inc.

# Anadarko Petroleum

## Where Do We Go From Here?

### Event

- We downgrade Anadarko to Neutral from Outperform based on the overhang from the Firestone incident and growing headwinds to the story.

### Impact

- **How to Estimate Near Term Underperformance?** The findings of the Firestone investigation are a clear negative for Anadarko. The immediate focus is how much can the name initially underperform. Based on situations where Colorado regulatory overhangs have caused underperformance, we see an immediate additional underperformance of ~7% which supplements the recent underperformance of ~3%.
- **Growing Near Term and Long Term Challenges:** Immediate challenges face the Colorado operators with the COGCC's NTO to check all flow lines within 1,000 feet of buildings which leaves a risk to near term costs and production. But longer term, growing challenges in greenfield exploration in the GOM is likely to again challenge the story following disappointing results at Shenandoah.
- **Return of the Referendums?** While "Raise the Bar" should insulate the DJ Basin from potential referendums regarding setbacks and other restrictions, such a polarizing incident could result in a rallying point for the anti-fracking community. We would highlight that in our view a new setback referendum, or something substantially similar, could not be brought onto the ballot until 2018 given the failure in 2016. However, even with the higher hurdle rate on signature collection, an attempt to bring something to the ballot box if it receives a broader push cannot be ruled out given the potential rallying point of this incident.

### Earnings and target price revision

- We revise our '17 EPS/CFPS estimates to (US$0.74)/US$8.13 from (US$0.38)/US$9.24 and our '18 estimates to (US$0.49)/US$9.70 from (US$0.59)/US$9.93. We downgrade to Neutral and lower our target to US$60 from US$74 as we reset our estimates post earnings and lower our multiple due to the increased overhang on the stock.

### Price catalyst

- 12-month price target: US$60.00 based on a DCF methodology.
- Catalyst: Details on Colorado Impact, Delaware Basin Results

### Action and recommendation

- While the direct near term financial impacts to Anadarko are likely bearable, we believe that until there is more clarity on the impacts from this investigation, there will be an overhang on the stock which likely results in a sustained lower multiple for the foreseeable future. While long term investors may ultimately realize value if the overhang is removed, we see limited circumstances in which the added regulatory burden from the Firestone incident is quickly and clearly resolved, thus limiting the potential for a "V-shaped" recovery in the stock.

**Please refer to page 5 for important disclosures and analyst certification, or on our website www.macquarie.com/research/disclosures.**

Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 28-Apr-2021 01:44 PM.

## It's About Colorado – Overhang Likely to Persist

- **How to Estimate Near Term Underperformance?** The findings of the Firestone investigation are clearly a negative for Anadarko. The main near term question is how much can the stock underperform relative to the peers. Additionally, how much can this weigh on the broader Colorado names. We examined the underperformance in 2014 and 2016 when referendum concerns plagued the basin for a guidepost. We see that the Colorado names broadly underperformed the E&P sector by ~10% in those periods. With the recent underperformance last week upon the initial shutting in of wells by ~3%, we believe there could be another ~7% of near term underperformance.
- **Return of the Referendums?** While "Raise the Bar" should insulate the DJ Basin from potential referendums regarding setbacks and other restrictions, such a polarizing incident could result in a rallying point for the anti-fracking community. As a reminder, Raise the Bar was the referendum passed in November which increases the hurdle to not only pass an amendment to the State of Colorado constitution but also makes placing an initiative on the ballot more challenging. We would highlight that in our view a new setback referendum, or something substantially similar, could not be brought onto the ballot until 2018 given the failure in 2016. However, even with the higher hurdle rate on signature collection, an attempt to bring something to the ballot box if it receives a broader push cannot be ruled out given the potential rallying point of this incident. Additionally, Colorado is already one of the most stringently regulated states in the nation in respect to energy and is likely to see increased pressure following this incident. Near term impacts to production and costs are not measurable at this time but the risk is clearly a one way risk.
- **Initial Regulatory Response:** The Colorado Oil & Gas Conservation Commission released a Notice to Operators detailing required steps that all operators must take to systematically inspect their existing flowlines and verify ones that are not in active use following the Firestone incident. The order comes in two phases with the first phase being the re-inspection of any existing flowline within 1,000 feet of a building before May 30, 2017. The second phase requires that all flowlines with 1,000 feet of buildings have proven integrity before June 30, 2017. We would expect this is likely to be the initial reaction to insure that flowlines are safe and could not replicate the Firestone incident. However, additional regulations could be discussed and we would anticipate there likely to be an increase in proposals.

## But It's Also About More than Colorado – GOM Under Pressure

- We would also highlight the company's decision to suspend appraisal drilling at Shenandoah and evaluate a path forward while taking a material impairment is also likely to weigh on the story. In the Gulf of Mexico, the near term focus is tiebacks with which the company continues to see success. However, with the determination that Shenandoah may not be a viable project at current crude prices, the longer term strategy in the GOM comes in to question. With 160mboe/d of production, the near term strategy of tie backs can sustain production into 2019 but longer term growth is growing increasingly elusive, especially if an already discovered project like Shenandoah is not deemed economic.

## Firestone Fire Investigation Summary

- The Firestone Fire Department investigated the house explosion on April 17th and have determined that a cut feeder line that ran to within ~5 feet of the house had not been turned off at the well head. The resulting flow of hydrocarbons saturated the ground, worked its way into a French drain and ultimately into the sump pit and into the basement of the house. Initial indications are the pipe was buried at a depth of 7 feet and may have been cut prior to the construction of the house although those details remain unclear.

## Earnings Summary

- 1Q17 production came in ahead of expectations and was driven by beats across all product lines and geographies. Realized prices were also better across the board. Comparisons to consensus are relatively challenged given the number of moving parts during 1Q17 from the Marcellus and Eagle Ford asset sales.


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

- Looking ahead to 2Q17 guidance, US oil guidance is below our estimate as is Algeria oil guidance while Ghana is inline. US natural gas production is above our guidance while US NGL production is in line with our estimate. FY17 production guidance is mostly unchanged with the exception of US natural gas guidance which is raised slightly. Differential guidance is comparable to our estimates although we note that FY17 oil differential guidance is slightly tighter than previous guidance while natural gas differential guidance widens slightly. 2Q17 operating expense guidance is comparable to our estimates while DD&A and production tax guidance are above our estimates. FY17 LOE guidance is slightly lower than previous guidance. 2Q17 capex guidance of US$1,050-$1,250mm compares to our estimate of US$1,075mm and consensus is US$1,211mm.

## Fig 1 APC Model Summary

**ANADARKO PETROLEUM (APC US, NEUTRAL, TARGET PRICE: US$60.00)**

| Price Assumption | | 2016A | 2017E | 2018E | 2019E |
|---|---|---|---|---|---|
| Oil-WTI | $/b | 43.25 | 54.75 | 52.50 | 56.60 |
| Gas-Henry Hub | $/mmbtu | 2.50 | 3.30 | 3.15 | 2.75 |
| **Income Statement** | | **2016A** | **2017E** | **2018E** | **2019E** |
| Oil & Liquids | kb/d | 445.3 | 459.6 | 539.0 | 635.2 |
| Natural Gas | mmcf/d | 2,098.7 | 1,343.5 | 1,180.2 | 1,302.9 |
| Total Production | kboe/d (@ 6:1) | 795.0 | 683.5 | 735.7 | 852.4 |
| Gas Production Ratio | % | 44.0 | 32.8 | 26.7 | 25.5 |
| Production per Share Growth YoY | % | -7.4 | -19.0 | 6.9 | 15.0 |
| Net Revenue | m | 6,781.4 | 10,684.7 | 10,286.6 | 12,698.8 |
| *Operating Costs* | m | (2,349.0) | (2,931.0) | (2,851.5) | (3,441.8) |
| *G&A Costs* | m | (1,440.0) | (1,049.1) | (1,057.1) | (1,090.5) |
| EBITDA | m | 2,992.4 | 6,704.6 | 6,378.0 | 8,166.5 |
| Interest Costs | m | (890.0) | (873.6) | (783.9) | (766.7) |
| DD&A & Other Non-Cash Costs | m | (5,174.4) | (6,228.7) | (5,865.6) | (7,131.9) |
| Net Income | m | (3,072.0) | (397.7) | (271.5) | 267.9 |
| EPS (basic) | | (5.93) | (0.72) | (0.49) | 0.48 |
| EPS (diluted) | | (5.93) | (0.72) | (0.49) | 0.48 |
| Adjusted EPS (diluted) | | (3.10) | (0.74) | (0.49) | 0.48 |
| Dividend Per Share | | 1.1 | 0.2 | 0.2 | 0.2 |
| Revenue per Share Growth YoY | % | -13.7 | 48.5 | -4.4 | 22.6 |
| EBITDA per Share Growth YoY | % | -26.7 | 128.5 | -5.6 | 27.1 |
| Basic WA Shares OS | m | 521.8 | 553.5 | 557.5 | 561.5 |
| Diluted WA Shares OS | m | 521.8 | 553.5 | 557.5 | 561.5 |
| **Balance Sheet** | | **2016A** | **2017E** | **2018E** | **2019E** |
| Cash | m | 3,184.0 | 5,937.5 | 5,356.3 | 5,375.6 |
| Debt | m | 15,567.0 | 16,900.0 | 16,900.0 | 16,436.0 |
| Net Debt | m | 12,383.0 | 10,962.5 | 11,543.7 | 11,060.4 |
| Debt/Total Cap | % | 50.1 | 52.8 | 53.2 | 52.0 |
| Net Debt/Total Cap | % | 44.5 | 42.2 | 43.8 | 42.3 |
| Net Debt/CF | x | 4.0 | 2.4 | 2.1 | 1.6 |
| Total Assets | m | 45,564 | 42,989 | 43,080 | 44,293 |
| Total Liabilities | m | 30,067 | 27,889 | 28,199 | 29,144 |
| Total S/H Equity | m | 15,497 | 15,099 | 14,881 | 15,149 |
| **Ratios Analysis** | | **2016A** | **2017E** | **2018E** | **2019E** |
| ROA | % | -3.5 | -0.9 | -0.6 | 0.6 |
| ROCE | % | -2.8 | 0.9 | 0.8 | 2.8 |
| ROE | % | -10.4 | -2.7 | -1.8 | 1.8 |
| Price/Book | x | 1.9 | 2.1 | 2.1 | 2.1 |
| Book Value | | 29.7 | 27.3 | 26.6 | 27.0 |
| **Valuation** | | **2016A** | **2017E** | **2018E** | **2019E** |
| P/E | x | nmf | nmf | nmf | nmf |
| P/CF | x | 9.5 | 6.9 | 5.8 | 4.5 |
| EV/DACF | x | 11.2 | 6.3 | 7.3 | 5.7 |
| Enterprise Value | m | 41,747 | 42,114 | 42,920 | 42,662 |
| EV/Reserves | $/boe | 14.61 | | | |
| EV/Production[4] | $k/boe/d | 52.51 | 61.61 | 58.34 | 50.05 |
| Reserve/Production | years | 9.1 | | | |
| Dividend Yield | % | 1.9 | 0.4 | 0.4 | 0.4 |
| Core Net Asset Value (PV10AT)[3] | | 35.92 | | | |
| P/NAV | x | 1.6 | | | |
| Core NAV + Risked Resource Upside (PV10AT)[3] | | 99.61 | | | |
| P/(NAV+Risked Upside) | x | 0.6 | | | |
| **Sensitivities (Adjusted Cash Flow)** | | **2016A** | **2017E** | **2018E** | **2019E** |
| Oil WTI +/- US$1.00/b | % | NA | 2.0 | 2.4 | 2.2 |
| Gas +/- C$0.25/mcf | % | NA | 1.1 | 1.4 | 1.2 |
| Oil +/- 100 b/d | % | NA | NA | NA | NA |
| Gas +/- 1.0 mmcf/d | % | NA | NA | NA | NA |

| Quarterly Forecast | | 1Q17E | 2Q17E | 3Q17E | 4Q17E |
|---|---|---|---|---|---|
| Oil-WTI | $/b | 51.77 | 53.50 | 57.00 | 56.50 |
| Gas-Henry Hub | $/mmbtu | 3.07 | 3.15 | 3.50 | 3.50 |
| Liquids Realization | $/b | 44.69 | 44.57 | 47.68 | 47.65 |
| Gas Realization | $/mcf | 3.00 | 2.95 | 3.33 | 3.37 |
| Oil & Liquids | kb/d | 485.0 | 437.8 | 445.8 | 470.3 |
| Natural Gas | mmcf/d | 1859.0 | 1240.0 | 1140.0 | 1145.0 |
| Total Production | kboe/d (@ 6:1) | 794.8 | 644.4 | 635.8 | 661.1 |
| Gas Production Ratio | % | 39.0 | 32.1 | 29.9 | 28.9 |
| Net Revenue | m | 3414.6 | 2253.6 | 2449.6 | 2566.9 |
| EBITDA | m | 2110.6 | 1370.3 | 1566.6 | 1657.1 |
| Net Income | m | (318.4) | (99.8) | 24.3 | (3.7) |
| EPS (basic) | | (0.58) | (0.18) | 0.04 | (0.01) |
| EPS (diluted) | | (0.58) | (0.18) | 0.04 | (0.01) |
| Adjusted EPS (diluted) | | (0.60) | (0.18) | 0.04 | (0.01) |
| Cash Flow from Operations | m | 688.6 | 1126.7 | 1305.0 | 1381.5 |
| CFPS | | 1.25 | 2.04 | 2.36 | 2.49 |
| Production per Share Growth YoY | % | -12.3 | -24.9 | -23.9 | -15.1 |
| Production per Share Growth QoQ | % | 0.3 | -18.2 | -0.4 | 3.8 |
| CFPS Growth YoY | % | 30.6 | 55.3 | 41.9 | 29.2 |
| CFPS Growth QoQ | % | -35.3 | 63.3 | 15.6 | 5.7 |
| Net Revenue/boe | $/boe | 34.28 | 35.96 | 39.40 | 39.74 |
| *Operating costs/boe* | $/boe | (9.25) | (10.39) | (10.64) | (10.68) |
| Operating Netback/boe | $/boe | 25.03 | 25.57 | 28.76 | 29.06 |
| *G&A/boe* | $/boe | (3.76) | (4.59) | (4.37) | (4.20) |
| *Interest/boe* | $/boe | (3.12) | (3.67) | (3.72) | (3.58) |
| *Cash Taxes/boe* | $/boe | (10.58) | 0.12 | (0.14) | (0.08) |
| Cash Netback/boe | $/boe | 7.57 | 17.43 | 20.54 | 21.20 |
| **Cashflow Analysis** | | **2016A** | **2017E** | **2018E** | **2019E** |
| Cash Flow from Operations | m | 3075.0 | 4501.8 | 5406.0 | 7080.9 |
| *Chgs in Working Cap* | m | (75.2) | 285.0 | (619.3) | 0.0 |
| Net Cash Flow from Operations | m | 2999.8 | 4786.8 | 4786.8 | 7080.9 |
| Cash Flow from Investing | m | (2762.0) | (1924.0) | (6011.0) | (6816.0) |
| Cash Flow from Financing | m | 2008.0 | (110.7) | (111.5) | (112.3) |
| Increase in Cash | m | 2241.3 | 2752.1 | (716.5) | 152.6 |
| Free Cash Flow[1] | m | (505.2) | (194.2) | (205.0) | 764.9 |
| Debt Adjusted Cash Flow (DACF) | m | 3727.7 | 6678.3 | 5876.3 | 7541.0 |
| CFPS | | 5.89 | 8.13 | 9.70 | 12.61 |
| Capital Expenditures | m | 3505.0 | 4696.0 | 5611.0 | 6316.0 |
| Capex/Cash Flow | x | 1.1 | 1.0 | 1.0 | 0.9 |
| **Per Boe Statistics** | | **2016A** | **2017E** | **2018E** | **2019E** |
| Net Revenue/boe | $/boe | 24.65 | 37.21 | 36.46 | 39.15 |
| *Operating costs/boe* | $/boe | (8.09) | (10.19) | (10.62) | (11.06) |
| Operating Netback/boe | $/boe | 16.55 | 27.01 | 25.84 | 28.08 |
| *G&A/boe* | $/boe | (4.96) | (4.21) | (3.94) | (3.51) |
| *Interest/boe* | $/boe | (3.07) | (3.50) | (2.92) | (2.46) |
| *Cash taxes/boe* | $/boe | (0.75) | (3.06) | 0.20 | (0.17) |
| Cash Netback/boe | $/boe | 7.78 | 16.25 | 19.19 | 21.94 |
| *Depletion and Depreciation/boe* | $/boe | (15.08) | (14.82) | (17.62) | (18.76) |
| *Stock based compensation/boe* | $/boe | 0.00 | 0.00 | 0.00 | 0.00 |
| *Other Non-cash/boe* | $/boe | (24.95) | (16.28) | (5.75) | (4.67) |
| *Deferred Taxes/boe* | $/boe | 10.33 | 4.27 | 2.59 | 0.47 |
| Earnings Netback/boe | $/boe | (21.93) | (10.59) | (1.59) | (1.01) |
| **Capital Efficiencies** | | **2016A** | **3-Year** | | |
| F&D (Proven)[2] | $/boe | 17.34 | NM | | |
| FD&A (Proven)[2] | $/boe | 17.35 | NM | | |
| Recycle Ratio[2] | x | 0.4 | | | |

All figures USD unless noted and production and reserve figures are net of royalties
1) Cash flow from Operations (before chg in WC) Less Capex and Dividends; 2) Includes Revisions; 3) Strip pricing; 4) EV excludes non-producing assets
Source: Company Data, Macquarie Research, May 2017

Source: Company data, Macquarie Capital (USA), May 2017



Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

## Macquarie Quant View

The quant model currently holds a strong negative view on Anadarko Petroleum. The strongest style exposure is Earnings Momentum, indicating this stock has received earnings upgrades and is well liked by sell side analysts. The weakest style exposure is Growth, indicating this stock has weak historic and/or forecast growth. Growth metrics focus on both top and bottom line items.

**463/591**

Global rank in Energy

| | |
|---|---|
| **% of BUY recommendations** | 81% (30/37) |
| **Number of Price Target downgrades** | 6 |
| **Number of Price Target upgrades** | 0 |




Displays where the company's ranked based on the fundamental consensus Price Target and Macquarie's Quantitative Alpha model.

Two rankings: Local market (United States) and Global sector (Energy)

### Macquarie Alpha Model ranking

A list of comparable companies and their Macquarie Alpha model score (higher is better).




### Factors driving the Alpha Model

For the comparable firms this chart shows the key underlying styles and their contribution to the current overall Alpha score.




### Macquarie Earnings Sentiment Indicator

The Macquarie Sentiment Indicator is an enhanced earnings revisions signal that favours analysts who have more timely and higher conviction revisions. Current score shown below.




### Drivers of Stock Return

Breakdown of 1 year total return (local currency) into returns from dividends, changes in forward earnings estimates and the resulting change in earnings multiple.




### What drove this Company in the last 5 years

Which factor score has had the greatest correlation with the company's returns over the last 5 years.




### How it looks on the Alpha model

A more granular view of the underlying style scores that drive the alpha (higher is better) and the percentile rank relative to the sector and market.

| | Normalized Score |
|---|---|
| Alpha Model Score | -1.33 |
| Valuation | -0.81 |
| Growth | -1.19 |
| Profitability | -0.84 |
| Earnings Momentum | 0.00 |
| Price Momentum | -0.51 |
| Quality | -1.03 |
| Capital & Funding | -0.25 |
| Liquidity | -1.50 |
| Risk | -1.24 |
| Technicals & Trading | 1.70 |




Source (all charts): FactSet, Thomson Reuters, and Macquarie Research. For more details on the Macquarie Alpha model or for more customised analysis and screens, please contact the Macquarie Global Quantitative/Custom Products Group (cpg@macquarie.com)



Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 28-Apr-2021 01:44 PM.

