# EXHIBIT 109
# [Filed Under Seal]



MEETING OF THE

# BOARD OF DIRECTORS

## August 1 & 2, 2016

## DAY 1 SLIDES

Exhibit
532

ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# Financial Review

August 2016 Board of Directors Meeting

# 2016 Second Quarter – Consolidated Income Analysis

| *$ millions* | Budget | Adjusted Actual[1] |
|---|---|---|
| **Commodity Revenue** | $1,651 | $1,679 (Meets Expectations) |
| **Other Revenue** | $306 | $344 (Favorable) |
| **Cash Expenses** | ($1,312) | ($1,187) (Favorable) |
| **Non-Cash Expenses** | ($1,212) | ($994) (Favorable) |
| **Taxes, Interest & Other** | $20 | ($146) (Unfavorable) |
| **Net Income**<br>**Net Income/share** | **($547)**<br>($1.07) | **($304)**<br>($0.60) (Favorable) |

| | Budget | Actual |
|---|---|---|
| **Discretionary Cash Flow**<br>DCF/share | **$563**<br>$1.10 | **$669**<br>$1.31 (Favorable) |

*Favorable* *Unfavorable* *Meets Expectations (+/- 3%)*

[1]*Excludes items affecting comparability (IAC)*

# 2016 Total Year – Consolidated Income Analysis

| *$ millions* | Budget | Adjusted Forecast[1] |
|---|---|---|
| **Commodity Revenue** | $6,586 | $7,004 |
| **Other Revenue** | $1,358 | $1,434 |
| **Cash Expenses** | ($5,210) | ($4,953) |
| **Non-Cash Expenses** | ($4,886) | ($4,615) |
| **Taxes, Interest & Other** | $12 | ($384) |
| **Net Income** | **($2,140)** | **($1,514)** |
| **Net Income/share** | ($4.19) | ($2.98) |

| | Budget | Forecast |
|---|---|---|
| **Discretionary Cash Flow** | **$2,362** | **$3,023** |
| DCF/share | $4.63 | $5.92 |

*Favorable*   *Unfavorable*   *Meets Expectations (+/- 3%)*

[1]*Excludes items affecting comparability (IAC)*

# 2016 Total Year – APC Capital and G&G Program



ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# Equity Update

August 2016 Board of Directors Meeting

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

# Market Summary (7/27/2016)







| | 2Q16 | 3QTD | YTD |
|---|---|---|---|
| Anadarko Petroleum | 16.2% | -2.0% | 10.8% |
| Peer Average* | 19.4% | -7.2% | 10.2% |
| **Over/(Under) Performance** | **-3.2%** | **5.2%** | **0.6%** |
| S&P 500 | 1.3% | 3.0% | 6.0% |
| **Over/(Under) Performance** | **14.9%** | **-5.0%** | **4.8%** |

**Peer Average includes: APA, COP, CVX, DVN, EOG, HES, MRO, MUR, NBL, OXY, PXD*

# Market Valuation vs. Peer Group

| Peers | Discounted Oil Price $/Bbl | EV/EBITDAX 2017E | Market Cap ($B) |
|---|---|---|---|
| EOG Resources | $77.40 | 11.0x | $44.56 |
| Occidental Petroleum | $75.22 | 9.7x | $57.57 |
| Devon Energy | $72.47 | 8.6x | $19.78 |
| Apache Corporation | $67.90 | 6.4x | $20.31 |
| Marathon Oil | $67.43 | 5.6x | $11.96 |
| Hess Corporation | $67.38 | 7.4x | $17.14 |
| Murphy Oil | $63.31 | 5.0x | $4.98 |
| Anadarko Petroleum | $61.77 | 7.2x | $27.89 |
| Noble Energy | $57.60 | 7.4x | $15.05 |
| ConocoPhillips | $57.57 | 6.2x | $50.48 |
| Pioneer Natural Res. | $57.54 | 10.5x | $25.09 |
| Total Group Average | $65.96 | 7.7x | $26.80 |

*Source: UBS Weekly as of 7/25/2016*

# Top 20 Holders

| Top Shareholders | Investment Style | 2Q16 BOD Meeting (MM) | Change* (MM) |
|---|---|---|---|
| ClearBridge Investments, LLC | GARP | 38.7 | 3.6 |
| The Vanguard Group, Inc. | Index | 32.9 | 0.5 |
| State Street Global Advisors (US) | Index | 25.2 | 0.4 |
| Fidelity Management & Research Company | GARP | 23.8 | -3.2 |
| Wellington Management Company, LLP | Core Value | 23.6 | -0.8 |
| BlackRock Institutional Trust Company, N.A. | Index | 20.9 | 0.8 |
| Franklin Advisers, Inc. | Income Value | 14.9 | 2.2 |
| Carmignac Gestion | Growth | 12.8 | 0.7 |
| Harris Associates L.P. | Core Value | 8.5 | -2.6 |
| Dodge & Cox | Deep Value | 8.0 | 8.0 |
| BlackRock Financial Management, Inc. | Core Growth | 7.0 | -1.3 |
| Adage Capital Management, L.P. | Hedge Fund | 6.6 | -0.4 |
| Goldman Sachs Asset Management (US) | Core Growth | 6.1 | 2.7 |
| BlackRock Investment Management (UK) Ltd. | Core Growth | 5.7 | 0.0 |
| Putnam Investment Management, L.L.C. | Core Growth | 5.3 | 0.6 |
| D. E. Shaw & Co., L.P. | Hedge Fund | 4.5 | 0.2 |
| Norges Bank Investment Management (NBIM) | Core Value | 4.5 | 0.0 |
| American Century Investment Management | Core Growth | 4.2 | 0.5 |
| Geode Capital Management, L.L.C. | Index | 4.0 | 0.0 |
| Northern Trust Investments, Inc. | Index | 3.9 | 0.0 |
| | TOTAL SHARES: | 261MM | 12MM |

** Compared to 1Q16 BOD Meeting positions*
*Source: ThomsonOne*

# APC Sell-Side Overview

| | Current | Previous BOD |
|---|---|---|
| **BUY** | **29** | **28** |
| **HOLD** | **7** | **7** |
| **SELL** | **1** | **-** |
| Average Price Target | $65 | $61 |

| **Changes in Ratings** | ***Current Price Target*** |
|---|---|
| Drexel Hamilton – Initiated Coverage Buy | $108 |
| CLSA- Initiated Coverage Sell | $58 |

*Source: Factset*

A N A D A R K O P E T R O L E U M C O R P O R A T I O N



2016
BOARD OF DIRECTORS

# U.S. Onshore

Darrell Hollek, Executive Vice President

August 1, 2016

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

# HSE Performance: U.S. Onshore 2nd Quarter 2016

## Employee and Contractor Safety Performance

- Employee TRIR higher in 2Q 2016
  - *Of 6 in the Qtr, 3 were hearing shifts*
- Contractor TRIR lower in 2Q 2016
  - *Lowest in last 8 yrs*

## Regulatory Update

- Federal Court ruled against BLM regulating hydraulic fracturing on federal lands
- Public comment period for draft Pipeline Hazardous Material Safety Administration (PHMSA) pipeline safety regulations ended
  - *Final rules expected by end of 2016*
- Responding to numerous U.S. EPA request for compliance information
- U.S. EPA finalizing an Information Collection Request (ICR) for air quality data

## Seismicity

- Anadarko will participate in the Texas Center for Integrated Seismicity Research (CISR)




## SEEP CEO Winners

- Rockies Completions
  - *Chairman's award for Safety Excellence*
- Powder River Basin
  - *Chairman's award for Environmental Excellence*

# 2nd Qtr Highlights & 2016 Outlook

## Production Outlook

- Capital reduced >70% from 2014
- LOE and G&A have followed capital reductions
- Production declines lag capital by 6 quarters
  - *Base management*
  - *Strategic utilization of DUC inventory*

## Q2 Records With Lower Activity

- GWA Q2 prod record – 243 MBOE/d
  - *Gross Gas Record 715 MMcf/d*
- GWA Q2 drilling records
  - *$589 M for a short lateral well*
  - *$46/ft (Avg is down 13% from Q1 2016)*
- DB Q2 prod record – 46.7 MBOE/d
  - *4 consecutive weeks of prod records*
- DB Q2 drilling records
  - *$88/ft for 7,500' lateral @ $1.66 MM total drill costs*



# 2016 U.S. Onshore Business Delivery







## Q3 Areas of Focus

- Improve TRIR
- Execute asset sales
- Cost structure – LOE, transport, G&A etc.
- Continue to implement process safety
- Aggressively optimize base production
- Funding options for DB & DJ

**2016 FORECASTED U.S. ONSHORE BUSINESS DELIVERY**

| | Total Prod | Oil | Capex | Controllable Cash Costs/BOE | Reserves |
|---|---|---|---|---|---|
| Wattenberg | Favorable | Favorable | On Target | Favorable | On Target |
| Uintah Basin | Unfavorable | On Target | On Target | Favorable | On Target |
| Wyoming | On Target | On Target | On Target | Favorable | On Target |
| Eagleford | On Target | Unfavorable | Favorable | Favorable | Favorable |
| Marcellus | Favorable | On Target | Favorable | On Target | Favorable |
| Carthage/HV | On Target | On Target | On Target | Favorable | Favorable |
| Delaware Basin | Favorable | Favorable | Unfavorable | On Target | Favorable |
| **TOTAL U.S. ONSHORE** | On Target | On Target | Unfavorable | On Target | Favorable |

Favorable On Target Unfavorable

[redacted]

[redacted]

[redacted]

# U.S. Onshore 2016 Divestiture Program

● 2016 Targeted Divestitures

**CLOSED**

- **Wamsutter**
  - Effective Date: 7/1/16
  - 322,000 acres
  - $610 MM
- **Steward – DB**
  - Effective Date: 2/2/16
  - 9,800 acres
  - ~$136 MM
- **East Chalk**
  - Effective Date: 3/7/16
  - 100,000 acres
  - $107 MM

[redacted]

[redacted]



2016
BOARD OF DIRECTORS

# Anadarko Midstream

Don Sinclair – SVP; President & CEO, WES & WGP

August 1, 2016

[redacted]

# WES and APC Midstream Evolution

## Capital Expenditures




## EBITDA




Note: WES financial data shown on an as reported basis

# WES / WGP: Significant Business Creating Value

## % of Natural Gas Throughput

At IPO | YE 2015[2]




| EV / 2016E EBITDA[1] | |
|---|---|
| WES | 17.4x |
| Peers[3] | 13.1x |
| | |
| Current Yield[1] | |
| WES | 6.5% |
| Peers[3] | 8.2% |

## Operating Data[2]

| Pipelines (mi) | | 13,980 |
|---|---|---|
| Compression (HP) | | 983,840 |
| Proc / Treat Capacity (MMcf/d) | | 4,204 |
| Avg Throughput | (MMcf/d) | 3,996 |
| | (Mbbls/d) | 138 |

## Enterprise Value

| Market Capitalization[1] | ($MM) |
|---|---|
| WES | 5,280 |
| WGP | 8,209 |
| Net Debt | 2,810 |
| Total Enterprise Value | 16,299 |

Notes:
1. Dated July 8, 2016; research estimates provided by UBS MLP Weekly report as of July 8, 2016
2. As reported for 12 months ended December 31, 2015
3. Peer group includes AM, AMID, CEQP, CNNX, DPM, ENBL, ENLK, EQM, MEP, PTXP, RMP, SMLP, SXE, WPZ

# WES/WGP EV Compared to Peers




Source: *UBS MLP Weekly, for the week ended 7/8/2016*

# APC US Onshore Headcount

| | Denver | The Woodlands | Field Locations | % in Field | Total Headcount | % of Total Headcount |
|---|---|---|---|---|---|---|
| **Rockies** | 189 | | 480 | 72% | 669 | 25% |
| **S&A** | | 184 | 418 | 69% | 602 | 23% |
| **Midstream** | 73 | 80 | 680 | 82% | 833 | 31% |
| **E&P Services** | 176 | 292 | 44 | 9% | 512 | 19% |
| **Exploration** | 12 | 33 | | - | 45 | 2% |
| ***Total Corp*** | ***450*** | ***589*** | ***1,622*** | ***61%*** | ***2,661*** | ***100%*** |

# Motivation for Change

- **Optimize Project Based Model as a Margin-Driven Service Provider**




- **Advance Process Safety Management**
  - Revisit post Ramsey incident
  - Improve enterprise risk mitigation
- **Align as a Large Gatherer and Processor**
  - Increase accountability
  - Develop critical skillsets
- **Increase Third-Party Focus**
  - Leverage "golden infrastructure"
  - Protect APC volumes



# Midstream Re-Organization

- Combined WES & APC Midstream Under Common Leadership April 2016
- Added Midstream Operations to Structure with Commercial & Engineering



ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# International and Deepwater Exploration

Bob Daniels, Executive Vice President

August 1, 2016

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

# 2016 6&6 Capital Forecast: $435 MM

[redacted]

| Area | Budget ($ MM) | 6&6 Forecast ($ MM) |
|---|---|---|
| *International* | 311 | 311 |
| *Gulf of Mexico* | 73 | 111 |
| *INV & Technology* | 13 | 13 |
| **Total** | **$398** | **$435** |

*Data may not add to totals due to rounding

**CAPITAL BREAKDOWN BY COUNTRY/REGION**
**6&6 FORECAST**



# 2016 Gulf of Mexico Exploration Activity

[redacted]

**SHENANDOAH**

Shenandoah-5 Successful

1043 ft Net Oil Pay

Shenandoah-6 Planned for Q4

[redacted]



# Shenandoah Appraisal Update

- Confirmed HC Accumulation East of Shen-2
- Encountered 1,043 Ft Net Oil Pay
- Full to Base, No Water Encountered
- Approximately 420 Ft Updip from Shen-2
- Shen-6 Planned for Q4 2016






[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exploration Looking Forward

## Strengths

- Reputation
- Track record of success
- Institutional knowledge
- Seismic imaging and attribute advantage
- Depositional and petroleum system knowledge
- Deepwater drilling and development skills
- Unconventional expertise
- Global business development

## Weaknesses

- Inventory depth
- Portfolio diversity/concentration risk
- Partnering challenges
- Competition for limited capital
- Reluctance to take on longer term commitments

## Opportunities

- Leverage APC name brand
- Buyer's market
- High quality opportunities available
- Take advantage of "lower" entry costs
- Governments flexible

### Areas of Interest



# Organic Exploration Success Drives Value Creation

10-YEAR LOOKBACK

**~$10 Billion**
Capital Invested

Net Discovered Resources — **~6.5 BBOE**

Monetized — **~$14 Billion**

Resources Retained — **~5 BBOE**
Net Production — **~250 MBOE/d**

**Recognized Industry Leader***
Organic Volume Additions
Value Creation

**Unmatched Option Value**
Develop the Best, Monetize the Rest

**Legacy Asset Creation**
Lucius, Jubilee, Mozambique, Shenandoah....

## Organic Volume Additions, BBOE (2009-2013)




*Source: Wood Mackenzie Exploration Service Corporate Benchmarking Report, September 2014.

## Value Created, $ B (2009-2013)




*Source: Wood Mackenzie Exploration Service Corporate Benchmarking Report, September 2014.

ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# International & Deepwater Operations

Jim Kleckner, Executive Vice President

August 1, 2016

[redacted]




2016 Forecast: $1,043 MM




[redacted]

| 2016 Total Year Forecast | Gulf of Mexico | Ghana | Algeria | Alaska | Forecast | Budget | Variance |
|---|---|---|---|---|---|---|---|
| Production, MMBOE | 28 | 8 | 26 | 4 | 66 | 65 | |
| Capital, $MM | 654 | 255 | 40 | 94 | 1043 | 1052 | |
| LOE, $/BOE | 6.07 | 19.84 | 3.98 | 12.38 | 7.20 | 6.57 | |
| EBITDAX, $MM | 543 | 157 | 634 | 79 | 1413 | 1366 | |
| G&A, $MM | 42 | 10 | 27 | 2 | 81 | 92 | |
| Reserves, MMBOE | 13 | 7 | 11 | 2 | 33 | 42 | |

# Health, Safety and Environmental Overview

## LiveSAFE – "Journey to Safety Excellence"

- Behavioral Based Safety Culture
- Making Safety Personal, Relevant and Important
- 440 Classes Conducted Since 2008

## Safety Performance

- YTD Intl/DW Employee TRIR Reflects Two Incidents:
  - *Hearing Shift; Office Move Injury*
- YTD Intl/DW Contractor TRIR Reflects:
  - *Restricted/Lost Time Injuries 18; Medical Treatment Injuries 7*

## Recognition & Awards

- Center for Offshore Safety - 2015 Offshore Safety Leadership Award
- Bureau of Safety and Environmental Enforcement (BSEE) Audit – 0 Findings; 19 Best Practices

## APC Leads Joint Mexico/US Offshore Safety Preparedness Drill

- Tabletop Exercise Held with Over 144 Participants Including Multiple US & Mexican Agencies
- APC is the Responsible Party for the Next MEXUS Full-Scale Exercise in 2017

Intl & DW Americas Safety Performance




**2016 numbers reflect adjusted org structure removing ~350,000 man hours



# Gulf of Mexico: Near-Term Value Growth

- **Tie-backs Continue to Exceed Expectations**
  - BTAX ROR 35% - 100%
- **Expanding Facilities to Meet Record Production Volumes**
- **Leveraging Infrastructure for Entry into 3rd Party Opportunities**




| NET SALES VOLUMES | 2015 | 2016E |
|---|---|---|
| LIQUIDS (MBBL/D) | 68 | 76 - 79 |



[redacted]

[redacted]

[redacted]

# Deepwater Drilling Rig Commitments

- **Negotiated Short Term Reduced Rate Option for the Rowan Resolute Drillship**
  - Schedule Up to 7 Months of Holiday/Drilling at $180 M/d – Add 9 Months at $580 M/d to End of Contract (Decrease of $42 M/d Below Existing Contract)
  - Reduced 2016 Capital Spending by ~$110 MM
- **Supplementing Schedule with New Tie-Back Opportunities**
- **"Partner Supported" Project Inventory Challenged Due to Capital Constraints**
- **Evaluating Early Rig Contract Termination Options**



ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# Global LNG

Mitch Ingram, Executive Vice President

August 1, 2016

IDENTIFY AND COMMERCIALIZE RESOURCES ▪ EXPLORE IN HIGH-POTENTIAL PROVEN BASINS ▪ GLOBAL BUSINESS DEVELOPMENT APPROACH ▪ ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

# Status Update

[redacted]

# Legal and Contractual Framework

[redacted]

[redacted]

# Path Forward

[redacted]



2016
BOARD OF DIRECTORS

# 2016 Strategy Discussion

August 1-2, 2016

# Areas of Discussion

## AUGUST 1ST – FUNDAMENTAL ANALYSIS AND BACKGROUND

- **Commodity Markets Outlook**
- **Industry Dynamics**
  - Impacts of Low Commodity Pricing on Global Industry
  - Lower 48 (L48) Growth Outlook
- **Enterprise Risk**
  - Governance Structure and Discussion of Current Key Risks
- **Major Asset Overviews**
  - Portfolio Characteristics and Attributes

## AUGUST 2ND – STRATEGY DISCUSSION

- **Strategy Discussion**
  - Fundamental Business Objectives
  - Competing Priorities
  - Tactical Implications of Increased Volatility
  - Commodity Pricing Scenario Analysis
    - *"Crisis Management" ($40 oil, $2.50 gas)*
    - *"Back to Work" ($60 oil, $2.75 gas)*
    - *"Recovery" ($70 oil, $2.75 gas)*
- **Summary and Discussion**

# Executive Summary

## Commodity Market Volatility Continues

- Moderately improving supply/demand fundamentals
- Multiple industry structural factors supportive of higher pricing
- Current market pricing still significantly challenged
  - *2017 forward strip ~$50/barrel; Prompt month ~$47/barrel*

## Execution of Historically Successful Business Model Challenged Under Current Market Conditions

- Multiple business priorities competing for investment under constrained cash generation capacity
- Inability to fund all priorities within organic cash flows at current commodity price levels

## Necessary to Understand Business Capabilities / Limitations Under a "Reasonable" Range of Commodity Price Outcomes

- Near-term tactical decisions will vary based on prevailing commodity price conditions
- Relatively small movement of commodity price assumptions has a significant impact on financing demands of current business model
- Scenario planning models are best suited to frame strategic analysis of options

## Process Designed to Engage the Board in Discussion of Topical Business Issues

- Ensure understanding of key business issues and risks
- Clearly demonstrate portfolio capabilities and limitations

# Executive Summary (continued)

## Scenario Planning

- Provide insight into business limitations / potential under a range of commodity price outcomes
  - *"Crisis Management" ($40 oil price / $2.50 gas price)*
  - *"Back to Work" ($60 oil price / $2.75 gas price)*
  - *"Recovery" ($70 oil price / $2.75 gas price)*

## "Crisis Management"

- Significant business stress
- Unable to adequately fund historically successful business model
- Business viability in question without significant restructuring

## "Back to Work"

- Cash generation capacity sufficient to fund *most* business objectives
- Key scenario considerations
  - *Investor expectations around growth delivery*
  - *Upstream industry response*
  - *Potential reduction in flexibility commensurate with increased long-cycle capital commitments*
  - *Appropriate leverage position (considering commodity price volatility, growth expectations and capital commitments)*

## "Recovery"

- Cash generation capacity sufficient to fund *all* business objectives
- Key scenario considerations
  - *Management of investor expectations (growth, profitability, etc.)*
  - *Significant upstream industry response expected (impact on service cost inflation/growth capacity)*
  - *Ability to reduce leverage over time via free cash flow*

ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# Commodity Market Outlook

# Executive Summary

## GLOBAL CRUDE OIL

Oil market fundamentals continue to improve as demand growth consistently exceeds market expectations and Non-OPEC production declines accelerate while unexpected supply outages in Canada, Nigeria and Venezuela outweigh Iran's strong return to the market. The price recovery has stalled on continued concerns of demand growth being impacted by economic weakness and thus far slower than expected inventory declines for both crude oil and refined products. The global oil market is expected to move into a supply deficit position by 2H2016 which will result in sustained inventory draws and provide further price support heading into 2017. Longer-term balances suggest a slowing of demand growth (~1 MMB/d) as OECD countries return to their slow structural declines, but overall demand still increases to over 100 MMB/d by 2020. The market will require nearly 20 MMB/d of new supply by 2020 to not only meet this expected demand growth, but to also overcome existing production declines which are likely to be steeper as a result of a sustained period of lower upstream investment. This supply requirement is too large to be met fully by lower cost US shale and OPEC alone. Prices are therefore expected to increase to $65 - $70/B level by 2018 to encourage investment in marginal supply sources such as Brazil (deep water) and Canada (oil sands).

## US NATURAL GAS

Natural gas price increases this quarter have reflected a tightening of the fundamentals as US production declines and solid structural demand growth bring the market towards a more balanced position. Stocks are positioned to end the 2016/17 heating season at normal levels, but may be below normal as initial forecasts indicate colder winter temperatures. The longer term outlook for demand growth remains robust as consumption reaches approximately 100 Bcf/d by 2020 driven by strong increases in LNG shipments (+8 Bcf/d) and higher export volumes to Mexico (+2 Bcf/d). Large base decline rates from shale gas wells coupled with continued strong demand growth will require nearly 40 Bcf/d of new supply to meet expected demand in 2020. Although the Appalachia region is poised to fill a portion of this supply requirement, continued infrastructure limitations in the region will require Haynesville, Gulf Coast and/or Midcontinent volumes to balance the market. Prices are expected to increase towards the estimated breakeven in those regions outside of Appalachia (~$3/MMBtu) to stimulate investment. However, a concurrent cyclical recovery in both gas and oil upstream activity has the potential to lead to service cost escalation likely pushing breakeven prices beyond current levels.

## US NATURAL GAS LIQUIDS

As a preview into the future NGL market, the second quarter resulted in notable improvement via growing ethane demand and consistent propane exports. The outlook for ethane continues to be constructive in late 2016 and into 2017 as existing crackers return to service with expanded capacity, waterborne exports commence from the US Gulf Coast and as many as five new crackers begin operation over the next 18 months (~500 MB/d of additional demand capacity). While a similar dynamic is unfolding on the propane side via PDH start-ups and new export capacity, domestic consumption along with steady exports and flattening gas plant production will be needed to rebalance the market late in 2017. Post-2017, higher ethane premiums (over gas value) will be needed to motivate additional extraction to meet demand. Infrastructure constraints will be focused on fractionation as capacity additions will lag the market due to commitment fatigue from the previous build-out. An improving domestic market for propane will hamper export growth and result in underutilization of terminal capacity.

# Crude Oil Outlook

- **Future demand growth expected to slow vs. recent robust rates**
  - Outlook for slower China economic growth
  - OECD demand reverts back towards slow structural decline
  - Global demand reaches 100 MMBbl/d by 2020
- **2020 supply requirements can't be met just by core OPEC and US Shale**
  - Capacity adds in Iran/Iraq will be offset by losses in OPEC Africa and Venezuela
  - Global balance requires supply growth from oil sands and deep water
- **Marginal supply sources (i.e. Non-OPEC/Non-US shale) require $65 - $70/B to stimulate investment**
  - Service cost escalation likely as activity / oil prices increase
  - Volatility may lead to higher discount rates also offsetting current low cost structure

| Nominal ($/Bbl) | 2018 – 2020 | |
|---|---|---|
| | Brent | WTI |
| Forward Market (7/18/16) | 56 | 53 |
| Analyst Range | 69 - 81 | 66 - 78 |
| APC Fundamentals | 78 | 75 |




*Source: NYMEX, APC Fundamentals, PIRA, IHS, WoodMac, Citi*




*Sources: APC Fundamentals*

# Natural Gas Outlook

| Nominal ($/MMBtu) | 2018-2020 |
|---|---|
| Forward Market (7/18/2016) | 3.03 |
| Consultant Range | 3.25 - 4.00 |
| APC Fundamentals | 3.60 |

- **US gas demand growth approaches ~20 Bcf/d despite impact of renewables in power sector**
  - LNG exports add ~ 8 Bcf/d while Mexico export growth adds ~2 Bcf/d
- **Continuation of NE pipeline constraints requires new supply outside of Appalachia to balance market**
  - Over 25 Bcf/d of new supply needed outside of Northeast
  - Marginal gas prices must be set based on economics outside of Appalachia
- **Long-term prices being driven toward $3.50 or more to meet non-Appalachian breakevens and likely service cost escalation**
  - Gulf Coast breakeven prices likely to provide guideline for long-term price trends







*Sources: APC Fundamentals, WoodMac*

# Global LNG Supply and Demand

## Global LNG Demand vs. Post FID Supply




Source: Wood Mackenzie

## Global LNG Demand vs. Contracted Supply




Source: Wood Mackenzie

- **Until 2021, demand growth met with operational and under construction (post FID) supplies**
- **Additional supply needed from new (Pre-FID) sources starting in 2022**

**Increasing competition to fill the gap due to significant un-contracted supply from:**

- Existing projects
- Under construction projects (Post FID)
- Development projects (Pre FID)
- Customers with over contracted volumes



2016
BOARD OF DIRECTORS

# Commodity Markets Fundamental Analysis

# Crude Oil Summary

| Nominal ($/Bbl) | 2H 2016 | | 2017 | | 2018 – '20 | |
|---|---|---|---|---|---|---|
| | Brent | WTI | Brent | WTI | Brent | WTI |
| Forward Market (7/18/2016) | 49 | 47 | 52 | 50 | 56 | 53 |
| Analyst Range (Avg. Min – Max) | 50 - 55 | 49 - 55 | 53 - 62 | 53 - 59 | 69 - 81 | 66 - 78 |
| APC Fundamentals | 53 | 53 | 60 | 60 | 78 | 76 |

## Key Market Fundamentals

- 2016 demand stronger than forecasted; while output disruptions in Canada and Nigeria have offset Iranian supply growth – consensus market balance now 2H16 and stock draws thru 2017
- Price forecasts have increased by $6 - $7/B vs. previous quarterly update. Forward market not reflecting long-term cost of supply to stimulate sufficient new investment
- Conservatively estimated oil demand growth and base decline rates require ~20 million B/d of new supply by 2020
- Market will be unable to balance on OPEC and US shale alone. Oil sands and deep water projects require $65 - $70/B at today's costs. Service cost escalation likely as activity/prices increase




Source: NYMEX, APC Fundamentals, PIRA, IHS, WoodMac, Citi




Sources: IEA, EIA, JPMorgan, Goldman Sachs, Citi, Energy Aspects, WoodMac, PIRA, APC Fundamentals

# Global Oil Demand







*Sources: IEA, EIA, Energy Aspects, JODI, WoodMac, APC Fundamentals*
*Europe-5 = UK, France, Italy, Germany & Spain*




*Sources: IEA, Citi, JPMorgan, Goldman Sachs, Energy Aspects, WoodMac, PIRA, APC Fundamentals*

- **2016 demand thus far exceeding consensus expectations (1H16 ~1.5 and FY16 ~1.4 MMB/d)**
  - Market has consistently underestimated demand growth since 2015
  - China's industrial slowdown impacting diesel; but consumer fuel use increasing (LPG, gasoline and jet fuel)
  - India's demand growth ~300 MB/d on strong economy and hydroelectric issues (increasing diesel demand)
  - US gasoline consumption maintaining pace, pick up in diesel demand in 2Q16
- **2016/17 global demand forecasts ↑ ~0.2 MMB/d from previous update**
  - Concerns over China have waned; while India and US demand have remained strong during 1H16
  - Demand growth slowing and refining margins trending lower, anticipate lower growth thru 2H16 and into 2017
  - Continued Non-OECD growth dependent on India, China and Middle East

# Non-OPEC Supply

- **Consensus outlook for US supply below 8.5 million B/d thru 2017**
  - Y-O-Y declines approaching 1 MMB/d by mid-2016
  - Some forecasts expect increased output by late 2016 on assumption of drilling / completions pick-up at ~$50/bbl
  - APC Fundamentals expects steeper declines based on slower return of capital spending and lag effect when activity resumes
- **Reductions in upstream capital spending visible in other Non-OPEC; output has declined >1.0 MMB/d Y-O-Y thru Apr-16**
  - Canada wildfire related declines estimated at 900 MB/d in May and 400 MB/d in June (not shown in chart to right)
  - China output has declined by 300 Mb/d on upstream spending cuts.
  - Kazakhstan output hit 4-year low in April as declines accelerate and a pick up in maintenance activities
  - Brazil output has recently steadied on new pre-salt project development; but Mexico and Colombia trending lower




*Sources: EIA, Genscape, Goldman Sachs, Standard Chartered, WoodMac, PIRA, APC Fundamentals*




*Sources: IEA*

# OPEC Supply




*Sources: History - IEA, EIA, OPEC, Argus Media, Reuters ; Forecast - Various Sources*




*Sources: IEA, EIA, OPEC, Argus Media, Reuters*

- **Iran supply return has surprised to upside (↑ +800 MB/d vs. 4Q15)**
  - New oil fields and two South Par condensate projects have provided output boost; but likely some inventory liquidation being counted as supply increase
  - Further growth and/or sustainability of supply increase still in question

- **Iran's upside being offset by OPEC outages and Iraq/Saudi restraint**
  - Political instability / social unrest has impacted output in Nigeria, Libya and Venezuela (↓+600 MB/d in May)
  - Saudi Arabia and Iraq not exhibiting same production growth as 2015 (~flat vs. 4Q15)
    - *Iraq output likely to have plateaued in near-term on upstream investment cuts / focus on insurgents*
    - *Saudi crude inventories have declined ~50 million bbls since Oct 2015 through the end of May*
    - *Al-Falih after OPEC meeting "[t]here is no reason to expect Saudi Arabia is going on a flooding campaign"*
    - *Neutral Zone could still add ~500 MB/d to market if fields were restarted with Kuwait*

# Global Petroleum Inventories

- **OECD inventories have remained relatively flat since Aug. 2015**
  - OECD petroleum inventories still ~350 MMB above 5-year averages
  - Nearly three quarters of the excess OECD petroleum inventories accounted for in US
  - US excess petroleum inventories approximately 50/50 crude oil and refined product




Source: IEA

* Includes NGLs + Feedstocks

- **1H16 US crude inventory builds followed more typical seasonal trends**
  - 2016 crude inventory build half the levels of 2015 and ~20 million bbls above 5-year average
  - Foreign crude imports ↑ 600,000 B/d Y-O-Y; leading to sustained inventory levels
  - Accelerating declines in US supply, removal of export ban, and tighter crude time structure (<$1/bbl 2nd mo. – front) expected to push US inventories near 5-year range by EOY.




Sources: EIA, APC Fundamentals

# Global Oil Supply / Demand Balance - 2020




*Sources: IEA, Wood Mackenzie, BP, Barclays, APC Fundamentals*

- **Long-term oil demand growth expectations tempered vs. historical consumption rates**
  - 2015 – 2020 global demand growth subdued ~1 million B/d
  - Slower China economy primary driver for lower non-OECD demand; Current OECD demand strength seen as temporary, revert back towards slow structural decline
  - Global demand @100 million B/d in 2020




*Sources: APC Fundamentals*

- **Global supply additions of ~20 million B/d needed to offset declines and meet new demand growth**
  - Base decline rate likely higher than 5% in near-term due to lower upstream investment from prolonged low price environment
  - Analysis assumes OPEC exhausts current levels of spare capacity

# Long-term OPEC / Non-OPEC Supply

- **OPEC spare capacity not expected to increase appreciably by 2020**
  - Overall OPEC productive capacity has remained relatively unchanged since 2005
  - Since Saudi Arabia capacity increase in 2009/10 additional capacity increases from Iran and Iraq have been offset by losses elsewhere
  - Trend expected to continue into 2020 – capacity adds in Iran will be balanced with losses in Africa, Indonesia and Venezuela




Sources: IEA, WoodMac

* History includes Angola, Ecuador and Indonesia for comparison purposes

- **2020 supply requirements need Non-OPEC investment beyond US shale**
  - US shale will represent a large portion of future supply growth, but market can not balance without other Non-OPEC supply
  - With conservative base decline rates and demand growth estimates; global balance requires supply growth from oil sands (Canada) and deepwater (Brazil)




* includes Biofuels, GTL and other non-conventional oils; excludes OPEC NGLs

Sources: IEA, WoodMac

# Cost of Supply

- **Cost curve data suggests marginal supply requires $65 - $70/B to stimulate sufficient supply investment**
  - Lower marginal costs due to wider middle section of curve from expanding potential of shale and service sector deflation
  - Upside price risk on cost escalation and decreased well productivity with increasing activity in more marginal shale plays
- **Higher prices likely to result in a return to service cost escalation**
  - Historical relationship suggests drilling costs ~10% higher than current when crude prices reach $65/B
  - Price volatility could lead to higher discount rates also offsetting lower cost structure
- **Assuming cost escalation in higher price environment - breakeven price likely increases to $70/B**




Sources: Goldman Sachs, WoodMac, APC Fundamentals




Sources: NYMEX, Genscape

# Crude Oil Price Outlook – 2020




*Source: NYMEX, APC Fundamentals, PIRA, IHS, WoodMac, Citi*




*Sources: ICE*

- **Consultants anticipating price increases >$70/B by 2020**
  - Long-term price expectations are +$20/B above current forward market
  - Higher prices >$60-65/B needed to support investment in non-OPEC supply (i.e. deep water, oil sands, etc.)
- **Long-term Brent-WTI differential ~ $2 – 4/B**
  - Near-term (2016-2017) likely to be narrow (<$1/B) as declining US production requiring higher import levels
  - Longer term (2018+) WTI expected to equilibrate with international market in Latin America / Europe
- **Long end of forward curve has traded below $65-$70/B since mid-2015**
  - Investment deferrals may delay necessary supply additions; leading to upward price volatility later in period

# Natural Gas Summary

| Nominal ($/MMBtu) | 2H 2016 | 2017 | 2018-'20 |
|---|---|---|---|
| Forward Market (7/18/2016) | 2.85 | 3.14 | 3.03 |
| Consultant Range | 2.30 – 2.70 | 2.80 - 3.50 | 3.25 - 4.00 |
| APC Fundamentals | 2.65 | 3.30 | 3.60 |

## Key Market Fundamentals

- Combination of export driven demand growth and supply declines create potential for price volatility through 2017 as Appalachian pipeline restrictions continue
- Demand growth through 2020 approaches 20 Bcf/d even with renewables replacing ~ 5 Bcf/d of gas demand
- Expected continuation of Northeast US pipeline constraints means new supply outside of Appalachia will be needed to balance market
- Long-term price curve being driven toward $3.50 or more by 2020 due to non-Appalachian breakeven costs and service cost escalations






# US Gas Demand




*Sources: APC Fundamentals, Goldman Sachs*

- **2016 demand slightly weaker than expectations to date, but 2H16 remains generally strong**
  - Lower demand on mild 1Q16 weather (-0.5 Bcf/d) and 2Q16 price gains easing coal-to-gas (C2G) switching (-0.5 Bcf/d)
  - Mexico and LNG exports each up ~1 Bcf/d
  - Industrial gas demand up ~0.5 - 1 Bcf/d (chemical & fertilizer plants along USGC)
- **2017 demand outlook mostly unchanged; key drivers of Mexico/LNG exports and industrial demand adding over 2 Bcf/d**
  - Higher 1H17 prices eases C2G switching, lowering Y-O-Y demand significantly
  - Ethane crackers add ~0.3 Bcf/d industrial demand
  - Sabine Pass T2 brings total exports above 1.5 Bcf/d (assuming full utilization), +1 Bcf/d from 2016
  - Mexico exports exceed 4 Bcf/d with new pipe completions, +0.5 Bcf/d from 2016

# Gas Demand – Renewables Impact

- **Primary growth of renewable electric generation to come from wind, nearly doubling from 2015 to 2020**
  - 14 GW capacity added through 2017
  - Additional 24 GW capacity expected from 2018 - 2020
- **New hydro generation also expected in near-term outlook**
  - 4 units planned in Washington
  - Smaller units in Texas, Kentucky, and Iowa
- **Collective growth of all renewable sources expected to increase by 7-9 % per year through 2020**
- **Renewables growth equates to about 5 Bcf/d of gas demand loss and has been factored into demand forecasts**




*Source: EIA AEO 2016*



# US Gas Supply

- **2Q16 production nearly flat**
  - Production down 0.3 Bcf/d Y-O-Y
  - Northeast growth ~2.8 Bcf/d offset by TX (-1.2 Bcf/d) and Midcon (-0.6 Bcf/d)
- **2H16 prod to decrease ~1.5 Bcf/d Y-o-Y**
  - Key declines are South TX (-1.1 Bcf/d), Rockies (-0.7 Bcf/d), and Midcon (-0.9 Bcf/d)
- **Supply growth resumes in 2H17 (>3 Bcf/d) to meet demand**
  - Denial of NY water permit postpones Constitution pipeline until 2H18 at earliest
  - NEPA growth limited to < 0.5 Bcf/d until Atlantic Sunrise, anticipated end 2017/early 2018
  - Utica and SWPA growth (+2.5 Bcf/d) also pipe dependent, but needed projects under construction with no anticipated issues
  - Gulf Coast supply declines of almost 1 Bcf/d Y-o-Y must flatten to balance demand estimates, some additional drilling needed
- **Supply restrictions → price volatility**
  - Colder than normal winter is forecast
  - Appalachian supply may not be able to fully meet additional demand

**US L48 Production Growth**




*Sources: Genscape, APC Fundamentals, various consultants*

**Marcellus Production vs. Pipeline Takeaway**




*Sources: APC Fundamentals*

# Gas Supply/Demand Balance – 2020




*Sources: APC Fundamentals, WoodMac*

- **Total demand to grow 20 Bcf/d by 2020**
  - LNG exports add ~ 8 Bcf/d
  - Mexico export growth adds ~2 Bcf/d
- **Steep decline rates (e.g., 68% 12-mo rate in Appalachia) from unconventional plays require ~37 Bcf/d of supply to be replaced**
- **New gas supply of ~55 Bcf/d required to balance demand**
  - No more than half of new supply from Northeast US due to pipeline constraints
  - NE supply growth requires new pipe projects, especially Atlantic Sunrise, Rover, Leach Xpress and many other projects; Constitution Pipeline not required but would be very helpful
  - Over 25 Bcf/d of new supply needed outside of Northeast → marginal gas prices must be set based on economics outside of Appalachia

# Gas Cost of Supply

- **Most economic supply outside of Appalachia is in Gulf Coast and Rockies**
  - Haynesville breakeven: ~$2.50 to $3.50
  - Other Gulf Coast and Midcontinent: ~$3.00
- **Extensive gas supply available with near term breakeven near $3.00**
- **Service cost escalation likely; potential to drive breakeven prices closer to $3.50**
  - Concurrent recoveries of both oil and gas upstream activity has not occurred in market for some time
  - Service sector already operating at very depressed cost levels; uptick in activity will likely result in corresponding increase in costs
- **Other consultant estimates suggest NYMEX above $3.50 required just to grow production**




*Sources: APC Fundamentals, Genscape, WoodMac*



# Henry Hub Price Outlook – 2020

- **Long term price outlooks generally reflect need for higher prices by 2020**
  - Strong demand growth requires high volume of new supply
  - Northeast pipeline constraints preclude Appalachia from meeting all growth
  - Gulf Coast breakeven prices likely to provide guideline for long-term price trends




- **Long dated contracts had been steadily trending down since the beginning of 2015 until flattening in 2016**
  - Abundant supply has encouraged cost efficiencies
  - Record low count of active rigs leaves only most efficient equipment active; production growth needed to put upward pressure on costs




*Note: Monthly average data do not fully reflect changes from end February to present because of intra-month volatility in February prices*

# APC Price Scenario Comparisons

- **Lower end oil price scenarios below consultant outlooks and cost of supply analysis**
  - $40/B case results in global supply shortfall; would lead to upside price pressure
  - $60/B case consistent with forward market and conservative cost of supply analysis
  - $70/B case in line with longer-term consultant & APC Fundamentals expectations and accounts for likely service cost escalation



Source: NYMEX, APC Fundamentals, PIRA, IHS, WoodMac

- **All gas price scenarios below fundamental outlooks**
  - $2.50/MMBtu case unsustainable as supply ex-Appalachia cannot be economically produced and pipeline constraints limit production potential from Northeast
  - $2.75/MMBtu case also below ex-Appalachia breakeven costs – would require continued cost efficiency gains or if Mexico and/or LNG export demand severely underperforms base case estimates



Source: NYMEX, APC Fundamentals, PIRA, IHS, ICF, WoodMac

# Ethane Summary

## Price

| Mont Belvieu (% WTI) | 2H 2016 | 2017 | 2018-'20 |
|---|---|---|---|
| Forward Market (7/18/16) | 19% | 22% | 24% |
| Consultant Avg (IHS/WM) | 19% | 23% | 26% |
| APC Fundamentals | 19% | 23% | 23% |

- C2 crude ratio to outperform prior 4-year average (14%)
- Premium is expected to trend with increases in demand

## Market Summary

- Improvement attributed to higher demand (exports & incremental cracker expansions)
- Demand expected to increase steadily post 3Q16 with the advent of waterborne exports along with new cracker commissioning
- Constructive outlook for 2H16 & beyond via demand increases prompting incremental recovery of higher cost supply
- Bulk of incremental recovery expected to originate from areas closest to Mont Belvieu initially, but more distant regions will see recovery as crackers demand higher cost supply
- Full T&F cost recovery unnecessary in outermost areas as increasing premiums will prompt marginal cost based C2 recovery in PADDs 1 & 4




*Sources: EIA, AFPM, IHS Chemical, Genscape, APC Fundamentals*




*Source: APC Fundamentals*

# Propane Summary

## Price

| Mont Belvieu (% WTI) | 2H 2016 | 2017 | 2018-'20 |
|---|---|---|---|
| Forward Market (7/18/16) | 46% | 44% | 41% |
| Consultant Avg (IHS/WM) | 47% | 44% | 50% |
| APC Fundamentals | 47% | 46% | 48% |

- Recent oil-linked strength pressuring export margins and chemical demand
- With anticipated lower gas plant production and growing consumption, market tightens substantially post-2017
- Forward curve not consistent with expected S/D fundamentals

## Market Summary

- Inventory overhang gradually dissipating via flattening gas plant production and growing demand
- PDH demand and normal weather-related demand rebalances market by mid-2017
- Continued export demand growth at risk as a result of higher domestic prices and global price competition




Sources: OPIS, NYMEX, APC Fundamentals




Sources: EIA, APC Fundamentals, Woodmac, IHS




Sources: EIA, APC Fundamentals

# Natural Gas Liquids – Infrastructure Outlook

- **LPG export terminals at risk of low utilization**
  - Tightening domestic market reduces export arbitrage
  - Increased global competition as Iran seeks to grow its LPG market share
  - Without lower relative prices, USGC disadvantaged on a delivered cost basis (e.g. 10 ₵/gal terminal fees, plus long-haul freight)




*Sources: APC Fundamentals, Woodmac, IHS*

- **Infrastructure constraints will occur as ethane recoveries increase**
  - Next phase of NGL build-out will focus on fractionation as capacity hits full utilization late in 2017
  - Capacity not likely to be added in a timely fashion due to "commitment fatigue" from previous build-out
  - Sustained ethane premiums needed to prompt additional fractionation commitments
  - Ample pipeline capacity will prevent transport constraints until after 2020




*Sources: EIA, APC Fundamentals*





2016
BOARD OF DIRECTORS

# Industry Dynamics

# U.S. Rig Count – Trends and Expectations




*Sources: Baker-Hughes (rig count history) and RS Energy Group Research*

- **Commodity Price Downturn Drove a Substantial Reduction in U.S. Rig Count**
- **Upstream Efficiency Improvements Expected to Limit Increases in Rig Count due to Higher Commodity Pricing**
  - Partially mitigates potential rig-related cost inflation

# Lower 48 Oil Supply




*Source: RS Energy Group Research*

- **Higher Pricing Necessary to Hold Volume Flat at Expected 2016 Exit Rates**
  - At least $60 WTI required to build back to 2016 exit rates
- **WTI Pricing Higher Than $60 Required to Incentivize Supply Growth**
  - Continued decline in oil production in 2017 likely at current strip pricing

# Global (Non-US) Project Deferrals







*Source: Wood Mackenzie*

- **Total Deferred Investment ~$160 B Over Five Years**
  - Driven by relatively high full-cycle breakeven costs (~$60 oil) and large capital commitments
  - Higher commodity prices and/or significantly greater cost reductions required to incentivize investment
- **Immediate Impact on Supply Due to Deferred Projects Negligible**
  - Results in deferred production of ~1 MMB/d by 2020 growing to ~2.5 MMB/d by 2023
  - Will contribute to tighter future supply/demand balance

# Peer Group Capital Investment




- **Continued Capital Investment Reductions by Peer Group**
  - Total 2014 peer group capital ~$129 B, down to ~$45 B in 2016
    - *2015 year-on-year reduction averaged 38%*
    - *2016 year-on-year reduction averaged 50%*
- **2016 Production Guidance Relatively Flat**
  - Ranges from ~-10% to ~+10% across peer group
  - CVX, NBL and PXD provided positive production growth guidance
- **Outlook for 2017 Growth Could Be Substantially More Challenged**

ANADARKO PETROLEUM CORPORATION



2016
BOARD OF DIRECTORS

# Enterprise Risk

# Anadarko's Enterprise Risk Management

- **Board of Directors and Executive Management Oversight**
  - Governance and Risk Committee
  - Audit Committee
  - Executive Committee
  - Risk Council
- **Integrated Risk Identification and Management**
  - Enterprise Risk Management Committee (ERMC)
  - Financial Risk Management Committee (FRMC)
  - Division/Regional Management
  - Asset Teams
- **Rigorous Monitoring and Reporting**
  - Risk Register
  - Above-Ground Risk Assessment
  - Key Risk Summary
- **Integrated Risk Culture**
  - Encourage communication throughout organization
  - Empower business teams to identify and manage exposures
  - Avoid undue bureaucracy



# Governance Framework



# Current Key Risks

## Commodity Pricing Improved in Q2 2016; Volatility Expected to Continue

- Crude oil prices increased 35% to $45/bbl in June on more balanced supply projections
- Natural gas spot prices increased ~8% over average Q1-2016 pricing due to hotter than normal summer temperatures and flattening-to-declining U.S. production

## Adverse Colorado Oil and Natural Gas Ballot Initiatives Gaining Support

- Funded NGO's have been engaged to collect signatures for ballot initiatives

## Federal Environmental Regulations

- US EPA issued final air quality regulations for new oil and natural gas operations and has announced it will issue regulations for existing oil and natural gas operations as well
- Anadarko submitted comments to BOEM on the proposed new offshore air regulations
- Pipeline and Hazardous Materials Safety Administration (PHMSA) proposed an extensive expansion of pipeline safety regulations
- Litigation to challenge parts of BSEE's Final Well Control Rule being considered by Anadarko and joint industry work groups

## Mozambique

- Mozambique's economy continuing to destabilize after debt crisis unveiled in April 2016
- Resettlement plan submitted to Government of Mozambique in June 2016

## Financial

- Monetized incremental WGP units yielding ~$475 MM in proceeds





2016
BOARD OF DIRECTORS

# Major Asset Overviews

# Opportunity Set: Materiality and Investment Returns

[redacted]

# Cumulative Free Cash Flow and Capital Intensity

[redacted]

*Shenandoah metrics shown @ $70/$2.75

# Complementary Cash Cycle Example

[redacted]

# Wattenberg Overview

[redacted]

# Delaware Basin Overview

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Gulf of Mexico Exploration/Operations Overview



[redacted]

[redacted]

[redacted]

[redacted]

# Shenandoah Overview

## Strengths

- Large oil accumulation
- High quality reservoir properties, high quality oil
- Strong land position in basin, synergy with nearby discoveries
- Appraisal program progressing, 6 penetrations to date
- Shen-5 results similar to Shen-2 (1000' oil pay)

## Weaknesses

- Current development economics challenged
- Geologic uncertainty and the presence of faulting affect development risks
- Technological hurdles increase regulatory and operational risks possibly affecting time to first production
- 20,000 psi-rated drilling rig and blowout preventer commitments will be costly, but shared with other parties

## Opportunities

- Incorporation of Shen-5 results will improve economics
- 20,000 psi-rated subsea development proof of concept for future projects
- Potential synergy for nearby subsea tiebacks and regional JV host solutions

| Key Play Statistics | |
|---|---|
| Undeveloped Resource, Net (MMBOE) | 113 |
| 2016 Capital Allocation ($MM) | 110 |
| NAV @ $70/$2.75 ($B)* | 0.01 |

* Shenandoah not selected in $60/$2.75 "Back to Work" case; $70/$2.75 NAV substituted






# Deepwater GOM Exploration

## Strengths
- World-class hydrocarbon basin
- Long-term record of exploration success
- Strong reputation as an operator
- Significant cash inflow via monetization of discoveries/JVs
- Developed/producing projects generate significant cash

## Weaknesses
- Declining opportunity set will require consistent, sustained investment to rebuild
- Challenging to sell-down / find partners in current environment
- Out-of-the-money DW rig contracts

## Opportunities
- "Buyer's market" with low entry cost prospects
- High quality, longer term opportunities available
- Exploration needed to fill rig commitments

| Key Play Statistics | |
|---|---|
| Undeveloped Resource, Net (MMBOE) | 700 |
| 2016 Capital Allocation ($MM) | 111 |
| Base Case NAV @ $60/$2.75 ($B) | 0.8 |






# International Exploration/Operations Overview




International/Deepwater Exploration: ~100 MM Gross Acres

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 110

[ EMBED PaintShopPro ]
Inter-Office Correspondence

November 10, 2016

TO: Distribution

FROM: Property Accounting

SUBJECT: Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis

---

**Background**

In accordance with Accounting Bulletin 20.5, *Well Classification and Disposition of Suspended Well Costs*, as part of each quarter-end close, Property Accounting reviews the status of all exploratory wells in progress to assess whether the well costs are properly recorded.

Drilling of the second Shenandoah appraisal well, the Walker Ridge 52#2 (Shenandoah-3), concluded in Q4 2014. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil-water contact based on pressure data, and reduced the uncertainty of the resource range.

The following analysis documents the original analysis, the current quarter review of the justification for original suspension, and the changes in conditions that occurred during Q3 2016 which resulted in the recognition of dry hole expense on Shenandoah-3.

**Original Accounting Analysis**

Property Accounting reached the conclusion in Q4 2014 to suspend the well costs, despite the fact that the sands encountered were non-hydrocarbon bearing, based on understanding from conversations with Exploration, and a subsequent email dated December 17, 2014, that the well projected the oil-water contact and resulted in higher confidence in, and thus an increase to, the estimated resources for the Shenandoah project.

Per ASC 932-360-25-18:

> *Exploratory stratigraphic test wells are accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditures before production could begin (i.e. paragraph 932-360-25-10). The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs shall not continue to be carried as assets if the enterprise is not making sufficient progress assessing the reserves and the economic and operating viability of the project or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well.*

Property Accounting documented its conclusion to continue capitalization of the well as a suspended well in a memo drafted December 29, 2014. The memo noted that pressure data collected in this appraisal well could be used to project an oil-water contact between the discovery and appraisal well and since the projected oil-water contact was close to the appraisal well, the data suggested a higher confidence (and therefore increase) in the resources of the field. This was considered a successful appraisal well to determine the extent of the reservoir. The memo also noted that while hydrocarbons were not found in this wellbore, geologic, fluid and pressure data obtained from the well raised the confidence level of the resources of the field and contributed to the ongoing development of the Shenandoah project. Therefore, it was determined to be appropriate to continue capitalization of this well cost as suspended well cost,

pending the determination of proved reserves for the Shenandoah project. It was further noted in the same memo, as well as in notes retained in conjunction with the December 17, 2014 quarterly Gulf of Mexico Exploration meeting with Property Accounting, that management was also evaluating future utility of the wellbore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands. However, Property Accounting relied on the presumed increase in the resource estimates as the justification for continued capitalization of the Shenandoah-3 well costs in reaching its accounting conclusions in Q4 2014. No new information came to the attention of Property Accounting during subsequent quarterly discussions with Exploration that indicated the resource estimates decreased following the drilling of the Shenandoah-3 well. Once the well was capitalized on this basis of presumed increase in resource estimates at December 31, 2014, the Property Accounting group monitored the status of the Shenandoah project in its entirety against the sufficient progress criteria of ASC 932-360-35-19, without revisiting the potential future utility of the wellbore until the third quarter of 2016.

**Current Quarter Review of Justification for Suspension**

During the third quarter of 2016, a review by the accounting department of the Shenandoah-3 capitalized costs determined the well did not increase the overall resource estimate of the Shenandoah project, nor was the well a suitable candidate for a sidetrack producer. The review found that the former Chief Accounting Officer (CAO) relied upon the injection well capability of Shenandoah-3 as the predominant reason for suspending the well costs at year-end 2014.

Since the basis for capitalization at year-end 2014 as relied upon by the CAO, i.e. based on its potential future utility as an injection well, differs from the predominant rationale relied upon to support Property Accounting's original analysis, we considered whether it was appropriate that the well was suspended at December 31, 2014 based solely on its potential future utility.

First, we considered whether it was reasonably possible, at year-end 2014, that the Shenandoah-3 well could have had potential future utility as an injection well in the Shenandoah project:

- A February 18, 2014 presentation on the economics of a potential two spar development scenario that contemplates the need for water injection wells.
- The Vice President of Deepwater and International Exploration stated in an email on February 12, 2015 communication that the well is potentially usable as future water injection well.
- On January 23, 2015, email correspondence occurred between the former CAO and the Marathon CAO stating that the basis for suspending the well was related to assessing the future utility of the wellbore as a possible injection well for the field, or as a development well to sidetrack into oil-bearing sands.

Therefore, we conclude that it was reasonably possible, based on facts and circumstances available prior to filing of the 2014 financial statements, that the Shenandoah-3 well could have had potential future development utility as an injection well in the Shenandoah project.

Next, given that the suspended well costs for Shenadoah-3 at December 31, 2014 would have represented costs associated with potential future water injection in the development phase of a project for which final investment decision (FID) had not been made, we considered whether it was appropriate to capitalize development costs in advance of the development stage of a project.

Per ASC 932-360-25-14:

> *Development costs shall be capitalized as part of the cost of an entity's wells and related equipment and facilities. Thus, all costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and shall be capitalized, whether the well is successful or unsuccessful. Costs of drilling those wells and costs of constructing equipment and facilities shall be included in the entity's uncompleted wells, equipment, and facilities until drilling or construction is completed.*

Service wells are defined in the ASC Glossary as:

> *A service well is a well drilled or completed for the purpose of supporting production in an existing field. Wells in this class are drilled for the following specific purposes: gas injection (natural gas,*

*propane, butane, or flue gas), water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.*

At year-end 2014, as addressed above, it was reasonably possible for the Shenandoah-3 well to have potential future use as a water injection well in the development of the Shenandoah project. A water injection well meets the definition of a service well which would support production in the Shenandoah field. The Shenandoah-3 well was drilled as an exploratory stratigraphic test well. It was not drilled with the original intention of use as a water injection well. Therefore, we do not consider it a development cost that should be capitalized, *whether the well is successful or unsuccessful*, under ASC 932-360-25-14. However, we do believe that given that the well was unsuccessful under ASC 932-360-25-18, it is appropriate to consider whether it is reasonably possible that the wellbore has future utility in the development phase. If it is not reasonably possible that the well has future utility, the costs should be expensed. Anadarko believes, in certain situations, it is appropriate to suspend development costs prior to FID. For instance, the Shenandoah-5 and Shenandoah-6 appraisal wells have been or will be drilled, prior to project sanction, with additional capital expenditures to allow the wells the capability of being producers. Therefore, while the project is still in the appraisal phase, and the costs are considered exploratory costs at the time incurred, we believe it is appropriate and consistent with successful efforts accounting that since such costs would provide future benefit in the actual development stage of the project, it is appropriate to capitalize such costs pending FID, assuming it is reasonably possible the well has future utility. Given the large resource range of the Shenandoah project, even at year-end 2014 after the Shenandoah-3 well was drilled, it was a reasonable judgment to conclude that it was reasonably possible the Shenandoah project would proceed to FID and; accordingly, appropriate to capitalize the Shenandoah-3 well cost until its future utility as a water injection well in the project development was determined. Similarly, information regarding the project development obtained through Q3 2016, including that the Shenandoah-3 well was in the proximity of the currently modeled injection well locations, provided confirming and corroborating evidence that it was reasonable to conclude in the fourth quarter of 2014 that the Shenandoah-3 well could be used in any future development of the field.

**Current Quarter Analysis of Potential Use as a Water Injection Well**

In Anadarko's third quarter 2016 Operations report, the Company announced that it plans to develop the Shenandoah field using a semi-submersible platform if a final investment decision is reached. The semi-submersible platform is being designed for the capability of handling the equipment necessary for water injection. Further, during the third quarter of 2016, development studies of water injection scenarios for the Shenandoah project were substantially advanced based on planning and modeling of optimal locations for injection wells. These subsurface water flood scenarios currently show that the optimal locations of water injection wells are on either side of the Shenandoah-3 well location, but not the specific location of the Shenandoah-3 well. In addition, the company's water injection models do not incorporate a possible east-west trending fault which may inhibit the use of the Shenandoah-3 as a water injector. With the latest results of the ongoing subsurface water flood studies, it was determined in Q3 2016 that it was no longer reasonably possible for the Shenandoah-3 wellbore to be part of the Shenandoah development plan. In addition, given that the wellbore is not in the optimal location, the company will not invest the resources to undertake the multi-month study necessary to determine whether the well meets the mechanical specifications for water injection utilization. Given this determination was made within 21 months from the Shenandoah-3 completion date, the outcome of the studies appear to have been made within a reasonable time frame given the size and scope of the Shenandoah project.

**Conclusion**

Based on the above discussion and analysis, the conclusion made by the former CAO to suspend the Shenandoah-3 well costs at December 31, 2014 given the wellbore's potential utilization for water injection was an appropriate and reasonable application of accounting literature. At September 30, 2016, it is no longer reasonably possible to justify continued capitalization given the low probability of the wellbore's future utilization, and therefore, the suspended well cost of $64MM was taken to dry hole expense in the third quarter.

In conjunction with the review performed in Q3 2016, it was determined that approximately $7MM of the $64MM well costs were attributed to a bypass well used for coring activities, and should have been expensed in Q4 2014 as the coring activities bore no future utility. Well costs associated with the bypass well are considered out-of-period and have been reported to Financial Accounting and Reporting for materiality consideration.

**Distribution**
Chris Champion
Louis Williams
Jennifer Edwards
Amanda McMillian
KPMG

# EXHIBIT 111

**To:** Catherine Green (Catherine.Green@anadarko.com)[Catherine.Green@anadarko.com]
**From:** Champion, Chris[/O=APC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CHAMPION, CHRIS (NMS730)167]
**Sent:** Tue 11/15/2016 2:13:46 PM Coordinated Universal Time
**Subject:** FW: Shen Accounting Memos
**Attachment:** Suspended Well Control Memo (Final).docx
**Attachment:** DH Analysis (Final).docx

---

Final memos that include clarification changes.

Chris

Exhibit
339

[ EMBED PAINTSHOPPRO ]

Inter-Office Correspondence

**To:** Distribution

**From:** Internal Controls

**Subject:** Suspended Well Controls Assessment

**Date:** November 10, 2016

***Purpose***

The purpose of this memorandum is to evaluate the impact of accounting for suspended wells on Anadarko Petroleum Corporation's (the Company or Anadarko) assessment of the effectiveness of internal control over financial reporting.

***Background***

The Walker Ridge 52 #2 well (Shenandoah-3), a well located in the Gulf of Mexico, was drilled to TD and suspended in Q4 2014. Property Accounting reached the conclusion in Q4 2014 to suspend the wells costs, despite the fact that the sands encountered were non-hydrocarbon bearing, based on understanding from conversations with Exploration, and a subsequent email dated December 17, 2014, that the well projected the oil-water contact and resulted in higher confidence in, and thus an increase to, the estimated resources for the Shenandoah project. Property Accounting documented its conclusion to continue capitalization of the well as a suspended well in a memo drafted December 29, 2014. The memo noted that pressure data collected in this appraisal well could be used to project an oil-water contact between the discovery and appraisal well and since the projected oil-water contact was close to the appraisal well, the data suggested a higher confidence (and therefore increase) in the resources of the field. This was considered a successful appraisal well to determine the extent of the reservoir. The memo also noted that while hydrocarbons were not found in this wellbore, geologic, fluid and pressure data obtained from the well raised the confidence level of the resources of the field and contributed to the ongoing development of the Shenandoah project. Therefore, it was determined to be appropriate to continue capitalization of this well cost as suspended well cost, pending the determination of proved reserves for the Shenandoah project. It was further noted in the same memo, as well as in notes retained in conjunction with the December 17, 2014 quarterly Gulf of Mexico Exploration meeting with Property Accounting, that management was also evaluating future utility of the wellbore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands. However, Property Accounting relied on the presumed increase in the resource estimates as the justification for continued capitalization of the Shenandoah-3 well costs in reaching its accounting conclusions in Q4 2014. No new information came to the attention of Property Accounting during subsequent quarterly discussions with Exploration that indicated the resource estimates decreased following the drilling of the Shenandoah-3 well. Once the well was capitalized on this basis of presumed increase in resource estimates at December 31, 2014, the Property Accounting group monitored the status of the Shenandoah project in its entirety against the

sufficient progress criteria of ASC 932-360-35-19, without revisiting potential future utility of the wellbore.

During the third quarter of 2016, there was a review by the accounting department of the justification for suspension of significant Deepwater and International exploratory wells. The review determined that the Shenandoah-3 well did not increase the overall resource estimate of the Shenandoah project, nor was the well a suitable candidate for a sidetrack producer. The review found that the former Chief Accounting Officer (CAO) relied upon the injection well capability of Shenandoah-3 as the reason for suspending the well costs at year-end 2014. This was not communicated to Property Accounting. Accordingly, Property Accounting was not aware that ongoing monitoring of the status of evaluation as an injection well was necessary. Property Accounting's analysis was primarily predicated on their understanding that the well results increased the overall resource estimate; however, we now understand that there was a misunderstanding in the communication of the well results between Exploration and Property Accounting.

In Anadarko's third quarter 2016 Operations report, the Company announced that it plans to develop the Shenandoah field using a semi-submersible platform if a final investment decision is reached. The semi-submersible platform is being designed for the capability of handling the equipment necessary for water injection. Further, during the third quarter of 2016, development studies of water injection scenarios for the Shenandoah project were substantially advanced based on planning and modeling of optimal locations for injection wells. These subsurface water flood scenarios currently show that the optimal locations of water injection wells are on either side of the Shenandoah-3 well location, but not the specific location of the Shenandoah-3 well. In addition, the company's water injection models do not incorporate a possible east-west trending fault which may inhibit the use of the Shenandoah-3 as a water injector. With the latest results of the ongoing subsurface waterflood studies, it was determined in Q3 2016 that it was no longer reasonably possible for the Shenandoah-3 wellbore to be part of the Shenandoah development plan. In addition, given that the wellbore is not in the optimal location, the company will not invest the resources to undertake the multi-month study necessary to determine whether the well meets the mechanical specifications for water injection utilization. At September 30, 2016, it is no longer reasonably possible to justify continued capitalization given the low probability of the wellbore's future utilization, and therefore, the suspended well cost of $64MM was taken to dry hole expense in the third quarter.

***Description of the Control and Root Cause***

In 2014, the risk of suspended well costs remaining suspended but no longer qualifying for continued capitalization was addressed by a control that Property Accounting would meet with Operations and Exploration each quarter to discuss the status of current period exploratory wells. In addition, a schedule of suspended wells (QK-7D) was circulated through Operations and Exploration each quarter and was signed by management up through the Executive Vice President over International and Deepwater Exploration prior to filing the 10-Q/10-K.

In almost all circumstances, once the initial determination to suspend an exploratory well has been made based on the evidence provided by the well, the future quarterly discussion with Operations and Exploration about that project would focus on an evaluation against the sufficient progress criteria in ASC 932-360-35-19.

This control was deficient from first quarter 2015 through the second quarter of 2016 because Property Accounting did not follow-up each quarter with Operations or Exploration on the evaluation of the future utility of the Shenandoah-3 well as an injection well in conjunction with their ongoing quarterly discussions regarding the status of the Shenandoah project. The root cause of the control deficiency is the lack of communication from the former CAO back to the Property Accounting team.

The established process for evaluating whether wells should be initially suspended, and for the ongoing monitoring against the sufficient progress criteria, involved members of the Property Accounting group up through the Director of Expenditure Accounting. The former CAO was not involved in that process on a regular basis; however, there were two instances where the former CAO was directly involved in an evaluation of whether a well should be suspended. The first instance was the Tubarao #2 well in 2013 which did not find hydrocarbons, but was suspended based on substantive positive evidence of the economic and operational viability of the project, and was the last well in the appraisal program that gave the Company the confidence to submit a plan of development to the government of Mozambique. The Shenandoah-3 was the second instance in which the CAO was involved and made the decision to suspend the well. This was the only instance where there was a failure to communicate back to Property Accounting the predominant justification from the CAO's perspective for suspension of an exploratory well cost that differed from what Property Accounting believed was the predominant justification for the suspension.

We have determined that this communication oversight occurred during the year-end financial reporting process for 2014, and prior to filing of the 2014 financial statements, and impacted the operation of the control throughout 2015 and 2016.

In the third quarter of 2016, in addition to the quarterly meetings, an enhancement was added where an analysis of the justification for suspension of significant GOM and International projects is prepared by Accounting and is circulated with the QK-7D, so that there is a central documented understanding of the justification for suspension across Operations, Exploration and Accounting.

***Consideration of Other Deficiencies***

The evaluation of this deficiency has not identified other deficiencies. We considered whether other situations could exist where a decision made by the CAO was not communicated to the team responsible for the ongoing accounting and found no evidence of other instances. The Company has controls in place over significant and unusual transactions, and quarterly meetings to discuss significant accounting matters each quarter, and these controls were tested in 2014 and 2015 and concluded to be operating effectively. We believe this was an isolated incident of unintentional failure to communicate on the part of the former CAO, who consistently demonstrated and encouraged open communication during her tenure with the Company, and is no way indicative of a broader issue of insufficient communication on significant accounting decisions. We also considered the fact that the Shenandoah-3 well was not the predominant accounting matter under consideration at year-end 2014 due to the precipitous decline in oil prices in late 2014, and the relative quantitative immateriality of the cost of the Shenandoah-3 well.

***<u>Applicable Guidance Related to Deficiencies in Internal Control</u>***

We considered PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with an Audit of Financial Statements* (PCAOB AS No. 5), that establishes standards and provides guidance for evaluating identified deficiencies and on communicating matters related to a company's internal control over financial reporting in our determination of the severity of the deficiency. The guidance related to the determination of the significance of the control failure is as follows:

A deficiency in internal control over financial reporting exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

- A deficiency in design exists when (a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met.
- A deficiency in operation exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively.

A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

> Note: There is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either "reasonably possible" or "probable," as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ("FAS 5").

An evaluation of the severity of each deficiency, individually or in combination, should be performed to determine whether the deficiency is a significant deficiency or a material weakness. The severity of a deficiency does not depend on whether a misstatement actually occurred.

***<u>Evaluation of Severity</u>***

Anadarko reported suspended well costs of $1.1 billion at December 31, 2015 of which $1 billion was related to 13 projects in the Deepwater and International. Other than the Shenandoah-3 well, all other Deepwater and International suspended wells at December 31, 2015 were capitalized based on the predominant fact of the well having found a sufficient quantity of reserves to justify its completion as a producing well. The former CAO was involved in and made the decision to suspend a well in only two instances, and the Shenandoah-3 was the only well where the

communication failure occurred. Given the nature and complexity of the Shenandoah project, the Shenandoah-3 well cost is on the high end of suspended well cost for an individual well. We believe it would be rare for an individual suspended well cost to exceed $100MM and therefore, believe the maximum potential exposure to the control deficiency is limited to $100MM, noting that the actual amount exposed to the deficiency is the $64MM suspended balance of the Shenandoah-3 well.

*Qualitative Assessment of Severity*

We considered the indicators of a material weakness in internal control as noted in PCAOB AS No. 5. The indicators include

- Identification of fraud, whether or not material on the part of senior management
  - Fraud was not identified on the part of senior management.
- Restatement of previously issued financial statements to reflect the correction of a material misstatement
  - No significant prior period error resulted from this deficiency and the prior period financial statements will not be restated.
- Identification by the auditor of a material misstatement of the financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting
  - This issue was identified in a review of the justification for suspension of wells in Deepwater and International in the third quarter of 2016 and was not identified by the external auditors.
- Ineffective oversight of the company's financial reporting and internal control by the company's audit committee
  - Given the relative quantitative immateriality of the Shenandoah-3 well cost to the total suspended well balance, we do not believe that this issue would have risen to the level of the audit committee.

***Conclusion***

We considered all relevant quantitative and qualitative factors when evaluating the severity of the identified deficiency. This deficiency arose in the year-end 2014 financial reporting process, and was perpetuated through 2015 and 2016 in that the control was operating as designed but the Property Accounting group was unaware that they should be following up on the potential future utility of the wellbore because they were unaware of the predominant justification for capitalization. In addition to the quarterly discussions that are already held as part of this process, in order to enhance the controls around suspended well accounting and mitigate the risk of this issue occurring in the future, the Company has enhanced the documentation that supports the QK-7D control. Previously, a schedule of suspended wells (QK-7D) was circulated through Operations and Exploration each quarter and was signed by management up through the Executive Vice President over International and Deepwater Exploration prior to filing the 10-Q/10-K. Beginning in the third quarter of 2016, an analysis of the justification for suspension of

significant Deepwater and International projects is prepared by Accounting and is circulated with the QK-7D, so that there is a central documented understanding of the justification for suspension across Operations, Exploration and Accounting. There are no other deficiencies with which it should be aggregated. Accordingly, we have determined that the deficiency does not rise to the level of a significant deficiency or material weakness in internal control over financial reporting.

**Distribution**
Chris Champion
Louis Williams
Jennifer Edwards
Amanda McMillian
KPMG

[ EMBED PaintShopPro ]
Inter-Office Correspondence

November 10, 2016

TO: Distribution

FROM: Property Accounting

SUBJECT: Q3 2016 – Shenandoah-3 Suspended Well Accounting Analysis

---

**Background**

In accordance with Accounting Bulletin 20.5, *Well Classification and Disposition of Suspended Well Costs*, as part of each quarter-end close, Property Accounting reviews the status of all exploratory wells in progress to assess whether the well costs are properly recorded.

Drilling of the second Shenandoah appraisal well, the Walker Ridge 52#2 (Shenandoah-3), concluded in Q4 2014. The Shenandoah-3 well found approximately 50% (1,470 feet) more of the same well-developed reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered more than 1,000 feet of net oil pay in excellent quality, Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, reservoir qualities and down-dip thickening. The well also enabled the projection of oil-water contact based on pressure data, and reduced the uncertainty of the resource range.

The following analysis documents the original analysis, the current quarter review of the justification for original suspension, and the changes in conditions that occurred during Q3 2016 which resulted in the recognition of dry hole expense on Shenandoah-3.

**Original Accounting Analysis**

Property Accounting reached the conclusion in Q4 2014 to suspend the well costs, despite the fact that the sands encountered were non-hydrocarbon bearing, based on understanding from conversations with Exploration, and a subsequent email dated December 17, 2014, that the well projected the oil-water contact and resulted in higher confidence in, and thus an increase to, the estimated resources for the Shenandoah project.

Per ASC 932-360-25-18:

> *Exploratory stratigraphic test wells are accounted for in a manner similar to an exploratory well drilled in an area requiring a major capital expenditures before production could begin (i.e. paragraph 932-360-25-10). The costs of drilling the exploratory-type stratigraphic test well are capitalized pending determination of whether proved reserves are found, subject to the condition that those costs shall not continue to be carried as assets if the enterprise is not making sufficient progress assessing the reserves and the economic and operating viability of the project or if the quantity of reserves found would not justify completion of the well for production had it not been simply a stratigraphic test well.*

Property Accounting documented its conclusion to continue capitalization of the well as a suspended well in a memo drafted December 29, 2014. The memo noted that pressure data collected in this appraisal well could be used to project an oil-water contact between the discovery and appraisal well and since the projected oil-water contact was close to the appraisal well, the data suggested a higher confidence (and therefore increase) in the resources of the field. This was considered a successful appraisal well to determine the extent of the reservoir. The memo also noted that while hydrocarbons were not found in this wellbore, geologic, fluid and pressure data obtained from the well raised the confidence level of the resources of the field and contributed to the ongoing development of the Shenandoah project. Therefore, it was determined to be appropriate to continue capitalization of this well cost as suspended well cost,

pending the determination of proved reserves for the Shenandoah project. It was further noted in the same memo, as well as in notes retained in conjunction with the December 17, 2014 quarterly Gulf of Mexico Exploration meeting with Property Accounting, that management was also evaluating future utility of the wellbore as an injection well for the field, or as a development well to sidetrack into oil-bearing sands. However, Property Accounting relied on the presumed increase in the resource estimates as the justification for continued capitalization of the Shenandoah-3 well costs in reaching its accounting conclusions in Q4 2014. No new information came to the attention of Property Accounting during subsequent quarterly discussions with Exploration that indicated the resource estimates decreased following the drilling of the Shenandoah-3 well. Once the well was capitalized on this basis of presumed increase in resource estimates at December 31, 2014, the Property Accounting group monitored the status of the Shenandoah project in its entirety against the sufficient progress criteria of ASC 932-360-35-19, without revisiting the potential future utility of the wellbore until the third quarter of 2016.

**Current Quarter Review of Justification for Suspension**

During the third quarter of 2016, a review by the accounting department of the Shenandoah-3 capitalized costs determined the well did not increase the overall resource estimate of the Shenandoah project, nor was the well a suitable candidate for a sidetrack producer. The review found that the former Chief Accounting Officer (CAO) relied upon the injection well capability of Shenandoah-3 as the predominant reason for suspending the well costs at year-end 2014.

Since the basis for capitalization at year-end 2014 as relied upon by the CAO, i.e. based on its potential future utility as an injection well, differs from the predominant rationale relied upon to support Property Accounting's original analysis, we considered whether it was appropriate that the well was suspended at December 31, 2014 based solely on its potential future utility.

First, we considered whether it was reasonably possible, at year-end 2014, that the Shenandoah-3 well could have had potential future utility as an injection well in the Shenandoah project:

- A February 18, 2014 presentation on the economics of a potential two spar development scenario that contemplates the need for water injection wells.
- The Vice President of Deepwater and International Exploration stated in an email on February 12, 2015 communication that the well is potentially usable as future water injection well.
- On January 23, 2015, email correspondence occurred between the former CAO and the Marathon CAO stating that the basis for suspending the well was related to assessing the future utility of the wellbore as a possible injection well for the field, or as a development well to sidetrack into oil-bearing sands.

Therefore, we conclude that it was reasonably possible, based on facts and circumstances available prior to filing of the 2014 financial statements, that the Shenandoah-3 well could have had potential future development utility as an injection well in the Shenandoah project.

Next, given that the suspended well costs for Shenadoah-3 at December 31, 2014 would have represented costs associated with potential future water injection in the development phase of a project for which final investment decision (FID) had not been made, we considered whether it was appropriate to capitalize development costs in advance of the development stage of a project.

Per ASC 932-360-25-14:

> *Development costs shall be capitalized as part of the cost of an entity's wells and related equipment and facilities. Thus, all costs incurred to drill and equip development wells, development-type stratigraphic test wells, and service wells are development costs and shall be capitalized, whether the well is successful or unsuccessful. Costs of drilling those wells and costs of constructing equipment and facilities shall be included in the entity's uncompleted wells, equipment, and facilities until drilling or construction is completed.*

Service wells are defined in the ASC Glossary as:

> *A service well is a well drilled or completed for the purpose of supporting production in an existing field. Wells in this class are drilled for the following specific purposes: gas injection (natural gas,*

*propane, butane, or flue gas), water injection, steam injection, air injection, salt-water disposal, water supply for injection, observation, or injection for in-situ combustion.*

At year-end 2014, as addressed above, it was reasonably possible for the Shenandoah-3 well to have potential future use as a water injection well in the development of the Shenandoah project. A water injection well meets the definition of a service well which would support production in the Shenandoah field. The Shenandoah-3 well was drilled as an exploratory stratigraphic test well. It was not drilled with the original intention of use as a water injection well. Therefore, we do not consider it a development cost that should be capitalized, *whether the well is successful or unsuccessful*, under ASC 932-360-25-14. However, we do believe that given that the well was unsuccessful under ASC 932-360-25-18, it is appropriate to consider whether it is reasonably possible that the wellbore has future utility in the development phase. If it is not reasonably possible that the well has future utility, the costs should be expensed. Anadarko believes, in certain situations, it is appropriate to suspend development costs prior to FID. For instance, the Shenandoah-5 and Shenandoah-6 appraisal wells have been or will be drilled, prior to project sanction, with additional capital expenditures to allow the wells the capability of being producers. Therefore, while the project is still in the appraisal phase, and the costs are considered exploratory costs at the time incurred, we believe it is appropriate and consistent with successful efforts accounting that since such costs would provide future benefit in the actual development stage of the project, it is appropriate to capitalize such costs pending FID, assuming it is reasonably possible the well has future utility. Given the large resource range of the Shenandoah project, even at year-end 2014 after the Shenandoah-3 well was drilled, it was a reasonable judgment to conclude that it was reasonably possible the Shenandoah project would proceed to FID and; accordingly, appropriate to capitalize the Shenandoah-3 well cost until its future utility as a water injection well in the project development was determined. Similarly, information regarding the project development obtained through Q3 2016, including that the Shenandoah-3 well was in the proximity of the currently modeled injection well locations, provided confirming and corroborating evidence that it was reasonable to conclude in the fourth quarter of 2014 that the Shenandoah-3 well could be used in any future development of the field.

**Current Quarter Analysis of Potential Use as a Water Injection Well**

In Anadarko's third quarter 2016 Operations report, the Company announced that it plans to develop the Shenandoah field using a semi-submersible platform if a final investment decision is reached. The semi-submersible platform is being designed for the capability of handling the equipment necessary for water injection. Further, during the third quarter of 2016, development studies of water injection scenarios for the Shenandoah project were substantially advanced based on planning and modeling of optimal locations for injection wells. These subsurface water flood scenarios currently show that the optimal locations of water injection wells are on either side of the Shenandoah-3 well location, but not the specific location of the Shenandoah-3 well. In addition, the company's water injection models do not incorporate a possible east-west trending fault which may inhibit the use of the Shenandoah-3 as a water injector. With the latest results of the ongoing subsurface water flood studies, it was determined in Q3 2016 that it was no longer reasonably possible for the Shenandoah-3 wellbore to be part of the Shenandoah development plan. In addition, given that the wellbore is not in the optimal location, the company will not invest the resources to undertake the multi-month study necessary to determine whether the well meets the mechanical specifications for water injection utilization. Given this determination was made within 21 months from the Shenandoah-3 completion date, the outcome of the studies appear to have been made within a reasonable time frame given the size and scope of the Shenandoah project.

**Conclusion**

Based on the above discussion and analysis, the conclusion made by the former CAO to suspend the Shenandoah-3 well costs at December 31, 2014 given the wellbore's potential utilization for water injection was an appropriate and reasonable application of accounting literature. At September 30, 2016, it is no longer reasonably possible to justify continued capitalization given the low probability of the wellbore's future utilization, and therefore, the suspended well cost of $64MM was taken to dry hole expense in the third quarter.

In conjunction with the review performed in Q3 2016, it was determined that approximately $7MM of the $64MM well costs were attributed to a bypass well used for coring activities, and should have been expensed in Q4 2014 as the coring activities bore no future utility. Well costs associated with the bypass well are considered out-of-period and have been reported to Financial Accounting and Reporting for materiality consideration.

**Distribution**
Chris Champion
Louis Williams
Jennifer Edwards
Amanda McMillian
KPMG

# EXHIBIT 112

**To:** Gwin, Robert[Robert.Gwin@anadarko.com]; Christiansen, John[John.Christiansen@anadarko.com]
**Cc:** Walker, Al[Al.Walker@anadarko.com]; Flake, Joe[Joe.Flake@anadarko.com]; Reeves, Bobby[Bobby.Reeves@anadarko.com]
**From:** Hollek, Darrell[/O=APC/OU=INTEGRATION/CN=RECIPIENTS/CN=ZDEH1]
**Sent:** Thur 12/15/2016 1:07:46 PM Coordinated Universal Time
**Subject:** RE: BOD Memo & Press Release

---

Good here

---

**From:** Gwin, Robert
**Sent:** Thursday, December 15, 2016 7:06 AM
**To:** Christiansen, John
**Cc:** Hollek, Darrell; Walker, Al; Flake, Joe; Reeves, Bobby
**Subject:** Re: BOD Memo & Press Release

Ha! One step ahead of me. Thx John.
On Dec 15, 2016, at 06:59, Christiansen, John <John.Christiansen@anadarko.com> wrote:

All,

I've incorporated Bob's, Al's and Darrell's comments into this version and tried to simplify the opening paragraph around the tiebacks.

Let me know if there are other edits …

JC

---

**From:** Hollek, Darrell
**Sent:** Thursday, December 15, 2016 6:55 AM
**To:** Gwin, Robert; Walker, Al; Flake, Joe
**Cc:** Reeves, Bobby; Christiansen, John
**Subject:** RE: BOD Memo & Press Release

I agree with Bob. In that first paragraph it may be better to say "Anadarko also provided updates on the company's oil growth expectation" and on its rig activity in the Delaware and the DJ basins.
Bob the numbers around floaters has been verified.

---

**From:** Gwin, Robert
**Sent:** Wednesday, December 14, 2016 11:00 PM
**To:** Walker, Al; Flake, Joe
**Cc:** Hollek, Darrell; Reeves, Bobby; Christiansen, John
**Subject:** RE: BOD Memo & Press Release

With that suggested change I think there are some other tweaks in that area that are needed, as I've suggested in the attached. John, I've also included some other edits (and logic behind them in comment boxes) that I think are needed.

Bob

---

**From:** Walker, Al
**Sent:** Wednesday, December 14, 2016 6:05 PM
**To:** Flake, Joe
**Cc:** Hollek, Darrell; Gwin, Robert; Reeves, Bobby
**Subject:** Re: BOD Memo & Press Release

I can roll with that…
On Dec 14, 2016, at 6:03 PM, Flake, Joe <Joe.Flake@anadarko.com> wrote:

To make it clearer, we could use the following language:

"Specifically, the company expects to end the first quarter of 2017 with fourteen operated rigs in the Delaware Basin and six operated rigs in the DJ Basin. This compares to seven and one operated rigs in each respective basin at the end of Q3 2016."

Language above included in the attached red-line.

Joe

**Exhibit**
**303**

**From:** Hollek, Darrell
**Sent:** Wednesday, December 14, 2016 5:55 PM
**To:** Flake, Joe
**Cc:** Walker, Al; Gwin, Robert; Reeves, Bobby
**Subject:** Re: BOD Memo & Press Release

I get your math but reality is we have 5 in DJ today and I have indicated such in my meetings the last 2 days. Delaware matches up but DJ is really off a month as to when last 2 rigs added. No issue at all with totals at the end of q1. Just may confuse a few on timing. Maybe not a big deal.
On Dec 14, 2016, at 5:46 PM, Flake, Joe <Joe.Flake@anadarko.com> wrote:

Darrel:

The following is how the incremental rig counts were derived:

| | Q3 Ops Report | Adds Associated with FCX announcement | Add in Press Release | End-Q1 2017 Rig Count |
|---|---|---|---|---|
| DJ | 1 | 2 | 3 | 6 |
| Delaware | 7 | 2 | 5 | 14 |

The Q1 2017 ending rig count matches up with Brad's expectations. For the press release I think the difference you are seeing is a matter of perspective. For investors, they have seen a) the Q3 ops report and b) our statement when the FCX deal was announced that we were adding two rigs in each basin. The rigs added in the current draft release is the difference between a plus b and our expected Q1 2017 ending rig count.

Hopefully, this makes more sense.

Joe

---

**From:** Hollek, Darrell
**Sent:** Wednesday, December 14, 2016 5:28 PM
**To:** Flake, Joe
**Cc:** Walker, Al; Gwin, Robert; Reeves, Bobby
**Subject:** Re: BOD Memo & Press Release

Joe, based on our earlier discussion I thought we agreed that we were adding 5 rigs in Delaware and 1 in the DJ in the first Qtr. ( not 3 in DJ). We have already accelerated activities into December and will have issues ramping this quickly.
Al, further to Joe's note the capital requirements are different than what you will find in the 11+1 that I will review on Friday.
Also the rig activity required to deliver the growth profile will mean as many as 38 rigs working in the Delaware. Access to this equipment and people will be a must. I have to admit that my preference would be to drop the growth by 1% because we don't know what we don't know. For sure we will need to ramp up spend in a big way for midstream gathering that is not totally understood today.
All of this to say I can live with this but the activity level to achieve the growth is really aggressive.
On Dec 14, 2016, at 4:38 PM, Flake, Joe <Joe.Flake@anadarko.com> wrote:

Attached are mark-ups of the BOD memo and draft press release for your review. We have reviewed the forward oil growth rate expectations (12-14% CAGR to 2020) with Brad & Danny and both believe it is a doable, aspirational target based on the modeled CAPEX profiles. For clarity, I wanted to remind you of a few specifics around this modeling work:

1. Modeled $50 & $60 oil price scenarios
2. Assumes ~$2 B of sales proceeds from Maverick and Marcellus is re-invested in L48 (over the 2017 – 2019 horizon)
    a. 2017 CAPEX: $4.6 B in the $50 scenario & $5.1 B in the $60 scenario (vs ~$4.1 B in the current budget)
3. Under the $50 scenario Mozambique is **not** funded beyond the current 2017 budget
4. Under both scenarios, the model chooses **not** to invest in Shenandoah and it is deactivated post-2017
5. With the $50 oil scenario DW/Intl exploratory investment is significantly constrained (~$300 - $500 MM per year over next five years)

6. Oil growth CAGR calculated from 2016 to 2020

I hope this makes sense and please let me know of any questions.

Thanks

Joe

<Draft BOD 12-14-06 RGG V2.docx>
<DRAFT APC GOM Acquisition Close 12-14-16 1600 JAF.docx>
<DRAFT APC GOM Acquisition Close 12-14-16 1800 JAF v2.docx>
<DRAFT APC GOM Acquisition Close 12-15-16 0700 (marked).docx>

# EXHIBIT 113

**To:** Shotts, Doug[Doug.Shotts@anadarko.com]
**From:** Prosser, Wendy[/O=APC/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REDPATH, WENDY (WTA223)3A9]
**Sent:** Sun 2/5/2017 10:11:36 PM Coordinated Universal Time
**Subject:** Fwd: Shen 6 update with cross section
**Attachment:** Shen6_Xsection_drilling_no5.pptx
**Attachment:** ATT00001.htm

---

FYI :(

Begin forwarded message:

**From:** "Chandler, Paul" <Paul.Chandler@anadarko.com>
**To:** "McGrievy, Pat" <Pat.McGrievy@anadarko.com>, "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>, "Oudin, Chip" <Chip.Oudin@anadarko.com>, "Prosser, Wendy" <Wendy.Prosser@anadarko.com>, "Gauthier, Lisa" <Lisa.Gauthier@anadarko.com>, "Urazimanova, Aliya" <Aliya.Urazimanova@anadarko.com>, "Ju, David" <David.Ju@anadarko.com>
**Subject: Shen 6 update with cross section**

All,
I've attached a cross section updated to 3 PM Sunday. As you can see the UW2 appears to be wet as does the upper portion of the UW3. This was the one scenario we feared the most. I don't have any good recommendations at this time other than to keep drilling to confirm the deeper sands are indeed all wet. After that, we need to discuss our options again. An updip second borehole for project appraisal ( likely not a keeper as original planned) is an option if we think there are enough reserves up there to justify. It's a really tough call but there are no good options at this point anyway. We can discuss more. Let me know what you think.

Paul

*Paul A. Chandler*
*Anadarko Petroleum Corporation*
*Project Geological Advisor*
*GOM Development*
*832-636-8762*

# EXHIBIT 114

# MEMORANDUM

| | | | |
|---|---|---|---|
| TO: | Ernie Leyendecker | DATE: | 2/13/2017 |
| FROM: | Shenandoah Development Team | | |

RE: Project Recommendation: Conduct sidetrack out of the WR52 #3 (Shen #6) appraisal well

**Executive Summary:**

The Shenandoah Development Team is seeking approval to conduct a sidetracking operation out of the WR52 #3 (Shenandoah #6) appraisal well prior to rig de-mobilization. The AFE dry hole cost, inclusive of the temporary abandonment of the sidetrack, is $45.95 MM (gross) or $15.16 MM (net to Anadarko) based on a working interest of 33.0%. The primary objective of the proposed sidetrack is to refine the resource estimations within the potentially large Shen 5 fault block. Additionally, the outcome of the sidetrack operation should help to provide additional resource size clarity and constrain the number of development options currently contemplated by the Shenandoah project team.

**Background & Key Facts:**

**WR 52 #3 Design Objectives & Preliminary Well Results:**

The Shenandoah #6 appraisal well was originally designed to (1) test and extend the proven Wilcox reservoirs to the east; (2) confirm oil/water contacts for the objective reservoirs and potentially extend the LKO down structure; and (3) provide an understanding of connectivity to adjacent wellbores in the area. Additionally, this well was designed to be utilized as a "keeper well" in a future sidetrack operation, pending future project sanctioning.

The WR 52 #3 (Shenandoah #6) reached a TD of 32,047′ (MD) or 31,769′ (TVD) in only 52 days on February 8th. The well found all major Shenandoah Upper and Lower Wilcox reservoir sands present with exception of the UW1; however, all of the sands were slightly low to prediction and were all water bearing. These results indicate the presence of faulting between the Shenandoah #6 and the Shenandoah #5 well and further suggest a different hydrocarbon pressure regime to the west and/or possibly the absence of an up-dip seal to the east. Although the drilling metrics for the Diamond Ocean Black Hawk were outstanding and the final well cost is expected to come in ~$50MM gross under the original AFE, the subsurface results and the resource implications of Shenandoah #6 have been disappointing. The probability for economic resource potential on the eastern flank of the Shenandoah field has materially diminished. Additionally, the Shenandoah #6 results clearly demonstrate the challenge in our ability to estimate oil/water contacts and to confidently detect reservoir compartmentalization or conversely reservoir continuity for the Shenandoah Field.

**Shen 6 ST Proposal and Objectives:**

The team is seeking approval to sidetrack the WR 52 #3 wellbore to the W-SW in order to . The key objective is to test ~~the~~ down-dip ~~of~~ ~~within~~ the Shenandoah #5 fault-block to establish a deeper lowest-known oil and ~~to~~ find oil/water contacts. Confirmation of oil/water contacts would improve confidence in estimates of resource size and column height, establish connectivity in the oil and water columns, and provide better guidance for development options. The key project risks are finding greater compartmentalization and further reduction in ~~recoverable~~ resource expectations. This situation ~~presents~~ ~~resolves~~ itself if the sidetrack turns out to be fault separated or is all wet. Partnership alignment would suffer further as well.

Anadarko holds a 33% WI/ 28% NRI. Partners are ConocoPhillips (30%), Cobalt (20%) and Venari (17%). ConocoPhillips and Cobalt have both voiced their preference to move off the location, but the team believes they are very likely to join in as both partners' sale activities could be jeopardized by a non-consent election. Since this is not a lease preservation event (180-day clock), non-consenting partners lose rights to the data for the Shenandoah #6 sidetrack and lose the right to participate in any additional immediate sidetrack wells drilled from this location ~~immediate up-dip sidetrack~~. The penalty for newly discovered producible reservoirs is 600%.

The rig is estimated to go on standby around February 17th, pending approvals for either sidetracking or T&A operations. A time-line of events is provided in the appendix (Figure #2).

## Analysis

The updated mid-case geologic interpretation shows two new faults separating the Shenandoah #5 from Shenandoah #6 (Figure #1). The fault architecture and location is supported by the seismic interpretation and is in line with previously identified faults that have been carried as low confidence faults on the risk matrix. Partners have indicated alignment in the new geologic picture. Estimated oil/water contacts are based on pressure measurements from well penetrations in the oil column and with the water pressure ~~and~~ gradients from the Shenandoah #3 well applied across the field. ~~Only in~~ In the East, the oil/water contacts are estimated based on ~~assumed to be~~ the highest known water depths found in Shenandoah #6.



***Figure #1:*** *Depth structure map of the UW2 sand in the Shenandoah field*

The Shenandoah Partnership has made concept select for a Semi capable of producing 100,000 MBO per day with enough weight capacity to expand production capability and allow for future water injection. Although latest well results seriously put any new-built production solution in question, the team still sees a path to commercial viability with alternate development solutions.

This interpretation estimates in-place hydrocarbon volumes to be ~1 Billion STB of oil. Reservoir modeling estimates this to lead to economically recoverable reserves in the range of 150 – 250 MMBOE for various deterministic development scenarios. Preliminary economic analysis indicates that the Shenandoah field does not have the resource to justify a new facility. The facilities team has brought forward early cost estimates for using an existing facility to be ~$900MM for a 5-well development. At invest pricing ($50/BO) economic analysis confirms the continued commercial potential and (pending in-depth analysis) still sees the commercial viability of the Shenandoah project.

The team specifically evaluated a sidetrack options down-dip of Shenandoah #5, up-dip of Shenandoah #6, and a short sidetrack to the West. Oil-in place analysis found a down-dip penetration in the Shenandoah #5 fault block to provide the best benefit to constrain further decisions on the project. Figure #1 shows the Shenandoah #6 sidetrack target with its intent to prove up resource in the Shenandoah #5 fault block and confirm the oil/water contact assumption. Finding the oil/water contact would provide credence to the estimated oil/water contact assumption across the field.

With lease obligations within the 180-day clock the team still sees the importance to continue work towards the previous timeline of SOP in 2018. Improved certainty around resource and production expectations is paramount to deliver an economic project where production solutions are in line with resource size expectations.

## Conclusion

With the Shenandoah Partnership being on a 180 day clock to keep the lease it is important to continue to move quickly towards SOP. Taking the immediate opportunity to constrain resource uncertainty and give appropriate guidance for development planning are important factors in proceeding to an immediate sidetrack.

## Appendix




***Figure #2:*** *Timeline of events starting February 9th.*

# EXHIBIT 115
# [Filed Under Seal]

# EXHIBIT 116

**To:** Robert Strickling[rwstrick1836@gmail.com]
**From:** Camden, Chris[/O=APC/OU=INTEGRATION/CN=RECIPIENTS/CN=YCXC8]
**Sent:** Wed 5/24/2017 5:55:46 PM Coordinated Universal Time
**Subject:** RE: Lunch Thurs 25th ?

---

Shen 6 was wet. S/T to Shen 5 fault block was wet. Still no idea where OWC is. Mgmt decided to write off Shen Field and suspend capital expenditures while we explore go-fwd options. I'm currently working on WCD for Coronado #3. We are scheduled to spud it in Oct/Nov this year. If that well comes in big, then we might have a joint development option with the discovered Shen resources.

**Chris**

---

**From:** Robert Strickling [mailto:rwstrick1836@gmail.com]
**Sent:** Wednesday, May 24, 2017 11:25 AM
**To:** Camden, Chris <Chris.Camden@anadarko.com>
**Subject:** RE: Lunch Thurs 25th ?

Question, what's up with Shenandoah? I don't even see it mentioned on the APC website. I heard we selected a semi for the production platform so something must be moving forward. Just curious.

Sent from Mail for Windows 10

---

**From:** Camden, Chris
**Sent:** Monday, May 22, 2017 2:06 PM
**To:** Robert Strickling
**Subject:** RE: Lunch Thurs 25th ?

Personally Sensitive

Personally Sensitive Would love to catch up over a lunch whenever you are able.

**Chris**

---

**From:** Robert Strickling [mailto:rwstrick1836@gmail.com]
**Sent:** Monday, May 22, 2017 12:29 PM
**To:** Camden, Chris <Chris.Camden@anadarko.com>
**Subject:** RE: Lunch Thurs 25th ?

It would be nice Personally Sensitive
Personally Sensitive

I'll let you know when I can meet you.

Robert

Sent from Mail for Windows 10

---

**From:** Camden, Chris
**Sent:** Monday, May 22, 2017 10:36 AM
**To:** Robert Strickling
**Subject:** Lunch Thurs 25th ?

Hey man,
Been meaning to try and get a lunch with you. Are you available this Thurs ?

Thanks !

**Chris Camden**
Deepwater Exploration Engineering
Anadarko Petroleum Corporation
Direct: 832-636-2861
Cell: 832-217-9360

Click here for Anadarko's Electronic Mail Disclaimer

**Exhibit**
0177

# EXHIBIT 116A

**To:** Gauthier, Lisa[Lisa.Gauthier@anadarko.com]
**Cc:** Chandler, Paul[Paul.Chandler@anadarko.com]; Oudin, Chip[Chip.Oudin@anadarko.com]; McGrievy, Pat[Pat.McGrievy@anadarko.com]; Steinberger-Glaser, Anita[Anita.Steinberger-Glaser@anadarko.com]
**From:** Pachman, Jeff[/O=APC/OU=DOMESTIC/CN=RECIPIENTS/CN=WGV237]
**Sent:** Mon 7/3/2017 8:00:26 PM Coordinated Universal Time
**Subject:** Re: Shenandoah data room follow-up this week

---

Will be confirming with my counterpart at Statoil for this Thursday from 9:00-3:00. Please set up a work station accordingly and remain available to sit down with their representatives during such time.

Again, please leave room for optimism and the unknown. Admittedly, their are many different interpretations as we ourselves have many. We can remain hopeful for future well results to refine, redefine or confirm or reconfirm things for a successful development of Shenandoah. We are not presenting to executive management and sharing all of the risks and worst case scenarios. We are presenting how we see things to an interested third party that has seen partner interpretations as well as our own, but presenting things in a hopeful and positive way not in a negative and dire straights way.

Sent from my iPhone

On Jul 3, 2017, at 2:27 PM, Gauthier, Lisa <Lisa.Gauthier@anadarko.com> wrote:

> If it has to be next week when Chip is out (because of timing, etc) would Kathy be available to help out? I'll be around. Whenever we do get it scheduled, I should be available to discuss OWCs.
>
> Sent from my iPhone
>
> On Jul 3, 2017, at 2:11 PM, Chandler, Paul <Paul.Chandler@anadarko.com> wrote:
>
>> We knew the timing of all this was going to be an issue for potions of July due to vacations. Chip and I have not even had a chance to review our new borehole trajectories in Open Works yet. As usual, everything is moving faster than we can have ready to show. Next week will be tight. I personally will have to be out of the office all of Thursday afternoon. If Wednesday or Thursday is the only time they can do this then I agree with Chip in that they can maybe have workstation access and can look at the seismic data and draw their own conclusions. If they could wait until Chip gets back from vacation it would be much better than trying to cram something in this week. It will take Wednesday to get a workstation set up for those guys so really Thursday is the only option if it has to be this week.
>>
>> Paul
>>
>> Sent from my iPhone
>>
>> On Jul 3, 2017, at 1:32 PM, Pachman, Jeff <Jeff.Pachman@anadarko.com> wrote:
>>
>>> Never mind......I think Breck is out on vacation as well. Thursday from 9:00 to 3:00 then?
>>>
>>> Sent from my iPhone
>>>
>>> On Jul 3, 2017, at 12:59 PM, Oudin, Chip <Chip.Oudin@anadarko.com> wrote:
>>>
>>>> Jeff,
>>>> My mistake earlier. I thought you said 9:00 or 3:00, instead of 9:00 to 3:00. If you want me there, it will have to be Thursday, as I will be flying to Scotland Friday. As mentioned before, getting data ready will be tight.
>>>> I know it's a day off, but has anyone else responded to this thread?
>>>> Chip
>>>>
>>>> Sent from my Verizon 4G LTE smartphone
>>>>
>>>> -------- Original message --------
>>>> From: "Pachman, Jeff" <Jeff.Pachman@anadarko.com>
>>>> Date: 7/3/17 12:25 PM (GMT-06:00)
>>>> To: "Oudin, Chip" <Chip.Oudin@anadarko.com>
>>>> Cc: "McGrievy, Pat" <Pat.McGrievy@anadarko.com>, "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>, "Chandler, Paul" <Paul.Chandler@anadarko.com>, "Gauthier, Lisa" <Lisa.Gauthier@anadarko.com>
>>>> Subject: Re: Shenandoah data room follow-up this week

Will Monday or Tuesday work better?

Sent from my iPhone

On Jul 3, 2017, at 12:24 PM, Pachman, Jeff <Jeff.Pachman@anadarko.com> wrote:

> 3:00?
>
> Sent from my iPhone
>
> On Jul 3, 2017, at 11:37 AM, Oudin, Chip <Chip.Oudin@anadarko.com> wrote:
>
>> We used to set up a data room on 11 for visits like this. First we will need to set up an appropriate project (a subset of what I have) and make it available to a workstation on a designated floor (if 11 is still used for datarooms, it will be 11, if available.) Because I think we will need time to set up, I would push for 3:00 Thursday, but that doesn't allow STO much time to view data, unless they don't mind staying late. Pat, what do you think about all this?
>> Chip
>>
>> Sent from my Verizon 4G LTE smartphone
>>
>> -------- Original message --------
>> From: "Pachman, Jeff" <Jeff.Pachman@anadarko.com>
>> Date: 7/3/17 11:18 AM (GMT-06:00)
>> To: "Oudin, Chip" <Chip.Oudin@anadarko.com>
>> Cc: "McGrievy, Pat" <Pat.McGrievy@anadarko.com>, "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>, "Chandler, Paul" <Paul.Chandler@anadarko.com>, "Gauthier, Lisa" <Lisa.Gauthier@anadarko.com>
>> Subject: Re: Shenandoah data room follow-up this week
>>
>> Do you plan to have a workstation set up on one of the floors? Does a 9:00 to 3:00 clock session seem adequate? If so, I will advise Statoil accordingly.
>>
>> Sent from my iPhone
>>
>> On Jul 3, 2017, at 11:14 AM, Oudin, Chip <Chip.Oudin@anadarko.com> wrote:
>>
>>> Unless we don't care what is seen by STO, then we will need at least a day to set up a project that won't have all datasets and all interpretations in it. Lord knows, that might just talk them out of it. I would vote for Thursday.
>>> As for their requests, if they can resolve the issues they want to investigate (fault orientation, sub-seismic fault presence, OWC's, and sand presence), and if they can do it in an afternoon, then they are better than we are.
>>> We will need to discuss this on Wednesday. My recent mapping address their first two questions, and I'm not sure how open and transparent you want to be with regards to those maps. It might just talk them out of it.
>>> If you can hold them off a week, I will be out of the country.
>>> Have a Happy 4th!
>>> Chip
>>>
>>> Sent from my Verizon 4G LTE smartphone
>>>
>>> -------- Original message --------
>>> From: "Pachman, Jeff" <Jeff.Pachman@anadarko.com>
>>> Date: 7/3/17 10:19 AM (GMT-06:00)

To: "McGrievy, Pat" <Pat.McGrievy@anadarko.com>, "Steinberger-Glaser, Anita" <Anita.Steinberger-Glaser@anadarko.com>, "Chandler, Paul" <Paul.Chandler@anadarko.com>, "Oudin, Chip" <Chip.Oudin@anadarko.com>
Subject: Fwd: Shenandoah data room follow-up this week

Please let me know which day works best and at what time.
Thanks.

Remember....we want to talk them into this deal, not out of it.
Thanks.

Sent from my iPhone

Begin forwarded message:

**From:** Dan Greathouse <dgre@statoil.com>
**Date:** July 3, 2017 at 9:29:28 AM CDT
**To:** "Jeff Pachman (jeff.pachman@anadarko.com)" <jeff.pachman@anadarko.com>
**Cc:** Bill Moore <bmoo@statoil.com>, Jim Meek <jmee@statoil.com>, Ahmed Osman <aosm@statoil.com>, Matthew Hill <MHILL@statoil.com>, Kerry Botha <KERBO@statoil.com>, "Frank Meyer (frank.meyer@anadarko.com)" <frank.meyer@anadarko.com>, "Poole, Andrew" <Andrew.Poole@anadarko.com>
**Subject: Shenandoah data room follow-up this week**

CAUTION: This message originated from a source external to Anadarko. Do not click on any links or open attachments unless you recognize or have verified the sender and trust the content. Report suspicious email to ITSecurity@anadarko.com.

Jeff:

I have had a request from the subsurface team to find out they can visit Anadarko this Wednesday, 5th July or Thursday, 6th July.

They need to review some of the SH seismic data to investigate the following issues:

1. Clarify the location and orientation of the fault that separates Well #6ST1 and Well#5.
2. Ensure there are no sub-seismic faults that can impede aquifer support
3. OWCs uncertainty – we have noticed some differences between different interpretations
4. Extent of Lower Wx D and E sands, especially in the West.

Please let me know by COB today if this request is feasible during this holiday week because one of the individuals is coming from Norway and needs to make travel arrangement.

Regards,
Dan Greathouse
2107 City West Blvd., Suite 100
Houston, TX 77042
(o) 713-918-8247
(f) 713-918-8290

----------------------------------------------------------------------
The information contained in this message may be CONFIDENTIAL and is intended for the addressee only. Any unauthorized use, dissemination of the information or copying of this message is prohibited. If you are not the addressee, please notify the sender immediately by return e-mail and delete this message.
Thank you

# EXHIBIT 117
# [Redacted]



# Shenandoah : Sizing It Right
# A Retrospective
## Tech Forum

July 18, 2017

# Agenda

- Overview
- Geology, Petrophysics, and Geophysics
- Interpretation through Time – Shen-1 (2009) thru Shen-5 (2016)
- Current Interpretation & Mapping – Post Shen-6 & -6ST, -6STBP (2017)
- Stratigraphy, Core, & Rock Physics
- Seismic Coverage and Reprocessing
- Shenandoah Resources through Time
- StagSeis Reprocessing 2017 – Could it really look like this?

# Shenandoah – Historic Overview

ANADARKO

2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018

Shen #1 — Discovery well – 280' net pay in the Wilcox sands

Shen #2 — 1,000' net pay in the Wilcox sands

★ Start 20K equipment development and IPT work

Acquired 490' of whole core — #3 — Down-dip dry hole

Acquired 542' of whole core — #4 — Encountered Salt to the North, found 626' of pay in the ST

Acquired 80' of whole core — #5 — 1,043' of net pay

#6 — Dry hole East of Shen 5, subsequent ST down-dip of Shen 5 did not reach TD

**Start of Lease maintenance operations**

★ ***APC elects to withdraw from project completely due to reserve size and risk***

- Leases acquired between 2003 – 2007
- Partnership spent ~ $1.5B for exploration and appraisal activities
  - Drilling: ~$1,300MM
  - 20A: ~$ 100MM (total spend expected to be ~ $170MM)
  - IPT: ~$ 100MM
- Vendor spending on 20A ~$350MM




The Shenandoah Discovery is located on WR blocks 51, 52 and 53 in ~ 5,300 ft of water depth. The field was discovered by the Shen 1 in WR block 52 in 2009 with a modest pay count of 260 ft of TVD pay in numerous Lower Wilcox sands. The Shen 2 appraisal well which was drilled in 2013, encountered over 1000' of net TVD pay in 8 productive intervals in the U&L Tertiary. This rather extraordinary discovery also kicked off an Integrated project and a newly-established 20A team to develop a means to safely drill, complete and produce the HP HC's.

Our partners are COPC, Cobalt and Venari; Marathon had a 10% WI but relinquished their interest in a transaction with Venari and Anadarko in 2016.

The Shenandoah basin also includes smaller U&L Wilcox discoveries at Yucatan and Coronado. [redacted]

The U&L Wilcox sands at Shenandoah are considered to have some of the best rock and fluid qualities relative to other discoveries with 21% Porosity and perms that range from 50-100 md and HC fluids of 32 degree API gravity and 1,200 GOR.

Since 2009, we have drilled a total of 6 wells with 11 Wilcox penetrations; two of these wells were designed as keeper wells.

Currently we see a base case recovery of 250 MMBOE with a high case of 400 MMBOE.

# ShenCorTan Basin Early Resource Assessment







ANADARKO

## Shenandoah Geology & Geophysics

Ok, so how could we not develop Shenandoah?
(Or how could Development screw this up?)

# Post Yucatan Re-depthed Wazocto RTM




*20,000 feet of salt !*



WR 51 ANA #2
608124007900
ELEV_KB : 86
<1.26MI>
WR 52 ANA #1BP2
608124003402
ELEV_KB : 82
U. Wilcox 1
Top Lower Wilcox
Top Cretaceous
Shenandoah WR 51 #2
Shenandoah WR 52 #1
S
N
Salt
Oligocene & Eocene Marls
23.8 – 49.0 mya
Upper Wilcox
49.0 – 55.0 mya
Lower Wilcox
55.0 – 65.0 mya
Cretaceous Limestone
65.0 – 135 mya
V.E. = 1.0 X
-25,000 sstvd
-26,000 sstvd
-27,000 sstvd
-28,000 sstvd
-29,000 sstvd
-30,000 sstvd
-31,000 sstvd
-32,000 sstvd
-33,000 sstvd
ANADARKO
2013, Post
Shen-2


Biostratigraphic Chart
Neogene
Miocene
Oligocene
Paleogene
Eocene
Paleocene
Cretaceous
B/Marls -- 49 m.y.
UW2 - 53 m.y.
UW3
LWA - 55 m.y.
LWB
LWC - 58 m.y.
LWD
LWE
Creta -- 65 m.y.
WR 52-2 OH
L. Eocene
Upper Paleocene
Middle Paleocene
Middle Wilcox
Lower Wilcox
ANADARKO
Shen 3

# Shenandoah Petrophysics

- Acquired 1,100' of whole core
  - Shen #3, Shen #4BP, Shen #5
- Good rock properties

| | Petrophysical data |
|---|---|
| Depth (TVDss) | -28,230' to -31,550' |
| Gross Thickness | 1,300' – 2,100' |
| Net/Gross | 40% - 50% |
| Average Effective ϕ | 20.5% |
| Average Permeability | 80 md |
| Effective $S_w$ | 21% |
| Rock Compressibility | 2 - 3 micro sips |

- Image Logs on most wells
  - NGI, OBMI, ADN, BARS




- Bedding Dips / Azimuth
  - 22 – 42 deg; 140 – 175 Az




## Shen 5 – UW2 Core



ANADARKO

# Wilcox Analogs – Shenandoah Compares Favorably

**Wilcox Well Comparison**

| | | *Shen 5 | *Shen 2 |
|---|---|---|---|
| GOR (scf/stb) | [redacted] | 1124 | 1261 |
| Viscosity | | 1.32 | 0.89 |
| Pi (Psia) | | 22,569 | 22,755 |
| Net Pay H | | 1043 | 1001 |
| Avg Porosity (PHIE) | | 0.199 | 0.211 |
| Avg Permeability ($K_{air}$) | | 47 | 50 |
| Completion Type | | C&P*** | N/A |

*PVT from UW3 (Shen 2 and Shen 5) **Cased Hole Frac Pack ***Case & Perf

[redacted]

## Shenandoah Geology & Geophysics

Ok, so again - how could we not develop Shenandoah?

ANADARKO

# Mapping Interpretation Through Time

# Extraordinary Results in Shenandoah Basin

Shenandoah 1 (Press Release Feb. 2009) – First Well to Document "Miocene-Like" Reservoir Conditions in the GOM Lower Tertiary Play

- Higher Porosity-Permeability vs. Frontal Trend Wells
- Better Oil Quality (API + GOR) Compared to Earlier Wilcox Discoveries
- Multiple Sand Reservoirs with Inter-Fan Shale Top Seals



# Top of Upper Wilcox "2"

*Post Shen2 2013*




Shenandoah Structural Uncertainty (Post Shen3, 2014)
Top Upper Wilcox 2 (CI 250)
APC, Exploration
Discovery
Appraisal
Planned
Shen 3
Cobalt
APC, Development
ConocoPhillips
Rafts

# Shenandoah Reservoir Outlines
# P99 & P90 Based on Expl Post-Shen-3 Maps
# MDT EOWCs from Interpretation 2

ANADARKO




## Possible Shenandoah Reservoir Outlines

- UW-2 West (EOWC=30,510') ; East (?)
- UW-3 West (EOWC=30,6090' ; East (?)
- LW-A West (EOWC=30,690') ; East (OWC =28,252')
- LW-B West (EOWC=30,800') ; East = Wet
- LW-C West (EOWC=30,800') ; East (OWC=28,803')
- LW-D (EOWC=31,400') ; East (EOWC=29,600')
- LW-E (EOWC=31,850') ; East (EOWC=30,400')

| | Min Area (acres) | Avg. Area (Acres) | Max Area (Acres) |
|---|---|---|---|
| West EOWC | 1036 (LWC) | 1396 | 2048 (UW2) |
| East EOWC | 0 | 276 | 1058 (LWE) |

| | Min Area (Acres) | Avg. Area (Acres) | Max Area (Acres) |
|---|---|---|---|
| West LKO | 853 (LWE) | 1031 | 1289 (LWA) |
| East LKO | 0 | 29 | 98 (LWA) |


Shen 1
Shen 3
Shen 2


NE
<1.25MI>
<1.52MI>
WR 51 ANA #2
608124007900
ELEV_KB : 86
WR 52 ANA #1BP2
608124003402
ELEV_KB : 82
WR 52 ANA #2 FINAL
608124009300
ELEV_KB : 82
U. Wilcox 1
Top Lower Wilcox
Top Cretaceous
Upper Wilcox 2
Upper Wilcox 3
Lower Wilcox A
Lower Wilcox B
Lower Wilcox C
Lower Wilcox D
Lower Wilcox E

ANADARKO

# Shenandoah Structural Uncertainty (Pre-Shen4, 2014)




NW
NE
Shen-4OH
Shen-4BP
Shen-4ST
Shen-2
Future Shen-5
Shen-1
Future Shen-6
Shen-3
ANADARKO
Vertical scale: 1" = 200'

# Shenandoah
2015 - 2016

## Depth Structure Map – Top of UW2 Sandstone
## Post Shen4 BP1 – Development




N
S
WRS1 ANA #3ST1 BP1
WRS1 ANA #3ST1
B/Marls
T/LWA (UT?)
T/LWA MRK
LWB
LWC
LWD
LWE
T/Cret.
MD Section
Shen-4 ST to BP Core Correlation
Exploration 's Interp by Breck Johnson
500'
Upper lobe
Faulted out?
Resolve High Sw?
V.E. = 1
Section Azimuth: 177°
South
North
ANADARKO


A
A'
WR51-3 Shen-4: Pre-Drill Expected Case (Rev8 FINAL2 Data)


A
A'
WR51-3 Shen-4: Post-Drill Interp – Dev (Rev8 FINAL2 Data)

# Yuc-2/Shen-4ST/Shen-2/E-Loc/L-Loc/Shen-3



# Shenandoah Structural Map Evolution: Upper Wilcox 2 Sand



# Shenandoah Structural Map Evolution: Upper Wilcox 2 Sand



# Shenandoah Structural Map Evolution: Upper Wilcox 2 Sand



# Shenandoah Structural Map Evolution: Upper Wilcox 2 Sand




**MDT Pressures**

- Pushed OWC deeper
- Shen-4 & Shen-2 isolated

## Shen 5 Results




Stratigraphic TVD Cross Section



Structure Map : Top of UW2 Sand- Post Shen5, 2016
Shen 1 – Disc.
UW2 sd Not Present
Shen 2
(Oil Reservoir)
LKO = -28,994'
Shen 5 oil
LKO = -29,405'
Shen 2 oil
Prop Shen6
Shen3 BP1
(Water leg)
EOWC = -30,200
Shen 5 oil/Shen 3 wtr
HKW = -30,686'
Shen 3 wtr
Shen4
LKO = -30,276'
Shen 4 ST1 oil
EOWC = -30,200
Shen 5 oil/Shen 3 wtr
Shen5
(Oil reservoir)
52
EOWC = -30,400
Shen 2 oil/Shen 3 wtr
HKW = est. -31,100'
Spill – west blocks
EOWC = -31,000
Shen 4 ST oil/Shen 3 wtr
EOWC = -30,900
Shen4ST oil/Shen3 wtr
extrapolated for F.B.
EOWC = -30,700
Shen4ST oil/Shen3 wtr
extrapolated for F.B
95
96

# Shenandoah Structural Evolution

ANADARKO

Top of Upper Wilcox - Postdrill Yucatan 2 - July 2014


[redacted]

Top of Upper Wilcox - Postdrill Shen-3 - Dec. 2014 to June 2015




Upper Wilcox 2 - Postdrill Shen-4ST1 & BP1 - Jan. 2016







**Pre-drill resource Mean 110MMBOE**

ANADARKO

# Current Mapping Interpretation


Structure Map – UW2
Current Interpretation
Shen 5
(Oil Reservoir)
Shen 1
(Disc.)
** UW2 sd Not Present
Shen 7
Shen 2
(Oil Reservoir)
Shen 2
Shen 4 ST1 & BP1
(Oil Reservoir)
Shen 6
(Water Leg)
Shen 3
(Water Leg)
Shen 6 ST1 & BP1
(Water Leg)
1002' TVT Net Pay
U. Wilcox 2 Sand


NW
NE
Shen 4
Shen 4 BP1
Shen 4 ST1
Shen 2
Shen 5
Shen 1
Shen 6
Shen 3
Base of Salt
ANADARKO
Vertical scale: 1" = 200'
35


SW
NE
ANADARKO
626' Net Pay
473' Net Pay
542' Core
1002' Net Pay TVT
1043' Net Pay TVT
79' Core
488' Core
236' Net Pay TVT
Stratigraphic TVD Cross Section
36


Shenandoah Schematic Structural Cross Section
Wells are projected: Schematic Section
Shen-4
OH
Salt
ST01
ST01 BP01
473' Pay
Shen-2
1001' Pay
Shen-5
Shen-6
ST01
wet
OH
wet
Shen-3
BP01
BP Core
OH
Wet
WEST
EAST
SALT CANOPY
NW Basin
Miocene
Observed Fault
Olig/Eocene Marls
UW Shale
UW 1,2,3
LW A&B
LW C
LW D&E
Cret
OH
?
ST
First Keeper Well
80' Whole Core
Shen-4 BP Core
Shen-4 ST01
544' Whole Core
Residual Oil Saturation
Shen-3 BP Core
490' Whole Core
Shen-3
Increases
Pressure
Decreases
37

ANADARKO

# Shenandoah Overview: Stratigraphic Discussion

# Turbidite Overview

## Unconfined Turbidite Lobe Deposition







Powers et al, 2013

# Reservoir Rock Typing (RRT)

- **All 3 conventionally cored wells used for rock typing**
  - Shen-3BP1 (489 ft)
  - Shen-4ST1BP1 (542 ft)
  - Shen-5 (79 ft)
- **Petrofacies and Hydraulic Flow Unit (HFU) based classification**

Depositional Model




*Powers et al, 2013*

Petrofacies
5



ANADARKO

# Shenandoah Overview: Core and Rock Properties

# Shenandoah Whole Core

- **Approximately 1100' feet of whole core obtained.**
  - 470 Rotary SWCs
- **Most work completed**
  - SCAL to be completed by Mid 2018
- **Representative core in UW2, UW3, LWA, LWB, & LWC sands from Shen3, Shen4 BP1 & Shen 5.**
- **Interpreted by APC as a sand rich turbidite in a weakly confined to unconfined distribution of lobes that is in a proximal setting.**
- **Facies distribution characterized as Axis, Off Axis, Margin and Background.**
- **Channeling observed as likely broad and shallow but not dominating.**

Shen 3 – LWA sand



## Structure Map – UW 2




## U. Wilcox 2 Sand

ANADARKO

# Seismic Coverage and Reprocessing Update

Multiple Datasets:
WGC E-Octopus WAZ
WGC Rev8 Coil
CGG StagSeis Deux

Multiple Reprocessings:
2011 CGG E-Octo WAZ
2016 CGG WAZ/Coil
2017 CGG WAZ/Coil/Stag




Shenandoah Basin Seismic Coverage and CGG Reprocessing Areas

# 2016 CGG Shenandoah WAZ/Coil Reprocessing

- **Initiated Sept. 2015**
  - 40-block input (WAZ & Rev VIII Coil), 16-block core output
  - All partners ultimately involved
  - Target completion date Aug. 2016
  - [redacted]
- **Completed Dec. 2016**
  - Extensive scenario testing
  - Additional WAZ-only products tested & delivered Jan. 2017
    - *Concern about interference between WAZ & Coil inputs*
- **Additional Delivery Post Shen-6 OH**
  - Final-2a Velocity Model incorrect at Shen-6; Rev8 Coil more representative
  - CGG incorporated Shen-6 sonic into Final-3 Velocity model, remigrated Feb. 2017
  - Final-3 products distributed to partners March 2017
  - 4 Blocks StagSeis Deux incorporated into 2016 Reprocessing (APC-only), April-June 2017
- **Positive Experience with CGG**
  - Willing to iterate, cooperate with partnership






WGC E-Octopus WAZ (2011) – Trace 33181 – Shen-1/Shen-6 Diagonal




WGC Rev8 Coil (2015) – Trace 33181 – Shen-1/Shen-6 Diagonal




ANADARKO

CGG WAZ/Coil Reprocessing (2016) – Trace 33181 – Shen-1/Shen-6 Diagonal

# Regional Seismic Line – Shen-1






1) BOS Offsets
2) Deep Uplift
3) Dip/Facies Change – Fault or Weld?




West-East Arbline – Faulting Example

# Seismic Well Tie – Shen4ST/Shen2/Shen5/Shen6ST/Shen6/Shen1



ANADARKO

# Shenandoah Reserves Through Time


Shenandoah Resource Estimates through Time
ANADARKO
2009
2013
2014
2015
2016
2017
Pre-Drill Shenandoah #1
Pre-Drill Shenandoah #2
Post-Drill Shenandoah #2
Post-Drill Shen #3 & Yuc #2
Post-Drill Shen #3 & Yuc #2
Post-Drill Shenandoah #4
Post-Shen-4: Joint Expl/Dev Jan2016
Post-Shen-5: Dev. Deterministic 3Q16
Post-Shen-6: Dev. "Quick-look" 2Q17
0
200
400
600
800
1000
1200
1400
1600
1800
Gross Resources (MMBO)
WR52-2 and WR96-2 appraisal wells encounter thick UW & LW sands, mostly wet, off-structure
Revised mapping incorporates fault system separating Shenandoah into W & E blocks
WR51-3 encounters salt in NW sector of field, eliminating 800 ac; ST1 & BP1 find oil (820' & 470', respectively) in compartmentalized (faulted) LW sands; UW sands mostly missing (FIO?)
Re-evaluation of Shenandoah resource range, facilitated by SCT, incorporating Exploration and Development interpretations with greater uncertainty in undrilled areas (January 2016)




Both maps are mid-case.
One representative horizon – arrow points to the top of the horizon – UW2. All other sands look similar in structure, but differ in net pay & OWC estimates with the LWB and LWC costed to the water.
You see a big 3-way structural closure against salt to the North that is segmented by mainly NW – SE trending faults. We have drilled 6 wells mainly in the center portion of the field and the Eastern Flank of the field. To South we drilled in separate features Yucatan and south/East not shown on the map we have drilled Coronado.
On the net pay of just the UW2 shows the water wedge – which varies by FB. You also see we have interpreted an E-W trending fault south of Shen 5 that disconnects the FB from the aquifer. The East is interpreted all wet. The well we are recommending to be drilled as a lease holding operation is the Shen 7. It will be set up as a future producer, same as Shen 5.

# Area and STOOIP – Preliminary Analysis

**UW2 Sand – Mid Resource Case**
**Down to EOWC's and HKW in Shen-6 FB**




★ Potential Development Locations

| Fault Block | STOOIP (MMSTB) All Reservoirs Combined |
|---|---|
| Shen-4 FB2 | 26.4 |
| Shen-4 FB 1 | 105.6 |
| Shen-4 | 132.2 |
| Shen-2 | 193.6 |
| Shen-5 | 61 |
| Shen-5A | 37.5 |
| Shen-5 Updip | 105.7 |
| Shen-6 | 274.4 |
| Shen-1 | 24.9 |
| **Total** | **961.3** |

STOOIP required for economic well (assumes facility is already in place):

- Assumptions: $50 oil, 0.3 PIR
- 100 MMSTB (30% RF aquifer support) – 300 MMSTB (10% RF depletion drive)

# Development Plan

- **Expected STOOIP: ~1 BBO based on mid resource**
- **Key Performance Uncertainties:**
  - Aquifer connectivity and strength
  - Location of Northern Boundary
  - Additional Faulting and Transmissibility
- **Dynamic data are needed**
- **Development philosophy is to de-risk reservoir uncertainties with Phase I development**

**Shenandoah Fault-Block Schematic – Base Case**




- **Drill Shen 2 up-dip offset in 2018 – Shen 7**
- **Facility Limit: 60,000 BOPD, 1st production April 2022**
- **Phase I: Complete and bring on-line Shen 5 and Shen 7 in 2022**
  - Shen 5 commingled production through Lower B
  - Shen 7 commingled production through Lower C
- **After ~ 6 months of dynamic production data decide on Phase II**
  - 2 wells to the west of phase I
- **Potential phase III development with wells in up-dip producing fault blocks**

| Phases | Description | OOIP contacted | EUR |
|---|---|---|---|
| Phase I (2 wells) | Shen 5 (depletion drive) and well in Shen 2 FB (aquifer support) | ~ 375 MMBO | 79 MMBOE |
| Phase II (2 wells) | 2nd phase development to the West with 2 wells open to aquifer | ~290 MMBO (incremental) | 115 MMBOE (incremental) |

## What Did We Learn from Appraisal Wells?



- Structure is more complicated
- Structure is more tightly constrained by salt/welding/faulting (Shen-4)
- Greater potential for compartmentalization – structural and/or stratigraphic
  - *No two oil-bearing wells clearly in communication*
  - *Uncertainty about compartment size, STOIP, and deliverability*
- Uncertainty over fluid levels (OWC's), common aquifer, and aquifer connectivity
- Current seismic data hints at complexities but does not resolve clearly
  - *2015 WGC Rev8 Coil*
  - *2016 CGG Reprocessing*
  - *2017 CGG (w/StagSeis) Reprocessing*

# 2017 STAGSEIS DATA INCORPORATION AND REPROCESSING



2017 CGG StagSeis Data
Eocene Trough Horizon*
Depth Structure Map
*Eocene trough horizon above Top Wilcox shales

APC Shenandoah - Eocene Trough Dip Attribute 3/2017
CGG StagSeis Data



APC Shenandoah - Eocene Trough Amplitude Map 3/2017
CGG StagSeis Data




2017 CGG-reprocessed
WAZ/Coil data (15 Hz)
Eocene Peak Horizon*
Dip Attribute Extraction
*Eocene peak horizon above top
Wilcox shales


2017 CGG-reprocessed
WAZ/Coil data (15 Hz)
Eocene Peak Horizon*
Amplitude Extraction




**Arbitrary Seismic Well Tie – Shen-5 to Shen-6BP @ tar zone**
Seismic fault patterns near Shen-6ST/BP wellbores trend NE-SW
Data shown is 15 hz version of CGG Final3 (post-Shen-6) volume



**Mapped Horizon Above UW2 (Zero-Crossing) Depth Structure**
Seismic fault patterns near Shen-6ST/BP wellbores appear NE-SW

**WSW-ENE Cross Section – Shen-4ST/Shen-2/ Shen-5/ Shen-6 (BHL)**

Actual Well Dips Projected into Plane of Section (Van Mount 3/2017)




Down-to-the-West Faulting can be interpreted to solve structure between Shen-4ST, Shen-2, and Shen-5.
Down-to-the-East faulting is most likely structural solution between Shen-5 and Shen-6.




APC GOM Operations – Eocene/U.Wilcox horizon – Dip Attribute Map Aug. 2014

**APC Shenandoah - Eocene Trough Dip Attribute 3/2017**
**CGG StagSeis Data**



## Shen Basin Tectonic Framework – Thoughts

Basin has experienced extensional and contractional deformational events.

**Phase I (~E-W Extension):**

- Western basin margin is large throw (down to the east) extensional flt.
- Blk 51 fault system (down to the west) antithetic to Western margin flt.
- Active from Mz into Eocene?




**Phase II (~N-S Contraction):**

- Development of over-thrust geometries observed at Shen-1 and Shen-4 welds (and BOS canopy highs).
- Rotation to steeper dip of northern (Shen) basin margin (eastern side steeper than western side).
- Rotation of southern (Yuc) margin of basin.
- Sin-or-post LM4.




Two phase tectonic model is consistent with deformation observed in NGI to date.

(Van Mount 3/17)

## Regional Transect down Wcx Depositional Fairway




### Restoration to Oligocene




(Van Mount 3/17)

# Shenandoah – Epilogue

ANADARKO

- APC and ConocoPhillips exited Shenandoah in February 2018; Venari and Cobalt retained interest. Cobalt's interest was sold at bankruptcy auction on 3/7/18 to Navitas Petroleum for $1.8 MM. Navitas then brought in LLOG and Beacon, with LLOG designated as unit operator. Current interests are split as follows: LLOG (oper)/Beacon/Navitas 70%; Venari 30%. LLOG filed a Suspension of Production (SOP) with BOEM/BSEE in April 2018 and is awaiting a decision regarding the SOP. The Shenandoah unit – WR51, WR52, and N/2 WR53 – was set to expire on April 18, 2018, due to lack of operations on the block for 365 days.

- APC and partners allowed Yucatan (WR95) to expire in Nov. 2017. LLOG and Venari acquired WR95 in Mar. 2018 for $695,555. (Shell had previously acquired WR95 in 2007 for $34.9 MM.)

- APC is assigning all interest in its Coronado blocks to another operator and retaining an ORRI.

## Shenandoah - Takeaways

ANADARKO

- Never discount an interpretation because it seems wrong or different. All interpretations are wrong until proven otherwise.
- If you have undesirable or inconclusive data, don't ignore it. Factor it into your range of uncertainty.
- Compartmentalization is the bane of most deepwater developments that fail.
- Enthusiastically over-estimating the P10 (high side) is okay; enthusiastically over-predicting the P90 (low side) can be fatal (i.e. difficult to recover from).
- It is extremely important to verify OWC's early in the appraisal phase
- High-cost development in a low price scenario in a remote environment with many unknowns → Not good!
- Shen-2 appraisal initiated a large-scale project – 20A, Facilities, Subsea, Drilling, IPT – involving hundreds of employees and contractors. In May 2017, Anadarko wrote off $902 MM associated with Shenandoah.

# EXHIBIT 118
# [Redacted]

## Commercial Focus

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

Supervisor Comments:

Chip is very aware of the needs of the corporation but is very focused on making the right decision for commerciality of a project. He is highly regarded by his peers, partners and APC management. [ HTMLCONTROL Forms.HTML:Hidden.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: E - Exceptional

Employee Comments:

One of the traits I bring to every project is a focus on commerciality, with much effort given to understanding the subsurface risks that could affect the value of the project.

## Integrity and Trust

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

Supervisor Comments:

Chip holds a high regard for personal ethical values and is not afraid to stand up and do the right thing.  He sets a good example for

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: E - Exceptional

Employee Comments:

I do what I say, and I'm honest.Â If asked to do something, I will usually be direct and forthcoming about how and when it will be done.

Exhibit 105

others.[ HTMLCONTROL Forms.HTML:Hidden.1 ]

## Open Communication

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: A - Acceptable

Supervisor Comments:

Chip is not afraid to give his opinion yet will listen to other people's views. Chip does realize that sometimes he is very blunt which may turn others off but it is not done out of spite. He can continue to work on this area.[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

Nobody has ever accused me of being shy.Â I feel that open communication, with everybody that I work with, is beneficial to me, my team, and to those around me.

If I have a fault, it's that I sometimes talk too much, and that I'm direct (i.e. blunt) with my comments.Â

## People and Passion

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: A - Acceptable

Supervisor Comments:

Chip is very passionate about his work and getting things done on time as well as done correctly. His work ethic is a role model for others in the group. [ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

Hopefully I exhibit a passion for my work to those around me.Â My feeling is that, when the passion is gone, then I should walk away.Â

## Servant Leadership

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Values+Scale&shscale_scalereverse=false')" ]: A - Acceptable

Supervisor Comments:

Chip has done a good job of assisting others in reaching common goals. He has also been helpful in knowledge transfer as well as mentoring.[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

I'll say what I said last year - if the project succeeds, then I and those around me succeed.

# Goals

Goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_0_hidjs);setField('wf_sect_2_o_0_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_0_hidjs);%20setField('wf_sect_2_o_0_sd','t');" ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[redacted]

[redacted]

**Status:** Complete **Start:** 01/01/2014 **Due:** 06/30/2014

**Progress:**

[redacted]

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: 2 - Meets Expectations

Supervisor Comments:

Chip worked on the Jubilee project for the first half of the year before transitioning out. His past knowledge of the field has been invaluable and has had added a large value to the partnership. He did a great job of transitioning with Shea and getting him up to speed on the project. He had a great attitude and willingness to help which was greatly appreciated.[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

Transitioned out of group in June 2014.Â

[redacted]

I think I prepared Shea Maddox well to handle his transition into my former role.

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_1_hidjs);setField('wf_sect_2_o_1_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_1_hidjs);%20setField('wf_sect_2_o_1_sd','t');" ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[redacted]

| **Status:** | **Start:** | **Due:** |
|---|---|---|
| Complete | 01/01/2014 | 06/30/2014 |

**Progress:**

[redacted]

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: 2 - Meets Expectations

Supervisor Comments:

[redacted]

Employee Comments:

Transitioned out of group in June 2014.Â

[redacted]

Again, Chip's prior knowledge of the area was utilized and he has always done a good job of transitioning and sharing his knowledge with others.[ HTMLCONTROL Forms.HTML:Hidden.1 ]
[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[redacted]

I think I prepared Shea Maddox and Monica Miley well for their transitions into the ghana projects.

Â

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_2_hidjs);setField('wf_sect_2_o_2_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_2_hidjs);%20setField('wf_sect_2_o_2_sd','t');" ]
[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[redacted]

**Status:** Complete **Start:** 01/01/2014 **Due:** 06/30/2014

**Progress:**

[redacted]

[redacted]

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]:

[ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]:

2 - Meets Expectations

Supervisor Comments:

[ HTMLCONTROL Forms.HTML:Hidden.1 ]
[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

same as above.

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_3_hidjs);setField('wf_sect_2_o_3_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_3_hidjs);%20setField('wf_sect_2_o_3_sd','t');" ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

**Goal Name:** Transition to GOM Deepwater Development
**Goal Description:** Move from Int'l Business Development to Gulf of Mexico Deepwater Development. Move into deepwater project in early- to mid-stage development. Acquire knowledge from new teammates and SME's to assist with seismic interpretation, reservoir characterization, well planning, and development decisions ASAP. Transfer 6 1/2 year's of Ghana knowledge to replacement geophysicist and IBS teammates prior to and after transition.
**Measurement Source:** Move out of IBS into GOM Deepwater Development.

| **Status:** | **Start:** | **Due:** |
| --- | --- | --- |
| Complete | 06/30/2014 | 12/31/2014 |

**Progress:**
Transitioned to GOM Development group in June 2014. Assumed geophysical responsibilities for Shenandoah discovery and surrounding opportunities.

**Rating by Pat McGrievy:**

**Rating by Chip Oudin:**

| | | | |
|---|---|---|---|
| [ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: | [ HTMLCONTROL Forms.HTML:Select.1 ] | [ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: | 2 - Meets Expectations |

| Supervisor Comments: | Employee Comments: |
|---|---|
| [ HTMLCONTROL Forms.HTML:Hidden.1 ]<br>[ HTMLCONTROL Forms.HTML:Hidden.1 ] | Moved from IBS into GOM Deepwater Development 6/20/2014 |

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_4_hidjs);setField('wf_sect_2_o_4_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_4_hidjs);%20setField('wf_sect_2_o_4_sd','t');" ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

**Goal Name:** Shenandoah Evaluation and Feasibility Study
**Goal Description:** Evaluate multiple development scenarios for Shenandoah discovery incorporating uncertainty in resource size and drive mechanism, to help define risk assessment, strategic business fit, potential returns, and any/all technology gaps.
**Measurement Source:** Participate in multi-disciplinary meetings for Exp and Dev groups. Conduct detailed mapping incorporating latest 3D data volumes to assess resource size and to build framework for Geo-modeling and reservoir simulation. Work with Exploration team to influence development data requirements, appraisal well locations, and ultimate resource value of Shenandoah to APC; focus on incorporating results from appraisal activities into parametric studies to identify risk and narrow resource uncertainty ranges. Communicate with team members, Exploration, Technology, all key disciplines (drilling, completions, production, facilities), partners, and vendors, to ensure that all data necessary to conduct ongoing studies are available for optimum results. Work with facility project team to evaluate pre-screening development concepts for concept selection phase.

| **Status:** | **Start:** | **Due:** |
|---|---|---|
| On Target | 07/01/2014 | 12/31/2014 |

**Progress:**
Mapped Shenandoah and surrounding areas on three versions of Rev8 coil data (final data volume expected late Nov. 2014); interpretation supports presence of faulting across the Shenandoah prospective area. Geomodelling effort put on hold pending completion of Shen-3

well. Attended meetings with Development team, Exploration, partners, seismic vendors, and all parties (drilling, completions, production, facilities, vendors) associated with development concept-select process. Despite gag order imposed by Exploration regarding alternative interpretation of Shenandoah structure, I have provided basis for structural framework that agrees with previous Development interpretation and agrees (in concept) with partner interpretations and observations. Ongoing interpretation incorporating structural and stratigraphic complexities will factor into risking of resource assessment for Shenandoah and into development concept select, scheduled for early 2015.

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: 2 - Meets Expectations

Supervisor Comments:

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

Ongoing work at Shenandoah awaits arrival of final volume of Rev8 coil 3D data.Â Generated maps and presentations for project in support of Development team and ongoing project activities, but due to inter-departmental politics, I have been restrained from open communication with partners and proceeding with project objectives.Â It is gratifying to see that my work is in general alignment with previous Development and partner interpretations, but it has been equally frustrating working on a project where my work has been rebuked and/or ignored by other parts of APC.

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[ HYPERLINK "javascript:hideAll(wf_sect_2_o_5_hidjs);setField('wf_sect_2_o_5_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_2_o_5_hidjs);%20setField('wf_sect_2_o_5_sd','t');" ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

**Goal Name:** Shenandoah Basin OBO Property Evaluation

[redacted]

**Status:** **Start:** **Due:**
On Target 07/01/2014 12/31/2014

**Progress:**

[redacted]

**Rating by Pat McGrievy:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: [ HTMLCONTROL Forms.HTML:Select.1 ]

**Rating by Chip Oudin:**

[ HYPERLINK "javascript:openUrl('/showscale?bplte_company=ANDRK&shscale_showvalue=false&shscale_scalesrc=1&shscale_scaleid=Goals+Scale&shscale_scalereverse=false')" ]: 2 - Meets Expectations

Supervisor Comments:

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

[redacted]

## Individual Development Activities

Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

[ HYPERLINK "javascript:hideAll(wf_sect_3_o_0_hidjs);setField('wf_sect_3_o_0_sd','f');" ] | [ HYPERLINK "javascript:showExpandAll(wf_sect_3_o_0_hidjs);%20setField('wf_sect_3_o_0_sd','t');" ] [ HTMLCONTROL Forms.HTML:Image.1 ]

[ HTMLCONTROL Forms.HTML:Hidden.1 ]**Category: Development Activities[ HTMLCONTROL Forms.HTML:Hidden.1 ]**
**Development Activity Name:** Attend Industry Conferences
**Value :** Open Communication,
People and Passion
**Description :** Attend at least one industry conference/seminar to see new technologies, to see peers and colleagues, and to represent Anadarko in professional setting
**Measurement Source :**

**Start:** 01/01/2014 **End :** 12/31/2014 **Status :** Complete

**Progress :** Attended GCAGS in Lafayette in October; will attend AGL in Austin in November.

Supervisor Comments:

[ HTMLCONTROL Forms.HTML:Hidden.1 ]
[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Comments:

Attended GCAGS in Lafayette in October; will attend AGL in Austin in November.

# Combined Year-End Rating

Determine the alpha and numeric rating for goals and core values.

**Combined Year-End Rating** **[ HTMLCONTROL Forms.HTML:Select.1 ]**

Rating Weights

Section Comments:

Supervisor Overall Comments:

Chip has been a major contributor to the Ghana projects over the last 6 and a half years. His hard work, leadership and dedication to the project has added a significant value to APC. Chip is an excellent geophysicist and will be a valuable asset to APC in his next position.[ HTMLCONTROL Forms.HTML:Hidden.1 ]

Employee Overall Comments:

*No comments*

| | | | |
|---|---|---|---|
| Save and Close | [ HTMLCONTROL Forms.HTML:Hidden.1 ]Close Without Saving | [ HTMLCONTROL Forms.HTML:Select.1 ] | GO |

[ HTMLCONTROL Forms.HTML:Hidden.1 ]

# EXHIBIT 119



# Structural Uncertainties of the Shenandoah Discovery

ANADARKO
SHENANDOAH BASIN

# Our Values

ANADARKO

**People and Passion**

We will ...

- Recognize and reward strong performance
- Respect diversity in thought, practice and culture
- Create a high energy work environment
- Learn and continuously develop ourselves and others
- Think big – Innovate!

We will not ...

- Accept apathy or cynicism
- Allow enthusiasm to overwhelm reason

**Commercial Focus**

We will ...

- Understand and execute our strategy
- Safeguard the long-term interests of shareholders
- Maintain high standards for health, safety and the environment
- Act responsibly with company assets

We will not ...

- Sacrifice long-term value for short-term gain
- Use the excuse, "we've always done it that way"

**Open Communication**

We will ...

- Communicate freely, clearly, and concisely
- Listen for understanding
- Encourage diverse opinions and constructive debate

We will not ...

- Knowingly mislead or intentionally withhold information

ANADARKO

# Previous Partner Structural Interpretations – Shenandoah

- Recognition that 51#2 and 52#1BP2 are in separate compartments
- Primary 3-way closure against salt/bounding fault (APC, Marathon ‘13)
- East-West trending faults (Cobalt, ConocoPhillips ‘13, Marathon ‘14)
- E-W and N-S trending faults (Venari, ConocoPhillips ‘14, APC Ops)

Current APC Expl interpretation based on Rev8 RTM FWI PSDM Coil data.

**No faulting**

ANADARKO

# Shenandoah (MRO Map)

## *Lower Wilcox (TH400)*




Marathon Oil

*(Partner Meeting Sept. 2013)*

# Primarily E-W faulting

ANADARKO

## Depth Structure Map on Top Wilcox - Early Eocene 50ma (Top Reservoir) (Subsea Feet)




*(Partner Meeting Sept. 2013)*

ConocoPhillips

**Primarily N-S faulting**

ANADARKO

Shenendoah

# Appraisal Well Locations on Venari Top Wilcox Pay Map

*(Partner Meeting Sept 2013)*




- Mapped structural column to spill-point = 4200'
- Anadarko's proposed WR 52 #2 appraisal well is +/- 200' below LKO (Wilcox 2 & 3 as one tank)
- Potential oil column to proposed location = 3700'
- WR 52 #2 well is positioned to test maximum fill of structure and to prove lateral continuity of reservoirs

VENARI

# Modeled E-W faults but recognized N-S faults







"Structural Interp in COP Model: faulted 3-way closure against salt to north and salt/salt welds to east and west."

Recognition by COP of N-S lineations in data. "Additional faulting and potential for structural compartmentalization will be incorporated into the geomodel."

*(Partner Meeting April 2014)*

ConocoPhillips


Eocene-Uwcx Mkr Horizon
DSG 3D Display (vert exag 2.6)
Oblique View from South
Shen-2
Shen-1
Shen-3
(drilling)
Don't worry, these lineations are not faults and in no way impact the Shenandoah structure.
Cube 2 (TVDSS)

# APC Exploration – Top Upper Wilcox surface, July 2014






# Line 1 – SW-NE Well Tie – Rev8m2 RTM FWI PSDM

BAK REV8_5 Model Horizons


File
View
Seismic
Horizons
Faults
Wells
Help
WSW
ENE
25000
30000
35000
Base Salt
Oligocene
Eocene
Upr Wcx
Lwr Wcx A
Cretaceous
Please note – these are not faults. The only fault is the one that isolates the 52-1BP2 from the rest of the structure
Line 2 – WSW-ENE Arb Line – Rev8m2 RTM FWI PSDM
SRVY:
LINE:
TRACE:
Z:
A:
X:
Y:
BAK REV8_5 Model Horizons


SeisWorks/Seismic View: ArbitraryLine <3>
File View Seismic Horizons Faults Wells Help
NNW
SSE
APC WR51-3
(orig)
25000
30000
35000
Base Salt
Oligocene
Eocene
Upr Wcx
Lwr Wcx A
Cretaceous
Please note –this is not a fault, and there is no chance for salt in the poor data area.
Line 3 – SSE-NNW Well Tie – Rev8m2 RTM FWI PSDM
BAK REV8_5 Model Horizons
Mode: Point.
LINE:
TRACE:

# EXHIBIT 120
# [Redacted]



# Shenandoah

## Economics: Two Spar Scenario

IDENTIFY AND COMMERCIALIZE RESOURCES • EXPLORE IN HIGH-POTENTIAL PROVEN BASINS • GLOBAL BUSINESS DEVELOPMENT APPROACH • ENSURE FINANCIAL DISCIPLINE AND FLEXIBILITY

# AGENDA

- Shenandoah and Vito comparison
- Exploration P50 assumptions and economics
- Development deterministic assumptions and economics
- Economic sensitivities
- Future economic optimizations
- Principle risks going forward

ANADARKO PETROLEUM CORPORATION

# Vito vs. Shenandoah: Subsurface, Operations, & Project Drivers

- Shenandoah:
  - Excellent Mobility translates to Higher Rates & Lower Reservoir DD pressures
  - High GOR's provide for Natural Artificial Lift
  - Mudline SIP at Shenandoah requires 20 KPSI Deployment; dry tree opportunity
  - Asphaltenes (Mod. High AOP) will require mitigation plan
  - Multiple units could provide completion challenges

[redacted]

| Parameter | [redacted] | Shenandoah |
|---|---|---|
| Geologic Unit | [redacted] | U&L Wilcox |
| Reservoir Depth | [redacted] | 30,500' |
| Reservoir Characterization | [redacted] | Multiple units; vertically pressure separated |
| Porosity | [redacted] | 21% |
| Permeability (md) | [redacted] | 40-130 |
| Fluid Avg. Viscosities (cp) | [redacted] | 1 |
| Avg. fluid GOR (SCF/bbl) | [redacted] | 1,350 |
| Oil Sp. Gr (API) | [redacted] | 32-35 |
| Asphaltenes (AOP Pressure) | [redacted] | 12-15% |
| Mudline SI pressures | [redacted] | 16 KPSI |

Logs Not to scale



# Top of Lower Wilcox "A"

**C.I. = 250 ft**




# Top of Lower Wilcox "B"

**C.I. = 250 ft**






# Exploration P50 Case

- Multi-Zone MMRA Reserves:
  - P90 Area= LKO ; P10 Area = 3,000' Column Height
  - Combined Recoverable Resources: 949 MMBO
  - Recovery Factor ~ 25%; 500 acre spacing
  - GOR = 1,000 scf/STB
- Economics are Point Forward (1/2014):
  - 3 Appraisal Wells (Keep 2 for Water Injection)
  - Transportation: $4.00 Oil & $1.00 Gas
  - Market & Quality Deduct: $4.30 Oil & $0.26 Gas
  - IPT = $33MM
- First Production July 2018

**Net APC Investment Pricing: $95/bbl & $3.25/ MCF**

| | NPV0 ($MM) | NPV10 ($MM) | ROR (%) | PIR10 ($M/$M) | F&D ($/boe) | LOE ($/boe) |
|---|---|---|---|---|---|---|
| P50 Case | 10,305 | 2,308 | 34 | 1.4 | 14.64 | 3.33 |

# Exploration P50 Case Continued

- Drilling Costs Assumes Learning Curve
  - 25% reduction after 4 wells
- Completion Costs Assumes Learning Curve
  - Gravel Pack $90 MM/well
  - 25% reduction after 4 wells
- Facility Costs
  - Two spars with 100 kBOPD Capacity
  - Spar 1 Year 2018 / Spar 2 Year 2022 ; Water Injection Year 2028
- Operating Costs
  - Fixed Well: $5.8MM/Well/Yr
  - Variable: $1.0/bbl Oil & $0.05/mcf Gas

| | IP (BOPD) | EUR (MMBO) | Well Count | Drill Cost ($MM) | Water Injectors | Total D&C ($B) | Total Facility ($B) |
|---|---|---|---|---|---|---|---|
| LW (C/D/E) | 18,150 | 26.7 | 12 | $199 | 9 Wells | $9.4 | $3.4 |
| LW (A/B) | 18,575 | 28.9 | 12 | $193 | | | |
| UW (1/2/3) | 17,225 | 28.2 | 10 | $188 | | | |

# Exploration Gross Production and Capital Spend Profiles

## Production Rates




## Capital Spend




- Assumes Phased Approach
  - Phase 1: Pre-drill 4 wells followed by completion (1 MODU)
  - Phase 2: Ramp up to 2 MODUs for five years
  - Phase 3: Ramp down to 1 MODU

# Deterministic Case Assumptions

- Productive Area (Between LKO and Spill Point)
  - RF 20%; EUR = 767.5 MMBO (Sensitivity: 30%; EUR = 1,151.2 MMBO)
  - Assumes Water Injection
  - Spacing 500 acres (Sensitivity:400 acres; 600 acres)
  - Average GOR = 1,280 scf/STB
- Economics are Point Forward (1/2014):
  - 3 Appraisal Wells (Keep 1 for Producer)
  - Transportation: $6.00 Oil & $1.00 Gas
  - Market & Quality Deduct: $3.00 Oil & $0.26 Gas
  - IPT & 20A $303MM (2014 - 2019) + $400MM long lead equipment (2015 - 2018)
- First Production July 2019 (Sensitivity:6 months earlier; 6 months later)

Net APC Investment Pricing: $95/bbl & $3.25/ MCF

| | NPV0 ($MM) | NPV10 ($MM) | ROR (%) | PIR10 ($M/$M) | F&D ($/boe) | LOE ($/boe) |
|---|---|---|---|---|---|---|
| Base Case | 6,824 | 1,192 | 19 | 0.43 | 21.72 | 6.28 |

# Deterministic Case Assumptions Continued

- Drilling Costs Assumes No Learning Curve
  - Base Case Cost: $210MM (Sensitivity: $184MM Low / $342MM High)
  - Base Case Days: 183 (Sensitivity: 159 days Low / 309 days High)

- Completion Costs Assumes No Learning Curve
  - Cased Hole Perforated With Sliding Sleeve
  - Base Case Cost: $100MM (Sensitivity: $80MM Low / $125 MM High)
  - Base Case Days: 62 (Sensitivity: 90 days High)
  - Sliding Sleeve Costs: $20MM

- Facility Costs
  - [redacted] with Injection Capability
  - Spar 1 Year 2019 / Spar 2 Year 2022 ; Water Injection From Start (Sensitivity: No Water Injection Aquifer Support)

- Operating Costs
  - Fixed Platform: $36MM/ Yr
  - Fixed Well (Intervention): $5.0MM/Producer/Yr 1st 10 Years then $7.0MM
  - Variable $0.81/bbl Oil & $0.90/mcf Gas & $0.79/bbl Water
  - Injection: $1.00/bbl

# Deterministic Case Assumptions Continued

- Uptime Assumptions:
  - Well = 90%
  - Facility = 95%

- Commingling Assumptions:
  - Rates based on nodal analysis with facility, tubing and drawdown constraints (DD: 2,000 – 6,000 psi)
  - Lower Wilcox (LW): Produce LW C/D/E commingled then mechanical sleeve shift to LW A/B
  - Upper Wilcox (UW): Produce UW 3 then mechanical sleeve shift to UW 1/2
  - Injectors assume mechanical sleeve shifts (3 producers/ 1 injector)

| | Constrained Avg. Well Rate (BOPD) | EUR (MMBO) | Well Count | Sliding Sleeve ($MM) | Water Injectors | Total D&C * ($B) | Total Facility ($B) |
|---|---|---|---|---|---|---|---|
| LW (C/D/E) | 11,000 | 22.3 | 11 | NA | 4 Wells | $9.3 | $6.3 |
| LW (A/B) | 20,000 | 26.1 | | $20/Well | 4 Wells | | |
| UW (3) | 16,500 | 16.8 | 9 | NA | 3 Wells | | |
| UW (1/2) | 12,000 | 9.3 | | $20/Well | 3 Wells | | |

* Includes 3 appraisal wells

# Deterministic Gross Production and Capital Spend Profiles

## Production Rates




## Capital Spend




- Assumes Two 15k capable MODU's for drilling
  - Assumes predrill nine wells (Drilling days 3x completion days)
  - Aggressive drilling to reach peaks rates; limited phasing
- Assumes One 20k capable MODU for completing
  - Technology availability 2Q 2108 - 4Q 2018

# Tornado Chart: Base Case (PIR10 =0.43)



# Tornado Chart: Base Case (NPV10 = $1,192MM)



# Future Case Optimization on Base Case Reservoir Description

- Refine well counts, rates and recoveries based on simulation
  - Optimize well spacing
  - Optimize water injection timing and rate
  - Understand depositional model impact on recoveries

- Look for ways to minimize pre spend dollars
  - Optimize drilling and completion schedules
  - Delay water injection (wells and topsides)

- Refine costs and timing
  - Understand technology needs and cost impact
  - Evaluate increased appraisal before investment scenario
  - Balance flexibility in design with speed to first production

# Principal Risks Going Forward

- In place and recoverable resource size with only two well penetrations
  - Lateral extent and connectivity
  - Aquifer support
- Potential for large capital exposure before 1st production
  - 20k technology studies and 20k rig commitment
  - Possible need to pre-drill producer and injector wells prior to losing drilling window
- Timing uncertainty to execute on 20k technology
- Potential for higher operating expense
  - Costs and frequency of well remediation with high AOP
  - Other productivity threats?

# EXHIBIT 121

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LEA S. FRYE** | § | |
| | § | |
| ***Plaintiff,*** | § | **CASE NO. 4:17-cv-2289** |
| | § | |
| **vs.** | § | |
| | § | **(FILED UNDER SEAL)** |
| **ANADARKO PETROLEUM CORP.,** | § | |
| | § | |
| ***Defendant.*** | § | |

**DECLARATION OF LEA S. FRYE**

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. My name is Lea S. Frye. I am of sound mind, at least eighteen (18) years of age, and I am capable of making this declaration. The facts contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

2. From 2005 until 2016, I was employed as a Reservoir Engineer for Anadarko Petroleum Corporation ("APC"). My job duties included evaluating the size of resources in oil fields and using my expertise to help Defendant develop economic models aimed at maximizing shareholder value.

3. In October 2005, I signed a Proprietary Information and Invention Agreement. A true and correct copy is attached to this Declaration.

4. In January 2014, APC tasked me with evaluating the Shenandoah field ("Shenandoah"), which is an oil and gas resource in the Gulf of Mexico. My assigned role was to analyze scientific data and help Defendant decide whether the project should move forward to production. My focus was on current perceived value of Shenandoah and any associated risks to that value.

5. From March 2014 until my resignation, I observed and otherwise became aware of knowingly false statements by APC executives regarding the characteristics and economics of Shenandoah. Here are six examples (other examples are discussed in my First Amended Complaint):

a. APC repeatedly overstated the size of the Shenandoah resource. For example, APC approximated the size of Shenandoah at "900 MMBOE (million barrels of oil equivalents) in net discovered resources" during an investor conference, describing the Shenandoah basin as a "$2-4 billion opportunity." These numbers were grossly inflated based on the scientific data that was available.

b. After the Shenandoah 3 appraisal well ("Shen 3") was drilled in 2014, APC concealed the fact that Shen 3 was a "wet well" that did not reveal the presence of oil and gas. A wet well is also commonly referred to as a "dry hole." Despite this, during an investor call in February 2015, APC Senior Vice President of Exploration Bob Daniels claimed the Shen 3 well revealed over 1,500 feet of "quality sand." This representation was misleading, because he discussed it as a positive, when the reality was very negative.

c. The Shenandoah 4 appraisal well ("Shen 4") included multiple penetrations. One revealed salt, which can never yield oil. After several penetrations, hydrocarbon-bearing sands were located. However, the size of the area containing hydrocarbon was smaller than hoped for. Accordingly, a downward adjustment to the prior approximations regarding Shenandoah ("900 MMBOE" and "$2-4 billion opportunity") was warranted. However, APC did not publish any downward adjustment despite the data obtained from Shen 4.

d. During an October 2015 earnings call, APC executives made additional misleading statements after learning that Shen 4 was a dry hole that revealed salt. For example, even though Shen 4 found clear evidence of multiple fault zones, CEO Walker and Senior VP Daniels reiterated their previous overly optimistic projections, which had now been disproved.

e. At the direction of Ernie Leyendecker (Vice President of Gulf of Mexico Exploration; since promoted), APC ignored the existence of faulting in the Shenandoah basin. Mr. Leyendecker was "adamant" in insisting that no maps could be used that revealed the existence of known faulting. During meetings, Mr. Leyendecker and others directed those involved in Shenandoah to simply conceal the faults. In other words, Mr. Leyendecker was requiring us to use maps of Shenandoah that were deliberately misleading.

f. Following Shen 3 and Shen 4 and the disconnect between the evidence and APC's public statements about Shenandoah, Anadarko's Risk Consistency Team ("RCT") joined the exploration and development teams in a meeting to come to a consensus on the Shenandoah

resource size. According to APC, the RCT exists to prevent "salesmanship and overly optimistic evaluations of exploration prospects" and "minimize personal bias" of those involved in exploration efforts.1 Based on the input from the RCT group, the meeting resulted in an agreement that going forward, the projected resource size for Shenandoah would be decreased to 425 MMBOE rather than the 900 MBOE originally stated. However, the exploration team did not honor this agreement and continued to overstate the size of the resource, claiming the resource size was 550 MMBOE. This was a 29.4% exaggeration.

6. In January 2016, I spoke up to my supervisor (Pat McGrievy) about what I believed to be an ongoing pattern of fraud involving Shenandoah, as described above. I told him it was wrong, and he clearly knew what I was referring to. However, nothing changed.

7. In March of 2016, I took leave under the Family and Medical Leave Act (FMLA). I needed this leave because I was suffering health problems and personal problems that were caused by my work environment. I was experiencing retaliation from supervisors, as explained in the First Amended Complaint.

8. On May 9, 2016, I submitted a whistleblower complaint to the Securities and Exchange Commission (SEC). In the complaint, I summarized the fraud I observed while working on the Shenandoah project.

9. On May 19, 2016, I resigned from APC for the reasons I explained in my letter of resignation and in the First Amended Complaint.

10. In May of 2017, I reviewed APC's Form 10-Q for the first quarter of 2017. In that document, APC stated that it had "suspended appraisal activity" on the Shenandoah project and taken a $467 million impairment for the purchase price of the leases. When I saw this, it was clear to me that the economic analysis and feedback that I provided (along with others) years earlier had been validated. As a result, I felt compelled to tell the public about the fraud I witnessed.

11. After reviewing APC's Form 10-Q for the first quarter of 2017, I sought counsel from a securities fraud law firm in New York (Kaplan Fox & Kiltsheimer LLP) regarding what I witnessed. I provided them with a copy of my SEC whistleblower complaint in order to get a professional opinion on whether APC had violated securities laws.

---

1 Dean Hennings, *The Power of the Portfolio*, 9 GEOEXPROM 6 (2013), *available at* http://www.geoexpro.com/articles/2013/06/the-power-of-the-portfolio. prospects in a consistent manner."

12. In June 2017, my lawyer (David Minces) obtained a copy of a Proprietary Information and Inventions Agreement ("PIIA") that I signed in 2005, shortly after I started my employment with APC.

13. I would like to provide a copy of my SEC whistleblower complaint (including attached exhibits) to the shareholders of APC and the general public. However, I have not done so. The only reason I have not done so is because APC's lawyers sent me two different letters in summer 2017 claiming that everything in my SEC whistleblower complaint is APC's confidential and/or proprietary information that cannot be disclosed without violating the PIIA. The letters from APC counsel also made it clear that if I disclose any of the information in my SEC whistleblower complaint to shareholders or the general public, APC will sue me, which is a scary prospect for me and my family and APC has coerced me into remaining silent.

14. I would like for the public and APC shareholders to know the truth about Shenandoah. This is important to me because I believe a fraud has occurred. I want APC to be held accountable and for shareholders to know the truth, and I think exposing what happened is the right thing to do. However, I am not currently willing to risk being sued in order to make the truth known. Thus, while I do not agree that the PIIA prevents me from going public, I am seeking an order from the Court that resolves this issue and provides clarity regarding my rights and obligations under the PIIA. Otherwise, my only options are to remain silent or risk being sued if I disclose what I know.

15. If a Court rules that I can disclose my SEC whistleblower complaint (or parts thereof) to APC shareholders and the general public, I will do so. This is a certainty.

16. Executed on January 18, 2018.

Lea S. Frye

# EXHIBIT 122

**DECLARATION OF LEA S. FRYE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMAR JUDGMENT**

I, Lea S. Frye, declare as follows:

1. I submit this declaration in support of Plaintiff's opposition to summary judgment in this case. I have personal knowledge of the facts that I state below. If I were to be called as a witness in this case, I could and would competently testify about what I have written in this declaration.

2. From October 2005 until my resignation in 2016, I was employed as a reservoir engineer for Anadarko Petroleum Corporation ("Anadarko").

3. In January 2014, Anadarko management tasked me with evaluating the Shenandoah field ("Shenandoah"), a deep-water oil and gas resource in the Gulf of Mexico. My assigned role was to analyze the available scientific data in order to estimate Shenandoah's produceable size and assess whether the project should move forward to production. My focus was on the current perceived value of Shenandoah at that time and any associated risks to that value.

4. On various occasions between 2014 and 2016, I reported to Anadarko management what I believed to be an ongoing pattern of fraud involving Shenandoah. As I have made clear in repeated statements and documents since then, based on the information available at the time, I had serious, substantial doubts about the commercial viability of the Shenandoah project during what I now understand to be the Class Period in this lawsuit.

5. At my deposition, I was asked about a September 21st, 2015 email marked as Exhibit 358 at my deposition in which I congratulated team members for finding hydrocarbons in a shen-4 sidetrack well. My intent was to support my team on a project plagued by setbacks and severe risks, not an expression of belief in the commercial viability of the project—at that time, I believed there was a very small chance that the project could ever be commercially viable. And unfortunately, this news was quickly overshadowed by more bad news in the days that followed, including small-scale faulting at a second shen-4 sidetrack well and results from asphaltene on set pressure testing that precluded comingling different zones for production.

6. During my deposition, I was asked questions about a January 27th 2016 internal Anadarko email marked at my deposition as Exhibit 362 (APC-00222712). Specifically, I was asked questions about the 88.2% $P_c$ figure referenced in that exhibit. At Anadarko, we sometimes referred to "Pc" as "P of C."

7. During my decade of working at Anadarko, my understanding and experience was that P of C was not a primary measure of whether a particular oil project was deemed commercially viable, or a driver in the decision-making process as to whether or not to sanction the project for development.

8. During my time on the Shenandoah project, we rarely discussed or debated P of C in the context of determining its commercial viability. Instead, we focused on the metric "PIR10" (based on mean risked resources) and other considerations such as partner alignment, technological capability, country risks, market risks, and project risks. Given the billions of dollars it would have taken to develop Shenandoah, commercial viability was not about whether Anadarko could "break even" but whether Shenandoah would yield enough profit to Anadarko to justify the enormous amount of time, money, and risk that its development would require, relative to other prospects in the Company portfolio.

9. Additionally, the P of C discussed by Defendants was a derived product of the resource distribution that did not reflect the development team's point of view. As reflected in the presentation that I and others made to Anadarko's Executive Committee on or about February 1st, 2016 (marked as Exhibit 371 at my deposition), the development team determined and conveyed to management that the Shenandoah proved resources fell below the minimum threshold for commerciality at Anadarko. In both that presentation (Exhibit 371) and Exhibit 362 that Defendants marked at my deposition, the risked mean PIR10 was calculated to be .22, which fell below the corporate hurdle rate of .3.

10. Based on the information that I and others on this Shenandoah project conveyed to the Executive Committee, Defendants knew during the Class Period that geoscientists and Anadarko's Shenandoah partners viewed the commercial risks of the Shenandoah project vastly differently than how Anadarko portrayed them externally to the public.

11. Given all the information that I and others communicated to Anadarko's management during the Class Period, Defendants were well aware of the economic impediments and limitations associated with the Shenandoah project.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on 9/26/2024, 2024, at Helena, Montana

[signature]

Lea S. Frye

# EXHIBIT 123

# Exhibit A-1

# D.E. 2 - Plaintiff's Original Complaint

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LEA S. FRYE** | § | |
| | § | |
| *Plaintiff,* | § | **CASE NO. _________** |
| | § | |
| **vs.** | § | |
| | § | **(FILED UNDER SEAL)** |
| **ANADARKO PETROLEUM CORP.,** | § | |
| | § | |
| *Defendant.* | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

LEA S. FRYE ("Plaintiff") files this lawsuit against ANADARKO PETROLEUM CORPORATION ("Defendant"), showing as follows:

**I.**
**SUMMARY OF CLAIMS**

1. This is an action filed under the Dodd-Frank Wall Street Reform and Consumer Protection Act, which was passed on January 5, 2010 to strengthen whistleblower protections that include prohibitions against retaliation.

2. Section 21F(h)(1)(A) of the Act forbids employers from directly or indirectly discharging, demoting, suspending, threatening or harassing employees for providing information to the Securities and Exchange Commission ("SEC").

3. Defendant has engaged in retaliation that violates the Act. Plaintiff, a former employee, seeks damages arising from such retaliation.

4. Plaintiff also seeks a declaration that Defendant cannot use a non-disclosure agreement to conceal its fraud from disclosure in a securities fraud case.

5. This lawsuit is filed under seal in an abundance of caution pending

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 4 of 185

adjudication concerning the agreement for which Plaintiff seeks declaratory relief. Pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), a party is entitled to immunity from civil or criminal liability for disclosures of any purported trade secrets if such filing is made under seal. 18 U.S.C. §1833(b)(1)(B).

## II.
## JURISDICTION AND VENUE

6. Plaintiff's claims arise under the Act. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78a.

7. In addition, this Court has jurisdiction over the subject matter of Plaintiff's claims pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum specified by 28 U.S.C. § 1332 (exclusive of interest and costs) and the parties satisfy the diversity requirement.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and it is the district in which Defendant resides.

## III.
## THE PARTIES

9. Plaintiff is a citizen and resident of the State of Colorado. Plaintiff was employed by Defendant from 2005 until 2016 and is not a shareholder of Defendant.

10. Defendant is a publicly-traded company incorporated in the State of Delaware maintaining its principal place of business in The Woodlands, Texas. Defendant can be served with summons through its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136. Alternatively, if the

registered agent of Defendant cannot, with reasonable diligence, be found at its place of business, Defendant may be served with process through the Texas Secretary of State pursuant to TEX. BUS. ORG. CODE §5.251 and TEX. CIV. PRAC. & REM. CODE §17.026.

## IV.
## RELEVANT FACTS

11. From 2005 until May 2016, Plaintiff was employed by Defendant as a Reservoir Engineer.

12. Plaintiff's job duties included evaluating the size of resources in oil fields and using her expertise to help Defendant develop economic models aimed at maximizing shareholder value.

13. As a Reservoir Engineer, Plaintiff was required to work collaboratively with fellow Reservoir Engineers and other colleagues employed by Defendant.

14. During her employment, every one of Plaintiff's performance evaluations indicated that she met and/or exceeded Defendant's performance expectations in her capacity as a Reservoir Engineer.

15. In early 2014, Defendant tasked Plaintiff with evaluating a resource in the Gulf of Mexico that had oil-producing potential. Plaintiff's role included analyzing a variety of scientific data in order to help Defendant decide whether the project should move forward to production.

16. Between 2014 and 2016, Plaintiff observed numerous acts and omissions by Defendant's executives that bear on whether Defendant violated federal securities laws, including overstatements and other misrepresentations made to investors in

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 6 of 185

public statements and public filings with the SEC. During this period, Defendant overstated the value of an oil and gas resource by more than one billion dollars.

17. The acts and omissions Plaintiff personally observed and otherwise became aware of included but were not limited to (1) inflating the size of the specific resource; (2) disregarding scientific evidence during statements to investors, business partners and the general public; (3) suppressing the truth; and (4) generally misrepresenting the economics associated with its resources.

18. Plaintiff resisted Defendant's overstatements and misrepresentations. She expressed concerns to her supervisors and pointed out the numerous ways that Defendant was misrepresenting facts based upon known data about the size of the resource on the project to which she was assigned. However, Plaintiff and others were silenced. For example, Plaintiff was berated and humiliated by her bosses during meetings about the project. Science-based maps of the resource area were replaced with unscientific maps, which were then used to justify continuing misrepresentations. Colleagues' scheduled presentations–which would have fairly, accurately illustrated and discussed the scientific data–were canceled. Defendant did not want the truth made known to the public or even discussed internally.

19. Defendant continued to misrepresent the value of its resources even after its own Risk Consistency Team advocated a significant downward adjustment to the optimistic projections previously announced to the public.

20. After Plaintiff's internal concerns to her supervisors were met with resistance and hostility, Plaintiff was kept out of important meetings that she had

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 7 of 185

historically attended and was given only limited access to information about the project to which she was assigned. As a result, it became increasingly clear to Plaintiff that Defendant resented her opposition to its efforts to mislead the public.

21. By spring of 2016, the work environment had become intolerable for Plaintiff. She knew Defendant was violating its own internal rules and guidelines in addition to those established by the SEC, and it was clear that high-level executives were involved and had no intent of changing course. Her bosses were mistreating her, denying her access to information and ostracizing her.

22. Based on her position with Defendant, Plaintiff became concerned about later being falsely blamed for Defendant's violations of law or otherwise caught in the crossfire. Plaintiff was also worried about the harm Defendant's actions would eventually have on investors and partners who trusted and relied upon Defendant's misrepresentations. As a result, Plaintiff experienced serious health conditions that included anxiety, depression, inability to sleep, unusual weight gain, damaged family relationships and malaise. Accordingly, Plaintiff took leave in spring 2016 as authorized by the Family and Medical Leave Act (FMLA).

23. Plaintiff asked her superiors to include her in a layoff that was part of an ongoing reduction in force ("RIF"). Based on her tenure and Defendant's benefit plan, Plaintiff would have been entitled to receive considerable severance pay had she been laid off in a RIF. Defendant, however, refused to include Plaintiff in the layoff and instead subjected her to continuing harassment and hostility.

24. On May 9, 2016, Plaintiff submitted a whistleblower complaint to the SEC in the form of a detailed letter ("SEC letter") that discussed Defendant's violations of the federal securities laws.[1] In support, Plaintiff attached lawfully-obtained supporting evidence (for ease of reference, the contents of the SEC letter and attachments are referred to herein as the "Information"). Defendant was made aware of the SEC letter immediately after it was submitted to the SEC and was provided a copy of the letter shortly thereafter.

## V.
## FIRST CAUSE OF ACTION: RETALIATION IN VIOLATION OF DODD-FRANK ACT

25. Plaintiff reasserts and incorporates by reference each of the above numbered paragraphs.

26. The Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Act") was enacted on January 5, 2010 to strengthen whistleblower protections contained in the Security and Exchange Act of 1934 15 U.S.C. § 78a, *et seq.* ("Exchange Act") and to provide additional protection for whistleblowers from against retaliation by employers.

27. Section 21F(h)(1)(A) of the Act forbids employers from directly or indirectly discharging, demoting, suspending, threatening or harassing employees for providing information to the SEC.

28. After Plaintiff mailed the SEC letter to the SEC, and Defendant learned that she had done so, Defendant retaliated against Plaintiff. Defendant's unlawful acts included but were not necessarily limited to the following:

---

1 *See* Exhibit 1, SEC whistleblower complaint dated May 9, 2016.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 9 of 185

a) Upon information and belief, Defendant informed Plaintiff's colleagues and coworkers that she was an SEC whistleblower, making Plaintiff a pariah within the company had she returned to work;

b) Upon information and belief, Defendant told some of Plaintiff's colleagues and coworkers (many of whom were her friends) that they were expressly forbidden from speaking with Plaintiff;

c) Upon information and belief, some of Plaintiff's colleagues and coworkers (many of whom were her friends) were implicitly dissuaded from communicating with Plaintiff, even on a personal basis;

d) Since Plaintiff's superiors berated her and reduced her job responsibilities (*i.e.*, by denying her access to meetings and other job-related data to which she ordinarily had access to) when she internally resisted Defendant's misrepresentations, it was reasonable for Plaintiff to assume that her SEC complaint would result in similar (and perhaps worse) treatment upon her return to work; and

e) While Defendant knew Plaintiff was in a vulnerable state during her FMLA leave, Defendant instructed its third-party administrator to retroactively shorten the duration of her FMLA leave.

29. For the reasons set forth in the preceding paragraph (including subparts), Plaintiff resigned from her employment with Defendant on May 19, 2016. While Plaintiff would have otherwise continued working for Defendant but for the unlawful mistreatment and retaliation she experienced described herein, she resigned based on her reasonable belief that doing so was necessary and in the best interest of herself and her family.

30. In addition to being retaliatory, Defendant's acts and omissions amounted to a constructive discharge because they had the effect of unfavorably altering the terms and conditions of Plaintiff's employment to a degree that compelled her to resign and would have also prompted other reasonable employees to resign.

31. Defendant's course of conduct was aimed at (1) dissuading Plaintiff and

others from filing whistleblower complaints; and (2) forcing Plaintiff to resign. These motives are inconsistent with not only federal law but also Defendant's purported "zero tolerance" policy forbidding retaliation.

32. After Plaintiff's employment ended, Defendant continued to retaliate against her. Examples included the following:

a) Defendant unilaterally canceled Plaintiff's health insurance (which covered Plaintiff and her immediate family) at a time when Defendant knew Plaintiff was in a vulnerable state without first providing Plaintiff the opportunity to extend coverage via the Consolidated Omnibus Budget Reconciliation Act ("COBRA");

b) Defendant unilaterally and arbitrarily accelerated Plaintiff's "qualifying event" date, resulting in one month less of post-employment COBRA eligibility; and

c) Defendant withheld payment of $7,797.30 that was owed to Plaintiff for her accrued but unused vacation time during a period when she was not only in a vulnerable state but also without employment.

33. Ultimately, each of these matters (a-c, above) was rectified, but only after Plaintiff's counsel insisted on her behalf that Defendant restore her health insurance, correct the dates of her FMLA-approved leave, correct the qualifying event date for COBRA, allow her to continue health insurance through COBRA and pay her the amount owed for her accrued but unused vacation pay. As a result, Plaintiff incurred legal fees and expenses and related stress and anxiety that she would otherwise not have incurred but for Defendant's harassment and retaliation.

## VI.
## DAMAGES ARISING FROM DEFENDANT'S VIOLATIONS OF DODD-FRANK ACT

34. Plaintiff reasserts and incorporates by reference each of the above numbered paragraphs.

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 11 of 185

35. Plaintiff seeks the following damages, all of which were caused by Defendant's unlawful retaliation in violation of the Act:

a) Reinstatement with the same seniority status Plaintiff would have had but for Defendant's unlawful retaliation;

b) Double the amount of back pay (plus interest) that Plaintiff lost as a result of her constructive discharge;

c) An award of additional damages for the mental anguish, emotional distress, humiliation, and damage to reputation caused by Defendant's harassment of Plaintiff because of her lawful acts as a whistleblower; and

d) Compensation for Plaintiff's litigation costs, expert witness fees and reasonable attorney's fees.

## VII.
## Second Cause of Action: Request for Declaratory Judgment

36. Plaintiff reasserts and incorporates by reference each of the above numbered paragraphs.

37. As discussed herein, Plaintiff has knowledge and Information concerning Defendant's alleged violations of the federal securities laws. Plaintiff wants to allow counsel investigating potential violations of the federal securities laws on behalf of Defendant's shareholders to use the Information in a federal securities class action complaint.

38. Defendant opposes disclosure of any Information, contending that the Information constitutes its "proprietary information" that is prohibited from disclosure by contract.

### A. The Proprietary Information and Invention Agreement

39. On October 18, 2005, Plaintiff and Defendant executed a Proprietary

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 12 of 185

Information and Invention Agreement (the "PIIA").

40. For ease of reference, the operative language in the PIIA (attached as Exhibit 2) is pasted below:

1. **Nondisclosure of Proprietary Information**.

The Employee acknowledges that, during the course of his/her employment, the Employee may i) have access to Proprietary Information, as defined below, of the Company or other information and data of a secret or proprietary nature of the Company which the Company wishes to keep confidential, and ii) may develop, during the course of his/her employment, such Proprietary Information for the Company; therefore, the Employee agrees that:

(a) For the purposes of this Agreement, the term "Proprietary Information" shall mean any and all methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature disclosed to the Employee or otherwise made known to him/her as a consequence of or through his/her employment by the Company (including information originated by the Employee), including, but not limited to, information regarding the Company's business, products, processes, and services; information relating to research, development, inventions (including Inventions as defined below), trade secrets, intellectual property of any type or description, data, business plans, marketing strategies, engineering, contract negotiations, and business methods or practices, but shall not include information which (i) is in the public domain to such an extent as to be readily available to competitors, (ii) is in the Employee's possession prior to the execution of this Agreement from a source other than the Company, (iii) is or becomes generally known to the public other than by disclosure by the Company or by the Employee, or (iv) is received by Employee from a party other than the Company which party was under no legal obligation of confidentiality with the Company with respect to such information.

(b) The Company has exclusive property rights to all Proprietary Information and the Employee hereby assigns all rights he/she might otherwise possess in any Proprietary Information to the Company. Except as required in the performance of his/her duties to the Company, the Employee will not at any time during or after the term of his/her employment, which term shall include any time in which the Employee may be retained by the Company as a consultant, directly or indirectly use, communicate, disclose or disseminate any Proprietary Information to an unauthorized party.

(c) All documents, records, notebooks, notes, memoranda and similar repositories of, or containing, Proprietary Information or any other information of a secret, proprietary, confidential or generally undisclosed nature relating to the Company or its operations and activities made or compiled by the Employee at any time or made available to him/her prior to or during the term of his/her employment by the Company, including any and all copies thereof, shall be the property of the Company, shall be held by him/her in trust solely for the benefit of the Company, and shall be delivered to the Company by him/her on the termination of his/her employment or at any other time on the request of the Company.

Case 4:17-cv-02289 Document 118-1 Filed on 07/28/20 in TXSD Page 13 of 185

**B. The controversy involving the PIIA**

41. As it has made clear in several letters from its outside counsel, Defendant has forbidden Plaintiff from disclosing the Information and has threatened to pursue damages if the Information is disclosed.

42. The Information does not constitute proprietary information or an invention protected by the PIIA, nor does it constitute "methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature." Accordingly, Plaintiff should be permitted to disclose the Information without fear of reprisal.

43. As set forth in more particularity below, there is a substantial and continuing controversy between Plaintiff and Defendant and a declaration of rights in accordance with 28 U.S.C. § 2201 is necessary.

**C. The parties' communications regarding the PIIA**

44. In a June 20, 2017 teleconference with Defendant's outside counsel, Plaintiff's counsel (1) stated that Plaintiff would like authorization to allow counsel investigating potential claims against Defendant (for violations of the federal securities laws) to use the Information in a federal class action complaint; and (2) asked Defendant to state whether it believes the Information to be disclosed (as set forth in the SEC letter) is protected by the PIIA.

45. On June 21, 2017, counsel for Defendant emailed a letter to Plaintiff's counsel contending the Information "seems to fall squarely within" the PIIA "because it relates to Anadarko's 'business, products, process and services' as well as the

Company's research and development."[2] Based on this overly broad interpretation of the PIIA, Defendant declined to provide what it characterized as a "release of [Plaintiff's] confidentiality obligations" and reserved "all of its rights, remedies and damages should the protected information be disclosed in any manner (except as may be permitted by any applicable whistleblower or other laws)."[3]

46. Plaintiff is not seeking a "release" of obligations but rather a declaration that the PIIA does not contractually obligate her to safeguard and conceal the Information because the Information is not of the variety protected (or protectable) by the PIIA.

47. On June 22, 2017, counsel for Plaintiff wrote to The Honorable Judge Lee H. Rosenthal, who is presiding over a securities class action case involving Defendant (*Edgar v. Anadarko Petroleum Corporation*, Cause No. 4:17-cv-1372). In the letter, which was provided to all parties of record, Plaintiff sought a pre-motion conference to "alert the Court of material non-public information" that relates to securities fraud. The June 22 letter (1) explained that "the information, if made public, will have a material impact upon the upcoming motion practice before the Court"; and (2) on this basis, sought "an *in camera* review of the PIIA and the non-public information" because Plaintiff "has an interest in . . . participating as a witness."[4] The letter also provided a summary of Plaintiff's employment with Defendant, described the SEC letter in general terms and explained that the

2 *See* Exhibit 3, letter from Anadarko counsel dated June 21, 2017.

3 *Id.*

4 *See* Exhibit 4, June 22, 2017 letter to The Honorable Judge Lee H. Rosenthal.

Information to be disclosed "will significantly alter the claims and the class period of the [*Edgar*] complaint." Accordingly, Plaintiff asked Judge Rosenthal to consider her request for an *in camera* review "in an expedited manner" so the Information could be disclosed prior to the deadline to seek lead Plaintiff status in the *Edgar* lawsuit.

48. On June 22, 2017, counsel for Defendant emailed Judge Rosenthal's Case Manager to oppose Plaintiff's request for a pre-motion conference.[5]

49. On July 6, 2017, counsel for Defendant emailed a second letter to Plaintiff's counsel to reiterate Defendant's contention that the PIIA prohibits dissemination of any Information.[6] Below is the text of that letter:

> RE: Anadarko Petroleum Corporation
>
> Dear David:
>
> I write in response to your June 22, 2017 e-mail, which (i) explains that the information your client wishes to disclose in the *Edgar* matter[1] is contained in your June 4, 2016 (or May 9, 2016) letter to Messrs. Ceresney and Shipchandler (the "SEC Letter") and (ii) assumes that Anadarko Petroleum Corporation's ("Anadarko" or the "Company") is opposed to the disclosure of the information contained in the SEC Letter.
>
> To be clear, the information in the SEC Letter is "Proprietary Information" as defined in the Proprietary Information and Invention Agreement ("PIIA") that your client signed on October 18, 2005. Any disclosure of Anadarko's proprietary information contained in the SEC Letter to third parties (except as may be permitted by any applicable whistleblower or other laws), including plaintiff's counsel in the *Edgar* matter, is prohibited by that agreement. The Company is not waiving any of its rights under the PIIA, and will specifically enforce the protections it bargained for in the PIIA should its confidential information be disclosed in violation of the agreement.
>
> Additionally, Anadarko reserves all of its rights, including but not limited to its rights under both the PIIA and applicable law, to enforce the agreement or seek a remedy for any breach.

---

5 *See* Exhibit 5, email from Anadarko counsel dated June 22, 2017.

6 *See* Exhibit 6, letter from Anadarko counsel dated July 6, 2017.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 18 of 185

50. Plaintiff maintains that the PIIA does not prohibit her from disclosing Defendant's fraud. The Information Plaintiff intends to disclose generally consists of (1) public statements that are neither proprietary nor confidential; and (2) unlawful acts and omissions by Defendant that violate federal securities laws, including the Exchange Act, and thus cannot be lawfully shielded from disclosure by the PIIA without construing the PIIA in a manner that is unreasonably broad and in violation of established principles of contract law and public policy.

51. Clearly, the PIIA was intended to protect Anadarko's inventions and proprietary, confidential information such as "methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature."[7]

52. Plaintiff is not attempting to steal inventions or use Defendant's confidential information to unlawfully compete. Plaintiff seeks only to disclose fraud that has harmed the public. Further, while the PIIA seeks to broadly protect "secrets," no sound reading of the PIIA or the law countenances an approach in which Defendant can use the PIIA to opportunistically conceal its unlawful acts and omissions, yet this is precisely what Defendant is attempting to do.

**D. Declaratory relief necessary**

53. Plaintiff's injury can be redressed by the requested relief: a declaratory judgment that the PIIA does not cover the Information, and that Plaintiff is not prohibited under the terms of the PIIA from allowing counsel to use the Information

---

7 *See* Exhibit 2, p. 1, ¶ 1.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 17 of 185

in a federal securities class action complaint. Further, Plaintiff seeks this ruling on an expedited basis.

54. But for the PIIA, Plaintiff would allow counsel investigating claims against Defendant and others on behalf of Anadarko shareholders to use the Information in a federal securities class action complaint. Accordingly, Plaintiff seeks a judgment declaring that the PIIA does not prohibit her from allowing counsel to use the information concerning Defendant's alleged violations of the federal securities laws in a federal securities class action complaint.

55. Plaintiff has filed this action for declaratory relief to avoid legal risk, including Defendant's threat to "specifically enforce the protections it bargained for in the PIIA" in the event that Plaintiff discloses any of the Information contained in the SEC letter.[8]

**E. The forum selection clause**

56. The PIIA includes a forum selection clause providing that the "substantive laws of the State of Texas . . . will govern the interpretation, validity and effect of this Agreement . . . [and] the Company and [Plaintiff] agree that personal jurisdiction and venue shall be proper within the state or federal courts situated in Harris County, Texas, to hear such disputes arising under this Agreement." Accordingly, it is consistent with the parties' intent for this Court to evaluate the PIIA and adjudicate the parties' rights thereunder in the manner requested.

---

[8] *See* Exhibit 6.

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 18 of 185

## VIII.
## PRAYER FOR RELIEF

57. Plaintiff has paid the jury fee and demands a jury trial of her Dodd-Frank cause of action and seeks recovery of all damages specified herein.

58. In addition, Plaintiff seeks the following:

a) A judgment (on an expedited basis) declaring that (1) the PIIA does not cover the Information; and (2) the PIIA does not prohibit Plaintiff from allowing counsel to use the Information in a federal securities class action complaint; and

b) All other legal and equitable relief to which Plaintiff is justly entitled.

Respectfully submitted,

**MINCES PLLC**

By: *__/s/ David M. Minces__*
**David M. Minces**
Attorney-in-Charge
Federal I.D. No.: 435389
State Bar No.: 24026880
Email: david.minces@mincespllc.com
**Gabriela M. Barake**
Federal I.D. No.: 3006704
State Bar No.: 24099794
Email: gabriela.barake@mincespllc.com
**MINCES PLLC**
4545 Bissonnet, Suite 286
Bellaire, Texas 77401
Telephone: (346) 701-8563
Facsimile: (713) 583-9795

**ATTORNEYS FOR PLAINTIFF**

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 19 of 185

OF COUNSEL:
**Francisco J. Caycedo**
Federal I.D. No.: 36976
State Bar No. 24040664
Email: frank.caycedo@mincespllc.com
**MINCES PLLC**
4545 Bissonnet, Suite 286
Bellaire, Texas 77401
Telephone: (346) 701-8563
Facsimile: (713) 583-9795

# EXHIBIT 1

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 21 of 185

MINCES PLLC

David M. Minces
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

May 9, 2016

Andrew Ceresney, Director
SEC Office of the Whistleblower
100 F Street NE
Mail Stop 5631
Washington, DC 20549

Mr. Shamoil Shipchandler
Regional Director
801 Cherry Street
Suite 1900, Unit 18
Fort Worth, TX 76102

Re: Lea Frye | Summary of Dodd-Frank Act Violations by Anadarko

Dear Mr. Ceresney and Mr. Shipchandler:

I am writing on behalf of my client, Lea Frye. Attached to this letter is a lengthy letter summarizing the specific ways that Anadarko executives have violated the Dodd-Frank Act. Below is a summary of the contents of the letter in hopes that the more detailed letter will be an easier read once you have a summary of its contents.

## Executive Summary

What follows is a classic case of company executives achieving financial gains through the manipulation and falsification of information provided to shareholders. The evidence provided in the attached letter is detailed and specific, utilizing original source documents and emails to build a case that we believe demands the attention of the Commission.

The source documents are full of industry and company-specific lingo, as well as complicated scientific terminology. However, Ms. Frye is committed to helping the Commission understand that terminology and its significance with regard to Anadarko's actions, and the attached letter is a starting point. Because of her education, training, experience and insider knowledge, Ms. Frye is willing and able to provide context regarding the roles of those involved (and their agendas) and guide the Commission to the location and sources of additional evidence.

Anadarko Petroleum Corporation ("Anadarko") is recognized in the oil and gas industry for its expertise on the exploration side of the business. As with other exploration companies, Anadarko places a premium on developing "Resources," which is the industry term used to describe new oil and gas finds that have not yet been developed into "Proven Reserves." As you are no doubt aware, resources are a key measure that investors use to calculate the expected financial return of the company. In general, changes in stated resources lead directly to changes in the price of the exploration company's stock.

Case 4:17-cv-02289 Document 118-1 Filed on 07/28/20 in TXSD Page 22 of 185



Because of the importance of resources to investors, there are very clear and specific industry guidelines that mandate the manner in which resources must be assessed and calculated. Aware of this and hoping to convey a commitment to law-abiding transparency, Anadarko publishes its own guidelines on the reporting of resources, with an obvious goal of assuring investors that they can have confidence in the accuracy and scrupulousness with which Anadarko reports on its resources.

For the past two years, this has not happened. As the attached letter explains in detail, Ms. Frye is aware of many examples in which Anadarko intentionally disregarded the applicable guidelines. The effect was a years-long overstatement of resources by several billion dollars. Ms. Frye has the specific information that proves this, as the attached letter discusses in more detail.

### A. Anadarko's reporting on the Shenandoah Basin project

In 2013, Anadarko drilled an exploratory in the Shenandoah Basin that was nicknamed "Shen 2". It was a follow-up to the modestly encouraging "Shen 1" well, which found approximately 300 feet of oil-bearing deposits in the same geological formation.

The Shen 2 well was by all standards a very good well, in that it found oil deposits that were over 1000 feet thick. [redacted]

[redacted]. This unsupportable optimism was then incorporated into materials that Senior Vice President of Exploration Bob Daniels delivered to investors in many different venues and formats. Unfortunately, as we describe in detail, this valuation was essentially a sham, and the supporting analysis violated most of the guidelines in place for accurate reporting of resources.

### B. Internal feedback ignored

Those who reported to Mr. Leyendecker and supported the inflated numbers were typically promoted. Those (such as Ms. Frye) who honestly evaluated the data, adhered to the applicable protocols for estimating the resource value (which led to far more modest projections) and spoke up were bullied, intimidated, and shut out of meetings that they were supposed to attend.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 23 of 185



When individuals (including but not limited to Ms. Frye) from other parts of the company were vocal about the need to report more accurately about the Shenandoah resource, Anadarko's RCT team was enlisted. This team consists of experts from other parts of the company that review the methods used to report on resources. In other words, they serve an internal audit function, and they were specifically asked to examine the Shenandoah project and more specifically the size of the Shenandoah resource. Their feedback was also ignored.

After reviewing the available geological data that Anadarko possessed, the RCT team was very clear in finding that the resource claims made by exploration executives needed a significant downward adjustment. [redacted] In fact, in subsequent investor calls, Senior Vice President of Exploration Bob Daniels has done the opposite, reassuring investors with statements indicating that in terms of Shenandoah, "everything was still coming in according to our initial estimates." This and other examples are discussed in chronological fashion in the attached letter, which is amply supported by internal Anadarko documents and publicly-available information.

### C. Insider trading suspected

It also warrants mention that since the announcement of the Shen 2 well results, Senior Vice President of Exploration Bob Daniels has sold over $12 million of his Anadarko stock (NYSE: APC). [redacted] The stock sales of Ernie Leyendecker are not publicly available, but we suspect that he too has profited from selling Anadarko stock at just the right time with the benefit of inside information. Accordingly, we hope the Commission will investigate this.

### D. Effect on Lea Frye's life

The events of the past two years have taken a considerable toll on Ms. Frye and her family. Repeatedly, she tried to get Anadarko to follow ethical procedures. The stress at work was compounded by stress at home. Ms. Frye gained 35 pounds and endured constant pain in her back and neck. She could no longer get consistent, restful sleep, in part because of work-related anxiety and fear and in part because of physical discomfort.

All of this led to depression and damage to Ms. Frye's most important relationships. She would come home from work exhausted—not from arduous work or long hours, but rather from the weight and fatigue of wondering when the other shoe might drop and what life might look like when that happens. Her teenage son began to struggle academically and became angry, withdrawn and depressed himself as he watched his mother's overall well-being deteriorate. Her marriage suffered, and tensions grew to a point that her husband ultimately cornered her to ask "What is it going to take to get my wife back?"

Ms. Frye is currently on extended medical leave as a result of depression and anxiety. However, her condition is improving, and she is ready to expose the truth.

### E. In-person meeting requested

While much evidence is presented in the attached letter, Ms. Frye would appreciate the chance to provide the Commission with her personal narrative, and she will gladly be a resource who can provide investigators with the questions to ask and the names of the people who should answer them. She can tell you where to find evidence and who will validate the data she has provided. If the Commission will allow it, Ms. Frye can make its job easier and help prevent others from being harmed by Anadarko's fraud. To that end, we would appreciate the chance to meet with Commission investigators as soon as possible.

We appreciate your attention to the information Ms. Frye has provided, and we ask that you look into this situation with the utmost urgency.

Respectfully,

David M. Minces

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 25 of 185

MINCES PLLC

David M. Minces
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

May 9, 2016

Andrew Ceresney, Director
SEC Office of the Whistleblower
100 F Street NE
Mail Stop 5631
Washington, DC 20549

Mr. Shamoil Shipchandler
Regional Director
801 Cherry Street
Suite 1900, Unit 18
Fort Worth, TX 76102

Re: Lea Frye | Violations of Law by Anadarko

Dear Mr. Ceresney and Mr. Shipchandler:

I am writing on behalf of my client, Lea Frye, who has been placed in a very difficult position by Anadarko Petroleum Company ("Anadarko") through no fault of her own. Ms. Frye has felt trapped in a difficult predicament, and she is no longer willing to remain quiet about violations of law that have affected her life and career and threaten to harm many others.

This letter is lengthy in order to provide the Commission with sufficient information to perform a targeted investigation.

## Overview

In recent years, Lea Frye has witnessed an ongoing pattern of corporate fraud at the highest levels of Anadarko. As the size and dollar value of this fraud has grown, Ms. Frye has become increasingly uncomfortable and has realized that if she remains silent, she risks being perceived as a participant. Accordingly, she has asked us to write in hopes that the Commission will conduct a thorough investigation.

Since joining Anadarko in October 2005, Ms. Frye has consistently proven herself to be an exemplary performer. She and other Reservoir Engineers provide reservoir engineering support for Anadarko's deepwater development teams in the Gulf of Mexico. More specifically, Ms. Frye's team provides data that is then ostensibly used to provide economic evaluations of prospective resources to determine whether to move a project forward to production or not.

In 2014, Ms. Frye began to work on evaluating the Shenandoah discovery, which is located in Walker Ridge in the Gulf of Mexico. At this time, the Shenandoah project still resided with Anadarko's exploration team for funding of appraisal wells targeted to better define resource potential.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 20 of 185



During this period, Ms. Frye and others on the development team furnished data that was ignored and/or manipulated by exploration executives in order to paint a rosy outlook for investors, partners and the general public regarding the Shenandoah project. Economic projections were made with selective disregard for the hard data and scientific analysis Ms. Frye and others are paid to provide. The result is what has now become a large-scale fraud that Ms. Frye intends to stop before significant harm is done.

As you consider the facts, please know that this is not a letter written by a subpar employee with an axe to grind or a job to save. In fact, the opposite is true. Ms. Frye is a stellar employee, and this cannot be legitimately disputed. Every one of her performance evaluations proves that her work always meets and often exceeds expectations.[1] Regrettably, Anadarko sought her expertise and then buried her findings because those findings were inconsistent with the desired narrative.

## TIMELINE OF EVENTS

### A. Anadarko's pledged allegiance to accurate reporting

[redacted] The following excerpt is noteworthy:

[redacted]

---

1 For example, in her 2014 and 2015 evaluations, Ms. Frye received an overall score of A1 (usually exceeds but always meets performance standards). *See* Exhibit 5. In 2012, she received an E1—a rare feat that illustrates unusual excellence. Ms. Frye has never once been disciplined for misconduct, rules violations or any performance deficiency.

[redacted]

The above statements in the Manual are important because they promise that Anadarko will report about its reserves and resources with the kind of integrity, accuracy and transparency the law requires.

### B. New oil discovered in Walker Ridge 51 and 52

In 2009, Anadarko announced a new oil discovery in the area known as Walker Ridge 51 and 52. The Shenandoah 1 well ("Shen 1") found a section of porous rock (referred to in industry lingo as "reservoir sand") that for a vertical depth of around 300 feet contained oil that could be recovered. This was accurately reported to the public as an encouraging find.

### C. The Shen 2 well

Following the success of Shen 1, surveys of the surrounding area indicated geological features that could contain oil in this area in significant quantities, so a second exploratory well was drilled that became known as Shenandoah 2 ("Shen 2"). This well—located in Walker Ridge, Block 51—was also a success, prompting Vice President of Deepwater and International Exploration Bob Daniels to describe it as "one of Anadarko's largest oil discoveries in the Gulf of Mexico," the success of the well was attributed to rock and fluid properties that were "of much higher quality than previously encountered by the industry in Lower Tertiary discoveries."[3]

### D. Exploration goal: 800+ MMBOE

In March 2013, Anadarko held an investor relations conference. During the investor relations conference call, those in attendance were informed of the exploration goal of delivering "800+ Million Barrels of Oil Equivalents (MMBOE)."[4] This statement is significant not because it is evidence of wrongdoing but rather because it created internal pressure and therefore an incentive to exaggerate.

---

2 *See* Exhibit 2, Reserves and Resources Manual (2012).

3 Press Release, Anadarko, Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay (Mar. 19, 2013) (on file with author).

4 *See* Exhibit 3, Delivering Differentiating Value (Mar. 13, 2012), p. 7 ("Creating Value Through Exploration").

### E. Shen 2 and the March 19, 2013 Press Release (Shen 2)

On March 19, 2013, Anadarko issued a press release about the results of its Shen 2 well: recoverable oil over 1000 feet vertically of the rock formation.

[redacted]

Geological faults are important features in oil exploration, since the amount of oil found (and the ability to extract that oil) can change dramatically when a fault line is encountered. [redacted]

[redacted]

### F. January 2014: Lea Frye asked to help develop field

In January 2014, Ms. Frye moved from the Eastern Gulf Of Mexico Development group to lead the Shenandoah Pre-Development group, which reported to Pat McGrievy. Her role was to coordinate subsurface efforts with facility efforts to evaluate multiple development scenarios incorporating uncertainty in resource size and recovery, based on different drive mechanisms. At the time, the project was still in the appraisal phase and was being funded by the exploration team.

Among the tasks assigned to Ms. Frye was to run economics. Thus, in anticipation of an upcoming meeting to discuss the project, Executive Vice President of Deepwater and International Development Jim Kleckner asked Ms. Frye to develop an economic model that summarized the development team's view of the Shenandoah prospect for an offsite development and exploration meeting.

Specifically, Ms. Frye was asked to focus on current perceived value and any associated risks to that value for Shenandoah. The goal was to use her model to assist the Executive Committee in establishing budgets for the following year, in order to maximize shareholder value.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 29 of 185



### G. The February 2014 meeting

On February 19, 2014, a meeting was convened. Along with Ms. Frye, the following people attended the meeting:

- Darrell Hollek (Senior VP Gulf of Mexico and International Development)[5]
- Ernie Leyendecker (VP Gulf of Mexico Exploration)[6]
- David Blakeley (Manager Gulf of Mexico Exploration Engineering)
- David O'Brien (Business Advisor)[7]
- Pat McGrievy (General Manager, DWGOM)

During the meeting, Ms. Frye presented the economics based on all known information about the field. The information she provided was derived by utilizing industry best practice modeling and sensitivity analysis, with input from multiple team members on the integrated project team. Her analysis indicated that the available resources were likely much smaller than exploration was claiming.

Some did not like Ms. Frye's feedback, even though her findings were developed utilizing best estimates for oil in place, recovery and costs to develop the field. Her feedback did not mirror the overly optimistic claims made by the exploration side of the business, so Mr. Leyendecker became visibly agitated. He viciously berated Ms. Frye during the meeting because her findings were inconsistent with the optimistic message he preferred. He directed the following derisive remarks at Ms. Frye:

- "You do not know anything."
- "I have worked the Gulf of Mexico longer than you."
- "This is the best field ever. . . . it is as good as Troika."

Ms. Frye's methods were sound, and these statements were at odds with the hard data. As an engineer, Mr. Leyendecker should have known this. As a reminder, Ms. Frye had been recruited to the Shenandoah project *because* of her expertise.

---

5 Mr. Hollek's current title is Senior Vice President, On Shore Development.

6 Mr. Leyendecker has since been promoted to Senior Vice President, International Deepwater Exploration.

7 Mr. O'Brien has since been promoted to the position of General Manager, Delaware Basin–Growth & Technology.

The February 19, 2014 meeting was Ms. Frye's first knowledge of a developing culture within Anadarko's exploration team. Mr. Leyendecker and other executives did not want to hear anything about the Shenandoah project that did not align with their desired outcome.

[redacted]

**H. March 4, 2014: Inflated numbers published to shareholders**

On March 4, 2014, shareholders were presented with inflated information about Anadarko's exploration successes in 2013. For example, the slide show used during the 2014 Investor Conference provided a forecast that was far too optimistic given the science. Slides 74 and 75 approximated "900+ MMBOE in net discovered resources," even though that figure was predicated in part on the grossly overstated Shenandoah resource.[8] True and correct copies of slides 74 and 75 are pasted below and on the following page:

**Slide 74**




---

8 *See* Exhibit 4, prospectus entitled "2014 Anadarko Investor Conference," slides 74-75.

## Slide 75




Slide 83 from the March 2014 presentation to shareholders was also misleading. It quantified the size of the exaggeration in dollar figures, advising investors that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity."[9] A cut and paste of Slide 83 is pasted on the following page.

---

9 *See* Exhibit 4, slide 83.

**Slide 83**

## Shenandoah Basin: ~$2 - $4 Billion Net Opportunity

- **Emerging Giant Resource**
- **Significant Value Creation**
  - Less than $300 Million Net Investment Through 2013
- **Excellent Transmissibility**
  - Permeability
  - Thickness
  - Fluid Viscosity
- **Strategic and Expanding Position in Basin**
- **2014 Planned Activity**
  - Drill 3 - 4 Appraisal Wells




[redacted] Further, the overstated value was compounded by Anadarko's understatement of the net capital required to develop the resource.

Misrepresentations such as this were not innocent. By March 2014, Ms. Frye had spent significant time working with exploration staff to demonstrate how proper use of modeling the available geological information required far lower projections of recoverable oil. [redacted]

Numerous internal documents incriminate Anadarko, some of which are attached to this letter and others of which are not but can be provided by Ms. Frye and/or obtained from Anadarko.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 33 of 185



## I. Shen 3

Following the success of the Shen 2 well, drilling of the Shenandoah 3 ("Shen 3") well began in the second quarter of 2014. While Shen 3 was also located in Walker Ridge (Block 52), [redacted] Shen 3 was a "wet well" that did not reveal the presence of hydrocarbons (oil and gas).[10] Despite this, Anadarko executives elected to ride the wave of Shen 2 knowing the general public would accept distorted findings and projections based on the success of Shen 2. [redacted]

Even though Shen 3 was a wet well, [redacted]

The calculated strategy of the exploration team can be accurately described as "piggybacking." They deliberately manipulated the facts (and more specifically what *was* and *was not* known about Shen 3) and redefined the criteria for optimism when the facts did not match the desired outcome. [redacted] The development team (primarily Ms. Frye) pointed this out, but their feedback was ignored.

[redacted] Additionally, while pressure data is one indicator of what is in the well, such data must be considered in conjunction with other mitigating factors.

[redacted]. Executives on the exploration team ignored this and then made overly optimistic resource projections as if this information did not exist.

---

10 A "wet well" is often referred to in the oil and gas industry as a "dry hole."

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 34 of 185



[redacted]

### J. Shen 4

As with Shen 3, the anticipated size of the Shenandoah 4 ("Shen 4") resource was exaggerated beyond what the science supports. This well was started in the middle of 2015, and drilling was completed at the end of the year.

#### (1) Walker Ridge 51 #3

The well involved multiple penetrations for diagnostic purposes. The first was Walker Ridge 51, #3. [redacted] Salt is a rock structure that can never yield oil. [redacted]

#### (2) Sidetrack well (Walker Ridge 51 #3 ST #1)

The purpose of a sidetrack well is to gain a broader understanding of the size of the resource. [redacted]

The well did find hydrocarbon in the range of 600+ vertical feet. While still significant, the well was not equivalent to the 1,000 vertical feet seen in Shen 2 well, which was utilized by exploration to characterize the thickness over the entire Shenandoah area. To overcome this inconvenient obstacle, the mapping was manipulated in order to exaggerate the size of the resource. [redacted]

---

11 Accurately extrapolating oil-water contact requires evaluation of data within the same fault block.

12 [redacted]

### (3) Bypass Well: Walker Ridge 51 #3 BP #1

Immediately after the sidetrack, the well was by-passed in order to capture whole core (essentially a core sample) over the hydrocarbon sands. [redacted]

[redacted]

[redacted]

## L. August 18, 2014: Leyendecker directive to ignore the faults

On August 18, 2014, emails were exchanged regarding the method by which faulting would be represented in the Shenandoah project going forward. The most notable part of this email exchange was Mr. Leyendecker's "adamant" insistence (as reported by Pat McGrievy and Geological and Geophysical (G&G) Manager Tim Trautman) that no maps were to be used that revealed faulting during meetings about the amount of oil that could be recovered from the Shenandoah project.[13] Astonished, members of the development team expressed discomfort with this approach because it concealed highly relevant data.

Mr. Leyendecker's directive was an active suppression of internal data regarding the true size of the Shenandoah resource. This was disturbing for several reasons. First, the Commission prescribes standards regarding the use of defined pressure data to define oil-water contact, and Anadarko's internal standards mirror those standards. Second, Mr. Leyendecker was advocating the deliberate improper analysis of faulting in a way that skewed the data in favor of perceived profitability.

[redacted]

---

13 *See* Exhibit 7, email exchange dated August 18, 2014.

[redacted]

[redacted]

By communicating that he was "adamant" about his approach to mapping, Mr. Leyendecker chilled people into silent adherence. To avoid any lingering doubt, he and others made repeated references to the mandate that only one map could be shown during presentations.[14] The development team's map (which was consistent with Commission requirements) was prohibited in favor of the exploration group's map, [redacted] This suppressed the truth, which was that the Shenandoah project could not produce the volume of oil the exploration team publicly projected.

**M. February 2-3, 2015: Operations Report and investor call with Daniels**

On February 2, 2015 the Operations Report was published. An investor call followed a day later. During that call, Senior Vice President of Exploration Bob Daniels described the recently completed Shen 3 well in glowing terms. In characterizing it as a successful appraisal well, he described over 1,500 feet of "quality sand."

This representation was stunning. The truth is that Shen 3 was a dry hole, [redacted]

**N. February 17, 2015: Leyendecker continues to massage the message**

On February 17, 2015 Mr. Leyendecker canceled a scheduled presentation to be given by Doug Shott (an internal expert not on the exploration team). The reason? He believed Mr. Shott's report included "unfavorable" news about the Shenandoah project. In truth, "unfavorable" was a synonym for "real." Mr. Leyendecker did not want the truth about the project to be revealed because it belied numerous, prior representations about the size (and attendant value) of the Shenandoah resource.

**O. October 28, 2015: Q3 earnings call perpetuates unfounded optimism**

The exaggerations continued during the Q3 earnings call. When discussing the Shenandoah project (following the completion of Shen 4), CEO Al Walker and EVP Bob Daniels represented that Shen 4 had located even more oil, pushing the known depth of oil down by more than 400 feet. They reiterated their overly optimistic projections, [redacted]

---

14 *See* Exhibit 7, email exchange dated August 18, 2014.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 38 of 185



[redacted]

Any competent reservoir engineer or petroleum geologist knows the above data must be accounted for when determining amount of oil that can be recovered from a formation. However, Anadarko executives sold a different story with their exaggerated projections.

**P. RCT feedback requested**

During the process of evaluating Shen 4, it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data. This prompted an evaluation by Anadarko's Risk Consistency Team (RCT), which exists in part to prevent "salesmanship and overly optimistic evaluations of exploration prospects."[15] A stated goal of the RCT is to "minimize personal bias" of those involved in exploration efforts in order to "characterize the subsurface risk and potential of leads and prospects in a consistent manner."[16] With regard to the Shenandoah project, RCT intervention was long overdue.

The feedback from the RCT confirmed the dramatic overstatement of the Shenandoah resource. [redacted].

In January 2016, Chris Camden circulated a chart (pasted on the following page) that illustrates the liberties taken by the exploration team.

---

15 Dean Hennings, *The Power of the Portfolio*, 9 GEOEXPROM 6 (2013), *available at* http://www.geoexpro.com/articles/2013/06/the-power-of-the-portfolio.

16 *Id.*

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted] [redacted]

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 40 of 185



[redacted]

### Q. Ms. Frye speaks up

Ms. Frye was appalled to learn that Mr. Daniels and others were simply ignoring the RCT feedback and abandoning the agreed-upon mean of [redacted]. She refused to be complicit and made this clear in late January 2016, when she aptly told Mr. McGrievy, "It's wrong."

### R. The size and scope of the Shenandoah misrepresentations

[redacted] Mr. Leyendecker, Mr. Daniels and other Anadarko executives represented to the public that the Shenandoah field was the third richest resource *ever* discovered in the Gulf of Mexico.[18] Worse yet, they continued to do this even after the science flatly disproved such a representation.

It is impossible to calculate the monetary effect of the years-long overstatement of the Shenandoah resource. [redacted] Further, important questions remain.

18 The only deep-water fields discovered to date involving more than 550 MBOE were the Mars-Ursa and the Tahiti/Caesar/Tonga fields.

How much did Anadarko profit as a result of its misrepresentations? How did this effect stock prices and investor confidence? While we are not capable of ascertaining the answers to these questions, we hope the Commission will seek those answers.

### S. Anadarko's compensation structure rewards resource exaggerations

Historically, a large part of investor value creation at Anadarko has come through conversion of exploration discoveries to shareholder value through monetization and/or conversion of discoveries to producing assets. This has led to the publication of annual exploration goals to the investor community.

Exaggerations and fuzzy math are actually incentivized by Anadarko's compensation structure. [redacted]

[redacted] Below are examples:

| Name | Career trajectory |
|---|---|
| Ernie Leyendecker | Promoted to Senior Vice President, Exploration (Gulf of Mexico) |
| David Blakeley | Promoted to Director of Exploration Engineering |
| Robert Strickling | Promoted to Reservoir Engineering Manager (Gulf of Mexico) |
| Jake Ramsey | Promoted to Manager Exploration (Regional Team) |
| Beth Kendall | Promoted to Distinguished Geophysical Advisor |

## T. False representations have not been corrected

Anadarko has compounded its potential liability by never squarely addressing the overstated size and value of the Shenandoah field. The motivation for remaining silent is obvious: the price of Anadarko stock is trading at less than half the value it was a year ago, and now is not an ideal time to inform the world that information provided to shareholders about the Shen 3 and Shen 4 wells was exaggerated rather dramatically for several years.

Statements made during the October 28, 2015 earnings call illustrate that deliberate silence and vague reassurances remain the preferred approach. Below are excerpts from a question-and-answer session between the investment community and Anadarko executives Al Walker (CEO) and Bob Daniels (Executive Vice President):

<u>Statements made by CEO Al Walker</u>

Q: Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans?

A: . . . It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. . . . we pushed the lowest known oil down about 400 feet. . .. But we're very encouraged with what we saw and *it was all well within the range of expectation of what we had put out there.* [19]

<u>Statements made by Executive Vice President Bob Daniels</u>[20]

Q: And then maybe if I could do one quick follow up and you may not have anything to add on Shenandoah, but post the recent appraisal, any thoughts on resource range there at Shenandoah?

A: On the resource range, *we're riding right where we thought*. We always do a probabilistic resource range. *We're still in that range with the results of the well.* [21]

The above statements were false. Mr. Walker knew the size of the Shenandoah resource was not actually "all well within range of the expectation of what we had put out there" because his internal experts had repeatedly told him about many

19 *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

20 Mr. Daniels is the Vice President of International and Deepwater Exploration.

21 *See* <u>Exhibit 6</u>, transcript from October 28, 2015 earnings call.

factors that would limit the size of the resource. Likewise, Mr. Daniels had actual knowledge that they were not actually "still in that range" when he falsely reassured the investment community.

### U. Rule 10b-5 Violations

#### (1) Anadarko violated Rule 10b-5

The exploration team violated Rule 10b-5 on a massive scale by repeatedly overstating the size of the Shenandoah resource. Underneath this global violation was a years-long series of misrepresentations and omissions of material fact. Along the way, they demonstrated an intent to mislead by hiding faults, ignoring science, ignoring RCT feedback and even attempting to silence and intimidate those who spoke up, such as Ms. Frye. Collectively, this sequence of events proves scienter.

Here is one example, from page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. *The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.*

[redacted] Shen 3 was two miles away from Shen 2, and [redacted]

#### (2) Role of resources in share price proves materiality

It is no secret that resources and reserves are among the metrics that drive Anadarko's share price. When they characterized the Shenandoah resources as the third-largest resource ever found in the Gulf of Mexico, Mr. Leyendecker, Mr. Daniels and others on the exploration team knew the effect their representations would have on the investment community. Their manipulations of the verbiage and mapping used in reference to the Shenandoah resource was an effort to mislead the public into believing that Shenandoah (and therefore Anadarko) was more robust than the science established.

### V. Significance of overstating reserves

[redacted]

There are similarities between Anadarko's overstatement of reserves and the manner in which Shell overstated reserves more than a decade ago. For example, the Commission concluded that Shell overstated proved reserves by 4.47 billion barrels of hydrocarbon reserves (approximately 23%).[23] [redacted]

Shell was deemed to have overstated future cash flows by approximately $6.6 billion.[25] [redacted] yet Anadarko published the value range as a "$2-4 billion net opportunity." This range was [redacted] higher than reality at the low end ($2 billion) and [redacted] higher than reality at the high end ($4 billion).

### W. Insider trading suspected

It warrants mention Senior Vice President of Exploration Bob Daniels sold more than $6 million of his Anadarko stock (APC) roughly two months after Anadarko published false optimism about the size of the Shenandoah resource. In other words, he was selling at a time when all messages to the public were that now was the time to buy. On the following page is a timeline of the key events:

---

22 *See* Exhibit 2, Reserves and Resources Manual (2012).

23 Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

[redacted]

25 Press Release, Securities and Exchange Commission, Royal Dutch Petroleum Company and the "Shell" Transport and Trading Company, P.L.C. Pay $120 Million to Settle SEC Fraud Case Involving Massive Overstatement of Proved Hydrocarbon Reserves (Aug. 24, 2004) (on file with author).

**February 19, 2014:** During a meeting involving Mr. Leyendecker, Ms. Frye and others on the Development and Exploration teams, Ms. Frye presents the economics and explains the underlying science, which indicates the Shenandoah resource should be valued at [redacted] [6] Mr. Leyendecker berates Ms. Frye, then describes the Shenandoah basin as "the best field ever."

**March 4, 2014:** Unabashed optimism during the Investor Conference. Shareholders are told (in a slide show) that Anadarko has discovered "900+ MMBOE in net resources,"[27] which includes the Shenandoah resource, which is described as a "$2-$4 billion dollar net opportunity."[28]

**May 21, 2014:** Senior Vice President of Exploration Bob Daniels sells 61,379 shares of his Anadarko stock (transaction of approximately $6.143 million).[29]

When Mr. Daniels sold more than $6 million of his stock, he must have known that (1) the Shenandoah resource was a factor in the share price; and (2) the size of the Shenandoah resource had been overstated. The public did not and could not know the latter. This, we suspect that Mr. Daniels' trade was on the basis of material nonpublic information relating to Anadarko stock (APC). We understand that Rule 10b-5(c) includes affirmative defenses, and we cannot honestly assess those based on information currently available. Thus, we ask the Commission to further investigate.[30]

## X. Litigation hold already requested

Ms. Frye has served Anadarko with a very detailed litigation hold request that specifically identifies the categories of documents and information that Anadarko

---

26 Ms. Frye is happy to further explain this.

27 *See* Exhibit 4, slide 83.

28 *Id.*

29 This information is publicly available and was obtained from a public source.

30 The stock sales of Ernie Leyendecker of Senior Vice President, Exploration (Gulf of Mexico)) are not publicly available, but we suspect that he too may have profited by selling Anadarko stock at just the right time with the benefit of inside information. Accordingly, we hope the Commission will also investigate his transactions.

should take affirmative steps to preserve. The letter identifying the documents that should be preserved is attached as Exhibit 1 to this letter.

### Y. List of key witnesses

Below is a list of 19 current and former Anadarko employees who can verify the facts included in this letter. Some of these people have nothing to hide and are likely to immediately tell the truth. Others have much to lose and may lie. A summary of each person's role, relevant knowledge and culpability is provided.

1) **Chip Oudin.** Geophysicist, Development. Feels strongly that Exploration was overstating resources. Pointed out numerous flaws in Exploration team's methodology.

2) **Paul Chandler.** Geologist, Development. Pointed out numerous errors in Exploration team's methodology. Clearly stated that their resource statements were incorrect.

3) **Tim Trautman.** Geological and Geophysical (G&G) Manager, Exploration. Responsible for risking and sizing of resources. Reported directly to Ernie Leyendecker and was at times Mr. Leyendecker's designated messenger. Manager of Beth Kendall, Jake Ramsey, and Breck Johnson. Mr. Trautman and his subordinates should have used appropriate techniques (defined by Anadarko Risk Consistency Team (RCT)) to understand the size of the Shenandoah resource, but they collectively ignored procedures to support Mr. Leyendecker's claim of a spectacular find. Some benefited handsomely with promotions and (presumably) large bonuses.

4) **Matt Morris.** Member of the RCT who told the Exploration group that (1) they were absolutely incorrect in their methodology; and (2) they were significantly overstating the size of the Shenandoah resource.

5) **Jake Ramsey.** Exploration Geologist who reported to Mr. Leyendecker; subsequently promoted.

6) **Breck Johnson.** Exploration Geologist who reported to Mr. Leyendecker; replaced Jake Ramsey when Mr. Ramsey was promoted.

7) **Christian Noll.** Geologist, Development. Attended meeting with RCT regarding Shenandoah resource size. Can verify that exploration methodology was incorrect and that value of Shenandoah resource was overstated.

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 47 of 185



8) **Pat McGrievy.** General Manager, Development side. Lea Frye's manager. Knows the truth but not the type to speak up.

9) **Tom Bergesser.** Former member of RCT; now works in Exploration. Attended RCT meeting in which Exploration team was told to change its methodology and reduce the projected value of the Shenandoah resource.

10) **Tim Fausnaut.** Geophysics Manager, Geophysical Technology. Former member of RCT who evaluated value projections. Attended meeting in which RCT told Exploration team to reduce projected value of Shenandoah resource.

11) **Robert Strickling.** Reservoir Engineer who supported the Shenandoah exploration. Directly responsible for the economic evaluation of the project and for providing net resources information to senior management. Recently promoted.

12) **Chris Camden.** Replaced Robert Strickling when Mr. Strickling was promoted. Now Engineer for Exploration team.

13) **Darrell Hollek.** Former Senior Vice President, Gulf of Mexico and International Development. Now Senior Vice President, On-Shore Development. His team knew the Exploration was overstating values, but he did nothing to stop it.

14) **Jim Kleckner.** Executive Vice President, Deepwater and International Development. Darrell Hollek's boss; took some interest in understanding the information the Development team (including Ms. Frye) was trying to bring forward about the Shenandoah project.

15) **Al Walker.** Chief Executive Officer. Perhaps misled by those below him, but communicated incorrect info directly to shareholders. Knew or should have known size of the Shenandoah resource was being repeatedly overstated.

16) **Bob Daniels.** Executive Vice President, Exploration. Communicated directly to shareholders and the general public; heavily invested in meeting net resource goals. Repeatedly overstated resource size and provided vague reassurances when the message should have been to reduce expectations. Did not adjust expectations to match the science, which clearly showed lower expected recoverable amounts of oil.

17) **Ernie Leyendecker.** Former Vice President, Gulf of Mexico Exploration. Since promoted to Senior Vice President, International Deepwater Exploration. He was the primary driver of overstating potential resources on the Shenandoah project. Abused Ms. Frye and others below him who spoke up. Concealed some facts and distorted others for his own gain in used car salesman fashion.

18) **David Blakeley.** Manager, Gulf of Mexico Exploration Engineering. Now Director of all Exploration engineering. His group is responsible for reporting the Net Risk Resources Discovered (i.e., the amount of oil that is likely to be recoverable). His support of the overstated values likely garnered Mr. Leyendecker's support and his own recent promotion.

19) **Beth Kendall.** Geophysicist. Ms. Kendall was promoted during the Shenandoah project. Aware of the fact the resource size was exaggerated.

## Conclusion

Anadarko executives have put Ms. Frye in an impossible position. As the legislative history of the Dodd-Frank Act recognizes, "whistleblowers often face the difficult choice between telling the truth and the risk of committing 'career suicide.'"[31] This is exactly how Ms. Frye has felt during the past two years. Accordingly, Ms. Frye asks the Commission to take all action necessary to deter Anadarko from forcing other hard-working, honest people like her to either remain silent or find a new employer and perhaps a new career.[32]

Ms. Frye and I would like to meet with someone from the Fort Worth office as soon as possible. When you meet Ms. Frye, I think you will find her to be sincere, credible and quite informed, and her ability to explain the data is compelling. Further, there is additional evidence that she can either provide or describe for the Commission that was not attached to this letter because we did not want to make it more complicated or voluminous than it already is.

Respectfully,

David M. Minces

---

31 S. Rep. No. 111-176 at 110-112 (2010).

32 While Ms. Frye is certain that Anadarko has overstated the Shenandoah resource, she suspects there are other ongoing exploration projects in which Anadarko executives have engaged in similar misrepresentations. She is glad to provide whatever information she has and can direct the Commission to others who may have knowledge about other projects.

# EXHIBIT 1

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 50 of 185

MINCES PLLC

**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

April 20, 2016

Ms. Amanda M. McMillian
Senior VP, General Counsel, Corporate Secretary and Chief Compliance Officer
Anadarko Petroleum Company
1201 Lake Robbins Drive
The Woodlands, Texas 77380

Re: Lea Frye | Request for Litigation Hold

Dear Ms. McMillian:

This letter is intended as formal notice of your legal duty to take steps to preserve all documents and electronic data (including but not limited to email) relating to Ms. Frye's potential claims.

In order to ensure that relevant data is preserved, we ask that you issue an internal "litigation hold" and refrain from destroying or disposing of any computer, server or other device that houses potentially relevant data. Likewise, we request that you suspend any document destruction policies and practices that might otherwise lead to the destruction of potentially relevant electronic data. This is not merely an obligation to refrain from destroying evidence. Rather, you have an affirmative legal duty to take all measures reasonably necessary to safeguard all documents and information that could relate to any of Ms. Frye's claims. Your counsel will be familiar with the importance of these obligations and the steps needed to comply.

In particular, we request that you preserve each category of data enumerated below. Please note that this list is not intended to be exclusive or exhaustive.

Please be sure to preserve the following data. For clarify, the term "data" as used below is intended to include and encompass paper documents and electronically stored data (of all kinds, including emails) in its native format. Unless otherwise stated, we ask that Anadarko preserve all items and categories of items listed below dating back to January 1, 2012:

1) All personnel records of Lea Frye, including but not limited to her raises, bonuses, commendations and performance evaluations.

2) All data relating to Ms. Frye's health condition and the specific conditions that necessitated her current leave.

Case 4:17-cv-02289 Document 118-1 Filed on 07/28/20 in TXSD Page 51 of 185



3) All data relating to Ms. Frye's FMLA leave.

4) All data relating to any request Ms. Frye made to be included in recent layoffs and/or the reason(s) such requests were denied.

5) All data relating to the date Ms. Frye's physician has recommended that she return to work.

6) All data relating to any discussions among human resources personnel, managers and/or persons with supervisory authority over Ms. Frye that relate in any way to her alleged performance deficiencies or the possibility of terminating her employment for any reason.

7) All data relating to the reservoir engineering support provided by Ms. Frye and Reservoir Engineers in conjunction with the Shenandoah project.

8) All economic evaluations and/or projections of prospective resources and related data provided by Ms. Frye and/or others on the development team that relate in any way to the Shenandoah project.

9) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with SEC requirements.

10) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with Anadarko's Reserves and Resources Manual.

11) All data showing or relating to Anadarko's efforts to ensure that reporting about the Shenandoah project fully complied with applicable Petroleum Resources Management System (PRMS) guidelines.

12) All data showing or relating to the findings of the Shenandoah 1 well.

13) All data showing or relating to the vertical depth at which the Shenandoah 1 well revealed oil could be recovered.

14) All data showing or relating to the findings of the Shenandoah 2 well.

15) All data showing or relating to the vertical depth at which the Shenandoah 2 well revealed oil could be recovered.

16) All data showing or relating to the findings of the Shenandoah 3 well.

17) All data showing or relating to the vertical depth at which the Shenandoah 3 well revealed oil could be recovered.

18) All data showing or relating to the findings of the Shenandoah 4 well.

19) All data showing or relating to the vertical depth at which the Shenandoah 4 well revealed oil could be recovered.

20) All data showing or relating to the reasons Anadarko explained during its March 2013 investor relations conference that one of its 2013 goals was to deliver "800+ Million Barrels of Oil Equivalents (MMBOE)."

21) All data relied upon in support of the representations made in the slide show presented to investors during the March 2013 investor relations conference.

22) All data relied upon in support of the representation in the March 19, 2013 press release that 360 MMBOE was an accurate figure for Net Risked Resources.

23) All data showing or relating to extrapolations considered and/or made regarding the Shen 2 well based on characteristics and/or properties found in the Shen 1 well.

24) All data showing or relating to the presence or absence of faulting in or around the Shen 1 well.

25) All data showing or relating to the presence or absence of faulting in or around the Shen 2 well.

26) All data showing or relating to the presence or absence of faulting in or around the Shen 3 well.

27) All data showing or relating to the presence or absence of faulting in or around the Shen 4 well.

28) All data showing or relating to the reason(s) Lea Frye was asked to help develop the Shenandoah field.

29) All data showing the persons involved in the decision to ask Lea Frye to help develop the Shenandoah field, including but not limited to data indicating why they wanted Ms. Frye to assist and the specific input given by those involved in making this decision.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 53 of 185



30) All emails that Ernie Leyendecker sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

31) All emails that Darrell Hollek sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

32) All emails that David Blakeley sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

33) All emails that David O'Brien sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

34) All emails that Pat McGrievy sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

35) All emails that Tim Trautman sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

36) All emails that Jim Kleckner sent to and/or received from Ms. Frye that in any way discuss, describe or relate to Ms. Frye's work on the Shenandoah project.

37) All data showing any economic forecast and/or model Ms. Frye created, prepared or discussed regarding the Shenandoah project or any portion of the Shenandoah project, regardless of whether such economic forecast or model was complete or incomplete and regardless of whether such forecast or model was considered formal, informal, accepted, rejected, relied upon or not relied upon.

38) All data relating to any request that Ms. Frye focus on current perceived value and/or associated risks to that value for the Shenandoah project or any portion of the Shenandoah project.

39) All documents created for or during the February 19, 2014 meeting about the Shenandoah project that was attended by Ms. Frye, Ernie Leyendecker, Darrell Hollek, David Blakeley, David O'Brien and Pat McGrievy, regardless of who authored or prepared such data.

40) All feedback and analysis provided by Ms. Frye relating to the Shenandoah field.

41) All data provided and/or reviewed by Ms. Frye relating to industry best practice modeling and sensitivity analysis in connection with the Shenandoah project.

42) All data provided and/or reviewed by persons other than Ms. Frye relating to industry best practice modeling and sensitivity analysis in connection with the Shenandoah project.

43) All data provided and/or reviewed by Ms. Frye that related to estimates for oil in place, recovery and costs to develop the Shenandoah field.

44) All emails sent by Ernie Leyendecker that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

45) All emails sent by Darrell Hollek that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

46) All emails sent by David Blakeley that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

47) All emails sent by David O'Brien that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

48) All emails sent by Pat McGrievy that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

49) All emails sent by Tim Trautman that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

50) All emails sent by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

51) All emails sent by Robert Strickling that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

52) All emails sent by Jake Ramsey that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

53) All emails sent by Beth Kendall that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

54) All emails sent by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

55) All emails received by Ernie Leyendecker that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

56) All emails received by Darrell Hollek that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

57) All emails received by David Blakeley that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

58) All emails received by David O'Brien that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

59) All emails received by Pat McGrievy that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

60) All emails received by Tim Trautman that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

61) All emails received by Jim Kleckner that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

62) All emails received by Robert Strickling that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

63) All emails received by Jake Ramsey that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

64) All emails received by Beth Kendall that mention Lea Frye by name and discuss any matter relating to the Shenandoah project.

65) All emails that Lea Frye sent to Ernie Leyendecker, Darrell Hollek, David Blakeley, David O'Brien, Pat McGrievy, Tim Trautman, Jim Kleckner, Robert Strickling, Jake Ramsey and/or Beth Kendall that discuss or relate to the Shenandoah project.

66) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's exploration team.

67) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's development team.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 56 of 185



68) All data showing or relating to value estimates of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's Risk Consistency Team ("RCT").

69) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's exploration team.

70) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's development team.

71) All data showing or relating to estimated, projected and/or anticipated mean MMBOE of the Shenandoah resource (or any part thereof) that were provided by any person on Anadarko's RCT.

72) All data showing or relating to recovery factors in connection with the Shenandoah resource (or any part thereof).

73) All data showing or relating to technology costs in connection with the Shenandoah resource (or any part thereof).

74) All data showing or relating to faulting in connection with the Shenandoah resource (or any part thereof).

75) The slide show used during the March 2014 Investor Conference.

76) All data relied upon in support of the approximation of "900+ MMBOE in net discovered resources," which was made on slide 74 of the slide show provided during the March 2014 Investor Conference (slide entitled "Industry-Leading Exploration Success Again in 2013."[1]

---

1 *See* Exhibit 4 to demand letter dated April 20, 2016.

77) All data relied upon in support of the representation that the Shenandoah Basin was a "$2-$4 billion dollar net opportunity," as stated on slide 83 of the slide show provided during the March 2014 Investor Conference (slide entitled "Shenandoah Basin: ~$2-$4 Billion Net Opportunity."[2]

78) All data showing any proposed value of the Shenandoah resource by Anadarko's development team.

79) All data showing a proposed valuation of the Shenandoah resource at $1.1 billion, regardless of the person(s) who proposed such a valuation.

80) All data relating to the effect or anticipated effect that faults crossing the geological feature would or may have on the projections of oil on the Shenandoah basin.

81) All data in which it was shown or alleged that the Shenandoah 3 well ("Shen 3") was a "wet well."

82) All data in which it was shown or suggesting that Shen 3 did not reveal the presence of hydrocarbons.

83) All data showing and/or suggesting that the Shenandoah well revealed the presence of hydrocarbons.

84) All data showing and/or suggesting that oil-water contacts were defined by using pressure data obtained from Shen 2 and Shen 3.

85) All data identifying, specifying and/or approximating the distance (in miles) between Shen 2 and Shen 3.

86) All data showing and/or suggesting that a discontinuity (faulting) between Shen 2 and Shen 3.

87) All data showing and/or identifying the presence or absence of faulting between Shen 2 and Shen 3.

88) All data showing the presence or absence of faults in Shen 1, based on oil-based microimaging (OBMI).

89) All data showing the presence or absence of faults in Shen 2, based on oil-based microimaging (OBMI).

---

2 *Id.*

90) All data showing the presence or absence of faults in Shen 3, based on oil-based microimaging (OBMI).

91) All data showing the presence or absence of faults in Shen 4, based on oil-based microimaging (OBMI).

92) All data showing or relating to the manner in which oil-water contacts in any Shenandoah well were extrapolated from findings by any other Shenandoah well.

93) All data showing or relating to the manner in which the highest known water point in any Shenandoah well was extrapolated from findings by any other Shenandoah well.

94) All data showing or relating to the manner in which the lowest known oil point in any Shenandoah well was extrapolated from findings by any other Shenandoah well.

95) All data showing or suggesting the presence or absence of salt in any part of Shen 4.

96) All data showing or suggesting the presence or absence of sand in any part of Shen 4.

97) All data showing the presence or absence of hydrocarbons in any part of Shen 4.

98) All mapping and proposed mapping relating to Shen 4, regardless of whether such mapping was accepted or rejected, and regardless of whether such mapping was accepted or rejected.

99) All data showing the range (in vertical feet) that revealed the presence of hydrocarbons in Shen 4.

100) All data showing or discussing the reason(s) a sidetrack well was drilled in Shen 4.

101) All data showing or discussing the reason(s) a bypass well was drilled in Shen 4.

102) All data showing or discussing the data obtained from the bypass well in Shen 4.

103) All data showing or discussing the data obtained from the sidetrack well in Shen 4.

104) All well log data relating to Shen 1.

105) All well log data relating to Shen 2.

106) All well log data relating to Shen 3.

107) All well log data relating to Shen 4.

108) All geologic data provided by Paul Chandler relating to any other aspect and/or portion of the Shenandoah project.

109) The well log data Geological Advisor Paul Chandler provided to Ernie Leyendecker and others in advance of the meeting that was scheduled for August 12, 2014 but did not go forward as scheduled.

110) All data provided or discussed by Paul Chandler that discussed faulting.

111) All data provided or discussed by Paul Chandler that discussed any fault in Shen 2.

112) All data provided or discussed by Paul Chandler that discussed OBMI data.

113) All emails dated August 18, 2014 that relate to the method by which faulting would be represented in the Shenandoah project going forward, including but not limited to those sent or received by Ernie Leyendecker, Pat McGrievy and Tim Trautman).

114) All data showing or relating to any directive given by Ernie Leyendecker, Pat McGrievy or Tim Trautman that related to the maps that would and/or would not be used to represent the Shenandoah resource (or any part thereof), including but not limited to maps that showed the presence or absence of faulting.

115) All data relied upon to support the projections and representations made in the February 2, 2015 Operations Report.

116) All emails exchanged that discuss or relate to the February 2, 2015 Operations report, regardless of whether such emails were sent before or after the issuance of the Report, and regardless of whether such emails discussed the final version of the Report or an earlier draft/iteration of the Report that was superseded by the final Report.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 60 of 185



117) All data relied upon to support the projections and representations made by Senior Vice President of Exploration Bob Daniels during the February 3, 2015 investor call.

118) All data relied upon to support the representation that Shen 3 revealed more than 1,500 feet of "quality sand," as stated by Senior Vice President of Exploration Bob Daniels during the February 3, 2015 investor call.

119) Data showing the substance of the presentation Doug Shott was originally scheduled to give on February 17, 2015, including (if applicable) any slide shows, handouts or other materials Mr. Shott planned to show, rely on or distribute during the presentation.

120) All data showing or relating to the reasons Doug Shott's presentation scheduled for February 17, 2015 did not go forward on the scheduled date.

121) All data that identifies or tends to identify the person(s) who made the decision to cancel or postpone the presentation (by Doug Shott) that was originally scheduled for February 17, 2015.

122) All emails that discuss and/or relate to the presentation (by Doug Shott) or the subject matter of the presentation that was originally scheduled for February 17, 2015 but did not go forward as scheduled, regardless of whether such emails were sent before or after February 17, 2015, and regardless of who sent such emails.

123) All data relied upon to support the projections and representations made during the October 28, 2015 earnings call.

124) All data that supported the representation (made during the October 28, 2015 earnings call) that Shen 4 had found more oil, pushing the known depth of oil down by more than 400 feet.

125) All data revealing the presence or absence of salt in Shen 4.

126) All data provided to, reviewed by or provided by Anadarko's RCT that related to the mean size of the Shenandoah resource.

127) All emails sent to and/or received by any member of Anadarko's RCT that related in any way to the mean size of the Shenandoah resource or the method by which that mean size should be determined.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 61 of 185



128) All data in which reference is made to the Shenandoah resource having a mean size or projected mean size of 425 MMBOE.

129) All data in which reference is made to the Shenandoah resource having a mean size or projected mean size of 550 MMBOE.

130) All data that shows, tends to show or relates to the effect of the Shenandoah resource and/or representations about the Shenandoah resource on Anadarko's share price.

131) All data that shows, tends to show or relates to the gross revenue (of Anadarko) that can be attributed in whole or in part to the Shenandoah resource.

132) All data that shows, tends to show or relates to the profits (of Anadarko) that can be attributed in whole or in part to the Shenandoah resource.

133) Anadarko's annual exploration goals for the year 2013, and the data relied upon in support of such goals.

134) Anadarko's annual exploration goals for the year 2014, and the data relied upon in support of such goals.

135) Anadarko's annual exploration goals for the year 2015, and the data relied upon in support of such goals.

136) Anadarko's annual exploration goals for the year 2016, and the data relied upon in support of such goals.

137) The dollar amount in total bonuses received by Ernie Leyendecker for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

138) All promotions received by Ernie Leyendecker since 2012 and the underlying data upon which such promotions were based.

139) The dollar amount in total bonuses received by David Blakeley for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

140) All promotions received by David Blakeley since 2012 and the underlying data upon which such promotions were based.

141) The dollar amount in total bonuses received by Robert Strickling for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

142) All promotions received by Robert Strickling since 2012 and the underlying data upon which such promotions were based.

143) The dollar amount in total bonuses received by Jake Ramsey for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

144) All promotions received by Jake Ramsey since 2012 and the underlying data upon which such promotions were based.

145) The dollar amount in total bonuses received by Beth Kendall for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

146) All promotions received by Beth Kendall since 2012 and the underlying data upon which such promotions were based.

147) The dollar amount in total bonuses received by Darrel Hollek for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

148) All promotions received by Darrel Hollek since 2012 and the underlying data upon which such promotions were based.

149) The dollar amount in total bonuses received by David O'Brien for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

150) All promotions received by David O'Brien since 2012 and the underlying data upon which such promotions were based.

151) The dollar amount in total bonuses received by Pat McGrievy for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

152) All promotions received by Pat McGrievy since 2012 and the underlying data upon which such promotions were based.

153) The dollar amount in total bonuses received by Tim Trautman for each calendar year between 2012 and the present, and the underlying data upon which such bonuses were based.

154) All promotions received by Tim Trautman since 2012 and the underlying data upon which such promotions were based.

155) All data supporting the excerpt below, found on page 9 of Anadarko's 2014 10K:

> The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range.

156) All non-privileged data illustrating Anadarko's efforts to issue and comply with a litigation hold and all additional efforts to preserve the data and categories of data identified in this letter.

157) All computers and other devices used to create and/or save any data or category of data identified in this letter.

As a reminder, the use of the term "data" in the preceding list is intended to encompass *both* hard copies of documents and electronically stored information such as email, text messages and social media communications of any kind.

Please instruct all persons who may possess relevant data to preserve such data in its native, electronically stored format, even if the they or Anadarko have paper copies of those same items. As you know, the obligation to preserve evidence is serious, and their failure to do so could result in a variety of undesirable consequences. We have given similar instructions to our client.

We thank you in advance for your cooperation.

Respectfully,

David M. Minces

# EXHIBIT 2




[redacted]

"This [redacted] should be considered the confidential and proprietary property of Anadarko Petroleum Corporation. Any unauthorized distribution, review, dissemination or copying of the Reserves and Resources Manual is strictly prohibited."

[redacted]

[redacted]

James T. Hackett

5/20/10

**James T. Hackett** **Date**

Chairman and Chief Executive Officer

# EXHIBIT 3

www.anadarko.com | NYSE: APC

2012 ANADARKO INVESTOR CONFERENCE

INVESTOR RELATIONS CONTACTS:

John Colglazier
Vice President
832/636-2306

Clay Gaspar
Manager
832/636-2541

Wayne Rodrigs
Manager
832/636-2305

# Delivering Differentiating Value

## Bob Daniels
## SVP, Worldwide Exploration

March 13, 2012



# Creating Value Through Exploration

- **4+ BBOE Net Discovered Resources 2004 - 2011**
  - *$7.5 Billion Exploration Capital*
  - *$8 Billion Exploration Monetizations*

**2012**
- *Caesar/Tonga*
- *El Merk*

**2014**
- *Lucius*

**2015**
- *TEN Complex*

**2016**
- *Heidelberg*
- *MTAB Complex*

**2017**
- *Shenandoah*
- *Vito*

**2018**
- *Mozambique*

***And* … Transitioning Discoveries Into $25+ Billion of Value**

**DISCOVERIES UNDER APPRAISAL**

| | |
|---|---|
| Heidelberg | Mozambique |
| Itaipu | Shenandoah |
| Itauna | TEN |
| MTAB | Vito |
| Mercury | Wahoo |

*Sanctioned*
*Appraising*

*Notional First Sales Date*

# EXHIBIT 4

2014 ANADARKO INVESTOR CONFERENCE




INVESTOR RELATIONS

**John Colglazier**
Senior Vice President
832/636-2306

**Jeremy Smith**
Director
832/636-1544

**Bill Tedesco**
Manager
832/636-3375

# Driving Exploration Value Creation

Bob Daniels
EVP, International & Deepwater Exploration

March 4, 2014

# Driving Exploration Value Creation

- Identify and Capture Value-Creation Opportunities
- Create Value Through Commercial Discoveries
- Provide Optionality to Realize and Enhance Value



# Industry-Leading Exploration Success Again in 2013

- 67% Deepwater Exploration/Appraisal Success
- 900+ MMBOE Net Discovered Resources
- ~1.5 BBOE Net Resources to Development

*Top-10 Deepwater Discoveries**

- #5 Orca
- #7 Coronado

**Deepwater Discoveries**

- Coronado
- Yucatan
- Phobos
- Mozambique

**Appraising**

- Coronado
- Shenandoah
- Paon
- Mozambique

**Developing**

- Heidelberg
- Lucius
- TEN
- Mozambique

* IHS Energy, January 2014

# Shenandoah Basin: ~$2 - $4 Billion Net Opportunity

- **Emerging Giant Resource**
- **Significant Value Creation**
  - Less than $300 Million Net Investment Through 2013
- **Excellent Transmissibility**
  - Permeability
  - Thickness
  - Fluid Viscosity
- **Strategic and Expanding Position in Basin**
- **2014 Planned Activity**
  - Drill 3 - 4 Appraisal Wells



Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 75 of 185

# EXHIBIT 5

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 76 of 185

Anadarko Petroleum Corporation

# 2009 Performance Planning & Review

| | | |
|---|---|---|
| **Employee Name:** Lea Frye | **Job Title:** Sr Reservoir Engineer | **Supervisor's Name:** Brad Berg |
| **Employee ID:** 124188 | **Department:** Exploration Engineering | **Next Level Supervisor:** David O'Brien |

**Step 1: Goals** - Your goals should be specific, measurable, attainable, realistic and time-bound. Your goals should be aligned with both corporate and department goals.

| | | |
|---|---|---|
| 1 **EXCEEDS EXPECTATIONS:** Usually exceeds and consistently meets all relevant performance standards. | 2 **MEETS EXPECTATIONS:** Consistently meets and sometimes exceeds all relevant performance standards. | 3 **NEEDS IMPROVEMENT:** Often falls short of and sometimes meets performance standards. |

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| Support the greater GOM exploration team drill ready inventory goal by building a drill ready inventory for the Western GOM area. | Mature 2-4 prospects to drill ready status by the end of 2009. | [redacted] | 1 | 1 |
| Maintain and replenish GOM exploration prospect inventory with economic quality prospects through lease sales, trades and/or other deals. | Complete reserves, risking and economic evaluation of G&G identified lease acreage available in lease sales 208 in March & 210 in August. Work with G&G and Land to evaluate and make recommendations on all trades and deals based on economic criteria compared to other opportunities in the GOM. | Portfolio planning - Coordinated and presented GOM portfolio planning submission for the year 2009. | 2 | 1 |
| Analyze production trends in the shelf and deepwater productive intervals in support of the regional team goal to find the next new exploration play in the GOM. | Present by year end the combined G&G and reservoir analysis of the Pliocene reservoir remaining play potential and high graded exploration areas. | [redacted] | 1 | 1 |

Anadarko Petroleum Corporation

# 2009 Performance Planning & Review

| | | | | |
|---|---|---|---|---|
| | | [redacted] | | |
| Obtain a greater knowledge of the reservoir engineers' role in the operations and analysis of exploration wells during the drilling and post drill phases of the prospect cycle. | Timely communication of key well operations. Stewardship of the pressure and fluid program from acquisition to interpretation. Application of knowledge gained toward reserves, risking, and recommendations for future operations as part of the post drill review. | [redacted] | 2 | 1 |
| Work with GOM peers to document some economic standards to ensure consistency and comparability between GOM prospects in prospect inventory. | Document and present GOM economic standardization process to peers by end of first quarter 2009. Develop capital and production spreadsheet which applies economic standards for use by GOM engineers incorporating standards by year end 2009. | Collaborated with peers to develop and document some economic standards for the different GOM play types to ensure consinstancey in economic cases between the GOM engineers. Early in the year I presernted a complilation of the work including the economic summary template and GOM project scheduler.<br><br>Economic Summary Template - Continue to maintain the economic summary tool which links to PEEP reports. This tool ensures accuracy and consistency in economic summary sheets as well as saves engineers time filling them out. I shared this tool with Lower 48 and International.<br><br>GOM Project Scheduler - Developed a usable template incorporating GOM economic standards to schedule capital, production and reserves that | 2 | 1 |

Case 4:17-cv-02789 Document 118-1 Filed on 07/26/20 in TXSD Page 78 of 185

Anadarko Petroleum Corporation

# 2009 Performance Planning & Review

| | | | | |
|---|---|---|---|---|
| | | can be copied into PEEP for speed and consistency. Currently the scheduler is being used for Miocene, Pliocene and Pleistocene prospects. Additional modifications and upgrades have been identified, but not completed. | | |
| Work with greater GOM exploration team to secure GOM JV. | Prepare and present individual prospects reserves, risking and economics to potential partners by end of second quarter. Assist in running combined JV economics for negations of deal terms. | [redacted] | 1 | 1 |
| | | **Overall Goal Rating** | 1.5 | 1 |

**Step 2: Values** - Assess each of the following values according to the scale below.

| **Values Scale** | | Exceptional | | Acceptable | | Needs Improvement |
|---|---|---|---|---|---|---|

| **Value** | **Comments (Only complete this section if NI)** | **Self Assessment (E, A, or NI)** | **Manager Assessment (E, A, or NI)** |
|---|---|---|---|
| Integrity and Trust | | E | E |
| Servant Leadership | | A | E |
| People and Passion | | A | A |
| Commercial Focus | | E | E |
| Open Communication | | A | A |
| | **Overall Value Rating** | A | A |

**Step 3: Combined Year-End Rating** - Determine the alpha and numeric rating for goals and values

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 79 of 185

Anadarko Petroleum Corporation

# 2009 Performance Planning & Review

| | [illegible] | [illegible] |
|---|---|---|
| **Combined Year-end Rating** | [illegible] | [illegible] |

**Step 4: Development Plan** - Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the 2009 performance planning process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| Communication Skills | Effective Communication in a Demanding Work Environment | 10/27/09 |
| | | |
| | | |

**Step 5: Performance Planning Signatures** -The supervisor, employee, and next level supervisor's signature are required. After the performance meeting the employee being assessed may add comments to the final assessment form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

| Supervisor's Signature | Date: 2/2/2010 |
|---|---|

**Supervisor's Comments:** Lea was a tremendous contributer to the GOM team in 2009. Early in the year, Lea took on the reservoir engineering responsibilities for the Vito well, and did an excellent job preparing the well to drill, and later logging and evaluating the results. She was also a member of the team that discovered Lucius, a project that was pulled together in record time and turned out to be one of the most valuable GOM discoveries that APC has made in recent years. Lea continues to impress me with her technical abilities, her desire to understand the issues most leveraging to our program, and her strong work ethic (which was tested repeatedly during the pressure testing and fluid sampling of our numerous successful wells in 2009). Lea is continuing to work with the New Plays team to identify the next great opportunity in the GOM, and I look forward to her contributions in 2010.

| Employee's Signature | Date: |
|---|---|

**Employee's Comments:**

| Next Level Supervisor's Signature | Date: |
|---|---|

**Next Level Supervisor's Comments:**

Anadarko Petroleum Corporation

# 2011 Performance Review Process Form

| | | |
|---|---|---|
| Employee Name: Lea Frye | Job Title: Staff Reservoir Engineer | Supervisor's Name: David Blakeley |
| Employee ID: 124188 | Department: Exploration-Gulf of Mexico | Next Level Supervisor: David O'Brien |

**Step 1: Core Values** - Assess each of the following core values according to the scale below.

| Values Scale | E | Exceptional | A | Acceptable | N | Needs Development |
|---|---|---|---|---|---|---|

| Core Value | Comments (Required for N) | Self Assessment (E, A, or N) | Manager Assessment (E, A, or N) |
|---|---|---|---|
| Integrity and Trust | | E | E |
| Servant Leadership | | A | A |
| People and Passion | | E | E |
| Commercial Focus | | A | A |
| Open Communication | | A | A |
| | Overall Core Value Rating | A | A |

**Step 2: Goals** - Your goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

| 1 | EXCEEDS EXPECTATIONS: Usually exceeds and consistently meets all relevant performance standards. | 2 | MEETS EXPECTATIONS: Consistently meets and sometimes exceeds all relevant performance standards. | 3 | NEEDS DEVELOPMENT: Often falls short of and sometimes meets performance standards. |
|---|---|---|---|---|---|

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| Prepare to resume Work in the GOM | Prepare and Submit EP's for all 2011 & 2012 planned wells.<br><br>Submit APD's when EP's are approved.<br><br>Move permitted wells through AFE approval process in a timely manner. Support rig scheduling and tendering activities | [redacted] | 1 | 1 |
| Commercial Advisor/Portfolio Management | Provide consistent and timely economic analysis for all GOM investment decisions<br><br>*Provide Economic Analysis of all trades<br><br>Ensure prospect inventory is up to date as new timing and cost data emerge in the GOMs/farm-outs/farm-ins | Provided economic updates to reservoir tech and portfolio planning group throughout the year as new cost and/or geologic interpretations arose.<br><br>Collaborated with team members in execution of the portfolio planning updates for both April and December. | 2 | 2 |
| Replenish Leasehold | Prepare for APC's "virtual lease sale" in 2011 and the 2011\12 BOEMRE lease sales<br><br>Seek to expand prospect inventory | [redacted] | 1.5 | 1 |

Anadarko Petroleum Corporation

## 2011 Performance Review Process Form

| | | | | |
|---|---|---|---|---|
| | through creative deals and trades into other operator's prospects in high priority plays | [redacted] Provided companies and/or partners with development costing scenarios for these projects when requested. | | |
| Operational Support | Provide operational support for all GOM exploration well activates<br><br>Maintain cost containment by providing value of information analyses | [redacted] provided some assistance with an MDT job for the international engineering group in January. | 2 | 2 |
| Other | Support and encourage "One GOM" culture through weekly communications with Development team management and staff.<br>Continue to support regional projects | [redacted]<br><br>Supplied production maps and analog field data for the Regional Teams "Cretaceous Knowledge Share" poster session. | 1 | 1 |
| Personal | Provide data support to team members and Knowledge Share with peers | Assisted with November 9th Spill Drill.<br><br>Provided GOM deepwater EURs to exploration engineering group for analog comparison/study.<br><br>[redacted] | 1 | 1 |

| | | | | |
|---|---|---|---|---|
| | | [redacted] | | |
| | | Overall Goal Rating | 1.25 | 1 |

**Step 3: Combined Year-End Rating** - Determine the alpha and numeric rating for goals and core values.

| | Self Assessment | Manager Assessment |
|---|---|---|
| Combined Year-End Rating | 1.25 A | A1 |

**Step 4: Development Plan** - Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| WCD Software | Merlin/Avalon software- WCD / Merlin/Avalon user conference | 3/29 & 10/17 |
| Safety/Regulatory Training | SEMS 151 Training and Live Safe Training | 4/7 & 7/21 |
| Spill Drill Training | Attended training for Spill Drill | 11/3 |

**Step 5: Performance Review Signatures** - The employee, supervisor, and next level supervisor's signature are required. After the performance review meeting, the employee being assessed may add comments to his/her Performance Review Form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

**Employee's Signature** [signature] **Date:** 1/18/12

**Employee's Comments:**
While it was a frustrating year from a drilling standpoint, it was a productive year getting ready for the next round. I enjoyed working with everyone & learning so much from my peers & colleagues. I will miss you all.

**Supervisor's Signature** David Blakeley **Date:** 1/17/12

**Supervisor's Comments:**
Great Job - Thanks for the extra effort and iniative needed to re-start the GoM

**Next Level Supervisor's Signature** [signature] **Date:** 1/17/2012

**Next Level Supervisor's Comments:**
YOUR EXTRA EFFORT STAYING FOCUSED IN 2011 IS APPRECIATED BY ME AND YOUR TEAM. BEST OF LUCK IN 2012 WITH YOUR NEW CHALLENGES!

Case 4:17-cv-02269 Filed 07/26/19 in TXSD Page 33 of 185

Anadarko Petroleum Corporation

# 2012 Performance Review Process Form

| | | |
|---|---|---|
| **Employee Name:** Lea Frye | **Job Title:** Staff Reservoir Engineer | **Supervisor's Name:** Alan O'Donnell |
| **Employee ID:** 124188 | **Department:** Mississippi Canyon | **Next Level Supervisor:** Darrell Hollek |

**Step 1: Core Values** - Assess each of the following core values according to the scale below.

| Values Scale | E | Exceptional | A | Acceptable | N | Needs Development |
|---|---|---|---|---|---|---|

| Core Value | Comments (Required for N) | Self Assessment (E, A, or N) | Manager Assessment (E, A, or N) |
|---|---|---|---|
| Integrity and Trust | Goes the extra mile to ensure accuracy. Established great credibility with partners through productivity work at Blind Faith. | E | E |
| Servant Leadership | Did much more that asked during Spill Drills. Always takes time to help others. | A | E |
| People and Passion | | A | A |
| Commercial Focus | Played a key role in strategy for Shadowcat, Blind Faith, Neptune/Swordfish | E | E |
| Open Communication | Has a large sphere of influence the helps her achieve results. Well respected. | E | E |
| | **Overall Core Value Rating** | E | E |

**Step 2: Goals** - Your goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

| 1 | **EXCEEDS EXPECTATIONS:** Usually exceeds and consistently meets all relevant performance standards. | 2 | **MEETS EXPECTATIONS:** Consistently meets and sometimes exceeds all relevant performance standards. | 3 | **NEEDS DEVELOPMENT:** Often falls short of and sometimes meets performance standards. |
|---|---|---|---|---|---|

| Goal | Measurement Sources (Quantitative and/or Qualitative) | Actual Results | Self Assessment (1, 2, or 3) | Manager Assessment (1, 2, or 3) |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | 2 | 2 |

Anadarko Petroleum Corporation

# 2012 Performance Review Process Form

| | | | | |
|---|---|---|---|---|
| | | [redacted] | | |
| [redacted] | [redacted] | [redacted] <Lea has done an excellent job in analyzing and understanding the cause and impact of [redacted] She initiated and coordinated an in-depth internal study that spanned the Res Technology Group, other GOM Asset Teams, and | 1 | 1 |

# 2012 Performance Review Process Form

| | | | | |
|---|---|---|---|---|
| | | International Operations. Our understanding of Miocene productivity has benefitted from her initiative and efforts. In addition, Lea has gained high credibility with partners which has in turn improved our communications.> | | |
| Miocene Exploration: Support G&G team with reserves, risking and economic evaluation of Miocene prospects. | [redacted] | I did not accomplish a great deal toward this goal due to [redacted] I did provide support to the G&G team with an aquifer analysis on the nearby Mica field. This analysis helps support [redacted] <Lea supported the team effectively on this.> | 2 | 2 |
| [redacted] | [redacted] | [redacted] <Lea has been a key driver in bringing the SC well to the drill stage. She provided res engineering for the trade with Murphy, development scenarios, drilling/LL afes, EP, and EPA Air Permit. She also was key in producing the presentation material for making | 1 | 1 |

# 2012 Performance Review Process Form

| | | | | |
|---|---|---|---|---|
| | | 5+ presentations to Management and partners.> | | |
| [redacted] | [redacted] | [redacted]<br><Lea successfully obtained approval to [redacted] She also helped in the strategy and economics for the renegotiation of the [redacted] | 1 | 1 |
| Other: Personal | Organize EGOM file structure and reduce duplicated files and efforts for greater team (by 4Q).<br>ALinks: Simplify and standardize engineering routine tasks like SEC, portfolio, budget and forecasting to develop the same products for all the fields (by year end). Document and submit to ALinks any tool and or process developed along the way (Goal -2 to 3 ALinks submittals).<br>Actively participate and assist in developing spill drill best practices and procedures for flow team (Ongoing). | Alinks: Submitted 4 links to Offshore Magazine deep water facilities posters and a word document summarizing the different data sources used to gather analog data for GOM fields.<br><br>EGOM Processes: Made progress toward a common budget, forecasting reserve tool for the EGOM fields.(Ongoing)<br><br>Spill Drill: Participated as deputy for past two in house spill drills for the flow calculations team. Helping to organize and document data needs, data transfer and best practices for future spill drill (Ongoing).<br><br>Other: Contributed data request for Cheyenne East - IPA benchmark consortium.<br><br>Took on mentoring/training role for EGOM engineer New Hire in August 2012 (Ongoing).<br><Lea met her Alinks and EGOM processes goals very well. In this years spill drills she went far above and | 1 | 1 |

| | | | | |
|---|---|---|---|---|
| | | beyond what was required of her in participation and coordination of the Flow Calculation portion of the Flow Engineering Team. She was a major contributor to the FET strategy, work flow, and data integrity. She also took charge of the Flow Calc Group during the fall drill and drove them to results when a clash of strong personalities threatened to sidetrack the undermine the objectives.<br>Lea has also done an excellent job in mentoring our new Res Engr> | | |
| | | **Overall Goal Rating** | 1 | 1 |

**Step 3: Combined Year-End Rating** - Determine the alpha and numeric rating for goals and core values.

| | Self Assessment | Manager Assessment |
|---|---|---|
| **Combined Year-End Rating** | E1 | E1 |

**Step 4: Development Plan** - Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

| Development Need | Developmental Activities (classes, skills, on-the-job assignments, rotations, conferences, mentoring) | Completion Date |
|---|---|---|
| PTA and RTA | Fekete Harmony and Ecrin software (Pressure Transient Analysis) - In house experts (Cordill, Browning) and in house 1/2 day training with both still need to go to a PTA 1 week Ecrin course next year | Harmony - 2/13<br>Ecrin - 7/20 |
| Nexus | Simulation software - In house experts and on the job training (Beecher and Dobbs) | Ongoing |
| Training | TecPlot Training (1 Day). Completed 11/8; Petrolook Training (1/2 day) Completed 7/23; Attended Gemini Solutions User conference (1Day); RAMP - Ongoing weekly meetings focused on petro physics and core analysis; On-line Incident Command 100 & 200 | Techplot 11/18<br>Petrolook 7/23<br>Gemini User Confernce 10/22<br>ICS 100 & 200 YE |

**Step 5: Performance Review Signatures** - The employee, supervisor, and next level supervisor's signature are required. After the performance review meeting, the employee being assessed may add comments to his/her Performance Review Form before signing that they have received the form and had a performance review conversation. The final document must be returned to the supervisor.

Case 4:17-cv-02289 Document 158-1 Filed on 07/24/19 in TXSD Page 38 of 185

Anadarko Petroleum Corporation

# 2012 Performance Review Process Form

| Employee's Signature [signature] | Date: 1/23/2013 |
|---|---|

**Employee's Comments:**

Good Feedback, - looking forward to another good year

| Supervisor's Signature [signature] | Date: 1/23/13 |
|---|---|

**Supervisor's Comments:** Lea distinguished herself this year by taking strong initiative (focusing the Flow Calculation Team during the Fall GOM spill drill), doing excellent analytical work (Blind Faith productivity and reserve analysis), and determinely driving the Shadowcat Prospect to the approval and drill ready stage. She did this plus field surveillance, budgeting, and portfolio while being the sole Reservoir Engineer in the group for 7 months out of the year. In August she also took on the extra burden of mentoring a new hire RE. Lea is has a fantastic work ethic and has a broad sphere of influence.

An areas to focus on is to listen for understanding. Many times you can talk over someone that is trying to tell you something important.

| Next Level Supervisor's Signature [signature] | Date: 1/28/2013 |
|---|---|

**Next Level Supervisor's Comments:**

# Anadarko 2013 Performance Review Process Form for Lea Frye

**Employee Information**

| | |
|---|---|
| Name: | Lea |
| Last Name: | Frye |
| Position Title: | Sr Staff Reservoir Engineer |
| Org Unit ID: | Eastern GOM (10000266) |
| Supervisor: | Danny Hart |
| HRBP: | Dalon Schuckman |
| Grade: | 88 |

**Confirmation of Mid-Year Discussion**

☑ Select checkbox when mid-year discussion has occurred.

**Date** 07/30/2013

**Values**

**Commercial Focus**

**Rating by Danny Hart:**

**Supervisor Rating*:** E - Exceptional

**Rating by Lea Frye:**

**Employee Rating*:** E - Exceptional

**Comments by Mike Ferfon:**
Strong commercial focus demonstrated in a role that has this as it's primary objective within a DW GOM asset team. Your work on pushing Shadowcat forward and the Blind Faith NPV Rationalization efforts is commendable.

**Comments by Lea Frye:**
I have a strong track record of doing my very best, as well as bringing out the best in both people and teams. Consider the team interactions and work done around the Shadowcat project. Not only did I maintain the highest standards for my own work, but I spent a considerable effort helping the others I was working with to also perform at the same high level. The fact that others come to me for help and advice on a regular basis demonstrates the level of knowledge sharing I am known for. I am always keeping the big picture in mind when completing any evaluation, and incorporate that into my analysis.

**Comments by Darrell Hollek:**
*No comments*

**Comments by Dalon Schuckman:**
*No comments*

**Integrity and Trust**

**Rating by Danny Hart:**

**Supervisor Rating*:** E - Exceptional

**Rating by Lea Frye:**

**Employee Rating*:** E - Exceptional

**Comments by Lea Frye:**
This one is simple. I have been here eight years, and am well known throughout the company. For that entire time I have always upheld the highest standards in business integrity and ethics. I am known as someone who gets things done and done on time. Prioritizing is the key, and when I prioritize I always take in to account internal and/or external deadlines and potential value impact to the company.

**Comments by Mike Ferfon:**
You work with a high level of integrity and I alkways trust that you are putting in your best effort on projects.

**Comments by Darrell Hollek:**
*No comments*

**Comments by Dalon Schuckman:**
*No comments*

**Open Communication**

**Rating by Danny Hart:**
**Supervisor Rating*:** A - Acceptable

**Rating by Lea Frye:**
**Employee Rating*:** A - Acceptable

**Comments by Lea Frye:**
I try hard to practice this skill as I have found that teams work better with open communication and that more is usually accomplished with face to face communication whenever possible. I make it a point to visit with people I work with frequently and with other peers to discuss technical matters. While I have not perfected this skill, I do feel accomplished at communication with my co-workers and peers as people often visit me for advice and guidance.

**Comments by Mike Ferfon:**
Open Communication is important in the DW RE role as it is a natural nexus for workflows to converge and be driven from. You are a very consistent communicator in meetings and with your direct as well as indirect coworkers. One item to possibly have awareness of is how you make your points and opinions in very rare instances where it can be abrupt. Smoothing out that delivery can allow more focus on the content of what you are saying.

**Comments by Darrell Hollek:**
*No comments*
**Comments by Dalon Schuckman:**
*No comments*

People and Passion

**Rating by Danny Hart:**
**Supervisor Rating*:** A - Acceptable

**Rating by Lea Frye:**
**Employee Rating*:** E - Exceptional

**Comments by Lea Frye:**
I come to work to get things done, and I expect that should be evident to those who work with and around me. I push hard, and work every day to do better than the day before. Part of what drives me is to keep learning to do better, and frankly the challenge of all the unknowns on every project we do is a big driver for me. I enjoy the learning part of this job, and take every opportunity I can to improve my knowledge and skills.

One thing that I think is very unique about me is that I have forged very good working relationships with individuals in virtually every segment of our company. I have found that people differ quite a bit, and by taking note of what is important to different individuals, I can relate to them better, be a better work partner, and motivate them to do their best work. In my mentoring roles, I am trying to pass this along, as it can do a lot to improve performance of the various work teams that we all participate in.

**Comments by Mike Ferfon:**
Your passion for your work is evident and consistent.
**Comments by Darrell Hollek:**
*No comments*
**Comments by Dalon Schuckman:**
*No comments*

Servant Leadership

**Rating by Danny Hart:**
**Supervisor Rating*:** A - Acceptable

**Rating by Lea Frye:**
**Employee Rating*:** E - Exceptional

**Comments by Lea Frye:**
My starting point is that I work very hard to do what people ask or need me to do. I feel strongly that before I can ask others to perform at their highest level, I need to be demonstrating that by my own work. From there, I am not afraid to ask, or to expect others to also perform at a high level. On a regular basis, I share what I know with others, even when the help they need is not related to my direct work. I have experience in multiple areas of the company, and am still considered a resource to many of the people in those areas. This practice has also helped at times when I need assistance from the other segments of the company, and I feel that people will go out of their way to assist me when

needed do in a large part to their appreciation to my style of helping others.

This expands further to the idea of working in teams. People know that I trust them and their expertise to do their jobs well, and they also know that I expect it of them. They also know that they can rely on me to deliver on my side. I respect the opinions and input of others, but I am not afraid to stand up for things I feel are important, or critical to project success. My approach is to credit others as much as possible, and by helping others to succeed at their roles, to help guide the team to succeed in accomplishing great things for the company

**Comments by Mike Ferfon:**
High expectations come with the Sr Staff Engineering position in this Value and it speaks high of you to have achieved this level on the early end. Good examples of you giving credit to your team members and other groups for contributions directly related to your work was recognized. Also, be aware to credit those before you as well when it is due. Your recent initiative of making the region aware of the intricacies and timing issues associated with getting an approved EP through the BOEMRE is commendable.
**Comments by Darrell Hollek:**
*No comments*
**Comments by Dalon Schuckman:**
*No comments*

**Goals**

**Goal Name:**
[redacted]
**Goal Description:**
**Measurement Source:**
[redacted]

| Status: | Start: | Due: |
|---|---|---|
| On Target | 07/01/2013 | 10/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Volumes: [redacted]

Capex: [redacted]

**Comments by Mike Ferfon:**
[redacted]
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
[redacted]
**Goal Description:**
**Measurement Source:**
[redacted]

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations

**Comments by Lea Frye:**
[redacted]

**Comments by Mike Ferfon:**
[redacted]

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Alink submittals:
**Goal Description:**
**Measurement Source:**
minimum of 3 submittals with a stretch of 5 submittals

| Status: | Start: | Due: |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Year to date I have submitted two quality A-links topics which many peers have commented on as easy to follow and understand while still delivery a key message or learning. One of theses topics received a certificate of appreciation for "featured content" in February. I still am on target to meet my goal of three submittal, as I have another presentation in works to highlight the EPA air permitting requirements and the impact on timing and drilling operations for those project East of the 87.5 degree longitude.
**Comments by Mike Ferfon:**
These contributions are very educational and valuable to the corporation for transfer of knowledge. Keep up the great work in this area.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Training:
**Goal Description:**
**Measurement Source:**
Re certify for water survival, Nexus software training, SPE or OTC conference attendance and time permitting Kappa software training and/or Nautilus course.

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Completed Nexus Training (3/25-3/29); Offshore Water Survival (8/16) and Nautilus Course (6/17 -6/26)
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
[redacted]
**Goal Description:**
[redacted]
**Measurement Source:**
[redacted]

| Status: | Start: | Due: |
|---|---|---|
| | 07/01/2013 | 10/31/2013 |

Case 4:17-cv-02289 Document 118-1 Filed on 07/26/20 in TXSD Page 93 of 185

**Rating by Danny Hart:**
**Supervisor Rating*:** 1 - Exceeds Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations

**Comments by Lea Frye:**
[redacted]

**Comments by Mike Ferfon:**
I really appreciated the level of scrutiny with which you approached this evaluation with the team, breaking down the value proposition into components that made it easy to see what the inherent risks were versus the reward. This work provided a nice buffer of comfort when it came time to [redacted]

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
[redacted]
**Goal Description:**
**Measurement Source:**
[redacted]

| Status: | Start: | Due: |
|---|---|---|
| Will Not Meet | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Other higher priority worked pushed this goal to the back burner. However, progress has been made toward [redacted]

**Comments by Mike Ferfon:**
Understandable on the priorities. One thing to consider for these types of evaluations is that even if there is not a final product from the G&G staff, a basic, high level analysis can still be framed up that might be essential in directing your colleagues thinking on the interpretation side. Early RE input can be beneficial whenever possible.

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Mentoring
**Goal Description:**
Continue to mentor new hire reservoir engineer; focusing mainly on application of technical skills in EGOM, assisting with software knowledge training and most emphases on everyday processes for EGOM base production and new developments. Continue to assist with IHUB simulation evaluations for existing and future IHUB fields.
**Measurement Source:**
Quality of work performed by mentoree

| Status: | Start: | Due: |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations

**Comments by Lea Frye:**
My main focus on mentoring was processes, fundamentals of software, where to find needed data and introduction to in house experts. My mentoree is performing high quality work and making relationships with our in house experts to help guide the work. Not only have I mentored within our EGOM group but I have also mentored other GOM engineers throughout the year. Early in the year I held a mini PEEP training session for a few of the new reservoir engineers and I have helped some of the less experienced engineers by acting as a sounding board for their technical work.

**Comments by Mike Ferfon:**

Thanks for your contributions here. I know the GOM Leadership Team sees this as essential for the Sr Staff level and your efforts are recognized.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
WCD Team Advisor
**Goal Description:**
Advise WCD team with the development of WCD best practices and work flows.
**Measurement Source:**
Advise WCD team with the development of WCD best practices and work flows.

| **Status:** | **Start:** | **Due:** |
|---|---|---|
| On Target | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Continue to advise worst case discharge team with recommended work flows utilizing the Gemini Solutions software. Assisted early in the year with recommended data capture and data quality to be used in the calculations which is part of the final recommended WCD work flow rolled out to all GOM engineers.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Flow Engineering Team
**Goal Description:**
Actively participate and assist in developing spill drill best practices and procedures for flow team (Ongoing).
**Measurement Source:**

| **Status:** | **Start:** | **Due:** |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
Participated in the annual exercise required for the flow engineers team. This exercise took place on 11/5/2013.
**Comments by Mike Ferfon:**
Thanks for your continued participation in this process which is essential to us continuing to operate in the GOM.
**Comments by Danny Hart:**
*No comments*

**Goal Name:**
AFE clean up
**Goal Description:**
Close out old AFEs and supplement as needed for all EGOM assets.
**Measurement Source:**
Close out old AFEs and supplement as needed for all EGOM assets.

| **Status:** | **Start:** | **Due:** |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations

**Comments by Lea Frye:**
With the help of our engineering tech, my colleague and I have all EGOM AFEs with compliance for supplement guidelines and closed all outdated AFEs to prevent additional charges form hitting them with out being notified. This effort has made cost tracking manageable for our team and those that will follow.

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
[redacted]

**Goal Description:**
[redacted]
**Measurement Source:**
[redacted]

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 1 - Exceeds Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations

**Comments by Lea Frye:**
[redacted]

**Comments by Mike Ferfon:**
One of your main strengths is in driving processes and this was clearly on display here. [redacted]

**Comments by Danny Hart:**
*No comments*

**Goal Name:**
Miscellaneous
**Goal Description:**
Capture of accomplishments not in original goals
**Measurement Source:**

| Status: | Start: | Due: |
|---|---|---|
| Complete | 01/01/2013 | 12/31/2013 |

**Rating by Danny Hart:**
**Supervisor Rating*:** 2 - Meets Expectations

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations

**Comments by Lea Frye:**
High Rate Well Productivity Initiative Team: Functioned as team lead for the Brownfield Team. The Brownfield team deliverables included case studies of operated and non operated assets with lessons learned and threat analysis flow diagrams for the most common productivity threats with recommended monitoring and mitigation plans for the reservoir, tubing/completion, flowline and topsides. These deliverables were used to identify areas of strengths and weakness in our operation philosophy which was presented to the steering committee, worldwide operations and GOM operations.

Knowledge Share: Worked closely with my Cesar Tonga counterpart and several in house experts on [redacted]

**Comments by Mike Ferfon:**
Thanks for your contributions with this initiative. It is always good to shine light on what best practices should be.

**Comments by Danny Hart:**
*No comments*

**Individual Development Activities**

**Combined Year-End Rating**

**Combined Year-End Rating A2 - Acceptable/Meets Expectations**

Section Comments:

**Comments by Mike Ferfon:**

Lea had a very strong year coming off the heals of a well deserved promotion to Sr Staff Engineer where the bar is raised significantly. Her strengths are clearly in consistent solid work ethic, driving processes, and in project evaluations. One thing to consider is to continue to add technical tools to the toolbox in application to grass roots technical analysis. Your consistent, methodical approach to your work is a primary reason I recommended you for the Shenendoah assignment where I feel you will bring even more value.

# Anadarko 2014 Performance Review Process Form for Lea Frye

## Employee Information

**Year-End Instructions:**
Employee must rate each value and goal listed in the sections below. Use the comment fields to give detailed examples.
Supervisor must rate each individual goal and value and must select an overall rating and enter overall comments. Supervisor may use the comment fields for individual goals and values as needed.
Click here for more information on the Performance Review Process.

| | |
|---|---|
| Name: | Lea |
| Last Name: | Frye |
| Position Title: | Sr Staff Reservoir Engineer |
| Org Unit ID: | Operations Eastern Gulf of Mexico (10000259) |
| Supervisor: | Pat McGrievy |
| HRBP: | Dalon Schuckman |
| Grade: | 88 |

## Values

Review each of the core values below.

For more information, click here - Core Values Expected Behaviors Guide.

### Commercial Focus

**Rating by Pat McGrievy:**
Supervisor Rating*: E - Exceptional
**Supervisor Comments:**

Lea has demonstrated her commercial focus time and time again through her engineering and economic work on the Shenandoah project and also reflected in the GOM studies such as the Brownfield high rate Initiative. This was a study which she helped to coordinate. The results will be rolled out in Q1, 2015 and should be an excellent tool to help other reservoir and production engineers manage the many brownfield wells in the GOM. She's clearly the lead when it comes to coordinating the efforts of the Shenandoah Team. She continues to be very holistic in her thought process and understands the big knobs that drive the commercial solutions and ultimate decisions. She consistently challenges the status quo and is a highly respected "big picture" thinker. I have a high regard for Lea and her commercial skill sets.

**Rating by Lea Frye:**
Employee Rating*: E - Exceptional
**Employee Comments:**
I am always keeping the big picture in mind and encouraging team members to the same. Anticipating what comes next and planning ahead for the decision that will be required is important and something I do well. The decisions we make are not always straight forward as many factors influence the outcome, so I endeavor to understand all the risks and the rewards and way them against each other before recommending a course of action on all projects I work.

## Integrity and Trust

**Rating by Pat McGrievy:**

Supervisor Rating*: E - Exceptional

**Supervisor Comments:**

SInce joining the Foldbelt Team in late 2013 as subsurface team lead for Shenandoah, Lea has developed a strong professional relationship with both her fellow Foldbelt Team and her Shenandoah subsurface project for which she leads. Lea plans her business well & sets priorities and everyone on the immediate and extended Shenandoah team knows their responsibility and how they can impact the project. She is a trusted technical contributor who readily helps others get organized; laying out goals, objectives and largely corriographing each internal and external partnership meeeting that she organizes and participates. She produces positive value-added results under just about any situation that she's dealt. She tells the truth no matter circumstances-she has exceptional judgement on how/when to present sensitive material.

.

She continues to establish herself amongst her peers to be reliable, conscientious and one with high moral standards. She has clearly earned the trust and respect of her peers and extended Shenandoah team.

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Employee Comments:**

I have always upheld the highest standards in business integrity and ethics. I am known as an individual whom speaks truthfully based on the knowledge at hand and who is willing to admit to my errors. I will not be swayed to bend the truth to fit a purpose. I am known as someone who gets things done and done on time.

## Open Communication

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea relates well to others as demonstrated by the broad spectrum of potentially challenging and opinionated personalities (drilling, completions, project engineers) that she works with on the Shenandoah surface and subsurface teams on a routine basis. She effectively articulates opinions/ideas to all audience types and is always timely in her delivery of information to others. She also listens appropriately to others opinions. She is effective at providing the right lelvel of information based on the audience and eagerly seeks others opinions and knowledge to ensure that their sentiments are heard and well-understood..

**Rating by Lea Frye:**

Employee Rating*: A - Acceptable

**Employee Comments:**

I continue to practice this skill as I have found that teams work better with open communication. On my current project, I have orchestrated a multi-discipline team meeting held weekly to promote face to face communication. While it is not always easy to keep the peace, the communication has helped each discipline to see how decisions impact each other and learn to compromise for the greater good. These meetings have also served as a great avenue on practicing how to communicate effectively in preparation for partner meetings. While I have not mastered all these skills I feel I have made progress toward being a role model for others.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 99 of 185

## People and Passion

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea has a quick action for results (no matter the timeframe). Readily volunteers for opportunities beyond her primary job (i.e. Brownfield high rate well initiative; Subject Expert for A-Links) . She has an energy toward challenges-take on many "process improvement" tasks for the benefit of the team.

In addition, she effectively builds and maintains respectful and positive working relationships with her immediate and extended teams. She treats people fairly and has a passion for her work and for the success of the team and for the company. Lea has a strong personality, however, (which is good as she readiliy stands for what she believes) and obviously has a real passion for her work, but at times her outspoken passion may be construed by others to be slightly condescending at times.

**Rating by Lea Frye:**

Employee Rating*: E - Exceptional

**Employee Comments:**

My passion for my work is evident in the work product delivered. I strive to improve in every aspect from technical to business acumen and relationships with my peers. I push hard, and work every day to do better than the day before. Part of what drives me is pride in a job well done as well as a pure thirst for unraveling the mysteries of the subsurface world.

Working relationships are important to me, I strive to build and grow relationships based on honesty and trust. I enjoy learning what motivates individuals and harnessing this knowledge to achieve great things as a team.

## Servant Leadership

**Rating by Pat McGrievy:**

Supervisor Rating*: A - Acceptable

**Supervisor Comments:**

Lea acts in the company's best interest over her own personal interests. She generally makes others feel valuable. She assesses her peers individual motivator's to get the best results and she can easily relate to any team member regardless of personality differences. Humility- always shares credit, uses "we" & "us". She usually uses clear/strategic judgement on picking her battles and "calling in favors". Request of her colleagues usually come first, no matter what extra effort that may call for in completing tasks on/before the deadline.

**Rating by Lea Frye:**

Employee Rating*: A - Acceptable

**Employee Comments:**

I work hard to anticipate what people need from and me to deliver an accurate timely product. I strive to perform at my highest level always and have found that by doing so this motivates other to do the same. I make every attempt to give time help others, even when the help they need is not related to my direct work.

I respect the opinions and input of others, but I am not afraid to stand up for things I feel are important, or critical to project success. My approach is to credit others as much as possible, and by helping others to succeed at their roles, to help guide the team to succeed in accomplishing great things for the company.

## Goals

Goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

**Goal Name:** [redacted]

**Goal Description:** Goal Description: [redacted]

**Measurement Source:** Phase 1: 3rd Quarter 2014
Phase 2: YE 2014
Phase 3: 2015

**Status:** On Target **Start:** 01/01/2014 **Due:** 12/31/2014

**Progress:**

[redacted]

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**

[redacted]

**Rating by Lea Frye:**

Employee Rating*: 2 - Meets Expectations

**Employee Comments:**

[redacted]

[redacted]

Lea has been very busy as her time has been consumed with effectively managing the Shenandoah technical team as well as directing the study of the high rate well initiative. Her ability to go above and beyond in delivering is very commendable and highly-appreciated by management.

[redacted]

**Goal Name:** [redacted]
**Goal Description:** [redacted]
**Measurement Source:** [redacted]
**Status:** On Target **Start:** 01/01/2014 **Due:** 12/31/2014

**Progress:**
[redacted]

**Rating by Pat McGrievy:**
Supervisor Rating*: 2 - Meets Expectations
**Supervisor Comments:**
Lea has been the point for both the exploration and development teams for data gathering (fluids and core data) and collaborating with other technical experts such as Nikhil Joshi (FA) and Jonn Cromb (completions needs), among many other disciplines, to ensure that all disciplines requirements are achieved to move the project forward. Lea also periodically consults with Brad Browning, who has a wealth of experience on data gathering and management.

**Rating by Lea Frye:**
Employee Rating*: 2 - Meets Expectations
**Employee Comments:**
[redacted]

**Goal Name:** [redacted]
**Goal Description:** [redacted]
**Measurement Source:** [redacted]
**Status:** On Target **Start:** 01/01/2014 **Due:** 10/31/2014

**Progress:**
[redacted]

**Rating by Pat McGrievy:**
Supervisor Rating*: 1 - Exceeds Expectations
**Supervisor Comments:**
[redacted]

**Rating by Lea Frye:**
Employee Rating*: 1 - Exceeds Expectations
**Employee Comments:**
[redacted]

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 101 of 185

[redacted]

[redacted]

**Goal Name:** Inter Disciplinary Communication
**Goal Description:** Participate and attend monthly EXP and DEV meetings. Influence next appraisal well placement based on parametric studies. Collaborate and work with all key disciplines (drilling, completions, production, 20 K technology group and facilities) to ensure data transfer and communication.
**Measurement Source:** On going through out the project

**Status:** On Target **Start** 01/01/2014 **Due:** 12/31/2014

**Progress:**
Internal surface/subsurface meetings have been a great avenue for communication among the team. This has spurred many great ideas and discussion around focus for the project.

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**
Lea has demonstrated strong leadership skills in the technical management and advancement of this project. She has done a real good job of keeping the technical staff aligned with her weekly luncheon technical staff meetings with both the the Shenandoah subsurface and project-related teams. without this meeting, internal alignment would've been difficult. Her strengths in these meeting settings are her ability to keep the meetings on point and to force discussions and solutions on some of the more challenging and contentious issues such as completion practices and flow assurance. Her effective work relations with the exploration team has also reaped benefits in influencing appraisal well locations. The Shenandoah project team maintains communication with the exploration team through monthly technical meetings and bi-lateral communication to apraisa both teams on project advancements and plans forward. Again, Lea usually has the lead on the development side for these meetings.

**Rating by Lea Frye:**

Employee Rating*: 1 - Exceeds Expectations

**Employee Comments:**
Openly communicating with exploration team about development team work and resulting subsurface interpretations. Several formal and informal meetings were held to share our thoughts and ideas around the subsurface uncertainties as related to appraisal and data capture and the potential impact on sanction timing. Led basin pressure interpretation meeting which ultimately led to the current appraisal well bottom hole location [redacted]
Organize weekly surface/subsurface meetings held to transfer knowledge and generate discussion between disciplines. These meetings have been an effective means of identifying key decisions points, key risks and potential gaps in technology and/or studies. Furthermore, the meetings lead to two workshops geared toward defining a dry tree base case and a wet tree base case for comparative purposes along with key sensitivities/differences to be explored in order gain alignment amongst the team as the project prepares to move from feasibility studies to concept select. This alignment will better define the path forward as we move through 2015 and make some major decisions that will work toward narrowing down to a single development concept for concept select.

**Goal Name:** Partner Meetings
**Goal Description:** Coordinate initial April 2 and all subsequent quarterly subsurface partner meetings. Coordinate partner alignment kick-off meeting scheduled for late April. Responsible for presentation content for subsurface parametric studies as well as updates on other on-going studies to keep partners informed and aligned. Maintain collaboration with partners throughout all project phases. Utilize Live Link as a tool to share and communicate with partners.
**Measurement Source:** Quarterly Meeting through 4Q 2014. Feedback from team and partners on delivery of presentations and collaboration.

**Status:** On Target **Start** 01/01/2014 **Due:** 12/31/2014

**Progress:**
Continue to collaborate with partners on development ideas and leverage their expertise/manpower as needed to satisfy project needs.
On target to complete all quarterly partner meetings by December.

**Rating by Pat McGrievy:**

Supervisor Rating*: 1 - Exceeds Expectations

**Supervisor Comments:**
Lea has lead or has helped to coordinate each of the quarterly partner meetings (subsurface and surface-facility project meetings) throughout the 2014 evaluation period. She also routinely communicates, interfaces and collaborates with her technical counterparts with the other company's which make up the Shenandoah partnership. Her

**Rating by Lea Frye:**

Employee Rating*: 1 - Exceeds Expectations

**Employee Comments:**
Coordinate agendas and partner presentation material for all partner meetings. This is an important role as partners expect clear, concise and timely communication about the project. To date, Anadarko has hosted six partner meetings with great success. Partners have been very complimentary of the meetings and the progression of the project

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 102 of 185

ability to manage these meetings on the techncal level and provide the proper level if information to the partnership has been commended by many who have attended these meetings. This perhaps is the most time-consuming and most important role for Lea. She has conducted herslf quite well in meeting management skills and has demonstrated her leadership skills amongst her peers. The most recent meeting, held in November was a two day partner alignment workshop and the feedback from the partnership was very good. Despite the complexity of this project and the potential for misalignment, I'm very pleased with where this project is headed and it can be directly related to the work that Lea has done and

through the feasibility stage. Anadarko will host two workshops mid-November to gain alignment with partners going in to concept select early in 2015 carrying two main development concepts to be compared. The project team has prepared for this with the two internal workshops held on 10/23 and 10/27.

**Goal Name:** Progress Shenandoah Discovery

**Goal Description:** [redacted]

[redacted]

**Measurement Source:** [redacted]

**Status:** Off Target

**Start:** 01/01/2014

**Due:** 12/31/2014

**Progress:**

[redacted]

**Rating by Pat McGrievy:**

**Supervisor Rating*:** 1 - Exceeds Expectations

**Supervisor Comments:**

Lea has done a very admirable job of progressing and directing the multiple teams that make up the Senandoah project. This arguably is the most complex and challenging projects in the history of APC from all angles. [redacted]

Despite the litany on challenges of this project, Lea has been essentially been flying solo as a reservoir engineer, managing and directing traffic for her counterparts on the Shenandaoh team. She has done a very commendable job for the Shenandoah project.

**Rating by Lea Frye:**

**Employee Rating*:** 2 - Meets Expectations

**Employee Comments:**

[redacted]

[redacted]

## Individual Development Activities

Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

**Category: Development Activities**
**Development Activity Name:** In-House Formal Training
**Value :** Open Communication,
People and Passion,
Servant Leadership
**Description :** Attend the following courses: Project Management, Livelink training and ACES training if available this year
**Measurement Source :** Complete by 3Q 2014
**Start:** 01/01/2014 **End :** 12/31/2014 **Status :** On Target
**Progress :**

**Supervisor Comments:**
Lea has successfully completed these needed training courses.

**Employee Comments:**
Goal Meet

**Category: Development Activities**
**Development Activity Name:** Training/Conference
**Value :** Commercial Focus
**Description :** Attend Formation Damage Course, OTC , internal reservoir characterization meetings and other conferences or training opportunities of interest and applicability as time permits.
**Measurement Source :** Complete by 4Q 2014
**Start:** 01/01/2014 **End :** 12/31/2014 **Status :** On Target
**Progress :**

**Supervisor Comments:**

Lea has completed the formation damage seminar which proved to be valuable in her work on the high rate well initiative.

**Employee Comments:**
Goal Meet

## Combined Year-End Rating

Determine the alpha and numeric rating for goals and core values.

**Combined Year-End Rating A1 - Acceptable/Exceeds Expectations**

Section Comments:

**Supervisor Overall Comments:**

As her rating indicates (A1), Lea had a very strong year in a leadership capacity as the team lead at Shenandoah. Her strengths are her ability to skillfully and diplomatically drive processes and people without collateral damage; effectively manage her project work and reliably meet deadlines; and consistently exude strong work ethic for which she is a role model. Lea's ability to effectively manage and progress the Shenandoah project to its current state, is highly commendable given the various strong personalities and the many obstructions that have been encountered in 2014. I'm confident that she will continue to function at this high level in 2015. I'm feel fortunate to have her on my team.

**Employee Overall Comments:** *No comments*

## Signatures

The employee's signature indicates the employee and supervisor have had the performance discussion.

Manager: *Pat McGrievy* *01/26/2015*
Pat McGrievy

Employee: *Lea Frye* *01/27/2015*
Lea Frye

Case 4:17-cv-02289 Document 113-1 Filed on 07/20/20 in TXSD Page 104 of 185

Section Comments:

| Supervisor Signature Comments: | Employee Signature Comments: |
| --- | --- |
| *No comments* | 2014 was a great year full of new learning opportunities for me as the subsurface lead for the Shenandoah development team. I have grown in strength in my knowledge of deep-water developments through the interactions I have had with my peers, the facilities team and the 20A team. A special thank you for the support of my colleagues and my supervisor as we faced many challenges in 2014. I am proud of the work accomplished by all involved and look forward to 2015. |

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 103 of 183

# Anadarko 2015 Performance Review Process Form for Lea Frye

## Employee Information

**Year-End Instructions:**
Employee must rate each value and goal listed in the sections below. Use the comment fields to give detailed examples.
Supervisor must rate each individual goal and value and must select an overall rating and enter overall comments. Supervisor may use the comment fields for individual goals and values as needed.
Click here for more information on the Performance Review Process.

Name: Lea
Last Name: Frye
Position Title: Sr Staff Reservoir Engineer
Org Unit ID: Operations Eastern Gulf of Mexico (10000259)
Supervisor: Pat McGrievy
HRBP: Dalon Schuckman
Grade: 88

## Values

Review each of the core values below.

For more information, click here - Core Values Expected Behaviors Guide.

### Commercial Focus

**Rating by Pat McGrievy:**

**Supervisor Rating*:** E - Exceptional

**Supervisor Comments:**
Year in and year out, Lea continues to demonstrate her commercial focus through her engineering and commercial work at Shenandoah, which is unquestionably one of the most complex projects from a number of fronts in Anadarko's portfolio. She's clearly the beacon when it comes to leading and coordinating the technical and commercial efforts of the team. She approaches problems with a strong technical and business decision perspective. She continues to be very holistic in her thought process and understands and has a command on the big knobs that drive the commercial solutions and ultimate decisions. She consistently challenges the status quo with her well respected "big picture" thought process. I have a great deal of respect for Lea's technical and commercial skill sets.

**Comments by Dalon Schuckman:**
*No comments*

**Rating by Lea Frye:**

**Employee Rating*:** E - Exceptional

**Employee Comments:**
One of my strengths is my ability to keep the big picture in mind. This lends well to my current role on the Shenandoah project team which has a large multi discipline team all working toward a common goal, a sanction decision. This year was more challenging then most given the price environment but as team I feel we have made good choices to continue down the path at a reduced speed.

## Integrity and Trust

**Rating by Pat McGrievy:**

**Supervisor Rating*:** E - Exceptional

**Supervisor Comments:**

Lea continues to be a very dependable team player for the Shenandoah Team. She is considered to be reliable and conscientious by her peers and one with high moral standards and solid work ethic. Along these same lines, Lea is always one to be direct and truthful and one with a balanced conviction, despite the fact that her opinions and technical positions toward the project may not be of popular opinion.
She consistently delivers high quality results on all of her project work.

**Comments by Dalon Schuckman:**

*No comments*

**Rating by Lea Frye:**

**Employee Rating*:** E - Exceptional

**Employee Comments:**

I have always upheld the highest standards in business integrity and ethics. I am known as an individual whom speaks truthfully based on the knowledge at hand and who is willing to admit to my errors. I will not be swayed to bend the truth to fit a purpose. I am known as someone who gets things done and done on time.

## Open Communication

**Rating by Pat McGrievy:**

**Supervisor Rating*:** A - Acceptable

**Supervisor Comments:**

Lea is very confident individual who is not shy about vocalizing her thoughts and opinions internal and external to the team, despite whether or not it is of popular opinion. Her viewpoints, however, are usually spot-on, however. Her technical strengths and influential abilities play well at partnership meetings when positions need to be established.
Her opinions, however, are usually well-balanced. She is usually timely on delivering information to those who need information to make informed decisions. Lea usually practices diplomacy and tact in stressful or confrontational situations and is always one to listen to another person's position before responding with her own opinions. Lea is well-balanced on seeing and respecting other people's positions and opinions.

**Comments by Dalon Schuckman:**

*No comments*

**Rating by Lea Frye:**

**Employee Rating*:** A - Acceptable

**Employee Comments:**

I strive to foster open communication with my counterparts. Communicaiton is important to me but has always been a skill set that does not come easily. With each interaciton, meeting and presentation I strive to improve and hope that the effort I give shows. I know there is still room for improvement and I will continue to work in this area.

## People and Passion

**Rating by Pat McGrievy:**

**Supervisor Rating*:** N - Needs Development

**Supervisor Comments:**

Lea consistently demonstrates this value with her fellow colleagues in support of their work and efforts during presentations and reviews. She generally is the one to take the lead in building the strategy and organizing the presentation materials for the team. Lea is also extremely passionate about the success of the projects which she supports, as she does a real good job of working with extended team members as she seeks out and usually obtains the right level of detail and information from them.
Area for Improvement: Lea understands the value of building strong professional relationships and she clearly shows unquestionable passion for the success of the project but on occasion her passion can manifest itself openly visible through frustration and an increased level of temperament. She just needs to take a deep breath and relax in tense situations. This can create results which are counteractive to her intentions.

**Comments by Dalon Schuckman:**

*No comments*

**Rating by Lea Frye:**

**Employee Rating*:** A - Acceptable

**Employee Comments:**

I come to work to get things done, and I expect that should be evidentto those who work with and around me. I push hard, and work every day. Part of what drives me is I enjoy the learning part of this job, and takeevery opportunity I can to improve my knowledge and skills.

One thingthat I think is very unique about me is that I have forged very good workingrelationships with individuals in virtually every segment of ourcompany. I have found that people differ quite a bit, and by taking noteof what is important to different individuals, I can relate to them better, bea better work partner, and motivate them to do their best work.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 107 of 185

## Servant Leadership

**Rating by Pat McGrievy:**

**Supervisor Rating*:** A - Acceptable

**Supervisor Comments:**

Lea has been a contributor to a number of GOM initiatives in 2015; examples are the GOM Miocene High Rate Potential wells initiative as well as assisting in multiple spill drills as an RE supporting the flow control group. She demonstrated strong mentoring skills with the summer intern, who was on the borderline of a job offer, as well as Wendy Redpath (new RE for Shenandoah) and also Corrie Beard who she helped mentor in Worst Case Discharge processes. She also work quite closely with Nikhil Joshi, who she helped broaden his awareness and skills sets of being an RE. There have been numerous mentorships with other engineers throughout the year. In general, she recognizes the importance of improving the technical qualities of her immediate and extended team members as the project will ultimately benefit from the time she devotes to mentoring the lesser experienced.She also shares opportunities with her peers to present technical and commercial information to senior management. Generally she is very unselfish in this regard. One more point is that she recognizes team successes is demonstrated by her initiation of "after work happy hours" and for the team to relax and reflect on recent wins. .

**Comments by Dalon Schuckman:**

*No comments*

**Rating by Lea Frye:**

**Employee Rating*:** A - Acceptable

**Employee Comments:**

I work very hard to do what people ask or need me to do. I feel strongly that before I can ask others to perform at their highest level, I need to be demonstrating that by my own work. From there, I am not afraid to ask, or to expect others to also perform at a high level.
I am willing to help others on projects even when not related to my direct work as I have experience in multiple areas of the company. This practice has also helped at times when I need assistance from the other segments of the company, and I feel that people will go out of their way to assist me when needed due in a large part to their appreciation to my style of helping others.

## Goals

Goals should be specific, measurable, attainable, relevant and time-bound. Your goals should be aligned to the corporate goals as well as your department and team goals.

**Goal Name:** Shenandoah EP Submittals and Next Appraisal Well

**Goal Description:** [redacted]

**Measurement Source:** Hand off of EP documentation to regulatory

**Status:** Not Yet Started **Start:** 03/05/2015 **Due:** 08/31/2015

**Employee Progress Notes:**

Plan ot share responsibilty with another engineer due to work load of other critical timing items.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**

**Supervisor Rating*:** 2 - Meets Expectations

**Supervisor Comments:**

[redacted]

**Rating by Lea Frye:**

**Employee Rating*:** 2 - Meets Expectations

**Employee Comments:**

Less progress on this front was made then I would have liked given the workloads associated with the project team. However, the subsurface team has hosted several partner meetings to keep partners informed on progress and request feedback on the next well location options available. [redacted]

**Goal Name:** Progress Shenandoah Parametric Studies
**Goal Description:** [redacted]

**Measurement Source:** Completion of an updated geologic model(s) complete with reservoir model outputs/results

**Status:** On Target **Start:** 01/01/2015 **Due:** 10/01/2015

**Employee Progress Notes:**
Defined scope, goals, and timelines. Set up monthly progress meetings. Geo-models under construction 7/2015 and dynamic modeling strategy in place.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**
**Supervisor Rating*:** 2 - Meets Expectations
**Supervisor Comments:**
[redacted]

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations
**Employee Comments:**
[redacted]

**Goal Name:** Inter Disciplinary Communication
**Goal Description:** Collaborate and work with all key disciplines (drilling, completions, production, 20 K technology group and facilities). Use live link and bi-monthly surface/subsurface meetings to ensure data transfer and communication between teams.

**Measurement Source:** Feedback form colleagues

**Status:** On Target **Start:** 01/01/2015 **Due:** 12/31/2015

**Employee Progress Notes:**
Continued dialog on-going through meetings and workshops. Progressing project team understanding of risks and mitigations through communications.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**
**Supervisor Rating*:** 2 - Meets Expectations
**Supervisor Comments:**
Lea has done a good job of coordinating the efforts and communicating with drilling, completions and facilities teams, inclusive of 20A. Her weekly luncheon meetings have been very effective at keeping everyone informed on the progress of the team.

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations
**Employee Comments:**
Continued to hold surface/subsurface meetings held to transfer knowledge and generate discussion between disciplines. These meetings have been an effective means of identifying key decisions points, key risks and potential gaps in technology and/or studies.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 169 of 185

**Goal Name:** Partner Meetings

**Goal Description:** Coordinate quarterly subsurface partner meetings and co-coordinate quarterly IPT partner meetings. Responsible for presentation content for subsurface parametric studies as well as updates on other on-going studies to keep partners informed and aligned. Utilize Live Link as a tool to share and communicate with partners. Organize workshops as needed to encourage collaboration with partners throughout all project phases.

**Measurement Source:** Quarterly Meetings through 4Q 2016. Feedback from team and partners on delivery of presentations and collaboration.

**Status:** On Target **Start:** 03/05/2015 **Due:** 12/31/2015

**Employee Progress Notes:**
Increased amount of partner communication from standard quarterly updates. Great progress has been made on narrowing differences in interpretations between partners.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**

**Supervisor Rating*:** 1 - Exceeds Expectations

**Supervisor Comments:**
Achieving and sustaining partner alignment has been the theme for the Shenandoah team in 2015 and moving forward. The team has accomplished this priority through a litany of meetings and workshops aimed at keeping our partners informed and enabling critical constant collaboration to occur. Success at Shenandoah relies on our ability to effectively communicate throughout the appraisal and pre-development process through the sanction phase. Lea has been extremely effective in coordinating and conducting these meetings and workshops.

**Rating by Lea Frye:**

**Employee Rating*:** 1 - Exceeds Expectations

**Employee Comments:**
In addition to the already scheduled quarterly meetings the project team hosted many workshops with partners through out 2015. I played a large role in setting agendas, coordinating presentation content and maintaining a unified message at the subsurface hosted workshops. I also participated in the leadership team for the concept select workshops led by the facility project manger. The entire project team dedicated a large effort to keeping partners informed in a timely manner and to encourage collaboration with all the workshops.

**Goal Name:** Progress Shenandoah Discovery

**Goal Description:** [redacted]

**Measurement Source:** Progress toward concept select stage by year end 2015.

**Status:** On Target **Start:** 01/01/2015 **Due:** 12/31/2015

**Employee Progress Notes:**

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**

**Supervisor Rating*:** 1 - Exceeds Expectations

**Supervisor Comments:**

Lea continues to an admirable job of progressing and directing the multiple teams that make up the Shenandoah project. This arguably is the most complex and challenging projects in the history of APC from all angles. [redacted]

Lea has done a very commendable job with the Shenandoah project thus far.

**Rating by Lea Frye:**

**Employee Rating*:** 2 - Meets Expectations

**Employee Comments:**

While the team has had some bumps along the road, at the end of the day, great strides have been made to keep on path while still making the right decision to [redacted]

**Goal Name:** Mentoring
**Goal Description:** Provide mentorship and training to new Shenandoah team members, specifically geared toward a reservoir engineer's roles and responsibilities on the project team. Provide guidance on training and work flows to enable transitioning in to a new role.

**Measurement Source:** Contributions of protégé

**Status:** On Target **Start:** 01/30/2015 **Due:** 12/31/2015

**Employee Progress Notes:**
Mentoring a summer intern in addition to an internal role change engineer.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**
**Supervisor Rating*:** 1 - Exceeds Expectations
**Supervisor Comments:**
Lea spent a great deal of her time in 2015 mentoring a number of engineers. She demonstrated strong mentoring skills with the summer intern, who was on the borderline of a job offer, as well as Wendy Redpath (new RE for Shenandoah) whom she is currently developing. Also, Corrie Beard who she helped mentor in Worst Case Discharge assessments and one who has become very helpful to Lea as a result. She also work quite closely with Nikhil Joshi, who she helped broaden his awareness and improved his skills sets as an RE. There have been numerous mentorships with other engineers throughout the year, too numerous to mention. In general, she recognizes the importance of improving the technical qualities of her immediate and extended team members as the project will ultimately benefit from the time she devotes to mentoring the lesser experienced. She also shares opportunities with her peers to present technical and commercial information to senior management. Generally she is very unselfish in this regard.

**Rating by Lea Frye:**
**Employee Rating*:** 1 - Exceeds Expectations
**Employee Comments:**
Official mentor roles for this past year includes a summer intern and a new reservoir engineer on the Shenandoah project. Through the summer intern mentoring, I demonstrated the ability to develop the skills required to deliver results for a complex project and present said material successfully. While I can not take credit for developing all the skills learned and demonstrated by the summer intern, I did provide the intern with all the tools required to be successful which includes utilizing our internal experts. Looking forward to my second mentor opportunity with a new engineer in the group with past production experience. This project will have many opportunities to help teach new skill sets ranging from economics, project management, well operations and data analysis. Current operations has lent the opportunity to introduce MDT operations and fluid analysis protocols this year.

---

**Goal Name:** Training
**Goal Description:** Attend either a core and special core analysis course and/or a rock mechanics course.
Complete stage 2 project management training. If time permits, attend relavent conference or other training suggested by supervisor for 2015

**Measurement Source:** Completion and implementation of training

**Status:** Will Not Meet **Start:** 04/20/2015 **Due:** 12/31/2015

**Employee Progress Notes:**
No formal training, have been learning as I go through mentorship of peers on project management and rock mechanics. Did attend OTC and several internal Source Control training sessions.

**Supervisor Progress Notes - Preface comments with your name:**

**Rating by Pat McGrievy:**
**Supervisor Rating*:** 3 - Needs Development
**Supervisor Comments:**
Lea's ability to commit and participate in external training classes was challenged by her technical workload in keeping the Shenandoah project on schedule. Non the less, her continued effectiveness as a reservoir engineer depends on spending some time on self development. She should be able to find this time in 2016 as she will have two additional reservoir engineers as support on the Shenandoah Project.

**Rating by Lea Frye:**
**Employee Rating*:** 2 - Meets Expectations
**Employee Comments:**
Completed two internal required training modules for the source control team. No external training this year due to time and budget.

## Individual Development Activities

Review and identify skills and behaviors needed to effectively meet goals. The Development Plan is completed as part of the Performance Review Process.

## Combined Year-End Rating

Determine the alpha and numeric rating for goals and core values.

**Combined Year-End Rating A1 - Acceptable/Exceeds Expectations**

**Section Comments:**

**Supervisor Overall Comments:**
Overall, Lea continues to perform at a high level for the Shenandoah project team. She remains the focal point and coordinator for all technical work relating to the immediate and extended Shenandoah teams. She works well across all disciplines (good technical understanding and drivers of what each team brings to the table) and has built and maintained strong connections with her manager, her counterparts on the drilling, completions, 20A and facility teams as well as the Shenandoah partnership. She has also done quite well in mentoring lesser experienced engineers as evidenced by her work with the summer intern and more recently, getting Wendy Redpath up to speed as an RE on the Shenandoah project. She has clearly earned the technical and professional respect from all who work to support the Shenandoah project.

**Employee Overall Comments:**
*No comments*

## Signatures

The employee's signature indicates the employee and supervisor have had the performance discussion.

Manager: ______________________________
Pat McGrievy

Employee: ______________________________
Lea Frye

**Section Comments:**

**Supervisor Signature Comments:** *No comments*

**Employee Signature Comments:**
*No comments*

# EXHIBIT 6

Seeking Alpha$^{\alpha}$

# Anadarko Petroleum (APC) Robert Al Walker on Q3 2015 Results - Earnings Call Transcript

Oct. 28, 2015 2:55 PM ET
by: SA Transcripts

I think we've done a pretty darn good job of that since 2007, so it's not just all of a sudden we're waking up and trying to do that in 2016.

**Evan Calio - Morgan Stanley & Co. LLC**

Great, that makes sense. And a second question, if I could. Any guidance on 2016 maintenance CapEx or spend to stay flat, which is likely lower due to efficiencies, drawdowns as well as your offshore startups?

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Well, I think the number that we've been using recently, it's probably still an appropriate number and that's about $2.7 billion in terms of that maintenance number you're looking for and that is still a function of lots of things that are assumptions in that including commodity prices and service costs.

So I would call that a good placeholder number, but I don't think there's a lot of precision around it and I'm not sure anybody could give you a lot of precision at any time, when there's as much volatility in the market as there is.

**Evan Calio - Morgan Stanley & Co. LLC**

That's fair. Congrats on the Shenandoah appraisal. Can you discuss how the results compare to pre-drill expectations or comments on reservoir quality and then go-forward plans? I'll leave it at that. Thanks.

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Yeah. Thanks, Evan, for the congratulations. Team did a really good job on that and we're real pleased with it. We got 622 feet of pay, what we ended up doing was we tested up to the north with trying to find out where the basin edge was and the first well established where the basin edge was. Then we came in and drilled to the south with a sidetrack and got the 622 feet of pay.

It was all oil. We encountered no water in that. The reservoir quality in the initial assessment looks pretty – well, it looks comparable to everything else we found out there, so very good reservoir quality. We're still in the early stages of that evaluation. We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well and that's to establish the reservoir quality in the oil column which will roll directly into our development planning.

So it's very important to get that core and we're just in the process of it. That's going to give us a much better handle on all the fluid properties, all the reservoir properties, but we pushed the lowest known oil down about 400 feet. As I mentioned, we didn't establish an oil-water contact here, so that tells us there's more down below us. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. But we're very encouraged with what we saw and it was all well within the range of expectation of what we had put out there.

**Evan Calio - Morgan Stanley & Co. LLC**

Thanks, guys.

**Operator**

Case 4:20-cv-00576 Document 350-8 Filed 08/17/26 in TXSD Page 391 of 461

And our next question comes from Doug Leggate of Bank of America. Please go ahead.

**Doug Leggate - Bank of America Merrill Lynch**

Thanks. Thanks, guys. Good morning.

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Hey. Good morning, Doug. This guy got your last name right.

**Doug Leggate - Bank of America Merrill Lynch**

Yeah, yeah. I thought you're going to comment on my voice. I sound a little husky this morning. So, guys, on the capital allocation for next year, so I get the living within cash flow. But given the very strong performance you seem to be having in the Delaware, how should we think about how you're allocating capital to your core plays? And could you maybe just touch on where you're not spending capital, what the implications are for potentially there's a lot of asset sales that are likely to deliver this quarter?

**Robert Al Walker - Chairman, President & Chief Executive Officer**

Anadarko Petroleum's (APC) CEO R. A. Walker on Q4 2014 Results - Earnings Call Transcript Case 4:17-cv-02289 Document 113-1 Filed on 07/20/20 in TXSD Page 116 of 185 7/29/16, 7:34 PM

Seeking Alpha α

# Anadarko Petroleum's (APC) CEO R. A. Walker on Q4 2014 Results - Earnings Call Transcript

Feb. 3, 2015 3:28 PM ET
by: SA Transcripts

As a result I continue to believe and think it's likely that you are going to see our capital plan evolve through the year based upon the way in which costs sync up with revenue associated with the commodity price environment. Consequently if we get into a much more extended period where we have low commodity prices and we do not have much movement on the service cost side, I think you can anticipate we could very likely drop our capital plans that we come out with to a lower number.

We would achieve that through dropping rigs and not completing wells that we have drilled. So we have a lot of flexibility built into what we are proposing to our Board here and as a result I see the initial capital plan as one that is just a starting point.

**Doug Leggate**

I appreciate the answer. I guess my follow-up is hopefully a bit more positive and I guess it seems to me from the ops report the results from Shenandoah and Paon, I guess these are higher profile wells you have. I am just wondering if you are -- the guys are stationed now where you can talk about potential scale in both cases and potential development schedules for those potential assets, but I realize it might be a little early but just order of magnitude and potential timing would be really helpful. Thanks.

**R. A. Walker**

Yeah, you bet, it's a little early I think you probably are correct in that comment and Bob and Jim Kleckner respectively can address some of your question more specifically. But I think as it relates to how we take those development I am not concerned today about how we would necessarily do that from a technical standpoint, how it fits into our capital allocation plans in future years. I think of that as little bit more of a coming attraction once we understand better what the costs really are to take those two first lifting or first production.

So why don't we handle the Shenandoah question first and then come back to the Paon question a little bit because I think they do somewhat go hand in hand and Jim needs to add something around what Bob has to say.

**Robert P. Daniels**

Hey Doug, good morning. At Shenandoah I'll start there, we are so excited about what we are seeing there. We have got very good results for what we set out to do at the most recent appraisal well. If you remember that appraisal well was several miles away and about 1,500 feet down dip of the number 2, I guess 2.3 miles to the east and 1,500 feet down there. And we are looking to see if we can establish oil water contacts at that location. So we knew it be very far down there and close to that.

We want to look at the lateral sand and the reservoir continuity; we want to look at quality of sands in that area because as we get down closer to oil water contact we have to get an idea about the drive mechanism and would we have an effective water drive then for recovery.

We had a model that we would see potential interval expansion as we move to off structure and then we want to get pressure data to show pressure continuity into the other number 2 well.

So overall we are looking to understand the oil in place better and the potential recovery mechanism. But if you look at the results we really did all of that. We have excellent lateral sand continuity. The packages are all present, they are very well co-relatable. They have expanded, so that model of expansion did work out. We had up to about 1,470 feet of gross sand section versus a 1,000 feet that we

Anadarko Petroleum's Case 4:17-cv-02289 Q4 Document 118-1 Call Filed on 07/20/20 in TXSD Page 117 of 185 7/29/16, 7:34 PM

had in the number 2 well. The oil/water contacts were not encountered in the well based on the pressure data we were able to project those up. So we got a much better handle on the oil in place and that has expanded. We have more confidence on it.

So that was a very positive thing. Reservoir quality was good. So that gives us lot of confidence on the potential for the water drive. So we got a lot more confidence on our geologic model and the eastern side of our structural interpretation. We have gotten out pipeline over there. And then the potential for the active water drive and a much higher confidence level on oil/water contacts for the field lie.

# EXHIBIT 7

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 119 of 185

[redacted]

**From:** Oudin, Chip
**Sent:** Monday, August 18, 2014 11:12 AM
**To:** McGrievy, Pat; Frye, Lea; Chandler, Paul
[redacted]

[redacted] Depending on what's been shown, to whom it's been shown, and when it was shown, we may be stuck (politically) between a rock and a hard place. Especially if interested third parties are involved in any of the basin discoveries...

[redacted]

[redacted]

# EXHIBIT 8

Case 4:17-cv-02289 Document 113-1 Filed on 07/20/20 in TXSD Page 122 of 185

[redacted]

[redacted]

[redacted]

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 125 of 185

# EXHIBIT 9

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 126 of 185

Anadarko Investors

## Anadarko Announces Shenandoah Appraisal Well Encounters More Than 1,000 Net Feet of Oil Pay

HOUSTON, TX -- (MARKETWIRE) -- 03/19/13 -- Anadarko Petroleum Corporation (NYSE: APC) today announced its Shenandoah-2 well in the deepwater Gulf of Mexicoencountered more than 1,000 net feet of oil pay in multiple high-quality Lower Tertiary-aged reservoirs.

"The successful Shenandoah-2 well marks one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries," said Bob Daniels, Anadarko Sr. Vice President Deepwater and International Exploration. "With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronadowell, Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf ofMexico."

The Shenandoah-2 well, located in Walker Ridge block 51, was drilled to a total depth of 31,405 feet in approximately 5,800 feet of water, more than 1 mile southwest and approximately 1,700 feet structurally down-dip from the Shenandoah-1 discovery. Similar to the initial Shenandoah discovery well, log and pressure data from the Shenandoah-2 well indicate excellent-quality reservoir and fluid properties. The well was drilled to test the down-dip extent of the accumulation, and the targeted sands were full to base with no oil-water contact.

"We are incorporating the information obtained from Shenandoah-2 into our planning and anticipate further appraisal drilling to advance this potentially giant project," Daniels added.

Anadarko is the operator of the Shenandoah-2 well and the previously announced Shenandoah-1 discovery well, located in Walker Ridge block 52, with a 30-percent working interest. Other co-owners in Shenandoah are ConocoPhillips (NYSE: COP) with a 30-percent working interest, Cobalt International Energy L.P. (NYSE: CIE) with a 20-percent working interest, Venari Resources LLC with a 10-percent working interest andMarathon Oil Company (NYSE: MRO) with a 10-percent working interest.

Additionally, in the Shenandoah Basin, Anadarko has a 15-percent working interest in both the Coronado well, located in Walker Ridge block 98, and the Yucatan prospect, located in Walker Ridge block 95.

A map of the Shenandoah Basin in the deepwater Gulf of Mexico will be available under the "Media Center/Anadarko News" tab at www.anadarko.com.

Anadarko Petroleum Corporation's mission is to deliver a competitive and sustainable rate of return to shareholders by exploring for, acquiring and developing oil and natural gas resources vital to the world's health and welfare. As of year-end 2012, the company had approximately 2.56 billion barrels-equivalent of proved reserves, making it one of the world's largest independent exploration and production companies. For more information about Anadarko and APC Flash Feed updates, please visitwww.anadarko.com.

*This news release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Anadarko believes that its expectations are based on reasonable assumptions. No assurance, however, can be given that such expectations will prove to have been correct. A number of factors could cause actual results to differ materially from the projections, anticipated results or other expectations expressed in this news release, including Anadarko's ability to successfully drill, complete, test and produce the wells and prospects identified in this news release. See "Risk Factors" in the company's 2012 Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other public filings and press releases. Anadarko undertakes no obligation to publicly update or revise any forward-looking statements.*

PDF Attachment Available:http://media.marketwire.com/attachments/201303/58726_APCShenandoahBasinMap3-19-13.pdf

ANADARKO CONTACTS

MEDIA:
John Christiansen, john.christiansen@anadarko.com, 832.636.8736
Brian Cain, brian.cain@anadarko.com, 832.636.3404
Christina Ramirez, christina.ramirez@anadarko.com, 832.636.8687

INVESTORS:
John Colglazier, john.colglazier@anadarko.com, 832.636.2306
Brian Kuck, brian.kuck@anadarko.com, 832.636.1397
Bill Tedesco, william.tedesco@anadarko.com, 832.636.3375

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 127 of 183

Additional assets available online: Documents (2)

http://investors.anadarko.com/2013-03-18-Anadarko-Announces-Shenandoah-Appraisal-Well-Encounters-More-Than-1-000-Net-Feet-of-Oil-Pay

# **EXHIBIT 2**

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 125 of 185

Petroleum Corporation

APC 246 (1/1/02)

# PROPRIETARY INFORMATION AND INVENTION AGREEMENT

THIS PROPRIETARY INFORMATION AND INVENTION AGREEMENT ("Agreement") effective as of the date executed by Employee and written below, is entered into between ANADARKO PETROLEUM CORPORATION, a Delaware corporation, and its subsidiaries (collectively referred to herein as the "Company") and the employee who is named below ("Employee").

That in consideration of and as a part of the terms of employment by Company and for such length of time as the employment shall continue and thereafter as provided herein, the Employee and the Company agree as follows:

1. **Nondisclosure of Proprietary Information**.

The Employee acknowledges that, during the course of his/her employment, the Employee may i) have access to Proprietary Information, as defined below, of the Company or other information and data of a secret or proprietary nature of the Company which the Company wishes to keep confidential, and ii) may develop, during the course of his/her employment, such Proprietary Information for the Company; therefore, the Employee agrees that:

(a) For the purposes of this Agreement, the term "Proprietary Information" shall mean any and all methods, inventions, improvements or discoveries, whether or not patentable or copyrightable, and any other information of a similar nature disclosed to the Employee or otherwise made known to him/her as a consequence of or through his/her employment by the Company (including information originated by the Employee), including, but not limited to, information regarding the Company's business, products, processes, and services; information relating to research, development, inventions (including Inventions as defined below), trade secrets, intellectual property of any type or description, data, business plans, marketing strategies, engineering, contract negotiations, and business methods or practices, but shall not include information which (i) is in the public domain to such an extent as to be readily available to competitors, (ii) is in the Employee's possession prior to the execution of this Agreement from a source other than the Company, (iii) is or becomes generally known to the public other than by disclosure by the Company or by the Employee, or (iv) is received by Employee from a party other than the Company which party was under no legal obligation of confidentiality with the Company with respect to such information.

(b) The Company has exclusive property rights to all Proprietary Information and the Employee hereby assigns all rights he/she might otherwise possess in any Proprietary Information to the Company. Except as required in the performance of his/her duties to the Company, the Employee will not at any time during or after the term of his/her employment, which term shall include any time in which the Employee may be retained by the Company as a

Anadarko Petroleum Corporation

APC 246 (1/1/02)

consultant, directly or indirectly use, communicate, disclose or disseminate any Proprietary Information to an unauthorized party.

(c) All documents, records, notebooks, notes, memoranda and similar repositories of, or containing, Proprietary Information or any other information of a secret, proprietary, confidential or generally undisclosed nature relating to the Company or its operations and activities made or compiled by the Employee at any time or made available to him/her prior to or during the term of his/her employment by the Company, including any and all copies thereof, shall be the property of the Company, shall be held by him/her in trust solely for the benefit of the Company, and shall be delivered to the Company by him/her on the termination of his/her employment or at any other time on the request of the Company.

**2. Assignment of Inventions.**

(a) For purposes of this Paragraph 2, the term "Inventions" shall mean discoveries, concepts and ideas, whether patentable or copyrightable or not, including but not limited to designs, computer software, products, devices, data, improvements, know-how, processes, methods, formulae and techniques, as well as improvements thereof or know-how related thereto, concerning any past, present or prospective activities of the Company.

(i) During his/her employment by the Company, all Inventions the Employee makes shall be the sole property of the Company and Employee agrees to perform the provisions of this Paragraph 2 with respect thereto without the payment by the Company of any royalty or any consideration therefor other than the regular compensation paid to the Employee in the capacity of an employee.

(ii) At any time after termination of his/her employment, all Inventions based on Proprietary Information which Employee makes, discovers or conceives shall be the sole property of the Company and Employee agrees to perform the provisions of this Paragraph 2 with respect thereto without the payment by the Company of any royalty or any further consideration therefor.

(b) The Employee shall apply, at the Company's request and expense, for United States and foreign letters patent or copyrights either in the Employee's name or otherwise as the Company shall desire.

(c) The Employee hereby assigns to the Company all of his/her rights to such Inventions, and to applications for United States and/or foreign letters patent or copyrights and to United States and/or foreign letters patent or copyrights granted upon such Inventions.

(d) The Employee shall acknowledge and deliver promptly to the Company without charge to the Company but at its expense such written instruments (including applications and assignments) and do such other acts, such as giving testimony in support of the Employee's inventorship, as may be necessary in the opinion of the Company to obtain, maintain, extend, reissue and enforce United States and/or foreign letters patent and copyrights relating to the Inventions and to vest the entire right and title thereto in the Company or its

Anadarko Petroleum Corporation

APC 246 (1/1/02)

nominee. The Employee acknowledges and agrees that all original works of authorship and copyright developed or conceived of by the Employee (solely or jointly with others) during the term of Employee's employment which is related to the business of the Company shall be a "work for hire" under the copyright law of the United States and other applicable jurisdictions.

(e) As a matter of record the Employee has identified on Exhibit 1 attached hereto all inventions or improvements relevant to the subject matter of his/her employment by the Company which have been made or conceived or first reduced to practice by the Employee alone or jointly with others prior to his/her original employment by the Company, which he/she desires to remove from the operation of this Paragraph 2; and the Employee covenants that such list is complete. If there is not such a list on Exhibit 1, the Employee represents that he/she has made no such inventions and improvements at the time of signing this Agreement.

(f) The Employee represents that his/her performance of all the terms of this Agreement and as an employee of or consultant to the Company does not and will not breach any agreement or duty to keep in confidence proprietary information acquired by him/her in confidence or in trust prior to his/her employment by the Company. The Employee agrees not to enter into any agreement either written or oral in conflict herewith and represents and agrees that he/she has not brought and will not bring with him/her to the Company or use in the performance of his/her responsibilities at the Company any materials or documents of a former employer which are not generally available to the public, unless he/she has obtained written authorization from the former employer for their possession and use, a copy of which has been provided to the Company.

(g) The provisions of this Paragraph 2 shall not limit in any respect the restrictions applicable to the Employee under Paragraph 1.

**3. Shop Rights.**

The Company shall also have the royalty-free right to use in its business, and to make, use and sell products, processes and/or services derived from any inventions, discoveries, concepts and ideas, whether or not patentable, including but not limited to processes, methods, formulas and techniques, as well as improvements thereof or know-how related thereto, which are not within the scope of Inventions as defined in Paragraph 2 but which are conceived or made by the Employee during the period he/she is engaged by the Company or with the use or assistance of the Company's facilities, materials or personnel.

**4. Successors and Assigns.** This Agreement shall be binding upon the Employee, his/her heirs, executors, assigns and administrators and shall inure to the benefit of the Company, its successors and assigns.

**5. Severability.** Wherever there is any conflict between any provision of this Agreement and any statute, law, regulation or judicial precedent, the latter shall prevail, but in such event the provisions of this Agreement thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirement of the law. In the event that any part, section, paragraph or clause of this Agreement shall be held by a court of proper jurisdiction to be

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 132 of 185



indefinite, invalid or otherwise unenforceable, the entire Agreement shall not fail on account thereof, but the balance of the Agreement shall continue in full force and effect unless such construction would clearly be contrary to the intention of the parties or would result in an unconscionable injustice.

6. **Survival of Obligations**. All obligations, duties, rights, remedies, express representations, or other provisions required to give force and effect to this Agreement, or made in or given in this document, which have accrued prior to completion or cessation of Employee's employment with the Company shall survive the completion or cessation of his/her employment with the Company and shall continue and remain in full force and effect.

7. **Applicable Law.** The substantive laws of the State of Texas, excluding any law, rule or principle which might refer to the substantive law of another jurisdiction, will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place for performance thereof. This Agreement is to be at least partially performed in Harris County, Texas, and, as such, the Company and Employee agree that personal jurisdiction and venue shall be proper with the state or federal courts situated in Harris County, Texas, to hear such disputes arising under this Agreement.

8. **Entire Agreement.** This Agreement is the entire agreement of the parties with regard to the subject matter hereof, and supersedes and replaces any prior oral or written agreement or any other communications relating to the text of this Agreement, and may not be modified except by written amendment signed by the authorized representatives of both parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the day and year this first written below.

Lea S Frye
Employee Signature

10/18/05
Date

Lea S Frye
Name (Printed)

[redacted]
Social Security Number or Social Insurance Number

Houston
Location

Anadarko Petroleum Corporation

APC 246 (1/1/02)
Exhibit 1

**EXHIBIT 1**

PROPRIETARY INFORMATION AND INVENTION AGREEMENT

LIST OF INVENTIONS OR IMPROVEMENTS

________________________________________
Employee Signature

________________________________________
Date

________________________________________
Name (Printed)

________________________________________
Social Security Number or Social Insurance Number

________________________________________
Location

# **EXHIBIT 3**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO

DIRECT DIAL
212-735-4132
DIRECT FAX
917-777-4132
EMAIL ADDRESS
SUSAN.SALTZSTEIN@SKADDEN.COM

June 21, 2017

**BY EMAIL**

David M. Minces
Minces PLLC
4545 Bissonnet Street, Suite 286
Bellaire, Texas 77401

RE: Applicability of the Proprietary Information and Invention Agreement

Dear David:

Your June 20, 2017 email demands a response – within 24 hours – to your client's request that Anadarko Petroleum Corporation ("Anadarko" or the "Company") advise you as to whether a confidentiality agreement (the Proprietary Information and Invention Agreement ("PIIA")) precludes Ms. Frye, a former Anadarko employee, from sharing unspecified information in an unrelated litigation with unnamed plaintiff firms.

You make this expedited request for Anadarko's overnight position on June 20th despite the Company promptly providing you with a copy of the PIIA on May 22nd, shortly after you requested it. That copy was provided in response to your most recent request that Anadarko confirm your client's belief that she was not bound to keep Company information confidential by virtue of any formal agreement. We referenced the PIIA, provided a copy for your review and heard no more about the matter until your communications this week.

We note that your vague allusion to "SEC materials" provides Anadarko with no specific details as to the type of materials or information that you seek to divulge (nor in what format). While our review is continuing, that information seems to fall squarely within "Proprietary Information" as defined in the PIIA because it relates to

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 136 of 185



Anadarko's "business, products, processes and services" as well as the Company's research and development. The PIIA expressly prohibits the direct or indirect use, communication, disclosure or dissemination of any Proprietary Information to any unauthorized party. The obligations and duties under the PIIA remain in full force and effect regardless of whether Ms. Frye has left her employment with the Company. As a result, there is no basis to relieve Ms. Frye of the obligations she undertook when she entered into the PIIA with the Company on October 18, 2005.

In light of your demand that the Company take a position within this short time frame and your failure to identify the specific information that Ms. Frye wishes to disclose or the relevance of that information to the pending action, Anadarko declines to provide you with a release of your client's confidentiality obligations. Anadarko reserves all of its rights, remedies and damages should the protected information be disclosed in any manner (except as may be permitted by any applicable whistleblower or other laws).

Finally, given your initial inquiry suggesting that your client did not recall that she had a confidentiality agreement, please confirm that Ms. Frye has not already, directly or indirectly, provided any information that may be subject to the PIIA to anyone involved in the pending Edgar litigation.

Very truly yours,

Susan L. Saltzstein

Susan L. Saltzstein

# EXHIBIT 4

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 138 of 185

MINCES PLLC

**David M. Minces**
Board Certified Labor & Employment Law
Texas Board of Legal Specialization

**<u>Confidential Treatment Requested</u>**

June 22, 2017

Chief Judge Lee H. Rosenthal
United States District Court for the Southern District of Texas
Post Office Box 61010
Houston, Texas 77208
Via E-mail: lisa_eddins@txs.uscourts.gov

Re: *Edgar v. Anadarko Petroleum Corp., et al.,* 4:17-cv-1372
**Pre-Motion Conference Letter**

Dear Judge Rosenthal:

Our client, a former Anadarko employee, respectfully requests a pre-motion conference consistent with the requirements and intent of Your Honor's Local Procedure No. 4. This conference is sought on an **<u>expedited basis</u>** to alert the Court of material non-public information related to Defendants in the above referenced securities class action. Our client has information to impart for use in a related complaint, and but for a Proprietary Information and Invention Agreement ("PIIA"), would do so. This information, if made public, will have a material impact upon the upcoming motion practice before the Court, and therefore our client requests an *in camera* review of the PIIA and the non-public information. Our client has an interest in the present case in participating as a witness. I conferred with Anadarko counsel on June 20, 2017 in a good faith effort to reach an agreement.[1] Since no agreement was reached regarding the proposed disclosure, our client seeks Court intervention.

From 2005 to 2016, our client provided engineering support for Anadarko. Upon commencing employment, our client signed the PIIA, which protects certain categories of information from disclosure. Between 2014 and 2016, our client observed numerous examples of actions taken by Anadarko that bear on whether Anadarko violated the federal securities laws—actions that are not alleged or accounted for in the *Edgar* complaint. This information relates to certain projects that were underway during a time period that overlaps the time period at issue in the *Edgar* litigation.

In 2016, pursuant to the Dodd-Frank Act whistleblower protections, our client submitted a letter to the SEC that outlined alleged violations by Anadarko in detail

---

[1] I conferred with outside counsel representing Anadarko in the SEC matter (Susan Saltzstein, Skadden, Arps, Slate, Meagher & Flom, LLP). She and other parties of interest are copied on this letter.

("SEC Letter") and attached lawfully-obtained supporting evidence. It is this information (the "Information") that our client intends to disclose in the *Edgar* case, and Anadarko was made aware of the Information more than a year ago, in writing.

Upon learning of the *Edgar* lawsuit and reviewing the complaint, our client through my firm consulted on a confidential basis with Kaplan Fox, a firm with a well-established securities litigation practice, and Lynn Pinker Cox & Hurst, a nationally recognized Dallas firm. To advise their clients, these firms would like to be able to share the Information. If the firms are permitted to share the Information, this may result in the Information becoming public through the filing of a complaint. The Information will significantly alter the claims and the class period of the current operative complaint. If new claims are asserted under the PSLRA,[2] notice will likely need to be re-issued to inform potential class members of their rights.

After carefully reviewing the Information and the PIIA, we do not believe the Information is of the type protected. Alternatively, to the extent the PIIA seeks to suppress the Information, such efforts contravene public policy.[3] Nevertheless, our client is wary of filing anything that will become public record and thus, out of an abundance of caution, respectfully asks that Your Honor conduct an *in camera* review of the PIIA and the SEC Letter that summarizes the Information and provides numerous concrete examples. Our client has no interest in sharing proprietary or confidential information outside of the pending litigation and would agree to a protective order that balances all parties' interests.

Given the upcoming deadline of July 3, 2017 for parties to request Lead Plaintiff status in the *Edgar* lawsuit, in the interest of preserving judicial resources, our client respectfully asks the Court to consider this request in an expedited manner so that the Information can be disclosed *prior to* the deadline. Alternatively, our client requests a stay of a ruling on any motions to serve as Lead Plaintiff to best preserve judicial resources.[4] As the Information will significantly alter both claims and class period, allowing our client to share the Information now is consistent with the underlying policy of the PSLRA in appointing the most adequate Lead Plaintiff.

---

2 15 U.S.C. § 78u-4 *et seq.*

3 *Brado v. Vocera Communs., Inc.*, 14 F. Supp. 3d 1316 (N.D. Cal. 2014); *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002).

4 *See Alexander v. Convergent Outsourcing, Inc.*, No. H-16-3318, 2017 U.S. Dist. LEXIS 58769, at *2-3 (S.D. Tex. Apr. 18, 2017) (Rosenthal, J.) ("A district court has the inherent power to stay cases to control its docket and promote efficient use of judicial resources."); *In re Cyberonics Inc. Sec. Litig.*, 468 F. Supp. 2d 936, 940 (S.D. Tex. 2006) (requiring republication to re-determine most adequate plaintiff where the new complaint "substantially expands the potential class of plaintiffs by adding new claims and significantly expanding the class period"); *Sevel v. AOL Time Warner, Inc.*, 232 F. Supp. 2d 615, 618 (E.D. Va. 2002) ("The Court grants the motion to stay proceedings with respect to the determination of lead plaintiff and the approval of lead counsel").

Respectfully submitted,



**David M. Minces**
Federal I.D. No.: 435389
State Bar No.: 24026880
**Minces PLLC**
4545 Bissonnet Street
Suite 286
Bellaire, Texas 77401
david.minces@mincespllc.com
Telephone: (346) 701-8563
Facsimile: (713) 583-9795

**cc:**

Mr. Michael K. Hurst
Ms. A. Shonn Brown
Mr. Jonathan R. Childers
Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

Mr. Frederic S. Fox
Mr. Jeffrey P. Campisi
Mr. Donald R. Hall
Kaplan Fox & Kilsheimer LLP
850 Third Ave., 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

Mr. Jeremy A. Lieberman
Mr. J. Alexander Hood II
Ms. Hui M. Chang
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Ms. Susan L. Saltzstein
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036-6522
Telephone: (212) 735-4132
Facsimile: (917) 777-4132

Mr. Patrick V. Dahlstrom
Pomerantz LLP
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Mr. Laurence D. King
Kaplan Fox & Kilsheimer LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

Mr. Peretz Bronstein
Bronstein, Gewirtz & Grossman, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296

Ms. Amanda M. McMillian
Anadarko Petroleum Company
1201 Lake Robbins Drive
The Woodlands, Texas 77390
Telephone: (832) 636-1000
Amanda.McMillian@anadarko.com

Mr. Willie C. Briscoe
The Briscoe Law Firm, PLLC
3131 McKinney Avenue, Suite 600
Dallas, Texas 75204
Telephone: (214) 643-6011
Facsimile: (281) 254-7789

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 142 of 185

# EXHIBIT 5

## Paula Makopoulos

**From:** Saltzstein, Susan L <Susan.Saltzstein@skadden.com>
**Sent:** Thursday, June 22, 2017 12:49 PM
**To:** 'Lisa_Eddins@txs.uscourts.gov'
**Cc:** ahood@pomlaw.com; amanda.mcmillian@anadarko.com; David Minces; Donnie Hall; Fred Fox; Frank Caycedo; hchang@pomlaw.com; jalieberman@pomlaw.com; Jeff Campisi; Jonathan R. Childers; Laurence King; Michael K. Hurst; pdahlstrom@pomlaw.com; peretz@bgandg.com; Ralph Labaton; Shonn Brown; wbriscoe@thebriscoelawfirm.com; Paula Makopoulos; Reed, Noelle M; 'Edwards, Jen'
**Subject:** RE: [Ext] Re: Edgar v. Anadarko Petroleum Corporation | Case Number 4:17-cv-1372

Dear Ms. Eddins:

We will be appearing in the Edgar litigation on behalf of Anadarko Petroleum Corporation and the individual defendants. The request below comes from a non-party to this litigation seeking a pre-motion conference and an advisory opinion concerning a contract not at issue in the Edgar litigation (indeed Mr. Minces letter acknowledges as much (that the ". . . actions . . . are not alleged or accounted for in the Edgar Complaint"). We do not believe that a conference – particularly one that is expedited – is either necessary or appropriate.

In the event the Court wishes to entertain this non-party request, we would be available on July 19th which we understand from your call with Ms. Reed is the Court's next available date. And we would file a substantive response to Mr. Minces' submission in compliance with the Court's procedures. Thanks again for your consideration.

Very truly yours,

Susan L. Saltzstein

**Susan L. Saltzstein**
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square | New York | 10036-6522
T: 212.735.4132 | F: 917.777.4132
susan.saltzstein@skadden.com

Skadden

Please consider the environment before printing this email.

**From:** Lisa_Eddins@txs.uscourts.gov [mailto:Lisa_Eddins@txs.uscourts.gov]
**Sent:** Thursday, June 22, 2017 12:24 PM
**To:** Paula Makopoulos
**Cc:** ahood@pomlaw.com; amanda.mcmillian@anadarko.com; David Minces; Donnie Hall; Fred Fox; Frank Caycedo; hchang@pomlaw.com; jalieberman@pomlaw.com; Jeff Campisi; Jonathan R. Childers; Laurence King; Michael K. Hurst; pdahlstrom@pomlaw.com; peretz@bgandg.com; Ralph Labaton; Shonn Brown; Saltzstein, Susan L (NYC); wbriscoe@thebriscoelawfirm.com
**Subject:** [Ext] Re: Edgar v. Anadarko Petroleum Corporation | Case Number 4:17-cv-1372
**Importance:** High

Paula,

Unfortunately the court no longer has any time available on June 29. I could get this case before her tomorrow at 10:30 ( or 2:30) but short of that I will not have nay time until July 19th. Please advise ASAP if they can make the Friday timing work.

Lisa

Lisa Eddins
Case Manager to
Chief Judge Lee H. Rosenthal
(713)250-5517-Office
(713)250-5213-Fax

From: Paula Makopoulos <paula.makopoulos@mincespllc.com>
To: "lisa_eddins@txs.uscourts.gov" <lisa_eddins@txs.uscourts.gov>
Cc: Fred Fox <FFox@kaplanfox.com>, Laurence King <LKing@kaplanfox.com>, "Jeff Campisi" <jcampisi@kaplanfox.com>, Donnie Hall <DHall@kaplanfox.com>, "Ralph Labaton" <RLabaton@kaplanfox.com>, "Michael K. Hurst" <MHurst@lynnllp.com>, Shonn Brown <SBrown@lynnllp.com>, "Jonathan R. Childers" <JChilders@lynnllp.com>, Frank Caycedo <frank.caycedo@mincespllc.com>, "David Minces" <david.minces@mincespllc.com>, "amanda.mcmillian@anadarko.com" <amanda.mcmillian@anadarko.com>, "Susan.Saltzstein@skadden.com" <Susan.Saltzstein@skadden.com>, "pdahlstrom@pomlaw.com" <pdahlstrom@pomlaw.com>, "hchang@pomlaw.com" <hchang@pomlaw.com>, "peretz@bgandg.com" <peretz@bgandg.com>, "ahood@pomlaw.com" <ahood@pomlaw.com>, "jalieberman@pomlaw.com" <jalieberman@pomlaw.com>, "wbriscoe@thebriscoelawfirm.com" <wbriscoe@thebriscoelawfirm.com>
Date: 06/22/2017 11:14 AM
Subject: Edgar v. Anadarko Petroleum Corporation | Case Number 4:17-cv-1372

---

Dear Ms. Eddins:

As a follow up to the call from our office earlier this week, attached is a letter to Judge Rosenthal requesting a pre-motion conference. Our understanding is that the Court had availability on June 29, 2017. If this is still the case, we would appreciate the opportunity to be heard via teleconference (as counsel for many of the affected parties reside outside of Houston) on this date.

All affected parties are being copied on this email.

Respectfully submitted,

PAULA A. MAKOPOULOS
LEGAL ANALYST
4545 BISSONNET STREET, SUITE 286 | BELLAIRE, TEXAS 77401
TEL | 346-701-8563 FAX | 713-583-9795
SCHEDULE AN APPOINTMENT

This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution, or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail and delete all copies of this message.
[attachment "Judge Rosenthal 06-22-17 Anadarko.pdf" deleted by Lisa Eddins/TXSD/05/USCOURTS]

---------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 145 of 185

thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

# EXHIBIT 6

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
212-735-4132
DIRECT FAX
917-777-4132
EMAIL ADDRESS
SUSAN.SALTZSTEIN@SKADDEN.COM

July 6, 2017

VIA E-MAIL

David M. Minces
Minces PLLC
4545 Bissonnet Street
Suite 286
Bellaire, Texas 77401

RE: Anadarko Petroleum Corporation

Dear David:

I write in response to your June 22, 2017 e-mail, which (i) explains that the information your client wishes to disclose in the *Edgar* matter[1] is contained in your June 4, 2016 (or May 9, 2016) letter to Messrs. Ceresney and Shipchandler (the "SEC Letter") and (ii) assumes that Anadarko Petroleum Corporation's ("Anadarko" or the "Company") is opposed to the disclosure of the information contained in the SEC Letter.

To be clear, the information in the SEC Letter is "Proprietary Information" as defined in the Proprietary Information and Invention Agreement ("PIIA") that your client signed on October 18, 2005. Any disclosure of Anadarko's proprietary information contained in the SEC Letter to third parties (except as may be permitted by any applicable whistleblower or other laws), including plaintiff's counsel in the *Edgar* matter, is prohibited by that agreement. The Company is not waiving any of its rights under the PIIA, and will specifically enforce the protections it bargained for in the PIIA should its confidential information be disclosed in violation of the agreement.

Additionally, Anadarko reserves all of its rights, including but not limited to its rights under both the PIIA and applicable law, to enforce the agreement or seek a remedy for any breach.

[1] *Edgar v. Anadarko Petroleum Corporation*, 4:17-cv-1372 (S.D.Tx.).

Very truly yours,

Susan L. Saltzstein

Susan L. Saltzstein

# D.E. 9 - Motion to Transfer

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

United States Courts
Southern District of Texas
FILED
SEP 22 2017
David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Lea S. Frye, | § | |
| | § | **Case No. 4:17-cv-2289** |
| Plaintiff, | § | ***SEALED*** |
| | § | |
| v. | § | **DEMAND FOR JURY TRIAL** |
| | § | |
| Anadarko Petroleum Corporation | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**DEFENDANT'S UNOPPOSED MOTION TO TRANSFER WITHIN THIS DISTRICT (SEALED)**

Defendant Anadarko Petroleum Corporation ("Anadarko" or the "Company") moves to transfer this Action within this District to the Honorable Judge Lee H. Rosenthal, who is currently presiding over an action captioned *Edgar v. Anadarko Petroleum Corporation, et al.*, Case No. 4:17-cv-01372 (the "Edgar Litigation"). Transfer of this case is warranted because Plaintiff contends that the above-captioned action is related to the Edgar Litigation. Prior to filing this action, Plaintiff sought Judge Rosenthal's intervention in the Edgar Litigation concerning the same claim asserted here. As described in the complaint, "counsel for Plaintiff wrote to The Honorable Judge Lee H. Rosenthal, who is presiding over [the Edgar Litigation] . . . and explained that the Information to be disclosed will significantly alter the claims and the class period of the [*Edgar*] complaint." (Compl. at 12-13 (quotation omitted).) Accordingly, Defendant respectfully requests that this Court transfer the action within this district to Judge

Rosenthal so that—in the interests of consistency and judicial efficiency—the same court may consider both actions. Plaintiff does not oppose this motion.

## <u>THE EDGAR LITIGATION</u>

On May 3, 2017, Robert Edgar filed a complaint initiating the Edgar Litigation against Anadarko, R. A. Walker, and Robert G. Gwin (the "Edgar Defendants") in the United States District Court for the Southern District of Texas, Houston Division. The allegations in the complaint stem from an April 17, 2017 explosion at one of the Company's wells located in Colorado. Edgar asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Rule 10b-5 promulgated thereunder. Specifically, Edgar argues that the defendants in that case made false and misleading statements regarding the adequacy of Anadarko's maintenance and safety protocols. The Edgar Litigation was assigned to the Honorable Lee H. Rosenthal.

## <u>FRYE'S REQUEST FOR A PRE-MOTION CONFERENCE IN THE EDGAR LITIGATION</u>

On June 20, 2017, shortly after the Edgar Litigation was initiated, Plaintiff Frye, through her attorney, contacted outside counsel for the Edgar Defendants to solicit the Company's position on whether Plaintiff Frye was precluded from "sharing information in the pending Edgar litigation" by a Proprietary Information and Invention Agreement ("PIIA") she had signed at the outset of her employment with the Company. (*See* Declaration of Noelle M. Reed in Support of Defendant's Unopposed Motion to Transfer Within this District ("Reed Decl.") Ex. 1.)

Anadarko responded by letter on June 21, 2017, explaining that it was unclear exactly what information was at issue but that it generally appeared to be covered by the PIIA and declining to release Plaintiff from the confidentiality obligations of the PIIA. (*See* Reed Decl. Ex. 2.) In a June 22, 2017 e-mail response, Plaintiff clarified the information she sought to disclose and again stated that she was seeking to disclose that information "in the pending *Edgar* case." (Reed Decl. Ex. 3.)

Shortly thereafter, Plaintiff requested a pre-motion conference before Judge Rosenthal to "alert the Court of material non-public information related to Defendants in the above referenced securities class action," stating that this information would "have a material impact upon the upcoming motion practice before the Court." (Reed Decl. Ex. 4.) The letter noted that the information at issue would "significantly alter the claims and the class period of the current operative complaint." (*Id.*) On June 22, 2017, Judge Rosenthal declined to schedule an expedited pre-motion conference, having determined that the issue could be addressed at the August 25, 2017 initial pre-trial conference. That conference was later postponed to permit briefing on a motion to dismiss in the Edgar Litigation.

## THE ABOVE-CAPTIONED ACTION

On July 21, 2017, Plaintiff Frye filed a complaint under seal initiating the above-captioned action. The complaint seeks a declaratory judgment that (i) the PIIA does not cover the information Plaintiff wishes to disclose, and (ii) the PIIA does not prohibit Plaintiff from allowing counsel to use the information in a federal securities class action. The request for a declaratory judgment thus expressly references the Edgar Litigation.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 133 of 165

**THIS COURT SHOULD TRANSFER THIS ACTION TO JUDGE ROSENTHAL**

In addressing this action's allegations, it will be necessary for the Court to be familiar with both the Edgar Litigation and this action. Moreover, the request for a declaratory judgment is an extension of the prior request to Judge Rosenthal for authorization to disclose information in the Edgar Litigation. For these reasons, it serves the interest of judicial efficiency and economy for Judge Rosenthal to handle this matter going forward, and Defendant therefore respectfully requests that this Court transfer the action within this district to Judge Rosenthal. *See, e.g., Montemayor Seguy v. United States*, 329 F. Supp. 2d 880, 882 (S.D. Tex. Aug. 2, 2004).

DATED: September 22, 2017

Respectfully submitted,

Noelle M. Reed
Fed. Bar No. 27139
Texas Bar No. 24044211
Email: Noelle.Reed@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
(713) 655-5122 – Telephone
(713) 483-9122 – Facsimile

*Attorney-in-charge for Defendant Anadarko Petroleum Corporation*

*Of Counsel:*

Jay B. Kasner
*(Admitted Pro Hac Vice)*
Email: Jay.Kasner@Skadden.com
Susan L. Saltzstein
*(Admitted Pro Hac Vice)*
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
4 Times Square
New York, New York 10036-6518
(212) 735-3000 – Telephone
(917) 735-2000 – Facsimile

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 155 of 185

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 22, 2017, I conferred with David M. Minces, Plaintiff's counsel, about the relief requested in this motion. Plaintiff is not opposed.

Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2017, I filed the foregoing document under seal in conventional paper format and sent a copy via electronic mail to counsel for Plaintiff:

**David M. Minces**
*Attorney-in-Charge*
Fed. Bar No. 435389
Texas Bar No. 24026880
Email: david.minces@mincespllc.com
**Gabriela M. Barake**
Fed. Bar No. 3006704
Texas Bar No. 24099794
Email: gabriela.barake@mincespllc.com
**Francisco J. Caycedo**
Fed. Bar No. 36976
Texas Bar No. 24040664
Email: frank.caycedo@mincespllc.com
**MINCES PLLC**
4545 Bissonnet, Suite 286
Bellaire, Texas 77401
(346) 701-8563 – Telephone
(713) 583-9795 – Facsimile

Noelle M. Reed

# D.E. 16 - Motion to Dismiss Original Complaint

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 157 of 185

United States Courts
Southern District of Texas
FILED

OCT 2 7 2017

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Lea S. Frye, | § | |
| | § | **Case No. 4:17-cv-2289** |
| Plaintiff, | § | ***SEALED*** |
| | § | |
| v. | § | **<u>DEMAND FOR JURY TRIAL</u>** |
| | § | |
| Anadarko Petroleum Corporation, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT ANADARKO PETROLEUM CORPORATION'S
MOTION TO DISMISS THE COMPLAINT (SEALED)**

Noelle M. Reed
*Attorney-in-Charge*
Fed. Bar No. 27139
Texas Bar No. 24044211
Email: Noelle.Reed@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
(713) 655-5122 – Telephone
(713) 483-9122 – Facsimile

**Attorneys for Defendant Anadarko Petroleum Corporation**

Of Counsel:
Jay B. Kasner
(*Admitted Pro Hac Vice*)
Email: Jay.Kasner@Skadden.com
Susan L. Saltzstein
(*Admitted Pro Hac Vice*)
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
4 Times Square
New York, New York 10036-6518
(212) 735-3000 – Telephone
(917) 735-2000 – Facsimile

Heather A. Lohman
Fed. Bar No. 28417
Texas Bar No. 24027008
Email: Heather.Lohman@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
(713) 655-5105 – Telephone
(713) 483-9105 – Facsimile

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

NATURE AND STAGE OF THE PROCEEDING ..... 2

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF FACTS ..... 3

I. The Parties ..... 3

II. Allegations relating to Plaintiff's claim of retaliation in violation of the Dodd-Frank Act ..... 3

III. Allegations relating to Plaintiff's declaratory judgment action ..... 6

SUMMARY OF THE ARGUMENT ..... 8

ARGUMENT ..... 9

I. Standard of Review ..... 9

II. Plaintiff's Dodd-Frank Act claim must be dismissed because she fails to identify a cognizable retaliatory act that occurred during her ten-day tenure as a whistleblower. ..... 10

A. Conduct that took place before May 9, 2016, cannot have been caused by Plaintiff's submission of the SEC Letter on May 9. ..... 11

B. The allegations of retaliatory conduct after May 9, 2016, are conclusory, based on supposition, and lack direct factual support. ..... 12

C. Plaintiff fails to allege that any alleged retaliation was causally related to the SEC Letter. ..... 15

D. Plaintiff cannot recover non-economic damages. ..... 16

III. Plaintiff's claim for a declaratory judgment must be dismissed because this Court lacks subject matter jurisdiction, and the claim would fail on the merits. ..... 17

A. This Court lacks subject matter jurisdiction over Plaintiff's claim for a declaratory judgment. ..... 17

B. Even if this Court had jurisdiction over Plaintiff's claim for a declaratory judgment, the claim would fail on the merits. ..... 19

CONCLUSION ..... 21

# TABLE OF AUTHORITIES

## CASES

*American States Insurance Co. v. Bailey*,
133 F.3d 363 (5th Cir. 1998) .......... 17

*Asadi v. G.E. Energy (USA), L.L.C.*,
720 F.3d 620 (5th Cir. 2013) .......... 2, 8, 10, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2, 9

*Body by Cook, Inc. v. State Farm Mutual Automobile Insurance*,
869 F.3d 381 (5th Cir. 2017) .......... 16

*Boudreaux v. O.S. Restaurant Services L.L.C.*,
No. 13-5333, 2013 WL 5722714 (E.D. La. Oct. 21, 2013) .......... 18

*In re Boyd Veigel, P.C.*,
575 F. App'x 393 (5th Cir. 2014) .......... 18

*Caldwell v. Enterprise Products Co.*,
No. H-15-3463, 2016 WL 3166866 (S.D. Tex. June 7, 2016) .......... 15

*Crabtree v. Ibarra*,
No. H-10-1118, 2010 WL 3910047 (S.D. Tex. Oct. 4, 2010) .......... 15

*Cuvillier v. Taylor*,
503 F.3d 397 (5th Cir. 2007) .......... 9

*Dark v. Potter*,
293 F. App'x 254 (5th Cir. 2008) .......... 9

*Feldman-Boland v. Morgan Stanley*,
No. 15cv6698, 2016 WL 3826285 (S.D.N.Y. July 13, 2016) .......... 3, 8, 17

*Gonzalez v. Kay*,
577 F.3d 600 (5th Cir. 2009) .......... 2

*Irvin v. Masters Advanced Remediation Services, Inc.*,
No. H-16-2488, 2016 WL 7406750 (S.D. Tex. Dec. 22, 2016) .......... 16

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 160 of 185


*Johnson v. DocuLynx, Inc.*,
No. 16-cv-01643-MEH, 2016 WL 9344258 (D. Colo. Oct. 25, 2016) .................. 16

*Lamb v. Rockwell Automation, Inc.*,
No. 15-CV1415-JPS, 2016 WL 4273210 (E.D. Wis. Aug. 12, 2016) ............. 11-12

*Lawrence v. International Business Machine Corp.*,
No. 12cv8433(DLC), 2017 WL 3278917 (S.D.N.Y. Aug. 1, 2017) ...................... 14

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......................................................................... 8, 18, 19

*Miller v. City of Los Angeles*,
No. CV 13-5148-GW(CWx), 2014 WL 12610195 (C.D. Cal. Aug. 7, 2014) ....... 13

*Moore v. City of New York*,
No. 15-CV-6600 (GBD) (JLC), 2017 WL 35450 (S.D.N.Y. Jan. 3, 2017), *adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017) .................................. 13

*National Presort, Inc. v. Bowe Bell + Howell Co.*,
663 F. Supp. 2d 505 (N.D. Tex. 2009) ............................................................ 19

*Norris v. Hearst Trust*,
500 F.3d 454 (5th Cir. 2007) ............................................................................ 9

*Orix Credit Alliance, Inc. v. Wolfe*,
212 F.3d 891 (5th Cir. 2000) .......................................................................... 17

*Randolph v. Dimension Films*,
630 F. Supp. 2d 741 (S.D. Tex. 2009), *aff'd mem. per curiam*, 381 F. App'x 449 (5th Cir. 2010) ........................................................................................ 9

*Sasol North America, Inc. v. GTLPetrol, L.L.C.*,
682 F. App'x 312 (5th Cir. 2017) ............................................................ 3, 8, 19

*Shriners Hospital for Children v. McCarthy Bros. Co.*,
80 F. Supp. 2d 707 (S.D. Tex. 2000) .............................................................. 19

*United States v. Fidelity & Deposit Company*,
10 F.3d 1150 (5th Cir. 1994) .......................................................................... 19

*United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*,
626 F. App'x 528 (5th Cir. 2015) .................................................................... 13

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corporation*,
125 F.3d 899 (5th Cir. 1997) .......................................................................... 13

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 161 of 185

*Vantage Trailers, Inc. v. Beall Corp.*,
567 F.3d 745 (5th Cir. 2009) ............................................................ 3, 8, 18, 19

*Verble v. Morgan Stanley Smith Barney, LLC*,
148 F. Supp. 3d 644 (E.D. Tenn. 2015), *aff'd* 676 F. App'x 421 (6th Cir.), *cert. denied*, 137 S. Ct. 1348 (2017) ............................................................ 12

*Vista Outdoor Inc. v. Reeves Family Trust*,
234 F. Supp. 3d 558 (S.D.N.Y. 2017), *appeal filed*, No. 17-1059 (2d Cir. Apr. 12, 2017) ............................................................ 15

*Vital v. National Oil Well Varco*,
No. H-12-1357, 2013 WL 1880842 (S.D. Tex. May 3, 2013) .............................. 16

*Wadler v. Bio-Rad Laboratories, Inc.*,
141 F. Supp. 3d 1005 (N.D. Cal. 2015) ............................................................ 3, 17

*Whittaker v. Northern Illinois University*,
424 F.3d 640 (7th Cir. 2005) ............................................................ 12-13, 14

*Williams v. New York City Health & Hospitals Corp.*,
No. 08-CV-4132 (RRM)(LB), 2010 WL 2836356 (E.D.N.Y. July 16, 2010) ....... 13

*Wilson v. Susquehanna Bancshares, Inc.*,
No. GLR-14-79, 2014 WL 2094039 (D. Md. May 19, 2014) ......................... 14-15

**STATUTES**

15 U.S.C. § 78u-6(a)(6) ............................................................ 8, 10

15 U.S.C. § 78u-6(h)(1) ............................................................ 10

15 U.S.C. § 78u-6(h)(1)(A) ............................................................ 1, 10, 12

15 U.S.C. § 78u-6(h)(1)(C) ............................................................ 8, 17

Fed R. Civ. P. 8(a)(6) ............................................................ 9

Fed. R. Civ. P. 12 ............................................................ 13

Fed. R. Civ. P. 12(b)(6) ............................................................ 9

Defendant Anadarko Petroleum Corporation ("Anadarko") respectfully moves to dismiss Plaintiff's Original Complaint (the "Complaint" or "Compl.") for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiff Lea S. Frye ("Plaintiff" or "Ms. Frye"), a former Anadarko employee, seeks judicial approval to share Anadarko's confidential information with plaintiff's counsel in a putative securities class action pending before this Court. Ms. Frye's request should be denied because the information she seeks to share is protected from disclosure by a valid and enforceable confidentiality agreement between Ms. Frye and Anadarko. Moreover, Ms. Frye has conceded that this information—which she gained as a reserve engineer for Anadarko in the Gulf of Mexico—is not related to the underlying facts of the securities litigation, which arises out of a fire in Colorado.

This is not the first time Ms. Frye has sought to influence the securities litigation. Ms. Frye first reached out to at least two law firms and then sought a conference with this Court in an attempt to participate in the securities litigation, despite being a nonparty with no standing to do so. Ms. Frye then filed this case seeking a declaratory judgment that she is not prohibited from disclosing Anadarko's confidential information. But as described below, Ms. Frye's declaratory judgment action seeks an impermissible advisory opinion and is meritless.

The Complaint also tacks on an unrelated but equally meritless claim that Anadarko retaliated against Ms. Frye in violation of Section 21F(h)(1)(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-6(h)(1)(A) (made part of the Exchange Act by Section 922(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1841 (the "Dodd-Frank Act")). Ms. Frye previously filed a purported whistleblower complaint with the Securities and Exchange Commission ("SEC") in which she

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 163 of 185

alleged that Anadarko had engaged in a variety of misconduct related to its operations in the Gulf of Mexico. Ms. Frye alleges that Anadarko retaliated against her for the SEC complaint by, among other things, not including her in a round of planned layoffs that apparently occurred before she submitted anything to the SEC. For the reasons discussed below, Ms. Frye has failed to state a claim for either declaratory judgment or a violation of Section 21F(h)(1)(A) of the Exchange Act (as added by the Dodd-Frank Act), and her Complaint should be dismissed with prejudice.

## NATURE AND STAGE OF THE PROCEEDING

On July 21, 2017, Ms. Frye filed her Complaint under seal and thereafter obtained an order sealing this entire action. On September 26, 2017, the case was transferred to this Court on Anadarko's Unopposed Motion to Transfer Within this District. (Docket No. 10.) On October 11, 2017, the Court granted Anadarko's Unopposed Motion to Extend Time to Answer or Move and to Set a Briefing Schedule and set this Motion to Dismiss for oral argument on January 5, 2018. (Docket No. 15.)

## STATEMENT OF THE ISSUES

This motion presents the following questions:

*First*, whether Plaintiff's claims for whistleblower protection under the Dodd-Frank Act for alleged retaliation that occurred before she was a whistleblower should be dismissed. *See Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 625 (5th Cir. 2013).

*Second*, whether Plaintiff's claims under the Dodd-Frank Act should be dismissed for failure to plausibly allege a retaliatory act by Anadarko or a causal relationship between any alleged retaliation and Ms. Frye's disclosure to the SEC. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

Case 4:17-cv-02289 Document 113-1 Filed on 07/20/20 in TXSD Page 164 of 185

*Third*, whether Plaintiff's claim for non-economic damages under the Dodd-Frank Act should be dismissed because those damages are not an available remedy under the statute. *See Feldman-Boland v. Morgan Stanley*, No. 15cv6698, 2016 WL 3826285, at *6 (S.D.N.Y. July 13, 2016); *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1026 (N.D. Cal. 2015).

*Fourth*, whether Plaintiff's claim for declaratory judgment should be dismissed because this Court lacks subject matter jurisdiction, as Ms. Frye has failed to plead that there is an actual controversy. *See Sasol N. Am., Inc. v. GTLPetrol, L.L.C.*, 682 F. App'x 312, 314-15 (5th Cir. 2017); *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 751 (5th Cir. 2009).

*Fifth*, whether Plaintiff's claim for a declaratory judgment should be dismissed because the information she seeks to disclose is covered by a confidentiality agreement.

## STATEMENT OF FACTS

### I. The Parties.

Defendant Anadarko Petroleum Corporation is a publicly traded company incorporated in the State of Delaware and maintaining its principal place of business in The Woodlands, Texas. (Compl. ¶ 10.)

Plaintiff Lea S. Frye is a resident of the State of Colorado and was employed by Anadarko as a reservoir engineer from 2005 until she resigned on May 19, 2016. (*Id.* ¶¶ 9, 11, 29.)

### II. Allegations relating to Plaintiff's claim of retaliation in violation of the Dodd-Frank Act.

In early 2014, Anadarko tasked Ms. Frye with evaluating a resource in the Gulf of Mexico that had oil-producing potential. (*Id.* ¶ 15.) Ms. Frye alleges that between 2014 and 2016, she observed numerous acts and omissions by Anadarko's executives that "bear on whether Defendant violated federal securities laws, including overstatements and other

misrepresentations made to investors in public statements and public filings with the SEC." (*Id.* ¶ 16.) Ms. Frye fails to identify any specific act or omission by Anadarko, relying instead on vague and conclusory claims that Anadarko "suppress[ed] the truth," "disregard[ed] scientific evidence," and "generally misrepresent[ed] the economics associated with its resources." (*Id.* ¶ 17.) Ms. Frye alleges that she expressed concern internally to her supervisors about these purported misrepresentations. (*Id.* ¶ 18.)

Sometime in spring 2016, Ms. Frye took an extended medical leave from Anadarko. On May 9, 2016, while she was on leave under the Family and Medical Leave Act ("FMLA"), Ms. Frye submitted a whistleblower complaint to the SEC (the "SEC Letter") detailing her allegations that Anadarko had violated federal securities laws. (*Id.* ¶ 24, Ex. 1.) The SEC Letter included attachments that contain Anadarko's confidential and proprietary information. (*See, e.g.*, Exs. 2, 7-8 to Compl. Ex 1.) Ms. Frye alleges that "Defendant was made aware of the SEC Letter immediately after it was submitted to the SEC and was provided a copy of the letter shortly thereafter." (Compl. ¶ 24.) Just ten days later, on May 19, 2016, Plaintiff resigned her employment with Anadarko. (*Id.* ¶ 29.) Ms. Frye remained on FMLA leave until her resignation.

Ms. Frye alleges that <u>before</u> she became an SEC whistleblower, her supervisors at Anadarko had retaliated against her for her internal complaints in a variety of ways, including by allegedly excluding her from meetings, denying her access to information, and "ostracizing" her. (*Id.* ¶¶ 18, 20, 21.) She further contends that her request to be included in an ongoing reduction in force ("RIF") layoff was denied. (*Id.* ¶ 23.)

Ms. Frye also alleges that Anadarko retaliated against her after she "mailed the SEC letter to the SEC, and Defendant learned that she had done so." (*Id.* ¶ 28.) As alleged in the

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 166 of 183

Complaint, the purported retaliatory acts that took place after Ms. Frye became a whistleblower consisted of the following:

- "Upon information and belief, Defendant informed Plaintiff's colleagues and coworkers that she was an SEC whistleblower, making Plaintiff a pariah within the company <u>had she returned to work</u>" (emphasis added);
- "Upon information and belief, Defendant told some of Plaintiff's colleagues and coworkers (many of whom were her friends) that they were expressly forbidden from speaking with Plaintiff";
- "Upon information and belief, some of Plaintiff's colleagues and coworkers (many of whom were her friends) were implicitly dissuaded from communicating with Plaintiff, even on a personal basis";
- "Since Plaintiff's superior berated her and reduced her job responsibilities (*i.e.*, by denying her access to meetings and other job-related data to which she ordinarily had access to) when she internally resisted Defendant's misrepresentations, it was reasonable for Plaintiff to assume that her SEC complaint would result in similar (and perhaps worse) treatment upon her return to work"; and
- "While Defendant knew Plaintiff was in a vulnerable state during her FMLA leave, Defendant instructed its third-party administrator to retroactively shorten the duration of her FMLA leave." (*Id.*)

Ms. Frye claims that these purported acts by Anadarko caused her to resign on May 19, 2016. (*Id.* ¶ 29.) She conclusorily alleges that Anadarko's conduct was designed to stop others from filing whistleblower complaints and to force her to resign. (*Id.* ¶ 31.)

Ms. Frye also asserts three alleged acts of retaliation after her resignation, each of which she admits has been rectified. (*Id.* ¶¶ 32-33.) Specifically, Ms. Frye claims that Anadarko failed to offer her Consolidated Omnibus Budget Reconciliation Act ("COBRA") health insurance coverage, recorded an incorrect COBRA start date, and withheld payment for certain accrued but unused vacation time. (*Id.* ¶ 32.) Although the Complaint acknowledges that each of these issues was resolved in her favor (*id.* ¶ 33), Ms. Frye contends that she incurred legal fees and other expenses and suffered "stress and anxiety" for which she seeks redress.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 167 of 185

## III. Allegations relating to Plaintiff's declaratory judgment action.

On October 18, 2005, Ms. Frye and Anadarko executed a Proprietary Information and Invention Agreement ("PIIA"). (*Id.* ¶ 39, Ex. 2.) The PIIA provides that Ms. Frye will not disclose Anadarko's "Proprietary Information," broadly defined as:

> [A]ny and all methods, inventions, improvements or discoveries, . . . and any other information of a similar nature disclosed to the Employee or otherwise made known to him/her as a consequence of or through his/her employment by the Company (including information originated by the Employee), including, but not limited to, information regarding the Company's business, products, processes, and services; information relating to research, development, inventions . . . , trade secrets, intellectual property of any type or description, data, business plans, marketing strategies, engineering, contract negotiations, and business methods or practices.

(Compl. ¶ 40, Ex. 2.)

In a June 20, 2017 telephone call[1] with Anadarko's counsel, Plaintiff's counsel asked that Anadarko authorize Ms. Frye to convey unspecified "SEC information" about Anadarko to counsel investigating potential securities claims against Anadarko in connection with a federal class action complaint now pending in this Court. (Compl. ¶ 44.) On June 21, 2017, Anadarko responded through counsel and explained that the information Ms. Frye disclosed to the SEC constitutes Proprietary Information under the PIIA. (*Id.* ¶ 45.) Anadarko declined to release Ms. Frye from her confidentiality obligations under the PIIA and asked that she confirm that she had not already provided Anadarko's confidential information to third parties. (*Id.*)

---

[1] Although the Complaint indicates that the request was made only in a telephone call, Exhibit 3 to the Complaint notes that it was written in response to a June 20, 2017 e-mail from Plaintiff's counsel. In the June 20, 2017 e-mail, Plaintiff's counsel threatens to seek the intervention of this Court if Anadarko fails to respond to Ms. Frye's request within 24 hours. (Ex. 1 to Declaration of Noelle M. Reed in Support of Defendant's Unopposed Motion to Transfer Within this District (Docket No. 9-1).)

In response, on June 22, 2017, counsel for Plaintiff submitted a letter to this Court under the caption of the pending securities action, *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-cv-1372 (S.D. Tex. Complaint filed May 3, 2017). (Compl. ¶ 47.) In the letter, counsel admitted that Plaintiff had already contacted at least two law firms and may have provided them with Anadarko's confidential information. (*Id.* ¶ 47, Ex. 3.) Ms. Frye, an unrelated third party to the *Edgar* action, asked this Court to hold a conference on an expedited basis to provide an advisory opinion as to whether Ms. Frye's disclosure of Anadarko's confidential information to counsel in the *Edgar* case would violate the PIIA. (*Id.*) This Court determined that there was no need for an expedited conference but agreed to take up the issue at a later status conference. (E-mail from Lisa Eddins, Case Manager to Chief Judge Lee H. Rosenthal, to counsel of record in the securities litigation and counsel for Ms. Frye (June 22, 2017, 1:55 p.m. CDT).)

On July 21, 2017, Ms. Frye filed this case, in which she requests an expedited declaratory judgment that will allow her "to avoid legal risk" in the event that she discloses Anadarko's information to the securities litigation counsel. (Compl. ¶ 55.) Among the information Ms. Frye apparently intends to disclose is the content of the SEC Letter, which was derived from Anadarko's confidential and proprietary information, and its attachments, at least one of which expressly states that it is the "confidential and proprietary property of Anadarko Petroleum Corporation." (*Id.* ¶ 24 (defining the "Information" as the contents of the SEC Letter and its attachments).) Importantly, the Complaint does not specify why Ms. Frye believes the SEC Letter and its attachments are not covered under the PIIA. The Complaint simply concludes—without factual support—that none of the Information is proprietary. (*Id.* ¶ 42 ("The Information does not constitute proprietary information . . . . Accordingly, Plaintiff should be permitted to disclose the Information without fear of reprisal.").)

## SUMMARY OF THE ARGUMENT

Both of Plaintiff's claims should be dismissed with prejudice. First, Plaintiff asserts a claim pursuant to the Dodd-Frank Act against Anadarko for allegedly retaliating against her because of her SEC Letter. But Plaintiff is unable to muster any specific facts to support her claim, let alone enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, Plaintiff relies either on unsupported, conclusory allegations or allegations of retaliatory conduct that occurred before she provided confidential information to the SEC. The former are insufficient as a matter of law, and the latter fail to state a claim under the Dodd-Frank Act because Ms. Frye was not a whistleblower at the time of these alleged retaliatory acts, as the statute requires. *See* 15 U.S.C. § 78u-6(a)(6); *Asadi*, 720 F.3d at 625. Additionally, Plaintiff seeks non-economic damages that are unavailable under the Dodd-Frank Act. *See* 15 U.S.C. § 78u-6(h)(1)(C); *Feldman-Boland*, 2016 WL 3826285, at *6.

Second, Plaintiff's request for a declaratory judgment that would allow her "to avoid [the] legal risk" of breaching the PIIA by providing blanket immunity for the disclosure of information to counsel in the securities litigation is nothing more than a second attempt to obtain an impermissible advisory opinion from this Court. As such, this Court lacks jurisdiction to entertain Plaintiff's claim. Plaintiff has failed to establish that there is an actual, immediate controversy warranting a grant of declaratory relief. *See Sasol N. Am.*, 682 F. App'x at 314-15. Indeed, her own allegations make clear that there is no substantial controversy between the parties; Plaintiff is asking this Court to decide the rights of the parties under a contract with respect to a potential breach that has not yet occurred and may never occur. It is well settled that "[d]eclaratory judgments cannot be used to seek an opinion advising what the law would be on a hypothetical set of facts." *Vantage Trailers*, 567 F.3d at 748 (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Even if this Court were to find that it had

jurisdiction over Plaintiff's declaratory judgment claim, the claim fails on the merits because she seeks to disclose information that falls squarely within the definition of Proprietary Information as defined in the PIIA.

## ARGUMENT

### I. Standard of Review

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Randolph v. Dimension Films*, 630 F. Supp. 2d 741, 744 (S.D. Tex. 2009) (Rosenthal, J.) (quoting *Bell Atl.*, 550 U.S. at 570), *aff'd mem. per curiam*, 381 F. App'x 449 (5th Cir. 2010). A plaintiff's "complaint must allege 'more than labels and conclusions,'" and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Bell Atl.*, 550 U.S. at 555).

> [Federal Rule of Civil Procedure] 8(a)(2) . . . requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.

*Dark v. Potter*, 293 F. App'x 254, 258 & n.29 (5th Cir. 2008) (per curiam) (quoting *Bell Atl.*, 550 U.S. at 555 n.3).

A complaint "'must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true "raise a right to relief above the speculative level."'" *Randolph*, 630 F. Supp. at 744 (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl.*, 550 U.S. at 555)). "[A] court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Id.* at 745.

**II. Plaintiff's Dodd-Frank Act claim must be dismissed because she fails to identify a cognizable retaliatory act that occurred during her ten-day tenure as a whistleblower.**

Plaintiff's claim under the Dodd-Frank Act can be premised only on alleged retaliatory acts that occurred in the ten-day period between when she submitted the SEC Letter and her resignation. Section 21F(h)(1)(A) of the Exchange Act (added by the Dodd-Frank Act) provides that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower . . . (i) in providing information to the [SEC] in accordance with this section." 15 U.S.C. § 78u-6(h)(1)(A). "The text of [15 U.S.C.] § 78u-6(h)(1)(A)(ii) protects whistleblowers from retaliation for their participation in the investigation, and possible judicial or administrative action of the SEC, that follows on the heels of the information initially provided to the SEC." *Asadi*, 720 F.3d at 625 (emphasis added). The Dodd-Frank Act defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the securities laws to the [SEC], in a manner established, by rule or regulation, by the [SEC]." 15 U.S.C. § 78u-6(a)(6). To qualify for protection from retaliation under 15 U.S.C. § 78u-6(h)(1), then, an individual must have provided the SEC with information relating to a violation of the securities laws. *See Asadi*, 720 F.3d at 625-27.

By her own admission, Plaintiff first provided information to the SEC on May 9, 2016, and she resigned her employment just ten days later, on May 19, 2016. (Compl. ¶¶ 24, 29.) When she submitted the SEC Letter, Ms. Frye was already on extended FMLA leave from Anadarko. (*Id.* ¶¶ 22, 24.) Thus, Ms. Frye's entire ten-day tenure as a "whistleblower" occurred while she was on leave and not working on Anadarko's premises. As discussed below, any claim for conduct that occurred before May 9, 2016, is simply not actionable under the Dodd-

Frank Act. Moreover, the Complaint's limited allegations of alleged retaliatory conduct occurring during the actionable period are conclusory, based on pure supposition, and in the case of certain of the alleged acts, were rectified by the Company.

**A. Conduct that took place before May 9, 2016, cannot have been caused by Plaintiff's submission of the SEC Letter on May 9.**

Ms. Frye's attempt to bolster the Complaint by alleging that Anadarko retaliated against her for acts that allegedly occurred before she submitted the SEC Letter is unavailing because pre-whistleblower conduct is not actionable under the whistleblower protection provisions of the Dodd-Frank Act. *See Asadi*, 720 F.3d at 625. The Complaint includes allegations of a series of acts that necessarily took place before May 9, 2016. (Compl. ¶ 18, 20-23.) Specifically, Ms. Frye claims that she was "humiliated" by her superiors while working on her project, and that they kept her out of important meetings, gave her limited access to pertinent information about her project, and refused to lay her off (*id.* ¶¶ 18, 20, 23), all of which must have occurred before Ms. Frye took her extended leave from the Company. Similarly, Ms. Frye's allegations that she became concerned about being falsely blamed for Anadarko's alleged violations of the law or "caught in the crossfire" and suffered "serious health conditions," such as anxiety, depression, and inability to sleep as a result (*id.* ¶ 22) were allegedly the reason she took leave—and therefore occurred before the May 9 SEC Letter.

Because each of these alleged retaliatory acts took place before Ms. Frye submitted the SEC Letter (*id.* ¶ 24), they do not implicate the whistleblower protection available under the Dodd-Frank Act. *See Asadi*, 720 F.3d at 626-27. That she later became a whistleblower does not cure this defect. *See Lamb v. Rockwell Automation, Inc.*, No. 15-CV1415-JPS, 2016 WL 4273210, at *3-4 (E.D. Wis. Aug. 12, 2016) (filing a whistleblower complaint after an employer's alleged retaliation did not subject that conduct to the whistleblower protections of the

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 173 of 185

Dodd-Frank Act because plaintiff must have been a whistleblower at the time of the alleged retaliation). Instead, the question is whether Ms. Frye was a whistleblower when the alleged retaliation took place. *See Verble v. Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 651 (E.D. Tenn. 2015) ("At issue in this case is whether plaintiff is protected under [15 U.S.C. § 78u-6(h)(1)(A)]; that is, whether he classified as a whistleblower at the time the alleged retaliation took place."), *aff'd* 676 F. App'x 421 (6th Cir.), *cert. denied*, 137 S. Ct. 1348 (2017). Here, because the answer is indisputably no, any claims based on alleged retaliatory acts that took place before Ms. Frye submitted the SEC Letter should be dismissed.

**B. The allegations of retaliatory conduct after May 9, 2016, are conclusory, based on supposition, and lack direct factual support.**

Plaintiff alleges only a handful of alleged post-May 9, 2016 acts of retaliation (Compl. ¶¶ 24, 28), not one of which demonstrates that Anadarko acted in any way to "discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against" her. 15 U.S.C. § 78u-6(h)(1)(A).

First, Ms. Frye alleges, based solely on information and belief, that (1) Anadarko informed her colleagues that she was a whistleblower, which she assumes would have made her a pariah "had she returned to work"; (2) Anadarko purportedly told some of her colleagues not to talk to her; and (3) some of her colleagues were "implicitly" dissuaded from communicating with her. (Compl. ¶ 28(a)-(c).) These three allegations are essentially the same grievance: Ms. Frye alleges that Anadarko would have ostracized her had she returned to work. Even assuming these allegations are true, Ms. Frye was on leave during this time period and resigned before she could actually experience any negative effects. A claim of retaliation cannot be based solely on a fear of negative consequences. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005)

(holding that plaintiff's decision to voluntarily leave her job before suffering an adverse employment action defeated her claim of retaliation).

Moreover, all three allegations are based solely on information and belief. But "even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief." *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, 626 F. App'x 528, 533 n.7 (5th Cir. 2015) (per curiam) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)); *see also Miller v. City of Los Angeles*, No. CV 13-5148-GW(CWx), 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (dismissing plaintiff's claim because "vaguely alleging on 'information and belief' that [defendant] 'lobbied' or 'conspired with' or 'agreed with'" alleged co-conspirators to discriminate against him was not sufficient to state a claim, noting that "'information and belief' pleading is allowed—indeed, necessary at times—but the words are not talismanic, and a plaintiff cannot avoid [Fed. R. Civ. P.] 12 simply by slapping the 'information and belief' label onto speculative or conclusory allegations"). Even where the relevant facts are in the hands of the defendant, courts have held that plaintiffs must allege sufficient facts explaining what led them to a particular conclusion based on information and belief. *See, e.g.*, *Moore v. City of New York*, No. 15-CV-6600 (GBD) (JLC), 2017 WL 35450, at *23-24 (S.D.N.Y. Jan. 3, 2017), *adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017); *Williams v. N.Y.C. Health & Hosp. Corp.*, No. 08-CV-4132 (RRM)(LB), 2010 WL 2836356, at *4 (E.D.N.Y. July 16, 2010).

Here, the Complaint is silent as to the factual bases for these allegations. For example, it does not identify (1) who at Anadarko made the alleged statements to Ms. Frye's colleagues and coworkers, (2) when the alleged statements were made, (3) the recipients of the alleged

statements, "many of whom were [Plaintiff's] friends," or (4) why Ms. Frye believes these statements were ever made. (Compl. ¶ 28.)

Second, Ms. Frye alleges that "it was reasonable for Plaintiff to assume that her SEC complaint would result in similar (and perhaps worse) treatment when she returned to work." (*Id.* ¶ 28(d).) This allegation is based on purported actions by Ms. Frye's superiors before she sent the SEC Letter. Ms. Frye cannot shoehorn an inactionable claim into a Dodd-Frank claim based on alleged conduct that occurred entirely before she became a whistleblower. *See Lawrence v. Int'l Bus. Mach. Corp.*, No. 12cv8433(DLC), 2017 WL 3278917, at *9-11 (S.D.N.Y. Aug. 1, 2017) (holding that alleged protected conduct must be a "but-for" cause of the adverse employment action). And likewise, Ms. Frye cannot base a claim purely on fear or supposition without any factual allegations of actual conduct by Anadarko during the period she was a whistleblower. *See Whittaker*, 424 F.3d at 647-48.

Third, Ms. Frye alleges that Anadarko retroactively shortened the duration of her FMLA leave. (Compl. ¶ 28(e).) In addition to failing to provide any detail about when, how, or by how much her FMLA was allegedly "retroactively shorten[ed]," Ms. Frye admits in her Complaint that Anadarko already remedied this issue. (*Id.* ¶¶ 28(e), 33 (noting that Ms. Frye's counsel "insisted on her behalf" that Anadarko "correct the dates of her FMLA-approved leave" and claiming that she incurred legal fees for this and other corrections).)

Finally, Ms. Frye alleges that, though she resigned, she was essentially forced to do so because Anadarko made her working conditions intolerable. (*Id.* ¶ 31.) But she does not allege, as she is required to do, that Anadarko intended for her to resign. *Wilson v. Susquehanna Bancshares, Inc.*, No. GLR-14-79, 2014 WL 2094039, at *2-3 (D. Md. May 19, 2014) (dismissing claim under the Dodd-Frank Act for retaliation due to constructive discharge where

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 178 of 185

plaintiff conclusorily alleged he was compelled to resign but failed to show that defendant had intended for him to resign). Contradictorily, at the same time she makes this claim, she also claims that Anadarko intentionally failed to include her in a round of layoffs. (Compl. ¶ 23.)

Simply put, Plaintiff fails to provide even the slightest factual details, most or all of which are within her knowledge, required to nudge her Complaint from theoretically possible to plausible. *Cf. Caldwell v. Enter. Prods. Co.*, No. H-15-3463, 2016 WL 3166866, at *4 (S.D. Tex. June 7, 2016) (Rosenthal, J.) (holding that conclusory allegations of remarks regarding employee's age were insufficient to support a claim of age discrimination); *Crabtree v. Ibarra*, No. H-10-1118, 2010 WL 3910047, at *3 (S.D. Tex. Oct. 4, 2010) ("The plaintiff claims that the defendants 'ratified adverse employment actions' against him, but he does not say how. . . . When the plaintiff's claims are insufficiently detailed to determine their plausibility, the Court will not speculate.").

### C. Plaintiff fails to allege that any alleged retaliation was causally related to the SEC Letter.

To state a claim under Dodd-Frank, a plaintiff must allege "(1) that the plaintiff engaged in a protected activity, (2) that the plaintiff suffered an adverse employment action, and (3) that the adverse action was causally connected to the protected activity." *Vista Outdoor Inc. v. Reeves Family Trust*, 234 F. Supp. 3d 558, 571 (S.D.N.Y. 2017), *appeal filed*, No. 17-1059 (2d Cir. Apr. 12, 2017). Ms. Frye's Complaint is also devoid of any allegations from which this Court could infer a causal relationship between the protected activity (her SEC Letter) and any alleged retaliation by Anadarko. Ms. Frye alleges that for some time before she sent the SEC Letter, she was "berated and humiliated" during meetings and that "[h]er bosses were mistreating her, denying her access to information and ostracizing her." (Compl. ¶¶ 18, 21.) Her Complaint essentially alleges that after sending the SEC Letter on May 9, 2016, she feared that the same

acts would continue if she returned to work, which she never did. (*Id.* ¶ 28.) Ms. Frye's own allegations demonstrate that it is not the case that "[a]fter Plaintiff mailed the SEC letter to the SEC, and Defendant learned that she had done so, Defendant retaliated against Plaintiff." (*Id.*) The retaliation had allegedly begun well before Ms. Frye sent the SEC Letter, and Ms. Frye was merely anticipating the same allegedly retaliatory conduct upon her return, which never occurred. The facts as alleged do not reflect a causal connection.

The failure to allege a causal connection is fatal to Ms. Frye's retaliation claim. *See Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017) (holding, in a claim for retaliation, that "Plaintiffs' conclusory assertion that [alleged retaliation] was causally connected to the Plaintiffs' complaints [was] insufficient" to demonstrate a causal connection); *Vital v. Nat'l Oil Well Varco*, No. H-12-1357, 2013 WL 1880842, at *8 (S.D. Tex. May 3, 2013) (Rosenthal, J.) (dismissing claims of retaliation when Plaintiff alleged no facts to suggest a causal relationship between the protected activity and the alleged retaliation); *Irvin v. Masters Advanced Remediation Servs., Inc.*, No. H-16-2488, 2016 WL 7406750, at *3 (S.D. Tex. Dec. 22, 2016) (Rosenthal, J.) (dismissing retaliation claim under the Fair Labor Standards Act when plaintiff merely alleged that defendant had "acted willfully"); *see also Johnson v. DocuLynx, Inc.*, No. 16-cv-01643-MEH, 2016 WL 9344258, at *7 (D. Colo. Oct. 25, 2016) ("Because Plaintiff does not allege Defendant failed to pay him, 'because of any lawful act done by' Plaintiff, Plaintiff's claim that Defendants retaliated against him by deciding not to pay him is not 'plausible on its face.'") (citation omitted).

**D. Plaintiff cannot recover non-economic damages.**

In any event, Ms. Frye's claim for non-economic damages should be dismissed. The anti-retaliation provisions enacted by the Dodd-Frank Act specifically identify the damages

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 178 of 185

available for claims brought under the statute. *See* 15 U.S.C. § 78u-6(h)(1)(C). Among the relief Ms. Frye seeks is "[a]n award of additional damages for the mental anguish, emotional distress, humiliation, and damage to reputation caused by Defendant's harassment of Plaintiff because of her lawful acts as a whistleblower." (Compl. ¶ 35.) But non-economic damages are not available under the plain language of the Dodd-Frank Act. *See, e.g.*, *Feldman-Boland*, 2016 WL 3826285, at *6 ("Dodd-Frank does not permit emotional damages . . . ."); *Wadler*, 141 F. Supp. 3d at 1026 (holding that certain kinds of non-economic damages (e.g., emotional distress) are available under the Sarbanes-Oxley Act but not under Dodd-Frank.). Accordingly, Ms. Frye's claim for these damages must be dismissed.

## III. Plaintiff's claim for a declaratory judgment must be dismissed because this Court lacks subject matter jurisdiction, and the claim would fail on the merits.

### A. This Court lacks subject matter jurisdiction over Plaintiff's claim for a declaratory judgment.

"A federal court may not issue a declaratory judgment unless there exists an 'actual controversy.'" *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir. 1998) (citation omitted). Courts engage in a three-step analysis to determine whether a declaratory judgment action should proceed. *See Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). "First, the court must determine whether the declaratory action is justiciable." *Id.* "Second, if it has jurisdiction, then the district court must resolve whether it has the 'authority' to grant declaratory relief in the case presented." *Id.* (citation omitted). "Third, the court has to determine how to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Id.*

In the declaratory judgment context, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment." *MedImmune*, 549 U.S. at 127 (citation omitted). Without an immediate and substantial controversy, there is no case or controversy under Article III of the U.S. Constitution, and the federal courts lack subject matter jurisdiction. *See In re Boyd Veigel, P.C.*, 575 F. App'x 393, 396 (5th Cir. 2014) (per curiam).

Ms. Frye attempts to satisfy the requirements of a "substantial controversy" of "sufficient immediacy and reality" by alleging that (1) Anadarko threatened to "specifically enforce the protections it bargained for in the PIIA" if she were to disclose its Proprietary Information, and (2) but for the PIIA, she would provide the information contained in the SEC Letter to private litigation counsel investigating claims against Anadarko. (Compl. ¶¶ 53-55 (citation omitted).) But Ms. Frye's own allegations demonstrate that there is no immediate or real controversy—Anadarko cannot enforce the PIIA unless the contract is breached, and Ms. Frye represents that she will not disclose information contained in the SEC Letter because of the PIIA. (*Id.* ¶ 54.) Even assuming that Anadarko's July 6, 2017 letter constitutes a threat of legal action, "threats of legal action, alone, cannot create an actual controversy under the Declaratory Judgment Act. [Plaintiff] must still demonstrate that the controversy was sufficiently immediate and real." *Vantage Trailers*, 567 F.3d at 751 (citation omitted). Here, Ms. Frye explicitly states that she only "filed this action for declaratory relief to avoid legal risk." (Compl. ¶ 55.) That cannot be the basis of a declaratory judgment action.

In actuality, Ms. Frye is asking the Court to decide the rights of the parties under the PIIA with respect to a breach that has not yet occurred and may never occur. Her claim is "hypothetical, conjectural, conditional [and] based upon the possibility of a factual situation that may never develop." *Boudreaux v. O.S. Rest. Servs. L.L.C.*, No. 13-5333, 2013 WL 5722714, at *5 (E.D. La. Oct. 21, 2013) (citations omitted); *see id.* at *3, *5-6 (finding that defendant's

statement that it would aggressively enforce a non-compete agreement in response to a hypothetical breach did not make the dispute ripe for review). While phrased as seeking a determination "that the PIIA does not cover the Information, and that Plaintiff is not prohibited under the terms of the PIIA from allowing counsel to use the Information in a federal securities class action complaint" (Compl. ¶ 53), Ms. Frye is really seeking an impermissible advisory opinion regarding whether her hypothetical behavior would breach the PIIA. *See Vantage Trailers*, 567 F.3d at 748 (citing *MedImmune*, 549 U.S. at 127); *see also Sasol N. Am.*, 682 F. App'x at 315 (affirming dismissal of declaratory judgment claim based on "hypothetical and unspecified potential infringements"); *Nat'l Presort, Inc. v. Bowe Bell + Howell Co.*, 663 F. Supp. 2d 505, 511-14 (N.D. Tex. 2009) (dismissing declaratory judgment claim because a letter reserving the right to sue, which included a counterproposal, and an exchange regarding breach of a settlement did not "establish a case or controversy"). Accordingly, Ms. Frye's Complaint seeks an impermissible advisory opinion that this Court lacks jurisdiction to decide.

### B. Even if this Court had jurisdiction over Plaintiff's claim for a declaratory judgment, the claim would fail on the merits.

An unambiguous contract is construed "as a matter of law." *Shriners Hosp. for Children v. McCarthy Bros. Co.*, 80 F. Supp. 2d 707, 710 (S.D. Tex. 2000) (citing *United States v. Fid. & Deposit Co.*, 10 F.3d 1150, 1152 (5th Cir. 1994)). Here, the PIIA clearly defines "Proprietary Information," and "[p]ursuant to the general rules of contract construction, the language used by the parties to a contract should be accorded a plain grammatical meaning." *Id.* Plaintiff seeks to disclose the SEC Letter and its attachments in violation of the PIIA, and her bald claim that the Information is not protected by the PIIA is belied by the documents themselves. (Compl. ¶ 42.)

For example, the SEC Letter relies on an excerpt from Anadarko's 2012 Reserves and Resources Manual that bears the warning: "This Reserves and Resources Manual should be

considered the confidential and proprietary property of Anadarko Petroleum Corporation. Any unauthorized distribution, review, dissemination or copying of the Reserves and Resources Manual is strictly prohibited." (Ex. 2 to Compl. Ex. 1.) Among the attachments to the SEC Letter are also e-mail communications relating to Anadarko's business methods, processes, and practices. (Exs. 7-8 to Compl. Ex. 1.) This is highly sensitive, competitive information pertaining to Anadarko's core business.

The SEC Letter itself discusses Proprietary Information in detail. Ms. Frye discloses, for example, confidential communications from internal meetings in which Anadarko employees discussed the Company's processes, services, research, development, and business plans. (Compl. Ex. 1, at 5.) She discusses Anadarko's business methods (*e.g.*, *id.* at 11), as well as the Company's internal data regarding well prospects (*e.g.*, *id.* at 11-12). She discloses the Company's strategic decision to involve a specialized team on the project at issue to minimize personal bias and the internal discussions surrounding the resource data. (*Id.* at 14-15.) She complains about Anadarko's compensation structure, disclosing the Company's business methods and practices. (*Id.* at 17.) She also discloses excerpts from various internal presentations concerning the project at issue. (*See, e.g.*, *id.* at 15-16.) These internal presentations reveal the process that Anadarko uses to evaluate prospective plays or exploration plays. This information is highly proprietary and confidential and could be used by a competitor to gain a strategic or competitive advantage. Ms. Frye further promises additional "internal documents [that] incriminate Anadarko," which may also contain Proprietary Information. (*Id.* at 8.)

From the face of the Complaint, it appears that Ms. Frye seeks to disclose the SEC Letter and its attachments in their entirety, which fall squarely within the definition of Proprietary

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 182 of 183

Information under the PIIA. If she seeks to disclose additional information, such as the additional "internal documents" she references in the SEC Letter (*id.*), she has left this Court with no way to evaluate whether that additional information is covered under the PIIA and thus no way to decide the declaratory judgment action. Under either scenario, if this Court finds that it does have jurisdiction over Ms. Frye's claim for a declaratory judgment, the claim should be dismissed with prejudice on the merits.

## CONCLUSION

For the reasons stated herein, this Court should dismiss the Complaint with prejudice.

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 183 of 183

DATED: October 27, 2017

Respectfully submitted,

Noelle M. Reed
Fed. Bar No. 27139
Texas Bar No. 24044211
Email: Noelle.Reed@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
(713) 655-5122 – Telephone
(713) 483-9122 – Facsimile

*Attorney-in-Charge for Defendant Anadarko Petroleum Corporation*

*Of Counsel:*

Jay B. Kasner
(*Admitted Pro Hac Vice*)
Email: Jay.Kasner@Skadden.com
Susan L. Saltzstein
(*Admitted Pro Hac Vice*)
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
4 Times Square
New York, New York 10036-6518
(212) 735-3000 – Telephone
(917) 735-2000 – Facsimile

Heather A. Lohman
Fed. Bar No. 28417
Texas Bar No. 24027008
Email: Heather.Lohman@Skadden.com
Skadden, Arps, Slate, Meagher
& Flom LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
(713) 655-5105 – Telephone
(713) 483-9105 – Facsimile

Case 4:17-cv-02289 Document 118-1 Filed on 07/20/20 in TXSD Page 184 of 185

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2017, I filed the foregoing document under seal in conventional paper format and sent a copy via electronic mail to counsel for Plaintiff:

**David M. Minces**
*Attorney-in-Charge*
Fed. Bar No. 435389
Texas Bar No. 24026880
Email: david.minces@mincespllc.com
**Gabriela M. Barake**
Fed. Bar No. 3006704
Texas Bar No. 24099794
Email: gabriela.barake@mincespllc.com
**Francisco J. Caycedo**
Fed. Bar No. 36976
Texas Bar No. 24040664
Email: frank.caycedo@mincespllc.com
**MINCES PLLC**
4545 Bissonnet, Suite 286
Bellaire, Texas 77401
(346) 701-8563 – Telephone
(713) 583-9795 – Facsimile

Noelle M. Reed

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Lea S. Frye, | § | |
| | § | **Case No. 4:17-cv-2289** |
| Plaintiff, | § | ***SEALED*** |
| | § | |
| v. | § | **DEMAND FOR JURY TRIAL** |
| | § | |
| Anadarko Petroleum Corporation, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**[PROPOSED] ORDER GRANTING DEFENDANT ANADARKO PETROLEUM CORPORATION'S MOTION TO DISMISS THE COMPLAINT (SEALED)**

On this day the Court considered Defendant Anadarko Petroleum Corporation's Motion to Dismiss the Complaint. After considering the Motion, the Plaintiff's response, and all documents on file with the Court, the Court has concluded that the Motion should be, and is, GRANTED.

It is therefore ORDERED that Plaintiff's Original Complaint is hereby DISMISSED, with prejudice. The Court will issue a final judgment in a separate order.

Signed this ____ day of ________________, 2017.

______________________________
CHIEF UNITED STATES DISTRICT JUDGE
LEE H. ROSENTHAL