# Exhibit 115

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
---------------------------------------------------x

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Civil Action No. 4:20-cv-00576 |

---------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
LEA FRYE
Friday, October 7, 2022

Reported By: Lynne Ledanois, CSR 6811
Job No. 142789

THE VIDEOGRAPHER: We are back on the record at 8:12 p.m. and this is the beginning of Media Unit Number 10. Go ahead. 8:12PM

FURTHER EXAMINATION

BY MS. ROSENBERG: 8:13PM

Q Ms. Frye, do you still have Exhibit 371 in front of you?

A Hold on, let me check.

I don't, but I can open it. Would you like me to? 8:13PM

Q Yes, thank you.

A It is open.

Q This is the Shen 5 appraisal well proposal dated February 1st, 2016; right?

A Correct. 8:13PM

Q Ms. Jensen asked you some questions about the structure map on Slide 5.

Do you recall that?

A Yes.

Q With all of the information known at this time, the recommendation was to drill Shen 5; correct? 8:13PM

MR. MINCES: Objection asked and answered.

THE WITNESS: I'll return back to my previous testimony that, remember, we were on a 8:14PM

180-day clock, we had to either commence operations or we would lose the leases without defining is there commercial hydrocarbons to go to development or not, so we were bringing this well forward for those purposes. 8:14PM 8:14PM

BY MS. ROSENBERG:

Q You believed that that was the right thing to do to move the project closer to a minimum economic field size for sanctioning; right?

MR. MINCES: Same objection. 8:14PM

THE WITNESS: I'll clarify that it was the right thing to do to definitively define do we or do we not go forward with the development.

BY MS. ROSENBERG:

Q And if you take a look at Slide 14. 8:14PM

A Yes.

Q Ms. Jensen asked you some questions about the strategic opportunities listed at the bottom of that chart.

Do you see that? 8:15PM

A Yes.

Q There's also a timeline there, 2016, 2017, 2018.

Do you see that?

A Yes, I do. 8:15PM

Q And there is an orange star in mid 2018; is that fair? 8:15PM
A Yes, roughly that time frame.
Q And below that it's listed SOP/FID; right?
A Correct. 8:15PM
Q What does that mean?
A FID is an acronym for final investment decision. I'm blanking on what SOP stands for. There was many acronyms; I cannot recall that particular one. 8:16PM
Q Is it suspension of production?
A That fits with it, but I don't remember.
Q But FID definitely stands for final investment decision?
A Yes, I do recall that one, yes. 8:16PM
Q And so at this time, is it fair to say that you're targeting a decision about whether to go forward with the final investment decision in mid 2018?
MR. MINCES: Objection, form. 8:16PM
THE WITNESS: I'll point out on the timeline there are multiple wells and what's implied with this timeline is drill Shen 5. If Shen 5 has success in the amount of new hydrocarbon proven probable, a new hydrocarbon potential distribution 8:17PM

in a sufficient manner, we would then drill Shen 6. 8:17PM

And then the next sort of call-out is upon success at Shen 6 which has deemed at that point we felt there were sufficient hydrocarbons to move forward, we would continue forward to that decision point. 8:17PM

I know this is a simplified slide, so that is inferred and that would have been discussed in words at the meeting, if that makes sense.

BY MS. ROSENBERG: 8:17PM

Q So the ultimate decision about whether to sanction the project would depend not only on Shen 5 but also on Shen 6 and if those were being successful, you anticipated a decision likely in 2018; is that fair? 8:18PM

A Likely --

MS. JENSEN: Objection.

THE WITNESS: -- in early '18.

BY MS. ROSENBERG:

Q Ms. Jensen asked you a few questions about your motivations for filing your letter to the SEC. I believe you said you felt it was the right thing to do; is that right? 8:18PM

A Yes, that's correct.

Q You also told Anadarko that if they paid a 8:18PM

lump sum payment, you would go away quietly and confidentially; right? 8:18PM

MS. JENSEN: Objection, misstates the evidence.

THE WITNESS: That was prior to filing with the SEC. 8:19PM

BY MS. ROSENBERG:

Q And Anadarko did not pay you that lump sum payment?

MR. MINCES: Objection, asked and answered. We've covered all of this. 8:19PM

THE WITNESS: As I stated earlier, no, I did not receive any money.

MS. ROSENBERG: Nothing further. Thank you. 8:19PM

THE WITNESS: Thank you.

MS. JENSEN: We can go off the record.

THE VIDEOGRAPHER: For the day or just for now?

MS. JENSEN: For the day. 8:19PM

MS. ROSENBERG: For the day.

THE VIDEOGRAPHER: We are off the record. The time is 8:19 p.m. This ends the testimony given by Lea Frye.

The total number of media used was ten and 8:19PM

will be retained by Veritext Legal Solutions. 8:19PM

(Proceedings concluded at 8:19 p.m.)