# Important disclosures:

### Recommendation definitions

**Macquarie - Australia/New Zealand**
Outperform – return >3% in excess of benchmark return
Neutral – return within 3% of benchmark return
Underperform – return >3% below benchmark return

Benchmark return is determined by long term nominal GDP growth plus 12 month forward market dividend yield

**Macquarie – Asia/Europe**
Outperform – expected return >+10%
Neutral – expected return from -10% to +10%
Underperform – expected return <-10%

**Macquarie – South Africa**
Outperform – expected return >+10%
Neutral – expected return from -10% to +10%
Underperform – expected return <-10%

**Macquarie - Canada**
Outperform – return >5% in excess of benchmark return
Neutral – return within 5% of benchmark return
Underperform – return >5% below benchmark return

**Macquarie - USA**
Outperform (Buy) – return >5% in excess of Russell 3000 index return
Neutral (Hold) – return within 5% of Russell 3000 index return
Underperform (Sell)– return >5% below Russell 3000 index return

### Volatility index definition*

This is calculated from the volatility of historical price movements.

**Very high–highest risk** – Stock should be expected to move up or down 60–100% in a year – investors should be aware this stock is highly specula ive.

**High** – stock should be expected to move up or down at least 40–60% in a year – investors should be aware this stock could be speculative.

**Medium** – stock should be expected to move up or down at least 30–40% in a year.

**Low–medium** – stock should be expected to move up or down at least 25–30% in a year.

**Low** – stock should be expected to move up or down at least 15–25% in a year.
* Applicable to Asia/Australian/NZ/Canada stocks only

**Recommendations** – 12 months
**Note:** Quant recommendations may differ from Fundamental Analyst recommendations

### Financial definitions

All "Adjusted" data items have had the following adjustments made:
Added back: goodwill amortisation, provision for catastrophe reserves, IFRS deriva ives & hedging, IFRS impairments & IFRS interest expense
Excluded: non recurring items, asset revals, property revals, appraisal value uplift, preference dividends & minority interests

**EPS** = adjusted net profit / efpowa*
**ROA** = adjusted ebit / average total assets
**ROA Banks/Insurance** = adjusted net profit /average total assets
**ROE** = adjusted net profit / average shareholders funds
**Gross cashflow** = adjusted net profit + depreciation
*equivalent fully paid ordinary weighted average number of shares

All Reported numbers for Australian/NZ listed stocks are modelled under IFRS (International Financial Reporting Standards).

### Recommendation proportions – For quarter ending 31 March 2017

| | AU/NZ | Asia | RSA | USA | CA | EUR | |
|---|---|---|---|---|---|---|---|
| Outperform | 47.26% | 55.50% | 38.46% | 45.47% | 59.09% | 48.21% | (for global coverage by Macquarie, 8.20% of stocks followed are investment banking clients) |
| Neutral | 38.01% | 29.31% | 42.86% | 48.77% | 37.88% | 36.79% | (for global coverage by Macquarie, 0.25% of stocks followed are investment banking clients) |
| Underperform | 14.73% | 15.19% | 18.68% | 5.76% | 3.03% | 15.00% | (for global coverage by Macquarie, 8.00% of stocks followed are investment banking clients) |

### APC US vs S&P 500, & rec history




(all figures in USD currency unless noted)

Note: Recommendation timeline – if not a continuous line, then there was no Macquarie coverage at the time or there was an embargo period.
Source: FactSet, Macquarie Capital (USA), May 2017

### 12-month target price methodology

APC US: US$60.0 based on a DCF methodology

**Company-specific disclosures:**

Important disclosure information regarding the subject companies covered in this report is available at www.macquarie.com/research/disclosures.

| Date | Stock Code (BBG code) | Recommendation | Target Price |
|---|---|---|---|
| 09-Mar-2017 | APC US | Outperform | US$74.00 |
| 20-Dec-2016 | APC US | Outperform | US$84.00 |
| 02-Nov-2016 | APC US | Outperform | US$79.00 |
| 12-Oct-2016 | APC US | Outperform | US$76.00 |
| 14-Sep-2016 | APC US | Outperform | US$71.00 |
| 04-May-2016 | APC US | Outperform | US$61.00 |
| 21-Mar-2016 | APC US | Outperform | US$58.00 |
| 08-Jan-2016 | APC US | Outperform | US$60.00 |
| 09-Sep-2015 | APC US | Outperform | US$83.00 |
| 12-May-2015 | APC US | Outperform | US$100.00 |
| 15-Apr-2015 | APC US | Outperform | US$96.00 |
| 21-Jan-2015 | APC US | Outperform | US$97.00 |
| 09-Dec-2014 | APC US | Outperform | US$99.00 |
| 18-Jul-2014 | APC US | Outperform | US$125.00 |

**Target price risk disclosures:**
**APC US:** With multiple, large investment opportunities in hand, various challenges exist to manage the portfolio and maintain momentum. Setbacks could lead to production delays, cost overruns, capital-markets exposure and disappointing financial results relative to estimates and price target assumptions.


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

**Analyst certification:**
We hereby certify that all of the views expressed in this report accurately reflect our personal views about the subject company or companies and its or their securities. We also certify that no part of our compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report. The Analysts responsible for preparing this report receive compensation from Macquarie that is based upon various factors including Macquarie Group Ltd total revenues, a portion of which are generated by Macquarie Group's Investment Banking activities.

**General disclaimers:**
Macquarie Securities (Australia) Ltd; Macquarie Capital (Europe) Ltd; Macquarie Capital Markets Canada Ltd; Macquarie Capital Markets North America Ltd; Macquarie Capital (USA) Inc; Macquarie Capital Limited and Macquarie Capital Limited, Taiwan Securities Branch; Macquarie Capital Securities (Singapore) Pte Ltd; Macquarie Securities (NZ) Ltd; Macquarie Equities South Africa (Pty) Ltd; Macquarie Capital Securities (India) Pvt Ltd; Macquarie Capital Securities (Malaysia) Sdn Bhd; Macquarie Securities Korea Limited and Macquarie Securities (Thailand) Ltd are not authorized deposit-taking institutions for the purposes of the Banking Act 1959 (Commonwealth of Australia), and their obligations do not represent deposits or other liabilities of Macquarie Bank Limited ABN 46 008 583 542 (MBL) or MGL. MBL does not guarantee or otherwise provide assurance in respect of the obligations of any of the above mentioned entities. MGL provides a guarantee to the Monetary Authority of Singapore in respect of the obligations and liabilities of Macquarie Capital Securities (Singapore) Pte Ltd for up to SGD 35 million. This research has been prepared for the general use of the wholesale clients of the Macquarie Group and must not be copied, either in whole or in part, or distr buted to any other person. If you are not the intended recipient you must not use or disclose the information in this research in any way. If you received it in error, please tell us immediately by return e-mail and delete the document. We do not guarantee the integrity of any e-mails or attached files and are not responsible for any changes made to them by any other person. MGL has established and implemented a conflicts policy at group level (which may be revised and updated from time to time) (the "Conflicts Policy") pursuant to regulatory requirements (including the FCA Rules) which sets out how we must seek to identify and manage all material conflicts of interest. Nothing in this research shall be construed as a solicitation to buy or sell any security or product, or to engage in or refrain from engaging in any transaction. In preparing this research, we did not take into account your investment objectives, financial situation or particular needs. Macquarie salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions which are contrary to the opinions expressed in this research. Macquarie Research produces a variety of research products including, but not limited to, fundamental analysis, macro-economic analysis, quantitative analysis, and trade ideas. Recommendations contained in one type of research product may differ from recommendations contained in other types of research, whether as a result of differing time horizons, methodologies, or otherwise. Before making an investment decision on the basis of this research, you need to consider, with or without the assistance of an adviser, whether the advice is appropriate in light of your particular investment needs, objectives and financial circumstances. There are risks involved in securities trading. The price of securities can and does fluctuate, and an individual security may even become valueless. International investors are reminded of the additional risks inherent in international investments, such as currency fluctuations and international stock market or economic conditions, which may adversely affect the value of the investment. This research is based on information obtained from sources believed to be reliable but we do not make any representation or warranty that it is accurate, complete or up to date. We accept no obligation to correct or update the information or opinions in it. Opinions expressed are subject to change without notice. No member of the Macquarie Group accepts any liability whatsoever for any direct, indirect, consequential or other loss arising from any use of this research and/or further communication in relation to this research. Clients should contact analysts at, and execute transactions through, a Macquarie Group entity in their home jurisdiction unless governing law permits otherwise. The date and timestamp for above share price and market cap is the closed price of the price date. #CLOSE is the final price at which the security is traded in the relevant exchange on the date indicated.

**Country-specific disclaimers:**
**Australia**: In Australia, research is issued and distributed by Macquarie Securities (Australia) Ltd (AFSL No. 238947), a participating organisation of the Australian Securities Exchange. **New Zealand**: In New Zealand, research is issued and distributed by Macquarie Securities (NZ) Ltd, a NZX Firm. **Canada**: In Canada, research is prepared, approved and distr buted by Macquarie Capital Markets Canada Ltd, a participating organisation of the Toronto Stock Exchange, TSX Venture Exchange & Montréal Exchange. Macquarie Capital Markets North America Ltd., which is a registered broker-dealer and member of FINRA, accepts responsibility for the contents of reports issued by Macquarie Capital Markets Canada Ltd in the United States and sent to US persons. Any US person wishing to effect transactions in the securities descr bed in the reports issued by Macquarie Capital Markets Canada Ltd should do so with Macquarie Capital Markets North America Ltd. The Research Distribution Policy of Macquarie Capital Markets Canada Ltd is to allow all clients that are entitled to have equal access to our research. **United Kingdom**: In the United Kingdom, research is issued and distr buted by Macquarie Capital (Europe) Ltd, which is authorised and regulated by the Financial Conduct Authority (No. 193905). **Germany**: In Germany, this research is issued and/or distributed by Macquarie Capital (Europe) Limited, Niederlassung Deutschland, which is authorised and regulated by the UK Financial Conduct Authority (No. 193905). and in Germany by BaFin. **France**: In France, research is issued and distributed by Macquarie Capital (Europe) Ltd, which is authorised and regulated in the United Kingdom by the Financial Conduct Authority (No. 193905). **Hong Kong & Mainland China**: In Hong Kong, research is issued and distributed by Macquarie Capital Limited, which is licensed and regulated by the Securities and Futures Commission. In Mainland China, Macquarie Securities (Australia) Limited Shanghai Representative Office only engages in non-business operational activities excluding issuing and distributing research. Only non-A share research is distributed into Mainland China by Macquarie Capital Limited. **Japan**: In Japan, research is Issued and distributed by Macquarie Capital Securities (Japan) Limited, a member of the Tokyo Stock Exchange, Inc. and Osaka Exchange, Inc. (Financial Instruments Firm, Kanto Financial Bureau (kin-sho) No. 231, a member of Japan Securities Dealers Association). **India:** In India, research is issued and distributed by Macquarie Capital Securities (India) Pvt. Ltd. (CIN: U65920MH1995PTC090696), 92, Level 9, 2 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai – 400 051, India, which is a SEBI registered Research Analyst having registration no. INH000000545. **Malaysia**: In Malaysia, research is issued and distributed by Macquarie Capital Securities (Malaysia) Sdn. Bhd. (Company registration number: 463469-W) which is a Participating Organisation of Bursa Malaysia Berhad and a holder of Capital Markets Services License issued by the Securities Commission. **Taiwan**: In Taiwan, research is issued and distributed by Macquarie Capital Limited, Taiwan Securities Branch, which is licensed and regulated by the Financial Supervisory Commission. No portion of the report may be reproduced or quoted by the press or any other person without authorisation from Macquarie. Nothing in this research shall be construed as a solicitation to buy or sell any security or product. The recipient of this report shall not engage in any activities which may give rise to potential conflicts of interest to the report. Research Associate(s) in this report who are registered as Clerks only assist in the preparation of research and are not engaged in writing the research. **Thailand**: In Thailand, research is produced, issued and distributed by Macquarie Securities (Thailand) Ltd. Macquarie Securities (Thailand) Ltd. is a licensed securities company that is authorized by the Ministry of Finance, regulated by the Securities and Exchange Commission of Thailand and is an exchange member of the Stock Exchange of Thailand. The Thai Institute of Directors Association has disclosed the Corporate Governance Report of Thai Listed Companies made pursuant to the policy of the Securities and Exchange Commission of Thailand. Macquarie Securities (Thailand) Ltd does not endorse the result of the Corporate Governance Report of Thai Listed Companies but this Report can be accessed at: http://www.thai-iod.com/en/publications.asp?type=4. **South Korea**: In South Korea, unless otherwise stated, research is prepared, issued and distributed by Macquarie Securities Korea Limited, which is regulated by the Financial Supervisory Services. Information on analysts in MSKL is disclosed at http://dis.kofia.or.kr/websquare/index.jsp?w2xPath=/wq/fundMgr/DISFundMgrAnalystStut.xml&divisionId=MDIS03002001000000&serviceId=SDIS03002001000. **South Africa**: In South Africa, research is issued and distributed by Macquarie Equities South Africa (Pty) Ltd, a member of the JSE Limited. **Singapore**: In Singapore, research is issued and distributed by Macquarie Capital Securities (Singapore) Pte Ltd (Company Registration Number: 198702912C), a Capital Markets Services license holder under the Securities and Futures Act to deal in securities and provide custodial services in Singapore. Pursuant to the Financial Advisers (Amendment) Regulations 2005, Macquarie Capital Securities (Singapore) Pte Ltd is exempt from complying with sections 25, 27 and 36 of the Financial Advisers Act. All Singapore-based recipients of research produced by Macquarie Capital (Europe) Limited, Macquarie Capital Markets Canada Ltd, Macquarie Equities South Africa (Pty) Ltd and Macquarie Capital (USA) Inc. represent and warrant that they are institutional investors as defined in the Securities and Futures Act. **United States**: In the United States, research is issued and distr buted by Macquarie Capital (USA) Inc., which is a registered broker-dealer and member of FINRA. Macquarie Capital (USA) Inc, accepts responsibility for the content of each research report prepared by one of its non-US affiliates when the research report is distr buted in the United States by Macquarie Capital (USA) Inc. Macquarie Capital (USA) Inc.'s affiliate's analysts are not registered as research analysts with FINRA, may not be associated persons of Macquarie Capital


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

(USA) Inc., and therefore may not be subject to FINRA rule restrictions on communications with a subject company, public appearances, and trading securities held by a research analyst account. Information regarding futures is provided for reference purposes only and is not a solicitation for purchases or sales of futures. Any persons receiving this report directly from Macquarie Capital (USA) Inc. and wishing to effect a transaction in any security described herein should do so with Macquarie Capital (USA) Inc. Important disclosure information regarding the subject companies covered in this report is available at www.macquarie.com/research/disclosures, or contact your registered representative at 1-888-MAC-STOCK, or write to the Supervisory Analysts, Research Department, Macquarie Securities, 125 W.55th Street, New York, NY 10019.
© Macquarie Group


Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.

# Research

## Heads of Equity Research

Peter Redhead (Global - Head) (852) 3922 4836
Christine Farkas (US) (1 212) 231 6668
Greg MacDonald (Canada) (1 416) 628 3934

## Consumer

Chad Beynon (Head of US Consumer) (1 212) 231 2634
Bob Summers (New York) (1 212) 231 1072
Laurent Vasilescu (New York) (1 212) 231 8046

### Emerging Leaders – Consumer Discretionary

Matthew Brooks (New York) (1 212) 231 1585

### Autos

Takuo Katayama (New York) (1 212) 231 1757

## Energy

### Oil & Gas

Vikas Dwivedi (Head of Oil & Gas, Global Energy Strategist) (1 713) 275 6352
Iain Reid (London) (44 20) 3037 2119

### US Exploration & Production

Paul Grigel (Denver) (1 303) 952 2754

### US Refining

Vikas Dwivedi (Head of Oil & Gas, Global Energy Strategist) (1 713) 275 6352

### Oilfield Services

Walt Chancellor (Houston) (1 713) 275 6230

### International/Canadian Oil & Gas Producers

Brian Bagnell (Calgary) (1 403) 539 8540
Brian Kristjansen (Calgary) (1 403) 539 8508
Tom Hems (Calgary) (1 403) 218 6666

### Energy Infrastructure

David Noseworthy (New York) (1 212) 231 6681

## Financials

### Banks/Trust Banks

David Konrad (New York) (1 212) 231 0525
Jason Bilodeau (Toronto) (1 416) 848 3687

### Property & Casualty Insurance

Amit Kumar (New York) (1 212) 231 8013

## Industrials

### Building Products

Adam Baumgarten (New York) (1 212) 231 0633

### Business Services

Hamzah Mazari (New York) (1 212) 231 2442

### Chemicals

Cooley May (Head of US Basics & Industrials) (1 212) 231 2586

### Diversified Industrials

Jamie Clement (New York) (1 212) 231 0452
Michael Glen (Montreal) (1 514) 905 3636

### Construction & Engineering/Machinery

Sameer Rathod (San Francisco) (1 415) 762 5034
John D'Angelo (Boca Raton) (1 415) 732 5038

### Transports

Konark Gupta (Toronto) (1 416) 848 3539

## Materials

### Steel & Metals

Aldo Mazzaferro (New York) (1 212) 231 0693

### Global Metals & Mining

Michael Siperco (Toronto) (1 416) 848 3520
Matt Murphy (Toronto) (1 416) 848 3541
Michael Gray (Vancouver) (1 604) 639 6372

## Technology

Gus Papageorgiou (Toronto) (1 416) 848 3512

## TMET

### Telecommunications

Amy Yong (New York) (1 212) 231 2624
Greg MacDonald (Toronto) (1 416) 628 3934

### Cable, Satellite & Entertainment

Amy Yong (New York) (1 212) 231 2624
Andrew DeGasperi (New York) (1 212) 231 0649

### Internet

Ben Schachter (New York) (1 212) 231 0644

### Media & Entertainment

Tim Nollen (New York) (1 212) 231 0635

### Semiconductors

Srini Pajjuri (New York) (1 415) 762 5018

### Software

Sarah Hindlian (New York) (1 212) 231 1371

## Utilities & Alternative Energy

Angie Storozynski (Head of US Utilities & Alternative Energy) (1 212) 231 2569
Andrew Weisel (New York) (1 212) 231 1159
James Ward (New York) (1 212) 231 0707
David Noseworthy (New York) (1 212) 231 6681

## Commodities & Precious Metals

Colin Hamilton (Global) (44 20) 3037 4061
Jim Lennon (London) (44 20) 3037 4271

## Economics and Strategy

David Doyle (Toronto) (1 416) 848 3663

## Quantitative Analysis

Gurvinder Brar (Mumbai) (9197) 8055 5902
Steve Gao (London) (44 20) 3037 2765
Giuliano De Rossi (London) (44 20) 3037 1997

## Find our research at

Macquarie: www.macquarieresearch.com/ideas/
Thomson: www.thomson.com/financial
Reuters: www.knowledge.reuters.com
Bloomberg: MAC GO
Factset: http://www.factset.com/home.aspx
CapitalIQ www.capitaliq.com
Contact macresearch@macquarie.com for access requests.

## Email addresses

FirstName.Surname@macquarie.com
eg. peter.redhead@macquarie.com

# Equities

## Head of US Equities

Robert Ansell (New York) (1 212) 231 0888

## Head of Canadian Equities

David Washburn (Toronto) (1 416) 848 3631

# Sales

## US Sales

Khristina McLaughlin (New York) (1 212) 231 8012
Jeff Evans (Boston) (1 617) 598 2508
Lisa Sowell (Atlanta) (1 212) 231 1787
Simon Barrington (London) (44 20) 3037 4927
Troy Pilalas (San Francisco) (1 415) 762 5025

## Canada Sales

David Ricciardelli (Toronto) (1 416) 572 7150

# Trading

## US Sales Trading

J.T. Cacciabaudo (New York) (1 212) 231 6381

## Canada Trading

Perry Catellier (Co-head, Toronto) (1 416) 848 3619
Michael O'Rourke (Co-head, Toronto) (1 416) 848 3633

## International Sales Trading

Mike Gray (New York) (1 212) 231 0928

Provided for the exclusive use of Travis Gilbert at Occidental Petroleum on 29-Apr-2021 01:44 PM.
This publication was disseminated on 03 May 2017 at 08:00 UTC.