# Exhibit 116

# Evolution of Resources

ANADARKO

## Shenandoah Resource Estimates




* January 2016

# Economic Summary – Comparison

ANADARKO

| Case Description | | Invest $60/bbl Net AT NPV10 ($MM) | Invest $60/bbl AT PIR10 | Invest $60/bbl F&D ($/BOE) | Mean Gross EUR (MMBOE) | $P_c$ |
|---|---|---|---|---|---|---|
| Zero Contingency | Risked Mean | 237 | 0.28 | 14.01 | 412.6 | 88.2% |
| | Unrisked Mean | 283 | 0.30 | 13.80 | 467.8 | 100% |
| Facility Only Contingency | Risked Mean | 182 | 0.19 | 15.15 | 412.6 | 88.2% |
| | Unrisked Mean | 221 | 0.21 | 14.94 | 467.8 | 100% |
| Recommended Contingency | Risked Mean | 174 | 0.18 | 15.38 | 412.6 | 88.2% |
| | Unrisked Mean | 212 | 0.20 | 15.18 | 467.8 | 100% |
| Recommended Contingency (20K Well Rates) | Risked Mean | 191 | 0.20 | 15.38 | 412.6 | 88.2% |
| | Unrisked Mean | 232 | 0.22 | 15.18 | 468.0 | 100% |
| Recommended Contingency (20K Well Rates Optimized) | Risked Mean | 208 | 0.22 | 15.38 | 412.6 | 88.2% |
| | Unrisked Mean | 250 | 0.24 | 15.18 | 468.0 | 100% |

*Increased facilities costs at $80 oil (market driven)

# Exhibit 117

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------x

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Civil Action No. 4:20-cv-00576 |

---------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
J. RICHARD DIETRICH
Saturday, March 11, 2023

Reported By: Lynne Ledanois, CSR 6811
Job No. 5780790

finding oil, because of the information it provided helped Anadarko define 'where the reservoir isn't as much as where it is' and gave Anadarko 'more clarity on the numbers that we should be working with [i.e., the estimated quantities of recoverable resources in the field]." 2:01PM 2:01PM

Do you see that?

A Yes.

Q And you cited the portion where Mr. Camden believed that Shen 3 was always a successful appraisal well; right? 2:02PM

A I quoted that, yes.

Q The portion about "always considered a successful appraisal well" isn't in quotes; right?

A Yes, it's not. I don't know exactly why. You know, I would have to go back and look at his deposition testimony and see if that was just paraphrasing what he said. 2:02PM

Q Why is that relevant?

A It's not. 2:02PM

Q Why did you write it then?

A Again, in -- parts of my report are simply trying to explain what I understand about facts and circumstances before I apply accounting analysis to them. 2:03PM

Q But you told me that this was -- that this considering Shen 3 to be a successful appraisal well is an irrelevant fact; right? 2:03PM
A Correct. Now --
Q Did you conclude -- 2:03PM
A I'm sorry, let me be clear. When I was developing my report, I had not made determinations yet on the accounting. And so I didn't know when I was writing parts of the report what may or may not be important in making an accounting determinations. 2:03PM
So what you're seeing here is the work product by which I came to understand the facts and circumstances that were applicable to my accounting judgments on Anadarko's accounting for its -- its wells. 2:04PM
Q Before submitting your report, why didn't you go back and edit out the irrelevant portions of your report?
A I just didn't.
Q So some portions of this report just include irrelevant facts; is that right? 2:04PM
A Well, they may or may not be relevant to readers of my report as, again, I've testified to today, there's lots of discussion that I have seen in the record about successful or unsuccessful views to 2:04PM

describe the success of a well. 2:04PM
And as a matter of accounting, the word "successful" or "unsuccessful" is not used in 932-360.
Q Paragraph 95 -- by the way, is Chris 2:05PM Camden an accountant at Anadarko?
A I don't believe so.
Q Is he a financial reporting person at Anadarko?
A I don't believe so. 2:05PM
Q Does that matter?
A Well, it matters for knowing what the facts and circumstances are about which he does have knowledge.
But as far as the accounting 2:05PM determinations, it does not.
Q Then go ahead and take a look at your Paragraph 95.
You write, "As a result, in my opinion, Anadarko's decision to suspend the Shen 3 well costs 2:05PM as of December 31, 2014 was reasonable and consistent with GAAP (specifically ASC 932-360), because the information from the Shen 3 appraisal well enabled Anadarko to both better estimate the size of the Shenandoah reservoir and reduce the 2:06PM

uncertainty of the quantity of recoverable resources." 2:06PM

A Uh-huh.

Q That's what you wrote; correct?

A Yes. 2:06PM

Q That's your opinion; correct?

A My opinion is with respect to Anadarko's decision, yes.

Q You cite to two reasons why Anadarko's decision was reasonable and consistent with GAAP; correct? 2:06PM

A I believe that that's a basis on which Anadarko made its accounting determination, yes.

Q Were those proper bases?