# EXHIBIT 39

# Anadarko Petroleum Corp.

## Large Exploration Expense Drives 1Q17 EPS/CFPS Miss but EBITDX Beats; Maintains 2017 Guidance

Equities

Americas
Oil Companies, Secondary

| | |
|---|---|
| 12-month rating | Buy |
| 12m price target | US$80.00 |
| Price | US$56.28 |

RIC: APC.N BBG: APC US

| Trading data and key metrics | |
|---|---|
| 52-wk range | US$72.69-44.99 |
| Market cap. | US$31.5bn |
| Shares o/s | 560m (COM) |
| Free float | 100% |
| Avg. daily volume ('000) | 1,167 |
| Avg. daily value (m) | US$73.3 |
| Common s/h equity (12/17E) | US$15.4bn |
| P/BV (12/17E) | 2.0x |

EPS (UBS, diluted) (US$)

| | 12/17E | | | |
|---|---|---|---|---|
| | From | To | % ch | Cons. |
| Q1 | (0.28) | (0.60) | NM | (0.24) |
| Q2E | (0.02) | (0.06) | NM | (0.08) |
| Q3E | 0.17 | 0.18 | 6 | 0.02 |
| Q4E | 0.33 | 0.37 | 12 | 0.08 |
| 12/17E | 0.20 | (0.10) | NM | (0.23) |
| 12/18E | 1.80 | 1.50 | -17 | 0.64 |
| 12/19E | 3.65 | 3.65 | NM | 2.17 |

William A. Featherston
Analyst
william.featherston@ubs.com
+1-212-713 9701

Michael Ziffer, CFA
Associate Analyst
michael.ziffer@ubs.com
+1-212-713 2257

Christopher Zhang, CFA
Associate Analyst
christopher.zhang@ubs.com
+1-212-713 9957

### 1Q EPS/CFPS misses on large exploration expense but EBITDX beats

Clean 1Q EPS (loss) of ($0.60) was much wider than UBSe of ($0.28) & consensus of ($0.24) with the miss vs. UBSe driven entirely by a much higher than expected exploration expense due to the dry hole at Shenandoah-6 (impacting EPS by >$0.30/share). CFPS of $1.84 also missed consensus' $1.99 & UBSe of $2.11 while EBITDX of ~$1.66bn exceeded expectations. Production fell 4% YoY to 795 MBoed, towards the high end its "adjusted" guidance range of 779-801 MBoed (including volumes from divested assets) but just below UBSe of 801 MBoed. Per-unit costs rose 29% YoY to $6.57/Mcfe, ~9% above UBSe due to the higher exploration expense.

### No change to 2017 guidance but 2Q volume guide a bit light vs. expectations

APC maintained its 2017 guidance which includes a capex budget of $4.5-$4.7bn (+60-68% YoY) and volumes of 644-655 MBoed (roughly flat YoY pro-forma for divestitures). Production guidance excludes volumes associated with its recent Eagle Ford and Marcellus divestitures that closed in 1Q17 (contributed a combined ~124 MBoed during the quarter) implying APC's "reported" production is ~675-686 MBoed. APC also disclosed 2Q17 volume guidance of 626-648 MBoed, below consensus of 663 MBoed and our prior estimate of 653 MBoed. We lowered our 2017 CFPS estimate from $9.15 to $8.90 (mostly on the 1Q miss) and made minor changes to 2018 CFPS.

### Other key takeaways from 1Q results:

1) investigators confirmed the recent home explosion in Firestone, CO was caused by an abandoned, severed one inch gas line that was still connected to APC's nearby well & had not been sealed off properly (several uncertainties are still under investigation including when the line was cut, how it was cut, and who is responsible); 2) currently at 15 rigs and 6 rigs in the Delaware and DJ Basins, respectively (vs. 9 and 5 rigs at YE16); 3) testing a new completion design in the DJ Basin with cumulative oil production outperforming current type curve by >10% after ~100 days; & 4) Calpurnia (deepwater GoM) and Gorgon (Colombia) exploration wells encountered 20 feet of net oil pay and 260-360 feet of gas pay, respectively, while the Shenandoah-6 appraisal well was dry .

### Valuation: discount to peers on price/NAV and EV/DACF

Our $80 price target assumes ~0.70x NAV, or 7.0x normalized 2017E DACF.

| Highlights (US$m) | 12/14 | 12/15 | 12/16 | 12/17E | 12/18E | 12/19E | 12/20E | 12/21E |
|---|---|---|---|---|---|---|---|---|
| EBITDX | 10,878 | 5,126 | 4,324 | 6,866 | 8,454 | 10,573 | 11,649 | 12,716 |
| DACF | 9,683 | 5,333 | 3,647 | 5,665 | 7,230 | 9,965 | 10,969 | 11,466 |
| CFPS (UBS, US$) | 17.83 | 8.87 | 5.30 | 8.90 | 11.65 | 14.85 | 16.40 | 17.90 |
| EPS (UBS, US$) | 4.13 | (2.01) | (3.08) | (0.10) | 1.50 | 3.65 | 4.25 | 4.95 |
| **Profitability/valuation** | **12/14** | **12/15** | **12/16** | **12/17E** | **12/18E** | **12/19E** | **12/20E** | **12/21E** |
| Prod per share growth % | 7.2 | -1.2 | -9.0 | -17.1 | 3.8 | 7.5 | 6.5 | 7.5 |
| ROACE % | 5.3 | (0.4) | (1.5) | 1.3 | 3.8 | 6.5 | 7.1 | 7.5 |
| EV/EBITDX x | 5.6 | 10.4 | 9.8 | 6.4 | 5.1 | 4.0 | 3.5 | 3.1 |
| EV/DACF x | 6.3 | 10.0 | 11.6 | 7.8 | 5.9 | 4.2 | 3.7 | 3.4 |
| P/CFPS (UBS) x | 5.3 | 8.5 | 10.0 | 6.3 | 4.8 | 3.8 | 3.4 | 3.1 |

Source: Company accounts, Thomson Reuters, UBS estimates. Metrics marked as (UBS) have had analyst adjustments applied. Valuations: based on an average share price that year, (E): based on a share price of US$56.28 on 02 May 2017 19:34 EDT

www.ubs.com/investmentresearch

This report has been prepared by UBS Securities LLC. **ANALYST CERTIFICATION AND REQUIRED DISCLOSURES BEGIN ON PAGE 25.** UBS does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

**UBS Research THESIS MAP** a guide to our thinking and what's where in this report

PIVOTAL QUESTIONS

**Q: Can a large-cap, global E&P offer attractive long-term oil growth?**

While there is investor concern that large-cap, global E&Ps will struggle to deliver competitive long-term growth, APC is an exception. Notably, APC plans to direct the ~$6 billion in free cash flow that should be generated from its recently acquired deepwater Gulf of Mexico assets over the next five years to its onshore activities in the Delaware and DJ Basins where it has added a combined 13 rigs since 3Q and expects to increase activity further which should more than double its production from these fields to 600+ MBoed by 2020. This should enable +15% (+11% organically, ex Gulf Mexico acquisition) companywide oil CAGR from 2016-21, assuming ~$55/Bbl WTI and $3/Mcf Henry Hub. Compared to other large-cap E&Ps that can deliver comparable long-term growth, APC trades at a discount to these peers.

**Q: What does APC plan to do with its large cash position?**

After closing its Marcellus and Eagle Ford divestitures last quarter, APC now has ~$5.8 billion of cash on its balance sheet. We expect it to seek bolt-on acquisition opportunities in the Delaware and DJ basins to deploy this cash. Should no attractive M&A opportunities arise and if oil prices remain above $50/Bbl, we would expect APC to boost its capex to levels in excess of operating cash flow and accelerate longer-term growth above its +15% CAGR target.

UBS VIEW

APC should deliver above-average cash flow per debt-adjusted share growth over the next several years and has a significant inventory of unbooked deepwater discoveries & unconventional US resources that offer longer term growth opportunities or are asset monetization candidates to improve its balance sheet and/or help fund its development projects. Notably, APC plans to direct the free cash flow from its recently acquired Gulf of Mexico assets to accelerating US onshore activity which should enable companywide oil growth of +15% (+11% organically) per annum through 2020 assuming ~$55/Bbl (vs. peers' mid-single digit growth). And following asset sale proceeds of >$7bn since the beginning of 2016, we expect it will continue to evaluate material divestitures which should help close its price/NAV discount vs. peers.

EVIDENCE

Outperforms peers on several key metrics: 1) above-avg unbooked-to-proved ratio (~6.7x vs. large cap peers' ~4.5x); 2) 2017-21 cash flow per debt-adjusted share growth (metric with highest correlation to intra-sector relative performance) of ~10% per annum (vs. peers' ~8%) at futures strip prices; & 3) 2018-20 oil growth of ~13% per annum (vs. peers of ~9% per annum)

WHAT'S PRICED IN?

At strip prices, APC is trading at a P/NAV of 0.69x vs. peers' 1.28x. APC also trades at a ~1 turn discount to peers on 2018E EV/DACF, vs. its historical ~0.2x turn premium to the group.

UPSIDE / DOWNSIDE SPECTRUM




Source: UBS

more→

COMPANY DESCRIPTION

Anadarko Petroleum is an independent oil and gas exploration and production company with operations in onshore resource plays in the Rocky Mountains, the southern US, and the...

more →

William A. Featherston, Analyst, william.featherston@ubs.com, +1-212-713 9701

COMMENTARY

return ↑

## Key Highlights from 1Q Results

- **APC maintained its 2017 capex budget of $4.5-$4.7 billion (up ~60-68% YoY and excluding WES spending of ~$930 million).** We'd note APC is allocating ~$560 million to midstream spend this year, well above last year's midstream capex of ~$150 million). The bulk (~80%) of APC's capex will be allocated towards its **U.S. onshore upstream and midstream developments** where it expects to spend ~$1.9 billion, of which ~$840 million and ~$820 million will be spent in the DJ and Delaware Basins upstream activity, respectively. The company is planning to average 10-14 rigs to drill >150 gross wells (vs. an average of ~7 rigs and ~104 wells last year) in the Delaware Basin and 5-6 rigs to drill ~290 wells (vs. an average of ~2 rigs and ~90 wells last year). APC also expects to spend ~$560 million on the expansion of its midstream infrastructure in the Delaware Basin. Meanwhile, APC is planning to spend ~$1.1 billion on its **deepwater Gulf of Mexico, Algeria, and Ghana assets** and another ~$650 on **exploration** to drill up to 10 exploration/appraisal wells in the deepwater Gulf of Mexico, Cote d'Ivoire, and Colombia. APC will also spend ~$120 million on its Mozambique LNG project and ~$100 million on corporate/other. ***Assuming 2017 capex of ~$4.6 billion and current futures strip prices, we forecast APC will generate a FCF deficit (after dividends) this year of ~$455 million.***

- **APC also reiterated its 2017 production guidance of 644-655 MBoed (357-362 MBbld oil) which excludes volumes associated with its Eagle Ford and Marcellus divestitures that closed in 1Q17.** But with Eagle Ford and Marcellus contributing ~40 MBoed and ~84 MBoed to 1Q volumes, respectively, we estimate APC's implied "reported" production range is ~675-686 MBoed (see Figure 1 below). Meanwhile, APC's 2017 production guidance includes volumes (~80 MBoed, ~80% oil) from its Gulf of Mexico acquisition which closed on December 15th and we estimate implies a pro-forma 2016 base of ~651 MBoed (Figure 2 below). Thus, we estimate APC's "organic" total and oil production growth for 2017 is roughly flat and up ~3% YoY, respectively while natural gas should decline ~7% YoY and NGLs should increase ~9% YoY. *We left our FY17 production estimate roughly unchanged at ~688 MBoed, at the high end of APC's implied "reported" volume guidance.*

**Figure 1: APC's Same-Store Sales and Implied Reported Production Guidance in 2017 vs. 2016**

| | 2016 | 2017 (1) |
|---|---|---|
| Oil (MBbld) | 287 | 360 |
| NGLs (MBbld) | 90 | 98 |
| Natural Gas (MMcfd) | 1,187 | 1,185 |
| **Total "Same-Store Sales"(MBoed)** | **575** | **655** |
| Eagle Ford (MBoed) - closed March 1st | | 10 |
| Marcellus (MBoed) - closed March 31st | | 21 |
| **Total "Reported" Production (MBoed)** | **793** | **686** |

Source: Company documents and UBS estimates

(1) assumes mid-point of APC's 2017 production guidance

**Figure 2: APC's Pro-Forma (Adjusted for GoM Acquisition) Production Guidance in 2017 vs. 2016**

| | 2016 (1) | 2017 | YoY Change |
|---|---|---|---|
| Oil (MBbld) | 348 | 360 | 3.4% |
| NGLs (MBbld) | 90 | 98 | 8.9% |
| Natural Gas (MMcfd) | 1,279 | 1,185 | -7.4% |
| **Total Pro-Forma Production (MBoed)** | **651** | **655** | **0.6%** |

Source: Company documents and UBS estimates

(1) assumes ~80 MBoed from GoM acquisition is in for FY16

- **APC disclosed 2Q17 volume guidance of 626-648 MBoed, below consensus of 663 MBoed and our prior estimate of 653 MBoed.** We'd note APC has a strong track record of setting conservative quarterly targets as well as initial annual production targets which it then beats. As outlined in Figure 3 below, APC has reported quarterly production above the mid-point of its original guidance range in 24 of the past 25 quarters by an average of 2.4%. And as shown in Figure 4, APC has beaten the mid-point of the full year guidance it provides at the beginning of each year for each of the last eight years, and has exceeded the top end of the range in six of those years.

**Figure 3: APC Has Historically Exceeded the High End of Quarterly Guidance**

| | APC Guidance (MBoed) | Midpoint of Guidance | Reported Production | Production Beat vs. Midpoint | Production Beat vs. High End |
|---|---|---|---|---|---|
| 1Q17 | 656-678 | 667 | 671 (1) | **0.6%** | -1.0% |
| 4Q16 | 696-717 | 706.5 | 739 (2) | **4.6%** | 3.1% |
| 3Q16 | 739-761 | 750 | 780 | **4.0%** | 2.5% |
| 2Q16 | 780-802 | 791 | 792 | **0.1%** | -1.2% |
| 1Q16 | 813-815 | 824 | 827 | **0.4%** | -1.0% |
| 4Q15 | 739-761 | 750 | 779 | **3.9%** | 2.4% |
| 3Q15 | 772-793 | 782.5 | 787 | **0.6%** | -0.8% |
| 2Q15 | 846-868 | 857 | 846 | **-1.3%** | -2.5% |
| 1Q15 | 878-907 | 892.5 | 934.3 | **4.7%** | 3.0% |
| 4Q14 | 837-859 | 848 | 853.8 | **0.7%** | -0.6% |
| 3Q14 | 826-848 | 837 | 848.7 | **1.4%** | 0.1% |
| 2Q14 | 791-813 | 802 | 847.7 | **5.7%** | 4.3% |
| 1Q14 | 770-793 | 781.5 | 802 | **2.6%** | 1.1% |
| 4Q13 | 771-791 | 781 | 805.5 | **3.1%** | 1.8% |
| 3Q13 | 757-779 | 768 | 775.2 | **0.9%** | -0.5% |
| 2Q13 | 730-756 | 743 | 750.2 | **1.0%** | -0.8% |
| 1Q13 | 740-769 | 754.5 | 793.2 | **5.1%** | 3.1% |
| 4Q12 | 707-730 | 718.5 | 741.2 | **3.2%** | 1.5% |
| 3Q12 | 707-725 | 716 | 738.5 | **3.1%** | 1.9% |
| 2Q12 | 708-722 | 715 | 742 | **3.8%** | 2.8% |
| 1Q12 | 671.5-687.7 | 679.6 | 703.7 | **3.5%** | 2.3% |
| 4Q11 | 652-681 | 666.5 | 683 | **2.5%** | 0.3% |
| 3Q11 | 636-661 | 648.5 | 659.5 | **1.7%** | -0.2% |
| 2Q11 | 667-686 | 676.5 | 684.7 | **1.2%** | -0.2% |
| 1Q11 | 666-685 | 675.5 | 690 | **2.1%** | 0.7% |

Source: Company documents

(1) Excludes volumes associated with asset sales which contributed 124 MBoed to 1Q17 production but excluded from APC's guidance

(2) Excludes volumes associated with asset sales and acquisitions which contributed 35 MBoed to 4Q16 production but excluded from APC's guidance

**Figure 4: APC's Track Record of Exceeding Full Year Production Guidance**

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* | 2016* |
|---|---|---|---|---|---|---|---|---|
| Production Growth Guidance (Start of Year) | 1-3% | 3-5% | 4-6% | 3-5% | 3.8-6.5% | 6-7% | (2%)-0% | (2%)-(4)% |
| Full Year Production Growth | 7% | 7% | 6% | 8% | 6.2% | 7.8% | 4.0% | 2.7% |
| **Beat vs. Midpoint of Guidance** | **5%** | **3%** | **1%** | **4%** | **1%** | **1%** | **5.0%** | **4.7%** |

Source: Company documents

*Adjusted 2015 full-year production growth to exclude ~31.1 MBoed from asset sales (APC's reported 2015 volumes were 836.1 MBoed and pro-forma – adjusted for asset sales – is 805 MBoed)

*Adjusted 2016 full-year production growth to exclude ~67 MBoed from asset sales/acquisitions (APC's reported 2016 volumes were 793 MBoed and pro-forma – adjusted for asset sales – is 726 MBoed)

- **APC made no change to its long-term (2016-21) oil production CAGR of +15% with a 2021 target of ~600 MBbld of oil production.** However, we'd note that its long-term oil production CAGR removes volumes from its 2016 base related to its Gulf of Mexico acquisition; including these volumes in the 2016 base implies an "organic" oil production CAGR of ~11%. Nonetheless, APC expects to deliver this growth "utilizing cash inflows" at ~$55/Bbl WTI and $3/Mcf Henry Hub…in line with our model's expectations. But assuming the current depressed futures curve, we estimate APC would have free cash flow deficits to the tune of ~$850 million per annum from 2018-20 which could presumably be funded by its cash war chest. APC's long-term production will be supported by the continued growth of its onshore US unconventional portfolio (e.g. Delaware and DJ Basins) and the 3Q16 start-up at the TEN complex in Ghana. In order to achieve this growth, APC expects to ramp activity toward ~600 gross wells/year in each play, up from 90 gross wells in the Delaware and 104 in the DJ Basin turned online last year. ***Beyond this year, we forecast 2018 companywide production growth of ~5% YoY and oil growth of 15%; from 2019-21, we forecast production growth of >7% per annum and growth in oil production of 11% per annum.*** The outsized 2018 oil growth is driven by APC benefitting from adding wells that are currently being choked back after its midstream infrastructure is largely in place and the company shifts to pad development in 2H17.
- **APC expects considerable margin improvement in 2017 on the combination of less gassy assets from divestitures and more oil from its recent Gulf of Mexico acquisition.** For reference, APC divested assets last year with a combined >900 MMcfd of natural gas production (~39% of its FY15 natural gas production) while it acquired Gulf of Mexico assets with production of ~80 MBoed (>80% oil). As such, APC expects its companywide oil mix to increase from ~40% in 2016 to ~55% this year which should boost its EBITDX/Boe by ~25% YoY from ~$19.50 last year to ~$24 in 2017. And we expect its margins to continue improving with its long-term oil production CAGR increasing its oil mix to ~63% by 2020.