A As I explain in my report, there's judgment involved in accounting for certain items. And here there's judgments on whether Anadarko can -- whether it can suspend drilling costs on Shen 3 and it can do so if it chooses to do so and is not required to do so if it chooses not to do so. They have discretion here in my opinion. 2:06PM 2:07PM

So what I'm trying to say here is what my understanding is that supports Anadarko's decision to suspend Shen 3 well costs, not that they are required to suspend Shen 3 well costs based on this. 2:07PM

Q My question, sir, is much simpler. I'm 2:07PM
not sure if you understood it.
My question is: When you wrote, "because
the information from the Shen 3 appraisal well
enabled Anadarko to both better estimate the size of 2:07PM
the Shenandoah reservoir and reduce the uncertainty
of the quantity of recoverable resources," were
those proper bases upon which to base a decision?
A I'm not saying they are proper or improper.
I'm saying I infer from Anadarko's decision that those 2:08PM
were the bases on which they drew that conclusion.
Q Did you examine those bases to determine
whether Anadarko had a basis to suspend the Shen 3
well costs as of December 31, 2014?
A I have an opinion that's based on my reading 2:08PM
of GAAP on whether Anadarko could suspend Shen 3 well
costs and that's the basis for my opinion about the
accounting that was acceptable under GAAP for Anadarko
with respect to Shen 3.
Q Does your opinion that Anadarko could 2:09PM
suspend the well costs for Shen 3 as of December 31,
2014 take into account whether Anadarko -- Shen 3
enabled Anadarko to better estimate the size of the
Shenandoah reservoir?
A No. 2:09PM

but almost nobody else does. I will be glad to explain it if you like. 2:32PM

So when we then go down to the next paragraph, 932-360-25-10, "The costs of drilling exploratory wells and the cost of drilling exploratory-type stratigraphic test wells shall be capitalized as part of the entity's uncompleted wells, equipment and facilities pending determination of whether the well has found proved reserves." 2:33PM 2:33PM

Now, that language where it says "the well" and it also says "wells" is internally inconsistent. So somebody has to make a judgment about whether it says, the well has found proved reserves. 2:33PM

Here's why a reasonable interpretation would not say that a well individually must find proved reserves. That's because when Shen 1 was drilled, it found reserves, but it did not find proved reserves. 2:33PM

So if you believe "the well" means the individual well, and we'll talk more about this later, then you would say that every well that's drilled in deepwater that does not individually identify proved reserves would have to be expensed. 2:34PM

That is not a reasonable interpretation of 25-10 in my opinion. 2:34PM

Q Why --

A Now -- I'm sorry, go ahead.

Q Let me stop you there. 2:34PM

Why is that not a reasonable interpretation that every well that did not find proved reserves should be expensed?

A Well, let me go on and explain why below. Because, again, this is the initial recognition section. So what we need to do now is look at 932-360-35. 2:34PM

Q Before we get there --

A I'm sorry.

MS. PHILLIPS: Dan, he's not done responding to your question. If you could let him finish. 2:34PM

THE WITNESS: That's okay.

BY MR. DROSMAN:

Q I want to make sure we are on the same page. And maybe you're right. 2:34PM

Can you just tell me before you go to another provision, you said that it would not be a reasonable opinion that each well that did not find proved reserves should be expensed. I'm just asking 2:35PM

you why? 2:35PM

A If that were the case, every well that's drilled in an appraisal setting would result in expensing of all of them and that would be consistent with those costs being deemed G&G costs which are 2:35PM expensed as described somewhere here in what I just read.

But I apologize, this is going to take us back to the history.

When FAS 19 was written, G&G costs were 2:35PM always expensed and there was a proposal to expense all stratigraphic test wells.

And before final adoption, the board determined that stratigraphic test wells would be suspended and not expensed immediately. 2:36PM

So that's what Paragraph 25-17 and 25-18 are trying to explain. In FAS 19, they were in the basis for conclusions I believe as Paragraphs 200 and 201.

They were brought into the codification 2:36PM when it was created to help the reader understand what stratigraphic test wells were because they would no longer refer to the basis for conclusions in FAS 19.

To be clear, FAS 19 basis for conclusions 2:36PM

were never GAAP, but they were sometimes used by readers to help understand what the then standard was saying. 2:36PM
Q Okay. So --
A Sorry, I just gave you a whole lot. You just got five minutes of lecture in class, Dan. 2:36PM
Q I just want to back up for a moment and ask you: Can you tell me why it was that it would not be a reasonable opinion that each well that did not find proved reserves to be expensed? 2:37PM
And you told me that that would require expenses all appraisal wells that were drilled.
A Yes.
Q And my question to you --
A And Shen 1, that would be expensed too, because it didn't find proved reserves. 2:37PM
Q Okay.
A So every --
Q No proved reserves in Shen 1; is that right? 2:37PM
A I'm sorry?
Q No proved reserves in Shen 1?
A That's correct, it found oil but it didn't find proved reserves. If it would have found proved reserves, then you do an FID on it at that moment and 2:37PM

we'd be done, everything else would be a development cost. 2:37PM

Q 932-360-35-18 speaks to wells that found oil but not did find proved reserves; right?