- **APC should generate higher cash flow per debt-adjusted share growth over the next several years compared to peers under current futures strip prices.** We prefer to measure E&P companies' growth on a debt-adjusted per share basis given varying degrees of capital allocation between capex, share repurchases, and debt reduction. This metric has the highest correlation to intra-sector relative performance. We forecast APC to generate cash flow per debt-adjusted share growth of 10% annually over 2017-21, compared with the global large cap E&P peer average of 8%. Measured on production per debt-adjusted share, we forecast APC posts a 3% CAGR over 2017-21, roughly in line with the global peer average over the same timeframe. *We outline APC's debt-adjusted production and cash flow growth vs. peers in Figure 5.*

**Figure 5: APC's Debt-Adjusted Production and Cash Flow per Share Growth vs. Peers**

| | Production (Bcfe) per DA Share | | | | | | |
|---|---|---|---|---|---|---|---|
| **Global E&Ps** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **'17-21 CAGR** |
| Apache Corporation | -2% | -10% | 11% | 6% | 4% | 6% | 7% |
| ConocoPhillips | -12% | 0% | -1% | 0% | 0% | -1% | 0% |
| Hess Corporation | -24% | -8% | 3% | 0% | 2% | 4% | 2% |
| Marathon Oil | -31% | -4% | 1% | 10% | 9% | 9% | 7% |
| Murphy Oil | -25% | 0% | 3% | -1% | 4% | -5% | 0% |
| Noble Energy | 4% | -12% | 1% | 16% | 19% | 20% | 14% |
| Occidental Petroleum | -11% | -6% | 5% | 3% | 0% | -1% | 2% |
| **Average** | **-14%** | **-6%** | **3%** | **5%** | **5%** | **5%** | **4%** |
| **Anadarko Petroleum** | **-16%** | **-11%** | **4%** | **4%** | **3%** | **4%** | **3%** |

| | Discretionary Cash Flow per DA Share | | | | | | |
|---|---|---|---|---|---|---|---|
| **Global E&Ps** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **'17-21 CAGR** |
| Apache Corporation | -32% | 33% | 1% | 2% | 12% | 7% | 5% |
| ConocoPhillips | -43% | 67% | 24% | -8% | 2% | -1% | 4% |
| Hess Corporation | -62% | 64% | 1% | 2% | 9% | 10% | 6% |
| Marathon Oil | -52% | 80% | 0% | 17% | 17% | 17% | 13% |
| Murphy Oil | -46% | 54% | 0% | -6% | 4% | -2% | -1% |
| Noble Energy | -24% | -1% | 14% | 28% | 36% | 31% | 27% |
| Occidental Petroleum | -35% | 33% | 7% | 3% | 0% | 2% | 3% |
| **Average** | **-42%** | **47%** | **7%** | **6%** | **12%** | **9%** | **8%** |
| **Anadarko Petroleum** | **-46%** | **54%** | **12%** | **11%** | **9%** | **9%** | **10%** |

Source: UBS Estimates

Note: Based on current NYMEX natural gas, WTI and Brent strip prices (2017- $3.29/MMBtu, $49.26/Bbl & $52.57/Bbl; 2018- $3.07/MMBtu, $49.2/Bbl & $51.37/Bbl; 2019- $2.87/MMBtu, $49.43/Bbl & $51.17/Bbl; 2020- $2.86/MMBtu, $50.09/Bbl & $51.57/Bbl; 2021 & LT- $2.9/MMBtu, $50.74/Bbl & $52.45/Bbl). All figures include the effect of disclosed hedge positions.

- **DJ Basin equities (including APC) have sold off recently after a home explosion occurred near one of APC's legacy vertical wells in Firestone, CO...prompting concerns that the accident may re-open discussions of increased setback rules in the basin.** Last week, APC disclosed it had shut in 13 MBoed (75% natural gas) from ~3,000 legacy vertical wells in the DJ Basin following a home explosion in Firestone, CO which was located ~200

feet from an Anadarko vertical well. APC and other DJ Basin E&Ps have since underperformed the XOP (oil and gas, exploration and production ETF) by 3-4% since the announcement after market close on April 26th (see Figure 6). Yesterday after the market close, investigators confirmed the explosion was caused by an abandoned, severed one inch gas line that was still connected to APC's nearby well that had not been sealed off properly; the odorless gas saturated the nearby soil and seeped into the home through a French drain and a sump pump in the basement, and was ultimately ignited by an unknown cause.

- **There are still several key uncertainties, including** when the line was cut, how it was cut, and who is responsible…all of which will be resolved in the ongoing investigation. However, given two previous attempts by anti-development groups to reduce the pace of oil and gas development in Colorado, we believe this unfortunate tragedy has and may continue to provide headline risk for APC and other operators in the basin.

- **Market concerns stem from Colorado's history of getting public pushback on oil and gas drilling in the state.** For reference, last year there were many different proposed ballot initiatives affecting Colorado's oil and gas industry with the most concerning one being initiative #78. This initiative (which never acquired enough signatures to make it on the ballot) would have required a 2,500-foot buffer (vs. 500 feet currently) between all new oil and gas development, including fracking, from both occupied structures and areas of special concern, including areas such as waterways, public parks, and open spaces. Notably, the proposal would have reduced available drilling locations by >90%. Thus, the recent home explosion in Firestone, CO is prompting concerns that this tragedy will at a minimum raise operating costs and potentially embolden anti-development efforts similar to initiative #78. Fortunately, the Raise the Bar initiative (Amendment 71) passed last year, which makes future ballot initiatives clear a higher hurdle of also securing 2% of eligible voters in each senate district (as well as signatures equalling 5% of the previous elections voter turnout) as well as requiring an initiative to secure >55% approval to pass.

**Figure 6: DJ Basin E&Ps Have Underperformed the XOP by ~3-4% Since 4/26**

| Ticker | 4/26 Closing Price | Current Price | % Change |
|---|---|---|---|
| APC | $59.96 | $56.28 | -6% |
| BBG | $4.06 | $3.59 | -12% |
| PDCE | $58.23 | $54.77 | -6% |
| SYRG | $8.02 | $7.57 | -6% |
| XOG | $16.91 | $15.83 | -6% |
| **Average** | | | **-7%** |
| XOP | $35.87 | $34.67 | -3% |

Source: FactSet

- **APC provided a brief exploration update.** In the **deepwater Gulf of Mexico,** the **Calpurnia** exploration well encountered 20 feet of net-oil pay and was subsequently sidetracked updip where it found nearly 60 net feet of true vertical thickness oil pay. The wellbore was temporarily abandoned and is expected to be utilized for future production as a tieback to one of APC's nearby operated facilities at Heidelberg or Caesar/Tonga with first production possibly within 18 months. Meanwhile, the **Shendandoah-6** appraisal well and subsequent sidetrack did not encounter the oil-water contact on the eastern portion of the field. APC has currently suspended appraisal activity while it evaluates the path forward, including monetizing the field or abandoning it as economics are marginal at current oil prices. We carry just $300 million worth of value for the field in our NAV. In **Colombia**, APC had a discovery at the **Gorgon** exploration well which encountered 260-360 feet of gas pay, its third offshore discovery although we certainly believe it would prefer to find liquids.

## Valuation: Discount to Peers on P/NAV and EV/DACF

- **Large discount to peers on price/NAV basis.** On a price/NAV basis assuming futures strip prices, APC trades at 0.69x NAV, well below the average price/NAV multiple in our large-cap E&P coverage of 1.28x. On the UBS price deck, APC is valued at a 0.49x NAV, also a significant discount to the peer average of 0.65x. We view P/NAV as the most relevant comparative multiple for APC given the material exploration success (e.g., Mozambique) that is not yet contributing to current cash flow but certainly has measurable value, as well as the value of WGP ($7.6 billion of equity net to APC) which contributes minimal cash flow to APC.

- **APC trades at 9.0x and 8.2x 2017-18E DACF under current strip prices, respectively.** Its 2017-18E multiples are ~1x below its peer averages, compared to its historical average of a 0.2x premium, despite material value (Mozambique LNG, WGP) not contributing to 2017-18 cash flow.

- **Adjusting for its stake in WGP, we estimate APC's E&P business is being valued at 8.8x and 8.1x 2017-18E DACF, still 1.2x and 1.0x below the peer averages, respectively under strip,** despite superior debt-adjusted cash flow per share growth outlook.



CONFIDENTIAL UBS00069043

**Figure 7: APC's Valuation vs. Peers Under Various Oil and Gas Price Scenarios**

| | | | Valuation Under UBS Price Deck | | | | | Valuation Under NYMEX Strip Prices | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Price | EV/DACF | EV/DACF | | | P/NAV | | EV/DACF | | | P/NAV | |
| | 5/2/2017 | Hist. Avg. | 2017E | 2018E | 2019E | 1P | 2P | 2017E | 2018E | 2019E | 1P | 2P |
| Apache Corporation | $48.47 | 6.2x | 7.0x | 6.0x | 4.9x | 1.59x | 0.69x | 8.9x | 8.5x | 8.2x | NA | 1.44x |
| Chesapeake Energy | $5.32 | 9.2 | 8.1 | 6.1 | 4.4 | 1.31 | 0.75 | 8.7 | 8.0 | 7.6 | NA | NA |
| ConocoPhillips | $46.70 | 7.1x | 7.6x | 5.4x | 4.7x | NA | NA | 9.4x | 7.9x | 8.6x | NA | NA |
| Devon Energy | $38.85 | 6.8 | 8.7 | 6.6 | 4.9 | 1.25 | 0.57 | 10.2 | 9.7 | 8.9 | 1.91 | 1.24 |
| Encana | $10.59 | NA | 11.4x | 7.7x | 5.2x | NA | 0.53x | 12.8x | 10.0x | 9.3x | NA | 1.20x |
| EOG Resources | $91.87 | 8.2 | 10.2 | 7.6 | 5.4 | NA | 0.68 | 12.4 | 10.6 | 8.7 | 2.26 | 1.30 |
| Hess Corporation | $47.01 | 5.9x | 8.8x | 7.1x | 5.8x | 1.10x | 0.71x | 11.5x | 11.2x | 11.1x | 2.01x | 1.32x |
| Marathon Oil | $14.64 | 6.0 | 7.4 | 5.5 | 3.9 | 1.34 | 0.65 | 8.0 | 7.9 | 6.9 | 2.30 | 1.67 |
| Murphy Oil | $25.91 | 4.8x | 5.3x | 4.4x | 4.0x | 0.98x | 0.60x | 5.9x | 5.9x | 6.0x | NA | 1.33x |
| Noble Energy | $31.42 | 7.5 | 7.7 | 5.8 | 3.9 | NA | 0.51 | 9.3 | 8.2 | 6.6 | 1.94 | 0.89 |
| Occidental Petroleum | $60.04 | 8.4x | 9.8x | 8.1x | 6.9x | 1.16x | 0.76x | 11.7x | 11.0x | 10.8x | 1.38x | 1.15x |
| **Average** | | **7.0x** | **8.4x** | **6.4x** | **4.9x** | **1.25x** | **0.65x** | **10.0x** | **9.1x** | **8.4x** | **1.97x** | **1.28x** |
| **Anadarko Petroleum** | **$56.28** | **7.2x** | **7.7x** | **5.9x** | **4.6x** | **0.90x** | **0.49x** | **9.0x** | **8.2x** | **7.5x** | **1.08x** | **0.69x** |
| **Anadarko Petroleum (exc. WGP)** | | | **7.2x** | **5.3x** | **4.1x** | | | **8.8x** | **8.1x** | **7.6x** | | |

Source: Company reports and UBS estimates

Notes: Based on UBS official NYMEX natural gas and WTI and ICE Brent crude oil commodity price forecasts of: 2017- $3.20/MMBtu, $57.50/Bbl & $59.80/Bbl; 2018- $3.00/MMBtu, $63/Bbl & $65/Bbl; 2019 & LT- $3.25/MMBtu, $68/Bbl & $70/Bbl.

Note: Based on current NYMEX natural gas, WTI and Brent strip prices (2017- $3.29/MMBtu, $49.26/Bbl & $52.57/Bbl; 2018- $3.07/MMBtu, $49.2/Bbl & $51.37/Bbl; 2019- $2.87/MMBtu, $49.43/Bbl & $51.17/Bbl; 2020- $2.86/MMBtu, $50.09/Bbl & $51.57/Bbl; 2021 & LT- $2.9/MMBtu, $50.74/Bbl & $52.45/Bbl). All figures include the effect of disclosed hedge positions.

# Operational Highlights

**Although lower oil prices prompted a near 50% YoY reduction in capital spending last year, APC has materially ramped up US onshore activities since 3Q16 and continued to increase its rig count which currently stands at 21 rigs (up from 17 at the end of January).** APC's long-term production growth will be supported by the continued investment in the Niobrara and Delaware Basin (with most other US onshore development plans cut back almost entirely), the 3Q16 start-up at the TEN complex in Ghana, and the start-up at Mozambique next decade. The company is targeting a 2016-20 oil production CAGR of 15% in a $50-$60/Bbl price environment, and estimates it holds net risked resource potential of +16 BBoe (1.7 BBoe of proved reserves, 5 BBoe in the DJ and Delaware, 2.5 BBoe in other Us onshore, 1.5 BBoe in the deepwater GoM, 3 BBoe in Mozambique, and >2 BBoe risked resources from international and exploration. APC expects to convert 2 BBoe of this resource to proved over the next three years. *We highlight updates for each core operating region below:*

## Onshore Resource Plays

- **In the Permian where it holds 245,000 net acres, APC increased the resource estimate of its southern Delaware Wolfcamp position to 3+ BBoe on its investor call in March from the 2+ BBoe disclosed previously.** APC raised its Wolfcamp A type well EUR from 1,000+ MBoe to 1,500+ MBoe as it changed its type well from a 4,500-foot lateral "short-lateral-equivalent" (SLE) well to a 7,500-foot lateral "mid-lateral-equivalent" (MLE) well. Despite the longer lateral, APC continues to estimate 6,000+ drilling locations for its new Wolfcamp A wells with well cost of $7.0 million (vs $5.1 million for 4,500 foot horizontals implying an 18% reduction in cost per lateral foot) . APC added another 5 rigs in the basin during 1Q and has since brought on one additional rig, boosting its total Permian rig count to 15

operated and four non-operated rigs. APC plans to average 10-14 operated drilling rigs during the year and drill more than 150 operated wells. APC spud 51 wells and turned 21 to sales during 1Q17, supporting a ~9% QoQ increase in production to 54 MBoed (+46% YoY), including 31 MBbld of crude oil. ***Assuming an 1,500 MBoe average EUR per well, we estimate APC's Delaware Wolfcamp position holds ~2.9 BBoe of net resource potential worth ~$27 share to our NAV.***

  - **Outside of the Wolfcamp A, APC also estimates 4,000+ drilling locations with EURs of 900-1,300+ MBoed in the Delaware Basin, bringing 1+ BBoe of potential upside to its resource estimate.** APC is evaluating the potential of Wolfcamp B, C, and D benches, and notes other operators on its offset acreage have been drilling in the Bone Spring and Avalon//Leonard zones.

  - On the March Investor call, APC highlighted potential gas processing constraints in the Delaware Basin, but noted that its relationship with WES and large investment in midstream ($560 million this year) will provide it an advantage.

- **In March, APC also increased the resource estimate for it DJ Basin position to 2+ BBoe from 1.5+ BBoe.** APC has 350,000 net acres prospective for the Niobrara in the core Wattenberg field. APC raised its Niobrara from type well EUR by ~15% to 560 MBoe and 385 MBoe for its wells in the core and extended areas, respectively. Similar to the change in the Delaware Basin, APC changed its DJ Basin type well from a 4,500-foot lateral SLE well to a 6,700-foot lateral MLE well, and raised its well cost to $2.7 million for the new type well from the actual cost of $2.1 million for a SLE well in 4Q16. Adjusting for lateral length, the new type curve economics benefit from a 14% reduction in well cost per horizontal lateral foot. Despite the longer lateral, APC has now identified 3,600+ and 900+ drilling locations for in the core and extended areas, respectively. APC picked up an additional rig in January, bringing its current total to 6 operated rigs; the company also exited 1Q with two completion crews active in the play. It plans to average 5-6 operated rigs and drill ~290 wells this year. APC spud 71 wells and turned 38 to sales during 1Q17, enabling a slight 1% YoY increase in net sales volumes to ~242 MBoed (although oil volumes declined 17% YoY to 79 MBbld oil). While we believe APC's Delaware Basin position has become at least as competitive as Wattenberg in generating attractive returns, both areas remain drivers of APC's long term oil growth. ***Assuming a weighted average EUR of 525 MBoe average EUR per well, we estimate APC's Wattenberg acreage adds ~$14.50/share to our NAV.***

- APC's production from the **Greater Natural Buttes** averaged 53 MBoed (~83% natural gas) in 1Q, down 5% QoQ and 24% YoY. The company dropped its only rig in the play during 1Q16.

## Gulf of Mexico

- **Gulf of Mexico** net sales volumes rose 51% QoQ to 159 MBoed, nearly double year-ago levels, largely reflecting production associated with the FCX

acquisition (closed on December 15) as well as strong performance from Caesar/Tonga and ramp-ups at Heidelberg and K2.

- APC reached first oil at **Lucius** (49% w.i.) in January 2015; the seventh well came online during 3Q16 and enabled the field to reach average nameplate capacity of 80 MBbld during 4Q16. The eighth producing well is scheduled to spud this month with first production expected by year-end 2017. Along with the announcement it is acquiring FCX's deepwater Gulf of Mexico assets, APC raised its recoverable resource estimate for Lucius by 100 MMBoe to +400 MMBoe. *We estimate the development adds ~59 MMBoe of net unbooked resource potential worth ~$1.1 billion or $2.00/share to NAV.*

- At the **Heidelberg** field (44% w.i., post recent acquisition) in the **Gulf of Mexico,** first production commenced in January 2016 from three wells (ahead of original expectations for a 2Q16 start-up) and production from the field is now approaching 40 MBoed. The development's fourth producing well has reached its target rate of 13 MBoed while the fifth well is now online, currently producing 7 MBoed and expected to ramp to a peak rate of ~12 MBoed. *APC estimates Heidelberg holds 200-400 MMBoe of gross resource potential (~116 MMBoe net including ~50 MMBoe unbooked); we value APC's stake in the unbooked resource potential at ~$645 million, or ~$1.15/share.*

- At the **Shenandoah** prospect (33% w.i.), the **Shenandoah-6** appraisal well and subsequent sidetrack well failed to establish oil-water contact on the eastern flank of the field and was declared a dry hole. Results from Shenandoah-6 were key to determining the field's true resource size and progressing towards a final investment decision; appraisal activity has been suspended as the partners evaluate future plans for the project. APC has written off the asset and we no longer ascribe value to it I our NAV.

- The company has stated that its **Gulf of Mexico tie back opportunities generate IRRs of >70% at ~$60/Bbl WTI (and ~30% IRRs at ~$30/Bbl)**, and has identified over 50 such opportunities (including recent acquisition) in the Gulf of Mexico. To that end, it has been named operator after reaching a co-development agreement on the **Constellation** prospect (33% interest). Development drilling will begin in 2Q17 with first production from 2-3 wells tied back to the Constitution spar expected in late 2018. We estimate the field can add 15-20 MBoed of gross production. APC is also evaluating a tie back opportunity at the **Warrior** prospect (65% working interest); it will drill an appraisal well later this quarter, which should dictate timing as to when it could be tied into the Marco Polo facility. Longer term, the **Phobos** prospect (100% working interest) can be tied back at the Lucius facility; however, that facility is currently running at capacity so any future tiebacks will have to await for capacity to become available.

## Ghana

- **Jubilee** (APC 24.1% unitized w.i.) production averaged 82.5 MBbld gross during 1Q, up from 78 MBbld in 4Q. The Tullow Oil-operated Jubilee project is

located on both the Deepwater Tano block (18% w.i.) and West Cape Three Points block (31% w.i.) with total resource potential of 470-1,065 MMBbl gross.

- **The operator expects gross production from Jubilee to be ~68.5 MBbld (~16.5 MBbld net to APC) in 2017, which includes a facility shutdown of up to 12 weeks as previously disclosed.** As announced in February 2016, an issue was identified with the turret bearing of the FPSO which resulted in the need to implement new operating and offtake procedures, resulting in the shutdown of the FPSO for an extended period in April with production resuming in early May. At last update, Tullow noted that since then 18 offtakes to the storage tanker had been successfully completed using a dynamically positioned shuttle tanker. It continued to operate the field under these new procedures for the remainder of 2016.

- **For the long term, Tullow and its partners now see converting the FPSO to a permanently spread moored facility, with offtake through a new deepwater offloading buoy, as the preferred solution.** At last disclosure, the first phase of this work will involve the installation of a stern anchoring system to replace the three heading control tugs. The second phase of work will take place in 1H17 to rotate the FPSO to its optimal spread moor heading. These phases are expected to cost $100-$150 million and require the Jubilee FPSO to be shut-down for 8-12 weeks in 1H17. Upon completion of the spread mooring work in mid-2017, the partners will review opportunities to improve the efficiency, with additional gross operating expenditure of the revised procedures is expected to be ~$115 million for 2016 and $80 million for 2017. Finally, a deepwater offloading buoy is anticipated to be installed in the first half of 2018. While Tullow noted it has a comprehensive package of insurances, APC does not have insurance to cover the facility.

- The **Tweneboa-Enyenra-Ntomme ("TEN")** complex (17% w.i.), located ~30 km west of the Tullow-operated Jubilee Field, achieved first production in mid-August, on time and on budget three years after the Plan of Development was approved by the Government of Ghana in May 2013. It produced ~50 MBbld in 1Q (up from 46 MBbld in 4Q) and FPSO capacity of >80 MBbld was successfully tested during the quarter. WoodMackenzie estimates the TEN complex holds ~280 MMBoe of gross recoverable resource (August 2016 "TEN" report), near the low-end of operator Tullow Oil's 300-500 MMBoe estimate. We estimate the project adds ~$1.25/share to APC's 2P NAV.