A It speaks to the subsequent measurement of wells that have suspended costs. And here's -- there are several places in here, but I'll refer to 932-360-35-18 because this one causes substantial confusion, I think. 2:38PM

If you look at the last sentence, I believe it is, so it's one, two, three, four, five -- six lines down. It says, "For purposes of determining whether capitalized drilling costs shall continue to be capitalized pending the determination of proved reserves, a project may include more than one exploratory well or exploratory-type stratigraphic well if the reserves are intended to be extracted in a single integrated producing operation." 2:38PM 2:38PM

So the idea is if you're trying to find a reservoir and all of the appraisal wells are trying to identify that reservoir to determine whether there's proved reserves in the reservoir, then all of those costs for purposes of determining whether capitalized drilling costs shall continue to be 2:39PM 2:39PM

capitalized pending the determination of proved 2:39PM reserves, a project may include more than one exploratory well or exploratory stratigraphic test well if the resources are intended to be extracted in a single integrated production -- producing 2:39PM activity.

That's the part that singly leads to the conclusion that it is permissible to take all of the suspended well costs regardless of whether there's any oil in the wellbore regardless -- notice, 2:40PM there's nothing in here about successful or unsuccessful even though those words show up a lot in the record. They are not the basis by which an accountant makes this determination.

So that I think -- I hope helps. 2:40PM

Let me say one other thing on this one.

This method is called successful efforts accounting, right. And here the successful effort means finding proved reserves. So all of the costs after the initial exploratory well that identifies 2:40PM reserves are part of the process of identifying proved reserves.

If you do that successfully, all of the costs are now classified as a long-lived asset and depreciated. 2:41PM

# Exhibit 118

**From:** "Oudin, Chip" <Chip.Oudin@anadarko.com>
**To:** "McGrievy, Pat" <Pat.McGrievy@anadarko.com>, "Frye, Lea" <Lea.Frye@anadarko.com>, "Chandler, Paul" <Paul.Chandler@anadarko.com>
**Subject:** RE: August Shenandoah Meetings
**Sent:** Mon, 18 Aug 2014 16:11:34 +0000
Post_drill_Yuc2_bak_maps.pptx

I will need guidance on #2, as I disagree with the unfaulted tank model as currently carried by Exploration post-Yuc-2 (see attached). Depending on what's been shown, to whom it's been shown, and when it was shown, we may be stuck (politically) between a rock and a hard place. Especially if interested third parties are involved in any of the basin discoveries...

---

**From:** McGrievy, Pat
**Sent:** Monday, August 18, 2014 10:47 AM
**To:** Oudin, Chip; Frye, Lea; Chandler, Paul
**Subject:** FW: August Shenandoah Meetings

FYI, on bullet #2. I'll get to the bottom of this by EOD if I can get a few minutes of Tim's time. Bullet #4 and #5 also intriguing.

---

**From:** Trautman, Tim
**Sent:** Monday, August 18, 2014 9:48 AM
**To:** McGrievy, Pat
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** RE: August Shenandoah Meetings

Pat,

Here are the items which we would like to discuss at the meeting this Wednesday.

Items to discuss:

(1) Review development's "key" slides for upcoming Shenandoah partner's meeting
(2) Make sure APC is presenting only one set of structure maps to partners
(3) Revisit coring recommendation criteria (costs, coring intervals, and core footage)
(4) Discuss the next Shenandoah appraisal well location (scheduled for 2015) assuming we "find contacts" as projected from Yucatan pressure gradients (and no other surprises from the current drilling well).
(5) [redacted] (because we want to keep the rig at Shenandoah for a subsequent coring operation)? [redacted]

Thanks, Tim

---

**From:** McGrievy, Pat
**Sent:** Monday, August 11, 2014 9:45 AM
**To:** Trautman, Tim
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** RE: August Shenandoah Meetings

Yes, we can do that.

---

**From:** Trautman, Tim
**Sent:** Monday, August 11, 2014 9:40 AM
**To:** McGrievy, Pat
**Cc:** Ramsey, Jake; Kendall, Beth; Pachman, Jeff; Strickling, Robert; Camden, Chris; Blakeley, David
**Subject:** August Shenandoah Meetings

Pat,

Could your asset team give the Shenandoah exploration team an overview of what you plan to discuss with the partners on August 26 and 28.

Maybe this could be the agenda for our monthly SHENANDOAH meeting scheduled for AUGUST 20.