- Also in Ghana, at the **Mahogany/Teak/Akasa/Banda (MTAB) complex** on the West Cape Three Points block (31% working interest), APC and partners have filed a development plan to the government that would enable an expansion of the greater Jubilee area to include the MTAB field. While no details were provided, we expect the plan would extend plateau production from the Jubilee FPSO.

## Mozambique LNG

- **Management remains committed to Mozambique LNG, and continues to highlight that the timing of FID is subject to uncertainty regarding its legal and contractual framework, offtake agreements and project financing.**

  - **The critical steps to reaching FID and first production by the end of the decade are: 1) approving a plan of development** – the Development Plan for the initial two-train Golfinho/Atum project was submitted to the Mozambique government during 4Q; **2) converting its HOA off-take agreements to firm purchase & sales agreements** (already secured non-binding HOA for >8 MMTPA, but would like to have binding agreements for ~9-10 MMTPA); and **3) securing project financing** (received indications of interest for 2/3 of the ~$15 billion budget for the first two 6 MMTPA trains). APC estimates it could reach a Final Investment Decision by year end 2017 at the earliest . . . but more likely 2018. Upon reaching FID, first production should commence 4-5 years later.

  - Management has highlighted that it has advanced all critical contracts with the Mozambique government. APC and ENI have jointly submitted the Resettlement Plan which is under review by the government of Mozambique. APC and its partners previously received third-party reserves certification for the Prosperidade complex which straddles the block with ENI's Mamba, as well as reserve certification for Golfino/Atum which is located entirely on APC's block and large enough to supply Mozambique Train 1. APC has also completed the FEED project and selected a consortium (CB&I, Chiyoda Corporation and Saipem (CCS JV)) for the initial development of the onshore LNG park. It estimates its recoverable resource estimate is +75 Tcf on its Area 1 block (26.5% working interest).

- **In March, ExxonMobil (Sell) agreed to acquire from Eni (Buy) a 25% interest in the Area 4 block offshore Mozambique for $2.8bn, providing a valuation marker for APC's 26.5% stake in the adjacent offshore Area 1.** While Area 1 contains the separate (from Area 4) Golfinho and Atum fields, we'd note it also consists of the Prosperidade complex which overlaps with ENI's Area 4 (Mamba). And in late 2015, APC and ENI reached a unitization agreement for the massive natural gas resources straddling the Prosperidade/Mamba reservoirs. Thus, we believe the deal between ENI and XOM highlights the value of Area 1 to APC. Assuming recoverable resource of 65 Tcfe in Area 1 (or ~16 Tcfe net to XOM), we estimate XOM is paying ~$0.175/Mcfe…just below our estimate assumed for APC's stake in Area 1 of ~$0.188/Mcfe. ***As such, we've slightly reduced our estimated value for APC's 26.5% stake in Area 1 to ~$3.5 billion (or $6.30/share) from ~$3.7 billion (or ~$6.75/share).*** Nonetheless, given APC holds an asset worth >$3 billion that will not contribute to cash flow for several years while it trades at a ~1x turn discount to peers on 2018E EV/DACF, we believe the market is putting little to no value on its stake in Mozambique and the deal between XOM and ENI highlights APC's assets clearly has material value. That being

said, we also believe the market would prefer APC to sell some or its entire stake to pull value forward.

## Algeria

- Net sales from **Algeria** averaged 76 MBbld in 1Q17, up 7% YoY and flattish vs. 4Q16. Gross production averaged 374 MBoed during the quarter, down from its recent peak of 404 MBoed in 4Q16.

# Exploration Update

**APC maintains the most robust exploration program in the E&P sector, and has historically beaten annual resource targets prior to 2014.** APC is allocating ~$650 million to exploration in 2017 to drill up to 10 exploration/appraisal wells in the deepwater Gulf of Mexico, Côte d'Ivoire, and Colombia. As a reminder, APC's 2015 and 2016 exploration programs (~$600 million and ~$400 million) targeted >700 MMBoe and 250 MMBoe of resource additions, respectively. In 2014, APC's exploration program targeted >600 MMBoe of resource additions from the ~$800 million in capital allocated to its exploration program, but discovered a disappointing ~200 MMBoe. However, we'd note that in previous years APC had consistently beaten its annual resource targets by a healthy margin (see Figure 8 below).

- **APC's exploration program has been so efficient at discovering large-scale resource at a low cost that it has been able to monetize a portion of its discoveries to effectively fund its efforts.** From 2006-15, APC discovered ~6.5 BBoe of resource with a capital program of ~$10 billion, for an impressive finding cost of ~$1.50/Boe. Over that same time period, it has monetized ~$14 billion of assets, but still has ~5 BBoe of these discoveries under development with ~250 MBoed of net production. In other words, APC's exploration program has effectively been self-funding as it generated so much resource addition that it was able to divest assets that generated value (proceeds and carried interests) in excess of its exploration capex over that time period.

**Figure 8: APC's Historical Resource Adds from Exploration vs. Annual Targets**

| (in MMBoe) | Resource Target | Actual Resource Discovered | % of Target Achieved |
|---|---|---|---|
| 2009 | 200 | 357 | 179% |
| 2010 | 400 | 650+ | 163% |
| 2011 | 500+ | 730 | 146% |
| 2012 | 800+ | 1,500+ | 188% |
| 2013 | 800+ | 900+ | 113% |
| 2014 | 600+ | ~200 | 33% |
| 2015 | 700+ | ? | ? |
| 2016 | 250 | ? | ? |

Source: Company documents

**We outline APC's near term exploration and appraisal activity in each region below:**

- In the **deepwater Gulf of Mexico** APC drilled an exploration well at the Calpurnia prospect and plans to drill 4-5 appraisal wells this year.
  - APC announced the **Calpurnia** exploration well (76.45% w.i.) spud in December encountered 60 net feet of oil pay in Miocene-aged sands. Calpurnia is located near the APC-operated Caesar-Tonga, Heidelberg, and Holstein fields. The wellbore was temporarily abandoned and is expected to be used for future production as a tieback to one of the nearby operated facilities.
  - APC announced it mid-December that its **Warrior** prospect (65% w.i.) encountered >210 net feet of oil pay in multiple high-quality Miocene-aged reservoirs. The Warrior discovery is located approximately 3 miles from the Anadarko-operated K2 field and is expected to be tied back to its Marco Polo production facility. An appraisal well is planned to spud in 2Q17, with results helping dictate the timing of when the prospect would be tied back to Marco Polo.
  - After completing operations on the Warrior exploration well, the rig spud the **Shenandoah-6** appraisal well in December and subsequently drilled a sidetrack, but the well did not encounter the oil-water contact on the eastern flank of the field, which was expected to further quantify the full resource potential. APC has currently suspended appraisal activity at **Shenandoah** (33% w.i.) while it evaluates the path forward (likely to either divest or abandon given challenged economics in a ~$50/Bbl environment).
  - Also in the Shenandoah Basin, a second appraisal well (**Coronado-3**) is planned at the Chevron-operated Coronado discovery (APC 35% w.i.). In March 2013, CVX announced a discovery at the Coronado prospect, which encountered more than 400 feet of net pay in the Inboard Lower Tertiary trend. However, in 2Q14, the initial appraisal well did not find the Lower Miocene objective and was plugged and abandoned.
  - APC also plans to drill a second appraisal well (Phobos-3) at its 2013 **Phobos** discovery (100% w.i.), where it drilled an appraisal well at and encountered >90 net feet of high-quality oil pay in the secondary objective Pliocene-aged reservoir (announced in mid-December) and ~130 net feet of oil pay in a Wilcox-aged reservoirs (the primary objective). Located ~12 miles south of the Lucius spar, Phobos is being evaluated as a potential tieback to Lucius in order to hold volumes at that facility flat; however, with Lucius still at capacity, Phobos is unlikely to be tied back to the facility anytime soon.
- On the Grand Fuerte block (50% w.i.) offshore **Colombia**, APC announced in March a natural gas discovery at the **Purple Angel-1** exploration well which was designed to test objectives similar to those at APC's play-opening Kronos discovery. The well encountered 70-110 feet of gas pay although we expected APC to be targeting oil at Purple Angel. For reference, the 2015 Kronos

discovery on the block encountered 130-230 net feet of gas pay in the upper objective and proved a working hydrocarbon system. Subsequently to the end of 1Q, APC made its third discovery offshore Colombia at the **Gorgon** prospect located ~17 miles north/northeast of Purple Angel-1. The well encountered between 260 - 360 feet of gas pay. This is APC's third gas discovery in Colombia, a geologic success but likely a commercial failure as it seeks to find oil. In the **Grand Col** area (100% w.i.), the entire 30,000km$^2$ Esmeralda 3D survey was complete during 3Q16, and APC is preparing to evaluate potential drilling locations for possible operations in 2018. Overall, APC has ~16 million gross acres offshore Colombia so any success should increase enthusiasm for follow-on potential. And given APC's high working interest in Colombia, any discoveries that reach the development stage would be candidates for the successful JV/carry agreements it used to develop Lucius and Heidelberg in the deepwater Gulf of Mexico.

- Offshore **West Africa** in **Cote d'Ivoire**, APC plans to drill 1-3 exploration/appraisal wells this year. APC plans to spud another appraisal well at its Paon discovery in May (**Paon-6A**, 65% w.i.) to test the updip extent of the oil accumulation in the "South Channel" of the discovery, with a contingent drillstem and interference test planned for late 2017. For reference, APC previously disclosed that it successfully drilled the **Paon**-3A horizontal sidetrack and encountered ~120 net feet of pay. Following the previously completed Paon-3AR and Paon-4A wells, APC's Paon-5A appraisal well encountered nearly 100 net feet of vertical pay during 1Q16. During 3Q16, a drillstem test was also complete at Paon-5A. With equipment-limited maximum stable flow rates at 9 MBbld and 21 MMcfd, the results met deliverability expectations, and the ongoing interference test has confirmed reservoir connectivity. At last update, the partners had begun evaluating development options for the field with project sanction possibly in 1H17 with the next step largely dependent on securing an adequate natural gas offtake contract. Given APC's 65% interest in Paon, we expect APC to try to reduce its working interest by bringing in a third party to fund a significant portion of APC's share of the development. On the exploration front, following Paon-6A, APC plans to drill an exploration well at each of the two opportunities, the **Gendarme** and **Colibri** prospects (90% w.i.), adjacent to its discoveries at the **Pelican** prospect in **Block CI-527** and the **Rossignol** prospect in **Block CI-528** (90% w.i. for both blocks) in 3Q16.

**Figure 9: APC's Exploration Calendar**

| Region | Prospect | Working Interest | Spud Date |
|---|---|---|---|
| Gulf of Mexico | Warrior-2 appraisal | 65% | 2Q17 |
| Gulf of Mexico | Phobos-3 appraisal | 65% | 2017 |
| Gulf of Mexico | Coronado-3 appraisal | 35% | 2017 |
| Cote d'Ivoire | Paon-6 appraisal | 65% | May 2017 |
| Cote d'Ivoire | Gendarme | 90% | 2017 |
| Cote d'Ivoire | Colibri | 90% | 2017 |

Source: UBS estimates and company data

## First Quarter Results Review

- **Clean 1Q17 EPS loss of ($0.60) was much wider than UBSe of ($0.28) and consensus of ($0.24)**. Relative to UBSe, the miss was driven entirely by a much higher than expected exploration expense vs. our estimate due to the dry hole at Shenandoah-6, impacting EPS by >$0.30/share.

- **CFPS of $1.84 missed consensus of $1.99 and UBSe of $2.11.** EBITDX of ~$1.66 billion rose 126% YoY and was above both consensus and UBSe of ~$1.47 billion and ~$1.62 billion, respectively.

- **Companywide sales volumes declined 4% YoY to 795 MBoed, comfortably above the "adjusted" guidance range of 779-801 MBoed (including production from divested assets) but slightly below UBSe of 801 MBoed.** Liquids comprised ~61% of companywide production, above the year ago level of ~54%. Adjusting for asset sales, production was 672 MBoed, in the upper half of the 656-678 MBoed guidance range.

- **Realized commodity prices surged 72% YoY and were 1% above our forecast.** Crude realizations rose 54% YoY to $50.38/Bbl, NGL realizations surged 74% YoY to $26.93/Bbl, and natural gas realizations rose 65% YoY to $2.98/Mcf.

- **Aggregate pre-tax per-unit costs rose 29% YoY to $6.57/Mcfe, 9% above our forecast entirely driven by the higher than expected exploration expense.** APC's 1Q per unit cost is also well above the estimated peer average of $5.66/Mcfe.

- **Adjusted GPM income** of $91 million more than tripled from the year ago $29 million and exceeded our $80 million forecast and the $75-$85 million guidance range.

- The figure below provides the primary factors impacting APC's 1Q17 EPS and CFPS results, as well as outlining the differences between results and our estimates.

**Figure 10: Anadarko Petroleum First Quarter Statistical Summary**

| | First Quarter Results | | | Results vs. Estimates | | | Consensus |
|---|---|---|---|---|---|---|---|
| | 1Q17 | 1Q16 | % Change | 1Q17A | 1Q17E | % Change | |
| **Production Volumes:** | | | | | | | |
| Natural Gas (Bcf) | 167.3 | 209.6 | -19% | 167.3 | 166.9 | 0% | 137.7 |
| Crude Oil (MMBbls) | 33.0 | 28.7 | 17% | 33.0 | 33.3 | -1% | 32.6 |
| Natural Gas Liquids (MMBbls) | 10.6 | 11.6 | -8% | 10.6 | 10.9 | -3% | 10.4 |
| Total (Bcfe) | **429.2** | **451.5** | **-4%** | **429.2** | **432.3** | **-1%** | **396.4** |
| Total (MBoed) | **794.8** | **826.8** | **-4%** | **794.8** | **800.6** | **-1%** | **734.0** |
| **Prices:** | | | | | | | |
| Natural Gas ($/Mcf) | $2.98 | $1.81 | 65% | $2.98 | $3.02 | -1% | $3.09 |
| Crude Oil ($/Bbl) | 50.38 | 32.72 | 54% | 50.38 | 49.21 | 2% | 50.30 |
| Natural Gas Liquids ($/Bbl) | 26.93 | 15.50 | 74% | 26.9 | 26.6 | 1% | 23.81 |
| Total ($/Mcfe) (a) | **$5.70** | **$3.32** | **72%** | **$5.70** | **$5.63** | **1%** | |
| **E&P Unit Costs ($/Mcfe):** | | | | | | | |
| Lifting Cost | $0.60 | $0.46 | 30% | $0.60 | $0.53 | 13% | |
| Transportation | 0.58 | 0.54 | 8% | 0.58 | 0.60 | -3% | |
| Administrative and General | 0.63 | 0.54 | 15% | 0.63 | 0.65 | -4% | |
| DD&A | 2.60 | 2.55 | 2% | 2.60 | 2.65 | -2% | |
| Exploration Expense | 1.29 | 0.28 | 362% | 1.29 | 0.68 | 89% | |
| Interest | 0.52 | 0.49 | 7% | 0.52 | 0.51 | 2% | |
| Production Taxes (% of Rev) | 6.3% | 7.8% | -19% | 6.3% | 7.0% | -10% | |
| Total | **$6.57** | **$5.11** | **29%** | **$6.57** | **$6.01** | **9%** | |
| | 2.69 | | | | | | |
| **Pre-Tax Income Per Mcfe** | **($0.87)** | **($1.80)** | **-51%** | **($0.87)** | **($0.38)** | **128%** | |
| **Cash Flow Per Mcfe** | **$2.36** | **$0.86** | **174%** | **$2.36** | **$2.69** | **-12%** | |
| **Earnings Per Share** | **($0.60)** | **($1.12)** | **-47%** | **($0.60)** | **($0.28)** | **113%** | **($0.24)** |
| **Cash Flow Per Share** | **$1.84** | **$0.76** | **141%** | **$1.84** | **$2.11** | **-13%** | **$1.99** |
| **EBITDX** | **$1,659** | **$733** | **126%** | **$1,659** | **$1,615** | **3%** | **$1,466** |