Thanks, Tim

# Exhibit 119

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | ) Civil Action No. 4:20-cv-00576 |

VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

CHARLES "CHIP" F. OUDIN, III

Thursday, June 30, 2022

Remotely Testifying from The Woodlands, Texas

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 5267938

give an overview of what he planned to discuss with the partners as part of an on- -- upcoming meeting?
A. I do.
Q. And Tim Trautman, we talked about him before, he's on the exploration team; right?
A. Yes.
Q. Specifically he was the manager?
A. Yes.
Q. And Pat McGrievy was his counterpart?
A. Yes.
Q. So he was saying he wanted to review the presentation before the development team gave it to the partners?
A. Yes.
Q. And on August 18, he sends a list of items that he wanted to discuss with Pat McGrievy, an- -- and would it be also the development team?
A. Yes.
Q. And one of those topics was, "Make sure APC is presenting only one set of structure maps to partners"?
A. Yes, that's a topic.
Q. And you recall that from the time; right?
A. Yes.
Q. And by one set of structures, one set of

maps to partners, did he mean exploration's preferred maps?

MR. GRUENSTEIN: Objection.

THE WITNESS: I don't know exactly what he meant.

BY MS. JENSEN:

Q. But did you disagree with the maps that exploration were showing at the time at the partner meetings?

A. I did.

Q. So Pat forwards this on to you, and you respond to Pat later that same day of August 18, 2014.

Could you read your e-mail response?

A. "I will need guidance on #2," is that the one you're referring to?

Q. Yes.

A. "I will need guidance on #2, as I disagree with the unfaulted tank model as currently carried by Exploration post-Yuc-2 (see attached). Depending on what's been shown, to whom it's been shown, and when it was shown, we may be stuck (politically) between a rock and a hard place. Especially if interested third parties are involved in any of the basic -- basin discoveries." [As read]

Q. And what was post-Yuc-2?
A. The Yucatan 2 well was something that had been drilled in 2014 -- I don't know the timing -- down on the structure to the south of us named Yucatan in which Anadarko had a small percentage.
Q. And so the -- the data that became available after that well, Yuc 2, impacted the mapping of Shenandoah?
A. Yes, it did.
Q. And you disagreed with exploration's unfaulted tank model?
A. I did.
Q. And that's because you had mapped faults at this point?
A. Yes, I had.
Q. Did exploration refuse to take into account the data that became available after Yu- -- Yuc 2 in their mapping?
A. Exploration took the Yuc 2 data into account as it directly impacted the drilling of the Shen 3 well, which was ongoing at this time, I believe.
Q. But hadn't -- they hadn't mapped the faults that you had mapped?
A. No, they had not.

Q. And if the unfaulted map was shown -- and if your faulted map would be shown to management, that would be politically difficult because it would contradict prior presentations of the exploration team?

MS. KAMIN: Objection.

THE WITNESS: It would have presented two different versions or interpretations from one company, which to partners is not the thing you do. So going forward with a unified front at this stage with the group or organization that was in charge of the project was the proper thing to do.

MS. JENSEN: I'm going to strike that as nonresponsive.

BY MS. JENSEN:

Q. Chip, you can make your speeches that have been prepared by your counsel at a later time. But I asked you a very specific question.

MS. KAMIN: Okay. And I'm going to object --

MR. GRUENSTEIN: I'm going to object --

MS. KAMIN: -- to the sidebar.

MR. GRUENSTEIN: And I'm going to object --

MS. JENSEN: I mean, that was -- that was

clearly scripted. So that was nonresponsive to my question. And so I -- I -- I will ask again. So stop --

MR. GRUENSTEIN: I'm going to interrupt and provide an instruction to the witness, that Ms. Jensen is not allowed to instruct on how to answer the questions. She also can't strike testimony. Later down the road she may be able to move to strike, but every answer that you provide is in the record.

MS. JENSEN: And to be clear, I disagree with what counsel for the Defendants are saying for this employ- -- this former employee in his deposition. And, also, I can move to strike on the record. It will be considered at a different time. I am absolutely entitled to say that I move to strike a clearly nonresponsive answer that has been scripted by counsel.

MR. GRUENSTEIN: That's -- you are entitled to move to strike, but since you said you strike it, I just wanted to make sure that the witness understood that it was a mo- -- motion to strike as opposed to actually being stricken. And I certainly object to the characterization as answers being scripted by counsel.

MS. KAMIN: As do I.
MS. JENSEN: Okay.
BY MS. JENSEN:
Q. What third -- what interested third parties were you referring to?
A. At this time, in reference to your Yucatan 2, we were a partnership of five different companies on Shenandoah. At Yucatan 2, the parties involved were Anadarko and Shell. The other four parties in Shenandoah were not involved. At Coronado, the parties involved in -- were Anadarko and I believe ConocoPhillips, maybe someone else. But when it's referring to third parties in the basin, it is referring to other companies that have interest in some blocks and not in others. And, therefore, when you would drill a well or obtain a lease or do something on one block where another party is not involved, you're not so free and willing to give information about that block to the noninvolved parties.
Q. And so at this point you were not allowed to show your maps, development maps, to the partners; correct?
A. Correct.
Q. So looking up the -- the chain, Pat