Source: Company documents and UBS estimates

## Figure 11: APC's Production, Price Realizations, and Per-Unit Costs (2014-2021E)

| | | | 2016 | | | | | 2017E | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 1QA | 2QA | 3QA | 4QA | 2016 | 1QA | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
| **Production Volumes:** | | | | | | | | | | | | | | | | |
| Natural Gas (Bcf) | | | | | | | | | | | | | | | | |
| U.S. | **945.1** | **852.0** | 209.6 | 199.1 | 184.3 | 173.1 | **766.0** | 167.3 | 113.8 | 106.9 | 100.5 | **488.5** | **411.7** | **399.4** | **387.4** | **375.8** |
| Canada | | | | | | | | | | | | | | | | |
| Other International | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Natural Gas Total (Bcf) | **945.1** | **852.0** | 209.6 | 199.1 | 184.3 | 173.1 | **766.0** | 167.3 | 113.8 | 106.9 | 100.5 | **488.5** | **411.7** | **399.4** | **387.4** | **375.8** |
| | **-2%** | | | | | | | | | | | | | | | |
| Crude Oil (MMBbls) | | | | | | | | | | | | | | | | |
| US | **73.9** | **84.8** | 21.1 | 20.7 | 21.4 | 22.1 | **85.3** | 24.2 | 22.9 | 25.5 | 28.5 | **101.1** | **121.9** | **140.8** | **158.0** | **177.0** |
| Alaska | | | | | | | | | | | | | | | | |
| Algeria | **24.1** | **21.6** | 5.9 | 5.4 | 6.0 | 6.3 | **23.5** | 6.3 | 5.6 | 5.1 | 5.1 | **22.1** | **22.1** | **22.1** | **22.1** | **22.1** |
| Canada | | | | | | | | | | | | | | | | |
| Other International | **8.3** | **9.4** | 1.6 | 0.9 | 1.7 | 2.6 | **6.9** | 2.5 | 2.5 | 2.1 | 2.3 | **9.5** | **8.8** | **9.9** | **11.0** | **11.0** |
| Crude Oil Total (MMBbl) | **106.3** | **115.9** | 28.7 | 26.9 | 29.2 | 30.9 | **115.7** | 33.0 | 31.1 | 32.6 | 35.9 | **132.7** | **152.7** | **172.8** | **191.1** | **210.0** |
| Natural Gas Liquids (MMBbls) | | | | | | | | | | | | | | | | |
| U.S. & Canada | **42.6** | **45.1** | 11.1 | 11.5 | 11.2 | 10.7 | **44.5** | 10.1 | 8.5 | 8.3 | 8.0 | **34.8** | **39.0** | **42.9** | **47.2** | **51.0** |
| Algeria | **1.1** | **2.2** | 0.5 | 0.5 | 0.6 | 0.7 | **2.4** | 0.5 | 0.5 | 0.5 | 0.5 | **2.1** | **2.0** | **1.9** | **1.8** | **1.7** |
| Natural Gas Liquids Total (MMBbl) | **43.7** | **47.3** | 11.6 | 11.9 | 11.9 | 11.4 | **46.8** | 10.6 | 9.0 | 8.7 | 8.5 | **36.9** | **41.0** | **44.8** | **49.0** | **52.7** |
| **Prices:** | | | | | | | | | | | | | | | | |
| Natural Gas ($/Mcf) | | | | | | | | | | | | | | | | |
| UBS Forecast (NGW) | | | | | | | | | | | | | | | | |
| UBS Forecast (Henry Hub) | **$4.45** | **$2.67** | **$2.09** | **$1.95** | **$2.81** | **$2.98** | **$2.46** | **$3.32** | **$3.25** | **$3.00** | **$3.25** | **$3.20** | **$3.00** | **$3.25** | **$3.25** | **$3.25** |
| U.S. | **3.98** | **2.72** | 1.81 | 1.62 | 2.35 | 2.56 | **2.06** | 2.98 | 2.95 | 2.70 | 2.95 | **2.90** | **2.65** | **2.90** | **2.90** | **2.90** |
| Canada | | | | | | | | | | | | | | | | |
| Other International | **0.0** | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |
| | **$3.98** | **$2.72** | $1.81 | $1.62 | $2.35 | $2.56 | **$2.06** | $2.98 | $2.95 | $2.70 | $2.95 | **$2.90** | **$2.65** | **$2.90** | **$2.90** | **$2.90** |
| Differentials to: NYMEX Henry Hub | | | | | | | | | | | | | | | | |
| United States | **($0.41)** | **($0.34)** | ($0.28) | ($0.33) | ($0.46) | ($0.42) | **($0.37)** | ($0.34) | ($0.30) | ($0.30) | ($0.30) | **($0.31)** | **($0.35)** | **($0.35)** | **($0.35)** | **($0.35)** |
| Canada | | | | | | | | | | | | | | | | |
| Crude Oil ($/Bbl) | | | | | | | | | | | | | | | | |
| UBS Forecast (WTI) | **$92.89** | **$48.81** | **$33.64** | **$45.59** | **$44.92** | **$49.16** | **$43.35** | **$51.77** | **$55.50** | **$60.50** | **$62.00** | **$57.50** | **$63.00** | **$68.00** | **$68.00** | **$68.00** |
| UBS Forecast (Brent) | **$99.38** | **$53.57** | **$35.32** | **$47.41** | **$47.46** | **$51.95** | **$45.56** | **$55.11** | **$57.50** | **$62.50** | **$64.00** | **$59.80** | **$65.00** | **$70.00** | **$70.00** | **$70.00** |
| US | **91.4** | **45.1** | 32.23 | 43.15 | 44.36 | 48.12 | **42.0** | 49.29 | 53.00 | 57.52 | 58.74 | **54.9** | **60.5** | **65.5** | **65.5** | **65.5** |
| Alaska | | | | | | | | | | | | | | | | |
| Algeria | **107.7** | **51.9** | 34.62 | 46.65 | 45.88 | 49.39 | **44.2** | 53.20 | 55.50 | 60.50 | 61.43 | **57.4** | **63.0** | **68.0** | **68.0** | **68.0** |
| Canada | | | | | | | | | | | | | | | | |
| Other International | **103.3** | **51.0** | 32.27 | 47.37 | 45.61 | 47.18 | **43.3** | 53.77 | 55.50 | 60.50 | 62.00 | **57.7** | **63.0** | **68.0** | **68.0** | **68.0** |
| Crude Oil Total ($/Bbl) | **$96.03** | **$46.84** | $32.72 | $43.99 | $44.75 | $48.30 | **$42.54** | $50.38 | $53.66 | $58.17 | $59.33 | **$55.49** | **$61.00** | **$65.96** | **$65.93** | **$65.89** |
| Differentials to: NYMEX WTI | | | | | | | | | | | | | | | | |
| US | **($1.98)** | **($3.85)** | ($4.65) | ($4.58) | ($2.84) | ($2.10) | **($3.52)** | ($2.48) | ($2.50) | ($2.50) | ($2.50) | **($2.49)** | **($2.50)** | **($2.50)** | **($2.50)** | **($2.50)** |
| Algeria | **($1.99)** | **($1.40)** | ($4.08) | ($4.43) | ($4.90) | ($4.54) | **($4.49)** | ($1.91) | ($2.00) | ($2.00) | ($2.00) | **($1.98)** | **($2.00)** | **($2.00)** | **($2.00)** | **($2.00)** |
| Canada | | | | | | | | | | | | | | | | |
| Other International | **$0.67** | **($3.07)** | ($3.05) | ($0.04) | ($1.85) | ($4.77) | **($2.46)** | ($1.34) | ($2.00) | ($2.00) | ($2.00) | **($1.84)** | **($2.00)** | **($2.00)** | **($2.00)** | **($2.00)** |
| Natural Gas Liquids ($/Bbl) | | | | | | | | | | | | | | | | |
| U.S. & Canada | **$35.63** | **$17.37** | $15.14 | $19.36 | $18.77 | $24.25 | **$19.33** | $26.36 | $27.20 | $29.65 | $30.38 | **$28.27** | **$31.22** | **$34.38** | **$34.38** | **$34.38** |
| Algeria | **56.0** | **30.1** | 22.8 | 24.1 | 23.74 | 30.1 | **25.6** | 37.6 | 40.3 | 43.9 | 45.0 | **41.6** | **45.7** | **49.3** | **49.3** | **49.3** |
| Natural Gas Liquids Total ($/Bbl) | **36.08** | **17.96** | 15.50 | 19.55 | 19.04 | 24.63 | **19.65** | 26.93 | 27.99 | 30.40 | 31.30 | **29.02** | **31.92** | **35.01** | **34.92** | **34.86** |
| Differentials to: NYMEX WTI | | | | | | | | | | | | | | | | |
| US | **38%** | **36%** | 45% | 42% | 42% | 49% | **45%** | 51% | 49% | 49% | 49% | **50%** | **50%** | **51%** | **51%** | **51%** |
| Algeria | **73%** | **62%** | 68% | 53% | 53% | 61% | **59%** | 73% | 73% | 73% | 73% | **73%** | **73%** | **73%** | **73%** | **73%** |
| **E&P Unit Costs ($/Mcfe):** | | | | | | | | | | | | | | | | |
| Lifting Cost | **$0.64** | **$0.55** | $0.46 | $0.47 | $0.46 | $0.48 | **$0.47** | $0.60 | $0.70 | $0.70 | $0.70 | **$0.67** | **$0.70** | **$0.70** | **$0.70** | **$0.70** |
| Transportation | **0.64** | **0.62** | 0.54 | 0.57 | 0.59 | 0.60 | **0.58** | 0.58 | 0.58 | 0.58 | 0.58 | **0.58** | **0.58** | **0.58** | **0.58** | **0.58** |
| Administrative and General | **0.71** | **0.67** | 0.54 | 0.59 | 0.58 | 0.70 | **0.60** | 0.63 | 0.76 | 0.70 | 0.70 | **0.69** | **0.68** | **0.64** | **0.62** | **0.60** |
| DD&A | **2.47** | **2.51** | 2.55 | 2.28 | 2.48 | 2.57 | **2.47** | 2.60 | 3.05 | 3.05 | 3.05 | **2.92** | **3.00** | **3.00** | **3.00** | **3.00** |
| Exploration Expense | **0.76** | **0.42** | 0.28 | 0.18 | 0.71 | 0.68 | **0.46** | 1.29 | 0.50 | 0.55 | 0.55 | **0.75** | **0.65** | **0.50** | **0.50** | **0.50** |
| Amortization of Goodwill | **0.0** | **0.0** | 0.0 | 0.0 | 1.0 | 0.0 | **0.0** | 0.0 | 0.0 | 0.0 | 0.0 | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |
| Production Taxes (% of Rev) - inc Algeria | **8.0%** | **6.4%** | 7.8% | 9.0% | 7.5% | 5.1% | **7.2%** | 6.3% | 7.0% | 6.5% | 6.5% | **6.6%** | **6.6%** | **6.6%** | **6.6%** | **6.6%** |
| Production Taxes (% of Rev) - ex Algeria | **9.6%** | **7.4%** | 7.8% | 9.0% | 7.5% | 5.1% | **8.4%** | 6.3% | | | | | | | | |

Source: UBS estimates and Company documents



CONFIDENTIAL UBS00069054

## Figure 12: APC's Income Statement and Discretionary Cash Flow (2014-2021E)

| | | | 2016 | | | | | 2017E | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Millions, except per share amounts) | 2014 | 2015 | 1QA | 2QA | 3QA | 4QA | 2016 | 1QA | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
| **Revenues:** | | | | | | | | | | | | | | | | |
| Natural Gas Sales | $3,764 | $2,319 | $379 | $322 | $433 | $443 | $1,577 | $498 | $336 | $289 | $297 | $1,419 | $1,091 | $1,158 | $1,123 | $1,090 |
| Oil and Condensate Sales | 10,204 | 5,426 | 938 | 1,185 | 1,305 | 1,493 | 4,921 | 1,664 | 1,670 | 1,898 | 2,128 | 7,360 | 9,318 | 11,398 | 12,598 | 13,841 |
| Natural Gas Liquids | 1,575 | 850 | 180 | 233 | 226.0 | 281 | 920 | 286 | 252 | 266 | 267 | 1,071 | 1,309 | 1,569 | 1,712 | 1,838 |
| Other | 78 | 292 | 38 | 34 | 56 | 51 | 179 | 65 | 45 | 45 | 45 | 200 | 200 | 200 | 200 | 200 |
| Financial Hedges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | $15,621 | $8,887 | $1,535 | $1,774 | $2,020 | $2,268 | $7,597 | $2,513 | $2,303 | $2,498 | $2,737 | $10,050 | $11,918 | $14,325 | $15,634 | $16,968 |
| **Costs and Expenses:** | | | | | | | | | | | | | | | | |
| Lifting Cost | ($1,172) | ($1,014) | ($208) | ($202) | ($198) | ($203) | ($811) | ($258) | ($248) | ($249) | ($257) | ($1,012) | ($1,102) | ($1,194) | ($1,280) | ($1,367) |
| Transportation | ($1,186) | ($1,135) | ($242) | ($246) | ($256) | ($258) | ($1,002) | ($249) | ($206) | ($206) | ($213) | ($873) | ($913) | ($989) | ($1,060) | ($1,132) |
| Administrative and General | (1,316) | (1,221) | (246) | (257) | (250) | (298) | (1,051) | (269) | (269) | (249) | (257) | (1,044) | (1,071) | (1,091) | (1,133) | (1,171) |
| DD&A | (4,555) | (4,603) | (1,149) | (984) | (1,069) | (1,099) | (4,301) | (1,115) | (1,081) | (1,083) | (1,119) | (4,399) | (4,723) | (5,115) | (5,484) | (5,857) |
| Exploration expense | (1,411) | (778) | (126) | (76) | (304) | (291) | (797) | (553) | (177) | (195) | (202) | (1,127) | (1,023) | (853) | (914) | (976) |
| Amortization of Goodwill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Production Taxes | (1,245) | (553) | (117) | (157) | (148) | (114) | (536) | (155) | (158) | (159) | (175) | (647) | (770) | (928) | (1,014) | (1,102) |
| Algerian Production Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Prov. for Impairment of prop./doubtful accts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | ($10,885) | ($9,304) | ($2,088) | ($1,922) | ($2,225) | ($2,263) | ($8,498) | ($2,599) | ($2,140) | ($2,141) | ($2,223) | ($9,103) | ($9,602) | ($10,170) | ($10,886) | ($11,606) |
| E&P Operating Income | $4,736 | ($417) | ($553) | ($148) | ($205) | $5 | ($901) | ($86) | $163 | $356 | $514 | $947 | $2,316 | $4,155 | $4,748 | $5,362 |
| Minerals Income | | | | | | | | | | | | | | | | |
| G&P, Marketing & Transportation Income | $195 | $177 | $29 | $57 | $59 | $70 | $215 | $91 | $105 | $105 | $105 | $406 | $436 | $480 | $528 | $581 |
| GPM DD&A | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Interest Expense | ($753) | ($825) | ($220) | ($217) | ($220) | ($233) | ($890) | ($223) | ($223) | ($223) | ($223) | ($892) | ($890) | ($890) | ($890) | ($890) |
| Other Income | ($19) | ($15) | -$18 | -$8 | -$41 | -$21 | ($88) | ($14) | $0 | $0 | $0 | ($14) | ($45) | ($30) | ($25) | ($60) |
| Pre-Tax Income | $4,159 | ($1,080) | ($762) | ($316) | ($407) | ($179) | ($1,664) | ($232) | $45 | $238 | $396 | $447 | $1,818 | $3,715 | $4,361 | $4,993 |
| Income Taxes | (1,878) | 252 | $227 | $93 | $29 | ($30) | 319 | ($55) | ($13) | ($72) | ($127) | (267) | ($694) | ($1,378) | ($1,662) | ($1,877) |
| Tax Rate | 45% | 23% | 30% | 29% | 7% | -17% | 19% | -24% | 30% | 30% | 32% | 60% | 38% | 37% | 38% | 38% |
| Income from Equity affiliates | $187 | $191 | $36 | $81 | $83 | $63 | $263 | $43 | $65 | $65 | $65 | $238 | $285 | $285 | $295 | $295 |
| **Net Income** | $2,094 | ($1,019) | ($571) | ($304) | ($461) | ($272) | ($1,608) | ($330) | ($34) | $102 | $204 | ($57) | $838 | $2,052 | $2,405 | $2,821 |
| **Income from Discontinued Operations** | | | | | | | | | | | | | | | | |
| Preferred Dividend | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Net Income Available to Common** | $2,094 | ($1,019) | ($571) | ($304) | ($461) | ($272) | ($1,608) | ($330) | ($34) | $102 | $204 | ($57) | $838 | $2,052 | $2,405 | $2,821 |
| **EPS** | $4.13 | ($2.01) | ($1.12) | ($0.60) | ($0.89) | ($0.50) | ($3.08) | ($0.60) | ($0.06) | $0.18 | $0.37 | ($0.10) | $1.50 | $3.65 | $4.25 | $4.95 |
| * EPS including discontinued ops | | | | | | | | | | | | | | | | |
| Avg. Shares - Basic (milions) | 505 | 507 | 509.4 | 510.5 | 517.0 | 551.0 | 529.8 | 551.0 | 552.4 | 553.4 | 554.4 | 553.1 | 556.9 | 560.9 | 564.9 | 568.9 |
| Avg. Shares - Diluted (milions) | 507 | 508 | 509.0 | 510.0 | 517.0 | 551.0 | 521.8 | 551.0 | 553.4 | 554.4 | 555.4 | 553.6 | 557.4 | 561.4 | 565.4 | 569.4 |

**Share Repurchase Worksheet**

**Discretionary Cash Flow**

| | | | 2016 | | | | | 2017E | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Millions, except per share amounts) | 2014 | 2015 | 1QA | 2QA | 3QA | 4QA | 2016 | 1QA | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
| Net Income Before Preferred | $2,094 | ($1,019) | ($571) | ($304) | ($461) | ($272) | ($1,608) | ($330) | ($34) | $102 | $204 | ($57) | $838 | $2,052 | $2,405 | $2,821 |
| D.D. & A. | 4,555 | 4,603 | 1,149 | 984 | 1,069 | 1,099 | 4,301 | 1,115 | 1,081 | 1,083 | 1,119 | 4,399 | 4,723 | 5,115 | 5,484 | 5,857 |
| Amortization of Goodwill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Taxes | 1,320 | (1,195) | (190) | (174) | (29) | (30) | (423) | 0 | 3 | 18 | 32 | 53 | 381 | 755 | 911 | 1,029 |
| *Deferred Tax - as a percentage* | 70.3% | 474.2% | 83.7% | 187.1% | 100.0% | -100.0% | 132.6% | 0.0% | 25.0% | 25.0% | 25.0% | 19.8% | 54.8% | 54.8% | 54.8% | 54.8% |
| Amortization of Restr. Stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest expense -- zero coupon bonds | 15 | 15 | 4 | 4 | 4 | 4 | 15 | 4 | 4 | 4 | 4 | 15 | 15 | 15 | 15 | 15 |
| Impairment of Int'l Prop. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exploration Expense | 1,245 | 2,267 | 35 | 10 | 255 | 313 | 613 | 250 | 124 | 137 | 141 | 652 | 667 | 556 | 596 | 636 |
| *Deferred Exploration - as a percentage* | 88% | 291% | 28% | 13% | 84% | 108% | 77% | 45% | 70% | 70% | 70% | 58% | 65% | 65% | 65% | 65% |
| Capitalized Interest | (198) | (163) | (38) | (42) | (31) | (20) | (131) | (25) | (35) | (35) | (35) | (130) | (145) | (150) | (155) | (155) |
| Capitalized G&A | | | | | | | | | | | | | | | | |
| Other | - | - | - | - | - | - | - | - | - | - | (5) | (5) | 15 | (5) | 15 | (10) |
| Total | $9,031 | $4,508 | $389 | $478 | $807 | $1,094 | $2,767 | $1,014 | $1,144 | $1,308 | $1,461 | $4,927 | $6,494 | $8,338 | $9,270 | $10,193 |
| **Cash Flow Per Share** | $17.83 | $8.87 | $0.76 | $0.94 | $1.56 | $1.99 | $5.30 | $1.84 | $2.07 | $2.36 | $2.63 | $8.90 | $11.65 | $14.85 | $16.40 | $17.90 |

Source: UBS estimates and Company documents

## Figure 13: APC's Cash Flow Statement and Balance Sheet (2014-2021E)

| | 2014 | 2015 | 1Q:16A | 2Q:16A | 3Q:16A | 4Q:16A | 2016 | 1Q:17A | 2Q:17E | 3Q:17E | 4Q:17E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows From Operations** | | | | | | | | | | | | | | | | |
| Net Income | ($1,563) | ($6,812) | ($998) | ($611) | ($747) | ($452) | ($2,808) | ($275) | ($34) | $102 | $204 | ($2) | $838 | $2,052 | $2,405 | $2,821 |
| DD&A | 4,550 | 4,603 | 1,149 | 984 | 1,069 | 1,099 | 4,301 | 1,115 | 1,081 | 1,083 | 1,119 | 4,399 | 4,723 | 5,115 | 5,484 | 5,857 |
| Amortization of Goodwill | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Taxes | (105) | (3,152) | (413) | (407) | (301) | (117) | (1,238) | (660) | 3 | 18 | 32 | (607) | 381 | 755 | 911 | 1,029 |
| Exploration | 1,245 | 2,267 | 35 | 10 | 255 | 313 | 613 | 1,012 | 124 | 137 | 141 | 1,414 | 667 | 556 | 596 | 636 |
| Impairments | 836 | 5,075 | 16 | 18 | 27 | 166 | 227 | 373 | 0 | 0 | 0 | 373 | 0 | 0 | 0 | 0 |
| Other | (986) | 1,577 | 517 | 687 | 555 | 54 | 1,813 | (876) | 4 | 4 | 4 | (865) | 15 | 15 | 15 | 15 |
| Discretionary Cash Flow | $3,977 | $3,558 | $306 | $681 | $858 | $1,063 | $2,908 | $689 | $1,179 | $1,343 | $1,501 | $4,712 | $6,624 | $8,493 | $9,410 | $10,358 |
| Working Capital Changes | 4,489 | (5,435) | (443) | 548 | (73) | 60 | 92 | 434 | 0 | 0 | 0 | 434 | 0 | 0 | 0 | 0 |
| *Cash Provided by Operations* | $8,466 | ($1,877) | ($137) | $1,229 | $785 | $1,123 | $3,000 | $1,123 | $1,179 | $1,343 | $1,501 | $5,146 | $6,624 | $8,493 | $9,410 | $10,358 |
| **Cash Flows From Investing** | | | | | | | | | | | | | | | | |
| Capital Expenditures | ($9,508) | ($6,067) | ($1,022) | ($857) | ($739) | ($887) | ($3,505) | ($1,194) | ($1,383) | ($1,433) | ($1,575) | ($5,584) | ($6,230) | ($7,430) | ($7,930) | ($7,930) |
| Acquisition Costs | ($1,527) | ($3) | 0.0 | 0.0 | 0.0 | -1740.0 | ($1,740) | 0.0 | 0.0 | 0.0 | 0.0 | $0 | $0 | $0 | $0 | $0 |
| Net Proceeds From Asset Sales | 4,968 | 1,415 | 35 | 865 | 381 | 1,075 | 2,356 | 2,851 | 200 | 0 | 0 | 3,051 | 0 | 0 | 0 | 0 |
| Other | -405 | -116 | 14 | 0 | 67 | 46 | 127 | 65 | 0 | 0 | 0 | 65 | 0 | 0 | 0 | 0 |
| *Cash Provided (Used In) Investing* | ($6,472) | ($4,771) | ($973) | $8 | ($291) | ($1,506) | ($2,762) | $1,722 | ($1,183) | ($1,433) | ($1,575) | ($2,468) | ($6,230) | ($7,430) | ($7,930) | ($7,930) |
| **Cash Flows From Financing** | | | | | | | | | | | | | | | | |
| Increase in Long Term Debt | $2,879 | $4,632 | 4682.0 | 593.0 | 565.0 | 202.0 | $6,042 | 0.0 | 14.3 | 151.7 | 89.8 | $256 | $0 | $0 | $0 | $0 |
| Repayment of Long Term Debt | (1,425) | (4,033) | ($1,608) | ($3,817) | ($598) | ($809) | (6,832) | ($10) | $0 | $0 | $0 | (10) | (203) | (682) | (1,001) | (1,688) |
| Issuance of Preferred Stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Equity Issuance | 121 | 34 | 30 | 0 | 2,158 | 0 | 2,188 | 0 | 52 | 0 | 52 | 104 | 123 | 123 | 123 | 123 |
| Equity Repurchase | (45) | (55) | (30) | (1) | (1) | (6) | (38) | (21) | 0 | 0 | 0 | (21) | 0 | 0 | 0 | 0 |
| Dividends Paid | (505) | (553) | (25) | (26) | (27) | (27) | (105) | (28) | (28) | (28) | (28) | (111) | (117) | (123) | (129) | (135) |
| Other | 650 | 195 | 70 | 461 | (5) | 227 | 753 | (139) | 0 | 0 | 0 | (139) | 0 | 0 | 0 | 0 |
| *Net Cash Used In Financing* | $1,675 | $220 | $3,119 | ($2,790) | $2,092 | ($413) | $2,008 | ($198) | $39 | $124 | $114 | $79 | ($196) | ($681) | ($1,006) | ($1,700) |
| *Effect of Exchange Rate Change* | 2 | (2) | -1.0 | 0.0 | 0.0 | 0.0 | (1) | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - |
| **Change in Cash** | 3,671 | (6,430) | 2,008 | (1,553) | 2,586 | (796) | 2,245 | 2,647 | 35 | 35 | 40 | 2,757 | 198 | 382 | 474 | 728 |
| **Cash at Beginning of Period** | 3,698 | 7,369 | 939 | 2,947 | 1,394 | 3,980 | 939 | 3,184 | 5,831 | 5,866 | 5,901 | 3,184 | 5,941 | 6,138 | 6,521 | 6,994 |
| **Cash at End of Period** | 7,369 | 939 | 2,947 | 1,394 | 3,980 | 3,184 | 3,184 | 5,831 | 5,866 | 5,901 | 5,941 | 5,941 | 6,138 | 6,521 | 6,994 | 7,722 |
| | | 14779.2 | | | | | | | | | | | | | | |