# Exhibit 120

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---------------------------------------------------x

| | |
|---|---|
| In re ANADARKO PETROLEUM CORPORATION SECURITIES LITIGATION | Civil Action No. 4:20-cv-00576 |

---------------------------------------------------x

**CONFIDENTIAL**

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
ALLEN FERRELL, Ph.D.
Thursday, March 2, 2023

Reported By: Lynne Ledanois, CSR 6811
Job No. 5772235

Q Well, I mean, I want to understand your testimony. So is there any other reason under your analysis that you disagree with that statement? 3:45PM

A No. I mean, in terms of the particular statement you made in your question, I would point to that, but I also -- and this is critically important, at the end of the day we want to understand the basis for Mr. Steinholt's inflation line, which is the May 3rd price reaction. 3:45PM

Q Okay. So elaborate on that. 3:46PM

So why do you disagree based on Mr. Steinholt's inflation?

A Well, so the damages, the inflation line Mr. Steinholt works off of, his estimate of the abnormal return to Anadarko on May 3rd that he ascribes to the accounting write-off. 3:46PM

So at the end of the day, that's the basis for the inflation line.

Q Okay. So -- but my question had nothing to do with that because my question talked about the stock price at the beginning of the class period. 3:46PM

So you're now talking about the end of the class period?

A I disagree with that, because he is saying that when an inflation line, which he goes to the 3:47PM

beginning of the class period with, is saying that's 3:47PM
the price in the beginning of the class period the
information the plaintiffs allege could ensure it's
disclosed.
Q Okay. But again, you agree that there is 3:47PM
a statistically significant price decrease on
May 3rd, 2017?
A I do.
Q Now, if -- hypothetically, if the
disclosure of the alleged truths in the corrective 3:47PM
disclosure causes the price to climb by a
statistically significant amount, that is evidence
that the price had been inflated; is it not?
A I just want to be real clear, forgive me for
restating the question. 3:48PM
So your assumption is there's corrective
information, it is corrective of the misstatements.
No argument about whether it's corrective or not.
It's new corrective information, so the
market hadn't priced it earlier, that there is no 3:48PM
confounding information and, ergo, that caused what
we're positing to be a statistically significant
negative residual in your hypothetical.
Under all those conditions, I agree.
Now, separate question as to what the 3:48PM

inflation line looks like, as I said in my report, you know, if Mr. Steinholt is saying that Shen 4 changed the commercial viability, that has to be incorporated in the inflation line. 3:48PM

So I'm not agreeing to the quantum of the inflation itself, but I think I agree with your hypo as I understand it. 3:48PM

Q So -- okay. When you say that Shen 4 changed commercial liability that has to be incorporated in the inflation line, what you're saying there is that the inflation has to be increased; right? 3:49PM

A Well, I'm referring to -- so this business about Shen 4 is a reference to Mr. Steinholt, and that's Paragraph 47 in my report. 3:49PM

So the effect of it would be it would decrease the inflation at the beginning of the class period. I think he has -- he increases the inflation as you go back in time, he has it the wrong way. 3:49PM

That is, if it's -- I'm not saying this is true, but his claim is after Shen 4, it became even more unviable or it was certainly unviable.

Under that theory, the inflation would necessarily be lower pre-Shen 4 relative to -- 3:49PM

anyway, directionally he's wrong on the inflation line. 3:50PM

Q Well, I mean, if you're going to talk relative -- we might end up with a word salad here.

But if you're talking relative, isn't it the same principle, however, that the inflation would be a greater amount after Shen 4? 3:50PM

I'm not talking about what it should be pre-Shen 4, but in relative terms, after Shen 4, that should be a greater amount? 3:50PM

A I think we agree. That is, if I'm saying X is less than Y, that means Y is bigger than X. But remember, he's getting the bigger number from the corrective disclosure that he's taking back.

He's not haircutting that. But what he says is this major change in the commercial liability for the worst, doesn't really make any sense to me. 3:50PM

Q But if -- and let's leave aside the directionality of it. Okay? But if what we're saying -- what you're saying is that the inflation should be greater after Shen 4, then leaving aside directionality, your complaint is that Mr. Steinholt's inflation or damages model is too conservative? 3:51PM 3:51PM

A No, I disagree with that. So first of all, I'm not saying there's any inflation. I'm saying on his own terms, he gets it wrong. 3:51PM
Q I understand you're not -- you don't have to concede there's damages. 3:51PM
I'm just trying to understand, Number 1, your critique and also to confirm, I think, that what you're saying is that post Shen 4, it should be greater than pre-Shen 4?
A According to Mr. Steinholt's theory as elaborated in Paragraph 47. And it's not conservative because even on those terms, his own terms, the inflation should be lower in the beginning of the class period, he makes it higher. 3:51PM
Q But the number -- I think I understand your position. 3:52PM
Okay. Event studies are a generally accepted methodology for determining price impact in securities fraud litigation; right?
A Yes. 3:52PM
Q And also a generally accepted methodology for determining loss causation in securities fraud litigation?
A Yes, not by itself, but yes.
Q And the same holds for materiality? 3:52PM