| | 2014 | 2015 | 1Q:16A | 2Q:16A | 3Q:16A | 4Q:16A | 2016.0 | 1Q:17A | 2Q:17E | 3Q:17E | 4Q:17E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | | | |
| Current Assets | $11,221 | $3,982 | $5,767 | $3,212 | $5,918 | $5,266 | $5,266 | $7,707 | $7,742 | $7,777 | $7,817 | $7,817 | $8,015 | $8,397 | $8,871 | $9,599 |
| Property Plant and Equipment | 41,589 | 33,751 | 33,526 | 32,345 | 31,099 | 32,168 | 32,168 | 29,065 | 29,042 | 29,255 | 29,569 | 29,569 | 30,408 | 32,168 | 34,018 | 35,454 |
| Goodwill | 6,569 | 6,331 | 6,325 | 6,237 | 6,197 | 5,904 | 5,904 | 5,739 | 5,739 | 5,739 | 5,739 | 5,739 | 5,739 | 5,739 | 5,739 | 5,739 |
| Deferred Charges & Other | 2,310 | 2,350 | 2,304 | 2,239 | 2,203 | 2,226 | 2,226 | 2,182 | 2,182 | 2,182 | 2,182 | 2,182 | 2,182 | 2,182 | 2,182 | 2,182 |
| **Total Assets** | $61,689 | $46,414 | $47,922 | $44,033 | $45,417 | $45,564 | $45,564 | $44,693 | $44,705 | $44,953 | $45,307 | $45,307 | $46,344 | $48,485 | $50,809 | $52,974 |
| **Liabilities and Stockholders Equity** | | | | | | | | | | | | | | | | |
| Current Liabilities | $10,234 | $4,181 | $6,657 | $3,244 | $3,762 | $3,328 | $3,328 | $3,762 | $3,762 | $3,762 | $3,762 | $3,762 | $3,762 | $3,762 | $3,762 | $3,762 |
| Long-Term Debt | 15,092 | 15,718 | 15,726 | 15,641 | 15,090 | 15,281 | 15,281 | 15,284 | 15,298 | 15,450 | 15,540 | 15,540 | 15,337 | 14,655 | 13,654 | 11,965 |
| Other Long Term Liabilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Taxes | 9,249 | 5,400 | 4,940 | 4,686 | 4,343 | 4,324 | 4,324 | 3,664 | 3,667 | 3,685 | 3,717 | 3,717 | 4,097 | 4,853 | 5,763 | 6,792 |
| Other Deferred | 4,796 | 5,658 | 5,898 | 5,862 | 6,310 | 7,134 | 7,134 | 6,904 | 6,908 | 6,912 | 6,915 | 6,915 | 6,930 | 6,945 | 6,960 | 6,975 |
| Preferred Stock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stockholders Equity | 22,318 | 15,457 | 14,701 | 14,600 | 15,912 | 15,497 | 15,497 | 15,079 | 15,070 | 15,144 | 15,373 | 15,373 | 16,218 | 18,270 | 20,670 | 23,479 |
| **Total** | $61,689 | $46,414 | $47,922 | $44,033 | $45,417 | $45,564 | $45,564 | $44,693 | $44,705 | $44,953 | $45,307 | $45,307 | $46,344 | $48,485 | $50,809 | $52,974 |
| **Net Debt** | $14,105.0 | $15,917.0 | $16,616.0 | $15,673.0 | $12,934.0 | $13,343.0 | $13,343.0 | $11,339.0 | $11,318.3 | $11,435.1 | $11,484.8 | $11,484.8 | $11,084.0 | $10,020.0 | $8,545.0 | $6,128.8 |
| **Net Debt/Capitalization (Year End)** | 38% | 51% | 55% | 52% | 42% | 43% | 43% | 37% | 37% | 37% | 37% | 37% | 35% | 30% | 25% | 17% |
| **Net Debt/EBITDX (Year End)** | 1.3x | 3.1x | | | | | 3.1x | | | | | 1.7x | 1.3x | 0.9x | 0.7x | 0.5x |
| **Debt/EBITDX** | 1.3x | 3.0x | | | | | 3.6x | | | | | 2.2x | 1.8x | 1.4x | 1.2x | 1.0x |
| **EBITDA/Interest** | 14.4x | 6.2x | | | | | 4.9x | | | | | 7.7x | 9.5x | 11.9x | 13.1x | 14.3x |

Source: UBS estimates and Company documents

# UPSIDE / DOWNSIDE SPECTRUM

return




Source: UBS

**Upside (US$114):** Our upside case assumes APC is acquired. In an environment where Super-Majors have under-invested in both global exploration and US unconventional shales, APC offers a one-stop solution, and we believe management is a willing seller. With most acquisitions of E&Ps historically done at NAV, we should note that our NAV estimate for APC is ~$114/share, implying 9.4x normalized 2018E EV/DACF and +100% upside from current levels.

**Upside (US$80):** Our $80 price target assumes ~0.70x NAV, or 7.0x normalized 2018E DACF.

**Downside (US$51):** Our downside case scenario assumes APC fails to meet its short- and long-term production targets, does not have exploration success, and its current FCF deficit widens. Under these assumptions and assuming current strip prices, we could see APC declining to 5.0x normalized 2018E DACF, implying a stock price move to ~$51/share.

## COMPANY DESCRIPTION

return ↑

Anadarko Petroleum is an independent oil and gas exploration and production company with operations in onshore resource plays in the Rocky Mountains, the southern US, and the Appalachian basin. The company is also among the largest independent producers in the deepwater Gulf of Mexico and has production and exploration activities worldwide, including Algeria, Mozambique, Colombia, Cote d'Ivoire, New Zealand, Ghana, Brazil, Kenya, and several other countries. Anadarko actively markets natural gas, oil, and natural gas liquids production and owns and operates gas-gathering systems in core producing areas.

### Industry outlook

While we came into 2017 with a cautious view of the E&P sector given expensive valuations, this year's sell-off has left us incrementally more positive with E&Ps now discounting a recovery near the long dated futures curve but below our 'normalized' forecasts. But as we expect oil prices to remain in a ~$50-$60/Bbl range this year, we continue to prefer well-capitalized, oil-weighted oil E&Ps that are both low on the cost curve and offer attractive relative valuation.

### Production by Commodity (2017E)




### Absolute and Debt-Adjusted Growth Metrics

| Anadarko Petroleum (APC) | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | '17-21 CAGR |
|---|---|---|---|---|---|---|---|
| Absolute Production Growth | -5% | -14% | 5% | 8% | 7% | 7% | 7% |
| Production per Debt-Adj Share Growth | -16% | -10% | 7% | 10% | 10% | 11% | 9% |
| Cash Flow per Debt-Adj Share Growth | -46% | 86% | 35% | 30% | 14% | 15% | 23% |

Source: Company Documents and UBS Estimates

**Forecast returns**

| | |
|---|---|
| Forecast price appreciation | +42.1% |
| Forecast dividend yield | 0.4% |
| Forecast stock return | +42.5% |
| Market return assumption | 6.3% |
| Forecast excess return | +36.2% |

**Valuation Method and Risk Statement**

Anadarko Petroleum is subject to risks associated with volatile movements in crude oil prices and natural gas prices. Anadarko also has exposure to political, economic and meteorological events as well as geological risk associated with resource exploration. Moreover, Anadarko's production and financial targets are best estimates and at risk of not being achieved while its limited financial guidance disclosures make the forecasting of future earnings results challenging. Our $80 price target assumes ~0.70x NAV, or 7.0x normalized 2017E DACF.



CONFIDENTIAL UBS00069059

## Required Disclosures

This report has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS.

For information on the ways in which UBS manages conflicts and maintains independence of its research product; historical performance information; and certain additional disclosures concerning UBS research recommendations, please visit www.ubs.com/disclosures. The figures contained in performance charts refer to the past; past performance is not a reliable indicator of future results. Additional information will be made available upon request. UBS Securities Co. Limited is licensed to conduct securities investment consultancy businesses by the China Securities Regulatory Commission. UBS acts or may act as principal in the debt securities (or in related derivatives) that may be the subject of this report. This recommendation was finalized on: 03 May 2017 05:24 AM GMT.

**Analyst Certification:**Each research analyst primarily responsible for the content of this research report, in whole or in part, certifies that with respect to each security or issuer that the analyst covered in this report: (1) all of the views expressed accurately reflect his or her personal views about those securities or issuers and were prepared in an independent manner, including with respect to UBS, and (2) no part of his or her compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by that research analyst in the research report.

**UBS Investment Research: Global Equity Rating Definitions**

| 12-Month Rating | Definition | Coverage[1] | IB Services[2] |
|---|---|---|---|
| **Buy** | FSR is > 6% above the MRA. | 46% | 30% |
| **Neutral** | FSR is between -6% and 6% of the MRA. | 38% | 28% |
| **Sell** | FSR is > 6% below the MRA. | 16% | 18% |
| **Short-Term Rating** | **Definition** | **Coverage[3]** | **IB Services[4]** |
| **Buy** | Stock price expected to rise within three months from the time the rating was assigned because of a specific catalyst or event. | <1% | <1% |
| **Sell** | Stock price expected to fall within three months from the time the rating was assigned because of a specific catalyst or event. | <1% | <1% |

Source: UBS. Rating allocations are as of 31 March 2017.
1:Percentage of companies under coverage globally within the 12-month rating category.
2:Percentage of companies within the 12-month rating category for which investment banking (IB) services were provided within the past 12 months.
3:Percentage of companies under coverage globally within the Short-Term rating category.
4:Percentage of companies within the Short-Term rating category for which investment banking (IB) services were provided within the past 12 months.

**KEY DEFINITIONS:Forecast Stock Return (FSR)** is defined as expected percentage price appreciation plus gross dividend yield over the next 12 months. **Market Return Assumption (MRA)** is defined as the one-year local market interest rate plus 5% (a proxy for, and not a forecast of, the equity risk premium). **Under Review (UR)** Stocks may be flagged as UR by the analyst, indicating that the stock's price target and/or rating are subject to possible change in the near term, usually in response to an event that may affect the investment case or valuation. **Short-Term Ratings** reflect the expected near-term (up to three months) performance of the stock and do not reflect any change in the fundamental view or investment case. **Equity Price Targets** have an investment horizon of 12 months.

**EXCEPTIONS AND SPECIAL CASES:UK and European Investment Fund ratings and definitions are: Buy:** Positive on factors such as structure, management, performance record, discount; **Neutral:** Neutral on factors such as structure, management, performance record, discount; **Sell:** Negative on factors such as structure, management, performance record, discount. **Core Banding Exceptions (CBE):** Exceptions to the standard +/-6% bands may be granted by the Investment Review Committee (IRC). Factors considered by the IRC include the stock's volatility and the credit spread of the respective company's debt. As a result, stocks deemed to be very high or low risk may be subject to higher or lower bands as they relate to the rating. When such exceptions apply, they will be identified in the Company Disclosures table in the relevant research piece.

Research analysts contributing to this report who are employed by any non-US affiliate of UBS Securities LLC are not registered/qualified as research analysts with FINRA. Such analysts may not be associated persons of UBS Securities LLC and therefore are not subject to the FINRA restrictions on communications with a subject company, public appearances, and trading securities held by a research analyst account. The name of each affiliate and analyst employed by that affiliate contributing to this report, if any, follows.

**UBS Securities LLC:** William A. Featherston; Michael Ziffer, CFA; Christopher Zhang, CFA.

**Company Disclosures**

| Company Name | Reuters | 12-month rating | Short-term rating | Price | Price date |
|---|---|---|---|---|---|
| **Anadarko Petroleum Corp.**[4, 6a, 6b, 7, 16, 26] | APC.N | Buy | N/A | US$56.28 | 02 May 2017 |
| **Tullow Oil**[20] | TLW.L | Neutral (CBE) | N/A | 205p | 02 May 2017 |

Source: UBS. All prices as of local market close.
Ratings in this table are the most current published ratings prior to this report. They may be more recent than the stock pricing date

4. Within the past 12 months, UBS AG, its affiliates or subsidiaries has received compensation for investment banking services from this company/entity or one of its affiliates.
6a. This company/entity is, or within the past 12 months has been, a client of UBS Securities LLC, and investment banking services are being, or have been, provided.
6b. This company/entity is, or within the past 12 months has been, a client of UBS Securities LLC, and non-securities services are being, or have been, provided.
7. Within the past 12 months, UBS Securities LLC and/or its affiliates have received compensation for products and services other than investment banking services from this company/entity.
16. UBS Securities LLC makes a market in the securities and/or ADRs of this company.
20. Because this security exhibits higher-than-average volatility, the FSR has been set at 15% above the MRA for a Buy rating, and at -15% below the MRA for a Sell rating (compared with 6/-6% under the normal rating system).
26. A U.S.-based global equity strategist, a member of his team, or one of their household members has a long common stock position in Anadarko Petroleum Corp.

Unless otherwise indicated, please refer to the Valuation and Risk sections within the body of this report. For a complete set of disclosure statements associated with the companies discussed in this report, including information on valuation and risk, please contact UBS Securities LLC, 1285 Avenue of Americas, New York, NY 10019, USA, Attention: Investment Research.

**Anadarko Petroleum Corp. (US$)**



| Date | Stock Price (US$) | Price Target (US$) | Rating |
|---|---|---|---|
| 2014-01-31 | 80.69 | 95.0 | Buy |
| 2014-04-02 | 86.47 | 100.0 | Buy |
| 2014-04-03 | 99.02 | 110.0 | Buy |
| 2014-05-22 | 101.58 | 115.0 | Buy |
| 2014-06-11 | 108.32 | 120.0 | Buy |
| 2014-07-02 | 107.63 | 127.0 | Buy |
| 2014-10-06 | 97.19 | 125.0 | Buy |
| 2014-12-03 | 80.67 | 110.0 | Buy |
| 2015-01-26 | 82.66 | 100.0 | Buy |
| 2015-04-30 | 94.1 | 104.0 | Buy |
| 2015-06-24 | 81.45 | 98.0 | Buy |
| 2015-09-07 | 68.34 | 82.0 | Buy |
| 2015-11-11 | 61.01 | 77.0 | Buy |
| 2016-01-12 | 37.33 | 62.0 | Buy |
| 2016-02-02 | 39.26 | 60.0 | Buy |
| 2016-05-02 | 51.95 | 64.0 | Buy |
| 2016-07-06 | 55.19 | 69.0 | Buy |
| 2016-10-31 | 59.44 | 73.0 | Buy |
| 2016-12-05 | 68.29 | 79.0 | Buy |
| 2016-12-15 | 70.33 | 82.0 | Buy |
| 2017-01-18 | 69.89 | 81.0 | Buy |
| 2017-03-08 | 61.4 | 80.0 | Buy |

Source: UBS; as of 02 May 2017

**Tullow Oil (p)**



| Date | Stock Price (p) | Price Target (p) | Rating |
|---|---|---|---|
| 2014-01-31 | 673.0 | 788.0 | Neutral |
| 2014-04-03 | 681.0 | 766.0 | Buy |
| 2014-06-27 | 726.0 | 809.0 | Buy |
| 2014-11-10 | 433.0 | 596.0 | Buy |
| 2014-12-03 | 359.0 | 396.0 | Neutral |
| 2015-01-16 | 311.0 | 285.0 | Neutral |
| 2015-07-29 | 201.0 | 230.0 | Neutral |
| 2015-09-07 | 168.0 | 166.0 | Neutral |
| 2015-11-06 | 186.0 | 196.0 | Neutral |
| 2015-11-16 | 162.0 | 204.0 | Buy |
| 2016-01-13 | 110.0 | 179.0 | Buy |
| 2016-03-09 | 182.0 | 179.0 | Neutral |
| 2016-07-04 | 219.0 | 204.0 | Neutral |
| 2016-07-28 | 166.0 | 192.0 | Neutral |
| 2016-10-10 | 239.0 | 222.0 | Neutral |
| 2017-01-19 | 256.0 | 222.0 | Sell |
| 2017-03-07 | 227.0 | 222.0 | Neutral |
| 2017-04-06 | 212.0 | 205.0 | Neutral |

Source: UBS; as of 02 May 2017

## Global Disclaimer

This document has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS.

Global Research is provided to our clients through UBS Neo and, in certain instances, UBS.com (each a "System"). It may also be made available through third party vendors and distributed by UBS and/or third parties via e-mail or alternative electronic means. The level and types of services provided by Global Research to a client may vary depending upon various factors such as a client's individual preferences as to the frequency and manner of receiving communications, a client's risk profile and investment focus and perspective (e.g., market wide, sector specific, long-term, short-term, etc.), the size and scope of the overall client relationship with UBS and legal and regulatory constraints.

All Global Research is available on UBS Neo. Please contact your UBS sales representative if you wish to discuss your access to UBS Neo.

When you receive Global Research through a System, your access and/or use of such Global Research is subject to this Global Research Disclaimer and to the terms of use governing the applicable System.

When you receive Global Research via a third party vendor, e-mail or other electronic means, your use shall be subject to this Global Research Disclaimer and to UBS's Terms of Use/Disclaimer (http://www.ubs.com/global/en/legalinfo2/disclaimer.html). By accessing and/or using Global Research in this manner, you are indicating that you have read and agree to be bound by our Terms of Use/Disclaimer. In addition, you consent to UBS processing your personal data and using cookies in accordance with our Privacy Statement (http://www.ubs.com/global/en/legalinfo2/privacy.html) and cookie notice (http://www.ubs.com/global/en/homepage/cookies/cookie-management.html).

**If you receive Global Research, whether through a System or by any other means, you agree that you shall not copy, revise, amend, create a derivative work, transfer to any third party, or in any way commercially exploit any UBS research provided via Global Research or otherwise, and that you shall not extract data from any research or estimates provided to you via Global Research or otherwise, without the prior written consent of UBS.**

This document is for distribution only as may be permitted by law. It is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or would subject UBS to any registration or licensing requirement within such jurisdiction. It is published solely for information purposes; it is not an advertisement nor is it a solicitation or an offer to buy or sell any financial instruments or to participate in any particular trading strategy. No representation or warranty, either expressed or implied, is provided in relation to the accuracy, completeness or reliability of the information contained in this document ("the Information"), except with respect to Information concerning UBS. The Information is not intended to be a complete statement or summary of the securities, markets or developments referred to in the document. UBS does not undertake to update or keep current the Information. Any opinions expressed in this document may change without notice and may differ or be contrary to opinions expressed by other business areas or groups of UBS. Any statements contained in this report attributed to a third party represent UBS's interpretation of the data, information and/or opinions provided by that third party either publicly or through a subscription service, and such use and interpretation have not been reviewed by the third party.