A I'm not going to opine on materiality. I can opine on -- value-relevant information materiality has a legal connotation that I want to avoid. 3:52PM
Q But you can agree setting that aside the legal term "materiality," that event studies can be -- are a generally accepted methodology for determining value -- new value-relevant information; is that how you would say it? 3:52PM
A Yes.
Q Now, your report at Paragraph 26 states that market and industry indices selected are intended to capture the impact on a stock price of regular market-wide and industry-wide related information; is that right? 3:53PM
A Yes. 3:53PM
Q And what do you mean by "regular"?
A All I mean is during the estimation period, you're using the entire estimation period to estimate the coefficients on the market and the industry. So those coefficients are estimated using the estimation period are going to reflect that relationship between the industry and the individual stock that's occurring during that period, the period for which -- that you're using for the estimation of the coefficients. 3:53PM
Q So in your mind, is there a distinction 3:54PM

# Exhibit 121

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
------------------------------------------x
GEORGIA FIREFIGHTERS' PENSION
FUND, individually and on Behalf
of All Others Similarly Situated,
Plaintiffs,
Case No.
4:20-cv-00576
v.
ANADARKO PETROLEUM CORPORATION, R.
A. WALKER, ROBERT G. GWIN, ROBERT
P. DANIELS, and ERNEST A.
LEYENDECKER, III,

Defendants.
------------------------------------------x
10:05 a.m.
November 19, 2021

* CONFIDENTIAL *

VIRTUAL DEPOSITION of ALEXANDER YOUNGER, testifying on behalf of the Norfolk County Council as Administering Authority of the Norfolk Pension Fund in the above entitled matter, pursuant to Notice, before Stephen J. Moore, a Registered Professional Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

ALEXANDER YOUNGER - CONFIDENTIAL

understand, Mr. Younger?

A Sorry, I then got lost there. Could you repeat it? Apologies.

Q Let me go back to the transcript.

Is there anything in this paragraph, paragraph 136 of the Complaint, that makes a promise or guarantee that Shenandoah will be commercially developed?

MR. SOLOMON: Same objections.

A This isolated paragraph is part of the entirety of the Complaint and he is merely talking about capital allocation.

Q Okay.

A Sorry, apologies. Would you mind if we took a quick break.

MR. SOLOMON: I was about to suggest that.

MS. BAKER: Shall we come back at 1:50 New York time, ten minutes?

MR. SOLOMON: Do you have an idea of how much longer you want to go, please, Nathalie?

MS. BAKER: I do not think I will

be much longer.

I will take a look while we are on break, I think probably less than 30 minutes.

MR. SOLOMON: Okay that's helpful. Thank you very much.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER: This is the beginning of media unit 3, we are back on the record at 1:54.

Q Mr. Younger, can you please go to page 49 paragraph 152 of the Complaint.

A I am just going to go there.

Q Sure.

A It's Exhibit 005, isn't it?

Q It is.

A Sorry, apologies, I shouldn't have shut it. Would you give me that paragraph reference again, please?

Q 152 on page 49.

A Thank you.

I am on paragraph 152.

ALEXANDER YOUNGER - CONFIDENTIAL

Q So, are you alleging that the lack of commercial viability of the Shenandoah project was revealed through the expense of a suspended exploratory well cost and the $467 million impairment?

MR. SOLOMON: Objection, the Complaint speaks for itself.

Q You can answer.

A The lack of commercial viability was revealed by the disclosure of those two items you referred to.

Q And are you alleging that was the first time the lack of commercial viability regarding the Shenandoah project was revealed?

MR. SOLOMON: Objection, the Complaint speaks for itself. It says that in the paragraph.

Q You can answer.

A The use of the phrase first revealed and we have in the Complaint.

Q Are you alleging that the expense and impairment associated with the Shenandoah project corrected earlier statements regarding the Shenandoah project?

ALEXANDER YOUNGER - CONFIDENTIAL

A Well, the relationship here was that they are making a write-down and expensing though items in respect of the project, they are not referencing back to previous statements.

Q So what does the expense and impairment related to the Shenandoah project tell you about those earlier statements regarding the Shenandoah project?

MR. SOLOMON: Objection, the Complaint speaks for itself.

A Those two items disclose the commercial viability.

Q So, are you saying that because the Shenandoah project was expensed and the asset was impaired, the Shenandoah project was therefore not commercially viable?

MR. SOLOMON: Objection, the Complaint speaks for itself.

A The Complaint as we have drafted states it's the lack of a commercial viability of the Shenandoah project.

Q Looking at paragraph 154. States, "Following news of the 1Q 17 10-Q, the

ALEXANDER YOUNGER - CONFIDENTIAL

trading price of Anadarko common stock declined approximately 8 percent."

A I can see that, yes.