Nothing in this document constitutes a representation that any investment strategy or recommendation is suitable or appropriate to an investor's individual circumstances or otherwise constitutes a personal recommendation. Investments involve risks, and investors should exercise prudence and their own judgement in making their investment decisions. The financial instruments described in the document may not be eligible for sale in all jurisdictions or to certain categories of investors. Options, derivative products and futures are not suitable for all investors, and trading in these instruments is considered risky. Mortgage and asset-backed securities may involve a high degree of risk and may be highly volatile in response to fluctuations in interest rates or other market conditions. Foreign currency rates of exchange may adversely affect the value, price or income of any security or related instrument referred to in the document. For investment advice, trade execution or other enquiries, clients should contact their local sales representative.

The value of any investment or income may go down as well as up, and investors may not get back the full (or any) amount invested. Past performance is not necessarily a guide to future performance. Neither UBS nor any of its directors, employees or agents accepts any liability for any loss (including investment loss) or damage arising out of the use of all or any of the Information.

Any prices stated in this document are for information purposes only and do not represent valuations for individual securities or other financial instruments. There is no representation that any transaction can or could have been effected at those prices, and any prices do not necessarily reflect UBS's internal books and records or theoretical model-based valuations and may be based on certain assumptions. Different assumptions by UBS or any other source may yield substantially different results.

This document and the Information are produced by UBS as part of its research function and are provided to you solely for general background information. UBS has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. In no circumstances may this document or any of the Information be used for any of the following purposes:

(i) valuation or accounting purposes;

(ii) to determine the amounts due or payable, the price or the value of any financial instrument or financial contract; or

(iii) to measure the performance of any financial instrument.

By receiving this document and the Information you will be deemed to represent and warrant to UBS that you will not use this document or any of the Information for any of the above purposes or otherwise rely upon this document or any of the Information.

UBS has policies and procedures, which include, without limitation, independence policies and permanent information barriers, that are intended, and upon which UBS relies, to manage potential conflicts of interest and control the flow of information within divisions of UBS and among its subsidiaries, branches and affiliates. For further information on the ways in which UBS manages conflicts and maintains independence of its research products, historical performance information and certain additional disclosures concerning UBS research recommendations, please visit www.ubs.com/disclosures.

Research will initiate, update and cease coverage solely at the discretion of UBS Research Management, which will also have sole discretion on the timing and frequency of any published research product. The analysis contained in this document is based on numerous assumptions. All material information in relation to published research reports, such as valuation methodology, risk statements, underlying assumptions (including sensitivity analysis of those assumptions), ratings history etc. as required by the Market Abuse Regulation, can be found on NEO. Different assumptions could result in materially different results.

The analyst(s) responsible for the preparation of this document may interact with trading desk personnel, sales personnel and other parties for the purpose of gathering, applying and interpreting market information. UBS relies on information barriers to control the flow of information contained in one or more areas within UBS into other areas, units, groups or affiliates of UBS. The compensation of the analyst who prepared this document is determined exclusively by research management and senior management (not including investment banking). Analyst compensation is not based on investment banking revenues; however, compensation may relate to the revenues of UBS and/or its divisions as a whole, of which investment banking, sales and trading are a part, and UBS's subsidiaries, branches and affiliates as a whole.

For financial instruments admitted to trading on an EU regulated market: UBS AG, its affiliates or subsidiaries (excluding UBS Securities LLC) acts as a market maker or liquidity provider (in accordance with the interpretation of these terms in the UK) in the financial instruments of the issuer save that where the activity of liquidity provider is carried out in accordance with the definition given to it by the laws and regulations of any other EU jurisdictions, such information is separately disclosed in this document. For financial instruments admitted to trading on a non-EU regulated market: UBS may act as a market maker save that where this activity is carried out in the US in accordance with the definition given to it by the relevant laws and regulations, such activity will be specifically disclosed in this document. UBS may have issued a warrant the value of which is based on one or more of the financial instruments referred to in the document. UBS and its affiliates and employees may have long or short positions, trade as principal and buy and sell in instruments or derivatives identified herein; such transactions or positions may be inconsistent with the opinions expressed in this document.

**United Kingdom and the rest of Europe:** Except as otherwise specified herein, this material is distributed by UBS Limited to persons who are eligible counterparties or professional clients. UBS Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. **France:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities France S.A. UBS Securities France S.A. is regulated by the ACPR (Autorité de Contrôle Prudentiel et de Résolution) and the Autorité des Marchés Financiers (AMF). Where an analyst of UBS Securities France S.A. has contributed to this document, the document is also deemed to have been prepared by UBS Securities France S.A. **Germany:** Prepared by UBS Limited and distributed by UBS Limited and UBS Europe SE. UBS Europe SE is regulated by the Bundesanstalt fur Finanzdienstleistungsaufsicht (BaFin). **Spain:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities España SV, SA. UBS Securities España SV, SA is regulated by the Comisión Nacional del Mercado de Valores (CNMV). **Turkey:** Distributed by

UBS Limited. No information in this document is provided for the purpose of offering, marketing and sale by any means of any capital market instruments and services in the Republic of Turkey. Therefore, this document may not be considered as an offer made or to be made to residents of the Republic of Turkey. UBS AG is not licensed by the Turkish Capital Market Board under the provisions of the Capital Market Law (Law No. 6362). Accordingly, neither this document nor any other offering material related to the instruments/services may be utilized in connection with providing any capital market services to persons within the Republic of Turkey without the prior approval of the Capital Market Board. However, according to article 15 (d) (ii) of the Decree No. 32, there is no restriction on the purchase or sale of the securities abroad by residents of the Republic of Turkey. **Poland:** Distributed by UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce regulated by the Polish Financial Supervision Authority. Where an analyst of UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce has contributed to this document, the document is also deemed to have been prepared by UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce. **Russia:** Prepared and distributed by UBS Bank (OOO). **Switzerland:** Distributed by UBS AG to persons who are institutional investors only. UBS AG is regulated by the Swiss Financial Market Supervisory Authority (FINMA). **Italy:** Prepared by UBS Limited and distributed by UBS Limited and UBS Limited, Italy Branch. Where an analyst of UBS Limited, Italy Branch has contributed to this document, the document is also deemed to have been prepared by UBS Limited, Italy Branch. **South Africa:** Distributed by UBS South Africa (Pty) Limited (Registration No. 1995/011140/07), an authorised user of the JSE and an authorised Financial Services Provider (FSP 7328). **Israel:** This material is distributed by UBS Limited. UBS Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. UBS Securities Israel Ltd is a licensed Investment Marketer that is supervised by the Israel Securities Authority (ISA). UBS Limited and its affiliates incorporated outside Israel are not licensed under the Israeli Advisory Law. UBS Limited is not covered by insurance as required from a licensee under the Israeli Advisory Law. UBS may engage among others in issuance of Financial Assets or in distribution of Financial Assets of other issuers for fees or other benefits. UBS Limited and its affiliates may prefer various Financial Assets to which they have or may have Affiliation (as such term is defined under the Israeli Advisory Law). Nothing in this Material should be considered as investment advice under the Israeli Advisory Law. This Material is being issued only to and/or is directed only at persons who are Eligible Clients within the meaning of the Israeli Advisory Law, and this material must not be relied on or acted upon by any other persons. **Saudi Arabia:** This document has been issued by UBS AG (and/or any of its subsidiaries, branches or affiliates), a public company limited by shares, incorporated in Switzerland with its registered offices at Aeschenvorstadt 1, CH-4051 Basel and Bahnhofstrasse 45, CH-8001 Zurich. This publication has been approved by UBS Saudi Arabia (a subsidiary of UBS AG), a Saudi closed joint stock company incorporated in the Kingdom of Saudi Arabia under commercial register number 1010257812 having its registered office at Tatweer Towers, P.O. Box 75724, Riyadh 11588, Kingdom of Saudi Arabia. UBS Saudi Arabia is authorized and regulated by the Capital Market Authority to conduct securities business under license number 08113-37. **Dubai:** The information distributed by UBS AG Dubai Branch is intended for Professional Clients only and is not for further distribution within the United Arab Emirates. **United States:** Distributed to US persons by either UBS Securities LLC or by UBS Financial Services Inc., subsidiaries of UBS AG; or by a group, subsidiary or affiliate of UBS AG that is not registered as a US broker-dealer (a **'non-US affiliate'**) to major US institutional investors only. UBS Securities LLC or UBS Financial Services Inc. accepts responsibility for the content of a document prepared by another non-US affiliate when distributed to US persons by UBS Securities LLC or UBS Financial Services Inc. All transactions by a US person in the securities mentioned in this document must be effected through UBS Securities LLC or UBS Financial Services Inc., and not through a non-US affiliate. UBS Securities LLC is not acting as a municipal advisor to any municipal entity or obligated person within the meaning of Section 15B of the Securities Exchange Act (the "Municipal Advisor Rule"), and the opinions or views contained herein are not intended to be, and do not constitute, advice within the meaning of the Municipal Advisor Rule. **Canada:** Distributed by UBS Securities Canada Inc., a registered investment dealer in Canada and a Member-Canadian Investor Protection Fund, or by another affiliate of UBS AG that is registered to conduct business in Canada or is otherwise exempt from registration. **Mexico:** This report has been distributed and prepared by UBS Casa de Bolsa, S.A. de C.V., UBS Grupo Financiero, an entity that is part of UBS Grupo Financiero, S.A. de C.V. and is an affiliate of UBS AG. This document is intended for distribution to institutional or sophisticated investors only. Research reports only reflect the views of the analysts responsible for the reports. Analysts do not receive any compensation from persons or entities different from UBS Casa de Bolsa, S.A. de C.V., UBS Grupo Financiero, or different from entities belonging to the same financial group or business group of such. For Spanish translations of applicable disclosures, please see www.ubs.com/disclosures. **Brazil:** Except as otherwise specified herein, this material is prepared by UBS Brasil CCTVM S.A. to persons who are eligible investors residing in Brazil, which are considered to be: (i) financial institutions, (ii) insurance firms and investment capital companies, (iii) supplementary pension entities, (iv) entities that hold financial investments higher than R$300,000.00 and that confirm the status of qualified investors in written, (v) investment funds, (vi) securities portfolio managers and securities consultants duly authorized by Comissão de Valores Mobiliários (CVM), regarding their own investments, and (vii) social security systems created by the Federal Government, States, and Municipalities. **Hong Kong:** Distributed by UBS Securities Asia Limited and/or UBS AG, Hong Kong Branch. **Singapore:** Distributed by UBS Securities Pte. Ltd. [MCI (P) 007/09/2016 and Co. Reg. No.: 198500648C] or UBS AG, Singapore Branch. Please contact UBS Securities Pte. Ltd., an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110); or UBS AG, Singapore Branch, an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110) and a wholesale bank licensed under the Singapore Banking Act (Cap. 19) regulated by the Monetary Authority of Singapore, in respect of any matters arising from, or in connection with, the analysis or document. The recipients of this document represent and warrant that they are accredited and institutional investors as defined in the Securities and Futures Act (Cap. 289). **Japan:** Distributed by UBS Securities Japan Co., Ltd. to professional investors (except as otherwise permitted). Where this document has been prepared by UBS Securities Japan Co., Ltd., UBS Securities Japan Co., Ltd. is the author, publisher and distributor of the document. Distributed by UBS AG, Tokyo Branch to Professional Investors (except as otherwise permitted) in relation to foreign exchange and other banking businesses when relevant. **Australia:** Clients of UBS AG: Distributed by UBS AG (ABN 47 088 129 613 and holder of Australian Financial Services License No. 231087). Clients of UBS Securities Australia Ltd: Distributed by UBS Securities Australia Ltd (ABN 62 008 586 481 and holder of Australian Financial Services License No. 231098). This Document contains general information and/or general advice only and does not constitute personal financial product advice. As such, the Information in this document has been prepared without taking into account any investor's objectives, financial situation or needs, and investors should, before acting on the Information, consider the appropriateness of the Information, having regard to their objectives, financial situation and needs. If the Information contained in this document relates to the acquisition, or potential acquisition of a particular financial product by a 'Retail' client as defined by section 761G of the Corporations Act 2001 where a Product Disclosure Statement would be required, the retail client should obtain and consider the Product Disclosure Statement relating to the product before making any decision about whether to acquire the product. The UBS Securities Australia Limited Financial Services Guide is available at: www.ubs.com/ecs-research-fsg. **New Zealand:** Distributed by UBS New Zealand Ltd. UBS New Zealand Ltd is not a registered bank in New Zealand. You are being provided with this UBS publication or material because you have indicated to UBS that you are a "wholesale client" within the meaning of section 5C of the Financial Advisers Act 2008 of New Zealand (Permitted Client). This publication or material is not intended for clients who are not Permitted Clients (non-permitted Clients). If you are a non-permitted Client you must not rely on this publication or material. If despite this warning you nevertheless rely on this publication or material, you hereby (i) acknowledge that you may not rely on the content of this publication or material and that any recommendations or opinions in such this publication or material are not made or provided to you, and (ii) to the maximum extent permitted by law (a) indemnify UBS and its associates or related entities (and their respective Directors, officers, agents and Advisors) (each a 'Relevant Person') for any loss, damage, liability or claim any of them may incur or suffer as a result of, or in connection with, your unauthorised reliance on this publication or material and (b) waive any rights or remedies you may have against any Relevant Person for (or in respect of) any loss, damage, liability or claim you may incur or suffer as a result of, or in connection with, your unauthorised reliance on this publication or material. **Korea:** Distributed in Korea by UBS Securities Pte. Ltd., Seoul Branch. This document may have been edited or contributed to from time to time by affiliates of UBS Securities Pte. Ltd., Seoul Branch. **Malaysia:** This material is authorized to be distributed in Malaysia by UBS Securities Malaysia Sdn. Bhd (Capital Markets Services License No.: CMSL/A0063/2007). This material is intended for professional/institutional clients only and not for distribution to any retail clients. **India:** Distributed by UBS Securities India Private Ltd. (Corporate Identity Number U67120MH1996PTC097299) 2/F, 2 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai (India) 400051. Phone: +912261556000. It provides brokerage services bearing SEBI Registration Numbers: NSE (Capital Market Segment): INB230951431, NSE (F&O Segment) INF230951431, NSE (Currency Derivatives Segment) INE230951431, BSE (Capital Market Segment) INB010951437; merchant banking services bearing SEBI Registration Number: INM000010809 and Research Analyst services bearing SEBI Registration Number: INH000001204. UBS AG, its affiliates or subsidiaries may have debt holdings or positions in the subject Indian company/companies. Within the past 12 months, UBS AG, its affiliates or subsidiaries may have received compensation for non-investment banking securities-related services and/or non-securities services from the subject Indian company/companies. The subject company/companies may have been a client/clients of UBS AG, its affiliates or subsidiaries during the 12 months preceding the date of distribution of the research report with respect to investment banking and/or non-investment banking securities-related services and/or non-securities services. With regard to information on associates, please refer to the Annual Report at: http://www.ubs.com/global/en/about_ubs/investor_relations/annualreporting.html

The disclosures contained in research documents produced by UBS Limited shall be governed by and construed in accordance with English law.

UBS specifically prohibits the redistribution of this document in whole or in part without the written permission of UBS and UBS accepts no liability whatsoever for the actions of third parties in this respect. Images may depict objects or elements that are protected by third party copyright, trademarks and other intellectual property rights. © UBS 2017. The key symbol and UBS are among the registered and unregistered trademarks of UBS. All rights reserved.

UBS

# EXHIBIT 40

Rose & Associates

# Exploration Economics, Risk Analysis & Prospect Evaluation

Exhibit 345

## CHAPTER SUMMARIES

### Day 1

**CHAPTER 1: INTRODUCTION**

- Precision is not accuracy.
- Risk analysis requires consistency and no bias to deliver what you promise.
- The expected value is the sum of the probability-weighted outcomes.
- Log:log plot will allow you to recognize bias and uncertainty.

**CHAPTER 1: INTRODUCTION**

- Without a consistent risk process in place, most companies will over-estimate the portfolio results by 2 times
- The best companies have:
  - Good geotechnical skill and integrated teams
  - Systematic and probabilistic methods
  - Central portfolio coordination

**CHAPTER 2: STATISTICS**

- Statistics quantify opinions
- Summarize, analyze and communicate
- Histograms display relative frequency
  - Identify the shape, mode and range
- Cumulative probability plots display probability value pairs
  - Identify P10, P50 and P90

**CHAPTER 2: STATISTICS**

- P90 small is the "greater than" convention
- The fractile formula is rank/(n+1)
  - Sort large to small for P >
- P10/P50 = P50/P90
- P10 = P50^2/P90
- P90 = P50^2/P10
- P50 = (P10 * P90)^.5

**CHAPTER 2: STATISTICS**

- The Means:
  - Arithmetic (could be too small)
  - Statistical (could be too large)
  - Swanson's (about right)
  - Mz= 0.3*P90 + 0.4*P50 + 0.3*P10
  - Truncated (about the same as Swanson's)

**CHAPTER 2: STATISTICS**

- Central limit theorem
- Addition tends toward Normal
  - Mode = Mean = Median
- Multiplication tends toward Lognormal
  - Mode < Median < Mean
- Lognormal distributions will plot as straight lines on log cumulative probability graph

# CHAPTER SUMMARIES
(continued)

## Day 1 (continued)

### CHAPTER 2: STATISTICS

- Use field size distributions as reality checks.
  - Use the most recent third.
- Triangular estimates will cause a higher mean.
- The Mean is the best single value in portfolio and decision analysis.

### CHAPTER 3: UNCERTAINTY

- 80% confidence intervals are wider than you think.
- Uncertainty causes the Winner's Curse.
- Statistics are a better estimator than Intuition.

### CHAPTER 3: UNCERTAINTY

- Biases will negatively affect estimates
  - Overconfidence – narrow ranges
  - Representative – wrong conclusion from a small or biased sample
  - Availability – wrong conclusion from recent or dramatic data
  - Anchoring – inappropriate use of a previous value
  - Conditioning – limited experience
  - Motivation – intentional misrepresentation

### CHAPTER 3: UNCERTAINTY

- Multiple working hypotheses = more alternatives
- Most variables have uncertainty
- Objective:
  - Improve consistency
  - Reduce uncertainty
  - Improve accuracy
  - Enhance profitability

### CHAPTER 4: RESERVES

- Even producing properties have ½ order of magnitude uncertainty
- Area x net pay X B/AF = reserves
- B/AF = RY = 7758 x por x sat x rec eff./ FVF
- Area typically has the most uncertainty and recovery yield the least

### CHAPTER 4: RESERVES

- Improved estimating process:
  - Start with P90 – P10 range
  - Calculate P50
  - Calculate the Mean
  - Reality check the P1 and P99
  - Use analogs to improve estimates
  - Revise the P90 – P10 range
  - Compare independent estimates and average
  - Revise the P90 – P10; calc. the P50 and the Mean

© Rose & Associates, LLP

# CHAPTER SUMMARIES (continued)

## Day 2

### CHAPTER 4: RESERVES

- Estimates are lognormal also:
  - Estimate of ranges of area
  - 3 values for % fill
  - 3 values for fault extent
  - 3 values for dip rate
  - = 27 lognormally distributed cases

### CHAPTER 4: RESERVES

- Area is filled area including
  - Area of closure and fillup
- Net pay is average net pay for the field including
  - Gross interval
  - Net to gross
  - Geometry factor

### CHAPTER 4: RESERVES

- Hydrocarbon recovery yield including
  - Porosity
  - HC saturation
  - Recovery efficiency
  - Formation volume factor
- Range
  - Oil 60 to 1100 Barrels per Acre-Ft
  - Gas 100 to 2400 MCF per Acre-Ft

### CHAPTER 4: RESERVES

Graphical Monte Carlo

P90 x P90 X P90 = P98.7

P50 X P50 X P50 = P50

P10 X P10 X P10 = P1.3

P23 X P23 X P23 = P10

P77 X P77 X P77 = P90

### CHAPTER 4: RESERVES

- The process
  - Area x net pay x RY = resources
  - GRV x NTG x RY = resources
  - Input closure area at P10
  - Input net pay of best average at P10
  - Input P90 reasonable minimums
  - Examine and adjust P1 and P99

### CHAPTER 4: RESERVES

- Could this prospect turn out to be a 1 well field?
- P10/P90 ratios should be appropriate
- Most common error is that P99 is too high
- Beware of the "illegal addition" of proved reserves

© Rose & Associ...