Q And what is the news of the 1Q 2017 10-Q referring to?

MR. SOLOMON: Objection to form, the Complaint speaks for itself.

A Right as documented in the Complaint.

Q So the news that this is referring to is specifically the news relating to Shenandoah?

MR. SOLOMON: Objection, the Complaint speaks for itself, and to the extent any answer would require you to reveal attorney-client privileged information, I instruct you not to answer.

A Yeah, the statement as made in the Complaint.

Q Are you alleging that as a result of the news regarding Shenandoah Anadarko's common stock declined 8 percent?

MR. SOLOMON: Objection, the

Complaint speaks for itself.

A Anadarko's stock price declined by approximately 8 percent after that 10-Q.

Q Do you have a view as to why Anadarko's common stock declined approximately 8 percent?

MR. SOLOMON: Objection, the Complaint speaks for itself and calls for expert testimony.

Mr. Younger is not a damages expert.

A I believe that that does relate to loss causation where we would expect a financial expert to be making that judgment.

Q Do you have a lay person's view as to why Anadarko's common stock declined approximately 8 percent?

A I think the Complaint speaks for itself based on that news, but if you are asking me for a detailed loss causation analysis, then I don't believe that is going to be a lay person's view, and therefore I'm not properly qualified to provide it.

Q But you're -- okay, thank you.

# Exhibit 122

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

--------------------------------x

IN RE: ANADARKO PETROLEUM CORPORATE SECURITIES LITIGATION

Case No. 4:20-cv-576

--------------------------------x

December 16, 2022
10:07 a.m. (CST)

REMOTE VIDEOTAPED DEPOSITION

of LYNDON PITTINGER, held at the above time and date taken before Erica Ruggieri, RPR, CSR and Notary Public of The State of New York.

* * *

without considering all these other factors that you say should have been considered?

MS. JENSEN: And then he answered the question. So asked and answered.

Q. Is it a yes or a no?

MS. JENSEN: Objection as misleading.

A. I did not attempt to quantify every single brick of value and, you know, at what point -- or what caused what. I was just trying to -- in the scope of my work I was trying to assess where the issues were in terms of realistic assumptions going into their evaluation.

Q. But then not drawing a conclusion as to whether the project was or was not commercially viable?

MS. JENSEN: Objection, misstates the report.

A. Could you repeat the question? I missed a word.

Q. Yeah. I was saying is the purpose of your report not to say whether Shen was or was not commercially viable?

MS. JENSEN: Objection, asked and answered. Also misstates the report.

A. I apologize for this. Could I ask you to ask the question one more time?

Q. Sure. Was the purpose of your report to say whether Shenandoah was or was not commercially viable at any point in time?

MS. JENSEN: Objection. The report speaks for itself.

MR. GRUENSTEIN: Well, if the report spoke for itself, we wouldn't be doing a deposition.

MS. JENSEN: So it's beyond -- the report says what it says. So I don't understand the purpose of a question to say what the purpose of a report is when the report says

what it says.

MR. GRUENSTEIN: Well, maybe he can answer the question because he's had somewhat inconsistent answers on this or at least that's how I'm hearing it.

A. The purpose of my report was to evaluate the Shenandoah petroleum engineering and economic evaluation issues and resources assessment issues with the Shenandoah appraisal program.

I'm not trying to opine on what Shenandoah -- what Anadarko should have decided to do at various points. I am expressing the -- my evaluation of the petroleum engineering, the economic evaluation and the resource assessment issues.

Q. Okay. So is it your opinion that Shenandoah was not commercially viable after Shenandoah 4?

A. Yes.

Q. Okay. And it sounds like

you testified that the PIR was below .3 at that time, correct?

A. Yes. In the scope -- in the context of the study the economics prepared by McGrievy's group for the Shen-5 AFE presented in, I think it's late January 2016, had a PIR of .22, which is below the .3 of corporate threshold that was discussed by Hollek in his deposition.

Q. And that's enough for you to conclude that the project was not commercially viable?

MS. JENSEN: Objection, foundation. Misstates the report.

A. My conclusion is based on a lot more of that. I could go --

Q. No, no, no.

A. -- over the entire report but the faulting issues were so well recognized and the complexity of the faulting after Shen-4 was so dramatically, you know, was on such a fine scale and -- sorry, I lost my

train of thought.

Q. I can ask another question. So it sounds like you are saying that the mere fact that the PIR was less than .3 was not the basis for you to decide that Shen-4 was not commercially viable after Shen -- I'm sorry, that Shenandoah was not commercially viable after Shen-4?

MS. JENSEN: Objection, form.

A. My opinion as to the commerciality of the Shenandoah prospect after -- discovery after Shen for was based on much more than just the PIR of .22.

Q. Okay. And did you conduct any modeling based on all of the other factors that you've listed before as to what the PIR should have been after Shen-4?

A. In the context of this study I did not. Given that the PIR was already below the corporate threshold and that there were very large issues, very important issues